Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application forthcoming

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, | Case No. 5:25-cv-06618 |
| *Plaintiffs*, | |
| v. | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MARCO RUBIO, in his official capacity as Secretary of State, and | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, | |
| *Defendants*. | |

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION

1.    In the United States of America, no one should fear a midnight knock on the door for voicing the wrong opinion. That is because America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. American liberty enshrines in the First Amendment the "inalienable human rights" to "think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted).

2.    But Secretary of State Marco Rubio and the Trump administration are trying to turn the inalienable human right of free speech into a privilege contingent upon the whims of a federal bureaucrat, triggering deportation proceedings against noncitizens residing lawfully in this country for their protected political speech regarding American and Israeli foreign policy. The Secretary of State and the President claim to possess unreviewable statutory authority to deport any lawfully present noncitizen for speech the government deems anti-American or anti-Israel.

3.    They are wrong. The Federalists tried the same gambit 227 years ago with the Alien Friends Act, which allowed President Adams to deport any noncitizen he deemed dangerous to "peace and safety." An Act Concerning Aliens, ch. 58, § 1, 1 Stat. 570, 571 (1789) (expired Mar. 3, 1801). It was "one of the most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and in judgment).

4.    225 years after the Alien Friends Act expired, the danger of nighttime raids on noncitizens for perceived thoughtcrime is reality once more. Secretary Rubio and the Trump administration's war against noncitizens' freedom of speech is intended to send an unmistakable message: Watch what you say, or you could be next.

5.    Message received. At Plaintiff Stanford Daily, the independent, student-run newspaper at Stanford University, writers present on student visas are declining assignments related to the conflict in the Middle East, worried that even reporting on the conflict will endanger their

lawful immigration status. And Plaintiffs Jane Doe and John Doe, lawfully present noncitizens with no criminal history, have likewise self-censored because of their rational concern about the ongoing danger of deportation for expression Secretary Rubio deems anti-American or anti-Israel.

6.      This pall of fear is incompatible with American liberty. Our First Amendment stands as a bulwark against the government infringing the inalienable human right to think and speak for yourself. That is why the Supreme Court held over 80 years ago that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted).

7.      Secretary Rubio and the administration rely on two provisions of the Immigration and Nationality Act ("INA") for their supposed power to censor lawfully present noncitizens. The first allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision"). The second allows the Secretary to "at any time, in his discretion, revoke" a "visa or other documentation." *Id.* § 1201(i) (the "Revocation Provision").

8.      Both provisions are unconstitutional as applied to protected speech. The First Amendment cements America's promise that the government may not subject a speaker to disfavored treatment because those in power do not like his or her message. And when a federal statute collides with First Amendment rights, the Constitution prevails. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech …."); *see also, e.g.*, *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967) (rejecting "balancing" First Amendment rights against "interests of national security").

9.      Secretary Rubio and the Trump administration claim (as all censors do) that this time is different, that the supposed repulsiveness of anti-American and anti-Israel views mean the government should get a free pass for censorship. But "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414

(1989) (holding the First Amendment protects burning the American flag in protest). Plaintiffs, who are affected by this censorship, bring this case to restore freedom of speech in the United States.

## JURISDICTION AND VENUE

10.    This action arises under the First and Fifth Amendments to the United States Constitution.

11.    The Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fifth Amendments to the U.S. Constitution.

12.    The Court has authority to issue the requested relief under the Declaratory Relief Act at 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

13.    Venue in this action against officers and employees of the United States is proper in this district under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to these claims occurred in this district and additionally under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Stanford Daily resides in this district.

## DIVISION

14.    This action should be assigned to the San Jose Division because a substantial part of the events giving rise to these claims occurred in the county of Santa Clara, where Plaintiff Stanford Daily resides. Civil L.R. 3-2(c), (e).

## THE PARTIES

*Plaintiffs*

15.    Plaintiff Stanford Daily Publishing Corporation ("Stanford Daily") is a California nonprofit corporation based in Stanford, California. Its primary holding is *The Stanford Daily*, which is the independent, student-run newspaper of Stanford University.

