# EXHIBIT A

*Democracy Dies in Darkness*

# Trump told donors he will crush pro-Palestinian protests, deport demonstrators

Trump has waffled on whether the Israel-Gaza war should end. But speaking to wealthy donors behind closed doors, he said that he supports Israel's right to continue "its war on terror."

May 27, 2024    More than **1 year ago**

By Josh Dawsey, Karen DeYoung and Marianne LeVine

Former president Donald Trump promised to crush pro-Palestinian protests on college campuses, telling a roomful of donors — a group that he joked included "98 percent of my Jewish friends" — that he would expel student demonstrators from the United States, according to participants in the roundtable event with him in New York.

"One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave," Trump said on May 14, according to donors at the event.

When one of the donors complained that many of the students and professors protesting on campuses could one day hold positions of power in the United States, Trump called the demonstrators part of a "radical revolution" that he vowed to defeat. He praised the New York Police Department for clearing the campus at Columbia University and said other cities needed to follow suit, saying "it has to be stopped now."

"Well, if you get me elected, and you should really be doing this, if you get me reelected, we're going to set that movement back 25 or 30 years," he said, according to the donors, who spoke on the condition of anonymity to detail a private event.

Trump has waffled publicly about whether Israel should continue its war in Gaza, saying "get it over with … get back to peace and stop killing people." Major Republican donors have lobbied him in recent months to take a stronger stance backing Israel and its prime minister, Benjamin Netanyahu.

The private New York meeting offers new insight into his current thinking. Speaking to wealthy donors behind closed doors, Trump said that he supports Israel's right to continue "its war on terror" and boasted of his White House policies toward Israel.

The former president didn't mention Netanyahu, whom he resents for acknowledging Joe Biden's victory in 2020 and hasn't spoken to in years.

Trump has offered few policy specifics about how he would treat Israel in a second term. He cast doubt on the viability of an independent Palestinian state in a recent Time magazine interview, saying he was "not sure a two-state solution anymore is gonna work," adding: "there may not be another idea." A two-state solution to the Israeli-Palestinian conflict has been the end goal of U.S. policy under Democratic and Republican presidents for decades.

Trump's campaign did not respond to detailed questions about The Washington Post's reporting. "When President Trump is back in the Oval Office, Israel will once again be protected, Iran will go back to being broke, terrorists will be hunted down, and the bloodshed will end," Karoline Leavitt, the campaign's national press secretary, wrote in an email.

Both Trump and Biden have struggled with the politics of the Israeli-Palestinian conflict on the campaign trail. Biden's base is deeply divided on the Gaza-Israel war, but Trump's rhetoric on the subject has limited his ability to capitalize on his opponent's problems.

Trump has repeatedly claimed in public statements and interviews that Hamas's Oct. 7 attack on Israel, which sparked the Gaza war, would have never happened if he were president.

But he has also criticized Israel's approach to the war, albeit in somewhat confusing terms. In a March interview with the Israeli newspaper Israel Hayom, Trump said, "You have to finish up your war. To finish it up. You gotta get it done." In April, he argued the war was bad for Israel's image, telling conservative talk show radio host Hugh Hewitt that Israel is "absolutely losing the PR war."

Trump took a different tone in the meeting with donors. Instead of saying it was time to wrap up the war, he said he supported Israel's right to continue its attack on Gaza.

"But I'm one of the only people that says that now. And a lot of people don't even know what October 7th is," Trump said.

Trump repeatedly listed for the donors everything he believed he had done for Israel in the White House. He moved the U.S. Embassy to Jerusalem, bucking decades of U.S. policy. He recognized the Golan Heights, which Israel seized from Syria in 1967, as an integral part of Israel after what he said was a five-minute conversation with David Friedman, his ambassador there.

He also polled the room if they liked Friedman.

"So I did Golan Heights. You know that's worth $2 trillion, they said, that piece, if you put it in real estate terms. But it's worth more than that. It is," Trump said, according to donors present.

Israel, Trump argued, needs his help. Street demonstrations for Israel get smaller crowds than his rallies, he said. In Washington, and particularly in Congress, "Israel is losing its power," he added. "It's incredible."

The former president repeatedly expressed frustration that Jewish Americans did not vote for him as much as he believes they should, the donors said.

"But how can a Jewish person vote for a Democrat, and Biden in particular — but forget Biden. They always let you down," he said, referring to Democrats.

Trump has made similar comments in public, occasionally triggering backlash. Some Jewish Americans have said that his rhetoric evokes the antisemitic idea that American Jews are more loyal to their religion or to Israel than to the United States.

Several influential Republican donors, including Miriam Adelson, have pressed Trump to publicly express support not only for Israel but also for Netanyahu, its embattled leader.

Trump never mentioned Netanyahu at the roundtable. But he has frequently complained about Netanyahu in public — particularly after the Israeli prime minister acknowledged Biden's victory in the 2020 election even as Trump was still fiercely challenging the results.

"Bibi Netanyahu rightfully has been criticized for what took place on October 7," Trump told Time, referring to the Israeli government's failure to prevent the surprise attack, in which Hamas militants killed about 1,200 Israelis and took 253 hostage. He also recalled that he had a "bad experience with Bibi," claiming that Israel had planned to participate in the 2020 U.S. strike that killed Iranian Gen. Qasem Soleimani but backed out at the last minute.

Trump's annoyance with Netanyahu dates to his time in the White House and his frustration that he felt he did not get enough credit for what he did for Israel and the leader when he was in office, John Bolton, Trump's former national security adviser, said in an interview.

"He doesn't like Netanyahu ... it's because Bibi is one of the premier democratic politicians in the world in terms of getting publicity about himself and Trump resents that," said Bolton, a frequent Trump critic. "Trump fundamentally sees Netanyahu as getting credit for things Trump thinks he ought to get credit for."

Until the 2020 election, the two leaders had a close working relationship, according to one person familiar with their relationship, who spoke on the condition of anonymity to describe the leaders' private conversations. But Trump was "taken aback" by a video Netanyahu made congratulating Biden on his victory. Trump, this person said, thought the video was a "little too cordial."

Sen. Lindsey Graham (R-S.C.), a Trump ally and sometimes critic, didn't directly address Trump's comments about Israel when asked about them in an interview. But he offered a broad assessment.

"We can have our opinions about our allies but I think they're in the middle of a fight for their life, there'll be plenty of time for the accountability to be had," he said. "The best route to deliver that accountability will be the Israeli people."

Trump and Netanyahu's relationship will "continue to prosper and flourish" if they're both in office at the same time again, Matthew Brooks, chief executive of the Republican Jewish Coalition, said in an interview.

"He's giving the Israelis a blank check to go in and do what they need to do to destroy Hamas and eliminate the threat in Gaza from Hamas. And what he's also saying, which is actually true, he said 'but do it quickly' because time is not Israel's ally right now," Brooks said.

"President Biden stands against antisemitism and is committed to the safety of the Jewish community, and security of Israel. Donald Trump does not," James Singer, a spokesman for the Biden campaign, said in a statement earlier this month.

Top Trump allies recently visited Israel for meetings with Netanyahu and other officials in a delegation headed by Robert O'Brien, another of Trump's former White House national security advisers. The trip was organized by the pro-Israel American Israel Public Affairs Committee, and the group did not come bearing messages from Trump or speaking on behalf of the Trump administration, said Ed McMullen, who served as U.S. ambassador to Switzerland under the Trump administration.

The group watched gruesome footage of the Oct. 7 attack and toured parts of the country where Israelis had been killed or kidnapped, making for an "educational visit that was life-changing," McMullen said. The group is likely to debrief Trump on the trip at some point, he added.

At the donor roundtable, Trump said he had studied Jewish history and had thoughts about this moment in U.S. history.

"And you know, you go back through history, this is like just before the Holocaust. I swear. If you look, it's the same thing," Trump said. "You had a weak president or head of the country. And it just built and built. And then, all of a sudden, you ended up with Hitler. You ended up with a problem like nobody knew."

## What readers are saying

The comments reflect a strong opposition to Donald Trump, with many expressing concerns about his potential re-election and the implications for democracy and civil rights. Several comments draw parallels between Trump and historical fascist leaders, emphasizing fears of... <u>Show more</u>

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT B

# Trump, citing Hamas attacks, vows sweeping immigration crackdown if elected

By Kate Sullivan, CNN

⏱ 3 min read · Updated 10:36 AM EDT, Tue October 17, 2023



Republican presidential candidate former President Donald Trump speaks to guests during a campaign event at the Dallas County Fairgrounds on October 16, 2023 in Adel, Iowa. Trump also spoke at a rally in Clive, Iowa, the same afternoon. Scott Olson/Getty Images

**(CNN)** — Former President Donald Trump said Monday that if elected again to the White House, he would reinstate and expand a travel ban on people from predominantly Muslim countries, suspend refugee resettlements and aggressively deport those whom he characterized as having "jihadist sympathies."

During a campaign event in Clive, Iowa, Trump pointed to the deadly attacks by Hamas in Israel and raised fears about a potential assault on the US as he sought to make the case for his hard-line immigration policies. His proposals would amount to a sweeping overhaul of America's immigration system and would almost certainly face legal challenges if implemented.

During his presidency, Trump's travel ban was a signature policy that limited travelers from seven predominantly Muslim countries: Iran, Libya, Iraq, Sudan, Somalia, Syria and Yemen. The administration later extended the travel ban to include several African countries. President Joe Biden revoked the travel ban after he took office in 2021.

Trump said Monday that he would implement "strong ideological screening of all immigrants to the United States" and said the US would block "dangerous lunatics, haters, bigots and maniacs to get residency in our country."

He also said he would ban travel from Gaza, Syria, Somalia, Yemen, Libya" or anywhere else that threatens our security."

The former president said he would revoke student visas of "radical anti-American and antisemitic foreigners" enrolled in US colleges and universities and deport them. Trump

criticized pro-Palestinian protests and said he would send Immigration and Customs Enforcement officers to what he described as "pro-jihadist demonstrations."

"We have to protect our own country," Trump said.

Republican presidential candidates have sought to position themselves as steadfast supporters of Israel after Hamas launched a deadly surprise attack on the country, which then declared war on the terrorist group. Trump has denounced the attacks and expressed support for Israel, but he received considerable backlash from his GOP rivals and others last week for criticizing Israeli Prime Minister Benjamin Netanyahu and saying Netanyahu was caught unprepared by Hamas' attack. Trump also praised the Iran-backed Lebanese militant group Hezbollah as "very smart."

Trump and his team have since backtracked, including saying in a statement, "There was no better friend or ally of Israel" than the former president. He also posted on social media, "#IStandWithBibi," a reference to Netanyahu's nickname.

Other Republican presidential candidates on Monday called for revoking student visas and deporting foreign nationals in the US who have aligned themselves with Hamas. The escalating rhetoric by GOP candidates comes as the Israel-Hamas conflict deepens and the death toll from the war sharply climbs.

"Anyone who stands up and says they want to kill Jews, they support terrorism, they should have that visa revoked," Sen. Tim Scott of South Carolina said in a radio interview on "The Sean Hannity Show."

Florida Gov. Ron DeSantis also endorsed such a proposal, saying on "The Guy Benson Show" that he thought if someone on a visa expressed support for Hamas, "You don't have a right to be here on a visa, you don't have a right to be studying in the United States."

