# EXHIBIT J

1       UNITED STATES DISTRICT COURT

2       DISTRICT OF MASSACHUSETTS (Boston)

3              No. 1:25-cv-10685-WGY
               Volume 2, Page 78 to 121

4

5  AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,

6            Plaintiffs

7  vs.

8

9  MARCO RUBIO, in his official capacity as
   Secretary of State, et al,

10            Defendants

11

12                *********

13

14          For Bench Trial Before:
            Judge William G. Young

15

16

17          United States District Court
            District of Massachusetts (Boston.)

18          One Courthouse Way
            Boston, Massachusetts 02210

19          Wednesday, July 9, 2025

20                ********

21

22      REPORTER: RICHARD H. ROMANOW, RPR

23          Official Court Reporter
            United States District Court

24  One Courthouse Way, Room 5510, Boston, MA 02210

25              rhr3tubas@aol.com

---

1          A P P E A R A N C E S

2

3  RAMYA KRISHNAN, ESQ.
   CAROLINE DeCELL, ESQ.

4  ALEXANDER ABDO, ESQ.
   SCOTT B. WILKENS, ESQ.

5  ALEXANDRA CONLON, ESQ.
      Knight First Amendment Institute at Columbia

6      University
       475 Riverside Drive, Suite 302

7      New York, NY 10115
       (646) 745-8500

8      E-mail: Ramya.krishnan@knightcolumbia.org
   and

9  COURTNEY GANS, ESQ.
   NOAM BIALE, ESQ.

10     Sher Tremonte LLP
       90 Broad Street, 23rd Floor

11     New York, NY 10004
       (212) 540-0675

12     Email: Cgans@shertremonte.com
       For Plaintiffs

13

14  ETHAN B. KANTER, ESQ.
    WILLIAM KANELLIS, ESQ.

15  VICTORIA M. SANTORA, ESQ.
    JESSICA STROKUS, ESQ.

16     DOJ-Civ
       P.O. 878

17     Ben Franklin Station
       Washington, DC 20044

18     (202) 616-9123
       Email: Ethan.kanter@usdoj.gov

19  and
    SHAWNA YEN, ESQ.

20     United States Attorney's Office
       1 Courthouse Way, Suite 9200

21     Boston, MA 02210
       Email: Shawna.yen@usdoj.gov

22     For Defendants

23

24

25

---

1              I N D E X

2

3  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

4

5  PETER HATCH  (Continued.)

6   By Ms. Conlon          12

7   By Ms. Strokus

8

9

10

11           E X H I B I T S

12            (None marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1          P R O C E E D I N G S

2       (Resumed, 11:00 a.m.)

3       THE COURT:  All right.  We'll start with this

4  issue which Ms. Strokus characterizes as a "percolating

5  issue."

6       But, Mr. Kanellis --

7       MR. KANTER:  Mr. Kanter, your Honor.

8       THE COURT:  Mr. Kanter.  I'm sorry.  And I have

9  read your briefs, and I am appreciative about them, and

10  in at least one respect I do reconsider my order.  And

11  let me say I appreciate the careful way you have, um,

12  suggested redactions in the subset of materials.  And

13  you're absolutely right in at least two respects.

14  There's no reason to disclose e-mails or cell phones,

15  you can redact those.

16       I guess I do want to say one other thing.  I don't

17  understand why you're objecting so vigorously to this

18  subset?  And I'll tell you why.

19       What I get from this -- the whole exercise is

20  trying to persuade me, is this shows officers of the

21  government -- some are attorneys, actually seeking to

22  follow the law, to bring the conduct of enforcement

23  agents and the like, in accordance with the law.  And it

24  reveals the process that they went through to follow the

25  law.  That's what I get about it.  And that's really

```
1   what drew my interest.  There's a larger group of
2   material, but that's what drew my interest to this
3   subset.  I'll say no more.
4       Why shouldn't I, um, subject to the protective
5   order that it's used, "Just for the purposes of this
6   litigation.  It's not to be spread around.  We'll see if
7   any of it gets in evidence."  I'll hear you.
8       MR. KANTER:  Thank you, your Honor.
9       I will start with one clarification in light of
10  the examination that is, um, we're in the middle of, and
11  that was the reference to the so-called "ROAs," "Reports
12  Of Analysis," and Ms. Conlon can correct me, I thought I
13  heard, um, her to say that some of the ROAs are in the
14  subset.  They are not.
15      MS. CONLON:  And I stood up to say exactly that.
16  I wanted to indicate to the Court that I think I made a
17  mistake.
18      THE COURT:  Okay, so we're not talking about that.
19      MR. KANTER:  I just want to --
20      THE COURT:  Go ahead, as to the materials I have
21  here.
22      MR. KANTER:  To begin with and that I think as
23  the -- and that three of the documents in the subset --
24  this is the thing.  There were two in-camera
25  submissions.  The third, we explained the confusion
```

```
1   there, which had to do with merely, you know -- the
2   first in-camera submission was redacted and we provided
3   it to the plaintiffs, it's been the subject of the
4   plaintiffs' motion to compel, which your Honor decided
5   in the government's favor, denying the plaintiffs'
6   motion to compel.
7       So the point regarding the subset that I wanted to
8   make was that the first document in the subset and the
9   last two were part of what was litigated in that motion
10  to compel.  That's the only sort of point of
11  clarification.  Because, um, the documents in the subset
12  straddled the two submissions.
13      THE COURT:  Understood.  All right.  I don't want
14  to take up your time.
15      MR. KANTER:  Yes.
16      THE COURT:  But let me say this.  On this issue,
17  and indeed throughout the litigation I've made it clear,
18  that I'm not impugning in any way the good faith of
19  counsel for the defense, or of the plaintiffs.  All
20  right?  Trials are living things.  Now -- it's one thing
21  in the run-up to a trial, you're ruling on discovery
22  motions, but now it's put to me.  I am the factfinder
23  here.  I take that with extraordinary seriousness.
24      And so now -- though in a jury-waived case I'm
25  perfectly able to look at something and say -- for
```

```
1   instance, I've adhered to the enhanced Visa scrutiny.  I
2   think "Well that's national security, put that out,"
3   we're dealing with people who at one time we invited in
4   and we gave them Visas, green cards, and the like, and
5   that's what I'm looking at.  And that's the class, if I
6   think of it as a class, the class of people who these
7   lawyers represent.
8       So putting that to one side, I look at the rest of
9   it, some of it's interesting to me.  And I'm not judging
10  anything, I'm simply telling you why it's interesting to
11  me.
12      MR. KANTER:  Your Honor, I take your point --
13      THE COURT:  So you tell me why I should put it
14  aside and not have it part of the record.
15      MR. KANTER:  Exactly.  I will offer this up.  That
16  it is a difficult calculus that often the law
17  enforcement, um, officers and investigators, and so
18  forth, are confronted with.
19      THE COURT:  Except where's the government if I
20  reveal any of it?
21      MR. KANTER:  We represent the defendant agencies.
22      THE COURT:  Correct.
23      MR. KANTER:  And those agencies reviewed these
24  documents carefully, at multiple levels, and it's --
25  it's a question.  As your Honor pointed out, there are
```

```
1   instances in which the government may choose to -- not
2   with waiving a privilege, but nevertheless turn
3   something over.  And in the case we have decided that
4   certain materials will only be shown attorneys' eyes
5   only.  That is an ongoing discussion and consideration.
6       But I take the point your Honor is making, which
7   is we're saying this goes to the matters at issue in the
8   factfinding of the Court.  And you're asking why is it
9   that the government would stand on its privileges with
10  respect to some of that information?  I take that point.
11  I will take it back to the agencies.  And -- but, you
12  know, we, um, we want to represent the agencies, extend
13  the privileges that are theirs to assert.  And, um --
14      THE COURT:  All right, here's what we're going to
15  do.  Now -- you go ahead and do that, but -- and I'll
16  take responsibility.
17      By 5:00 this afternoon, redact -- if I've missed
18  any, all cell phone numbers, all e-mail addresses, and
19  otherwise turn it over.  Subject to a complete call-back
20  if the agency -- because the question is am I going to
21  have it as part of the record or not?  It's attorneys'
22  eyes only, it's used for the purposes of this
23  litigation.  That's the order.  Let's call the witness
24  back and we'll run till 12:00.
25      MR. KANTER:  I take the order, I'm not challenging
```

87

```
1   it --
2         THE COURT:  Feel free in the appropriate way.
3         MR. KANTER:  A point of information, which is we
4   have redacted and we've shown the Court our redactions
5   with respect to what you just referenced.  Already it is
6   before your Honor.  And secondly, to the extent that
7   your Honor is proposing to turn over material that is
8   outside those redactions, we would request a stay of the
9   ruling so the Solicitor General can decide whether or
10  not to seek mandates.  But I don't understand your Honor
11  to be turning over material that we have redacted.
12        THE COURT:  Wait a minute.  Wait a minute.  I
13  just -- I just -- yes, and I've made --
14        MR. KANTER:  We provided redactions.
15        THE COURT:  I know you have, and I've sustained so
16  much of them as, um -- excuse me.  I've sustained so
17  much of them as excised cell phone and e-mail addresses.
18  You're going to have to do it again, because as to the
19  rest of it, I overrule it.  Now you make a motion to
20  stay --
21        MR. KANTER:  I make a motion to stay.
22        THE COURT:  Of course, which is your right.  I
23  allow the motion until 9:00 tomorrow morning.  You will
24  then turn it over unless there is a stay from some court
25  of competent jurisdiction.  I have the obligation to try
```

88

```
1         I have urged cooperation in significant respects,
2   though I don't challenge anyone's good faith, there has
3   not been cooperation.  I need to get through the trial.
4   The parties are benefitted if I get through the trial.
5   Now let's get the witness in here.
6         (Pause.)
7         THE COURT:  Where'd he go?
8         MS. SANTORA:  Your Honor, Victoria Santora for the
9   defendants.  If I may?  We were not able to respond to
10  the motion to compel, but I do just want to note that as
11  plaintiffs --
12        THE COURT:  You just won it?
13        MS. SANTORA:  So I did -- just to the extent that
14  you said that you will consider the witness's conduct in
15  not appearing at trial, I do want to note that it was a
16  logistical issue more on the part of the attorneys than
17  on the witness.
18        THE COURT:  Then it could be worked out rather
19  than having to make motions.  You know we have days.  We
20  have a weekend here.
21        MS. SANTORA:  I agree, your Honor.  And we are
22  willing to cooperate with opposing counsel.
23        THE COURT:  I expect it.  And that's helpful.
24  Thank you, Ms. Santora.
25        What happened to -- usually when we have a jury
```

89

```
1   this case and there's exigencies in moving through the
2   case.  That's the order of the Court.
3         All right.
4         MR. WILKENS:  Your Honor, may I be briefly heard
5   for the plaintiffs?  Scott Wilkens.
6         THE COURT:  Well I don't think you'll be part of
7   it, but, Mr. Wilkens, we've got a witness coming in, but
8   it's always a pleasure for you to fill the time.
9         (Pause.)
10        MR. WILKENS:  I will sit down, your Honor.  Thank
11  you.
12        THE COURT:  Well there's no need, I spoke
13  seriously.
14        Yes, Mr. Biale?
15        MR. BIALE:  Your Honor, briefly there's another
16  issue.
17        We have a lawyer who went down to New York for the
18  deposition that was --
19        THE COURT:  Oh, I know.  That's right.
20        You know I'm troubled by this nonproduction of
21  witnesses.  I sense some gamesmanship here.  Having said
22  that, I'm not going to compel his attendance.  It bears
23  on the Court's assessment of these witnesses when he's
24  called upon to testify.  Believe me, it bears on it that
25  he was not produced against this background.
```

```
1   and we have sequestered witnesses and they don't come
2   when you call them, I tell stories about the courtroom
3   to the jury.
4         MS. CONLON:  We'll hear your stories, your Honor.
5         THE COURT:  No, here he is.
6         (Mr. Hatch, the witness, enters courtroom.)
7         THE COURT:  And, Ms. Conlon, you may continue.
8         MS. CONLON:  Thank you, your Honor.
9
10  DIRECT EXAMINATION BY MS. CONLON:  (Continued.)
11  Q.  Okay, Mr. Hatch, before the break you were
12  describing for the Court, um, the instructions that you
13  received at the March meeting with HSA leadership
14  concerning student protestors.  One of the things you
15  said was that you were directed, um, to review and
16  analyze whether any of the student protestors had, for
17  example, supported terrorist organizations.
18        Did anybody specify Hamas in particular in the
19  meeting?
20  A.  I don't --
21        MS. STROKUS:  Objection, your Honor, to the extent
22  it calls for the deliberative process in the discussions
23  in the meeting.
24        THE COURT:  Oh, actually, Ms. Strokus, you're
25  right, you must ask were any of the directions relative
```

