1   CRAIG H. MISSAKIAN (CABN 125202)
    United States Attorney
2   PAMELA T. JOHANN (CABN 145558)
    Chief, Civil Division
3   KELSEY J. HELLAND (CABN 298888)
    Assistant United States Attorney
4
        450 Golden Gate Avenue, Box 36055
5       San Francisco, California 94102-3495
        Telephone: (415) 436-6488
6       FAX: (415) 436-6748
        kelsey.helland@usdoj.gov
7
    Attorneys for Defendants
8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                    SAN JOSE DIVISION

12
    STANFORD DAILY PUBLISHING CORP., *et*     Case No. 5:25-cv-06618-NW
13  *al.*,
                                              **DEFENDANTS' CROSS-MOTION FOR**
14          Plaintiffs,                       **SUMMARY JUDGMENT AND OPPOSITION**
                                              **TO PLAINTIFFS' MOTION FOR SUMMARY**
15      v.                                    **JUDGMENT**

16  RUBIO, *et al.*,                          Date:  November 19, 2025
                                              Time:  9:00 a.m.
17          Defendants.                       Place:  Courtroom 3, 5th Floor

18                                            The Honorable Noël Wise

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION ..........................................................................................................1

RELIEF REQUESTED .......................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

I.      INTRODUCTION ....................................................................................................1

II.     ISSUES TO BE DECIDED .....................................................................................2

III.    BACKGROUND ......................................................................................................3

        A.      Statutory Background. ..................................................................................3

                1.      Nonimmigrant student visas. ............................................................3

                2.      Visa-revocation and foreign-policy-removal provisions. ..................3

        B.      Longstanding Enforcement of the Statutes. .................................................5

        C.      Enforcement of the Statutes by the Current Administration. ........................6

        D.      Plaintiffs Have Not Been Threatened With Enforcement. ............................9

IV.     LEGAL STANDARD ............................................................................................11

V.      ARGUMENT ..........................................................................................................11

        A.      Plaintiffs Lack Standing. ............................................................................11

                1.      Stanford Daily lacks standing. ........................................................11

                2.      The individual Plaintiffs lack standing. ..........................................13

        B.      Plaintiffs' Claims Lack Merit. ...................................................................16

                1.      The statutes do not violate the First Amendment. ..........................16

                2.      The statutes do not violate the Fifth Amendment. ..........................20

VI.     CONCLUSION ......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abourezk v. Reagan,*
    592 F. Supp. 880 (D.D.C. 1984) .................................................................. 4, 22

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................ 11

*Arab Anti-Discrimination Comm. v. Reno,*
    70 F.3d 1045 (9th Cir. 1995) ............................................................................ 18

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ............................................................................................ 25

*Bluman v. FEC,*
    800 F. Supp. 2d 281 (D.D.C. 2011) ................................................................ 18

*Boutilier v. INS,*
    387 U.S. 118 (1967) ............................................................................................ 24

*Bridges v. California,*
    314 U.S. 252 (1941) ............................................................................................ 17

*Bridges v. Wixon,*
    326 U.S. 135 (1945) ............................................................................................ 17

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................................ 19

*Cal. Pac. Bank v. FDIC,*
    885 F.3d 560 (9th Cir. 2018) ............................................................................ 23

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................................................ 14

*Carlson v. Landon,*
    342 U.S. 524 (1952) ..................................................................................... 21, 22

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................ 11

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ............................................................................................ 19

*Culinary Workers Union, Loc. 226 v. Del Papa*,
    200 F.3d 614 (9th Cir. 1999) ..................................................................................... 15

*Demore v. Kim*,
    538 U.S. 510 (2003).................................................................................... 16, 20, 21

*Dep't of State v. Muñoz*,
    602 U.S. 899 (2024)........................................................................................... 19

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)...................................................................................... 12, 13

*Fiallo v. Bell*,
    430 U.S. 787 (1977).......................................................................................... 21

*Goldstein v. Galvin*,
    719 F.3d 16 (1st Cir. 2013) ............................................................................... 16

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................................................................... 21, 25

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952)........................................................................... 17, 20, 21, 22

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...................................................................................... 19, 22, 25

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...................................................................................... 11, 12

*Int'l Ps. for Ethical Care Inc. v. Ferguson*,
    146 F.4th 841 (9th Cir. 2025) ............................................................................ 13

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950).......................................................................................... 17

*Khalil v. Trump*,
    784 F. Supp. 3d 705 (D.N.J. 2025) ..................................................................... 25

*Jordan v. DeGeorge*,
    341 U.S. 223 (1951).......................................................................................... 24

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972).......................................................................................... 19

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...................................................................................... 21, 25

*Kwong Hai Chew v. Colding*,
   344 U.S. 590 (1953) ........................................................................................ 17

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) ...................................................................... 15, 16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 13

*Mahler v. Eby*,
   264 U.S. 32 (1924) .................................................................................... 24, 25

*Massieu v. Reno*,
   915 F. Supp. 681 (D.N.J. 1996) .................................................................... 25

*Mathews v. Diaz*,
   426 U.S. 67 (1976) .......................................................................... 16, 20, 21

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ........................................................................................ 12

*NAACP v. Button*,
   371 U.S. 415 (1963) ...................................................................................... 13

*Negusie v. Holder*,
   555 U.S. 511 (2009) ...................................................................................... 20

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
   118 F.4th 770 (6th Cir. 2024) .................................................................. 18, 20

*Palestine Info. Off. v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988) ...................................................................... 21

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972) ...................................................................................... 25

*Pritkin v. DOE*,
   254 F.3d 791 (9th Cir. 2001) ........................................................................ 13

*Qatanani v. Bondi*,
   144 F.4th 485 (3d Cir. 2025) ........................................................................ 18

*Regan v. Wald*,
   468 U.S. 222 (1984) ...................................................................................... 22

*Reno v. Am-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ...................................................................................... 18

*Rodriguez Diaz v. Garland*,
   53 F.4th 1189 (9th Cir. 2022) ............................................................................ 16, 21

*AAUP v. Rubio*,
   780 F. Supp. 3d 350 (D. Mass. 2025) ....................................................................... 16

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ................................................................................................... 22

*Smith v. Goguen*,
   415 U.S. 566 (1974) ................................................................................................... 25

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ............................................................................................. 12, 13

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................................... 15

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) ....................................................................... 11, 14, 15

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) .................................................................................... 14

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ............................................................................................. 16, 21

*Turner v. Williams*,
   194 U.S. 279 (1904) ................................................................................................... 17

*United Pub. Workers of Am. v. Mitchell*,
   330 U.S. 75 (1947) ..................................................................................................... 16

*United States v. Curtiss–Wright Export Corp.*,
   299 U.S. 304 (1936) ............................................................................................. 21, 24

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ............................................................................... 18, 19

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ................................................................................................... 17

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................... 25

*Younger v. Harris*,
   401 U.S. 37 (1971) ..................................................................................................... 15

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ................................................................................................. 21, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1, (2015) ..................................................................................................... 24

**Statutes**

8 U.S.C. § 1101 ................................................................................................................ 3
8 U.S.C. § 1182 ................................................................................................. 4, 20, 23
8 U.S.C. § 1201 ....................................................................................................... passim
8 U.S.C. § 1227 ....................................................................................................... passim
8 U.S.C. § 1229a .............................................................................................................. 5
8 U.S.C. § 1429 .............................................................................................................. 19
Pub. L. 82-414 .................................................................................................................. 3
Pub. L. 101-649 ................................................................................................................ 4

**Rules**

Federal Rule of Civil Procedure 56 ............................................................................ 1, 11

**Other Authorities**

Executive Order 13899 ..................................................................................................... 7
Executive Order 14161 ............................................................................................. passim
Executive Order 14188 ............................................................................................... 7, 19

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on November 19, 2025 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113, the Honorable Noël Wise presiding, Defendants Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security, will and hereby do move this Court for an order granting summary judgment in favor of Defendants and against Plaintiffs Stanford Daily Publishing Corporation ("Stanford Daily"), Jane Doe, and John Doe. This motion is made pursuant to Federal Rule of Civil Procedure 56. If summary judgment is not granted in full, Defendants seek summary adjudication on each of Plaintiffs' claims and each event as the basis therefor. This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Kelsey J. Helland ("Helland Decl.") and exhibits attached thereto, the Court's files in this matter, other matters of which the Court takes judicial notice, and any oral argument and additional evidence presented.

