CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*, | Case No. 5:25-cv-06618-NW |
| Plaintiffs, | **DECLARATION OF KELSEY J. HELLAND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RUBIO, *et al.*, | |
| Defendants. | |

I, Kelsey J. Helland, declare as follows:

1.    I am an Assistant United States Attorney in the Northern District of California and counsel of record for Defendants in the above-captioned matter.  If called to testify, I would and could competently testify as to the facts in this declaration.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the public version of the State Department Foreign Affairs Manual section regarding Nonimmigrant Visa Revocations, 9 FAM 403.11. This document is also available on the State Department website at https://fam.state.gov/FAM/09FAM/09FAM040311.html.

3.       Attached hereto as Exhibit 2 is a true and correct copy of volume two of the July 10, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

4.       Attached hereto as Exhibit 3 is a true and correct copy of volume one of the July 11, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

5.       Attached hereto as Exhibit 4 is a true and correct copy of volume two of the July 11, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

6.       Attached hereto as Exhibit 5 is a true and correct copy of the July 17, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate.  Executed this 24th day of September, 2025, in San Francisco, California.


                                        */s/ Kelsey J. Helland*
                                        KELSEY J. HELLAND

# EXHIBIT 1

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

# 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

## 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

## 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

# 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

# 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

## 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1) **Unavailable**

(2) **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

(3) **(U)** The visa has been physically removed from the passport in which it was issued; or

(4) **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

# 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

# 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

(1) **(U)** Notify the individual of the intention to revoke the visa;

(2) **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3) **(U)** Request the individual to present the travel document in which the visa was issued.

# 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c. **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See [9 FAM 402.8-8](#), Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

   (1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

   (2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation. In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c. **Unavailable**

# 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;   11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

# 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;   10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1) **(U)** Jeopardize an ongoing investigation;

(2) **(U)** Prejudice an intended prosecution;

(3) **(U)** Preclude apprehension of the subject in the United States;

(4) **(U)** Put informants at risk; or

(5) **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c. **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

# 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

# 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:** Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record. Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years. This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest. This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle. Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority. Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## *9 FAM 403.11-5(C)  Unavailable*

*(CT:VISA-2150;  04-29-2025)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

## 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

Unavailable

(1)  **Unavailable**

(2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3)  **Unavailable**

(4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a. **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1)  **(U)** Canceled.  Adjusted;

(2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

(3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

(4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

(5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

(6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b. **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

# 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;   05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1)  **(U)** Counterfeit visa per testimony of individual (file number); or

(2)  **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


********


BENCH TRIAL DAY 4



BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE



United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 10, 2025



********



Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

1   A P P E A R A N C E S

2   RAMYA KRISHNAN
    XIANGNONG WANG
3        Knight First Amendment Institute at Columbia
         University
4        475 Riverside Drive, Suite 302
         New York, NY 10115
5        (646) 745-8500
         Carrie.decell@knightcolumbia.org
6   and
    COURTNEY GANS
7   NOAM BIALE
    ALEXANDRA CONLON
8        Sher Tremonte LLP
         90 Broad Street, 23rd Floor
9        New York, NY 10004
         (212) 540-0675
10       Cgans@shertremonte.com
         For Plaintiffs

11

12  ETHAN B. KANTER
    WILLIAM KANELLIS
13  VICTORIA M. SANTORA
    JESSICA A. STROKUS
14       DOJ-Civ
         P.O. 878
15       Ben Franklin Station
         Washington, DC 20044
16       (202) 616-9123
         Ethan.kanter@usdoj.gov
17  and
    SHAWNA YEN
18       United States Attorney's Office
         1 Courthouse Way, Suite 9200
19       Boston, MA 02210
         Shawna.yen@usdoj.gov
20       (617) 748-3100
         For Defendants

21

22

23

24

25

1

2                                    <u>INDEX</u>

3

    <u>WITNESS</u>                                                      <u>PAGE</u>

4

5    PETER HATCH

6         Direct Examination By Ms. Conlon (continued)      75
         Cross-Examination By Ms. Santora                   90
7         Redirect Examination By Ms. Conlon               107

8    AMY GREER

9         Direct Examination By Mr. Biale                   113
         Cross-Examination By Mr. Kanellis                 125
10

11
      <u>E X H I B I T S</u>
12

13    <u>Exhibit No</u>.             <u>Received</u>

14
       237                      124
15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          (Resumed, 11:19 a.m.)

3          THE COURT:  The witness may resume the stand.

4          MS. CONLON:  Ms. Conlon, you may continue.

5    BY MS. CONLON:

6    Q.   So we've spoken quite a bit about Canary Mission, that

7    source of names, and the court alluded earlier with you to the

8    fact that names came from elsewhere.  I just want to turn to

9    the "elsewhere" part of that for a moment.

11:19 10         You had previously testified that the names came through

11   Derek Gordon, correct?

12   A.   Yes, they came through ICE leadership, HSI leadership.

13   Q.   And they came on multiple occasions, right?  It wasn't one

14   delivery?

15   A.   Right, there were multiple.

16   Q.   And certain -- well, you'll tell me if it's for all or

17   some, but in certain instances you received more than just the

18   name of a person to look at, right?

19   A.   We would get the name, occasionally we would get what

11:19 20  protest they were alleged to have attended, maybe where they

21   were a student, some basic information.  The lead usually

22   contained some basic information.

23   Q.   When you say "the lead," you mean like the verbal

24   information Mr. Gordon gave you about the person?

25   A.   Yes.

Q.    And when you say that in certain instances Mr. Gordon gave

you the name of a student and which protest they had attended,

you mean like the date and place and time of a particular

protest, correct?

A.    I believe so.

Q.    And he didn't just give you their name and the protest

they went to and the school they went to but also their

suspected nationality, correct?

A.    No.  I don't -- again, these are -- as I said before in my

deposition, the leads didn't go through me.  Most of the leads

went to the team lead or through my deputy.

      But as I recall, when hearing the information, I don't

know if I could say that they -- I don't know the details of

each lead other than they usually had a name, they definitely

had a name, that they were a protester and then it may have

included what school they were from.  I don't recall hearing

anything about nationality.

Q.    Mr. Hatch, I'm going to be referring to the transcript of

your deposition.  For the benefit of the court and the

government, I'm thinking about pages 213 to 214 of Mr. Hatch's

deposition, and I want to make sure you have a copy.

      Actually, can we put it up on the screen because it's just

one page.  213.  We just need a moment.  I just want you to be

able to see it.

      I'm going to draw your attention to the bottom half of the

1    page, and you can let me know if it refreshes your recollection

2    because I'm assuming that you simply forgot.

3         Line 16, you were asked:  "Do analysts get anything more

4    than the name of a student protester when they're asked to

5    research that individual?"

6         Answer:  "Yes."

7         "What information besides the name do they get?"

8         We're going to start -- Ms. Safavi objected.  Starting at

9    line 24, Answer:  "As I recall, they could get what protest

11:22 10   they were at," and then continuing on to the next page, which

11    may take us technically a moment.

12    A.   Is it possible I can see the whole page?  That's better.

13    I can read this.

14    Q.   Okay.  "They could get the suspected nationality."  Do you

15    see that there?

16    A.   Yes, they could get it.  I don't recall but it's possible

17    the nationality could have been part of the lead.  I just don't

18    recall it.

19    Q.   So to the best of your recollection -- you can take that

11:23 20   down.

21         To the best of your recollection having reviewed your

22    deposition testimony, they could get the student name, where

23    they were a student, the protests they attended and their

24    suspected nationality, among other things; is that right?

25    A.   They could get it, yes.

```
 1   Q.    Now, Mr. Gordon would convey that information to them
 2   separate from the directive to look at the Canary Mission
 3   website.  That was a separate source of information; is that
 4   correct?
 5   A.    Yes, we had multiple sources of information.  Canary
 6   Mission was not the only one.
 7   Q.    And about the quarter of the people identified came
 8   through alternate sources other than Canary Mission, right?
 9   A.    I guess up to.
11:23 10   Q.    I'm sorry?
11   A.    Up to a quarter.
12   Q.    Up to a quarter?
13   A.    I don't know the exact numbers of the leads we got.
14   Sorry.
15   Q.    Sorry, no.
16         You testified a bit in your deposition about the process,
17   to the extent to which the process involves the front office,
18   which I assume is the front office of HSI, in terms of
19   identifying leads.  And I want to ask you about that.
11:24 20         The leads, the list of leads usually goes through the
21   front office, the leadership of HSI, isn't that correct?
22   A.    Could you show the deposition?
23   Q.    Sure.  Do you not recall?  Because we don't ordinarily
24   just show people their depositions unless they don't remember.
25   If you don't remember, we can if you want to.
```

```
  1            THE COURT:  He's asked and that's your answer, you're
  2    not going to show it to him.
  3            MS. CONLON:  I mean, I just -- you're right, not
  4    unless you don't recall.
  5            THE COURT:  It's not whether I'm right.  This is your
  6    case to try, but that strikes me that when a witness asks --
  7    well, it's your case to try.  Show it to him or not.
  8    A.   You referenced the deposition, so I'd like to see the
  9    deposition.
11:25 10  Q.   Sure.  Can we please turn to page 177 of the deposition
 11    transcript.  Actually, I guess it's page 178.  I apologize.
 12    Page 178, please.
 13            If you look at lines one through five, you indicated that
 14    -- you made a clarification about the list you received.  You
 15    testified that, "They usually go through the front office, so
 16    the leadership of HSI, but they come from Office of Border
 17    Czar, Office of the Secretary."
 18            Do you see that there?
 19    A.   I see that.
11:25 20  Q.   So we can take that down.
 21            So when you say, "They go through the front office," that
 22    means who exactly?
 23    A.   So the front office are the people we mentioned before.
 24    It could go through Mr. Gordon, Mr. Hammer.  Again, that's the
 25    HSI top leadership.
```

1    Q.   And when you say, "They go through the leadership of HSI,

2    but they come from the Office of the Border Czar," you're

3    speaking of the Office of the Border Czar, which is housed, as

4    I understand it, outside of the Department of Homeland

5    Security, right?

6    A.   So when I said that, I was giving you possible examples of

7    where the leads came from.  I don't -- as I had said earlier, I

8    don't know exactly, because I'm not familiar with that process

9    and I was not privy to that, I don't know how they got the -- I

11:26 10   don't know how HSI got the leads.  I don't know how it was sent

11   to them, and I don't know who sent it to them.  And at that

12   point I was speculating who it came from.

13       I think I mentioned they came from possibly the Border

14   Czar, possibly DHS, possibly other partners, even the public.

15   So those leads can come from all directions.

16   Q.   So I hear you saying you don't know for certain where the

17   particular student protester names given to the tiger team came

18   from but that the regular process -- and I'm literally reading

19   your words here, "The clarification would be those lists

11:27 20   usually go through the front office so the leadership of HSI

21   but they come from Office of Border Czar, Office of the

22   Secretary."  That is the ordinary process, correct?

23   A.   No, it is not.  The ordinary process for leads or the

24   ordinary process for the protesters?

25   Q.   The ordinary process for lists.  You said, "Lists usually

1    go through the front office, so the leadership of HSI, but they

2    come from Office of Border Czar, Office of the Secretary."

3    A.   The leads go through -- in this case, the leads went

4    through the front office and could have come from those

5    locations.

6        As I said before, for example, with the Canary Mission

7    list, I don't know how that was presented to us.  I don't know

8    who sent that, notified us of the website.  I don't know of any

9    leads, any particular leads coming from any place outside of

11:28 10   HSI.  I can't tell you where each lead came from.

11    Q.   So I am clear here, when you made a reference in your

12    deposition in response to a question about the leads to the

13    Office of the Border Czar, you were referring to the Border

14    Czar who is appointed by the President outside of the

15    Department of Homeland Security; is that correct?

16    A.   When I said "Border Czar," I was referring to the Border

17    Czar.

18    Q.   The Border Czar being Tom Homan.  We can talk about him by

19    name, right?

11:28 20   A.   That's correct.

21    Q.   Tom Homan was -- withdrawn.  Tom Homan does not work for

22    DHS, right?

23    A.   I think -- I don't know who the Border Czar works for, if

24    he works for DHS --

25    Q.   He's not part of HSI's leadership; is that fair to say?

A.    He's not part of HSI leadership.

Q.    When you said that ordinarily -- or I'm not sure what you're saying about it now, but when you said in your deposition that, "Lists go through the front office but come from the Office of Border Czar or Office of the Secretary," "Office of the Secretary" was a reference to the Secretary of Homeland Security, correct?

A.    Yes.  And what I meant was their offices.  So obviously the Secretary of Homeland Security is not sending us leads personally.

Q.    The executive office?

A.    Yes, her office, her staff, as well as Border Czar.  And for clarification, as I said before in the deposition and now, I don't know where each particular lead came from.  I don't know where each particular list came from.  So I can't say for certain, but I was giving you general where they may have come from.  I could not cite, for example, a specific lead that came from any particular source if you were to ask me.

Q.    Yeah, I understand that you don't know the specific origin of these leads.  I'm asking you how it normally works since you don't know the specifics of this source of leads.  So that's what I wanted to clarify.

A.    To answer your question on how it normally works is I get the lead from the chain of command.  That's the normal process. How the chain of command gets it is something beyond my

1    visibility.

2    Q.    Okay.  Well, just to be very clear, the question you were

3    asked was about how leadership gets it, and the answer you gave

4    was that the lists go through the front office.  Was that

5    untrue?  Is that incorrect?

6    A.    The list goes through the front office -- in this case,

7    the lists and leads were coming from the front office, the HSI

8    front office.

9    Q.    And literally in your deposition you said, quote, "But

11:31 10    they come from Office of Border Czar, Office of the Secretary."

11    Was that incorrect?

12    A.    They could come from --

13    Q.    That isn't what you said.  Do you want to see it?

14         MS. SANTORA:  Objection.

15         THE COURT:  The objection is sustained.  I've looked

16    at the deposition.  He said what he said.  You've read it.

17    It's part of the record.  He's given his testimony here today.

18    Let's move on.

19    Q.    Okay.  We can move on to -- I only have a few questions

11:31 20    remaining.

21         So we spoke about the ROAs for five particular people, and

22    you looked at them with me.  You've mentioned that there were

23    approximately 200, as best you know, ROAs generated by the

24    tiger team, right?

25    A.    Approximately, yes.  I don't recall the numbers.  I was

 1    not keeping stats of what I read.

 2    Q.   I understand.  Now, most of the ROAs, so far as you know,

 3    mentioned Israel or Palestine, correct?

 4    A.   Yes, as you saw the way they were mentioned in the five we

 5    reviewed earlier.

 6    Q.   In other words, whether a person -- references to what the

 7    person had said concerning Israel or Palestine?

 8    A.   Could be.

 9    Q.   Many of them mentioned specifically the war in Gaza,

11:32 10    right?

11    A.   I don't know.

12    Q.   Do you recall seeing any that mentioned the war in Gaza?

13    A.   I recall, yes.

14    Q.   Is that a yes?

15    A.   Yes.  Some mentioned Gaza, I believe.

16    Q.   Some mentioned pro-Palestinian protests, right?

17    A.   I think so.

18    Q.   More than just the one we saw today, correct?

19    A.   Yes, I think so.

11:32 20    Q.   Some used the term "pro-Hamas," correct?

21    A.   I believe so.

22    Q.   Some, like the ones we saw today, mentioned a student

23    protester's public writing, correct?

24    A.   If you mean a post as public writing, then yes.

25    Q.   I don't only mean a post.  Articles in newspapers, for

example?

A.   That's possible as well.

Q.   To be clear, I'm not asking you to just summarize what you and I looked at in those five, but I'm asking the broader body of ones --

A.   I understand.

Q.   Okay.  Some mentioned a student protester's social media, right?

A.   That's correct.

Q.   Some of the ROAs mentioned public statements by protesters, not from social media, not from, say, an article, right?

A.   Yes, some mentioned public statements.

Q.   Some mentioned a student protester's chants at a student protest, right?

A.   I believe some did.

        THE COURT:  Some of them mentioned criminal activity.

        THE WITNESS:  Yes, sir.

Q.   Well, the question is about the ones we haven't seen, so I guess the question for you, to build on what Your Honor has asked, Mr. Hatch, approximately how many of them mentioned criminal activity?

A.   I don't recall those numbers.

Q.   Today we looked at five, only one of which made a reference to a person having been arrested.  Is that a

1    representative sample?

2    A.    I think there were two with.

3    Q.    I'm sorry?

4    A.    I think that I read two today -- two of those five had

5    criminal activity.  One had the ones you mentioned about the

6    New York cases, but another had an LSD possession charge.

7    Q.    I am talking about recent criminal activity at a protest.

8    You're talking about something else.  I understand the

9    distinction, so let me be clear.

11:34 10       Of the population of reports of analysis that you

11    reviewed, approximately how many included allegations of recent

12    criminal conduct in connection with a protest?

13    A.    I don't know.

14    Q.    Did any of the reports of analysis you reviewed mention

15    that a person had been convicted of a crime?

16    A.    I don't remember.

17    Q.    Hmm.  Some of the ROAs that you reviewed, not just the

18    ones in this courtroom, specifically mentioned a protester's

19    membership in a student group, right?

11:35 20    A.    That's possible.

21    Q.    That's possible or that is what you recall?

22    A.    I believe there were some.

23    Q.    Some specifically mentioned a student's membership in the

24    group Students For Justice in Palestine, right?

25    A.    I think that was one.

Q.   Some specifically mentioned a student protester's
statements or views on Israel, correct?

A.   I believe so.

Q.   Fair to say that the vast majority of the ROAs you
reviewed said nothing about criminal activity whatsoever?

A.   I don't know.

Q.   You don't know whether the vast majority --

A.   I don't recall the details of those ROAs.

Q.   Now, this whole effort, tiger team effort, began sometime
11:36 in March, right?

A.   I believe so, yes.

Q.   And it was responsive to two executive orders issued by
the President, one of which we've spent some time discussing,
and those would be Executive Order 14161 and 14188, correct?

A.   As I said before, the tiger team was formed because of the
large number of individuals in the lists.  The tiger team was
formed to look at protesters.

Q.   Okay.  And the reason that you were looking at protesters
was because of the executive orders, correct?

11:37 A.   The reason I was looking at protesters is because I was
directed to from HSI leadership.  Whether or not they did it in
response to the executive orders was not something I was privy
to.

     Do the protesters' activities relate to an executive
order?  Possibly.  I guess it could be characterized that way.

1    But you're asking me if I characterized it that way, and I did

2    not.

3    Q.    Well, Mr. Hatch, I really don't want to have to go back to

4    your deposition transcript, but I will if you don't recall

5    saying this.

6         You've previously testified that Mr. Gordon gave you

7    guidance or instructions about the executive orders to produce

8    reports of analysis on student protesters.  You linked those

9    things, isn't that correct?

11:37 10    A.    I think it's fair to say that yes, but that's not my -- I

11    did link those things, but my direction to the team was not

12    execute the executive order.  My direction to the team was look

13    at protesters.

14    Q.    I don't want to argue with you.  I'm not asking about your

15    direction to your team.  I'm asking about what you received,

16    the directions you got.  And the directions you got were to

17    create these reports of analysis on student protesters as part

18    of HSI's response to Executive Orders 14161 and 14188, isn't

19    that right?

11:38 20    A.    I don't know if -- I'm just trying to answer the question

21    as best I can, Your Honor.  I don't characterize it that way.

22    I know that the executive orders, I know one of those executive

23    orders existed.  As I said in my deposition, that was the first

24    time I had read one of them.  So the context of everything we

25    were doing is obviously from the executive orders, but in this

 1   particular effort, my direction to the team and as I received

 2   it, my characterization of it is we were looking at protesters.

 3   Q.   Can we please put page 149 of the deposition transcript on

 4   the screen.   Please take a look.

 5      Line 11, Question:  "Well, you -- you agreed -- you

 6   answered in the affirmative to whether you have received

 7   guidance or instructions about the executive orders and you

 8   named as one person who has provided that guidance, Mr. Gordon.

 9   My question is what was that guidance?"

11:39 10      Ms. Safavi objects.  You answered, "Produce reports of

 11   analysis on individuals involved in protests as it relates to

 12   Title 8."

 13      That's what you said, right?

 14   A.   Yes, I think that's what I just said a minute ago.   The

 15   job was to produce reports of analysis on individuals involved

 16   in protests as it relates to Title 8 and violations of law.

 17   Q.   I'm not sure why you're so resistant to answer this here.

 18      THE COURT:  Don't characterize the witness's answers.

 19   I'm listening.

11:40 20      MS. CONLON:  Okay.  We can take down the transcript.

 21   Q.   Now, these protests that we're talking about, the student

 22   protests, they began in October of 2023, right?

 23   A.   Yes, I believe so.

 24   Q.   Okay.  This urgent effort by HSI to identify these student

 25   protesters didn't start in 2023 when the protests began.   It

1    started after these executive orders in the spring of 2025,

2    right?

3    A.   It started in the spring of 2025.

4         MS. CONLON:  Okay.  Nothing further.

5         THE COURT:  Ms. Santora, do you wish to examine this

6    witness?

7         MS. SANTORA:  Yes, I do, Your Honor.

8    CROSS-EXAMINATION BY MS. SANTORA:

9    Q.   Good morning.  I want to ask you a few questions.

11:41 10        During your direct testimony yesterday you testified about

11   your role with the Office of Intelligence, correct?

12   A.   Yes, I did.

13   Q.   And you are the highest-ranking official in the Office of

14   Intelligence?

15   A.   I am.

16   Q.   And are you responsible as leadership in the Office of

17   Intelligence for providing guidance to your analysts?

18   A.   Yes, I do.

19   Q.   Are you responsible for providing training to your

11:41 20   analysts?

21   A.   Yes, training, policy, procedures, equipment and

22   allocation of analysts.

23   Q.   So would it be fair to say that if there were changes to

24   policies and procedures in your office, you would know about

25   those?

A.    Yes, if they related to the analysts, yes.

Q.    And you would provide training to your analysts on those?

A.    That's correct.

Q.    Would it be possible for a new policy or procedure to exist in your office without you knowing about it?

A.    In my office, no.

Q.    And since the beginning of 2025, have there been any changes to the policies and procedures in your office?

A.    No.  We've been doing our analysis the same way since I started in 2019, 2020, and developed the way we do analysis. We haven't changed the way we do subject profiles at any time in say -- during that time we've always done subject profiles this way.  We conduct our analysis the same way.  And for that matter, we've been looking at the same violations of law during that time as well.

Q.    So you haven't changed the content of your reports of analysis?

A.    We have not.

Q.    So it's always included biographical information?

A.    It has.

Q.    Information about criminal activity?

A.    Yes.

Q.    Information about potential violations of law, including Title 8?

A.    Yes.

1    Q.    And I just mentioned reports of analysis.  Can you, for

2    the benefit of everyone, define what is a report of analysis?

3    A.    It's the way the analyst documents their work product, and

4    it is specifically designed for analyzing criminals, criminal

5    networks, criminal conspiracies, and subject profile is just

6    one ROA type that we use.

7    Q.    You mentioned that your office receives leads or tips that

8    can generate the creation of a report of analysis, correct?

9    A.    That's correct.

11:43 10    Q.    And from where does the Office of Intelligence receive

11    tips or leads?

12    A.    In general terms, beyond the scope of a protest, we

13    receive them from all different kinds of directions.  They can

14    come from an agent's contacts.  They can come from interagency

15    partners.  They can even come from the tip line, which is a

16    public-facing mechanism for the public to provide tips.  They

17    even can be mailed to the office, hard copies.

18    Q.    And with respect to the protesters, did your office

19    receive leads in a different way?

11:44 20    A.    I think we were getting the leads from all directions.  I

21    don't know in particular where we were getting the leads from.

22    Q.    Okay.  When your office receives a lead, generally

23    speaking, what does it do with it?

24    A.    Usually it's provided to an analyst to do exactly what you

25    saw with these ROAs, to look for information, as I said before,

1    that's a violation, potential violation of law, with our

2    specialty being immigration and customs laws.  But it's also,

3    as we're building that, it's also to get the context of the

4    individual, which is why the biographical information and the

5    car information like I mentioned is in there.

6    Q.   And is a lead ever insufficient for your office to do

7    anything with it?

8    A.   Yes.  There are times when a lead just has incomplete

9    information, a nonspecific name, no identifying information to

11:45 10   help us identify or narrow down who it was.

11   Q.   And in that case what does your office do?

12   A.   We would just file the lead.  We'd move on.

13        THE COURT:  Well, that question interests me.  I've

14   had cases where someone's identified as LNU or FNU LNU, first

15   name unknown, last name unknown, and I wondered what we're

16   talking about in my case.  And your answer jogged that memory.

17        When you don't have enough to do anything, do you

18   report that in any way, or you just don't do anything because

19   you haven't got enough to work on?

11:46 20        THE WITNESS:  It's mostly the latter, sir.

21        THE COURT:  The latter, all right.  Ms. Santora, go

22   ahead.

23   Q.   Assuming that there's sufficient information in the lead,

24   what does -- I guess I'll ask this.  Does your office do -- you

25   said you would create a report of analysis; is that correct?

A.   That's correct.

Q.   And in creating that report of analysis, you testified earlier that you do independent research?

A.   Yes.

Q.   So you look into the information in the lead and independently confirm?

A.   Try to, yes.

Q.   And that's the information that goes into the report of analysis?

A.   Yes.

Q.   So to be clear, the report of analysis is a fact-based document?

A.   Yes, we try, as you saw with those, we try to just report the facts or what the analyst finds and properly source it so anyone reading it knows where this that came from.

Q.   Does a report of analysis make any recommendations?

A.   It does not.

Q.   Does it include any opinions?

A.   Does not.

Q.   Does it make any referrals?

A.   No.

Q.   Or any judgments?

A.   No.

Q.   How do you know that reports of analysis don't include those things I just referred to, recommendations, opinions,

```
 1   referrals and judgments?

 2   A.   It's in our policy.

 3   Q.   You spoke during your direct examination about a tiger

 4   team, correct?

 5   A.   That's correct.

 6   Q.   Generally speaking, what is a tiger team?

 7   A.   A tiger team is a term of art we use for an ad hoc,

 8   temporary standup of analysts or a combination of analysts that

 9   get assigned to a project, usually when it's a large workload,

10   and we use it when we have to bring analysts in from other

11   parts so a specific group or section doesn't have the capacity

12   to handle, so we'll bring in others to help.

13        And it's a way of differentiating between whether

14   someone's doing their normal job or whether they're doing this

15   additional duty or whether they have been reassigned to this

16   duty.

17             THE COURT:  So tiger team, you've had Tiger Teams more

18   than once on different subjects?

19             THE WITNESS:  Yes, Your Honor.  We've used a tiger

20   team maybe half a dozen times since I've been at HSI for all

21   different types of things.  It's just a term of art.

22             THE COURT:  Thank you.

23   BY MS. SANTORA:

24   Q.   So why is the term tiger team used, if you know?

25   A.   I think, I mean we got it from business, military I think
```

1  uses the term as a way to focus analysts.  I didn't make up the

2  term tiger team.  If I go back to my Coast Guard days, we would

3  set up a tiger team to fix an engine problem when you needed an

4  electrician or mechanic.  It's kind of always been in

5  existence.

6  Q.   So you've heard the term back to your Coast Guard days?

7  A.   I have, yes.

8  Q.   So it's a term that's used in government jargon?

9  A.   Yes, and I believe in business, too.

11:49 10  Q.   And it sounds a bit intimidating.  Is it meant to

11  intimidate?

12        MS. CONLON:  Objection.

13        THE COURT:  Sustained.  He said it's a term of art.

14  Q.   Is it meant to intimidate?

15        MS. CONLON:  Objection.

16        THE COURT:  Why don't you ask him whether he means it

17  to intimidate.

18  Q.   Do you mean it to intimidate?

19  A.   No, not at all.  It's an internal term.

11:49 20        THE COURT:  The sense I get, so we're clear on what

21  I'm hearing, is you mobilize a Tiger Team because you need to

22  do the work assigned, correct?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  And calling it a tiger team conveys to me

25  some sense of urgency and importance in that work.

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Is that right?

 3                THE WITNESS:  That's correct.  And we're analysts, so

 4      we're nerds.  We're the nerds.  We're a law enforcement and

 5      we're analysts.  We're nerds.  We're not ferocious.

 6                THE COURT:  It's not like painting decals on fighter

 7      planes.

 8                THE WITNESS:  No, sir.

 9                THE COURT:  Go ahead.

11:50 10  BY MS. SANTORA:

11      Q.   I want to talk to you about the tiger team that was

12      created in March of 2025.  What topic was that Tiger Team

13      created to address?

14      A.   That was protesters and we had gotten a lot of leads.

15      Q.   Were you asked specifically or was that tiger team asked

16      specifically to look into student protesters?

17      A.   All protesters.

18      Q.   All protesters, okay.

19           And ultimately how many people did the tiger team look

11:51 20  into?

21      A.   Over 5,000, more than 5,000.  I don't know the exact

22      number.

23      Q.   And in looking into those people, did the Office of

24      Intelligence analyze any differently than it normally does?

25      A.   A little bit.  Normally we do an ROA on everybody, no
```

matter what.  And that's why you'll see the variation as we saw

from the five today where one was two pages and one was longer.

But in this instance, because we had so many names, I told

the analysts if you don't find anything beyond the biographic

information -- we were looking at violations of law and as it

relates to protests.  So some of the names, for example, were

said to be at a protest, but we never found that they were at a

protest.  We never found anything.  We didn't find any conduct.

We didn't find anything related to the individual.  So it would

have been a one-page ROA.  And so I told the team for the sake

of expediency to get through this long list to just not do the

ROAs on those individuals.

Q.    Okay.  You talked about the fact that you received

information from Canary Mission with respect to these lists,

correct?

A.    Yes.

Q.    To be clear, does your office work with Canary Mission?

A.    No.  Like I said before, we have no association with

Canary Mission.  Canary Mission is not associated with HSI at

all.  I don't know who posts on that website.  I don't know who

runs that website.  I don't know anybody in that organization.

I don't have any connection with anybody in that organization.

Q.    Does the office treat Canary Mission information

differently than it treats other information?

A.    We treat it just like any other lead.

Q.   Was the office asked to look at Canary Mission information

differently than other information?

A.   No, we were not asked to look at it differently.  We were

not asked to change the ROA process or our process of criminal

analysis.

Q.   Would it be relevant to a report of analysis that someone

had been charged with a crime but not convicted?

A.   As long as the charge was factual, it could be included in

the ROA, so yes.

11:53   THE COURT:  I don't understand a charge that wasn't

factual.

THE WITNESS:  I guess you're right.  A charge would be

included in that section you saw, the criminal history.

BY MS. SANTORA:

Q.   And how would that be relevant to the analysis, a charge

that was not a conviction?

THE COURT:  That's pretty hypothetical.  I don't know

what to do with that.  This is a law enforcement operation or

part of a law enforcement operation.  Of course you include

11:54   charges because you might want to -- or someone, some enforcer

might want to follow up on that.  I just don't understand.

MS. SANTORA:  Okay.  We'll move on.  Thank you, Your

Honor.

THE COURT:  All right.

MS. SANTORA:  Preserving the government's objection to

1    these documents being entered into evidence based on privilege,

2    in case our objection is ultimately overruled -- the overruling

3    objection is upheld, I do want to ask questions about the

4    documents that opposing counsel --

5           THE COURT:  You don't waive the objection properly

6    preserved by exercising your opportunity during the trial to

7    ask about such documents.

8           MS. SANTORA:  Thank you, Your Honor.

9           I want to ask you about a document you looked at

11:55 10    earlier.  I believe it was, it was in the packet we received.

11    It was Exhibit K related to Mr. Mahdawi.  I don't know what

12    letter it's been marked.

13           MS. CONLON:  It was marked as a number, and it's 235.

14           MS. SANTORA:  235, okay.  Are you able to show the

15    witness?

16           THE COURT:  I'm an equal opportunity helper.

17           MS. SANTORA:  Thank you, Your Honor.

18           THE COURT:  Here's the documents that have now been

19    marked, and thank you, Ms. Conlon, Exhibit 235 in evidence.

11:55 20    BY MS. SANTORA:

21    Q.   Do you see subject profile for Mohsen Mahdawi?

22           THE COURT:

23    A.   I'm looking at the one for Suri.

24           THE COURT:  You said K.

25           MS. SANTORA:  Sorry.  That was K.  I don't know what

1  letter this was.

2          THE COURT:  You want Mahdawi?

3          MS. SANTORA:  Mahdawi, yes.

4          THE COURT:  All right.  In the packet as it was

5  delivered to the court, it's Exhibit E.  And so our record is

6  complete, someone will help me, Exhibit E has become --

7          MS. CONLON:  235.

8          THE WITNESS:  Are you going to ask me about --

9          THE COURT:  Since I have now become a document

11:56 10  custodian.  Go ahead.

11  BY MS. SANTORA:

12  Q.   I believe when you were being questioned earlier --

13          THE WITNESS:  Sir, this is Khalil.

14          THE COURT:  It is, and that's my mistake.  I'm not

15  much of a document custodian.  Yes.

16          MS. SANTORA:  I can give the witness my copy --

17          THE COURT:  No.  I have it right here.  Now I've got

18  the right one.  Having nothing to do with this exhibit, but it

19  reminds me, the government has made an ex-parte submission,

11:57 20  properly.  The court has reviewed it, and pertaining to one of

21  these exhibits, and that's something potentially should be

22  redacted or withdrawn.  I want to know precisely what it is

23  with the brackets as you've done it in time for our conference

24  at 3:00.  You can hand it up to the clerk so I know what we're

25  talking about.  Go ahead.

```
 1   BY MS. SANTORA:
 2   Q.   Mr. Hatch, you are looking at the subject profile now of
 3   Mohsen Mahdawi, correct?
 4   A.   Yes, I am.
 5   Q.   And do you remember when opposing counsel was questioning
 6   you and they said that in this report of analysis it included
 7   only biographical information, correct?
 8   A.   Yes.
 9   Q.   And do you see the last bullet under Analysis and
10   Findings?
11   A.   Yes, I do.
12   Q.   That relates to possession of various drugs, correct?
13   A.   It does.
14   Q.   Would you describe that as biographical information?
15        MS. CONLON:  Objection, Your Honor.
16        THE COURT:  No.  She may have that question in that
17   form.
18   A.   I don't know.
19   Q.   Would you describe the drug charges as biographical
20   information?
21        MS. CONLON:  Objection.  It doesn't even say
22   "charges."
23   Q.   Would you describe that bullet relating to this individual
24   being in possession of drugs as biographical information?
25   A.   I'd more likely say it was criminal history.
```

```
 1    Q.    Thank you.
 2          And that bullet appears in the analysis and findings
 3    section, correct?
 4    A.    It did, it also appears in criminal history.
 5    Q.    Okay.  Thank you.  I want to ask you about another one of
 6    the documents opposing counsel asked you about.  These are the
 7    documents related to Rumeysa Ozturk.
 8                THE COURT:  In the packet of documents given to the
 9    court, these appear as Exhibit C.  And they are now in evidence
10    as what?  Ms. Conlon.
11                MS. CONLON:  Sorry.  Ms. Ozturk, 232.
12                THE COURT:  232.
13                THE WITNESS:  Do you want this one back, sir?
14                THE COURT:  Yes.
15                THE WITNESS:  Okay.
16    BY MS. SANTORA:
17    Q.    Opposing counsel asked you earlier about the first bullet
18    under analysis and findings, and they mentioned the coauthoring
19    of an op-ed.  Do you remember that exchange?
20    A.    Yes.
21    Q.    And if you look at the rest of that bullet, it says that
22    she wrote the op-ed with Tufts Students for Justice in
23    Palestine, which was suspended for calls for Student Intifada.
24          Would that part of the bullet factor into the office's
25    analysis?
```

```
 1   A.    Yes, I mean it is part of it.
 2   Q.    Moving on, I would like to ask you, I want to ask you some
 3   questions about the executive orders that you referenced in
 4   your testimony.
 5   A.    Okay.
 6   Q.    How did your office respond to Executive Order 14161 and
 7   Executive Order 14188, if at all?
 8   A.    Can you give me the titles?  I don't know them by the
 9   numbers.
12:02 10  Q.    Executive Order 14161 is protecting -- I'm sorry, I don't
11   have the title in front of me.  14188 has to do with
12   antisemitism.  You mentioned that you had not seen that
13   executive order until your deposition, correct?
14   A.    That's correct.
15   Q.    So we can put that to one aside.  With respect to the
16   other executive order that you --
17   A.    Okay.  I'm familiar with that.
18   Q.    -- yesterday and today, how did your office respond to
19   that executive order?
12:03 20  A.    I recall when I read that executive order, I saw that just
21   about everything related to that executive order and us were
22   things we were already doing.  They all related to existing
23   Title 8 issues.  So it did not task my office with doing
24   anything different.
25   Q.    And so your office didn't change the way it analyzed
```

1    information in response to the executive orders?

2    A.    No.  And especially in that executive order, it didn't

3    change anything.  It all related to Title 8.  It emphasized

4    things in Title 8, but nothing was new to us.

5    Q.    So the executive order essentially directed your office to

6    follow Title 8?

7    A.    That's how I interpreted it for the most part.

8    Q.    And your office does follow Title 8?

9    A.    We have been since I've been there and, I mean, since HSI

12:04 10    has existed.

11    Q.    And how long has HSI existed?

12    A.    HSI, and in its previous form, Customs' Office of

13    Investigations, has been around since the 1950s, and I believe

14    Title 8 has been since the 1950s.

15    Q.    I want to go back for a second to the ROAs about the

16    protesters.  You said that your office looked into 5,000 leads

17    related to that, correct?

18    A.    Over 5,000, yes.

19    Q.    And because of the bulk of work in that particular

12:04 20    situation, ROAs were not created in every circumstance,

21    correct?

22    A.    That's correct.

23    Q.    Do you know in what percentage of cases ROAs were created?

24    A.    I don't know the exact numbers, but I would estimate, I

25    think I said 200, so less than -- I'm not good at public math.

1    Less than 5 percent.

2    Q.    Less than 5 percent.  And so 95 percent did not result in

3    the creation of an ROA?

4    A.    That would seem to be true.

5    Q.    What happened with those 95 percent of the 5,000 cases?

6    A.    If we didn't do an ROA, we just moved on to the next

7    person on the list or the next lead.  We didn't do anything

8    with them.

9    Q.    Okay.  So in 95 percent of those 5,000 cases regarding

12:05 10    protesters, your office did nothing?

11    A.    We moved on to the next lead, yes.

12              MS. SANTORA:  Thank you.

13              THE COURT:  Ms. Conlon, anything further?

14              MS. CONLON:  Yes, Your Honor.

15              THE COURT:  You may.

16              MS. CONLON:  Is it okay with Your Honor if I examine

17    from here?

18              THE COURT:  Of course it is.  So you all understand, I

19    understand that by passing the bar, you have the right to be

12:06 20    within the bar enclosure denominated by the rug in deeper blue.

21    It's not an instruction that you have to stay on that rug, but

22    I learned you could move around in the bar enclosure as a

23    lawyer.  Go ahead, Ms. Conlon.

24

25

1           MS. CONLON:  Okay.

2    REDIRECT EXAMINATION BY MS. CONLON:

3    Q.   So you were just asked about the percentage of ROAs that

4    were generated as a result of this line of effort, and you have

5    estimated -- and don't worry, this won't be an equation.  But

6    you've estimated about 5 percent; is that right?

7    A.   Yes.

8    Q.   And your estimate is based on the notion knowing that

9    there were over 5,000 names at least on Canary Mission, and you

12:06 10  saw maybe 200 reports; is that right?

11   A.   As I recall, yes, I think that's what I said.

12   Q.   Now, you have said before you didn't look at all the

13   reports generated by the tiger team, right?

14   A.   That's correct.

15   Q.   You happened to have seen about 200, correct?

16   A.   Somewhere in there.  I don't know the exact numbers.

17   Q.   Right?

18   A.   I'm giving you an estimate.  That's all I'm doing.

19   Q.   No, no.  I appreciate that you have seen 5 percent of --

12:07 20  if we're sticking with percentages, I appreciate that what you

21   can tell us is that you've seen 200 and you know that at least

22   more than 5,000 people were looked at.  But I understood you to

23   be saying earlier you can't tell us how many ROAs were actually

24   created.  Am I mistaken?

25   A.   I'm estimating that somewhere under 200 or around 200 ROAs

1    were produced.  In my testimony I believe I said, as you

2    mentioned earlier, dozens, I had read -- you asked me how many

3    I had read.  I said dozens.  And then you brought up my

4    deposition and said, "You said here 100," and I had said

5    earlier 20.

6        So I would estimate I've read between 20 and 100, but I

7    know the team produced more, and I'm estimating they produced

8    less than 200 in total.

9    Q.   And what is that based on?  What is your estimate of what

12:08 10   the team produced, I mean, based on?

11   A.   Just my recollection of the effort described to me by the

12   team lead.  I'm giving you my best estimate.

13   Q.   I appreciate that.  Fair to say you don't actually recall

14   the total number that were created by the tiger team?

15   A.   I do not recall the total number.

16   Q.   Fair to say you are in a position to speak about the total

17   number as an estimate only that you personally reviewed?

18   A.   That's correct.

19   Q.   Now, that 5,000-person list which resulted in -- for many

12:08 20   folks resulted in no ROAs, one of the reasons it resulted in no

21   ROAs for so many people is because that list included a lot of

22   U.S. citizens, right?

23   A.   That's correct.

24   Q.   And it's not within the purview of the Office of

25   Intelligence to write reports of analysis about U.S. citizens,

1    correct?

2    A.    We absolutely are.

3    Q.    Oh, you wrote them about U.S. citizens?

4    A.    HSI intelligence is authorized to write ROAs about U.S.

5    persons.  That's the question you asked me, right?

6    Q.    Yes, that is the question I'm asking.

7    A.    Now, are you asking me if any of the protesters that were

8    U.S. citizens had ROAs written on them?

9    Q.    Well, I guess that's a good question.

12:09 10    A.    I don't know.  I don't recall, I don't recall reading an

11    ROA on a U.S. person.

12    Q.    Now, the circumstance in which you could write an ROA

13    about a U.S. person, that would not be for a violation of Title

14    8 immigration offense, right, for example, being out of status

15    or any number of things?

16    A.    We are authorized to write ROAs on U.S. persons for any

17    violation of U.S. law, potential violation of U.S. law,

18    suspicion of violating U.S. law, information related to

19    violations of U.S. law, as I've said before.

12:10 20    Q.    Sorry.  So going back to the question I think you tried to

21    ask if I was asking just a moment ago, the tiger team did not,

22    to your knowledge, create ROAs on U.S. citizen protesters; is

23    that correct?

24    A.    I don't recall reading any ROAs on U.S. citizen

25    protesters.

1  Q.   And you did not understand the project at hand to be one

2  that included looking at U.S. citizen student protesters,

3  correct?

4  A.   I didn't interpret the focus to be U.S. persons.

5  Q.   Now, you've said that ROAs were only generated for some

6  small number out of the overall group.  And one reason that

7  could happen is if you couldn't sufficiently identify a person;

8  is that correct?

9  A.   That's correct.  That's one reason.

12:11 10  Q.   Another reason that could happen was if you couldn't

11  confirm that a student had actually attended a protest; is that

12  right?

13  A.   That's correct, that's one reason.  It's a possible

14  reason, yes.

15  Q.   In other words, the student protester initiative of the

16  tiger team was meant really to capture people who protested, is

17  that correct, who had attended protests?

18  A.   I would not use the word "capture."

19  Q.   Well, we can pick a different word.

12:11 20        THE COURT:  Focus on is the sense of her question.  Do

21  you accept that?

22  A.   That was the focus, yes.

23  Q.   So if no protest, no ROA; is that right?

24  A.   Yeah.  If we found no activity, we would move on to the

25  next one.

1   Q.   I'm a little confused because "activity" -- I'm asking

2   specifically about protest activity.  If you did not find

3   evidence of protest activity, the person did not receive an

4   ROA; is that correct?

5   A.   That is correct.

6   Q.   Now, the ROAs were not limited to persons who attended

7   protests who had potentially committed a criminal offense,

8   correct?

9   A.   When we start out with the leads, we don't know what we

12:12 10   have to begin with, so we look, as you saw in the ROAs, we

11   focus on the individual.

12   Q.   And ROAs were generated for students who attended protests

13   who were not suspected of having committed a crime, isn't that

14   right?

15   A.   That is correct, yes.

16        MS. CONLON:  Just a moment.

17   Q.   You said that you weren't directed to look at the Canary

18   Mission list any differently from how you look at other

19   information.  Did I hear that correctly?

12:12 20   A.   The Canary Mission list, it was one source of leads we

21   get.  We were not directed to look at Canary Mission any

22   differently than we would another lead on a protester.

23   Q.   You didn't receive a directive to look at any other

24   collection of people from any other single source in the way

25   that you did for the Canary Mission website, correct?

```
 1   A.   I think it's fair to say that Canary Mission was unique.
 2   Q.   It was unique because it was the focal point of this
 3   effort, wasn't it?
 4   A.   It was unique because it was a large amount of leads,
 5   large amount of information on protesters.
 6              MS. CONLON:  Just a moment.
 7   Q.   I think you testified earlier, but tell me if I'm wrong,
 8   that you as the director of the office are familiar with
 9   training given to analysts about how to do these reports of
10   analysis, right?
11              THE COURT:  This is redirect.  That's beyond the
12   scope.
13              MS. CONLON:  Your Honor, I'm sorry, I thought that
14   just came up in the government's questioning.
15              THE COURT:  I didn't.
16              MS. CONLON:  You didn't hear that?
17              THE COURT:  That may not be the same.
18              MS. CONLON:  Can I have just one second to see?  I'm
19   sorry.
20              I think that's it.  Thank you so much.  Thank you for
21   your time.
22              THE COURT:  Nothing more, Ms. Santora?
23              You may step down.  Thank you.  This witness is
24   excused.  Call your next witness.
25              MR. BIALE:  Thank you, Your Honor.  Noam Biale for the
```

1    plaintiffs.  Plaintiffs call Amy Grier.

2              THE COURT:  She may be called.

3              AMY GREER, Sworn

4              COURTROOM CLERK:  Can you please state your name and

5    spell your last name for the record.

6              THE WITNESS:  Sure.  My name is Amy Greer, G-r-e-e-r.

7              MR. BIALE:  May I proceed, Your Honor?

8              THE COURT:  You may.

9    DIRECT EXAMINATION BY MR. BIALE:

12:16 10   Q.   Good afternoon, Ms. Greer.

11   A.   Good afternoon.

12   Q.   Where do you work?

13   A.   At Dratel & Lewis as an associate attorney.

14   Q.   And what is Dratel & Louis?

15   A.   It is a small criminal defense firm.

16   Q.   Where is it based?

17   A.   In Manhattan.

18   Q.   And how long have you been a licensed attorney?

19   A.   Since September 18, 2020.

12:16 20   Q.   Okay.  Good memory for the date.

21   A.   It was the day RGB died.

22   Q.   I see.

23   A.   It was not a celebratory day.

24   Q.   I see.  And you're admitted to the New York bar?

25   A.   Yes.

Q.   Any other states?

A.   Actually that 2020 date I was admitted to the State Bar of Alaska.  And since then I've been admitted to the District of New Jersey, the District of New York, and the District of the District of Columbia.

Q.   Do you know an individual by the name of Mahmoud Khalil?

A.   Yes.

Q.   How do you know him?

A.   He is my client.

Q.   When did you begin representing Mr. Khalil?

A.   In or around November of 2024.

Q.   And since you began representing him in November of 2024, have you met with Mr. Khalil in person?

A.   I have.

Q.   Approximately how many times?

A.   Approximately two to three times.

Q.   In addition to the two to three times you met with Mr. Khalil in person, have you ever met with him in a videoconference or on FaceTime or something like that?

A.   Yes.  I have met with him numerous times by videoconference, Signal, et cetera.

Q.   You said "numerous times."  Can you estimate for us how many times you met with Mr. Khalil by videoconference?

A.   Sure.  Between November and March, probably weekly, so however that adds up to.  And then after his detention, I met

1    with him nearly daily by videoconference.

2    Q.    Okay.  So fair to say you've met with Mr. Khalil, at least

3    by videoconference, dozens, maybe even over 100 times?

4    A.    Yes.

5    Q.    Are you familiar with Mr. Khalil's wife?

6    A.    Yes.

7    Q.    What is her name?

8    A.    Dr. Noor Abdalla.

9    Q.    And have you met Dr. Abdalla in person?

12:18 10   A.    Yes.

11   Q.    Approximately how many times?

12   A.    Probably five or six times.

13   Q.    Have you also met with Dr. Abdalla on videoconference?

14   A.    Yes, numerous times.

15   Q.    Numerous.  Can you give us a ballpark estimate?

16   A.    I was one of the primary contacts for Dr. Abdalla

17   throughout the course of this case.  So it's hard to estimate,

18   but probably a few times a week, so at least dozens, if not

19   more.

12:19 20   Q.    And just so we're clear, when you say "this case," you're

21   referring --

22   A.    Sorry.  The habeas and immigration case post-detention.

23           THE COURT:  Case in which you represent him as his

24   attorney?

25           THE WITNESS:  One of them, yes, sir.

1          MR. BIALE:  Thank you.

2    Q.   Are you familiar with Dr. Abdalla's voice?

3    A.   Yes.

4    Q.   Okay.  Have you ever been to the building where Mr. Khalil

5    and Dr. Abdalla live?

6    A.   Yes.

7    Q.   Approximately how many times have you been there?

8    A.   Approximately twice.

9    Q.   Are you familiar with the lobby of that building?

12:19 10   A.   Yes.

11   Q.   Okay.  I'd like to direct your attention to March 8, 2025.

12   What do you recall happened that day?

13   A.   In the evening of March 8, 2025, I received a phone call

14   from Mahmoud.

15   Q.   Okay.  Do you remember approximately what time?

16   A.   I remember exactly what time.  It was 8:26 p.m.

17   Q.   And without telling me what -- when you say "Mahmoud,"

18   we're talking about Mr. Khalil?

19   A.   Sorry.  Mr. Khalil, yes.

12:20 20   Q.   Without telling me what Mr. Khalil told you in that phone

21   call, can you tell us about anything that he did in that phone

22   call?

23   A.   I am not sure if he handed the phone to the agent from

24   immigration or if the agent took the phone, but the phone was

25   given to one of the agents.

1    Q.   And when you say, "one of the agents," can you clarify

2    what you mean?

3    A.   Sure.  Mr. Khalil called me because agents had entered,

4    and I know this because I spoke with the agent on the

5    telephone, and so that agent introduced himself to me over the

6    telephone.

7    Q.   Okay.  And did the agent identify what agency he was from?

8    A.   He said he was from Department of Homeland Security, HSI.

9    Q.   Okay.  And you understood based on the way the phone call

12:21 10   went that this agent was physically present with Mr. Khalil at

11   the time?

12   A.   Yes.

13   Q.   Now, were you physically present with Mr. Khalil and with

14   this agent at the time?

15   A.   No.

16   Q.   Okay.  Could you hear anything in the background of the

17   phone call?

18   A.   With Mr. Khalil?

19   Q.   Yes.

12:21 20   A.   I could hear him speaking, Mr. Khalil speaking, and I was

21   obviously hearing the agent speaking to me.  And then I heard

22   other voices, ambient voices in the background.

23   Q.   Okay.  And then what happened next after you received this

24   phone call?

25   A.   Well, I spoke to the agent and he hung up on me.

Q.    Okay.  And what happened after that?

A.    Well, I freaked out a little, to be completely candid, and I called the partners at my law firm.  And then while I was on the phone with one of them, I received another phone call.

Q.    And who was the second phone call -- who did the second phone call come from?

A.    The second phone call came from Dr. Noor Abdalla.

Q.    And Dr. Abdalla call you from her phone or from somebody else's phone?

A.    She called me from Mr. Khalil's phone.

Q.    Okay.  And approximately when did Dr. Abdalla call you from Mr. Khalil's phone?

A.    It was at 8:34, so eight minutes later.

Q.    And when Dr. Abdalla called you, were you able to hear her voice over the phone?

A.    Yes.

Q.    Did you hear any other sounds over the phone?

A.    Yes.  I could hear Mahmoud, or Mr. Khalil, speaking in the background, and I heard other ambient male voices.

Q.    Okay.  I'd like to show you what's been marked for identification as Exhibit A1.

       Mr. Kumar, if you can pull that up and just pause on the first frame.

       Do you see that in front of you, Ms. Greer?

A.    Yes.

         1    Q.   Just looking at the image in the middle, do you see the

         2    location?

         3    A.   On the bottom left there, or do you mean the actual --

         4         THE COURT:   No.  Do you recognize the location?

         5    A.   Yes, I do.

         6         MR. BIALE:   Thank you, Your Honor.

         7    Q.   Where do you recognize that -- what do you recognize that

         8    location to be?

         9    A.   That is the lobby of Mr. Khalil and Dr. Abdalla's

12:24  10    apartment building.

        11    Q.   And how do you recognize that location to be the lobby of

        12    their apartment building?

        13    A.   Because I've been there and because I actually noticed the

        14    tiling on the floor when I visited, it's kind of an odd

        15    linoleum tile.

        16         MR. BIALE:   Okay.  Mr. Kumar, I'd like you to play --

        17    and I'm hoping that we have sound -- play the video to 7

        18    seconds.

        19         THE COURT:   Well, you're calling her to authenticate

12:24  20    this video?

        21         MR. BIALE:   Yes, Your Honor.

        22         THE COURT:   And what do you -- let me ask this

        23    preliminary question.  What do you understand this to be?  Yes,

        24    what do you think this is, this video?

        25         THE WITNESS:   From what I know of this video, this is

1    the video of when Mahmoud, Mr. Khalil, was arrested.

2          THE COURT:  And how did you come to know that?

3          THE WITNESS:  I know that because I received it from

4    Dr. Abdalla on the evening that Mr. Khalil was arrested.

5          THE COURT:  All right.  And who do you think took it?

6          THE WITNESS:  Dr. Abdalla.

7          THE COURT:  Thank you.  All right.  Mr. Kanellis.

8          MR. KANELLIS:  I'll reserve my objection, Your Honor.

9          THE COURT:  Reserved, okay.  You may proceed.

12:25 10          MR. BIALE:  Could you play it to seven seconds,

11    Mr. Kumar, and with sound.

12          (Video played.)

13    BY MR. BIALE:

14    Q.   Okay.  You just heard some voices on that video, and you

15    heard at the end it sounded like a woman's voice say, "He's not

16    resisting."

17    A.   Mm-hmm.

18    Q.   Do you recognize that person's voice?

19    A.   Yes.

12:25 20    Q.   Who is that?

21    A.   Dr. Abdalla.

22          MR. BIALE:  Now, Mr. Kumar, if you can play a few more

23    seconds to ten seconds.

24          (Video played.)

25          MR. BIALE:  Stop.

```
 1   Q.   Now I'm going to ask you, who do you recognize in the
 2   video?
 3   A.   The person facing the camera is Mr. Khalil.
 4        MR. BIALE:   Okay.  And now, with the court's
 5   indulgence, I'll ask to play another 20 seconds of the video,
 6   if we can do that.
 7        THE COURT:   Proceed.
 8        (Video played.)
 9   Q.   Okay.  You just heard some additional parts of the video,
12:26 10   and you heard Dr. Abdalla say "Hi Amy."
11   A.   Mm-hmm.
12   Q.   Do you know who she is referring to?
13   A.   Yes.
14   Q.   Who is she referring to?
15   A.   Me.
16   Q.   And how do you know that?
17   A.   Because I was on the phone with her.  I answered the
18   telephone when she called.
19   Q.   Okay.  Can you just tell us about what you remember about
12:27 20   that conversation.
21   A.   Sure.  I was on the phone with Dr. Abdalla and one of the
22   partners at my law firm, and together we were advising Dr.
23   Abdalla, I was saying to her --
24        MR. KANELLIS:   Objection, Your Honor.  Two bases.
25        THE COURT:   I'll hear you.
```

1      MR. KANELLIS:  First is, if she's going to discuss

2  these communications, she may be waiving her privilege.

3  Second, calls for hearsay.

4      THE COURT:  Well, the first is, I suppose she knows

5  that, and she may make her own determinations.

6      The second is, what she says is hardly -- well, I'm

7  not so sure it's even hearsay.  If she was advising her, it's

8  not for the truth.  That's the advice, act in this way.  Any

9  response from Mr. Khalil's wife I would think under the

12:28 10  circumstances is an excited utterance.

11      So subject to your motion to strike, you may answer

12  the question.  What did you say and -- did the partner speak,

13  before we go any further?

14      THE WITNESS:  We were both speaking, but I was

15  primarily the one speaking.

16      THE COURT:  And what's the name of the partner?

17      THE WITNESS:  Lindsay Lewis.

18      THE COURT:  All right.  And tell us what each person

19  said as best you can recall.

12:28 20      THE WITNESS:  Okay.  When we first got on the phone,

21  we were attempting to calm Dr. Abdalla down.  "It's going to be

22  okay.  Can you stay with us?  Let's talk through this."  And

23  that was both Lindsay and myself, Ms. Lewis and myself.  I was

24  asking Dr. Abdalla, "How many people do you see?  What's

25  happening now?  Can you ask them where they're taking him?  Can

1    you ask them if they will show you a warrant?  Will one of them

2    identify themselves to you?  Can you get a name?  Again, where

3    are they taking him?"

4         And I honestly do not recall, because this was

5    obviously a rapidly unfolding situation, whether it was myself

6    or Lindsay who asked if we could speak with one of the agents

7    again and to see if Dr. Abdalla could hand one of them the

8    phone.

9         MR. BIALE:  Okay.  So Your Honor, at this time I would

12:29 10   play the rest of the video, given what you've heard about

11   Ms. Greer's memory of what was said on that phone call, but I

12   don't want to take up the time if the court would be prepared

13   to receive the video in evidence now.

14        THE COURT:  Well, I have this problem, but perhaps

15   Mr. Kanellis wouldn't object on this ground.  That's not the

16   original video because the visages of the agents are obscured.

17   Someone has done that.  If he has no problem with that, I am

18   prepared to receive the video as a video of whatever it

19   records.  So we'll ask him.

12:30 20        MR. KANELLIS:  Your Honor, obscuring the faces is not

21   the issue.  The issue is it hasn't been properly authenticated.

22   If Ms. Abdalla wants to come and lay the foundation, no issue

23   with that.

24        THE COURT:  I think it's been adequately identified,

25   and that objection is overruled, and A1 is admitted as an

1    exhibit, now it will be Exhibit 237.  237.  But I'll review it,

2    so we need not play it.

3              (Exhibit 237 admitted into evidence.)

4              MR. BIALE:  That's fine, Your Honor.

5    BY MR. BIALE:

6    Q.   Let me just ask so the court understands because it's a

7    good point.  The court pointed out that the faces are obscured

8    in the video.  And I think you testified before that you

9    received the video from Dr. Abdalla shortly after it was taken;

12:31 10   is that right?

11   A.   Yes, approximately two hours later.

12   Q.   In the version that you received from Dr. Abdalla, were

13   the agents' faces obscured?

14   A.   No.

15   Q.   Okay.  How did, if you know, how did the faces of the

16   agents come to be obscured in the video?

17   A.   We, as a legal team, knew that there has been a respectful

18   protocol when videos are shown publicly to blur out the faces

19   of other people besides, you know, the person agreeing to make

12:32 20   the video public.  So as a team, we decided to blur out the

21   video -- excuse me, blur out the faces.  And I was privy to

22   part of those conversations, and then one of the legal team

23   members undertook that, the blurring.

24   Q.   Just to be clear, that was to protect the identities of

25   the agents who were involved in the arrest, right?

A.   Right, to protect the identities of any person who

appeared in the video who was not Mahmoud.

Q.   Okay.  Now, you've seen this version of the video before?

And by "this version," I mean the exhibit that was just

admitted into court.

A.   The Associated Press version, yes, I have seen it.

Q.   And you have also seen the version that Dr. Abdalla sent

you two hours after this incident?

A.   Correct.

Q.   Other than the obscured faces of agents, is there any

difference between those two videos, or are they identical?

A.   They appear identical to me, yes.

          MR. BIALE:  No further questions.

          THE COURT:  Mr. Kanellis.

          MR. KANELLIS:  Very short, Your Honor.

CROSS-EXAMINATION BY MR. KANELLIS:

Q.   Ms. Greer, is it?

A.   Yes.

Q.   Let's keep that video up.  Have you had -- you are a

criminal defense attorney?

A.   Yes, sir.

Q.   And you represent criminal clients who have been accused

of breaking the law.  Fair statement?

A.   I represent people who have been accused of breaking the

law.

```
 1   Q.   And have a few of your clients ever been arrested?
 2   A.   Sure.
 3   Q.   And when they were arrested, have a few of your clients
 4   ever been handcuffed?
 5   A.   Yes.
 6            MR. BIALE:  Objection.  Your Honor.
 7            THE COURT:  No.  Overruled, overruled.  This is
 8   certainly something that is appropriate.  I don't know how far
 9   we'll go, but he may proceed with it.
10            MR. KANELLIS:  I've made that point, Your Honor.  I'm
11   going to move on to another one.
12            THE COURT:  All right.
13   MR. KANELLIS:
14   Q.   Do you remember in the video that hanging from the chests
15   of the two -- and we can play it back if you need your memory
16   refreshed, but hanging from the chests of the two agents were
17   identification badges, correct?
18   A.   I recall seeing at least one.
19   Q.   At least one?
20   A.   Yeah, I mean, just from memory.
21   Q.   From memory.  Do you want, we can play the video back.
22            THE COURT:  It's in evidence.  I'm going to have to
23   look at it.
24   Q.   All right.  So there was no -- no one was concealing the
25   fact that these were law enforcement officers, right?
```

A.    No.

           MR. KANELLIS:  Okay.  No more questions, Your Honor.

           THE COURT:  Nothing further for this witness,
Mr. Biale?

           MR. BIALE:  No, Your Honor.

           THE COURT:  You may step down.  So call your next
witness.

           MR. BIALE:  Your Honor, at this time plaintiffs have
called all our witnesses who we have not previously identified
as being called out of order, and so, except with respect to
those witnesses, plaintiffs rest.

           THE COURT:  All right.  And who is left, just so we
know?

           MR. BIALE:  Sure.  Sorry.  One second.

           So here is what it includes.  So we have Jeff Reger,
who is scheduled to testify on Monday.  He's the executive
director of MESA.

           On Tuesday, the government is going to be calling the
agents who were involved in four of the relevant arrests, and
we have agreed with the government that, because both sides
wanted to call those witnesses, we have agreed that the
cross-examinations could go beyond the scope of the direct so
that we don't have to call them separately.

           And then on Friday, we will have Veena Dubal, who is
the head of --

```
 1              THE COURT:  Friday of this week?
 2              MR. BIALE:  No.  Friday of next week.  I'm sorry,
 3     would you like to know the whole schedule?  I was just telling
 4     you plaintiffs' witnesses.
 5              THE COURT:  No, no.  Keep going.
 6              MR. BIALE:  So Friday of next week we will have
 7     plaintiffs' additional witnesses.  These are the ones who are
 8     out of the country this week.  Veena Dubal, who is the general
 9     counsel of AAUP, and Cinzia Arruzza, who is a professor at
10     Boston University.
11              THE COURT:  All that's fine.
12              MR. BIALE:  And we may -- sorry, just to be complete,
13     we may call one very brief summary witness to talk about
14     evidence that's already been admitted or will be admitted, but
15     that's still to be determined.
16              THE COURT:  All right.  So the government may call a
17     witness.
18              MR. KANELLIS:  Your Honor, we have operated under the
19     understanding it was going to last -- our first witness would
20     be available tomorrow.
21              THE COURT:  Fine.  We'll charge you with the time, but
22     that's fine.  Well, actually, we'll charge you with the time,
23     but we'll stop the clock now.  There were matters that I was
24     going to see you on at 3:00, once I've handled the proceeding I
25     have on for 3:00.  I'm happy to handle it now.
```

            1           Where I'd like to start, if anyone could help me, and

            2   I'm looking to the government, is the ex-parte submission in

            3   the red folder, I want to see what document, to what document

            4   does that relate.  And in that document -- you don't have to

            5   reveal it to them, but in that document to what words or

            6   sentence, if you can point it out.  It doesn't have to be done

            7   -- oh, Ms. Santora is ready to do it.

            8           MS. SANTORA:  I was going to confer with our agent.

            9           THE COURT:  You go right ahead.

    12:37 10           MR. BIALE:  Your Honor, sorry.  Before we get there, I

           11   of course forgot about one witness.  We have also indicated to

           12   the government that we wished to call Stuart Wilson, who is a

           13   government official.  We have served a trial subpoena for him

           14   on the government.  The government so far has not accepted

           15   service of that subpoena but has told me that he will be

           16   available to come to testify either next Monday or next Friday.

           17           MR. KANELLIS:  That's not accurate.

           18           MR. BIALE:  Which part of it is not accurate?

           19           MS. SANTORA:  I can explain.  I think I know what

    12:38 20   you're talking about.  So we had indicated based on -- or I had

           21   indicated, and I'm sorry if this was confusing, that based on

           22   the trial schedule as the parties had currently set, it seemed

           23   like the only days where there would be available trial time is

           24   Monday and Friday.  And I had tried to indicate that we were

           25   inquiring with our witness as to his availability on those

1    days, not that he was available.

2         MR. BIALE:  That's fine.

3         MR. KANELLIS:  I apologize for multiple people

4    speaking, Your Honor.  One point of clarification, we have I

5    think cooperated very well with respect to sharing time and

6    figuring out how to fill out these two weeks.  Mr. Wilson was

7    not identified on their witness list.  We had no idea --

8         THE COURT:  Well, I deal with cases in controversy.

9    So far I don't have controversy.  Assuming we can get him and

12:39 10   fit him in, that's fine.

11         All right.  Have we got the document we're concerned

12    about or the portion of it?

13         MS. SANTORA:  Yes.  Let us just confer for one minute.

14    I want to make sure we have the accurate information, Your

15    Honor.

16         THE COURT:  Well, we've got a whole team here.  What

17    was the matter, the housekeeping or other matter that we were

18    going to have to talk about at 3:00?  Let's talk about it.

19         MR. KANELLIS:  Your Honor, I would ask that we do that

12:39 20   at sidebar.  It contains sensitive information.

21         THE COURT:  Sidebar on the record I will do it.

22         MR. KANELLIS:  Yes, sir.

23         THE COURT:  Very well.

24    (Sealed sidebar excised from transcript.)

25         THE COURT:  One minute while I total up the time.

1           MR. BIALE:  Your Honor, can I ask one clarifying

2    question?

3           THE COURT:  Of course.

4           MR. BIALE:  This relates to what we were just

5    discussing, but the question can be asked on the public record.

6           THE COURT:  Yes.

7           MR. BIALE:  With respect to the ROAs that were

8    admitted into evidence today, other than the particular one

9    that we just handed back --

12:46 10           THE COURT:  That we're dealing with.

11           MR. BIALE:  I just want to get clarification.  Are

12    those part of the public record?

13           THE COURT:  They are not.

14           MR. BIALE:  Those are sealed?

15           THE COURT:  They're sealed.  But all -- for instance,

16    though I take it the last video has been on TV and the like,

17    all the exhibits in this case are for the court.  This court's

18    protocol is not to share those during the trial or until the

19    court is done with its decision.

12:47 20           The court in its decision will make reference to those

21    things upon which the court has relied.  I've always taken the

22    position that those things, unless classified, and I've dealt

23    with cases that had classified data, are then public so the

24    decision may be thoroughly reviewed by obviously higher courts

25    but anyone who wants to analyze the court's reasoning.

1          Now, there are various protective orders into which

2     the attorneys have voluntarily entered, and those continue, and

3     you are all subject to those.

4          MR. BIALE:  Thank you for that helpful clarification,

5     Your Honor.

6          THE COURT:  Total elapsed time for the plaintiffs is

7     two days, two hours, 45 minutes.  Defense, three hours, 15

8     minutes.  We'll resume tomorrow promptly at 9:00 a.m.  Thank

9     you.

10         (Recess, 12:47 p.m.)

11                          * * * * *

12              CERTIFICATE OF OFFICIAL REPORTER

13              I, Kelly Mortellite, Registered Professional

14    Reporter, Registered Merit Reporter and Certified Realtime

15    Reporter, in and for the United States District Court for the

16    District of Massachusetts, do hereby certify that the foregoing

17    transcript is a true and correct transcript of the

18    stenographically reported proceedings held in the

19    above-entitled matter to the best of my skill and ability.

20                   Dated this 10th day of July, 2025.

21

22              /s/ Kelly Mortellite

23         _____

24         Kelly Mortellite, RPR, RMR, CRR

25         Official Court Reporter

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


******** 


BENCH TRIAL DAY 5


BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE


United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025


********


Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

```
1   A P P E A R A N C E S

2   RAMYA KRISHNAN
    SCOTT WILKENS
3        Knight First Amendment Institute at Columbia
         University
4        475 Riverside Drive, Suite 302
         New York, NY 10115
5        (646) 745-8500
         Carrie.decell@knightcolumbia.org
6   and
    COURTNEY GANS
7   NOAM BIALE
    ALEXANDRA CONLON
8        Sher Tremonte LLP
         90 Broad Street, 23rd Floor
9        New York, NY 10004
         (212) 540-0675
10       Cgans@shertremonte.com
         For Plaintiffs
11

12  ETHAN B. KANTER
    WILLIAM KANELLIS
13  VICTORIA M. SANTORA
    JESSICA A. STROKUS
14       DOJ-Civ
         P.O. 878
15       Ben Franklin Station
         Washington, DC 20044
16       (202) 616-9123
         Ethan.kanter@usdoj.gov
17  and
    SHAWNA YEN
18       United States Attorney's Office
         1 Courthouse Way, Suite 9200
19       Boston, MA 02210
         Shawna.yen@usdoj.gov
20       (617) 748-3100
         For Defendants
21

22

23

24

25
```

1

2                                    <u>INDEX</u>

3
     <u>WITNESS</u>                                                    <u>PAGE</u>
4

5    MAUREEN SMITH

6       Direct Examination By Ms. Strokus                      8
        Cross-Examination By Mr. Wilkens                      20
7

8
     <u>E X H I B I T S</u>
9

10   None

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2           (Begins, 9:02 a.m.)
 3           THE COURT:  Let me say, as I have each day I've
 4    authorized Internet access to these proceedings and, therefore,
 5    if you are accessing these proceedings via the Internet, have
 6    in mind that the rules of court remain in full force and
 7    effect.  That means there's no taping, streaming, rebroadcasts
 8    or screenshots or other transcription of these proceedings.
 9    You must keep your microphone muted at all times.  If you do
10    not, I shall cut you off from access.
11           With that said, the government may call its first
12    witness.
13           MR. BIALE:  Can we just briefly raise, before the
14    government calls --
15           THE COURT:  Well, I see some things that perhaps need
16    attending to.  I plan to do it during the break this morning.
17    I'd like to take evidence.
18           MR. BIALE:  That's fine, Your Honor.  I just want to
19    say I think timing will work out fine.  We need to address it
20    and get clarity before the second witness testifies, but it's
21    fine to --
22           THE COURT:  Well, before the second witness, very
23    well.
24           MR. BIALE:  Thank you, Your Honor.
25           THE COURT:  Call the first witness, Ms. Santora.
```

1          MS. SANTORA:  The government calls Maureen Smith.  Ms.

2     Smith is testifying remotely, and I do understand she is having

3     some trouble logging in, so it might take a second for her to

4     get logged in.

5          THE COURT:  Well, all right, and that's fine.  And I

6     don't know if she can hear me, but I apologize for not starting

7     early with her, but I appreciate her presence.

8          And since we're waiting, but as soon as she's ready,

9     do you have someone to signal when she's ready?

10          MS. SANTORA:  Yes.  I think if we could just pull up

11     the Zoom link, we should see if she's been able to log in.  We

12     have an attorney with her who will be questioning her.

13          THE COURT:  Very well.  Then we can talk about other

14     matters in the interim is what I'm saying.

15          So, two matters that I think need addressing and I was

16     going to address during the break.  First of all, with respect

17     to Exhibit A, and I see Mr. Kanter here, the document as to

18     which the government has asserted the Presidential

19     communications privilege.  I have that matter under advisement.

20          MR. KANTER:  Yes.

21          THE COURT:  In view now of the coordinate proceedings

22     in the Court of Appeals, I state that document is not going to

23     be used, disclosed, at all until the court, if ever, until the

24     court has concluded its analysis of the government's assertion

25     of that privilege.

1          Yes, I have looked at it in order to make that

2    determination, and I am considering it.  But you understand

3    that's as far as it's going in these proceedings, unless I were

4    otherwise to order, and I will make the order just as soon as I

5    can.  If I decide that the privilege applies, as I understand

6    the governing law, I should return the document physically, and

7    I will, to government counsel, and it's certainly not part of

8    the record and that's an end of it.

9          MR. KANTER:  And if Your Honor decides that the

10   privilege does not apply, the result would be --

11         THE COURT:  Well, look, I think since the matter is in

12   limbo, I'm going to be very cautious what I say, but I'll say

13   this.

14         MR. KANTER:  It's still under advisement.

15         THE COURT:  It looks to me like the document is, as to

16   these proceedings, of very peripheral relevance.  So let's say

17   that I decide that the privilege does not apply.  I note it is

18   to be construed narrowly, but let's say I decide it's not to

19   apply.  I don't have any present intention of making any

20   disclosure of it, but I may consider it part of the record.

21         Does that answer your question?

22         MR. KANTER:  Thank you, Your Honor.

23         THE COURT:  Yeah.  All right.  The second thing is

24   about these witnesses and service and the like.  And I had

25   hoped all this could be worked out.  But let me -- and I'm not

 1   going to entertain argument on this.  Let me tell you two lines

 2   that I'm following.

 3          One, we're not going to be adding witnesses to this

 4   case and so we're limited to the witnesses disclosed in the

 5   pretrial order.

 6          Two, the government isn't going to put on, given the

 7   fact that the weekend is coming up and witnesses, we're going

 8   to have to go through next week and Wednesday we're not going

 9   to sit, the government is not going to put on a witness now

10   without making that witness available for deposition if they

11   want, the plaintiffs want to take the deposition.

12          All right.  Are we ready with Ms. Smith?

13          COURTROOM CLERK:  Yes, she's on the Zoom.

14          THE COURT:  Let's go.

15          MR. BIALE:  Your Honor --

16          THE COURT:  Let's go with Ms. Smith.

17          MR. BIALE:  Yes, Your Honor.

18          THE COURT:  We'll take a break and I'll hear you.

19          MR. BIALE:  I'll raise it then.

20          THE COURT:  Do I understand, Ms. Santora, that we're

21   going to have an on camera lawyer interrogate her?

22          MS. SANTORA:  Yes, I think you can see her on camera

23   now.

24          THE COURT:  I can.  All right.  Let's start by

25   swearing the witness.

1          <u>MAUREEN SMITH, Sworn</u>

2          COURTROOM CLERK:  Can you please state your full name

3     and spell your last name for the record.

4          THE WITNESS:  Maureen Amanda Smith.

5          THE COURT:  Thank you.  You don't have to keep your

6     hand up.

7          THE WITNESS:  Okay.

8          THE COURT:  And counsel is with you, if she could

9     introduce herself.

10          MS. STROKUS:  Good morning, Your Honor.  Jessica

11     Strokus on behalf of defendants.  And Your Honor, I have one

12     request.  As we are appearing via Zoom, may I remain seated

13     during examination and objections on cross-examination?

14          THE COURT:  Of course you may.  Of course you may.

15          MS. STROKUS:  Thank you, Your Honor.

16          THE COURT:  Let me say this, Ms. Smith.  I know it

17     would have been more convenient to you if I started early.  All

18     I can say is I have plenty to do, and I appreciate you starting

19     at our usual time.  Very well.  Ms. Gursky, you may inquire.

20     DIRECT EXAMINATION BY MS. STROKUS:

21     Q.   Good morning, Ms. Smith.

22          Where do you currently work?

23     A.   I work at the U.S. Department of State.

24     Q.   And how long have you been employed with the State

25     Department?

1   A.   I have been employed since September of 1999.

2   Q.   What was your first position with the State Department?

3   A.   My first position with the State Department was at the

4   United States Consulate General in Guadalajara, Mexico.

5   Q.   And can you please briefly walk us through the duty

6   stations and positions that you've held.

7   A.   Yes.  After that I went back to D.C. and I had an

8   orientation class for foreign service generalists.  Then I was

9   given language training in Portuguese.  I went to Recif, Brazil

10   where I was the sole consular officer and deputy principal

11   officer.

12       After Recif I went to Merida, Mexico as an entry level

13   officer and after that Santo Domingo, Dominican Republic as the

14   immigrant visa unit chief; after that back to Merida, Mexico as

15   the consular section chief and deputy principal officer; then

16   to Mexico City as American citizen services chief; then back to

17   D.C. for French and Haitian Creole language training.  I went

18   to Port-au-Prince for two years as deputy consul general.  Then

19   after that I went to Guadalajara, Mexico as the nonimmigrant

20   visa unit chief, and after that to Kingston, Jamaica as deputy

21   consul general, which is where I am now.

22   Q.   Ms. Smith, have you had a change in your employment since

23   February of this year?

24   A.   Yes.  As of the beginning of February of this year, I went

25   to Washington, D.C. on long-term temporary duty, TDY, until

```
 1   now.  And I'm in Kingston, packing up to report to a one-year
 2   position up in D.C.
 3        So thank you for indulging me in doing the testimony from
 4   here virtually, everyone there in the court.
 5   Q.   And what was your temporary duty station that's now going
 6   to be your permanent station for the next year?
 7   A.   I am a senior adviser in the Bureau of Consular Affairs
 8   front office.
 9   Q.   And are there any roles at the Bureau of Consular Affairs
10   immediately superior to your role?
11   A.   Yes.  My direct supervisor is Mr. John Armstrong, the
12   senior bureau official for consular affairs.
13   Q.   Ms. Smith, are you familiar with how decisions at the
14   State Department have historically been made?
15   A.   Yes, I am familiar with how decisions are made
16   historically.
17   Q.   And has the State Department's policy evolved in the time
18   that you've been employed?
19   A.   Yes, it has evolved.
20   Q.   Has the State Department created an exhibit that would
21   assist you in presenting your testimony today?
22   A.   Yes.
23           MS. STROKUS:  Your Honor, I'd like to mark --
24           MR. WILKENS:  Objection.
25           THE COURT:  Wait a minute.  Well, she's leading, but
```

 1    it's background.  I'll let that stand.

 2              MS. STROKUS:  Your Honor, I'd like to mark for

 3    identification Exhibit HM.

 4              THE COURT:  Have I got this?

 5              MS. STROKUS:  I believe you do, Your Honor.

 6              THE COURT:  HM for identification.

 7    BY MS. STROKUS:

 8    Q.   And Ms. Smith, are you familiar with this exhibit?

 9    A.   Yes, I am familiar with it.

10    Q.   Will it help present the evidence to which you are

11    testifying and assist in comprehension today?

12    A.   Yes, it will assist.

13              MS. STROKUS:  Your Honor, pursuant to 107(a) and 611,

14    I move Exhibit HM into evidence.

15              MR. WILKENS:  Objection.  Your Honor, I'd like to voir

16    dire about the how the exhibit was prepared because it hasn't

17    been established.

18              THE COURT:  Forgive me, but I'll ask you to state your

19    name.

20              MR. WILKENS:  Scott Wilkens, Your Honor, for the

21    plaintiffs.

22              THE COURT:  Mr. Wilkens, you're of course welcome, but

23    no voir dire.  I don't understand what the relevance of this is

24    and Ms. Gursky, tell me why you think this is relevant.

25              MR. WILKENS:  Your Honor, we don't have a copy.

1          THE COURT:  Well, the government will provide you one

2    forthwith.  I have one.  But Ms. Gurksy, tell me why this is

3    relevant.

4          MS. STROKUS:  Your Honor, I'm Ms. Strokus, just to

5    clarify.

6          THE COURT:  Ms. Strokus, yes.  And you must forgive

7    me.  I recognize you.  I just hadn't got your name down yet.

8    Forgive me that.  Ms. Strokus.  And you've gotten a trip now as

9    part of this case.  Tell me why it's relevant.

10          MS. STROKUS:  Your Honor, plaintiffs have alleged a

11    new policy which they have termed an ideological deportation

12    policy that they assert that the State Department and the

13    Department of Homeland Security are employing.

14          THE COURT:  I understand that.

15          MS. STROKUS:  This witness is going to testify that

16    the State Department's policies and practices, the way it

17    implements law and regulation have been in place for, in some

18    instances, up to 70 years.  And the purpose of this exhibit is

19    to aid, to assist her in presenting her testimony based on her

20    knowledge and aid in the court's comprehension, simply because

21    of the large volume of years to cover for what is currently

22    being implemented today.

23          THE COURT:  But this goes way back before she was

24    employed there, so she doesn't have personal knowledge, for

25    instance, of what was going on in 2004, and certainly she

1    doesn't have -- though I can take judicial notice of the

2    Immigration Act of 1924, and she doesn't have personal

3    knowledge of the visa security measures in 1941.

4         I can take judicial notice of the events, the World

5    Trade Center bombing, September 11 terrorist attacks, one

6    imagines they changed their policies.

7         MS. STROKUS:  Your Honor --

8         THE COURT:  Let's proceed this way.  You go ahead and

9    ask her your questions.  I understand that central to this case

10   is an alleged policy, and the government denies that there's

11   any such policy.  But it's pretty clear the government has

12   procedures, and I'm interested to know what she has to say

13   about those procedures.  Let's proceed that way.

14        I've looked at this.  It's hardly conclusive on

15   anything, but I'll defer ruling.  So go ahead and ask your

16   questions.

17        MS. STROKUS:  Your Honor, just to clarify, Ms. Smith

18   did just testify that she joined the State Department in 1999.

19   And if I could make a brief offer of proof for all of the

20   testimony that would come before --

21        THE COURT:  No.  I stand corrected as to when she

22   joined, and I'm appreciative of that, but I don't need an offer

23   of proof at this time.  Go ahead, ask questions.

24        MS. STROKUS:  Thank you, Your Honor.

25   BY MS. STROKUS:

1    Q.    Ms. Smith, when with did the State Department's visa

2    issuance policy originate?

3          THE COURT:  Which policy?  Excuse me, I didn't hear

4    the type of policy.

5          MS. STROKUS:  Visa issuance policy.

6          THE COURT:  Again, forgive me.  Say it again.

7          MS. STROKUS:  Sure.  My question, Your Honor, was when

8    did today's -- when did the State Department's visa issuance

9    policy originate.

10          MR. WILKENS:  Objection.

11          THE COURT:  Overruled.  You may answer.

12   A.    Thank you, Your Honor.

13          With the Immigration Act of 1924.

14   Q.    And Ms. Smith, what did that Immigration Act of 1924 do?

15          MR. WILKENS:  Objection.

16   A.    It laid out some basic --

17          THE COURT:  I'm going to sustain that.  I can look at

18   the Act.  We're back in 1924.  That's over a century ago.

19   Let's come to this case.

20          MS. STROKUS:  Yes, Your Honor.  Certainly, Your Honor.

21   BY MS. STROKUS:

22   Q.    So skipping over some questions that I intended to ask

23   Ms. Smith, Ms. Smith, after World War II, what was the next

24   major development in immigration law?

25          MR. WILKENS:  Objection.

```
 1              THE COURT:  No.  Overruled.  She may tell us.
 2   A.    After World War II, the major milestone was the
 3   Immigration and Nationality Act in 1952 which laid out rules
 4   and regulations on visas and established ineligibilities and
 5   what DHS would call inadmissiblities, as well as rules around
 6   visa revocation.
 7   Q.    And is the INA still the governing law today?
 8   A.    Yes, it is still the governing law.
 9              MR. WILKENS:  Objection.
10              THE COURT:  Well, overruled.  I'm the judge of the
11   law, but I'm going to let that stand.  Go ahead.  That's the
12   act that's in effect today.  Go ahead.  Go ahead, counsel.
13              MS. STROKUS:  Yes.
14   BY MS. STROKUS:
15   Q.    Have there been any amendments that have been relevant to
16   the State Department visa security policy in the years
17   following 1952?
18   A.    Yes.  One in particular stands out in my mind that came
19   into effect right before I started with the State Department,
20   which was in 1996, which established the ineligibilities for
21   illegal presence 212(a)(9)(i) and 212(a)(9)(ii).
22   Q.    And you started at the State Department when again?
23   A.    In September of 1999, and I got to my first post in
24   November of 1999.
25   Q.    What was the next major event that impacted the State
```

1  Department's visa security policy?

2  A.   If I may back up just a little bit because something that

3  impacted the State Department was in 1993, the first World

4  Trade Center bombing when it --

5        MR. WILKENS:  Objection.

6        THE COURT:  What's the ground of the objection?

7        MR. WILKENS:  I mean, she testified that she joined

8  the department in 1999.  Now she's going to back to before she

9  joined, Your Honor.

10       THE COURT:  Yes, but she has training and the like.

11 To tell you the truth, so far I haven't heard anything that is

12 particularly relevant, but I'd like to move on.  If she doesn't

13 get to something relevant pretty soon, I'll issue a direction.

14 But this is all background and perhaps it's helpful.

15       Go ahead.  After the World Trade Center bombing, what

16 happened so far as you know?

17       THE WITNESS:  Yes, Your Honor.

18 A.   So after the first World Trade Center terrorist bombing,

19 there was a push within Consular Affairs for some system

20 automation as well as limited biometric collection.  And if we

21 fast forward, I started in '99, then the September 11, 2001

22 terrorist attacks happened.  And that was a major wake-up call

23 for the State Department for Consular Affairs and for the whole

24 U.S. Government in terms of our failure to properly vet visa

25 applicants, since at least a couple of them were in the U.S. on

1    student visas.  At least one had attended flight school in the

2    United States.

3        So in the immediate years following the September 11

4    terrorist attacks, there were several laws that came into

5    effect and major changes in the Bureau of Consular Affairs in

6    terms of full biometric collection.  And, for example, the INS

7    became DHS with all of its different components, HSI, ICE, also

8    consular officers having access to entry and departure data for

9    all aliens.

10        Another major shift was that before 9/11 foreigners could

11    transit the U.S. without a visa.  And starting in 2002,

12    foreigners needed to obtain a visa in order to even switch

13    planes in the United States.

14        Also the visa security program was created, which is where

15    HSI has agents co-located in consular sections abroad that

16    conduct additional vetting on visa applicants.  And also in the

17    few years following 9/11 it was mandated that U.S. Government

18    agencies needed to share in a very fulsome way derogatory

19    information on visa applicants.  And also there was sharing of

20    biometric data especially between DHS and Consular Affairs.

21    Q.   Ms. Smith, was there anything specific to student visa

22    applicants that occurred following 9/11?

23    A.   Yes.  Specific to student visa applicants the SEVIS system

24    was created, also referred to as SEVP, Student and Exchange

25    Visitor Program.  And that was literally a database that was

1    created by ICE to track students from the moment that they are

2    issued their I-20 or DS-2019 form in order to apply for a visa

3    abroad.  And it tracks when they report to class in the United

4    States.  If they were to flunk out of school, their status

5    would change.

6         ICE certifies designated school officials at every school

7    that is accredited to issue the I-20 or DS-2019, and the DSO,

8    as they're called, is supposed to update in SEVIS, in the SEVP

9    any and all student movements, including if someone is, for

10   example, adversely terminated at the school.

11   Q.   Ms. Smith, all of these changes and evolutions that you've

12   mentioned after the September 11 terrorist attacks, are they

13   still being implemented today by the State Department?

14   A.   Yes, they are still in effect today.

15   Q.   After the implementation and all of this evolution in

16   response to the September 11 terrorist attacks, was there

17   anything else that occurred that created additional evolution

18   in the State Department's visa security policy?

19   A.   So for example, in 2013, there was the Boston Marathon

20   bombing that was carried out by a naturalized U.S. citizen and

21   a legal permanent resident.  And that brought to the forefront

22   once again for Consular Affairs the need to properly vet all

23   applicants because of serious national and public security

24   concerns.

25        The next big event was in 2015, the San Bernardino

1   shooting that was carried out by a Pakistani national who

2   obtained a K-1 fiance visa in order to enter the U.S. to marry

3   a U.S. citizen.  And he had posted on his social media, I think

4   it was the day before or the day of the shooting, he had posted

5   what he was going to do.  And then a review of social media

6   revealed afterwards that he had pro-ISIS postings on his social

7   media.  So this was when the Bureau of Consular Affairs first

8   started to take a really hard look at how to vet social media.

9   Q.   And for how long has the State Department required visa

10  applicants to provide social media handles for the purpose of

11  visa vetting?

12  A.   So to mention that in 2016, so about a year after the San

13  Bernardino shootings, FDNS, the Forensic Document National

14  Security director within USCIS started social media vetting of

15  certain subsets of applicants.

16       And in the State Department, in, it was 2019 or 2020,

17  started to require that all visa applicants, whether

18  nonimmigrant or immigrant visa applicants, were obliged to

19  report their social media handles on their DS-160 or DS-260

20  electronic application forms.

21  Q.   And Ms. Smith, following after, say, 2020, has there been

22  additional development in the State Department's visa security

23  policy?

24  A.   Yes.  There have been further developments in terms of

25  interagency and biometric checks.  Also there have been some

1  innovations, for example, for a while there was a predictive

2  analytic software that was run as a pilot at some posts on visa

3  applicants based on their biographic and other information.

4  Sort of a first foray into an AI type system on visa

5  applicants.

6      And another is a focus on data-driven decisions and

7  metrics.  So everything on refusal rates, productivity, there

8  have been different innovations over the years since around

9  2019, 2020, leading up until today and continuing.

10 Q.   Ms. Smith, is the State Department, to your knowledge,

11 continuing to implement the same statutes and regulations today

12 as it has since the passage of the Immigration and Nationality

13 Act in 1952?

14 A.   Yes.  The State Department and specifically Consular

15 Affairs continues to uphold everything that is in the INA.

16      MS. STROKUS:  Your Honor, I have nothing further for

17 this witness and tender the witness to the court.

18      THE COURT:  Yes.  Thank you.

19      Mr. Wilkens, do you wish to inquire of this witness?

20      MR. WILKENS:  Yes, I do, Your Honor.

21      THE COURT:  You may.

22 CROSS-EXAMINATION BY MR. WILKENS:

23 Q.   Ms. Smith, you've talked about, I think you called them

24 everything from sort of major changes to changes over the years

25 to innovations.

1    And am I correct that when those types of changes have

2  happened, the Department of State and in particular the Bureau

3  of Consular Affairs has regularly issued policy guidance to all

4  posts on how those changes should be implemented?

5  A.   Yes, that is correct.  One way that the State Department

6  or Consular Affairs issues guidance to the field is via cables,

7  yes.

8  Q.   And while we're on that topic, in addition to cables, how

9  else does the Department provide policy guidance to visa

10 officers around the world and in Washington?

11 A.   Another way that the State Department provides guidance is

12 via FAM updates, the Foreign Affairs Manual, 9 FAM in

13 particular, which is everything about how consular officers

14 need to apply the INA abroad, sort of operational instructions.

15    Another way besides cables and FAM updates, sometimes

16 emails are released until a cable can get fully cleared because

17 any cable that is released from the State Department has

18 numerous layers of clearances both within Consular Affairs as

19 well as throughout the State Department building, many

20 different offices.

21    And another way that guidance is released to the field is,

22 depending on the topic, Consular Affairs may hold a webinar in

23 order to give information and receive questions from the field.

24 Q.   And in addition to taking account of the various types of

25 changes that you spoke about earlier, this type of policy

 1   guidance is also issued to implement executive orders no matter

 2   what the Presidential administration, correct?

 3           MS. STROKUS:  Objection, Your Honor.

 4           THE COURT:  What's the ground?

 5           MS. STROKUS:  Scope of her prior testimony.

 6           THE COURT:  Overruled.  He may have it.  Is that the

 7   practice?

 8           THE WITNESS:  Counsel, can you please repeat the

 9   question?  I want to make sure I understand.

10           THE COURT:  Yes.  His question is, does like policy

11   guidance get issued to consular offices when it's necessary to

12   implement a President's executive orders.

13           THE WITNESS:  Thank you, Your Honor.

14           The Consular Affairs would release cables or webinar

15   or hold webinars if an executive order is relevant to visa work

16   or let's say U.S. passport adjudications.  So it really depends

17   on the topic.  We don't hold a webinar or release a cable based

18   on every executive order.  It really depends on what the topic

19   of the executive order is.

20   Q.   And under this administration, isn't it correct that the

21   bureau has issued policy guidance with respect to executive

22   orders issued by the President?

23           MS. STROKUS:  Objection, Your Honor.

24           THE COURT:  I'm not getting into how they've changed

25   the visa applications, if at all and on what basis.  In my

1    mind, all of those things implicate national security, and

2    that's the line I'm following.  So that question I'm sustaining

3    on that ground.

4    Q.   So I will come back to a related area in a moment.  Let me

5    just step back for a second about your position, Ms. Smith,

6    which you talked about earlier as special adviser.  You've been

7    in that role since February, right?

8    A.   That is correct, I've been in that role since February.

9    Q.   And that is the first role that you've had sort of in the

10   head office, the front office in Washington, D.C. since you

11   joined the Department in 1999, correct?

12   A.   Yes, that is correct.  That's the first role I've had in

13   the Consular Affairs front office since I joined.

14   Q.   You've, so to speak, been in the field up until taking

15   that role; is that fair?

16   A.   Yes, that's correct.  Other than language training, I've

17   been in the field.

18   Q.   Okay.  And so would it be fair to say that you've been on

19   the receiving end of the policy guidance we've talked about

20   under various cables that are sent or the Foreign Affairs

21   Manual, the emails that you mentioned that are sent prior to

22   some cables being issued; is that right?

23   A.   Yes, I've been on the receiving end of guidance from D.C.

24   Q.   And in your current role since February, you've been on

25   the, let's say the generating end, the creation end of the

1   policy guidance that goes out to consular posts around the

2   world and to the visa office in D.C., correct?

3          MS. STROKUS:  Objection, Your Honor.

4          THE COURT:  No.  He may have that.  Is that a proper

5   characterization, ma'am?

6          THE WITNESS:  I guess what I'd do is I'd caveat it a

7   little bit, because I am one of many people within the Bureau

8   of Consular Affairs who are attempting to faithfully carry out

9   what the President is releasing via executive orders.

10  BY MR. WILKENS:

11  Q.   And would it be fair to say that one of the principal

12  responsibilities of your role is to help implement President

13  Trump's executive orders, and in particular, let me refer to a

14  couple of them in particular, Executive Active order 14161,

15  which is titled Protecting the United States from Foreign

16  Terrorists and Other National Security and Public Safety

17  Threats, and Executive Order 14188, titled, Additional Measures

18  to Combat Antisemitism; is that right?

19         MS. STROKUS:  Objection, Your Honor, scope.

20         THE COURT:  No.  Overruled.  He may have it.

21  A.   Yes, that is correct.  As part of my job in D.C. is to

22  help the Bureau of Consular Affairs implement executive orders

23  out of the White House, including the EOs that you mentioned,

24  EO 14161 and the EO on antisemitism.

25  Q.   And in your role as special adviser since February, you

1   have in fact undertaken a number of tasks to implement those

2   two executive orders, isn't that right?

3          MS. STROKUS:  Objection, Your Honor, scope.

4          THE COURT:  Overruled.

5   A.   Can you please ask the question again?  I think it's two

6   questions.  So would you mind separating the questions, please.

7          THE COURT:  Follow that direction.

8          MR. WILKENS:  I'm trying to remember the question,

9   Your Honor.

10         THE COURT:  I'll break it down.  He asked about two

11  executive orders.  So since you've had this duty in February,

12  have you worked on the executive order relative to measures to

13  combat terrorism and the like, the first one he mentioned?

14         THE WITNESS:  Yes, Your Honor.  So EO 14161, I have

15  been a member of the team to help implement that executive

16  order, which basically directed the State Department to find

17  ways to better vet visa applicants abroad.  And so it was left

18  to the State Department and specifically the Bureau of Consular

19  Affairs to envision and implement what that entailed, what that

20  means.

21         THE COURT:  And his second question was, the executive

22  order dealing with antisemitism.

23         THE WITNESS:  Yes, Your Honor.  Although I've been

24  less involved with that executive order specifically, I have

25  had some dealings with it but not as much as EO 14161.

```
 1   BY MR. WILKENS:
 2   Q.   Turning you specifically to the antisemitism EO, what
 3   guidance are you aware of that has been issued to visa
 4   officers, to consular officers to implement the antisemitism
 5   EO?
 6              MS. STROKUS:  Objection, Your Honor, scope.
 7              THE COURT:  Sustained.  But this is not on scope.
 8   We're not getting into the vetting of visa applicants.
 9              MR. WILKENS:  Your Honor, let me mark an exhibit to
10   sort of make it clear that some of this material is before the
11   court and has been marked as exhibits that deals with this
12   question.
13              THE COURT:  Maybe it is.  So we'll have to work out
14   from there, but that's the line I'm following.
15              MR. WILKENS:  Yes.
16              Could we pull up Exhibit 64, please.  Terrorists.
17              THE COURT:  I have it.
18              THE WITNESS:  I'm viewing it as well.
19              THE COURT:  Thank you.
20   BY MR. WILKENS:
21   Q.   Ms. Smith, please take a moment to look at that, if you
22   need to.
23              MS. STROKUS:  Your Honor, I'm going to object to the
24   introduction of this exhibit to this witness.
25              THE COURT:  Wait a minute.  It's a little too late.
```

1    This document is in evidence under the pretrial order.  So

2    we've got a document in evidence, it's redacted, and I'm not

3    changing that.

4         MS. STROKUS:  I understand, Your Honor.  My objection

5    is under Rule 611(b), the scope of cross-examination.

6         THE COURT:  Well, that's within the court -- I see,

7    it's scope.  And I overrule the objection.  But yes, maybe --

8    well, no, she's adverse.  He may inquire.  The matter is within

9    my discretion.  He may inquire, but I'm not getting into

10   changes in practice for vetting visa applicants.  But hope

11   springs eternal, Mr. Wilkens, so go ahead.

12        MR. WILKENS:  Yes.

13   BY MR. WILKENS:

14   Q.   And have you seen this cable before, Ms. Smith?

15   A.   Yes, I have seen this cable before.

16   Q.   And is this cable one of the types of policy guidance

17   that's been issued to implement the executive orders we spoke

18   about a moment ago, including the antisemitism executive order?

19        MS. STROKUS:  Objection, Your Honor.

20        THE COURT:  Overruled.

21   A.   Yes, this is one example of how executive orders are

22   implemented.

23   Q.   Okay.  And just with respect to cables more generally but

24   including this cable, am I correct that cables don't just apply

25   to visa officers located in diplomatic posts around the world

1    but also can provide policy guidance to the visa officers

2    working here in D.C., isn't that correct?  Well --

3              THE WITNESS:  Were you going to say something, Your

4    Honor.

5              THE COURT:  No.

6              THE WITNESS:  Sorry.

7              MR. WILKENS:  Sorry.  That was me.  Let me withdraw

8    that.

9              THE COURT:  Withdrawn.

10   BY MR. WILKENS:

11   Q.   I'll ask you, so the cables -- yeah.  This cable applies

12   not just to visa applicants who are applying for visas through

13   posts abroad but also applies to visa holders who are present

14   in the United States, isn't that right?

15   A.   So the question is whether the cable guidance would apply

16   to visa holders in the United States as well?

17   Q.   Yes.

18   A.   I think it's a little bit of a broad question to try and

19   answer because if a student has been admitted to the United

20   States, they are admitted by Customs and Border Protection, S,

21   Ms and Js are categories that are submitted, duration of

22   status.  And so there's certain aspects of their presence here

23   that are -- well, actually, most aspects of their presence in

24   the United States are sort of governed by the Department of

25   Homeland Security and not the State Department.

1    Q.    The State Department, though, is the agency with the

2    statutory authority to revoke visas, correct?

3    A.    That is correct, the State Department has the authority to

4    revoke visas.

5    Q.    And that includes student visas, correct?

6    A.    That is correct, that includes student visas that the

7    State Department has the authority to revoke.

8    Q.    And could I ask you to turn to paragraph 11 of this cable,

9    which is on page five of six?

10    A.    Yes.  Could I have a moment to read it, please.

11         Okay.

12    Q.    Okay.  So with respect to paragraph 11, does that make it

13    clear that the cable, the guidance provided by this cable is

14    applicable not just to students applying for visas from abroad

15    at consular posts but also the students in the United States

16    and the possibility that the State Department will revoke their

17    visas?

18              MS. STROKUS:  Objection.

19              THE COURT:  Well, the document speaks for itself.  The

20    objection is overruled.  No.  The objection is sustained.  The

21    document speaks for itself.  That's what it says.

22              MR. WILKENS:  Okay, Your Honor.

23    BY MR. WILKENS:

24    Q.    Just to be clear, the questions that I will be asking with

25    respect to policy guidance, I intend to ask those questions

1    about policy guidance with regard to visa holders in the U.S.,

2    not visa applicants abroad who are applying through U.S.

3    diplomatic posts.  I just want to be clear about that, that

4    that's what I want to focus on.

5        So am I correct that in the bureau in which you are a

6    senior adviser that there is a visa office that handles the

7    revocation of visas for students who are already in the United

8    States, student visa holders?

9    A.   Yes, that is correct, there is the visa office in D.C.

10   that would handle the revocation of visas there; yes, that is

11   correct.

12   Q.   And we spoke a moment ago about different types of

13   guidance, policy guidance that is provided by the Department of

14   State and the bureau, which you mentioned, for example,

15   includes the Foreign Affairs Manual, cables, emails in advance

16   of cables being issued and webinars.

17       And do those types of guidance -- don't those types of

18   guidance also apply to visa officers in Washington who are

19   working on visa revocations?

20            MS. STROKUS:  Objection.

21            THE COURT:  Overruled.

22   A.   So I think what you're asking is whether the same

23   standards would apply abroad or domestically in the United

24   States on whether there are grounds to revoke a visa.

25       So there are certainly rules as it does briefly mention in

1    paragraph 11 of the cable in Exhibit 64, there is brief mention

2    of that.  And so for example, it mentions how in driving under

3    the influence, a consular officer abroad is able to revoke a

4    visa, even if the person is in the United States.  But most

5    times it needs to be the visa office in the U.S. that would

6    perform the prudential revocation.

7    Q.   And could you just briefly explain what the term

8    "prudential revocation" means for the court.

9    A.   Yes, a prudential revocation is when a visa is revoked but

10   it actually does not take effect until the person departs the

11   United States.

12   Q.   Okay.  And I just want to just back up for one second just

13   to be clear.  So the types of guidance we talked about, the

14   Foreign Affairs Manual, cables, emails, webinars, all of that,

15   those types of policy guidance with regard to the two EOs we

16   spoke about apply to students, student visa holders, the

17   revocation of student visas for students who are already

18   present in the United States, correct?

19           MS. STROKUS:  Objection.

20           THE COURT:  No.  Overruled.

21   A.   A consular officer, whether they're abroad or in the

22   United States, would need to look at the totality of the

23   circumstances of an applicant's situation, would need to look

24   at all facts their case, any and all criminal history, any

25   aspect of the applicant in order to determine if there are

1  grounds for revocation or prudential revocation.

2  Q.  And I want to focus on the question of where the guidance

3  that the consular officer, particularly located in D.C., is

4  relying on.

5      And what I'm asking is, they also rely on the various

6  types of policy guidance that you mentioned, which includes the

7  Foreign Affairs Manual, cables, emails, webinars, isn't that

8  correct?

9  A.  Yes, an officer in D.C. would also rely on the Foreign

10  Affairs Manual, cables, webinars.  We are all held to the same

11  standard.

12  Q.  And I think you mentioned a moment ago that with the

13  exception of sort of DUIs, for example, most visa revocations

14  for visa holders in the United States, student visa holders in

15  the U.S. are handled out of visa officers -- are handled by

16  visa officers located in Washington, isn't that right?

17  A.  That is correct.

18  Q.  Okay.

19  A.  The majority of visa revocations are performed from D.C.

20  Q.  If we can just turn back to the first page of this

21  exhibit, 64, and I'm going to direct you to the latter couple

22  of sentences of paragraph two, the summary paragraph.

23      Do you see where it's quoting from Secretary Rubio there?

24  A.  Yes, I do see the quote from Secretary Rubio.

25  Q.  And that quote from Secretary Rubio is guidance to visa

1    officers, including those who are handling the revocation of

2    visas of students who are in the U.S., right?

3              MS. STROKUS:  Objection, hearsay.

4              THE COURT:  No.  The document is in evidence.  It's

5    not hearsay, but I'm sustaining the objection.  The document

6    speaks for itself.  That's what it says.

7              MR. WILKENS:  Okay, Your Honor.

8              THE COURT:  Except the identity of who said it is

9    unclear.  So we'll let Mr. Wilkens have that.

10             You understand that the quoted portion in that

11   paragraph, ma'am, comes from the present Secretary of State,

12   Marco Rubio?

13             THE WITNESS:  Yes, Your Honor.  That comes from

14   Secretary Rubio.

15             THE COURT:  Thank you.

16   By MR. WILKENS:

17   Q.   And just to be clear, that's part of the guidance, right?

18             THE COURT:  Well, the document speaks for itself.

19             MS. STROKUS:  Objection.

20             THE COURT:  The objection is sustained.  I can read.

21   BY MR. WILKENS:

22   Q.   Let me move off of this exhibit, Ms. Smith.

23        Just briefly, to go back to your role as special adviser,

24   you mentioned that you report to Mr. Armstrong, right?

25   A.   Yes, that is correct, I report to Mr. John Armstrong.

1    Q.   And you also work closely with the Office of the Counselor

2    to Secretary Rubio, correct?

3    A.   Yes, I do work with the office of the counselor.

4    Q.   And the Office of the Counselor -- well, could you explain

5    just briefly the Department of State sort of organizational

6    structure?

7    A.   Yes, I can explain.  So the Office of the Counselor -- the

8    consular reports directly to the Secretary of State, and they

9    are responsible for providing guidance, and also they can take

10   on special projects for the Secretary's office.

11   Q.   And the Office of the Counselor which reports directly to

12   the Secretary has provided you with various tasks related to

13   the implementation of the two executive orders we've discussed,

14   correct?

15          MS. STROKUS:  Objection.

16          THE COURT:  Overruled.

17   A.   I do sometimes receive instruction from the office of the

18   consular, but most times it is through the senior bureau

19   official in consular affairs.

20   Q.   I just want to be clear, in addition to reporting to

21   Mr. Armstrong, you also have this working relationship with the

22   office of the consular, which reports directly to Secretary

23   Rubio, right?

24   A.   Yes, I do have a working relationship with the Office of

25   the Counselor.

1    Q.    And you've received tasks regarding the implementation of

2    the two executive orders from Mr. Armstrong and the Bureau of

3    Consular Affairs and also from the office of the consular to

4    Secretary Rubio, correct?

5            MS. STROKUS:  Objection.

6            THE COURT:  Overruled.

7    A.    Can you clarify which executive orders, please.

8    Q.    Yes.  The two we were speaking about earlier.

9    A.    Yes, I have received guidance or instructions for EO

10   141617 and EO 14188.

11   Q.    You spoke earlier about the connections, the work between

12   the Department of Homeland Security and the Department of State

13   and how that has changed or increased over time, correct?

14   A.    Yes, I spoke earlier about how that has evolved over time,

15   become a much closer relationship, starting really with the

16   1992 World Trade Center bombing and especially after the 9/11

17   terrorist attacks, in terms of biometric and information

18   sharing.

19   Q.    And in your role as special adviser, you have worked with

20   the Department of Homeland Security, correct?

21           MS. STROKUS:  Objection.

22           THE COURT:  Overruled.

23   A.    Yes, in my role as senior adviser, I have worked with the

24   Department of Homeland Security.

25   Q.    And I want to just focus on two aspects of that,

1    Ms. Smith.  You have participated in what is referred to as a

2    student visa working group, right?

3              MS. STROKUS:  Objection.

4              THE COURT:  I'm not clear can where that falls on the

5    line I'm following, so I'm going to sustain it but without

6    prejudice to you following it up.

7    Q.   Okay.  Since you became special adviser, some of your work

8    has involved the revocation of visas of students who have

9    engaged in student protests, correct?

10             MS. STROKUS:  Objection.

11             THE COURT:  Overruled.

12   A.   Can you repeat the question, please.

13   Q.   Yes.  In your role as special adviser, you have worked on

14   issues related to the revocation of student visas for students

15   who engaged in student protests, correct?

16   A.   Yes, in my role as senior adviser, I have worked on

17   matters related to the revocation of student visas and also

18   frankly revocation of visas for anyone, whether or not they're

19   a student, who has been arrested or otherwise broken our laws

20   in the United States.

21   Q.   But you have worked, in your role as special adviser, you

22   have worked on the revocation of student visas for students

23   engaged in protests only since February of 2025, right?

24             MS. STROKUS:  Objection.

25             THE COURT:  Overruled.

1   A.    In my role as senior adviser since February of 2025, I

2   have worked on cases where applicants have derogatory

3   information in our system.

4           THE COURT:  Wait.  Excuse me for interrupting, but I'm

5   going to pretty strictly follow my line.  His questions, I

6   understood, don't deal with applicants.  They only deal with

7   people who are here lawfully on visas that have issues.  And

8   I've understood your testimony about revocation of visas to

9   apply to such persons.

10          This last question, as I heard it, is only this.  You

11  first began working on the revocation of visas of the student

12  protesters after the assumption of your role in February 2025.

13  Is that true?

14          THE WITNESS:  So to answer your question more

15  directly, Your Honor, since arriving in February of 2025, my

16  work has included not only student visa holders.  So you're

17  asking, sir, about any visa holder in the United States,

18  including students.  And yes, my work has included that.

19          THE COURT:  But you're making the point that your work

20  is much broader than that, at least in the revocation of visa

21  area?

22          THE WITNESS:  Yes, Your Honor, my work, yes.

23          THE COURT:  Yes, I understand.  Mr. Wilkens.

24  BY MR. WILKENS:

25  Q.    Let me focus on two different ways, as I understand it, in

```
 1    which your work has concerned the revocation of student visas
 2    involving student protesters.
 3         One way has been referrals coming from the Department of
 4    Homeland Security to the Bureau of Consular Affairs and
 5    Mr. Armstrong that recommend -- that have recommended the
 6    revocation of the visas of certain students who were engaged in
 7    student protests, isn't that right?
 8              MS. STROKUS:  Objection.
 9              THE COURT:  Overruled.
10    A.   Would you mind repeating the question, please.
11              THE COURT:  He says, his question is that one way
12    you've been involved in the revocation of visa-holding student
13    protesters is when a recommendation comes from the Department
14    of Homeland Security advising that such visa should be revoked;
15    is that correct?
16              THE WITNESS:  Thank you for repeating the question,
17    Your Honor.  That is correct.
18         We, as I stated during my deposition, we sometimes get
19    information from the Department of Homeland Security about
20    student visa holders or other types of visa holders who are in
21    the United States and there is some sort of derogatory
22    information.
23         And as I stated during my deposition, my role has been
24    fairly limited with regard to specific visa cases, occasionally
25    checking in our system whether the person has a valid
```

1    nonimmigrant visa, if it is an expired nonimmigrant visa, if

2    they are a legal permanent resident, checking if someone is a

3    U.S. citizen.  So it's a little bit more verifying the actual

4    status of the person in the United States.

5    BY MR. WILKENS:

6    Q.    And Ms. Smith, with respect to that limited role, you

7    dealt with, in that way, the case of Mahmoud Khalil, correct?

8            MS. STROKUS:  Objection.

9            THE COURT:  Overruled.

10   A.    Yes, I do recognize the name Khalil Mahmoud.

11   Q.    You were asked by the Office of the Counselor to Secretary

12   Rubio to check in the system whether Mr. Khalil was a visa

13   holder or a lawful permanent resident, correct?

14   A.    I am not sure if it was from the Office of the Counselor

15   or from the Department of Homeland Security, but yes, I did

16   check if Khalil was a visa holder or a legal permanent

17   resident.

18   Q.    And did you have that sort of involvement in the cases

19   involving Rumeysa Ozturk or Badar Khan Suri or Yunseo Chung?

20           MS. STROKUS:  Objection.

21           THE COURT:  Overruled.

22   A.    As I stated during my deposition, I thought I recognized

23   the name Suri, but I thought it was a female, and during the

24   deposition I saw it was a male.  So if I worked on it, it would

25   have been just to verify the visa status or an LPR.

1           Did you say the other name was Chung?

2    Q.    Yes.

3    A.    I do not recognize that name.  And can you repeat the name

4    of the other applicant, please?

5    Q.    Mohsen Mahdawi.  Sorry, go ahead.

6    A.    Sorry.  I do recognize the name Mahdawi, but I thought --

7    I think it's a he --

8    Q.    Yes.

9    A.    I thought he was from a different country.  And when I saw

10   it during the deposition, it was a different country than I had

11   remembered.  The name does sound familiar.  But again, my role

12   would have been limited to checking if the person was a valid

13   visa holder or a legal permanent resident, visa status.

14   Q.    Thanks.  I'll ask about one more name, Rumeysa Ozturk.

15   Were you involved in her case in any way?

16   A.    I do not remember working on her case, no.

17            MR. WILKENS:  Okay.  Thank you.  And Your Honor, I

18   just wanted to raise one thing.  It looked to me like

19   Ms. Strokus maybe had been speaking with someone else in the

20   room.  And if there's someone else in the room, I'd like them

21   to be identified.

22            MS. STROKUS:  That's fine, Your Honor.  We have agency

23   counsel here.  We just have a limited screen.

24            THE COURT:  I appreciate that.

25            MR. ANDERSON:  Carl Anderson, with the State

 1 | Department.

 2 |         THE COURT:  And Mr. Anderson, thank you for

 3 | identifying yourself.

 4 |         Is that it for this witness?

 5 |         MR. ANDERSON:  Thank you, Your Honor.

 6 |         MR. WILKENS:  Not it for my questions, Your Honor, but

 7 | yes, thank you for clarifying that.

 8 |         THE COURT:  And Mr. Anderson, you are certainly

 9 | welcome.

10 | BY MR. WILKENS:

11 | Q.  I want to -- so you've just spoken about one way in which

12 | the Bureau of Consular Affairs has worked with the Department

13 | of Homeland Security on revoking the visas of student

14 | protesters, and I want to -- I just want to talk about one

15 | other way, as I understand it, that the two agencies have

16 | addressed or discussed the issue of visa revocations for

17 | student protesters.

18 |     And you were part of a student working group with DHS in

19 | which the issue of the revocation of student visas for students

20 | who are engaged in protests was discussed, correct?

21 |         MS. STROKUS:  Objection.

22 |         THE COURT:  Well, I think that may run afoul of the

23 | deliberative privilege.  Sustained.

24 |         I'll ask the question.  As part of your job, ma'am, at

25 | some time in the period we're talking about, you were part of a

1    working group within DHS, the Department of Homeland Security,

2    that concerned itself with student protesters.  Is that true?

3            THE WITNESS:  Your Honor, in my role as senior adviser

4    in Consular Affairs, I did participate in a group with the

5    Department of Homeland Security about student visa protesters

6    and other matters, yes.

7            THE COURT:  Thank you.

8    BY MR. WILKENS:

9    Q.  And I want to ask about what you referred to in your

10   deposition as the Homeland Security Council.  Do you remember

11   talking about that?

12           MS. STROKUS:  Objection.

13           THE COURT:  Well, since I don't know -- I don't have

14   the deposition before me, I'll allow her to answer yes or no.

15           Do you remember mentioning that individual or office

16   in your deposition, ma'am?

17           THE WITNESS:  Yes, Your Honor, I did mention in my

18   deposition that the Homeland Security Council calls meetings,

19   and I have attended several of those meetings.

20   BY MR. WILKENS:

21   Q.  And in those meetings, the attendees, the meetings that

22   you attended, the issue of student protesters and the

23   revocation of their visas came up, didn't it?

24           MS. STROKUS:  Objection, Your Honor.  Presidential

25   communications privilege.

```
 1            THE COURT:  What?  Presidential?  Is that --
 2            MS. STROKUS:  Yes, Your Honor.
 3            THE COURT:  -- the privilege you're asserting?
 4            MS. STROKUS:  Homeland Security Council is a direct
 5   advisory to the President, Your Honor.
 6            THE COURT:  So let me be very clear now.  You're
 7   asserting the executive privilege of the President of the
 8   United States with respect to these meetings?
 9            MS. STROKUS:  Yes, Your Honor, the Homeland Security
10   Council is part of the executive, it is part of the White
11   House.
12            THE COURT:  You're all part of the executive, aren't
13   you?  You're part the executive.
14            MS. STROKUS:  I am, Your Honor.  I mean specifically
15   that this council advises directly to the President.  It is
16   part of the Executive Office of the President.
17            THE COURT:  This council we're talking about is part
18   of the Executive Office of the President.  What's his or her
19   name?
20            MS. STROKUS:  Yes.  Your Honor, it is a council of
21   people who have been collected to advise on Homeland Security.
22   It is termed the Homeland Security Council, and it is part of
23   the Executive Office of the President.
24            THE COURT:  Okay.  I appreciate your help.  So there's
25   an informal council on Homeland Security.
```

1          MS. STROKUS:  No, Your Honor.  It is a formal council.
2     It is a formal council that is part of the Executive Office of
3     the President.
4          THE COURT:  And its name is --
5          MS. STROKUS:  The Homeland Security Council.
6          THE COURT:  Thank you.  And it's comprised of whom?
7          MS. STROKUS:  Your Honor, that is part of the
8     Presidential communications privilege.
9          THE COURT:  So it's a secret council?
10          MS. STROKUS:  The existence of the council is not a
11     secret, Your Honor.
12          THE COURT:  But its membership is secret?
13          MS. STROKUS:  They are staff members of the Executive
14     Office of the President, Your Honor.
15          THE COURT:  And its membership is secret?
16          MS. STROKUS:  I would not say that it is secret, Your
17     Honor.  I would say that it is privileged.
18          THE COURT:  And it's privileged from this court?  I
19     may not know who these people are?  I mean, you tell me that.
20     Is that what you're saying?
21          MS. STROKUS:  Given the ongoing issues with privilege
22     in this court, Your Honor, I will maintain that this is the
23     Presidential communications privilege and the identities of the
24     individuals on the Homeland Security Council are privileged.
25     The discussions that are had within the Homeland Security

1    Council and agencies are privileged under the Presidential

2    communications privilege because this council is part of the

3    Executive Office of the President and provides direct

4    recommendations, direct advice for the President to take action

5    in his duty under the Constitution.

6            THE COURT:  Your position is clear.  Let me ask you

7    this, because this pertains to my research on Exhibit A as to

8    which this -- and Mr. Kanter may respond to this as well.  And

9    really it does not come up in the context that counsel has now

10   raised it where at least the name of this secret entity is

11   Homeland Security, which the natural inference is it involves

12   national security.

13           MR. KANTER:  Homeland Security Council, not secret.

14           THE COURT:  The name is not secret, no.  But now its

15   members are apparently secret.

16           MR. KANTER:  Privilege.

17           THE COURT:  Privilege, you say.  So she takes that

18   position, and I'm not in a position to overrule it, and I'm not

19   going to, at least now.

20           But go back to Exhibit A.  If I rule that Exhibit A is

21   privileged, my review of that exhibit is, that has nothing to

22   do with or the claim that -- if any claim were raised that it

23   has to do with national security is so peripheral that, to be

24   almost evanescent.  Be that as it may, if it did have to do

25   with national security and the executive privilege of the

 1    President of the United States is invoked, the decided cases

 2    indicate that no adverse inference may be drawn from that.  And

 3    those are higher courts, and I respect that.  But if it didn't

 4    have to do with national security, I'm wondering when such

 5    privilege is invoked, whether, as you'll find if you were here

 6    in Massachusetts dealing with the attorney-client privilege,

 7    under the common law of Massachusetts, where I started and

 8    still reside, if you invoke the attorney-client privilege, the

 9    factfinder is entitled to draw an adverse inference that the

10    attorney-client privilege is invoked, but you're hiding

11    something.

12         I wonder whether when national security is not at

13    play, as it appears to be as your co-counsel has invoked it,

14    but with respect to Exhibit A where it appears it doesn't,

15    what's the law on that?

16         I'm not asking now.  It's a matter that could be

17    briefed if we even get that far because I haven't ruled whether

18    the privilege applies or not, but it's appropriate to raise it

19    now.

20         Sorry for the detour, Ms. Smith.  We'll let Mr.

21    Wilkens get back to work.

22         MR. WILKENS:  Thank you, Your Honor.

23    BY MR. WILKENS:

24    Q.   So Ms. Strokus and Ms. Smith, I want to return for a

25    moment to the Homeland Security Council with respect to what is

1   public about it.  And a great deal has been made public by

2   White Houses over time.  And so in particular, the Homeland

3   Security adviser is Stephen Miller, isn't that correct?  That's

4   on the White House website; isn't that right?

5   A.   Yes, the Homeland Security security adviser is Stephen

6   Miller.

7   Q.   And can you name the agencies -- I'm not asking for the

8   names of the people but the agencies and agency heads who are

9   as a matter of public record part of the council?

10          MS. STROKUS:  Your Honor, objection again.

11          THE COURT:  Same grounds?  Same grounds?

12          MS. STROKUS:  Yes, Your Honor.

13          MR. WILKENS:  Your Honor, I'd like to pull up a White

14  House web page that shows the information that I'm trying to

15  ask about to show that it's public.

16          THE COURT:  Well, you may, but then why don't you pull

17  it up and show it to the witness or read it to the witness --

18          MR. WILKENS:  Yes, Your Honor.

19          THE COURT:  -- because you have it, and let's see what

20  she says about it.

21          MR. WILKENS:  Yes, Your Honor.  We'll pull it up now.

22          MS. STROKUS:  Your Honor, I'm going to object to this.

23  This was not produced to the defendants in discovery.

24          THE COURT:  True.  But I'm going to allow him to do it

25  if it's on the White House website.  Now, a privilege has been

1    invoked.  I think I might want to take a look at it, and it

2    would be helpful, can you people print things out?  Why don't

3    you take a screenshot of it and print it out?  I'm swimming in

4    paper here.

5            MS. CONLON:  I know.  Unfortunately, we have no

6    printer access in the courthouse, but we'll put it on the

7    screen in a second.

8            THE COURT:  All right.  Let's put it on the screen.

9            MR. WILKENS:  Pre-marked as EP.

10           THE COURT:  Okay.  Now, EP, this is one of your newer

11   documents.  So this is EP.

12           MS. STROKUS:  Your Honor, may we have a quick recess

13   so that we can determine what is public and what is not?  We

14   have not seen this before, and my understanding --

15           THE COURT:  I don't see the need for a recess.  It's

16   sufficiently public that they can get their hands on it.  And

17   it's represented to the court that this is the White House's

18   own website.  I'm reading it, it says Homeland Security

19   Council.

20           MS. STROKUS:  Your Honor, I would just point out that

21   at the top of the page it says, "Under President George W.

22   Bush," and that this is frozen in time, it is not current.

23           THE COURT:  All right.  That's fine.  And therefore,

24   the way we'll proceed is you're going to have to move on,

25   Mr. Wilkens, because she says that this is not the current

 1   council.  When you can get to a printer, print that out, and

 2   let me have it.

 3   BY MR. WILKENS:

 4   Q.   Can I ask you, Ms. Smith, if you read that --

 5             THE COURT:  She can't read it.

 6             MS. STROKUS:  Objection on.

 7             THE COURT:  Wait a minute.  He hasn't asked his

 8   question yet.  Let him ask the question.

 9   BY MR. WILKENS:

10   Q.   What I want to ask is, is the description of the Homeland

11   Security Council and its agency members an accurate description

12   of the current Homeland Security Council?

13             THE COURT:  She doesn't have the document before her.

14   She does?  She has it before her.

15             MS. STROKUS:  Objection, speculation, foundation.

16   This has not been produced in discovery.  It's a historical

17   document.

18             THE COURT:  Yes, he knows that.  And so what he's

19   asking her is, is the historical document, is the composition

20   the same today?  You object to that, asserting the same

21   privilege, I take it?

22             MS. STROKUS:  Yes, Your Honor, under the privilege and

23   also because it's speculative.

24             THE COURT:  Look.  I've heard you.  I understand the

25   grounds of the objection.

1       Now, I'm in the middle of the trial.  I need to sort

2  this out.  So without sustaining this objection in any way, I'm

3  going to direct you to move on, because if the assertion of

4  privilege is correct, the question you ask, since you can only

5  come up with one from a prior administration and that's some

6  time ago, calls for her divulging matters as to which such a

7  claim has been made, an interesting claim.  Anything else?

8       MR. WILKENS:  Yes, Your Honor.

9  BY MR. WILKENS:

10  Q.   I'd like to just briefly focus on a few cables of the type

11  that you testified about earlier, cables that the Bureau of

12  Consular Affairs issued as part of its implementation of the

13  two executive orders that we spoke about.

14       MR. WILKENS:  And I will go through them as quickly as

15  I can, Your Honor.

16  Q.   Let me direct you to, if we can pull up Exhibit 51,

17  please.

18       MS. STROKUS:  Your Honor, I'm going to object to this,

19  make a scope objection.

20       THE COURT:  Your objection is scope.  Overruled.

21  A.   Okay.  I see Exhibit 51.  I would appreciate a minute or

22  two to read through it, please.

23       Okay, I am ready, sir.

24  Q.   Okay.  Thank you.  Do you recognize this cable?

25  A.   Yes, I do recognize this cable.

1    Q.   Is it one of the cables that you were referring to earlier

2    with respect to providing policy guidance about the

3    implementation of the executive orders?

4    A.   As we can see in the summary paragraph on page one, it

5    does mention EO 14161, and the cable, to summarize it in a

6    sentence or two, directs visa hosts abroad to catch up on their

7    backlog of what are called system messages.

8         System messages are derogatory information that appears in

9    our systems abroad when there's a visa holder.  So it's someone

10   who already has a visa, and then it's derogatory information

11   that pops into our system once they've been arrested, or other

12   derogatory information.

13   Q.   If I could ask you just briefly, based on your

14   understanding -- well, sorry.  Strike that.

15        If you could turn to paragraph three, please, on page two

16   of seven.

17   A.   Okay, I see it.  Can I just have a minute to read through

18   it, please?

19   Q.   Sure.

20   A.   Okay.

21   Q.   Okay.  I want to direct your attention to most of the way

22   down the paragraph where the sentence begins, "Visa holders who

23   overstay their admission period."  And in that sentence, I just

24   want to focus on the phrase -- well, it says, "engage in

25   conduct that poses a threat to U.S. national security or

1  otherwise misuse their visas should have their visas revoked

2  under INA 221(i)."  Do you see that?

3  A.   Yes, I do see that.

4  Q.   This is not a statutory exam, but could you briefly

5  describe your understanding of INA 221(i)?

6  A.   I have not read INA 221(i).  I'm not an expert on that, I

7  apologize.

8  Q.   Okay.  So with respect to the phrase "or otherwise misuse

9  their visas," where can a visa officer in Washington who is

10  looking at the revocation of student visas, where could they go

11  to determine what it means to misuse a visa?

12  A.   Well, my first look as a consular officer would be to the

13  9 Foreign Affairs Manual which has all of the rules about how

14  to implement visa law and to, as I've said before and as I said

15  during my deposition, to look at the facts for each and every

16  case.  Each and every case is analyzed individually.  As a

17  consular officer, my job is to took at the totality of

18  circumstances and all of the facts for each and every visa

19  applicant or each and every visa holder.

20  Q.   Okay.  Let me direct you to paragraph 11 on page five

21  which is under a heading, "Revocation if the alien is still in

22  the United States."

23  A.   Yes, I see that paragraph.

24  Q.   Okay.  Obviously you see that most of it is redacted for

25  law enforcement, but I just want to ask about the unredacted

1  part.

2     What do you understand it to mean, that requests for

3  revocation of visas when the individuals in the U.S. have to be

4  sent to what's called here the revocation team?

5  A.   So it's exactly what it says there, that hosts abroad need

6  to refer to the team in D.C. when they think that a visa merits

7  revocation.

8         THE COURT:  What do the initials mean, since I'm

9  unfamiliar with your organization, VO, I assume means visa

10  office.  SAC means what?

11         THE WITNESS:  I believe that SAC is security advisory

12  and clearances, and I am not sure what RC stands for.  But you

13  are correct, Your Honor, it's a team within the visa office.

14         THE COURT:  Yes.  And that's the visa office in

15  Washington?

16         THE WITNESS:  That is correct, sir, it is the visa

17  office in Washington.

18         THE COURT:  Thank you.

19  BY MR. WILKENS:

20  Q.   A moment ago you spoke about a visa officer, including

21  you, looking at the totality of the circumstances in deciding

22  whether a visa should be revoked, right?

23  A.   Yes.  Each case would be looked at individually to gather

24  all of the facts in order to make a decision on a visa

25  revocation.

1    Q.   And under the two executive orders we've been talking

2    about and the policy guidance with regard to how they should be

3    implemented, the facts, the totality of the circumstances

4    include a student engaging in a student protest, correct?

5           MS. STROKUS:  Objection.

6           THE COURT:  If I understand, your question is a

7    hypothetical.  Ask it again.

8           MR. WILKENS:  Sorry, Your Honor.

9    BY MR. WILKENS:

10   Q.   Since -- when you are considering the totality of

11   circumstances, is engaging in a campus protest inconsistent

12   with a student's visa status?

13          MS. STROKUS:  Objection.

14          THE COURT:  Overruled.  She may give us her opinion.

15   A.   Well, I think it's a bit of a hypothetical question, but

16   we would need to look at all of the facts of the case.  I mean,

17   I don't want to veer off into, you know, if this, then that.

18   But, you know, if it were someone, a visa holder who engages in

19   violent activity, whether it's during a protest or not, if they

20   were arrested for that violent activity, then that is something

21   that we would consider for possible visa revocation.

22   Q.   So I'm not -- so putting aside student visa holders who

23   engage in some kind of violence or have been arrested, putting

24   that to one side, isn't it accurate to say that engaging in a

25   campus protest -- sorry.  Isn't it accurate to say that when

1   you are looking at the totality of the circumstances, engaging

2   in a campus protest is inconsistent with a student's visa

3   status?

4          MS. STROKUS:  Objection, asked and answered.

5          THE COURT:  Well, she hasn't answered it, but he

6   stated it the other way.  He's asking --

7          THE WITNESS:  Can you repeat the question, please,

8   counsel.

9          THE COURT:  Well, the information ultimately is coming

10  to me, and I guess what he's trying to get at is, do you think

11  that engaging in a student protest, nonviolent and standing

12  alone, is inconsistent with a student's visa status -- I'll

13  state it differently -- is grounds for revoking his visa

14  status?  Do you think that?

15         THE WITNESS:  I think it's a difficult question to

16  answer.  If it's a nonviolent protest and it's not a protest

17  that is supporting terrorism, then I'm not sure that that would

18  be a problem.  I think that we would probably see it in a

19  negative light if the person were protesting in a way that

20  supports terrorism, even if it's a nonviolent protest.

21         THE COURT:  Thank you.

22         THE WITNESS:  Again, I think we'd have to look at the

23  totality of the circumstances for the individual applicants.

24         MR. WILKENS:  Just one moment, Your Honor.

25         THE COURT:  Of course.

1          While we're waiting, I've waffled on the document, HM

2     for identification, which was proffered by the defendants as

3     admissible evidence under 611.  Reviewing it and on reflection,

4     it's not.  It doesn't meet the criteria of 611, but the court

5     receives it as a chalk or demonstrative aid, illustrative of

6     the witness's testimony.

7          MS. STROKUS:  Your Honor, just to clarify, it was also

8     offered under 107(a).

9          THE COURT:  And I am excluding it.  Thank you for your

10    precision.  Your rights are saved.

11         Is that it for this witness?

12         MS. CONLON:  No.

13         MR. WILKENS:  Your Honor, we're trying to pull up a

14    document.  We're going to return for a moment, but it will be

15    brief, to the Homeland Security Council and a current White

16    House document that describes, it's a Presidential memorandum

17    from President Trump issued since he entered office that

18    describes the National Security Council and also describes when

19    that becomes the Homeland Security Council through the change

20    of agency heads who are part of the Homeland Security Council

21    but not the National Security Council.

22         THE COURT:  Well, you know, where does it come from?

23         MR. WILKENS:  The Whitehouse.gov.  It's an

24    executive -- it's in the same part of the Whitehouse.gov

25    website that has the executive orders that we've been talking

1    about.

2              THE COURT:  If it does, I mean, I suppose it's

3    something of which I could take judicial notice.  I mean, you

4    proffered something that was not current, so the objection was

5    very well taken.  But if you have something current, I don't

6    know what this witness can add to it because, at least for

7    presiding here in the midst of trial, I'm not going to take it

8    upon myself to overrule the objection that's been stated as to

9    Presidential communications.  I am going to reflect on it.

10             MR. WILKENS:  Yes, Your Honor.  We would like to just

11   offer it.  It's EQ for identification.

12             THE COURT:  Where is it physically?

13             MR. WILKENS:  It's coming up.

14             MS. STROKUS:  Your Honor, I object.

15             MR. WILKENS:  It will come up on screen.

16             MS. STROKUS:  Objection.

17             THE COURT:  Yes.  And your objection is sustained

18   because that's too evanescent for this old guy, a ruling not

19   found in the Federal Rules of Evidence.

20             Look, when you get me a paper copy, life goes on, then

21   I'll take a look at it.

22             MR. WILKENS:  Yes, Your Honor.  We'll do that over the

23   break.

24             THE COURT:  And it seems to me that it's a type of

25   thing as to which I can take judicial notice.  It doesn't have

 1    to be marked as an exhibit, unless of course there's some

 2    dispute that that is in fact what the White House website

 3    itself is putting out.

 4    BY MR. WILKENS:

 5    Q.   So Ms. Smith, just returning to the issue of student -- a

 6    student protest and a student visa holder who is present at a

 7    student protest, when that is inconsistent with the student

 8    visa status, which we spoke about a couple of minutes ago, I

 9    want to ask you, so a nonviolent protest but a protest that can

10    be considered pro-Hamas, that is consistent with a student's

11    visa status, correct?

12              MS. STROKUS:  Objection.

13              THE COURT:  Sustained.  These questions are

14    argumentative.  The language is what it is.  She's an employee

15    of the agency, and therefore you may argue that's a statement

16    of the agency, but these matters are all subject to argument

17    here.

18              No.  Sustained.  And I've allowed her to give her

19    answer, not on your specific question, but as to how she would

20    go about it.

21              MR. WILKENS:  Thank you, Your Honor.  Let me just

22    quickly go --

23              THE COURT:  How much more have you for her?

24              MR. WILKENS:  Just, I think, Your Honor, we're going

25    to break soon.  I think I just need ten, ten more minutes.

```
 1              THE COURT:  I think I can go ten more minutes.  Go
 2    ahead.
 3              MR. WILKENS:  Thank you, Your Honor.
 4    BY MR. WILKENS:
 5    Q.    So if we could turn to Exhibit 50 and pull that up,
 6    please.
 7    A.    Okay.  I have Exhibit 50 open.  The subject is "Caught and
 8    revoked."
 9    Q.    Okay.
10    A.    Could I have a minute to read through it, please?
11    Q.    Oh, yes.  Please go ahead.
12    A.    Okay, I'm ready.
13    Q.    Okay.  And do you recognize this cable?
14    A.    Yes, I recognize this cable.
15    Q.    And is it one of the cables that we referred to earlier
16    that was put in place as policy guidance to implement the
17    executive orders?
18              MS. STROKUS:  Objection, scope.
19              THE COURT:  Overruled.
20    A.    Yes, it is related to EO 14161 as it mentions in the
21    opening line of the cable.
22    Q.    Okay.  And one thing we didn't do when we looked at
23    Exhibit 51, and maybe we can do this without turning to it, but
24    that exhibit, the cable is titled "Catch and Revoke, National
25    Security Through Timely Processing of Visa Systems Messages."
```

1    This one, as you mentioned, is titled "Caught and Revoked,

2    Updated Guidance."

3        Is it fair to say that this cable here is an update,

4    updated guidance to the cable that we were speaking about

5    earlier, Exhibit 51, "Catch and Revoke"?

6    A.   I'd just like to check Exhibit 51 to make sure that we're

7    referring to the other one.

8    Q.   Sure.

9    A.   Just a moment.  Yes, Exhibit 51 is "Catch and Revoke" and

10   Exhibit 50 is, "Caught and Revoked."  So yes, that is correct

11   that it is a follow-up cable to Exhibit 51.

12   Q.   Thank you.

13       Let me just quickly address two more cables.  If we can

14   turn to Exhibit 53, please.

15   A.   Okay, I see Exhibit 53.  Let me just open it and review

16   it, please.

17   Q.   Sure.

18   A.   Okay, I'm ready.

19   Q.   Thank you.  Do you recognize this cable as well, Ms.

20   Smith?

21   A.   Yes, I do recognize this cable.

22   Q.   Okay.  And just quickly to confirm, this is also one of

23   the cables that provides policy guidance on the implementation

24   of the two executive orders we've been talking about, correct?

25           MS. STROKUS:  Objection to scope.

1          THE COURT:  Well, I've been overruling scope

2    objections, and of course this is an agreed-upon exhibit, but

3    this one seems directed entirely to visa applicants, so I'm

4    just not going to permit it, because of the implications for

5    national security.  Sustained.

6          MR. WILKENS:  Objection.

7    BY MR. WILKENS:

8    Q.   If I could pull up Exhibit CG, which is another cable.

9    A.   Okay.  I am clicking on it now.  I'm going to look at it.

10   I need a minute to read through.

11   Q.   Yes.

12         MS. STROKUS:  Your Honor, I'm going to object to this

13   exhibit.  It doesn't appear that -- it has been pointed out to

14   me by the witness that there's something in this document that

15   is incorrect.

16         THE COURT:  Well, it can be corrected then, if it's

17   necessary.  The document has been marked for identification.

18   She can be inquired of.

19         MS. STROKUS:  Your Honor, it has been pointed out to

20   me that this exhibit is marked by the plaintiffs.  It appears

21   to be a leaked cable.  It was not produced by the defendants in

22   discovery, and therefore we cannot verify the accuracy of this

23   exhibit.

24         THE COURT:  Well, that may be.  He may inquire about

25   it.  You're saying it may not be authentic.  I can follow that.

1    BY MR. WILKENS:

2    Q.    Ms. Smith, you have seen this cable before, correct?

3    A.    Let me -- so the other documents that are produced here in

4    AgileLaw have a REF number at the bottom, and this one does

5    not.  This one has a number in the bottom right-hand side.  And

6    there are some -- it looks, as Jessica said, it looks to be a

7    leaked cable because someone provided it from their email I can

8    see.  So I really can't attest to the veracity of the document.

9         There's also some, I can see, like, for example, on the

10   bottom of page one and the top of page two, there appear to be

11   some sort of like black fuzzy markings.  So I'm not sure I feel

12   comfortable attesting to the veracity of this document.

13            THE COURT:  Well, I take your testimony, ma'am, and I

14   appreciate it.  But his question was have you seen this cable?

15   Do you recognize it?

16            THE WITNESS:  Let me just take a minute to look at it,

17   please.  Okay.  Yes, Your Honor, this cable does look familiar.

18   BY MR. WILKENS:

19   Q.    All right.  And when you say it looks familiar, you recall

20   seeing this cable with the subject line "Action Request

21   Expanding Screening and Vetting For FMJ Applicants," correct?

22            THE COURT:  I don't see anything here that goes to

23   people who are valid visa holders in the United States.  This

24   concerns itself with increased scrutiny of the issuance of

25   visas.  And so I'm going to sustain it, consistent with my

1    other rulings, though it appears to be an authentic document,

2    albeit perhaps leaked.

3            MR. WILKENS:  Your Honor, this cable states at

4    paragraph two, the bottom of paragraph two it states that it --

5    "This guidance supersedes REF B."  And if you look at page one

6    of the cable, where it says "Reference," REF B is a cable that

7    we earlier, the witness earlier talked about and put into

8    evidence, which is 25 State 26168.  That's Exhibit 64, which

9    applies to the revocation of visas.  So this cable that the

10   witness has just --

11           THE COURT:  But it doesn't talk about that.

12           MR. WILKENS:  So the specific relevance of what's in

13   this cable to revocation of visa holders is that it addresses

14   activities that are inconsistent with holding a visa.

15           THE COURT:  Where?  Where does it do that?

16           MR. WILKENS:  Let me -- it's -- maybe, let me just

17   come at this it a different way, Your Honor.

18           THE COURT:  All right.

19   BY MR. WILKENS:

20   Q.   Ms. Smith, am I correct that -- am I correct that one

21   ground for revoking a visa of someone present in the U.S. is if

22   the visa officer considers that they would not have been

23   granted a visa in the first instance?

24   A.   Okay.  So just to clarify, are we moving on from Exhibit

25   CG?  Because I thought we were talking about Exhibit CG.

1          THE COURT:  We are.  I'm moving on from it.  We'll see

2    where we go.  He's over ten minutes now.  Final few questions,

3    Mr. Wilkens?

4          But you can answer that.  Is it a valid ground to

5    revoke a visa that never should have been issued in the first

6    place?

7          THE WITNESS:  Yes, that is a valid ground.  If we see

8    that a consular officer should not have issued a visa in the

9    first place, that there are facts to support that, yes, that

10   would be grounds to revoke a visa.

11         THE COURT:  All right.

12         MR. WILKENS:  Your Honor, could we -- I may have just

13   very few questions.  If we could take a break now, I will

14   quickly determine whether --

15         THE COURT:  Very few questions?  You told me ten

16   minutes.  You're at 13 by my counting.

17         MR. WILKENS:  I apologize, Your Honor.

18         THE COURT:  We'll take the recess for one half hour.

19         MR. WILKENS:  Thank you, Your Honor.

20         THE COURT:  Understand, we are not getting into the

21   application for visas.  That's an inventive strategy, I follow

22   that.  I'm not going to let her answer questions now because

23   they could now, under their heightened scrutiny, use it to

24   revoke a presently existing visa.  So far in this case I

25   haven't seen that ground asserted at all, but the very few I

1    take it, and you will represent to the court, will not exceed

2    five minutes, right, not exceed five minutes?

3            MR. WILKENS:  I'll do my best, Your Honor -- yes.

4            THE COURT:  I hear the answer yes.  We'll recess until

5    25 minutes after 11:00.  We'll recess.

6            (Recess, 10:56 a.m.)

7                          *  *  *  *  *

8            CERTIFICATE OF OFFICIAL REPORTER

9

10           I, Kelly Mortellite, Registered Professional

11   Reporter, Registered Merit Reporter and Certified Realtime

12   Reporter, in and for the United States District Court for the

13   District of Massachusetts, do hereby certify that the foregoing

14   transcript is a true and correct transcript of the

15   stenographically reported proceedings held in the

16   above-entitled matter to the best of my skill and ability.

17               Dated this  11th day of July, 2025.

18

19               /s/ Kelly Mortellite

20               _____

21               Kelly Mortellite, RPR, RMR, CRR

22               Official Court Reporter

23

24

25

# EXHIBIT 4

1                  UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS (Boston)

3                           No. 1:25-cv-10685-WGY
                            Volume 2, Page 66 to 131
4

5    AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                Plaintiffs
6

7    vs.

8

9    MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10                Defendants

11
                          * * * * * * * * *
12

13

                        For Bench Trial Before:
14                      Judge William G. Young

15

16
                        United States District Court
17                      District of Massachusetts (Boston.)
                        One Courthouse Way
18                      Boston, Massachusetts 02210
                        Friday, July 11, 2025
19

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                 United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhr3tubas@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
        Knight First Amendment Institute at Columbia
 6      University
        475 Riverside Drive, Suite 302
 7      New York, NY 10115
        (646) 745-8500
 8      E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
11      New York, NY 10004
        (212) 540-0675
12      Email: Cgans@shertremonte.com
        For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16      DOJ-Civ
        P.O. 878
17      Ben Franklin Station
        Washington, DC 20044
18      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20      United States Attorney's Office
        1 Courthouse Way, Suite 9200
21      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
22      For Defendants

23

24

25
```

```
1                         I N D E X

2

3  WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5  MAUREEN SMITH  (By Zoom, continued.)

6     By Ms. Strokus

7     By Mr. Wilkens              69

8

9  JOHN ARMSTRONG

10    By Ms. Santora      78

11    By Ms. Conlon            124

12

13                       E X H I B I T S

14

15       EXHIBIT 238.............................. 72

16       EXHIBIT 239.............................. 76

17

18

19

20

21

22

23

24

25
```

```
 1        P R O C E E D I N G S
 2        (Resumed, 11:30 a.m.)
 3        THE COURT:  Mr. Wilkens, go ahead, for your 5
 4   minutes.  I have been given a document, the heading is
 5   the "White House Organization of the National Security
 6   Council and Subcommittees," January 20th, 2025.
 7        Go ahead.
 8        MR. WILKENS:  Yes, your Honor, and I will come
 9   back to that in a little while.  I want to focus --
10        THE COURT:  In your 5 minutes?
11        MR. WILKENS:  Yes.  I want to focus my 5 minutes
12   on Visa revocations, not applications for Visas.  But
13   with respect to Visa revocations, why the cable that we
14   were talking about, marked as CG, is relevant to Visa
15   revocations.
16
17   CROSS-EXAMINATION BY MR. WILKENS:  (By Zoom, Continued.)
18   Q.  So you earlier, several times today, have spoken
19   about the Foreign Affairs Manual.  Do you remember that?
20   A.  Yes, I have referred several times to the Foreign
21   Affairs Manual today.
22   Q.  Okay.
23        MR. WILKENS:  And if we can pull up Exhibit CK,
24   please.
25        (On screen.)
```

1  A.    Okay, I see the document.  I'm going to open it

2  and review it.  I just need a minute or two.

3  Q.    Sure.  And I'm going to only ask you about one

4  specific provision, but -- on Page 6.

5  A.    Oh, okay.

6  Q.    And I can tell you which number.

7       MS. STROKUS:  Your Honor, I'm going to object

8  again on the same grounds as the prior document.

9       THE COURT:  I haven't got it yet.  I haven't got

10 it.

11      It's on Page 6?

12      MS. STROKUS:  This document was not produced by

13 the government in discovery, and we therefore cannot

14 attest to its authenticity.  It appears to be a leaked

15 version.

16      THE COURT:  Yeah, once again this is allegedly a

17 "leaked version" of a government document.

18      All right, um, so you're going to have to prove

19 authenticity, and that's fine.  Go ahead.

20      MR. WILKENS:  Your Honor, if I could?  In the

21 bottom left this shows that it's the public version of

22 the FAM.  There is a nonpublic version, but this is from

23 the state.gov website, that's where it comes from.  And

24 it was produced by the plaintiffs in this case.

25      THE COURT:  Yeah, all right.

```
 1          MS. STROKUS:  I'll withdraw my objection that it
 2     is, um -- that it is leaked.  However, I continue to
 3     state that the government did not produce this document.
 4          THE COURT:  It isn't even offered yet, so let's
 5     see his question.  But we'll take it as authentic.
 6     Q.    Ms. Smith, do you recognize this document?
 7     A.    Yes, this appears to be a section of 9 FAM.
 8     Q.    Okay.  And you're aware that portions of the 9 FAM
 9     are publicly available, correct?
10     A.    Yes, that is correct.  There is one version online
11     for the public that has some sections that are labeled
12     unavailable, um, and we have the full version internally
13     in Consular Affairs.
14     A.    Okay.  And you'll see the heading here, that this
15     9 FAM 403.11 deals with or covers Visa revocations,
16     correct?
17     A.    That is correct, 9 FAM 403.11 does cover Visa
18     revocations.
19     Q.    Okay.  And let me ask you to turn to -- oh, um,
20     let me first move this into evidence.
21     What exhibit number?
22          MS. STROKUS:  Objection, your Honor, proper
23     foundation.  Foundation and authenticity.  Again, it was
24     not produced by the government in discovery.
25          THE COURT:  Understood.  But I thought you waived
```

1    the foundation when you agreed that it was part of the

2    public manual, the Foreign Affairs Manual?

3         MS. STROKUS:  Your Honor, it was not stipulated to

4    as part of the exhibit list.

5         THE COURT:  Isn't it marked as one of the, um,

6    unagreed-to exhibits?

7         MS. STROKUS:  It is not agreed to.

8         THE COURT:  I know it's not agreed to, but it was

9    marked for identification as a nonagreed-to exhibit,

10   isn't that correct?

11        MS. STROKUS:  Yes, your Honor.

12        THE COURT:  Overruled.  It may be admitted and it

13   will be Exhibit 200 and --

14        MR. WILKENS:  238, your Honor.

15        THE COURT:  238.  Thank you.

16        (Exhibit 238, marked.)

17   Q.   If I could direct you, Ms. Smith, to Page 6 of

18   Exhibit 238, and to the provision at the bottom, which

19   is titled 9 FAM 403.11-5(b), "Prudential Revocations."

20   Do you see that?

21   A.   I do.  I would like a minute to read through that

22   paragraph, since you're focusing on that one.

23   Q.   Sure.

24   A.   (Reads.)  Okay.

25   Q.   Okay.  And just looking at this paragraph, um, if

1    you go down to the third line, after that first word

2    classification, there's a comma, it says, "The

3    Department may revoke a Visa if an ineligibility or lack

4    of entitlement is suspected when an individual would not

5    meet requirements for admission or in other situations

6    where warranted."

7         Do you see that?

8    A.    Yes, I do see that text.

9    Q.    Okay.  And so based on that text, isn't it correct

10   that the bases for eligibility or for admission and the

11   reasons for ineligibility for admission are relevant to

12   the prudential revocation of a Visa?

13        MS. STROKUS:  Objection.

14        THE COURT:  Overruled.

15   A.    So, um, I'm not qualified to talk about admission

16   because that is a Customs and Border Protection

17   decision, they deal with inadmissibility.  So would you

18   mind repeating the question, um, focusing on what you

19   would like me to answer, please?

20   Q.    Yes.  So with respect to the granting of Visas,

21   um, isn't this passage indicating that with respect to

22   the revocation of Visas, the factors that a Visa officer

23   can look at for the, um, eligibility of a person for the

24   granting of a Visa are relevant to Visa revocations?

25        MS. STROKUS:  Objection.

1        THE COURT:  No, overruled.  I'll let him have that

2   question and one more.

3   A.    Well I think it's a complicated question to answer

4   because Visa eligibility is covered in other sections of

5   the FAM.  This citation that you're noting on Page 6 of

6   Exhibit CK is related to, um, revoking a Visa, and as

7   it, you know, pretty simply states in the text, if, um

8   -- the Department can revoke a Visa if ineligibility is

9   um, you know, identified, um, or if an -- if the person

10  is believed to no longer be entitled to their Visa.  And

11  so, um, I hope that answers the question.

12        THE COURT:  All right.  One more.

13        MR. WILKENS:  Yes, your Honor.

14  Q.    If we could turn to Exhibit CG, the cable that we

15  were speaking about earlier, please.  Oh, sorry.  Yes,

16  CG.

17  A.    Yes, I'm bringing that up now.  Just a moment.

18  Okay.  I am ready.

19  Q.    Okay.  And if we turn to a Page 6 of that exhibit,

20  and, um, the paragraphs, um -- well beginning with 20,

21  that describe, um, factors that can be taken into

22  account for the eligibility or ineligibility for the

23  granting of a Visa.

24  A.    Okay, I'll read through Paragraphs 20 and 21.

25  Just a moment, please.

1    Q.    Yeah.

2    A.    (Reads.)  Okay.

3    Q.    Am I right that these factors, identified here in

4    this cable, can be taken into account in revoking a

5    Visa?

6         MS. STROKUS:  Objection, your Honor.

7         THE COURT:  Overruled.

8    A.    Yes, the information contained in Paragraphs 20

9    and 21 of Exhibit CG can be taken into account when a

10   decision is made to revoke a Visa.  Paragraphs 20 and 21

11   talk about if an applicant is not credible, um, if their

12   activities are inconsistent with, um, their Visa class,

13   um, if there are inconsistencies or derogatory

14   information that is discovered during vetting, and so

15   all of these factors could be relevant to a Visa

16   revocation.  And as I've stated prior, a Consular

17   officer always looks at the totality of circumstances,

18   um, and all facts for every case, um, before making, um,

19   a decision to revoke a Visa.

20   Q.   Okay.

21        MR. WILKENS:  Your Honor, I would move this

22   exhibit into evidence.

23        THE COURT:  Do you object?

24        MS. STROKUS:  Objection, your Honor.

25        THE COURT:  Overruled.  It may be admitted,

```
 1   Exhibit 239.
 2           (Exhibit 239, marked.)
 3           THE COURT:  Now do you have any further questions
 4   for this witness?
 5           MR. WILKENS:  I do not, your Honor.
 6           THE COURT:  I take it you do not.
 7           (Laughter.)
 8           THE COURT:  And counsel for the government, any
 9   further questions for the witness?
10           MS. STROKUS:  No, your Honor, and cognizant of the
11   Court's time.
12           THE COURT:  Thank you.  And thank you, Ms. Smith.
13           Very well.  Call your next witness.
14           MS. SANTORA:  Your Honor, the government calls
15   John Armstrong.
16           MR. BIALE:  And, your Honor, before this witness
17   comes in, and this is just the issue I raised at the
18   beginning --
19           THE COURT:  Yes, and I'll hear you.
20           MR. BIALE:  With respect to -- you know we have a
21   dispute about what documents can be used.  Our plan is
22   to cross-examine this witness, Ms. Conlon will
23   cross-examine this witness using some of the documents
24   that were initially produced in-camera --
25           THE COURT:  I understand.  I'm not surprised.
```

1          MR. BIALE:  I just want to make that clear, so we

2     don't have a fight about it in the middle of the

3     testimony.

4          THE COURT:  Well they can object, but I intend,

5     having given the documents to you, if they pertain to

6     his cross-examination, they may use them.

7          MR. BIALE:  Thank you, Judge.

8          THE COURT:  Mr. Armstrong may be called.

9          (Witness takes the stand.)

10         (JOHN ARMSTRONG, sworn.)

11         THE CLERK:  And please state your full name,

12    spelling your last name for the record.

13         THE WITNESS:  John Armstrong, A-R-M-S-T-R-O-N-G.

14         THE COURT:  And if I may start, um, welcome.  I

15    had originally thought we were going to hear your

16    testimony remotely because you were or are on your way

17    to the United Kingdom?

18         THE WITNESS:  Um, no, that is not me, sir.  I just

19    run things in Washington.  Although we do have official

20    travel from time to time.

21         THE COURT:  Okay, I am mistaken.  But you are

22    welcome.

23         THE WITNESS:  Thank you, sir.

24         THE COURT:  Ms. Santora, go right ahead.

25         MS. SANTORA:  Thank you, your Honor.

```
 1
 2           * * * * * * * * * * * * * *
 3           JOHN ARMSTRONG
 4           * * * * * * * * * * * * * *
 5
 6    DIRECT EXAMINATION BY MS. SANTORA:
 7    Q.    Hello, Mr. Armstrong, thank you for being here
 8    today.
 9          Can you tell us your current role at the State
10    Department?
11    A.    My current position is Senior Bureau Official in
12    the Bureau of Consular Affairs.
13    Q.    And how long have you been in that role?
14    A.    I assumed it on the 27th of February of this year.
15    Q.    How long have you worked for the State Department?
16    A.    It's, um, over 30 years.  It will be 31 in
17    October.
18    Q.    So when did you first start working for the State
19    Department, in what year?
20    A.    1994, in October, I believe.  It was October 14th.
21    Q.    And in what capacity?
22    A.    When I began, I started as a Foreign Service
23    Officer.  I continue to be one today.
24    Q.    Can you briefly tell the Court about your
25    assignments starting with your first and going up
```

1  through your current role?

2  A.    I'd be happy to.  Initially when I came in in

3  October of 1994, I was assigned, um, following basic

4  training, to take consular training, and then Rumanian

5  language, and then sent to Rumania for 2 years as a Vice

6  Consul where I ran the nonimmigrant Visa section and the

7  fraud prevention section.

8       After Rumania, I went to Warsaw Poland where I

9  served as the trade officer on -- working on trade

10  issues for two years.

11       And then from there, I went back to Washington

12  D.C. where I served as the Belarus desk officer in the

13  Office of Western Slavic and Moldovan Affairs.

14       Following that position -- just a moment, I have

15  to think.  I went back to Warsaw for four years, where I

16  was a political officer and I was also the labor

17  officer.

18       Following that time in Warsaw, I went to the

19  Russia desk, the Office of Russia Affairs, where I was a

20  Senior Political Officer for two years.

21       After that I studied Ukrainian for a year and then

22  went to Kyiv Ukraine to our embassy where I was the

23  Deputy Consul General.

24       Following Kyiv, I went to -- my next posting was

25  in the Bahamas, at Embassy Nassau, where I was the

1    Consular Section Chief, which I did for a year, and then

2    I was Acting Deputy Chief Admission, the Number 2

3    position, for two years.

4         Following that, I returned to Washington D.C.

5    where I was the Director of the Washington Passport

6    Agency for three years.

7         After that, I went to Embassy Warsaw in Poland

8    where I was the Economic Counselor running the Economics

9    Section for three years.

10        After that, in 2020, during covid, I returned to

11   Washington and was the Director of the Office of Eastern

12   European Affairs which deals with Ukraine, Belarus, and

13   Molodova.

14        Following that position, where I was for two

15   years, I was a Senior Advisor in the Office of Sanction

16   Coordination, also at the main building of the State

17   Department.

18        Following that, I studied Spanish and went to

19   Lima, Peru, where I was Consul General, and I served

20   until returning to Washington in the middle of February

21   of this year, and I was briefly the Deputy Assistant

22   Secretary for Overseas Citizen Services.

23        And then I assumed my current position on February

24   27th of this year.

25   Q.    And are you -- is there anyone senior -- can you

1    remind the Court of what is your current position?
2    A.    My current position is Senior Bureau Official in
3    the Bureau of Consular Affairs.  I'm the top official in
4    the Bureau of Consular Affairs.
5    Q.    And who is senior to you at the State Department?
6    A.    The Undersecretary for Management.
7    Q.    Anyone else senior to you at the State Department?
8    A.    Um, yes.  Well there's the two Deputy Secretaries,
9    the Deputy Secretary, and then the Deputy Secretary for
10   Management and Resources.  And above them is the
11   Secretary of State.
12   Q.    What does the Bureau of Consular Affairs do?
13   A.    Basically we have three missions.  First of all,
14   we're responsible for passport issuance throughout the
15   United States at 29 passport bureaus and centers.  It's
16   approximately 25 million passport products a year.
17          Secondly, we are in charge of, um, processing
18   Visas at Foreign Missions -- our Foreign Missions abroad
19   or diplomatic posts, that's over 200 of them, and
20   there's approximately 14 million applications a year.
21          And then finally, we are responsible for the
22   welfare of American citizens abroad and providing them
23   services they need.  If they're in need, we try to help
24   them.  Overall we have a staff of approximately 13,000
25   and a budget of $5.5 billion.

1   Q.    What are your responsibilities as a Senior

2   Official in the Bureau of Consular Affairs?

3   A.    I am responsible for the operations of the Bureau.

4   The buck stops with me.

5   Q.    And that includes being responsible for the Visa

6   section that you mentioned?

7   A.    Yes, ma'am.

8   Q.    Are you aware of the policies applicable to Visas?

9   A.    Yes.

10  Q.    Would you say that you're aware of all policies

11  applicable to Visas?

12  A.    In general, yes, I would say that.

13  Q.    Would you say it would be possible for a policy

14  related to Visas to exist without you knowing about it?

15        MS. CONLON:  Objection, your Honor.

16        THE COURT:  She may have it in that form.

17  A.    I would be very surprised if there was such a

18  policy.  I have a good hand on the pulse of what's done

19  by the Visa office, your Honor.

20  Q.    Does the Bureau of Consular Affairs get involved

21  in issuance of Visas, is that correct?

22  A.    Could you repeat the question please?

23  Q.    Is the Bureau of Consular Affairs involved in the

24  issuance of Visas?

25  A.    Yes, it is, we are responsible for that overseas.

1    Q.    And are there different types of Visas?

2    A.    Yes, there are.  There are two basic types, or the

3    nonimmigrant Visa and the immigrant Visa.

4    Q.    What is a nonimmigrant Visa?

5    A.    Nonimmigrant Visas are for people who are coming

6    for temporary purposes in the United States and will be

7    leaving and returning -- leaving the United States for

8    another destination, students, tourists, um, people

9    coming to work, um, journalists.

10    Q.    And how is an immigrant Visa different from that?

11    A.    Immigrant Visas are for people who are coming to

12    remain in the United States, permanently.

13    Q.    Are you familiar with the allegations in this

14    case?

15    A.    I have some knowledge, but I haven't ever seen all

16    of them.

17    Q.    Is it fair to say, based on your knowledge, that

18    this case does not involve immigrant Visa holders?

19    A.    Yes.

20    Q.    So when I ask you questions about Visa holders, if

21    I don't specify, I'm referring to nonimmigrant Visa

22    holders.  Okay?

23    A.    I understand.

24    Q.    I believe you mentioned this, but what type of

25    Visa, nonimmigrant or immigrant, is a student Visa?

1    A.    Student Visas are nonimmigrant Visas, they're Fs,

2    Ms, and they can be Exchange Visitors, which are Js.

3    Q.    What standards apply to the issuance of

4    nonimmigrant Visas?

5    A.    Could you clarify the question?

6    Q.    What legal authorities apply to the issuance of

7    nonimmigrant Visas?

8    A.    The applicant for the Visa has to, um, show that

9    they are qualified for that Visa.  In some cases they

10   need a petition.  In others they need forms, like

11   students will need a form from an accredited university.

12   Students also, as do tourists, have to overcome Section

13   214(b) of the Immigration and Nationality Act, which is

14   an intending immigrant.  They have to show that they do

15   not intend to remain in the United States to the

16   satisfaction of a Consul Officer at an interview.  The

17   law, which we all follow very strictly, places the

18   burden of proof on the applicant, on the alien.  If our

19   Consul Officer is not convinced, the Consul Officer --

20   of that, they must refuse that application.

21   Q.    Does the Bureau of Consular Affairs deal with the

22   revocations of nonimmigrant Visas?

23   A.    Yes, we do.  Yes.  And it has for years.  It's in

24   the Immigration and Nationality Act, I believe it's

25   Section 221(i).

1    Q.    And what standards apply -- I believe you just

2    mentioned one, what legal authorities apply to Visa

3    revocations?

4    A.    The key legal authority for a revocation is

5    Section 221(i) of the Immigration and Nationality Act,

6    which if I remember correctly, your Honor, gives the

7    Secretary of State and any Consular Officer the ability

8    to revoke a Visa at any time for any reason.  We treat

9    this seriously.  And of course some sort of evidence is

10   needed.  We don't go do this on a whim.  We review each

11   case individually and carefully.

12   Q.    Does the Bureau of Consular Affairs make

13   removability determinations?

14   A.    I'm sorry?

15        THE COURT:  I didn't catch it either.  Would you

16   ask the question again.

17        MS. SANTORA:  Sure, I'll rephrase it a little bit.

18   Q.    Does the State Department make removability

19   determinations?

20        THE COURT:  Removability determinations.

21   A.    Yes, the Secretary of State can make those

22   determinations, I believe it's, um -- it's also in the

23   INA.  We call it 4(c) is the section.  But it's a longer

24   section citation.

25   Q.    Would that be INA Section 237(a)(4)(c)?

1    A.    I believe that's it, yes.

2    Q.    Okay.  Are you familiar with the State

3    Department's process and protocols for, um, the

4    revocations of Visas, which we talked about a few

5    questions ago?

6    A.    Yes, I am.

7    Q.    And are you familiar with the State Department's

8    process and protocols for making determinations under

9    237(a)(4)(c), the statute you just referenced?

10   A.    Yes, ma'am, I am.

11   Q.    How are you familiar with those, um, processes and

12   protocols?

13   A.    It's part of my job.  I have to know about these

14   things in order to lead the Bureau of Consular Affairs.

15   Q.    Have you prepared a chart to assist the Court with

16   explaining how the process and protocol works?

17   A.    My staff and I have reviewed the chart, yes.

18   Q.    Okay.

19         MS. SANTORA:  Your Honor, I would like to identify

20   Exhibit H, or mark for identification Exhibit HN.  This

21   is the chart that Mr. Armstrong referred to.

22         THE COURT:  Um, do I have it?

23         MS. SANTORA:  It should be in a binder.

24         THE COURT:  Yes, well I have -- yes, I do have it.

25   Yes.  HN.  And I will permit this chalk to be used as --

 1    I will permit this chart to be used as a chalk.

 2        Go ahead.

 3        MS. SANTORA:  Thank you.

 4    Q.    Mr. Armstrong, I think we're going to pull the

 5    chart up on the screen.

 6        (Technical difficulties.)

 7        MS. SANTORA:  Your Honor, may I approach?  I can

 8    also give him a paper copy.

 9        THE COURT:  He can use mine.  But of course you

10    may.

11        THE WITNESS:  I'll take this one, sir, so you can

12    also see it.

13        THE COURT:  Thank you.

14        (Hands up.)

15        THE COURT:  A question I have, and I've seen these

16    initials come up.  I'm roughly familiar with this chart.

17    But do you see, um, the Bureau of Consular Affairs is

18    there roughly in the center.  And then to the right,

19    there's two little boxes, "NIV" and "LPR."  What do

20    those initials stand for?

21        THE WITNESS:  Your Honor, "NIV" is "Nonimmigrant

22    Visa," and "LPR" is "Legal Permanent Residence."

23        THE COURT:  Yes, understood.

24        Proceed.

25        THE WITNESS:  No problem.

1    Q.    Okay, it looks like we might not be able to pull

2    the chart up on the screen, so, um -- um, okay.

3         Mr. Armstrong, is this the chart that you were

4    just referring to when I asked if you had prepared a

5    chart?

6    A.    Yes, it is.

7    Q.    Okay.  Based on your experience at the Bureau of

8    Consular Affairs, does the chart accurately represent

9    the State Department's process and protocol for Visa

10   revocations and foreign policy determinations under INA

11   Section 237(a)(4)(c)?

12   A.    It accurately represents that in the case of

13   referrals from the Department of Homeland Security.

14   Q.    Okay.  So does the State Department rely on

15   information when it is revoking a nonimmigrant Visa or

16   making a foreign policy determination under INA Section

17   237(a)(4)(c)?

18   A.    I'm sorry, I don't understand the question.  Do we

19   rely on information?  From various sources.  We do rely

20   on information from various sources, including it may

21   come from the Department of Homeland Security, it may

22   come from sources that we have, it may come from law

23   enforcement, diplomatic sources abroad, the media.  So a

24   variety of sources.  Yes, we do actually look at

25   information.

Q.    Okay, let's focus on information that you received
from, you mentioned, the Department of Homeland
Security.  Do you see them referenced in the chart?
A.    Yes, on the left-hand side, the big blue box.
Q.    Okay.  And how does information come, if it does,
to the Bureau of Consular Affairs from the Department of
Homeland Security?
A.    From my experience it comes in the form of an
e-mail, which serves as a cover letter, and then an
attachment with additional information about the case.
Q.    And is that attachment referred to as a
"referral"?
A.    Yes.
Q.    And when the Bureau of Consular Affairs receives
the information, um, what do they first determine about
the individual?
A.    Well the first thing they do is confirm receipt to
DHS, that we have actually received this, your Honor,
and that we are acting on it.  After that, um, the -- as
related to your Honor's question, the question is
whether it's a nonimmigrant Visa or whether it's a legal
permanent resident.  Nonimmigrant Visas go for
processing and review to the Visa office.  The legal
permanent residents take a different track and go up to
the Secretary of State if we find that the evidence is

1    sufficient to take action.

2    Q.    Okay, let's stick with the nonimmigrant Visas

3    first.  You said they go to the Visa office.  What does

4    the Visa office then do with the referral after they

5    receive it?

6    A.    The Visa office examines the information, seeing

7    if it's serious enough to enact a revocation.  It will

8    also consult with, um, lawyers at the State Department

9    who work for the Legal Advisor, they don't work for

10   Consul Affairs directly, but there are lawyers assigned

11   to look at it from a legal point of view.

12        After that, if the Visa office finds it's

13   sufficient, they'll discuss it with whoever received

14   the, um, referral from DHS, and if that person agrees,

15   then it will go into the revocation process and the Visa

16   will be revoked.  If not, um, then -- well actually in

17   either case, whether it's revoked or whether it's not,

18   there'll be a communication back to DHS telling DHS what

19   was done in that case.  Or there's one other

20   possibility.  If I may?

21   Q.    Sure.

22   A.    There may be a request for more information.

23   Q.    And who would they request more information from?

24   A.    They would write back to whoever in DHS had sent

25   the referral.

1    Q.    Okay.  Let's talk now about the other part of the

2    chart, relating to this "LPR" on the chart.  That's a

3    "Lawful Permanent Resident"?

4    A.    Yes.

5    Q.    And how is a lawful permanent resident different

6    from a nonimmigrant Visa?

7    A.    Um, first of all, we cannot revoke the status of a

8    lawful permanent resident.  Um, the Secretary of State

9    can have a finding that that person is removable, but we

10   cannot do that in the -- in the Bureau of Consular

11   Affairs.  So what happens in that case, after an

12   analysis of information -- and this is done in each case

13   individually, an action memo, um, sometimes called a

14   "decision memo," is sent to the Secretary of State, and

15   the Secretary of State will have a choice then, and from

16   my experience in most cases there are three choices.

17   One, agree and find the person removable, usually under,

18   um, 4(c), as we talked about.  Um, disagree and find the

19   person not removable.  Or discuss, in other words ask

20   for more information.

21   Q.    And in the event that the Secretary of State finds

22   the person removable, um, what happens after that?

23   A.    Um, the, um, Department of Homeland Security is

24   informed of this, and this usually take two routes.

25   There will be an informal notification back to the

1    person who sent the original referral, as a courtesy,

2    but the official notification goes from the Secretary of

3    State to, um, the DHS secretary, because the DHS

4    secretary is his interlocutor.

5    Q.    And I believe you also mentioned that it's

6    possible for the Secretary of State to determine that

7    the person is not removable, correct?

8    A.    That's correct.  And in which case the Bureau of

9    Consular Affairs would contact the person in DHS who

10   made the referral and say the Secretary has found --

11   has disagreed and does not fine the person removable.

12   Q.    Okay, I want to go back to --

13        THE COURT:  Just to get a feel for this.

14        THE WITNESS:  Yes, sir.

15        THE COURT:  With respect to, um, legal permanent

16   residence.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Under the statute, this is a

19   determination that is, um, by statute, given to the

20   Secretary, that officer in the government, that cabinet

21   Secretary himself or herself?

22        THE WITNESS:  Yes.

23        THE COURT:  And then as I'm listening to you,

24   pretty much as a matter of courtesy, since it's a

25   Cabinet Secretary who's made that determination, the

 1    communication as to the result, goes to the Cabinet

 2    Secretary in the Department of Homeland Security, and in

 3    today's world, she, then takes action, because action

 4    falls within the Department of Homeland Security.

 5          Is that right?

 6          THE WITNESS:  That is correct, sir.  The actual

 7    formal -- Homeland Security will not take action in

 8    those cases until they receive the official notification

 9    Secretary to Secretary.  What we would send to Consular

10    Affairs is a courtesy that, yes, the Secretary has made

11    this finding.  Then the official notification will go

12    from Executive Secretary to Executive Secretary.

13          THE COURT:  Thank you.

14          THE WITNESS:  Certainly.

15    Q.    I want to go back, for a second, to nonimmigrant

16    Visas.

17          Does the Visa office independently analyze the

18    referral that it received from DHS?

19    A.    Yes, most definitely, that's our job.  We're not a

20    rubber stamp for DHS.

21    Q.    Do all referrals of nonimmigrant Visa holders from

22    DHS that go to the Visa office result in Visa

23    revocations?

24    A.    No.

25    Q.    Do you have any idea of the percentage that does

1    result in Visa revocations?

2    A.    Based on my time in my current position, I would

3    say approximately 25 to 30 percent are sent back without

4    action be taken, either to ask for more information or

5    we just find the information not significant enough to

6    take action.

7    Q.    Okay.  And you've been in your position since

8    February of 2025, correct?

9    A.    Yes, ma'am.

10   Q.    And has the Bureau of Consular Affairs handled DHS

11   referrals consistently with this chart that we've been

12   discussing since that time?

13   A.    Yes, and it's my understanding even before.  We do

14   not create any policy or procedure here.

15         MS. CONLON:  Objection, move to strike as

16   nonresponsive.

17         THE COURT:  Overruled.  That may stand.

18   Q.    Does this chart depict how the Bureau of Consular

19   Affairs handles all referrals from DHS?

20   A.    Yes.

21   Q.    Does it accurately depict how the Bureau of

22   Consular Affairs would handle a DHS referral involving

23   protesters?

24   A.    Yes, all referrals from DHS.

25   Q.    Okay.  So the chart focuses on a referral from

1    DHS, but you mentioned that the State Department, in

2    revoking Visas and, um, making removability

3    determinations, can rely on information from other

4    sources, correct?

5    A.    That is correct.

6    Q.    And, um, what are those other sources?

7    A.    For example, the media.  There can be derogatory

8    information that comes up after a Visa was issued, some

9    action the Visa holder took or is planning to take, and

10   if it's significant enough, that could lead to a, um,

11   revocation of the Visa.  Information received from law

12   enforcement.  Information that happens that is, um, sent

13   by the public.  Poison pen letters.

14        I, in fact, know of a case like this, when I was

15   in Ukraine, of a security guard who worked at the

16   embassy, who supposedly was going as a tourist, but one

17   of his colleagues revealed his true intention, which was

18   to remain in the United States.  And we revoked that

19   Visa and fired him.

20   Q.    And so would you say that some of the information,

21   um, is internal information to the State Department?

22   A.    It can be, yes.

23   Q.    And in the case of information that it not based

24   on a referral, um, say we're talking about a

25   nonimmigrant Visa holder, so it goes to the Visa office

1    and the Visa office determines that the Visa should not

2    be revoked.  In those circumstances, again where there's

3    no referral, does the Visa office tell DHS about the

4    Visa revocation?

5    A.    No, DHS is not involved in this.

6    Q.    Okay.

7          (Pause.)

8          MS. SANTORA:  Your Honor, I move to introduce into

9    evidence this chart.

10         MS. CONLON:  Your Honor, we understand it doesn't

11   aid or assist with testimony, so we object for it coming

12   in for sort of its truth, but to the extent that it's a

13   demonstrative aid, I don't even know that it needs to be

14   admitted.

15         THE COURT:  I think that's a proper

16   characterization.  If he says this is accurate and it's

17   been accurate throughout his tenure, as I understand it,

18   it will be part of the record, but as HN, a chalk.  And

19   the difference is, as factfinder, I have to decide

20   whether to believe, disbelieve, or believe in part any

21   witness's testimony.

22         Here the chart depends on my belief of this

23   witness's testimony, it doesn't stand alone.  They

24   created it for this trial.  And I accept it in that

25   fashion.  I mean no disrespect, that's just my

1    responsibility.  Actually I find this helpful and I will

2    be referring to it.  But it was created for the witness,

3    for his testimony, and so what he has to say about it

4    really governs.

5         Go ahead.

6         MS. SANTORA:  Thank you, your Honor.

7    Q.    Mr. Armstrong, I'm going to show you a document

8    that is an exhibit in this case, this is Exhibit 70.

9         MS. SANTORA:  Your Honor, may I approach to hand

10   this document to the witness?

11        THE COURT:  Of course.

12        (Hands to witness.)

13        THE WITNESS:  Thank you.

14        May I familiarize myself with it?

15        THE COURT:  Of course.

16        THE WITNESS:  Thank you, sir.

17   A.    (Reads.)  I have finished my review.

18   Q.    Okay, thank you.  Have you seen this document

19   before?

20   A.    Yes.

21   Q.    And what is it?

22   A.    It's an Executive Order from the President.

23   Q.    What is the title?

24   A.    "Protecting the United States from Foreign

25   Terrorists and other National Security and Public Safety

1    Threats."

2    Q.    In what capacity have you seen it?

3    A.    In my official capacity as the top official in the

4    Bureau of Consular Affairs.

5    Q.    What is the purpose of the document?

6    A.    The purpose is to protect the United States and

7    the American people from foreign threats.

8    Q.    Have you relied on this document to do your job?

9    A.    Yes, we have referred to this document in doing my

10   job, as have other people in the Bureau of Consular

11   Affairs, and not only.

12   Q.    How would you use it with respect to doing your

13   job?

14   A.    Well I think the key thing is, um, to summarize

15   this document, is it instructs all of us to use existing

16   procedures to maximize the security of the American

17   people.

18   Q.    Does it require anything of the State Department?

19   A.    It requires quite a few things of the State

20   Department.  They're enumerated.  Again, to summarize,

21   it's increasing our vigilance and to make sure we're

22   using all existing mechanisms, procedures, and policies

23   that we have to ensure the security of the American

24   people.

25   Q.    Did it create new legal authorities related to the

1    State Department's work?

2    A.    To my knowledge, no.

3    Q.    Did the State Department do anything in response

4    to the Executive Order?

5    A.    Yes, we take our orders from the President,

6    whoever that is, and we increase our use of the -- it

7    reviewed actually what we were doing, and that review is

8    actually ongoing.

9    Q.    And can you explain what exactly, if anything, the

10   State Department did in response to this Executive

11   Order?

12   A.    Well one thing I can actually say, and it's --

13   it's a bit of "Inside Baseball," your Honor, if I may?

14   Um, there's -- in our nonimmigrant Visa system, there

15   are messages that come when derogatory information

16   appears, and a lot of our posts are very -- have a lot

17   of work to do, a lot of people to interview, they have

18   backlogs, and they don't always review those messages in

19   a timely manner and act upon them.  We noted this and we

20   emphasized to our diplomats overseas that they need to

21   review this information, and when justified, to revoke

22   Visas, not to let it build up.  It needs to be kept up.

23   Because people -- if there is negative information and

24   they have a Visa and it should be revoked, we need to do

25   that, and not delay.  I think this was talked about,

1    some people have called it the "Catch and Revoke
2    Policy."
3    Q.    I'd like to show you -- okay, I'd like to show you
4    the document, um, you just referred to.
5          MS. SANTORA:  Your Honor, may I approach?
6          THE COURT:  You may.
7          MS. SANTORA:  This is Exhibit 21 for the record,
8    and I'm going to show it to the witness.
9          (Hands to witness.)
10         THE WITNESS:  Thank you.
11         THE WITNESS:  May I review it?
12         THE COURT:  Of course.
13         THE WITNESS:  Thank you.
14   A.    (Reads.)  I've completed my review.
15   Q.    Okay.  Is this the document you were referring to?
16   A.    Yes.
17   Q.    And can you explain what it is?
18   A.    This is an instruction, a guidance to our
19   diplomatic posts abroad, over 200 posts.  In particular
20   you can see that because it says "All diplomatic and
21   consular posts collective," it's known as an "all-back."
22   It was sent out talking about this very thing I spoke
23   about, about the need to review systems messages on a
24   regular timely basis, and to take action where
25   warranted.

Q.    Okay.  And is this document implementing the
Executive Order we were just talking about, Executive
Order 14161?

A.    Yes, it even refers to it in the second paragraph.

Q.    And how does it implement the Executive Order?

A.    By increasing the emphasis on and the vigilance in
reviewing systems messages which carry -- can carry
significant negative information about Visa holders, and
then when justified, revoking these Visas, which is done
at the diplomatic posts.

Q.    Does it provide new legal authority for revoking
Visas?

A.    No, not -- no, it's using the 221(i).

Q.    So in revoking Visas under this guidance, the
State Department is relying on existing legal authority,
correct?

A.    Yes, I believe so.  I believe 221(i) has been in
the INA since the beginning, 70 years ago.

Q.    Okay.  Are you aware of anything else that the
State Department has done in response to Executive Order
14161?

A.    We've issued guidance to the field, again
emphasizing the importance of security and the
importance of reviews, for example the importance of
214(b) has been an issue that we've raised with the

```
1    field.  Again, these are using existing policies and

2    authorities, it's nothing new in that regard.

3    Q.    I'd like to show you another document.

4         MS. SANTORA:  This has been entered into evidence

5    as Exhibit 53 in this case, your Honor.

6         THE COURT:  Say again the document number?

7         MS. SANTORA:  Exhibit 53.

8         THE COURT:  53.

9         MS. SANTORA:  No, I'm sorry, your Honor, it

10   actually is Exhibit 64.

11        THE COURT:  64.

12        MS. SANTORA:  May I approach to give a copy of

13   this document --

14        THE COURT:  You may.

15        (Hands to witness.)

16        THE WITNESS:  Thank you.

17        May I review it, your Honor?

18        THE COURT:  Of course.

19        THE WITNESS:  Thank you, sir.

20   A.    (Reads.)  I've completed my review.

21   Q.    Okay.  Do you recognize that document?

22   A.    Could you repeat the question please?

23   Q.    Do you recognize that document?

24   A.    I do recognize this document.

25   Q.    What is it?
```

1    A.    It is a guidance to the field.  As discussed

2    previously, it is an all-back, it's sent out to all our

3    posts abroad.

4    Q.    And, um, what is the guidance related to?

5    A.    It's related to, um, social media and online

6    screening of students and exchange visitors, the F, M,

7    and J Visa classes.

8    Q.    And is it guidance that was issued in response to

9    the Executive Order we were just talking about?

10    A.    Yes.

11    Q.    And how does it implement that Executive Order?

12    A.    It increases the vetting of, um, a class of Visa

13    applicants.

14    Q.    Why does it do that?

15    A.    In order to improve the security of the United

16    States.

17    Q.    What class of Visa applicants does it increase

18    vetting to?

19    A.    Students and exchange visitors.

20    Q.    And that's social media vetting, correct?

21    A.    Yes.

22    Q.    And why does it focus on students and exchange

23    visitors?

24    A.    Well I can think of a couple of reasons.  First of

25    all, the social media is -- when the INA was written --

1    and in the past this hasn't been considered, it didn't

2    exist, but it's a gold mine of information.  And also,

3    um, people who are younger, students, and most students

4    and exchange visitors are -- I'm 60 and I don't use

5    social media much, but they do use social media a lot.

6    So they're a group that uses all that information and

7    those tools.  And so it makes it available to us.

8    Q.    Does it create new legal authority, um, for

9    vetting through social media chats?

10           MS. CONLON:  Objection, your Honor, these

11    questions about legal authority seem to call for a legal

12    conclusion.

13           THE COURT:  No, I want to hear his view.

14           You may answer, sir.

15           THE WITNESS:  Thank you, your Honor.

16    A.    No, it doesn't.  It talks about Section 214(b) of

17    the Immigration and Nationality Act, and also, um,

18    Section 212(a)(3)(b), which is, um, support for

19    terrorist organizations.  These are not new.

20    Q.    And how do those sections that you just referred

21    to relate to vetting?

22    A.    In the vetting one could find information that

23    would lead to a 214(b) refusal under an intending

24    immigrant, for example, if someone talks about their

25    previous unauthorized work in the United States.  Or it

1    could lead to a finding on support for a terrorist

2    organization, someone brags about how they've given

3    money to Hamas.

4    Q.    And both of those would bear on someone's

5    eligibility for a Visa?

6    A.    Most definitely.

7    Q.    Are you aware of anything else that, um, the

8    Department of State did in response to Executive Order

9    14161?

10    A.    There were, um -- there was a review, um, at least

11    a partial review of 3(c) policies, and, um, that's a

12    foreign policy ground for refusal under the INA, um, and

13    there were some that the Secretary authorized to be

14    added.  One, for example, for, um, government officials

15    who assist in a legal migration to the United States.

16    Q.    You said 3(c) policies.  Are you referring to a

17    section of the INA when you say that?

18    A.    Yes, ma'am.

19    Q.    What section is that?

20    A.    I don't know the whole number, we call it "3(c)."

21    It's the foreign policy section.  Ineligibility on

22    foreign policy grounds.

23    Q.    Okay.

24          (Pause.)

25          MS. SANTORA:  Your Honor, I'd like to mark for

1   identification Exhibit JJ, the statute that the witness

2   just referred to.

3          THE COURT:  The statute?

4          MS. SANTORA:  Yes.

5          THE COURT:  I see no reason for adding statutes

6   in.

7          MS. SANTORA:  Okay.

8          THE COURT:  A citation to them is sufficient.

9          MS. SANTORA:  Okay.  May I approach to show the

10  witness a copy of the statute to refresh his

11  recollection?

12         THE COURT:  Of course.

13         (Approaches, hands document to witness.)

14         THE WITNESS:  Thank you.

15         May I review it, your Honor?

16         THE COURT:  Well it's pretty thick, I don't even

17  know what she's going to ask here.  But of course take a

18  look at it.

19         THE WITNESS:  May I ask which part you're

20  referring to?  It is rather thick.

21         MS. SANTORA:  Yes, I was referring to the section

22  you referenced, which I believe is Section (a)3(c), it's

23  INA 312 of 1182, the statute.

24  A.    (Looks.)  Is this, ma'am, the section that says

25  "See foreign policy"?

Q.    Yes.

A.    Yes, I believe that is it.

Q.    Okay.  Can you take a moment to review it.

A.    (Looks.)  I've reviewed it.

MS. SANTORA:  If you don't mind, may I approach also to get it back?

(Approaches witness to get document back.)

Q.    So the statute you just reviewed, Mr. Armstrong, was that the statute you were referring to when you referred to "3(c) policies"?

A.    Yes.

Q.    And do 3(c) policies apply to, um, Visa holders or to Visa applicants?

A.    It could be both actually, um, if a Visa holder was outside the United States.  But also an applicant could be found ineligible under 3(c).

Q.    Okay.  So 3(c) policies do not apply to Visa holders in the United States?

A.    No.  That's my understanding.

Q.    Okay.  I'd like to show you another document.

MS. SANTORA:  If I could approach?  This has been marked as Exhibit 71 in this case.

(Approaches witness with document.)

THE WITNESS:  Thank you.

A.    (Looks.)  I'm familiar with this document.

1    Q.    Okay, what is the document?

2    A.    It's an Executive Order from the President of the

3    United States.

4    Q.    And what is it titled?

5    A.    "Additional Measures to Combat Antisemitism."

6    Q.    And how are you familiar with that document?  In

7    what capacity have you seen that document before?

8    A.    In carrying out my job.

9    Q.    And how have you relied on it to do your job?

10   A.    It makes clear that the official policy of the

11   United States is to combat antisemitism both at home and

12   abroad.

13   Q.    Did the State Department rely on this document to

14   revoke Visas?

15   A.    We would rely on the Immigration and Nationality

16   Act.  It doesn't give us any authority here, it

17   instructs us and emphasizes.  It's a document that

18   informs what we're doing, yes, but not as a part of the

19   law that we would use to revoke a Visa.

20   Q.    Okay.  Did the document change the State

21   Department's authority to revoke Visas?

22   A.    It's my understanding it didn't.

23   Q.    Did the document change the State Department's

24   process and protocols for revoking Visas?

25   A.    No.

1    Q.    Did the document change the State Department's

2    authority to make removability determinations?

3    A.    No.

4    Q.    Did the document change the State Department's

5    process and protocols for making removability

6    determinations?

7    A.    No.

8    Q.    I'd like to show you a few more documents.

9         MS. SANTORA:  Your Honor, the documents that I'm

10   intending to show the witness are not privileged but

11   have been marked as confidential, um, based on the

12   protective order signed between the parties.  We would

13   ask that the courtroom be cleared of the public for the

14   purposes of putting on this document.

15        THE COURT:  I'm not going to clear the courtroom

16   unless I see what the documents are.

17        MS. CONLON:  What documents are we talking about?

18        MS. SANTORA:  So they are -- the documents will be

19   Exhibits 8, 12, 16, 19, and --

20        THE COURT:  8.

21        MS. SANTORA:  8.  12.

22        THE COURT:  Wait a minute.

23        MS. CONLON:  Sorry, are these the documents from

24   the certified administrative record in this case, are

25   those all from that record?

1          MS. SANTORA:  They're from the sealed version of

2     the administrative record.

3          MS. CONLON:  I see.  So 8, 12 --

4          MS. SANTORA:  So 16, 19, and 21.

5          THE COURT:  Well I'm not disposed to clear the

6     courtroom, there's a constitutional right --

7          MS. CONLON:  And we would object to that.

8          THE COURT:  -- to have a public courtroom for

9     public trials.  So, um -- and these have been marked in

10    evidence in this case, which means they are documents

11    upon which I may, and I may be required, to make my

12    decision.  So that request is denied.  You see -- I'm

13    not doing it.

14         MS. SANTORA:  Thank you, your Honor.

15    Q.    Mr. Armstrong, I would like to show you a

16    document, I'll show you one at a time.

17         MS. SANTORA:  If I may approach?

18    Q.    The first has been marked as Exhibit 8 in this

19    case.

20         (Approaches witness, hands document.)

21         THE WITNESS:  Thank you.

22         May I review it?

23         MS. SANTORA:  Sure.

24         THE WITNESS:  Thank you.

25    A.    (Reads.)  I've completed my review.

1   Q.    Okay.  Do you recognize this document?

2   A.    I do.

3   Q.    What is it?

4   A.    It's a memorandum from Secretary Rubio to the

5   Secretary of Homeland Security.

6   Q.    And in what capacity have you seen this document?

7   A.    In doing my job, my official duties at the State

8   Department.

9   Q.    What does the memorandum relate to?

10  A.    The memorandum informs, um, the Secretary of

11  Homeland Security of Secretary Rubio's finding in a case

12  of a particular alien, finding the person, um, removable

13  under 273(a)(4)(c) of the Immigration and Nationality

14  Act.  Actually two people, one is blacked out.

15  Q.    Okay.  Who is the person whose name is not

16  redacted?

17  A.    Mahmoud Khalil.

18  Q.    And can you summarize what the document finds with

19  respect to Mr. Khalil?

20  A.    That section of the INA deals with foreign policy

21  grounds for finding removability, which the Secretary of

22  State does, or if given a different document.  It

23  informs of it here and then talks about Mr. Khalil's

24  antisemitic -- role in antisemitic protests and

25  disruptive activities that foster a hostile environment

1    for students in the United States.

2    Q.    And it provides that as the basis for finding

3    Mr. Khalil removable?

4    A.    Yes, it describes it on the back, on the second

5    page.

6    Q.    What does it say about Mr. Khalil's activities?

7          THE COURT:  Well in view of your objection,

8    remember it's in evidence.  I've read it.

9          MS. SANTORA:  Okay, thank you, your Honor, we can

10   move on.

11   Q.    Mr. Armstrong, I'd like to show you another

12   document.

13         MS. SANTORA:  If I may approach?  This has been

14   marked as Exhibit 12 in this case.

15         (Approaches witness, hands document.)

16         THE WITNESS:  Thank you, your Honor.  May I review

17   it?

18         THE COURT:  Of course.

19         THE WITNESS:  Thank you.

20   A.    (Reads.)  I've completed my review.

21   Q.    Do you recognize this document?

22   A.    I do.

23   Q.    Have you seen it before?

24   A.    I have, in performance of my official duties in

25   leading the Bureau of Consular Affairs.

1    Q.    Okay.  And what is the document?

2    A.    The document's similar to the previous one, it's a

3    memorandum from the Secretary of State informing the

4    Secretary of Homeland Security of a decision made

5    regarding the removability of an alien.

6    Q.    What alien does it refer to?

7    A.    It refers to Mohsen Mahdawi.

8    Q.    And what does it find with respect to Mr. Mahdawi?

9    A.    Oh, sorry I pronounced it wrong.  The Secretary of

10   State informs us that he found Mr. Mahdawi removable

11   under Section 237(a)(4)(c)(1) of the Immigration and

12   Nationality Act.

13   Q.    And does the document provide the Secretary's

14   rationale for that finding?

15   A.    It does, on the second page.  That rationale was

16   Mr. Mahdawi's involvement and leadership of disruptive

17   protests at Columbia University, and that included

18   antisemitic conduct and calling for the destruction of

19   Israel.  The Secretary also noted that this is clearly

20   against U.S. policy to counter antisemitism.  And

21   Mr. Mahdawi's activities undermine the peace process in

22   the Middle East, including coming to a peaceful

23   resolution of the ongoing conflict in Gaza.

24   Q.    Thank you.  I'd like to show you another document.

25         MS. SANTORA:  If I can approach?  This is Exhibit

1    Number 19.

2         THE COURT:  Say again the number?

3         MS. SANTORA:  19.

4         THE COURT:  Thank you.

5         (Approaches, hands to witness.)

6         THE WITNESS:  Thank you.

7         May I review it, your Honor?

8         THE COURT:  Of course.

9         THE WITNESS:  Thank you.

10   A.    (Reads.)  I've completed my review.

11   Q.    Do you recognize this document?

12   A.    I do.

13   Q.    Have you seen it before?

14   A.    I have, in performance of my duties as the senior

15   Bureau official of the Bureau of Consular Affairs at the

16   State Department.

17   A.    What is the document?

18   A.    The document is a communication, a memorandum from

19   Secretary Rubio to the Secretary of Homeland Security.

20   Q.    And what is the memo about?

21   A.    The memo informs Secretary Noem that Secretary

22   Rubio has found two aliens, um, one is Yunseo Chung, and

23   the other one is blacked out, so I don't know who the

24   person is, um, to be removable under the foreign policy

25   section of the INA, Section 237(a)(4)(c)(1).

1    Q.    And does the document provide the Secretary's

2    rationale for this determination?

3    A.    Yes, it does.  It found that Ms. Chung and the

4    other unnamed person were involved in, um, participation

5    and apparently leadership roles in antisemitic protests

6    and disruptive activities.  It created a hostile

7    environment for Jewish students in the United States.

8    Q.    Thank you.  I'd like to show you another document.

9          MS. SANTORA:  If I could approach.  This is

10    labeled as Exhibit 21 in this case.

11          (Approaches, hands witness document.)

12          THE WITNESS:  Thank you.

13          Your Honor, may I review it?

14          THE COURT:  Yes.

15          THE WITNESS:  Thank you.

16    A.    (Reads.)  I've completed my review.

17    Q.    Do you recognize this document?

18    A.    I do.

19    Q.    And have you seen it before?

20    A.    Yes, I have, as in my leadership role of the

21    Bureau of Consular Affairs at the Department of State.

22    Q.    What is the document?

23    A.    The document is a memorandum from Secretary Rubio

24    informing Secretary Noem, the Secretary of Homeland

25    Security, of Secretary Rubio's decision to find Badar

1    Khan Suri deportable under INA Section 273(a)(4)(c)(1),

2    which is the foreign policy section.

3    Q.    And does the memo provide the rationale for the

4    Secretary's determination?

5    A.    Yes, it does, it cites Mr. Suri's direct

6    connection to Hamas leadership as well as his

7    involvement in antisemitic activities that created a

8    hostile environment for Jewish students in the United

9    States.

10   Q.    Okay, I have one more document to show you.

11        MS. SANTORA:  If I could approach?  This is

12   Exhibit 16.

13        (Approaches, hands to witness.)

14        THE WITNESS:  Thank you.

15        Your Honor, I'd like to review?

16        THE COURT:  Sure.

17        THE WITNESS:  Thank you.

18   A.    (Reads.)  I've completed my review.

19   Q.    Do you recognize the document?

20   A.    I most certainly do.

21   Q.    What is it?

22   A.    It's a communication, um, a memorandum from me to

23   Andre Watson, who's the Assistant Director of the

24   National Security Division of ICE, at DHS.

25   Q.    And you wrote that in your official capacity as

1  the Senior Bureau Official at the Bureau of Consular

2  Affairs, correct?

3  A.    I did not write it, I signed it.  Other people

4  drafted the document.

5  Q.    Okay.  But you have reviewed what the memo said,

6  correct?

7  A.    I did, before signing it, yes.

8  Q.    And, um, what is the purpose of the memorandum?

9  A.    The purpose is to inform Mr. Watson of the

10  decision made to, um, revoke, um, Rumeysa Ozturk's Visa

11  due to her activities in the United States, and it was

12  revoked under Section 221(i) of the Immigration and

13  Nationality Act.

14  Q.    And --

15  A.    And I signed it on the back.  That's me.

16  Q.    Thank you.

17        What was the basis for your determination?

18        THE COURT:  His determination?

19  Q.    What was basis for your determination that the

20  Visa should be revoked?

21        THE COURT:  He may answer.

22        THE WITNESS:  Thank you, your Honor.

23  A.    The basis was her antisemitic activities in the

24  U.S., as detailed.  It talks about creating a hostile

25  environment for Jewish students, and indicating support

1   for a designated terrorist organization.  I believe it

2   was Hamas, but it might have been Hezbollah.  I don't

3   remember exactly.

4   Q.   I want to direct your attention to the last line,

5   the last line of the first paragraph of the memorandum.

6   It says, "Due to ongoing ICE operations, security of

7   this revocation will be silent.  The Department of State

8   will not notify the subject of the revocation."

9        Does the Department of State, when it revokes

10  nonimmigrant Visas, typically inform the Visa holder

11  that their Visa has been revoked?

12  A.   Yes, we usually do.

13  Q.   And in this case you did not?

14  A.   That is correct.  And judging from the context,

15  ICE had made a request that we not inform so that they

16  could take action to remove Ms. Ozturk from the United

17  States.

18       THE COURT:  Let me ask you a couple of questions

19  here, but I'm going back to the other four that you've

20  been shown, and I'm talking about the chart.

21       You know about the Secretary's actions because, as

22  I understand it, your involvement here, as the Director

23  of the Bureau of Consular Affairs, you're the one who

24  causes the memo or in fact sends the memo to the

25  Secretary of State saying "Agree," "Disagree,"

1    "Discuss"?

2        THE WITNESS:  Yes, I'm the last one who looks at

3    it, yes.

4        THE COURT:  All right.  So, um, my question is

5    broader than the, um, what you've been shown.

6        But since you've been there, in your official

7    capacity, can you estimate how many such memos involve

8    student protests, protesters, and concerns about

9    antisemitism, limit it as to that.  About how many such

10    memos have you sent to the Secretary of State?

11        THE WITNESS:  I would estimate the number of such

12    memos would be between 15 to 20.

13        THE COURT:  All right.  And of those 15 to 20, if

14    you can break down how many were agreed and executed,

15    how many were disagreed, how many were discussed?

16        THE WITNESS:  In my recollection, almost all were

17    agreed.  There may have been one that was not.  I'm the

18    not sure.  And there may have been another one that was

19    discussed and later agreed to.

20        THE COURT:  Yeah, just asking for your best

21    recollection.

22        Go ahead, Ms. Santora.

23    Q.    And related to those memos that your Honor was

24    just discussing, um, the -- your office, before sending

25    an action memo to the Secretary, independently analyzes

1    the information in referrals, correct?

2    A.    That is correct, we analyze it.  The Visa office,

3    along with legal counsel, analyze it, um, independently

4    of DHS, the information.

5    Q.    And then makes a recommendation on removability to

6    the Secretary, correct?

7    A.    That is correct.  And the recommendation is

8    reviewed by many people.  And then I -- or whoever is

9    sitting in the position I am currently in, makes the

10   final determination of whether it goes forward to the

11   Secretary or not.  My practice is to read the whole

12   memo.

13   Q.    And the Secretary, um, makes the ultimate

14   determination on removability, correct?

15   A.    That is correct, the Secretary of State, Marco

16   Rubio.

17   Q.    You said before that you were familiar with the

18   allegations in this complaint, correct?

19   A.    I have some knowledge of them, I have not read the

20   complaint.

21   Q.    Are you familiar with the fact that the plaintiffs

22   in this case allege that the government is implementing

23   an ideological deportation policy?

24   A.    I have heard that --

25         MS. CONLON:  Objection, your Honor.

1          THE COURT:  No, she may so characterize it.  And

2     she may ask the question.  And his answer may stand.

3     A.    I have heard that accusation.  I believe it's

4     groundless.

5     Q.    So is there an ideological deportation policy?

6     A.    No.

7     Q.    How do you know?

8     A.    I run the Bureau of Consular Affairs.  I'm

9     responsible for everything those 13,000 people do.  At

10    the end of the day, the buck stops with me.  I would

11    know if there was an ideological deportation policy

12    going on that involved the Bureau of Consular Affairs or

13    the State Department for that matter.  It's silly to

14    suggest that there's such a policy that I didn't know

15    about.

16    Q.    Does the State Department have any policy to

17    revoke Visas based on protected speech?

18    A.    No.

19    Q.    Does the State Department have any policy to find

20    people removable based on protected speech?

21    A.    No.

22    Q.    Does the State Department have any policy to

23    revoke Visas based on political viewpoints?

24    A.    Um, if you're supporting a terrorist organization,

25    yes, in that case.  And it's been made clear by the

1    statements of Marco Rubio and, um -- this is not

2    something that we started with Marco Rubio.  If you

3    support terrorism, you can have your Visa revoked.

4    Q.    And is that a provision of the law?

5    A.    It's in the law.  There's the ineligibility, the

6    3(b) that we talked about.  And actually that example

7    you gave me, right before 3(c), they have 3(b) that goes

8    into several pages of discussion of this.  These

9    officers abroad are required to put in a security

10    advisory opinion on any case that they think that

11    there's any indication of support for terrorism.  We

12    treat this very seriously.

13    Q.    Has anyone ever told you to revoke the Visas on

14    the basis of protected speech?

15    A.    No.

16    Q.    As anyone ever told you to find someone removable

17    on the basis of their protected speech?

18    A.    I can't find anyone removable, but no one has

19    instructed me to prepare the materials for the Secretary

20    to make that finding.

21    Q.    Could the State Department be deploying an

22    ideological deportation policy in secret without your

23    knowledge?

24        MS. CONLON:  Objection.

25        THE COURT:  Based upon the entire record, I'm

1  going to sustain that.

2        (Pause.)

3  Q.    To be clear, it's your testimony that it would not

4  be possible for an ideological deportation policy to be

5  implemented at the State Department without your

6  knowledge, correct?

7  A.    That is my --

8        MS. CONLON:  Objection.

9        THE COURT:  No, no, he can -- and I sustained the

10 earlier objection because the whole gravamen of the case

11 is that it is an avowedly public operation supported by

12 the statements of the -- here the defendant public

13 officials.  And I'll let his testimony stand.

14       Anything else for this witness?

15       MS. SANTORA:  No, that's it.  Thank you, your

16 Honor.

17       THE COURT:  All right.

18       Ms. Conlon?

19       MS. CONLON:  Yes, may I, um, go to the podium?

20       THE COURT:  You may.

21       THE WITNESS:  Your Honor, may I stand up for a

22 minute?

23       THE COURT:  Of course you can.

24       THE WITNESS:  Thank you, sir.

25       (Stands.)

1          (Then Sits.)

2

3      CROSS-EXAMINATION BY MS. CONLON:

4      Q.     Good afternoon, Mr. Armstrong.

5      A.     Good afternoon.

6      Q.     Okay.  So you were asked --

7          THE COURT:  Wait.  Wait a minute.  Wait a minute.

8      I have, at this moment, received an order from the Court

9      of Appeals, so let me read it.

10         (Reads.)

11         THE COURT:  Here's how we're going to proceed.

12     Let me read this in open court and you'll all have

13     copies.  This is entered and I received it as you hear

14     it, and this is the order of the Court of Appeals in the

15     First Circuit.

16         "The government has filed a mandamus petition and

17     accompanying request for interim relief.  Plaintiffs

18     have opposed.  After initial review of the parties'

19     submissions and relevant portions of the record, we

20     grant the government's request for a stay of any further

21     disclosure of documents for which the government says it

22     has claimed privilege and where waiver is the only basis

23     stated for rejecting the claim of privilege.  Plaintiffs

24     may file a more fulsome answer to the petition by

25     Monday, July 14, 2025, at 5:00 p.m.

```
 1        The District Court is invited to address the
 2   petition by Tuesday, July 15, 2025 at 5:00 p.m.  The
 3   Court's response should identify what the reason was for
 4   the in-camera review and detail the rationale for its
 5   waiver rulings on the government's assertion of certain
 6   privileges.  The motion for administrative stay is
 7   denied as moot.  The Court will rule promptly on the
 8   petition."
 9        In light of the order of the First Circuit, and
10   because it's 5 minutes to 1:00, I think we'll suspend
11   proceedings at this time.
12        Ms. Conlon?
13        MS. CONLON:  Could I begin my examination, with
14   the 5 minutes remaining, without anything that will
15   affect the order from the First Circuit just so we can
16   get started?
17        THE COURT:  Well I'm deferential to their order.
18   I've got to reflect on what it reaches.  But for my
19   review of this order, it reaches everything that has
20   been -- that this Court has disclosed to you as to which
21   the government has objected.
22        And you've got 5 minutes.
23        MS. CONLON:  5 minutes to argue it or 5 minutes to
24   --
25        THE COURT:  No, no, 5 minutes to question him.
```

1        MS. CONLON:  Okay.  Just for the clarity for the

2    Court and the record, our understanding, I think, is

3    different in terms of the group of documents that we

4    understood the government to be filing the petition

5    about, um, but I am certainly able to start examining

6    this witness without using any documents at all.  So I

7    just wanted to be clear, because I hear the Court saying

8    that the Court thinks that the documents that I might

9    use in this examination, which is to say the ones we

10   received from the Court yesterday, are implicated by the

11   government's petition, and I want to be clear that our

12   understanding is that they are not, and that that

13   relates to documents that have yet to be disclosed to

14   us.  But I understand the Court needs to review the

15   document that's in front of you more thoroughly.  So if

16   I may begin the examination --

17       THE COURT:  It's not a document, it's an order.

18       MS. CONLON:  Correct, the binding order.  So I

19   will not -- I have no intention, in this remaining

20   minute --

21       THE COURT:  Right.  You have 4 minutes.  Go ahead.

22       MS. CONLON:  Thank you, your Honor.

23       (Pause.)

24   Q.   Mr. Armstrong, you testified on direct examination

25   about certain noncitizens, um, by name, that the

1    government asked you about.  To be clear, um, you had

2    personal involvement in the decisions with respect to

3    all of them, is that right?

4    A.    That's my recollection, because in the case of the

5    ones that went to the Secretary of State for decision,

6    the action memo would have gone through me before it

7    went up.  And in the one remaining case, I -- as I

8    recall, the action memo actually went to me from one of

9    the Deputy Assistant Secretaries.  So, yes, I was

10   involved, in my professional duties, in these cases.

11   Q.    And when you say that it went to you before it

12   went up to Secretary Rubio, it's the case that you

13   actually had to clear the document to go to Secretary

14   Rubio, is that right?

15   A.    That's correct.  I'm the -- for the action memo,

16   before it can leave the Bureau of Consular Affairs, it

17   comes from -- it's actually from me, um, the decision --

18   the action memo is from me.  And as I stated, it's my

19   practice to read, um, the documents before they go up.

20   I treat it seriously, I treat my duties seriously to

21   read it in full.  And make corrections, if needed, I may

22   add.

23   Q.    And when you say "corrections," what kind of

24   corrections?

25   A.    Um, there's any number.  It's part of the

 1    clearance or the approval process.  It's serious

 2    business.  For example, sometimes, despite best efforts,

 3    there's simple grammatical errors or punctuation errors.

 4    I can't send something to the Secretary with not enough

 5    commas or a semicolon in the wrong place.  Sometimes

 6    it's more serious, there are what I believe, in my

 7    position, I judge to be something that is not phrased in

 8    the clearest way to get across our point or, for

 9    example, not the best evidence is used to make our

10    point.  Sometimes I disagree completely and send the

11    document back to the drafter and I say, "This can't

12    stand, you have to fix this."

13    Q.    You're describing a sort of searching review

14    before it goes to the Secretary, is that right?

15    A.    That's correct, much of my time is spent doing

16    such activities.

17    Q.    With respect to the five individuals whose

18    documents you just reviewed with the government, you

19    didn't make any corrections about those, right?

20    A.    I -- I'm trying to be helpful, but I review in a

21    week, you know, sometimes 10, 15, or more action memos

22    that go to other parts of the State Department, and I

23    can't recall what I did on a memo that was, you know,

24    several months ago.

25    Q.    You don't have an independent recollection of the

1   back and forth on these memos that the government showed

2   you, is that right?

3   A.    I do not.  But my general practice is that I

4   review things thoroughly and judiciously before I sign

5   them.  I have to sign off on it, and that's my

6   responsibility, even if it's someone else's fault.

7   Q.    And if you disagreed with a memo that came to you

8   that was intended for the Secretary, you could stop it

9   from going to him, right, by not clearing it?

10  A.    That's correct, I could send it back.

11  Q.    You didn't do that for any --

12      THE COURT:  I think that's a good place to stop.

13      MS. CONLON:  Okay.

14      THE COURT:  We'll stop taking testimony today.

15  We'll start promptly at 9:00 a.m. on Monday next week.

16      The total elapsed time is, um, for the plaintiffs,

17  3 days, 55 minutes.  For the defense, 1 day, 1 hour, um,

18  35 minutes.

19      Understand you've only got four days -- four and a

20  half days for the plaintiffs, and I thought that that

21  included -- I intend that that include closing

22  arguments.  So assuming you want some cross-examination

23  here, um, time is of the essence.

24      Now have a good weekend.

25      MR. KANELLIS:  Your Honor, I apologize.

1          THE COURT:  Well now the apology is properly

2     sought.  I said we're stopping at 1:00.  We're stopping.

3          We'll recess.

4          (Adjourned, 1:00 p.m.)

```
1                    C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Friday, July 11, 2025, to the best of my skill and

9    ability.

10

11

12

13

14   /s/ Richard H. Romanow 07-11-25
     _____
15   RICHARD H. ROMANOW  Date

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 5

1                    UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:25-cv-10685-WGY

4

5    AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                Plaintiffs

6

7    vs.

8

9    MARCO RUBIO, in his official capacity as
     Secretary of State, et al,

10              Defendants

11                          * * * * * * * * *

12

13

14                       For Bench Trial Before:
                         Judge William G. Young

15

16

17                       United States District Court
                         District of Massachusetts (Boston.)
                         One Courthouse Way

18                       Boston, Massachusetts 02210
                         Thursday, July 17, 2025

19

20                          * * * * * * * *

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter

23                  United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210

24                       rhr3tubas@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
         Knight First Amendment Institute at Columbia
 6       University
         475 Riverside Drive, Suite 302
 7       New York, NY 10115
         (646) 745-8500
 8       E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
11       New York, NY 10004
         (212) 540-0675
12       Email: Cgans@shertremonte.com
         For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16       DOJ-Civ
         P.O. 878
17       Ben Franklin Station
         Washington, DC 20044
18       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20       United States Attorney's Office
         1 Courthouse Way, Suite 9200
21       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
22       For Defendants

23

24

25
```

```
1                          I N D E X
2
3     WITNESS                   DIRECT  CROSS  REDIRECT  RECROSS
4
5     MOHAMED MAKLAD
6        By Mr. Kanellis          5
7        By Mr. Biale                   18
8
9     ANDRE WATSON
10       By Mr. Kanellis         26
11       By Ms. Krishnan                60
12
13                        E X H I B I T S
14
15          EXHIBIT 240.............................. 22
16          EXHIBIT 241.............................. 22
17          EXHIBIT 242.............................. 80
18          EXHIBIT 243.............................. 97
19          EXHIBIT 244.............................. 98
20          EXHIBIT 245.............................. 99
21          EXHIBIT 246.............................. 99
22
23
24
25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Because I have authorized internet
 4    access to these proceedings, it's appropriate to say
 5    that if you are attending these proceeding via internet,
 6    you must remember that the rules of court remain in full
 7    and effect, and that means there is no taping,
 8    streaming, rebroadcast, screen shots, or other
 9    transcription of these proceedings.
10          Also, you must keep your microphone muted.  That's
11    very important.  And if you do not, I shall have to cut
12    you off.
13          Very well.  The plaintiffs are calling two
14    witnesses.  You may call your first witness.
15          MR. KANELLIS:  Your Honor, today the government
16    will be calling two witnesses.
17          THE COURT:  I misspoke.  And, Mr. Kanellis, you
18    may call the first of the two.
19          MR. KANELLIS:  Your Honor, the U.S. government
20    calls Mohamed Maklad.
21          THE COURT:  He may be called.
22          (MOHAMED MAKLAD, sworn.)
23          THE CLERK:  Can you please state your full name
24    and spell your last name for the record.
25          THE WITNESS:  My name is Mohamed Maklad, and my
```

```
1    last name is M-A-K-L-A-D.

2         THE COURT:  Mr. Kanellis, you may proceed.

3

4         * * * * * * * * * * * * * *

5         MOHAMED MAKLAD

6         * * * * * * * * * * * * * *

7

8    DIRECT EXAMINATION BY MR. KANELLIS:

9    Q.    Mr. Maklad, where do you work?

10   A.    I work at Homeland security Investigations.

11   Q.    And that's a part of the Department of Homeland

12   Security?

13   A.    That is correct.

14   Q.    And what is your job at Homeland Security

15   Investigations?

16   A.    I'm a Supervisory Analyst.

17   Q.    And what do you do as a Supervisory Analyst?

18   A.    I conduct research and analysis in support of our

19   agency's needs.

20   Q.    As a Supervisory Analyst, have you had any

21   experience retrieving data and information from public

22   sources?

23   A.    I have.

24   Q.    And in that role have you had any experience

25   analyzing and summarizing data from public sources?
```

```
1    A.     I have.

2    Q.     Why are you here to testify today?

3    A.     I'm here to provide summary exhibits on public

4    events and publications by AAUP and MESA.

5    Q.     You said by AAUP and MESA?

6    A.     Yes, correct.

7    Q.     And those are two of the plaintiffs in this case,

8    correct?

9    A.     Yes, sir.

10   Q.     And then you said, um -- did you say "public

11   events"?

12   A.     Yes, I did.

13   Q.     What do you mean by "public events"?

14   A.     Events that we're able to access through publicly-

15   available information that occurred of some kind of

16   gathering.

17   Q.     You also mentioned, I think, "publications," is

18   that right?

19   A.     I did, sir.

20   Q.     What do you mean by "publications"?

21   A.     Anything that would be associated with the

22   plaintiffs.

23   Q.     Okay.  Can you describe for the Court the volume

24   of public events and publications you've retrieved when

25   searching for the information that underline these
```

```
1    charts?
2    A.    For all of --
3          MR. BIALE:  Objection.
4          THE COURT:  Well the chart's not yet before the
5    Court, but this is where he's going.  Overruled.  He may
6    have it.
7    A.    Thousands, sir.  Over a thousand of volumes that
8    we got to make these exhibits.
9    Q.    And have you compiled these thousands of
10   references to the summary charts?
11   A.    I have.
12   Q.    Did you compile the sources for the work
13   underlying these summary charts?
14   A.    I have.
15   Q.    And how did you do so?
16   A.    I did so on an EXCEL spreadsheet, sir.
17   Q.    Did you say an EXCEL spreadsheet?
18   A.    EXCEL spreadsheets.
19   Q.    Can you move the microphone a little bit closer to
20   you?
21   A.    (Moves mic.)
22   Q.    Yes, thank you.
23         Was the spreadsheet with the sources for the data
24   you compiled provided to plaintiffs in this case?
25   A.    It was.
```

```
 1        MR. BIALE:  Objection.
 2        THE COURT:  Well do you know that?
 3        THE WITNESS:  I provided it to the defense.
 4        THE COURT:  Well my question is to you, do you
 5   know that it was provided?  And you started to answer.
 6        You provided them?
 7        THE WITNESS:  I provided it to the defense team.
 8        THE COURT:  Okay.  And when did you do that?
 9        THE WITNESS:  I did that on July 3rd, sir.
10        THE COURT:  Thank you.
11        Go ahead.
12        MR. KANELLIS:  Your Honor, may I approach?
13        THE COURT:  You may.
14        MR. KANELLIS:  Let the record reflect I'm handing
15   you, the witness, three exhibits marked for
16   identification.
17        THE COURT:  And which are they?
18        MR. KANELLIS:  Sir, they are HJ, HL, and HH.
19        THE COURT:  All right.
20        (Hands to witness and judge.)
21        THE COURT:  Proceed.
22   Q.   Are these exhibits that you prepared for this
23   litigation, sir?
24   A.   They are.
25        MR. KANELLIS:  Let's pull up Exhibit HJ, labeled
```

1    "Comparison AAUP Public Events 2022 through 2025."

2         (On screen.)

3    Q.    Can you explain to the Court what information

4    you're attempting to summarize with this exhibit?

5    A.    This is a summary of the total number of events

6    listed on AAUP's websites, between 2022 and 2025.

7    Q.    And does it include the entire year of 2025?

8    A.    It includes just the first 6 months of 2025.

9    Q.    And what do you mean by "public events"?

10   A.    These were events listed on the AAUP websites, um,

11   various webinars, gatherings, and things that would

12   bring people together over a certain cause.

13   Q.    And how were you able to determine that these

14   public events were sponsored or promoted by the

15   plaintiff, AAUP?

16   A.    I determined that by pulling it from their website

17   directly.

18   Q.    And how do you know you were looking at AAUP's

19   website?

20   A.    Based on the AOR, sir, the AAUP network.

21   Q.    Now with respect to looking at AAUP's website, is

22   it possible, in your mind, that AAUP sponsored more

23   events than are listed on this website?

24        MR. BIALE:  Objection.

25        THE COURT:  Well I'm going to sustain that, "Is it

1    possible?"  Let's get to the guts of it.

2          What's the difference between blue and red here?

3          THE WITNESS:  Your Honor, blue represents the

4    overall events and red is events that have been

5    identified as being related to Palestine and Israel.

6    Q.    And how many events total did you see promoted on

7    AAUP's website?

8          THE COURT:  Well the document speaks for itself.

9    What's the relevance of this?

10         MR. KANELLIS:  Your Honor, this shows AAUP's

11   political activity after 2025.  After the ideological

12   deportation policy was in place, it increased, it did

13   not decrease.  It was unaffected by AAUP's --

14         THE COURT:  Yes, I understand your point.

15         Yes?

16         MR. BIALE:  Your Honor, if I may?

17         THE COURT:  Yes.

18         MR. BIALE:  No one is claiming, in this case, that

19   the organization's speech has been chilled.  The

20   organization's --

21         THE COURT:  That's understood.  I've limited it.

22         MR. BIALE:  Yes.

23         THE COURT:  But it's peripherally relevant, and so

24   I'll admit it.

25         HJ is admitted.

1      MR. BIALE:  Your Honor, I'm sorry, I have a

2  further objection to this document.

3      THE COURT:  Yes?

4      MR. BIALE:  We don't know anything about the

5  methodology that this witness used to determine what is

6  a Palestine/Israel-associated event.

7      THE COURT:  He's here for cross-examination.  I'll

8  reconsider it.

9      MS. CONLON:  He stated --

10      THE COURT:  I said it's "peripherally relevant."

11  It's a line in their closing argument, I suppose.

12      MR. BIALE:  And, your Honor, the data about these

13  events is also not in evidence.  He's saying he pulled

14  it from the website.

15      THE COURT:  But it's available to you?

16      MR. BIALE:  But we don't know what he looked at,

17  your Honor.

18      THE COURT:  Oh, wait a minute.  Wait a minute.

19  Well that slows me down.

20      And so Mr. Kanellis can address that?

21      MR. KANELLIS:  Your Honor, we made the witness

22  available, then we produced --

23      THE COURT:  No.  No.

24      MR. KANELLIS:  They elected not to question him.

25      THE COURT:  No, the data has got to be produced.

```
1           MR. KANELLIS:  We produced it.
2           THE COURT:  Is this all you gave them is this?
3           THE WITNESS:  And the source data, your Honor.
4           THE COURT:  And the source data?
5           THE WITNESS:  Yes, your Honor.
6           THE COURT:  And what does the source data look
7      like?
8           THE WITNESS:  It's an EXCEL spreadsheet, your
9      Honor, that contains all of the --
10          THE COURT:  Okay.
11          Is that one here?
12          MR. KANELLIS:  Um, yes, your Honor.
13          THE COURT:  Can I see it?
14          MR. KANELLIS:  We can pull that.  It's on --
15          Your Honor, we -- we don't have the --
16          (Discussion.)
17          MR. KANELLIS:  We don't have a physical copy, your
18     Honor, with us.
19          (Pause.)
20          MR. KANELLIS:  The source data, your Honor, was
21     sent to plaintiffs.
22          THE COURT:  No one's impugning that, he so
23     testified.
24          MR. BIALE:  Well, your Honor --
25          THE COURT:  I mean can I see what it looked like?
```

1        MR. KANELLIS:  Yes, your Honor, we will -- but

2   we're going to have to print that out.

3        THE COURT:  All right, then we'll reserve on

4   admitting it.

5        MR. BIALE:  For clearing the record, your Honor, I

6   believe he testified that he sent the source data to

7   defendants.  Now we received spreadsheets, but I don't

8   know what this data relates to.

9        THE COURT:  Well all right.  I need help on this,

10  so I'll vacate the admission of this, but he can go on.

11       Let's find out about these other ones, quickly.

12       MR. KANELLIS:  Um --

13       THE COURT:  You said 10 minutes, Mr. Kanellis.

14       MR. KANELLIS:  Yes, I did.

15       THE COURT:  Go ahead.

16  Q.   How many events are listed by AAUP in Exhibit --

17       THE COURT:  Well the document speaks for itself.

18  If you get it in evidence, the numbers will be there.

19  Let's look at the evidence.

20       (Pause.)

21       MR. KANELLIS:  Let's go to "Hotel Lima," Exhibit

22  HL.

23       (On screen.)

24  Q.   And what's the purpose of this chart?

25  A.   The purpose of this chart is to show, um, what the

1    witness has identified, to testify in this case, um,

2    their searches or their associations related to

3    Palestine or Israel in Google Overtime in 2024 and '25.

4         THE COURT:  Forgive me for interrupting.

5         THE WITNESS:  Yes, sir?

6         THE COURT:  I don't know what that means,

7    "associations relative to Palestine"?

8         THE WITNESS:  Yes, your Honor.

9         THE COURT:  Tell us what you mean by that?

10         THE WITNESS:  So basically, sir, what we've done

11    is we've taken all the names on the bottom on the, um --

12    in random, in Google, and identified whether their name,

13    and "Israel" and "Palestine," has come with a result in

14    Google in 2024 and 2025, showing an association between

15    that name and some kind of publication on Israel and

16    Palestine.

17         THE COURT:  I see.  I see.  And blue is 24 and red

18    is 25?

19         THE WITNESS:  Yes, your Honor.

20         MR. BIALE:  Your Honor --

21         THE COURT:  Wait a minute.  Wait a minute.

22         How is this relevant?

23         MR. KANELLIS:  Your Honor, the plaintiffs have

24    claimed that -- the individual witnesses have claimed

25    that they were active and associated with issues with

1    Palestine and Israel prior to the implementation of the

2    ideological deportation policy in 2025.  This shows that

3    if there was any public association with those witnesses

4    and the issue of Palestine and Israel, it increased

5    after -- for most of these witnesses, after the

6    implementation of the ideological deportation --

7         THE COURT:  If I understand though, this is some

8    Google search where -- and we'll take Professor Nickel

9    as an example, where his name and "Palestine" is in the

10   same reference.

11        Is that correct?

12        THE WITNESS:  That's correct, your Honor.

13        THE COURT:  Yeah, that's too remote.  It's

14   excluded.  Let's look at the, um --

15        MR. KANELLIS:  Let's go to the final exhibit.

16        THE COURT:  Yes.

17        MR. KANELLIS:  "Hotel Hotel."

18        (On screen.)

19   Q.    And, Mr. Maklad, what does Exhibit "Hotel Hotel"

20   depict?

21   A.    Exhibit "Hotel Hotel" depicts a single -- the

22   number of events in a single day in 2024 and 2025

23   sponsored by AAUP under the Day of action for Higher

24   Education.

25   Q.    What is your understanding of the Day of Action

 1   For Higher Education?

 2         MR. BIALE:  Objection, foundation.

 3         MR. KANELLIS:  I'm laying a foundation.

 4         THE COURT:  And you may.

 5   A.    My understanding of the Day of Action for Higher

 6   Education is it is sponsored by AAUP and others to

 7   engage in free speech activities across college

 8   campuses.

 9   Q.    And how do you know this was sponsored by AAUP,

10   this National Day of Action for Higher Education?

11   A.    AAUP was quoted saying that they spearheaded this

12   action in 2024, and in 2025, their logo and on their

13   website, "A Day of Action," indicates that they've

14   sponsored these events.

15         MR. BIALE:  Objection, move to strike.  Quoted

16   from where?  We have no idea where he's getting this

17   information, your Honor.

18         THE COURT:  Well you can inquire.

19         All right.

20   Q.    And what does this chart show about, um, the, um,

21   political activity of AAUP and MESA from April 17th,

22   2024 compared to the same day, April 17th, 2025?

23         MR. BIALE:  Objection.  There was no testimony

24   that this is activity of MESA.  He stated that this was

25   activity of MESA.

 1          THE COURT:  Correct.

 2          MR. BIALE:  Although the exhibit says "MESA," and

 3    I'm not sure where that comes, your Honor.

 4          MR. KANELLIS:  Oh, I can give you that foundation,

 5    your Honor, I can explain.

 6    Q.    Why do you include "MESA" on the title page of

 7    this exhibit?

 8    A.    MESA was also included as a sponsor on their

 9    website, "Day of Action."

10    Q.    And how do you know that?

11    A.    I saw the emblem on the website where I pulled the

12    information from.

13          MR. BIALE:  Objection.

14    Q.    And then what did the exhibit show about the

15    political activity of MESA and AAUP comparing 2024 and

16    2025?

17    A.    In 2024, there were approximately 9 events that

18    occurred, um, according to the website where I pulled

19    this information.  And in 2025, there were approximately

20    191 events that occurred, according to this --

21    Q.    What is the increase percentage-wise in events

22    sponsored by AAUP and MESA from 2024 to 2025?

23    A.    Approximately 2000 percent.

24    Q.    2000 percent?

25    A.    Yes, sir.

```
 1          MR. KANELLIS:  Your Honor, we tender the witness.
 2          Oh, your Honor, actually -- my apologies.  We move
 3     into evidence the Exhibits HH and, um, the first
 4     exhibit?
 5          THE COURT:  HJ.
 6          MR. KANELLIS:  Yes, sir.
 7          MR. BIALE:  Your Honor --
 8          THE COURT:  I'll reserve until I've heard cross-
 9     examination.
10          Mr. Biale, go ahead.
11          MR. BIALE:  Okay.  And very briefly.
12
13     CROSS-EXAMINATION BY MR. BIALE:
14     Q.    You said that these are related to the National
15     Day of Action, right?
16     A.    Yes, sir.
17     Q.    And the National Day of Action is an event that,
18     um, has, um, relates to topics -- a variety of topics
19     that AAUP and MESA have an interest in, right?
20     A.    Correct.
21     Q.    And in fact, in the source data you provided, the
22     very first event description is "Indiana Graduate
23     Workers Coalition went on Strike at Indiana University,"
24     right?
25     A.    That's correct, that's what I provided.
```

1  Q.    Okay.  You don't know -- you have no idea whether

2  that strike had anything to do with Israel or Palestine,

3  right?

4  A.    On the website it claims that these were, um,

5  looking for opportunities to combat, um -- to provide

6  opportunities for free speech to include Palestine and

7  divestment issues, according to the Day of Action

8  website.

9  Q.    What website are you talking about?  You keep

10  mentioning a website.

11  A.    The Day of Action website where I obtained this

12  information from.

13  Q.    Okay.  And what is the URL for the Day of Action

14  website?

15  A.    I can retrieve it.  It's a "Coalition for Higher

16  Ed.org."

17  Q.    Okay.  And a "Coalition for Higher Ed," that's a

18  different organization from AAUP, right?

19  A.    It's sponsored by AAUP on the website.

20  Q.    "Yes" or "No."  Is the Coalition for Higher

21  Education the same as AAUP?

22  A.    It is not.

23  Q.    Is the Coalition for Higher Education the same as

24  MESA?

25  A.    It is not.

1    Q.    Okay.   Now looking at these charts that you show.

2    Assuming, just for the sake of argument, that these are

3    in fact political activities engaged in by these

4    organizations between 2024 and 2025, what this shows,

5    right, is that the organizations have engaged in much

6    more political activity in 2025, correct?

7    A.    That is what is shown, correct.

8    Q.    Okay.   So whatever resources that they were

9    deploying to other things in 2024, in 2025, they've

10   deployed those resources much more to political

11   activity, right?

12        MR. KANELLIS:   Objection, your Honor, vague.

13        THE COURT:   No, overruled.

14   A.    Can you repeat the question, please?

15   Q.    I said whatever resources they had to direct to

16   other activities in 2024, they have directed more of

17   those resources to political activities to 2025, "Yes"

18   or "No"?

19   A.    I'm not sure I -- I cannot answer that.  I don't

20   know what the resources were in 2024 versus 2025.

21   Q.    Well presumably it took some resources of the

22   organization to plan these events, right?

23        MR. KANELLIS:   Objection, calls for speculation.

24        THE COURT:   Well, on this foundation, I have to

25   sustain it.

1          MR. BIALE:  All right.  If I could have one

2     moment?

3          (Pause.)

4     Q.    Now with respect to HJ, sir, you testified that

5     these were public events, right?

6     A.    That is correct, from the AAUP website under the

7     events tab.

8     Q.    Okay.  And when you said "public," you meant that

9     there was public information available about them on the

10    website, correct?

11    A.    That is correct.

12    Q.    You don't know whether these events were attended

13    by members of the public, right?

14    A.    I am not aware of that.  I just know what I was

15    able to pull from the website.

16    Q.    Okay.  And that website, again, doesn't have any

17    information about whether these were public events in

18    the sense that everyone from the public was invited,

19    right?

20    A.    All this is showing is the number of events over

21    time and what was displayed on the AAUP website.

22    Whether they were public or private?  I don't know.

23    Q.    You don't know.  Okay.

24          (Pause.)

25    Q.    And all you know is they were advertised, you

1    don't actually know if these events occurred, right?

2    A.    I do not know if they occurred, but I know they're

3    advertised by AAUP.

4         MR. BIALE:  Nothing further.

5         THE COURT:  I will admit both Exhibits HH as

6    Exhibit 240 and HJ as Exhibit 241.

7         (Exhibits 240 and 241, marked.)

8         THE COURT:  You have nothing else for this

9    witness, do you, Mr. Kanellis?

10        MR. KANELLIS:  No, sir.

11        THE COURT:  All right, you may step down.

12        Call your next witness.

13        MR. KANELLIS:  Your Honor, the United States --

14   the government defendants call Assistant Director Andre

15   Watson.

16        MS. CONLON:  Your Honor --

17        THE COURT:  Now wait a minute.

18        MS. CONLON:  I just want an exhibit number.

19        THE COURT:  Ms. Conlon, I have no direction from

20   the Court of Appeals.  Now my understanding is that

21   Mr. Watson is familiar with documents that to which the

22   stay undoubtedly applies, so I don't know what we're

23   doing.

24        I -- in other words, I am not going to -- I

25   recognize that when the stay went into effect, we, um,

1    had heard the direct examination of Mr. Armstrong, and

2    we had one question or two on the cross-examination, and

3    then the stay went into effect.

4        Now I suppose I could take his direct examination,

5    um, but we're not going to get anywhere on cross-

6    examination in light of the stay.  Though I'm not going

7    to consider the direct of either Armstrong or Watson if

8    somehow I am precluded from considering the documents as

9    to which the stay presently applies.

10       So with that said, I'm not clear what we're doing.

11   And I'll start with you.

12       MR. KANELLIS:  Well, your Honor, it was our

13   understanding, and perhaps it was an misimpression, that

14   certainly we are delaying Mr. Armstrong's cross, or the

15   remainder of it, until we hear from the First Circuit.

16   But it was our understanding we could proceed with

17   Mr. Watson today with direct and cross on the --

18       THE COURT:  But they can't cross on the documents

19   that are, um -- I mean I'm not going to permit it,

20   because I have to obey the stay.  Even if you told me,

21   "Well we'll waive it," I must obey it.  And so of course

22   I will.

23       So, I'm sorry, this is part of the problem of a

24   stay in the midst of trial proceeding.  But, um, I just

25   don't think it will be as coherent as if we did it all

1    at once.

2         So --

3         MS. KRISHNAN:  Your Honor, may I be heard on the

4    issue of documents?

5         THE COURT:  Yes.  Why don't you, once again,

6    introduce yourself.

7         MS. KRISHNAN:  Yes.  Good morning, your Honor, my

8    name is Ms. Krishnan.

9         THE COURT:  Yes.

10        MS. KRISHNAN:  So I'll start by saying that the

11   only documents that are part of the core documents that

12   we plan to cross-examination Mr. Watson on are the

13   letters that he authored that went to the State

14   Department, and our understanding is that the First

15   Circuit stay doesn't reach those documents because those

16   documents are ones over which the government only claims

17   the law enforcement privilege, and we had understood

18   your Honor to have overruled the assertion of that

19   privilege.

20        THE COURT:  And your understanding is correct.

21   Your understanding of what I've done is correct.  But I

22   read the order of the Court of Appeals -- and I'm not at

23   all clear that their understanding is the same as mine.

24        So unless the government agrees with you and has

25   no problem with -- I certainly accept your

1    representation that there's no problem allowing cross-

2    examination as to those transmittal letters, then I'd be

3    fine.

4         But Mr. Kanellis?

5         MR. KANELLIS:  That's fine with us, your Honor.

6         THE COURT:  Oh, it is?

7         MR. KANELLIS:  Yes.

8         THE COURT:  All right.

9         MR. KANELLIS:  That is the --

10        THE COURT:  No, no, I'll hold her to it.  I mean

11   she's an officer of the court.

12        He made be called.

13        (Pause.)

14        THE COURT:  And while he's coming, are we clear

15   then that the only thing that remains for the

16   evidentiary presentation is the cross-examination of

17   Mr. Armstrong, if you press to have Armstrong as a

18   witness, is that right?

19        MS. KRISHNAN:  Yes, in addition to, um, one of

20   plaintiffs' witnesses, Professor Veena Dubal, who is the

21   General Counsel of AAUP.

22        THE COURT:  Yeah, when are we going to hear her?

23        MS. KRISHNAN:  Friday.

24        THE COURT:  Okay, thank you.

25        (ANDRE WATSON, sworn.)

1        THE CLERK:  And please state your full name and

2    spell your last name for the record.

3        THE WITNESS:  Yes, ma'am.  Andre Watson.  My last

4    name is spelled W-A-T-S-O-N.

5        THE CLERK:  Thank you.

6

7    * * * * * * * * * * * *

8    ANDRE WATSON

9    * * * * * * * * * * * *

10

11   DIRECT EXAMINATION BY MR. KANELLIS:

12   Q.    Good morning, Mr. Watson.  I'm going to call you

13   "AD Watson," because your title is "Assistant Director."

14   Is that all right with you?

15   A.    Yes, sir.

16   Q.    AD Watson, who do you work for?

17   A.    U.S. Immigrations and Customs Enforcement.

18   Q.    And what is your current position?

19   A.    The Assistant Director of the National Security

20   Division.

21   Q.    And for how long have you held the position of the

22   Assistant Director for the National Security Division?

23   A.    Since July of 2020.

24   Q.    Let's talk briefly about your background.  Where

25   did you grow up?

1    A.    I grew up in the Tidewater Region of Virginia,

2    sir.

3    Q.    And did you go to college?

4    A.    Yes, sir.

5    Q.    Where did you go to college?

6    A.    Ultimately the Old Dominion University in Norfolk

7    Virginia.

8    Q.    After you graduated from college, um, what year

9    was that actually?

10   A.    In 1993, sir.

11   Q.    And what did you do after you graduated from Old

12   Dominion University in 1993?

13   A.    I accepted an appointment to the position of

14   Special Agent with the United States Customs Service.

15   Q.    Briefly describe for the Court your

16   responsibilities as a Special Agent for the Customs

17   Service?

18   A.    Conducting criminal investigations as to

19   violations of customs and federal law, in addition to

20   revenue collection investigations in furtherance of

21   customs duties.

22   Q.    Was that your first employment with the federal

23   government?

24   A.    Yes, sir, it was.

25   Q.    May I ask you why did you want to work for the

1  federal government?

2  A.    I grew up in a house that had military backgrounds

3  with my father and I always saw a career either in the

4  military or in law enforcement.

5  Q.    How long did you remain as a Special Agent for the

6  U.S. Customs Service?

7  A.    Until the creation of the Department of Homeland

8  Security.

9  Q.    And when was that?

10 A.    March of 2003, sir.

11 Q.    Do you have an understanding, based upon your

12 experience, of why the Department of Homeland Security

13 was formed in 2003?

14 A.    Yes, sir, I do.

15       MS. KRISHNAN:  Objection.

16 Q.    What is your understanding?

17 A.    It was created in response to the terrorist

18 attacks that occurred on 9/11.

19 Q.    And what -- can you describe generally the changes

20 that occurred with respect to the U.S. Customs Service

21 in 2003?

22       MS. KRISHNAN:  Objection, relevance.

23       THE COURT:  No, no, he may do it.  Generally.

24       How did things change?

25 A.    For Special Agents assigned to the U.S. Customs

```
 1    Service, we were merged with Special Agents from the
 2    Immigration and Naturalization Service, and for
 3    uniformed personnel with U.S. Customs Service, they were
 4    merged with uniformed personnel from the Immigration and
 5    Naturalization Service, and two agencies were created
 6    therein, being one, um, Immigration and Customs
 7    Enforcement, and the other being U.S. Customs and Border
 8    Protection.
 9          THE COURT:  Just so I'm clear, prior to this
10    merger, the first agency was in what Cabinet Secretary?
11          THE WITNESS:  For U.S. Customs Service, that was
12    within the Department of Treasury, your Honor.
13          THE COURT:  And --
14          THE WITNESS:  And the Immigration and
15    Naturalization Service was within the Department of
16    Justice.
17          THE COURT:  Understood.  Thank you.
18          THE WITNESS:  Yes, sir.
19    Q.    So since 2003, you said the Department of Homeland
20    Security was created.  Was the Department of Homeland
21    Security Investigations also created at that time?
22    A.    Um, ICE was.
23    Q.    Uh-huh.  And what about -- can you explain to the
24    Court the difference between ICE and HSI, if there is
25    one?
```

1    A.    Yes, sir.  Homeland Security Investigations is a

2    program office within U.S. Immigrations and Customs

3    Enforcement.

4    Q.    Okay.  Now since 2003, you've worked for HSI,

5    correct?

6    A.    Yes, sir.

7    Q.    And has HSI's mission changed or stayed the same

8    since 2003?

9    A.    It has stayed the same.

10   Q.    Have priorities changed with different

11   administrations since your -- since its inauguration in

12   2003?

13   A.    Yes, sir.

14   Q.    Can you give some examples of priorities changing

15   with different Presidential administrations?

16   A.    Yes, sir.  I can begin with during the Obama

17   administration that our priorities realigned to

18   organized crime and firearms trafficking, to include

19   firearms smuggling from the United States into the

20   Republic of Mexico.

21   Q.    Okay.  And were there any other changes after the

22   Obama administration left office?

23   A.    Yes, sir, with the first Trump administration.

24   Q.    Okay.  Now you're aware that this case centers

25   around HSI's enforcement of its Title VIII mission,

1    right?

2    A.    Yes, sir.

3    Q.    Can you explain to the Court briefly what your

4    understanding of the Title VIII mission is?

5    A.    The Title VIII mission for HSI focuses on

6    opportunities to conduct criminal investigations as it

7    relates to violations of United States Code.  That

8    sometimes goes into the space of Title VIII in areas

9    such as Alien smuggling and so forth.

10    Q.    Does Title VIII also include civil law violations?

11    A.    It can.

12    Q.    And in 2003, was HSI's mission, did it include the

13    ability to enforce civil immigration laws?

14    A.    Yes, sir.

15    Q.    And just to be clear, were HSI's authorities, in

16    2003, different than they are now?

17    A.    No, sir.

18    Q.    You've talked about, um -- strike that.

19          Has the emphasis on Title VIII enforcement changed

20    over time?

21    A.    Yes, sir, it has.

22    Q.    Well can you describe how it's changed?

23    A.    It has changed in areas like investigations --

24    criminal investigations, in furtherance of worksite

25    enforcement, labor trafficking.  So there have been

1    times where HSI Special Agents have leveraged

2    opportunities to conduct criminal investigations into

3    those activities and allegations.

4    Q.    And has the emphasis on Title VIII enforcement

5    changed with different administrations?

6    A.    Yes, sir.

7    Q.    Does the -- do these changes impact the way HSI

8    does business, in your experience?

9    A.    No, sir.

10   Q.    Can you explain to the Court why, if the

11   priorities regarding Title VIII are different, your

12   responsibilities remain the same?

13   A.    Pursuant to our statutory authority, by way of the

14   Homeland Security Act of 2003, as well as DHS delegation

15   Order 7030.2, we've always had that authority to conduct

16   criminal investigations to include enforcement of the

17   Immigration and Nationality Act.  So if we encounter a

18   scenario where we're conducting a criminal investigation

19   and we in turn identify an undocumented alien or a

20   foreign student that is present without inspection or

21   out of status or here otherwise contrary to law, we can,

22   in coordination with the principal legal advisor and/or

23   Enforcement and Removal Operations, take action.

24   Q.    Let's take a step back to your background for a

25   moment after you began working at HSI in 2003.

1        Can you briefly describe for the Court your
2   professional background and promotions?
3   A.    Um, yes.  So again, beginning with my employment
4   as a Special Agent with the U.S. Customs Service, I
5   began in Atlanta, Georgia and served there for just
6   under 8 years.  And prior to that I took a reassignment
7   to the U.S. Customs Service post in Vancouver or British
8   Columbia as a Customs representative.  And from that
9   location I promoted out and became a Supervisory Special
10  Agent in the Wayne Washington field office.  At the time
11  we merged and became DHS and then ICE.  And then I took
12  reassignment to ICE headquarters serving as a Section
13  Chief and Unit Chief within the National Security
14  Division.

15       And then on to an Assistant Special Agent in
16  Charge in our Houston, Texas field office.  Then back to
17  headquarters to serve at the Department of Justice
18  International Organized Crime Intelligence Operations
19  Center.  And then a reassignment to the Office of the
20  Director to serve as the Chief of Staff to the Deputy
21  Director.  And then as a Deputy Special Agent In Charge
22  in the Washington, D.C. field office.  Then Special
23  Agent in Charge in the Baltimore, Maryland field office.
24  Before a detail assignment to DHS headquarters to serve
25  as the Principal Deputy Assistant Secretary for the

1    Countering of Weapons of Mass Destruction field office.

2    Q.    And what do you do now, again?

3    A.    The Assistant Director for the National Security

4    Division.

5    Q.    How many people work for the National Security

6    Division approximately?

7    A.    Up to 400 employees, sir.

8    Q.    What is the mission of the National Security

9    Division?

10    A.    Our mission is to leverage Customs and Immigration

11    Authorities through programmatic support for HSI Special

12    Agents that are assigned to the FBI's Joint Terrorism

13    Task Force, as well as the Counterintelligence Task

14    Force, to HSI Special Agents that are assigned to our

15    Human Rights Violators and War Crimes Center -- as well

16    as Unit, and also to our Special Agents that are working

17    in the Counterintelligence Development Unit.  And

18    finally, with regards to the Student and Exchange

19    Visitor Program compliance and oversight functions for

20    just over 7,000 certified schools and universities in a

21    student population of just under 1.3 million.

22    Q.    The Student and Exchange Visitors Program, I think

23    I mixed up that.  Can you describe that a little bit?

24    A.    Yes, sir.  So that has primacy for oversight and

25    compliance functions as it relates to colleges and

1  universities that are SEVP certified.  So you're looking

2  at a population of just under 7,000 schools.  But you

3  also have designated school officials, just under

4  40,000, that are certified by SEVP, to coordinate the

5  functions of schools and universities in compliance with

6  the code of federal regulations.  And again, the student

7  population is just under 1.3 million currently in the

8  United States.

9  Q.    How does the enforcement of immigration laws under

10 Title VIII touch on issues of national security?

11 A.    With regards to Title VIII, um, we are talking

12 about non-immigration Visa holders and overstays, alien

13 overstays, but also foreign students that are studying

14 in the United States.  So by way of the movement of

15 people comes the opportunity for the United States

16 government to screen and vet those persons that are

17 coming into the United States.

18       So through our lines of effort and through

19 partnerships across the agencies, we work hand and glove

20 with the Department of Justice and the Department of

21 State to identify risk and innate vulnerabilities as it

22 relates to individuals that are presenting themselves

23 for inspection or entry into the United States.  But

24 also while they're here in the United States, to ensure

25 that they are in compliance with the laws thereto.  If

 1   there are threats or concerns that are raised, we
 2   coordinate with the inner agency to take action as
 3   appropriate.
 4   Q.    Why do these threats or concerns cause -- or how
 5   does that cause you, in the NSD, to take action?
 6   A.    With threats and concerns, we look to activities,
 7   associations, and/or conduct, and if there is linkage to
 8   foreign terrorist organizations or there are other
 9   national security or public safety concerns, those are
10   indicators of opportunities whereby further analysis and
11   review is required to determine if that person's
12   presence is contrary to law.
13   Q.    Since your work in 2003 with HSI, are you aware of
14   historical events where immigration concerns have
15   overlapped with the National Security Division's
16   mandate?
17   A.    Yes, sir.
18   Q.    And can you provide examples of those?
19   A.    Most recently, um, we've had instances of foreign
20   students that have made threats at colleges and
21   universities, and based on reports that came to the
22   attention of law enforcement either by way of local
23   law-enforcement representatives assigned to the Joint
24   Terrorism Task Forces or to the school officials.  HSI
25   was brought in to conduct criminal investigations in

1    coordination with the JTTF in the case of one school,

2    and in the case of another, after the fact, successfully

3    taking action by one, issuing NTAs, in the case of one

4    school, for individuals that were arrested on state

5    charges, and in the instance of the other, issuing an

6    NTA pursuant to a threat made by a student against a

7    university Professor.

8            THE COURT:  What's an "NTA"?

9            THE WITNESS:  A "Notice to Appear," your Honor.

10           THE COURT:  Thank you.

11   Q.    And are there other historical events where the

12   National Security Division has investigated matters

13   relating to immigration?

14   A.    Yes, sir, there is a continuous requirement in

15   that space where the National Security Division has

16   supported our Special Agents that are assigned to the

17   Joint Terrorism Task Forces, and I have the privilege of

18   seeing that information by way of reporting from my

19   personnel at FBI headquarters, sir.

20   Q.    Okay.  Was the Boston Marathon Bombing, was that

21   an example of such an immigration-related national

22   security concern?

23   A.    Yes, sir.

24   Q.    And how about the San Bernadino attack?

25   A.    Yes, sir.

1   Q.    Okay, let's be clear about something.  Does HSI

2   make evaluations about whether someone may or may not

3   receive a Visa?

4   A.    Yes, sir.

5   Q.    You make the evaluations or -- or how do you make

6   those evaluations?

7   A.    We contribute to that process.

8   Q.    I see.  And has that always been the case since

9   HSI was formed in 2003?

10  A.    To the best of my knowledge.

11  Q.    Does HSI make decisions to revoke a visitor's

12  Visa?

13  A.    No, sir.

14  Q.    What agency do you understand makes that decision?

15  A.    The Department of State, sir.

16  Q.    You were aware of the charges in the complaint,

17  um, filed by the American Association of University

18  Professors and other organizations, right?

19  A.    Yes, sir.

20  Q.    I'm going to refer to that organization as AAUP.

21        Are you familiar with the allegations that the

22  government is targeting certain foreign Visa and green

23  card holders for protesting?

24  A.    Yes, sir.

25  Q.    So that we can address them, describe your

 1    understanding of what those allegations are?

 2    A.    That we are looking to, um, foreign students

 3    and/or potential faculty members and targeting them

 4    based on their speech alone.

 5    Q.    Does the U.S. government target individuals for

 6    removal from the U.S. based solely on participating in

 7    public protests?

 8    A.    No, sir.

 9          MS. KRISHNAN:  Objection.

10          THE COURT:  The objection's overruled.  The answer

11    may stand.

12    Q.    In the last couple of years, have you been aware

13    of incidents relating to public safety at public

14    protests?

15    A.    Yes, sir.

16    Q.    And, um, how are you aware of that?

17    A.    Through reporting, um, to my division by way of

18    personnel assigned to the Joint Terrorism Task Forces.

19    Q.    Okay.  And I believe earlier you discussed threats

20    at school offices, right, is that what you're referring

21    to here?

22    A.    Yes, sir.

23    Q.    Has HSI turned its attention to what is happening

24    at certain on-campus protests?

25    A.    HSI is aware of those activities based on

1    referrals that come to our agency, sir.

2    Q.    AD Watson, people have the right to protest in

3    this country, don't they?

4    A.    Yes, sir.

5          MS. KRISHNAN:  Objection.

6    Q.    And people have the right to --

7          THE COURT:  Overruled in that form and the answer

8    may stand.

9    Q.    People have the right to peaceably assemble in

10   this country, correct?

11   A.    Yes, sir.

12   Q.    Then why is HSI aware or -- of what's happening at

13   protests around the country?

14   A.    Upon receipt of referrals and/or information to

15   our Office of Intelligence, sir.

16   Q.    And how does that trigger HSI's statutory

17   authority?

18   A.    The first opportunity comes from the allegation,

19   and then it is to, one, identify either associations or

20   activity, or conduct by persons that are identified in

21   the referral.

22   Q.    Why doesn't HSI just wait until an action or a

23   violence has happened to act?

24         MS. KRISHNAN:  Objection.

25         THE COURT:  Well I think that's too general.

1    Let's come to this case.

2    Q.    How many different Presidential administrations

3    have you worked under?

4    A.    At least 4 to 5, sir.

5    Q.    With the 4 to 5 administrations you've worked

6    under, have HSI's statutory authorities changed in any

7    material respect?

8    A.    No, sir.

9    Q.    A different question.

10        With any of these 4 to 5 administrations, has

11    HIS's priorities executing its statutory mission

12    changed?

13    A.    Yes, sir.

14    Q.    When the Trump administration was voted in in

15    November, did that alter in any respect HSI's statutory

16    mission?

17    A.    No, sir.

18    Q.    Since the beginning of President Trump's second

19    term, have the protocols or standards for HSI's

20    enforcement of its statutory mission changed in any

21    respect?

22        MS. KRISHNAN:  Objection, lack of foundation.

23        THE COURT:  Well to the extent of his authority

24    and knowledge, I'm going to let him answer.

25        Has it within your purview?

1           THE WITNESS:  No, sir.

2           THE COURT:  All right, that may stand.

3    Q.    Are you familiar with what an "Executive Order"

4    is?

5    A.    Yes, sir.

6    Q.    Can you describe for the Court your understanding

7    of what is an Executive Order?

8    A.    An Executive Order is what I will frame as the

9    Commander's intent, by way of the President of the

10   United States, and direction for the Executive Office,

11   and the agencies and department therein, to action

12   accordingly pursuant to the laws that they have

13   available.

14   Q.    In your career, have you had occasion to be part

15   of HSI's response when implementing the objectives of an

16   Executive Order?

17   A.    Yes, sir.

18   Q.    And based on that experience, describe for the

19   Court how HSI responds to Presidential executive orders?

20   A.    Upon more recently notification of an Executive

21   Order from the Trump administration, we look to identify

22   existing lines of effort in program divisions that can

23   complement the requirements or the desired in-state.  So

24   we're already looking at our lines of effort to include

25   tactics and procedures that could prove helpful in

1    fulfilling the requirements therein.

2          THE COURT:  Let me tell you what I heard you say.

3          In the current administration, upon receipt of

4    Executive Orders, you align your resources and

5    priorities, within the statutory framework or regulatory

6    framework, best to accomplish those goals, is that fair?

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  All right.

9    Q.    AD Watson, this year you referenced an Executive

10   Order, um, issued by the Trump administration.  Was this

11   Executive Order relating to national security?

12   A.    Yes, sir.

13         MR. KANELLIS:  Your Honor, may I approach?

14         THE COURT:  You may.

15         MR. KANELLIS:  Let the record reflect I am

16   presenting the witness what has been marked and admitted

17   into evidence as Exhibit 70.

18         Your Honor, I have a copy for you, if you would

19   like.

20         (Hands up.)

21         MR. KANELLIS:  70.

22         (On screen.)

23   Q.    Mr. Watson, have you had an opportunity to -- AD

24   Watson, have you had an opportunity to look over this

25   document?

1    A.    Yes, sir.

2    Q.    Are you familiar with this document?

3    A.    Yes, sir.

4    Q.    Briefly describe for the Court what is this

5    document?

6    A.    "Protecting the United States Against Foreign

7    Terrorists and other National Security and Public Safety

8    Threats."

9    Q.    And when did you, um, see this document for the

10   first time?

11   A.    The latter part of January 2025, sir.

12   Q.    And this came from President Trump's office,

13   correct?

14   A.    Yes, sir.

15   Q.    And what was your understanding of what this order

16   related to?

17   A.    Screening and vetting of, um, foreign nationals

18   and aliens.

19   Q.    When you received this Executive Order, did HSI

20   already conduct screening and vetting of foreign aliens?

21   A.    Yes, sir.

22   Q.    What did you do with respect to your

23   responsibilities in your office in response to this, um,

24   upon receipt of this Executive Order?

25   A.    Ensured that my subordinate staff, one, was aware,

1    and to executing operations accordingly.

2    Q.    What do you mean by "executing operations

3    accordingly"?

4    A.    Existing screening and vetting operations, sir.

5    Q.    And can you elaborate a little bit about what that

6    means in terms of what the National Security Division

7    actually did?

8    A.    Yes, sir.  So through process on an annual basis,

9    the National Security Division receives just under 1.3

10   million records from the U.S. Customs and Border

11   Protection arrival and departure information system.  In

12   addition to that, we also receive records from the

13   Student Exchange Visitor Information System, and we also

14   receive records from the Department of State Bureau of

15   Consular Affairs as it relates to potential overstays

16   that are believed to be within the Continental United

17   States.

18   Q.    Did you understand this Executive Order, when you

19   reviewed it and received it, to change HSI's authorities

20   in any way?

21   A.    No, sir.

22   Q.    Did you understand this Executive Order to change

23   HSI's protocols for arrest or investigation?

24   A.    No, sir.

25   Q.    Did it change or alter the tools HSI already had

1    available with respect to conducting investigations?

2    A.    No, sir.

3    Q.    Did you -- did HSI, in response to this Executive

4    Order, and your office in particular, develop a plan of

5    action to implement the objectives of this Executive

6    Order?

7    A.    Yes.

8    Q.    And can you describe, um, generally to the Court

9    what did that plan entail?

10   A.    That plan entailed a unit within the Office of

11   Intelligence to process referrals, um, from a variety of

12   sources, um, to complement the Executive Order and our

13   existing lines of effort.

14   Q.    Did that, um, initiative that you've just

15   described involve coordination with the Department of

16   State?

17   A.    Yes, sir.

18   Q.    And can you describe for the Court, um -- well,

19   strike that.

20         Had -- prior to this Executive Order, had HSI in

21   the past coordinated with the Department of State to

22   implement national security interests?

23   A.    Yes, sir.

24   Q.    And describe how you've done so, you, HSI and NSD,

25   have done so in the past?

A.    So in the past, with regards to coordination from
the Department of State, we've had that through our
Human Rights Violators and War Crimes Center, we've had
the pleasure of a virtual and/or part-time
representative from the Department of State supporting
that initiative in the space of human rights violators
and war criminals.

       Conversely, we've also leveraged that Department
of State asset through our Counterthreat Lead
Development Unit, as it relates to international
military students that are in the United States, that
sometimes go absent without leave.  And upon receiving
notifications from the Department of Defense of that
declaration, we then in turn coordinate with the
Department of State to make sure that they are aware of
that status issue, and then take appropriate action as
deemed necessary.

Q.    With respect to the Executive Order that is
contained in Exhibit 7, you indicated you coordinated
with State.  Well how did you -- what steps did you take
to coordinate with State?

       THE COURT:  Actually I'm going to interrupt.

       Your testimony is that following the Executive
Order, you developed a plan of action concerning these
matters.

```
 1          Is that written down anywhere?
 2          THE WITNESS:  Not to my knowledge, sir.
 3          THE COURT:  All right.  Describe it, as best you
 4   can, what's the plan now?
 5          THE WITNESS:  The plan was -- a team, based within
 6   the Office of Intelligence, that would conduct analysis
 7   on referrals from a variety of sources and prepare
 8   Reports Of Analysis for review and consideration and
 9   potential referral to the Department of State.
10          THE COURT:  And these Reports of Analysis, I've
11   heard them referred to as "ROAs," is that correct?
12          THE WITNESS:  Yes, your Honor.
13          THE COURT:  And that's -- in essence, that's the
14   plan?
15          THE WITNESS:  Yes, your Honor.
16          THE COURT:  Go ahead, Mr. Kanellis.
17          MR. KANELLIS:  Your Honor, you anticipated my next
18   line of questions.
19          THE COURT:  Well go ahead.
20   Q.    Which is, um, AD Watson, for purposes of this
21   trial, have you reviewed a visual depiction of the
22   collaborative process between DHS and State?
23   A.    Yes, sir.
24   Q.    And would this chart help you to explain to the
25   Court in understanding how that process worked?
```

```
 1    A.     Yes, sir.

 2           (Interruption.)

 3           THE COURT:  He hasn't shown it to you yet.  You're

 4    assuming it will help you.  I assume he's going to show

 5    you what we have marked as HN.

 6           Is that right?

 7           MR. KANELLIS:  HO?

 8           THE COURT:  Well maybe this is something else.

 9    All right.

10           MR. KANELLIS:  I'm not sure about HO.  I have the

11    exhibit here, your Honor, and we will --

12           (On screen.)

13           MR. KANELLIS:  Your Honor, may I approach?

14           THE COURT:  You may.

15           (Hands to witness and judge.)

16    Q.    AD Watson, we have on the screen here a visual

17    PowerPoint presentation to assist in your testimony to

18    the Court.

19           Can you describe to the Court, in a little more

20    detail, how this initiative between State and DHS works

21    with respect to DHS's response to the Executive Order?

22    A.     Yeah.  So as I understand it, the HSI Office of

23    Intelligence was the "process owner," if you will, by

24    way of their employees being criminal analysts to

25    conduct analyses of referrals of information from a
```

```
 1    variety of sources.  Those analysts in turn, um, upon
 2    receipt of those referrals, would conduct open-source
 3    analysis and various checks to, one, validate the
 4    availability of information and/or the referral, and
 5    they would put together what's called a Report of
 6    Analysis.  That Report of Analysis was prepared and
 7    reviewed and ultimately submitted for approval within
 8    the Office of Intelligence leadership framework, and
 9    then from there, um, with a letterhead memorandum
10    prepared, in coordination with the Office of the
11    Principal Legal Advisor as well as HSI's Special Agents
12    assigned to the Office of Intelligence on detail, a
13    package for referral to me as the Assistant Director.
14    Q.    Okay.  And so here we have, on the screen,
15    depicting the HSI Director for National Security -- the
16    Assistant Director for National Security Division, and
17    that's you?
18    A.    Yes, sir.
19    Q.    Now what did you do when you received this packet?
20    A.    Upon receipt of the approved packet, um, I then
21    reviewed the letterhead, um, memorandum -- the
22    letterhead memorandum letter, as well as the ROA, and
23    with approval signed it, meaning I'm approving the
24    submission package together, and providing a digital
25    signature, and then referred it to the Department of
```

1    State.

2         THE COURT:  I just want to -- your testimony was

3    you reviewed it, and with approval, signed it, those

4    were the words that you used.  But I understand that to

5    mean you reviewed it, and if you approved it, you signed

6    it?

7         THE WITNESS:  Yes, your Honor.

8         THE COURT:  All right.  I understand.

9    Q.    And with respect to the State Department, did you

10   participate in the internal processes of the State

11   Department regarding this referral you sent to them?

12   A.    No, sir.

13   Q.    Did you hear back from the State Department at any

14   point in time?

15   A.    Sometimes.

16   Q.    Sometimes.  Not all the time?

17   A.    Correct.

18   Q.    Okay.  Well let's pick up again from when you

19   heard back from the State Department.

20         What happened then?

21   A.    Thank you.  We, on occasion, would receive

22   notification from the Department of State that an action

23   letter is forthcoming by way of transmission from the

24   Department of State's Executive Secretary to the ICE

25   Executive Secretary.

1   Q.    And what happened next?

2   A.    Upon receipt of that correspondence, we would then

3   transfer it to the HSI Office of Domestic Operations and

4   then from there to the appropriate HSI field office for

5   action as deemed appropriate.

6        THE COURT:  Just so as I understand this chart.

7   Back it comes with the notation, "Action Letter," but

8   it's parallel, it runs through you and through the ICE

9   Executive Secretary, have I got that correct?

10       THE WITNESS:  Yes, your Honor.

11       THE COURT:  So who, um -- but once that action

12  letter comes out, I don't see any place where action

13  stops, it -- in any event you're notified, the Secretary

14  is notified, and the action letter moves on, because

15  this is a letter for action, to the HSI Domestic

16  Operations Division.

17       Have I got that right?

18       THE WITNESS:  Yes, your Honor.

19       THE COURT:  So you're notified, but you're not

20  asked to do anything else.  Now comes the action from

21  the Department of State?

22       THE WITNESS:  Yes, your Honor.

23       THE COURT:  Okay.

24       THE WITNESS:  And I would further add to that,

25  that in the beginning, some went to me directly, and the

1    others flowed through the Executive Secretary.  So

2    that's the reason why you have two arrows.  There were,

3    um, variations in who it went to.  But those were the

4    two recipients, either myself or the ICE Executive

5    Secretary.

6         THE COURT:  Or both?

7         THE WITNESS:  Yes, sir.

8    Q.    So then it went to the HSI SAC office, right?

9    A.    Yes, sir.

10   Q.    And in the SAC office, these are regional offices

11   that would be in the place where the individual and his

12   targeting is supposedly located, is that a fair

13   statement?

14   A.    Yes, sir.

15   Q.    Okay.  And then were arrests, um, made at that

16   point?

17   A.    Yes, sir.

18   Q.    And what if somebody had left the country, were

19   arrests made?

20   A.    No, sir.

21   Q.    Okay.

22        THE COURT:  Well he's given an example that would

23   justify these red boxes that say "No action."  But other

24   than having left the country already, where there other

25   grounds at that stage for no action?  Does my question

```
1   make sense?
2           THE WITNESS:  It does, your Honor.
3           For the purpose of this, um, matter, um, no.  But
4   in other contexts the answer can be no action.  Because
5   if someone does leave by way of a voluntary departure,
6   then there's no action, they left on their own accord.
7           THE COURT:  All right.
8           THE WITNESS:  So that's the reason why you would
9   have that box there.
10          THE COURT:  Thank you.
11          MR. KANELLIS:  Your Honor, we, pursuant to Rule
12  107, we move into evidence, as a pedagogical exhibit,
13  um, the exhibit, um, you have in your hand.
14          MS. KRISHNAN:  Objection, this is a chalk, it
15  doesn't need to be in evidence.
16          MR. KANELLIS:  Your Honor, you --
17          THE COURT:  Wait a minute.  I'm a little unclear
18  here, I guess.  I'm perfectly willing to take this as a
19  chalk as I took HN.  Isn't that satisfactory?
20          MR. KANELLIS:  Yes, your Honor, it's just a device
21  to aid the Court.
22          THE COURT:  It is, and it is as I understand it.
23  Q.   AD Watson, as HSI's Assistant Director for
24  National Security, do you have some familiarity with the
25  volume of protests that have occurred in the United
```

1    States after the attacks of October 7th, 2023?

2    A.    Yes, sir.

3    Q.    And, um, how would you describe the number of

4    protests based on your personal knowledge?

5    A.    It increased.

6    Q.    Have these protests occurred around the country?

7    A.    Yes, sir.

8    Q.    And to your knowledge have any of these protests

9    included speech against the State of Israel or in

10   support of Palestine?

11   A.    Yes, sir.

12   Q.    With respect to the volume of leads that the

13   National Security Division has reviewed, through this

14   process you've just described, has the volume of leads

15   increased by HSI -- received by HSI increased over the

16   last 6 months?

17   A.    Yes, sir.

18   Q.    How much would you say?

19   A.    Um, I'd give it a modest increase, sir.

20   Q.    And have you received leads regarding individuals

21   who have been associated with protests?

22   A.    Yes, sir.

23   Q.    And with respect to the leads you received

24   regarding individuals associated with these protests,

25   about how many total have you reviewed?

A.     At least 20.  But I don't believe more than 30,
sir.

Q.     So between the thousands of protests, you've
reviewed 20 or 30 referrals, is that a fair statement?

A.     Yes, sir.

       MS. KRISHNAN:  Objection, misstates testimony.

       THE COURT:  No, he just adopted it.  I'm going to
let that stand.

Q.     I'm going to ask you about five individuals who
passed through this referral process you've just
described?

       Are you familiar with the name "Rumeysa Ozturk"?

A.     Yes, sir.

Q.     Is Ms. Ozturk one of the individuals referred in
the vetting process between DHS and State that you just
described?

A.     Yes, sir.

Q.     Was Ms. Ozturk's referral processed through the
vetting procedures you've outlined above?

A.     Yes, sir.

Q.     And was Ms. Ozturk arrested?

A.     Yes, sir.

Q.     Was Ms. Ozturk arrested because she engaged in
political speech?

       MS. KRISHNAN:  Objection.

1          THE COURT:  Well I'm going to sustain that.  You

2    are leading this witness.  You called him.

3          MR. KANELLIS:  All right, that's fine.

4    Q.    Are you familiar with the name "Badar Khan Suri"?

5    A.    Yes, sir.

6    Q.    Is Mr. Suri one of the individuals referred in the

7    vetting process between DHS and State described above?

8    A.    Yes, sir.

9    Q.    And was Mr. Suri's referral given the same

10   multilevel vetting review you've described before?

11   A.    Yes, sir.

12   Q.    Was Mr. Suri arrested?

13   A.    Yes, sir.

14   Q.    Was Mr. Suri arrested because of his political

15   speech?

16          MS. KRISHNAN:  Objection, your Honor.

17          THE COURT:  Sustained.

18          MR. KANELLIS:  Your Honor, what is the basis for

19   the --

20          THE COURT:  You're leading the witness.

21   Q.    Do you know why Mr. Suri was arrested?

22   A.    Yes, sir.

23   Q.    Why was he arrested?

24   A.    Because the State Department took action on his

25   immigration status, sir.

1   Q.    Are you familiar with the name "Mohsen Mahdawi"?

2   A.    Yes, sir.

3   Q.    Is Mr. Mahdawi one of the individuals referred in

4   the vetting process between DHS and State that you

5   described to the Court?

6   A.    Yes, sir.

7   Q.    Did Mr. Mahdawi receive a full vetting for the

8   multiple levels of review you described?

9   A.    Yes, sir.

10  Q.    And was Mr. Mahdawi arrested?

11  A.    Yes, sir.

12  Q.    And why was Mr. Mahdawi arrested?

13  A.    A change by the Department of State in his

14  immigration status.

15  Q.    Are you familiar with the name, um, "Mahmoud

16  Khalil"?

17  A.    Yes, sir.

18  Q.    Is Mr. Khalil one of the individuals referred to

19  in the -- that's referred in the vetting process between

20  the Department of Homeland Security and State that

21  you've described to the Court?

22  A.    Yes, sir.

23  Q.    Did Mr. Khalil's case receive a full vetting

24  through the process you've described to the Court?

25  A.    Yes, sir.

```
1    Q.    Was Mr. Khalil arrested?

2    A.    Yes, sir.

3    Q.    And why was Mr. Khalil arrested?

4    A.    Action by the Department of State against his

5    immigration status.

6    Q.    Are you familiar with the name "Yunseo Chung"?

7    A.    Yes, sir.

8    Q.    Is Ms. Chung one of the individuals referred in

9    the process you've described regarding the State and DHS

10   collaboration you've described to the Court?

11   A.    Yes, sir.

12   Q.    And did Ms. Chung's case receive a full multilevel

13   review, the same multilevel review you've described to

14   the Court?

15   A.    Yes, sir.

16   Q.    In your career, AD Watson, going back more than 20

17   years to 2003, have you ever heard of a policy

18   instituted by the U.S. government to target people for

19   deportation based upon engaging in political speech?

20         MS. KRISHNAN:  Objection.

21         THE COURT:  Overruled.

22   A.    No, sir.

23   Q.    In the last year, have you heard about any Visa

24   revocation decisions or removal decisions made by anyone

25   in the U.S. government that remains solely because
```

```
 1    someone engaged in political speech?
 2          MS. KRISHNAN:  Objection.
 3          THE COURT:  Sustained.
 4    Q.    Are you aware, in the last year, of any decisions
 5    made by anyone in the U.S. government regarding removing
 6    a person from the United States for political speech?
 7          MS. KRISHNAN:  Objection.
 8          THE COURT:  Overruled.
 9    A.    No, sir.
10          MR. KANELLIS:  We tender the witness.
11          THE COURT:  Ms. Krishnan.
12
13    CROSS-EXAMINATION BY MS. KRISHNAN:
14    Q.    Good morning, Mr. Watson.
15    A.    Good morning.
16    Q.    You were the Assistant Director at the National
17    Security Division, correct?
18    A.    I am.
19    Q.    In HSI?
20    A.    Correct.
21    Q.    That makes you the senior-most official in the
22    National Security Division?
23    A.    Correct.
24    Q.    You report to Acting Deputy Executive Associate
25    Director William Russo?
```

A.     Today, yes.

Q.     And you've been in your current role since July
2020?

A.     Correct.

Q.     And you've worked at DHS since its inception?

A.     Correct.

Q.     In 2003?

A.     Correct.

Q.     The President has issued several Executive Orders
that relate to HIS's work, right?

A.     There are overlaps in the Executive Orders and
HSI's investigative authorities, yes.

Q.     You need to be familiar with these Executive
Orders to do your job?

A.     I'm sorry, I'm not following the question, Madam.

Q.     Well the Executive Orders that you say overlap
with HSI's work, you have to be familiar with those
Executive Orders to do your job, correct?

A.     We have to be familiar with our authority by way
of statute and that training comes from the Federal Law
Enforcement Training Center in Brunswick, Georgia.  So
those are the authorities that give us the ability to
conduct investigations.  So I would reference the
Homeland Security Act of 2003 as well as DHS Delegation
Order 7030.2, it is those authorities that give HSI the

```
1    ability to conduct criminal investigations.
2    Q.    So your testimony is that you don't need to be
3    familiar with Executive Orders that touch on HSI's work?
4          MR. KANELLIS:  Objection, mischaracterizes --
5          THE COURT:  Sustained, that wasn't his testimony.
6    Q.    Do you need to be familiar with Executive Orders
7    to do your job?
8    A.    (Pause.)  Do I need to have situational awareness
9    of Executive Orders?  It's helpful.
10   Q.    Did you tell Mr. Kanellis that you were familiar
11   with Executive Order 14161?
12   A.    May I see it again to make sure I'm speaking to
13   the correct one.
14         THE WITNESS:  (From Judge.)  Thank you, sir.
15   A.    (Looks.)  Yes.
16   Q.    This Executive Order is titled "Protecting the
17   United States from Foreign Terrorists and other National
18   Security and Public Safety Threats"?
19   A.    Yes, ma'am.
20   Q.    Okay.  And you are also familiar with Executive
21   Order 14188?
22   A.    By way of this matter, yes.
23   Q.    And it's titled, "Additional Measures" --
24         THE COURT:  Your answer then, that, um -- here's
25   what I hear.
```

```
1              Once this case came up and you were preparing to
2      testify and the like, you became more familiar with that
3      Executive Order, is that accurate what you were saying
4      to me?
5              THE WITNESS:  Yes, your Honor.
6              THE COURT:  And before that you may have known
7      that it existed, but at least in terms of touching on
8      what you say "situational awareness," doing your job,
9      you didn't have any particular, um, awareness of that?
10             THE WITNESS:  Yes, your Honor.
11             THE COURT:  Are my statements fair?  I don't want
12     to put anything in your mouth.
13             THE WITNESS:  Your statements are fair.  Yes, your
14     Honor.
15             THE COURT:  All right.
16             Go ahead.
17     Q.    ICE is enforcing Executive Order 14188, is that
18     correct?
19     A.    I'm sorry, state that again.  Someone was
20     coughing.
21     Q.    ICE is enforcing Executive Order 14188, isn't it?
22     A.    "Enforcing" the Executive Order?
23     Q.    Yes.
24     A.    May I see it, please?
25     Q.    You'd like to see the Executive Order?
```

1    A.    Yes, ma'am.  I don't have it in front of me.

2    Q.    It's being pulled up on the screen.

3    A.    Okay.  (Looks.)

4    Q.    All right.  I'm going to ask you again.

5          Is ICE enforcing the Executive Order 14188?

6    A.    So, Counselor, I only see Page 1 in front of me,

7    and this Executive Order speaks to specific lines of

8    effort and gives primacy to various departments.  So

9    I'll reference in Section 3, um, Section C, that the

10   attorney in general is encouraged to employ appropriate

11   civil rights enforcement authorities.  ICE is a

12   component within the Department of Homeland Security and

13   not within that framework.  So since I can only see the

14   first page, I don't think it's wise to speak beyond that

15   under oath.

16   Q.    And, Mr. Watson, you were deposed in this case,

17   correct?

18   A.    Yes.

19   Q.    You were deposed just over a month ago on June

20   11th?

21   A.    The month of June, yes.  The date I don't

22   remember.

23   Q.    And you understood that you were then under oath?

24   A.    Yes.

25   Q.    And you had an attorney present with you at that

1   deposition?

2   A.    Yes.

3   Q.    You were asked this question and gave this answer

4   at that deposition.

5         Question:  "So as you indicated in your

6   declaration, ICE enforces the Executive Order 14188,

7   correct?"  And your answer was "Yes, ma'am"?

8         MR. KANELLIS:  Objection, your Honor.  Can the

9   witness and can I see the transcript so we can --

10        THE COURT:  Well she's read it, and in these

11  circumstances, she's entitled to read it.  If she wants

12  to question him, then she should show it to him.  But

13  that's what he said on his deposition and I'm allowed to

14  pair it with his testimony at trial, and I do.

15        Go ahead.  Go ahead, Ms. Krishnan.

16        MS. KRISHNAN:  Thank you.

17  Q.    HSI is implementing the two Executive Orders we've

18  discussed?

19        MR. KANELLIS:  I'm going to object again, your

20  Honor, what she said mischaracterizes --

21        THE COURT:  Wait a minute.  When I need your

22  argument, I'll ask for it.  The objection is sustained.

23        See he hasn't said it.

24        MS. KRISHNAN:  I was reading from the data, but I

25  believe we've now got the deposition transcript up on

1    the screen.  And this starts at the bottom of Page 11,

2    um, 111, my apologies, and it runs on to the top of 112.

3         (On screen.)

4    Q.    So it says:  "So as you indicated in your

5    declaration, ICE enforces this Executive Order 14188,

6    correct?"  And the answer states, "Yes, ma'am."

7         You said that, right?

8    A.    It's captured in the transcript, Counselor.

9    Q.    Okay, thank you.

10        And HSI is implementing --

11   A.    I'm sorry, the screen just went dark.  I

12   apologize.  I can't see it anymore.

13   Q.    Understood.  I'm not asking -- this question isn't

14   about your deposition transcript.

15        HSI is implementing EO 14161 and EO 14188, is that

16   right?

17   A.    (Looks.)  HSI has participated in support of

18   Enforcement and Removal Operations as it relates to

19   Title VIII initiatives.  So by virtue of that support

20   that HSI, as a program office, has provided to ERO, that

21   that can apply on a large macro scale.  But I can't

22   speak to individual instances as I do not have oversight

23   of every operation or investigation that is being

24   conducted in the United States.

25   Q.    HSI has implemented the Executive Orders we've

1    discussed by initiating a new program, right?

2    A.    That's fair.

3    Q.    Uh-huh.  And you learned of this program through

4    an executive briefing in March?

5    A.    That's correct.

6    Q.    Attended by senior HSI leaders?

7    A.    That's correct.

8    Q.    Including Acting Deputy Executive Associate

9    Director Derrick Gordon?

10    A.    Gordon, yes.

11    Q.    And then Acting Executive Associate Director

12    Robert Hammer?

13    A.    That's correct.

14    Q.    Assistant Director of the Office of Intelligence

15    Peter Hatch was also present?

16    A.    That's correct.

17    Q.    As was your deputy, Bradley Etter?

18    A.    That's correct.  Well not my deputy, Mr. Etter is

19    the deputy of Assistant Director Peter Hatch.  Mr. Etter

20    works within the Office of Intelligence.  He's not my

21    deputy.

22    Q.    Understood.  And the purpose of this program, what

23    you called the Plan of Action letter, it was to identify

24    protesters whose actions violated the Executive Orders?

25    A.    (Pause.)  The plan of action was to address the

 1    referrals of information, um, as it relates to it.  So I

 2    can't say, as you stated, that is the plan of action,

 3    that's not what I recall specifically.

 4    Q.    But you became aware of activities at student

 5    protests from the Reports of Analysis, that was your

 6    testimony?

 7    A.    Me personally, yes.

 8    Q.    Okay.  And the program we'd been discussing, it

 9    led to a new process, right?

10    A.    I don't know that it's a new process, because I

11    can't speak to the lines of effort that the Office of

12    Intelligence already has in place.

13    Q.    Well I'm going to return to the deposition

14    transcript.  (Pause.)  All right, well before I get to

15    the transcript.

16          This process was new in your time at HSI, is that

17    right?

18    A.    It's new in my role as the Assistant Director

19    where we, by way of the National Security Division, are

20    providing a resource in support thereof.

21    Q.    Were you aware of this process before you assumed

22    your current role as Assistant Director in the National

23    Security Division?

24    A.    Not to my knowledge, no.

25    Q.    Okay.  And the process we're discussing, that

1    involved collaboration between the Office of

2    Intelligence, the National Security Division, and the

3    State Department, right?

4    A.    If you're referencing the meeting between

5    Mr. Hammer, Mr. Gordon, Mr. Hatch, Mr. Etter, and

6    myself?  Yes.

7    Q.    And pursuant to this process, the Office of

8    Intelligence creates Reports of Analysis?

9    A.    The Office of Intelligence creates Reports of

10   Analysis by way of a mission-essential function, that's

11   what they do regardless.

12   Q.    "Yes" or "No," the Office of Intelligence creates

13   Reports of Analysis?

14          MR. KANELLIS:  Objection, asked and answered.

15          THE COURT:  It was.  But just so I'm clear.

16          You've always been providing Reports of Analysis,

17   is that correct?

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  All right.  But then you have this

20   meeting -- here's what I'm getting from this.

21          So you have this meeting, and so your focus in

22   doing what you've always done, that does change about

23   the emphasis on a certain aspect of things.

24          Isn't that right?

25          THE WITNESS:  Yes, your Honor.

1         THE COURT:  All right.

2    Q.    And at this briefing, you discussed Reports of

3    Analysis on activities contrary to the Executive Orders,

4    those were the specific Reports of Analysis you

5    discussed at this meeting?

6         MR. KANELLIS:  Objection, your Honor.

7         THE COURT:  Sustained, on the deliberative process

8    privileged, what they discussed.

9         MS. KRISHNAN:  This concerns an instruction that

10   was provided at the briefing.

11        THE COURT:  Well you're cross-examining, you may

12   frame it that way, you were instructed thus and so.

13        MS. KRISHNAN:  Okay.

14   Q.    Was the Office of Intelligence instructed to

15   create Reports of Analysis on activities contrary to the

16   Executive Orders?

17   A.    I don't recall that instruction being given or

18   hearing it.  I don't recall.

19   Q.    Well as part of the process that we're describing,

20   the Office of Intelligence producing Reports of Analysis

21   on activities contrary to the Executive Orders?

22        THE COURT:  I guess I'm not following.  In other

23   words, among the duties that he was expected to see

24   implemented, was Reports of Analysis of activity that

25   ran contrary to the Executive Orders?

1          MS. KRISHNAN:  That's correct.

2          THE COURT:  All right.  I follow that.

3          Is that what you were told?  Is that what you were

4     expected to emphasize or focus on, Reports of Analysis

5     of conduct that, among other things, ran contrary to the

6     President's Executive Orders?

7          THE WITNESS:  That was a deliverable that would be

8     produced upon completion of analysis.  So it's an

9     output, your Honor, that could result from their efforts

10    to review information received from various sources.

11         THE COURT:  Right, I follow that.  So let me put

12    it to you another way.

13         One of the things you were directed to do was look

14    at your leads and see if, having done your professional

15    work, there's conduct contrary to the Executive Orders?

16         THE WITNESS:  Yes, sir, your Honor.

17         THE COURT:  All right.

18         Go ahead, Ms. Krishnan.

19         MS. KRISHNAN:  Thank you.

20    Q.    And these reports were then sent to the National

21    Security Division?

22    A.    If they were approved.

23    Q.    Approved by the Office of Intelligence?

24    A.    That's correct.

25    Q.    Uh-huh.  And upon receipt of these reports, the

1    National Security Division reviews them?

2    A.    That's correct.

3    Q.    And if the National Security Division determines

4    that an ROA should be referred to the State Department

5    for potential action, it refers that Report of Analysis

6    to the State Department?

7    A.    In coordination with the Office of the Principal

8    Legal Advisor.

9    Q.    Senior leaders at HSI have been continually

10   updated about the new program, correct?

11   A.    I don't understand the question in terms of

12   "continually updated"?

13   Q.    Well have senior leaders received updates about

14   the new program?

15   A.    They have received briefings and updates on the

16   work and progress thereto.

17   Q.    This program has been discussed in numerous

18   meetings since the executive briefing, right?

19   A.    (Pause.)  It has come up on several occasions from

20   its inception, but I can't say when those briefings

21   ceased.

22   Q.    Well it has been discussed on at least a weekly

23   basis, right?

24   A.    At its inception, yes.

25   Q.    And in these meetings, senior HSI leaders were

1    present?

2    A.    Yes.

3    Q.    I want to talk more about your role in the process

4    we've been discussing.

5          You received instructions in connection with the

6    process, right?

7    A.    Yes.

8    Q.    From senior HSI leaders?

9    A.    Yes.

10   Q.    Including Derrick Gordon?

11   A.    Yes.

12   Q.    And Robert Hammer?

13   A.    Yes.

14   Q.    You were instructed to make referrals to the State

15   Department?

16   A.    Yes, when deemed appropriate.

17   Q.    Uh-huh.  These referrals included the Report of

18   Analysis?

19   A.    Yes.

20   Q.    And an accompanying letter?

21   A.    Yes.

22   Q.    That was signed by you?

23   A.    Yes.

24         THE COURT:  I just want to get the names right.

25   From Derrick Gordon and Robert --

1        THE WITNESS:  Hammer.

2        THE COURT:  Hammer.  Yes.  Thank you.

3   Q.    And when deemed appropriate, you sent these

4   referrals directly to John Armstrong?

5   A.    He was one recipient, yes.

6   Q.    He's the head of the State Department's Bureau of

7   Consular Affairs?

8   A.    That is my last understanding.

9   Q.    HSI couldn't act on these referrals alone?

10  A.    Correct.

11  Q.    HSI needed Secretary of State Marco Rubio or

12  Senior Bureau Official John Armstrong to decide whether

13  it was appropriate for HSI to act or not?

14  A.    (Pause.)  Their decision is pursuant to their

15  authorities, not ours.

16        THE COURT:  Well I think what she's asking is you

17  understood that, um, when she says you "needed them"

18  under the law to take it any further, it was a decision

19  that resided by law in the Secretary of State or in some

20  instances Mr. Armstrong, is that what you thought?

21        THE WITNESS:  Yes, your Honor.

22        THE COURT:  All right.

23  Q.    And some of these referrals sought the Secretary

24  of State's assessment whether a noncitizen's activities

25  in the U.S. would compromise a compelling U.S. foreign

1    policy interest, right?

2    A.    Correct.

3    Q.    In some of these referrals, it was the State

4    Department's assessment whether to revoke a Visa,

5    correct?

6    A.    Correct.

7    Q.    You had conversations with the State Department

8    about these referrals?

9    A.    Only to inform that they are coming.

10   Q.    Okay.  The first time you had one of these

11   conversations was in March?

12   A.    That seems accurate.

13   Q.    You made the referral in Mahmoud Khalil's case?

14   A.    I signed the letter, yes.

15   Q.    And in Yunseo Chung's case?

16   A.    I signed that letter too.

17   Q.    In Rumeysa Ozturk's case?

18   A.    I signed that letter.

19   Q.    In Mohsen Mahdawi's case?

20   A.    I signed that letter.

21   Q.    In Badar Khan Suri's case?

22   A.    I signed that letter.

23   Q.    And these referrals I just mentioned, they were

24   part of any process we've been discussing?

25   A.    Yes.

1   Q.    All of these referrals went through you?

2   A.    Yes.

3   Q.    And you've made other referrals through this

4   process?

5   A.    Yes.

6   Q.    And as part of this new process, you've seen

7   Reports of Analysis that discuss a person's

8   pro-Palestinian views?

9   A.    (Pause.)  Some could have contained that

10  information, but I can't speak to every one without the

11  benefit of the document in front of me.

12  Q.    Some did in fact contain that information,

13  correct?

14        THE COURT:  Well he just answered that.

15        MS. KRISHNAN:  He said "could have."

16        THE COURT:  Okay, I stand corrected.  You are

17  right.

18        Are you able to testify that some did?

19        THE WITNESS:  I would respectfully ask your Honor,

20  since I'm under oath, to have the benefit of a review.

21        THE COURT:  All right.

22  Q.    At your deposition you were asked, "Since this new

23  program began in March, have you seen any ROAs that

24  discussed someone's pro-Palestinian views?"  And your

25  answer was "Yes."

1           Do you recall saying that?

2      A.    I do.

3      Q.    And you have seen ROAs that discuss a person's

4      anti-Israel view?

5      A.    I have seen those, yes.

6      Q.    You've also seen ROAs that discuss a person's

7      alleged pro-Hamas advocacy?

8      A.    Yes.

9      Q.    You've seen ROAs that discuss a person's alleged

10     antisemitic activities?

11     A.    Yes.

12     Q.    And your best recollection is that the number of

13     referrals that you have made since March is between 10

14     and 50?

15     A.    I do recall giving that answer, yes.

16     Q.    Uh-huh.  This was as of June, when we had the

17     deposition?

18     A.    Yes.

19     Q.    In deciding to make referrals as part of this

20     process, you have relied only on information contained

21     in the Reports of Analysis that you received, right?

22     A.    Yes.

23     Q.    In other words, the basis for referral in each

24     case was the Report of Analysis?

25     A.    Yes.

1   Q.    You read the ROAs you received before deciding

2   whether to refer them to the State Department?

3   A.    I review them, yes.

4   Q.    And you review them to determine whether they are

5   complete?

6   A.    Yes.

7   Q.    In other words, you review them to make sure that

8   they're readable?

9   A.    That's fair.

10  Q.    And to make sure the ROA contains what it says it

11  contains?

12  A.    That's fair.

13  Q.    And if they are complete, you send them to the

14  State Department?

15  A.    Yes.

16  Q.    In fact in every case you have received a Report

17  of Analysis as part of the new program we've been

18  discussing, you've referred it to the State Department?

19  A.    (Pause.)  Yes.

20  Q.    Because the question whether a Visa should be

21  revoked or whether a removability determination should

22  be made, that's a determination for the State Department

23  to make?

24  A.    Yes.

25  Q.    I'd like for us to look at one of the letters that

1   you wrote.  I will show you a document that has been

2   premarked as D by the government.

3           MS. KRISHNAN:  Your Honor, may I approach?

4           THE COURT:  This is not yet in evidence?

5           MS. KRISHNAN:  It's not in evidence, your Honor.

6           THE COURT:  You may.

7           (Hands.)

8           MR. KANELLIS:  Your Honor, I'm going to object to

9   the extent that this document is attorneys-eyes only.

10          THE COURT:  For that reason we're not going to put

11  it on the public screen, but we may use it.

12          MR. KANELLIS:  Thank you, your Honor.

13  A.    (Reads.)

14  Q.    This is a true and accurate copy of the referral

15  letter that you sent in Mr. Khalil's case?

16  A.    It appears to be the case.  But for clarification,

17  you said earlier a letter I "wrote," and there's a

18  difference between you writing a letter and signing a

19  letter.  So I want to be clear that in the questions

20  you've asked me up to this point, signing is applicable.

21  Q.    Okay, so this is a true and accurate copy of the

22  referral letter that you sent in Mr. Khalil's case?

23  A.    That I signed and that I sent.

24  Q.    Thank you.

25          MS. KRISHNAN:  I'd like to offer this as an

```
 1    exhibit, um, Number 242.
 2         MR. KANELLIS:  Objection, your Honor, no
 3    foundation for a hearsay exception.
 4         THE COURT:  Overruled.  It's admitted as Exhibit
 5    242 in evidence.
 6         (Exhibit 242, marked.)
 7    Q.   Now you testified at your deposition -- you
 8    testified at your deposition that you don't --
 9         THE COURT:  Well I think I should simply say for
10    everyone's guidance that my receiving it in evidence
11    means only that it is part of the record in this case
12    and, um, it does not lose its attorneys-eyes only
13    designation.  I think I've made that clear with respect
14    to documents given to plaintiffs and the like.  Where
15    it's agreed they're attorneys-eyes only, that
16    restriction remains until further order of the Court.
17         But go ahead, it is in evidence, and it's part of
18    the record upon which I will review and base my
19    decision.
20         Go ahead.
21         MS. KRISHNAN:  Thank you, your Honor.
22         May I just clarify that, um, what you just said
23    means that I can't, um, quote anything from the
24    document?
25         THE COURT:  No, you can.
```

```
 1          MS. KRISHNAN:  Oh, I can quote.  Thank you.
 2    Q.    Now you testified at your deposition that you
 3    don't determine whether an activity is antisemitic in
 4    your work, correct?
 5    A.    Ma'am, I don't have my testimony in front of me to
 6    confirm that, so it would be helpful, if that's
 7    available, to see it.
 8          MS. KRISHNAN:  Let me show it to you.
 9          (On screen.)
10    Q.    Could you read lines -- this is on Page 135, Lines
11    4 to 10.
12    A.    (Reads.)
13    Q.    And please tell me when you're done reading.
14    A.    Yes, I see that.  Yes, ma'am.
15    Q.    Thank you.
16          So you testified at your deposition that you don't
17    determine whether an activity is antisemitic, correct?
18    A.    Yes.
19    Q.    And you testified that you don't know how someone
20    else at HSI determines whether an activity is
21    antisemitic?
22    A.    Correct.
23    Q.    Now if you look at, um, 242, in the first sentence
24    here you state:  "I am writing to provide a summary of
25    the actions by Mahmoud Khalil that violate President
```

```
 1    Trump's Executive Orders on antisemitic"?

 2    A.     Uh-huh.

 3    Q.     So you don't know how HSI determines activities

 4    are antisemitic?

 5    A.     I don't because I didn't.

 6    Q.     Okay.  And so you don't know -- but you say here,

 7    um, that Mr. Khalil's actions violate President Trump's

 8    Executive Orders on antisemitism?

 9    A.     I signed the letter, yes.

10         THE COURT:  Who -- these letters, they may differ

11    in detail of course, but who would prepare such a letter

12    for your signature?

13         THE WITNESS:  The letters that --

14         THE COURT:  And I don't mean that disparagingly,

15    people prepare letters for my signature.

16         Go ahead.

17         THE WITNESS:  Thank you, your Honor.

18         So the letters accompany the ROA.  I don't know

19    who prepared it within the Office of Intelligence --

20         THE COURT:  But within the team that put the

21    packet together -- you get a packet?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  And you testified -- and I don't mean

24    to delay it, but you've testified to your review of the

25    packet, and having reviewed it and read the letter, you
```

1    have signed it.

2         Is that a proper characterization of your

3    involvement in these letters?

4         THE WITNESS:  Yes, your Honor.

5         THE COURT:  Go ahead.

6    Q.    When you signed this letter, did you adopt its

7    contents?

8         THE COURT:  Well I think that's what "signing"

9    means and that's the inference I'm going to draw.

10        MS. KRISHNAN:  Thank you, your Honor.

11   Q.    And just to be clear, the Executive Orders

12   referred to in this first sentence, they are EO 14161

13   and EO 14188, correct?

14   A.    That's fair.

15   Q.    Now during your deposition you testified that you

16   don't know how HSI assesses whether a person's presence

17   or activities in the U.S. could have adverse foreign

18   policy consequences?

19        MR. KANELLIS:  Objection, your Honor, what he

20   testified to in his deposition is irrelevant, she can

21   just ask him the question.

22        THE COURT:  Well I'll make that determination.

23   But he's present and so I think your use of the

24   deposition should be confined to impeaching him.  And

25   I'll sustain the objection on that ground.

Q.   You don't know how HSI assesses whether a person's
presence or activities in the U.S. could have adverse
foreign policy consequences?

A.   Can you repeat that question again, please?

     THE COURT:  You don't know whether a person's
presence or activities in the United States could have
adverse foreign policy consequences?

     THE WITNESS:  Correct.

Q.   And you don't know who at HSI makes that
determination?

A.   Correct.

Q.   So turning to -- back to the first sentence of the
first paragraph of Exhibit 242.

     It states that Mr. Khalil's actions, quote, "may
be sufficient for the Secretary of State to determine
there are compelling adverse foreign policy consequences
to the U.S. from Mr. Khalil's presence here," right?

A.   (Looks.)  I'm sorry, when you're reading that
sentence, did you say the first sentence in the first
paragraph?

Q.   Yes.

A.   (Reads.)  Okay.  "May be sufficient for the
Secretary of State to determine" -- yes.

Q.   So you don't know how HSI made that assessment?

A.   (Pause.)  I don't, but I would defer to the Report

1    of Analysis that was completed by the Office of

2    Intelligence and the intelligence professionals that

3    were responsible for it.

4    Q.    Is your testimony that the Report of Analysis

5    created by the Office of Intelligence included that

6    assessment?

7    A.    When you say "included that assessment," what do

8    you mean?

9    Q.    Well the assessment we've been talking about is

10   the Secretary -- that it may be sufficient for the

11   Secretary of State to determine that there are

12   compelling adverse foreign policy consequences to the

13   U.S. from Mr. Khalil's presence in the United States?

14   A.    The Report of Analysis that's done by the Office

15   of Intelligence professionals is materials that they

16   have found through their research, those materials are

17   what is provided in that determination for the benefit

18   thereof.

19   Q.    "Yes" or "No."  The Report of Analysis created by

20   the Office of Intelligence included the assessment that

21   I just described, that it may be sufficient for the

22   Secretary of State to determine that there are

23   compelling adverse foreign policy consequences for the

24   U.S.?

25        MR. KANELLIS:  Objection.

1      THE COURT:  No, she may have the question in that

2    form.  Overruled.

3      You may answer.

4    A.    By including the Report of Analysis as part of the

5    package?  I think that's fair.

6    Q.    And I'm asking about the contents of the Report of

7    Analysis?

8    A.    I understand, but I don't have that in front of

9    me.

10      THE COURT:  He answered your question that he

11    thought it was fair.

12      MS. KRISHNAN:  Okay, well the ROA will speak for

13    itself.

14    Q.    And the agency has not decided what activities

15    contrary to the EO means?

16    A.    I'm sorry, which agency?

17    Q.    ICE.  ICE has not decided what activities are

18    contrary to EO 14161 and EO 14188, correct?

19    A.    This letter is coming from HSI, so I can't speak

20    for ICE.  I can only speak to the program office on the

21    letter.

22    Q.    All right.  Let me ask about HSI then.

23      Has HSI -- withdrawn.

24      HSI has not decided what activity is contrary to

25    the Executive Order means?

A.    I'm sorry, is that a question for me?

Q.    That is a question for you.

A.    By way of the Report of Analysis being submitted
with the letterhead referral, it's for that
consideration.  Hence the word "may."

Q.    "Yes" or "No," Mr. Watson.  Has HSI decided what
activities are contrary to the Executive Orders?

THE COURT:  I guess really I don't understand the
question.  He's got before him a Report of Analysis.  He
signs the letter which was intended to move the thing
along to the Secretary of State, or to Mr. Armstrong
anyway, and I infer that he adopts what he signed after
reviewing the Report of Analysis.  So the logical
inference from that, given the language here, is that
the appropriate individuals who did the investigation
came to that conclusion.  But if you're asking whether
there was a separate, um, standard, "This conduct fits,"
"This conduct does not," that's a different question.
That's my confusion.

MS. KRISHNAN:  Your Honor, that's precisely why I
want to ask this question, because in his deposition
testimony he stated that HSI had not decided what
activities are contrary to --

THE COURT:  Well I haven't heard any evidence to
suggest that HSI has, as a general matter, decided it,

 1    and -- but again, I say that to help.

 2         About how much more have you got for this witness?

 3    Or phrased another way, do you want to take the morning

 4    recess?

 5         MS. KRISHNAN:  Yes, thank you.

 6         THE COURT:  All right.  We'll take the morning

 7    recess for one half hour till 11:15.  We'll stand in

 8    recess.

 9         (Recess, 10:45 a.m.)

10         (Resumed, 11:15 a.m.)

11         THE COURT:  Ms. Krishnan, you may continue.

12    Q.   Mr. Watson, just to finish the topic we were on

13    before the break.

14         HSI has not adopted standards for deciding what

15    activities violate the two EOs we have been discussing,

16    correct?

17    A.   Not to my knowledge.

18    Q.   And just returning to the letter, Exhibit 242.

19    The first sentence of the third paragraph states that:

20    "Mr. Khalil's involvement in the March 6th, 2025 protest

21    at Barnhard College aligns with the Executive Orders

22    focused on deporting Hamas sympathizers."

23         Do you see that?

24         MR. KANELLIS:  Objection, she misreads it.

25         THE COURT:  Well it's not exactly what it says,

1    but, um --

2          Do you see that sentence, sir?

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  That was her question.  So focus on

5    that sentence.

6          Now your question?

7          (Pause.)

8    Q.    So your testimony is that HSI has not adopted, um,

9    a standard for deciding what activities --

10         THE COURT:  He just testified to that.  Let's move

11   on.

12         MS. KRISHNAN:  All right.

13   Q.    You don't know whether EO 14188 indicates that it

14   is the foreign policy of the U.S. to combat

15   antisemitism, correct?

16   A.    I'm sorry, ask that question again, please?

17   Q.    You don't know whether EO 14188 indicates that it

18   is the foreign policy of the U.S. to combat

19   antisemitism, correct?

20   A.    I don't have that EO in front of me.  So maybe

21   that could be helpful, considering that I'm under oath.

22   Q.    I don't -- the question is whether you know or you

23   don't know?

24   A.    I don't know.

25   Q.    Okay.  And you haven't been told whether the U.S.

```
1   has a policy of combating antisemitism domestically or
2   abroad?
3   A.    I'm sorry, I haven't been told.  I'm trying to
4   understand the question.  There's an Executive Order.
5   Q.    The question is, you haven't been told that the
6   U.S. has a policy of combating antisemitism in America
7   and abroad?
8   A.    I don't recall being told, no.
9   Q.    In your letter, um, at the second line of the last
10  paragraph on the first page, you state that:  "HSI is
11  concerned that Mahmoud Khalil's protest activities,
12  quote, 'may undermine U.S. foreign policy.'"  Correct?
13  A.    Correct.
14  Q.    "May undermine U.S. foreign policy by creating a
15  hostile environment to Jewish students," right?
16  A.    That is one part of the sentence, yes.
17  Q.    You testified earlier, during your direct
18  examination, that your job at HSI is to protect national
19  security and public safety, right?
20  A.    Yes.
21  Q.    That is HSI's mandate?
22  A.    One of them, yes.
23  Q.    And you don't know whether antisemitic activity
24  falls within HSI's national security and public safety
25  mandate?
```

1          THE COURT:  Ask it again?  I didn't understand the
2    question.
3    Q.    You don't know whether antisemitic activity falls
4    within HSI's national security and public safety
5    mandate?
6          MR. KANELLIS:  Objection, foundation.
7          THE COURT:  Well to me it's too vague, because it
8    could.  It's so vague.
9          MS. KRISHNAN:  Okay.
10   Q.    Does antisemitic activity fall within HSI's
11   national security mandate?
12         THE COURT:  Again, I don't know what you mean by
13   "antisemitic activity."  Two of the witnesses you have
14   called have defined "antisemitism."  When we -- if we
15   have any time this morning, it's sort of sensitive, I
16   think -- we're not going to have a bifurcated trial
17   argument, but now that we're pretty much done with
18   evidence, I was going to make some observations sort of
19   to tee up what I'm thinking going into final arguments
20   and to define certain things.  One of the things I'm
21   going to define is "antisemitism."  And now that I
22   started talking -- and I'm going to define it in the way
23   plaintiffs' witnesses defined it, that is "hostility
24   based upon one's faith or ethnicity to the group."
25   That's what "antisemitism" is.

1    Now antisemitic activity can range from pure

2    speech to -- and we've seen it, horrific violence.  So I

3    don't know what that means.

4    The objection is sustained.

5    MS. KRISHNAN:  Understood, your Honor.  My

6    question is about antisemitic activity as that term is

7    used in Mr. Watson's letter.

8    THE COURT:  Well then can we ask him, to what did

9    you think that phrase meant?  What did you think that

10   phrase meant, "antisemitic activity," when you saw you

11   letter?

12   THE WITNESS:  Well there's more to that phrase,

13   and what's left out in the sentence you read was the

14   part about indicating support for a designated terrorist

15   organization, that is where HSI would be concerned

16   pursuant to, as you referenced, our posture and mission

17   as it relates to national security and public safety,

18   and by way of our participation on the Joint Terrorism

19   Task Forces.

20   Q.   So HSI is concerned about antisemitic activity

21   only insofar as it is tied to support for a designated

22   foreign terrorist organization?

23   A.   In this instance it's captured in the letter, each

24   is a case-by-case determination.

25   Q.   Well I'm asking generally, in the context of the

1    program that we've been talking about, is HSI concerned

2    about antisemitic activities only so far as it

3    demonstrates support for a designated foreign terrorist

4    organization?

5    A.    That could be a trigger in reference thereto, yes.

6    Q.    So is HSI -- so HSI is concerned about antisemitic

7    activity outside of that circumstance?

8    A.    I don't understand the question?

9          THE COURT:  No, no, that question makes sense

10    because your answer was "It could be a trigger."

11          THE WITNESS:  Yes.

12          THE COURT:  And as I listen to that, that suggests

13    that there's other forms of antisemitic activity that

14    also could be a trigger.

15          Is that what you meant to say?

16          THE WITNESS:  Yes.

17          THE COURT:  Tell me what they are?

18          THE WITNESS:  Other triggers could relate to

19    associations, activities, or conduct that violates the

20    Immigration and Nationality Act or U.S. law.

21          THE COURT:  Well do associations violate the Act?

22    You used the word "associations" and then you went to

23    conduct.

24          THE WITNESS:  Not necessarily, it's a case-by-case

25    determination.  Associations would warrant a further

1    investigation.

2        THE COURT:  For instance, as to one of these

3    individuals, it turned out that the wife of one of these

4    individuals, her father, was an alleged Hamas leader.

5    Now a law-enforcement agency, one imagines, would be

6    interested in that fact.  The fact itself might not be

7    useful, but that's certainly an interesting fact.

8    Whatever she's trying to get at, that's what I'm --

9        What else is there?

10        THE WITNESS:  So --

11        THE COURT:  Something like that?  That's an

12    association.

13        THE WITNESS:  The association could be relevant as

14    to a determination of admissibility.  So if that factor

15    is known by --

16        THE COURT:  Well my duty here is people we've

17    already admitted they're lawfully in here and the issue

18    the plaintiffs claim is that the way they were -- their

19    Visas were taken away or their status was taken away,

20    they challenge that, that's the issue.  So they're

21    lawfully here.

22        And we'll let you ask the next question.

23        (Pause.)

24    Q.    And so to be clear, HSI is concerned about

25    associations that demonstrate antisemitic activity

1    whether or not it's linked with terrorist activity?

2    A.    Foreign terrorist activity can be a cornerstone

3    and it can expand.  I would defer to the investigation

4    and the analysis to determine if this is something that

5    should be referred for consideration in coordination

6    with the Office of the Principal Legal Advisor.

7    Q.    Does antisemitic activity, as that term is used in

8    your letter, fall within either the national security or

9    public safety mandates of HSI?

10   A.    It can based upon conduct.

11   Q.    Okay.  At your deposition you were asked, quote,

12   you said that "HSI's topics in areas of interest include

13   national security and public safety."  My question is

14   "Whether antisemitism falls within either national

15   security or public safety for HSI?"  And your answer was

16   "I don't know."

17   A.    I recall that, yes.

18   Q.    And you don't know whether pro-Palestinian

19   advocacy falls within HSI's national security and public

20   safety mandates?

21   A.    I don't know.  But if an allegation is received or

22   information is referred, an investigation or inquiry can

23   be conducted to determine if the activity or conduct is

24   contrary to law.

25   Q.    Contrary to law?

```
 1   A.     Uh-huh.

 2   Q.     Not contrary to the Executive Orders?

 3   A.     Contrary to law, as I stated.

 4   Q.     Well does "contrary to law" include the two

 5   Executive Orders we've been discussing?

 6   A.     It could if the conduct aligns within that

 7   framework.

 8          THE COURT:  No, no, she's trying to get at

 9   whether, in your view, the Executive Orders, standing

10   alone, are another source of action?

11          THE WITNESS:  No, sir, not alone.

12          THE COURT:  Okay.

13   Q.     You have written other letters like the ones we've

14   been discussing relating to Mahmoud Khalil, correct?

15   A.     Yes.

16   Q.     I'd like to show you a document that has been

17   premarked as B by the government.

18          THE WITNESS:  And, your Honor, if I may?

19   A.     Once again, you're saying the word that I've

20   "written" other letters.  I've clarified it earlier in

21   my testimony that I've signed them.

22   Q.     My apologies.  You've signed other letters like

23   this one?

24   A.     Yes.

25          MS. KRISHNAN:  May I approach, your Honor?
```

1          THE COURT:  Of course.

2          (Hands to witness.)

3    Q.    This is a true and accurate copy of the referral

4    letter that you sent in Ms. Chung's case?

5    A.    (Looks.)  Yes.

6          MS. KRISHNAN:  I offer this as Exhibit 243.

7          THE COURT:  Any objection?

8          MR. KANELLIS:  Um, no, your Honor.  But it is

9    attorney-eyes only.  I'll just make that --

10          THE COURT:  And I've spoken to that.  It's

11    admitted in evidence, Exhibit 243.  We understand it's

12    attorneys-eyes only.

13          (Exhibit 243, marked.)

14    Q.    I'd now like to show you a document that's been

15    premarked as Exhibit F by the government.

16    A.    (Looks.)

17    Q.    Is this a true and accurate copy of the referral

18    letter that you sent in Mr. Mahdawi's case?

19    A.    (Looks.)  It appears to be.

20          MS. KRISHNAN:  I offer this as Exhibit 244.

21          MR. KANELLIS:  No objection subject to the

22    attorneys-eyes only designation, your Honor.

23          THE COURT:  And I understand that it is.  It's

24    Exhibit 244 in evidence.

25          (Exhibit 244, marked.)

1    Q.    I'd now like to show you a document which has been

2    premarked as Exhibit H by the government.

3    A.    (Looks.)

4    Q.    Is this a true and accurate copy of the referral

5    letter that you sent in Ms. Ozturk's case?

6    A.    It is one that I digitally signed, but the

7    reproduction uses off-key terminology in the header on

8    Page 2.

9         THE COURT:  I guess I -- I appreciate your

10   patience, Mr. Watson, but looking back at Exhibit 244

11   and its second page, it reads, um, on the second page,

12   "Homeland Security Investigations RE," and then the

13   individuals, and in that case it was Mahdawi, um, and

14   Page 2.  Here what's left off, as I compare them, is

15   "Homeland Security," and the second line is hard to make

16   out, but it appears to be "Rumeysa Ozturk, Page 2."

17        Have I compared them correctly?

18        THE WITNESS:  Affirmative, your Honor.

19        THE COURT:  Very well.

20        Go ahead.

21        MS. KRISHNAN:  I'd like to offer it as Exhibit

22   245.

23        MR. KANELLIS:  No objection subject to the --

24        THE COURT:  No objection, it's Exhibit 245 in

25   evidence.

1          (Exhibit 245, marked.)

2     Q.    I have one more letter that I would like to show

3     you.  This document has been premarked as Exhibit I by

4     the government.

5     A.    (Reads.)

6     Q.    Is this a true and accurate copy of the referral

7     letter that you sent in Mr. Suri's case?

8     A.    Yes, ma'am.

9          MS. KRISHNAN:  I'm offering this as Exhibit 246.

10          MR. KANELLIS:  No objection, subject to the

11    attorneys-eyes only restriction, your Honor.

12          THE COURT:  Noted, and it is, but it's admitted as

13    Exhibit 246 -- not but it's admitted, and it's admitted.

14          (Exhibit 246, marked.)

15    Q.    Just so we're clear.  Before an official

16    determination is made by the State Department after

17    receiving a referral letter, a notice goes from the

18    State Department to HSI about the State Department's

19    forthcoming action?

20    A.    I'm not following on that question, ma'am?

21          THE COURT:  Nor am I, Ms. Krishnan.

22          (Pause.)

23          MS. KRISHNAN:  I'll clarify.

24    Q.    Before an official determination is made by the

25    State Department, there are sometimes informal

1    communications between the State Department and HSI,

2    correct?

3         MR. KANELLIS:  Objection, foundation.

4         THE COURT:  Well that's pretty general.  But in

5    letters of this sort where the basis is the concern

6    about a Title VIII violation, um, limited to that, and

7    limited to, um, subsequent to January 20th in the Trump

8    administration, is that correct?

9         THE WITNESS:  It can happen.

10        THE COURT:  Well do you -- and I've been given

11   this chalk and the next arrow on the chalk is the arrow

12   that says "Action Letter."

13        Now she properly asks, between your transmittal

14   letter in and an action letter out, with the limitations

15   that I've just posed, do you recall interaction with

16   State Department officials?  Do you recall?  You don't

17   have to be the one interacting, but do you recall such

18   interactions?

19        THE WITNESS:  I don't recall them.

20        THE COURT:  You don't.  All right.

21        THE WITNESS:  With the referral going over in

22   between?

23        THE COURT:  Right.

24        THE WITNESS:  I don't recall it.

25        THE COURT:  Once they got it.

1        THE WITNESS:  Right.  I don't recall that.

2        THE COURT:  All right, that's his answer.

3   Q.    A change in a person's immigration status doesn't

4   have to result in arrest, correct?

5        THE COURT:  Well there's been this whole -- it's

6   not a matter of this case, but I can take judicial

7   notice of proceedings in other cases.

8        There was this whole business where apparently

9   tapping into the FBI's database, a whole raft of student

10  Visas were cancelled.  I had 9 in one case, 2 in

11  another.  And about 50 temporary restraining orders

12  resulted.  The reason being that the FBI's database, for

13  perfectly logical reasons, has arrests in it.  It isn't

14  just limited to convictions.  So action allegedly was

15  being taken that these people had committed crimes.  It

16  is still the fact in the United States that a person is

17  innocent until convicted.  And, um, my understanding, as

18  far as I've spoken, I think I'm on sound ground.

19       My understanding is that they -- but I'm not clear

20  who "they" is, has revised that policy and now is

21  scrutinizing things in a different way.  I don't see

22  what that has to do with this case?

23       But go ahead, Ms. Krishnan.

24       MS. KRISHNAN:  Thank you.

25  Q.    You said, in your direct examination, that people

1    were arrested because of a change in their immigration

2    legal status, correct?

3    A.    Correct.

4    Q.    A change that was affected by a determination by

5    the State Department?

6    A.    Correct.

7    Q.    And that change in a person's immigration status,

8    that doesn't have to result in arrest, correct?

9    A.    (Silence.)

10          THE COURT:  Well, again if we're talking about

11   this case --

12          MS. KRISHNAN:  We are.

13          THE COURT:  All right.

14          My belief is that, um, for instance, taking away

15   someone's student Visa does not automatically unleash

16   the enforcement and removal officers of Homeland

17   Security.  I'm talking about something else.

18          So is the question you're asking, um, once an

19   action letter is received, an action letter from the

20   Department of State is, um -- I'll ask this question.

21          An action letter from the Department of State,

22   that does trigger an arrest, it triggers action.  That's

23   the action that it triggers, isn't it?

24          THE WITNESS:  It can, yes.

25          THE COURT:  It can.  But it need not, is that

1    right?

2        THE WITNESS:  When you receive the action letter

3    from the Department of State saying that the Visa has

4    been revoked or the status has changed, it, one, can

5    trigger a redetermination.  So with that notice, that

6    goes to Domestic Operations and it goes to the HSI field

7    office.  That HSI field office works in coordination

8    with the Principal Legal Advisor in, one, crafting and

9    preparing a notice to a peer for the person in question

10   before an immigration judge, pursuant to the action from

11   the Department of State.

12       THE COURT:  I see.  I see.  And you've already

13   gone over the -- which we needn't go over again.  If you

14   can't find the person, it turns out they've left the

15   United States, then that action letter, no further

16   action is necessary?

17       THE WITNESS:  Yes, your Honor.

18       THE COURT:  But your answer to me is back comes

19   the action letter, out goes -- in the usual course, a

20   notice to appear --

21       THE WITNESS:  Yes, sir.

22       THE COURT:  -- and proceedings follow?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  Thank you.

25       Go ahead, Ms. Krishnan.

```
1    Q.    You don't know what inquiry the State Department
2    does once it receives a referral letter from you,
3    correct?
4    A.    Correct.
5    Q.    Mr. Khalil was arrested on March 8th of this year.
6    Do you know the date of his letter from his case?
7    A.    (Looks.)  March 7th is the date stamp.
8    Q.    Thank you.
9          MS. KRISHNAN:  No further questions.
10         THE COURT:  Nothing further for this witness?
11         MR. KANELLIS:  No, sir.
12         THE COURT:  Very well.  You may step down.  Thank
13   you.
14         (Steps down.)
15         THE COURT:  Is that all the -- as I hear it,
16   that's all the witnesses we have for today?
17         (Silence.)
18         THE COURT:  All right.  Let me stop the clock
19   then.
20         (Pause.)
21         THE COURT:  The total elapsed time is the
22   plaintiffs, 3 days, 2 hours, 45 minutes.  The defense, 2
23   days, 40 minutes.
24         There are motions for the Court that I should act
25   upon and I am going to at this time.
```

1          There is a motion to seal the, um -- a certain

2     motion, a discovery motion.  That motion is -- the

3     motion to seal is allowed.  The motion to compel is

4     denied as wholly untimely.

5          The matter of an adverse inference is premature.

6     We're not going to -- I'm not going to consider adverse

7     inferences until I come to consider the whole case.

8          So that takes care of ECF documents.  I just ruled

9     on Document 214.  The motion to seal was Document 215.

10          I also have Document 211, a motion to compel

11     additional documents.  This appears to be the list to

12     which reference has been made in the course of the

13     trial.

14          The -- I think these documents are within the

15     scope of the stay.  The request asks for documents

16     within the scope of the stay.  So I'm not going to rule

17     on it.  But because it might be helpful, um, if I were

18     permitted to rule on it, I can give an indicative

19     ruling.  My indicative ruling is that I would deny it as

20     to the first bullet point on the first page as

21     overbroad, and the last bullet point on the second page,

22     because it's imprecise.

23          As to all the other documents, I would allow the

24     motion, and if those documents are in the possession of

25     the Court, and I believe certain action memos are, I

1    would, um -- and having reflected on it, I would deny --

2    excuse me, I would overrule the, um, asserted privileges

3    and, um, turn them over to the defense, at least to

4    subject them to cross-examination.  They'll be before

5    the Court in any event, but I will turn them over to the

6    defense, um, and they might be used during the cross-

7    examination of Mr. Armstrong, if ever I'm permitted to

8    cross-examine Mr. Armstrong.

9         Now let's talk about what we're going to do here.

10        MR. KANTER:  Your Honor, may I pose a question?

11        THE COURT:  Yes.

12        MR. KANTER:  Your reference, if I am permitted to

13   allow the cross-examination of Mr. Armstrong.  The

14   question pertains to your Honor's deliberative process

15   ruling privilege on Monday regarding the Armstrong

16   action memos in which you denied the deliberative

17   process privilege claimed on the merits except as to

18   certain interlineations which you found were.

19        THE COURT:  Right.

20        MR. KANTER:  It is our understanding that the

21   mandamus petition concerns privilege rulings that either

22   have not yet been made or were made solely based on

23   waiver.  Therefore it is our understanding that your

24   ruling regarding the action memos on the merits permits

25   those action memos to be, um, the subject of cross-

1    examination of Mr. Armstrong, which, um, there's no

2    objection from the government on, um, allowing that,

3    they are subject to attorneys-eyes only, which occurred

4    today regarding Mr. Watson.

5        Therefore, as it relates to action memos, um, that

6    is not, in our understanding, as an impediment to the

7    cross-examination of Mr. Armstrong, which we'd like to

8    put on tomorrow morning.

9        THE COURT:  And you've answered me.

10       What do you say to that?

11       MR. BIALE:  I'd say that we agree, your Honor.

12       THE COURT:  Wonderful.

13       MR. BIALE:  Except insofar as the other action

14   memos have not been disclosed, I think those should

15   follow within the same rubric.

16       THE COURT:  But we're going to.

17       MR. BIALE:  I'm sorry, I should let Ms. Conlon

18   address this.

19       THE COURT:  I said what I would do.  The other

20   action memos in the possession of the Court will be

21   disclosed forthwith, subject to attorneys-eyes only, and

22   we will make copies just as soon as I get off the bench.

23   And the copies, the government will have copies of what

24   we may copy, so they know exactly what it is.  Now I

25   find that very helpful.

1        And that being so, and I think it will be clear

2    that we will finish the evidence tomorrow, now let's

3    talk about what will happen.

4        MR. KANTER:  And one -- I'm sorry to interrupt.

5        THE COURT:  But please don't be.  The one time I

6    didn't want to be interrupted, I was quick to say so.

7    But other than that --

8        Go ahead.

9        MR. KANTER:  Okay.

10        Mr. Armstrong, although he appeared in person for

11    direct is unable to appear in person for cross-

12    examination tomorrow.  If he can appear by --

13        THE COURT:  So long as you can arrange it, that

14    will be fine with the Court, I'm eager to get it

15    concluded.

16        MS. CONLON:  Your Honor, I understand the Court is

17    willing, but I want the record to be clear that we

18    object, because he testified here in person and the

19    Court had the benefit of seeing his demeanor and

20    everything else, and we don't think it's fair that we

21    don't get the benefit of having him back here.  So I

22    appreciate the ruling is moot, but I just want to lodge

23    our objection.

24        THE COURT:  And you have, but I adhere to my

25    ruling.  I've tried entire civil cases remotely.  I can

 1    see his demeanor sufficiently.

 2        All right, now let's talk about what's going to

 3    happen.

 4        45 minutes for argument.  The plaintiffs will

 5    argue last.  The defense will argue first.  When shall

 6    we do it?  Shall we do it on Monday or do you want to

 7    put it off further?

 8        MR. KANTER:  Um --

 9        THE COURT:  What's the government's position?

10        (Pause.)

11        MR. KANELLIS:  Your Honor --

12        THE COURT:  You were ready Friday.

13        MR. KANELLIS:  We can do it tomorrow or -- I would

14    defer to the Court.  I think you are in a better

15    position to guide us as to what you want.

16        THE COURT:  Well I'm going to make the

17    determination.

18        MS. KRISHNAN:  Your Honor, if the Court would be

19    amenable, Monday would be preferable to the plaintiffs.

20        THE COURT:  Monday.  We'll do it Monday -- well I

21    work for Ms. Belmont, but I believe we are able to do

22    it.

23        45 minutes a side is an hour and a half.  I know

24    I'll have questions.  And, um, shall we start at 10:00,

25    will that be more convenient?  You're all here ready to

1    start at 9:00.  I'll be ready to start at 9:00.  I'm

2    asking if it would be more convenient to start at 10:00?

3              MS. KRISHNAN:  10:00 is fine.

4              THE COURT:  Very well.

5              MS. CONLON:  Your Honor, we have another question

6    concerning closing arguments, if that's okay?

7              THE COURT:  Of course it's okay.

8              MS. CONLON:  If plaintiffs wish to split the

9    closing argument between two attorneys is that

10   permissible?

11             THE COURT:  That's fine for this case.

12             MS. CONLON:  Okay.

13        And with respect to time, if plaintiffs have less

14   than 45 minutes remaining of trial time, we presume

15   plaintiffs just have less than 45 minutes for argument.

16   But we just want to confirm our understanding.

17             THE COURT:  Your understanding is correct.

18             MS. CONLON:  Okay.

19             THE COURT:  Now before I move off that, but

20   recognizing that, um, we're going to have final

21   arguments on Monday, um, I think it's appropriate to say

22   a few words about -- I think they're words in a

23   definitional sense, and I'm going to mention words as I

24   did with antisemitism.  And all I'm stating, and I just

25   state it to be helpful, is how I think these words

1   figure in this first amendment case.

2        I do it with some diffidence because, um, I

3   recognize that, um, a quick definition that I give here

4   necessarily may lead or apply in a somewhat different

5   guise in the totality of the circumstances as presented

6   by the facts.  But I really do think that it would be

7   helpful if my operating definitions were known to the

8   parties.  That does not make them right.  And it's open

9   to the parties to simply say that they are wrong and

10  support it with both factual support in the case and,

11  um, legal support, if I'm wrong.

12       So let me just start, because these words are used

13  in the documents before the Court, and this is the

14  meaning to which, as I approach final argument, I

15  ascribe to them.  I've already spoken to antisemitism.

16       "Antisemitism" is that feeling of hostility to a

17  person or a group on account of faith or certain

18  ethnicity.  I consider that it is a fit subject of the

19  United States government to discourage antisemitism and,

20  um, just as it would and should discourage Islamophobia,

21  any sort of anticlericalism, and indeed hostility to

22  atheists, sectarian hostility, it's not part of the

23  America cannon.  And it is a fit object of government to

24  discourage it and encourage inclusiveness and, um, our

25  ability to live together as citizens and lawful

1   visitors.

2        Antisemitism or antisemitic speech, standing

3   alone, is not illegal.  It may be repulsive, but it's

4   not illegal.  It is protected under the First Amendment.

5        Now let me jump to a word, a very broad-brush word

6   on foreign policy, because it is not within the purview

7   of this Court's authority to comment on the foreign

8   policy of the United States, that, quite clearly,

9   perhaps more than anything else in our separation of

10   powers, is committed to the Executive.  But because

11   events that figure in this case are significant, um, and

12   truly trying to stay away from any commentary, I think I

13   go into final argument thinking this.

14        That Hamas, in October 2023, initiated a horrific,

15   I'll use that normative word, against the State of

16   Israel and its people.  Israel responded with its full

17   military force and the struggle between the two

18   continues to this day.  The foreign policy of the Biden

19   administration was strongly to allie itself and support

20   the State of Israel.  That foreign policy has been

21   followed by the Trump administration and if anything

22   made more supportive.

23        And I mean nothing normative by this, but it

24   appears that at least with respect to the conduct of the

25   State of Israel in its war -- and I will call it "war,"

1    against Hamas, the foreign policy of the United States

2    is to allie virtually, 100 percent with the foreign

3    policy of the State of Israel.

4           Now to get back to definitions.  Criticisms of the

5    State of Israel are not antisemitism, they're political

6    speech, protected speech.  Even strong, violent

7    criticism speech -- well violence is not acceptable, and

8    that use of the word was probably wrong.  But I meant

9    vile criticisms of the State of Israel and its policies

10   are protected speech.  I think I can be this specific

11   saying that, um, the conduct of the State of Israel

12   is -- involves war crimes, it involves genocide, um,

13   those matters are protected speech.  Anyone is allowed

14   -- well put aside the "anyone," but it's protected

15   speech under the First Amendment to our Constitution.

16          What else?  (Pause.)  I think that's probably

17   sufficient.  Well a couple of legal questions.

18          The, um -- I take it we're agreed that Executive

19   Orders do not have the force of law.  But feel free to

20   challenge the Court on this.

21          I have asked the question at the beginning, um,

22   and I'm not sure of the answer, but I asked whether a

23   person not a citizen of the United States, but lawfully

24   here in the United States, has the same First Amendment

25   rights as a citizen?  As I have worked on this case

1    during the course of the case, and my own research,

2    leads me to think that probably they do.  The answer is

3    in the affirmative.  Again we're talking about pure

4    speech, we're not talking about conduct that puts

5    someone in fear or even more than that is, um, a threat

6    of violence against a person.

7            Oh, there is one other definition.  Criticism of

8    the State of Israel, the use of the words that I

9    mentioned, does not -- it's political speech, it does

10   not constitute pro-Hamas, um, support.  Pro-Hamas

11   support has to be something more than, um, that.

12           And I think that's the -- I think that's where

13   I'll stop.  I'm not going to entertain questions on

14   this.  When you get to arguing, I will pull

15   hypotheticals and we can go back and forth.  Please feel

16   free to challenge anything the Court has said, I've said

17   it just to help.

18           The Court is authorized to take judicial notice at

19   any time in a proceeding so long as I give notice that I

20   am taking judicial notice.  I think -- and I don't know

21   how this plays at all, honestly, and everything I say to

22   you is honest, but I am prepared to take judicial notice

23   that Steven Miller is the President's prime advisor on

24   immigration matters.  That's all.  I mean nothing

25   normative by that.

1        Now one other matter we should raise, and I think

2    it's ripe now, but we can raise it on Monday.  How long

3    do you want after final argument, where you will heard

4    my hypotheticals and where I push back and where I

5    don't, how long would you like for the filing of

6    requested findings and rulings?

7        MR. KANELLIS:  Your Honor, we ask for two weeks,

8    if that's not too long.

9        MR. BIALE:  And, your Honor, we would ask to

10   submit it next Friday.

11       THE COURT:  No, I'm going to give the two weeks.

12   I'm not insensitive to how this case started, but the

13   matter is complex.

14       So two weeks from, um, next Monday will be --

15   well Monday is the 21st, so that is Monday the 4th of

16   August.

17       Now the matter, as I indicated when I spoke the

18   other day, the matter then will be under advisement.

19   I'll move with all speed to address the matter.

20       The only other loose end is, um, these orders are

21   how we will proceed and conclude unless the Court of

22   Appeals enters some affirmative order that requires

23   action by this Court, and if it does, I will obey.

24       Are there any questions?  Though I'm not going to

25   get into any discussion, definitions, or legal issues.

1    Any questions on the part of the plaintiffs?

2    MS. KRISHNAN:  No, your Honor.

3    THE COURT:  The defense?

4    MR. KANELLIS:  No, your Honor.

5    THE COURT:  Again, thank you all.  9:00 tomorrow

6    morning.

7    We'll recess.

8    (Ends, 12:10 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5     hereby certify that the forgoing transcript of the

 6     record is a true and accurate transcription of my

 7     stenographic notes, before Judge William G. Young, on

 8     Thursday, July 17, 2025, to the best of my skill and

 9     ability.

10

11

12

13
       /s/ Richard H. Romanow 07-17-25
14     _____
       RICHARD H. ROMANOW   Date
15

16

17

18

19

20

21

22

23

24

25
```