DAN LAIDMAN (CA SBN 274482)
        *Counsel for Amici Curiae*
Davis Wright Tremaine LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6886
Email: danlaidman@dwt.com

GABRIEL ROTTMAN
        *Counsel for Amici Curiae*
        *Pro Hac Vice Application Pending*
MARA GASSMANN*
ALLYSON VEILE*
        *Of counsel*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
Email: grottman@rcfp.org

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> *Defendants*. | Case No. 5:25-cv-06618-NW <br><br> **BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: November 19, 2025 <br><br> Hearing Time: 9:00 AM <br><br> Judge: Hon. Noël Wise |

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Committee to Protect Journalists is a nonprofit organization with no parent corporation and no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iv

STATEMENT OF INTEREST OF AMICI CURIAE ....................................................... vii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 3

   I.   Non-citizen journalists perform important public interest reporting every day. ..................... 3

   II.  Allowing the government to wield removal and detention as a tool to punish protected speech would impermissibly chill newsgathering and reporting in the public interest, and do so in numerous ways. ....................................................... 5

CONCLUSION .......................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Abourezk v. Reagan*,
   592 F. Supp. 880 (D.D.C. 1984),
   *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986) .................................. 10

*Am. Acad. of Religion v. Chertoff*,
   463 F. Supp. 2d 400 (S.D.N.Y. 2006) ......................................................................................... 10

*Am. Ass'n of Univ. Professors v. Rubio*,
   No. CV 25-10685-WGY, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ..................................... 10

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ..................................................................................................................... 5

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982) .................................................................................................................. 5, 6

*Bridges v. Wixon*,
   326 U.S. 135 (1945) ............................................................................................................ 1, 3, 5, 6

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..................................................................................................................... 8

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ..................................................................................................................... 6

*Khalil v. Trump*,
   No. 25-CV-01963, 2025 WL 1514713 (D.N.J. May 28, 2025) ...................................................... 9

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ..................................................................................................................... 6

*Mahdawi v. Trump*,
   781 F. Supp. 3d 214 (D. Vt. 2025) ........................................................................................... 2, 7

*Massieu v. Reno*,
   915 F. Supp. 681 (D.N.J. 1996),
   *overruled on other grounds*, 91 F.3d 416 (3d Cir. 1996) ............................................................ 9

*Matal v. Tam*,
   582 U.S. 218 (2017) ..................................................................................................................... 6

*Neb. Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ..................................................................................................................... 5

iv

*Öztürk v. Trump*,
   779 F. Supp. 3d 462 (D. Vt. 2025)......................................................................... 2

*Öztürk v. Trump*,
   783 F. Supp. 3d 801 (D. Vt. 2025)......................................................................... 7

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)................................................................................ 6, 7

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)...................................................................................... 6

*Sessions v. Dimaya*,
   584 U.S. 148 (2018).............................................................................. 3, 5, 9

**Statutes**

8 U.S.C. § 1182(a)(3)(C)(iii) ...................................................................... 1, 9

8 U.S.C. § 1182(a)(3)(C)(iv) ......................................................................... 9

8 U.S.C. § 1201(i) ............................................................................... vii, 1, 9

8 U.S.C. § 1227(a)(1)(B) .............................................................................. 9

8 U.S.C. § 1227(a)(4)(C)(i)................................................................... vii, 1, 8

8 U.S.C. § 1252(g) .................................................................................... 7

Immigration and Nationality Act,
   8 U.S.C. §§ 1101 *et seq.*............................................................................ vii

**Other Authorities**

Aneer Rukh-Kamaa, Off. of Homeland Sec. Stat.,
   *U.S. Nonimmigrant Admissions: 2023* (Aug. 2024),
   https://perma.cc/4L3U-UC6V ...................................................................... 3

Angela Fu, *Foreign Journalists in the U.S. Are Self-Censoring to Protect Themselves
   from the Trump Administration*, Poynter (July 14, 2025),
   https://perma.cc/CY3Z-ZYG6 ...................................................................... 8

Br. of Amici Curiae Reporters Comm. for Freedom of the Press, Comm. to Protect
   Journalists, PEN Am., Reporters Without Borders, & Student Press L. Ctr.,
   *Öztürk v. Hyde*, No. 25-1019 (2d Cir. Sept. 9, 2025) ...................................... vii

