EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: emilyrose@siegelyee.com

Attorneys for Proposed *Amici Curiae*
THE CATO INSTITUTE, THE NATIONAL
COALITION AGAINST CENSORSHIP,
and THE RUTHERFORD INSTITUTE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, AND JOHN DOE, <br><br> Plaintiffs, <br><br> v. <br><br> MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, AND KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, <br><br> Defendants. | Case No. 5:25-cv-06618-NW <br><br> **UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; [PROPOSED] ORDER** <br><br> Date: November 19, 2025 <br> Time: 9 a.m. <br> Ctrm: 3, 5th Floor |

1   The Cato Institute, the National Coalition Against Censorship, and the Rutherford Institute, by its undersigned counsel, hereby move for leave to file the attached proposed brief as *amici curiae* in the above-captioned action. Plaintiffs have consented to the filing of this motion and Defendants have consented to the filing of all motions for leave to file amicus briefs. Therefore, this motion is unopposed. The Court has invited *amici curiae* to file briefs by October 15, 2025. (ECF No. 30.)

The above proposed *amici curiae* believe that the analysis and policy considerations in the accompanying brief will help to inform the Court's analysis. Based on this and the consents received, above proposed *amici curiae* prays that its unopposed motion to file the within proposed brief of amicus curiae be granted.

Dated: October 15, 2025

SIEGEL, YEE, BRUNNER & MEHTA

By_____
     EmilyRose Johns

Attorneys for Proposed *Amici Curiae*
THE CATO INSTITUTE, THE NATIONAL
COALITION AGAINST CENSORSHIP,
and THE RUTHERFORD INSTITUTE

# [**PROPOSED**] ORDER

IT IS HEREBY ORDERED THAT:

The Unopposed Motion for Leave to File Brief of *Amici Curiae* The Cato Institute, The National Coalition Against Censorship, and the Rutherford Institute in Support of Plaintiffs' Motion for Summary Judgment is GRANTED.

The Brief of *Amici Curiae* The Cato Institute, The National Coalition Against Censorship, and the Rutherford Institute in Support of Plaintiffs' Motion for Summary Judgment presented as Exhibit A to The Unopposed Motion shall be deemed filed as of the date of this order.

Dated: October ____, 2025

_____
Hon. Noël Wise
United States District Judge

# Exhibit A

EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: emilyrose@siegelyee.com

Attorneys for [Proposed] *Amici Curiae*
THE CATO INSTITUTE, THE NATIONAL
COALITION AGAINST CENSORSHIP,
and THE RUTHERFORD INSTITUTE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, AND JOHN DOE, <br><br>  Plaintiffs, <br><br> v. <br><br> MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, AND KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, <br><br>  Defendants. | Case No. 5:25-cv-06618-NW <br><br> **[PROPOSED] BRIEF OF *AMICI CURIE* THE CATO INSTITUTE, THE NATIONAL COALITION AGAINST CENSORSHIP, AND THE RUTHERFORD INSTITUTE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; [PROPOSED] ORDER** |

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* ............................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT................................................................2

BACKGROUND.................................................................................................................................3

ARGUMENT.......................................................................................................................................4

    I.    NONCITIZENS ARE PROTECTED BY THE FIRST AMENDMENT. ........................4

        A.    Noncitizens have constitutional rights. ......................................................................4

        B.    Noncitizens have First Amendment rights. ................................................................6

    II.   THE FOUNDERS BELIEVED THAT ALIENS ARE PROTECTED BY THE
           CONSTITUTION. ............................................................................................................8

CONCLUSION..................................................................................................................................10

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Abrams v. United States*,
    250 U.S. 616 (1919) ............................................................................................. 2, 3, 10

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ............................................................................................ 8

*Bridges v. Wixon*,
    326 U.S. 135 (1945) ................................................................................................ 6, 7, 8

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
    426 U.S. 572 (1976) .......................................................................................................... 6

*Hampton v. Mow Sun Wong*,
    426 U.S. 88 (1976) ............................................................................................................ 6

*Hellenic Lines, Ltd. v. Rhoditis*,
    398 U.S. 306 (1970) .......................................................................................................... 8

