Chessie Thacher (SBN 296767)
    cthacher@aclunc.org
Shaila Nathu (SBN 314203)
    snathu@aclunc.org
Angelica Salceda (SBN 296152)
    asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478

*Attorneys for Amici Curiae*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>*Defendants*. | Case No. 5:25-cv-06618-NW<br><br>**[PROPOSED] AMICI CURIAE BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, FIRST AMENDMENT COALITION, PEN AMERICAN CENTER, INC., FREEDOM OF THE PRESS FOUNDATION, AND AMERICAN ASSOCIATION OF COLLEGES AND UNIVERSITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Noël Wise<br>Date: Nov. 19, 2025<br>Time: 9:00 a.m.<br>Courtroom: 3 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.   The First Amendment Robustly Protects the Speech of Noncitizens—Including in the Immigration Context ............................................................................................. 2

   II.  Applying the Revocation and Deportation Provisions to Protected Speech Defies Precedent and Violates the First Amendment's Prohibition on Viewpoint Discrimination ................................ 5

     A.   Speech on matters of public concern, like Plaintiffs' reporting about the war in Gaza, sits at the heart of the First Amendment's protections. ......................................................... 5

     B.   Silencing protected speech about the war in Gaza because it advances a disfavored viewpoint is unconstitutional. ........................................................................................ 6

     C.   No legal grounds exist to justify categorical suppression of pro-Palestinian speech. .............. 10

   III.  The Revocation and Deportation Provisions Violate the Fifth Amendment's Due Process Guarantees and are Unconstitutionally Vague as Applied to Protected Speech ......................... 12

     A.   The Revocation and Deportation Provisions fail to provide fair notice. .................................. 13

     B.   The Revocation and Deportation Provisions invite arbitrary and discriminatory enforcement. ................................................................................................ 14

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases** .................................................................................................................... **Page(s)**

*Am. Ass'n of Univ. Professors v. Rubio*,
    Case No. 25-10685-WGY, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ................................... *passim*

*Am.-Arab Anti-Discriminatory Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ............................................................................ 2, 3, 11

*Arriaga v. Mukasey*,
    521 F.3d 219 (2d Cir. 2008) ................................................................................... 14

*Baggett v. Bullit*,
    377 U.S. 360 (1964) .............................................................................................. 14

*Bello-Reyes v. Gaynor*,
    985 F.3d 696 (9th Cir. 2021) ............................................................................... 2, 4

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) ............................................................................... 11

*Boos v. Barry*,
    485 U.S. 312 (1988) .............................................................................................. 12

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ................................................................................................ 3

*Bridges v. Wixon*,
    326 U.S. 135 (1945) .......................................................................................... 2, 15

*Chung v. Trump*,
    Case No. 1:25-02412-NRB, ECF No. 57 (S.D.N.Y. June 5, 2025) ....................................... 9

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ......................................................................................... 13, 14

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) .............................................................................................. 14

*Cohen v. California*,
    403 U.S. 15 (1971) .................................................................................................. 6

*Dep't of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020) ................................................................................................ 4

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965) ................................................................................................ 2

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .............................................................................................. 13

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ................................................................................................... 4

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) ...................................................................................................... 12

*Grayned v. City of Rockford*,
    408 U.S.104, 108 (1972) ....................................................................................... 13, 14

*Gutierrez-Soto v. Sessions*,
    317 F. Supp. 3d 917 (W.D. Tex. 2018) ........................................................................ 5

*Healy v. James*,
    408 U.S. 169 (1972) ...................................................................................................... 3

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ................................................................................................... 10, 11

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ...................................................................................................... 12

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ...................................................................................................... 7

*Jan v. People Media Project*,
    No. 3:24-CV-05553-TMC, 2025 WL 359009 (W.D. Wash. Jan. 31, 2025) ............... 6

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ...................................................................................................... 7

*Khalil v. Trump*,
    784 F. Supp. 3d 705 (D.N.J. May 28, 2025) .................................................. 8, 9, 10, 14

*Kolender v. Lawson*,
    461 U.S. 352 (1983) .................................................................................................... 14

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953) ...................................................................................................... 2

*Landau v. Corp. of Haverford Coll.*,
    780 F. Supp. 3d 548 (E.D. Pa. Jan. 6, 2025) ............................................................... 6

*Lee v. United States*,
    582 U.S. 357 (2017) .................................................................................................... 13

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) ...................................................................................... 2

*Mahdawi v. Trump*,
    781 F. Supp. 3d 214 (D. Vt. 2025) ........................................................................... 5, 9

*Matal v. Tam,*
  582 U.S. 218 (2017) ........................................................................................... 4, 11

*Meyer v. Grant,*
  486 U.S. 414 (1988) ........................................................................................... 4, 5

*Mohammed H. v. Trump,*
  781 F. Supp. 3d 886 (D. Minn. 2025) ............................................................... 5, 6

*N.Y. Times v. Sullivan,*
  376 U.S. 254 (1964) ........................................................................................... 5, 11

*N.Y. Times v. United States,*
  403 U.S. 713 (1971) ........................................................................................... 6

*Nat'l Socialist Party of Am. v. Vill. of Skokie,*
  432 U.S. 43 (1977) ............................................................................................. 11

*OPAWL-Bldg. AAPI Feminist Leadership v. Yost,*
  118 F.4th 770 (6th Cir. 2024) ............................................................................ 3

*Ozturk v. Hyde,*
  136 F.4th 382 (2d Cir. 2025) ............................................................................. 6

*Ozturk v. Trump,*
  779 F. Supp. 3d 462 (D. Vt. 2025) .................................................................... 6, 9

*Pham v. Ragbir,*
  141 S. Ct. 227 (2020) ......................................................................................... 3, 4

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992) ........................................................................................... 11

