1  Matthew S.L. Cate (SBN 295546)
   matt@matthewcatelaw.com
2  **LAW OFFICE OF MATTHEW S.L. CATE**
3  101 Montgomery Street, Suite 900
   San Francisco, CA 94104
4  Tel/Fax: 415-964-4400

5  *Counsel for Amici Curiae Student Press Law*
   *Center, Associated Collegiate Press,*
6  *College Media Association, and Fifty-five Student*
   *Media Outlets and Newsroom Leaders*

7

8                **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9                      **SAN JOSE DIVISION**

10

11  The Stanford Daily Publishing Corp., *et al.*,    Case No. 5:25-cv-06618-NW

12              Plaintiffs,                **[Proposed]** *Amici Curiae* **Brief of Student**
                                           **Press Law Center, Associated Collegiate**
13       v.                                **Press, College Media Association, and**
                                           **Fifty-five Student Media Outlets and**
14  Marco Rubio, in his official capacity as  **Newsroom Leaders in Support of Plain-**
15  Secretary of State, *et al.*,          **tiffs' Motion for Summary Judgment**

16              Defendants.                Date:       November 19, 2025
                                           Time:       9:00 a.m.
17                                         Courtroom:  3

18
                                           Trial Date:  n/a
19                                         Action Filed: August 6, 2025

20

21

22

23

24

25

26

27

28

**Corporate Disclosure Statement**

None of the following proposed *amici curiae* corporations have a parent corporation or any publicly held corporation owning 10 percent or more of its stock:

- Student Press Law Center
- Associated Collegiate Press
- College Media Association
- The Brown Daily Herald Incorporated, d/b/a *The Brown Daily Herald*
- The Cavalier Daily, Inc. d/b/a *The Cavalier Daily*
- The Daily Pennsylvanian Inc., d/b/a *The Daily Pennsylvanian*
- The Daily Princetonian Publishing Company, d/b/a *The Daily Princetonian*
- The Dartmouth, Inc. d/b/a *The Dartmouth*
- The Harvard Crimson, Inc. d/b/a *The Harvard Crimson*
- Illini Media Company, d/b/a *The Daily Illini*
- Independent Berkeley Students Publishing Company, Inc., d/b/a *The Daily Californian*
- Maryland Media, Inc. d/b/a *The Diamondback*
- The Red & Black Publishing Co. d/b/a *The Red & Black*
- Washington University Student Media, Inc. d/b/a *Student Life Newspaper*
- World Series Way Publishing Company, Inc. d/b/a *The Huntington News*
- Yale Daily News Publishing Co., Inc., d/b/a *Yale Daily News*

ASUCLA Communications Board d/b/a *The Daily Bruin* is a division of Associated Students UCLA, a nonprofit organization that does not have a parent corporation or any publicly held company owning 10 percent or more of its stock.

Brief of Student Press Amici I/S/O Plfs' MSJ / Case No. 5:25-cv-06618-NW

1

**Table of Contents**

2    Corporate Disclosure Statement .................................................................... ii

3    Table of Authorities ..................................................................................... iv

4    Identity and Interest of *Amici Curiae* ........................................................... 1

5    I.    Introduction ........................................................................................ 2

6    II.    Argument ........................................................................................... 4

7         A.    Student media instill democratic and civic values. ........................... 4

8         B.    The government's unlawful application of the Revocation Provision
              and Deportation Provision have inflicted widespread harm on student
9              media and its audience as valuable contributors and sources have gone
              silent in response to the government's threats. ................................. 6

10
         C.    The government's unlawful application of the Revocation Provision
11             and Deportation Provision threatens enduring harm to journalism
              education and civic discourse. ...................................................... 11
12
    III.    Conclusion ........................................................................................ 13
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## Table of Authorities

2

**Cases**

3

*Bridges v. Wixon,*
   326 U.S. 135 (1945) ..................................................................................2

4

5

*Keyishian v. Bd. of Regents,*
   385 U.S. 589 (1967) ................................................................................10

6

7

*Lamont v. Postmaster Gen.,*
   381 U.S. 301 (1965) ................................................................................10

8

*Lozman v. Riviera Beach,*
   585 U.S. 87 (2018) ....................................................................................2

9

10

*Mendocino Envntl. Ctr. v. Mendocino Cnty.,*
   192 F.3d 1283 (9th Cir. 1999) ...................................................................2

11

*NAACP v. Button,*
   371 U.S. 415 (1963) ................................................................................10

12

13

*Papish v. Bd. of Curators of the Univ. of Mo.,*
   410 U.S. 667 (1973) ................................................................................13

14

*Stanley v. Georgia,*
   394 U.S. 557 (1969) ................................................................................10

15

16

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ..................................................................................4

17

18

**State Statutes**

19

2022 Haw. Laws, ch. 24 § 2 ..........................................................................5

20

W. Va. Code § 18B-21-2 ...............................................................................4

21

22

**Constitutional Provisions**

23

U.S. Const. amend. I .............................................................................. *passim*

24

25

**Other Authorities**

26

Aatish Bhatia and Amy Fan, *Nearly 20 Percent Fewer International Students Traveled to the U.S. in August*, N.Y. Times (Oct. 6, 2025), http://bit.ly/46XCwTw .............. 11

