CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6488
      FAX: (415) 436-6748
      kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>RUBIO, *et al.*,<br><br>     Defendants. | Case No. 5:25-cv-06618-NW<br><br>**DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  November 19, 2025<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

## TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT ...............................................................................................................2

    A. Plaintiffs Lack Standing...........................................................................................2

        1. Stanford Daily lacks standing. ..................................................................2

            (i) Stanford Daily lacks associational standing. ................................2

            (ii) Stanford Daily lacks corporate standing. ....................................5

            (iii) Stanford Daily lacks organizational standing. .............................5

        2. The individual Plaintiffs lack standing. ....................................................6

    B. Plaintiffs' Claims Lack Merit. .................................................................................8

        1. The statutes do not violate the First Amendment. .....................................8

            (i) Plaintiffs' "facial" challenge ignores the statutes' legitimate scope. ...............................................................................................8

            (ii) The statutes' legitimate purposes overcome nonimmigrant visa-holders' reduced First Amendment protections. ...........................11

        2. The statutes do not violate the Fifth Amendment. ..................................14

III. CONCLUSION............................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAUP v. Rubio*,
   No. 25-10685-WGY, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ...................................... 5, 6, 7, 12

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) .................................................................................. 13

*Boutilier v. INS*,
   387 U.S. 118 (1967)........................................................................................................... 15

*Cal. Communities Against Toxics v. Armorcast Prods. Co.*,
   No. CV 14-5728 PA, 2014 WL 12966008 (C.D. Cal. Nov. 12, 2014)............................ 2, 3

*Demore v. Kim*,
   538 U.S. 510 (2003)..................................................................................................... 11, 14

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ............................................................................................................. 5

*Dep't of State v. Muñoz*,
   602 U.S. 899 (2024)........................................................................................................... 13

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)......................................................................................................... 3, 6

*Fiallo v. Bell*,
   430 U.S. 787 (1977)........................................................................................................... 14

*Fitzgerald Reno, Inc. v. DOT*,
   60 F. App'x 53 (9th Cir. 2003) ............................................................................................ 4

*Fleck & Associates, Inc. v. City of Phoenix*,
   471 F.3d 1100 (9th Cir. 2006) ......................................................................................... 2, 4

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952)........................................................................................ 12, 13, 14, 15

*Hellenic Lines Ltd. v. Rhoditis*,
   398 U.S. 306 (1970) ........................................................................................................... 12

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................................... 13, 14, 15

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................................ 2, 3

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ............................................................................................ 12

*Johnson v. United States*,
    576 U.S. 591 (2015) ............................................................................................ 14

*Jordan v. DeGeorge*,
    341 U.S. 223 (1951) ............................................................................................ 15

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................................................ 13

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953) ...................................................................................... 11, 12

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010) .............................................................................. 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 5

*Mahler v. Eby*,
    264 U.S. 32 (1924) ............................................................................................. 15

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ............................................................................................. 14

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ......................................................................................... 8, 9

*Noh v. INS*,
    248 F.3d 938 (9th Cir. 2001) ............................................................................ 10

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
    118 F.4th 770 (6th Cir. 2024) ........................................................................... 13

*Or. Advocacy Ctr. v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) ........................................................................ 2, 3

*Palestine Info. Off. v. Shultz*,
    853 F.2d 932 (D.C. Cir. 1988) ......................................................................... 14

*Peace Ranch, LLC v. Bonta*,
    93 F.4th 482 (9th Cir. 2024) ............................................................................... 6

*Presidio Golf Club v. National Park Service*,
   155 F.3d 1153 (9th Cir. 1998) .................................................................................. 4

*Pritkin v. DOE*,
   254 F.3d 791 (9th Cir. 2001) .................................................................................... 5

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
   993 F.2d 800 (11th Cir. 1993) .................................................................................. 4

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .................................................................................................. 9

*Rodriguez Diaz v. Garland*,
   53 F.4th 1189 (9th Cir. 2022) ................................................................................. 11

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ................................................................................................ 14

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) .................................................................................................. 3

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................................. 3

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................................................. 6

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................................... 10, 14

*United States v. Curtiss–Wright Export Corp.*,
   299 U.S. 304 (1936) ........................................................................................... 14, 15

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) .................................................................................. 13

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ................................................................................................ 11

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................................. 3

*Wash.State Grange v. Wash. State Repub. Party*,
   552 U.S. 442 (2008) ........................................................................................ 8, 9, 11

*Zemel v. Rusk*,
   381 U.S. 1 (1965) .................................................................................................... 15

**Statutes**

8 U.S.C. § 1201 ................................................................................................................. 10

8 U.S.C. § 1252 ................................................................................................................... 9

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................... 6

## I.    INTRODUCTION

Plaintiffs' opposition (Dkt. 44) confirms that they are seeking an advisory opinion about the scope of the First and Fifth Amendments that they do not need and the Court is ill-equipped to provide. The Court should enter summary judgment in the government's favor because Plaintiffs lack standing and their claims fail on the merits.

