1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4
        450 Golden Gate Avenue, Box 36055
5       San Francisco, California 94102-3495
        Telephone: (415) 436-6488
6       FAX: (415) 436-6748
        kelsey.helland@usdoj.gov
7
   Attorneys for Defendants
8
9              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
11                 SAN JOSE DIVISION
12
   STANFORD DAILY PUBLISHING CORP., et    Case No. 5:25-cv-06618-NW
13 al.,
                                           **DEFENDANTS' NOTICE OF MOTION AND**
14         Plaintiffs,                     **MOTION TO DISMISS VERIFIED AMENDED**
                                           **COMPLAINT WITH PREJUDICE**
15      v.
                                           Date:  January 8, 2026
16 RUBIO, et al.,                          Time:  9:00 a.m.
                                           Place:  Courtroom 3, 5th Floor
17         Defendants.
                                           The Honorable Noël Wise
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF CONTENTS</u>

2  NOTICE OF MOTION.................................................................................................................1

3  RELIEF REQUESTED...............................................................................................................1

4  MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

5  I.        INTRODUCTION ...........................................................................................................1

6  II.       ISSUES TO BE DECIDED .............................................................................................2

7  III.      BACKGROUND ..............................................................................................................2

8            A.        Statutory Background. ..........................................................................................2

9                     1.        Nonimmigrant student visas. ...................................................................2

10                    2.        Visa-revocation and foreign-policy-removal provisions. ........................3

11           B.        Longstanding Enforcement of the Statutes. .........................................................5

12           C.        Enforcement of the Statutes by the Current Administration.................................6

13           D.        Plaintiffs Have Not Been Threatened With Enforcement.....................................9

14  IV.      LEGAL STANDARD.....................................................................................................11

15  V.       ARGUMENT ..................................................................................................................11

16           A.        Plaintiffs Lack Standing......................................................................................11

17                    1.        Stanford Daily lacks standing. ...............................................................12

18                              (i)        Stanford Daily lacks associational standing. ............................12

19                              (ii)       Stanford Daily lacks corporate standing....................................15

20                              (iii)      Stanford Daily lacks organizational standing. ..........................15

21                    2.        The individual Plaintiffs lack standing. ..................................................16

22                              (i)        There is no substantial threat of enforcement for protected pro-
                                         Palestinian speech. .....................................................................17
23
24                              (ii)       Defendants have disavowed enforcement for pure political
                                         speech..........................................................................................19

25                              (iii)      Plaintiffs cannot rely on other unidentified "protected speech.".....20

26           B.        The Court Should Dismiss The Action With Prejudice........................................22

27  VI.      CONCLUSION...............................................................................................................23

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*AAUP v. Rubio*,
5
    780 F. Supp. 3d 350 (D. Mass. 2025) ............................................................ 20

6

*AAUP v. Rubio*,
    No. 25-10685-WGY, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ........................................... 16, 19
7

8
*Abourezk v. Reagan*,
    592 F. Supp. 880 (D.D.C. 1984) ..................................................................... 4

9

*Cal. Cmtys. Against Toxics v. Armorcast Prods. Co.*,
10
    No. CV 14-5728 PA, 2014 WL 12966008 (C.D. Cal. Nov. 12, 2014) ........................... 12

11

*California v. Texas*,
    593 U.S. 659 (2021) ....................................................................... 21
12

13
*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011) ................................................................ 22

14

*Chaset v. Fleer/Skybox Int'l, LP*,
15
    300 F.3d 1083 (9th Cir. 2002) ................................................................ 22

16

*Culinary Workers Union, Loc. 226 v. Del Papa*,
    200 F.3d 614 (9th Cir. 1999) ................................................................. 21
17

18
*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987) ................................................................. 22

19

20
*Dreier v. United States*,
    106 F.3d 844 (9th Cir. 1997) ................................................................. 11

21

*FDA v. All. for Hippocratic Med.*,
22
    602 U.S. 367 (2024) ................................................................... 12, 13, 15

23
*Fitzgerald Reno, Inc. v. DOT*,
    60 F. App'x 53 (9th Cir. 2003) ............................................................... 14

24

25
*Fleck & Assocs., Inc. v. City of Phoenix*,
    471 F.3d 1100 (9th Cir. 2006) .............................................................. 12, 14

26

*Foman v. Davis*,
27
    371 U.S. 178 (1962) ....................................................................... 22

28

*Goldstein v. Galvin,*
  719 F.3d 16 (1st Cir. 2013) ........................................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................................. 12, 14

*Int'l Ps. for Ethical Care Inc. v. Ferguson,*
  146 F.4th 841 (9th Cir. 2025) ....................................................................... 16

*Johnson v. Buckley,*
  356 F.3d 1067 (9th Cir. 2004) ....................................................................... 22

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ....................................................................................... 11

*Lopez v. Candaele,*
  630 F.3d 775 (9th Cir. 2010) .................................................................... 19, 20

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................. 15, 16

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ............................................................... 11, 12, 18, 20

*NAACP v. Button,*
  371 U.S. 415 (1963) ....................................................................................... 15

*Or. Advocacy Ctr. v. Mink,*
  322 F.3d 1101 (9th Cir. 2003) ....................................................................... 12

*Peace Ranch, LLC v. Bonta,*
  93 F.4th 482 (9th Cir. 2024) ............................................................ 16, 17, 19

*Presidio Golf Club v. National Park Service,*
  155 F.3d 1153 (9th Cir. 1998) ....................................................................... 14

*Pritkin v. DOE,*
  254 F.3d 791 (9th Cir. 2001) .................................................................... 15, 16

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock,*
  993 F.2d 800 (11th Cir. 1993) ....................................................................... 14

*Robinson v. United States,*
  586 F.3d 683 (9th Cir. 2009) ......................................................................... 11

*Safe Air for Everyone v. Meyer,*
  373 F.3d 1035 (9th Cir. 2004) ....................................................................... 11

*Saul v. United States*,
  928 F.2d 829 (9th Cir. 1991) .................................................................................. 22

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*,
  343 F.3d 1036 (9th Cir. 2003) ................................................................................ 11

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ................................................................................ 22

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
  600 U.S. 181 (2023).......................................................................................... 13, 14

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).................................................................................................. 13

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)................................................................................... 16, 20, 21

*Thomas v. Anchorage Equal Rights Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) .................................................................. 11, 17, 21

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ................................................................................. 17

*Trump v. Hawaii*,
  585 U.S. 667 (2018).................................................................................................. 20

*United Pub. Workers of Am. v. Mitchell*,
  330 U.S. 75 (1947).................................................................................................... 20

*Warth v. Seldin*,
  422 U.S. 490 (1975).......................................................................................... 12, 13

