Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>*Defendants*. | Case No. 5:25-cv-06618-NW<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:     January 8, 2026<br>Time:     9:00 AM<br>Courtroom: 3, 5th Floor<br><br>Judge Noël Wise |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................3

    Secretary Rubio and the Trump administration abuse the INA to target protected
    speech.............................................................................................................................3

    The Trump administration has continued to abuse the INA to target protected
    speech.............................................................................................................................6

    The administration's targeting of noncitizens' protected speech chills Plaintiffs'
    expression. ....................................................................................................................6

LEGAL STANDARD............................................................................................................9

ARGUMENT ....................................................................................................................10

I.    Plaintiffs have standing to challenge the Revocation and Deportation Provisions. ..........10

    A.    Plaintiffs are suffering an injury in fact. ................................................................11

        1.    The Doe Plaintiffs have alleged a credible threat of enforcement.............12

            a.    The Doe Plaintiffs intend to engage in protected speech...............12

            b.    The Doe Plaintiffs' intended speech is arguably proscribed by
                the Provisions..................................................................................13

            c.    The Doe Plaintiffs face a substantial threat of future
                enforcement.....................................................................................13

                i.    The government has threatened future enforcement..........14

                ii.    The government has not disavowed future
                      enforcement.........................................................................15

                iii.    The government has a history of enforcement...................17

        2.    Stanford Daily has alleged organizational, corporate, and
            associational injuries. ................................................................................18

            a.    Stanford Daily has alleged organizational injuries. ........................18

            b.    Stanford Daily has alleged corporate injuries. ...............................20

            c.    Stanford Daily has alleged associational injuries. ..........................21

B.  The Plaintiffs' injuries are traceable to the government and redressable by the limited relief Plaintiffs seek. ...................................................................23

1.  The Plaintiffs' injuries are traceable to the government. ...........................24

2.  The Plaintiffs' injuries are redressable by the limited relief sought. ..........25

CONCLUSION ...................................................................................................................25

PLAINTIFFS' RESPONSE TO MOTION TO DISMISS          CASE NO. 5:25-cv-06618

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)...................................................................................................1

4

5

*Am. Ass'n of Univ. Professors v. Rubio*,
    No. CV 25-10685, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ......................................passim

6

7

*Am. Encore v. Fontes*,
    152 F.4th 1097 (9th Cir. 2025) .................................................................1, 11, 13, 14

8

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh*,
    970 F.2d 501 (9th Cir. 1991) ................................................................................3, 15

9

10

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
    320 F.3d 1002 (9th Cir. 2003) ....................................................................................11

11

12

*Barke v. Banks*,
    25 F.4th 714 (9th Cir. 2022) ......................................................................................25

13

*Bland v. Fessler*,
    88 F.3d 729 (9th Cir. 1996) .......................................................................................11

14

15

*Bridges v. California*,
    314 U.S. 252 (1941)......................................................................................................1

16

17

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)........................................................................................20, 21, 24

18

19

*Cal. First Amend. Coal. v. Calderon*,
    150 F.3d 976 (9th Cir. 1998) ......................................................................................23

20

*Cal. Pro-Life Council, Inc. v. Getman*,
    328 F.3d 1088 (9th Cir. 2003) ...........................................................................1, 11, 14

21

22

*Columbia Basin Apartment Ass'n v. City of Pasco*,
    268 F.3d 791 (9th Cir. 2001) ......................................................................................23

23

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019).............................................................................................24, 25

24

25

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965).....................................................................................................11

26

27

*Edison v. United States*,
    822 F.3d 510 (9th Cir. 2016) ......................................................................................10

28

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ....................................................................................................18

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ......................................................................................22

*Flaxman v. Ferguson*,
  151 F.4th 1178 (9th Cir. 2025) .............................................................................11, 12

*Fleck & Assocs., Inc. v. City of Phoenix*,
  471 F.3d 1100 (9th Cir. 2006) ....................................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................................................18, 21, 22

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ...............................................................................................2, 25

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ....................................................................................................24

*Khalil v. Joyce*,
  No. 25-cv-01963, 2025 WL 2092376 (D.N.J. July 25, 2025) ..............................11, 12

*Khalil v. Trump*,
  784 F. Supp. 3d 705 (D.N.J. 2025) ..............................................................................5

*L.A. Press Club v. City of Los Angeles*,
  No. 25-cv-05423, 2025 WL 2640421 (C.D. Cal. Sep. 10, 2025) ................................23

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993) ..........................................................................................9

*Lew v. Kona Hosp.*,
  754 F.2d 1420 (9th Cir. 1985) ....................................................................................10

*Libertarian Party of L.A. Cnty. v. Bowen*,
  709 F.3d 867 (9th Cir. 2013) ......................................................................................11

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ...............................................................................passim

*Mahdawi v. Trump*,
  781 F. Supp. 3d 214 (D. Vt. 2025) .....................................................................5, 10, 17

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025) ......................................................................................................1

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ....................................................................................................20

*MSP Recovery Claims, Series LLC v. Amgen Inc.*,
    787 F. Supp. 3d 1046 (C.D. Cal. 2025) ................................................................10

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..............................................................................................1

*NAACP v. Button*,
    371 U.S. 415 (1963) ................................................................................18, 20, 24

*Nat. Grocers v. Rollins*,
    157 F.4th 1143 (9th Cir. 2025) ..............................................................................9

*Ozturk v. Trump*,
    783 F. Supp. 3d 801 (D. Vt. 2025) ........................................................................5

*Peace Ranch, LCC v. Bonta*,
    93 F.4th 482 (9th Cir. 2024) ................................................................................12

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*,
    122 F.4th 825 (9th Cir. 2024) ..............................................................................14

*Porter v. Martinez*,
    68 F.4th 429 (9th Cir. 2023) ................................................................................16

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945) ................................................................................................14

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
    993 F.2d 800 (11th Cir. 1993) ..............................................................................22

*S.D. Cnty. Credit Union v. Citizens Equity First Credit Union*,
    65 F.4th 1012 (9th Cir. 2023) ................................................................................9

*Salter v. Quality Carriers, Inc.*,
    974 F.3d 959 (9th Cir. 2020) ............................................................................9, 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ..........................................................................................21, 22

*Suri v. Trump*,
    No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) ......................................17

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ....................................................................................passim

*The Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ................................................................................19

*Thomas v. County of Humboldt*,
    124 F.4th 1179 (9th Cir. 2024) ..............................................................................9

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ..................................................................................12, 13

*United States v. Stevens*,
    559 U.S. 460 (2010) ..........................................................................................................16

*Vasquez Perdomo v. Noem*,
    148 F.4th 656 (9th Cir. 2025) ..........................................................................................23

*Younger v. Harris*,
    401 U.S. 37 (1971) ............................................................................................................17

**Statutes**

8 U.S.C.
    § 1182(a)(3)(C)(iii) ...................................................................................................passim
    § 1201(i) ....................................................................................................................passim
    § 1227(a)(4)(C)(i) ......................................................................................................13, 25
    § 1227(a)(4)(C)(ii) ..............................................................................................4, 13, 16
    § 1252(g) ....................................................................................................................11, 12

**Rules**

Fed. R. Civ. P. 65(d)(2)..........................................................................................................14

PLAINTIFFS' RESPONSE TO MOTION TO DISMISS          CASE NO. 5:25-cv-06618

**INTRODUCTION**

Since 1791, the First Amendment has barred the government from infringing the inalienable rights to free speech and a free press. The Founders' goal was simple: to place a shackle on the government's power to retaliate against disfavored speakers and thereby secure "much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." *Bridges v. California*, 314 U.S. 252, 265 (1941) (invalidating conviction of noncitizen on First Amendment grounds). The First Amendment embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Because of the importance of protecting free speech, "the Supreme Court has dispensed with rigid standing requirements" in First Amendment lawsuits. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). Chiefly, as the Supreme Court reaffirmed earlier this year, "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025). Instead, plaintiffs have standing when they "allege an intention to engage in" protected speech, which is "proscribed by a statute," and there is a "credible threat" the government will enforce the statute against them. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (cleaned up). These "unique standing considerations" when First Amendment rights are at stake "tilt dramatically toward a finding of standing." *Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) (cleaned up).

