CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6488
    FAX: (415) 436-6748
    kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RUBIO, *et al.*, <br><br> Defendants. | Case No. 5:25-cv-06618-NW <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS VERIFIED AMENDED COMPLAINT WITH PREJUDICE** <br><br> Date: January 8, 2026 <br> Time: 9:00 a.m. <br> Place: Courtroom 3, 5th Floor <br><br> The Honorable Noël Wise |

DEFENDANTS' REPLY ISO MTD
5:25-CV-06618-NW

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................................................1

II. ARGUMENT .................................................................................................................................1

    A. Stanford Daily Lacks Standing. ........................................................................................2

        1. Stanford Daily lacks associational standing. ...........................................................2

        2. Stanford Daily lacks corporate standing. .................................................................5

        3. Stanford Daily lacks organizational standing. .........................................................6

    B. The Individual Plaintiffs Lack Standing. ..........................................................................7

        1. Plaintiffs face no substantial threat of enforcement. ...............................................8

        2. Defendants have disavowed enforcement here. .....................................................10

        3. Plaintiffs cannot rely on other unidentified "protected speech." ..........................11

    C. Plaintiffs Fail To Establish Redressability. .....................................................................12

III. CONCLUSION ............................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AAUP v. Rubio*,
 ---F. Supp. 3d ----, 2025 WL 2777659 (D. Mass. 2025) ............................................... 7, 9, 11

*Al-Owhali v. Ashcroft*,
 279 F. Supp. 2d 13 (D.D.C. 2003) ............................................................................................ 6

*Barke v. Banks*,
 25 F.4th 714 (9th Cir. 2022) .................................................................................................... 14

*Burwell v. Hobby Lobby Stores, Inc.*,
 573 U.S. 682 (2014) .................................................................................................................. 5

*Cal. First Amend. Coal. v. Calderon*,
 150 F.3d 976 (9th Cir. 1998) .................................................................................................... 4

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) .................................................................................................................. 6

*Columbia Basin Apt. Ass'n v. City of Pasco*,
 268 F.3d 791 (9th Cir. 2001) .................................................................................................... 4

*Cuviello v. City of Oakland*,
 No. 06-cv-5517-MHP-EMC, 2009 WL 734676 (N.D. Cal. Mar. 19, 2009) ......................... 13

*FCA v. SJUSD Bd. of Educ.*,
 82 F.4th 664 (9th Cir. 2023) ..................................................................................................... 3

*FDA v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ............................................................................................................. 6, 7

*Fitzgerald Reno, Inc. v. DOT*,
 60 F. App'x 53 (9th Cir. 2003) ................................................................................................. 3

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
 98 F.4th 1180 (9th Cir. 2024) ................................................................................................. 13

*Fleck & Assocs., Inc. v. City of Phoenix*,
 471 F.3d 1100 (9th Cir. 2006) .............................................................................................. 2, 3

*Glenn v. Holder*,
 738 F. Supp. 2d 718 (E.D. Mich. 2010) .................................................................................... 6

*In re NSA Tele. Rec. Litig.*,
  No. 07-cv-01115-VRW, 2011 WL 13143696 (N.D. Cal. Jan. 31, 2011) .............................. 6

*Int'l Ps. for Ethical Care Inc. v. Ferguson*,
  146 F.4th 841 (9th Cir. 2025) ........................................................................................... 8

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ............................................................................................... 13, 14

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ......................................................................................................... 4

*Jones v. L.A. Central Plaza LLC*,
  74 F.4th 1053 (9th Cir. 2023) ........................................................................................... 2

*Juliana v. United States*,
  947 F.3d 1159 (9th Cir. 2020) ......................................................................................... 12

*L.A. Press Club v. City of L.A.*,
  --- F.Supp.3d ----, 2025 WL 2640421 (C.D. Cal. 2025) .................................................. 4

*Lew v. Kona Hosp.*,
  754 F.2d 1420 (9th Cir. 1985) ........................................................................................... 2

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ................................................................................ 8, 10, 11

*LSO, Ltd. v. Stroh*,
  205 F.3d 1146 (9th Cir. 2000) ......................................................................................... 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................. 7, 12

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ......................................................................................................... 5

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................................. passim

*NAACP v. Button*,
  371 U.S. 415 (1963) ......................................................................................................... 5

*NLRB v. Express Pub. Co.*,
  312 U.S. 426 (1941) ....................................................................................................... 13

*Porter v. Martinez*,
  68 F.4th 429 (9th Cir. 2023) ............................................................................................. 8