16.    *The Stanford Daily* covers news related to Stanford University, publishing short- and long-form articles along with editorials. Since the October 7, 2023, attack, *The Stanford Daily* has included coverage of student opinions and campus protests related to the conflict in Gaza. Since March 2025, fearing Secretary Rubio will revoke their visas under the Revocation Provision or

–3–

render them deportable under the Deportation Provision, many of the paper's noncitizen writers who are lawfully present in the United States have self-censored by declining to cover pro-Palestinian student protests at Stanford, refraining from covering topics related to the conflict in Gaza, and seeking removal of their previous articles about it.

17.    Plaintiff Jane Doe[1] is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. Jane Doe has published pro-Palestinian/anti-Israel commentary online. Jane Doe has not been accused of violating any university rules nor has she been charged with or convicted of any crime. Yet she is listed on the Canary Mission website, which compiles profiles on individuals the organization views as having "anti-Israel" opinions. A Trump administration official testified that "most of the names" of individuals targeted for deportation based on pro-Palestinian advocacy come from Canary Mission. Since March 2025, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel.

18.    Plaintiff John Doe is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. After the October 7, 2023, attack, John Doe peacefully attended pro-Palestinian protests at his university and elsewhere and published pro-Palestinian/anti-Israel commentary online. John Doe has not been accused of violating any university rules nor has he been charged with or convicted of any crime. Beginning in March 2025 and continuing into April 2025, John Doe feared that Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision based on his published works and pro-Palestinian stance. John Doe therefore refrained, for example, from publishing a study related to Gaza. He has since resumed his journalism and pro-Palestinian advocacy, placing him at risk of visa revocation and deportation.

---

[1] Jane Doe and John Doe are pseudonyms that two lawfully present noncitizens plaintiffs are using because they fear government retaliation for their protected expression. The Doe Plaintiffs are contemporaneously filing a Motion to Proceed Pseudonymously.

*Defendants*

19.    Defendant Marco Rubio is the Secretary of State and has authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Relevant here, the Revocation Provision provides Secretary Rubio unilateral discretion to "revoke" "visa[s] or other documentation," and the Deportation Provision provides Secretary Rubio unilateral discretion to render noncitizens deportable for protected speech if he "personally determines" the noncitizen's speech "compromise[s] a compelling United States foreign policy interest." Plaintiffs sue Secretary Rubio in his official capacity.

20.    Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over the Department of Homeland Security ("DHS"), which includes various component agencies including U.S. Immigration Customs and Enforcement ("ICE"). In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending, and therefore leads a mechanism by which Secretary Rubio's revocation and deportation proclamations are executed. Plaintiffs sue Secretary Noem in her official capacity.

## FACTUAL ALLEGATIONS

**I.    The October 7 Attacks and Ensuing Protests and Other Speech**

21.    On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza.

22.    At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel.

23.    Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution."

24. Other events featured pro-Palestinian advocates handing out flyers.

25. Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes. Many protests, however, remained peaceful.

26. Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums.

**II.    During the 2024 Campaign and After the Election, Trump Makes Clear His Administration Will Target Noncitizens Based on Speech.**

27. President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States.

28. The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism."

29. Mr. Trump's campaign website linked to the Republican Party platform.

30. Mr. Trump's campaign website separately promised to "Deport pro-Hamas radicals and make our college campuses safe and patriotic again."

31. At campaign rally on October 16, 2023, Mr. Trump promised to revoke the visas of foreign students deemed "radical, anti-American, and anti-Semitic" and to "aggressively deport" resident aliens with "jihadist sympathies."

32. At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas sympathizers on college campuses. The college campuses are being taken over, and all of the resident aliens who joined in the pro-jihadist protest this month—nobody's ever seen anything like it—come 2025 we will find you and we will deport you. We will deport you."

33. At a campaign rally on November 8, 2023, Mr. Trump promised, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses which have been infested with radicalism like never before."