DeSantis was responding to a question about whether he supported Republican Sen. Marco Rubio of Florida asking US Secretary of State Antony Blinken over the weekend to revoke immigrant visas of recipients in the US who have endorsed terrorist activity by Hamas.

CNN's Kristen Holmes contributed to this story.

# EXHIBIT C



Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism

The White House

January 30, 2025

**COMBATING ANTI-SEMITISM IN THE UNITED STATES:** Today, President Donald J. Trump signed an Executive Order to Combat Anti-Semitism.

- Expanding on his Executive Order 13899, President Trump's new Order takes forceful and unprecedented steps to marshal all Federal resources to combat the explosion of anti-Semitism on our campuses and in our streets since October 7, 2023.

- Every Federal executive department and agency leader will review and report to the White House within sixty days on *all* criminal and civil authorities and actions available for fighting anti-Semitism.

- Immediate action will be taken by the Department of Justice to protect law and order, quell pro-Hamas vandalism and intimidation, and investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities.

- The Order demands the removal of resident aliens who violate our laws.

**GOING ON OFFENSE TO ENFORCE LAW AND ORDER AND TO PROTECT CIVIL RIGHTS:** Immediately after the jihadist terrorist attacks against the people of Israel on October 7, 2023, pro-Hamas aliens and left-wing radicals began a campaign of intimidation, vandalism, and violence on the campuses and streets of America.

- Celebrating Hamas' mass rape, kidnapping, and murder, they physically blocked Jewish Americans from attending college classes, obstructed synagogues and assaulted worshippers, and vandalized American monuments and statues.

- The Biden Administration turned a blind eye to this coordinated assault on public order; it simply refused to protect the civil rights of Jewish Americans, especially students. According to a December 2024 U.S. House of Representatives Staff Report on anti-Semitism, "the failure of our federal government departments and agencies is astounding."

**PRESIDENT TRUMP KEEPS HIS PROMISES AND BUILDS ON HIS SUCCESS:** In his first term, President Trump kept his biggest promises:

- He moved the American Embassy in Israel to Jerusalem: After decades of broken promises and despite much criticism, President Trump was the President who finally

kept his commitment to Israel to move the American embassy from Tel-Aviv to Israel's true and rightful capital: Jerusalem.

- He established the Abraham Accords: President Trump delivered the greatest breakthrough for peace in the Middle East in decades by brokering the normalization of ties between Israel and the United Arab Emirates, Bahrain, Sudan, and Morocco, protecting Israel and Jews and spreading security and prosperity to the entire region.

Now, President Trump has promised that the Federal Government will:

- Protect the civil rights of our Jewish citizens: "My promise to Jewish Americans is this: With your vote, I will be your defender, your protector, and I will be the best friend Jewish Americans have ever had in the White House."

- Aggressively enforce the law, protect public order, and prosecute anti-Semitic crimes: "I will issue clear orders to my Attorney General to aggressively prosecute terroristic threats, arson, vandalism and violence against American Jews."

- Deport Hamas Sympathizers and Revoke Student Visas: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

# EXHIBIT D

2

```
 1              UNITED STATES DISTRICT COURT

 2            DISTRICT OF MASSACHUSETTS (Boston)

 3                    No. 1:25-cv-10685-WGY
                      Vol 1, Pages 1 to 84
 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                    Plaintiffs
 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10                  Defendants

11

12                    *********

13

14               For Bench Trial Before:
                 Judge William G. Young
15

16

17              United States District Court
                District of Massachusetts (Boston.)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Friday, July 18, 2025

20                    ********

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23              United States District Court
     One Courthouse Way, Room 5510, Boston, MA 02210
24                  rhr3tubas@aol.com

25
```

3

```
 1                    I N D E X

 2

 3   WITNESS            DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   JOHN ARMSTRONG (Continued, via zoom.)

 6    By Ms. Santora (via Zoom)

 7    By Ms. Conlon           5

 8

 9   VEENA DUBAL

10    By Mr. Wang            67

11    By Mr. Kanellis

12

13               E X H I B I T S

14               (None marked.)

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
       Knight First Amendment Institute at Columbia
 6     University
       475 Riverside Drive, Suite 302
 7     New York, NY 10115
       (646) 745-8500
 8     E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10     Sher Tremonte LLP
       90 Broad Street, 23rd Floor
11     New York, NY 10004
       (212) 540-0675
12     Email: Cgans@shertremonte.com
       For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16     DOJ-Civ
       P.O. 878
17     Ben Franklin Station
       Washington, DC 20044
18     (202) 616-9123
       Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20     United States Attorney's Office
       1 Courthouse Way, Suite 9200
21     Boston, MA 02210
       Email: Shawna.yen@usdoj.gov
22     For Defendants

23

24

25
```

```
 1              P R O C E E D I N G S

 2          (Begins, 9:00 a.m.)

 3          THE COURT:  Good morning.  Because I have made

 4   these proceedings available on the internet, it's

 5   appropriate to say that if you are accessing these

 6   proceedings on the internet, be aware that the rules of

 7   court remain in full force and effect, and that means

 8   there is no taping, streaming, rebroadcast, screen

 9   shots, or other transcription of these proceedings.

10          You must also keep your microphone muted at all

11   times.  If you do not, we will have to cut you off

12   immediately.

13          Very well.  The Clerk informs me we're ready to

14   go.  I see Mr. Armstrong on the screen.

15          And, yes, I'll ask the Clerk to remind you, sir,

16   that you remain under oath.

17          THE CLERK:  Sir, you remain under oath, do you

18   understand?

19          THE DEFENDANT:  Yes, I understand that I remain

20   under oath.

21          THE COURT:  And thank you.

22          And Ms. Conlon.

23          MS. CONLON:  Thank you, your Honor.

24          THE COURT:  You may examine.

25
```

1  CROSS-EXAMINATION BY MS. CONLON:  (Continued.)
2  Q.    Good morning, Mr. Armstrong.  Can you hear me?
3  A.    Good morning.  I can hear you.
4  Q.    Okay.  You're in D.C. right now?
5  A.    That is correct, I am in my office at 619th
6  Street, Northwest.
7  Q.    And can you just tell us who is in the room with
8  you other than Ms. Santora?
9  A.    We have two lawyers from the State Department,
10  Sarah Tulkowski and, um, Taylor Beaumont.
11  Q.    All right.  Okay.  Thank you.
12        Now, um, you testified that you would be very
13  surprised if a policy exists to Visas exists that you
14  don't know about, is that correct?
15  A.    I can't see how that could be the case.  That the
16  head -- at least for the time being, the Head of the
17  Bureau of Consular Affairs, which at the State
18  Department is the, um, part of the State Department that
19  is responsible for Visas and issuing Visas abroad.  So,
20  yes, I would be extremely surprised.  I do not see how
21  this could happen.
22  Q.    Now I want to talk about what "policy" means in
23  the context of your work.
24        State has a policy-making process, right?
25  A.    Yes, they're a policy-making process in the U.S.

government and the State Department also does that.
2  Q.    Before a policy is finalized, a few things have to
3  happen, right?
4  A.    Yes, usually -- yes, that is correct.
5  Q.    An action memo, with a proposed policy, must be
6  cleared by all offices who have any equities in it,
7  correct?
8  A.    Yes, I think that is correct.
9  Q.    A policy could require clearance from as many as
10  20 different offices, right?
11  A.    Um, even more actually.  I have seen some memos,
12  although they weren't necessarily a policy memo, that
13  had over 60 clearances.
14  Q.    In once an action memo with a policy has been
15  cleared by all relevant offices, it then has to go to
16  Secretary Rubio, right?
17  A.    It depends.
18  Q.    If it's a policy that the Secretary needs to sign
19  off on, he has to sign off on it before it's final,
20  right?
21  A.    That is true.  But there are also -- I have the
22  ability to sign off on policies too, to approve policies
23  for the Bureau of Consular Affairs, after the necessary
24  clearance process.
25  Q.    Once a policy has been cleared, signed off on by

1  whoever the senior-most official is that has to sign off
2  on it, then it can be publicly announced, correct?
3  A.    Well not all policies are publicly announced,
4  sometimes they're classified or they're sensitive but
5  unclassified.  But they would certainly be announced to
6  those people who need to deal with them.  In the case of
7  Consular Affairs, most of our things are, um, but not
8  all are unclassified.
9  Q.    In other words, whoever needs to know could then
10  be told about it?
11  A.    Yes, that is correct, on a need-to-know basis,
12  it's a good rule for OF-SAC.
13  Q.    Now once a policy had been finalized and those who
14  need to be made aware of it are made aware of it,
15  guidance about that policy can be conveyed to folks who
16  work in the State Department who have to implement it,
17  right?
18  A.    That's correct.  And usually guidance in that form
19  is especially for policies that affect these operations
20  abroad, and it would go out then in the form of a, um,
21  cable or telegram, and I believe we discussed these
22  previously.  And usually in the form of an All-Back, to
23  all diplomatic and Consular posts.
24  Q.    A cable --
25  A.    And oftentimes at --

1  Q.    Sorry.  I didn't mean to interrupt you, sir.
2  A.    No, I interrupted you.  Please go ahead.  Unless
3  you'd like me to finish.
4  Q.    I'll move on.
5        Other than a cable, sent "All-Back" as you say,
6  another way that guidance can be conveyed to State
7  employees is by making additions or revisions to the
8  Foreign Affairs Manual, correct?
9  A.    Yes, that is absolutely true, and the cables often
10  -- or the All-Backs often announce this guidance and
11  refer to the changes in the Foreign Affairs Manual.
12  That makes sure that everybody knows that this has
13  happened.  Because otherwise you could change the
14  Foreign Affairs Manual and there could be a new or a
15  modified policy and no one would know about it.
16  Q.    Now in your view, a decision by the Secretary on
17  an action memo is not, in and of itself, guidance,
18  correct?
19  A.    No -- well it depends what's part of the action
20  memo.  Sometimes you have the FAM revisions, the Foreign
21  Affairs Manual revisions, are also included and are part
22  of the action memo.  There can be more than one decision
23  made in the action memo, or --
24  Q.    I'm sorry.  In an action memo --
25  A.    -- or it's just --

1  Q.    It's so hard to do this where you can't see me.
2  A.    No, I apologize.
3  Q.    No, it's okay, we'll figure this out together.
4        In an action memo on a decision, something other
5  than an update to the FAM, a decision, that is an
6  action, that's, in your view, is only an action, that is
7  not a policy, correct?
8        MS. SANTORA:  Objection.
9        THE COURT:  Well I'm not really clear as to the
10 relevance of this.
11       MS. CONLON:  I can, your Honor --
12       THE COURT:  In these charts I've been given,
13 Mr. Armstrong, there's relevant -- well not relevant,
14 there's mention of something that is called an "action
15 letter."  So, um, I'll ask this question and I'll make
16 reference to our case specifically.
17       In our case you've testified, and I assume she's
18 going to cross-examine you at some stage, on, um,
19 communications you had with the Secretary, and then, um,
20 the Secretary of State, um, came up, in the relevant
21 individuals in our case, with something in it on those
22 chalks, these guidances I have, called an "action
23 letter."
24       Now when you get an "action letter," I understand
25 that to be a -- a direction for action.  It's not the

---

1        THE COURT:  All right, then we're clear.  That's
2  what she wants to ask about.
3        MS. SANTORA:  Okay.  I can share a copy of the
4  document that I had on the screen.  Just give me one
5  second.
6        THE COURT:  That's fine.
7        MS. CONLON:  And, Ms. Santora, we have copies
8  here, so I think it's just Mr. Armstrong who needs to be
9  able to see it.
10       MS. SANTORA:  Okay, then I'll just share a copy
11 with him on my screen, um, to save time.
12       THE COURT:  Exactly.
13       THE WITNESS:  Could you just make it larger?  My
14 eyesight has gotten worse with time.
15       MS. SANTORA:  Sure.
16       (Enlarged.)
17       THE WITNESS:  Yes, thank you.
18       All right.  Consular Affairs.  "Action memo goes
19 to Secretary of State."  (Looks.)  "There will no action
20 of foreign policy."  (Looks.)
21       Oh, I understand the CALC -- the action letter is
22 what goes back to the Department of Homeland Security
23 informing them of the action taken and letting them know
24 that the --
25       THE COURT:  So -- and I'm interrupting, so do I.