1  to Hamas?
2       MS. CONLON:  Yes, I will rephrase it.
3       THE COURT:  (To the witness.)  Do you see the
4  line?  Not the discussions, but the directions about
5  what you were going to do.
6       Did anyone mention that you were, among other
7  things, going to take a look at Hamas or pro-Hamas
8  activity?
9       THE WITNESS:  Um, yes, we -- the -- supporting
10  Hamas would be, um, relative to a violation of law.  So
11  it would be standard practice for an analyst to that
12  anyway.  However, um, my direction to the team, um, was
13  to look for, um -- as an example, to look for Hamas, any
14  statements in support of Hamas, or any activities.
15       THE COURT:  And a question for me.
16       Hamas was a designated terrorist organization well
17  before January 20th of this year, correct?
18       THE WITNESS:  Yes, your Honor, that's correct.
19       THE COURT:  All right.
20       Go ahead, Ms. Conlon.
21       MS. CONLON:  Thank you.
22  Q.  You were just talking about the directions that you
23  gave to others, but I want to bring it back to the
24  directions you received from HSI leadership before we
25  discuss what you may have directed others to do.  So

1  from my supervisors to, um, focus directly and solely on
2  Hamas.
3  Q.  Do you recall receiving any direction to focus on
4  any particular foreign terrorist organization?
5  A.  I recall receiving direction to focus on violations
6  of the U.S. law.  I don't -- I don't recall any
7  instruction to me specifically to Hamas.
8  Q.  Well earlier when you were answering the Court's
9  questions about the instructions you received, you give
10  certain examples of the kind of things that the Office
11  of Intelligence was supposed to be on the lookout for.
12  And your examples, as I recall, included inciting
13  violence, supporting terrorist organizations, etc.
14       But it's true that the direction was actually
15  broader, it was to look for any potential violations of
16  Title VIII, correct?
17  A.  Yes, any violations of U.S. law.
18  Q.  Including Title VIII?
19  A.  Our organization specializes in immigration and
20  customs law.
21  Q.  And the examples you were giving were examples that
22  might be particularly relevant to the review of a
23  student protester's conduct, is that correct?
24  A.  Yes.  You're asking me to speculate and those are
25  the ones that would be -- those are the ones that I can

1  sticking with what you were directed to do as a result
2  of this meeting.
3       Were you specifically directed to look at whether
4  student protesters supported Hamas as opposed to just
5  all foreign terrorist organizations, was there any
6  specific direction concerning Hamas?
7  A.  I don't recall receiving any specific direction to
8  me to look at Hamas.
9  Q.  You don't recall anything in the meeting about
10  student protestors resulting in direction to review
11  whether the student protestors expressed support for
12  Hamas?
13       MS. STROKUS:  Objection, your Honor, deliberative
14  process privilege.  He's asking about --
15       THE COURT:  Please.  Please.  I'm not a fan of
16  speaking objections.  It's sufficient, and I think it is
17  your right, to say "Objection, deliberative process
18  privilege."  That calls into mind what we're talking
19  about.  If I need argument, I'll ask for it.
20       This is directions.  It's limited to directions.
21       And do you understand the question?
22       THE WITNESS:  Yes, but I think, um, counsel
23  rephrased the question from one to the other.
24       THE COURT:  Go ahead.
25  A.  So I do not recall receiving any specific direction

1  think of that would be relevant right now.
2  Q.  Well you are an authority here, so I'm happy to have
3  your understanding of it.
4       Now when you say "supporting terrorist
5  organizations," in this context, were you given any
6  direction about what "supporting" means here for the
7  work of the Office of Intelligence?
8  A.  I was not.
9       THE COURT:  From something you said earlier, I got
10  the sense, but let's see if I heard it right.  And
11  thereafter you carried out that mission, but you carried
12  it out in your usual way?
13       THE WITNESS:  Yes, sir.
14  Q.  What kind of evidence does the Office of
15  Intelligence look for as indicative potentially that a
16  noncitizen supports a foreign terrorist organization?
17  Can you -- I'm trying to understand what you mean when
18  you say "supporting a terrorist organization"?
19       MS. STROKUS:  Objection, your Honor.
20       THE COURT:  Yeah, sustained.
21  Q.  What does "supporting a terrorist organization" mean
22  when you say it?
23  A.  (Pause.)  Again the analyst looks for indicators,
24  does not make the judgment on whether the activity
25  actually supports or doesn't support terrorism.  So we

1  look for activities, um, such as, um, support for a
2  terrorist -- statements in support of a terrorist
3  leader, um, everything from that to material support,
4  which would be providing money to a terrorist
5  organization or making, um, donations to an organization
6  that's affiliated with a terrorist organization.  But I
7  really don't want to say any more detail than that.
8      THE COURT:  And that's perfectly acceptable to the
9  Court.  Let me give you this example.
10     If you find out that a person was saying, um,
11  statements like this, "Hamas is right, what Hamas is
12  doing is right for the situation, or for the Middle
13  East, or just right."  And I'll stop there.
14     How does that fit or doesn't it?
15     THE WITNESS:  Yes.  In that example, the analyst
16  would be, um, within policy to include that statement,
17  because again the analyst is just collecting the facts.
18     THE COURT:  Right.
19     THE WITNESS:  If the person actually didn't say
20  that or someone alleged they say that and the analyst
21  found out that they didn't say that, then they would
22  write the facts and not the allegations.  So it's just
23  factfinding.
24     If they, um, made a statement in support of the
25  Yankees, the analyst wouldn't put it in there because

1  including that in the Report Of Analysis.  And it isn't
2  the, um, the presence or existence of a Report of
3  Analysis does not presume guilt or innocence, it's just
4  factfinding.
5  Q.  Okay.  So it's fair to say the analyst's job is to
6  include whatever facts could be relevant to a
7  determination that a person, um, act contrary to U.S.
8  law and that could include the person's speech, correct?
9  A.  That's correct.  It includes all kinds of
10 activities.
11 Q.  Now, um, this -- back to the March meeting -- we'll
12 move on from it momentarily, but back to this March
13 meeting where you received this guidance to produce
14 these reports.
15     A team was formed to carry out that line of
16 effort, correct?
17 A.  I don't believe the team was formed during that
18 meeting, I think the team was formed after that meeting,
19 maybe a week after, several days after.  I don't know
20 the exact timeframe.
21 Q.  And for our ease of reference here, that team's
22 nickname was the Tiger Team?
23 A.  It was called the "Tiger Team," yes.
24 Q.  And the Tiger Team included senior officials
25 carrying out this line of effort?

1  it's not related to a national security or public safety
2  issue.  Although in the case of the Yankees, it might
3  be.
4  Q.  Are you a Nationals' fan?
5  A.  I'm a Red Sox fan.
6  Q.  Oh, then you're in the right place.
7      So the Court gave you an example of a statement
8  that say, for example, "Hamas is right," that could be
9  relevant to, um, an analyst's compiling of a report of
10 analysis about a student protester.
11     Could a statement like "Free Palestinian" be
12 similarly relevant?
13 A.  Again all of these are on a case-by-case basis.  But
14 it could be, depending on the circumstances of that
15 individual.  But as long as that statement was factual
16 and we could corroborate that it was made by the
17 individual under the circumstances described.
18 Q.  And just to understand the flip side of it.  Could a
19 statement condemning the actions or the existence of
20 Israel still be relevant to a report of an analyst in
21 the same way?
22 A.  Again, it depends on the circumstances of the
23 individual.  It depends on the individual circumstances.
24 But the analyst would -- as long as that statement is
25 factual, the analyst would not be against policy in

1  A.  The Tiger Team consisted of not senior officials, it
2  consisted of analysts, an agent, um, and led by the unit
3  chief you mentioned earlier, Roy Stanley.  He was not
4  the unit chief at the time -- he was not the division
5  chief at the time, he was the unit chief.
6  Q.  Were you part of the Tiger Team?
7  A.  No, I was not part of the Tiger Team.
8  Q.  Who, um, briefed you on the progress of the Tiger
9  Team?
10 A.  Um, the unit chief, often through my deputy Brad
11 Edder, was the one briefing me on the activities, or the
12 progress of the Tiger Team.
13 Q.  Now the Tiger Team, which was formed shortly after
14 this March, um, meeting had rolling discussions over the
15 following days about its work, right?
16 A.  I believe they had daily discussions.
17 Q.  "Daily," you said?
18 A.  Within the team, you're asking me about discussions
19 within the team?
20 Q.  Actually, um, now understanding you're not a part of
21 the team, I'm interested in your contact with the team.
22     So how often did you speak with the team?
23 A.  I did not speak with the team as a group, I spoke
24 with the team leader maybe once a day on all issues, not
25 just, um, the team's issues, and specifically with the

99

```
 1   team, um, I mean over the last -- over -- maybe
 2   initially once a day.  But after weeks, when the team
 3   was home, maybe every other day, um, three times a week
 4   maybe.
 5   Q.  And the team itself, so far as you knew, did its
 6   work on a daily basis, right?
 7   A.  Yes.
 8   Q.  When you had discussions with senior leadership
 9   about the work of the Tiger Team, those discussions
10   included the people you mentioned earlier, Derrick
11   Gordon, Robert Handler, William Walker, Roy Stanley, is
12   that right?
13   A.  Yes.
14   Q.  Okay.  So I want to talk about the Tiger Team's
15   process for this line of effort.
16        The Tiger Team was -- well, withdrawn.
17        At the March meeting, I understand that a
18   procedure to expedite this work was set up, and I'm
19   thinking of what you said in your deposition, in
20   particular that the Office of Intelligence would do the
21   factfinding, the National Security Division of Homeland
22   Security Investigations would compile the information in
23   a letter to the State Department, and the State
24   Department would make the decision on what action to
25   take.
```

```
 1        Is that a fair summary of the process that emerged
 2   as a result of this meeting?
 3   A.  Yes, that's a fair summary of the three steps.
 4   Q.  Okay.  Now you have said, a couple of times, that
 5   Reports Of Analysis that the Office of Intelligence
 6   created did not have a recommendation of actions to
 7   take, right?
 8   A.  That's correct.
 9   Q.  The recommendations for any actions to take it
10   overlaid when the Report Of Analysis goes from the
11   Office of Intelligence to the National Security
12   Division, correct?
13   A.  The National Security Division is the first step in
14   the decision-making process on making judgments or
15   assessments of the facts collected in the ROA.
16   Q.  And it's your understanding that the National
17   Security Division is the next
18   appropriate step in a letter that the National Security
19   Division sends to the State Department, correct?
20        MS. STROKUS:  Objection, your Honor, this calls
21   for speculation.  He does not work in the National
22   Security --
23        THE COURT:  Well we'll see if he knows, whether he
24   worked there or not.
25        Is that correct?
```

100

```
 1        THE WITNESS:  That is the description of the
 2   process.  How the mechanics worked and how it was
 3   conveyed to the State Department?  I don't know the
 4   details of that.
 5   Q.  Well we talked in your deposition, right, about how
 6   the National Security Division would send a letter to
 7   the Department of State called a "DHS referral."  Do you
 8   remember that?
 9   A.  Yes, only because you showed me -- I did not know it
10   was even called a "DHS referral."  I just knew it as the
11   National Security Division's letter.
12   Q.  Okay.  So from your perspective, the way it works
13   is, your Office of Intelligence gives the report to
14   the National Security Division, and that division, which
15   is led by Andre Watson, gives a letter, we'll call it
16   the "DHS letter," to, um, the State Department?
17   A.  That's how I understand it.
18   Q.  Okay.  Now the first instance of a recommendation
19   being made by anyone in the chain of decision-makers
20   occurs in that step that the National Security Division
21   takes, correct?
22   A.  Yes, that's not made in the Office of Intelligence.
23   Q.  And I mention this, but just for clarity.
24        The head of the National Security Division is
25   Andre Watson, is that right?
```