**RELIEF REQUESTED**

Defendants seek entry of judgment in their favor on each of Plaintiffs' claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs ask this Court for the remarkable relief of defining how the First Amendment applies to nonimmigrant student visa holders in the absence of any actual enforcement action taken against them. Plaintiffs claim that months ago they attended protests and made various political remarks, but they admit that the government has not revoked their visas or initiated removal proceedings against them. Nor do Plaintiffs inform the Court of what, exactly, they wish to say which they contend could render them subject to potential enforcement in the future. In other words, Plaintiffs ask the Court for an advisory opinion.

Plaintiffs lack standing to seek their requested relief. Article III requires plaintiffs to demonstrate an actual injury that is concrete and particularized. Parties must rely on their own injuries, not those of third parties. And a threatened future injury must be imminent and certainly impending. Plaintiffs do not come close to meeting this standard here. Plaintiff Stanford Daily is a college

newspaper; it portrays itself as an advocacy organization for purposes of this litigation, but in reality, it simply reports on campus affairs.  It cannot maintain standing based on speculative injuries to its staff or interviewees.  Nor have the unidentified individual Plaintiffs demonstrated a sufficiently imminent future injury.  To the contrary, less than 1% of the thousands of campus protestors reviewed by DHS this year (with only a small fraction referred to the State Department) have been subject to revocation or removability enforcement, and such enforcement actions were based on more than pure protected speech.  Indeed, the individual Plaintiffs admit that they have not been subject to enforcement themselves, in spite of their prior speech.

Even if Plaintiffs had standing, their claims would fail on the merits.  Nonimmigrant student-visa holders have only temporary and tenuous connections to the United States.  Congress has wide discretion to legislate, and the Executive has wide discretion to vindicate, the foreign-policy interests of the United States with respect to such temporary visitors.  For decades, Congress has authorized the Executive to revoke visas and initiate removal proceedings for foreign-policy reasons.  Especially in light of the limited constitutional protections afforded to such visitors, these statutes pass constitutional muster under the First and Fifth Amendments.

The Court should therefore deny Plaintiffs' motion for summary judgment and grant this cross-motion for summary judgment.

## II.    ISSUES TO BE DECIDED

1.    Whether Plaintiffs have Article III standing, where one of them is a student newspaper and the other two are individual student-visa holders, none of whom has been subject to enforcement under the statutes at issue.

2.    Whether Plaintiffs' First Amendment claims fail, because nonimmigrant student-visa holders have reduced First Amendment rights, and the government has facially neutral and bona fide reasons for being able to revoke visas and initiate removal proceedings for foreign-policy reasons.

3.    Whether Plaintiffs' Fifth Amendment claims fail, because Plaintiffs have not been subject to any enforcement action and the statutes at issue appropriately recognize Congress's and the Executive's foreign-policy and national-security prerogatives.

III.    BACKGROUND

A.    Statutory Background.

1.    Nonimmigrant student visas.

Student and exchange visitor visa holders are nonimmigrants under the Immigration and Nationality Act ("INA").  *See* 8 U.S.C. § 1101(a)(15)(F), (J), (M).  With respect to F-1 nonimmigrant students, the INA allows for the entry of an alien who is "a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study. . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States."  *Id.* § 1101(a)(15)(F)(i) ("F-1 status").  An F-1 nonimmigrant student visa permits only temporary presence in the United States and the student must maintain "a residence in a foreign country which he [or she] has no intention of abandoning."  *Id.*  So, aliens present in the United States on F-1 nonimmigrant student visas are neither *residents* nor *immigrants*; rather, they have been granted permission to enter the United States temporarily for specific and limited educational purposes.  The same foreign residence requirement applies for J-1 nonimmigrant exchange visitor visas and M-1 vocational student visas.  *See id.* § 1101(a)(15)(J) & (15)(M).

2.    Visa-revocation and foreign-policy-removal provisions.

Since its first enactment in 1952, the INA has provided that nonimmigrant visas may be revoked at any time at the discretion of a consular officer or the Secretary of State.  *See* Immigration and Nationality Act § 221, Pub. L. 82-414 (1952).  In its current form, the statute provides:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.  Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . .  There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i).  An alien whose nonimmigrant visa has been revoked effective immediately may be placed into removal proceedings on that basis.  *See id.* § 1227(a)(1)(B).

Similarly, the INA has for decades provided the Secretary of State the authority to determine that

an alien is subject to deportation for foreign-policy reasons:  The INA's list of "classes of deportable aliens" includes those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."  *Id.* § 1227(a)(4)(C)(i).

The current foreign-policy-removal provision resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the INA.  Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest."  8 U.S.C. § 1182(a)(27) (1988).  The prior "public interest" ground—which was arguably *broader* than the current provision—was long interpreted to permit the government to exclude aliens for foreign policy reasons.[1]  To address concerns about the breadth of the prior version, the Executive suggested replacing it "with language that limits the grounds of exclusion to potentially serious foreign policy consequences."  1987 Hearing at 40 (testimony of Legal Adviser Sofaer).  Thus, the current language was enacted in 1990.  *See* Immigration Act of 1990, Pub. L. 101-649, 8 U.S.C. § 1251(a)(4)(C)(i) (1990) (predecessor to current § 1227(a)(4)(C)).

Importantly, the foreign-policy-removal provision specifies that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States *unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest*."  8 U.S.C. § 1227(a)(4)(C)(ii) (referring to the inadmissibility provision at 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added)).

The revocation of an alien's visa, or the Secretary of State's determination that an alien is removable, does not necessarily mean they will be removed from the United States.  Those are merely

---

[1] *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 885 (D.D.C. 1984) (noting that Otto Skorzeny and Mme. Ngo Dinh Nhu had been excluded on foreign policy grounds).  Indeed, when some representatives proposed to eliminate that provision in 1987, there were strong objections.  *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton).

1  grounds for removability that the Department of Homeland Security ("DHS") may assert in formal

2  removal proceedings in immigration court.  Aliens in removal proceedings are afforded procedural

3  protections under 8 U.S.C. § 1229a.  If an alien whose nonimmigrant visa has been revoked effective

4  immediately is placed into removal proceedings on the basis of the nonimmigrant visa revocation, and

5  there is no other valid basis for removal, an immigration judge, and later a federal court of appeals, may

6  review the revocation as it relates to the final order of removal.  *See* 8 U.S.C. § 1201(i); *see also id.*

7  § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of

8  removal rendered in removal proceedings).  And courts of appeals retain jurisdiction to review

9  "constitutional claims or questions of law" in removal proceedings.  *Id.* § 1252(a)(2)(D).