Br. of Amicus Curiae Reporters Comm. for Freedom of the Press,
   *Guevara v. Warden*, No. 5:25-cv-00086 (S.D. Ga. Sept. 15, 2025) ......................... vii

BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND
THE COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – CASE NO. 5:25-CV-006618-NW

*Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes,
   http://bit.ly/4fcczDv (last visited June 13, 2025)...................................................... 4

Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*,
   N.Y. Times (Sept. 9, 2024),
   https://perma.cc/WQ53-QTTD ................................................................................. 4

Lingling Wei et al., *China Puts Six-Month Limit on Its Ease of Rare-Earth Export
   Licenses*, Wall St. J. (June 11, 2025),
   https://perma.cc/U55V-8J99 ..................................................................................... 4

Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*,
   Wall St. J. (Feb. 13, 2025),
   https://perma.cc/X8JM-7UVG .................................................................................. 4

Lingling Wei, *Behind Xi Jinping's Pivot on Broad China Stimulus*,
   Wall St. J. (Oct. 15, 2024),
   https://perma.cc/6DZY-SQXC ................................................................................. 4

Lingling Wei, *Forced to Leave China—and My Family*,
   Wall St. J. (June 6, 2020),
   https://perma.cc/PRE2-RFUA .................................................................................. 4

*Lingling Wei*, Wall St. J.,
   https://perma.cc/9434-86H3 (last visited Aug. 15, 2025)........................................ 3

Order,
   *Khalil v. Trump*, No. 2:25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316 .................................. 8

Peter Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks for
   Their Reporting*, Am. Cmty. Media (Apr. 24, 2025),
   https://perma.cc/X4HD-5RMA ................................................................................. 8

Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*,
   NPR (Feb. 2, 2015),
   https://perma.cc/E6M2-L8VK .................................................................................. 4

Stephania Taladrid, *Jorge Ramos, The Voice of Latino America*,
   The New Yorker (Aug. 17, 2024),
   https://perma.cc/YQZ5-ELW3................................................................................ 4, 5

1

## STATEMENT OF INTEREST OF AMICI CURIAE

2

Proposed amici curiae are the Reporters Committee for Freedom of the Press ("Reporters

3

Committee") and the Committee to Protect Journalists ("CPJ") (together, "amici"), organizations

4

that work to defend the First Amendment and newsgathering rights of journalists.  Amici have an

5

interest in ensuring that the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, is

6

not interpreted and enforced in a manner that hinders or dissuades the press from gathering and

7

reporting the news.

8

Amici write to underscore the chilling effect that would result from the use of the foreign

9

policy grounds for deportation codified at 8 U.S.C. § 1227(a)(4)(C)(i), as well as the unilateral visa

10

revocation provision codified at 8 U.S.C. § 1201(i), to target First Amendment-protected

11

newsgathering and reporting in the public interest.

12

Lead amicus, the Reporters Committee, is an unincorporated nonprofit association founded

13

by leading journalists and media lawyers in 1970 when the nation's news media faced an

14

unprecedented wave of government subpoenas forcing reporters to name confidential sources.

15

Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal

16

resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The

17

Reporters Committee regularly files as amicus in cases involving issues relating to the ability of the

18

press to gather and publish the news, and it has submitted briefs in recent cases where the

19

government has argued that constitutional challenges by non-citizens to their detentions under the

20

immigration laws are unreviewable in the district courts.  *See, e.g.*, Br. of Amici Curiae Reporters

21

Comm. for Freedom of the Press, Comm. to Protect Journalists, PEN Am., Reporters Without

22

Borders, & Student Press L. Ctr., *Öztürk v. Hyde*, No. 25-1019 (2d Cir. Sept. 9, 2025); Br. of

23
24
25
26
27
28

BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND
THE COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – CASE NO. 5:25-CV-006618-NW

Amicus Curiae Reporters Comm. for Freedom of the Press, *Guevara v. Warden*, No. 5:25-cv-00086 (S.D. Ga. Sept. 15, 2025).

CPJ is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in New York City. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

**INTRODUCTION**

"Freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). That principle of law is essential to *domestic* press organizations, which often rely on the unique expertise of non-citizen journalists to report information of public concern on a range of national and international issues, as well as the United States electorate, which depends on that expertise to understand what is happening in this country. Allowing the government to deploy removal as a tool to target and punish reporting that it perceives as critical or unfavorable would give the government a powerful means of attempting to deter non-citizen journalists from engaging in protected newsgathering and speech *and* would thus deprive U.S. audiences of important reporting on matters of public concern.