*Ibrahim v. Dep't of Homeland Sec.*,
    669 F.3d 983 (9th Cir. 2012) ........................................................................................ 5, 6

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) .......................................................................................................... 8

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953) ................................................................................................. 6, 7, 8

*Ma v. Ashcroft*,
    257 F.3d 1095 (9th Cir. 2001) ......................................................................................... 8

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ............................................................................................................ 6

*Miller v. California*,
    413 U.S. 15 (1973) ............................................................................................................ 1

*Plyler v. Doe*,
    457 U.S. 202 (1982) .......................................................................................................... 6

*Price v. United States INS*,
    962 F.2d 836 (9th Cir. 1992) ........................................................................................... 8

*Sugarman v. Dougall*,
    413 U.S. 634 (1973) .......................................................................................................... 6

*Torao Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948) ................................................................................................................ 6
*Wong Wing v. United States*,
   163 U.S. 228 (1896) ................................................................................................................ 5
*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................................................................ 4, 5

**STATUTES**

8 U.S.C. § 1182(a)(3)(C)(iii) ........................................................................................................ 2, 4
8 U.S.C. § 1201(i) ........................................................................................................................... 2, 4
8 U.S.C. § 1226(a) ................................................................................................................................. 4
8 U.S.C. § 1227(a)(4)(C)(i) ................................................................................................................. 3

**OTHER AUTHORITIES**

*Art Censorship Index: Israel and Palestine 2023-Onwards*, NAT'L COAL. AGAINST CENSORSHIP ...... 1
Complaint, *Stanford Daily et. al. v. Rubio et. al,* No. 5:35-cv-06618 (N.D. Cal. 2025) ..................... 3
David Cole, *Are Foreign Nationals Entitled to the Same Constitutional Rights as Citizens?*, 25 T.
   JEFFERSON L. REV. 367 (Spring 2003) .................................................................................. 9
*Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-
   Semitism*, THE WHITE HOUSE (Jan. 30, 2025) ...................................................................... 3
JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE
   FEDERAL CONSTITUTION (Taylor & Maury eds., 1836) ..................................................... 9, 10
Resp. in Opp'n to Mot. for Release Ex. A, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135
   (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025)...2
*Silence Dogood, No. 8, 9 July 1722*, NAT'L ARCHIVES: FOUNDERS ONLINE (last visited Oct. 14, 2025)
   ............................................................................................................................................ 10

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend I .................................................................................................................... 2, 4

# INTEREST OF *AMICI CURIAE*

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs.

The National Coalition Against Censorship ("NCAC") is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision in *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote freedom of thought, inquiry, and expression, and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support the free expression rights of students, teachers, librarians, artists, and others. NCAC has long opposed attempts to censor or limit free expression on college campuses and tracks efforts to suppress artistic and cultural expression related to political conflict in Israel and Palestine. *See, e.g.*, *Art Censorship Index: Israel and Palestine 2023-Onwards*, NAT'L COAL. AGAINST CENSORSHIP (last visited Oct. 14, 2025).[1] It therefore has a longstanding interest in preserving robust First Amendment protections for all, including students and noncitizens. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its president, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held

---

[1] Available at http://bit.ly/4q5LFSP.

*The Stanford Daily, et. al. v. Marco Rubio, et. al.*, No. 5:25-cv-06618-NW
[Proposed] *Amici Curie* Brief in Support of Plaintiffs' Motion for Summary Judgment - 1

accountable when it infringes on the rights guaranteed by the Constitution and the laws of the United States.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The First Amendment prevents the government from "abridging the freedom of speech." U.S. CONST. amend I.

In this case, the federal government overstepped its boundaries when it abridged the First Amendment rights of two Stanford University students. These students want to exercise their First Amendment rights, but they fear that doing so would open them up to deportation. They have good reason to worry. Secretary of State Marco Rubio is attempting to use two provisions of the Immigration and Naturalization Act ("INA") to prevent legally present noncitizens from engaging in legally protected speech. More precisely, Secretary Rubio is attempting to render those noncitizens subject to deportation at the "discretion" or personal determination of the Secretary of State. 8 U.S.C. §§ 1201(i); 1182(a)(3)(C)(iii).