*Rafeedie v. I.N.S.,*
  795 F. Supp. 13 (D.D.C. 1992) .......................................................................... 5

*Ragbir v. Homan,*
  923 F.3d 53 (2d Cir. 2019) ................................................................................ 2, 4

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) ........................................................................................... 7

*Reno v. ACLU,*
  521 U.S. 844 (1997) ........................................................................................... 13

*Reno v. Am.-Arab Discrim. Comm.,*
  525 U.S. 471 (1999) ........................................................................................... 3

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ........................................................................................... 7

*Roth v. United States*,
   354 U.S. 476 (1957) ................................................................................................. 5

*Rowoldt v. Perfetto*,
   355 U.S. 115 (1957) ............................................................................................... 15

*Rueda Vidal v. Dep't of Homeland Sec.*,
   536 F. Supp. 3d 604 (C.D. Cal. 2021) ...................................................................... 5

*Scales v. United States*,
   367 U.S. 203 (1961) ............................................................................................... 15

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ............................................................................................... 13

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ........................................................................................... 5, 11

*Speech First v. Whitten*,
   604 U.S. __, 145 S. Ct. 701 (2025) ......................................................................... 2

*Spence v. Washington*,
   418 U.S. 405 (1974) ................................................................................................. 6

*Street v. New York,*
   394 U.S. 576, (1969) ............................................................................................. 11

*Suri v. Trump*,
   Case No. 1:25-cv-480 (PTG/WBP), 2025 WL 1392143 (E.D. Va. May 14, 2025) .............. 8

*Terminiello v. Chicago*,
   337 U.S. 1 (1949) ................................................................................................... 11

*Texas v. Johnson*,
   491 U.S. 397 (1989) ............................................................................................... 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ................................................................................................. 6

*United States v. L. Cohen Grocery Co.*,
   255 U.S. 81 (1921) ................................................................................................. 15

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001) ................................................................................... 14

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) .................................................................................... 3

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ................................................................................................. 3

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ............................................................................................ 2

*West Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ............................................................................................ 7

*Widmar v. Vincent*,
    454 U.S. 263 (1981) .......................................................................................... 12

*Yusupov v. Att'y Gen. of U.S.*,
    650 F.3d 968 (3d Cir. 2011) ...................................................................... 11, 15

**Statutes** ....................................................................................................... **Page(s)**

8 U.S.C. § 1201 ............................................................................................... *passim*

8 U.S.C. § 1227 ............................................................................................... *passim*

8 U.S.C. § 1252 ................................................................................................. 3, 4

52 U.S.C. § 30121 ................................................................................................... 3

# INTRODUCTION

The Trump Administration is waging an assault on freedom of speech in this country. For months, Defendants Secretary of State Marco Rubio and Secretary of Homeland Security Kristi Noem, among others, have targeted international students, faculty, and other noncitizens who engage in protected speech that supports Palestine or criticizes Israel and the U.S. government's support for Israel's actions in Gaza. The Administration claims that the presence of any noncitizen who expresses these views somehow poses "serious adverse foreign policy consequences," and that these noncitizens must have their visas revoked and be deported. It is an interpretation of the Immigration Nationality Act ("INA") that is overbroad in scope and unlawful in application.

Defendants misuse two INA provisions in particular—the "Revocation Provision," set forth at 8 U.S.C. § 1201(i), and the "Deportation Provision," set forth at 8 U.S.C. § 1227(a)(4)(C)(i)—to carry out their unconstitutional campaign of punishing pro-Palestinian speech. But the First Amendment forbids such retaliatory, viewpoint-based treatment, while the Fifth Amendment prohibits imposition of such punishment without notice. Many noncitizens now live in fear that they will lose their visas, suffer lengthy detentions, and be deported if their actual (or imputed) speech brings them into the Administration's crosshairs. This looming threat has led, by design, to stifled debate and is chilling organizations and people, like Plaintiffs, from exercising rights long protected by the Constitution.

Because no person in the U.S.—regardless of their citizenship status—should be punished simply for expressing views that the government does not like, this Court's intervention is needed. *Amici* respectfully urge the Court to grant Plaintiffs' converted motion for summary judgment (ECF No. 32) and deny Defendants' cross motion for summary judgment (ECF No. 33). *Amici* further request that the Court issue judgment declaring that, as applied to the protected speech of Plaintiffs and their noncitizen members, the Revocation and Deportation Provisions violate the First and Fifth Amendments. *Amici* join Plaintiffs in calling for Secretary Rubio to be enjoined from revoking visas on the basis of protected speech alone and for Secretary Noem to likewise be enjoined from initiating deportation proceedings against any Plaintiffs and their noncitizen members whose visas are revoked on the basis of protected speech. The Trump Administration should not be allowed to continue perverting the promises of liberty and free speech so fundamental to our American republic.

## ARGUMENT[1]

### I.    The First Amendment Robustly Protects the Speech of Noncitizens—Including in the Immigration Context

The language of the First Amendment—"Congress shall make no law . . . abridging the freedom of speech"—contains no distinction between citizens and noncitizens. The Supreme Court confirmed this understanding in the seminal case *Bridges v. Wixon*, 326 U.S. 135 (1945). It held that Harry Bridges could not be deported based on beliefs and expression that were constitutionally protected for citizens, because "[f]reedom of speech and of press is accorded aliens residing in this country." *Id.* at 148. "Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders . . . includ[ing] those protected by the First . . . Amendment[]." *Id.* at 161 (Murphy, J., concurring). It has therefore long been settled that First Amendment freedoms "extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority." *Id.*; *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (citing *Bridges* to recognize that the Bill of Rights applies to protect noncitizens).