27

28

Alice Qin, *Protecting student journalism: Rumeysa Ozturk and the tilting risk-reward equation of free speech*, The Duke Chronicle (Apr. 18, 2025). http://bit.ly/48TKHD3 .................................................................................2, 9

Ashley Mowreader, *International Student Visa Issuances Dropped in May*, Inside Higher Ed (July 17, 2025), http://bit.ly/48ShAzW .................................................. 11

Christine Fernando, *College journalists wrestle with transparency as students fear deportation for speaking out*, Associated Press (Apr. 25, 2025), http://bit.ly/42YMbbq.........................................................................................7

Daksha Pillai and Spencer Davis, *Office of Institutional Equity investigates Palestinian activists following Spectator op-ed*, Columbia Spectator (Apr. 22, 2025), http://bit.ly/4o1VT50 .............................................................................................12

Dan Levin, *When the Student Newspaper Is the Only Daily Paper in Town*, N.Y. Times (Oct. 19, 2019), https://nyti.ms/3reRON1.......................................4

Editorial Board, *Cutting student journalism cuts campus transparency*, The Daily Nebraskan (Mar. 4, 2025), http://bit.ly/4pVHKId .........................................12

Editorial Board, *Changes in The Dickinsonian's editorial policy*, The Dickinsonian (Sept. 18, 2025), http://bit.ly/4oi8z7N ...............................................8, 9

Elias Schisgall, *With International Students at Risk, Campus Newspapers Loosen Editorial Policies*, Nieman Reports (Apr. 17, 2025), http://bit.ly/4neb22t ............................. 8

Elissa Nadworny, *Colleges see significant drop in international students as fall semester begins*, NPR (Aug. 27, 2025), http://bit.ly/4nIk4Wp ......................................... 11

Emily Spatz, *Letter from the Editor: Clarifying our anonymity policies in an unprecedented time*, The Huntington News (Apr. 23, 2025), http://bit.ly/3VRpToa ..........................................................................................8

Frances Vinall, *Over 6,000 student visas revoked for crimes and overstays, U.S. says*, Wash. Post (Aug. 19, 2025), http://bit.ly/3IGsTAR .......................................10

Jake Offenhartz, *Under threat from Trump, Columbia University agrees to policy changes*, AP (Mar. 21, 2025), http://bit.ly/4pVNKkp.........................................12

Kayla Huynh, *Amid visa restrictions, international freshmen enrollment plummets at UW-Madison*, Milwaukee Journal Sentinel (Sept. 29, 2025), http://bit.ly/3VVIKyu.................................................................................11

Kaylee Kang, *et al.*, *Fewer foreign students, fewer dollars: US colleges feel the pinch*, Reuters (Oct. 3, 2025), http://bit.ly/47aNGWt...................................................12

Lauren Watson, *Student Journalists Wrestle with Censoring Their Own Work*, Columbia Journalism Review (Apr. 17, 2025). http://bit.ly/4mZU5sn ..........................9

— v —

Meghnad Bose, *A Student Journalist Covered a Pro-Palestine Protest. Soon, Her Graduation Came Under Threat*, Columbia Journalism Rev. (May 6, 2025), http://bit.ly/4723cmh...........................................................................................13

Natalia Mochernak, *'Fight to keep these papers alive': Student journalists react to print budget cuts*, The Daily Bruin (May 19, 2025), http://bit.ly/4oeGvT2 .....................12

Samantha Henry, *Journalism Advisory Organizations Issue Rare Alert to Student News Outlets*, Nieman Reports (Apr. 7, 2025), http://bit.ly/3KGfA3V.............................6

Sidne K. Gard, *When Speech Isn't Free*, F Newsmagazine (Apr. 27, 2025), http://bit.ly/478PZrX ...........................................................................................8

SPLC News, *Student media groups warn of unprecedented threats*, SPLC (Apr. 4, 2025), http://bit.ly/493gu4z ................................................................7

U.S. Dep't of State, *Report to Congress on Protection of Civil Society Activists and Journalists*, https://2021-2025.state.gov/wp-content/uploads/2022/06/Report-to-Congress-on-Protection-of-Civil-Society-Activists-and-Journalists.pdf................5

Zach Metzger, *The State of Local News: Executive Summary*, Local News Initiative (Oct. 23, 2024), http://bit.ly/46Us0wn ...........................................................4

Brief of Student Press Amici I/S/O Plfs' MSJ / Case No. 5:25-cv-06618-NW

**Identity and Interest of *Amici Curiae*[1]**

The Student Press Law Center ("SPLC") is a national, nonprofit, nonpartisan organization established in 1974. SPLC is the only organization in the United States focused exclusively on promoting, supporting, and defending the rights of high school and college journalists.

The Associated Collegiate Press ("ACP") is a national, nonprofit, nonpartisan organization established in 1921. ACP is the largest and oldest national membership organization for college student media in the United States.

The College Media Association ("CMA") is a national, nonprofit, nonpartisan organization established in 1955. CMA is the only organization focused exclusively on educating, supporting, and defending the rights of college media advisers and their students.