Stanford Daily does not have standing to ask this Court to declare federal immigration laws unconstitutional.  It does not have "associational standing"; courts have limited that doctrine to organizations that reflect the views of their members as to the issues raised in the litigation, but Stanford Daily is just a general-purpose student newspaper.  The issues in this lawsuit are not "germane" to its mission of reporting on campus activities.  Nor does it have "corporate" or "organizational" standing; it wholly fails to substantiate any claimed injuries, and in any event those injuries would be the result of the actions of third parties, not the government.

Nor do the individual Plaintiffs have standing.  They offer no evidence to overcome the government's showing that the specific campus-protest enforcement actions on which they base their claims concluded months ago, with no action taken against either of them.  At most, they point to general comments in the media by the Secretaries of State and Homeland Security about the importance of enforcing the law—but Plaintiffs ignore the Secretaries' comments that enforcement would be directed at supporters of terrorism, and in any event, such high-level comments do not show a specific threat directed at Plaintiffs.  That is especially true here, where the government's evidence reflects it has disavowed enforcement based on the "pure political speech" that Plaintiffs put at issue.

Plaintiffs' claims also fail on the merits.  Plaintiffs bring a facial First Amendment challenge, but they wholly fail to address the statutes' legitimate constitutional scope.  Plaintiffs ignore the government's authorities demonstrating that aliens (and especially temporary nonimmigrant visa holders) have reduced First Amendment protections and, as a consequence, the statutes' legitimate purpose satisfies the constitution.  Instead, Plaintiffs attack a series of straw men, pretending the government argues that aliens have "no" First Amendment rights, as if that were the only alternative to the full protections afforded citizens.  But Plaintiffs' black-or-white approach ignores the well-recognized "ascending scale" of rights that, in this context, supports the government's ability to exclude

1  nonimmigrants for foreign policy reasons.

2       Plaintiffs' Fifth Amendment vagueness challenge likewise fails, because Plaintiffs fail to

3  recognize nonimmigrants' reduced Fifth Amendment protections, the political branches' wide discretion

4  in immigration policy, and, most importantly, the need for statutes regarding foreign-policy issues to

5  paint with a broader brush than might be required in other contexts.  Congress cannot specify ahead of

6  time what specific foreign-policy problems the Secretary of State may need to address; nor does the

7  Constitution require it to try.  Rather, the Constitution recognizes the political branches' flexibility to

8  respond to changing international circumstances by allowing Congress to authorize the Executive to

9  exclude certain nonimmigrants when their presence jeopardizes the United States' interests.

10      The Court should therefore grant summary judgment for the government.

11 **II.    ARGUMENT**

12      **A.    Plaintiffs Lack Standing.**

13           **1.    Stanford Daily lacks standing.**

14                **(i)    Stanford Daily lacks associational standing.**

15      Stanford Daily does not have "associational standing," both because it is not the type of

16 organization that can invoke that doctrine, and because it does not satisfy the doctrine's elements.

17      As the Ninth Circuit has made clear, "[a]ssociational standing is reserved for organizations that

18 'express the collective views and protect the collective interests' of their members."  *Fleck &*

19 *Associates, Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt v. Wash. State*

20 *Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977)) (cleaned up).  Thus, "[t]o satisfy the requirements for

21 associational standing, the association's members must possess sufficient 'indicia of membership—

22 enough to satisfy the purposes that undergird the concept of associational standing: that the organization

23 is sufficiently identified with and subject to the influence of those it seeks to represent as to have a

24 'personal stake in the outcome of the controversy.'"  *Cal. Communities Against Toxics v. Armorcast*

25 *Prods. Co.*, No. CV 14-5728 PA, 2014 WL 12966008, at *2 (C.D. Cal. Nov. 12, 2014) (quoting *Or.*

26 *Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)).

27      Stanford Daily fails to provide any evidence that it represents the "collective views" of its

28 "members" with respect to the issues in this litigation, such that it has a sufficient "personal stake in the

outcome." *See* Compl. ¶¶ 65-71; Dkt. 44 at 10-12.  It asserts that it is a "voluntary membership organization," Compl. ¶ 66, and argues that that is sufficient, Dkt. 44 at 10.  But the fact that Stanford students work for the newspaper on a voluntary basis does not in any way demonstrate that the newspaper represents their views on the type of immigration subjects that Plaintiffs put at issue in this case.