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................................................ 11

*Younger v. Harris*,
  401 U.S. 37 (1971).................................................................................................... 18

*Zivkovic v. S. Cal. Edison Co.*,
  302 F.3d 1080 (9th Cir. 2002) ................................................................................ 22

**Statutes**

8 U.S.C. § 1101 ............................................................................................................... 3
8 U.S.C. § 1182 ............................................................................................................... 4
8 U.S.C. § 1201 ........................................................................................................... 3, 5
8 U.S.C. § 1227 ..................................................................................................... 3, 4, 5, 6
8 U.S.C. § 1229a ............................................................................................................. 4

Pub. L. 101-649.................................................................................................................. 4

**Rules**

Fed. R. Civ. P. 12.......................................................................................................... 1, 11
Fed. R. Civ. P. 15............................................................................................................... 22

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on January 8, 2026 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113, the Honorable Noël Wise presiding, Defendants Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security, will and hereby do move this Court for an order dismissing with prejudice the Verified Amended Complaint of Plaintiffs Stanford Daily Publishing Corporation ("Stanford Daily"), Jane Doe, and John Doe.  This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1).  This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Court's files in this matter, other matters of which the Court takes judicial notice, and any oral argument and additional evidence presented.

**RELIEF REQUESTED**

Defendants seek dismissal of the Verified Amended Complaint with prejudice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs ask this Court for the remarkable relief of defining how the First Amendment applies to nonimmigrant student visa holders in the absence of any actual enforcement action taken against them. Plaintiffs claim that months ago they attended protests and made various political remarks, but they admit that the government has not revoked their visas or initiated removal proceedings against them. Nor do Plaintiffs inform the Court of what, exactly, they wish to say which they contend could render them subject to potential enforcement in the future.  In other words, Plaintiffs ask the Court for an advisory opinion.

Plaintiffs lack standing to seek their requested relief.  Article III requires plaintiffs to demonstrate an actual injury that is concrete and particularized.  Parties must rely on their own injuries, not those of third parties.  And a threatened future injury must be substantial and imminent or certainly impending.  Plaintiffs do not come close to meeting this standard here.  Indeed, the Court has already expressed its "concerns regarding whether Plaintiffs have alleged sufficient facts to establish standing," Dkt. 52 at 2, and expressly found that there were "insufficient facts alleged in the [original] complaint for the Court to analyze whether any of the Plaintiffs have met their burden to establish standing," Dkt.

60 at 2.  But the Verified Amended Complaint does not cure the original Complaint's deficiencies.

Plaintiff Stanford Daily is a college newspaper.  It portrays itself as an advocacy organization for purposes of this litigation, but in reality, it simply reports on campus affairs.  It is neither the type of organization that could invoke the "associational-standing" doctrine for the claims in this case, nor has it shown any concrete or imminent injury to itself or its staff that could satisfy any other doctrine.

Nor have the unidentified individual Plaintiffs demonstrated a sufficiently imminent future injury.  To the contrary, less than 1% of the thousands of campus protestors reviewed by DHS earlier this year (with only a small fraction referred to the State Department) have been subject to revocation or removability enforcement, and such enforcement actions were based on more than pure protected speech.  Indeed, the individual Plaintiffs admit that they have not been subject to enforcement themselves, in spite of their prior speech, and government officials have disavowed enforcement based solely upon such speech.  Nor can Plaintiffs rely on other, unidentified and hypothetical "protected speech" to invoke this Court's jurisdiction to declare acts of Congress unconstitutional.

Plaintiffs have already amended their Complaint once to try to bolster their assertion of standing. But their new allegations are not good enough, nor could they plausibly add other allegations that would be.  The Court should therefore dismiss Plaintiffs' Amended Complaint with prejudice.

## II.    ISSUES TO BE DECIDED

1.    Whether Plaintiffs have Article III standing, where one of them is a student newspaper and the other two are individual student-visa holders, none of whom has been subject to enforcement under the statutes at issue.

2.    Whether the Court should dismiss the Verified Amended Complaint with prejudice, where the Court has previously articulated its concerns with Plaintiffs' standing, Plaintiffs' amended pleading remains deficient, and the government has submitted an evidentiary record confirming that Plaintiffs face no substantial threat of future enforcement for any identified speech.

## III.    BACKGROUND

### A.    Statutory Background.

#### 1.    Nonimmigrant student visas.

Student and exchange visitor visa holders are nonimmigrants under the Immigration and

1    Nationality Act ("INA").  *See* 8 U.S.C. § 1101(a)(15)(F), (J), (M).  With respect to F-1 nonimmigrant

2    students, the INA allows for the entry of an alien who is "a bona fide student qualified to pursue a full

3    course of study and who seeks to enter the United States temporarily and solely for the purpose of

4    pursuing such a course of study. . . at an established college, university, seminary, conservatory,

5    academic high school, elementary school, or other academic institution or in an accredited language

6    training program in the United States."  *Id.* § 1101(a)(15)(F)(i) ("F-1 status").  An F-1 nonimmigrant

7    student visa permits only temporary presence in the United States, and the student must maintain "a

8    residence in a foreign country which he [or she] has no intention of abandoning."  *Id.*  So, aliens present

9    in the United States on F-1 nonimmigrant student visas are neither *residents* nor *immigrants*; rather, they

10   have been granted permission to enter the United States temporarily for specific and limited educational

11   purposes.  The same foreign residence requirement applies for J-1 nonimmigrant exchange visitor visas

12   and M-1 vocational student visas.  *See id.* § 1101(a)(15)(J) & (15)(M).

13                    **2.    Visa-revocation and foreign-policy-removal provisions.**

14   Since its first enactment in 1952, the INA has provided that nonimmigrant visas may be revoked

15   at any time at the discretion of a consular officer or the Secretary of State.  *See* Immigration and

16   Nationality Act § 221, Pub. L. 82-414 (1952).  In its current form, the statute provides:

17              After the issuance of a visa or other documentation to any alien, the consular
                officer or the Secretary of State may at any time, in his discretion, revoke
18              such visa or other documentation.  Notice of such revocation shall be
                communicated to the Attorney General, and such revocation shall invalidate
19              the visa or other documentation from the date of issuance . . . .  There shall
                be no means of judicial review . . . of a revocation under this subsection,
20              except in the context of a removal proceeding if such revocation provides
                the sole ground for removal under section 1227(a)(1)(B) of this title.
21
22   8 U.S.C. § 1201(i).  An alien whose nonimmigrant visa has been revoked effective immediately may be

23   placed into removal proceedings on that basis.  *See id.* § 1227(a)(1)(B).