But you'd never know it from reading the government's brief. The government proceeds as though First Amendment pre-enforcement standing rules do not exist, confidently proclaiming that Plaintiffs lack standing because "the government has not revoked their visas or initiated removal proceedings against them." Defs.' Mot. to Dismiss ("Mot.") 1, Dkt. No. 66. But that is why Plaintiffs bring a *pre*-enforcement challenge. In this posture, "the plaintiffs themselves need not be the direct target of government enforcement." *Lopez*, 630 F.3d at 786. Rather, "past enforcement against parties similarly situated to the plaintiffs" confers pre-enforcement standing. *Id.* at 786–87; *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (noting "history of past enforcement against nearly identical conduct" helped establish a credible threat (quotation marks omitted)).

And there is such past enforcement in spades, giving Plaintiffs standing to challenge the Revocation and Deportation Provisions as applied to protected speech.[1]

Since March 2025, Secretary Rubio and the Trump administration have publicly, repeatedly, and gleefully used these Provisions to target lawfully present noncitizens just like Plaintiffs for protected speech just like their own. Senior District Judge William G. Young found "by clear and convincing evidence" that Secretaries Rubio and Noem "deliberately and with purposeful aforethought" used the Provisions to violate the First Amendment by targeting noncitizens for visa revocation and deportation based on such protected speech as coauthoring a student newspaper editorial criticizing Israel and chanting "from the river to the sea, Palestine will be free." *Am. Ass'n of Univ. Professors v. Rubio* (*AAUP*), No. CV 25-10685, 2025 WL 2777659, at *1–2, *19–20, *25 (D. Mass. Sept. 30, 2025). Judge Young called their weaponization of the Provisions against speech "not only unconstitutional, but a thing virtually unknown to our constitutional tradition." *Id.* at *46.

And the threat to noncitizens for sharing their views has not ceased. The Verified Amended Complaint details that, as recently as late October, the government arrested and revoked the visa of Sami Hamdi, a British political commentator on a pro-Palestinian speaking tour of the United States, making no secret that the revocation was due to the Trump administration's disagreement with his views. Am. Compl. ¶¶ 76–79. And on November 18, White House Deputy Chief of Staff and National Security Advisor Stephen Miller announced, "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." *Id.* ¶ 80.

Plaintiffs are directly in the crosshairs of the administration's efforts to wield the Provisions to punish protected speech and have self-censored their expression to avoid that fate. The Verified Amended Complaint explains that Jane Doe engaged in pro-Palestinian activism on social media and attended protests where she chanted "from the river to the sea." *Id.* ¶¶ 139–41. But because of

---

[1] The "Deportation Provision" allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). The "Revocation Provision" allows the Secretary to, "at any time, in his discretion, revoke" a "visa or other documentation." 8 U.S.C. § 1201(i). Plaintiffs challenge the two provisions solely as to their use against protected speech. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining the process for assessing a challenge as to only some of a statute's applications).

the administration's threats and actions, she has stopped attending protests and deactivated social media accounts. *Id.* ¶¶ 148–55. Similarly, John Doe made his X account private and is refraining from wearing certain pro-Palestinian apparel. *Id.* ¶¶ 169, 171. And noncitizen writers and editors at Stanford Daily are refusing to write or edit stories or opinion pieces related to Israel and Palestine and even quitting the paper, fearing the same fate as Rümeysa Öztürk, who submitted a pro-Palestinian op-ed to her student newspaper only to find herself thrown into the back of a van by masked federal agents and rushed to an ICE detention facility in rural Louisiana. *See AAUP*, 2025 WL 2777659, at *28 (describing, and including a picture of, ICE's ambush of Ms. Öztürk).

The Verified Amended Complaint alleges that Plaintiffs have engaged and wish to engage in speech falling within the crosshairs of an immigration statute the administration is actively using to target, detain, and deport other speakers just like them. That is precisely what is required of plaintiffs asserting a First Amendment challenge to the statute. *See Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991) (holding plaintiffs had pre-enforcement standing to mount a First Amendment challenge to immigration statute, noting that prior enforcement of the challenged statute against similar speech "underscores the government's willingness" to use it against the plaintiffs). The Court should deny the government's motion.

## BACKGROUND

President Donald Trump campaigned on a platform that included deporting lawfully present noncitizens for protected speech, promising to throw out "any student that protests" because "[as] soon as they hear, they're going to behave." Am. Compl. ¶ 35. He pledged to revoke visas of "radical, anti-American, and anti-Semitic" students and "aggressively deport" noncitizens with "jihadist sympathies." *Id.* ¶ 31. Now in power, his administration is using the Revocation and Deportation Provisions to do just that.

**Secretary Rubio and the Trump administration abuse the INA to target protected speech.**

On January 20, 2025, the President issued an executive order instructing the government to ensure resident noncitizens "do not bear hostile attitudes" toward the United States or "advocate for" or "support" "foreign terrorists and other threats to our national security." *Id.* ¶ 36. Ten days later, the White House committed to revoking the visas of and deporting "Hamas Sympathizers,"

including those whom the administration viewed as having "joined in the pro-jihadist protests." *Id.* ¶ 38. The administration considers the phrase "from the river to the sea, Palestine will be free" to express support for Hamas and to thus justify action under the Revocation or Deportation Provisions. *Id.* ¶ 39. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" could also be sufficient to invoke the provisions. *Id.* ¶ 39.

In early March 2025, Department of Homeland Security (DHS) agents arrested Mahmoud Khalil—a peaceful participant in pro-Palestinian advocacy at Columbia University—and transported him to an immigration jail in rural Louisiana. *Id.* ¶¶ 41–43. Proceedings followed under the Deportation Provision, which authorizes the Secretary of State to trigger deportation proceedings against noncitizens solely because of their protected speech, so long as the Secretary of State "personally determines" their activity compromises "a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). Secretary Rubio claimed Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." Am. Compl. ¶ 44. The day after Mr. Khalil's arrest, Secretary Rubio announced the federal government "will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* ¶ 45. President Trump pledged that Mr. Khalil's arrest was the "first" of "many to come," and that his administration would deport any noncitizen student involved in "pro-terrorist, anti-Semitic, anti-American activity." *Id.* ¶ 47.

In mid-April, masked DHS agents entered the naturalization interview of Mohsen Mahdawi—a legal permanent resident who had been a critic of Israel's military campaign in Gaza—and arrested him. *Id.* ¶¶ 56–58. As with Mr. Khalil, Secretary Rubio relied solely on Mr. Mahdawi's protected speech and cited the Deportation Provision as the basis for Mr. Mahdawi's arrest and deportation proceedings, bizarrely alleging the advocacy of this single international student hindered the United States government's ability to "promot[e] peace in the Middle East." *Id.* ¶ 59.

Weeks prior, six plain-clothed DHS officers surrounded and detained Tufts University PhD student Rümeysa Öztürk—a lawfully present noncitizen pursuant to an F-1 student visa—outside

-4-

her home. *Id.* ¶¶ 51, 53. Her offense? During her time at Tufts, Ms. Öztürk coauthored an editorial in the student newspaper urging Tufts, among other things, to recognize a genocide in Gaza and divest from Israeli companies. *Id.* ¶ 52. The State Department revoked Ms. Öztürk's visa without notice, DHS ambushed her, and then, as with Mr. Khalil, DHS immediately transferred her to an immigration jail in remote Louisiana to await deportation proceedings. *Id.* ¶¶ 53–55.

Secretary Rubio's department relied on the Revocation Provision to revoke Ms. Öztürk's visa. *Id.* ¶ 54. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation." It places no constraints on the Secretary's discretion and no guardrails against revoking visas based on protected speech.