*Presbyterian Church (U.S.A.) v. United States*,
　870 F.2d 518 (9th Cir. 1989) .................................................................................................. 6

*Pritkin v. DOE*,
　254 F.3d 791 (9th Cir. 2001) .................................................................................................. 7

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
　993 F.2d 800 (11th Cir. 1993) ................................................................................................ 2

*Roman v. MSL Capital, LLC*,
　No. 17-cv-2066-JGB, 2019 WL 3017765 (C.D. Cal. July 9, 2019) ..................................... 13

*Schmidt v. Lessard*,
　414 U.S. 473 (1974) .............................................................................................................. 12

*SFFA v. President and Fellows of Harvard Coll.*,
　600 U.S. 181 (2023) ................................................................................................................ 3

*Sierra Nevada Transp., Inc. v. Nevada Transp. Auth.*,
　No. 22-15823, 2023 WL 6871575 (9th Cir. Oct. 18, 2023) .................................................. 10

*Thomas v. Anchorage Equal Rights Comm'n*,
　220 F.3d 1134 (9th Cir. 2000) ........................................................................................ 8, 12

*United States v. Stevens*,
　559 U.S. 460 (2010) .............................................................................................................. 11

*Wash. State Grange v. Wash. State Repub. Party*,
　552 U.S. 442 (2008) .............................................................................................................. 11

*White v. Lee*,
　227 F.3d 1214 (9th Cir. 2000) ........................................................................................... 1, 2

**Rules**

Fed. R. Civ. P. 65 .................................................................................................................. 12, 13

## I. INTRODUCTION

Plaintiffs face no substantial threat of enforcement under the statutes that they ask this Court to hold unconstitutional. Stanford Daily, a student newspaper, has not been subject to immigration enforcement, nor could it be. Its student members have not been subject to enforcement either. Nor have the two individual Plaintiffs in this action, even though they previously engaged in pro-Palestinian speech and protests. Indeed, Plaintiffs do not dispute that the government months ago concluded an enforcement initiative related to such demonstrations, which did not result in any enforcement action being taken against any of them. In short, Plaintiffs lack standing to bring their claims.

Plaintiffs' failure to demonstrate a likelihood of future enforcement is made all the more stark by the breadth of the relief they are seeking. Plaintiffs ask this Court to hold unconstitutional two laws passed by Congress decades ago. They ask for a vague injunction prohibiting the laws' enforcement against "protected speech," without explaining what that term means, what kinds of speech would be protected, or why they should be allowed to obtain such broad relief for all such speech even though they have only personally alleged an interest in speaking about Palestine. And they ask for this when they have neither been subjected to enforcement under these laws themselves, nor face any substantial threat of being so.

Because Plaintiffs lack Article III standing to seek their dramatic relief, the Court should dismiss the Verified Amended Complaint without leave to amend.

## II. ARGUMENT

The Court should dismiss this matter because none of the three Plaintiffs has proven that they have Article III standing to overturn decades-old acts of Congress. At the outset, Plaintiffs wrongly argue that the government has only brought a facial, rather than factual, challenge to their standing, and so all of their allegations should be presumed true. *See* Dkt. 67 ("Opp.") 9-10. To be clear: the government has brought a factual challenge here, with supporting evidence, and Plaintiffs have the burden of proving the elements of standing with their own evidence in response. *See* Dkt. 66 ("Mot.") 6-9, 11; *see also Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

This matters, because in a factual attack, Plaintiffs' allegations are not entitled to any presumption of truth. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Rather, the Court must

1 look to the cognizable evidence submitted by the parties and determine whether Plaintiffs have met their burden to prove each element of standing. *See Jones v. L.A. Central Plaza LLC*, 74 F.4th 1053, 1057-58 & n.2 (9th Cir. 2023). To be sure, because they have been verified, the allegations in Plaintiffs' Amended Complaint generally qualify as cognizable evidence of Plaintiffs' own experiences, to the extent they have sufficient foundation and otherwise meet the standards of the Federal Rules of Evidence. *See Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985). But Plaintiffs are not competent witnesses to testify beyond their own experiences. The Court should therefore take Plaintiffs' allegations for what they are, rather than endowing them with a presumption of validity. *See White*, 227 F.3d at 1242.

Considering the evidence presented by both sides, the record is clear that Plaintiffs lack standing here. Stanford Daily lacks standing under any of the three theories it has put forward; it can't rely on speculative harms to third parties, and it has suffered no meaningful harms itself. And the individual Plaintiffs have not demonstrated any substantial likelihood that they will be subjected to immigration enforcement based on their speech. The Court should dismiss the matter without leave to amend.