34. At the same rally, Mr. Trump said, "If you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you and we will deport you."

35.    On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

36.    On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

37.    The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The Secretary of State serves at the pleasure of the President.

38.    On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

39.    The administration considers "From the river to the sea, Palestine will be free" to express support for Hamas, capable of justifying action under the Revocation or Deportation Provisions. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" might be sufficient to invoke the Revocation or Deportation Provisions. *Id.*

III.    **The Trump Administration Arrests, Detains, and Attempts to Deport Noncitizens for Protected Speech.**

40.    Trump and his administration made good on their promises, aggressively targeting lawfully present noncitizens for protected speech, particularly at universities.

41.     Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder).

42.     Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities.

43.     Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him from the United States.

44.     The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had "personally determined" Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of Mr. Khalil's "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

45.     On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z.



VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-cv-06618

46.    On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 1:05 PM), https://perma.cc/6VPC-AESU.

47.    On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women, and children." Ms. Leavitt also asserted Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus, though the government never offered evidence to substantiate this statement. She emphasized, "This administration is not going to tolerate individuals … studying in our country and then siding with pro-terrorist organizations."

48.    Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds. *Khalil v. Trump*, No. 25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316, *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

49.    On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar conceded that Mr. Khalil's deportable "offense" was participating in protests.

50.    Rümeysa Öztürk is a PhD student at Tufts University in Boston, Massachusetts. She is a citizen of Turkey and studies in the United States on an F-1 student visa.

51.    Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, *The Tufts Daily*, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies.

52.    On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home in Somerville, Massachusetts. The officers detained her and quickly transported her to a Louisiana immigration jail.

53.    Four days before Ms. Öztürk's arrest, Secretary Rubio, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS

spokesperson justified the revocation by asserting Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists."

54.    Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds. *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1355667 (D. Vt. May 9, 2025).

55.    Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States.

56.    As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests.

57.    Upon information and belief, on April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, masked DHS agents entered the interview room and arrested him, after which the Trump administration began proceedings to deport him from the United States.

58.    Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East. Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025).

59.    Mr. Mahdawi remained in a Vermont immigration jail until May 9, 2025, when a federal court ordered his release on constitutional grounds. *Mahdawi*, 2025 WL 1243135.

60.    Since March 2025, the Trump administration has continued revoking the visas of and arresting, detaining, and attempting to deport lawfully present noncitizens under the Deportation and Revocation Provisions based on protected expression and has reiterated its intention in public statements to continue doing so.

61.    On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be

1  revoked." Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM),

2  https://perma.cc/5ZJ3-4VUU.

3      62.    At a May 21, 2025, congressional hearing, Secretary Rubio, responding to a question

4  about the revocation of Öztürk's visa based on her speech, said he "proudly" revoked her visa, that

5  he revokes visas every day, and that he would continue revoking visas.

6      63.    On July 18, 2025, John Armstrong, Senior Bureau Official in the Bureau of Consular

7  Affairs, testified in the United States District Court for the District of Massachusetts that mere

8  criticism of Israel, such as calling for an arms embargo or calling Israel an "apartheid state" are, per

9  the Trump administration, legitimate grounds to revoke a visa. Trial Tr. vol. 1, 32–35, *Am. Ass'n of*

10  *Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-

11  PXXK.

12      64.    On July 29, 2025, White House Deputy Chief of Staff and Homeland Security

13  Advisor Stephen Miller posted on X that administration officials are "working continuously" to

14  revoke visas from noncitizens "who espouse hatred for American or its people"—not just

15  noncitizens who criticize Israel. Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM),

16  https://perma.cc/U9JN-FQK7.

17

18  

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    CASE NO. 5:25-cv-06618

**IV.    Stanford Daily's Noncitizen Staff Self-Censors, Fearing Immigration Consequences for Protected Speech.**

65.    Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper of Stanford University.

66.    Stanford Daily is a voluntary membership organization. Everyone who wants to join Stanford Daily is guaranteed a spot, and any Stanford student who *The Stanford Daily* publishes becomes a member of Stanford Daily.