---

1  policy, it's the implementation of procedures, um,
2  within the Department.
3        Am I correct?
4        THE WITNESS:  Sir, no disrespect intended, your
5  Honor, but could I see the chalk?
6        THE COURT:  Sure.
7        THE WITNESS:  Do we have a copy?
8        THE COURT:  Ms. Santora may have one.
9        MS. SANTORA:  Yes, your Honor, I can find one, if
10 you give me one second.
11       THE COURT:  Yes.
12       MS. CONLON:  We're talking about H -- well it was
13 HN.  I thinks it's still HN.
14       THE COURT:  Yes.
15       MS. CONLON:  But we can backtrack in particular.
16       THE COURT:  Correct.  Yes.
17       (Silence.)
18       THE WITNESS:  I apologize for needing to refresh
19 my memory.
20       THE COURT:  No, I understand.  But it's those that
21 I'll ask Ms. Conlon, so you can hear --
22       MS. CONLON:  Yes.
23       THE COURT:  -- It's those action letters that
24 you're talking about?
25       MS. CONLON:  That's correct, your Honor.

---

1  So that's what we're talking about, that's what her next
2  question is going to deal with, I take it.
3        Go ahead, Ms. Conlon.
4  Q.    Well now I think just to make sure we're all clear
5  in using words in the same way, there are action memos
6  that are sent to you, or to Secretary Rubio, and from
7  those there may be action letters that are sent from
8  State to Homeland Security, is that correct?
9  A.    That's my understanding, reviewing this, and based
10 on my knowledge of my job, and that informs the, um,
11 whatever person at the Department of Homeland Security
12 who gets it.  Of course if it's Secretary Rubio, it goes
13 to Secretary Noem.  If it's someone else like me writing
14 back, then it would go to the person who sent it.  And
15 that is closing the loop then because the referral on
16 this CALC is what started the whole process.
17 Q.    So my question is about -- is twofold, I suppose,
18 action memos that go to you, or the Secretary, decisions
19 that are made on those.  You've said before, and I just
20 want to make sure I understood it, that that's just a
21 decision, an action, that is not the creation of policy,
22 in your view, correct?
23 A.    I think that is accurate.  A single decision does
24 not a policy make in most cases.  Of course it can
25 depend on the situation.  I'm sure we could find a

14

```
1   hypothetical where it might.  But I get action memos all
2   the time, to send this cable, do that, um, agree to this
3   meeting or conference, and that is not a policy.
4   Q.    And an action letter sent by State to the
5   Department of Homeland Security, that is an example of
6   implementation of a policy, but that in and of itself is
7   not the creation of policy, right?
8        MS. SANTORA:  Objection.
9        THE COURT:  No, he may be asked the question.
10  Overruled.
11       THE WITNESS:  Thank you, your Honor.
12  A.    The action letter informs of the decision.  For
13  example, on the CALC, the Secretary would make a
14  decision on the action memo in the case of an alien.
15  For example, a 4(c) finding, I'm referring to INA
16  237(a)(4)(c).  And then that action letter informs the
17  Department of Homeland Security.  So to be informing of
18  a decision, not necessarily a policy.
19  Q.    Got it.  Now we can move on from this.  I think I
20  understand what you mean when you say "policy."  I want
21  to turn to guidance you've received, um, relating to
22  revocations of Visas.
23       So you've discussed revocations of Visas from
24  student protesters with senior officials inside and
25  outside of State, right?
```

15

```
1   Q.    Turning your attention to the deposition
2   transcript from June 12th, 2025, Page 203 to 204,
3   starting at Line 4.  You were asked this question.
4        "Do you have the occasion to speak with anyone in
5   the White House about the revocation of student Visas?"
6   Line 7, you gave the answer, "I have had such an
7   occasion."  And continuing on down the page, "You were
8   clarifying the occasions you had to do that," starting
9   at Line 17, and you said, "So the number of total
10  conversations wee probably more, more than over 20.  I
11  would say at least a dozen occasions."
12       I could keep going, but that was your testimony,
13  right?
14  A.    Um, that -- excuse me, Counselor, but I'm still
15  looking it up here.
16  Q.    Sure.
17  A.    What was the page?  220 was the page number?
18  Q.    No, sir, Page 203.
19  A.    Thank you.
20  Q.    And I first read to you from Lines 4 through 7.
21  A.    (Looks.)
22       MS. CONLON:  Your Honor, this might be more
23  efficient if we could just put it on the screen for
24  Mr. Armstrong so we can draw his attention to the
25  portion we're using.
```

```
1   A.    Yes, I've discussed revocation of student Visas
2   with senior officials both inside the State Department
3   and outside the State Department.
4   Q.    That's inclusive of senior officials at Homeland
5   Security, right?
6   A.    Yes.
7   Q.    Senior officials at the White House, correct?
8   A.    Yes.
9   Q.    In the first few months of your job, you spoke
10  with folks in the White House about the revocation of
11  student Visas at least 20 times, right?
12       MS. SANTORA:  Objection.  This calls for
13  information that's privileged.
14       THE COURT:  What privilege?
15       MS. SANTORA:  It would be Presidential
16  communications, your Honor.
17       THE COURT:  All right, I, um --
18       MS. CONLON:  No, no, the question only asked,
19  Judge, did he speak with anyone in the White House?
20  There's no indication that it was something that went to
21  the President.  And also he testified about it in his
22  deposition.  So if they want to do a search-out
23  privilege, then it's waived.
24       THE COURT:  Well then go through the deposition.
25       MS. CONLON:  Sure.
```

16

```
1        THE COURT:  Fine.  As you seek to --
2        (Pause.)
3        MS. CONLON:  No, never mind, your Honor, I'm told
4   it's not more efficient.
5   Q.    Okay.  So, Mr. Armstrong, you've had a chance to
6   look at Page 203.  You gave that testimony in your
7   deposition, I read that correctly, right?
8   A.    I believe you read it correctly, um, based on -- I
9   didn't compare it word for word, but I -- and I think it
10  is accurate, but somewhere between a dozen and over 20.
11  Q.    And those conversations included Steven Miller,
12  correct?
13  A.    Yes.
14  Q.    Those conversations also included his Deputy, Adam
15  Leason, right?
16  A.    Yes.
17  Q.    Now most --
18  A.    But not as many with Mr. Leason.
19  Q.    More with Mr. Miller.
20       Now most of the conversations about the revocation
21  of student Visas that you had with Mr. Miller took place
22  in March of this year, correct?
23  A.    It seems to be, yes, but I didn't keep an exact
24  tally at the time.  But it seems in March.
25  Q.    And some of those conversations with Mr. Miller
```

18

```
1   were interagency, that is between you and folks of other
2   relevant agencies were part of those discussions, right?
3   A.    Yes.
4   Q.    Interagency --
5   A.    They were telephonic.  I have never met Mr. Miller
6   in person to this day.
7   Q.    Interagency, in the context of these discussions
8   about student Visa revocations, included folks from
9   Homeland Security, the State Department, the Department
10  of Defense, and the White House, correct?
11       MS. SANTORA:  Objection.  Your Honor, this is
12  bearing into Presidential communications, I believe,
13  he --
14       THE COURT:  Here, um, here's the line I'm walking,
15  Ms. Santora.
16       If it's in the deposition, it's waived.  If she's
17  gone beyond the deposition, and I don't have the
18  deposition before me, but I'm following carefully, then
19  I think your assertion must be sustained.
20       So I take it your position is that the question
21  she just asked goes beyond what was set forth in the
22  deposition.  Is that your representation?  And I'm being
23  handed a copy of the deposition here.
24       MS. CONLON:  And, your Honor, I'm looking at Page
25  207 of the deposition.
```

19

```
1        MS. CONLON:  Yes, that makes sense.
2        THE COURT:  -- proceed, Ms. Conlon.
3        MS. CONLON:  Okay.  So, your Honor, we will submit
4   a designation after this cross-examination.
5        THE COURT:  That's fine.  Proceed then.
6        MS. CONLON:  Okay.
7        (Pause.)
8   Q.    Now, um, I'd like to turn to -- we're going to
9   move away -- well one other question.
10       You attended meetings of the Homeland Security
11  Council, correct?
12  A.    No, I did not attend meetings of the Homeland
13  Security Council in person, I took part in telephonic
14  discussions with people who were on the Homeland
15  Security Council.
16  Q.    Okay.
17  A.    I'm not of that rank to go to the Homeland
18  Security Council.
19  Q.    Well they invited you to speak.  We can leave it
20  there.
21  A.    In telephone conversations with members of the
22  Homeland Security Council, yes.
23  Q.    And those conversations concerned student Visa
24  revocations, is that fair?
25  A.    They concerned many issues, but student Visa
```

18

```
1        THE COURT:  Fine.
2        But, Ms. Santora, talking to you, is it your
3   position it goes beyond what's set forth in the
4   deposition?
5        MS. SANTORA:  Yes, I believe that question did go
6   beyond what was set forth in the deposition.
7        THE COURT:  Well then she'll be more specific in
8   the deposition.  I'm looking at Page 207.
9        MS. CONLON:  And I'm looking at, um, Lines 12
10  through 24, in particular the question that begins at
11  Line 16.  Which I can read if it's helpful to anybody.
12       THE COURT:  Well you know to save time, um, let me
13  propose this, to save time, Ms. Santora, and Ms. Conlon.
14       I'm going to honor her, um, claim of Executive
15  Privilege in the course of your oral cross-examination
16  of Mr. Armstrong.  At the same time what's revealed in
17  the deposition, um, in absence of his oral testimony,
18  which I'm sustaining, is waived and is before the Court
19  and I can read.  So all you need to do, again to save
20  time, is to say, "We want in Pages X, Lines whatever,"
21  and we don't need to question him about it.
22       MS. CONLON:  Okay.
23       THE COURT:  If you're on this vein of talking to
24  people, even by telephone, at the White House.
25       So with that guidance, um --
```

20

```
1   revocations were also discussed, as were general Visa
2   revocations.
3        MS. CONLON:  Okay, so I will rely on the
4   deposition for the remainder of what I'm questioning him
5   on.
6   Q.    Okay.  So some of the determinations that we are
7   going to talk about today involve U.S. foreign policy,
8   so I want to understand what you mean when you're
9   talking about U.S. foreign policy in these decisions
10  that you wrote.
11       It's your understanding that it is the foreign
12  policy of the U.S. to combat antisemitism at home and
13  abroad, is that right?
14  A.    Yes, it is my understanding that is the policy of
15  the United States, and actually President Trump's
16  Executive Order in a way codified long-term policy.  The
17  United States, at least in my tenure of over 30 years,
18  has always been opposed to antisemitism both in the
19  wider world and in our great country.
20  Q.    And when you say the "Executive order," that is
21  14188, right?
22  A.    I don't know the number offhand.  I believe there
23  was only one that dealt with antisemitism.  I can try
24  and look it up, if you'd like, ma'am.
25  Q.    No, I think that we can assume it's what you mean
```