101

```
 1   A.  That's correct.
 2   Q.  And he is the person who sends the letters that come
 3   from the Office of Intelligence -- or I'm sorry,
 4   withdrawn, and strike that.
 5        He's the person who sends the letter from the
 6   Department of Homeland Security to the Department of
 7   State conveying both the ROA produced by the Office of
 8   Intelligence and the letter from the Department of
 9   Homeland Security, correct?
10   A.  He's the one who signs the letter?  I do not know
11   how it gets sent.
12   Q.  Yes, a good distinction.  He's the signer.  We don't
13   know who the sender is.
14        Okay.  So you understood and understand that this
15   three-step process is intended for the State Department
16   to be able to make a determination, one way or the
17   other, about whether a person's Visa, in the case of a
18   Visa holder, should be revoked, correct?
19   A.  No.
20   Q.  Okay, tell me what's wrong with that?
21   A.  I think that's -- that may -- the State Department
22   can use the ROA and the information we collect in
23   whatever way they need to to make decisions related to
24   the State Department.  I think Visa revocations is one
25   way they may use it.  But it may not be the only way.
```

```
1   Q.  Okay.  Are you talking right now about how it
2   generally works or how it worked in this 3-step process
3   on student protesters?
4   A.  It's my understanding that this way would include --
5   what I just said would include both of your scenarios.
6   Q.  All right.  And to be clear, what you're saying is
7   that it would be up to the State Department to determine
8   what the appropriate action was to take?
9   A.  That's correct.
10  Q.  And that could include you understood and understand
11  a Visa revocation, right?
12  A.  It could include a Visa revocation.
13  Q.  And it could include a determination that a lawful
14  permanent resident is removable, correct?
15  A.  It could anything under their authorities and I
16  believe in that case -- the example you just mentioned
17  is one of their authorities.
18  Q.  Now this process was -- the 3-step process was
19  developed in conjunction with, um, Mr. Watson, who again
20  is the head of the National Security Division, right?
21  A.  Yes, but I don't -- this process could have existed.
22  It's not a complicated process of factfinding, a letter
23  to the authoritative decision-maker.  So, um, this could
24  have been used -- like I said, Title VIII's been around
25  since the 1950s.  This process would have been possible,
```

```
1   um, would have been acceptable at any time since Title
2   VIII.
3   Q.  It may have been.  But you've been in your job for 6
4   years, and until the Tiger Team was formed and this
5   meeting occurred, you had never seen the process work
6   this way, is that right?
7   A.  That's right, since 2019, I had never seen it used.
8   Q.  And it is, as you say, a simple and sort of
9   expedient process, just three steps, but to you it was
10  new, correct?
11  A.  Yes, for me it was new.
12  Q.  Now when the State Department did act on these
13  referrals, that information traveled back to DHS,
14  correct?
15      MS. STROKUS:  Objection, your Honor, calls for
16  speculation?
17      THE COURT:  Well I don't know that he knows, but
18  we'll see.
19      If you know the answer, you may give it.
20  A.  I don't know the process for how it got back to, um
21  -- I don't know the steps it took or the pathway it took
22  to get back to HSI.
23      THE COURT:  That's his answer.
24  Q.  In this case, you were in Tiger Team discussions,
25  consistent with this process, where you understood that
```

```
1   the Tiger Team received updates on whether the State
2   Department had acted on its referrals, correct?
3   A.  Yes, I believe that through National Security
4   Division representatives, um, I believe the team knew if
5   there was an action taken.
6   Q.  An action like an arrest?
7   A.  Yes.
8   Q.  An action like detention?
9   A.  Yes.
10  Q.  Now you said earlier --
11  A.  It did not go through me.
12  Q.  Right.
13  A.  So I'm making a, um, a speculation just from what I
14  saw.  But I did not dictate the process or have
15  usability of how the mechanics worked.
16  Q.  When you say it's speculation, but it's also from
17  what you saw, referring to what you saw, you mean the
18  meetings that you heard, whether or not you led them,
19  correct?
20  A.  Well I would hear back potentially from the unit
21  chief or Brad Edder, my deputy, that there had been an
22  action taken.
23  Q.  Well it is not required that the State Department
24  let the Department of Homeland Security know that it's
25  taking an action on a referral, right?
```

```
1       MS. STROKUS:  Objection, calls for speculation.
2       THE COURT:  Sustained.  Sustained.
3   Q.  In your experience, you often do not learn whether
4   or not the State Department has acted on a referral that
5   HSI has sent, correct?
6   A.  Me personally?  No.
7   Q.  And it's your understanding that HSI often is not
8   informed of what happens to a referral that it sends to
9   the State Department, right?
10  A.  You ask me?  I'm only speaking for the Office of
11  Intell.  HSI?  You'd have to ask -- that's the
12  operational part, the investigative part, the law
13  enforcement part of the agency, not the intelligence
14  part.  So I don't have visibility in how or when or
15  under what circumstances they would or would not be
16  notified.
17  Q.  And when you say "HSI," the operations part is
18  separate from the Office of Intelligence, are you
19  referring to Mr. Watson of the National Security
20  Division?
21  A.  The National Security Division.  The other divisions
22  I mentioned in my deposition, all, um, none of them
23  report to me, um, they all report to the same deputy
24  that I do.  So, no, I don't have any authority over
25  them.  I don't have, um -- I'm not required to have
```

1  visibility of their actions.
2  Q.  Just a moment.  (Pause.)
3     It is your understanding that HSI leadership has
4  had ongoing conversations with State Department
5  employees about the student protesters, correct?
6  A.  It is my understanding that, um, HSI -- members of
7  HSI have had conversations with the Sate Department.  I
8  don't know if I'm qualified to make the determination if
9  they're ongoing or at what frequency.
10 Q.  Okay.  So this three-step simple process, um,
11 required HSI to reallocate some of its personnel, right?
12 A.  It required me to reallocate some of my analysts,
13 um, because of the workload.
14 Q.  People were moved from the Counterterrorism
15 Intelligence Unit to work on this effort, correct?
16 A.  From the Counterintelligence Unit, the
17 Counterterrorism Intelligence Unit, from the Cyber
18 Intelligence Unit, from the Global Trade Intelligence
19 Unit, from all different parts of HSI intelligence.
20 Q.  And that was, as you say, because of the workload?
21 A.  That's correct.
22 Q.  Now, um, I want to talk about that workload and what
23 it resulted in.
24    Here hours of labor were generated in response to
25 lists of names of student protesters, right?

---

1  A.  Yes, but we were working off a number of sources,
2  including lists.
3  Q.  Now you saw a number of sources, but the lists were
4  communicated to you through Derrick Gordon, correct?
5  A.  They were communicated to the leadership, including
6  through the people we mentioned before.
7  Q.  None of the student protester names came to you from
8  any source other than HSI leadership, correct?
9  A.  They always came through, um, HSI, um, yes,
10 leadership positions.  We did not get -- I did not get
11 any lists sent to me directly from anyone outside the
12 agency.
13 Q.  These names were given to you.  Were they given to
14 you in a written form or verbally?
15 A.  Again, um -- I think most of them were -- I don't
16 know how they were --
17 Q.  If you don't recall --
18 A.  I don't recall how.
19 Q.  Okay.
20 A.  And again, they usually did not go through me
21 either, they went to my deputy or to the team leader.
22 Q.  The names went from Mr. Gordon either to you or to
23 your deputy or the leader of the Tiger Team, is that
24 right?
25 A.  That's correct.

1  Q.  And actually, I understand just now, and I can
2  understand why, you don't recall how the names were
3  transmitted to you.  I'd like to see if we can refresh
4  your recollection.  So just give me one moment to see if
5  I can find something that might be useful.  (Pause.)
6     Okay, I'd like to show you -- or actually we don't
7  even need to use the screen, because you have a binder.
8  Could you just look for me at Page 88 of the transcript,
9  and would you review just Lines 15 to 22.  And when
10 you've had a moment to do that, just let me know that
11 you've done that, and then I'd like to ask you a
12 question.
13    MS. STROKUS:  Your Honor, can I request that we do
14 actually use the screen as well here for the
15 government's counsels' purpose?
16    THE COURT:  You don't have it?  Yes, that may be
17 done if it can be done.  But you may press on,
18 Ms. Conlon.
19    MS. CONLON:  I can press on.  Okay, we'll start
20 putting it up.
21    (On screen.)
22 Q.  Okay.  Does looking at Page 88 refresh your
23 recollection at all as to whether you received any names
24 and requests to generate reports from Mr. Gordon in
25 writing or orally?

---

1  A.  Yes, in my deposition I said verbal, but when you
2  asked me about it now, I was thinking about the Canary
3  list, which was over 5,000 names, and I don't think we
4  got them verbally.
5  Q.  I will turn to that in a moment.
6     THE COURT:  Wait, I'm now not understanding.  The
7  what list, um, over 5000 names?
8     THE WITNESS:  The Canary Mission list.
9     THE COURT:  Oh, the Canary Mission list had over
10 5,000 names.  So it didn't make any sense when you said
11 you got it verbally.  You mean someone said, "Here is
12 a list that the Canary Mission has put together?
13    THE WITNESS:  Yes.
14    THE COURT:  I just want to understand.
15    THE WITNESS:  Yes, sir.  And actually, um, I need
16 to correct myself, because, um, when I was answering the
17 question I was thinking of the Canary Mission list,
18 which is thousands of names, and I was thinking we would
19 not have gotten that verbally.  But actually we, um, the
20 direction was to look at the website and that was a
21 verbal direction, so.  I'm trying to recall a
22 conversation from a long time ago.
23    THE COURT:  And I'm equally trying to understand.
24 So here's what I understand.
25    Because the Canary Mission had a website, you were

1  directed to take a look at this website for leads?
2      THE WITNESS: That's correct, yes, sir.
3      THE COURT: All right.
4  Q. Okay. The direction to look at the Canary Mission
5  website for its list was given to you in the March
6  meeting that was discussed or was it given to you at
7  another time?
8  A. I don't recall when it was given to us.
9  Q. And do you recall who gave you the direction?
10 A. I don't remember who mentioned it.
11 Q. Do you recall in what setting you received the
12 direction, like a briefing, a meeting?
13 A. I don't know.
14 Q. Okay. But your understanding is that the Office of
15 Intelligence should generate Reports Of Analysis on the
16 names of persons on the Canary Mission's website lists,
17 is that correct?
18 A. That we should look at the individuals named in the
19 Canary Mission website and, um, in that process, when we
20 look at an individual and do research on an individual,
21 it is our process to do an ROA when we have relevant
22 information and activities.
23     THE COURT: So that's over 5,000 people, is that
24 right?
25     THE WITNESS: Yes, sir.

1  visible to -- or known to a lot of people. And because
2  we're one of the agencies that is responsible for
3  investigating this type of activity, as it relates to
4  immigration and customs offenses, it seemed natural that
5  we would get the list and have to review it.
6  Q. And when you say "get the list," um, is it your
7  understanding Canary Mission provided the list to
8  someone in the government?
9  A. I don't -- I don't know how we, um, got the
10 notification. I don't know who notified us that this
11 website exists. But I can say that Canary Mission is
12 not part of the U.S. government. It is not information
13 that we would take as an authoritative source or -- and
14 we did not work with the individuals who created the
15 website. I don't know who creates the website. We
16 don't have a relationship with the creators of the
17 website.
18 Q. You had never, prior to 2025, been asked to
19 specifically review people identified on the Canary
20 Mission website, right?
21 A. I did not know the Canary Mission website existed
22 until I think after March, March or later of this year.
23 Q. But you have since then seen the Canary website?
24 A. I have looked at the Canary Mission website once.
25 Q. What was the occasion that led you to look at it?

1      THE COURT: Yeah. Okay.
2      THE WITNESS: Which shows why we needed a Tiger
3  Team. A normal division, a normal unit or section or
4  group of analysts, um, operating in our normal
5  organizational construct couldn't handle that workload.
6      THE COURT: Yes. Thank you.
7  Q. And was there a particular timeframe in which the
8  Tiger Team needed to try to get through this very long
9  list?
10 A. We are an organization or an agency that, um, in a
11 world where, um, taking months to do things is not
12 acceptable. So, yeah, it -- we were not -- I was not
13 going to be allowed to say we've got 5 -- well you know
14 a small number of analysts on this, it's going to take
15 them 6 months to get through 5,000 names. I was not
16 given a deadline. But I knew from how we were organized
17 and how we worked that we needed to work through this
18 expeditiously.
19 Q. What is your understanding of why the Canary
20 Missions list was the list to use for this project?
21 A. It was one -- it was a list that made accusations
22 or, um, asserted a lot of information like, um, these
23 protesters are involved in violent activities, are
24 condoning or supporting violence, possibly even
25 terrorist organizations, and that list was, I think,

1  A. I was curious, because I had heard of it.
2  Q. Do you recall approximately how long ago that was?
3  A. Maybe March, April.
4  Q. Do you have an understanding of what Canary Mission
5  does, like, as an organization, what it is?
6  A. No, I don't have any details on what, um -- only in
7  what type of information was presented on the website.
8  Q. And in broad strokes, do you understand that Canary
9  Mission identifies people who allegedly promote hatred
10 of the United States, Israel, and the Jewish people?
11     MS. STROKUS: Objection.
12     THE COURT: Well on this foundation, I'm going to
13 sustain that. He's told us what he knows about it.
14 Q. So it's fair to say that what you know about it
15 comes from what's on this website?
16 A. Yes, that's correct.
17 Q. Okay. Do you have an understanding of how Canary
18 Mission identifies the people on its website?
19     MS. STROKUS: Objection, your Honor.
20     THE COURT: Well I'm going to let him answer that
21 yes or no.
22     Do you have an understanding?
23     THE WITNESS: No.
24     THE COURT: That may stand.
25 Q. Do you have any understanding of what process they