10      **B.      Longstanding Enforcement of the Statutes.**

11      To determine whether a visa should be revoked under § 1201(i) and whether an alien is

12  removable under § 1227(a)(4)(C), the State Department ("State") has long relied on various sources,

13  including DHS.  *See* Helland Decl. Ex. 3 at 17-20, 35-38; Ex. 5 at 34-38.[2]

14      Specifically, DHS Immigration and Customs Enforcement ("ICE") Homeland Security

15  Investigations ("HSI") has throughout its history provided law enforcement-based derogatory

16  information to State for purposes of vetting aliens.  The HSI Office of Intelligence has historically

17  analyzed potential referrals regarding derogatory information from a variety of sources and, after

18  conducting extensive open-source reviews of information, prepared Reports of Analysis ("ROAs") for

19  potential referral to State based on the information obtained by HSI Office of Intelligence during its

20  review.  *See id.* Ex. 5 at 45.

21      When they receive such referrals, Office of Intelligence analysts conduct open-source analysis

22  and various checks to validate the availability of information and/or the referral, and, if warranted,

23  prepare an ROA.  *See id.* at 48-50.  The Office of Intelligence has historically generated approximately

24  25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa

25  referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement

26

27      [2] Both Plaintiffs and Defendants have submitted testimony from State and DHS officials from

28  the recent trial in *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.).  *See* Dkt. No. 13 Ex. D; Dkt.
   No. 14 Exs. J, K; Helland Decl. Exs. 2-5.

1    information to its leadership and other Executive Branch partners.  *See* Dkt. No. 14, Ex. K at 49.  Many

2    of these ROAs are referred to State for potential further action.

3         When State receives a referral from DHS, State first determines whether the information

4    received from DHS relates to a nonimmigrant visa holder or lawful permanent resident.  *See* Helland

5    Decl. Ex. 4 at 89.  In the case of a nonimmigrant visa holder, the information is sent to the Visa Office

6    within the Bureau of Consular Affairs.  *See id.*  The Visa Office examines the information to determine

7    whether it warrants revoking the nonimmigrant visa.  *See id.* at 90-92.  If the Visa Office agrees the

8    nonimmigrant visa should be revoked, the visa will be revoked under § 1201(i).  *See id.* at 90.  Prior to a

9    revocation decision, DHS may be asked to provide additional information.  *See id.* at 93-94.

10         State procedures for revoking visas are set forth in the Foreign Affairs Manual, 9 FAM 403.11.

11    *See id.* Ex. 1.  The Foreign Affairs Manual instructs consular officers that, "[a]lthough the decision to

12    revoke a visa is a discretionary one, [they] should not use this authority arbitrarily."  *Id.* at 9

13    FAM 403.11-4(A); *see also id.* Ex. 3 at 31-32, 52-55; Ex. 4 at 65, 85.  Staff should only revoke a visa

14    "where warranted" for various specified reasons.  *Id.* Ex. 1 at 9 FAM 403.11-5(B)(a).  These reasons

15    include "when [the State Department] receives derogatory information directly from another U.S.

16    Government agency."  *Id.*

17         In addition to the visa revocation process described above, the Bureau of Consular Affairs

18    analyzes DHS referrals for potential removability determinations under § 1227.  Each referral is

19    assessed individually.  Depending on the visa status of the individual and the concerns raised in the

20    referral, the Bureau may consider whether the foreign-policy-removal provision of § 1227(a)(4)(C)

21    applies to such individual.  Upon an assessment that the individual's presence or activities may present

22    foreign policy concerns under § 1227(a)(4)(C), the Bureau then develops an action memo to pursue a

23    determination from the Secretary of State.  *See* Helland Decl. Ex. 4 at 85-91.

24        **C.**   **Enforcement of the Statutes by the Current Administration.**

25         On January 20, 2025, the President signed Executive Order 14161: *Protecting the United States*

26    *from Foreign Terrorists and Other National Security and Public Safety Threats*.  90 Fed. Reg. 9451. The

27    EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist

28    attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration

laws for malevolent purposes." *Id.* § 1(a). To the extent that EO 14161 requires departments or agencies to act in furtherance of its policy goals (*see, e.g.*, §§ 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), § 4 makes express that any such action must be done consistent with all applicable law. *Id.* § 4(a)(i)-(ii).

Just over one week later, on January 29, 2025, the President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism.* 90 Fed. Reg. 8847. EO 14188 calls for stepped up federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." *Id.* § 1. EO 14188 directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* § 2. As above, however, EO 14188 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." *Id*. § 4(b); *see also* EO 13899 § 2(b), 84 Fed. Reg. 68779.

Following this issuance of EOs 14161 and 14188, DHS and State undertook measures to implement the priorities and emphases the EOs established. *See* Helland Decl. Ex. 3 at 21-22, 31-33; Ex. 5 at 43-46. With respect to EO 14161, State issued guidance in the form of a cable to its diplomatic posts abroad to review the nonimmigrant visa system, and when derogatory information related to an individual appeared in the system, to revoke the individual's visa, if warranted. *See id.* Ex. 4 at 99-101. However, State did not change its criteria or procedures for revoking nonimmigrant visas. *See id.* at 94.

Similarly, based on the EOs, DHS aligned its resources and priorities, within the existing statutory and regulatory framework, to best accomplish those goals. *See id.* Ex. 5 at 43. HSI developed a plan to process referrals from a variety of sources to complement the EOs and use HSI's existing lines of effort. *See id.* at 46. The plan created a team, based within the ICE HSI Office of Intelligence, to process the especially large volume of referrals it was receiving, particularly related to protesters. *See id.* at 48. Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the Office of Intelligence team investigated under Title 8 and for potential violations of law. *See id.* Ex. 2 at 83-84, 97. Part of the Office of Intelligence team's work involved reviewing the Canary Mission website, which itself listed more than 5,000 names of protesters. *See* Dkt. No. 14 Ex. J at 109-112; Helland Decl.

1   Ex. 2 at 98-99. However, Canary Mission was only one of multiple publicly available sources the team

2   reviewed. Dkt. No. 14 Ex. J at 118; *see* Helland Decl. Ex. 2 at 75-78. The team also obtained police

3   records for individuals arrested by police during protests. Dkt. No. 14 Ex. J at 118-119.

4        In the context of sharing information with the State Department, each ROA would be reviewed

5   and ultimately submitted for approval within the Office of Intelligence leadership framework. *See*

6   Helland Decl. Ex. 5 at 49-50. Thereafter, the Office of Intelligence would send a package for referral to

7   the Assistant Director of the HSI National Security Division. *See id.* If the Assistant Director approved

8   the referral package, it would be formally referred to the Department of State for information sharing

9   purposes. *See id.* at 50-51.