The provisions of the Immigration and Nationality Act ("INA") that Plaintiffs challenge here—8 U.S.C. § 1227(a)(4)(C)(i) and 8 U.S.C. § 1201(i)—each authorize the government to do exactly that. The "foreign policy grounds" of 8 U.S.C. § 1227(a)(4)(C)(i) allow the Secretary of State to declare a non-citizen deportable whenever the Secretary has "reasonable ground to believe" that the non-citizen's "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States." Indeed, the provision also explicitly permits the Secretary to seek removal based on "lawful . . . beliefs, statements, or associations" if the Secretary personally determines that the non-citizen's presence in the United States would "compromise a compelling United States foreign policy interest" and notifies the chairs of the House and Senate Judiciary and Foreign Relations Committees of that determination. *See id.*; 8 U.S.C. § 1182(a)(3)(C)(iii). Finally, the unilateral visa revocation provision of 8 U.S.C. § 1201(i) allows the Secretary to "at any time, in his discretion, revoke" *any* visa issued to any non-citizen, for any reason or for no reason.

1

The danger that these provisions will be used to punish protected speech, including reportage, is apparent on the face of the statutory language, and it is also no longer hypothetical. Plaintiffs file this case against the backdrop of an alarming trend:  The government has in recent months deployed the foreign policy grounds to seek removal after a student gave a speech at a protest, *see, e.g.*, *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 230 (D. Vt. 2025), and deployed the unilateral visa revocation provision to revoke the visa of Rümeysa Öztürk, a student at Tufts University after she co-bylined an op-ed in her university's newspaper, *see Öztürk v. Trump*, 779 F. Supp. 3d 462, 473 (D. Vt. 2025).  In proceedings challenging her detention, the only justification the government has offered thus far for "any of [its] adverse actions towards Ms. Öztürk is her co-authored op-ed."  *Id.* at 490.  Because the foreign policy grounds and unilateral visa revocation provisions threaten to chill important newsgathering and reporting in the public interest, amici write to offer the following two arguments in support of Plaintiffs.

*First*, there are many non-citizen journalists in the United States, and they perform public interest newsgathering and reporting every day.  Indeed, they are often uniquely situated to report on certain topics and communities.  They have special linguistic, cultural, geographic, and other knowledge that makes their reporting particularly valuable in certain contexts.  Subjecting these non-citizen journalists to removal and detention at will, based expressly on their reporting, would chill important reporting generally and would mean that specific news beats—immigration enforcement, for instance—could be affected more than others.

*Second*, the chilling effect caused by the recent deployments of the authorities at issue in this case could be particularly pernicious for non-citizen journalists.  One, as noted, the chill could fall more heavily on certain reporting topics, leading to a type of viewpoint discrimination that threatens to skew public discourse in favor of the government.  Two, the chill is amplified by the fact that the

2

government has asserted the power to *detain* its targets for visa revocation and removal pending

adjudication of the removal proceeding.  And, three, the chill is further compounded by the inherent

vagueness in both the visa revocation and removal provisions, especially the fluid and often

unknowable nature of what constitutes U.S. "foreign policy."  As such, these provisions produce

"hopeless indeterminacy, inconsistent with due process" under well-settled vagueness

principles.  *See Sessions v. Dimaya*, 584 U.S. 148, 158 (2018) (citation and internal quotation marks

omitted).

Amici accordingly urge this Court to grant summary judgment in favor of Plaintiffs.

## ARGUMENT

### I.    Non-citizen journalists perform important public interest reporting every day.

There are many thousands of non-citizen journalists working in the United States whose

speech is entitled to full First Amendment protection.  *See, e.g.*, *Bridges*, 326 U.S. at 148 ("Freedom

of speech and of press is accorded aliens residing in this country.").  For instance, the primary non-

immigrant visa for foreign journalists working for foreign publications is the I-Visa.  There were

approximately 12,150 journalists admitted on that visa in 2021; 25,270 admitted in 2022; and

32,470 admitted in 2023.  *See* Aneer Rukh-Kamaa, Off. of Homeland Sec. Stat., *U.S. Nonimmigrant

Admissions: 2023*, at 2 (Aug. 2024), https://perma.cc/4L3U-UC6V (admission figures include

spouses and children of foreign journalists).  There are many more non-citizen journalists working

under different visas or who are permanent residents.