Secretary Rubio and his colleagues have extraordinarily important duties. As they have explained, they have a responsibility to resist terrorism and to advance America's foreign policy and national security. However, they also have a second responsibility: they must respect and protect the individual rights guaranteed by the Constitution, including the freedom of speech. U.S. CONST. amend I.

The Trump Administration has implausibly claimed that the speech of a handful of college students undermines the Nation's foreign policy aim of promoting the Middle East peace process. Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025). These claims echo the government's now-discredited arguments from the World War I era, when anti-draft leaflets were suppressed even though "nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so." *Abrams v. United States*, 250 U.S. 616, 628 (1919) (Holmes, C.J., dissenting). Such suppression of speech is counterproductive, even when the speech at issue is

wrong or misguided. Rather, "the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution." *Id.* at 630. The First Amendment guarantees the rights of the people to freedom of expression, and the Stanford students who brought this case are as much a part of the people as anyone else. The Court should grant the claims of the Stanford Daily, Jane Doe, and John Doe for declaratory relief, to underscore that the First Amendment prohibits deporting noncitizen residents for their protected speech. And the Court should also grant their claims for injunctive relief, to prohibit the Defendants from deporting noncitizen residents for their protected speech.

## BACKGROUND

In 2024, presidential candidate Donald Trump vowed to deport "pro-Hamas radicals and make our college campuses safe and patriotic again." Complaint at 7, *Stanford Daily et. al. v. Rubio et. al,* No. 5:35-cv-06618 (N.D. Cal. 2025). Trump called for the cancelation of student visas of "Hamas sympathizers" and those who "joined in the pro-jihadist protests" on campuses, adding that "any student that protests, I throw them out of the country." *Id.* In January, after Trump had taken office, the White House promised to deport "resident aliens who joined in the pro-jihadist protests" and "quickly cancel the student visas of all Hamas sympathizers on college campuses." *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, THE WHITE HOUSE (Jan. 30, 2025).[2]

The White House's agenda of deportation and visa cancelation relies on two statutes. First, the Immigration and Naturalization Act allows the removal of "an alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States . . . ." 8 U.S.C. § 1227(a)(4)(C)(i). Although there is an exception for an "alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations, would be lawful within the United States," that exception may be overridden if "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest."

---

[2] Available at https://bit.ly/4q2yy4L.

*The Stanford Daily, et. al. v. Marco Rubio, et. al.*, No. 5:25-cv-06618-NW
[Proposed] *Amici Curie* Brief in Support of Plaintiffs' Motion for Summary Judgment - 3

8 U.S.C. § 1182(a)(3)(C)(iii). If the Secretary personally makes that determination, a noncitizen may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The Secretary may also, "at any time, in his discretion," revoke a visa from a lawfully present noncitizen, with "no means of judicial review." 8 U.S.C. § 1201(i).

Relying on these statutes, the federal government now argues that a single executive branch official has a practically unreviewable and entirely discretionary authority to cancel visas and deport resident aliens solely because they have spoken out on controversial issues. But this line of argument cannot be right. It is irreconcilable with the limits that the Constitution places upon the government—more particularly, it is irreconcilable with the constitutional bedrock that prevents the government from "abridging the freedom of speech." U.S. CONST. amend I.

Because the Administration has announced its intent to deport resident aliens, and because it has claimed a wide-ranging ability to do so, the pseudonymous individual plaintiffs of this action—John Doe and Jane Doe, both lawfully present on F-1 student visas—have refrained from expressing their opinions regarding controversial matters. It is unsurprising that noncitizen staff members of *The Stanford Daily* would follow suit and stay silent for the same reason. Predictably, the fear of adverse consequences, such as deportation, has produced a chilling effect. This Court can and should put an end to that chill and vindicate the plaintiffs' First Amendment rights.