In the intervening decades since *Bridges*, numerous courts of appeal—including the Ninth Circuit—have reaffirmed that the First Amendment encompasses the speech of noncitizens, with some specifically recognizing that this protection may be invoked against detention or deportation based on protected speech. *See, e.g.*, *Am.-Arab Anti-Discriminatory Comm. v. Reno ("AADC")*, 70 F.3d 1045 (9th Cir. 1995); *Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021); *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) *cert. granted, judgment vacated on other grounds sub nom.*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020); *see also OPAWL-Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024) ("'[T]he people' protected by the Fourth Amendment, and by the First and Second Amendments . . .

---

[1] Plaintiffs have demonstrated facts sufficient to establish standing to bring the First Amendment claims discussed herein, and also to show how Defendants are chilling their expressive activities and harming their personal, organizational, and associational interests. Defendants' arguments to the contrary falter when measured against the more lenient analysis applied to First Amendment cases, where "the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000); *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) (pre-enforcement action allowed because protected expression has "transcendent value to all society and not merely those exercising their rights"); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("[S]elf-censorship [is] a harm that can be realized even without actual prosecution."); *Am. Ass'n of Univ. Professors v. Rubio ("AAUP")*, No. 25-10685-WGY, 2025 WL 2777659, at *42 (D. Mass. Sept. 30, 2025) ("It is well settled that plaintiffs may establish standing based on 'the deterrent or chilling effect of government regulations that fall short of a direct prohibition against the exercise of First Amendment rights.'") (quoting *Speech First v. Whitten*, 604 U.S. __, 145 S. Ct. 701, 703 (2025) (Thomas, J. dissenting from the denial of certiorari)).

1  refers to a class of persons who are part of a national community or who have otherwise developed

2  sufficient connection with this country to be considered part of that community.") (quoting *United States*

3  *v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).[2]

4      Of these cases, *AADC* is perhaps the most instructive. There, the Ninth Circuit ruled that "values

5  underlying the First Amendment require the full applicability of First Amendment rights to the

6  deportation setting." 70 F.3d at 1064. The matter arose when immigration officials arrested eight

7  noncitizens who were "alleged to be members of a world-wide Communist organization." *Id*. at 1053.

8  Although the government later dropped these ideological charges and substituted technical immigration

9  violations, the noncitizens sued, claiming selective enforcement in violation of their First Amendment

10  rights. *Id*. at 1054. The court reasoned that if noncitizens were unable to assert the First Amendment to

11  defend their immigration status, "then their First Amendment rights in other contexts [would be] a

12  nullity, because the omnipresent threat of deportation would permanently chill their expressive and

13  associational activities." *Id*. at 1065-66. The court grounded its conclusion in two basic principles—

14  namely (1) that the government cannot abridge First Amendment freedoms solely because of an

15  association with "'an unpopular organization,'" *id.* at 1063 (quoting *Healy v. James*, 408 U.S. 169, 185-

16  86 (1972)), and (2) that "advocacy may be punished only if it is 'directed to inciting or producing

17  imminent lawless action and is likely to incite or produce such action.'" *Id*. (quoting *Brandenburg v.*

18  *Ohio*, 395 U.S. 444, 447 (1969)).[3]

19  ─────────────────
    [2] Defendants rely on *OPAWL* to argue that Plaintiffs have diminished speech rights because the Sixth

20  Circuit suggested that a "lesser level of scrutiny could apply" to campaign finance rules restricting
    noncitizens' speech. 118 F.4th at 777. But this election-related conclusion extends from the fact that

21  noncitizens do not otherwise have a right to participate in the U.S.'s democratic self-government—
    activities like voting, holding office, or serving on a jury. No such inference can be drawn, however,

22  about speech on matters of public concern. That a different level of scrutiny might apply to a campaign
    finance regulation does not mean that noncitizens should lose protection when lawfully engaging in

23  speech critical of the government. Additionally, Plaintiffs have defined "protected speech" in this
    lawsuit to "exclude[] speech subject to unique criminal prohibitions for noncitizens, such as donating to

24  election campaigns." ECF No. 32 at p. 1 n.2 (citing 52 U.S.C. § 30121(a)). Defendants' reliance on
    *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020) is misplaced for similar reasons.

25  [3] The Supreme Court ultimately held in *AADC* that 8 U.S.C. § 1252(g) barred jurisdiction over the
    plaintiffs' selective prosecution claims, reasoning that a noncitizen unlawfully present in the United

26  States could not raise such claims as "a defense against . . . deportation." *Reno v. Am.-Arab Discrim.*
    *Comm.*, 525 U.S. 471, 488 (1999). Here, however, no facts or argument in the record suggest that any

27  Plaintiff is in the country unlawfully. Moreover, the Ninth Circuit subsequently interpreted the Supreme
    Court's *AADC* decision to "foreclose[] selective prosecution claims only as to the three actions listed in

28  8 U.S.C. § 1252(g)"—actions that are not at issue in the present matter. *See Bello-Reyes*, 985 F.3d at
    700 n.4; *see also Ragbir*, 923 F.3d at 63 (concluding § 1252(g) does not apply to "many other decisions
    or actions that may be part of the deportation process—such as the decisions to open an investigation").

Just a few years later, the Ninth Circuit considered the case of *Bello-Reyes*. The plaintiff was a noncitizen who, while released on immigration bond, had criticized Immigration and Customs Enforcement ("ICE") in a widely publicized poem during a protest. 985 F.3d at 698. Less than thirty-six hours later ICE officials revoked his bond and re-arrested him. *Id.* The court observed: "Official reprisal for protected speech 'offends the Constitution because it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Id.* at 699-700. And because the lower court had failed to analyze the noncitizen's claims under a First Amendment framework, the matter was remanded with instructions to consider whether there was (1) a constitutionally-protected activity, (2) government action that would chill a person of ordinary firmness, and (3) evidence that the protected activity was a substantial or motivating factor in the government's conduct. *Id.* at 700.