SPLC, ACP, and CMA are joined by 55 student media outlets and newsroom leaders,[2] who—like Plaintiff The Stanford Daily Publishing Corporation—carry out important, and increasingly vital, work to inform their communities and who rely in part on noncitizen staffers, contributors, and sources who are lawfully present in the United States on student visas. These *amici curiae* (collectively, the "Student Press Amici") therefore have a profound interest in ending the government's unlawful application of the Revocation Provision and Deportation Provision to retaliate against noncitizen students for their speech.[3]

The Student Press Amici accordingly submit this brief to emphasize the importance of the work of a student press that reflects a diverse range of viewpoints and voices; to detail the real, persistent, and devastating chilling effect that the government's attack on disfavored speech has had on student-led newsrooms like *The Stanford Daily*; and to explain the potential

---

[1] This brief was authored entirely by counsel for the Student Press Amici and not by counsel for any party, in whole or in part. No party or counsel for any party contributed money to fund the preparation or submission of this brief. Apart from the *amici curiae* and their counsel, no one contributed money to fund the preparation or submission of this brief.

[2] These additional *amici* are identified in Appendix A to this brief.

[3] As used in this brief, these terms carry the same meaning as those applied in Plaintiffs' Motion. *See* Dkt 32-1 at 3.

1  long-term harms that will flow from allowing the government to continue its unlawful, anti-

2  constitutional campaign to stifle speech and speakers it dislikes.

3  **I.    Introduction**

> Here is the problem in concrete terms: Sure, it has gotten easier to
> publish, say, an op-ed you wrote for the campus newspaper through
> the internet. But how many people will actually read it? And what is
> the probability that the United States government is the one that
> does and decides to take issue with it? It's becoming less and less
> worth it to take that chance, for anyone. And, if dissent is an indis-
> pensable component of democratic enterprise, that's a problem —
> especially for student journalism.
>
> This is a precarious moment in higher education where every uni-
> versity desperately needs a witness. Regardless of whether they are
> read, student newspapers are crucial bodies of historical information
> for universities. Through first-person op-eds or interviews in news
> articles, they provide consistent and formalized ways of document-
> ing the perspectives of community members. If students believe it is
> no longer worth it to share their thoughts in a documented capacity
> — due to the prospect of being deported, detained or otherwise pun-
> ished — we simply cannot do our jobs.

15  Alice Qin, *Protecting student journalism: Rumeysa Ozturk and the tilting risk-reward equation of*

16  *free speech*, The Duke Chronicle (Apr. 18, 2025), http://bit.ly/48TKHD3.

17  The First Amendment prohibits the government from "retaliating against individuals

18  for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018). That pro-

19  tection applies equally to citizens and noncitizen residents alike. *See, e.g.*, *Bridges v. Wixon*, 326

20  U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this coun-

21  try."). And when the threat of retaliatory action "would chill or silence a person of ordinary

22  firmness from future First Amendment activities," the Constitution draws no distinction be-

23  tween directly punishing someone for what they said and frightening them into silence before

24  they said it. *See Mendocino Envntl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

25  The Student Press Amici submits this brief in support of Plaintiffs because current and

26  former student journalists—including those who work at *The Stanford Daily* and untold num-

27  bers of their peers, citizen and noncitizen alike, at student media outlets across the United

28  States—have seen their work and the vital lessons they learn from it hampered for the better

part of a year of by the unconstitutional chilling effects of the government's attack on disfavored political speech by noncitizen students. The Court should grant Plaintiffs' motion and enjoin Defendants from unconstitutionally applying the Revocation Provision and Deportation Provision to punish international students for their protected speech activity. The stakes for student journalism, journalism education, and the democratic values underlying those pursuits could hardly be higher.

*First*, beyond its indispensable benefit to the communities it serves, the student press imparts fundamental pro-democratic values on those who practice and engage with it. These lessons are taught equally to those noncitizen student journalists, sources, and contributors, whose experience with student journalism in the United States can have a force multiplier effect abroad.

*Second*, the government's unlawful application of the Revocation Provision and Deportation Provision has harmed student journalists across the country, regardless of their citizenship status. Contrary to Defendants' suggestion, *see* Defs' Cross-MSJ (Dkt 33) at 13, the chilling effects arising from their unconstitutional actions are widespread and devastating.

*Third*, if not enjoined, the threat of visa revocations to punish disfavored speech will inflict further harm on student newsrooms. A free press cannot thrive in an atmosphere of fear, whether the threat comes from a university dean or a federal deportation order. International student enrollment is cratering in response to the threat of visa revocations and deportations over social media posts or statements deemed to be "anti-American" or otherwise claimed by the government to be vaguely against U.S. interests. Current policies that drive international students away or compel them to self-censor have stripped campus media of the diverse voices necessary to provide the public with a full and accurate understanding of their communities. An unchecked system of government retaliation for protected speech activity will certainly expand a broader culture of government-led or government-pressured investigations into and retribution against student journalists who may report on politically sensitive issues.