Indeed, Stanford Daily's stated "mission" is to "act as a major source of news relating to or of interest to the Stanford University community and to provide an educational opportunity to Stanford University students in journalistic writing, photography and business."  Supp. Helland Decl. Ex. 6 at 1 (case adjusted).  Its own bylaws limit its "members" to its "Editorial" and "Business Staff."  *Id.* Ex. 7 at 1.  Nothing in its own governing documents suggests that the organization's purpose is to represent the views of its Editorial and Business Staff on immigration issues, or in bringing constitutional claims under the First and Fifth Amendments.  *See generally id.* Exs. 6, 7.  Students understandably join the newspaper to gain journalism experience—not to advocate on behalf of noncitizens.  Plaintiffs put forward no evidentiary basis for the Court to conclude that its "members" joined it for reasons related to this litigation.  *See Cal. Communities Against Toxics*, 2014 WL 12966008, at *3 ("[T]he FAC fails to allege sufficient facts describing Plaintiff's organizational structure, the number and type of members, the location of those members, and how the members influence the organization.").

In fact, Stanford Daily is fundamentally unlike any kind of organization that the Supreme Court has previously held, or even suggested, could invoke the doctrine of associational standing.  It is not an advocacy organization with a mission "to defend human and civil rights secured by law."  *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 197 (2023); *cf., e.g., FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 376 (2024) (denying standing to "pro-life medical associations); *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009) (denying standing to "a group of organizations dedicated to protecting the environment"); *Warth v. Seldin*, 422 U.S. 490, 494 (1975) (denying standing to organization with purpose "to alert ordinary citizens to problems of social concern . . . and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons").  Nor is it a "trade association" with a purpose of "protecting and enhancing the market for Washington apples."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344

(1977).

Rather, it is a student newspaper that works to "cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions."  Compl. ¶ 69.  If the doctrine of associational standing has any remaining vitality at all, *see* Dkt. 33 at 12, it should not be extended to a general-purpose student newspaper challenging provisions of the Immigration and Nationality Act.  *See Fleck*, 471 F.3d at 1106; *accord Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993) ("The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations—*like trade associations or environmental groups*.") (emphasis added).

Even if this structural problem were not sufficient by itself, Stanford Daily fails to satisfy the elements of the associational standing doctrine.  Most prominently, the interests it seeks to vindicate by this lawsuit are not "germane" to its mission of reporting about campus activities.  *See, e.g.*, *Fleck*, 471 F.3d at 1106 (privacy interests of members of gay men's social club not germane to club's profit-seeking mission); *Fitzgerald Reno, Inc. v. DOT*, 60 F. App'x 53, 53 (9th Cir. 2003) ("TTAX has no standing because it is a taxpayer organization whose purported environmental interests are not germane to its members.").  Plaintiffs argue that the "germaneness" requirement is "undemanding," citing the Ninth Circuit's decision in *Presidio Golf Club v. National Park Service*, 155 F.3d 1153 (9th Cir. 1998).  *See* Dkt. 44 at 11.  But the environmental and historical issues in that case were much more "germane" to the Presidio Golf Club's bona fide "interest in maintaining the historical and environmental integrity of the Clubhouse" than Plaintiffs' interest in immigration issues here.  155 F.3d at 1159.

Moreover, as discussed previously and in further detail below, none of Stanford Daily's individual "members" would have standing themselves.  *See* Dkt. 33 at 12-16.  And the involvement of individual members will be necessary to this litigation, because the newspaper has put their experiences and beliefs at issue.

Finally, Plaintiffs' associational standing theory has no limiting principle.  If a newspaper can file suit based on its reporters' and interviewees' fears of immigration enforcement, so could any other organization that happens to occasionally rely on the effort of a noncitizen.  Rather than start down this slippery slope, the Court should reject Plaintiffs' associational standing theory.

DEFENDANTS' REPLY ISO SUMMARY JUDGMENT
5:25-CV-06618-NW                          4

1       **(ii)**  **Stanford Daily lacks corporate standing.**

2    As explained previously, Plaintiffs do not allege (much less prove) that the government has

3 stopped Stanford Daily from engaging in any First Amendment activity.  *See* Dkt. 33 at 13.  Rather, they

4 argue that the newspaper's unidentified noncitizen "writers and editors" have "reacted" to the

5 government's enforcement actions directed at still other third parties, and that those "reactions" can

6 supply standing for Stanford Daily itself.  *See* Dkt. 44 at 12.  Not so.