24   Similarly, the INA has for decades provided the Secretary of State the authority to determine that

25   an alien is subject to deportation for foreign-policy reasons:  The INA's list of "classes of deportable

26   aliens" includes those "whose presence or activities in the United States the Secretary of State has

27   reasonable ground to believe would have potentially serious adverse foreign policy consequences for the

28   United States."  *Id.* § 1227(a)(4)(C)(i).

The current foreign-policy-removal provision resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the INA.  Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest."  8 U.S.C. § 1182(a)(27) (1988).  The prior "public interest" ground— which was arguably *broader* than the current provision—was long interpreted to permit the government to exclude aliens for foreign policy reasons.[1]  To address concerns about the breadth of the prior version, the Executive suggested replacing it "with language that limits the grounds of exclusion to potentially serious foreign policy consequences."  1987 Hearing at 40 (testimony of Legal Adviser Sofaer).  Thus, the current language was enacted in 1990.  *See* Immigration Act of 1990, Pub. L. 101-649, 8 U.S.C. § 1251(a)(4)(C)(i) (1990) (predecessor to current § 1227(a)(4)(C)).

Importantly, the foreign-policy-removal provision specifies that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States *unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest*."  8 U.S.C. § 1227(a)(4)(C)(ii) (referring to the inadmissibility provision at 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added)).

The revocation of an alien's visa, or the Secretary of State's determination that an alien is removable, does not necessarily mean they will be removed from the United States.  Those are merely grounds for removability that the Department of Homeland Security ("DHS") may assert in formal removal proceedings in immigration court.  Aliens in removal proceedings are afforded procedural protections under 8 U.S.C. § 1229a.  If an alien whose nonimmigrant visa has been revoked effective immediately is placed into removal proceedings on the basis of the nonimmigrant visa revocation, and

---

[1] *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 885 (D.D.C. 1984) (noting that Otto Skorzeny and Mme. Ngo Dinh Nhu had been excluded on foreign policy grounds).  Indeed, when some representatives proposed to eliminate that provision in 1987, there were strong objections.  *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton).

1   there is no other valid basis for removal, an immigration judge, and later a federal court of appeals, may

2   review the revocation as it relates to the final order of removal.  *See* 8 U.S.C. § 1201(i); *see also id.*

3   § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of

4   removal rendered in removal proceedings).  And courts of appeals retain jurisdiction to review

5   "constitutional claims or questions of law" in removal proceedings.  *Id.* § 1252(a)(2)(D).

6         **B.**     **Longstanding Enforcement of the Statutes.**

7        To determine whether a visa should be revoked under § 1201(i) and whether an alien is

8   removable under § 1227(a)(4)(C), the State Department ("State") has long relied on various sources,

9   including DHS.  *See* Dkt. 33-1 Ex. 3 at 17-20, 35-38; Ex. 5 at 34-38.

10       Specifically, DHS Immigration and Customs Enforcement ("ICE") Homeland Security

11  Investigations ("HSI") has throughout its history provided law enforcement-based derogatory

12  information to State for purposes of vetting aliens.  The HSI Office of Intelligence has historically

13  analyzed potential referrals regarding derogatory information from a variety of sources and, after

14  conducting extensive open-source reviews of information, prepared Reports of Analysis ("ROAs") for

15  potential referral to State based on the information obtained by HSI Office of Intelligence during its

16  review.  *See id.* Ex. 5 at 45.

17       When they receive such referrals, Office of Intelligence analysts conduct open-source analysis

18  and various checks to validate the availability of information and/or the referral, and, if warranted,

19  prepare an ROA.  *See id.* at 48-50.  The Office of Intelligence has historically generated approximately

20  25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa

21  referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement

22  information to its leadership and other Executive Branch partners.  *See* Dkt. No. 14, Ex. K at 49.  Many

23  of these ROAs are referred to State for potential further action.

24       When State receives a referral from DHS, State first determines whether the information

25  received from DHS relates to a nonimmigrant visa holder or lawful permanent resident.  *See* Dkt. 33-1

26  Ex. 4 at 89.  In the case of a nonimmigrant visa holder, the information is sent to the Visa Office within

27  the Bureau of Consular Affairs.  *See id.*  The Visa Office examines the information to determine whether

28  it warrants revoking the nonimmigrant visa.  *See id.* at 90-92.  If the Visa Office agrees the

1   nonimmigrant visa should be revoked, the visa will be revoked under § 1201(i).  *See id.* at 90.  Prior to a

2   revocation decision, DHS may be asked to provide additional information.  *See id.* at 93-94.

3          State procedures for revoking visas are set forth in the Foreign Affairs Manual, 9 FAM 403.11.

4   *See id.* Ex. 1.  The Foreign Affairs Manual instructs consular officers that, "[a]lthough the decision to

5   revoke a visa is a discretionary one, [they] should not use this authority arbitrarily."  *Id.* at 9

6   FAM 403.11-4(A); *see also id.* Ex. 3 at 31-32, 52-55; Ex. 4 at 65, 85.  Staff should only revoke a visa

7   "where warranted" for various specified reasons.  *Id.* Ex. 1 at 9 FAM 403.11-5(B)(a).  These reasons

8   include "when [the State Department] receives derogatory information directly from another U.S.

9   Government agency."  *Id.*

10         In addition to the visa revocation process described above, the Bureau of Consular Affairs

11  analyzes DHS referrals for potential removability determinations under § 1227.  Each referral is

12  assessed individually.  Depending on the visa status of the individual and the concerns raised in the

13  referral, the Bureau may consider whether the foreign-policy-removal provision of § 1227(a)(4)(C)

14  applies to such individual.  Upon an assessment that the individual's presence or activities may present

15  foreign policy concerns under § 1227(a)(4)(C), the Bureau then develops an action memo to pursue a

16  determination from the Secretary of State.  *See* Dkt. 33-1 Ex. 4 at 85-91.

17         **C.    Enforcement of the Statutes by the Current Administration.**

18         On January 20, 2025, the President signed Executive Order 14161: *Protecting the United States*

19  *from Foreign Terrorists and Other National Security and Public Safety Threats*.  90 Fed. Reg. 9451. The

20  EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist

21  attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration

22  laws for malevolent purposes." *Id.* § 1(a).  To the extent that EO 14161 requires departments or agencies

23  to act in furtherance of its policy goals (*see, e.g.*, §§ 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), § 4 makes

24  express that any such action must be done consistent with all applicable law.  *Id.* § 4(a)(i)-(ii).

25         Just over one week later, on January 29, 2025, the President signed Executive Order 14188,

26  *Additional Measures to Combat Anti-Semitism*.  90 Fed. Reg. 8847.  EO 14188 calls for stepped up

27  federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism,

28  and violence" against citizens and "especially in our schools and on our campuses."  *Id.* § 1.  EO 14188

directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* § 2. As above, however, EO 14188 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." *Id.* § 4(b); *see also* EO 13899 § 2(b), 84 Fed. Reg. 68779.