Citing constitutional grounds, federal courts have ordered the release of Mr. Khalil, Ms. Öztürk, and Mr. Mahdawi during their deportation proceedings. Am. Compl. ¶¶ 49, 55, 60. The court in Ms. Öztürk's action concluded "the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention." *Ozturk v. Trump*, 783 F. Supp. 3d 801, 810 (D. Vt. 2025). In Mr. Mahdawi's action, the court explained that he "raised a substantial claim that the Government arrested him to stifle speech with which it disagrees." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 228 (D. Vt. 2025), *appeal argued*, No. 25-1113 (2d Cir. Sep. 30, 2025). And in Mr. Khalil's suit, the court concluded the Deportation Provision was likely unconstitutionally vague as applied to him. *Khalil v. Trump*, 784 F. Supp. 3d 705, 771 (D.N.J. 2025), *appeal argued*, No. 25-2162 (3d Cir. Oct. 21, 2025); Order, *id.* (No. 25-cv-01963), Dkt. No. 316 (ordering Mr. Khalil's release).

Secretary Rubio and the Trump administration promised more visa revocations for protected speech. On May 8, 2025, DHS Assistant Secretary Tricia McLaughlin announced that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Am. Compl. ¶ 63. At a May 21, 2025, congressional hearing, Secretary Rubio, responding to a question about the revocation of Ms. Öztürk's visa based on her speech, said that he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas based on expression. *Id.* ¶ 65. And on July 29, 2025, Stephen Miller

posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for America or its people." *Id.* ¶ 67.

**The Trump administration has continued to abuse the INA to target protected speech.**

Since Plaintiffs filed this lawsuit, the Trump administration has continued to revoke visas based on protected speech. For example, on September 11, 2025, after Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau declared that noncitizens who "glorify violence and hatred are not welcome visitors in our country" and that the State Department would "undertake appropriate action." *Id.* ¶ 69. On September 15, Secretary Rubio affirmed that visa revocations were "under way," and that anyone "here on a visa and cheering on the public assassination of a political figure" should "prepare to be deported." *Id.* ¶ 71. In September and October, the State Department publicized a series of visa revocations based on protected speech about Charlie Kirk. *Id.* ¶¶ 70, 74.

Further, in late October, the State Department revoked the visa of, and DHS arrested, Sami Hamdi, a British political commentator who was on a speaking tour in the United States and often voices support for Palestinians. *Id.* ¶¶ 76–77. The State Department and DHS confirmed the basis for revoking his visa was that he "support[ed]" terrorism. *Id.* ¶¶ 77–79. DHS warned that noncitizens who want to "hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism" should "think again." *Id.* ¶ 79. These threats continued through the fall. *Id.* ¶¶ 68, 72, 75. On November 18, Stephen Miller warned: "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." *Id.* ¶ 80.

**The administration's targeting of noncitizens' protected speech chills Plaintiffs' expression.**

Plaintiff Jane Doe is a graduate of a United States university, with no relationship to Stanford Daily (or Stanford University), who resides in the United States pursuant to her lawful admission on an F-1 student visa and was a member of the pro-Palestinian student group Students for Justice in Palestine ("SJP") at her university. *Id.* ¶¶ 17, 135–36, 139.[2] She published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing "genocide" and perpetuating "apartheid." *Id.* ¶ 140. She has also used the slogan "from the river to the sea, Palestine will be free"

---

[2] The government deemed it significant that Ms. Öztürk's op-ed "joined in voicing opposition to Tufts' investment in Israel with" the Tufts SJP chapter. *AAUP*, 2025 WL 2777659, at *26.

and criticized American foreign policy, particularly its relationship with Israel. *Id.* ¶¶ 140–41. In other words, Jane Doe has said essentially all the same things Rümeysa Öztürk did.

In late 2023 or early 2024, Jane Doe appeared in a profile on the anonymously run Canary Mission website,[3] which a senior official in ICE's Homeland Security Investigations unit testified his team uses to generate "reports" on individuals that the State Department relies on to decide, among other things, "visa revocations." *Id.* ¶¶ 142–45.[4] Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi—all targeted by Secretary Rubio's State Department with the Provisions—each appeared on Canary Mission. *Id.* ¶ 147. In March 2025, Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. *Id.* ¶ 148.

Since then, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publicly publishing and voicing her opinions regarding Palestine and Israel, including by no longer attending pro-Palestinian protests, deactivating her main social media account and no longer posting pro-Palestinian content on her other social media accounts, no longer engaging in organizing supporting Palestinians, and refraining from wearing a keffiyeh or holding a Palestinian flag to show support for the Palestinian cause. *Id.* ¶¶ 149, 155. Through 2025, as she read and learned more about the government's visa revocations based on protected speech and its vows to continue them, she continued to self-censor. *See id.* ¶¶ 150–56. The only advocacy Jane Doe now feels comfortable engaging in is wearing watermelon earrings,[5] which are quickly removable. *Id.* ¶ 155.

Similarly, Plaintiff John Doe is a graduate of a major United States university, with no relationship to Stanford Daily (and, like Jane Doe, did not attend Stanford), who is lawfully present in the United States pursuant to his admission on an F-1 student visa and has studied and worked in journalism. *Id.* ¶¶ 18, 158–59. John Doe came to the United States to study journalism because of

---

[3] Canary Mission exists to expose people it considers "anti-Israel." Am. Compl. ¶ 143.

[4] Canary Mission provided "most" protesters DHS asked ICE to investigate. Am. Compl. ¶ 146.

[5] Watermelons share the same colors as the Palestinian flag, and advocates often use the symbol to support the Palestinian cause. Am. Compl. ¶ 155.

his admiration for America's strong protection for free speech and freedom of the press. *Id.* ¶ 158. After the October 7, 2023, attack and Israel's counter-offensive, he attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online. *Id.* ¶ 162. At protests, he participated in chants including "from the river to the sea, Palestine will be free," accusing Israel of committing "genocide," and calling Israel a "terrorist state." *Id.* ¶ 163. After Secretary Rubio and the Trump administration began targeting lawfully present noncitizen students because of their speech, the professor for whom John Doe served as a teaching assistant told him to reconsider his advocacy related to Israel and Palestine due to potential danger to his immigration status. *Id.* ¶ 164. And he read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. *Id.* ¶ 165. He has also read about the government's continued visa revocations based on protected speech and its vows to continue doing so. *Id.* ¶¶ 165, 172–74.

Because of the administration's actions and threats, John Doe has substantially reduced his pro-Palestinian speech and advocacy. *Id.* ¶¶ 165, 169, 171. For example, he made his social media account containing pro-Palestinian content private and is refraining from wearing certain pro-Palestinian apparel. *Id.* John Doe also delayed publishing his findings containing criticism of Israel's actions in Gaza for months, fearing adverse immigration action. *Id.* ¶ 165. Though John Doe has resumed a limited amount of protected speech, he continues to largely self-censor his expression (e.g., his social media account and clothing) out of fear of visa revocation and deportation. *Id.* ¶ 176.

Plaintiff The Stanford Daily Publishing Corporation is a nonprofit that publishes *The Stanford Daily*, the independent, student-run newspaper at Stanford University. *Id.* ¶¶ 81–82. Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities." *Id.* ¶ 84. But the government's use of the Revocation and Deportation Provisions to target noncitizens' protected speech is thwarting Stanford Daily's journalistic and educational activities by chilling its noncitizen writers, reporters, and editors. Stanford Daily's noncitizen members have quit, withheld articles, refused assignments, requested articles be taken

1    down, and asked for anonymity, all because they fear visa revocation, arrest, detention, and

2    deportation under the administration's ongoing enforcement of the Provisions. *Id.* ¶¶ 112, 132–33.