**A.     Stanford Daily Lacks Standing.**

**1.     Stanford Daily lacks associational standing.**

The government has explained why Stanford Daily cannot invoke the doctrine of associational standing. *See* MTD 12-15. Having previously made that their lead argument for the newspaper, Plaintiffs now downplay their reliance on it, calling it "curious" that the government focused on it first. *Compare* Dkt. 32-1 at 12; Dkt. 44 at 10-12, *with* Opp. 18-23. But Plaintiffs' milquetoast response does not overcome the flaws precluding them from invoking this doctrine here.

First, Plaintiffs wrongly argue that an organization's type does not matter for whether the associational-standing doctrine applies. *See* Opp. 21-22. But the Ninth Circuit has squarely held that the doctrine is "reserved for organizations that express the collective views and protect the collective interests of their members." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (cleaned up); *see also Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993) (noting that doctrine should be limited to organizations "like trade associations or environmental groups). Plaintiffs try to distinguish these cases on the ground that the

organizations there were corporations.  *See* Opp. 22.  But Plaintiffs provide no reason for ignoring the Ninth Circuit's limiting language—especially considering the Supreme Court's skepticism for such third-party standing theories.  *See* Mot. 12.

      Stanford Daily also wrongly tries to analogize itself to two other student organizations that plainly *did* express and protect the "collective views" of their members.  *See* Opp. 22 & n.10.  The first, the Fellowship of Christian Athletes, explicitly held "certain core religious beliefs," and "[i]n order for FCA to express these beliefs, it require[d] students serving in a leadership capacity to affirm a Statement of Faith and to abide by a sexual purity policy."  *FCA v. SJUSD Bd. of Educ.*, 82 F.4th 664, 671 (9th Cir. 2023) (*en banc*).  And the second, Students for Fair Admissions, was literally an advocacy organization with a mission "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law."  *SFFA v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 197 (2023).  To be sure, like Stanford Daily, these are also student organizations that aim to provide opportunities to their members.  But whereas the first two organizations exist to express particular views on specific issues, Stanford Daily exists to give students journalism experience and report on campus events.  *See* VAC ¶ 84.  Stanford Daily members don't need to "affirm" their agreement with any position at issue in this litigation in order to join the group.  *Cf. FCA*, 82 F.4th at 671.

      For similar reasons, the issues raised in this lawsuit are not "germane" to Stanford Daily's purpose.  *See, e.g.*, *Fleck*, 471 F.3d at 1106; *Fitzgerald Reno, Inc. v. DOT*, 60 F. App'x 53, 53 (9th Cir. 2003) (environmental issues raised in litigation were not germane to taxpayer group's purpose).  Again, the newspaper's purpose is to report on a broad range of campus events and provide journalism opportunities for students.  For purposes of this litigation, Plaintiffs also assert that, "as part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation."  VAC ¶ 85.  But that "mission" is notably absent from Stanford Daily's governing documents.  *See* Dkt. 48-1 Exs. 6, 7.  And the few examples it gives—a 1970s lawsuit following a police raid of its offices, and two unsourced statements of "advocacy" in the past two years—do not prove that these activities are in fact a

substantial part of the newspaper's purpose.[1]

That distinguishes this case from *California First Amendment Coalition v. Calderon*, 150 F.3d 976 (9th Cir. 1998), and *L.A. Press Club v. City of L.A.*, --- F.Supp.3d ----, 2025 WL 2640421 (C.D. Cal. 2025), on which Plaintiffs rely. In the former, the organization was created to vindicate the media's First Amendment rights. *See* 150 F.3d at 980-81; *see also* Who We Are, FIRST AMENDMENT COALITION, https://firstamendmentcoalition.org/about (last visited Dec. 29, 2025). In the latter, the L.A. Press Club had "created the role of Press Rights Chair" five years earlier "to track journalists' interactions with law enforcement, lobby for greater protections for press, and engage law enforcement agencies and civic officials about the rights of journalists." 2025 WL 2640421, at *5. And in both cases, the alleged violations much more directly impacted the media's ability to report on events: the State had prohibited journalists from witnessing aspects of criminal executions, and the Los Angeles Police Department was shooting journalists with rubber bullets, using tear gas, physically removing them from protests, and arresting them. *See* 150 F.3d at 979-80; 2025 WL 2640421, at *2-3. The issues in those lawsuits were therefore much more "germane" to those bona fide media-advocacy organizations than Stanford Daily's interest in immigration is here.