67.    Stanford Daily has over 150 members.

68.    Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities."

69.    Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions.

70.    In line with Stanford Daily's mission and core business activities, *The Stanford Daily* has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.

71.    Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.

72.    But since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students working at and contributing to Stanford Daily have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

73.    For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation,

arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper.

74.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would continue being a member of Stanford Daily.

75.    As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. The student attended, took notes, and interviewed sources. But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article.

76.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would publish the article.

77.    Similarly, a lawfully present noncitizen editor on staff, fearing adverse immigration consequences, asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine.

78.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editor would republish the article they had taken down and would edit stories involving Israel and Palestine.

79.    Another lawfully present noncitizen Stanford Daily staff writer, who had written about Israeli and Palestinian officials, as well other foreign affairs topics, asked Stanford Daily to remove all her articles from Stanford Daily's website, fearing adverse immigration consequences.

80.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the staff writer would not have asked Stanford Daily to remove the articles.

81.    Additionally, a lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website, fearing adverse immigration consequences.

—13—

82.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editorial board member would not have asked to remove the article.

83.    Secretary Rubio's use of the Deportation Provision and Revocation Provision to target protected expression has hindered Stanford Daily's journalism in other ways, too. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, Stanford Daily has received numerous requests from lawfully present noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech.

84.    Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine.

85.    But for the threat of visa revocation under the Revocation Provision and the threat of deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily.

86.    Since Secretary Rubio starting using the Deportation Provision and Revocation Provision against protected speech, Stanford Daily has received other requests from current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles.

87.    But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper.

88.    But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily.

—14—

**V.    Plaintiff Jane Doe Fears Deportation Due to Her Pro-Palestinian Speech.**

89.    Plaintiff Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

90.    Jane Doe is a former student at a United States university.

91.    Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university.

92.    Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." She has also used the slogan, "from the river to the sea, Palestine will be free."

93.    Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel.

94.    Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website.

95.    Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations it deems "anti-Israel."

96.    On July 9, 2025, during a trial in the United States District Court for the District of Massachusetts, Peter Hatch, a senior official in ICE's Homeland Security Investigations unit, testified that Derek Gordon, Deputy Special Agent in Charge of Homeland Security Investigations at DHS, asked Hatch to instruct Hatch's team to generate "reports" on individuals identified on Canary Mission's website. Trial Tr. vol. 2, 108–10, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 9, 2025), https://perma.cc/PCL4-6YTQ.

97.    The "reports" Mr. Hatch's team prepares are for the State Department, which uses them to make decisions regarding, among other things, "[v]isa revocations." *Id.* at 101.

98.    Mr. Hatch testified that "most" of the names of student protestors that DHS asked ICE to investigate "came from" Canary Mission's website. *Id.* vol. 1, 44.

99.    Prior to their detentions and attempted deportations, Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

100.    Since March 2025, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has

refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression.

101.    But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression.

**VI.    John Doe Fears Adverse Immigration Action for His Protected Speech.**

102.    Plaintiff John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

103.    John Doe is a former student at a United States university.

104.    After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online.

105.    At protests, John Doe participated in chants including, "From the river to the sea, Palestine will be free," as well as chants accusing Israel of committing "genocide."

106.    After the Trump administration began targeting other lawfully present noncitizen students for deportation based on protected speech, the professor for whom John Doe served as a teaching assistant advised John Doe to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status.

107.    After March 2025, fearing Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision following the administration's actions against other noncitizens, John Doe refrained from publishing a study containing criticism of Israel's actions in Gaza, which John Doe views as a genocide backed by the United States' foreign policy.

108.    But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, John Doe would have published and voiced his true opinions regarding Palestine and Israel without delay or fear of arrest, detention, or deportation for his protected speech.

109.    John Doe has resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel and Palestine. His continuing expression places him in danger of visa revocation under the Revocation Provision and deportation under the Deportation Provision.