1  here for our purposes.
2      Now your understanding about the long-time U.S.
3  policy combating antisemitism is also drawn from public
4  statements made by Secretary Rubio, right?
5  A.  Yes, Secretary Rubio has gone on record, it is my
6  recollection, to be strongly against antisemitism, both
7  domestically and, um, even more importantly, in the
8  world.
9  Q.  Now --
10  A.  I personally am also against antisemitism, just
11  for the record, and I have no embarrassment in stating
12  that.
13  Q.  Nor should you.
14      Now Secretary Rubio has made many public
15  statements about antisemitism, correct?
16  A.  It's my --
17      MS. SANTORA:  Objection.
18      THE COURT:  Well that's pretty vague and it's a
19  matter of record.  Sustained.
20      Go ahead.
21  Q.  With respect to Secretary Rubio's position on
22  pro-Palestinian student protests, your understanding is
23  he's against foreign aliens organizing antisemitic
24  activity in the U.S., is that right?
25  A.  It's my understanding that he's against anyone

---

1  organizing antisemitic activity in the United States.
2  He -- and again, my understanding is he has no power
3  against you, American citizens, doing such things.  He
4  does have power, under the law, as has every Secretary
5  of State, against aliens who could do such things.
6  Q.  Aliens organizing antisemitic protests in his
7  view, is that right?
8      MS. SANTORA:  Objection, lack of foundation.
9      THE COURT:  Sustained.  It's sustained.  This
10  witness can't state his view.
11      MS. CONLON:  Well, your Honor, I'm actually
12  interested in this witness's understanding of his boss's
13  --
14      THE COURT:  Well you didn't in that question.
15      MS. CONLON:  Yes, I'll clarify.
16  Q.  So, Mr. Armstrong, to be clear, I'm not asking you
17  to read Mr. Rubio's mind, but I want to focus on your
18  understanding of the State Department's position based
19  on Secretary Rubio's public statements.
20      Now it's your understanding that Secretary Rubio
21  has expressed that the State Department has a policy of
22  opposing antisemitic protests on U.S. college campuses,
23  correct?
24  A.  It's my understanding that Secretary Rubio has
25  stated he opposes antisemitism both at home and abroad,

---

1  so that would include public campuses, that would
2  include everywhere in the United States, and in the
3  whole world.
4  Q.  You have reviewed some of Secretary Rubio's public
5  statements in the course of your work, correct?
6  A.  Yes.
7  Q.  You have cleared written guidance for State
8  Department employees that actually quotes from Secretary
9  Rubio's public statements, right?
10  A.  It's my recollection that I cleared some cables
11  that quoted from the Secretary.  And there may have been
12  other documents, but there were a couple of cables in
13  particular that had stuck in my mind.
14  Q.  Okay.  And some of those --
15  A.  And why?  I do not know.
16  Q.  Some of those cables in particular related to
17  Visas and Visa revocations, right?
18  A.  I believe so, yes, that is my recollection.
19  Q.  You said, when we started this line of
20  questioning, that EO 14188 codifies a longstanding U.S.
21  policy against antisemitism.  And do I understand you
22  correctly to be saying, in other words this policy
23  existed, but it was first written or memorialized or
24  codified in that Executive Order.  Is that what you
25  meant?

---

1  A.  What I meant was that I used -- I said "In a
2  manner, I believe, codified it," because of course it's
3  not a legal code, it's an Executive Order.  It's not the
4  same as if Congress had passed it.  But, um, in my
5  career, in the over 30 years that I've served the
6  American people as a Foreign Service Officer at the
7  State Department, both at home and abroad, we have come
8  out repeatedly, various Secretaries of States, various
9  State Department officials, against antisemitism.  The
10  U.S. government has done that too.  And this is the
11  first Executive Order that I recall, um, where it was
12  said that "We are against antisemitism."  So in that
13  sense it memorialized, formalized, whatever way we want
14  to describe this, took this policy to the next concrete
15  level.  It was always there, um, since Day 1 of my
16  Foreign Service career.
17  Q.  Now you've talked about antisemitism just now in
18  that order, but I want to talk about your understanding
19  of it.
20      You have had to review referrals from HSI
21  concerning alleged antisemitic activity in the past few
22  months, right?
23  A.  Um, from DHS, but I don't remember what office in
24  DHS.
25  Q.  Those referrals were part of the implementation of

1  Executive Order 14188, right?
2  A.    That's an interesting question.  Yes, I think they
3  could be seen as an implementation.  Certainly we
4  reviewed a number of cases, actually several thousands
5  of students, um, for various things.
6  Q.    So just to bring you up to my question.  The
7  referrals you got from the Department of Homeland
8  Security concerning alleged antisemitic expression and
9  activity, that was pursuant to or the implementation of
10 EO 14188, correct?
11 A.    I think it was also the implementation of our
12 longstanding policy of being against antisemitism.  It
13 is not a new policy.  Again, it was brought to a higher
14 level.  But we've always been against antisemitism.
15 Q.    Isn't it true that people in the State Department
16 were asked to review activities of students for
17 antisemitism pursuant to the Executive Order 14188?
18 A.    We were asked to review their activities.  I don't
19 remember whether the Executive Order was cited in the
20 request.  But we were asked to review their activities
21 on antisemitism, and on other things too, on criminal
22 activity, like the 800 students who, um, had assault
23 charges.
24 Q.    To your knowledge the State Department has not
25 issued any guidance about what should be treated as

1  antisemitic, correct?
2      MS. SANTORA:  Objection.
3      THE COURT:  Overruled.
4  A.    I cannot remember a concrete piece of guidance.
5  It, um, seems to me there may have been -- been some.
6  But I do not remember a concrete cable where I can say
7  "This cable defines antisemitism."
8  Q.    I'll ask you again.
9      You haven't received any guidance from anyone on
10 what the State Department should treat as being
11 antisemitic, yes or no?
12     MS. SANTORA:  Objection.
13     THE COURT:  Yeah, sustained.  I think he's
14 answered that.
15     MS. CONLON:  Your Honor, I believe he just said he
16 can't recall, and maybe not in a cable, and then --
17     THE COURT:  I understand.  I understand.  The
18 transcript will speak for itself.  But the effort is to
19 persuade me.  And here's what I hear.  Anyone can -- and
20 he can correct it.
21     I hear him say there's been no guidance, formal or
22 informal, as to what should be treated as antisemitism.
23 I think that's the point.
24     MS. CONLON:  It is.
25 Q.    And fair to say you don't know whether your

2  subordinates in the Visa office, who write the action
2  memos that you review, have received training on how to
3  determine what activity is antisemitic?
4      MS. SANTORA:  Objection.
5      THE COURT:  No, overruled.
6  A.    I do not -- I do not know all what training they
7  have.  To my knowledge I do not know of any of them
8  having received formalized training on what is
9  antisemitism.
10 Q.    When employees in the Visa office are making these
11 assessments that come to you in writing, you don't know
12 where there's any written materials they review or refer
13 to, correct?
14 A.    Could you clarify, what kind of materials?  You
15 mean instruction materials?  Or are they looking at the
16 evidence that a person has engaged in antisemitic
17 activity or has supported a terrorist organization?
18 Q.    Materials about how to make that assessment.
19 A.    The assessment of antisemitism or not?
20 Q.    Yes.
21 A.    I do not know of any such materials.
22 Q.    You don't know what definition or standard the
23 Visa office uses to determine whether speech or conduct
24 is antisemitic, right?
25     MS. SANTORA:  Objection.

1      THE COURT:  Overruled.
2  A.    I do not know of any materials.  I do know that
3  there's a common understanding in our culture in our
4  society of what antisemitism is.  It's just --
5      THE COURT:  And -- thank you.  I'd like to now
6  ask, would you state that, so I understand it?  What do
7  you think is the common understanding of what
8  "antisemitism" is?
9      THE WITNESS:  In my opinion, antisemitism is
10 unjustified views, biases, or prejudices, or actions
11 against Jewish people, or Israel, that are the result of
12 hatred towards them.
13     THE COURT:  Thank you.
14 Q.    In other words, in your understanding antisemitism
15 includes hatred or prejudice against Israel and the
16 Israeli people, right?
17 A.    Yes.  In my understanding antisemites will
18 sometimes try to hide their views and say they're not
19 against Jews, they're just against Israel, which is a
20 farcical argument in my mind.  It's just a dodge.
21 Q.    It's a dodge.  It's a way of obscuring a person's
22 antisemitic views?
23 A.    In my opinion, yes, Counselor.
24 Q.    Now there are some cables that you cleared this
25 past few months concerning, um, the espousal or

1  endorsement or support of terrorism and antisemitism,
2  right?
3  A.   There may have been.  I believe so.  I don't
4  remember all the cables I cleared.  But I believe that I
5  did clear some, yes.  And actually probably approved
6  them.
7  Q.   Not only cleared, but also approved, as in the
8  final approver, right?
9  A.   Yes, that is correct.
10 Q.   Okay.  Now once such cable, which I will draw
11 everybody's attention to, it's Exhibit 64 in evidence.
12 It's a cable from March of this year.  And I just want
13 to ask about your understanding of a part of that as it
14 relates to endorsing, espousing, supporting terrorism,
15 and antisemitism.
16      MS. CONLON:  And tell me if you need a second to
17 pull it up, Ms. Santora.
18 A.   I am pulling it up.  Wait.  Wait.  Now, sorry, I
19 have to use my mouse.  (Pause.)  This is, um, an "Action
20 Request Enhanced Screen and Social Media Vetting for
21 Visa Applicants," yes?
22 Q.   Yes.
23 A.   Exhibit 64.
24 Q.   Exactly.  And so if you go to Paragraph 9 of this
25 document.

31

1  A.   This part talks about that, yes.  I'd have to flip
2  back up to see what the title is.
3  Q.   And some indicators, according to the cable, said
4  a person may endorse, espouse, or support a terrorist
5  organization, include evidence that an applicant added a
6  case for terrorist activity, correct?
7  A.   Can I read the lines, Counselor?
8  Q.   Oh, sure, and I'm actually not quoting, but go
9  ahead.
10 A.   Okay.
11 Q.   The last few sentences.
12 A.   Okay.  (Reads.)
13 Q.   Okay.  So I'm going to ask you.
14      It's fair to say this cable here has, um,
15 understandings of how a person may reflect that they
16 endorsed or espoused or support a terrorist
17 organization, um, which could include bearing a
18 hostility towards U.S. citizens or U.S. culture, among
19 other things, right?
20 A.   Yes, it does note that as a possible indicator.
21 Q.   Potential sympathy for a foreign terrorist
22 organization, right?
23 A.   (Looks.)  Yes, as a possible indicator.  This
24 requires judgment and it's not an easy task.
25 Q.   Okay.  Now if we can set this cable aside for a

32

1  A.   (Turns.)  I'm at Paragraph 9.
2  Q.   Excellent.  I'd like to draw your attention to the
3  bottom few sentences, because I'll be asking you about
4  them.
5  A.   Okay.
6  Q.   So this paragraph of this March cable that, um,
7  for clarity, did you approve or just clear this one, can
8  you tell?
9  A.   I have to look at the bottom.  (Looks.)
10 Q.   Can you go ahead and do that, please.
11 A.   (Looks.)  I believe I approved this one.
12 Q.   Okay.  So turning to --
13 A.   Also I can tell by looking at the tags, it's see
14 "See this," and "See management," "Counselor viewed
15 this," "Counselor management."
16 Q.   So looking at Paragraph 9, the bottom few
17 sentences, this portion of the cable concerns the
18 understanding of 3(b), which is one of the grounds for
19 potential ineligibility, on the basis of supporting
20 terrorism, correct?
21 A.   Yes, 3(b) is support for terrorism, a terrorist
22 activity, or a terrorist organization.
23 Q.   Now this cable provides guidance on how to
24 determine whether a person, um, endorses or espouses or
25 supports terrorism, right?