1  use or don't to verify the information they put on the
2  website?
3      MS. STROKUS:  Objection, your Honor.
4      THE COURT:  Well you know she's objecting
5  vigorously and there's no foundation for this.  He
6  answered no to the last question.  He looked at the
7  website once.  An understanding?  I suppose he might
8  have an understanding if there was some statement from
9  some other person or a source.  But this isn't
10  discovery.
11      MS. CONLON:  No, your Honor, I don't want to touch
12  on anything that could be deliberative, but I want to
13  better understand this witness's understanding of the
14  work that he was doing.
15      THE COURT:  I have it.
16      MS. CONLON:  Okay.
17      THE COURT:  Again, this isn't a game, you're
18  trying to persuade the factfinder here.  And here's what
19  I'm getting from this witness.
20      That, um, they got the -- I shouldn't even say
21  "got the list," somebody had access to this website.
22  Somebody, a superior, said, "Look here, check these
23  people out."  Well that's not precisely what he said,
24  but the transcript will govern.  And he got on it.  And
25  that because there's a reference to Canary Mission, he

1  of Analysis that were generated in response to the
2  directive to look at the Canary Mission website?
3  A.  We, um -- the analysts wrote ROAs on personnel or
4  individuals who are named in the website.
5  Q.  To your knowledge, did the analysts include, in
6  their ROAs, the allegations from the Canary Mission
7  website as relevant -- as information that could be
8  relevant to a potential violation of Title VIII?
9      MS. STROKUS:  Objection, your Honor.
10      THE COURT:  Sustained.  The best evidence are the
11  ROAs.
12      MS. CONLON:  And, your Honor, it's ironic because
13  I don't have them and I wish I did.
14      THE COURT:  I understand.
15      MS. CONLON:  But I can't offer them to you.
16      THE COURT:  And we will see about that.  Because
17  they would seem, at least with respect to the target
18  individuals, to be relevant.  Perhaps they should have
19  been prepared.  I've made a ruling now with respect to a
20  subset of documents.  It's clarified that I don't have
21  them.  I'm wondering about that.
22      Go ahead.
23      MS. CONLON:  Okay.  I'm sorry, I'm getting a
24  correction from somebody.  (Talks to co-counsel.)  Yes.
25  Okay.

1  went and looked at it once and saw whatever he saw.  And
2  he's careful to point out, "They're not us."  His
3  looking at it told him that they make accusations.  And
4  I will tell you, it's significant to me that he said,
5  "We approached it with an independent view," not simply
6  accepting accusations that they got.  Now it's not a
7  discovery deposition.  I think we've gotten his
8  knowledge.  But I'll ask this question.
9      Have I accurately characterized your testimony?
10  Because I didn't use your words exactly and I was just
11  saying this is what I'm hearing.
12      Have I accurately characterized it?
13      THE WITNESS:  Yes, your Honor.
14      THE COURT:  All right.  I think that's what he
15  knows.
16      MS. CONLON:  And, your Honor, if that's all he
17  knows, that's all he knows.  But we heard about a list
18  of 5,000 people on the website.  And I appreciate this
19  isn't discovery, but it's news to us that that is how it
20  worked.
21      THE COURT:  Well it's news to me, and I find it
22  very interesting.  But I'm telling you what I got from
23  it.  And now we've gotten it, so let's move on.
24  Q.  So, Mr. Hatch, um, understanding that you have not
25  spent time looking at the website, have you seen Reports

1      It is our understanding that the Court did receive
2  all 5 of the Reports of Analysis on the targeted
3  individuals in a production -- a document production to
4  the Court on June 11th, that is, um --
5      (To co-counsel.)  I think that's correct?
6      THE COURT:  Well I'll look at what I have,
7  physically.
8      MS. CONLON:  Okay.  And for the Court's ease of
9  reference, we understand that to be Docket 131, that
10  docket entry.
11      THE COURT:  Thank you.
12      MS. CONLON:  Okay.
13  Q.  Now, um, you said that the project was to look at
14  this list from Canary Mission.  Did the list of student
15  protesters -- it included information of student
16  protesters identified through other means apart from
17  simply Canary Mission?
18      MS. STROKUS:  Objection, your Honor, a
19  mischaracterization of testimony.
20      THE COURT:  Well let me ask this question.
21      She started out saying how much -- how many ROAs
22  did you look at, and you used the word the "student
23  protester effort," and as you started, I didn't know
24  what you were talking about.
25      Do we now understand that's the Tiger Team's work

1  after you got this list?  Well I shouldn't even say "got
2  this list," after the list was provided on the website?
3      THE WITNESS:  Yes, your Honor.  But the Canary
4  Mission wasn't the only, um, group of students.  It was
5  most of it.
6      THE COURT:  Yes.
7      THE WITNESS:  But it wasn't the only way that we
8  received, um, information on protesters.  And also there
9  were duplicates, we received information about the same
10  protester from multiple sources.  But Canary Mission was
11  the most inclusive of that.
12      THE COURT:  Do you recall other sources?  Without
13  revealing investigatory matters.
14      THE WITNESS:  There was another website that does
15  the same thing.  I don't remember the name of it.  Um,
16  and --
17      THE COURT:  If I suggested "Betar"?
18      THE WITNESS:  That sounds right, sir.
19      THE COURT:  Okay.  Go ahead.
20      THE WITNESS:  And then we would get individual
21  names or we could even get a list from a police
22  department if any protesters were arrested.  We could
23  get that.
24      So the list, um, came in from all different
25  directions.  The team -- the source of the information

1  was not necessarily relevant to the analyst, because the
2  analysts were doing factfinding, and the analysts were
3  not reporting, um, that, um -- where the name came from,
4  because They're independent from that.  Nor would
5  they -- it's not our standard practice, it's not within
6  policy for us to report other people's uncorroborated
7  allegations or assertions.  Everything, like I said
8  before, needs to be collaborated.
9      THE COURT:  So these sources though that you've
10  now identified, as far as my notes, they came down from
11  Mr. Jordan, is that right?
12      THE WITNESS:  Mr. Gordon.
13      THE COURT:  Mr. Gordon.  They all come down from
14  him.  But of course you're looking at them.  And you can
15  see if a police department -- for instance, if it
16  arrested someone at a protest, whether it fit within the
17  scope of what the Tiger Team was doing?
18      THE WITNESS:  Yes, sir.
19      THE COURT:  All right.  I think that it's noon.  I
20  am -- and I apologize for this, the time is not counted
21  against you, but we'll start promptly at 9:00 a.m.
22  tomorrow morning.
23      The total elapsed time for the plaintiffs is 2
24  days, 15 minutes.  For the defense, 2 hours, 30 minutes.
25      We'll recess till 9:00 a.m. tomorrow morning.

1  We'll recess.
2      THE CLERK:  All rise.
3      (Adjourned, 12:00 p.m.)

1              C E R T I F I C A T E
2
3
4      I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
5  hereby certify that the forgoing transcript of the
6  record is a true and accurate transcription of my
7  stenographic notes, before Judge William G. Young, on
8  Wednesday, July 9, 2025, to the best of my skill and
9  ability.
10
11
12
13
14  /s/ Richard H. Romanow 07-9-25
    RICHARD H. ROMANOW  Date
15

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 76

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
         Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
         Defendants

* * * * * * * *

BENCH TRIAL DAY 3

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 9, 2025

* * * * * * * *

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

---

1    A P P E A R A N C E S

2    RAMYA KRISHNAN
     XIANGNONG WANG
3        Knight First Amendment Institute at Columbia
         University
4        475 Riverside Drive, Suite 302
         New York, NY 10115
5        (646) 745-8500
         Carrie.decell@knightcolumbia.org
6    and
     COURTNEY GANS
7    NOAM BIALE
     ALEXANDRA CONLON
8        Sher Tremonte LLP
         90 Broad Street, 23rd Floor
9        New York, NY 10004
         (212) 540-0675
10       Cgans@shertremonte.com
         For Plaintiffs
11
12   ETHAN B. KANTER
     WILLIAM KANELLIS
13   VICTORIA M. SANTORA
     JESSICA A. STROKUS
14       DOJ-Civ
         P.O. 878
15       Ben Franklin Station
         Washington, DC 20044
16       (202) 616-9123
         Ethan.kanter@usdoj.gov
17   and
     SHAWNA YEN
18       United States Attorney's Office
         1 Courthouse Way, Suite 9200
19       Boston, MA 02210
         Shawna.yen@usdoj.gov
20       (617) 748-3100
         For Defendants
21
22
23
24
25

---

3

1
2                          INDEX
3
4    WITNESS                                          PAGE
5    ABU EL-HAJ
6      Direct Examination By Mr. Wang (continued)       5
       Cross-Examination By Mr. Kanellis               36
7
     PETER HATCH
8
9      Direct Examination By Ms. Conlon               42
10
     E X H I B I T S
11
12   Exhibit No.           Received
13
14     228                    16
15     229                    32
16     230                    33
       231                    34
17
18
19
20
21
22
23
24
25

---

4

1               P R O C E E D I N G S
2         (Begins, 9:04 a.m.)
3         THE COURT:  Have we got the witness on the video?  But
4    before we do, forgive me, I should say that I've allowed
5    internet access to these proceedings.  It's appropriate
6    therefore to say that if you are accessing these proceedings on
7    the internet, the rules of court remain in full force and
8    effect, which means there's no taping, streaming, rebroadcasts,
9    screenshots or other transcription of these proceedings, and it
09:04 10   is important that you keep your microphone muted.  If you do
11   not and interrupt the proceedings, we will turn you off.
12        Now, with that stated, counsel, are we ready to
13   continue?
14        MR. WANG:  Your Honor, one brief preliminary matter
15   before we recall Ms. Abu El-Haj.  Due to witness scheduling, we
16   reached out to the government yesterday to see if they would be
17   okay with me continuing the questioning of the witness in lieu
18   of my colleague, Ms. Conlon.  They consented on the
19   understanding that we would extend them the same courtesy, and
09:05 20   if you are amenable to it --
21        THE COURT:  I am.
22        MR. WANG:  Great.  Thank you.
23        THE COURT:  But state your name again.
24        MR. WANG:  Yes.  That's Xiangnong Wang for the
25   plaintiffs, Your Honor.

1    A.    No, it was not on Columbia's campus.  It was -- well, I
2    don't know if that's Columbia's campus.  It was up at 125th
3    Street on a plaza in front of, I think it was a Columbia arts
4    building, but I honestly do not know if that is considered
5    legally Columbia's campus.
6    Q.    The press conference was given at the Lenfest Center For
7    Arts at Columbia University --
8    A.    But we were not inside, we were not inside the building.
9    Q.    Ah, I see.  You were outside.  So in that respect you
10:00 10   question whether or not it was at Columbia University?
11   A.    Look, I generally just don't know whether legally that
12   public space is owned by Columbia University.  That's all I'm
13   saying.
14   Q.    New York has over eight million residents, doesn't it?
15         MR. WANG:  Objection.
16         THE COURT:  I don't know that she is a demographer.
17         MR. KANELLIS:  She can tell me if she knows.
18         THE COURT:  I'll allow it.
19   A.    That sounds right.
10:00 20        THE COURT:  All right.  We'll let that stand.
21   Q.    Okay.  And you knew that by giving this press conference,
22   in making these statements critical of the United States and
23   the policy regarding Palestine and the arrest of Mr. Khalil,
24   that this could be heard by a great number of people; isn't
25   that right?

43

1    A.    Yes, for the component called Immigration and Customs
2    Enforcement.
3    Q.    ICE?
4    A.    Yes.
5    Q.    And specifically, within ICE, you work for the Office of
6    Intelligence; is that right?
7    A.    I work for a subcomponent of ICE called Homeland Security
8    Investigations, and within Homeland Security Investigations,
9    I'm the assistant director for the Office of Intelligence.
10:03 10   Q.    Okay.  Now, you and I of course didn't get to prepare
11   together because you are here with the defendants, so I want to
12   give you a sense of what we're going to cover today for you and
13   the court.
14         In early March you were given the names of student
15   protesters for the Office of Intelligence to produce
16   analysis -- reports of analysis on; is that correct?
17   A.    Yes.
18         MS. STROKUS:  Objection, Your Honor, leading and
19   foundation.
10:04 20        MS. CONLON:  Your Honor, this is an adverse witness
21   and under Rule 611 --
22         THE COURT:  Please, I'm familiar with the rules of
23   evidence.  What's your response to that?
24         MS. STROKUS:  Your Honor, Mr. Hatch is a federal
25   government employee.