10       HSI has completed its review of the 5,000-plus campus-protester names referred to it. From

11   those leads, the Office of Intelligence team generated between 100 and 200 ROAs, representing no more

12   than, at most, about 4% of the total. *See id.* Ex. 2 at 83-84, 97-98, 105-108. Those ROAs were sent to

13   the National Security Division. For the remaining more-than-95% of leads, the Office of Intelligence

14   took no further action. *See id.* at 106. From the roughly 200 ROAs, between approximately 10 and 50

15   were referred to State regarding specific individuals associated with these protests. *See id.* Ex. 5 at 55-

16   56, 77. Of those referrals to State involving nonimmigrant visa holders, approximately 25% to 30% did

17   not result in revocations or removability determinations, either because they are sent back to DHS to ask

18   for more information or because State found the information not significant enough to warrant

19   revocation. *See id.* Ex. 4 at 93-94. Thus, less than 1% of campus-protest leads (at most, approximately

20   40 out of more than 5,000) have resulted in nonimmigrant visa revocations—and these revocations were

21   the result of the individuals' *conduct* at protests or other information discovered about them from the

22   resulting investigations, *not* their mere participation in or presence at public protests or pure political

23   speech. *See, e.g.*, *id.* Ex. 4 at 121-22; Ex. 5 at 39-41, 54-60, 92-95.

24       To be clear: Neither State nor DHS have a policy of targeting individuals based on protected

25   political speech. *See id.* Ex. 4 at 121-22; Ex. 5 at 59-60. State adheres to statutory authority rendering

26   aliens inadmissible for certain support for terrorist activity (*see, e.g.*, 8 U.S.C. § 1182(a)(3)(B)-(C)) and

27   maintains that supporting a terrorist organization can result in the revocation of a visa (*see* Helland Decl.

28   Ex. 4 at 121-22), but as explained below, such revocations do not burden protected speech. And for its

part, DHS views supporting terrorism and certain kinds of disruptive conduct as warranting investigation and potential referral—such as engaging in violence during protests, promoting the destruction of property, etc. (*see id.* Ex. 5 at 39-41, 59-60, 92-95)—but this, too, does not implicate protected speech. Indeed, DHS does not refer individuals for visa revocations solely because they participated in public protests. *See id.* at 39.  Nor does DHS refer individuals for visa revocations solely because they have used the phrase "from the river to the sea, Palestine will be free," or described Israel as having committed "genocide" or "apartheid" in Gaza. *See id.* at 59-60.  In short, both agencies have expressly disavowed any policy or intention to target individuals based on pure political speech.

### D.    Plaintiffs Have Not Been Threatened With Enforcement.

Plaintiffs are Stanford University's independent student-run newspaper and two pseudonymous individuals with unclear ties to the University or the newspaper.  According to their own representations, none of the three Plaintiffs has been subject to any enforcement action.

Plaintiff Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities." Dkt. No. 32-1 ("Mot.") 8 (quoting Dkt. No. 1 ("Compl.") ¶ 68).  It "has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions." Compl. ¶ 69.  The Stanford Daily asserts that "since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students working at and contributing to Stanford Daily have self-censored expression for fear of visa revocation, arrest, detention, and deportation." *Id.* ¶ 72.  "For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper." *Id.* ¶ 73. "As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza." *Id.* ¶ 75.  "But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id.*  The newspaper asserts that other current and former staff writers and editorial board

members have asked to be removed from the website, and that international students have been less willing to speak with Stanford Daily journalists, especially on the record and about topics like Israel and Palestine. *Id.* ¶¶ 77-88; *see also* Mot. 8. It does not assert that any immigration enforcement action has been taken against it, its staff, its editorial board, or any international students at Stanford. *See* Mot. 8; Compl. ¶¶ 65-88.

Plaintiff Jane Doe asserts that she "is a graduate of a United States university, resides in the United States lawfully pursuant to her admission on an F-1 student visa, and was a member of a pro-Palestinian student group." Mot. 7.[3] "She published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing 'genocide' and perpetuating 'apartheid.'" *Id.* "She has also used the slogan 'from the river to the sea, Palestine will be free,' and criticized American foreign policy, particularly its relationship with Israel." *Id.* Jane Doe "appeared in a profile on" the Canary Mission website. *Id.* "Since March 2025, fearing Secretary Rubio will revoke her visa . . . Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deactivated her social media accounts to guard against retaliation for past expression." *Id.* She does not assert that any enforcement action has been taken against her. *See id.*; *see also* Compl. ¶¶ 89-101.

Plaintiff John Doe asserts that he "is a graduate of a major United States university and is lawfully present in the United States pursuant to his admission on an F-1 student visa, working in journalism." Mot. 7. "After the October 7, 2023, attack and Israel's counter-offensive, he attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online." *Id.* "At protests, he participated in chants including 'from the river to the sea, Palestine will be free' and accusing Israel of committing 'genocide.'" *Id.* at 7-8. "After Secretary Rubio and the Trump administration began targeting lawfully present noncitizen students," John Doe's professor "told him to reconsider engaging in protected activity related to Israel and Palestine due to potential danger to his immigration status." *Id.* at 8. "He followed that advice, refraining from publishing an article criticizing Israel." *Id.* However, he has since "resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing

---

[3] Because the individual Plaintiffs are proceeding pseudonymously, the government has no way of confirming their immigration status, the veracity of their allegations, or whether they have committed any non-speech conduct that may bear on their status. For purposes of these cross-motions, the government does not dispute the truth of their representations regarding their individual experiences.

1  Israel of committing genocide as well as commentary critical of American foreign policy." *Id.*; *see also*

2  Compl. ¶¶ 102-09.  He does not assert that any enforcement action has been taken against him.  *See id.*

## IV.  LEGAL STANDARD

4          The purpose of summary judgment is to identify and dispose of unsupported claims.  *See Celotex*

5  *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate when the moving

6  party "shows that there is no genuine dispute as to any material fact and the movant is entitled to

7  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if there is sufficient

8  evidence for a reasonable fact finder to find for the non-moving party.  *See Anderson v. Liberty Lobby,*

9  *Inc.*, 477 U.S. 242, 248-49 (1986).  The existence of a "scintilla" of evidence in support of the non-

10  moving party's position is not sufficient; the non-moving party must offer sufficient evidence on which

11  a finder of fact could reasonably find for it.  *See id.* at 252.  A fact is "material" if it might affect the

12  outcome of the case.  *Id.* at 248.  The party moving for summary judgment has no burden to produce any

13  evidence on elements of a claim on which the non-moving party will bear the burden at trial.  *See*

14  *Celotex*, 477 U.S. at 322-23.  Summary judgment is proper if the non-moving party fails to produce

15  sufficient evidence on any element.  *See id.* at 322.

## V.  ARGUMENT

### A.  Plaintiffs Lack Standing.

18          "This is a case in search of a controversy."  *Thomas v. Anchorage Equal Rights Comm'n*, 220

19  F.3d 1134, 1137 (9th Cir. 2000) (en banc) (dismissing First Amendment challenge for lack of standing).

20  Plaintiffs put forward various theories for why they can invoke this Court's Article III jurisdiction, but

21  all of them fail because Plaintiffs have not shown they face an imminent injury that is traceable to the

22  federal government.

#### 1.  Stanford Daily lacks standing.

24          Stanford Daily argues that it has standing under three separate doctrines: (i) associational

25  standing; (ii) corporate standing; and (iii) organizational standing.  None apply here.

##### (i)  Stanford Daily lacks associational standing.

27          The doctrine of "associational standing" allows an organization to rely on the injuries of its

28  members to invoke the Article III jurisdiction of a federal court.  *See, e.g.*, *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333 (1977).  "To invoke it, an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343).