Congress has welcomed non-citizen journalists to work in the United States for good reason.

Foreign-born and non-citizen journalists are often uniquely situated to report or write on topics of

importance based on particular personal and professional experiences and cultural understandings.

For example, Lingling Wei is the chief China correspondent for *The Wall Street Journal*, based in

New York.  *Lingling Wei*, Wall St. J., https://perma.cc/9434-86H3 (last visited Aug. 15, 2025).  Wei is a Chinese-born reporter who became a naturalized U.S. citizen in 2010, after she had spent eleven years studying and then working as a journalist in New York.  Lingling Wei, *Forced to Leave China—and My Family*, Wall St. J. (June 6, 2020), https://perma.cc/PRE2-RFUA.  After becoming a naturalized citizen, Wei worked for a decade in the *Journal*'s China Bureau, but she was expelled from China in 2020 along with several other American journalists, at which point she returned to the U.S.  *Id.*  She and several other members of the staff of the *Journal*'s Beijing Bureau were finalists for a Pulitzer Prize in 2021 for their in-depth series on China's leader, Xi Jinping.  *See Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes, http://bit.ly/4fcczDv (last visited June 13, 2025).  Wei's recent work has included coverage of U.S.-China trade negotiations, Lingling Wei et al., *China Puts Six-Month Limit on Its Ease of Rare-Earth Export Licenses*, Wall St. J. (June 11, 2025), https://perma.cc/U55V-8J99; China's involvement in negotiations to end the war in Ukraine, Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*, Wall St. J. (Feb. 13, 2025), https://perma.cc/X8JM-7UVG; as well as Chinese domestic affairs, Lingling Wei, *Behind Xi Jinping's Pivot on Broad China Stimulus*, Wall St. J. (Oct. 15, 2024), https://perma.cc/6DZY-SQXC.

Similarly, Jorge Ramos worked for forty years as a news anchor based in Miami for Univision, providing news coverage to the Spanish-speaking community in the United States.  Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*, N.Y. Times (Sept. 9, 2024), https://perma.cc/WQ53-QTTD.  Ramos immigrated to the United States from Mexico on a student visa in 1983 and did not become a U.S. citizen until 2008.  Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*, NPR (Feb. 2, 2015), https://perma.cc/E6M2-L8VK. He has been called the "Walter Cronkite of Latino America" and his nightly news show averaged

over a million viewers.  *Id.*  As an immigrant himself, he is well-positioned to serve the informational needs of his audience.  Stephania Taladrid, *Jorge Ramos, The Voice of Latino America*, The New Yorker (Aug. 17, 2024), https://perma.cc/YQZ5-ELW3.  His background and skills have allowed him to interview not only sitting U.S. Presidents, such as Barack Obama and George W. Bush, but also Spanish-speaking leaders of many Latin American countries, including Fidel Castro and Hugo Chávez.  *Id.*  As such, his reporting offers unique insights into his subjects. *Id.*

As these examples illustrate, foreign-born journalists who come to the United States and work as non-citizens—whether they ultimately seek naturalization or not—often possess specialized linguistic and cultural knowledge that makes them particularly skilled at covering certain topics or subjects, irrespective of citizenship status.  And the editorial content they produce, including their viewpoints, is unquestionably First Amendment-protected speech.  *See Bridges*, 326 U.S. at 148. Excluding that content would not just irreparably harm our constitutional commitment to a free press, it would leave profound gaps in our national discourse.

II.    **Allowing the government to wield removal and detention as a tool to punish protected speech would impermissibly chill newsgathering and reporting in the public interest, and do so in numerous ways.**

Wielding removal as a tool to suppress speech, including reporting the government considers unfavorable or the expression of editorial viewpoints with which the government disagrees, would unquestionably chill newsgathering in the public interest.  "[E]ven minor punishments can chill protected speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), and removal represents a "drastic measure, often amounting to lifelong banishment or exile," *Sessions*, 584 U.S. at 157 (citation and internal quotation marks omitted).  By physically preventing a non-citizen journalist from engaging in newsgathering and reporting, the removal of a non-citizen

1   journalist has an "immediate and irreversible" impact on the right to gather and report the news, as

2   much so as any classic prior restraint.  *Cf. Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

3   And, meanwhile, domestic audiences would be deprived of access to removed non-citizens'

4   reporting.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867

5   (1982) (plurality opinion) (noting First Amendment protects not just the right to speak but "the right

6   to receive information and ideas" (citation omitted)); *see also Kleindienst v. Mandel*, 408 U.S. 753,

7   762–65 (1972) (discussing right to receive information from non-resident aliens).