## ARGUMENT

### I. NONCITIZENS ARE PROTECTED BY THE FIRST AMENDMENT.

#### A. Noncitizens have constitutional rights.

It has long been established that resident aliens have constitutional rights. When a significant influx of immigrants from Asia moved to the United States at the end of the nineteenth century, the Supreme Court found that the rights of those immigrants were "not less because they are aliens." *Yick Wo v. Hopkins*, 118 U.S. 356, 368 (1886). The Court established that the Fourteenth Amendment's Equal Protection Clause attached to persons and that it is "not confined to the protection of citizens." *Id.* at 369. Moreover, the Court grounded its extension of those Fourteenth Amendment rights to noncitizens not only on the facts of *Yick Wo*, but on "the nature

and theory of our institutions of government." *Id*. The United States is a nation of law, not "purely personal and arbitrary power." *Id*. at 370. Constitutional limits on government are established in order to curb such personal and arbitrary power—say, that of a single government officer to remove any resident noncitizen from the country at will who says something the officer finds objectionable. And to give those rights a meaningful bite, anyone—including a resident noncitizen—may challenge a government action in court that denies "a right in violation of the Constitution, laws, or treaties of the United States." *Id*. at 365.

To be sure, the United States may remove aliens from the country and forbid their entry for some legitimate reasons. But that authority does not imply a federal power to abuse the rights of noncitizens; they are entitled to the protections of the due process of law. In fact, the Supreme Court has emphasized that when Congress chooses to punish noncitizens by "subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, . . . such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused." *Wong Wing v. United States*, 163 U.S. 228, 237 (1896). In other words, noncitizens are protected by due process; the Congress—let alone the Executive—cannot "find the fact of guilt and adjudge the punishment by one of its own agents." *Id*. *Wong Wing* took the Fourteenth Amendment protections that *Yick Wo* established for resident noncitizens and applied the same reasoning to the Fifth and Sixth Amendments; "all persons within the territory of the United States are entitled to the protection guaranteed by those amendments." *Id*. at 238. To repeat: of course the United States *can* deport aliens for legitimate, lawful reasons. What it cannot do is to exercise that power in a manner that is unmoored from the due process of law that the Constitution requires.

The Ninth Circuit recognizes this principle as a matter of course. In *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), Ms. Ibrahim—a resident alien and, coincidentally, also a Stanford student—sued on First and Fifth Amendment grounds after she was placed on a no-fly list. Her visa was soon revoked, and she was unable to return to the United States after she left the country to attend a conference abroad. The government asserted that Ibrahim lacked standing to sue under those amendments because she had chosen to leave the United States. It was uncontested—and the court viewed it as "well established," citing a long

list of cases—that "aliens legally within the United States may challenge the constitutionality of federal and state actions." *Id.* at 994 (citing *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 580 (1976)*; Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101–03 (1976); *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953); *Torao Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419–20 (1948)). Even aliens illegally present within the United States can bring such a challenge. *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 211–12 (1982)).

The Ninth Circuit's conclusion in *Ibrahim* was not confined to the domain of any particular constitutional amendment. Rather, that court found that a nonresident alien could challenge the "constitutionality" of an action. Presumably, under the logic of *Ibrahim*, a nonresident alien might challenge the constitutionality of federal action because it contravenes (for instance) Article I; in any event, this line of reasoning certainly permits such a plaintiff to challenge federal action on First Amendment grounds.

**B.    Noncitizens have First Amendment rights.**

Speaking generally, the rights of noncitizens to challenge federal actions are well-established in the Ninth Circuit. More particularly, the Supreme Court has found that noncitizens must be allowed to vindicate their First Amendment rights.

Two Supreme Court opinions explain the First Amendment rights of noncitizens. In *Bridges v. Wixon*, 326 U.S. 135 (1945), a resident noncitizen appealed the denial of a writ of habeas corpus; the case involved the deportation of an alien who was a member of the Communist Party of the United States. The Court stated plainly that "freedom of speech and of press is accorded aliens residing in this country." *Id.* at 148. And Justice Frank Murphy addressed this constitutional issue further in a lengthy concurrence.