The Second Circuit's decision in *Ragbir* turned on analogous facts: an outspoken noncitizen, who maintained a "regular presence" outside an ICE office and led prayer vigils, alleged that he had been arrested in retaliation for his speech. 923 F.3d at 59-60. The government asserted that the noncitizen had failed to state a First Amendment claim. The court rejected this argument. It concluded that the speech at issue implicated "the apex of protection under the First Amendment" and that the criticism of ICE was "core political speech" that "trenches upon an area in which the importance of First Amendment protections *is at its zenith.*" *Id.* at 69-70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988)). As such, the *Ragbir* court ruled that the government's retaliation for his protected speech was "egregious," and the claim could proceed. *Id.* at 70 ("'It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys.'") (quoting *Matal v. Tam*, 582 U.S. 218, 248 (2017)).[4]

Lower courts currently confronting the question about whether noncitizens enjoy First Amendment protections for their political speech have answered "unequivocally" that they do. *AAUP*, 2025 WL 2777659, at *1. Specifically, after exhaustive analysis in the *AAUP* case, the District Court for

---

[4] Although the Supreme Court ultimately vacated the *Ragbir* decision for jurisdictional reasons in accord with *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), the Second Circuit's underlying conclusion remains intact: "speech critical of the exercise of the State's power lies at the very center of the First Amendment,'" even for noncitizen speakers. *Ragbir*, 923 F.3d at 70 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991)); *see also Pham*, 141 S. Ct. 227.

the District of Massachusetts ruled that "noncitizens have at least the core First Amendment right to political speech without reprisal." *Id.* at *45. "No one's freedom of speech is unlimited, of course, but these limits are the same for both citizens and non-citizens alike." *Id*. at *1; *see also Mahdawi v. Trump*, 781 F. Supp. 3d 214, 229 (D. Vt. 2025) ("Noncitizen residents . . . enjoy First Amendment rights in this country to the same extent as United States citizens."); *Mohammed H. v. Trump*, 781 F. Supp. 3d 886, 894 (D. Minn. 2025) (First Amendment's protection "extends to noncitizens.").

These more recent decisions were also built upon decades of other lower court decisions defining the First Amendment's contours in the immigration context. *See Rafeedie v. I.N.S.*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment . . . . ") (cleaned up); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 932 n. 35 (W.D. Tex. 2018) ("[A]liens residing in this country are entitled to the protections of the First Amendment."); *Rueda Vidal v. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 619–623 (C.D. Cal. 2021) (finding that an undocumented immigrant had "substantive rights protected by the First . . . Amendment[]").

## II. Applying the Revocation and Deportation Provisions to Protected Speech Defies Precedent and Violates the First Amendment's Prohibition on Viewpoint Discrimination

### A. Speech on matters of public concern, like Plaintiffs' reporting about the war in Gaza, sits at the heart of the First Amendment's protections.

The Framers designed the First Amendment "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). Courts thus construe speech that addresses matters of public concern or which is critical of the government to have "special protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011); *see Meyer*, 486 U.S. at 425. This safeguard reflects a "profound national commitment to the principle that debate on public issues"—including international law and human rights—"should be uninhibited, robust, and wide-open[.]" *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).

The war in Gaza, and the U.S.'s involvement in the conflict, unquestionably relate to matters of grave and widespread public concern. More than 100,000 people have been killed or injured in the war since 2023, and the U.S. has reportedly provided $21.7 billion in military aid to Israel during this time.[5]

---

[5] Matthew Lee, *US has given at least $21.7 billion in military aid to Israel*, Assoc. Press, Oct. 6, 2025, https://bit.ly/3W2gCcX; Julia Frankel & Phillip Holm, *These numbers show how 2 years of war have devastated Palestinian lives in Gaza*, Assoc. Press, Oct. 8, 2025, https://bit.ly/4nQ0A1U.

It therefore follows that Plaintiffs' news reporting, opinion pieces, and other speech covering these issues (*see* ECF No. 1 ¶¶ 16-18, 68, 105) is entitled to the utmost protection. Such protection continues a long tradition of First Amendment cases safeguarding news coverage of military operations and peaceful, anti-war protest. *See N.Y. Times v. United States*, 403 U.S. 713, 724 (1971) (lifting injunction on publication of the "Pentagon Papers," concerning the history of U.S. involvement in Vietnam, because "[o]pen debate and discussion of public issues are vital to our national health") (Douglas, J. concurring); *Spence v. Washington*, 418 U.S. 405, 410 (1974) (upholding right to hang American flag upside down with peace symbol superimposed as an "expression of anguish" about "domestic and foreign affairs," including the U.S.'s invasion of Cambodia); *Cohen v. California*, 403 U.S. 15, 16 (1971) (upholding right to wear a shirt reading "Fuck the Draft" as way of "informing the public of the depth of . . . feelings against the Vietnam War"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) (upholding students' right to wear arm bands to show "disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them").

As numerous other courts have recently recognized in this same context, speech "opposing violence in Palestine[] falls within the core of protected expression, which extends to noncitizens." *Mohammed H.*, 781 F. Supp. 3d at 894; *Ozturk v. Trump*, 779 F. Supp. 3d 462, 490 (D. Vt. 2025) (finding that noncitizen student's op-ed was "self-evidently speech regarding public issues" and likely protected by First Amendment) *amended sub nom. Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *see also Jan v. People Media Project*, No. 3:24-CV-05553-TMC, 2025 WL 359009, at *10 (W.D. Wash. Jan. 31, 2025) ("The terrorist attacks on October 7, and Israel's military response, are subjects of extensive news interest and political concern to the global community."); *Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 555 (E.D. Pa. Jan. 6, 2025) (donning attire to signify support for Palestine at college event is a "classic example of protected First Amendment expression").