Brief of Student Press Amici I/S/O Plfs' MSJ / Case No. 5:25-cv-06618-NW

1    For these reasons, the Student Press Amici ask the Court to grant Plaintiffs' Motion

2    for Summary Judgment and enjoin the government's unlawful attack on disfavored student

3    speech.

4    **II.    Argument**

5        **A.    Student media instill democratic and civic values.**

6        Student-run newsrooms are where young journalists learn by doing—interviewing, in-

7    vestigating and publishing news that serves their communities. But student media outlets are

8    far more than training grounds for future journalists; they provide a forum for democratic en-

9    gagement for all participants.

10       For one, as local professional news coverage has declined, student publications increas-

11   ingly fill critical gaps in public information. *See, e.g.*, Zach Metzger, *The State of Local News:*

12   *Executive Summary*, Local News Initiative (Oct. 23, 2024), http://bit.ly/46Us0wn (reporting

13   decline of 3,300 local newspapers in the United States since 2005 and the loss of more than

14   7,000 newspaper jobs between 2022-2023 alone). As a result of various market and structural

15   factors, nearly 55 million people in the United States now have limited or no access to local

16   news—making the student press more indispensable than ever.  *See id.*; *see also* Dan Levin,

17   *When the Student Newspaper Is the Only Daily Paper in Town*, N.Y. Times (Oct. 19, 2019),

18   https://nyti.ms/3reRON1 (describing, among other examples, *The Michigan Daily*'s staff of

19   300 student journalists working in Ann Arbor, Michigan, "to provide incisive coverage about

20   the city's police, power brokers, and policymakers, all while keeping up with school").

21       Beyond serving as an increasingly essential news source, student media teaches both its

22   practitioners and readers—citizens and noncitizens alike—the principles of inquiry, critical

23   thinking and reasoned debate central to democracy. Learning about these tools of civic engage-

24   ment and how best to use them as journalists is a critical part of the U.S. educational experi-

25   ence. The United States Supreme Court emphasized this long ago when it rejected the idea

26   that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism,

27   religion, or other matters of opinion." *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624,

28   642 (1943). Indeed, "educating the young for citizenship" while protecting their constitutional

— 4 —

1  freedom to disagree with the government is necessary "if we are not to strangle the free mind
2  at its source and teach youth to discount important principles of our government as mere plat-
3  itudes." *Id.* at 637.

4          The recognition of student journalism's role in instilling these values has gained in-
5  creasing resonance. State legislatures, for example, have enacted New Voices laws protecting
6  student journalists' rights and recognizing the civic and pedagogical benefits a robust and free
7  student press provides. *See, e.g.*, W. Va. Code § 18B-21-2(a)-(b) (affirming that "student press
8  can contribute to the continuing development of informed and civic-minded citizens" and
9  those involved in its practice should be protected "in order to encourage students to become
10  educated, informed, and responsible members of society"); 2022 Haw. Laws, ch. 24 § 2 ("al-
11  lowing student journalists at the University of Hawaii to exercise freedom of speech and free-
12  dom of the press in school-sponsored media and protecting their advisors from retaliation for
13  refusing to censor their students is a matter of statewide concern").

14          When the government makes dissent a deportable offense, it betrays the very lessons
15  our schools exist to teach.

16          The impact of these lessons and how they shape our shared futures, moreover, is not
17  limited to American shores. When international students get involved in American student
18  journalism, they develop a bond with the United States and its democratic values that goes far
19  beyond the "only temporary and tenuous connection[]" that Defendants assert our interna-
20  tional student visitors retain. *See* Defs' Cross-MSJ. The government has previously and
21  properly recognized that a free and vibrant press—in societies where it operates—is "essential
22  for effectively promoting respect for human rights and fundamental freedoms, strengthening
23  democratic institutions, and fostering resilient societies that are peaceful, prosperous, and in-
24  clusive." *See* Report to Congress on Protection of Civil Society Activists and Journalists, U.S.
25  Dep't of State, https://2021-2025.state.gov/wp-content/uploads/2022/06/Report-to-Con-
26  gress-on-Protection-of-Civil-Society-Activists-and-Journalists.pdf (last accessed Oct. 13,
27  2025), at 1. And when our First Amendment values are exported abroad, it "helps support
28  transparency and accountability, promote rule of law, and expose corruption." *See id.*

**B.** **The government's unlawful application of the Revocation Provision and Deportation Provision have inflicted widespread harm on student media and its audience as valuable contributors and sources have gone silent in response to the government's threats.**

Contrary to Defendants' assertions, the chilling effects of the government's actions are real, widespread, and well-documented. Student journalists—especially noncitizen students— report declining participation, self-censorship, and withdrawal from public discourse. Each of these results inflict harm not only on individual students but also on the broader educational and democratic mission of the student press.

The government's high-profile arrests of Mahmoud Khalil, Mohsen Mahdawi, and Rümeysa Öztürk in early 2025—and its audacious characterization of their speech as cause for removal from the United States—sent a clear message to international students: Say or write something that this administration does not like, and the government may grab you off the street, call you a terrorist sympathizer, lock you up in a distant detention facility, and ultimately kick you out of the country. *See, e.g.*, Plfs' Mot. at 6-7.