7    First, Plaintiffs have not quantified or substantiated these alleged reactions in any way that would

8 allow the Court to find standing.  *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) ("The

9 evidence at trial established that noncitizen households have historically responded to the census at

10 lower rates than other groups.").  And second, because the enforcement effort on which Plaintiffs base

11 their claims has concluded and less than 1% of referred noncitizens experienced any enforcement action,

12 Dkt. 33 at 8, any such "reactions" would neither be reasonable nor fairly traceable to Defendants.

13    In short, Plaintiffs cannot manufacture standing out of the unjustified decisions of Stanford

14 Daily's anonymous noncitizen writers and editors.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

15 560-61 (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).

16       **(iii)**  **Stanford Daily lacks organizational standing.**

17    Finally, Plaintiffs do not overcome the deficiencies in their organizational standing argument.

18 *Compare* Dkt. 33 at 13, *with* Dkt. 44 at 13-14.  Indeed, Plaintiffs simply double-down on their vague

19 allegations in the Complaint that an unknown number of unidentified noncitizens "working at and

20 contributing to Stanford Daily have self-censored."  Compl. ¶ 72; *see also* Dkt. 44 at 14.  But even if

21 true, Plaintiffs *still* supply no evidence indicating that there has been any material effect on the quantity

22 or quality of the newspaper's "core business activity" of reporting on campus events—especially now,

23 months after the Complaint was filed.  *See* Dkt. 44 at 13-14.  Nor would any such effects be fairly

24 traceable to Defendants.

25    Indeed, the district court in *AAUP* determined that the lead plaintiff group in that case *lacked*

26 organizational standing.  *See AAUP v. Rubio*, No. 25-10685-WGY, 2025 WL 2777659, at *44 (D. Mass.

27 Sept. 30, 2025).  As that court explained, the "harms" upon which AAUP attempted to rely—"deterred

28 and diminished noncitizen participation in AAUP events and diverted resources from more typical core

advocacy issues such as 'adjunctification' to dealing with immigration law"—were insufficient to for an organization to demonstrate standing in its own right. *Id.*

The Supreme Court has cautioned that the organizational standing doctrine is reserved for "unusual case[s]" and should not be "extend[ed]." *All. for Hippocratic Med.*, 602 U.S. at 396. The Court should decline to extend the doctrine here.

### 2. The individual Plaintiffs lack standing.

In order for a plaintiff to demonstrate standing based on potential future enforcement, the threat of enforcement must be "substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024).

Here, the individual Plaintiffs' claimed standing depends on their factual assertion that the government is taking ongoing immigration-enforcement actions based solely on protected political speech. *See* Dkt. 44 at 7. But Defendants have demonstrated that the government "has completed its review of the 5,000-plus campus-protester names referred to it," with "less than 1% of campus-protest leads . . . result[ing] in nonimmigrant visa revocations"—none of which included Plaintiffs, despite their prior speech. Dkt. 33 at 8. Moreover, the revocations that did occur "were the result of the individuals' conduct at protests or other information discovered about them from the resulting investigations, not their mere participation in or presence at public protests or pure political speech." *Id.*

Plaintiffs supply no evidence that could create a "genuine dispute as to [this] material fact." Fed. R. Civ. P. 56(a). Instead, Plaintiffs primarily argue that, in *AAUP*, the district court found that Secretaries Rubio and Noem had made general threats of "continue[d]" enforcement action with an intent to chill noncitizens' First Amendment rights. *See* Dkt. 44 at 7 (citing 2025 WL 2777659, at *41). But Plaintiffs misunderstand the district court's findings in *AAUP*. First, the facts and claims in *AAUP* are distinct from those in this case. AAUP itself was an association of university professors and graduate students who alleged that their participation in public protests led to them being targeted for deportation under an "ideological deportation policy." After concluding that AAUP itself lacked organizational standing, the court determined that its faculty and student members who were not U.S. citizens had sufficient standing to mount a First Amendment "as-applied" challenge that they had been specifically targeted for enforcement based on their viewpoints.

Second, the district court in that case expressly found that there "was no ideological deportation policy," and that "[i]t was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens."  2025 WL 2777659, at *39.  The claims in that case involved what the court called a specific, "discrete enforcement initiative" that had already concluded by the time of the trial in that matter in July. *Id.* at *52; *see also id.* at *4, *8-10 (describing results of completed investigations into campus protestors).  Plaintiffs therefore cannot use *AAUP* to overcome Defendants' evidence that the investigation effort that Plaintiffs claim to fear has concluded, with enforcement action taken against less than 1% of the referred individuals, and Plaintiffs themselves suffering no consequences.