Following this issuance of EOs 14161 and 14188, DHS and State undertook measures to implement the priorities and emphases the EOs established. *See* Dkt. 33-1 Ex. 3 at 21-22, 31-33; Ex. 5 at 43-46. With respect to EO 14161, State issued guidance in the form of a cable to its diplomatic posts abroad to review the nonimmigrant visa system, and when derogatory information related to an individual appeared in the system, to revoke the individual's visa, if warranted. *See id.* Ex. 4 at 99-101. However, State did not change its criteria or procedures for revoking nonimmigrant visas. *See id.* at 94.

Similarly, based on the EOs, DHS aligned its resources and priorities, within the existing statutory and regulatory framework, to best accomplish those goals. *See id.* Ex. 5 at 43. HSI developed a plan to process referrals from a variety of sources to complement the EOs and use HSI's existing lines of effort. *See id.* at 46. The plan created a team, based within the ICE HSI Office of Intelligence, to process the especially large volume of referrals it was receiving, particularly related to protesters. *See id.* at 48. Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the Office of Intelligence team investigated under Title 8 and for potential violations of law. *See id.* Ex. 2 at 83-84, 97. Part of the Office of Intelligence team's work involved reviewing the Canary Mission website, which itself listed more than 5,000 names of protesters. *See* Dkt. No. 14 Ex. J at 109-112; Dkt. 33-1 Ex. 2 at 98-99. However, Canary Mission was only one of multiple publicly available sources the team reviewed. Dkt. No. 14 Ex. J at 118; *see* Dkt. 33-1 Ex. 2 at 75-78. The team also obtained police records for individuals arrested by police during protests. Dkt. No. 14 Ex. J at 118-119.

In the context of sharing information with the State Department, each ROA would be reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework. *See* Dkt. 33-1 Ex. 5 at 49-50. Thereafter, the Office of Intelligence would send a package for referral to the Assistant Director of the HSI National Security Division. *See id.* If the Assistant Director approved the

1  referral package, it would be formally referred to the Department of State for information sharing

2  purposes. *See id.* at 50-51.

3       HSI has completed its review of the 5,000-plus campus-protester names referred to it. From

4  those leads, the Office of Intelligence team generated between 100 and 200 ROAs, representing no more

5  than, at most, about 4% of the total. *See id.* Ex. 2 at 83-84, 97-98, 105-108. Those ROAs were sent to

6  the National Security Division. For the remaining more-than-95% of leads, the Office of Intelligence

7  took no further action. *See id.* at 106. From the roughly 200 ROAs, between approximately 10 and 50

8  were referred to State regarding specific individuals associated with these protests. *See id.* Ex. 5 at 55-

9  56, 77. Of those referrals to State involving nonimmigrant visa holders, approximately 25% to 30% did

10  not result in revocations or removability determinations, either because they were sent back to DHS to

11  ask for more information or because State found the information not significant enough to warrant

12  revocation. *See id.* Ex. 4 at 93-94. Thus, less than 1% of campus-protest leads (at most, approximately

13  40 out of more than 5,000) have resulted in nonimmigrant visa revocations—and these revocations were

14  the result of the individuals' *conduct* at protests or other information discovered about them from the

15  resulting investigations, *not* their mere participation in or presence at public protests or pure political

16  speech. *See, e.g.*, *id.* Ex. 4 at 121-22; Ex. 5 at 39-41, 54-60, 92-95.

17       To be clear: Neither State nor DHS have a policy of targeting individuals based on protected

18  political speech. *See id.* Ex. 4 at 121-22; Ex. 5 at 59-60. State adheres to statutory authority rendering

19  aliens inadmissible for certain support for terrorist activity (*see, e.g.*, 8 U.S.C. § 1182(a)(3)(B)-(C)) and

20  maintains that supporting a terrorist organization can result in the revocation of a visa (*see* Dkt. 33-1 Ex.

21  4 at 121-22), but as explained below, such revocations do not burden protected speech. And for its part,

22  DHS views supporting terrorism and certain kinds of disruptive conduct as warranting investigation and

23  potential referral—such as engaging in violence during protests, promoting the destruction of property,

24  etc. (*see id.* Ex. 5 at 39-41, 59-60, 92-95)—but this, too, does not implicate protected speech. Indeed,

25  DHS does not refer individuals for visa revocations solely because they participated in public protests.

26  *See id.* at 39. Nor does DHS refer individuals for visa revocations solely because they have used the

27  phrase "from the river to the sea, Palestine will be free," or described Israel as having committed

28  "genocide" or "apartheid" in Gaza. *See id.* at 59-60. In short, both agencies have expressly disavowed

any policy or intention to target individuals based on pure political speech.

**D.    Plaintiffs Have Not Been Threatened With Enforcement.**

Plaintiffs are Stanford University's independent student-run newspaper and two pseudonymous individuals with no apparent ties to the University or the newspaper. According to their own representations, none of the three Plaintiffs has been subject to any enforcement action.

Plaintiff Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities." Dkt. 65 ("VAC") ¶ 84. "Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast," and includes:

> news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle" game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year.

*Id.* ¶ 104.

The Stanford Daily asserts that "since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students who are Stanford Daily members have self-censored expression for fear of visa revocation, arrest, detention, and deportation." *Id.* ¶ 112. "For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper." *Id.* ¶ 114. "As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza." *Id.* ¶ 116. "But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id.* The newspaper asserts that other current and former staff writers and editorial board members have asked to be removed from

the website, and that international students have been less willing to speak with Stanford Daily journalists, especially on the record and about topics like Israel and Palestine.  *Id.* ¶¶ 118-29.  It does not assert that any immigration enforcement action has been taken against it, its staff, its editorial board, or any international students at Stanford.  *See id.* ¶¶ 81-134.

Plaintiff Jane Doe asserts that she is "a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa."  *Id.* ¶ 135.  She is "a former student at a United States university," but has "no relationship" with Stanford Daily.  *Id.* ¶¶ 136-37.  She has "published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing 'genocide' and perpetuating 'apartheid.'"  *Id.* ¶ 140.  "She has also used the slogan 'from the river to the sea, Palestine will be free,'" and "criticized American foreign policy, particularly its relationship with Israel."  *Id.* ¶¶ 140-41.  Jane Doe "appeared in a profile on the Canary Mission website."  *Id.* ¶ 142.  She claims that, starting in March 2025, "fearing that Secretary Rubio will revoke her visa . . . Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression."  *Id.* ¶ 148.  She does not assert that any enforcement action has been taken against her.  *See id.* ¶¶ 135-157.