3         For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit out

4    of fear of adverse immigration consequences if they were associated with articles about Israel or

5    Palestine. *Id.* ¶¶ 114–15. As another example, a lawfully present noncitizen writer signed up to cover

6    a story about a vigil that brought together Jewish and Palestinian families to honor those who died

7    in the conflict in Gaza. *Id.* ¶ 116. The writer had attended, taken notes, and interviewed sources. *Id.*

8    But due to fear of adverse immigration consequences, the student decided against publishing an

9    article about the event. *Id.* ¶¶ 116–17. Other Stanford Daily members and contributors have asked

10   the paper to take down their past articles about the Middle East, fearing visa revocation or

11   deportation if they came to the attention of Trump administration officials. *See, e.g.*, *id.* ¶¶ 118–23,

12   133–34. The government's past enforcement and continuing threats to enforce the Revocation and

13   Deportation Provisions based on speech have harmed the quality and quantity of pieces Stanford

14   Daily is able to publish on the conflict between Israel and Palestine, as noncitizen members,

15   contributors, and sources have substantially reduced their participation. *Id.* ¶¶ 130–31, 133.

16                                    **LEGAL STANDARD**

17        The Court should deny the government's motion because Plaintiffs' allegations, when

18   accepted as true and viewed in the light most favorable to Plaintiffs, confer standing. *See Thomas v.*

19   *County of Humboldt*, 124 F.4th 1179, 1186 (9th Cir. 2024). And because at least one plaintiff has

20   standing, this Court has jurisdiction to consider the claims, without needing to consider the other

21   Plaintiffs' standing. *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1157 (9th Cir. 2025); *see also Leonard*

22   *v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (highlighting the "general rule" "that once the court

23   determines that one of the plaintiffs has standing, it need not decide the standing of the others").

24        A party may strategically decide to assert a "factual jurisdictional attack." *S.D. Cnty. Credit*

25   *Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023). The government

26   omits whether it considers its attack facial or factual, but it has failed to assert a factual attack.

27   Whether an attack is "facial" (where allegations are presumed true) or "factual" (entailing evaluation

28   of evidence) turns on whether the challenger disputes the allegations' truth. *Salter v. Quality*

-9-

1  *Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir. 2020) (determining attack was facial when party had "not

2  really challenged" the allegations' truth). The government asserts a facial attack because it does not

3  dispute the allegations' truth, but whether they confer standing. *See, e.g.*, Mot. 16–17 (not disputing

4  truth of Doe Plaintiffs' allegations). That remains true despite its outside evidence. *See MSP*

5  *Recovery Claims, Series LLC v. Amgen Inc.*, 787 F. Supp. 3d 1046, 1077 (C.D. Cal. 2025)

6  (concluding party failed to assert factual attack when evidence did not dispute relevant allegations).[6]

7  **ARGUMENT**

8  The Trump administration has used, promised to use, and continues using the Revocation

9  and Deportation Provisions to target lawfully present noncitizens like Jane Doe, John Doe, and

10  Stanford Daily's members for protected speech about the Middle East, American foreign policy,

11  and American politics. As Judge Young found, "Secretaries Noem and Rubio are engaged in a mode

12  of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis

13  of political speech, and with the intent of chilling such speech and that of others similarly situated."

14  *AAUP*, 2025 WL 2777659, at *46. Another court put it this way: "Legal residents—not charged

15  with crimes or misconduct—are being arrested and threatened with deportation for stating their

16  views on the political issues of the day." *Mahdawi v. Trump*, 781 F. Supp. 3d at 233.

17  Plaintiffs have engaged in the type of speech the Trump administration has wielded the

18  Provisions against and are self-censoring to avoid those consequences. They therefore have standing

19  to challenge the Provisions with respect to protected speech under the First Amendment.

20  **I.    Plaintiffs have standing to challenge the Revocation and Deportation Provisions.**

21  Plaintiffs have standing to challenge the Provisions because they can demonstrate "(1) an

22  injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of,

23  and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List*

24  *v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up). First Amendment suits present "unique

25  standing considerations" because the inability to quickly vindicate free speech rights can cause

26  _____

27  [6] Even if the government brought a factual attack, it would not change the analysis. The complaint's verified allegations constitute evidence akin to affidavits. *Lew v. Kona Hosp.*, 754 F.2d

28  1420, 1423 (9th Cir. 1985). And with a factual attack, any factual disputes are resolved in the plaintiffs' favor. *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016).

speakers to self-censor. *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). The Constitution abhors that possibility because "free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965). These unique First Amendment standing considerations "tilt dramatically toward a finding of standing." *Am. Encore*, 152 F.4th at 1113 (cleaned up).

### A.    Plaintiffs are suffering an injury in fact.

It is well settled that "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013); *see Dombrowski,* 380 U.S. at 486 (recognizing the "sensitive nature of constitutionally protected expression," in permitting a pre-enforcement action involving the First Amendment); *Bland v. Fessler,* 88 F.3d 729, 736–37 (9th Cir. 1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases …."). Thus, in First Amendment cases, "the Supreme Court has endorsed" a "hold your tongue and challenge now" method that enables proceeding against laws whose potential enforcement causes plaintiffs to self-censor. *Cal. Pro-Life Council*, 328 F.3d at 1094 (quotation marks omitted).

When, as here, plaintiffs elect to stay silent rather than risk government retribution for speech, "such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Bowen*, 709 F.3d at 870 (quotation marks omitted). Similarly, continuing to engage in protected speech under threat of enforcement is also an injury in fact sufficient to confer standing. *See Flaxman v. Ferguson*, 151 F.4th 1178, 1185–86 (9th Cir. 2025) (reversing district court's dismissal because professors alleged policies will chill their speech even though they continued engaging in the protected conduct). That means John Doe is doubly covered in light of his resumption of some limited speech.

A final note on pre-enforcement standing: Secretaries Rubio and Noem are not showing their full hand to the Court. Their (incorrect) argument that Plaintiffs lack standing "in the absence of any actual enforcement action taken against them," Mot. 1, neglects to mention that their position in related litigation is that 8 U.S.C. § 1252(g) *bars* federal district courts from reviewing "actual enforcement actions." *See, e.g.*, Resp'ts' Mot. to Stay 3, *Khalil v. Joyce*, No. 25-cv-01963, 2025

-11-

WL 2092376 (D.N.J. July 25, 2025), Dkt. No. 360-1 (arguing Section 1252(g) deprives district courts of "authority to disrupt or control removal proceedings"). In short, Secretaries Rubio and Noem are asking this Court to bless a "heads I win, tails you lose" system of constitutional rights, where noncitizens lack pre-enforcement standing to protect their free speech rights before an immigration enforcement action and are barred from seeking the district court's help after. The Trump administration's attempt to deny the nation's federal district courts the ability to review unconstitutional immigration statutes and actions should go nowhere.

### 1. The Doe Plaintiffs have alleged a credible threat of enforcement.

The Doe Plaintiffs' self-censorship is an injury sufficient to confer pre-enforcement standing under the *Driehaus* test because (1) they intend to engage in conduct affected with a constitutional interest, (2) their speech is subject to the Revocation and Deportation Provisions, and (3) there is a credible threat the government will enforce the Provisions against them. *Driehaus*, 573 U.S. at 159.

### a. The Doe Plaintiffs intend to engage in protected speech.

First, the Doe Plaintiffs intend to engage in constitutionally protected speech. The government does not contest that "political speech" is constitutionally protected. *Id.* at 162. And here, Jane Doe intends to resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression. Am. Compl. ¶ 149. This includes publishing pro-Palestinian/anti-Israel commentary online, such as commentary accusing Israel of committing "genocide" and perpetuating "apartheid" and using the slogan "from the river to the sea, Palestine will be free." *Id.* ¶ 140. John Doe intends to publish and voice his true opinions regarding Palestine and Israel. *Id.* ¶ 166. He would make public his X social media account containing pro-Palestinian commentary, wear "Palestinian Youth Movement" apparel, and increase his expression supporting Palestinians, criticizing American foreign policy, and opposing the Israeli government. *Id.* ¶¶ 169–71, 176.