Finally, as previously explained, Stanford Daily's members would not have standing in their own right, and their individual participation would be necessary in this litigation. *See* Mot. 15. Plaintiffs argue that their requests for declaratory and injunctive relief "do not require individualized proof," and so their members won't need to participate. *See* Opp. 23 (quoting *Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001)). But unlike the landlords' and tenants' Fourth Amendment claim in *Columbia Basin*, Plaintiffs' constitutional challenges here will require the Court to consider how the "ascending scale" of constitutional protections applies to individuals with varying connections to this country. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950); *see generally* Dkt. 48 at

---

[1] In their Verified Amended Complaint, Plaintiffs specifically alleged that Stanford Daily has in the past taken certain actions "as part of" its elsewhere-defined mission to report on campus events and provide students with journalism opportunities. VAC ¶ 85. But in their Opposition, Plaintiffs reframe this allegation to suggest that defending and advocating for press rights are themselves core tenets of its "purpose as a newspaper." Opp. 22-23. As discussed above, neither Plaintiffs' own allegations nor the rest of the record support this attempted reframing. This is one example of the government's disagreement with Plaintiffs' characterizations and interpretations of the cognizable evidence.

DEFENDANTS' REPLY ISO MTD
5:25-CV-06618-NW                                    4

8-15. Making matters worse, Plaintiffs' facial challenges will require the Court to use that "ascending scale" approach to evaluate "whether a substantial number of the law[s'] applications are unconstitutional, judged in relation to the statute[s'] plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *see also id.* at 747 (Barrett, J., concurring) ("[A] social-media platform's foreign ownership and control over its content-moderation decisions might affect whether laws overriding those decisions trigger First Amendment scrutiny. . . . The answers in any given case might cast doubt on—or might vindicate—a social-media company's invocation of its First Amendment rights."). Thus, Stanford Daily has put the individualized immigration status and particular speech of its members at issue in this case.

### 2. Stanford Daily lacks corporate standing.

Stretching their third-party-standing arguments even further, Plaintiffs argue that Stanford Daily can also rely on the alleged injuries of anyone "associated with it . . . 'in one way or another'" under a so-called "corporate standing" theory. But this doctrine does not relax Article III's standing requirements to allow a corporate organization to invoke the rights of anyone associated with it in any way. *See NAACP v. Button*, 371 U.S. 415, 428 (1963); *see also Murthy*, 603 U.S. at 61 ("Our decisions make clear that 'standing is not dispensed in gross.'"). Indeed, to the extent this doctrine even exists (as distinct from the associational and organizational doctrines discussed above and below), it requires Stanford Daily to show that its own rights are being violated. *See NAACP*, 371 U.S. at 423-28 (NAACP had standing to challenge law prohibiting it and its members from offering legal representation). But as previously explained, Stanford Daily makes no such showing here. *See* Mot. 15.

Plaintiffs' citations to *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) and to Justice Barrett's concurrence in *Moody* reflect their confusion on this issue. *See* Opp. 20-21. *Hobby Lobby* was not about Article III standing; it concerned whether corporations could state a claim under the Religious Freedom Restoration Act. *See* 573 U.S. at 688-91. And the HHS regulations at issue in that case directly applied to the corporations themselves, not their shareholders. *See id.* at 689. Similarly, Justice Barrett's concurrence in *Moody* did not address standing, and merely noted that the foreign status of a corporation's ownership would likely complicate the merits of a First Amendment challenge. *See* 603 U.S. at 746-47. Plaintiffs cannot invoke a corporate-standing theory here.

### 3. Stanford Daily lacks organizational standing.

Finally, Stanford Daily cannot rely on the disfavored doctrine of "organizational standing." *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024). As the government previously explained, Stanford Daily fails to demonstrate any substantial interference with its core business objectives, and any minimal injuries it does allege are the result of the decisions of third parties. *See* Mot. 15-16.

Plaintiffs primarily respond by citing a Ninth Circuit decision from 1989, long before the contrary authorities cited by the government were decided. *See* Opp. 19 (citing *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989)). But in that case, the government had actually taken enforcement action at the churches at issue by conducting extensive surveillance there. *See id.* at 520. Moreover, although the Ninth Circuit credited the plaintiffs' past injuries based on such enforcement, it nevertheless remanded for a determination of whether any future injury was sufficiently likely to support the plaintiffs' claims for prospective injunctive relief. *See id.* at 529. Subsequent decisions have thus distinguished *Presbyterian Church* where the threat of enforcement as to any particular individual was purely speculative. *See, e.g.*, *In re NSA Tele. Rec. Litig.*, No. 07-cv-01115-VRW, 2011 WL 13143696, at *7 (N.D. Cal. Jan. 31, 2011) ("The facts of this case are simply not analogous to Presbyterian Church, in which the chilling effect was caused by actual, substantiated unlawful surveillance of four churches lasting almost a year."); *Glenn v. Holder*, 738 F. Supp. 2d 718, 731 (E.D. Mich. 2010); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 27 (D.D.C. 2003).