## INJURIES TO PLAINTIFFS

110.    Secretary Rubio and Secretary Noem violate Plaintiffs' First Amendment rights by enforcing the Deportation Provision and Revocation Provision based on protected expression, the threatened enforcement of which chills Plaintiffs and/or their lawfully present noncitizen members from engaging in protected expression like attending protests, using certain slogans, and publicly voicing their true views about American foreign policy, Israel, and Palestine.

111.    The chill is amplified because Secretary Rubio and Secretary Noem's enforcement of the Deportation Provision and Revocation Provision has entailed ambush arrests by masked agents accompanied by prolonged detention in ICE holding facilities thousands of miles from detainees' homes.

112.    Secretary Rubio and Secretary Noem have enforced the Deportation Provision and Revocation Provision based on protected expression and will continue to do so absent declaratory and injunctive relief prohibiting enforcement of these statutes based on protected expression.

113.    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

114.    Plaintiffs have suffered and continue to suffer irreparable harm due to the Deportation Provision's and Revocation Provision's enforcements based on protected expression, which will continue absent declaratory and prospective injunctive relief.

115.    Because Plaintiffs and their lawfully present noncitizen members have engaged and wish to continue engaging in expression which Secretary Rubio might consider anti-American, anti-Israel, or detrimental to American foreign policy, they face an ongoing and credible threat of continued enforcement of the Deportation Provision and Revocation Provision.

116.    Secretary Rubio and Secretary Noem's ongoing threat to the protected expression of Plaintiffs and their members presents an actual controversy within this Court's jurisdiction.

**FIRST CLAIM**

**First Amendment**

**Deportation Provision**

**(Declaratory Relief)**

117.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

118.    The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

119.    America's First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

120.    Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

121.    The "advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up).

122.    A free press "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

123.    To that end, "[s]uppression of the right of the press to praise or criticize government agents and to clamor and contend for or against change … muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

124.    A press/communication platform's own rights are infringed when its contributors are chilled. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121–23 (1991).

125.    The Supreme Court has made clear that "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

126.    "It has long been recognized that resident aliens enjoy the protections of the First Amendment." *Price v. U.S. INS*, 962 F.2d 836, 841 (9th Cir. 1991).

127.    The INA allows the Secretary of State to render deportable noncitizens "whose … activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i).

128.    That deportation authority is subject to "[t]he exceptions" to the Secretary of State's authority to exclude noncitizens from the United States on foreign policy grounds. *Id.* § 1227(a)(4)(C)(ii) (incorporating *id.* § 1182(a)(3)(C)(ii)–(iii)).

129.    Those exceptions include that a noncitizen "shall not be excludable [for protected speech], unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii).

130.    The Deportation Provision, therefore, allows the Secretary of State to render lawfully present noncitizens deportable for protected speech if he "personally determines" that the noncitizen's activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i).

131.    When the government determines that a noncitizen is no longer lawfully in the United States through operation of the Deportation Provision, immigration officers may obtain a warrant to arrest and detain the noncitizen pending completing of removal proceedings. *See id.* § 1226(a); 8 C.F.R. § 287.8(c).

132.    Detention and/or deportation would deter a person of ordinary firmness from engaging in protected activity.

–19–

133.    As a result of the Deportation Provision, lawfully present noncitizens must either forego protected expression or risk detention and deportation.

134.    As applied to protected speech, the Deportation Provision is facially viewpoint based and content based because it applies solely to speech the government believes adversely affects its foreign policy.

135.    The government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

136.    "Viewpoint discrimination is thus an egregious form of content discrimination" because "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

137.    The Deportation Provision is facially viewpoint discriminatory as applied to protected speech for two reasons. First, it affords the Secretary of State unbounded discretion to render lawfully present noncitizens deportable on the basis of protected speech. Second, opinions the Secretary deems in his sole discretion adverse to America's foreign policy subject noncitizens to potential deportation, while those he views as aligning with or praising American foreign policy do not.

138.    Secretary Rubio and the Trump administration's enforcement of the Deportation Provision demonstrates the Deportation Provision's viewpoint discriminatory nature as applied to protected speech.