1  moment, but I want to stick with the discussion of 3(b),
2  um, so you can put that aside.
3       The State Department has, as I understood you to
4  say on direct, a policy of revoking Visas based on a
5  person's support for a terrorist organization, if that
6  is their viewpoint, correct?
7  A.   Support --
8       MS. SANTORA:  Objection.
9       THE COURT:  No, she may ask the question.
10 Overruled.  He may answer.
11 A.   Support for a terrorist organization, or terrorist
12 activity, is a reason to have a Visa revoked, yes.
13 Q.   And on direct you were asked the question, does
14 State have a policy to revoke Visas based on political
15 viewpoints?  And in responding to a question about
16 political viewpoints, you said, "If you're supporting a
17 terrorist organization, yes."  That's correct, right,
18 that's what you said?
19 A.   Yeah, support for Hamas will get your Visa
20 revoked.
21 Q.   Now I want to --
22 A.   No, I'd like to finish my answer, because it
23 doesn't seem that the full complexity of what we deal
24 with is being carried out.
25      THE COURT:  You may -- you may, sir.  Go ahead.

34

```
 1        THE WITNESS:  Thank you, your Honor.
 2   A.    This is not a mundane thing.  If we get this
 3   wrong, we get the Molotov cocktail attack in Colorado.
 4   If we get these sort of things wrong, you get the Boston
 5   Bomber.  If we get this stuff wrong, you get 9/11.
 6        MS. CONLON:  Your Honor, I'm going to ask that you
 7   --
 8   A.    This is very serious stuff, Counselor, and I don't
 9   think you realize --
10        THE COURT:  Wait.  Wait a minute.  Wait.  Wait.
11   I've said you could amplify your answer.  You've gone on
12   to characterize the question.
13        THE WITNESS:  I apologize.
14        THE COURT:  We're not doing that.  I fully accept,
15   sir, that you take this very seriously.  She's trying to
16   flesh out what's meant by the phrase "Support Hamas."
17   That is important to this Court, an understanding of
18   that.  And I'm going to allow her to ask questions along
19   that line.  That's what I need to get out of this.  What
20   does it mean to support Hamas?
21        As far as I can see, in this case, there is no
22   dispute, and I don't see how there could be, that Hamas
23   a terrorist organization.  That said, she's trying to
24   pin down what that means.
25        Go ahead, Ms. Conlon.
```

35

```
 1   A.    It could be.
 2        MS. SANTORA:  Objection.
 3        THE COURT:  Wait.  Wait.  The objection is noted,
 4   but overruled.  She may follow this line of questioning.
 5   Q.    A statement calling for limiting military aid to
 6   Israel could be covered, correct?
 7   A.    In my opinion, yes.
 8   Q.    A statement --
 9   A.    You'd have to look at the totality of the
10   situation and the whole thing that's being said.  Just
11   one statement by itself is probably not going to make
12   the decision.
13   Q.    A statement calling Israel an "apartheid state"
14   could probably be covered?
15   A.    It might be.  We'd have to look at the totality of
16   the case.  Which is what we do in the Visa revocations.
17   Q.    Now you said a second ago, "Well that's just your
18   opinion."  But, Mr. Armstrong, you are the senior bureau
19   official in Consular Affairs, right?
20   A.    I am the senior --
21        THE COURT:  Wait a minute.  You may answer.
22   A.    I am the senior bureau official at the present
23   time in the Bureau of Consular Affairs at the State
24   Department.  I've been in the position since February
25   27th of this year and continue to be in it.
```

36

```
 1        MS. CONLON:  Thank you, your Honor.
 2   Q.    Now in your view, the phrase, "From the river to
 3   the sea, Palestine will be free," could be covered by
 4   the endorsing, espousing, supporting, a terrorist
 5   organization provision, correct?
 6   A.    It's basically calling for genocide of all
 7   Israelis, because there's no space for Israelis in that
 8   "river to the sea."
 9   Q.    In your view, a statement denouncing Zionism could
10   be covered because Zionism is Jewish patriotism or
11   Israeli patriotism, correct?
12   A.    It could be, yes.
13   Q.    In your view, a statement criticizing Israel's
14   actions in Gaza could be covered, depending on the
15   statement, right?
16   A.    Yes, depending on the statement.  It could
17   definitely.  If you say that "They're worse than Hitler
18   in what they're doing in Gaza," that would be a
19   statement that I think would be leading in that
20   direction that you seem to go going, Counselor.
21   Q.    In other words, a statement comparing the policy
22   of Israel to that of the Nazis?
23   A.    I'm saying it's worst than the Nazis.
24   Q.    A statement calling for an arms embargo on Israel
25   could be covered, correct?
```

```
 1   Q.    And when you receive action memos about particular
 2   persons alleging that they have expressed support for
 3   terrorism, what we're talking about here, these
 4   understandings inform your decision-making, right?
 5   A.    Yes, my understanding does inform my
 6   decision-making, as does any other guidance that I have.
 7   And I actually discuss my decisions, if I have
 8   questions, with the people who sent the memos to me to
 9   make them.
10   Q.    In the cable we looked at a moment ago, there was
11   a reference to a person's hostile attitude toward U.S.
12   citizens, government, and culture, as potential
13   indicators that they support or sympathize with
14   terrorist organizations.  And I want to understand your
15   view of that as well.
16        In your view, criticism of this administration's
17   policies or actions toward Israel could be covered by
18   this provision, right?
19        MS. SANTORA:  Objection.
20        THE COURT:  Well this deals with Visa applications
21   and so I'm going to sustain that.
22        (Pause.)
23        MS. CONLON:  Just a moment, your Honor.
24        (Pause.)
25   Q.    The Court made the point that I'm asking you about
```

38

```
 1   3(b), to endorse or espouse or support a terrorist
 2   organization, but you're familiar with 4(b) as well,
 3   correct?
 4   A.    Could you refresh my memory, please.
 5   Q.    Sure.  You're familiar with the provision of the
 6   INA, which you in your deposition referred to as 4(b),
 7   which has these exact same grounds that are in 3(b), but
 8   as a ground for the revocation or the determination of
 9   removability, as opposed to something relating to the
10   ineligibility to come into this country, correct?
11        MS. SANTORA:  Objection.
12        THE COURT:  No, she may ask him to characterize
13   it, and the answer may stand.
14        MS. SANTORA:  Well if she's asking him about a
15   statute or a document, he's asked if she could show him
16   the statute or document.
17        THE WITNESS:  Well I would like to see it, ma'am,
18   if you have it there.
19        THE COURT:  Yes.
20        MS. CONLON:  I'm just trying to be very efficient
21   with our time, but I understand you want to see it.  So
22   maybe the easier way to do this is actually the cable
23   you just looked at, 64.
24   A.    Okay.
25   Q.    This cable is not only about Visa applicants, but
```

39

```
 1   organization, and you can see that this cable addresses
 2   not only applicants, but those who are here in our
 3   country, correct?
 4   A.    They may be here in the country, because actually,
 5   um, looking at Paragraph 11, um, you could have a --
 6   someone could have a valid Visa and not be in the
 7   country and have the Visa revoked.  Your previous
 8   question, if I understand it and remember it correctly,
 9   was "Was there a discussion of revocation in this
10   cable?"  "Yes, there is."  And specifically in Paragraph
11   11.  That's a good example.  Reading through it quickly,
12   I didn't see it, but it's definitely there in 11.
13        But the holder of the Visa can be -- for example,
14   if someone from Peru applies for a Visa, they get it,
15   additional information later comes to light, that Visa
16   can be revoked whether they're in Peru or whether
17   they're in the United States.
18   Q.    Okay.  So to answer my question, yes, this cable
19   applies to people who are Visa holders inside the United
20   States as well, correct?
21        THE COURT:  He just said it --
22   A.    It could, yes.
23   Q.    Okay.  Now you asked me to refresh your
24   recollection about the INA provision that, in your
25   deposition we described as 4(b).  I'm going to try to do
```