1    A.    Yes.
2         MR. KANELLIS:  No more questions.
3    A.    And I repeat, I'm a U.S. citizen.
4         THE COURT:  Nothing further for this witness,
5    Mr. Wang?
6         MR. WANG:  Nothing further from us.
7         THE COURT:  We thank you, Professor.  All right.  Call
8    your next witness.
9         MR. BIALE:  Your Honor, this is Noam Biale for the
10:01 10   plaintiffs.  Plaintiffs call Peter Hatch.
11         THE COURT:  He may be called.
12         PETER HATCH, Sworn
13         COURTROOM CLERK:  Can you please state your full name
14   and spell your last name for the record.
15         THE WITNESS:  Peter John Hatch, H-a-t-c-h.
16         COURTROOM CLERK:  Thank you.  You may be seated.
17   DIRECT EXAMINATION BY MS. CONLON:
18   Q.    Good morning.  Is there a way for me to adjust the volume
19   on this?  Okay.  Good morning, Mr. Hatch.
10:03 20   A.    Good morning.
21   Q.    My name is Alex Conlon.  Thank you for being here.
22         So just to situate us all, Mr. Hatch, you work for the
23   United States Government?
24   A.    Yes, I do.
25   Q.    Okay.  You work in the Department of Homeland Security?

1         THE COURT:  He is.
2         MS. STROKUS:  And he is prepared to testify honestly
3    and truthfully here today.
4         THE COURT:  Well, that's the presumption, and I
5    certainly respect him, as I do all witnesses.  She may lead
6    him.  I'm familiar with leading, and of course it bears on the
7    weight to be given to the answers, but she may proceed in that
8    fashion.
9         MS. CONLON:  Okay.
10:04 10   BY MS. CONLON:
11   Q.    Many of the names of the student protesters provided to
12   you for the Office of Intelligence to produce reports of
13   analysis on came from the website Canary Mission, correct?
14   A.    It's true many of the names, even most of the names came
15   from that website, but we were getting names and leads from
16   many different sources.
17   Q.    The reports of analysis on the student protesters, you had
18   the chance to review, or read, rather, many of them, right?
19   A.    I have read several but not all of the reports of analysis
10:05 20   coming out of that effort.
21   Q.    And the reports of analysis on the student protesters that
22   you've read, you have seen ones that mention Israel, correct?
23   A.    Yes.  They've mentioned several of the nations involved in
24   the Middle East conflict.
25   Q.    You've seen reports of analysis that mention Palestine,

46

```
 1   correct?
 2   A.   Yes.
 3   Q.   You've seen reports of analysis that mention
 4   pro-Palestinian protests, correct?
 5   A.   I've seen reports of analysis that mention Palestine and
 6   issues related to Palestine.
 7   Q.   You've specifically seen reports of analysis that mention
 8   pro-Palestinian protests, correct?
 9        THE COURT:  Well, I guess now she's framing it, so I
10   guess the way I hear her, she wants to have you say, when you
11   read reports, did the phrase "pro-Palestinian" -- what was her
12   third word -- "pro-Palestinian activities" or the like, did you
13   receive reports that had those phrases in it?
14        THE WITNESS:  I don't think the reports of analysis
15   mentioned that phrase as you've described it.  I think the
16   reports of analysis mentioned students involved in protests or
17   personnel involved in protests.  I don't know if a report of
18   analysis specifically said, mentioned pro-Palestine protests,
19   you know, those words.  I just don't remember.
20        THE COURT:  All right.  How about pro-Hamas?
21        THE WITNESS:  I do remember reports of analysis that
22   mentioned Hamas, but it isn't the analyst's job to make the
23   determination whether something is pro or con.  They would just
24   make the determination that a Hamas leader was, for example,
25   mentioned in the protest or there was some sort of activity or
```
*(line 10 timestamp: 10:06)*
*(line 20 timestamp: 10:07)*

47

```
 1        THE COURT:  Government counsel, I just want to call
 2   people by names, and again, your name, I'm sorry?
 3        MS. STROKUS:  Yes, Your Honor.  I'm Jessica Strokus on
 4   behalf of defendants.
 5        THE COURT:  Thank you, Ms. Strokus.
 6   BY MS. CONLON:
 7   Q.   So Mr. Hatch, this deposition took place June 25, right?
 8   A.   Yes.
 9   Q.   And you had government counsel there with you?
10   A.   Yes.
11   Q.   And of course you were under oath in the deposition?
12   A.   Yes.
13   Q.   And at the outset of that deposition you were instructed
14   that if a question was unclear, you could ask for
15   clarification, right?
16   A.   Yes.
17   Q.   And in fact, many times you did ask for clarification,
18   right?
19   A.   Yes.
20   Q.   Okay.  So turning your attention now to the section that
21   you see here on the screen, and this again is page 233,
22   starting at line six, you see where it says, Question:  "Do you
23   recall seeing any report of analysis that mentions
24   pro-Palestinian protests?"
25        Answer:  "Yes."
```
*(line 10 timestamp: 10:09)*
*(line 20 timestamp: 10:09)*

48

```
 1        Do you see that there?
 2   A.   I do, but that's not what it says.
 3   Q.   I'm sorry, that's not what it says?
 4   A.   I'm looking at line -- the question above that was, "Do
 5   you recall seeing any report of analysis that refers to
 6   pro-Palestinian protests."
 7   Q.   You then asked that the question be rephrased, right?  Do
 8   you see that on line four?
 9   A.   Yes.
10   Q.   And then the question was asked -- and I hate to repeat
11   it, but it says, "Do you recall seeing any report of analysis
12   that mentions pro-Palestinian protests?"
13        That is the question that was put to you, and the response
14   you gave was, "Yes."  Isn't that right?
15   A.   "Do you recall seeing any report of" -- yes.
16        MS. CONLON:  Okay.  You can take it from.
17   Q.   Now, the reports of analysis about the student protesters,
18   you said that you only reviewed several of them, correct?
19   A.   That's correct.
20   Q.   When you say "several," can you give us a sense of how
21   many that means?
22   A.   For this particular effort, I probably reviewed a couple
23   of dozen, maybe a dozen, maybe 20.
24        THE COURT:  When you say "this particular effort," to
25   what do you refer?
```
*(line 10 timestamp: 10:10)*
*(line 20 timestamp: 10:11)*

50

```
 1          THE WITNESS:  I review probably almost a thousand,
 2    maybe up to a thousand ROAs in total during a year, and we do,
 3    the Office of Intelligence does approximately 25,000 to 30,000
 4    ROAs a year.
 5          THE COURT:  But my question was, you're able to say
 6    this particular effort, you reviewed about 20.  What do you
 7    mean by "this particular effort"?  What was the mission or the
 8    effort that we're talking about?
 9          THE WITNESS:  When we were looking at the protests.
10:12 10   So personnel from -- individuals from the lists of people who
11    were involved in protests.
12          THE COURT:  Protests at Columbia or other places as
13    well?
14          THE WITNESS:  Other places as well.
15          THE COURT:  Thank you.  Just so I understand, college
16    protests or --
17          THE WITNESS:  Student, student protests and personnel
18    who was participating in those protests.
19          THE COURT:  Thank you.
10:12 20   BY MS. CONLON:
21    Q.   When you say "personnel participating in the student
22    protests," does that extend to faculty?
23    A.   It extends to everyone other than -- yes, and all others
24    who are involved who may not have been associated with the
25    university at all.
```

51

```
 1    approximately 100, isn't that right?
 2    A.   No.  We said about -- I've reviewed about 20 of those.
 3    Q.   Okay.
 4    A.   I don't recall the exact number.  Like I said, I review a
 5    lot of ROAs, so I'm estimating here.
 6    Q.   Okay.  I'm going to ask -- I'm going to ask that we put
 7    the transcript back up.  And can we please go first to page 83.
 8    So first -- and we're going to have to do this in a few parts,
 9    but Mr. Hatch, I want to direct your attention to lines 13 to
10:14 10   16 so that you're clear on the context for what I'm going to
11    show you next here.
12          In line 13 you're asked, "Do you recall whether any of
13    these reports of analysis on student protesters mentioned the
14    terms 'Israel' or 'Palestine,'" to which you said yes, which
15    you've also said today.  And now moving ahead to page 84, lines
16    10 to 12, when you were asked about those reports, the question
17    was, "And when you say dozens, what's a ballpark figure?"  And
18    in line 12 the answer you gave was, "Approximately, 100."
19          So you testified that you know that approximately 100 of
10:15 20   the reports of analysis on student protesters mentioned the
21    terms "Israel" or "Palestine," isn't that right?
22          MS. STROKUS:  Objection, Your Honor.  It's unclear
23    from the what's on the screen right now what the original
24    question was.
25          THE COURT:  If it's clear to the witness -- if it's
```

52

```
 1    clear to the witness, it's sufficiently clear.  Do you
 2    understand the question?
 3          THE WITNESS:  Can you show me page 83?
 4          MS. CONLON:  Of course.  And for ease -- sorry, the
 5    lines --
 6          MS. STROKUS:  You honor, we ask that the witness be
 7    provided a paper copy so we don't have to keep flipping back
 8    and forth.
 9          THE COURT:  Do you have one?  Do you have one?
10:16 10        MS. STROKUS:  No, Your Honor.
11          THE COURT:  I was thinking that it might be helpful if
12    I had one, but we live in the real world.
13          MS. CONLON:  We may have extra copies.  Can I take a
14    moment to look?
15          THE COURT:  Well, of course you may.
16          In the hierarchy of getting at the truth, among us, if
17    you have a copy, let's give it to the witness.
18          MS. CONLON:  If the court happens to have the pretrial
19    brief exhibits here, the court then does have a full copy, and
10:17 20   we have a copy we could give the witness as well.
21          THE COURT:  Give that to the witness.
22          MS. CONLON:  It's Exhibit 2 to the pretrial brief.
23          THE COURT:  Thank you, and I do.
24          MS. CONLON:  May I approach to give the witness the
25    binder?
```

53

```
 1    Q.   You said a moment ago that the Office of Analysis -- or
 2    Intelligence, rather, produces upwards of 25,000 reports of
 3    analysis on all kinds of subjects in a given year, right?
 4    A.   That's correct.
 5    Q.   And you said that you review a small slice of that in a
 6    given year, maybe a thousand.  Did I understand you right?
 7    A.   That's about right.
 8    Q.   And you said that in this line of effort, which was
 9    compiling reports of analysis on student protesters, that you
10:13 10   recall reviewing several dozen; is that correct?
11          MS. STROKUS:  Objection, Your Honor.  It misstates his
12    testimony.
13          THE COURT:  That's not exactly what he said.
14          MS. CONLON:  I'm seeking -- I'm sorry.
15          THE COURT:  But I understand, and let me try.
16          MS. CONLON:  Okay.
17          THE COURT:  So with respect to student protests, you
18    recall reviewing about 20?
19          THE WITNESS:  That's correct.
10:13 20        THE COURT:  All right.  Now go from there.
21          MS. CONLON:  Okay.
22    BY MS. CONLON:
23    Q.   So again, I just want to make sure I'm understanding you
24    and we're on the same page.
25          When you say "dozens," a couple dozen, you mean
```

54

```
 1        THE COURT:  You may.
 2   Q.   So Mr. Hatch, when you have a chance to look at pages 83
 3   and 84, that's where I've been directing your attention, just
 4   let me know.
 5   A.   Yes.
 6   Q.   Okay.
 7        THE COURT:  It isn't Exhibit 2 in mine, but don't slow
 8   down.
 9        MS. CONLON:  Okay.  I apologize.  We're going to get
10:18 10  clarification on that, Your Honor, but I won't stop, as you
11   say.
12   Q.   So Mr. Hatch, in the deposition you testified that
13   approximately 100 of the reports of analysis on student
14   protesters mentioned the terms "Israel" or "Palestine,"
15   correct?
16   A.   Yes, I did.
17   Q.   Okay.  When you testified earlier a moment ago that you
18   reviewed only maybe 20 or more of these reports of analysis,
19   you were talking about the same reports that you mentioned in
10:18 20  the deposition, right?
21   A.   Yes, I was.
22   Q.   Okay.
23        THE COURT:  It's Exhibit 6, but go right ahead.
24        MS. CONLON:  Okay.
25   Q.   And just to be clear, the 100 or so reports of analysis
```

55

```
 1   A.   We don't investigate.  We only analyze.
 2   Q.   You analyze, okay.  You research and analyze?
 3   A.   Yes.  We're talking about the Office of Intelligence.
 4   Q.   Yes.  And let's talk about that.  So you are the assistant
 5   director of the Office of Intelligence, right?
 6   A.   Yes, I am.
 7   Q.   And you have worked in law enforcement overall for more
 8   than 35 years, correct?
 9   A.   Yes, I have.
10:21 10  Q.   You joined the Department of Homeland Security in 2019?
11   A.   I became an HSI employee in 2019.  Before that I was an
12   officer in the Coast Guard.
13   Q.   And when you joined in 2019, you moved into the senior
14   role that you are in now, right?
15   A.   I did.
16   Q.   It may be obvious to others from your title, but so that
17   I'm clear, you are senior-most office -- official in the Office
18   of Intelligence; is that right?
19   A.   I am.
10:21 20  Q.   And you report directly to senior leadership of the
21   umbrella that is also Homeland Security Investigations?
22   A.   Yes, I report to the deputy.
23   Q.   The deputy is Derek Gordon?
24   A.   That is correct.
25   Q.   You oversee more than a thousand investigative analysts?
```