There are reasons to doubt the continued viability of the associational-standing doctrine.  *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (quotation omitted) (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing.").  Indeed, the doctrine flouts the requirements of Article III by allowing one party to rely on the injuries of another; "standing is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

Even if the doctrine survives, it has no application here.  Stanford Daily is not an "association" of "members."  It is not an advocacy organization.  It is a general-purpose student-run newspaper.  To be sure, the Supreme Court has allowed an advocacy organization to rely on the doctrine even when it was not "a traditional voluntary membership organization." *Hunt*, 432 U.S. at 344.  But in so doing, the Court focused on the facts that the organization "perform[ed] the functions of a traditional trade association representing the Washington apple industry," and "the apple growers and dealers . . . possess all of the indicia of membership in an organization." *Id.*  By contrast, Stanford Daily is not a "trade association" representing international students; it is a newspaper.  Applying the doctrine here would stretch it past the breaking point. *See Students for Fair Admissions*, 600 U.S. at 200 (recognizing that the apple growers in *Hunt* were "*effectively* members of the Commission") (emphasis in original).

Nor can Stanford Daily even satisfy the doctrine's criteria.  As discussed with respect to the individual Plaintiffs below, no individuals would have standing to sue in their own right, because there is no evidence that any of them have actually faced enforcement or have demonstrated a substantial threat of future enforcement.  Nor are the "interests" at issue here "germane" to the newspaper's purpose—again, Stanford Daily is a general-purpose newspaper that covers "all relevant campus activities." Compl. ¶ 69.  Stanford Daily has no special focus on international students or immigration

1    issues. *See id.* Finally, Plaintiffs have put the experiences of "individual members" at issue by

2    purporting to base their harms on such members' mere beliefs; the "participation" of those members will

3    therefore be necessary, especially if the case persists past summary judgment.

### (ii)    Stanford Daily lacks corporate standing.

5    The newspaper's "corporate standing" theory fares no better. Stanford Daily claims that it is

6    "'directly engaged' in activities like publishing noncitizens' work, enacting noncitizens' editorial

7    choices, and sponsoring noncitizens' speech." Mot. 13 (quoting *NAACP v. Button*, 371 U.S. 415, 428

8    (1963)). But the newspaper does not claim that the federal government has stopped it from taking any

9    of these actions; at most, it claims that noncitizens themselves have opted out of those activities for their

10   own reasons. Those intervening third-party decisions prevent Stanford Daily from establishing its own

11   standing to challenge federal statutes itself. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

12   (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).

### (iii)    Stanford Daily lacks organizational standing.

14   For similar reasons, Stanford Daily cannot establish that the statutes at issue have "'directly

15   affected and interfered with [its] core business activities.'" Mot. 13 (quoting *All. for Hippocratic Med.*,

16   602 U.S. at 395). The entirety of Plaintiffs' argument on this theory is that "Stanford Daily has

17   encountered significant interference with its core business activity−reporting." *Id.* (citing Compl. ¶ 72).

18   But, again, that "interference" has been the result of third parties making their own independent

19   decisions, none of whom would have standing in their own right (as discussed further below).

20   Moreover, the newspaper has submitted no evidentiary basis for the Court to conclude that any supposed

21   "interference" has in fact been "significant"; there are no declarations testifying that the newspaper has

22   been unable to publish as much as it previously did, or that the quality of its reporting has suffered by

23   any measure. There is no foundation on which to conclude that Stanford Daily has established standing.

### 2.    The individual Plaintiffs lack standing.

25   The individual Plaintiffs lack standing because they cannot show a substantial likelihood that

26   they will face visa revocations or removal proceedings based on their protected speech. *See Int'l Ps. for*

27   *Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs

28   have not demonstrated that their injuries are imminent").

1    At the outset, despite having previously published content regarding Israel and Gaza; criticized

2    America's foreign policy; described Israel's actions in Gaza as a "genocide"; used the slogan "from the

3    river to the sea, Palestine will be free"; attended protests; and been the subject of profiles on the website

4    Canary Mission, neither individual Plaintiff claims (much less submits evidence) that they have been

5    subject to enforcement under the statutes.  *See* Mot. 11-12; *see also* Compl. ¶¶ 17-18, 89-109.  Thus,

6    their standing must be based, if at all, on their fear of *future* enforcement.

7    The Ninth Circuit has established a three-part test to determine whether a plaintiff can establish

8    standing based on an alleged threat of future enforcement, considering "whether the plaintiffs have

9    articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have

10   communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or

11   enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139; *see also, e.g.*, *Tingley v.*

12   *Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).  These factors defeat Plaintiffs' standing here.

13   First, neither Jane nor John Doe has articulated a "concrete plan" to commit conduct that would

14   make them subject to visa revocation or removal.  At most, "Jane Doe has refrained from publishing and

15   voicing her true opinions regarding Palestine and Israel."  Mot. 7.  For his part, John Doe apparently

16   once "refrain[ed] from publishing an article criticizing Israel," but has since "resumed engaging in

17   protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide as

18   well as commentary critical of American foreign policy"—again, without suffering any enforcement

19   action.  *Id.* 8.  Plaintiffs submit no actual evidence on this point, confining their discussion to a handful

20   of lines in their brief.  Neither Defendants nor the Court can say that Plaintiffs have a "concrete plan" to

21   act in ways that would render them subject to enforcement under the statutes.

22   Indeed, the ambiguity of Plaintiffs' future plans underscores why the Court should deny their

23   request to litigate the contours of the First Amendment.  Plaintiffs do not ask the Court to evaluate

24   whether certain speech is protected.  *See generally* Compl.  Rather, they ask the Court to ponder in the

25   abstract about the boundaries of "protected speech" and then hold unconstitutional two statutes passed

26   by Congress to the extent they might cross the Court's hypothetical boundaries.  *See id.*  But Article III

27   does not allow the Court to render such an "advisory opinion."  *See California v. Texas*, 593 U.S. 659,

28   673 (2021) ("To find standing here" "would threaten to grant unelected judges a general authority to

1 conduct oversight of decisions of the elected branches of Government.").

2  Second, Defendants have not threatened Plaintiffs with enforcement. *See* Mot. 7-8, 11-12;

3 Compl. ¶¶ 89-109. Rather, "the record is devoid of any threat" directed toward them; "[t]here has been

4 no specific threat or even hint of future enforcement or prosecution." *Thomas*, 220 F.3d at 1140. This

5 case is therefore unlike cases where courts have found standing based on specific threats. *Cf., e.g.*,

6 *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("Most obviously, there is a history of past

7 enforcement here: SBA was the subject of a complaint in a recent election cycle," and "the Commission

8 panel actually found probable cause to believe that SBA's speech violated the false statement statute");

9 *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999) ("Here, there has

10 clearly been a specific threat of prosecution; the attorney general's letter to the union is precise and

11 exact—she will cause the statute to be enforced unless the union ceases distribution of the handbill.").

12  The Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), is instructive. The

13 Court contrasted a plaintiff who had actually been indicted with others who had not even been

14 threatened. *Id.* at 42. In this case, as in *Harris*, to Defendants' knowledge Plaintiffs have not engaged in

15 any action or conduct that puts them in immigrant danger of enforcement action.

16  Finally, the "history of enforcement" does not support Plaintiffs here. "[P]laintiffs' claims of

17 future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the

18 challenged law to the plaintiffs." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010). That is the case

19 here—both State and DHS have represented in this litigation, and elsewhere, that they do *not* pursue visa

20 revocations and removal proceedings purely based on political speech. *See* Helland Decl. Ex. 4 at 121-

21 22; Ex. 5 at 39, 59-60. Contrary to Plaintiffs' implication, merely using the terms "genocide,"

22 "apartheid," and "from the river to the sea, Palestine will be free" has not been used as the sole basis for

23 revoking student visas and initiating removal proceedings. Rather, revocations have been based on the

24 types of conduct described above and other derogatory information related to potential violations of U.S.