8       The threat of removal based on protected speech also has the potential to chill *other* non-

9   citizen reporters from reporting on matters that may prove controversial.  For foreign journalists

10  working within the United States—particularly for those that could not work as journalists in their

11  country of origin for fear of retaliation for their reporting—that threat imposes "as great a hardship

12  as the deprivation of the right to pursue a vocation or a calling."  *Bridges*, 326 U.S. at 147.  Non-

13  citizen journalists faced with the risk of deportation for their reporting may well be discouraged

14  from reporting or publishing on matters that could draw the attention of immigration authorities.  In

15  that way, the foreign policy grounds and visa revocation provisions could operate like content- or

16  viewpoint-based restrictions on speech, suppressing, for example, hard-hitting coverage of

17  increased immigration enforcement or other politically sensitive topics.  Courts have rejected

18  viewpoint discrimination as antithetical to our nation's First Amendment, and it is virtually never

19  permitted.  *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)

20  ("Viewpoint discrimination is thus an egregious form of content discrimination."); *Matal v. Tam*,

21  582 U.S. 218, 234 (2017) ("[T]he First Amendment forbids the government to regulate speech in

22  ways that favor some viewpoints or ideas at the expense of others[.]" (citation omitted)); *Iancu v.*

23  *Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) (calling viewpoint discrimination "poison

24

25

26

27

28

to a free society"). Yet permitting visa revocation, lengthy detention, and removal—all based on protected speech—would inevitably lead to the suppression of both news generally and would give the authorities a potent means of constraining news coverage of particular subjects.

The decision in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AADC*"), cited by the government in its cross-motion for summary judgment, is not to the contrary. That case stands for the narrow proposition that "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the *additional* reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491–92 (emphasis added). That is, in *AADC*, the government had retained various "technical violation" charges against the majority of the non-citizen plaintiffs seeking relief, *see id.* at 473–74, and the Court concluded that 8 U.S.C. § 1252(g) deprived federal courts of jurisdiction to review First Amendment claims arising from selective enforcement of those violations at that stage. *Id.* at 487. But *AADC* does not address cases in which speech "is the *only* reason for instituting removal proceedings." *Mahdawi*, 781 F. Supp. 3d at 225 n.4. Where the government seeks to rely on provisions that can on their face and in practice be applied solely based on protected speech, imposing deportation "as a punishment" would run headlong into the First Amendment in a manner that was not at issue in *AADC*. *See AADC*, 525 U.S. at 491 (noting "[e]ven when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose)" but not addressing situations where deportation is sought solely on the basis of protected speech or where criminal charges would be impermissible by virtue of the First Amendment).

It is worth emphasizing also that deportation is not the only consequence of the government's efforts to apply the foreign policy or unilateral visa revocation provisions to protected speech. In many of these cases, it has not just sought removal but has asserted the power to *detain* non-citizens for the duration of their removal proceedings and has argued that the detention is unreviewable until a removal order is issued and a petition for review can be filed in federal appellate courts. *See, e.g.*, *Öztürk v. Trump*, 783 F. Supp. 3d 801, 814 (D. Vt. 2025) (ordering release after more than a month in detention); Order, *Khalil v. Trump*, No. 2:25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316 (ordering release after more than three months in detention). The risk of detention clearly ratchets up the stakes and the potential chilling effect. While the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), immigration detention pending adjudication can last for months or years. Non-citizen journalists faced with the risk of months-long detention may be especially discouraged from reporting or publishing on matters that could draw the attention of immigration authorities—further suppressing First Amendment-protected activity.