Justice Murphy criticized the deportation, calling it "a concentrated and relentless crusade to deport an individual because he dared to exercise the freedom that belongs to him as a human being and that is guaranteed to him by the Constitution." *Id.* at 157 (Murphy, J., concurring). Murphy's concurrence recognized the government's power to choose who enters the United States, but noted that this power was far from absolute. Justice Murphy was "unable to believe

that the Constitution sanctions [the] assumption" that an "alien who merely writes or utters a statement critical of the Government . . . may be subjected to the legislative whim of deportation." *Id.* at 161. Rather,

> once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. . . . None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

*Id.*

Justice Murphy concluded that the First, Fifth, and Fourteenth Amendments apply no differently to aliens than they do to citizens once those aliens enter the United States. Although the government can regulate the entrance of aliens, both precedent and the First Amendment require the deportation power to be significantly circumscribed once an alien (legally) enters the United States:

> Any other conclusion would make our constitutional safeguards transitory and discriminatory in nature. Thus the Government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech. But the Government at the same time would be free, from a constitutional standpoint, to deport him for exercising that very same freedom.

*Id.* at 162.

In short, allowing the government to deport aliens because of their exercise of First Amendment rights would make "an empty mockery of human freedom." *Id.*

Justice Murphy's concurrence in *Bridges* contained both a powerful argument and a clarion call that warned about the dangers of government's stifling of the free speech of noncitizens, but in the moment that concurrence was just dicta. Five years later, however, it became law.

In *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), a resident alien temporarily left the United States and was excluded when he attempted to return. His suit alleged that his exclusion from the United States was arbitrary and capricious and a violation of due process under the Fifth Amendment.

In analyzing *Chew*'s facts, the Court noted that "if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of

*The Stanford Daily, et. al. v. Marco Rubio, et. al.*, No. 5:25-cv-06618-NW
[Proposed] *Amici Curie* Brief in Support of Plaintiffs' Motion for Summary Judgment - 7

the Fifth Amendment." *Id.* at 596. The Court then recognized that the First Amendment applies to an alien who lawfully enters and resides within the United States; notably, it relied on Justice Murphy's *Bridges* concurrence to do so. *Id.* at 596 n.5 (quoting *Bridges,* 326 U.S. at 161 (Murphy, J., concurring)). Mere "lawful presence" in the country was enough for constitutional rights to attach to an alien. *Id.* (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770–71 (1950)). In short, *Bridges* posited this principle and *Chew* made it law.

The Ninth Circuit has consistently read these two cases to establish and protect the constitutional rights of aliens. For instance, in *Price v. United States INS*, 962 F.2d 836 (9th Cir. 1992), the Ninth Circuit found that "resident aliens enjoy the protections of the First Amendment." Its reasoning rested on *Kwong Hai Chew* and *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970). In its analysis, the court repeatedly cited the sections of those two opinions that quoted Justice Murphy's *Bridges* concurrence. The Ninth Circuit reached the same finding in *Ma v. Ashcroft*, 257 F.3d 1095, 1109 n.23 (9th Cir. 2001), and *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1063–64 (9th Cir. 1995); both those opinions relied upon *Kwong Hai Chew* and *Bridges*. *American-Arab Anti-Discrimination Committee v. Reno* went further, though: It recognized that "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Am.-Arab Anti-Discrimination Comm.*, at 1064.

In sum, both the Ninth Circuit and the Supreme Court have found that resident aliens are entitled to First Amendment protections.

II.   **THE FOUNDERS BELIEVED THAT NONCITIZEN ARE PROTECTED BY THE CONSTITUTION.**

The nation's experience with the Alien and Sedition Acts should be included in any originalist analysis of the rights of noncitizens. Those acts—passed under President John Adams—undeniably restricted noncitizens' rights. In this context, the Alien and Sedition Acts force consideration of an important question: Were those Acts *consistent* with the rights of noncitizens as conceived of by the Founders, or were they fundamental *misreadings* of those rights? On balance, the evidence demonstrates that the legislative policy of the Acts was incompatible with the Framers' understanding of the rights of aliens.