### B. Silencing protected speech about the war in Gaza because it advances a disfavored viewpoint is unconstitutional.

"'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *West Va. Bd. of Educ. v.*

*Barnette*, 319 U.S. 624, 642 (1943)). Our Constitution forbids the government from picking and choosing which sides of an issue will be allowed a public hearing, and which will be suppressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Such discrimination is "presumed to be unconstitutional." *Id.* at 828.; *see Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

And yet, the thrust of Secretary Rubio's application of the Revocation and Deportation Provisions to protected speech has exactly this prescriptive effect. The Trump Administration has been invoking this statutory authority to label peaceful pro-Palestine, anti-war protesters as "Hamas Sympathizers," slating them for removal on the ground that their continued presence would have "serious adverse foreign policy consequences." Defendants selectively wield the Deportation Provision against such protesters, while leaving untouched noncitizens who praise Israel or the U.S. government's support for Israel. *Cf. Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (unlawful to target speech based on "the specific motivating ideology or the opinion or perspective of the speaker").

The evidence of Defendants' categorical targeting of pro-Palestine/anti-Israel speech is set forth in Plaintiffs' moving papers and bolstered by the public record. *See* ECF Nos. 13-14, 32. But to briefly summarize: soon after being sworn into office, President Trump issued Executive Order 14188, entitled "Additional Measures to Combat Anti-Semitism," as a domestic response to the events of October 7, 2023 in Israel. *See* 90 Fed. Reg. 8847 (Jan. 29, 2025). The President declared: "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* § 2. The "Fact Sheet" accompanying this order "promised" that the government would: "Deport Hamas Sympathizers and Revoke Student Visas." ECF No. 13, Ex. C at 2. It continued: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Id.*

Secretary Rubio, and other high-level administrative officials, amplified President Trump's message. Rubio promised: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." ECF No. 13, Ex. E. White House Deputy Chief of Staff Stephen Miller crowed: "We have officials working continuously to identity [sic], revoke or deny foreigners'

visas who espouse hatred for America or its people." ECF No. 14, Ex. O. Assistant Secretary of Public

Affairs for the Department of Homeland Security Tricia McLaughlin threatened: "If you are pushing

Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over

buildings, or other anti-American actions that we have seen lately on these campuses, you can book

yourself a ticket home. You can expect your visa will be revoked." ECF No. 13, Ex. H.

None of the Administration's threats were idle. Secretary Rubio targeted numerous noncitizen

students and university faculty who were believed to have espoused pro-Palestinian views (or at least

labeled to have done so by the nongovernmental outfit Canary Mission) and sought to render them

deportable. *See* ECF No. 13, Ex. I; ECF No. 14, Ex. K (vol. 1, 44), Exs. L-M; ECF No. 32 at 7-8

(describing Canary Mission and its government collusion). Government officials, for example, detained

legal permanent resident Mahmoud Khalil, a Columbia University graduate who had served as a

mediator between school administrators and pro-Palestinian student protesters.[6] President Trump

promised Khalil's arrest would be "the first arrest of many to come" (ECF No. 13, Ex. F), and so it was.

Defendants next detained and attempted to deem deportable a student who "lik[ed] or shar[ed]

posts that highlighted 'human rights violations' in the war in Gaza,"[7] a Georgetown professor with

family ties to Gaza who engaged in speech supportive of Palestinian rights,[8] a Tufts student who co-

wrote an op-ed in a campus newspaper criticizing her university's response to a student government

resolution regarding divestment from Israel,[9] a co-President of Columbia's chapter of the Palestinian

---

[6] *See* Morning Edition, *DHS Official Defends Mahmoud Khalil Arrest, But Offers Few Details on Why It Happened*, NPR, Mar. 13, 2025, https://bit.ly/3Ych75C; *Khalil v. Trump*, 784 F. Supp. 3d 705, 768 (D.N.J. May 28, 2025). Even after months of litigation in both federal and immigration court, it is still unclear which exactly of Mr. Khalil's purported statements, associations, or expressive activities resulted in the government's decision to label him a terrorist, then detain and attempt to deport him.

[7] Luis Ferré-Sadurní & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times, Mar. 15, 2025, https://bit.ly/4jipHbb.

[8] Jaclyn Diaz, *What we know about the case of detained Georgetown professor Badar Khan Suri*, NPR, Mar. 21, 2025, https://bit.ly/42xrx2c; *Suri v. Trump*, Case No. 1:25-cv-480 (PTG/WBP), 2025 WL 1392143 (E.D. Va. May 14, 2025) (ordering release pending resolution of habeas corpus petition), *stay denied in* Case No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) ("The government doesn't contest the district court's finding that it detained Suri in retaliation for his First Amendment activity.").

[9] Anemona Hartocollis, *Targeting of Tufts Student for Deportation Stuns Friends and Teachers*, N.Y. Times, Mar. 29, 2025, https://bit.ly/4luOlay; *Ozturk*, 779 F. Supp. 3d at 490 (concluding that the "only specific act cited by the government so far as justification for their adverse actions towards Ms. Ozturk is her co-authored op-ed," which "does not readily fall into one of the established exemptions to the First Amendment's protection from government speech regulation"); *AAUP*, 2025 WL 2777659, at *25-34.

Student Union,[10] and students at Columbia[11] and Cornell[12] who attended pro-Palestinian demonstrations.

In one of these cases Secretary Rubio applied the Revocation Provision, whereas in four others, he applied the Deportation Provision, determining that the targeted noncitizens were deportable for having participated in "antisemitic protests and disruptive activities, which foster[] a hostile environment for Jewish students" and undermine "U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." *Khalil*, 784 F. Supp. 3d at 719, Appx. A; *AAUP*, 2025 WL 2777659, at *14, *22, *23, *26 (discussing application of INA provisions in individual cases).