Almost immediately after news of those actions spread, and with Defendant Rubio's vow to engage in large-scale revocations of F-1 visas based on students' expression, student-run newsrooms across the United States began experiencing a crisis of unprecedented scale. Former contributors began calling to have their articles or op-eds removed or scrubbed of identifying details, lest they be subjected to visa revocation like Öztürk or other adverse immigration consequences based on their published speech. International students who were planning to write articles, op-eds, or letters to the editor about Palestine, ICE, immigration, or other topics that may draw unwanted attention from the government began withdrawing their submissions. The Student Press Law Center received a surge of calls through its hotline as student journalists began finding it difficult to convince international students and others to speak on the record for news articles or commentary on those issues.

Within 10 days of Öztürk's arrest, SPLC and five other national student media organizations issued a national alert advising student journalists on how best to try to navigate the fallout. *See, e.g.*, Samantha Henry, *Journalism Advisory Organizations Issue Rare Alert to Student*

— 6 —

*News Outlets*, Nieman Reports (Apr. 7, 2025), http://bit.ly/3KGfA3V. The alert advised student newsrooms that the government's actions to deport international students "demand urgent and unprecedented attention from student media in the United States" because noncitizen student speakers "have faced severe consequences" over their legally protected speech, "including visa revocation, detention, deportation or bans on reentry." *See* SPLC News, *Student media groups warn of unprecedented threats*, SPLC (Apr. 4, 2025), http://bit.ly/493gu4z. And the groups urged student media organizations to "revisit their policies on takedown requests and anonymous sources, particularly for those whose immigration status may make them targets for their lawful speech." *Id.*

In the weeks and months since, student journalists and their campus communities have continued to struggle through the chilling effect of the government's actual and threatened use of the Revocation Provision and Deportation Provision to punish disfavored speech. *See, e.g.*, Christine Fernando, *College journalists wrestle with transparency as students fear deportation for speaking out*, Associated Press (Apr. 25, 2025), http://bit.ly/42YMbbq ("The need to consider high-stakes safety risks has increased pressure on students in newsrooms that are meant to be learning labs for future journalists."). For example:

- The editor-in-chief of the *Columbia Political Review*, doubting that "it's a coincidence that we're getting more of these requests than we ever had before," reported having received half a dozen requests from international students and others "wanting to put the publishing process on hold" and as many seeking to remove published articles. *Id.*

- *The Alestle* at Southern Illinois University had to depart from its policy regarding anonymity for a then-upcoming article about eight international students whose visas had been revoked, even as experts caution that reliance on unnamed sources can hinder credibility. *Id.*

- The leader of Ohio State University's *The Lantern* said the impact of the government's visa-revocation and deportation actions—including visa revocations of 12 students at her university—and the resulting "pressure to do the right thing" had inflicted "a mental toll" on newspaper staff. *Id.*

Brief of Student Press Amici I/S/O Plfs' MSJ / Case No. 5:25-cv-06618-NW

- A staff writer at *F Newsmagazine*, at the School of the Art Institute of Chicago, told her publication that "I feel an underlying fear that any choice could be the wrong move that gets my student visa revoked." *See* Sidne K. Gard, *When Speech Isn't Free*, F Newsmagazine (Apr. 27, 2025), http://bit.ly/478PZrX.

There's more: At Northeastern University's newspaper, the editor-in-chief received "an influx of requests from worried students that The Huntington News anonymize quotes, remove photos and take down some articles entirely for their safety." *See* Elias Schisgall, *With International Students at Risk, Campus Newspapers Loosen Editorial Policies*, Nieman Reports (Apr. 17, 2025), http://bit.ly/4neb22t. And because "the landscape has changed enough where international students maybe aren't going to be able to fully complete their education in the United States, or there's a threat of them being arrested" over what they wrote for publication, *The Michigan Daily* at the University of Michigan retroactively anonymized two articles written by international students. *Id.*

As the 55 *amici curiae* on this brief representing America's student media can attest firsthand, student-run newsrooms across the country have received similar requests since the government's anti-immigrant and anti-speech crackdown. At *The Daily Tar Heel*, where the University of North Carolina newspaper agreed to remove columns over retaliation concerns. *Id.* At *The Exponent* at Purdue University, which reasoned that "it's unorthodox" to remove previously published content "but the situation we're in now is unorthodox" because when else "has the federal government ever said something so blatant as 'You protest on this issue, you're under threat'?" *Id.*; *see also, e.g.*, Emily Spatz, *Letter from the Editor: Clarifying our anonymity policies in an unprecedented time*, The Huntington News (Apr. 23, 2025), http://bit.ly/3VRpToa ("Since President Donald Trump took office in January, The Huntington News has seen an increased number of sources ask for anonymity, refuse to speak to reporters out of fear and even request to unpublish pieces that expressed positions critical of the United States government."); Editorial Board, *Changes in The Dickinsonian's editorial policy*,

1   The Dickinsonian (Sept. 18, 2025), http://bit.ly/4oi8z7N (explaining changes to policy to al-

2   low grants of anonymity to "international students who may be at legal risk if they voice certain

3   opinions or experiences").