Moreover, the statements cited in *AAUP*, and on which Plaintiffs try to rely here, were made months ago and do not reflect an ongoing effort to take such enforcement action with regard to Plaintiffs.  And in any event, such "general threat[s] by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact."  *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (internal quotation marks omitted).

Plaintiffs purport to be "[b]affl[ed]" by the government's explanation that initial enforcement decisions—such as deciding whether to take further action with respect to individuals that have been referred to HSI—are made by low-level agents, rather than the agencies' political leadership.  Dkt. 44 at 7.  But Defendants have explained that that is in fact how the government enforces the statutes at issue. *See* Dkt. 33 at 5-9.  And that matters, because under the process the government described, the vast majority of cases investigated by DHS and State are never escalated to the level where Secretaries would be involved.  *See id.*  Importantly, because Plaintiffs' standing depends on the actual likelihood of threatened enforcement, and not just their subjective belief, they must show that there is a substantial chance that the line agents investigating such cases would escalate them for action by the Secretary of State.  But Plaintiffs supply no evidence indicating that such agents are currently targeting university students for enforcement action based solely on protected speech.  *See generally* Dkt. 44.  To the contrary, Plaintiffs admit that they were among the set of student protesters previously referred for investigation, but no enforcement action was taken against them based on their speech.

Plaintiffs' attempt to minimize the government's disavowal of such threatened enforcement also fails.  *See* Dkt. 44 at 8-9.  Plaintiffs try to downplay this as a mere "litigation position."  But the

1   government has shown, as a factual matter, through the testimony of its non-attorney witnesses, that

2   "[n]either State nor DHS have a policy of targeting individuals based on protected political speech";

3   "DHS does not refer individuals for visa revocations solely because they participated in public protests";

4   "[n]or does DHS refer individuals for visa revocations solely because they have used the phrase 'from

5   the river to the sea, Palestine will be free,' or described Israel as having committed 'genocide' or

6   'apartheid' in Gaza." Dkt. 33 at 8-9 (citing Helland Decl. Exs. 4 & 5).  And while Plaintiffs try to

7   analogize themselves to a small handful of third parties who have been subject to enforcement action,

8   the government has consistently taken the position across these cases that individuals subject to

9   enforcement under the statutes have done more than exercise pure political speech.

10          **B.**     **Plaintiffs' Claims Lack Merit.**

11                 **1.**     **The statutes do not violate the First Amendment.**

12                        **(i)**     **Plaintiffs' "facial" challenge ignores the statutes' legitimate scope.**

13          Plaintiffs sow confusion about the standard applicable to their claims by bringing a "facial"

14   challenge to the statutes "as applied to protected speech."  *See* Dkt. 44 at 14, 24 n.10; Compl. ¶¶ 134,

15   137.  But facial challenges and as-applied challenges are two separate things with two separate

16   standards.  *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *Wash. State Grange v. Wash.*

17   *State Repub. Party*, 552 U.S. 442, 449-51 (2008).  Whereas "as-applied" challenges concern a law's

18   application to a particular set of facts, facial challenges concern the law's validity in the abstract.  *See*

19   *Wash. State Grange*, 552 U.S. at 450.

20          "Facial challenges are disfavored for several reasons."  *Id.*  "Claims of facial invalidity often rest

21   on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis

22   of factually barebones records."  *Id.* (internal quotation marks omitted).  "Facial challenges also run

23   contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question

24   of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law

25   broader than is required by the precise facts to which it is to be applied."  *Id.* (internal quotation marks

26   omitted).  "Finally, facial challenges threaten to short circuit the democratic process by preventing laws

27   embodying the will of the people from being implemented in a manner consistent with the Constitution."

28   *Id.* at 451.  The Supreme Court "has therefore made facial challenges hard to win."  *Moody*, 603 U.S. at

1    723.

2        For a facial challenge in the First Amendment context, "[t]he question is whether a substantial

3    number of the law's applications are unconstitutional, judged in relation to the statute's plainly

4    legitimate sweep." *Id.*  Thus, "[t]he first step in the proper facial analysis is to assess the [challenged]

5    laws' scope." *Id.* at 724.  In a facial challenge, courts cannot ignore this requirement merely because a

6    plaintiff has focused on the laws' application to certain situations.  *See id.* (explaining parties' and lower

7    courts' error in "focus[ing] on how the laws applied to the content-moderation practices that giant

8    social-media platforms use," rather than "address[ing] the full range of activities the laws cover, and

9    measure the constitutional against the unconstitutional applications").  Instead, the proper method for

10   challenging the application of a statute as-applied to specific situations is in individual adjudications,

11   such as habeas proceedings brought by those subject to the provisions.  Or, in immigration cases, in

12   eventual petitions for review of removal decisions, where Congress has specifically preserved aliens'

13   rights to raise constitutional challenges.  *See* Dkt. 33 at 4-5; *see also, e.g.*, 8 U.S.C. § 1252(a)(2)(D)

14   (preserving courts of appeals' jurisdiction over constitutional claims in review of removal proceedings);

15   *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 474, 487 (1999) (holding challenges to

16   removal, including First Amendment ones, must be brought in removal proceedings).