Plaintiff John Doe asserts that he "is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa."  *Id.* ¶ 158.  He is "a former student at a United States university," but has "no relationship" with Stanford Daily.  *Id.* ¶¶ 159-60.  "After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online."  *Id.* ¶ 162.  "At protests, John Doe participated in chants including '[f]rom the river to the sea, Palestine will be free,' chants accusing Israel of committing 'genocide,' and chants calling Israel a 'terrorist state.'"  *Id.* ¶ 163.  "After Secretary Rubio and the Trump administration began targeting other lawfully present noncitizen students," John Doe's professor told him "to reconsider engaging in protected activity related to Israel and Palestine due to potential danger to his immigration status."  *Id.* ¶ 164.  "In March 2025," "fearing Secretary Rubio would revoke his visa . . . John Doe refrained from publishing his findings containing criticism of Israel's actions in Gaza."  *Id.* ¶ 165.  However, he has since "resumed engaging in some protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel

1    and Palestine." *Id.* ¶ 167.  He does not assert that any enforcement action has been taken against him.

2    *See id.* ¶¶ 158-78.

3    **IV.    LEGAL STANDARD**

4            "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

5    'Controversies.'" *Murthy v. Missouri*, 603 U.S. 43, 56 (2024).  "A proper case or controversy exists only

6    when at least one plaintiff establishes that she has standing to sue." *Id.* at 57 (cleaned up).  "She must

7    show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or

8    imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* (cleaned

9    up).  "An allegation of future injury may suffice if the threatened injury is certainly impending, or there

10   is a substantial risk that the harm will occur." *Id.* at 58 (cleaned up).  As the party invoking the federal

11   court's jurisdiction, "[t]he plaintiff bears the burden of establishing standing as of the time she brought

12   the lawsuit and maintaining it thereafter." *Id.* (cleaned up); *see also, e.g.*, *Kokkonen v. Guardian Life*

13   *Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

14           A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under

15   Federal Rule of Civil Procedure 12(b)(1).  *See Savage v. Glendale Union High Sch., Dist. No. 205,*

16   *Maricopa Cnty.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003).  "A Rule 12(b)(1) jurisdictional attack may be

17   facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial attack

18   "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal

19   jurisdiction." *Id*.  A factual challenge, on the other hand, allows the court to look beyond the complaint

20   without "presum[ing] the truthfulness of the plaintiff's allegations." *White v. Lee*, 227 F.3d 1214, 1242

21   (9th Cir. 2000).  On a Rule 12(b)(1) motion, the Court can hear evidence outside the pleadings and

22   resolve factual disputes, if necessary, without treating the motion as one for summary judgment.

23   *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847

24   (9th Cir. 1997).

25   **V.     ARGUMENT**

26           **A.     Plaintiffs Lack Standing.**

27            "This is a case in search of a controversy." *Thomas v. Anchorage Equal Rights Comm'n*, 220

28   F.3d 1134, 1137 (9th Cir. 2000) (en banc) (dismissing First Amendment challenge for lack of standing).

Plaintiffs have put forward various theories for why they can invoke this Court's Article III jurisdiction, but all of them fail because Plaintiffs have not shown they face an imminent injury that is traceable to the federal government.

### 1. Stanford Daily lacks standing.

Stanford Daily has argued that it has standing under three separate doctrines: (i) associational standing; (ii) corporate standing; and (iii) organizational standing.  None apply here.

#### (i)    Stanford Daily lacks associational standing.

The doctrine of "associational standing" allows an organization to rely on the injuries of its members to invoke the Article III jurisdiction of a federal court.  *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).  The doctrine is an exception to the rule that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Indeed, there are reasons to doubt the continued viability of the associational-standing doctrine.  *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (quotation omitted) (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing.").  "Associational standing" flouts the requirements of Article III by allowing one party to rely on the injuries of another; "standing is not dispensed in gross."  *Murthy*, 603 U.S. at 61.

Even if the doctrine survives, it has no application here.  As the Ninth Circuit has made clear, "[a]ssociational standing is reserved for organizations that 'express the collective views and protect the collective interests' of their members."  *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt*, 432 U.S. at 345) (cleaned up).  Thus, "[t]o satisfy the requirements for associational standing, the association's members must possess sufficient 'indicia of membership— enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'"  *Cal. Cmtys. Against Toxics v. Armorcast Prods. Co.*, No. CV 14-5728 PA, 2014 WL 12966008, at *2 (C.D. Cal. Nov. 12, 2014) (quoting *Or. Advocacy*

*Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)).

Stanford Daily is not an "association" of "members" in the relevant sense. It is not an advocacy organization. It is a general-purpose student-run newspaper. In its Amended Complaint, the newspaper alleges that its mission is "to serve the Stanford community with relevant, unbiased journalism and provid[e] its editorial, tech and business staffs with unparalleled educational opportunities." VAC ¶ 84. It claims that its members "joined the organization to support its mission." *Id.* ¶ 92. It explains that its members are "either editorial members or business members," who each have different responsibilities. *Id.* ¶¶ 95-97. But it admits that, "[b]ecause Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast." *Id.* ¶ 104. Indeed, the Stanford Daily publishes: "news articles about academics [and] campus life"; "sports articles"; "opinion articles by columnists, the editorial board, and community members"; "arts and life articles about culture, music, books, and the screen"; "humor articles, including cartoons"; "games, including mini crosswords, full-size crosswords, and the 'Stanfordle'"; "'The Grind,' which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not"; and "*The Stanford Daily Magazine*, which is published twice per year. *Id.* Although it sometimes publishes articles about international issues, it has no particular focus on foreign policy, immigration, or constitutional law. *See id.* ¶¶ 104-09. Thus, while Stanford Daily is plainly a volunteer-run student newspaper, it is not the type of organization that can invoke the associational-standing doctrine to establish the article III jurisdiction of this Court.

In fact, Stanford Daily is fundamentally unlike any kind of organization that the Supreme Court has previously held, or even suggested, could invoke the doctrine of associational standing. It is not an advocacy organization with a mission "to defend human and civil rights secured by law." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 197 (2023); *cf., e.g., All. for Hippocratic Med.*, 602 U.S. at 376 (denying standing to "pro-life medical associations); *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009) (denying standing to "a group of organizations dedicated to protecting the environment"); *Warth*, 422 U.S. at 494 (denying standing to organization with purpose "to alert ordinary citizens to problems of social concern . . . and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons"). Nor is it a "trade

association" with a purpose of "protecting and enhancing the market for Washington apples." *Hunt*, 432 U.S. at 344. In each of these prior cases, the very purpose of the organization was to advocate for its members' interests regarding specific issues.