The Doe Plaintiffs have "specifically plead[ed] [their] intent and allege[d] corroborating past practice." *Peace Ranch, LCC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024). They have no obligation to allege "specific speech they would have made but for the challenged policies." *Flaxman*, 151 F.4th at 1187; *accord Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (Plaintiffs need not

-12-

"specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already violated the law in the past."). But in the interest of completeness, the Verified Amended Complaint does just that, with factual allegations Defendants do not dispute. Mot. 16.

> **b.   The Doe Plaintiffs' intended speech is arguably proscribed by the Provisions.**

Second, the Doe Plaintiffs' intended speech is "arguably proscribed by" the Provisions. *Driehaus*, 573 U.S. at 162 (cleaned up). That is because they enable the Secretary of State to revoke a visa and render noncitizens deportable based on protected speech about American foreign policy.

The Deportation Provision's text allows the Secretary to render lawfully present noncitizens deportable for their protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i)–(ii). Noncitizens are thus within the Provision's reach if they engage in any expression arguably implicating American foreign policy. And the Revocation Provision allows the Secretary "at any time, in his discretion" to "revoke [a] visa or other documentation." *Id.* § 1201(i). Noncitizen speakers are thus always within the Revocation Provision's reach because it places no constraints on the Secretary's discretion nor guardrails against revoking visas based on protected speech.

"[F]or the purposes of standing, [courts] accept Plaintiffs' interpretation of the statute so long as it is an arguable interpretation." *Am. Encore*, 152 F.4th at 1116. Here, Plaintiffs' interpretation is not just an arguable interpretation, but the *only* interpretation: the government has expressly adopted it. *See* Defs.' Cross-Mot. and Opp'n 24, Dkt. No. 33 ("That Congress did not limit the discretion to revoke visas and did not define what constitutes 'potentially serious foreign policy consequences' is telling."). At no point has the government argued Plaintiffs' speech is beyond the textual reach of the statutes. And that is what matters for standing.

> **c.   The Doe Plaintiffs face a substantial threat of future enforcement.**

And third, the Doe Plaintiffs face a substantial threat of future enforcement because "the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,'" the government has not "disavowed enforcement," and "there is a 'history of past prosecution or enforcement.'" *Am. Encore*, 152 F.4th at 1118 (quoting *Tingley*, 47 F.4th at 1067).

-13-

1

###### i.  The government has threatened future enforcement.

2      As the Ninth Circuit explained, when a law countenances punishment for protected speech,

3   a plaintiff "need not show that the authorities have threatened to prosecute him; the threat is latent

4   in the existence of the statute." *Cal. Pro-Life Council*, 328 F.3d at 1095 (quotation marks omitted).

5   Still, the officials with enforcement authority have communicated specific warnings to and

6   threatened every noncitizen, which necessarily includes Jane Doe and John Doe, with visa

7   revocation and deportations for engaging in anti-Israel, pro-Palestinian, or anti-American speech.

8   Am. Compl. ¶¶ 30–36, 38, 39, 45, 47, 62–75, 77–80. So, unlike the generic "we will enforce all

9   laws" promises the government's caselaw addresses, this matter involves specific threats to enforce

10  particular statutes against protected speech on defined topics. *Compare Lopez*, 630 F.3d at 787

11  (citing as a general-threat example a promise to enforce "all of the laws of San Diego, State, Federal

12  and County" (quotation marks omitted)), *with Planned Parenthood Great Nw., Haw., Alaska, Ind.,*

13  *Ky. v. Labrador*, 122 F.4th 825, 838 (9th Cir. 2024) ("Far from a general warning of enforcement,

14  the [enforcer's threat] singled out Idaho health care professionals who perform the specific act of

15  referring patients to abortion providers across state lines." (cleaned up)).

16      These specific threats have come from those statutorily empowered to enforce the challenged

17  Provisions. Only the Secretary of State can "personally determine[]" to render noncitizens

18  deportable under the Deportation Provision. 8 U.S.C. § 1182(a)(3)(c)(iii). And the Secretary

19  likewise has personal authority to revoke visas under the Revocation Provision. *Id.* § 1201(i). Even

20  if the Secretary could delegate his authority and the statutory command to "personally determine[]"

21  the Deportation Provision's applicability, Plaintiffs would still have standing "by virtue of the

22  enforcement authority delegated by the Secretary." *Am. Encore*, 152 F.4th at 1118. The "potential

23  for [lower level] workers to expose individuals to [adverse government action] for exercising First

24  Amendment speech that others find offensive creates its own chilling effect," which "presents

25  enough of a collective threat to create a credible or substantial risk of enforcement." *Id.* at 1119.

26  Plus, Secretaries Rubio and Noem lead and set the policy for their departments, so an injunction

27  against them binds everyone at their agencies. Fed. R. Civ. P. 65(d)(2); *see Regal Knitwear Co. v.*

28  *NLRB*, 324 U.S. 9, 14 (1945). At the State Department and DHS, the buck stops with Defendants.

-14-

1          **ii.    The government has not disavowed future enforcement.**

2          The government's brief insists the government has "expressly disavowed any policy or

3  intention to target individuals based on pure political speech" Mot. 8–9. No, it hasn't. President

4  Trump, Secretary Rubio, Secretary Noem, and those authorized to speak on their behalf have never

5  disavowed revoking visas or deporting noncitizens based on protected speech. Instead, as shown

6  above, high-ranking officials including Secretary Rubio and Stephen Miller continue to not only

7  brag about revoking visas and pursuing deportations for protected speech, but promise more will

8  come. The Court should take the President, and his Cabinet, at their word.

9          The government next points to Judge Young's finding that the government lacked an

10 "ideological deportation policy" and uses that to suggest Judge Young found the government was

11 not invoking the statutes based on speech. Mot. 19 & n.4 (quoting *AAUP*, 2025 WL 2777659, at

12 *39). Not so. In context, Judge Young was discussing whether there was a "policy," within the

13 context of an Administrative Procedure Act suit, "to deport all pro-Palestinian non-citizens." *AAUP*,

14 2025 WL 2777659, at *39. Though he determined *that* policy did not exist, he expressly found the

15 existence of a continuing policy to deport noncitizens based on speech and use those ongoing

16 deportation efforts to chill other noncitizens from speaking. *Id.* And he explicitly found that

17 government officials "*do not disavow* an intention to detain, deport, or revoke student visas in

18 response to what would inarguably be constitutionally protected speech if engaged in by a citizen."

19 *Id.* at *44 (emphasis added).

20         The only statements the government points to as reflecting a "disavowal" arose in the context

21 of litigation, Mot. 19—but that is immaterial under the Ninth Circuit requirement that a

22 "government's disavowal[s] must be more than a mere litigation position." *Lopez*, 630 F.3d at 788;

23 *see also Thornburgh*, 970 F.2d at 508 (holding noncitizens had standing to challenge immigration

24 statute on First Amendment grounds, despite the government dropping charges against them four

25 days before the hearing "for tactical reasons"). Outside of litigation, the government has maintained

26 its position that it can—and will—enforce the Provisions against noncitizens for protected speech.

27 Am. Compl. ¶¶ 30–36, 38, 39, 45, 47, 62–75, 77–80. In short, "Plaintiffs could well be the next

28

PLAINTIFFS' RESPONSE TO MOTION TO DISMISS                    CASE NO. 5:25-cv-06618

1  target given the Trump Administration's vow to continue applying the Revocation and Deportation

2  Provisions to protected speech." Amicus Br. of ACLU of N. Cal. et al. 10, Dkt. No. 40-1.

3       The government argues it has completed its review of campus protesters with less than 1%

4  of those protesters receiving nonimmigrant visa revocations—a meaningless statistic here, given

5  those protesters reviewed included citizens, who don't have visas to revoke. Mot. 2, 8, 17; *see also*

6  Dkt. No. 33-1 at 108. Regardless, the Ninth Circuit has already rejected a similar argument. In *Porter*

7  *v. Martinez*, the state tried to defeat standing by arguing "the odds of anyone being cited [under the

8  challenged statute] are 'vanishingly small.'" 68 F.4th 429, 437 (9th Cir. 2023). The court rejected

9  that argument because the state "nevertheless do[es] enforce [the challenged statute]" and did "not

10  disclaim their ability to do so in [future] cases." *Id.* So too here. The government does enforce the

11  Deportation and Revocation Provisions against speech and has not disclaimed doing so in the future.

12       Finally, disavowals are effective only when "the enforcing authority has disavowed the

13  applicability of the challenged law to the plaintiffs" or "expressly interpreted the challenged law as

14  not applying to the plaintiffs' activities." *Lopez*, 630 F.3d at 788. The government never asserts

15  Plaintiffs' past or future speech is beyond the *textual* reach of the Provisions. Nor could it. The

16  Deportation Provision, by its plain text, applies *solely* to "lawful" (i.e. protected) speech. 8 U.S.C.

17  §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). The Revocation Provision places no constraints on scope,

18  enabling Secretary Rubio to revoke a visa for "any" reason, including speech. *Id.* § 1201(i).