That is the case here. As the government has explained, Stanford Daily has not itself been the subject of any government enforcement at issue in this case. *See* Mot. 15-16. Nor could it. Rather, the newspaper asserts a speculative chain of causation whereby various unidentified third parties (who themselves also have not been subject to enforcement) have made their own decisions, and Stanford Daily has vaguely been harmed by those decisions. Again, those third parties would not even have standing themselves, for the reasons discussed below. But Stanford Daily certainly cannot rely on their actions to establish standing in its own right. *See All. for Hippocratic Med.*, 602 U.S. at 384 (explaining that "[t]he causation requirement precludes speculative links" as well as "attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing"); *see also, e.g.*, *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 410-11 (2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).[2]

Plaintiffs also argue that the organizational-standing finding for the Middle East Studies Association ("MESA") in *AAUP* should mean that Stanford Daily has standing here. *See* Opp. 19-20 (citing *AAUP v. Rubio*, --- F. Supp. 3d ----, 2025 WL 2777659, at *43 (D. Mass. 2025)). But in *AAUP*, MESA had "submitted evidence that in response to the alleged ideological deportation policy, it has had to shift resources, had *meaningfully* fewer submissions with respect to its upcoming flagship annual meeting, and likely lost membership as a result." *AAUP*, 2025 WL 2777659, at *31 (emphasis added). The organization had "substantiated" its allegations that the threat of government action had "*significantly* harmed its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East, including by reducing projected membership numbers and so membership dues, a reduced anticipated participation in its flagship annual meeting in November *based on current submission numbers*." *Id.* at *43 (emphases added). Here, such allegations—much less evidence—of similarly "significant" or "meaningful" harm are lacking. *See* VAC ¶¶ 112-34. At most, the newspaper specifically alleges that a handful of third parties have asked to have their past articles removed, and vaguely adds that the overall "quantity" and "quality" of reporting have decreased. *See id.* These allegations, based on third-party actions, fall far short of showing that the statutes at issue in this case have sufficiently injured Stanford Daily such that it could have those laws overturned. *See, e.g.*, *Murthy*, 603 U.S. at 69, 72; *All. for Hippocratic Med.*, 602 U.S. at 395-96.

### B.   The Individual Plaintiffs Lack Standing.

The government previously explained that the individual Plaintiffs lack standing because they cannot show a "substantial" likelihood that they will face visa revocations or removal proceedings based on their protected speech. *See* Mot. 16-21. Again, Plaintiffs' Opposition fails to overcome these problems.

---

[2] For the same reasons, Stanford Daily has not established that any of its alleged injuries are "fairly traceable" to Defendants for purposes of establishing Article III standing. *See Murthy*, 603 U.S. at 59-60.

### 1. Plaintiffs face no substantial threat of enforcement.

The government has demonstrated, with evidence, that the specific enforcement initiative that previously investigated a set of 5,000 campus disrupters concluded months ago, with no enforcement action taken against either individual Plaintiff here in spite of their prior speech. *See* Mot. 6-9, 16-19. Indeed, at least one of the two individual Plaintiffs claims to have been among the individuals investigated, yet the government took no action based on her speech. *See* VAC ¶¶ 142-45. Far from demonstrating any substantial likelihood of enforcement, the record here shows that the government has already declined to take enforcement action against Plaintiffs for the very conduct they claim to be worried about. *See Lopez v. Candaele*, 630 F.3d 775, 792 (9th Cir. 2010); *accord Int'l Ps. for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs have not demonstrated that their injuries are imminent").

Plaintiffs do not dispute these facts; they simply argue the Court should ignore them. *See* Opp. 16 (citing *Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023)). But Plaintiffs' reliance on *Porter* is misplaced. That case involved a motorist's challenge to a state law prohibiting horn-honking in certain circumstances. *See* 68 F.4th 434. The plaintiff had already personally been subjected to enforcement under the statute, and multiple law enforcement agencies continued to enforce the statute for that precise conduct on an ongoing basis. *See id.* at 437. Here, by contrast, Plaintiffs have *not* already been subjected to enforcement action, and the government *disputes* that the pure speech on which they rely has formed the basis for the enforcement actions that did occur. *See* Mot. 8, 17-19. In other words, it is not just the small number of prior enforcement actions that matters (although that is plainly relevant); what matters even more is that the very conduct about which Plaintiffs complain has been investigated and has not resulted in enforcement action, including as to Plaintiffs themselves.