139.    For example, Secretary Rubio's determination that Mr. Khalil's protected expression regarding Israel and Palestine triggered the Deportation Provision is that Mr. Rubio believed Mr. Khalil's opinions and expression "undermine[d] U.S. policy to combat anti-Semitism around the world and in the United States."

140.    Secretary Rubio's determination that Mr. Mahdawi's protected speech regarding Israel and Palestine triggered the Deportation Provision is that Mr. Rubio believed Mr. Mahdawi's opinions and expression undermined the government's position regarding the Middle East peace process.

141.    Laws discriminating based on viewpoint are per se unconstitutional. *See Iancu*, 588 U.S. at 399 ("The Court's finding of viewpoint bias ended the matter.")

142.    In the alternative, viewpoint discriminatory laws are subject to strict scrutiny.

143.    The First Amendment also generally forbids government actions that discriminate based on the content of the speaker's expression. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-discriminatory laws are subject to strict scrutiny. *Id.* at 163–64.

144.    The Deportation Provision is not narrowly tailored to achieve a compelling government interest with respect to deportations based on protected speech.

145.    Restricting speech to tilt public debate and opinion in the government's preferred direction "is not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

146.    Nor is the Deportation Provision's allowance for deportation based on protected speech narrowly tailored. It vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to deem any noncitizen's protected speech a foreign policy threat and to banish the speaker from the United States on that basis.

147.    The Deportation Provision's allowance for deportation based on protected speech is not the least restrictive means of advancing the government's foreign policy objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

148.    The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018).

149.    By allowing the Secretary of State to render lawfully present noncitizens deportable for protected speech about America's foreign policy, the Deportation Provision also blatantly discriminates based on viewpoint by codifying the ability of the government to take adverse action against protected speech by targeting its foreign policy critics with deportation.

150.     Deporting someone for protected speech would deter and is deterring people of ordinary firmness from engaging in protected speech.

151.     Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is viewpoint and content based when applied to protected speech and that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under it for engaging in protected speech.

**SECOND CLAIM**

**First Amendment**

**Deportation Provision**

**(Injunctive Relief)**

152.     Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

153.     The Deportation Provision violates the First Amendment for the reasons stated in Claim I.

154.     Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision for engaging in protected speech. *See Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *see also Ex parte Young*, 209 U.S. 123 (1908).

155.     Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

156.     Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

157.    The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (internal quotation marks omitted).

158.    Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**THIRD CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Declaratory Relief)**

159.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

160.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits laws, including immigration statutes, that are impermissibly vague. *Sessions*, 584 U.S. at 174–75 (majority op.).

161.    A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

162.    Because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (cleaned up).

163.    Moreover, when a regulation "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

164.    The Deportation Provision is vague on its face as applied to protected speech because it provides no guidance to noncitizens regarding when a person's expression would "compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii).

165.    The Deportation Provision is also vague on its face as applied to protected speech because it provides standardless, limitless discretion to government officials charged with its enforcement regarding when a person's expression would "compromise a compelling United States foreign policy interest."

166.    The Deportation Provision is also vague on its face as applied to protected speech because it authorizes arbitrary and discriminatory enforcement, granting the Secretary of State unfettered and unreviewable discretion to arbitrarily enforce the Deportation Provision based on his own subjective determination of what will compromise or adversely affect foreign policy.

167.    The Deportation Provision is also vague on its face as applied to protected speech because the United States' foreign policy interests are vast, ever-changing, and often kept confidential from the public. *See Massieu v. Reno*, 915 F. Supp. 681, 700–03 (D.N.J.) (concluding 8 U.S.C. § 1227(a)(4)(C)(i) is void for vagueness), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

168.    Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech and that the Fifth Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision for engaging in protected speech.

## FOURTH CLAIM

### Fifth Amendment (Vagueness)

### Deportation Provision

### (Injunctive Relief)

169.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

170.    The Deportation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to deportations based on protected speech for the reasons stated in Claim III.