40

```
 1   it is also about Visa revocations, correct?
 2   A.    I'm going to have to answer -- honestly I'm going
 3   to have to look at the cable.
 4   Q.    No, all we want are your honest answers, so please
 5   pull up the cable.
 6   A.    For March.
 7   Q.    So please pull up the cable, and I'm going to draw
 8   your attention first to Paragraph 2, on the first page,
 9   and next to Paragraph 11, titled "Revocation of Valid
10   Visas."  And once you've had a chance to read both of
11   those paragraphs, please let me know.
12   A.    2 and 11, yes?
13   Q.    Okay.  So having reviewed that --
14   A.    No, I'm sorry, Paragraphs 2 and 11?
15   Q.    Yes, please.
16   A.    Thank you.  (Reads.)
17   Q.    Okay, so having looked at this cable, you agree
18   with me that this cable --
19   A.    I apologize, I'm still reading Paragraph 11.
20   Could I please be allowed to finish?
21   Q.    Of course.
22   A.    Thank you.  (Reads.)  I have completed it.
23   Q.    Okay.  So you have looked at Exhibit 64, the cable
24   we've been discussing, about the grounds for the
25   endorsing, espousing, the support for a terrorist
```

```
 1   that very quickly here so we are all on the same page.
 2        MS. CONLON:  Can we please show Mr. Armstrong Page
 3   7 of what was identified as Exhibit 222.
 4        (On screen.)
 5   Q.    I'm going to show you, Mr. Armstrong, a copy of --
 6        MS. CONLON:  Oh, and we can't scroll?  (Scrolls.)
 7   Yes.  Okay.
 8   Q.    So, Mr. Armstrong, I'm showing you a copy of a
 9   statute.  And this is just to refresh your recollection.
10   A.    Yes, I appreciate that.
11   Q.    This is codified in the U.S. Code as 8 U.S.C.
12   1227, Deportable Aliens.  And you have control of the
13   mouse here, so I'm going to ask you to scroll to Page 7
14   of this, Section 4, titled "Security and Related
15   Grounds."
16   A.    (Scrolls.)  Yes, I see it, and I see "terrorist
17   activities."
18   Q.    Now you can see here, under 4(a), that this
19   statute applies to people who engage in the same grounds
20   we're talking about in 3(b), another part of the INA,
21   but here, instead of it being that they're ineligible,
22   as in Number 3, under 4 they are deportable, correct?
23   A.    I haven't compared the exact wording in 3(b), but
24   it does say that, yes, if they engage in, it's 1, 2, 3,
25   that they are deportable.
```

```
1   Q.    Just like --
2   A.    And I believe the finding in that would be done by
3   the Secretary of State.
4   Q.    And under (C), 4(c) here, which says "Foreign
5   Policy," so that rolls on to the top of Page 8, here we
6   can see a person who's present in the United States, as
7   determined by the Secretary, to have adverse
8   consequences for foreign policy, that person is
9   deportable, correct?
10  A.    Yes, the Secretary of State makes that
11  determination.
12  Q.    Right.  So my point is that you said, well, 3(b),
13  3(c), that's both -- Oh, our screens just did something
14  strange.  You said that those refer to applicants.  And
15  you would agree with me that 4(b) and 4(c) are
16  applicable to people who already have a valid Visa or a
17  green card, right?
18  A.    Based on a quick review here, yes, that makes
19  sense, they would, um --
20  Q.    Okay, well you say a "quick review."  But am I
21  recalling correctly that you testified on direct
22  examination that you have to be familiar with statutes,
23  about revocations, removability, to do your job, isn't
24  that what you said?
25  A.    I don't remember my testimony.  And I'm clearly
```

```
1   familiar with it, because I'm able to discuss it.  So,
2   yes, I am familiar with this.  And again the 4 -- the 4
3   authorities, those are determined by the Secretary.
4   Like the 4 -- excuse me, the 4(c).
5   Q.    So earlier I tried to ask you about the language
6   in that cable, about whether a person's alleged hostile
7   attitude towards U.S. Citizens, government, and culture,
8   may be indications that that person supports or
9   sympathizes with terrorist organizations.  I'm asking
10  that question with respect to 3(b) and 4(b).  And the
11  question is this.
12        In your view, criticism of the Trump
13  administration's policies or actions toward Israel could
14  be relevant to a 3(b) or 4(b) determination, correct?
15        MS. SANTORA:  Objection.
16        THE COURT:  No, overruled.
17  A.    It could be.  I would look at the totality of the
18  situation.  For example, if the person said that Hamas
19  should kill all of the Trump administration because of
20  the policy, yes, I would say that a statement like that,
21  which would be a criticism of the Trump administration,
22  would be indicative of support for a terrorist
23  organization.  So, yes, it could be.
24  Q.    (Pause.)  Hang on just a moment.
25        So you've given a pretty outrageous example of
```

```
1   what could be covered.  But you've been asked this
2   question and given this answer.
3         "Could a criticism of the administration's policy
4   or actions of Israel be covered by Paragraph 9?"  And
5   your answer is simply "Possibly," correct?
6   A.    Yes, it could be.  But again you have to look at
7   the totality of it.  Perhaps my example seems extreme,
8   but we deal with a lot of extremist people trying to get
9   into the United States and we've got to get it right,
10  Counselor, otherwise it results in terrorist attacks or
11  threats to our own citizens.
12  Q.    Well let's talk about some particular people whose
13  cases you dealt with.
14        You testified, on direct examination, that the
15  State Department uses only existing authorities and
16  policies to implement EO 14188 and 14161, correct?
17  A.    That's my recollection, yes, it is.  We have --
18  Q.    No, go ahead.
19  A.    We have, with revocations, long established the,
20  um, 3(c), um, 3(b), or 4(b), and 4(c) are long
21  established in the INA, I believe since the beginning
22  when it was initially -- when it became law in the '50s,
23  so it's over 70 years.  Yes, long-established policies
24  and methods, tools.
25  Q.    Long-established.  Your point has been that the
```

```
1   EOs did not create new legal authorities, right?
2   A.    Yes, that is -- they did not create a new
3   revocation.
4   Q.    Now just after you started in your current role,
5   which was February 27th, you were confronted with the
6   cases of Mahmoud Khalil and Yunseo Chung.  Are you
7   familiar with those names?
8   A.    I remember Mr. Khalil's name.  Um, Chung,
9   Mr. Chung is ringing a bell, but I don't remember that
10  one quite as well.  But there could have been someone by
11  that name.
12        MS. CONLON:  Your Honor, I'd like to show, um,
13  Mr. Armstrong what has been premarked as Exhibit EX,
14  it's an attorney's-eyes only document that we received
15  from the Court, the action memo concerning Mr. Khalil
16  and Ms. Chung.  I won't -- we want to be cognizant of
17  not putting it on the screen, because it's AEO.
18        THE COURT:  I'm assuming Ms. Santora has it.
19        MS. SANTORA:  Um, I -- can they share it with the
20  witness not on the public screen?
21        THE COURT:  Well you're saying it, and everyone is
22  cognizant, it's attorney's-eyes only.  I assumed you had
23  it?
24        MS. SANTORA:  I can get it, your Honor, um, if --
25        THE COURT:  Well so long as it's on your screen
```

1    only, that would be sufficient.  We can do that.
2        MS. SANTORA:  Okay.  If opposing counsel would
3    share it just to the witness's screen?
4        MS. CONLON:  We're trying to ensure that we do
5    that and do not show the public, so.
6        MS. SANTORA:  Yes, thank you.
7    Q.    So while we're getting you the document,
8    Mr. Armstrong, you mentioned that there are certain
9    determinations under 4(c), for example, that only the
10   Secretary of State can make.  One such determination is
11   that a person's presence or activities in the U.S. posed
12   a potential adverse foreign policy consequence to the
13   United States, right?
14   A.    Yes.  I cannot make that determination, only the
15   Secretary of State, whoever that person may be.
16   Q.    Okay, we're still working on getting you the
17   documents.
18        (Pause.)
19        MS. SANTORA:  Your Honor, I think I may have them
20   now.
21        THE COURT:  Thank you.
22        MS. CONLON:  That would be really helpful.  We
23   just don't want to mess up and put it publicly when
24   we're not supposed to.
25        MS. SANTORA:  Which one are you referring to?

1        MS. CONLON:  For Mr. Khalil and Ms. Chung, it's an
2    action memo.
3        (Pause.)
4        MS. CONLON:  Are you able to find it?
5        MS. SANTORA:  Yes.  Hold on one second.  I want to
6    be sure we have the right one.
7        MS. CONLON:  It's on DEF 121 is the Bates.
8        (Pause.)
9        MS. CONLON:  And is the Court able to see the
10   Court's copy?
11       THE COURT:  I have access to it.
12       You have about 45 minutes total in the
13   examination, if you want to reserve 45 minutes for
14   closing.  So go ahead.
15       MS. CONLON:  I'm sorry, your Honor, could you say
16   that again?  I didn't understand.
17       THE COURT:  You have 45 minutes for examination
18   and 45 minutes for closing, as we stand now at 10:00.
19       MS. CONLON:  Oh, I see.  I understand.  Okay.
20       MS. SANTORA:  I'm sorry, I don't think our copy
21   has numbers on them.
22       THE COURT:  Well it's before the Court.
23       MS. CONLON:  Okay, I'll just ask my questions and
24   we'll do our best.
25       THE COURT:  Yes, thank you.

47

1    Q.    So, Mr. Armstrong, you passed along, after
2    approving, action memos concerning Mahmoud Khalil and
3    Yunseo Chung to Secretary Rubio, correct?
4    A.    I believe there was an action memo.  If it went up
5    to the Secretary and I was working, I would have been
6    the last person to look at it before it went.  And my
7    name should be on it.
8    Q.    That's right.  I'm trying to show it to you,
9    because I'd like it to be in evidence and have a number.
10   A.    Counselor, if it has my name on it, I believe you.
11   Q.    I appreciate that.
12       THE COURT:  Well, look, these materials are before
13   the Court in their tortured history and I have made it
14   clear they are part of the record on which I am going to
15   make a decision.
16       MS. CONLON:  Okay.
17       THE COURT:  Now if you want to separate this out
18   and give it a number, I'm fine with that, we can do that
19   without the time running.
20       MS. CONLON:  Okay, thank you.
21       THE COURT:  Because it may help you, in both
22   sides, with the requests for findings and rulings.
23       MS. CONLON:  Exactly.
24       THE COURT:  So go ahead with your questions to the
25   witness.

48

1        MS. CONLON:  Okay.
2    Q.    So my question is that prior to issuing this
3    action memo to Secretary Rubio on March 8th, you were
4    not aware of any prior exercises of the Secretary's
5    removal authority under 4(c), correct?
6        MS. SANTORA:  Objection.
7        THE COURT:  Overruled.
8    A.    I do not recall any.  That doesn't mean there
9    weren't any.  I can only --
10   Q.    Mr. Armstrong, please look at the end of your
11   action memo.  Sorry, I should have drawn your attention
12   to it to just make this faster.  Would you please look
13   at the last line of your action memo.
14       MS. SANTORA:  There's a copy here, but it has
15   redactions applied to it, so I --
16       MS. CONLON:  All right, we'll just move on.
17   Q.    So you don't recall, as you sit here today,
18   whether before you, in almost the first week of your
19   job, authorized this action, whether it was something
20   the State Department had ever done before?
21   A.    I believe it was done before, just not under
22   Secretary Rubio, it was the beginning of March, I
23   believe that this took place.  Yes, the first week in
24   March?
25   Q.    This was March 8th, that's correct.

1    A.    Yeah, so Secretary Rubio would have been in the
2    saddle for 6 weeks.  But that doesn't mean it was never
3    used by other Secretaries of State.  As noted, the INA
4    has been in effect for over 70 years.  So I believe it
5    was used at other times.  But I would not be surprised
6    if Secretary Rubio had not used it within those 6 weeks
7    of his tenure.
8    Q.    So, Mr. Armstrong, you're saying that it was just
9    about Secretary Rubio being new to his role, but isn't
10   it true that what you wrote in the action memo was that
11   Mr. Khalil and Ms. Chung were likely to challenge their
12   removal under this authority, that the courts might
13   scrutinize its basis, and that's because there was no
14   prior exercise of this authority before, not just under
15   Secretary Rubio, under anyone, isn't that correct?
16   A.    No, my recollection is it was used at sometime
17   earlier as a matter of fact in this century.
18   Q.    In this century?
19   A.    But I don't remember a date.
20   Q.    Okay.  Let's move on to Mr. Mahdawi.
21         This is the action memo, which is also attorneys-
22   eyes only, and I believe it's something we can share
23   with the witness if Ms. Santora doesn't have an
24   unredacted copy of it.
25         You also prepared, or passed along, the action

memo concerning Mr. Mahdawi to Secretary Rubio, right?
2    A.    This is, um, 5.  Okay.  Sorry.  I'm getting the
3    right document.
4    Q.    I appreciate that.
5    A.    On March 15th, "Action Memo for the Secretary."
6    Yes, from CA John Armstrong.  That is me.
7    Q.    Now these -- this action memo concerns a number of
8    people, but in particular Mohsen Mahdawi, right?
9    A.    I see three people.  Momodou Taal.  Badar Khan
10   Suri.  And Mohsen Mahdawi.
11   Q.    The action memo concludes, for those mentioned,
12   that they are removable under 4(c), correct?
13   A.    Just a second.  (Looks.)  Yeah, and it asks the
14   Secretary to make that decision.  I can't make that
15   decision.  It's recommending that he make that decision.
16   But I didn't make that decision.  I made the case and
17   those who drafted it did I approved that argument,
18   but it's the Secretary's decision.  Which he did find
19   those three people to be removable under 4(c).  You can
20   see at the top, um, ma'am, it says the recommendations,
21   "Recommendation 1 approved," "Recommendation 2
22   approved."  So, yes, the Secretary agreed with the
23   recommendation.
24   Q.    Now for Mr. Suri and Mr. Mahdawi, for whom these
25   actions were approved about a week after Mr. Khalil's