56

```
 1        that mentioned the terms "Israel" or "Palestine" was a subset
 2   of the total reports of analysis on student protesters
 3   generated in this line of effort, correct?
 4   A.   Yes, I believe it was a subset.
 5   Q.   In other words, there were more than 100 reports of
 6   analysis generated about student protesters, right?
 7   A.   Slightly more, yes.
 8   Q.   How many more?
 9   A.   There were less than 200.
10:19 10  Q.   More than 100, less than 200?
11   A.   Yes.
12   Q.   Okay.  So I want to back up for a moment to -- so at a
13   high level, so you understand, those are the topics I want to
14   get into, but I want to get back for a moment to your work.
15        So you told us that you work in HSI, which is part of ICE,
16   and ICE works to, among other things, dismantle transnational
17   criminal organizations, right?
18   A.   Yes, HSI's mission is to dismantle transnational criminal
19   organizations.
10:20 20  Q.   As in, ICE's mission is broader, but HSI's work is focused
21   on dismantling transnational criminal organizations; is that
22   correct?
23   A.   That is correct.
24   Q.   HSI, where you work, identifies and investigates people
25   suspected of breaking criminal laws, right?
```

56

```
 1   A.   Approximately a thousand.
 2   Q.   Now, the Office of Intelligence focuses on criminal
 3   networks, criminal conspiracies, those engaged in criminal
 4   conduct, right?
 5   A.   That is correct.
 6   Q.   Its work is divided into different types of crimes or
 7   program areas like child exploitation or human trafficking?
 8   A.   Yes.
 9   Q.   Okay.  So you said earlier that the Office of Intelligence
10:22 10  doesn't do investigation.  It does research and analysis.
11   A.   Yes.  We are, investigative analysts are not law
12   enforcement officers.  They do not have arrest powers.  They
13   don't have investigative powers.
14   Q.   Okay.  And the Office of Intelligence supports
15   investigations, though it does not do them itself, through
16   factfinding, right?
17   A.   Yes, we -- yes, we do.
18   Q.   And those facts get memorialized in a report called a
19   report of analysis?
10:23 20  A.   Yes, the report of analysis is the way the investigative
21   analyst documents their work.
22   Q.   So I want to talk about what reports of analysis
23   ordinarily contain, and I will be direct with you and tell you
24   I have never seen one.  They have been withheld as privileged
25   in this case.  So if I ask you a question and it doesn't make
```

58

```
 1   sense or it's off-base, please tell me.
 2        A report of analysis can focus on a particular person?
 3   A.   Yes, they can focus on individuals, yes.
 4   Q.   For our purposes, I'll call an individual that's the
 5   subject of a report "the subject," just so I don't have to keep
 6   repeating it.
 7        The report can have a great deal of factual information
 8   about the subject, right?
 9   A.   The report should have a lot of factual information about
10:10 10   the subject and only factual information.
11   Q.   And the factual information they should have are facts
12   that could be relevant to a suspected violation of a criminal
13   law; is that right?
14   A.   Violations of primarily criminal law but violations of
15   law, and for HSI's mission, violations of immigration and
16   customs law, which is our specialty.
17   Q.   And when you say "immigration and customs law," are you
18   referring to the Immigration and Nationality Act?
19   A.   Title 8 for immigration.
10:24 20   Q.   Okay.  The reports of analysis on a subject include, among
21   other things, the person's immigration history?
22   A.   Yes, that would be part of it.
23   Q.   The history of their activity in the United States?
24        MS. STROKUS:  Objection, Your Honor.  This line of
25   questioning is teetering on the law enforcement privilege.
```

59

```
 1   What goes into the report of analysis --
 2        THE COURT:  I haven't heard it yet.
 3        MS. STROKUS:  Your Honor, what goes into a report of
 4   analysis has been withheld as privilege.
 5        THE COURT:  It may have, but ultimately that's the
 6   court's decision.  She may have the question.
 7   BY MS. CONLON:
 8   Q.   A report of analysis may contain history of the subject's
 9   activity in the United States, right?
10:25 10   A.   It would contain things like their criminal activity,
11   perhaps employment, travel.  But without getting into -- I want
12   to keep it in general terms because people know -- if criminals
13   learn what we write in a report of analysis, then they can make
14   adjustments.
15        THE COURT:  Actually, you've touched on the line I'm
16   trying to draw.  As I view the law enforcement privilege, and
17   you're a person who works in this area, so I want you to tell
18   me if you think a question trenches on it.
19        Nothing here should mess up or impair your office's or
10:26 20   any knowledge you have of government operations' ability to
21   enforce the laws and protect the nation generally.
22        Having said that, we're engaged in a search for truth
23   here about certain things that have happened or haven't
24   happened and are in factual dispute.  So it's not wrong for her
25   to start this way because documents have been withheld.  But if
```

59

```
 1   you think -- I'll be satisfied with the 30,000-foot view if I
 2   can understand what you were doing, and then we may drill down
 3   on things that have happened which may bear on what I've got to
 4   sort out here.  Do you understand my instructions?
 5        THE WITNESS:  Yes, Your Honor.
 6        THE COURT:  And so feel free to use them.  I'm not at
 7   all disrespectful of counsel.  You should listen to your
 8   counsel, but that's the line I'm following.  Go ahead.
 9        MS. CONLON:  Your Honor.
10:27 10        MS. STROKUS:  Your Honor, may I be heard?
11        THE COURT:  Yes.
12        MS. STROKUS:  These questions and the line of
13   questioning that already began and we are anticipating go
14   straight to methods, indicators, techniques that are privileged
15   under the law enforcement privilege and that will have
16   wide-ranging impacts on criminal and immigration investigation.
17        THE COURT:  I'm not clear why you've withheld, if such
18   documents exist, why you've withheld them with respect to the
19   specific targets because that's in the past.
10:28 20        MS. STROKUS:  Yes, Your Honor, it is in the past.
21   What I'm saying here is we're talking about reports of analysis
22   generally and what goes into them.
23        THE COURT:  So we are.  So I'd be interested to see
24   the reports of analysis about any of the people that were
25   denominated targets here.  She says you withheld that.  I'd be
```

60

```
 1   interested in seeing that.  Maybe we can save a lot of time.
 2        MS. STROKUS:  Yes, Your Honor, I believe those were
 3   submitted to you in camera and withheld from plaintiffs'
 4   counsel as law enforcement privilege.
 5        THE COURT:  I understand.
 6        MS. CONLON:  If I may assist.  The court redirected
 7   yesterday the government to submit a log indicating the basis
 8   for its withholding of a certain packet of materials you
 9   provided to them --
10:29 10        THE COURT:  I read the materials.
11        MS. CONLON:  They submitted a log that I think makes
12   reference, the one that was just filed last night I think
13   refers to, from what I can tell, at least two reports of
14   analysis on targeted noncitizens, so I know at least the court
15   has those, but of course not what else.
16        MS. STROKUS:  Yes, Your Honor.  You were provided the
17   individual for the five allegedly targeted individuals in this
18   case in camera.
19        THE COURT:  Okay.  We'll address that in 15 minutes,
10:29 20   or maybe we should address it now, have him step down, and
21   we'll see where we go.  Would you prefer to do it that way?
22        MS. CONLON:  I understand the witness has limited
23   time, and I want to be to respectful of it.
24        THE COURT:  Yes, I do, too.  So let's go ahead and get
25   him on his way.
```

62

```
 1   BY MS. CONLON:
 2   Q.   Okay.  So Mr. Hatch, without revealing any techniques of
 3   law enforcement, a report of analysis includes only factual
 4   information; is that right?
 5   A.   That is correct.
 6   Q.   It does not include, for example, a summary of anyone's
 7   opinion about the facts, correct?
 8   A.   No, it should not include any opinions at all.
 9   Q.   And a report of analysis in describing factual material
10:30 10  may append the underlying source materials to it for someone
11   else to review, correct?
12   A.   Yes, as part of our procedure, is to make sure that it's
13   repeatable and you can find out why certain things were
14   included or what the source material was for something being
15   included.
16   Q.   I want to talk about how ordinarily the Office of
17   Intelligence gets tasked in the ordinary course as opposed to
18   in this line of effort with creating these reports of analysis.
19   And a report of analysis can be generated by the Office of
10:31 20  Intelligence in response to a request from a law enforcement
21   partner, correct?
22   A.   Yes.  In fact, most of the time it's a special agent who
23   is asking the investigative analyst for help in finding more
24   information out about an individual.
25   Q.   A special agent who, for example, is already investigating
```

63

```
 1   before it's given to the investigator to determine whether or
 2   not to continue an investigation or to start an investigation.
 3   Q.   And when you say the Office of Intelligence gets tips or
 4   leads, so something outside of an agent in HSI asking for help,
 5   do you mean tips and leads like outside of the government, like
 6   civilians?
 7   A.   It includes civilians.  We have a tip line that civilians
 8   can call and provide information.
 9   Q.   Can civilians also provide information through the
10:33 10  agency's social media channels, for example, by tweeting at the
11   Department of Homeland Security?
12   A.   I suppose they could.  I have never seen an instance of
13   that.
14   Q.   So you're aware only of tips through a tip line and not
15   any other means; is that right?
16   A.   Tips through the tip line or some other connection point
17   with HSI.  Sometimes tips are left in emails or sent to emails
18   or sometimes to other public-facing phone numbers or email
19   boxes, not to an individual but to a box.
10:34 20  Q.   Now, ordinarily, after a report of analysis is generated,
21   and for clarity, that's done at the level of an analyst in the
22   Office of Intelligence; is that right?
23   A.   What's your question?  Can you repeat that?
24        THE COURT:  She hasn't asked it yet.
25   Q.   Reports of analysis are created not by you but by
```

64

```
 1   someone and seeking help from the Office of Intelligence to
 2   gather information?
 3   A.   That's one of the ways, yes.
 4   Q.   And that is most often the way, correct?
 5   A.   That is most often the way.  But it's not the only way.
 6   Q.   The agents who make such requests of the Office of
 7   Intelligence can be situated outside of the Office of
 8   Intelligence and in other parts of HSI, right?
 9   A.   Yes, the domestic offices, the programs, even leadership.
10:31 10  Q.   Requests for reports of analysis can also come from
11   outside of HSI and outside of the Department of Homeland
12   Security, correct?
13   A.   As long as it goes through HSI leadership and I get my
14   tasking from HSI leadership, we can be asked to look into any
15   individual.
16   Q.   Now, I want to talk about what ordinarily happens when the
17   Office of Intelligence receives such a request.  The office
18   gets the request from an agent, and when the report of analysis
19   is created, it goes back to the agent who asked for it,
10:32 20  correct?
21   A.   In most cases, yes, but not in every case.  It could be
22   provided to a related program.  And again, we're only talking
23   right now about what we receive from a special agent, but we do
24   get tips and leads before an investigation that needs some
25   background information or needs some information to be gathered
```

64

```
 1   investigative analysts in the Office of Intelligence, right?
 2   A.   Yes, the analysts write the ROAs.  I have not written
 3   ROAs.
 4   Q.   Not ever probably?
 5   A.   Right.
 6   Q.   Okay.  Once the ROA is drafted by an investigative -- or
 7   by an analyst, the ROA -- and I apologize for the record.
 8   That's what I'm abbreviating, report of analysis.
 9        THE COURT:  I am following.
10:35 10  Q.   The ROA does not have to go through any formal sign-off
11   procedure within the Office of Intelligence before it can leave
12   the office and be given to whoever requested it, correct?
13   A.   Yes.  They do not go through me, if that's what you're
14   asking.  I do not have approval process where I sign off on
15   every ROA.
16   Q.   Right, because there's like 25,000 of them in a year?
17   A.   Correct.
18   Q.   Okay.  And you have a deputy, correct?
19   A.   I have one deputy.
10:35 20  Q.   Mr. Etter, Bradley Etter?
21   A.   That's correct.
22   Q.   He also doesn't have to sign off on ROAs before they go
23   outside of the Office of Intelligence, right?
24   A.   No.  The relationship is the analyst works with the agent,
25   and that's a partnership that we try to encourage.
```