25 law, including but not limited to Title 8. *See ibid*; *see also* Dkt. No. 14 Ex. J at 92-95.[4]

26

27  [4] It would be inappropriate for this Court to adjudicate the validity of enforcement actions taken against third parties, who are not before the Court and who are in fact parties to separate litigation in their own right. The government has consistently taken the position across these cases that individuals

28 subject to enforcement under the statutes have done more than exercise pure political speech.

1      Further, Plaintiffs cannot rely on abstract statements from the Secretaries of State and Homeland

2  Security.  "'[G]eneral threat[s] by officials to enforce those laws which they are charged to administer'

3  do not create the necessary injury in fact."  *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am.*

4  *v. Mitchell*, 330 U.S. 75, 88 (1947)).  Crucially here, it is not the (politically-appointed) Secretary of

5  State or Homeland Security who makes threshold decisions about whether a student visa should be

6  revoked or removability proceedings should be initiated; rather, as described above, those initial

7  decisions are made by staff in various offices at State and DHS.  Plaintiffs therefore cannot rely on

8  general statements from the agencies' political leadership to establish how the statutes are actually

9  enforced.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 701-02 (2018) ("[T]he issue before us is not

10  whether to denounce the statements. It is instead the significance of those statements in reviewing a

11  Presidential directive, neutral on its face, addressing a matter within the core of executive

12  responsibility.").[5]  Nor do those statements suggest that pure political speech is used as a basis for

13  enforcement, as opposed to support for terrorism or other unprotected conduct.  Plaintiffs bear the

14  burden of establishing that State and DHS actually enforce the statutes against individuals like them

15  based on pure protected speech.  They have failed to do so.

16      **B.      Plaintiffs' Claims Lack Merit.**

17          **1.      The statutes do not violate the First Amendment.**

18              **(i)      Aliens have reduced First Amendment rights.**

19      The starting principle is that the First Amendment rights of citizens and aliens are not

20  coextensive.  The Supreme Court "has firmly and repeatedly endorsed the proposition that Congress

21  may make rules as to aliens that would be unacceptable if applied to citizens."  *Demore v. Kim*, 538 U.S.

22  510, 522 (2003); *see also, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *Rodriguez Diaz v. Garland*,

23  53 F.4th 1189, 1206 (9th Cir. 2022).  The Supreme Court has therefore recognized that "[t]he alien . . .

24  has been accorded a generous and ascending scale of rights as he increases his identity with our society,"

25  that "become more extensive and secure when he makes preliminary declaration of intention to become

26

27      ───────────────

28      [5] Of course, "[n]ot only do public officials have free speech rights, but they also have an
obligation to speak out about matters of public concern."  *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir.
2013); *see also AAUP v. Rubio*, 780 F. Supp. 3d 350, 384 n.11 (D. Mass. 2025).

1    a citizen, and [] expand to those of full citizenship upon naturalization." *Kwong Hai Chew v. Colding*,

2    344 U.S. 590, 596 n.5 (1953) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *see also, e.g.*,

3    *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen

4    "increases his identity with our society" do the "generous and ascending scale of rights" apply).

5    Consistent with this principle, the Supreme Court has held that the First Amendment does not

6    prohibit Congress or the Executive from deporting resident aliens based on their membership in the

7    Communist Party. *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952). That decision rested on

8    judicial findings that "the Communist Party during the period of the alien's membership taught and

9    advocated overthrow of the Government of the United States by force and violence." *Id.* at 583. The

10   Court recognized that "it often is difficult to determine whether ambiguous speech is advocacy of

11   political methods or subtly shades into a methodical but prudent incitement to violence." *Id.* at 592.

12   And the deportation orders at issue were not based on the aliens' personal advocacy for violence, but

13   rather their mere membership in the Communist Party. *See id.* at 582-84. Nevertheless, the Court

14   concluded that "the First Amendment does not prevent the deportation of these aliens." *Id.* at 592; *see*

15   *also Turner v. Williams*, 194 U.S. 279, 293 (1904) (rejecting First Amendment challenge to deportation

16   based on alien's anarchist beliefs and advocacy).

17   To be sure, the Supreme Court has also held that the First Amendment prohibited a criminal

18   contempt charge based on "comments pertaining to pending litigation which were published in

19   newspapers," where the affected parties included a lawful permanent resident and a corporation.

20   *Bridges v. California*, 314 U.S. 252, 258 (1941). But the Court in that case did not address the

21   petitioner's citizenship. *See generally id.*; *cf. id.* at 280 (Frankfurter, J., dissenting). In a subsequent

22   decision, the Court held that there was insufficient evidence of the petitioner's alleged membership in

23   the Communist Party to support his deportation, and stated in *dicta* that "[f]reedom of speech and of

24   press is accorded aliens residing in this country," citing only its prior decision in the petitioner's case.

25   *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Writing only for himself, Justice Murphy would have held

26   that the statute at issue was unconstitutional. *Id.* at 150 (Murphy, J., concurring). Three other justices,

27   by contrast, would have upheld the petitioner's deportation under Congress's "plenary power over the

28   deportation of aliens." *Id.* at 167 (Stone, J., dissenting). Thus, "*Wixon* does not resolve whether the

1   First Amendment applies to all resident aliens . . . . At most, its dicta suggests that lawful resident aliens,

2   what we today could call LPRs, can potentially invoke the First Amendment in some criminal

3   prosecutions." *Qatanani v. Bondi*, 144 F.4th 485, 516-17 (3d Cir. 2025) (Matey, J., dissenting).

4       Additionally, the Ninth Circuit previously held that "the values underlying the First Amendment

5   require the full applicability of First Amendment rights to the deportation setting." *Am.-Arab Anti-*

6   *Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995) (*AADC I*).  Thus, according to the

7   Ninth Circuit, plaintiff aliens could bring a selective enforcement claim on the ground that their removal

8   proceedings were retaliatory, and obtain injunctive relief to stop those proceedings in order to vindicate

9   their First Amendment rights.  *See id.* at 1065.  But the Supreme Court disagreed; it expressly rejected

10  the argument that post-removal relief "would come too late to prevent the 'chilling effect' upon [the

11  aliens'] First Amendment rights."  *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488

12  (1999) (*AADC II*).  The Court explained that "an alien unlawfully in this country has no constitutional

13  right to assert selective enforcement as a defense against his deportation."  *Id.*  Ultimately, "[w]hen an

14  alien's continuing presence in this country is in violation of the immigration laws, the Government does

15  not offend the Constitution by deporting him for the additional reason that it believes him to be a

16  member of an organization that supports terrorist activity."  *Id.* at 491-92.

17      Like the Supreme Court, other lower courts have recognized that, because "[f]oreigners fall

18  outside the community that's entitled to participate in the democratic process," "a lesser level of scrutiny

19  could apply to" First Amendment challenges involving aliens' speech.  *OPAWL - Bldg. AAPI Feminist*

20  *Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024) (noting issue without deciding it, because statute

21  survived strict scrutiny); *see also, e.g.*, *Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011)

22  (Kavanaugh, J.) (citing *Harisiades* and noting that "aliens' First Amendment rights might be less robust

23  than those of citizens in certain discrete areas"), *aff'd*, 565 U.S. 1104 (2012).