There are indications this is already happening. Some non-citizen journalists based in the United States are taking steps to self-censor in response to the Trump administration's stepped-up immigration enforcement. *See, e.g.*, Angela Fu, *Foreign Journalists in the U.S. Are Self-Censoring to Protect Themselves from the Trump Administration*, Poynter (July 14, 2025), https://perma.cc/CY3Z-ZYG6. Estefania Arellano-Bermudez, for example, is a reporter based in Detroit who is also a Deferred Action for Childhood Arrivals, or DACA, recipient. She told American Community Media she is often asked to cover ICE raids in Michigan because of her "rooted perspective" and expertise with the immigration system. Peter Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks for Their Reporting*, Am. Cmty. Media (Apr. 24, 2025),

https://perma.cc/X4HD-5RMA.  Arellano-Bermudez has felt the chilling effect of the government's immigration enforcement tactics, indicating that she is now more likely to turn down certain stories because she fears her reporting could make her a target.  *Id.*

Finally, the chilling effect described above is amplified further by the ever-changing and often secret nature of U.S. "foreign policy."  The foreign policy grounds permit the Secretary to seek removal based on the Secretary's belief that the non-citizen's "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences."  8 U.S.C. § 1227(a)(4)(C)(i).  Though § 1227(a)(4)(C)(ii) incorporates the "exceptions" of 8 U.S.C. § 1182(a)(3)(C), those exceptions do not cure § 1227(a)(4)(C)'s defects.  Instead, § 1182(a)(3)(C) explicitly allows the Secretary to base a deportation decision on a non-citizen's "past, current, or expected beliefs, statements, or associations" when "such beliefs, statements, or associations would be lawful within the United States," so long as the Secretary "personally determines that the alien's admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii), and certifies as much to Congress, *id.* § 1182(a)(3)(C)(iv).  And 8 U.S.C. § 1201(i) provides that the Secretary "may at any time, in his discretion, revoke such visa or other documentation," *see id.* § 1227(a)(1)(B) (cross-referencing *id.* § 1201(i)), for any reason or for no reason, including, presumably, protected newsgathering and reporting.

Each provision's breadth produces "hopeless indeterminacy, inconsistent with due process" under settled vagueness doctrine.  *See Sessions*, 584 U.S. at 158 (citation and internal quotation marks omitted).  Indeed, the foreign policy grounds have been found by courts as likely unconstitutional on exactly that theory.  In *Massieu v. Reno*, a district court found the foreign policy grounds unconstitutionally vague because "there is no conceivable way that an alien could know, *ex-ante*, how to conform his or her activities to the requirements of the law" when foreign policy is

"unpublished, ever-changing, and often highly confidential."  915 F. Supp. 681, 700 (D.N.J. 1996), *overruled on other grounds*, 91 F.3d 416 (3d Cir. 1996).  And in a recent case, another judge found the foreign policy grounds likely unconstitutional when invoked based on protected expression.  *See Khalil v. Trump*, No. 25-CV-01963, 2025 WL 1514713, at *50–52 (D.N.J. May 28, 2025) (finding a lawful permanent resident likely to succeed on merits of as-applied vagueness challenge).  Those concerns are only amplified in § 1201(i), which does not even include amorphous foreign policy concerns as a guidepost.

In sum, were the foreign policy grounds and visa revocation provisions deployable by the government based on protected newsgathering and reporting, their use—coupled with the threat of detention and the inherent vagueness in their terms—promises an acute chilling effect on public interest journalism by non-citizen journalists.  And it is difficult to see how either could survive under any standard of scrutiny as applied to protected speech and reporting, because "political speech is not, on its own, a facially legitimate reason for expelling persons from this country."  *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *46 (D. Mass. Sept. 30, 2025) (citing *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986) and *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415 (S.D.N.Y. 2006)).  As such, they should be found unconstitutional as applied to protected speech.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to grant Plaintiffs' motion for summary judgment.

BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 5:25-CV-006618-NW

Dated: October 15, 2025

Respectfully submitted,

*/s/ Dan Laidman*
Dan Laidman
     *Counsel for Amici Curiae*
Davis Wright Tremaine LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6886
Email: danlaidman@dwt.com

Gabriel Rottman
     *Counsel for Amici Curiae*
     *Pro Hac Vice Application Pending*
Mara Gassmann*
Allyson Veile*
     *Of Counsel*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
Email: grottman@rcfp.org

BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND
THE COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – CASE NO. 5:25-CV-006618-NW