The example of James Madison is representative. When Madison authored a committee report in the Virginia House of Delegates about the Alien and Sedition Acts, he rejected the idea that the government has absolute plenary power over noncitizen residents. Although "admission of [the] alien" may be "a favor," once that favor is done, "the favor becomes a right, and must be forfeited before it can be taken away. . . . It cannot be pretended that a person naturalized can be deprived of the benefits any more than a native can be disfranchised." 4 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 475 (Taylor & Maury eds., 1836).

Moreover, Madison recognized that noncitizens are not necessarily parties to the Constitution: To adopt the terminology of the day, noncitizens owe allegiance to some other sovereign. But "as they owe, on one hand, a temporary obedience [to the Constitution], they are entitled, in return, to their protection and advantage." *Id.* Madison then provides the example of the jury trial; even as citizens have the right to face a jury of their peers, resident aliens have the same protection.

Madison—and the Virginia House of Delegates, which was associated with no small number of the Framers—objected to the Sedition Acts precisely because they punished speech. As Madison explained, "the power over the press, exercised by the Sedition Act, is positively forbidden by one of the Amendments to the Constitution." *Id.* at 489. Resident noncitizens owe temporary obedience to the Constitution; in return, they receive reciprocal protections. Among those protections are the freedom to speak and to express oneself. These rights were "inalienable natural rights that found their provenance in God," not simply contractual relationships between two parties. David Cole, *Are Foreign Nationals Entitled to the Same Constitutional Rights as Citizens?*, 25 T. JEFFERSON L. REV. 367, 372 (Spring 2003).

Of course, Madison recognizes the government's power to remove aliens under some circumstances. What makes the use of this power permissible or impermissible, in Madison's view, is the distinction between "alien enemies" and "alien friends." Alien enemies "are under the law of nations, and liable to be punished for offences against it. Alien friends . . . are under the municipal law, and must be tried and punished according to that law only." ELLIOT, *supra*, at 476.

Today, however, the United States is not in a state of war. The nation has no "alien enemies"; even if it did, the deportation provisions the Trump Administration relies on make no distinction between alien enemies and alien friends. Instead, the provisions apply to all aliens, period. The prospect of indiscriminate deportation that this implies makes Madison's concerns about the Alien and Sedition Act appear prophetic. *Id.* at 477 ("The proceeding is authorized against aliens *of every nation;* of nations charged neither with any similar proceedings against American citizens, nor with any injuries for which justice might be sought, in the mode prescribed by the act.").

Madison's use of the Alien and Sedition Acts as President was consistent with the sentiments he expressed as a legislator. Although most of the provisions of the Alien and Sedition Acts had automatically ended by 1802, one remained. President Madison invoked that provision against British nationals in the War of 1812, but he did so in a manner consistent with the manner described above—that is, he invoked it against nationals of an enemy state in a declared war. He did not use the Acts to punish (for example) the authors of pro-British pamphlets. Both his writings and his actions provide strong evidence that the aliens residing in the United States in peace are entitled to full First Amendment protection.

## CONCLUSION

"Without Freedom of Thought, there can be no such Thing as Wisdom; and no such Thing as publick Liberty, without Freedom of Speech; which is the Right of every Man, as far as by it, he does not hurt or controul the Right of another: And this is the only Check it ought to suffer, and the only Bounds it ought to know." *Silence Dogood, No. 8, 9 July 1722*, Nat'l Archives: Founders Online (last visited Oct. 14, 2025).[3] Benjamin Franklin's words are as true then as they are now. Regardless of the government's characterizations of the plaintiffs' speech, they are protected by the Constitution in just the same way as is the "publishing of a silly leaflet by an unknown man." *Abrams*, 250 U.S. at 628 (Holmes, C.J., dissenting).

///

///

---

[3] Available at https://bit.ly/3IRUBdY.

For the foregoing reasons, as well as those presented by Plaintiffs, this Court should grant the Plaintiffs their requested Declaratory and Injunctive Relief.

Respectfully submitted,

Dated: October 15, 2025         SIEGEL, YEE, BRUNNER & MEHTA

*/s/ EmilyRose Johns*
EmilyRose Johns

Attorneys for [Proposed] *Amici Curiae*
THE CATO INSTITUTE, THE NATIONAL COALITION AGAINST CENSORSHIP, and THE RUTHERFORD INSTITUTE