Taken together, these actions and statements show that the Trump Administration is committed to silencing criticism about the role of both Israel and the U.S. in the war on Gaza. Defendants are doing so by taking "Executive Orders targeted at antisemitism, which already incorporated a definition of antisemitism encompassing protected speech, and implement[ing] them in a way that systematically center[s] that latent focus on protected speech . . . ." *AAUP*, 2025 WL 2777659, at *49. They are recasting *any* pro-Palestine political speech as a foreign policy threat, then wielding the Revocation and Deportation Provisions to target noncitizens who express such views. This blatant weaponization of the INA is an unconstitutional viewpoint-based restriction suppressing one side of an ongoing political debate. Plaintiffs report how their speech has been chilled, including that "staff writers on student visas are withholding or withdrawing articles about the war in Gaza and declining reporting assignments related to pro-Palestinian campus protests, worried that writing the wrong thing will endanger their immigration status." ECF No. 32 at 2. Although the government's viewpoint-based retaliation is

---

[10] Yash Roy, *A Palestinian student leader at Columbia was steps away from his final citizenship interview. He instead faces deportation.*, CNN, April 15, 2025, https://bit.ly/4q0qAtb; *Mahdawi*, 781 F. Supp. 3d at 221 (ordering release pending resolution of habeas corpus petition), *stay denied* 136 F.4th 443, 456 (2d Cir. 2025).

[11] Jonah E. Bromwich & Hamed Aleaziz, *Columbia Student Hunted by ICE Sues to Prevent Deportation*, N.Y. Times, Mar. 24, 2025, https://bit.ly/3XIY1E0; *Chung v. Trump*, Civ. No. 1:25-02412-NRB, ECF No. 57 (S.D.N.Y. June 5, 2025) (restraining order against detention); *AAUP*, 2025 WL 2777659, at *10 (recounting that Chung was targeted for attending protest where "Hamas fliers were distributed").

[12] Stephanie Saul, *Cornell Student Facing Deportation Felt Drawn to Protest*, N.Y. Times, Mar. 28, 2025, https://bit.ly/4chXYVB.

1  unlawful, Plaintiffs could well be the next target given the Trump Administration's vow to continue

2  applying the Revocation and Deportation Provisions to protected speech.

3      Worse yet is the fact that Defendants' application of the Deportation Provision in this manner is

4  unprecedented and out of step with the legislative history. As set forth by the district courts in *AAUP*

5  and *Khalil*, Congress incorporated the foreign policy ground language in the Deportation Provision more

6  than 35 years ago. Since then, and prior to 2025, the government has identified "only ***four*** instances of

7  the Secretary of State's exercising this extraordinary authority . . . : twice in 1995, once in 1997, and

8  once in 1999—none of which concerned domestic speech." *AAUP*, 2025 WL 2777659, at *13 n. 20

9  (citing Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990)); *Khalil*, 784 F. Supp. 3d

10  at 746-50 (determining that, "in a nutshell," Congress intended for § 1227 "to focus on foreign concerns,

11  not domestic ones," and to be both narrowly construed and sparingly used).

12      **C.  No legal grounds exist to justify categorical suppression of pro-Palestinian speech.**

13      In an attempt to justify ideologically-driven applications of the Revocation and Deportation

14  Provisions to protected speech, Defendants hide behind a nebulous rationale: "national-security and

15  foreign-policy interests in countering support for terrorist groups and addressing antisemitism." ECF No.

16  33 at 19. But this reasoning collapses under scrutiny, strict or otherwise. If the government could justify

17  suppressing disfavored views by invoking "foreign policy"—a category that can be stretched, under the

18  Administration's interpretation, to cover almost any issue of national (let alone international) concern—

19  noncitizens would be forced to choose between staying silent or expressing only support for the

20  Administration's preferred policies. Such would be the case whether the expression related to the flow

21  of global trade, nuclear weapon proliferation, the treatment of women in foreign nations, climate change,

22  or the proposed annexation of other countries. Not only would individual noncitizens suffer under this

23  regime, but so too would the quality of our nation's debate on matters of global concern.

24      This Court need not, and should not, cede its authority to question the government's generic

25  justifications about foreign policy and national security concerns. As the Supreme Court emphasized in

26  *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010): "Our precedents, old and new, make clear that

27  concerns of national security and foreign relations do not warrant abdication of the judicial role." *Id.* at

28  34. That is, the courts "do not defer to the Government's reading of the First Amendment, even when

1    such [national security] interests are at stake." *Id.*; *see also Yusupov v. Att'y Gen. of U.S.*, 650 F.3d 968,

2    981 (3d Cir. 2011). Said another way, the government's invocation of foreign policy cannot deprive the

3    courts of their "essential function in ensuring that aliens are not targeted by the INS in retaliation for

4    exercising their acknowledged constitutional rights." *AADC*, 70 F.3d at 1056.

5        While some might find expression that supports Palestinian rights or criticizes Israel

6    uncomfortable, offensive, or upsetting, the Supreme Court has "said time and again that 'the public

7    expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of

8    their hearers.'" *Matal*, 582 U.S. at 244 (quoting *Street v. New York,* 394 U.S. 576, 592, (1969)). Indeed,

9    Courts have construed the First Amendment to protect burning the American flag (*Texas v. Johnson*,

10   491 U.S. 397, 404 (1989)), shouting homophobic slurs at the funeral of a deceased veteran (*Snyder*, 562

11   U.S. at 461), burning a cross at a political rally (*R.A.V. v. St. Paul*, 505 U.S. 377, 402 n.4 (1992)), and

12   even dressing up as Nazi soldiers carrying Swastika banners in a parade through a predominantly Jewish

13   neighborhood, (*Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977)).[13]

14       The rationale in each of these controversial cases was unflinching: the First Amendment must

15   protect "even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562

16   U.S. at 461. If there is "a bedrock principle underlying the First Amendment, it is that the Government

17   may not prohibit the expression of an idea simply because society finds the idea itself hurtful or

18   disagreeable." *Texas v. Johnson*, 491 U.S. at 414. Nor may it lawfully silence "vehement, caustic, and

19   sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270;

20   *see also Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (observing that "a function of free speech under

21   our system of government is to invite dispute," and it may "best serve its high purpose when it induces a

22   condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger").