4        So, too, at *The Harvard Crimson* and *The Rice Thresher*. *See* Lauren Watson, *Student*

5   *Journalists Wrestle with Censoring Their Own Work*, Columbia Journalism Review (Apr. 17,

6   2025), http://bit.ly/4mZU5sn. That same fear reaches beyond international students who

7   have submitted material for publication. It understandably compels those students to exercise

8   extreme caution as sources, often depriving the student press of important voices. For example,

9   the editor-in-chief of the *Independent Florida Alligator* conveyed her newsroom's experience

10  confronting sources who are international students who, "especially in Florida, are just really

11  afraid that there's going to be repercussions for the things they say that get printed." *Id.*

12       And at *The Duke Chronicle*, Ms. Qin's conclusion that "we simply cannot do our jobs"

13  when international voices are chilled was not an assumption. *See* Alice Qin, *Protecting student*

14  *journalism: Rumeysa Ozturk and the tilting risk-reward equation of free speech*, The Duke Chroni-

15  cle (Apr. 18, 2025), http://bit.ly/48TKHD3. Rather, she experienced the harm firsthand when

16  she and an international student who was planning to contribute a "beautifully written" op-ed

17  decided not to run it over deportation concerns. *Id.* Ms. Qin and the writer recognized the

18  concept—as the government refuses to do in this case—that "[t]he probability of deportation

19  as a result of this specific op-ed is indeterminable, but recent news cycles convey that it is now

20  nonzero." *Id.*

21       Given the risk of deportation, the loss of educational opportunities and the prospect of

22  "tremendous personal harm" upon return to their home countries *see id.*, it is inaccurate to

23  characterize such an agonizing choice—and similar ones that have repeatedly played out in

24  similar conversations—as reflecting students "making their own independent decisions" un-

25  der anything less than duress. *See* Defs' Cross-MSJ at 13. These responses to high-profile ar-

26  rests and attempted removals of international students for no more than their speech—and the

27

28

news of revocation of *thousands* of international student visas in the wake of those incidents[4]—are as rational as they are all but compelled on those making the "independent decision" to remain silent on political issues. As the United States Supreme Court has made clear, "the threat of sanctions may deter almost as potently as the actual application of sanctions" and "[t]he danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)) (cleaned up).

That compelled silence harms the noncitizen student who suffers it. But the injury is felt far more broadly. Targeting international student journalists doesn't just punish speech—it erases perspective. International student journalists bring worldviews shaped by different political systems, cultures, and lived experiences. Their participation enriches campus dialogue, broadens understanding of global issues, and exposes all students to the practice of democracy as both an American ideal and a universal value. And limiting that exposure harms not only the noncitizen student who wishes to speak but also those who wish to hear them—even when the message is one the government dislikes. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (The "right to receive information and ideas, regardless of their social worth, is fundamental to our free society."); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306–07 (1965) (holding that law interfering with dissemination of communist propaganda was "an unconstitutional abridgment" of the right to receive the material). By reducing the comprehensiveness or perceived reliability of their coverage, the government's unlawful conduct here frustrates the work of student newsrooms who seek to serve and promote the First Amendment principles that are a necessary condition to informed self-governance.

//

//

//

//

---

[4] *See, e.g.*, Frances Vinall, *Over 6,000 student visas revoked for crimes and overstays, U.S. says*, Wash. Post (Aug. 19, 2025), http://bit.ly/3IGsTAR.

**C.    The government's unlawful application of the Revocation Provision and Deportation Provision threatens enduring harm to journalism education and civic discourse.**

In addition to the real harm that the Defendants' actions have already caused, the on-going threat of visa revocation to punish disfavored speech threatens to inflict ongoing and lasting harm on student newsrooms.

For one, the threat of being deported for lawful expression of ideas deemed "anti-American" will continue to reduce international student enrollment and prompt further self-censorship by those who remain, exacerbating the deprivation of essential diversity of perspective from campus media. Enrollment by international students has already plummeted in the wake of the government's crackdown against expression of government-disfavored views. The effect was nearly immediate as news of the Defendants' actions spread, with the number of F-1 visas issued for international students bound for the United States dropping by more than 20 percent in May 2025 compared to May 2024. *See* Ashley Mowreader, *International Student Visa Issuances Dropped in May*, Inside Higher Ed (July 17, 2025), http://bit.ly/48ShAzW. It has continued in the months since: By the fall semester, the number of international-student arrivals saw the largest recorded decline outside of the first year of the COVID-19 pandemic. *See* Aatish Bhatia and Amy Fan, *Nearly 20 Percent Fewer International Students Traveled to the U.S. in August*, N.Y. Times (Oct. 6, 2025), http://bit.ly/46XCwTw; Elissa Nadworny, *Colleges see significant drop in international students as fall semester begins*, NPR (Aug. 27, 2025), http://bit.ly/4nIk4Wp; *see also, e.g.*, Kayla Huynh, *Amid visa restrictions, international freshmen enrollment plummets at UW-Madison*, Milwaukee Journal Sentinel (Sept. 29, 2025), http://bit.ly/3VVIKyu (reporting more than 30 percent decrease in freshman enrollment at the University of Wisconsin-Madison, the largest decline in at least a decade).