17       Similarly here, Plaintiffs cannot artificially limit their challenge to the laws' application to

18   "protected speech."  Plaintiffs "chose to litigate these [claims] as facial challenges, and that decision

19   comes at a cost." *Moody*, 603 U.S. at 723.  Indeed, Plaintiffs' framing merely begs the question of what

20   qualifies as "protected speech" in the context of nonimmigrant student visa holders.  And this framing

21   still raises all of the problems the Supreme Court has repeatedly recognized regarding facial challenges

22   more broadly:  Plaintiffs ask the Court to speculate based on a barebones factual record; they ask the

23   Court to abandon the principle of judicial restraint and proactively announce a rule of constitutional law

24   extending beyond the factual circumstances of the parties before it; and the ruling they seek threatens to

25   prevent the government from implementing the laws consistent with the Constitution.  *See Wash. State*

26   *Grange*, 552 U.S. at 450-51.

27       Properly construed, the question the Court must decide is whether "a substantial number" of the

28   challenged statutes' applications are unconstitutional in relation to their legitimate sweep. *Id.*  The

1    answer is plainly no.  Indeed, Plaintiffs make no effort to quantify the relative scopes of what they view

2    as permissible or impermissible enforcement.  *See generally* Dkt. 44; Dkt. 32; Compl.  Rather, they limit

3    their discussion to what they call applications to "protected speech," without even defining the term.

4         But the statutes have a well-established and longstanding history of legitimate use.  *See* Dkt. 33

5    at 3-6.  Indeed, there are countless indisputably legitimate reasons that the government may decide to

6    revoke a visa after it was issued.  The President may decide to revoke the visas of foreign nationals from

7    a certain country for foreign-policy and national-security reasons.  *See Trump v. Hawaii*, 585 U.S. 667,

8    696 (2018).  The government may determine that a particular "visa had been obtained illegally."  *See,*

9    *e.g.*, *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001).  The list goes on.  Indeed, the visa-revocation

10   provision is not limited to speech-based grounds in any way.  *See* 8 U.S.C. § 1201(i).

11        Similarly, the foreign-policy-removal provision has more than three decades of history behind it.

12   *See* Dkt. 33 at 4.  The provision makes "deportable" those aliens "whose presence or activities in the

13   United States the Secretary of State has reasonable ground to believe would have potentially serious

14   adverse foreign policy consequences for the United States."  *Id.* § 1227(a)(4)(C)(i).  The need for such a

15   provision has long been recognized.  *See* Dkt. 33 at 4 & n.1.  Moreover, the statute expressly provides

16   that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements,

17   or associations, if such beliefs, statements, or associations would be lawful within the United States

18   unless the Secretary of State personally determines that the alien's [presence] would compromise a

19   compelling United States foreign policy interest."  8 U.S.C. § 1227(a)(4)(C)(ii).  In other words,

20   "protected speech" could only be used as the basis for removal in cases the Secretary of State himself

21   determines have a particularly and sufficiently high foreign-policy justification.

22        In short, the two challenged statutes' "plainly legitimate" scope is broad.  Plaintiffs have

23   supplied no evidence or argument comparing that broad scope to what they claim would be the statutes'

24   unconstitutional application, but it is readily apparent that any such application would be exceedingly

25   rare in comparison to the government's large volume of immigration enforcement work.  *See, e.g.*, Dkt.

26   33 at 5 (noting the Office of Intelligence's generation of approximately 25,000 to 30,000 Reports of

27   Analysis each year); *id.* at 8 (explaining that "less than 1% of campus-protest leads (at most,

28   approximately 40 out of more than 5,000) have resulted in nonimmigrant visa revocations").  Plaintiffs'

1  facial challenge therefore fails.  *See Wash. State Grange*, 552 U.S. at 457-58.

2             **(ii)    The statutes' legitimate purposes overcome nonimmigrant visa-holders' reduced First Amendment protections.**

3

4       Even on its own terms, however, Plaintiffs' challenge to the statutes "as applied to protected

5  speech" fails.  The government previously explained that nonimmigrant visa holders have reduced First

6  Amendment rights, and because the statutes have bona fide and legitimate purposes, they do not violate

7  the First Amendment in that context.  *See* Dkt. 33 at 16-20.