Here, by contrast, the purpose of Stanford Daily is to report on campus events. If the doctrine of associational standing has any remaining vitality at all, *see* Dkt. 33 at 12, it should not be extended to a general-purpose student newspaper challenging provisions of the Immigration and Nationality Act. *See Fleck*, 471 F.3d at 1106; *accord Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993) ("The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations—*like trade associations or environmental groups*.") (emphasis added).

Nor can Stanford Daily even satisfy the doctrine's criteria. "To invoke [associational standing], an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343).

Most prominently—and for similar reasons as why the newspaper is fundamentally not the type of organization that can even invoke this doctrine, discussed above—the interests that Stanford Daily seeks to vindicate by this lawsuit are not "germane" to its mission of reporting about campus activities. *See, e.g.*, *Fleck*, 471 F.3d at 1106 (privacy interests of members of gay men's social club not germane to club's profit-seeking mission); *Fitzgerald Reno, Inc. v. DOT*, 60 F. App'x 53, 53 (9th Cir. 2003) ("TTAX has no standing because it is a taxpayer organization whose purported environmental interests are not germane to its members."). Plaintiffs have previously argued that the "germaneness" requirement is "undemanding," citing the Ninth Circuit's decision in *Presidio Golf Club v. National Park Service*, 155 F.3d 1153 (9th Cir. 1998). *See* Dkt. 44 at 11. But the environmental and historical issues in that case were much more "germane" to the Presidio Golf Club's bona fide "interest in maintaining the historical and environmental integrity of the Clubhouse" than Plaintiffs' interest in immigration issues here. 155 F.3d at 1159. Again, Stanford Daily has no special focus on foreign policy or immigration; it is a general-purpose newspaper with an admittedly "vast" scope. VAC ¶ 104.

Second, as discussed with respect to the individual Plaintiffs below, no "members" of Stanford Daily would have "standing to sue in their own right," because there are no allegations or evidence that any of them have actually faced enforcement or have demonstrated a substantial threat of future enforcement. *See id.* ¶¶ 94, 110-34. And third, Plaintiffs have put the experiences of "individual members" at issue by purporting to base their harms on such members' mere beliefs; the "participation" of those members will therefore be necessary if the case persists past summary judgment.

Finally, Plaintiffs' associational-standing theory has no limiting principle. If a newspaper can file suit based on its reporters' and interviewees' fears of immigration enforcement, so could any other organization that happens to rely on the effort of a noncitizen. Rather than start down this slippery slope, the Court should reject Plaintiffs' associational-standing theory.

### (ii)    Stanford Daily lacks corporate standing.

The newspaper's "corporate standing" theory fares no better. *Cf. NAACP v. Button*, 371 U.S. 415, 428 (1963). To be sure, Stanford Daily alleges that it has sometimes been involved in publishing noncitizens' work or speech. *See generally* VAC ¶¶ 112-34. But the newspaper does not claim that the federal government has stopped it from doing so; at most, it claims that noncitizens themselves have opted out of those activities for their own reasons. *See id.* This case is therefore unlike *NAACP*, where the challenged state law directly prohibited the NAACP and its members from offering legal representation to black people in Virginia. *See* 371 U.S. at 423-26, 428. Rather, the intervening decisions of third parties here prevent Stanford Daily from establishing its standing to challenge federal statutes in its own right. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).

### (iii)    Stanford Daily lacks organizational standing.

For similar reasons, Stanford Daily cannot establish that the statutes at issue have "directly affected and interfered with [its] core business activities" under the doctrine of "organizational standing." *All. for Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has cautioned that the organizational standing doctrine is reserved for "unusual case[s]" and should not be "extend[ed]." *Id.* at 396. The Court should decline to extend the doctrine here.

Indeed, the district court in *AAUP* determined that the lead plaintiff group in that case *lacked*

organizational standing.  *See AAUP v. Rubio*, No. 25-10685-WGY, 2025 WL 2777659, at *44 (D. Mass. Sept. 30, 2025).  As that court explained, the "harms" upon which AAUP attempted to rely—"deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues such as 'adjunctification' to dealing with immigration law"—were insufficient for an organization to demonstrate standing in its own right.  *Id.*

Here, again, any alleged "interference" has been the result of third parties making their own independent decisions, none of whom would have standing in their own right (as discussed further below).  *See generally* VAC ¶¶ 112-34; *see also Defenders of Wildlife*, 504 U.S. at 560-61; *Pritkin*, 254 F.3d at 798.  Moreover, even if the Court were to consider these alleged indirect harms, Plaintiffs fail to quantify or substantiate them.  *See id.*  Although they vaguely allege that government actions (via the decisions of third parties) have "decreas[ed] the quantity and diversity of opinion pieces" and "affect[ed] the quality of pieces *The Stanford Daily* is able to publish," they do not provide any numbers or other specific facts to support those generalizations.  *Id.* ¶¶ 130-31.  This is not a foundation on which the newspaper can ask this Court to declare federal statutes unconstitutional.

## 2.    The individual Plaintiffs lack standing.

The individual Plaintiffs lack standing because they cannot show a substantial likelihood that they will face visa revocations or removal proceedings based on their protected speech.  *See Int'l Ps. for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs have not demonstrated that their injuries are imminent").

At the outset, despite having previously published content regarding Israel and Gaza; criticized America's foreign policy; described Israel's actions in Gaza as a "genocide"; used the slogan "from the river to the sea, Palestine will be free"; attended protests; and been the subject of profiles on the website Canary Mission, neither individual Plaintiff claims that they have been subject to enforcement under the statutes.  *See* VAC ¶¶ 17-18, 135-78.  Thus, their standing must be based, if at all, on their fear of *future* enforcement.

In order for a plaintiff to demonstrate standing based on potential future enforcement, the threat of enforcement must be "substantial."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024).  Under earlier Ninth Circuit

precedent, "part of the essence" of which was "incorporat[ed]" into the Supreme Court's standard, *Peace Ranch*, 93 F.4th at 487, courts would evaluate the likelihood of future enforcement by considering, among other things, "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute," *Thomas*, 220 F.3d at 1139; *see also, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).

Plaintiffs fail to demonstrate a substantial likelihood of enforcement here. As discussed below, Plaintiffs admit that they have not been the subject of any enforcement action to date, even though they engaged in the specific pro-Palestinian speech they are concerned about and the government conducted—and has completed—a specific enforcement initiative related to protests regarding that issue. Moreover, the government has disavowed taking immigration enforcement action for the "pure" political speech Plaintiffs claim to rely on, as opposed to violent speech or other disruptive conduct. Finally, Plaintiffs cannot rely on other, unidentified "protected speech," because Plaintiffs have alleged no personal intention to engage in such speech, and the Court cannot issue an advisory opinion holding a federal statute unconstitutional based on such an abstract hypothetical.