19       The government's pledges in its brief, including that it would not deport a speaker for

20  accusing Israel of "genocide" or using the "river to the sea" chant—even if not contradicted by its

21  ongoing deportation efforts—amount to nothing more than the government "invoking its

22  prosecutorial discretion" to promise not to punish Plaintiffs for their speech. *United States v.*

23  *Stevens*, 559 U.S. 460, 480 (2010). "But the First Amendment protects against the Government; it

24  does not leave us at the mercy of *noblesse oblige*." *Id.* Courts will not "uphold an unconstitutional

25  statute merely because the Government promise[s] to use it responsibly." *Id.* Rather, a government

26  "assurance that it will apply [a statute] far more restrictively than its language provides is pertinent

27  only as an implicit acknowledgement of the potential constitutional problems with a more natural

28  reading." *Id. Stevens* confirms the Provisions' irredeemable constitutional frailty as to speech.

-16-

### iii.    The government has a history of enforcement.

The Ninth Circuit has been clear that a "history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible." *Lopez*, 630 F.3d at 786–87. And here, the government has enforced the Provisions against similarly situated legally present noncitizens who engage in comparable protected expression to the Doe Plaintiffs.

Secretary Rubio invoked the Deportation Provision against Mr. Mahdawi because he used the slogan "from the river to the sea, Palestine will be free" and led "pro-Palestinian protests." Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi*, 781 F. Supp. 3d 214 (No. 25-cv-389), Dkt. No. 42-1; *AAUP*, 2025 WL 2777659, at *19–22; *see also* Am. Compl. ¶¶ 140, 149, 163, 166 (describing how the Doe Plaintiffs have used and intend to continue using the same slogan). Secretary Rubio enforced the Deportation Provision against Mr. Khalil because he participated in pro-Palestinian protests. Reply to Resp. to Mot. for Prelim. Inj. Ex. E, at 7, *AAUP*, 2025 WL 2777659 (No. 25-cv-10685), Dkt. No. 68-6; *see also* Am. Compl. ¶¶ 155, 162 (describing how the Doe Plaintiffs have and intend to continue participating in protests and pro-Palestinian expression). He enforced the Deportation Provision against Dr. Badar Khan Suri for pro-Palestinian speech and never contested detaining "Suri in retaliation for his First Amendment activity." *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *4 (4th Cir. July 1, 2025); *see also* Am. Compl. ¶¶ 140, 149, 163, 166 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian speech). And his department enforced the Revocation Provision against Ms. Öztürk because she "protest[ed] Tufts' relationship with Israel" in a student newspaper op-ed and engaged in other pro-Palestinian "activities and associations." *AAUP*, 2025 WL 2777659, at *26 (quotation marks omitted); *see also* Am. Compl. ¶¶ 139, 140, 149, 163, 166 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian advocacy, including through journalism and social media, and how Jane Doe was a member of Students for Justice in Palestine). The Doe Plaintiffs do not want to (and to bring this challenge, they need not) find themselves in the same position facing deportation.[7]

---

[7] The government, like the unsuccessful respondents in *Driehaus*, relies on *Younger v. Harris*, which involved intervenors who alleged a leafleteer's prosecution "inhibited" their speech but—critically—not that their own prosecutions were "likely, or even that a prosecution is remotely possible." 401 U.S. 37, 42 (1971). "That is not this case." *Driehaus*, 573 U.S. at 166. The Doe

-17-

1          **2.      Stanford Daily has alleged organizational, corporate, and associational**

2          **injuries.**

3          Stanford Daily has alleged three injuries, each of which confers standing. First, it has alleged

4    organizational injuries because the Provisions have "directly affected and interfered with [its] core

5    business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Second, it has

6    alleged corporate injuries because it is "directly engaged" in activities like publishing noncitizens'

7    work, enacting noncitizens' editorial choices, and sponsoring noncitizens' speech. *NAACP v.*

8    *Button*, 371 U.S. 415, 428 (1963). Third, it has alleged associational injuries because it can assert

9    its members' injuries. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

10         Curiously, the government spends most of its brief attacking associational standing while

11   spending just two paragraphs on organizational standing and five *sentences* on corporate standing.

12   Yet organizational and corporate standing—the doctrines designed to allow organizations to remedy

13   constitutional violations directly impacting their core purpose—provide the most straightforward

14   paths for the Court to find standing. But, as shown below, Stanford Daily readily satisfies all three.

15         **a.      Stanford Daily has alleged organizational injuries.**

16         First, Stanford Daily has alleged organizational injuries because it alleges the government's

17   use of the Revocation and Deportation Provisions against protected expression has affected and

18   interfered with the paper's reporting, its core business activity. The government's threats to enforce

19   and past enforcement of the Revocation and Deportation Provisions, and the threat of those

20   Provisions' future enforcement, have directly harmed Stanford Daily by causing lawfully present

21   noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down,

22   and seek anonymity due to fear of adverse immigration consequences under the Provisions. Am.

23   Compl. ¶ 112. This has hurt Stanford Daily's coverage by decreasing the quantity of opinion pieces

24   *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. *Id.* ¶ 130. And it

25   has specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is

26   able to publish because its readers are deprived of the unique perspectives of *The Stanford Daily*'s

27   _____

28   Plaintiffs have alleged a credible threat because the government is attempting to deport noncitizens
     like them for protected pro-Palestinian speech like theirs. That is what *Driehaus* requires.

international contributors. *Id.* ¶ 131; *see also* Amicus Br. of Student Press L. Ctr. et al. ("SPLC Br.")
10, Dkt. No. 42-1 ("International student journalists bring worldviews shaped by different political
systems, cultures, and lived experiences. Their participation enriches campus dialogue, broadens
understanding of global issues, and exposes all students to the practice of democracy as both an
American ideal and a universal value.").

The Ninth Circuit's decision in *The Presbyterian Church (U.S.A.) v. United States* is
instructive. 870 F.2d 518 (9th Cir. 1989). There, the Presbyterian Church claimed the government's
undercover surveillance violated the church's First and Fourth Amendment rights. *Id.* at 520–21.
The church alleged that "as a result of the surveillance of worship services, members have
withdrawn from active participation in the churches, a bible study group has been canceled for lack
of participation, clergy time has been diverted from regular pastoral duties, support for the churches
has declined, and congregants have become reluctant to seek pastoral counseling and are less open
in prayers and confessions." *Id.* at 521–22. The Ninth Circuit held these injuries supported
organizational standing, explaining: "When congregants are chilled from participating in worship
activities, when they refuse to attend church services because they fear the government is spying on
them and taping their every utterance, all as alleged in the complaint, we think a church suffers
organizational injury because its ability to carry out its ministries has been impaired." *Id.* at 522.

The same is true here. Stanford Daily's noncitizen members are chilled from writing and
editing the newspaper, refuse to accept reporting assignments related to campus events involving
Israel and Palestine, and some outright quit the paper, all to avoid adverse immigration
consequences under the Provisions. These harms directly and materially impair its ability to carry
out its publishing function. Stanford Daily has thus alleged precisely what *Presbyterian Church*
found sufficient to establish organizational standing.