Unsurprisingly, other cases recognize that the government's non-enforcement after investigating the precise conduct at issue is powerful evidence that the plaintiff lacks a substantial threat of future enforcement. *See, e.g.*, *Lopez*, 630 F.3d at 792 ("Jones's letter indicated that LACC did not intend to take any action against Lopez" which "vitiates Lopez's claim that he faces a credible threat of enforcement."); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (denying standing where "the agencies are now surely aware of these landlords and still have launched

1 no enforcement proceedings"). That is the case here.

2     Because they have not yet been subject to enforcement even after engaging in the speech they put at issue, Plaintiffs attempt to shift the focus from themselves to a small number of other high-profile cases where the government has taken enforcement action. *See* Opp. 17. Again, the government has consistently taken the position across those other cases that individuals subject to enforcement under the statutes have done more than exercise pure political speech. Indeed, contrary to Plaintiffs' characterization, the district court's discussion of these other cases in *AAUP* reflects that government officials analyzed a host of other factors in those cases beyond mere attendance at protests, use of certain phrases, or similar speech that Plaintiffs put at issue here. *See* 2025 WL 2777659, at *11, *19-20, *26 (discussing consideration of additional factors such as organizing and leading disruptive demonstrations, distributing Hamas-authored fliers, "calling for Israel's destruction," celebrating terrorism, maintaining a "direct connection to Hamas leadership," and having a relationship with a group that had been "suspended for alleged violent imagery and a call for intifada"). But those cases are not before this Court, and it would be inappropriate for the Court to weigh in on the validity of other third-party enforcement proceedings. What matters for present purposes is that Plaintiffs have not demonstrated any significant history of enforcement based on the pure speech that they have put at issue in this case.

    Finally, Plaintiffs cannot rely on a handful of social-media posts and interviews given by the Secretaries of State and Homeland Security or other government officials to establish that they face a substantial threat of enforcement based on the pure, pro-Palestinian speech they put at issue. *See* Opp. 14. There are two reasons why not. First, as the government has demonstrated, the investigation and enforcement process here is a ground-up approach that is driven by lower-level employees. *See* Mot. 7-8, 20. Especially since the previous campus-disruption investigation initiative has concluded, Plaintiffs submit no cognizable evidence that those line investigators or their supervisors are recommending enforcement action against anyone for their pro-Palestinian conduct, much less for the type of pure speech upon which Plaintiffs rely.

    Second, the leadership comments identified by Plaintiffs simply do not reflect a government effort to take enforcement action based on pure pro-Palestinian speech. Plaintiffs point to various high-level remarks, mostly dating from the spring, in which officials remarked that "preach[ing] hate for

1  America," "pushing Hamas propaganda," or "glorifying terrorists" would result in enforcement action.
2  Opp. 14 (citing, *e.g.*, VAC ¶¶ 62-63).  But these statements are inherently general.  They do not
3  demonstrate that merely attending protests or using the phrases Plaintiffs identify—with no other
4  conduct of concern—will result in enforcement action under the statutes.  And indeed, as already
5  discussed at length, the record demonstrates the opposite, as the then-contemporaneous enforcement
6  initiative concluded with enforcement action taken against less than 1% of the referred campus
7  disrupters.  *See* Mot. 8.

### 2. Defendants have disavowed enforcement here.

The government has shown that, as a factual matter, it does not have a policy of taking enforcement action based solely on the type of speech Plaintiffs have put at issue here.  *See* Mot. 19-20.  This disavowal shows that Plaintiffs do not face a substantial likelihood of enforcement in the future.  *See Lopez*, 630 F.3d at 788.  Plaintiffs try to blunt the force of the government's showing by erecting three artificial barriers to its impact.  *See* Opp. 15-16.  But the law does not support Plaintiffs' effort to escape the record here.

First, Plaintiffs argue that because the President and the Secretaries of State and Homeland Security have not yet personally said that the government won't enforce the statutes based on Plaintiffs' pro-Palestinian speech, the Court should ignore all of the other record evidence that the government does not use such speech as the sole basis for enforcement.  *See* Opp. 15.  But Plaintiffs are wrong that only such express disavowals by apex political leaders qualify in the analysis.  *See Sierra Nevada Transp., Inc. v. Nevada Transp. Auth.*, No. 22-15823, 2023 WL 6871575, at *2 (9th Cir. Oct. 18, 2023) (discussing variety of evidence that agency "interpreted its policy not to apply" to certain conduct).  Again, the government has shown through the testimony of its non-attorney witnesses that, in actual practice, the government does not target individuals for the pure political speech upon which Plaintiffs rely.  *See* Mot. 19.