171.    Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

172.    Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

173.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First and Fifth Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

174.    The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

175.    Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

## FIFTH CLAIM

### First Amendment

### Revocation Provision

### (Declaratory Relief)

176.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

177.    Subjecting noncitizens to adverse immigration action for protected speech violates the First Amendment for the reasons stated in Claim I.

178.    The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

179.    The Revocation Provision allows the Secretary of State to revoke a "visa or other documentation" based on protected speech.

180.    For example, Secretary Rubio used the Revocation Provision to revoke Rümeysa Öztürk's visa based on her protected speech of coauthoring an article for *The Tufts Daily* newspaper and he committed to revoking visas of other lawfully present noncitizens in the future based on protected speech.

181.    The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman*, 585 U.S. at 90.

182.    Revoking the visa or other documentation of a noncitizen would deter and is deterring people of ordinary firmness from engaging in protected speech.

183.    Revocations of visas and other documents for protected speech necessarily rely on viewpoint or content discrimination, because the Secretary of State is singling out particular expression for disfavored treatment, making the Revocation Provision subject to strict scrutiny as applied to protected speech.

184.    Restricting speech to tilt public debate and opinion about American foreign policy and silence views contrary to the current government's foreign policy "is not [a] valid, let alone substantial" government interest. *Moody*, 603 U.S at 740.

185.    The Revocation Provision, as applied to protected speech, is not narrowly tailored because it vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to revoke visas and other documentation based on protected speech for whatever reason the Secretary personally deems sufficient.

186.    The Revocation Provision, as applied to protected speech, is not the least restrictive means of advancing the government's objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

187.   Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the First Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

## SIXTH CLAIM

### First Amendment

### Revocation Provision

### (Injunctive Relief)

188.   Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

189.   Revoking noncitizens' visas or other documentation based on protected speech violates the First Amendment for the reasons stated in Claim V.

190.   Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

191.   Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

192.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

193.   The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

194.    The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**SEVENTH CLAIM**

**Fifth Amendment (Vagueness)**

**Revocation Provision**

**(Declaratory Relief)**

195.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

196.    For the reasons stated in Claim III, the Fifth Amendment prohibits vague laws that fail to give the public notice of what is required or lack standards to prevent arbitrary or discriminatory enforcement.

197.    The Revocation Provision is unconstitutionally vague as applied to protected speech because it provides noncitizens no notice of what protected expression could trigger the revocation of their visa or other documentation.

198.    The Revocation Provision is also vague on its face as applied to protected speech, because it provides limitless discretion to government officials charged with its enforcement regarding when a noncitizen's protected speech provides a basis revoke a visa or other documentation.

199.    The Revocation Provision is also unconstitutionally vague as applied to protected speech because it provides no guidance to government officials charged with its enforcement regarding when a noncitizen's expression should trigger revocation of a visa or other documentation.

200.    The Revocation Provision is also unconstitutionally vague as applied to protected speech because it authorizes arbitrary and discriminatory enforcement by granting the Secretary of State and subordinate officials unfettered and unreviewable authority to revoke a visa "at any time, in his discretion." 8 U.S.C. § 1201(i).

201.    Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Fifth Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

## EIGHTH CLAIM

### Fifth Amendment

### Discretionary Revocation Provision

### (Injunctive Relief)

202.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

203.    The Revocation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech for the reasons stated in Claim VII.

204.    Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

205.    Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

206.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

207.    The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

208.    The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in their official capacities and issue the following relief:

A.    Declare that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision[2] for engaging in protected speech;[3]

B.    Declare that, as to Plaintiffs and/or their noncitizen members, the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech;

C.    A preliminary and permanent injunction prohibiting Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech;[4]

D.    A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech;

---

[2] As used in the Prayer for Relief, "Deportation Provision" has the same meaning as in Paragraph Seven above.

[3] To be clear, Plaintiffs' lawsuit does not challenge the Secretary's separate exclusion authority under 8 U.S.C. § 1182(a)(3)(C)(iii). Plaintiffs' challenge is solely to 8 U.S.C. § 1227(a)(4)(C)(i) as applied to the initiation of deportation proceedings based on protected speech.