1    removability determination was issued, you specifically
2    anticipated that there could be concerns around the fact
3    that the determination was inextricably tied to their
4    speech, correct?
5         MS. SANTORA:  Objection.
6         THE COURT:  Overruled.
7    A.    Okay, can I review the memo so I can see what it
8    is I signed?  I mean this was 3 months ago.
9    Q.    You don't recall, is that correct, without having
10   to look?
11   A.    Ma'am -- I mean, ma'am, I have -- in a week I can
12   have 50 action memos go across my desk.
13   Q.    I understand that you have a very important job
14   with a lot to do.  I'm focused on these particular
15   people whose determinations led to determinations of
16   their removability.  So if you need to turn to the last
17   paragraph to remember what you said about it, that is
18   just fine, it's the last page of the memo.
19   A.    Thank you.  I appreciate that.  (Looks.)  Now the
20   question is Mr. Mahdawi, yes?
21   Q.    Yes, the question is Mr. Mahdawi and Mr. Suri.
22   But if you have Mr. Mahdawi in front of you, we can just
23   use that.
24   A.    Yeah, actually in the memo it's clear that it was
25   activities.  "Antisemitic conduct."  "Disruptive

1    protests" and "antisemitic conduct."
2    Q.    Mr. Armstrong, do you see where it says "Given the
3    potential that a court may consider his actions
4    inextricably tied to speech protected under the First
5    Amendment, it is likely that courts will closely
6    scrutinize the basis for this determination."
7         Do you see that?
8    A.    Which page is this on, on Page 4?
9    Q.    Yes, sir, the last page.
10   A.    (Looks.)  Yes, I see that.
11   Q.    Now this memo, that you noted the action and it
12   was approved, um, the date on the top, on the first
13   page, is March 15th.  I now understand from you that
14   what I see in the upper left, "Rec 1 approved," "Rec 2
15   approved," means the date -- means that the Secretary
16   approved the recommendation.
17        Is the date next to those two provisions on the
18   top left, by "Rec 1," "Rec 2," the date that the
19   Secretary approved the recommendation?
20   A.    Yes, that's --
21        MS. SANTORA:  Objection.
22        THE COURT:  No, overruled.
23   A.    That's my understanding, those are the dates of
24   the approval.
25   Q.    And do you see on the first page where it says,

1  right under "Background," "On March 14th, the Assistant
2  Director of NSD referred this information to CA"?
3  A.  Yes.
4  Q.  So this referral came on the 14th, the action memo
5  was produced on the 15th, and it was approved on the
6  15th.  Am I understanding all of that correctly?
7  A.  Yes.
8  Q.  And in that 24-hour period in which the action
9  memo was generated, 13 people in departments cleared it,
10  does that sound right?  If you look at the last page for
11  me.  Just making sure I'm understanding that chart
12  correctly.
13  A.  Yeah, it could actually be more than 24 hours,
14  depending on when it came in and when the memo went up.
15  But let's say, for the sake of argument, it was
16  approximately 24 hours.
17  Q.  So you do see that, am I right?
18  A.  Yes, I see the list of clearers.
19  Q.  Okay.
20      MS. CONLON:  Just a moment.
21      (Pause.)
22  A.  And you'll note, on a couple of them, it's "Info."
23  Q.  I'm so sorry, I missed that last thing you said.
24  What did you say?
25  A.  On a couple of them it's "Info."

1  Q.  And "info" just means someone's letting them know,
2  is that right?
3  A.  That's correct.  So those people actually did not
4  bring any changes or express any opinion about the
5  document.
6  Q.  So it would be more accurate to say that 10
7  offices or persons cleared this memo and three people
8  reviewed it, is that fair?
9  A.  I count, um, 9.  But, yeah, approximately 10.
10  Q.  Okay.  Now I have one more action memo I want to
11  discuss quickly.  And I would like you to, um --
12      MS. CONLON:  Ms. Santora, if you have Ms. Ozturk's
13  action number, that's what I'll be asking him about.
14  Q.  Now you decided to revoke Rumeysa Ozturk's Visa,
15  right?
16  A.  I believe that was under, um -- yes.  Yes, I
17  believe that was under authority that I did exercise in
18  my current position.
19  Q.  Meaning, um -- meaning as Senior Bureau Official,
20  you were empowered to make that choice, without needing
21  approval from the Secretary, is that what you mean?
22  A.  That's correct.
23  Q.  Now --
24  A.  In other words, it wasn't a 4(c).
25  Q.  In reaching that decision, you did -- I assume

1  what you always do, you reviewed the action memo in its
2  entirety, right?
3  A.  Yes, actually it was proposed to me -- I believe
4  if it would have come to me, it would have been from
5  the, um, Deputy Assistant Secretary for Visa Services,
6  um, Stuart Wilson.
7  Q.  That's right, Stuart Wilson is the person who
8  issued this action memo to you, correct?
9  A.  Yes, the, um -- I believe so.  I mean I'm -- yes,
10  that would make sense.
11  Q.  Do you have access to the action memo, sir?
12      MS. SANTORA:  Um, I am looking for it.
13      MS. CONLON:  I understand that it's on your
14  screen, Ms. Santora, we've shared it with you.  So
15  perhaps you can --
16      MS. SANTORA:  Oh, it is, okay.  It's on the
17  witness's screen, yes.
18  A.  Thank you.  Exhibit EY, yes?
19  Q.  Yes.
20      Now this memo reflects, on Page 1, that HSI
21  initially identified Ms. Ozturk as deportable
22  potentially under 4(c), the foreign policy provision,
23  right?
24  A.  Wait a minute.  Yes, in the background.
25  Q.  Yes, exactly.  Do you see that?

1  A.  Yes, and I see I underlined that.  Those are my
2  notes.
3  Q.  Yes, I understand, but I also understand that the
4  Court has determined that your notes are protected by a
5  privilege, so I am not going to ask you about any of
6  them, um -- I'll leave that there.
7  Q.  Now on the second page of the memo, it gets into
8  the factual basis for the proposed action, um, in that
9  big middle paragraph.  Do you see that paragraph, it's
10  the middle, the paragraph on the middle of 2?
11  A.  (Looks.)  Yes, the one that begins "Ozturk was
12  issued an F-1 Visa on December 14th, 2020, valid until
13  December 9th, 2025."  Yes?
14  Q.  Yes.  Now there are various factual allegations in
15  this paragraph compiled by HSI, correct?
16  A.  There's information from HSI, yes.
17  Q.  Now I'm not going to get into the specifics, but
18  it's fair to say, because you have this in front of you,
19  that this memo considered whether or not she had engaged
20  in antisemitic activity, right, is that a fair
21  characterization?
22  A.  Just a moment.
23  Q.  Sure.
24  A.  (Looks.)  Antisemitic activity was part of it.
25  I'm reading it.  I see that "S. Wilson noted the

1  totality of the circumstances."

2      So as I believe I stated in my deposition, and

3  have said before, we have to look at the totality of the

4  cases, something that we do with a fair amount of

5  effort.  And I think my notes, whether they're protected

6  or admissible or not, the copious amount of them

7  indicates that I looked at this with a fair amount of

8  effort and actually thought about the decision before

9  making it.

10      As a matter of fact, exceptionally, for all the

11  paper I go through in a week or a month or a day

12  sometimes, I actually remember taking some of these

13  notes.  I thought long and hard about Ms. Ozturk's case.

14      MS. CONLON:  Your Honor --

15      THE COURT:  Wait a minute.

16      MS. CONLON:  Okay.

17      THE COURT:  It's appropriate to say that, um, I

18  think I have erred.  I don't think any deliberative

19  privilege applies to ones notes to themself, and they

20  reflect precisely what the witness has testified, and I

21  now vacate the order as to these, Mr. Armstrong's notes,

22  on the memo to him, as to which he made the decision.

23      Go ahead.

24  Q.   Now these notes indicate, in that bottom

25  paragraph, the first line, you wrote the words "actions

---

1      The rest of the paragraph --

2  A.   I would -- yeah, I would point out that she had a

3  connection with this banned student organization.

4  Q.   Now you say she had a connection, but what the

5  report to you actually says is that the report from HSI

6  implies a connection between her and a now-banned

7  student group.  And if you look at the paragraph above

8  that, that implied connection is that she co-wrote an

9  Op-Ed where she agreed with the proposal that had also

10  been agreed to by that student group, isn't that

11  correct, that that's the activity with the connection?

12  A.   No, that is not the connection.  They said clearly

13  there's a connection, and the connection is not just the

14  Op-Ed in my understanding.

15  Q.   But your understanding was only based on this

16  action memo, right, you don't have independent knowledge

17  about Ms. Ozturk's activities apart from what was

18  presented to you here?

19  A.   My decision was based on the action memo, that is

20  correct.

21  Q.   And it goes on to say that the report presents no

22  evidence other than her membership in a group, which

23  notably is not the group that was banned, but a group

24  that supported a proposal by a banned group, it said it

25  had no evidence other than that, of her connection,

---

1  not words," concerning Ms. Ozturk, correct?

2  A.   Yes, that is my handwriting.  And the emphasis on

3  that was that it wasn't just her statements, it was

4  things that she did.

5  Q.   Yes, now that is exactly what I want to talk to

6  you about.  That whole sentence states, "While Ozturk

7  has been involved with actions, protesting Tufts'

8  relationship with Israel, DHS, ICE, HSI, has not however

9  provided any evidence showing that Ozturk has engaged in

10  any antisemitic activity or made any public statements

11  indicating support for a terrorist organization or

12  antisemitism generally."

13      What this sentence describes are things she did

14  not do, correct, actions she did not take?

15      THE COURT:  Well it says what it says.  But go

16  ahead with your question.

17  A.   I would read it with the whole paragraph, things

18  taken out of context do not reflect the totality of

19  complicated cases, which this was a complicated case, as

20  the amount of my notes indicate.

21  Q.   Now the whole --

22  A.   The next thing her --

23  Q.   I'm sorry, I'm going to walk you through the whole

24  paragraph, so don't worry, we're not going to ignore the

25  rest of it.

---

1  right?  That's all there was?

2      MS. SANTORA:  Objection.

3      THE COURT:  No overruled.  The question is

4  leading, um, strongly leading, but it's appropriate.

5  A.   (Pause.)  Is the question that you are asserting

6  that the only evidence was that she belonged to an

7  organization that was a satellite or an ally of another

8  organization, yes?

9  Q.   A "satellite"?

10  A.   Or associated with another organization.

11  Q.   Yes, I guess that is my question.  The activity

12  that was the basis for your reaction here, I just want

13  to make sure I understand, because I agree your notes

14  are important.

15      There seem to me to be two actions here described.

16  One, is her writing of an Op-Ed, that is a supposed

17  action.  Two, what's treated here, it seems as an

18  action, is that she was part of a group that in the

19  Op-Ed supported a proposal of another group.  So some

20  sort of attenuated affiliation with this other group.

21      Am I understanding that correctly?

22      MS. SANTORA:  Objection.

23      THE COURT:  No, the objection is made, but

24  overruled.