66

```
 1   Q.   In other words, we're talking about direct collaboration
 2   between the analyst in the Office of Intelligence and the agent
 3   who asked for the office's help?
 4   A.   That's correct.
 5        THE COURT:  This may all be relevant, but how much
 6   more do you think you have for this witness?
 7        MS. CONLON:  In general or on this topic?
 8        THE COURT:  No, in general.
 9        MS. CONLON:  I have a great deal more.
10:36 10      THE COURT:  And you want to get him out of here today?
11        MS. CONLON:  I do.  I understand that he has a lot on
12   his plate.
13        THE COURT:  He may very well.  They may have questions
14   for him.  All right.  You go ahead.  I guess I'm thinking,
15   though he's being perfectly responsive to your questions as far
16   as I can see, it might be helpful to get to this case.
17        MS. CONLON:  I'm almost there, I promise.
18   BY MS. CONLON:
19   Q.   So in the ordinary course, sticking with your regular
10:36 20   process, not the student protester process for a moment, after
21   the Office of Intelligence gives the report of analysis to the
22   party who requested it, that is often the end of the Office of
23   Intelligence's involvement in that case, correct?
24   A.   Yes.  Oftentimes we don't hear back from the agent on any
25   results of the investigation.
```

```
 1   Q.   Now, you've been in your role for six years,
 2   approximately?
 3   A.   Since 2019.
 4   Q.   For your first five and a half years in your role, you
 5   were never involved in the investigation of a foreign student
 6   engaged in political protest, correct?
 7   A.   I was never asked -- again, I don't do investigations.
 8   Q.   Sorry.
 9   A.   So I was never -- I don't recall any instance where I was
10:37 10   asked to review protest activity.
11   Q.   Now, prior to 2025, to the best of your knowledge, you
12   also weren't involved in cases involving lawful permanent
13   residence for potential action by the State Department,
14   correct?
15   A.   No.  We -- I don't recall any actions where we provided
16   information to the State Department, but we were -- that is,
17   that referral to the State Department is one of the statutes in
18   Title 8, and we've been investigating or we've been analyzing
19   Title 8 offenses since I've been there.
10:38 20   Q.   So just to bring you back to the question, you had seen
21   reports of analysis on visa holders that went to the State
22   Department prior to 2025 but not reports of analysis on green
23   card holders, lawful permanent residents that went to the State
24   Department before 2025, correct?
25   A.   That I don't recall because I thought your question was
```

67

```
 1   related to the protesters.  So if you're asking me, I don't
 2   recall any instances of LPRs being referred to the State
 3   Department because of protest activity.  I don't know the
 4   answer if we referred to any LPRs -- "we" being HSI referred
 5   any LPRs for other types of activity, I just don't -- I'm not
 6   sure I would remember those.
 7   Q.   You don't think you'd recall whether you reviewed reports
 8   that went to the State Department about lawful permanent
 9   residents before?
10:39 10   A.   Yes.  It's not something I would, as the assistant
11   director, that I would be involved in in the normal course of
12   business.  It wouldn't really rise to my level as an issue.
13   Q.   Do you recall ever seeing see a referral of a student
14   protester for a visa revocation before 2025?
15   A.   I don't recall that.
16   Q.   Now, President Trump was inaugurated in January, right, of
17   this year?
18   A.   Yes.
19   Q.   January 20.  Is that a yes, if you know?
10:40 20   A.   Yes.
21   Q.   And shortly after he took office, he issued several
22   executive orders that relate to the work of the Department of
23   Homeland Security, correct?
24   A.   Yes.
25   Q.   You read, for your work, executive orders that relate to
```

68

```
 1   the work of HSI, correct?
 2   A.   Yes, the ones that I can find and interpret, yes.
 3   Q.   Okay.  And one of the orders that has affected the work of
 4   HSI this year is Executive Order 14161, which is titled
 5   Protecting the United States From Foreign Terrorists and Other
 6   National Security and Public Safety Threats.  Is that right?
 7   A.   Yes, but if you're going to ask me questions about it, can
 8   I have it, can I read it?
 9   Q.   Of course.
10:40 10      MS. CONLON:  Your Honor, you look like you were going
11   to say something.  Should I continue?
12        THE COURT:  No.  I didn't understand your question.
13   But go ahead and ask your question.  He understood it, and I
14   think I do.  He's familiar with that executive order, but if
15   you're going to question him --
16        MS. CONLON:  He wants to see it.
17        THE COURT:  -- we better look at it.
18   Q.   Okay.  So we have put a document that has been marked as
19   Exhibit 70, which is in evidence, in front of you.  Do you see
10:41 20   it on the screen there?
21   A.   Yes, I do.
22   Q.   Do you recognize that as Executive Order 14161?
23   A.   Yes.
24   Q.   And you can see it was issued January 20, 2025?
25   A.   I can see that.
```

1    Q.   Okay.  You've seen this before, right?
2    A.   I have seen it.
3    Q.   Now, part of this executive order relates to HSI's work,
4    correct?
5    A.   It does.
6    Q.   The part that most directly relates to HSI's work I think
7    appears in Section 2, little (a), little number (4), so if you
8    would direct your attention there.  We may be able to make it
9    bigger, maybe.
10:42 10   A.   I can read it.
11   Q.   Great.  That part of the executive order calls for the
12   vetting and screening to the maximum degree possible all aliens
13   who intend to be admitted, enter or are already inside of the
14   United States, particularly those aliens coming from regions or
15   nations with identified security risks; is that right?
16   A.   Screening and vetting is part of HSI's mission.
17   Q.   That is exactly what I wanted to ask you.
18        Screening includes looking, from HSI's perspective, at an
19   individual to see if there is any derogatory information about
10:42 20   that person, right?
21   A.   Yes, that's also almost quoted directly from my
22   deposition.
23   Q.   I'm glad that you also remember it.
24        OI, Office of Intelligence screens a particular person and
25   then writes a report of analysis with any derogatory

1    information if they find it, right?
2    A.   Yes.  And we are one of the agencies that does screening
3    and vetting.  There are an umbrella of agencies or cluster of
4    agencies that do this in coordination.
5    Q.   Including and pursuant to this executive order, right?
6    A.   That's correct.
7    Q.   President Trump has issued other executive orders that
8    also affect your work this year, right?
9    A.   Yes.
10:43 10   Q.   Are you familiar with Executive Order 14188, which regards
11   combatting antisemitism?
12   A.   I am, but as you recall from the deposition, that was the
13   first time I had read that executive order.
14   Q.   So that's not one you had read closely?
15   A.   No.
16   Q.   Okay.  Then I will not ask you to read it now.
17        So turning to early March of this year, after this
18   executive order that we just looked at, Exhibit 70 --
19        THE COURT:  Now we're turning?  Just a matter of case
10:44 20   management here.
21        MS. CONLON:  Sure.
22        THE COURT:  I said we'd take a brief recess, at which
23   time I would hear the government, who is asking me to
24   reconsider on a subset of documents which I'm familiar with
25   which don't include but now they point out these ROAs at least

1    as to what we've denominated target individuals here.
2         I appreciate what you're doing.  I'm prepared to go on
3    or stop and have argument.  You're not part of it.  It doesn't
4    count against anyone's time.  How do you wish to proceed,
5    Ms. Conlon?
6         MS. CONLON:  I'd like to keep going if that's okay?
7         THE COURT:  It is okay, as long as I can pay full
8    attention.  We will take a recess out of necessity.  Go ahead.
9         MS. CONLON:  Okay.  Did Your Honor want to recess now?
10:45 10        THE COURT:  No.  Do you want to keep going?
11        MS. CONLON:  I do, if that's okay.
12        THE COURT:  We will.
13        MS. CONLON:  Okay, great.
14   BY MS. CONLON:
15   Q.   So in early March of this year you attended a briefing on
16   student protests, correct?
17   A.   I did.
18   Q.   This briefing on student protests in March included your
19   boss, Derek Gordon?
10:45 20   A.   Yes, my boss, Derek Gordon, the chief of operations,
21   William Walker, a number of other people, but the senior --
22   many of the senior leadership of HSI.
23   Q.   So you mentioned that the briefing on student protests in
24   March included William Walker, we've said Derek Gordon.  Do you
25   recall whether Robert Hammer was there?

1    A.   I think so.
2    Q.   And Mr. Hammer is the deputy executive associate director
3    of Homeland Security Investigations or rather he was just
4    before Mr. Gordon took over; is that right?
5    A.   He was at the time, yes.
6    Q.   Okay.  I see.  So the meeting occurred when Mr. Hammer was
7    still incumbent in that seat and then Mr. Gordon took over?
8    A.   That's correct.
9    Q.   The meeting also included Roy Stanley, the chief of the
10:46 10   analysis division for the Office of Intelligence; is that
11   right?
12   A.   I believe he was there and he is the unit chief for the
13   analysis division within Office of Intelligence.
14   Q.   Do you recall who else from senior leadership was there,
15   or is that the group?
16   A.   I don't -- I don't remember who else was there.
17   Q.   Okay.  Now, in this meeting, the meeting was convened by
18   HSI's leadership, correct?
19   A.   Yes.
10:47 20   Q.   And the meeting was held as part of HSI's effort to
21   implement Executive Order 14161, correct?
22   A.   I do not characterize it that way because, as I recall
23   from the discussions, I don't think that was the topic of the
24   meeting.  The meeting was to talk about protest activity or
25   student protesters who may be in violation of U.S. law.

1  Q.  So it's your understanding that the meeting was about an
2  effort to gather information on student protesters, but you
3  don't understand it to have been --
4      THE COURT:  Let's not beat around the bush.  I'm
5  interested in this meeting.  You're the witness.  Not how she
6  characterizes things.  What were the instructions or the like
7  from the briefing?
8      MS. STROKUS:  Objection, Your Honor.
9      THE COURT:  Overruled.
10:48 10     MS. STROKUS:  Objection, Your Honor, deliberative
11  process privilege.
12     THE COURT:  They weren't deliberating.  They were
13  being briefed.  When you're briefed, you're told what's going
14  to happen.  Were you deliberating?
15     THE WITNESS:  We weren't briefing.  We were
16  discussing.
17     THE COURT:  I stand corrected.  It was referred to as
18  a briefing.
19     So you were discussing and you have characterized the
10:48 20  discussion as student protesters who may have broken the law?
21     THE WITNESS:  Yes, sir.
22     THE COURT:  Okay.  And having been corrected and I
23  appreciate your persistence, I sustain the objection.
24     And now I'll ask this.  So as a result of that
25  meeting, what instructions, if any, were adopted?  And again,

1  I'm going to explain the line I'm drawing because I have some
2  trust that you're following the line.
3      When you're kicking stuff around, the rest of us
4  aren't entitled to know that, just as I kick stuff around with
5  my law clerks.  Once I've decided what we're going to do, well,
6  then in the judicial end I have to write it all out and that's
7  all above it.  In your executive end, whatever is decided that
8  bears on this case and student protesters, we're entitled to
9  know that, and I need to know it.
10:49 10     Do you have that in mind?
11     THE WITNESS:  Yes, Your Honor.
12     THE COURT:  So recognizing that's the line, what came
13  out of it?
14     THE WITNESS:  To look at the protesters, to develop
15  reports of analysis on the protesters, specifically looking for
16  violations of U.S. laws, including and specific to immigration
17  and customs laws.
18     THE COURT:  Can you be any more specific as to the
19  immigrations and customs laws that you were looking for?
10:50 20     THE WITNESS:  Thinking in general terms, it was
21  anything that may relate to national security or public safety
22  issues, things like were any of the protesters violent or
23  inciting violence?  I think that's a clear obvious one.  Were
24  any of them supporting terrorist organizations?  Were any of
25  them involved in obstruction or unlawful activity in the

1  protest?
2      THE COURT:  What do you mean by "obstruction"?
3      THE WITNESS:  Like blocking normal citizens from going
4  about their business.
5      THE COURT:  Okay.  Thank you.
6      THE WITNESS:  And that we would use the normal report
7  of analysis process and our normal trade craft for this.
8      THE COURT:  Proceed, Ms. Conlon.
9      MS. CONLON:  Okay.  Thanks.
10:51 10  BY MS. CONLON:
11  Q.  So you characterized it as a meeting, not a briefing; is
12  that right?
13  A.  I characterized it as a discussion.
14  Q.  You would call it a discussion?
15  A.  Yes.
16  Q.  The discussion was led by HSI leadership?
17  A.  I think only HSI was in the room.
18  Q.  So by default.
19     THE COURT:  We're going to --
10:51 20     MS. CONLON:  Sorry.
21     THE COURT:  I'm not the only one who needs a break
22  here.  The court reporters need to switch.  So what we're going
23  to do is we're going to take a break until 11:00.  That's the
24  break.  If you want to leave some time to have argument about
25  issues that are to be discussed, fine.  Otherwise you can run

1  until 12:00, and I'm stopping and we will take this matter up
2  tomorrow without any further argument.  And hopefully we can
3  get him on his way.
4      MS. STROKUS:  Your Honor, we were told by plaintiffs
5  that Mr. Hatch would be going first today.  He made his travel
6  arrangements to testify today.  I understand that we are going
7  into tomorrow.  May I request that we do, after the break,
8  arguments on the issues that are percolating so that Mr. Hatch
9  is able to rearrange his travel schedule?
10:52 10     THE COURT:  In other words, you'd like to cause him to
11  rearrange his travel schedule so that we get that taken care
12  of, argument about -- you call it the issues percolating -- the
13  issues about the documents I said could be turned over but I
14  wanted to give you a chance to argue.  That's how you'd like to
15  do it?
16     MS. STROKUS:  Your Honor, just based on the outline
17  that Ms. Conlon started in the beginning, it does not sound
18  like direct will be completed today.
19     THE COURT:  So long as he's going to be here tomorrow,
10:53 20  I'm fine with that.  She's nodding her head.  But for now,
21  five-minute break for all of us.  I will hear you at 11:00, no
22  more than ten minutes of argument.  That's not an invitation to
23  take ten minutes.  And when that's resolved, you may resume the
24  stand, and we'll have the pleasure of your company tomorrow
25  probably.  We'll recess.  (Recess, 10:53 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this  9th day of July, 2025.