24      And indeed, since *AADC I* the Ninth Circuit has held that a federal statute prohibiting foreign

25  nationals from contributing to election campaigns, as applied to a nonimmigrant visa holder, did not

26  violate the First Amendment.  *See United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020).  The court

27  in that case did not address the standard for such a First Amendment claim, instead recognizing that it

28  was bound by the Supreme Court's summary affirmance in *Bluman*, which had concerned a virtually

1  identical issue. *See id.* Nevertheless, the outcome of *Singh* (and *Bluman*) confirms that, even in the

2  Ninth Circuit, foreign nationals have reduced First Amendment rights compared to United States

3  citizens. Otherwise, a statute prohibiting campaign contributions would violate the First Amendment.

4  *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 339 (2010); *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).

5          Here, Plaintiffs base their claims solely on the rights of nonimmigrant student-visa holders. *See*

6  *generally* Compl. As explained above, such individuals are neither "residents" nor "immigrants" in the

7  United States and do not intend to be; they have been allowed to study here on a temporary basis, but,

8  among other things, must maintain a permanent residence in a foreign country which they have "no

9  intention of abandoning." 8 U.S.C. § 1101(a)(15)(F)(i). Contrast such connections with those of a

10 lawful permanent resident, who must have been admitted on an *immigrant* visa (based only on certain

11 enumerated grounds), and who has manifested an intention to reside in the United States permanently

12 and been granted permission by the United States to do so (subject to certain conditions). Contrast them

13 further with those of a citizen, whose connections are either established by birth or by completing the

14 rigorous naturalization process. *See, e.g.*, 8 U.S.C. § 1429.

15         On the "ascending scale" of constitutional rights, the interests implicated by nonimmigrants in

16 this case are therefore significantly lower than those of United States citizens and immigrants.

17                     **(ii)     Public interests outweigh any burdens on Plaintiffs' speech.**

18         Because this case involves the First Amendment interests of nonimmigrant student-visa holders,

19 the challenged statutes are constitutional so long as the government has articulated a facially legitimate

20 and bona fide justification for their use. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024);

21 *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).

22         The statutes easily pass that test. Indeed, the Executive Orders issued in January reflect the

23 government's interests in "protect[ing] its citizens from aliens who intend to commit terrorist attacks,

24 threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for

25 malevolent purposes," EO 14161, Sec. 1(a), and guarding against antisemitic "discrimination,

26 vandalism, and violence" against citizens, EO 14188, Sec. 1. There can be no dispute that the

27 government has legitimate national-security and foreign-policy interests in countering support for

28 terrorist groups and addressing antisemitism. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-

32 (2010) (*HLP*) (affirming restrictions on speech in criminal material support for terrorism bar).

But even applying intermediate or strict scrutiny, the statutes would survive. This is because regulating who comes to and lives or resides in the United States is, itself, a compelling government interest. *See Harisiades*, 342 U.S. at 588-89 (immigration policies are "intricately interwoven" with foreign affairs and "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *see also Negusie v. Holder*, 555 U.S. 511, 526-27 (2009) ("in the context of immigration law, 'culpability' as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability").

Congress has granted the Secretary of State broad authority in §§ 1182 and 1227 to find noncitizens inadmissible and deportable, even when it may burden their speech. Indeed, the government's authority over noncitizens has no comparator to citizens, as "[t]he exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry." *Mathews*, 426 U.S. at 80. As a result, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Kim*, 538 U.S. at 521 (citation and quotation omitted).

Here, therefore, Plaintiffs challenge executive and congressional conduct where their authority is at its zenith and entitled to the most deference from the courts: decisions concerning the presence of noncitizens, national security, and foreign affairs. *See Kim*, 538 U.S. at 522 ("any policy toward aliens is . . . interwoven with . . . policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"). For example, even lawful permanent residents can be held under a no-bail provision of the INA during the pendency of civil immigration proceedings. *See id.* at 521-23. And, under state law, lawful permanent residents can be prohibited from contributing to political campaigns. *See OPAWL*, 118 F.4th at 777. So too here, statutes allowing for immigration-related enforcement actions for pro-terrorist and antisemitic speech rely on both congressional and executive authority over foreign affairs, and, hence, would satisfy any standard of review.

## 2. The statutes do not violate the Fifth Amendment.

Plaintiffs' Fifth Amendment claims fare no better. The statutes are not unconstitutionally vague under the Due Process Clause because Congress and the Executive have substantial discretion with

respect to the admission and exclusion of nonimmigrants, and in that context, the statutes provide

sufficient notice to nonimmigrants that they may be subject to enforcement.

### (i)    Congress has increased discretion in the immigration context.

"For more than a century, [the Supreme Court] has recognized that the admission and exclusion

of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political

departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*,

430 U.S. 787, 792 (1977)); *see also Harisiades*, 342 U.S. at 588-89 ("[A]ny policy toward aliens is

vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign

relations [and] the war power."). "Because decisions in these matters may implicate 'relations with

foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic

circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature

or the Executive.'" *Hawaii*, 585 U.S. at 702 (quoting *Mathews*, 426 U.S. at 81).

The vagueness doctrine is meant to avoid "arbitrary and discriminatory enforcement" by

providing "fair warning[s]" that are "clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108

(1972); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). But "[t]he Supreme Court has long recognized

that the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far

more general than that which has always been considered requisite with regard to domestic affairs.'"

*Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss–*

*Wright Export Corp.*, 299 U.S. 304, 324 (1936)). As the Supreme Court has recognized, "because of the

leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of

necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting

*Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). And given aliens' reduced constitutional protections, the Due

Process Clause is not offended by such increased discretion in this context. *See Kim*, 538 U.S. at 522

("Congress may make rules as to aliens that would be unacceptable if applied to citizens."); *Mathews*,

426 U.S. at 78; *Rodriguez Diaz*, 53 F.4th at 1206.

Thus, the Supreme Court has held that Congress's authorization of immigration detention based

on membership in the Communist Party does not violate the Due Process Clause of the Fifth

Amendment. *See Carlson v. Landon*, 342 U.S. 524, 542 (1952). "As all alien Communists are

deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims, evidence of membership plus personal activity in supporting and extending the Party's philosophy concerning violence gives adequate ground for detention." *Id.* at 541.  Thus, "[t]here is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542.

Indeed, the government is not aware of the Supreme Court ever invalidating an immigration statute, facially or as-applied, on void-for-vagueness grounds.  *See Abourezk*, 592 F. Supp. at 886 n.19, *vacated*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).[6]  The Court should therefore reject the inquiry at the outset.  *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Harisiades*, 342 U.S. at 589).

### (ii)      The statutes are not unconstitutionally vague here.

The Supreme Court has made clear that courts must "consider whether a statute is vague as applied to the particular facts at issue, for 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  *HLP*, 561 U.S. at 18-19.  A court therefore must not "consider[] the statute's application to facts not before it"; such a decision regarding "how the statute applied in hypothetical circumstances" would impermissibly "incorporate elements of First Amendment overbreadth doctrine" into a Fifth Amendment vagueness challenge.  *Id.* at 19.  "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice.  And he certainly cannot do so based on the speech of others."  *Id.* at 20.