23       The extent to which protected speech might impact foreign audiences is also not a legitimate

24   ground for suppression. The First Amendment's protection for controversial speech applies just as

---

25   [13] Even advocacy praising a congressionally designated foreign terrorist organization, like Hamas,
     would be protected under the First Amendment, so long as the speaker did not coordinate with or render
26   material assistance to the organization. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th
     Cir. 2002) (under the material support for terrorism statute, individuals "may, with impunity, become
27   members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and
     philosophies of Hamas"); *accord Holder*, 561 U.S. at 39 ("[W]e in no way suggest that a regulation of
28   independent speech would pass constitutional muster, even if the Government were to show that such
     speech benefits foreign terrorist organizations.").

1  robustly to speech that may offend foreign audiences. As the Supreme Court has indicated: "[I]n public

2  debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide

3  'adequate 'breathing space' to the freedoms protected by the First Amendment . . . We are not persuaded

4  that the differences between foreign officials and American citizens require us to deviate from these

5  principles here." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (quoting *Hustler Magazine, Inc. v. Falwell*,

6  485 U.S. 46, 56 (1988)). The First Amendment's protections for free expression are well known the

7  world over, and foreign audiences are not likely to mistake the constitutionally compelled tolerance of

8  dissent as the U.S.'s endorsement of dissident views. *Cf. Widmar v. Vincent*, 454 U.S. 263, 271 n.10

9  (1981) ("[B]y creating a forum the University does not thereby endorse or promote any of the particular

10  ideas aired there. Undoubtedly many views are advocated in the forum with which the University desires

11  no association."); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112-20 (2001).

12  Ultimately, the *AAUP* court summed up the situation best after holding an extensive bench trial:

13  "[N]othing in the text, history, or tradition of the First Amendment suggests that persons lawfully

14  present here may be subject to adverse action based on their political speech, where that speech is

15  primarily concerned with the actions of foreign nations with whom the United States is not at war and

16  Congress has not made a specific determination that a specific organization threatens the violent

17  overthrow of the government." *AAUP*, 2025 WL 2777659, at *52. "This is a new invention that in

18  important ways goes beyond its closest analogues in the Red Scare." *Id. Amici* urge this Court not to

19  allow such scare tactics to extend any farther where protected political speech is at issue.

20  **III.    The Revocation and Deportation Provisions Violate the Fifth Amendment's Due Process Guarantees and are Unconstitutionally Vague as Applied to Protected Speech**

21  As Plaintiffs argue, even if this Court were to conclude that the Revocation and Deportation

22  Provisions could satisfy First Amendment scrutiny when applied to noncitizens' protected speech, the

23  Court should still conclude that the provisions are unconstitutionally vague under the Fifth Amendment

24  in that application. Both the Revocation and Deportation Provisions run afoul of due process guarantees

25  because they (1) fail to provide noncitizens with notice of what otherwise-lawful speech, opinions,

26  beliefs, or advocacy might result in detention and removal, and (2) afford Defendants unfettered

27  discretion to target the pro-Palestine speech that the Administration so disfavors. *See City of Chicago v.*

28  *Morales*, 527 U.S. 41, 56 (1999) (holding that a law can be vague for two independent reasons: if the

1   government fails to "provide the kind of notice that will enable ordinary people to understand what

2   conduct it prohibits," or if it would "authorize and even encourage arbitrary and discriminatory

3   enforcement"); *see also Grayned v. City of Rockford*, 408 U.S.104, 108 (1972) ("It is a basic principle of

4   due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

5   **A. The Revocation and Deportation Provisions fail to provide fair notice.**

6   Where, as here, a law seeks to regulate speech, courts require precision and "rigorous adherence"

7   to due process requirements so as "to ensure that ambiguity does not chill protected speech." *FCC v.*

8   *Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). Such precision is especially critical when the

9   severity of threatened "criminal sanctions may well cause speakers to remain silent rather than

10  communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S. 844, 872

11  (1997). For threats of deportation—viewed to be "a drastic measure, often amounting to lifelong

12  banishment or exile"—courts impose the "most exacting vagueness standard." *Sessions v. Dimaya*, 584

13  U.S. 148, 156-57 (2018) (plurality opinion); *see id*. at 183 (Gorsuch, J., concurring in the judgment); *Lee*

14  *v. United States*, 582 U.S. 357, 370 (2017) ("Deportation is always 'a particularly severe penalty.'").

15  Neither the Deportation Provision nor the Revocation Provision provides a noncitizen living in

16  the country with fair notice. On its face, the Revocation Provision states that the consular officer or

17  Secretary of State may revoke a visa "at any time, in his discretion." 8 U.S.C. § 1201(i). As applied to

18  protected speech, there is no explanation about what otherwise lawful expressive acts might be punished

19  and no scienter requirement that might narrow its construction. The Deportation Provision is nearly as

20  blank. It allows for the punishment of speech that does not violate any law, so long as, in Secretary

21  Rubio's view, that speech compromises a compelling "foreign policy interest." *Id.* § 1227(a)(4)(C)(i). In

22  the context of protected speech, these provisions leave everyone to guess at what expression is forbidden

23  and which foreign policy interest is at risk.