The sharp drop in the number of international students necessarily makes for a smaller pool of contributors to student publications who have unique perspectives on global, and local, issues. And the increasingly smaller number of international students who remain or continue to study in the United States will continue to self-censor in the ways that we have already seen.

— 11 —

1    *See above* at 6–10. The result will be an increasing homogenization of editorial voices that results

2    in a less-informed audience.[5]

3    Further, if left unchecked, the atmosphere of fear and compelled deference to the gov-

4    ernment's whim that is currently stoked by the unlawful threats of visa revocations will un-

5    doubtedly expand to citizens who engage in student journalism. Indeed, it already has.

6    For example, in spring 2025, the Office of Institutional Equity at Columbia University

7    formally accused two students, both U.S. citizens, of "discriminatory harassment" and initi-

8    ated disciplinary proceedings in connection with an op-ed published by the *Columbia Spectator*

9    that was critical of Israel. *See* Daksha Pillai and Spencer Davis, *Office of Institutional Equity*

10   *investigates Palestinian activists following Spectator op-ed*, Columbia Spectator (Apr. 22, 2025),

11   http://bit.ly/4o1VT50. That investigation arose in the context of the university's agreement

12   with the government to, among other things, adopt the government's preferred definition of

13   antisemitism and police speech that falls within its sweep. *See, e.g.*, Jake Offenhartz, *Under*

14   *threat from Trump, Columbia University agrees to policy changes*, AP (Mar. 21, 2025),

15   http://bit.ly/4pVNKkp (reporting that the university "acquiesce[ed] to an extraordinary ulti-

16   matum by the Trump administration to implement those and other changes or risk losing bil-

17   lions of dollars in federal funding").

18

19   ───────────────

20   [5] Further, the loss of school revenues that results from reduced international-student enroll-
     ment will surely prompt budget cuts that further erode the quality or frequency of student jour-
21   nalism. *See* Kaylee Kang, *et al.*, *Fewer foreign students, fewer dollars: US colleges feel the pinch*,
     Reuters (Oct. 3, 2025), http://bit.ly/47aNGWt (reporting that "dozens of schools . . . have
22   announced budget cuts in response to Trump administration policies that are upending higher
     education."). Such cuts would compound the pain that the student press has suffered in recent
23   years. *See, e.g.*, Natalia Mochernak, *'Fight to keep these papers alive': Student journalists react to*
     *print budget cuts*, The Daily Bruin (May 19, 2025), http://bit.ly/4oeGvT2 (reporting that in
24   addition to threatened cuts to UCLA's student newspapers, the University of Southern Cali-
     fornia, "UC San Diego, Indiana University, the University of Kansas, the University of Ne-
25   braska Omaha, Pennsylvania State University and Rider University have all faced funding cuts
     to their student newspapers"); Editorial Board, *Cutting student journalism cuts campus transpar-*
26   *ency*, The Daily Nebraskan (Mar. 4, 2025), http://bit.ly/4pVHKId (detailing additional cuts
     and characterizing them as threatening to "weaken oversight and deprive campus communities
27   of information they deserve").

28

Brief of Student Press Amici I/S/O Plfs' MSJ / Case No. 5:25-cv-06618-NW

1    Similarly, Columbia University's Barnard College threatened to prevent a student jour-

2   nalist from graduating if she did not answer questions about WKCR's radio broadcast of a

3   March 2025 Pro-Palestine protest. *See* Meghnad Bose, *A Student Journalist Covered a Pro-Pal-*

4   *estine Protest. Soon, Her Graduation Came Under Threat*, Columbia Journalism Rev. (May 6,

5   2025), http://bit.ly/4723cmh. The school's director of Student Intervention and Success ac-

6   cused the journalist—who reported on the protest from the station's broadcast studio—of

7   "disorderly conduct, disruptive conduct" and other misconduct. *See id.*

8    Absent Plaintiffs' requested injunction, a culture of suppression of and punishment for

9   speech will continue to grow and, ultimately, replace a cherished culture of inquiry and debate

10   on U.S. campuses—a culture fostered by a vibrant student press—with one of fear and self-

11   censorship. That would infringe on First Amendment rights and undermine the educational

12   mission of our schools that Congress and the courts have long recognized. See *Papish v. Bd. of*

13   *Curators of the Univ. of Mo.*, 410 U.S. 667 (1973) (*per curiam*) (reaffirming that public universi-

14   ties may not punish students for disfavored ideas).

15    Because the First Amendment and a commitment to promoting its lessons and values

16   prohibit the demonstrated chilling effect that has swept across student newsrooms and stands

17   to continue to do so otherwise, the Court should enjoin Defendants from deploying the Revo-

18   cation Provision and Deportation Provision to attack students for engaging in protected speech.

19   **III.    Conclusion**

20    For the foregoing reasons, the Student Press Amici respectfully urge the Court to grant

21   Plaintiffs' Motion for Summary Judgment and enjoin the government from continuing its un-

22   lawful campaign against protected student speech. At stake is nothing less than the ability of

23   student journalists—citizen and noncitizen alike—to engage freely in the democratic enter-

24   prise that education is meant to foster. The Constitution demands no less.