8       Instead of responding to the government's argument, Plaintiffs attack a straw man, pretending

9  that the government argues that "noncitizens have *no* First Amendment rights."  Dkt. 44 at 17.  But the

10  government did not make that argument.  *See* Dkt. 33 at 16-19.  Rather, the government explained that,

11  under binding Supreme Court and Ninth Circuit authority, aliens have *reduced* constitutional protections

12  (including First Amendment rights) compared to citizens, and the strength of their rights grows on "a

13  generous and ascending scale" as they increase their "identity with our society."  *Id.* at 16 (quoting

14  *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953)).

15       Plaintiffs offer no substantive response to that principle, which has been repeatedly reaffirmed by

16  the Supreme Court and Ninth Circuit in a variety of contexts.  *See, e.g.*, *Demore v. Kim*, 538 U.S. 510,

17  522 (2003) ("In the exercise of its broad power over naturalization and immigration, Congress regularly

18  makes rules that would be unacceptable if applied to citizens.") (internal quotation marks omitted);

19  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (holding that Fourth Amendment did not

20  apply to search of foreign national's property abroad, and distinguishing prior cases by noting that they

21  "establish only that aliens receive constitutional protections when they have come within the territory of

22  the United States and developed substantial connections with this country"); *Rodriguez Diaz v. Garland*,

23  53 F.4th 1189, 1205-06 (9th Cir. 2022) ("[W]e interpret the Due Process Clause consistent with

24  longstanding precedent recognizing that the process due aliens must account for the government's

25  countervailing interests in immigration enforcement—considerations that do not apply to U.S.

26  citizens.").

27       Instead, Plaintiffs cite a variety of cases for the unremarkable proposition that the First

28  Amendment "applies" to lawfully present aliens, without addressing *how* it applies.  *See* Dkt. 44 at 15-

16. For example, Plaintiffs argue that the Supreme Court's recitation in a footnote in *Kwong Hai Chew* of its prior dicta in *Wixon* somehow means that the First Amendment applies with full force to aliens. *See id.* at 16. But the very same footnote also reaffirmed the principle that aliens' rights increase with their connections to society: "Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Kwong Hai Chew*, 344 U.S. at 596 n.5 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950)).

Similarly, Plaintiffs argue that in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970), the full Supreme Court "adopted" the position of the concurrence in *Wixon. See* Dkt. 44 at 16. But *Hellenic Lines* was not about the First Amendment at all; it was about an injured seaman's claim under the Jones Act, and the Court held that a lawful permanent resident with "substantial and continuing contacts . . . with this country" could be subject to liability under the Jones Act even though the injured seamen was Greek. *See* 398 U.S. at 309. If anything, *Hellenic Lines* confirms that the extent of an individual's connections with this country is relevant to evaluating the extent to which American law applies to them. *See id.* But that case involving a lawful permanent resident and the Jones Act plainly does not stand for the proposition that nonimmigrant visitors are entitled to the full protections of citizens under the First Amendment. *See id.*

Thus, the question is not whether the First Amendment *applies*; the question is, what does the First Amendment *require* in these circumstances? Plaintiffs argue for an all-or-nothing approach, such that temporary visitors to the United States receive the same protections as citizens. *See* Dkt. 44 at 14-18. But that argument runs counter to the many authorities discussed recognizing the lesser protections available to noncitizens. And Plaintiffs' attempts to distinguish those authorities falter.

First, Plaintiffs unconvincingly try to escape the impact of *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), by arguing that it merely held that noncitizens could be punished for their speech to the same extent as citizens. *See* Dkt. 44 at 17. But of course, "citizens generally cannot be deported." *AAUP*, 2025 WL 2777659, at *45. The very fact that *Harisiades* affirmed a punishment for a noncitizen that could not be used for citizens demonstrates that the groups may indeed be treated differently in

some circumstances.  And indeed, then-Judge Kavanaugh cited *Harisiades* in 2011 for the proposition that the Supreme Court "has further indicated that aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas."  *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).

Second, Plaintiffs argue that *Bluman* and two appellate cases relying on it, *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024), and *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020), are inapplicable because they merely concerned "*one* unique abridgment of First Amendment rights, the ability to financially contribute to an election campaign."  Dkt. 44 at 17. But Plaintiffs concede that these cases confirm the government's central point:  noncitizens have reduced First Amendment rights compared to citizens.  Indeed, as these cases and those discussed above make clear, the extent of aliens' First Amendment rights depends on the context, including the extent of the aliens' connections to the country and the circumstances of the speech at issue.