### (i)   There is no substantial threat of enforcement for protected pro-Palestinian speech.

Despite having previously engaged in the very speech that they are concerned about, neither individual Plaintiff alleges they have been targeted for enforcement or received any direct threat of enforcement, much less suffered any actual enforcement action. *See* VAC ¶¶ 135-78. Rather, their claimed standing depends on their allegation that the government is taking ongoing immigration-enforcement actions based solely on protected political speech, especially related to protesting Israel's treatment of Palestinians. *See* VAC ¶¶ 155-57, 176-78.

However, Defendants have already demonstrated that the government months ago "completed its review of the 5,000-plus campus-protester names referred to it," with "less than 1% of campus-protest leads . . . result[ing] in nonimmigrant visa revocations"—none of which included Plaintiffs, despite their prior speech. Dkt. 33 at 8. And the revocations that did occur "were the result of the individuals' conduct at protests or other information discovered about them from the resulting investigations, not

their mere participation in or presence at public protests or pure political speech." *Id.*; *see also* Dkt. 14 Ex. J at 92-95.[2]  Thus, "without proof of an ongoing pressure campaign, it is entirely speculative" that Plaintiffs will be targeted for enforcement, and their claim for standing fails.  *Murthy*, 603 U.S. at 69.

Plaintiffs cannot rely on historic enforcement actions against other individuals when there is no substantial likelihood that they themselves will be subject to similar action.  The Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), is instructive.  The Court contrasted a plaintiff who had actually been indicted with others who had not even been threatened.  *Id.* at 42.  Even though one plaintiff had already been subject to enforcement action, the others had not sufficiently claimed "that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Id.*  Rather, "[t]hey claim[ed] the right to bring [their] suit solely because, in the language of their complaint, they 'feel inhibited.'" *Id.*  Such "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." *Id.*  In this case, as in *Harris*, to Defendants' knowledge Plaintiffs have not engaged in any action or conduct that puts them in imminent danger of enforcement action.  To be sure, Plaintiffs have alleged that enforcement against them is "possible"; but they have not alleged specific facts indicating that it would be "likely," whereas the government has put forward substantial evidence that the risk of any such enforcement would be vanishingly small.  *See, e.g.*, Dkt. 33 at 8.

In their Amended Complaint, Plaintiffs add a handful of allegations regarding the government's enforcement action against Sami Hamdi, "a British political commentator who was on a speaking tour in the United States and often supports Palestine." VAC ¶ 76; *see also id.* ¶¶ 77-79.  Plaintiffs do not allege that Mr. Hamdi was on a student visa like themselves, or had any interest in remaining in the United States besides his speaking tour.  *See id.*[3]  They do not identify any specific speech or remarks that he made, nor indicate whether they intend to make similar remarks.  *See id.*  In short, Plaintiffs offer

---

[2] It would be inappropriate for this Court to adjudicate the validity of enforcement actions taken against third parties, who are not before the Court and who are in fact parties to separate litigation in their own right.  The government has consistently taken the position across these cases that individuals subject to enforcement under the statutes have done more than exercise pure political speech.

[3] Indeed, Mr. Hamdi voluntarily departed the United States to the United Kingdom on November 12, 2025, and dropped a lawsuit he had initiated against the government.  *See Hamdi v. Trump*, No. 1:25-CV-01434-JLT (E.D. Cal. dismissed Nov. 17, 2025).

nothing to indicate that any enforcement actions taken against Mr. Hamdi indicate that they themselves face any threat of enforcement. *See id.*

### (ii)    Defendants have disavowed enforcement for pure political speech.

Moreover, the question whether a threat of future enforcement is "substantial" "often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch*, 93 F.4th at 490. "[P]laintiffs' claims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010). That is the case here—both State and DHS have represented in this litigation, and elsewhere, that they do *not* pursue visa revocations and removal proceedings purely based on political speech. *See* Dkt. 33-1 Ex. 4 at 121-22; Ex. 5 at 39, 59-60. Contrary to Plaintiffs' implication, merely using the terms "genocide," "apartheid," and "from the river to the sea, Palestine will be free" has not been used as the sole basis for revoking student visas and initiating removal proceedings. Rather, revocations have been based on the types of conduct described above and other derogatory information related to potential violations of U.S. law, including but not limited to Title 8. *See ibid.*

Plaintiffs have previously described this disavowal as a mere "litigation position" that is limited to this action. Dkt. 44 at 8. To the contrary, the government has shown, as a factual matter, through the testimony of its non-attorney agency-employee witnesses in another case, that "[n]either State nor DHS have a policy of targeting individuals based on protected political speech"; "DHS does not refer individuals for visa revocations solely because they participated in public protests"; "[n]or does DHS refer individuals for visa revocations solely because they have used the phrase 'from the river to the sea, Palestine will be free,' or described Israel as having committed 'genocide' or 'apartheid' in Gaza." Dkt. 33 at 8-9 (citing Dkt. 33-1 Exs. 4 & 5). And the district court in that case expressly found, after a full trial, that there "was no ideological deportation policy," and that "[i]t was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." *AAUP*, 2025 WL 2777659, at *39.[4]

---

[4] The government has previously explained that the facts and claims in *AAUP* were distinct from those in this case, and involved what the court called a specific, "discrete enforcement initiative" that had already concluded by the time of the trial in that matter in July. *See* 2025 WL 2777659, at *4, *8-10, *52. The plaintiffs there alleged that their participation in public protests led to them being targeted for deportation under an "ideological deportation policy." The court concluded there was no such policy, and that AAUP itself lacked organizational standing, but nevertheless its faculty and student

1    Further, Plaintiffs cannot rely on abstract statements from the Secretaries of State and Homeland

2  Security (much less other federal officials who are not even employed by the defendant agencies).

3  "'[G]eneral threat[s] by officials to enforce those laws which they are charged to administer' do not

4  create the necessary injury in fact." *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am. v.*

5  *Mitchell*, 330 U.S. 75, 88 (1947)).  Crucially here, it is not the Secretary of State or Homeland Security

6  who analyze and recommend that a student visa should be revoked or removability proceedings should

7  be initiated; rather, as described above, those threshold recommendations are made by staff in various

8  offices at State and DHS.  Plaintiffs therefore cannot rely on general statements from the agencies'

9  political leadership to establish how the statutes are actually enforced.  *See, e.g.*, *Trump v. Hawaii*, 585

10  U.S. 667, 701-02 (2018) ("[T]he issue before us is not whether to denounce the statements. It is instead

11  the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing

12  a matter within the core of executive responsibility.").[5]  Nor do those statements suggest that pure

13  political speech is used as a basis for enforcement, as opposed to support for terrorism or other

14  unprotected conduct.

15    Plaintiffs bear the burden of establishing that State and DHS actually enforce the statutes against

16  individuals like them based on pure protected speech.  They have failed to do so.

17            **(iii)    Plaintiffs cannot rely on other unidentified "protected speech."**

18    Finally, to establish standing based on a threat of future enforcement, Plaintiffs must "alleg[e] an

19  intention to engage in a course of conduct arguably affected with a constitutional interest."  *Susan B.*

20  *Anthony List*, 573 U.S. at 161 (internal quotation marks omitted).  This means that Plaintiffs cannot

21  establish their own standing based on the unrelated speech of third parties that Plaintiffs have no

22  intention of engaging in themselves.  *See Murthy*, 603 U.S. at 69 ("[T]he plaintiffs have only explicitly

23  identified an interest in speaking about COVID–19 or elections—so the defendants' discussions about

24  content-moderation issues must focus on those topics.").

25

26  _____

members who were not U.S. citizens had sufficient standing to mount a First Amendment "as-applied"
challenge that they had been specifically targeted for enforcement based on their viewpoints.

27

28    [5] Of course, "[n]ot only do public officials have free speech rights, but they also have an
obligation to speak out about matters of public concern."  *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir.
2013); *see also AAUP v. Rubio*, 780 F. Supp. 3d 350, 384 n.11 (D. Mass. 2025).

1      For example, in their Amended Complaint, Plaintiffs also point to a handful of social-media

2   posts in which officials at DHS and the State Department discussed removing foreign nationals who

3   celebrated the murder of Charlie Kirk.  *See* VAC ¶¶ 69-75.  According to a DHS account, individuals

4   who had their visas revoked had said things like "[Kirk] deserves to burn in hell"; "there are people who

5   deserve to die"; and that Kirk "DIED TOO LATE." *Id.* ¶ 73.  Such remarks made by temporary foreign

6   visitors would not be protected under the First Amendment.  *See* Dkt. 33 at 16-20.  But in any event,

7   Plaintiffs do not allege that they intend to make any similarly violent remarks directed at American

8   citizens themselves, so they cannot rely on them to establish their own standing.  *See, e.g.*, *Thomas*, 220

9   F.3d at 1141 (distinguishing past acts of enforcement as too different to establish plaintiffs' standing).

10      Indeed, the ambiguity of Plaintiffs' future plans underscores why the Court should deny their

11   request to litigate the contours of the First Amendment here.  Plaintiffs do not ask the Court to evaluate

12   whether certain specific speech is protected.  *See generally* VAC.  Rather, they ask the Court to ponder

13   in the abstract about the boundaries of "protected speech" and then hold unconstitutional two statutes

14   passed by Congress to the extent they might cross the Court's hypothetical boundaries.  *See id.*  But

15   Article III does not allow the Court to render such an "advisory opinion."  *See California v. Texas*, 593

16   U.S. 659, 673 (2021) ("To find standing here" "would threaten to grant unelected judges a general

17   authority to conduct oversight of decisions of the elected branches of Government.").

18      Other cases upholding standing for pre-enforcement challenges have involved speech and

19   conduct that is much more concrete than the unidentified "protected speech" Plaintiffs try to rely on

20   here.  For example, in *Susan B. Anthony List*, the plaintiffs "pleaded specific statements they intend to

21   make in future election cycles."  573 U.S. at 161.  Similarly, in *Culinary Workers Union, Loc. 226 v.*

22   *Del Papa*, a union challenged a statute "that criminalizes the willful and malicious making of derogatory

23   statements about banks" after "distributing handbills criticizing the management and financial

24   performance of the Commercial Bank of Nevada" and receiving a letter threatening enforcement by the

25   state Attorney General.  200 F.3d 614, 616 (9th Cir. 1999).

26      In short, even though Plaintiffs faced no enforcement action for their own historic speech and

27   face no substantial threat of future enforcement for any similar speech they might engage in, they

28   nevertheless want to serve as *de facto* class-action representatives on behalf of every foreign national in

1    the United States whose unidentified future speech might raise foreign-policy or national-security

2    concerns, and ask this Court to toss out longstanding statutes passed by Congress on that basis.  Federal

3    courts do not engage in such armchair decision-making.  The Court should dismiss Plaintiffs' claims.

4    **B.    The Court Should Dismiss The Action With Prejudice.**

5         Rule 15(a) of the Federal Rules of Civil Procedure states that, after a prior amendment, a party

6    may amend its complaint only with the opposing party's written consent or the court's leave.  *See* Fed.

7    R. Civ. P. 15(a)(2).  The court should "freely grant leave to amend when justice so requires."  *DCD*

8    *Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (cleaned up).  However, leave to amend is

9    not to be granted automatically.  *See id.*; *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir.

10   2002).

11        "Five factors are taken into account to assess the propriety of a motion for leave to amend: bad

12   faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has

13   previously amended the complaint."  *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (citation

14   omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, "[f]utility alone can justify the

15   denial of a motion to amend."  *Johnson*, 356 F.3d at 1077.  Amending a pleading is futile "where the

16   amended complaint would also be subject to dismissal."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d

17   1293, 1298 (9th Cir. 1998) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

18        Any further amendment would be futile here.  The Court has already articulated concerns with

19   Plaintiffs' standing, *see* Dkt. 60 at 2-3; Dkt. 52 at 2-3, and Plaintiffs have already had an opportunity to

20   fix them.  *See* Dkt. 65.  But the Verified Amended Complaint did not cure the original Complaint's

21   deficiencies.  And as explained in detail above, there is no reason to think those deficiencies could be

22   cured by further amendment.  The Court should therefore dismiss the Verified Amended Complaint with

23   prejudice.  *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011)

24   (dismissal without leave to amend is proper if amendment would be futile); *Chaset v. Fleer/Skybox Int'l,*

25   *LP*, 300 F.3d 1083, 1088 (9th Cir. 2002) ("Because any amendment would be futile, there is no need to

26   prolong the litigation by permitting further amendment").

27   //

28

1

## VI.     CONCLUSION

2          For the foregoing reasons, the Court should dismiss Plaintiffs' Verified Amended Complaint

3    with prejudice.

4

5    Dated:  December 12, 2025

6                                                    CRAIG H. MISSAKIAN
                                                     United States Attorney
7
                                                     */s/ Kelsey J. Helland*
8                                                    KELSEY J. HELLAND
                                                     Assistant United States Attorney
9
                                                     Attorneys for Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28