The ruling in *AAUP* is likewise instructive. There, Judge Young held the Middle East Studies
Association ("MESA"), an organization dedicated to fostering study of the Middle East, had
organizational standing to challenge the government's targeting of pro-Palestinian speakers for
deportation based on protected speech. *AAUP*, 2025 WL 2777659, at *43. He concluded MESA had
organizational standing because it "alleged … the challenged mode of enforcement and campaign

of coercive threats has significantly harmed its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East, including by reducing projected membership numbers and so membership dues, a reduced anticipated participation in its flagship annual meeting in November based on current submission numbers, and … by pressuring members to self-censor and so not to contribute scholarship and perspectives that they would otherwise contribute, which scholarship and discourse are the lifeblood of the organization." *Id.*

Stanford Daily's injuries are indistinguishable in form. The government's ability to enforce, threats to enforce, and past enforcement of the Revocation and Deportation Provisions based on protected speech has reduced Stanford Daily's membership, reduced participation by noncitizen members and contributors, and pressured noncitizens into self-censoring news articles, opinion pieces, and information they would otherwise contribute. Am. Compl. ¶¶ 112–134. This has significantly harmed Stanford Daily's core activity of providing the Stanford community with relevant, comprehensive, and unbiased journalism and serving as an outlet for Stanford community members to voice their opinions. *Id.* ¶¶ 105–06. Like the Presbyterian Church and MESA, Stanford Daily has organizational standing.[8]

### b.    Stanford Daily has alleged corporate injuries.

Second, Stanford Daily alleged corporate injuries because the people associated with it have been injured. "Corporations, which are composed of human beings with First Amendment rights, possess First Amendment rights themselves." *Moody v. NetChoice, LLC*, 603 U.S. 707, 746–47 (2024) (Barrett, J., concurring). So when the government infringes on the rights of noncitizens "who are associated with [Stanford Daily] in one way or another," Stanford Daily has standing "to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014); *see also NAACP*, 371 U.S. at 428 (holding corporation can "assert [its members'] right on its own

---

[8] The government notes AAUP lacked organizational standing. Mot. 15–16. But its asserted harm materially differed from MESA's and from Stanford Daily's here. AAUP established only "deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues," but not a threat to the organization's core function. *AAUP*, 2025 WL 2777659, at *44. Here, like with MESA, noncitizens' contributions are vital to Stanford Daily's core mission of reporting the news and views of Stanford's diverse community. Plus, the government ignores that Judge Young still held that AAUP had associational standing. *Id.*

1  behalf, because, though a corporation, it is directly engaged in those activities, claimed to be

2  constitutionally protected, which the statute would curtail").

3      The government has infringed on the rights of noncitizens associated with Stanford Daily. It

4  has infringed the rights of Stanford Daily's noncitizen members, who have self-censored expression

5  for fear of visa revocation, arrest, detention, and deportation. Am. Compl. ¶ 112. And it has infringed

6  the rights of Stanford Daily's noncitizen contributors, who have self-censored expression for fear

7  of visa revocation, arrest, detention, and deportation. *Id.* ¶ 113. Corporations can assert "the rights

8  and obligations of the *people* (including shareholders, officers, and employees) who are associated

9  with a corporation in one way or another." *Hobby Lobby*, 573 U.S. at 706. That is precisely what

10 Stanford Daily is doing here: asserting the First Amendment right of its members and contributors

11 to report the news without fear of arrest, detention, and deportation.

12               **c.      Stanford Daily has alleged associational injuries.**

13     Third, Stanford Daily has alleged associational injuries. "[V]oluntary membership

14 organization[s] with identifiable members" can assert associational standing to protect the interest

15 of members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*),

16 600 U.S. 181, 201 (2023).[9] That's Stanford Daily, a "voluntary membership organization" with

17 "over 150 identifiable members" who produce Stanford Daily's content. Am. Compl. ¶¶ 89–99.

18     Contrary to the government's argument, status as a voluntary membership organization is

19 not restricted to advocacy organizations. The government latches on to the fact that many

20 organizations securing associational standing happen (unsurprisingly) to be advocacy organizations.

21 Mot. 13. But it fails to note that in *none* of its authority was the organization's status as an advocacy

22 group part of the court's associational standing test. For example, in a recent en banc decision, the

23 Ninth Circuit held a voluntary school membership organization that "seeks to equip 'student athletes

24 from all backgrounds for fellowship, spiritual growth, and service on their campuses'" had

25

26     [9] An organization that is "not a traditional voluntary membership organization" but satisfies
*Hunt*'s "indicia of membership analysis" can also assert this type of standing. *SFFA*, 600 U.S. at
27 200, 201 (quoting *Hunt*, 432 U.S. at 342). But here, because Stanford Daily is a voluntary
membership organization with identifiable members, "[t]he indicia of membership analysis
28 employed in *Hunt* has no applicability." *Id.* at 201.

associational standing to pursue First Amendment claims. *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 672, 681–82 (9th Cir. 2023). Here, Stanford Daily squarely alleges that it seeks to "provide[] its editorial, tech and business staffs with unparalleled educational opportunities" through its rigorous and comprehensive news operations. Am. Compl. ¶ 84; *see also* SPLC Br. 4 ("[S]tudent media outlets are … training grounds for future journalists [and] provide a forum for democratic engagement for all participants.").[10]

The government cites only two cases for its idea that associational standing is limited to advocacy groups. The first concerned a corporation without members trying to assert its customers' interests with the purpose "to turn a profit." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006). The second concerned a corporation's standing to assert its employees' interests. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993). The government supplies no cases holding that an organization representing identifiable members lacks associational standing if it is not characterized as an advocacy group.

That underbrush cleared, Stanford Daily fulfills all three requirements for associational standing. *See Hunt*, 432 U.S. at 343. First, its noncitizen members have standing to sue in their own right because they, like the Doe Plaintiffs, face a credible threat of future enforcement based on speech and journalism about American foreign policy. *See supra* Part A.1.

Second, the free speech interests Stanford Daily seeks to protect—writing and publishing without fear of adverse immigration action—are germane to its purpose as a newspaper, which is "to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford

---

[10] For a comparator, Stanford Daily is directly analogous to Students for Fair Admissions (SFFA), which the Supreme Court held had associational standing. *SFFA*, 600 U.S. at 201. Stanford Daily is a validly incorporated 501(c)(3) nonprofit with over 150 identifiable members who joined voluntarily to support its mission. Am. Compl. ¶¶ 82, 91–92; *SFFA*, 600 U.S. at 201 (SFFA is "a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission." (quotation marks omitted)). Stanford Daily's members receive updates about this case's status from Stanford Daily's leadership and elect directors who represent their interests and have input on this case's direction. Am. Compl. ¶¶ 92–93; *SFFA*, 600 U.S. at 201 (SFFA's members "receive updates about the status of the case from SFFA's President; and they have had the opportunity to have input and direction on SFFA's case." (quotation marks omitted)). "Where, as here, an organization has identified members and represents them in good faith," courts "do not require further scrutiny into how the organization operates." *SFFA*, 600 U.S. at 201.

1   community members to publish opinions" and "defend[] and advocate[] for press rights and the

2   rights of all journalists to report the news and publish opinions without government or university

3   retaliation." Am. Compl. ¶¶ 83, 85; *see also Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976,

4   981 (9th Cir. 1998) ("[T]he interests the Coalition seeks to protect here—to cover and report news

5   without government interference—are germane to the Coalition's purpose."); *L.A. Press Club v.*

6   *City of Los Angeles*, No. 25-cv-05423, 2025 WL 2640421, at *9 (C.D. Cal. Sep. 10, 2025) ("Both

7   organizations seek to protect the right of journalists to safely cover and report news without

8   government interference, an interest clearly germane to their purposes." (quotation marks omitted));

9   SPLC Br. 4 (highlighting student media's purpose to instill "the principles of inquiry, critical

10  thinking and reasoned debate central to democracy").

11      And third, Stanford Daily's members' participation in the case is unnecessary. Neither the

12  constitutional question (whether the government can render noncitizens deportable or revoke visas

13  based on protected speech) nor the requested relief (declarations and injunctions) require Stanford

14  Daily members' individual participation. *See Columbia Basin Apartment Ass'n v. City of Pasco*,

15  268 F.3d 791, 799 (9th Cir. 2001) ("Because [injunctive and declaratory] relief do not require

16  individualized proof, the third [requirement] is satisfied."); *Vasquez Perdomo v. Noem*, 148 F.4th

17  656, 677 (9th Cir. 2025) ("As a general matter, membership organizations may bring constitutional

18  claims on behalf of their members."). Stanford Daily has associational standing.

19      **B.    The Plaintiffs' injuries are traceable to the government and redressable by the**

20      **limited relief Plaintiffs seek.**

21      The credible threat of enforcement Jane Doe and John Doe face, and the organizational,

22  corporate, and associational injuries Stanford Daily is suffering, are traceable to the government's

23  ability to enforce, threats to enforce, and past enforcement of the Revocation and Deportation

24  Provisions based on protected speech. And their injuries are redressable by the limited declaratory

25  and injunctive relief the Plaintiffs seek: declaring the Deportation Provision unconstitutional and

26  enjoining its enforcement *solely with respect to* deportations based on protected speech, Am. Compl.

27  ¶¶ B, C, D, and declaring the Revocation Provision unconstitutional and enjoining its enforcement

28  *solely with respect to* revocations based on protected speech, *id.* ¶¶ E, F, G.

-23-

1

**1.      The Plaintiffs' injuries are traceable to the government.**

2      The government does not contest that the Doe Plaintiffs' injuries are traceable to Secretaries

3  Rubio and Noem, who lead the departments charged with enforcing the Revocation and Deportation

4  Provisions. Stanford Daily's injuries are also traceable to the Defendants because its members and

5  people who associate with Stanford Daily have self-censored because of the government's actions.

6      Contrary to the government's suggestion, self-censorship is not "the result of third parties

7  making their own independent decisions." Mot. 16. For one thing, those decisions are not

8  independent of the government's unlawful conduct but the *product* of the government's unlawful

9  conduct. *See, e.g.*, *AAUP*, 2025 WL 2777659, at *38–39, *43 (rejecting government's attempt to

10  "dismiss[] … claims of collective chill as somehow wholly self-imposed" and holding "both AAUP

11  and MESA have associational standing to pursue their claim that the Public Officials are engaged

12  in a policy of targeting noncitizens based on their viewpoints in order to chill speech"). Plaintiffs'

13  decisions are not independent of the government's conduct because "the threat of sanctions may

14  deter almost as potently as the actual application of sanctions" and the "danger of that chilling effect

15  upon the exercise of vital First Amendment rights must be guarded against." *Keyishian v. Bd. of*

16  *Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP*, 371 U.S. at 433) (cleaned up). As the Student

17  Press Law Center amicus brief explained, "Given the risk of deportation, the loss of educational

18  opportunities and the prospect of tremendous personal harm upon return to their home countries, it

19  is inaccurate to characterize such an agonizing choice—and similar ones that have repeatedly played

20  out in similar conversations—as reflecting students making their own independent decisions under

21  anything less than duress." SPLC Br. 9–10 (cleaned up).

22      For another thing, those decisions are not the decisions of third parties. Stanford Daily's

23  injuries stem from its own members—writers, editors, and contributors—self-censoring their

24  contributions to the paper. They are not third parties but "the human beings" without which the

25  paper "cannot do anything at all." *Hobby Lobby*, 573 U.S. at 707.

26      And even if its writers and editors are third parties, Stanford Daily still has standing because

27  its own injuries remain traceable to Defendants, which in this context requires only that "third parties

28  will likely react in predictable ways" to the government's action. *Dep't of Com. v. New York*, 588

-24-

U.S. 752, 768 (2019). Third parties' predictable reaction to the government's enforcement of the Revocation and Deportation Provisions has been self-censorship, harming Stanford Daily's ability to associate with its noncitizen writers, editors, and contributors. *See* Am. Compl. ¶¶ 112–34. Those reactions have been substantiated by the Verified Amended Complaint, the declarations of Garry Kasparov and Uriel Epshtein, *see* Decl. of Garry Kasparov, Dkt. No. 23-1; Decl. of Uriel Epshtein, Dkt. No. 23-2, and the experiences of fifty-five student media outlets and newsroom leaders and other amici, *see* SLPC Br. 6 ("Contrary to Defendants' assertions, the chilling effects of the government's actions are real, widespread, and well-documented."); Amicus Br. of 19 States and DC 17 & n.42, Dkt. No. 37-1 (highlighting "[c]ountless news articles have documented this chilling effect"); Amicus Br. of Cato Inst. et al. 4, Dkt. No. 39 ("Predictably, the fear of adverse consequences, such as deportation, has produced a chilling effect.").

## 2.    The Plaintiffs' injuries are redressable by the limited relief sought.

Plaintiffs' injuries are redressable by the limited relief they seek: prohibiting the government from enforcing the Provisions against protected speech. Plaintiffs have facially challenged the statutes *only* with respect to protected speech. *See, e.g.*, Compl. ¶¶ A–H, Dkt. No. 1 (limiting relief to actions "based on protected speech" or "for engaging in protected speech"); Am. Compl. ¶¶ A–H (same); Mot. for Prelim. Inj. 14, Dkt. No. 11 ("This is not a challenge to Sections 1201(i) and 1227(a)(4)(C)(i) in all their applications, but only a narrow facial challenge as they apply to the government's reliance on protected speech to revoke immigration documentation or render a noncitizen deportable."); Mot. for Summ. J. 14, Dkt. No. 32-1 (same). A ruling in Plaintiffs' favor still allows the government to enforce the statutes on non-speech bases. *See John Doe No. 1*, 561 U.S. at 194 (explaining how to assess a challenge as to only some of a statute's applications).

## CONCLUSION

The Court should deny the government's motion to dismiss.[11]

---

[11] The government asks for a dismissal with prejudice, Mot. 22, but "dismissals for lack of Article III jurisdiction must be entered without prejudice." *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (quotation marks omitted) (concluding district court abused its discretion by dismissing the complaint with prejudice after determining plaintiffs lacked standing).

1    Dated: December 19, 2025                    Respectfully Submitted,

2                                                /s/ *Conor T. Fitzpatrick*

3    Marc Van Der Hout (Cal. Bar #80778)         Conor T. Fitzpatrick (Mich. Bar #P78981)*
     Johnny Sinodis (Cal. Bar #290402)           Daniel A. Zahn (D.C. Bar #90027403)*
4    Oona Cahill (Cal. Bar #354525)              **FOUNDATION FOR INDIVIDUAL**
     **VAN DER HOUT LLP**                        **RIGHTS AND EXPRESSION (FIRE)**
5    360 Post Street, Suite 800                  700 Pennsylvania Avenue SE, Suite 340
     San Francisco, CA 94108                     Washington, DC 20003
6    Telephone: (415) 981-3000                   Telephone: (215) 717-3473
     Facsimile: (415) 981-3003                   Email: conor.fitzpatrick@thefire.org
7    Email: ndca@vblaw.com                       Email: daniel.zahn@thefire.org

8
                                                 Colin P. McDonell (Cal. Bar #289099)
9                                                **FOUNDATION FOR INDIVIDUAL**
                                                 **RIGHTS AND EXPRESSION (FIRE)**
10                                               510 Walnut Street, Suite 900
                                                 Philadelphia, PA 19106
11                                               Telephone: (215) 717-3473
                                                 Email: colin.mcdonell@thefire.org
12

13                                               *Admitted pro hac vice

14                                               *Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO MOTION TO DISMISS          CASE NO. 5:25-cv-06618