Nor are Plaintiffs correct that the Court can disregard the evidence of how the government actually enforces these statutes because that evidence was submitted "in the context of litigation."  Opp. 15.  Of course, any time that evidence is presented in court, it is done so "in the context of litigation."  But that does not mean that such evidence has no value.  Indeed, the government has previously

1 explained that its description of its investigation practices was not a mere "litigation position" articulated
2 by attorneys in briefs. Mot. 19. Rather, it was based on the testimony of non-attorney "government
3 witnesses" whom the district court in *AAUP* found, "to a person," to be "decent, credible, dedicated non-
4 partisan professionals." 2025 WL 2777659, at *39.

Finally, Plaintiffs are wrong that "disavowals are only effective" when the enforcing authority takes the position that the plaintiff's conduct falls outside the text of the statute. *See* Opp. 16. The Ninth Circuit certainly did not hold as much in *Lopez*, where the court merely described the enforcing official's letter as stating that "no action will be taken" against the plaintiff. *See* 630 F.3d at 791-92. Plaintiffs also cite *United States v. Stevens*, 559 U.S. 460 (2010)—but that case involved an actual criminal prosecution under an animal cruelty statute; it did not address what evidence qualifies to demonstrate a substantial threat in a civil, facial, pre-enforcement challenge. *See id.* Rather, courts are reluctant to "premature[ly]" intervene in such facial challenges, because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449-51 (2008). Thus, even if the text of the statute could be interpreted to apply to a plaintiff's conduct, the government's disavowal of pursuing enforcement based solely on such acts is plainly relevant to the likelihood that the plaintiff will be subject to enforcement.

Taking a step back, Plaintiffs' various arguments on this issue lose sight of the actual question the Court is required to answer: whether Plaintiffs have demonstrated a "substantial risk" of future enforcement. *Murthy*, 603 U.S. at 58. But as the Ninth Circuit has made clear, "[i]n considering whether a plaintiff faces a realistic threat, [courts] consider a variety of factors." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). Plaintiffs' attempts to artificially limit the Court's consideration as it evaluates this question fall short. The government has shown that Plaintiffs do not face a substantial likelihood of enforcement, and Plaintiffs have failed to establish the contrary.

### 3. Plaintiffs cannot rely on other unidentified "protected speech."

The government previously explained that Plaintiffs, who have alleged a desire to engage in certain specific speech, cannot base their standing on allegations about other kinds of speech which Plaintiffs have never indicated an intention to pursue. *See* Mot. 20-22 (citing, *e.g.*, *Murthy*, 603 U.S. at

DEFENDANTS' REPLY ISO MTD
5:25-CV-06618-NW                                11

69). Plaintiffs ignore the point in their Opposition, even as they continue to try to rely on alleged enforcement actions concerning speech on other topics. *See* Opp. 6, 13-17.

The Court should reject Plaintiffs' gambit. Plaintiffs must demonstrate injuries based on their own injuries; "standing is not dispensed in gross." *Murthy*, 603 U.S. at 61. Past acts of enforcement directed at other individuals for different conduct do not establish that a particular plaintiff faces a substantial threat of enforcement for their own speech. *See Thomas*, 220 F.3d at 1141. The government has shown that a specific enforcement initiative relating to campus disruptions concluded months ago, with no enforcement action taken against Plaintiffs despite them having previously engaged in the exact speech they claim to want to pursue in the future. Plaintiffs do not face a substantial threat of enforcement, and they cannot overcome that deficiency by gesturing at third parties.

### C. Plaintiffs Fail To Establish Redressability.

Finally, Plaintiffs briefly argue in a single paragraph that they have satisfied the redressability element of standing. *See* Opp. 25. But Plaintiffs cannot meet their burden on this issue, because the Court lacks the power to issue the overbroad declaratory and injunctive relief Plaintiffs seek.

As the Supreme Court has explained, "generalized" challenges to government action that are not based on any "specifically identifiable Government violations of law" will "rarely" be able to establish redressability for purposes of Article III standing. *Lujan*, 504 U.S. at 568 (cleaned up); *see also id.* ("The most obvious problem in the present case is redressability."). In particular, "[t]o establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Thus, plaintiffs lack standing where "it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan." *Id.* at 1171 (holding plaintiffs lacked standing to enjoin the government from allowing use of fossil fuels).

As most relevant here, district courts lack authority to issue vague injunctions against government enforcement that fail to specify the proscribed conduct with sufficient particularity. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (vacating injunction merely telling defendants "not to enforce 'the present Wisconsin scheme' against those in the appellee's class"); *see also* Fed. R. Civ. P. 65(d)(1)(C). The Supreme Court has denounced the idea that district courts may issue "injunction[s]

broadly to obey the [law]." *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941).   Rather, "injunctive relief must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024).

Here, Plaintiffs seek broad declarations and injunctions establishing that two statutes are unconstitutional and prohibiting enforcement "as applied to protected speech."  VAC ¶¶ 8, 225, 233-36, 242, 252, 254-55, 261, 266-69, 272, 275.  But whether any particular "speech" is "protected" is a case-by-case inquiry that depends on the nature of the speaker, the contents of the speech, and the interests of the United States.  *See* Dkt. 33 at 16-25; Dkt. 48 at 8-15.  Indeed, Plaintiffs have never limited their claims in this case to any specific speech, whether related to Palestine or otherwise.  *See generally* VAC.  Rather, they seek to enjoin the government from taking any enforcement action under the statutes based on any "protected speech," of any kind, made by any speaker, without any connection to Plaintiffs themselves.

The Court could not possibly adjudicate in the abstract the infinite possibilities of what does or does not qualify as "protected speech."  Nor could it specify, in advance, what it means for the government to be prohibited from taking enforcement action "based on" such speech, especially when other problematic conduct is present.  Plaintiffs' requested relief thus boils down to an order that the government comply with the First and Fifth Amendments.  But as Judge Chen of this District has previously recognized, orders merely stating that law enforcement agencies "are barred from interfering with Plaintiffs' free speech rights" and "permitted to make only lawful arrests" are improper "'obey the law' injunctions and thus not enforceable." *Cuviello v. City of Oakland*, No. 06-cv-5517-MHP-EMC, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009).  Indeed, "'[o]bey the law' injunctions such as this are disfavored, as they are not narrowly tailored and are at odds [with] Federal Rule of Civil Procedure 65(d)." *Roman v. MSL Capital, LLC*, No. 17-cv-2066-JGB, 2019 WL 3017765, at *5 (C.D. Cal. July 9, 2019), *aff'd*, 820 F. App'x 592 (9th Cir. 2020).

Plaintiffs argue that their theory of recovery is authorized by *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010). *See* Opp. 25.  But the terms of the requested injunction in that case were clear and specific: the plaintiffs were "seeking to enjoin the [Washington] secretary of state from publicly releasing any documents that would reveal the names and contact information of the R–71 petition signers." *Id.* at

193. Because the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs," the Court held that the plaintiffs "must therefore satisfy [its] standards for a facial challenge to the extent of that reach." *Id.* at 194. And, applying those facial-challenge standards, the Court held that the public disclosure of petition signers' names "does not as a general matter violate the First Amendment." *Id.* at 191. Thus, no court even needed to grapple with the scope of any injunction, because the plaintiffs' facial challenge failed on its own terms. Here, while Plaintiffs' facial challenges similarly fail on the merits, *see* Dkt. 48 at 8-15, their requested relief would not be so specific, but would instead depend on the undefined and undefinable term "protected speech." The Court cannot issue declaratory or injunctive relief based on such ambiguity.

Because the Court lacks power to grant Plaintiffs' requested relief, Plaintiffs have failed to prove the redressability element of Article III standing.

## III. CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Verified Amended Complaint without leave to amend.[3]

Dated: December 29, 2025

    CRAIG H. MISSAKIAN
    United States Attorney

    */s/ Kelsey J. Helland*
    KELSEY J. HELLAND
    Assistant United States Attorney

    Attorneys for Defendants

---

[3] Plaintiffs argue that the Court cannot dismiss the case "with prejudice" for lack of standing, citing *Barke v. Banks*, 25 F.4th 714 (9th Cir. 2022). *See* Opp. 25 n.11. But as *Barke* makes clear, district courts are well within their discretion to deny leave to amend after granting a Rule 12(b)(1) motion. *See* 25 F.4th at 721. That is what the government requested here. *See* Mot. 22. And Plaintiffs do not argue that they should be granted leave to amend. *See generally* Opp.

DEFENDANTS' REPLY ISO MTD
5:25-CV-06618-NW               14