[4] Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings. Section 1252(f) does not, however, constrain this Court's ability to enjoin the Revocation Provision or render declaratory relief regarding the constitutionality of the Deportation Provision as to Plaintiffs and their noncitizen members. *See Biden v. Texas*, 597 U.S. 785, 800–01 (2022).

1

E.      Declare that the First Amendment prohibits revoking the visas or other

2  documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision[5] based

3  on protected speech;

4

F.      Declare that as to Plaintiffs and/or their noncitizen members, the Revocation

5  Provision is void for vagueness under the Fifth Amendment as applied to revocations of visas or

6  other documentation based on protected speech;

7

G.      A preliminary and permanent injunction prohibiting Secretary Rubio from revoking

8  the visas or other documentation of Plaintiffs and/or their noncitizens members under the

9  Revocation Provision for engaging in protected speech;[6]

10

H.      A preliminary and permanent injunction prohibiting Secretary Noem from initiating

11  deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked

12  under the Revocation Provision for engaging in protected speech;

13

I.      Award reasonable attorneys' fees and costs under 28 U.S.C. § 2412(b) and any other

14  applicable law; and

15

J.      Award such other relief as the Court may deem just and proper.

16  Dated: August 6, 2025                      Respectfully Submitted,

17  /s/ Marc Van Der Hout                      /s/ Conor T. Fitzpatrick
18  Marc Van Der Hout (Cal. Bar #80778)        Conor T. Fitzpatrick (Mich. Bar #P78981)*
    Johnny Sinodis (Cal. Bar #290402)          Daniel A. Zahn (D.C. Bar #90027403)*
19  Oona Cahill (Cal. Bar #354525)             FOUNDATION FOR INDIVIDUAL
    VAN DER HOUT LLP                           RIGHTS AND EXPRESSION (FIRE)
20  360 Post Street, Suite 800                 700 Pennsylvania Avenue SE, Suite 340
    San Francisco, CA 94108                    Washington, DC 20003
21  Telephone: (415) 981-3000                  Telephone: (215) 717-3473
    Facsimile: (415) 981-3003                  Email: conor.fitzpatrick@thefire.org
22  Email: ndca@vblaw.com                      Email: daniel.zahn@thefire.org

23

24

25

26    [5]  As used in the Prayer for Relief, "Revocation Provision" has the same meaning as in Paragraph
    Seven above.

27    [6]  The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because
    it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C.
28  1252(f)(1).

—31—

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application forthcoming

*Counsel for Plaintiffs*

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-cv-06618

1

**VERIFICATION OF GRETA REICH**

2      Under 28 U.S.C. § 1746, I, Greta Reich, declare as follows:

3          1.      I am the president of The Stanford Daily Publishing Corporation ("Stanford Daily")

4   and editor-in-chief of *The Stanford Daily.*

5          2.      I am an officer of Stanford Daily and am authorized by the corporation to act on its

6   behalf.

7          3.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

8          4.      I have personal knowledge of the factual allegations in paragraphs 15–16 and 65–88

9   of the Verified Complaint and know them to be true.

10         5.      I verify under penalty of perjury that the foregoing is true and correct.

11

12      Executed on August  5  , 2025.

13

14                                                            _____

15                                                                    Greta Reich

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## VERIFICATION OF JANE DOE

Under 28 U.S.C. § 1746, I, Jane Doe, declare as follows:

1. I am a Plaintiff in the present case.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3. I have personal knowledge of the factual allegations in paragraphs 17 (as to the allegations concerning my immigration status, my speech, and the impact of the challenged provisions on my speech), 89–94, and 100–101 of the Verified Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 5th, 2025.

Jane Doe

**VERIFICATION OF JOHN DOE**

Under 28 U.S.C. § 1746, I, John Doe, declare as follows:

1.      I am a Plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3.      I have personal knowledge of the factual allegations in paragraphs 18 and 102–109 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct.


Executed on August 5th, 2025.

_____

John Doe