25  A.   I'm sorry, there's too many talking at me at once.

```
1   I'm trying to focus on this.  I'm really trying to
2   answer the question.
3       THE COURT:  I don't doubt it, sir.  Let me try it.
4       As you looked at this paragraph and evaluated it
5   and the totality of the circumstances, is it correct
6   that you, um, considered or were considering at least
7   two actions, and I'll name them.  One, is the writing of
8   the Op-Ed.  And the second is the, um, affiliation with
9   the group that sponsored the Op-Ed, which, um, had,
10  you're inferring from this, a connection with the
11  now-banned student group.
12      Have I got that right?
13      THE WITNESS:  Okay.  In reviewing it, the key
14  thing is looking -- and as I recall it, and based on my
15  notes, the key thing that made -- was key in my
16  decision, were her actions.  The, one, actions of
17  protesting Tufts' relationship with Israel.  Secondly,
18  her activities and associations, which are not speech.
19  Activity and associations with these groups may
20  undermine foreign policy by creating a hostile
21  environment for Jewish students in indicating support
22  for a designated terrorist organization.  Those were the
23  key things.  Her activities and associations creating a
24  hostile environment for Jewish students and indicating
25  support for a designated terrorist organization.  And
```

```
1   then the actions of protesting against Israel.
2       THE COURT:  Go from there, Ms. Conlon.
3   Q.  It's fair to say that the Op-Ed that she wrote is
4   also being construed as an action here?
5       MS. SANTORA:  Objection.
6       THE COURT:  Overruled.
7   A.  If it's in a -- it wasn't the key factor.
8   Q.  Can you please answer the question.
9   A.  Sure, it wasn't a key factor.  If writing -- I
10  suppose one could consider that an action.  I think it
11  was more indicative of her motivation in her activities,
12  in her associations and in her activities to create a
13  hostile environment for Jewish students.  And I also
14  noted that the Tufts -- and its underlined, "images of
15  weapons."  Tufts Students for Justice in Palestine was
16  placed in suspension, the organization she was
17  associated with.
18  Q.  Right, associated in your view, because she
19  supported a proposal of another organization that this
20  organization also agreed with.  You agree with me this
21  doesn't say she was a part of the group that you've just
22  described?
23      THE COURT:  Too long.  Start another question.
24  Q.  Mr. Armstrong, this memo found that there were not
25  grounds under the foreign policy provision, correct,
```

```
1   that that was not presented here?
2   A.     Just one moment.  I believe so, yes, because we
3   didn't use that provision, which would have required the
4   -- also the approval of the Secretary of State.
5   Q.  And just so the record is --
6   A.  Yes, I think that's -- yes, a short answer is,
7   yes, the foreign policy grounds did not apply.  Of
8   course if the Secretary of State were to determine that,
9   then a different story.  But we didn't believe -- Deputy
10  Assistant Secretary Wilson did not believe that they
11  applied.
12  Q.  And just so the record is clear, whatever you've
13  said about her alleged affiliation with that group, this
14  action memo says that there was no evidence that she was
15  involved in any of the activities of the suspended
16  group.  It says that very clearly.  Do you see that?
17  It's the bottom of the second page, the top of the
18  third.
19  A.     It says "any antisemitic activity or public
20  statements indicating a support for a terrorist
21  organization, or antisemitism generally."  That's what
22  it says.
23  Q.  Sir --
24  A.  She was clearly involved with the Palestine -- I'm
25  sorry, the Tufts Students for Justice in Palestine.
```

```
1   Q.    Okay, just so we're really clear here, because I
2   really don't think she deserves to be besmirched
3   further, it says --
4       THE COURT:  Just a moment.  That's inappropriate.
5   All you do is ask questions.
6       Are we very clear on that, Ms. Conlon?
7       MS. CONLON:  Yes, your Honor.
8       THE COURT:  All right.  It's the witnesses who are
9   testifying here.  And though I play a bit role, I'm the
10  one who is going to draw the inferences.  Not you.
11      Go ahead.
12  Q.  It states, quote, "Nowhere has DHS, ICE, HSI,
13  shown any evidence that Ozturk was involved in any of
14  the activities which resulted in TJSP's being suspended
15  from Tufts," correct?
16  A.    Which paragraph are we in, please?
17  Q.  We're in the sentence at the bottom of the page
18  that rolls onto the top of the next one, that's right in
19  front of you.)
20  A.  (Looks.)  Yes, I see that.
21  Q.  So you said --
22  A.  "Nonetheless she was associated with the
23  organization, the Tufts Student for Justice in
24  Palestine.  She was against Tufts' relationship with
25  Israel.  An association is an activity.  She was
```

1  involved in the Tufts Students for Justice for Palestine
2  activity including when they had the interim suspension
3  for the use of images of weapons to promote a protest
4  rally.  You know if you know join the student intifada
5  --
6  Q.    Okay, Mr. Armstrong, we're short on time and I
7  think this memo is in evidence --
8  A.    It's sort of like saying -- I mean I don't want to
9  waste your time, ma'am, but it's sort of like saying --
10  Q.    I'm going to stop it right here, but I have one
11  question, just so I'm clear.
12        This was done under 221(i), not 4(c), correct?
13  A.    Just one moment.  I believe it was 221(i), but let
14  me look at the top of the memo.  Yes, 221(i).  Not 4(c).
15  Not 3(c).
16  Q.    And that's a provision that let's you revoke not
17  for foreign policy reasons, but for any reason?
18  A.    That is correct.
19  Q.    Or for none at all?
20  A.    There is a reason.  It's a discretion.  I treat
21  that power, as I believe all Consular Officers, and I
22  try to instill this in them, should treat it seriously.
23  A revocation is a serious decision.
24  Q.    Okay, thank you very much.
25        MS. CONLON:  Nothing further.

1        THE COURT:  And, Ms. Santora, do you have any
2  questions for this witness?
3        MS. SANTORA:  No, we don't, your Honor.
4        THE COURT:  Mr. Armstrong, thank you.  And you're
5  excused.
6        THE WITNESS:  Thank you, your Honor.
7        (Zoom ends.)
8        THE COURT:  And call the last witness.
9        MR. WANG:  Good morning, your Honor, Xiangnong
10  Wang for the plaintiffs, and the plaintiffs call Veena
11  Dubal.
12        (Interruption by Court Reporter.)
13        THE COURT:  And you did just right, but the first
14  thing you did was state your name and it seemed to come
15  from nowhere.
16        MR. WANG:  You know after two weeks, I've learned.
17        THE COURT:  So have we, sir.
18        The witness may take the stand.
19        (Take stand.)
20        (VEENA DUBAL, sworn.)
21        THE CLERK:  And can you please state your full
22  name and spell your last name for the record.
23        THE WITNESS:  Veena Dubal.  My last name is
24  D-U-B-A-L.
25

1        ***********
2        VEENA DUBAL
3        ***********
4
5  DIRECT EXAMINATION BY MR. WANG:
6  Q.    Good morning, Professor Dubal.  And the first
7  question for you, Professor, is where do you work?
8  A.    I work at the University of California, Irvine,
9  the School of Law.
10  Q.    And what do you do there?
11  A.    I'm a Professor of Law.
12  Q.    Do you have a role with the American Association
13  of University Professors?
14  A.    Yes, I am the General Counsel of the AAUP.
15  Q.    Right.  So I'm going to call that organization the
16  "AAUP," going forward, is that all right?
17  A.    Great.
18  Q.    When did you begin your role as General Counsel
19  with the AAUP?
20  A.    Um, late October, 2024.
21  Q.    And turning to the organization itself.  What is
22  the AAUP?
23  A.    So the AAUP is one of the nation's oldest
24  professional organizations, um, representing faculty,
25  um, and graduate student workers at Universities and

1  colleges in the U.S., and the goal of the organization
2  is to, um, define and protect academic freedom and
3  shared-governance principles.
4  Q.    Does the AAUP's mission encompass protecting its
5  members right to engage in speech outside of their
6  scholarly work?
7  A.    Yes, we call that "extramural speech," um, and
8  from our inception it has been central to the mission of
9  the organization.
10  Q.    And so what do you mean by "extramural speech"?
11  A.    So "extramural speech" is generally defined as
12  speech in which a speech was made as a citizen, a person
13  who makes it as a citizen, as opposed to in the context
14  of being a, um -- in the context of their expertise as a
15  researcher and a scholar.
16  Q.    And when you say as a citizen there, do you mean
17  in their personal capacity?
18  A.    In their personal capacity, yes.
19  Q.    Does that include engaging in political protests?
20  A.    Yes.
21  Q.    What about signing public protests?
22  A.    Yes.
23  Q.    Why is protecting extramural speech part of the
24  AAUP's mission?
25  A.    That's a great question.  So it was first

# EXHIBIT E



← **Post**

**Marco Rubio** ✔
@marcorubio

We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported



Immigration agents arrest Palestinian activist who helped lead Columbia University pr...

From apnews.com

6:10 PM · Mar 9, 2025 · **19.5M** Views

💬 16K        ⟲ 22K        ♡ 134K        🔖 3.5K        ↗

💬 Read 16K replies

# EXHIBIT F

TRUTH.

← **Truth Details**
4891 replies                                                                    •••



**Donald J. Trump** ✔ ⊞
@realDonaldTrump

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

**11.3k** ReTruths   **49.8k** Likes                          Mar 10, 2025, 1:05 PM

💬        ⇄        ♡        🔖        ↥

# EXHIBIT G

OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions

By Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis
Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.

_____

# EXHIBIT H



← **Post**

 **Tricia McLaughlin** ✔
@TriciaOhio

If you are in this country on a visa, green card or otherwise, you are a guest.

Act like it.

If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked.

> **Eden Yadegar** ✔ @edenyadegar · May 7
> RIGHT NOW AT COLUMBIA: Masked anti-Israel students just broke into the library during finals week.
>
> Columbia Public Safety unsuccessfully attempted to stop them.
>
> 
> 0:17

10:26 AM · May 8, 2025 · **54.1K** Views

💬 59        ⟲ 178        ♡ 772        🔖 16        ⬆

💬 Read 59 replies

# EXHIBIT I



# OUR MISSION

Canary Mission documents individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond. Canary Mission investigates hatred across the entire political spectrum, including the far right, far left and anti-Israel activists.

Canary Mission is motivated by a desire to combat the rise in anti-Semitism on college campuses. We pursue our mission by presenting the words and deeds of individuals and organizations that engage in anti-Semitism, racism and bigotry on the far right, far left and among the array of organizations that comprise the anti-Semitic Boycott, Divestment, Sanctions (BDS) movement.

Canary Mission gathers content from publicly available sources. Additionally, we collect and validate materials submitted privately through our website. We aggregate this information into a concise and easily searchable format, providing free access to the general public.

Before publication, all content is verified, meeting our high standards of accuracy and authenticity.

When published content is based on validated information submitted privately, a note indicating this is placed on the page.

The addition of individuals to our database is governed by our Ethics Policy .

Individuals who believe that they should be removed from the Canary Mission website are encouraged to be in touch with us and may become an Ex-Canary.

By shining a light on hate groups and their members, the public is better informed about bigotry on their campuses and in their communities. Canary Mission believes that we all have the right to know if an individual has been affiliated with movements that routinely engage in anti-Semitic rhetoric and actions, promote hatred of Jews and seek the destruction of Israel.

 



HOME                          ORGANIZATIONS

OUR MISSION                   EX-CANARY

ETHICS POLICY                 BLOG

CONTACT US                    CAMPAIGNS

STUDENTS                      CANADA

PROFESSORS

PROFESSIONALS

MEDICAL

Copyright © 2025 Canary Mission Inc.
All rights reserved.