/s/ Kelly Mortellite
_____

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter

# EXHIBIT L



# Mahmoud Khalil



**Status:** Student
**State:** New York
**Organizations:** CUAD, BDS
**University:** Columbia

---

Share:    

## PROFILE UPDATE – MARCH 12, 2025

- In March 2025, Mahmoud Khalil was arrested by the U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."

- Khalil has been leading anti-Israel protests at Columbia since at least October 12, 2023—just days after Hamas' attack on Israel. That day, he led a rally where activists chanted "From the river to the sea," a slogan condemned by the U.S. House of Representatives as antisemitic and used by Hamas to call for Israel's destruction.

- Khalil is a leader of the Columbia University Apartheid Divest group (CUAD), the current home for Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP), after they were suspended for pro-terror activities. It is now a coalition of "over 80 student groups."

- Khalil openly justified Hamas terrorism, speaking as a CUAD representative in a video posted on X. He stated, "We've tried armed resistance, which is legitimate under international law, but Israel calls it terrorism."

- On October 7, 2024, the first anniversary of Hamas' terror attack where they murdered 1,200 Israelis, Khalil held a leadership role in a CUAD-organized pro-Hamas protest at Columbia. The next day, CUAD defined this protest by their desire to "bring the war home"—a phrase tied to the movement's broader strategy of bringing about the downfall of the USA. For more information on their war on America, see Canary Mission's campaign "Bringing the War Home."

- CUAD's members wrote on August 16, 2024, that they "must work hard to weaken US imperialism." The New York Post also reported on March 9, 2025, that Khalil's group seeks the "total eradication of Western civilization."

- On March 24, 2024, CUAD co-organized a pro-terror event titled "Palestinian Resistance 101," featuring Khaled Barakat, a senior member of the Popular Front for the Liberation of Palestine (PFLP), a designated terrorist organization.

- Khalil has acted as a lead negotiator for CUAD during several major incidents in 2024 and 2025.
  - In April 2024, Mahmoud Khalil acted as a lead negotiator for the pro-Hamas encampment at Columbia on behalf of CUAD. The Columbia encampment was a violent, pro-Hamas stronghold where activists took over buildings, held workers hostage, and chanted for Israel's destruction. Police found weapons and antisemitic propaganda, while Jewish students faced harassment and threats.
  - Khalil served as a negotiator after pro-Hamas agitators occupied the library lobby at Barnard College on March 5, 2025, in protest of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted and the police were sent to the location citing a "bomb threat."

## Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia) & Arrest for Pro-Hamas Activities



CANARY MISSION

☰  **DAILY NEWS**   CAPTURED BY CANARY MISSION     Local News | Pro-Israel and Pro-Palestine rallies gather at...



Palestinian supporters demonstrate during a protest at Columbia University on Oct. 12, 2023, in New York.     AP Photo/Yuki Iwamura

Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition. He has also expressed support for Hamas terrorism as a CUAD representative.

CUAD is a coalition of "over 80 student groups working toward the goal of collective liberation." CUAD is part of the Boycott, Divestment, Sanctions (BDS) movement. The group's demands included "a ceasefire in the Israel-Hamas war, divestment from Israel… and to reinstate" the pro-terror campus groups Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP) after the Columbia administration suspended them. CUAD members have also declared that their goal is "to weaken US imperialism" and the "total eradication of Western civilization."

In March 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization." Khalil was scheduled to appear before a federal immigration judge.

On October 7, 2024, the first anniversary of Hamas' terror attack on Israel, Khalil participated in a leadership role in a pro-Hamas protest organized by CUAD at Columbia. The next day, CUAD wrote that it was necessary to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted. The police were sent to the location, citing a "bomb threat," making a series of arrests.

On March 24, 2024, CUAD co-organized a pro-terror event that hosted Khaled Barakat, a leader of a foreign terror organization. The event was titled: "Palestinian Resistance 101." The event also featured Charlotte Kates and Nerdeen Kiswani. Kates and Barakat are the heads of Samidoun, an organization banned in Germany and Israel for its ties to terrorism and the Popular Front for the Liberation of

  CANARY MISSION

**Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia**

On April 24, 2024, the New York chapter of the Palestinian Youth Movement (PYM) posted on Instagram: "THE PEOPLE'S (POPULAR) UNIVERSITY FOR PALESTINE: For the past week, students at Columbia's Gaza Solidarity Encampment have put on alternative programming for those joining on the lawns, from teach-ins to cultural performances…" The post included a video in which Khalil appeared [00:00:31] dancing at the encampment, alongside other anti-Israel activists.

On April 26, 2024, the New York Post reported: "The anti-Israel tent encampment at Columbia University is being led by a cohort of controversial student leaders…these students are the ones negotiating directly with leaders of the Ivy League university – holding campus hostage with dozens of tents and hundreds of protesters splayed out on the lawn…" The article quoted Khalil saying: "The university understood that we cannot operate on timelines. We cannot operate under time pressure."

In an April 27, 2024 Quds News Network (QNN) interview posted on X, Khalil said [00:00:05] in Arabic: "We have been negotiating since last night for more than 11 hours with the university to meet our demands regarding the cutting economic and academic ties with Israeli universities and the universities involved in slaughtering our Palestinian people…"

On April 29, 2024, Bwog Columbia Student News reported: "…Columbia University Apartheid Divest (CUAD) held a press conference to address the end of negotiations and the University's plans to clear the Encampment…" Speaking on behalf of CUAD, Khalil said: "…the students in this Encampment are a gift to Columbia" and "…the University should be proud of its student activists rather than suspend them and 'trample its reputation.'"

On April 30, 2024, a user posted on Instagram a video interview from CNN in which Khalil was asked [00:00:01]: "Are you…going to listen to the University and leave the encampment here?" Khalil replied [00:00:04]: "Of course not! The University is the one who should listen to us. They should listen to their student body who are demanding to end the war that's happening in Palestine. Our…demands are clear…regarding divestment from the Israeli occupation that companies that are profiting [sic] and…contributing to the genocide of our people…"

Asked by CNN [00:00:47]: "How far are you all willing to go here on campus?", Khalil replied [00:01:08]: "…the students will remain here…until they achieve their…demands."

On April 30, 2024, USA Today reported: "The school…suspended graduate student Mahmoud Khalil, lead negotiator for Columbia University Apartheid Divest in talks with the administration that have failed to resolve the crisis."

On May 2, 2024, the BBC, in a news brief titled: "Columbia student has suspension reversed," reported: "…Mahmoud Khalil…was suspended yesterday. Today…Khalil received a surprising message: it was abruptly reversed." Khalil reportedly said: "[They said] that after reviewing the evidence, they don't have any evidence to suspend…"

The BBC report said: "Khalil, a Palestinian international student who was born in [sic] raised in Syria, said that the thought of suspension had 'been stressful,' given that his visa in the US is dependent on his status as a student."

On April 26, 2024, The Verge reported: "Mahmoud Khalil, a Palestinian student who has been involved in the negotiations with Shafik's office, also spoke, saying international students were especially at risk. 'I am here on a foreign visa. That's why for the past six months, I've barely appeared on the media,' Khalil said."

The encampment was also in support of the BDS movement.



   



### Support for Hamas Terrorism

### Leading Role in a Pro-Hamas Protest

### Leading Role in a Library Takeover

### Pro-Hamas Encampment at Columbia University

### Background on Pro-Hamas Encampments

### The Columbia Student Intifada

### The Pro-Terror & Anti-Israel Movement After 10/7/2023

### Mahmoud Khalil's Work and Education

### Social Media and Weblinks



HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL

ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT M



# Rumeysa Ozturk

**Status:** Student
**State:** Massachusetts
**Organizations:** BDS
**University:** Tufts, TC



**Share:**   

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.

As of January 2025, Ozturk's LinkedIn profile said she had worked as a graduate research assistant at Tufts since August 2023, and as a course instructor at Tufts from July 2024 to August 2024.

As of the same date, Ozturk's LinkedIn said she was studying for a doctorate in child study and human development at Tufts, slated to graduate in 2026.

Ozturk graduated with a master's degree in developmental and child psychology from Teachers College, Columbia University (TC) in 2020. TC is located in New York, New York.

As of February 2025, Ozturk's LinkedIn said she was located in the Greater Boston area, Massachusetts.





˅ Social Media and Weblinks



HOME                                    ORGANIZATIONS

OUR MISSION                             EX-CANARY

ETHICS POLICY                           BLOG

CONTACT US                              CAMPAIGNS

STUDENTS                                CANADA

PROFESSORS

PROFESSIONALS

MEDICAL

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT N





# Mohsen Mahdawi

**Status:** Unknown
**State:** New York
**Organizations:** WOL, SJP, JVP, DAR, BDS
**University:** Columbia, BZU

Share: 

## Mohsen Mahdawi's Arrest, Call for Israel's Destruction, Justification of Hamas Terrorism and Support for the Pro-Hamas Encampment at Columbia University (Columbia)



Mahdawi speaking at an anti-Israel rally



CANARY MISSION

03:10

Mohsen Mahdawi is a leading anti-Israel activist who was arrested in April 2025 for his pro-Hamas activism. He has also called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

In December 2023, Mahdawi served as co-president of DAR Palestine at Columbia University (Dar at Columbia), Columbia's Palestinian student union, which is reportedly part of a coalition of 80 anti-Israel student groups. Columbia is located in New York, New York.

Mahdawi was also affiliated with the pro-terror activist group Within Our Lifetime (WOL) in 2023. He was reportedly a member of Students for Justice in Palestine (SJP) that same year.

Mahdawi is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

In December 2023, CBS reported [00:07:10] that Mahdawi "grew up in a refugee camp in the Israeli-occupied West Bank."

As of February 20, 2024, Mahdawi, who also goes by Mohsen Khader Mahdawi, was listed in Columbia's online directory as a student in the Department of Philosophy at Columbia's School of General Studies.

As of March 7, 2024, Mahdawi's since-deleted LinkedIn profile said he was slated to graduate from Columbia in 2024.

As of the same date, Mahdawi's LinkedIn also said he studied computer engineering at Birzeit University (Birzeit) from 2008 to 2014.

Birzeit University's student body has celebrated terrorists since at least 2003. That year, student government elections featured models of exploding Israeli buses, as parties competed on the basis of which Palestinian faction had killed the most Israelis.





"Hamas is a product of the Israeli occupation," he said. Hamas, which has governed Gaza since 2007, has been designated as a terrorist organization by the U.S. and European Union.

Mahdawi shares the view of many Palestinians that Gaza is a longtime "open-air prison" of Israel's doing.

is rooted in international law, under which occupied peoples have the right to resist the occupation of their land," they wrote. "If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out."

On Oct. 12, Mahdawi was among hundreds of pro-Palestinian demonstrators who gathered on Columbia's South Lawn. Supporters were called terrorists and had water thrown at them, he said.



CAPTURED BY CANARY MISSION

←    1 of 8    →

▾ **Arrested by ICE**

▾ **Calling for Israel's Destruction**

▾ **Justifying Hamas Terrorism in 2023**

▾ **Celebrating a Terrorist in 2013**

▾ **Anti-Israel Activism (BDS)**

▾ **Showing Support for the Pro-Hamas Encampment at Columbia**

▾ **SJP**

▾ **BDS**

▾ **Social Media and Weblinks**

ANARY MISSION

HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL

ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT O



### Post

**Stephen Miller** ✓
@StephenM

This is just patently false. We have officials working continuously to identity, revoke or deny foreigners' visas who espouse hatred for America or its people. This is a top priority. College students who witness such conduct can use the ICE tip line. Also: there is no "speech code" of any kind in the Columbia deal. There is an ironclad requirement — with enforcement mechanisms — to admit students based on actual merit and not illegal racial quotas, set asides or preferences.

> **Glenn Greenwald** ✓ 🇧🇷 @ggreenwald · Jul 29
>
> Exactly. No foreign students are being deported by the Trump State Department and ICE for criticizing the US - only for criticizing Israel.
>
> Just like the "hate speech" codes Trump demanded US colleges adopt allows students to call the US a "racist endeavor" but not Israel. …

9:08 PM · Jul 29, 2025 · **996.4K** Views

883                3K                15K                357

Read 883 replies