In any event, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'"  *Id.* at 19 (citation omitted).  Rather, what matters is whether the statute "grants too much enforcement discretion to the Government," or fails to provide "'a person of ordinary intelligence fair notice of what is prohibited.'"  *Id.* at 20 (citation omitted).  In evaluating these

---

[6] *Sessions v. Dimaya* did not deem an entire immigration statute invalid for vagueness. *See* 584 U.S. 148, 174-75 (2018) (holding that a "residual clause" is vague).

1    questions, an agency's regulations and guidance in implementing the statute can clarify the statute's

2    scope.  *See Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 571-72 (9th Cir. 2018).

3         Here, especially in light of nonimmigrant student visa-holders' limited due-process rights, the

4    statutes do not violate the vagueness doctrine of the Fifth Amendment.  Rather, they reflect the broad

5    brush that Congress must take to foreign policy-related statutes.  Congress has directly authorized the

6    State Department to revoke aliens' visas.  *See* 8 U.S.C. § 1201(i).  The State Department's discretion in

7    this regard has been clarified by the Foreign Affairs Manual, such that State Department staff should

8    only revoke a visa "where warranted" for various specified reasons.  Helland Decl. Ex. 1, 9 FAM

9    403.11-5(B)(a).  These reasons include "when [the State Department] receives derogatory information

10   directly from another U.S. Government agency."  *Id.*  And the Foreign Affairs Manual instructs consular

11   officers that, "[a]lthough the decision to revoke a visa is a discretionary one, [they] should not use this

12   authority arbitrarily."  *Id.* § 403.11-4(A).  The statute, as clarified by this implementing guidance,

13   sufficiently limits the government's enforcement discretion and supplies fair notice to nonimmigrant

14   visa holders that their visas are subject to revocation on the specified grounds.

15        Similarly, Congress specifically and clearly stated that "[a]n alien whose presence or activities in

16   the United States the Secretary of State has reasonable ground to believe would have potentially serious

17   adverse foreign policy consequences for the United States is deportable."  8 U.S.C. § 1227(a)(4)(C)(i).

18   That removability ground is subject to limited exceptions, such that the individual would not be

19   removable based on his "past, current, or expected beliefs, statements, or associations, if such beliefs,

20   statements, or associations would be lawful within the United States."  8 U.S.C. § 1182(a)(3)(C)(iii).

21   Congress created an exception to that exception: the Secretary of State could override that consideration

22   if he "personally determines that the alien's admission would compromise a compelling United States

23   foreign policy interest."  *Id*.

24        Thus, these provisions create a careful framework.  Under that framework, the Executive has

25   significant discretion to determine that one's mere presence, let alone activities, would potentially have

26   serious adverse foreign policy consequences and compromise compelling foreign policy interests.  The

27   Executive's constitutional role in determining what constitutes foreign policy considerations must be

28   respected.

1  That Congress did not limit the discretion to revoke visas and did not define what constitutes

2  "potentially serious adverse foreign policy consequences" is telling.  Expecting Congress to do so would

3  be problematic when the issue of "foreign policy" is specifically within the Executive's bailiwick.  *See,*

4  *e.g.*, *Zemel*, 381 U.S. at 17 (reiterating that Congress must "paint with a brush broader" in this area

5  "because of the changeable and explosive nature of contemporary international relations, and the fact

6  that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated

7  by, and acted upon by the legislature"); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320

8  (1936) (describing the President as "the sole organ of the federal government in the field of international

9  relations"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32, (2015) ("To allow Congress to

10  control the President's communication in the context of a formal recognition determination is to allow

11  Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.").

12  Put otherwise, so long as Congress wanted to maintain the State Department's discretion to

13  revoke visas and make aliens removable whose presence threatened American foreign policy interests,

14  the only way to do so was to draft statutes like §§ 1201(i) and 1227(a)(4)(C).  That is because the

15  relevant standard—whether an alien's presence and activities would potentially have serious adverse

16  foreign policy consequences or compromise a compelling United States foreign policy interest—is

17  something that is *necessarily* within the competency of the Executive, and the Executive alone.

18  Congress cannot preemptively adopt a comprehensive standard on the front-end to predict every fact

19  pattern that might fit this mold; nor can courts intelligently review on the back-end whether an alien

20  meets any such standard.  Instead, given our constitutional system, the decision is inevitably one that

21  must turn on the Executive's discretion.  And nothing in the Fifth Amendment prevents that.

22  Moreover, the standards set forth in these statutes are plainly *more* definite than other provisions

23  that the Supreme Court has upheld against vagueness challenges, even assuming the doctrine applies

24  here.  *See, e.g.*, *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (affirming deportation on ground that alien

25  was "afflicted with psychopathic personality" at the time of his entry, against challenge that he had not

26  received adequate warning that sexual orientation was covered by the statute); *Jordan v. DeGeorge*, 341

27  U.S. 223, 225, 232 (1951) (upholding deportability provision for a "crime involving moral turpitude" as

28  providing a "sufficiently definite warning as to the prescribed conduct"); *Mahler v. Eby*, 264 U.S. 32, 40

1   (1924) ("[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the

2   delegation quite within the power of Congress.").

3        Plaintiff's arguments to the contrary are unavailing.  *See* Mot. 23-25.  First, Plaintiffs primarily

4   rely on cases involving statutes applied to U.S. citizens.  *See id.* (citing *United States v. Williams*, 553

5   U.S. 285 (2008); *Kolender,* 461 U.S. 352; *Smith v. Goguen*, 415 U.S. 566 (1974); *Grayned*, 408 U.S.

6   104; *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972); *Baggett v. Bullitt*, 377 U.S. 360 (1964)).

7   None of these cases addressed the reduced due-process protections available to aliens, nor the specific

8   Congressional and Executive interests raised in the foreign-policy context, described at length above.

9        Second, each of Plaintiffs' cases involved the actual enforcement of a statute to actual conduct.

10  *See generally id.*  Here, by contrast, Plaintiffs request an advisory opinion based on unspecified,

11  hypothetical future conduct.  *See generally* Compl.  That is an improper subject for a vagueness

12  challenge.  *See HLP*, 561 U.S. at 18-19.

13       Finally, Plaintiffs' limited cases involving other aliens' vagueness challenges are distinguishable.

14  For example, in *Massieu v. Reno*, the district court actually acknowledged that "Congress could not have

15  statutorily dictated to the Secretary the seriousness of particular foreign policy consequences" and that

16  "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary

17  of State's decisions on matters of foreign policy" because "this nation's foreign policy is an ever-

18  changing amalgamation of interests and alliances often known only to the Secretary, himself."  915 F.

19  Supp. 681, 701 (D.N.J. 1996), *rev'd*, 91 F.3d 416 (3d Cir. 1996).  And the district court decision in

20  *Khalil v. Trump*—which is currently under review by the Third Circuit, and which, again, arose in the

21  context of an actual enforcement action—failed to give sufficient weight to Congress's and the

22  Executive's need for discretion in matters of foreign policy.  *See generally* 784 F. Supp. 3d 705 (D.N.J.

23  2025).

24  **VI.    CONCLUSION**

25       For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment,

26  grant Defendants' Cross-Motion for Summary Judgment, and enter final judgment in favor of

27  Defendants.

28

1    Dated:  September 24, 2025

2                                              CRAIG H. MISSAKIAN
                                              United States Attorney
3
                                              */s/ Kelsey J. Helland*
4                                              KELSEY J. HELLAND
                                              Assistant United States Attorney
5
                                              Attorneys for Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28