24  Even when properly read to encompass only speech that interferes with the U.S.'s relations with

25  foreign countries, the foreign policy ground is considerably more vague than other statutes that the

26  Supreme Court has struck down as void for vagueness. *See Khalil*, 784 F. Supp. 3d at 733-741, 750-59

27  (summarizing cases). Moreover, the Trump Administration's interpretation of the foreign policy ground

28  to encompass any government concern with global implications severely exacerbates the statute's

vagueness. After all, "[t]here is no one-stop shop, no single place to see all of America's foreign policy interests put down on paper," and many of these interests "are both enormously broad and fuzzy at their edges." *Id.* at 762-763. "[I]f 'foreign policy' under section 1227 is taken to include interests in fostering world economic stability or in creating good will toward the United States," there is no way "to know where these begin and end[.]" *Id.* at 763.

As the *AAUP* court adduced with respect to the plaintiff noncitizens in that case: they "have all been made to understand that there are certain things that it may be gravely dangerous for them to say or do, but have not been told precisely what those things are (or are not)." 2025 WL 2777659 at *50. This ambiguity violates core constitutional principles, and the muzzling grip needs to end. *See, e.g.*, *Baggett v. Bullit*, 377 U.S. 360, 367 (1964) (making clear that there should be no guessing at what is lawful versus unlawful conduct); *United States v. Loy*, 237 F.3d 251, 258, 265 (3d Cir. 2001) (parole condition forbidding possession of "pornography of any type" was unconstitutionally vague because it was impossible for individuals to know "what is prohibited") (citing *Grayned*, 408 U.S. at 108).

### B. The Revocation and Deportation Provisions invite arbitrary and discriminatory enforcement.

The Revocation and Deportation Provisions also violate due process when applied to protected speech because, absent the notice standards and objective requirements just discussed, they can succumb to arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983). A law that "reach[es] a substantial amount of innocent conduct" (*Morales*, 527 U.S. at 60-61) provides law enforcement authorities with "an unfettered power of interpretation" and is the type of ad hoc and subjective application of a policy with which the vagueness doctrine is concerned. *Loy*, 237 F.3d at 266; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("Standards provide the guideposts that check the [official]" and without them, "*post hoc* rationalizations . . . and the use of shifting or illegitimate criteria are far too easy."); c*f. Arriaga v. Mukasey*, 521 F.3d 219, 228 (2d Cir. 2008) (provision of the INA instructing removal of individuals convicted of stalking provided adequate limits on enforcement because it did not enable discretionary application).

As Plaintiffs contend, the phrase—"compromises a compelling foreign . . . policy interest"—"means whatever Secretary Rubio wants it to mean." ECF No. 32 at 24. And recent events show that what the Administration wants it to mean are expressive acts innocuous as attending a peaceful pro-

Palestine protest, writing an article about Israel's siege on Gaza, or being outspoken about the war on campus. Some of the Administration's statements even suggest that Defendants' unlimited discretion is aimed at noncitizens merely associated with pro-Palestine viewpoints or groups. *See, e.g.*, ECF No. 13, Ex. C at 2 (Trump: "I will . . . quickly cancel the student visas of all Hamas sympathizers on college campuses . . . ."); ECF No. 13, Ex. E at 1 (Rubio: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported"). Punishing association, however, violates due process prohibitions on guilt by association, which "does not suffice" as a ground for deportability. *Yusupov*, 650 F.3d at 983 (citing *Scales v. United States*, 367 U.S. 203, 224 (1961)). Courts "cannot assume that Congress meant to employ the term 'affiliation' in a broad, fluid sense which would visit such hardship on an alien for slight or insubstantial reasons." *Bridges*, 326 U.S. at 147; *Rowoldt v. Perfetto*, 355 U.S. 115, 120 (1957) (reversing deportation order based on communist party affiliation and stressing "solidity of proof that is required for a judgment" entailing deportation consequences).

Indeed, the Revocation and Deportation Provisions leave open, "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). Questions about application of the provisions to protected speech remain myriad: Does mere presence at a protest in support of Palestinian human rights bring you within the Administration's crosshairs? Does publicly criticizing the actions of the Israeli military amount to "alignment" with Hamas? What about criticism of U.S. financing in support of the war in Gaza? Does engaging in scholarship about the history of Palestine and the Middle East raise a red flag? Confronted with these questions and wishing to remain in the U.S., Plaintiffs and their noncitizen members should not have to go silent to save themselves. Nor should the rest of our community have to suffer the diminished debate that results from their silence, their censored opinions, and their altered editorial decisions. This harm is exactly what our constitutional protections are intended to guard against.

## CONCLUSION

Defendants' abuse of their removal powers to silence dissent and distort public debate cannot stand. *Amici* respectfully urge this Court to grant Plaintiffs' Motion for Summary Judgment and to deny Defendants' Cross-Motion for Summary Judgment.

Dated: October 15, 2025                   Respectfully submitted,

                                          */s/ Chessie Thacher*

                                          ACLU FOUNDATION OF
                                          NORTHERN CALIFORNIA, INC.
                                          Chessie Thacher (SBN 296767)
                                          Shaila Nathu (SBN 314203)
                                          Angelica Salceda (SBN 296152)

                                          *Attorneys for Amici Curiae*
                                          *American Civil Liberties Union of*
                                          *Northern California, First Amendment*
                                          *Coalition, PEN American Center, Inc.,*
                                          *Freedom of the Press Foundation, and American*
                                          *Association of Colleges and Universities*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on October 15, 2025, I electronically transmitted the foregoing [Proposed]

3  Amici Curiae Brief of the American Civil Liberties Union of Northern California, the First Amendment

4  Coalition, PEN American Center, Inc., the Freedom of the Press Foundation, and the American

5  Association of Colleges and Universities in Support of the Plaintiffs' Motion for Summary Judgment to

6  the Clerk of the Court for the United States Federal District Court for the Northern District of California,

7  San Jose Division using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing

8  to the CM/ECF registrants in the case.

9

10                                    */s/ Chessie Thacher*

11                                    Chessie Thacher

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28