25   //

26   //

27   //

28   //

1

2

Date: October 15, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LAW OFFICE OF MATTHEW S.L. CATE**

Matthew S.L. Cate

*Counsel for Amici Curiae Student Press Law Center, Associated Collegiate Press, College Media Association, and Fifty-five Student Media Outlets and Newsroom Leaders*

# Appendix A

# Appendix A

**Student News Organizations[1]**

The Student Press Amici include the following student news organizations, all of which are nonprofit, editorially independent news outlets led by students:

***The Alestle***
at Southern Illinois University, Edwardsville

**ASUCLA Communications Board d/b/a** ***The Daily Bruin***
at the University of California, Los Angeles

**The Brown Daily Herald Incorporated, d/b/a** ***The Brown Daily Herald***
at Brown University

***The Buccaneer***
at Peninsula College

***The Campus***
at Allegheny College

**The Cavalier Daily, Inc. d/b/a** ***The Cavalier Daily***
at the University of Virginia

***The Citizen***
at Laney College

***The College Voice***
at Connecticut College

***College Heights Herald***
at Western Kentucky University

***The Collegian***
at San Joaquin Delta College

***The Cornell Daily Sun***
Cornell University

***The Crimson White***
at the University of Alabama

***The Daily of the University of Washington***
at the University of Washington

---

[1] School names are provided only to help identify *amici*. No university, college, or other educational institution is a member of the Student Press Amici or otherwise participated in Student Press Amici's brief in support of Plaintiffs.

**The Daily Pennsylvanian Inc., d/b/a *The Daily Pennsylvanian***
at the University of Pennsylvania

**The Daily Princetonian Publishing Company, d/b/a *The Daily Princetonian***
at Princeton University

**The Dartmouth, Inc. d/b/a *The Dartmouth***
at Dartmouth College

***The Delphian***
at Adelphi University

**Maryland Media, Inc. d/b/a *The Diamondback***
at the University of Maryland, College Park

***The Dickinsonian***
at Dickinson College

***FAU University Press***
at Florida Atlantic University

**The Harvard Crimson, Inc. d/b/a *The Harvard Crimson***
at Harvard University

**Illini Media Company, d/b/a *The Daily Illini***
at the University of Illinois Urbana-Champaign

**Independent Berkeley Students Publishing Company, Inc., d/b/a *The Daily Californian***
at the University of California, Berkeley

***Kaleidoscope***
at the University of Alabama at Birmingham

***The Heights***
at Boston College

***The Maneater***
at the University of Missouri

***The Mass Media***
at the University of Massachusetts, Boston

***The Michigan Daily***
at the University of Michigan

***Mount Holyoke News***
at Mount Holyoke College

— 2 —

*The Northern Light*
at the University of Alaska, Anchorage

**Northwest Student Media**
at Northwest Missouri State University

*The Oberlin Review*
at Oberlin College

*The Orion*
at California State University, Chico

**The Red & Black Publishing Co. d/b/a** *The Red & Black*
at the University of Georgia

*The Retrograde*
at the University of Texas at Dallas

*The Rice Thresher*
at Rice University

*The Sun Star*
at the University of Alaska, Fairbanks

*The Trinity Tripod*
at Trinity College

*The Tufts Daily*
at Tufts University

*The Vanderbilt Hustler*
at Vanderbilt University

*The Wesleyan Argus*
at Wesleyan University

**Washington University Student Media, Inc. d/b/a** *Student Life Newspaper*
at Washington University in St. Louis

**World Series Way Publishing Company, Inc. d/b/a** *The Huntington News*
at Northeastern University

**Yale Daily News Publishing Co., Inc., d/b/a** *Yale Daily News*
at Yale University

**Student Newsroom Leaders**[2]

The Student Press Amici also includes the following student newsroom leaders, each of whom is participating as *amici* solely in their individual capacities:

**Sidne K. Gard**, Managing Editor, F Newsmagazine
at the School of the Art Institute of Chicago

**Alissa Gary**, Editor-in-Chief, *The Independent Florida Alligator*
at the University of Florida

**Ethan Grandin**, Editor-in-Chief, *The Review*
at the University of Delaware

**Adamari Gomez-Medrano**, Editor-in-Chief, ACCENT Student Media
at Austin Community College

**Max Guerra**, co-Editor-in-Chief, *City on a Hill Press*
at the University of California, Santa Cruz

**Callie Harkins**, Editor-in-Chief, *The Weekly Ringer*
at the University of Mary Washington

**Melanie Jackson**, Editor-in-Chief, *The Daily Campus*
at Southern Methodist University

**Olivia Mapes**, Editor-in-Chief, *The Exponent*
at Purdue University

**Makayla Paulsen**, Editor-in-Chief, *The Simpsonian*
at Simpson College

**Trinity Poon**, Editor-in-Chief, *The Bates Student*
at Bates College

**Allie Seibel**, Editor-in-Chief, *The Rocky Mountain Collegian*
at Colorado State University

---

[2] Titles and names of publications and schools are provided only to help identify *amici*.

App'x to Student Press Amici Brief / Case No. 5:25-cv-06618-NW