The practical effect of nonimmigrant visa holders' reduced First Amendment rights in this case is that the challenged statutes are constitutional so long as the government has articulated a facially legitimate and bona fide justification for their use.  *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).[1]  As the government previously explained, the applications of the statutes Plaintiffs challenge here further the government's legitimate national-security and foreign-policy interests in countering support for terrorist groups and addressing antisemitism.  *See* Dkt. 33 at 19 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-32 (2010)).

That is enough to reject Plaintiffs' claims, but as the government argued previously, the statutes would survive review even under a heightened standard.  *See* Dkt. 33 at 20.  That is because the decisions regarding admissibility, foreign policy, and national security by their nature serve compelling government interests.  *See id.* (citing, *e.g.*, *Harisiades*, 342 U.S. at 588-89).  And as the government previously explained with respect to Plaintiffs' vagueness challenge, the statutes are appropriately tailored because "so long as Congress wanted to maintain the State Department's discretion to revoke

---

[1] Plaintiffs strangely argue that the government does not "dispute that [the] laws are subject to strict scrutiny."  Dkt. 44 at 21.  But the government plainly argued that a lower standard applied.  *See* Dkt. 33 at 18-20.

1  visas and make aliens removable whose presence threatened American foreign policy interests, the only

2  way to do so was to draft statutes like §§ 1201(i) and 1227(a)(4)(C)."  *Id.* at 24.

3        Plaintiffs' First Amendment challenge therefore fails.

4              **2.    The statutes do not violate the Fifth Amendment.**

5        The parties' dispute regarding the Fifth Amendment boils down to a disagreement as to the scope

6  of the political branches' discretion with respect to the admission and exclusion of nonimmigrants for

7  foreign-policy reasons.  *Compare* Dkt. 33 at 20-25, *with* Dkt. 44 at 23-25.  The government has the

8  better view of the cases.

9        Indeed, Plaintiffs do not meaningfully dispute that the Supreme Court and lower courts have

10 recognized the political branches' discretion regarding "the admission and exclusion of foreign

11 nationals."  *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also*

12 *Harisiades*, 342 U.S. at 588-89; *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988).  Nor

13 do Plaintiffs dispute that, over and over again, the Supreme Court has held that noncitizens have reduced

14 Fifth Amendment protections compared to citizens.  *See, e.g.*, *Kim*, 538 U.S. at 522 ("Congress may

15 make rules as to aliens that would be unacceptable if applied to citizens."); *Mathews v. Diaz*, 426 U.S.

16 67, 78 (1976).  Plaintiffs' response to these undisputed points is merely that these prior cases did not all

17 arise in the vagueness context, and so the Court should ignore them.  *See* Dkt. 44 at 23-25.

18       Plaintiffs instead rely on the Supreme Court's plurality opinion in *Sessions v. Dimaya*, 584 U.S.

19 148 (2018), for the proposition that immigration laws are not wholly immune from vagueness

20 challenges.  *See* Dkt. 44 at 23.  But the issue in *Dimaya* was the INA's incorporation of a criminal

21 statute that the Court had already previously held to be void for vagueness.  *See* 584 U.S. at 155 (citing

22 *Johnson v. United States*, 576 U.S. 591 (2015)).  It is hardly surprising that the Court held that a criminal

23 statute that was unconstitutionally vague remained vague when it was used for immigration purposes.

24       But whereas criminal conduct can be defined with relative specificity, "the special exigencies of

25 foreign policy require Congress to draft statutes that 'provide a standard far more general than that

26 which has always been considered requisite with regard to domestic affairs."  *Palestine Info. Off.*, 853

27 F.2d at 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324

28 (1936)).  "[B]ecause of the leeway necessary to represent adequately this nation's interests in foreign

affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

The Constitution does not require Congress to spell out, in advance, the various specific foreign-policy concerns that could justify visa revocations and removals. Rather, such "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Id.* (quoting *Harisiades*, 342 U.S. at 589).

In that context—in light of their unique, foreign-policy purpose, and the political branches' special discretion in that area—the statutes are not impermissibly vague under the Fifth Amendment. *See, e.g.*, *HLP*, 561 U.S. at 18-20; *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (affirming deportation against vagueness challenge); *Jordan v. DeGeorge*, 341 U.S. 223, 225, 232 (1951) (same); *Mahler v. Eby*, 264 U.S. 32, 40 (1924) ("[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress.").

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter final judgment in favor of Defendants.


Dated:  November 3, 2025

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants