Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application pending

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> *Defendants*. | Case No. 5:25-cv-06618 <br><br> **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY FACTUAL FINDINGS AND LEGAL CONCLUSIONS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

NOTICE OF MOTION AND MOTION ...................................................................................1

MOTION'S SCOPE ...............................................................................................................1

INTRODUCTION....................................................................................................................2

BACKGROUND.......................................................................................................................4

      Secretary Rubio and the Trump administration abuse the INA to target
      protected speech. ...........................................................................................................4

      The administration's targeting of noncitizens' protected speech chills
      Plaintiffs' expression.....................................................................................................7

LEGAL STANDARD ..............................................................................................................8

ARGUMENT ...........................................................................................................................9

I.    Plaintiffs have standing to challenge the Revocation and Deportation
     Provisions. ..................................................................................................................11

     A.    The Doe Plaintiffs have individual standing. .........................................................11

     B.    Stanford Daily has associational, corporate, and organizational
         standing. ..................................................................................................................12

II.   The Revocation and Deportation Provisions violate the First and Fifth
     Amendments as to protected speech. ........................................................................13

     A.    The First Amendment protects noncitizens' speech. ...........................................14

     B.    Revoking visas and deporting noncitizens under the Revocation and
         Deportation Provisions is unlawful viewpoint discrimination. ............................17

     C.    The Revocation and Deportation Provisions are content based and fail
         strict scrutiny. ........................................................................................................19

     D.    The Revocation and Deportation Provisions are unconstitutionally
         vague as applied to protected speech. ....................................................................23

III.  Irreparable harm, the balance of equities, and the public interest favor an
     injunction...................................................................................................................25

IV.  The Court should waive the bond requirement. .......................................................25

CONCLUSION......................................................................................................................25

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION   CASE NO. 5:25-cv-06618

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States*,
  250 U.S. 616 (1919) ............................................................................................ 15

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................................ 9, 25

*All. for the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017) ............................................................................. 9

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ............................................................................... 9

*Am. Booksellers Ass'n, Inc. v. Hudnut*,
  771 F.2d 323 (7th Cir. 1985) ............................................................................. 11

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ..................................................................... 4, 15, 16

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ........................................................................... 25

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ............................................................................................ 21

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025) .......................................................................... 18

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ............................................................................................ 24

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) .............................................................................. 9

*Biden v. Texas*,
  597 U.S. 785 (2022) .............................................................................................. 1

*Boos v. Barry*,
  485 U.S. 312 (1988) ............................................................................................ 16

*Bridges v. California*,
  314 U.S. 252 (1941) ........................................................................................ 3, 25

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ................................................................................. 3, 15, 16

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ............................................................................................ 13

*Cal. Pro-Life Council, Inc. v. Getman*,
  328 F.3d 1088 (9th Cir. 2003) ................................................................................ 11

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
  457 F.3d 376 (4th Cir. 2006) .................................................................................. 18

*Cohen v. California*,
  403 U.S. 15 (1971) .................................................................................................. 14

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ................................................................................................ 17

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................................ 13

*Fink v. Kirchmeyer*,
  720 F. Supp. 3d 780 (N.D. Cal. 2024) .................................................................... 25

*Galvan v. Press*,
  347 U.S. 522 (1954) ................................................................................................ 16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................................................ 23

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................................................. 25

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................................. 16, 22

*Honeyfund.com Inc. v. Governor*,
  94 F.4th 1272 (11th Cir. 2024) ............................................................................... 19

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .......................................................................................... 12, 13

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ..................................................................................... 17, 18, 19

*In re Weitzman*,
  426 F.2d 439 (8th Cir. 1970) .................................................................................. 15

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ................................................................................................ 14

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ................................................................................ 25

*Junior Sports Mags. Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ................................................................................. 19

-iii-

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) ......................................................................... 18

*Khalil v. Joyce*,
  771 F. Supp. 3d 268 (S.D.N.Y. 2025) ............................................................. 4

*Khalil v. Trump*,
  No. 25-cv-01963 (D.N.J. June 20, 2025) ........................................................ 6

*Khalil v. Trump*,
  No. 25-cv-01963, 2025 WL 1514713 (D.N.J. May 28, 2025) ................ 5, 6, 20, 24

*Kolender v. Lawson*,
  461 U.S. 352 (1983) .............................................................................. 24, 25

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953) ............................................................................... 2, 15

*Lamont v. Postmaster Gen.*,
  381 U.S. 301 (1965) ................................................................................... 16

*Lozman v. Riviera Beach*,
  585 U.S. 87 (2018) ..................................................................................... 17

*LSO, Ltd. v. Stroh*,
  205 F.3d 1146 (9th Cir. 2000) .................................................................... 11

*Mahdawi v. Trump*,
  No. 25-cv-389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025) ...................... 5, 6, 24

*Massieu v. Reno*,
  915 F. Supp. 681 (D.N.J.) ..................................................................... 21, 24

*Matal v. Tam*,
  582 U.S. 218 (2017) ............................................................................. 17, 19

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................................... 19

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ................................................................................... 19

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018) ....................................................................................... 20

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .................................................................... 13, 14, 20, 21

*NAACP v. Button*,
  371 U.S. 415 (1963) ................................................................................... 13

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................. 9

*NRA v. Vullo*,
  602 U.S. 175 (2024) ......................................................................................... 3, 19

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
  118 F.4th 770 (6th Cir. 2024)............................................................................ 15

*Ozturk v. Trump*,
  No. 2:25-cv-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025), *amended sub nom.*,
  *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025)............................................... 6, 21

*Ozturk v. Trump*,
  No. 2:25-cv-374, 2025 WL 1420540 (D. Vt. May 16, 2025) ................................. 6

*Pahls v. Thomas*,
  718 F.3d 1210 (10th Cir. 2013)........................................................................... 15

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ........................................................................................... 24

*Parcham v. INS*,
  769 F.2d 1001 (4th Cir. 1985)............................................................................ 15

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ...................................................................................... 19, 20

*Republican Party of Minn. v. White*,
  536 U.S. 765 (2002) ........................................................................................... 20

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ............................................................................... 10, 16, 23

*Smith v. Goguen*,
  415 U.S. 566 (1974) ...................................................................................... 23, 24

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ........................................................................................... 17

*Speiser v. Randall*,
  357 U.S. 513 (1958) ........................................................................................... 15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................................... 11

*Texas v. Johnson*,
  491 U.S. 397 (1989) ........................................................................................... 21

-v-

*Turner Broad. Sys., Inc. v. FCC*,
 512 U.S. 622 (1994) ............................................................................................ 21

*United States v. Huitron-Guizar*,
 678 F.3d 1164 (10th Cir. 2012) .......................................................................... 15

*United States v. Playboy Ent. Grp., Inc.*,
 529 U.S. 803 (2000) ...................................................................................... 20, 22

*United States v. Robel*,
 389 U.S. 258 (1967) ...................................................................................... 16, 17

*United States v. Williams*,
 553 U.S. 285 (2008) ............................................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .................................................................................................. 9

*X Corp. v. Bonta*,
 116 F.4th 888 (9th Cir. 2024) ....................................................................... 14, 25

*Zadvydas v. Davis*,
 533 U.S. 678 (2001) ............................................................................................ 16

**Statutes**

8 U.S.C.
 § 1182(a)(3)(B)(i)(I) ........................................................................................... 22
 § 1182(a)(3)(C)(ii) ................................................................................................ 5
 § 1182(a)(3)(C)(iii) ...................................................................................... passim
 § 1201(i) ....................................................................................................... passim
 § 1227(a)(1)(B) ................................................................................................... 22
 § 1227(a)(4)(B)(i) ............................................................................................... 22
 § 1227(a)(4)(C)(i) ............................................................................... 1, 3, 5, 14
 § 1227(a)(4)(C)(ii) ................................................................................................ 5
 § 1252(f)(1) ........................................................................................................... 1

52 U.S.C.
 § 30121(a) ............................................................................................................. 1

*An Act Concerning Aliens*,
 ch. 58, 1 Stat. 570 (1798) (expired Mar. 3, 1801) ............................................. 10

**Constitutional Provisions**

Federal'nyĭ Zakon RF ob Informat͡sii, Informat͡sionnykh Tekhnologii͡akh i o
 Zashchite Informat͡sii [Federal Law of the Russian Federation on Information,
 Informational Technologies and the Protection of Information], Sobranie
 Zakonodatel'stva Rossiĭskoĭ Federat͡sii [SZ RF] [Russian Federation Collection
 of Legislation] 2006, No. 31, Item 3448 ............................................................ 10

-vi-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

U.S. Const. amend. I ................................................................................................ passim

U.S. Const. art. 1, § 8, cl. 1 ................................................................................. 15

Xianfa [Constitution] art. 51 (1982) (China) ..................................................... 10

**Regulations**

Exec. Order No. 14,161,
    90 Fed. Reg. 8451 (Jan. 20, 2025) ................................................................. 4

**Congressional Records**

4 Annals of Cong. 934 (1794) ........................................................................ 15, 20

**Other Authorities**

Charles Slack,
    *Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech*
    (2015) ............................................................................................................. 10

House Foreign Affairs Committee Republicans,
    *Secretary Rubio Testifies Before the House Foreign Affairs Committee:*
    *Protecting American Interests* (YouTube, streamed May 21, 2025) ............ 7, 12, 18

James Madison,
    *The Report of 1800* (Jan. 7, 1800) ....................................................... 3, 10, 15

Letter from James Madison to Thomas Jefferson (May 20, 1798) ................... 10

Oliver Ellsworth,
    *A Landholder 7* (Dec. 17, 1787) ................................................................ 15

Thomas Jefferson,
    *A Bill for Establishing Religious Freedom* (June 18, 1779) ................... 14, 20

Thomas Jefferson,
    *First Inaugural Address* (Mar. 4, 1801) ...................................................... 11

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that at the nearest available date at which counsel may be heard, Plaintiffs The Stanford Daily Corporation, Jane Doe, and John Doe ("Plaintiffs") will move for a preliminary injunction against Secretary of State Marco Rubio and Secretary of Homeland Security Kristi Noem ("Defendants") to enjoin Secretary Rubio from revoking the visas and other documentation of Plaintiffs and their noncitizen members under 8 U.S.C. § 1201(i) based on protected speech and to render preliminary factual findings and legal conclusions on other issues. The Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying declaration and exhibits, all pleadings and papers filed in this action, and such additional papers and arguments as may be presented.

## MOTION'S SCOPE

This motion seeks a preliminary injunction preventing Secretary of State Marco Rubio from revoking the visas and other documentation of Plaintiffs and their noncitizen[1] members under 8 U.S.C. § 1201(i) (the "Revocation Provision") based on protected speech and preventing Secretary of Homeland Security Kristi Noem from effectuating deportation proceedings thereupon.[2]

Plaintiffs also challenge the provision of the Immigration and Nationality Act allowing the Secretary of State to render a noncitizen deportable for protected speech if the Secretary "personally determines" that the noncitizen's activity "compromise[s] a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision"). But under the statute, only the Supreme Court can enjoin provisions in part IV of the INA, which includes the Deportation Provision but not the Revocation Provision. *See* 8 U.S.C. § 1252(f)(1). Section 1252(f), however, does not deprive lower courts of the ability to grant declaratory relief regarding those provisions. *Biden v. Texas*, 597 U.S. 785, 798–801 (2022).

---

[1] In this brief, "noncitizen" refers to noncitizens lawfully present in the United States.

[2] In this brief, "protected speech" refers to activity that, if a U.S. citizen engaged in it, the First Amendment would protect it but excludes speech subject to unique criminal prohibitions for noncitizens, such as donating to election campaigns. *See, e.g.*, 52 U.S.C. § 30121(a) (prohibiting certain noncitizens from contributing to federal, state, and local elections).

1    Accordingly, Plaintiffs request (1) a preliminary injunction against the Revocation Provision

2    and (2) preliminary factual findings and legal conclusions that the Revocation and Deportation

3    Provisions are unconstitutional as applied to noncitizens' protected speech. To facilitate this second

4    form of relief, Plaintiffs intend to file, after conferring with opposing counsel, a motion under Rule

5    65(a)(2) to consolidate the hearing on this Motion with the trial on the merits.

6                                              **INTRODUCTION**

7    It is difficult to imagine a sentence more incompatible with American liberty than "Watch

8    what you say, or else." That is because the First Amendment guards free speech by stripping the

9    government of the power to subject speakers to disfavored treatment simply because of their views.

10   The United States understands liberty as an unalienable right, not a privilege bestowed to a select

11   few by a kindly king or omnipotent parliament. Our First Amendment, therefore, does not

12   "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*,

13   344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted). So when Secretary of State Marco

14   Rubio invokes statutory authority to revoke the visas and trigger deportation of lawfully present

15   noncitizens for expressing anti-American and anti-Israel views, he betrays not just the First

16   Amendment, but the core American ideal of liberty as an unalienable right. Prompt action from this

17   Court is needed to restore that ideal.

18   Since March 2025, Secretary Rubio and the Trump administration have waged an assault on

19   free speech, targeting international students and faculty for deportation based on obviously protected

20   speech like peacefully attending protests and authoring editorials. Their attack is casting a chill over

21   noncitizens. At Plaintiff Stanford Daily, which publishes the independent student newspaper at

22   Stanford University, staff writers on student visas are withholding or withdrawing articles about the

23   war in Gaza and declining reporting assignments related to pro-Palestinian campus protests, worried

24   that writing the wrong thing will endanger their immigration status. Plaintiff Jane Doe fears the

25   same after her protected speech landed her on the Canary Mission database of pro-Palestinian

26   individuals and organizations, which the Trump administration uses as a blacklist to decide whom

27   to target. And Plaintiff John Doe fears adverse immigration action because he argues positions and

28

1  has used expressions Secretary Rubio and the Trump administration deem anti-American and anti-

2  Israel and have cited as permissible grounds for deportation.

3       Secretary Rubio and the Trump administration rely on two provisions of the Immigration

4  and Nationality Act for their asserted power to censor noncitizens' speech. The first allows the

5  Secretary to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs,

6  statements, or associations" "compromise a compelling United States foreign policy interest."

7  8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (hereinafter the "Deportation Provision"). The

8  second allows the Secretary to, "at any time, in his discretion, revoke" a "visa or other

9  documentation." 8 U.S.C. § 1201(i) (hereinafter the "Revocation Provision").

10      Both violate the First Amendment as applied to protected speech, which flatly prohibits

11  government officials from "us[ing] the power of the State to punish or suppress disfavored

12  expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024). And that is precisely what the Deportation

13  and Revocation Provisions allow Secretary Rubio and the Trump administration to do when applied

14  to speech: abuse statutory immigration powers to punish and suppress disfavored viewpoints

15  regarding American and Israeli foreign policy.

16      James Madison explained that because noncitizens "owe on one hand, a temporary

17  obedience" to American laws, "they are entitled in return, to their protection and advantage." James

18  Madison, The Report of 1800 (Jan. 7, 1800), *reprinted by* Nat'l Archives: Founders Online,

19  https://perma.cc/BF76-6LCD. That is why the Supreme Court made clear the First Amendment's

20  protection for "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges*

21  *v. Wixon*, 326 U.S. 135, 148 (1945). America's "First Amendment does not speak equivocally. It

22  prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command

23  of the broadest scope that explicit language, read in the context of a liberty-loving society, will

24  allow." *Bridges v. California*, 314 U.S. 252, 263 (1941) (invalidating noncitizen's criminal

25  conviction on First Amendment grounds).

26      Our liberty-loving society does not countenance midnight raids for thoughtcrimes or

27  detention and banishment for unpopular opinions. As the Ninth Circuit explained, if lawfully present

28  aliens cannot assert the First Amendment to defend their immigration status, "then their First

-3-

1    Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation

2    would permanently chill their expressive and associational activities." *Am.-Arab Anti-*

3    *Discrimination Comm. v. Reno* (*AADC*), 70 F.3d 1045, 1065–66 (9th Cir. 1995). This Court should

4    restore the constitutional order and enter a preliminary injunction prohibiting use of the Revocation

5    Provision to revoke the visas of Plaintiffs or their noncitizen members based on protected speech.

**BACKGROUND**

7         President Donald Trump campaigned on a platform of deporting lawfully present

8    noncitizens for protected speech, promising to throw out "any student that protests." Declaration of

9    Conor Fitzpatrick ("Fitzpatrick Decl.") Ex. A. He pledged to revoke visas of "antisemitic" students

10   and "aggressively deport" noncitizens with "jihadist sympathies," including "radical anti-

11   American[s]." Fitzpatrick Decl. Ex. B. Now in power, his administration is using the Deportation

12   and Revocation Provisions to do just that.

13   **Secretary Rubio and the Trump administration abuse the INA to target protected speech.**

14        On January 20, 2025, the President issued an executive order instructing the government to

15   ensure resident noncitizens "do not bear hostile attitudes" toward the United States or "advocate

16   for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No.

17   14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025). Ten days later, the White House committed to

18   revoking the visas of and deporting "Hamas Sympathizers," including those who "joined in the pro-

19   jihadist protests." Fitzpatrick Decl. Ex. C. The administration considers "from the river to the sea,

20   Palestine will be free" to express support for Hamas and to thus justify action under the Revocation

21   or Deportation Provisions. Fitzpatrick Decl. Ex. D, vol. 1, 32–35. Same with calling Israel "an

22   apartheid state" or "criticizing Israel's actions in Gaza." *Id.*

23        In early March 2025, Department of Homeland Security agents arrested Mahmoud Khalil—

24   a participant in peaceful pro-Palestinian advocacy at Columbia University—and transported him to

25   an immigration jail in rural Louisiana. *Khalil v. Joyce*, 771 F. Supp. 3d 268, 275–77 (S.D.N.Y.

26   2025). Proceedings followed under the Deportation Provision, which authorizes the Secretary of

27   State to trigger deportation proceedings against noncitizens "whose … activities in the United States

28   the Secretary of State has reasonable ground to believe would have potentially serious adverse

-4-

foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i). That authority is subject to "[t]he exceptions" to the Secretary of State's authority to exclude noncitizens from the United States on foreign policy grounds, *id.* § 1227(a)(4)(C)(ii) (incorporating *id.* §§ 1182(a)(3)(C)(ii)–(iii)), which provide that a noncitizen "shall not be excludable [for protected speech], unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii). The Deportation Provision, therefore, allows the Secretary to trigger deportation proceedings against lawful noncitizens for protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i).

For Mr. Khalil, Secretary Rubio claimed "condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine th[e] significant foreign policy objective" of "champion[ing] core American interests." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025). The day after Mr. Khalil's arrest, Secretary Rubio announced the federal government "will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Fitzpatrick Decl. Ex. E. President Trump pledged that Khalil's arrest was the "first" of "many to come," and that his administration would deport any noncitizen student involved in "pro-terrorist, anti-Semitic, anti-American activity." Fitzpatrick Decl. Ex. F.

In mid-April, masked DHS agents entered the naturalization interview of Mohsen Mahdawi—a legal permanent resident who had been a critic of Israel's military campaign in Gaza— and arrested him. *Mahdawi v. Trump*, No. 25-cv-389, 2025 WL 1243135, at *2 (D. Vt. Apr. 30, 2025). As with Mr. Khalil, Secretary Rubio cited the Deportation Provision as the basis for Mr. Mahdawi's arrest and deportation proceedings, bizarrely alleging the advocacy of a single international student hindered the United States government's ability to bring peace to the Middle East. Resp. in Opp. to Mot. for Release Ex. A at 2, *Mahdawi*, 2025 WL 1243135 (No. 25-dv-389), ECF No. 42-1.

Weeks prior, six plain-clothed DHS federal officers surrounded Tufts University PhD student Rümeysa Öztürk—a lawfully present noncitizen pursuant to an F-1 student visa—outside her home, handcuffed her, and dragged her into an unmarked vehicle. *Ozturk v. Trump*, No. 25-cv-

374, 2025 WL 1145250, at *2 (D. Vt. Apr. 18, 2025), *amended sub nom.*, *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025). Her offense? During her time at Tufts, Ms. Öztürk engaged in peaceful pro-Palestinian advocacy and co-authored an editorial in the student newspaper urging Tufts to, among other things, recognize a genocide in Gaza and divest from Israeli companies. *Id.* at *1; *see also* Fitzpatrick Decl. Ex. G. So Secretary Rubio revoked her visa without notice, DHS ambushed Ms. Öztürk, and then, as with Mr. Khalil, immediately transferred her to an immigration jail in remote Louisiana to await deportation proceedings. *Ozturk*, 2025 WL 1145250, at *2–3.

Secretary Rubio relied on the Revocation Provision to revoke Ms. Öztürk's visa. Verified Compl. ¶ 57. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation." It places no constraints on the Secretary's discretion and no guardrails against revoking visas based on protected speech.

Federal courts have ordered the release of Mr. Khalil, Ms. Öztürk, and Mr. Mahdawi during the pendency of their deportation proceedings. *See Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1420540, at *6 (D. Vt. May 16, 2025) (concluding "the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention"); *Mahdawi*, 2025 WL 1243135, at *8 (concluding "Mr. Mahdawi has raised a substantial claim that the Government arrested him to stifle speech with which it disagrees"); *Khalil*, 2025 WL 1514713, at *52 (concluding the Deportation Provision was likely unconstitutionally vague as applied to Khalil), *appeal docketed*, No. 25-2162 (3d Cir. June 23, 2025); *Khalil v. Trump*, No. 25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316 (ordering Khalil's release), *appeal docketed*, No. 25-2162 (3d Cir. June 23, 2025).

Secretary Rubio and the Trump administration promised more visa revocations for protected speech. On May 8, 2025, DHS Assistant Secretary Tricia McLaughlin announced that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Fitzpatrick Decl. Ex. H. And at a May 21, 2025, congressional hearing, Secretary Rubio, responding to a question about the revocation of Rümeysa Öztürk's visa based on her speech, said that he "proudly" revoked her visa, that he revokes visas

every day, and he would continue revoking visas based on expression. House Foreign Affairs Committee Republicans, *Secretary Rubio Testifies Before the House Foreign Affairs Committee: Protecting American Interests*, at 2:55:50–2:56:20 (YouTube, streamed May 21, 2025), https://perma.cc/MB5T-VBC9.

**The administration's targeting of noncitizens' protected speech chills Plaintiffs' expression.**

Plaintiff Jane Doe is a graduate of a United States university, resides in the United States lawfully pursuant to her admission on an F-1 student visa, and was a member of a pro-Palestinian student group. She published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing "genocide" and perpetuating "apartheid." She has also used the slogan "from the river to the sea, Palestine will be free" and criticized American foreign policy, particularly its relationship with Israel. In late 2023 or early 2024, Jane Doe appeared in a profile on the anonymously run Canary Mission website,[3] which a senior official in ICE's Homeland Security Investigations unit testified his team uses to generate "reports" on individuals that the State Department relies on to decide, among other things, "visa revocations." Fitzpatrick Decl. Ex. J, vol. 2, 101, 110.[4] Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi—all targeted by Secretary Rubio with the Revocation and Deportation Provisions—appeared on Canary Mission. Fitzpatrick Decl. Exs. L, M, N. Since March 2025, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deactivated her social media accounts to guard against retaliation for past expression.

Similarly, Plaintiff John Doe is a graduate of a major United States university and is lawfully present in the United States pursuant to his admission on an F-1 student visa, working in journalism. After the October 7, 2023, attack and Israel's counter-offensive, he attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online. At protests, he participated in chants

---

[3] Canary Mission's *raison d'etre* is to publish information about individuals and organizations that, in its judgment, "promote hatred of the USA, Israel and Jews on North American college campuses and beyond." Fitzpatrick Decl. Ex. I.

[4] The official also testified that "most" student protestors DHS asked ICE to investigate "came from" Canary Mission. Fitzpatrick Decl. Ex. K, vol. 1, 44.

including "from the river to the sea, Palestine will be free" and accusing Israel of committing "genocide." Verified Compl. ¶ 105. After Secretary Rubio and the Trump administration began targeting lawfully present noncitizen students, the professor for whom John Doe served as a teaching assistant told him to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status. He followed that advice, refraining from publishing an article criticizing Israel. He has resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide as well as commentary critical of American foreign policy and now faces the threat of visa revocation and deportation.

Plaintiff The Stanford Daily Publishing Corporation is a nonprofit that publishes *The Stanford Daily*, the independent, student-run newspaper at Stanford University. Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities." Verified Compl. ¶ 68. But the government's use of the Revocation and Deportation Provisions to target noncitizens' protected speech is thwarting Stanford Daily's journalistic and educational activities by chilling its noncitizen writers, reporters, and editors.

For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily out of fear of adverse immigration consequences if they were associated with articles about Israel or Palestine. Verified Compl. ¶ 73. As another example, a lawfully present noncitizen writer signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. Verified Compl. ¶ 75. The writer attended, took notes, and interviewed sources. Verified Compl. ¶ 75. But due to fear of adverse immigration consequences, the student decided against publishing any article about the event. Verified Compl. ¶ 75. Other Stanford Daily contributors have asked the paper to take down their past articles about the Middle East, fearing they would have their visas revoked or be deported if they came to the attention of Trump administration officials. Verified Compl. ¶¶ 77, 79, 81, 83, 86.

### LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction because (1) they are likely to succeed on the merits of their claims, (2) they are suffering irreparable harm to their First Amendment rights

absent the preliminary injunction due to self-censorship and the threat of adverse immigration action based on protected speech, (3) the balance of equities favors free speech over government censorship, and (4) a preliminary injunction advances the public's interest in open debate and protecting a flourishing marketplace of ideas. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (setting out preliminary injunction factors). Likelihood of success on the merits is "especially important when a plaintiff alleges a constitutional violation and injury," as it "usually demonstrates [a plaintiff] is suffering irreparable harm" and "also tips the public interest sharply in [a plaintiff's] favor." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).[5] In a constitutional challenge, therefore, courts "may not deny a preliminary injunction" when the movant establishes the four factors; it must uphold "its obligation to enforce constitutional rights." *Id.* at 1041 (cleaned up).

Plaintiffs are alternatively entitled to a preliminary injunction under the Ninth Circuit's "sliding scale" variant of the *Winter* test because (1) their claims raise serious merits questions, (2) they are suffering irreparable injury to their First Amendment rights, (3) the balance of hardships tips sharply in favor of free speech, and (4) the public interest always supports protecting constitutional rights. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (setting out "serious questions" preliminary injunction factors). The serious-merits-questions standard is "a lesser showing than likelihood of success on the merits." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). And because the Plaintiffs raise serious First Amendment questions, that alone "is irreparable injury sufficient to merit the grant of relief," "compels a finding that the balance of hardships tips sharply in Plaintiffs' favor," and is enough to trigger "the significant public interest in upholding First Amendment principles." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (cleaned up).

## ARGUMENT

Our Nation has been here before. In 1798, fearful that Irish and French immigrants were importing the spirit of the French Revolution, the Federalists in Congress passed, and President John Adams signed, the Alien Friends Act. It authorized the President to deport any noncitizen he deemed

---

[5] When the government is the opposing party, "the last two *Winter* factors 'merge.'" *Baird*, 81 F.4th at 1040 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

1    "dangerous to the peace and safety of the United States." An Act Concerning Aliens, ch. 58, § 1,

2    Stat. 570, 571 (1798) (expired Mar. 3, 1801). Secretary of State Thomas Pickering urged Adams to

3    use the law to deport Adams' critics and noncitizens with French sympathies. Charles Slack,

4    *Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech* 191 (2015).

5          As Justice Gorsuch explained, the Alien Friends Act was "one of the most notorious laws in

6    our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist

7    Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part

8    and in judgment). James Madison called the law a "monster that must for ever disgrace its parents."

9    Letter from James Madison to Thomas Jefferson (May 20, 1798), *reprinted by* Nat'l Archives:

10   Founders Online, https://perma.cc/QU5Q-CRAU. Madison compared the power the law bestowed

11   on the president to that of a king: "Could a power be well given in terms less definite, less particular,

12   and less precise. … They leave everything to the President. His will is the law." Madison, The

13   Report of 1800, *supra*. The law expired on its own terms in 1801 (along with its sister statute, the

14   Sedition Act), and the backlash helped usher Jefferson into the presidency.

15         But 225 years later, the spirit of the Alien Friends Act rises from the grave. Yet again we

16   have a President and Secretary of State fueled by a belief that the Constitution permits banishing

17   peaceful noncitizens from our shores for voicing "dangerous" ideas. Yet again they are wrong.

18         Allowing the Secretary to render noncitizens deportable whose views, in his subjective

19   judgment, compromise America's foreign policy interests places liberty in mortal peril and America

20   among unlikely bedfellows for speech rights. China's Constitution provides that "when exercising

21   their freedoms and rights, citizens … shall not undermine the interests of the state." Xianfa art. 51

22   (1982) [https://perma.cc/D8DG-5RSH]. Russia's laws, too, permit the "[r]estriction of access to

23   information" in the name of protecting "morality," its system of government, and the "security of

24   the state." Federal Law of the Russian Federation on Information, Informational Technologies and

25   the Protection of Information [Russian Federation Collection of Legislation] 2006, No. 31, Item

26   3448 [https://perma.cc/GW9F-C78F]. As China's and Russia's experiences show, giving the

27   government the power to censor when it believes speech threatens the government's interests is a

28   loophole with infinite diameter. It has no place in America's tradition of individual liberty.

America has charted a different course than the world's censorial regimes. *See Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 329 (7th Cir. 1985) (contrasting the United States with "[m]ost governments of the world" that "suppress[] critical speech"), *aff'd mem.*, 475 U.S. 1001 (1986). In 1801, after defeating Adams and his Alien and Sedition Acts, President Jefferson used his inaugural address to defend the free speech rights of those who called for dissolution of the Union, proclaiming, "If there be any among us who would wish to dissolve this Union, or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated, where reason is left free to combat it." Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/647Z-7LP9. Little could be more dangerous to the interests of a fledgling nation than calling for its extinction, yet our commitment to free speech remained. So it should today, 224 years later.

## I.     Plaintiffs have standing to challenge the Revocation and Deportation Provisions.

### A.     The Doe Plaintiffs have individual standing.

The Doe Plaintiffs can show injury in fact, a causal connection between it and the Revocation and Deportation Provisions that authorize the government to revoke these Plaintiffs' legal status and deport them for protected speech, and that it is likely the Court can redress that with a favorable decision, so thus have standing to challenge the statutes. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). Notably, a plaintiff need not subject themselves to arrest (or deportation) to challenge a censorial law but rather "satisfies the injury-in-fact requirement where he alleges an intention to engage in … conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (internal quotation marks omitted). In First Amendment cases, "the Supreme Court has endorsed" a "hold your tongue and challenge now" approach that enables proceeding against laws whose potential enforcement causes plaintiffs to self-censor. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (internal quotation marks omitted). The Ninth Circuit has made clear that when a "threatened enforcement effort implicates First Amendment rights," a credible threat of enforcement "tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

The Doe Plaintiffs have standing. They engaged in pro-Palestinian advocacy, including accusing Israel of committing "genocide" and perpetuating "apartheid," as well as chanting "from the river to the sea, Palestine will be free." That is precisely the type of protected speech Secretary Rubio and others in the Trump administration cite as a supposedly lawful basis to revoke other non-citizen students' visas and initiate deportation proceedings. Fitzpatrick Decl. Ex. D, vol. 1, 32–35. And Jane Doe's advocacy landed her on the Canary Mission watchlist, which the Trump administration confirmed is a primary resource for deciding whom to flag for reporting to the State Department for visa revocation and potential deportation. Fitzpatrick Decl. Ex. J, vol. 2, 101, 110. As a result, Jane Doe is aggressively self-censoring, deactivating her primary social media account and refraining from public commentary about Gaza. John Doe is cognizant of the risk, but intends to continue his advocacy, placing him in the crosshairs of Secretary Rubio's deportation efforts.

Secretary Rubio and the Trump administration have made crystal clear they intend to revoke more visas and initiate more deportation proceedings based on protected pro-Palestinian speech. On May 8, 2025, DHS Assistant Secretary McLaughlin announced that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Fitzpatrick Decl. Ex. H. And at a May 21, 2025, congressional hearing, Secretary Rubio said that he "proudly" revoked Rümeysa Öztürk's visa and he would continue revoking visas on similar grounds. House Foreign Affairs Committee Republicans, *supra*. The Doe Plaintiffs are squarely in the target zones of the Provisions and thus have standing to challenge them.

**B.    Stanford Daily has associational, corporate, and organizational standing.**

Stanford Daily, whose noncitizen contributors are self-censoring to avoid adverse immigration action, has standing to challenge the Revocation and Deportation Provisions three times over. To start, it has associational standing because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Stanford Daily's members have standing to sue in their own right because, like the Doe Plaintiffs, they either have engaged or intend to engage in protected speech critical of

-12-

American or Israeli foreign policy. Stanford Daily's noncitizen writers, for example, are declining to author articles concerning Israel and Palestine and those who have published such articles are asking Stanford Daily to remove them from the internet. Verified Compl. ¶¶ 73, 75, 77, 79, 83, 86. Second, the free speech interests Stanford Daily seeks to protect "are germane to [its] purpose." *Hunt*, 432 U.S. at 343. Stanford Daily's purpose is to provide accurate coverage and insightful commentary about the news of the day. Verified Compl. ¶¶ 68–69. Stanford Daily cannot accomplish its purpose if its noncitizen contributors are afraid to express their honest opinions or cover certain topics related to American foreign policy. Verified Compl. ¶ 72. And the noncitizen members' participation is unnecessary because neither the constitutional claims nor the requested relief requires individualized proof. *Hunt*, 432 U.S. at 344 (holding "declaratory and injunctive relief" are "properly resolved in a group context" because they do not need "individualized proof").

Stanford Daily also has corporate standing because it is "directly engaged" in activities like publishing noncitizens' work, enacting noncitizens' editorial choices, and sponsoring noncitizens' speech. *NAACP v. Button*, 371 U.S. 415, 428 (1963). The First Amendment protects Stanford Daily's speech, and the government's use of the Revocation and Deportation Provision against protected speech suppresses it. *Id.* Therefore, it has standing to protect its First Amendment rights and the rights of those associated with it. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014); *Moody v. NetChoice, LLC*, 603 U.S. 707, 746–47 (2024) (Barrett, J., concurring).

Finally, Stanford Daily has organizational standing because the challenged statutes have "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Stanford Daily has encountered significant interference with its core business activity—reporting. Verified Compl. ¶ 72. On each and all of the above bases, Stanford Daily has standing to challenge the Revocation and Deportation Provisions.

## II.    The Revocation and Deportation Provisions violate the First and Fifth Amendments as to protected speech.

Plaintiffs are likely to succeed in showing the Revocation and Deportation Provisions violate the First Amendment when enforced based on protected speech and the Fifth Amendment's void-for-vagueness doctrine in that regard. And the other factors—irreparable harm, the balance of

-13-

equities, and the public interest—favor a preliminary injunction because "when a party raises serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (cleaned up).

This is not a challenge to Sections 1201(i) and 1227(a)(4)(C)(i) in all their applications, but only a narrow facial challenge as they apply to the government's reliance on protected speech to revoke immigration documentation or render a noncitizen deportable. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining standard for as-applied facial challenge). So Plaintiffs must meet the "standards for a facial challenge to the extent" the Revocation and Deportation Provisions apply to protected speech. *Id.* In this type of challenge, courts assess the laws' scope as applied to protected speech, decide which applications violate the First Amendment, and measure the unconstitutional applications against the constitutional ones. *See Moody*, 603 U.S. at 724–25. Here, because Plaintiffs challenge the Provisions solely regarding the statutes' use based on protected speech, and because the Provisions cannot constitutionally be enforced based on protected speech, *every* application in Plaintiffs' challenge violates the Constitution.

### A.     The First Amendment protects noncitizens' speech.

The Revocation and Deportation Provisions are unconstitutional because the First Amendment shackles government authority to act based on antipathy towards a speaker's message. Consistent with the First Amendment's original understanding as a limitation of government power, rather than the grant of a right, courts have held free speech protections apply to noncitizens. The Framers "designed and intended" the First Amendment's command that "Congress shall make no law … abridging the freedom of speech, or of the press," U.S. Const. amend. I, to "remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971).

In our Republic, Thomas Jefferson explained, "the opinions of men are not the object of civil government, nor under its jurisdiction." Thomas Jefferson, A Bill for Establishing Religious Freedom (June 18, 1779), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/95P5-XXMF. James Madison similarly affirmed that "[o]pinions are not the objects of legislation." 4

-14-

Annals of Cong. 934 (1794). Other Founders agreed. *See, e.g.*, Oliver Ellsworth, A Landholder 7 (Dec. 17, 1787), *reprinted by* Teaching Am. Hist., https://perma.cc/66TU-EZ5V ("Civil government has no business to meddle with the private opinions of the people."). At bottom, "freedom of speech is a negative liberty. The First Amendment is a restriction on the government's power to 'abridge' speech." *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) (cleaned up).

Because the Constitution divested the government of authority to interfere with the marketplace of ideas, the First Amendment acknowledges no "distinction between citizens and resident aliens." *Kwong Hai Chew*, 344 U.S. at 596 n.5 (internal quotation marks omitted). One of the first modern First Amendment cases involved noncitizens' speech. *Abrams v. United States*, 250 U.S. 616, 617 (1919). Later Supreme Court cases made clear that "[f]reedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

The Ninth Circuit has held that the First Amendment prohibits deporting aliens for protected speech and explained that "[t]he Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection." *AADC*, 70 F.3d at 1065 (citing Madison, The Report of 1800, *supra*). Therefore, "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Id.* at 1064. After all, "[i]f aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities." *Id.* at 1065–66.[6]

The First Amendment therefore constrains how the legislative and executive branches may exercise their enumerated, plenary powers. For example, while Congress may "lay and collect Taxes," U.S. Const. art. 1, § 8, cl. 1, it would violate the First Amendment to condition a tax rebate on having a Republican yard sign. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("Congress may not by withdrawal of mailing privileges place limitations upon the freedom of speech which if

---

[6] Other circuits have likewise found lawfully present noncitizens enjoy First Amendment protection, albeit the courts did not address the issue in the context of immigration. *See, e.g.*, *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985); *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024); *In re Weitzman*, 426 F.2d 439, 449 (8th Cir. 1970); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168–69 (10th Cir. 2012).

directly attempted would be unconstitutional.") Likewise here: While Congress has authority to craft legislation regulating noncitizens in the country, *see Galvan v. Press*, 347 U.S. 522, 530 (1954), it cannot legislate in a manner that targets their protected speech.[7] As the Ninth Circuit held, quoting Justice Murphy's concurrence in *Wixon*, "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *AADC*, 70 F.3d at 1065 (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)).

These principles remain true even when the political branches invoke their foreign-affairs powers. As the Supreme Court explained, "Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal." *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). More recently, it stressed that "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role" to safeguard constitutional rights. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also Sessions*, 584 U.S. at 174–75 (majority op.) (holding unconstitutional an INA provision).

To that end, the Supreme Court has routinely invalidated foreign-affairs laws to uphold America's commitment to free speech. In *Boos v. Barry*, the Court struck down regulations barring demonstrations critical of foreign governments within 500 feet of a foreign embassy. 485 U.S. 312 (1988). In *Lamont v. Postmaster General*, it invalidated a federal law that unconstitutionally limited the First Amendment right to receive foreign Communist literature. 381 U.S. 301 (1965). In *Robel*, too, the Court struck down a national defense statute on First Amendment grounds, explaining that

---

[7] The Supreme Court has recognized the political branches enjoy significantly more discretion when determining who to allow into the country because noncitizens have no constitutional right to *enter* the United States. *Zadvydas v. Davis*, 533 U.S. 678, 693, 695–96 (2001) (noting the "distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"). As the Ninth Circuit explained, "The essential distinction between exclusion and deportation rests on this territorial concept of a diverse national community within which citizens and resident aliens interact. … We find no merit in the Government's argument that the broad authority of the political branches over immigration matters justifies limited First Amendment protection for aliens at deportation." *AADC*, 70 F.3d at 1064–65.

-16-

1  "[i]t would indeed be ironic, if, in the name of national defense, we would sanction the subversion

2  of one of those liberties … which makes the defense of the Nation worthwhile." 389 U.S. at 264.

3     **B.     Revoking visas and deporting noncitizens under the Revocation and**

4           **Deportation Provisions is unlawful viewpoint discrimination.**

5     Application of the Revocation and Deportation Provisions to noncitizens' protected speech

6  offends the "central tenet of the First Amendment that the government must remain neutral in the

7  marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). That tenet means

8  "[t]he government may not discriminate against speech based on the ideas or opinions it conveys."

9  *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). This is especially so because "speech on public issues

10  occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special

11  protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks omitted).

12     By allowing the Secretary of State to revoke visas and trigger the deportation of lawfully

13  present noncitizens for protected speech about America's foreign policy, the Revocation and

14  Deportation Provisions sanction blatant viewpoint discrimination, enabling the government to target

15  its critics and shelter its supporters. The provisions are codified retaliation, authorizing adverse

16  immigration action for engaging in protected speech. *See Lozman v. Riviera Beach*, 585 U.S. 87, 90

17  (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals

18  for engaging in protected speech.") This state-sanctioned viewpoint discrimination violates the First

19  Amendment.

20     The Deportation Provision singles out speech Secretary Rubio deems contrary to American

21  foreign policy as a deportable offense while leaving expression in line with American foreign policy

22  untouched. *See* 8 U.S.C. § 1182(a)(3)(C)(iii). The "essence of viewpoint discrimination," violating

23  "bedrock First Amendment principle[s]," is when a law "reflects the Government's disapproval of

24  a subset of messages." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring); *id.* at 223

25  (plurality op.). Here, the Deportation Provision's "facial viewpoint bias" that expressly singles out

26  speech contrary to American foreign policy "results in viewpoint-discriminatory application."

27  *Iancu*, 588 U.S. at 395. Secretary Rubio has invoked the Deportation Provision against noncitizens

28  who criticized Israel's military operations in Gaza, protested for Palestinians, or advocated for a

-17-

ceasefire. *See* Fitzpatrick Decl. Ex. D, 32–35. But he has never invoked it against those who praised Israel's military operations in Gaza, protested for Israeli hostages, or advocated for increased military operations. That is textbook viewpoint discrimination. *See Iancu*, 588 U.S. at 395.

Secretary Rubio and the Trump administration have *vowed* to continue their viewpoint-based enforcement of the Deportation Provision. *See* Fitzpatrick Decl. Exs. E, O. On March 10, 2025, President Trump, discussing his administration's attempt to deport Mr. Khalil, pledged that foreign students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, promising that Mr. Khalil's arrest was the "first" of "many to come." Fitzpatrick Decl. Ex. F.

The Revocation Provision's grant of unbridled discretion to the Secretary to revoke visas "at any time, in his discretion," 8 U.S.C. § 1201(i), renders it likewise viewpoint discriminatory as to revocations based on protected speech. As the Ninth Circuit has held, such exercise of unbridled discretion to limit speech is *per se* viewpoint discrimination. *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *see also Ateba v. Leavitt*, 133 F.4th 114, 124 (D.C. Cir. 2025) (discussing Ninth Circuit approach). The Revocation Provision not only unconstitutionally lacks "adequate safeguards to *protect* against the improper exclusions of viewpoints," *Kaahumanu*, 682 F.3d at 806 (quoting *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006)); it lacks *any* safeguards, rendering it viewpoint discriminatory, *see id.*

And because Plaintiffs challenge the Revocation Provision solely as applied to revocations based on protected speech, all applications in that challenge are necessarily viewpoint discriminatory. Any time the Secretary of State revokes immigration documentation based on speech, he is singling out the speaker's message for disfavored treatment. Secretary Rubio confirmed revoking Rümeysa Öztürk's visa would be the first of many revocations to come. House Foreign Affairs Committee Republicans, *supra*, at 2:55:50–2:56:20. And a DHS official threatened that noncitizens engaging in "anti-American" expression or "pushing Hamas propaganda" "can expect your visa will be revoked." Fitzpatrick Decl. Ex. H. In both structure and practice, the Revocation Provision sanctions open viewpoint discrimination against protected speech.

Because the Revocation and Deportation Provisions facially sanction viewpoint discrimination as applied to protected speech, they are unconstitutional in that regard, full stop. In *Matal*, a

-18-

"finding of viewpoint bias ended the matter" of the law's unconstitutionality because once a court has "found that a law 'aims at the suppression of views,' why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute?" *Iancu*, 588 U.S. at 399 (quoting *Matal*, 582 U.S. at 248 (Kennedy, J., concurring)). It would not, because "viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. It is such an obvious violation of free speech that "the Supreme Court has described the First Amendment as almost universally 'forbidding the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others.'" *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1124 (9th Cir. 2023) (VanDyke, J., concurring) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (cleaned up)); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024) (noting viewpoint discrimination is "likely even invalid per se").[8] This Court should "remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination," *Iancu*, 588 U.S. at 399 (Alito, J., concurring), and preliminarily enjoin the Revocation Provision as unconstitutional as applied to protected speech.

**C.    The Revocation and Deportation Provisions are content based and fail strict scrutiny.**

The Deportation Provision and Revocation Provision also unconstitutionally discriminate based on content when applied to noncitizens' protected speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Such content-discriminatory laws, like the Revocation and Deportation Provisions, "are presumptively unconstitutional" and enforceable "only if the government proves that they are narrowly tailored to serve compelling state interests," *id.*, and they are "the least restrictive means of achieving" those interests, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Here, revoking a visa under the Revocation Provision or initiating deportation proceedings under the Deportation Provision based on protected speech are

---

[8] If the Court concludes viewpoint-discriminatory laws are not unconstitutional per se, they are still, at minimum, subject to strict scrutiny, which, as explained in the next section, the Revocation and Deportation Provisions cannot survive.

-19-

1    inescapably tied to "the topic [the noncitizen] discussed or the idea or message expressed." *Reed*,

2    576 U.S. at 163. Both provisions fail strict scrutiny.

3         The Deportation Provision and Revocation Provision fail at the outset for lack of a compel-

4    ling interest as applied to noncitizens' protected speech. Attempting to cull dissenting voices from

5    the marketplace of ideas is not a legitimate government interest. As the Supreme Court explained

6    just last year, "suppression of free expression … is not [a] valid, let alone substantial" government

7    interest. *Moody*, 603 U.S. at 740; *accord* Jefferson, A Bill for Establishing Religious Freedom, *supra*

8    ("The opinions of men are not the object of civil government, nor under its jurisdiction."); 4 Annals

9    of Cong. 934 (Madison: "Opinions are not the objects of legislation."). Nor may the government

10   talismanically invoke foreign policy to establish a compelling governmental interest. "The First

11   Amendment requires a more careful assessment and characterization of an evil" to justify a

12   "sweeping" regulation of protected speech. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803,

13   819 (2000). That means the government must provide clarity on the interest before a court can decide

14   whether it is compelling. *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002).

15        If the government seeks to justify the Revocation and Deportation Provisions on the theory

16   that they promote a statutory interest in "United States foreign policy," 8 U.S.C. § 1182(a)(3)(C)(iii),

17   that is too broad and nebulous to pass constitutional muster. The government has described

18   America's foreign policy "interests" in myriad ways. *See Khalil*, 2025 WL 1514713, at *46 (listing

19   33 foreign policy "interests" identified in various governmental statements). Would the

20   government's statutory interest in its foreign policy allow it to ban noncitizens from expressing

21   support for foreign companies? *Id.* (noting America's foreign policy interest in "ensuring the global

22   economic competitiveness of American companies"). Would it allow banning noncitizens from

23   criticizing Israel's attack on Iranian nuclear sites? *Id.* (noting America's foreign policy interest in

24   "preventing nuclear proliferation"). One cannot know, the *Khalil* court explained, because the

25   supposed governmental interest is "both enormously broad and fuzzy at [its] edges." *Id.* at *48. And

26   "it is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." *Minn.*

27   *Voters All. v. Mansky*, 585 U.S. 1, 22 (2018) (cleaned up).

28

When the government seeks to regulate speech, "it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* But the only objective of invoking the Revocation or Deportation Provisions based on protected speech is silencing expression the government disfavors. And when an interest "is very much related to the suppression of free expression," it is not a valid government interest. *Moody*, 603 U.S. at 740; *see also Texas v. Johnson*, 491 U.S. 397, 416 (1989) ("[T]he government may not prohibit expression simply because it disagrees with its message… .") Even the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002).

In addition to lacking a compelling governmental interest (let alone advancing one), the Provisions are not tailored *at all*. The Deportation Provision lacks meaningful tailoring in permitting deportation based on any "beliefs, statements, or associations." 8 U.S.C. § 1182(a)(3)(C)(iii). It lacks time tailoring, too, encompassing the noncitizen's "past, current, *or expected*" protected speech. *Id.* (emphasis added). That's right: The Deportation Provision allows the Secretary of State to trigger the deportation of a noncitizen based on *protected* speech the Secretary *thinks* the noncitizen *might* espouse in the future. And it lacks factual tailoring, applying to whatever protected activity Secretary Rubio thinks (but need not prove) "would compromise a compelling United States foreign policy interest." *Id.*; *see also Massieu v. Reno*, 915 F. Supp. 681, 710 (D.N.J.) (noting that under the Deportation Provision the Secretary need only claim, rather than prove, a deportation is necessary for the provision to be satisfied), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). That is not narrow tailoring. It is not *any* tailoring. It is carte blanche, unreviewable authority to retaliate against government critics or those who hold (or may espouse) the "wrong" opinions.

Worse still, the Revocation Provision is a poster child for lack of tailoring when it comes to protected speech. It allows the Secretary to "at any time, in his discretion, revoke" a "visa or other documentation." 8 U.S.C. § 1201(i). It can apply to any action, including protected speech. *See, e.g.*, *Ozturk*, 2025 WL 1145250, at *2, *18. As with the Deportation Provision, the Secretary need not

provide a justification, nor supporting proof, for his decision to revoke a lawfully present noncitizen's visa. The government, again, cannot justify such broad and unrestrained powers.

Contrast the Revocation and Deportation Provisions with the material support for terrorism statute in *Holder*, which the Court held was narrowly tailored. In reaching this conclusion, it stressed how Congress was "conscious of its own responsibility to consider how its actions may implicate constitutional concerns," in that it limited the statute to apply only "to designated foreign terrorist organizations," provided "narrowing definitions" of prohibited actions, included "an explanation of the knowledge required," and created "limited exceptions," excluding "medicine and religious materials." 561 U.S. at 28, 35–36. And "most importantly," it "avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* at 36. Neither the Revocation Provision nor the Deportation Provision contain *any* limitations, much less limitations to protect against intrusions on protected speech.

The Revocation and Deportation Provisions are unconstitutional as applied to protected speech because the government could serve its purposes unrelated to protected speech through less restrictive means. "If a less restrictive alternative would serve the Government's purpose," it "must use that alternative." *Playboy Ent. Grp.*, 529 U.S. at 813. The government cannot justify the Deportation and Revocation Provisions with protestations it is trying to exclude "terrorists," as the INA has a separate deportation ground for noncitizens "engage[d] in a terrorist activity." *See* 8 U.S.C. § 1227(a)(1)(B); *id.* § 1182(a)(3)(B)(i)(I). That satisfies any purported interest in combatting "terrorism" without intruding on speech. And the government can still use the INA to deport any noncitizen whose entry or presence in the United States the Secretary has "reasonable ground" *unrelated to his speech activities* "to believe" would "have potentially serious adverse foreign policy consequences for the United States." *See id.* § 1227(a)(4)(B)(i). All told, the Revocation and Deportation Provisions are not the least restrictive means of addressing any legitimate government interest, *especially* as applied to protected speech.

1      **D.**      **The Revocation and Deportation Provisions are unconstitutionally vague as**

2      **applied to protected speech.**

3           Even if the Revocation and Deportation Provisions could avoid viewpoint discrimination

4      and survive strict scrutiny as applied to protected speech, they are unconstitutionally vague under

5      the Fifth Amendment in that application. The prohibition on vague speech regulations serves two

6      primary purposes: "guarantee[ing] that ordinary people have 'fair notice' of the conduct a statute

7      proscribes" and "guard[ing] against arbitrary or discriminatory law enforcement by insisting that a

8      statute provide standards." *Sessions*, 584 U.S. at 156 (plurality op.). This ensures "Congress, rather

9      than the executive or judicial branch, define what conduct is sanctionable and what is not." *Id.*

10     Where, as here, a law "is capable of reaching expression sheltered by the First Amendment," the

11     vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v.*

12     *Goguen*, 415 U.S. 566, 573 (1974). That is because "[u]ncertain meanings inevitably lead citizens

13     to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly

14     marked," distorting the marketplace of ideas through self-censorship. *Grayned v. City of Rockford*,

15     408 U.S. 104, 109 (1972) (cleaned up). Here, the Revocation and Deportation Provisions are

16     unconstitutional because they grant the Secretary unfettered discretion to revoke visas and render

17     noncitizens deportable based on protected speech and give noncitizens like Plaintiffs and their

18     noncitizen members no notice of what triggers those consequences.

19          The government faces a doubly stringent standard here, as the Revocation and Deportation

20     Provisions affect noncitizens' immigration status. Because deportation is a "drastic measure, often

21     amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to

22     criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (cleaned up) (applying

23     heightened vagueness test to invalidate an INA provision). Held to this stringent standard (and even

24     the normal standard), both provisions are void for vagueness as to protected speech.

25          The Deportation Provision is unconstitutionally vague on its face as applied to protected

26     speech as it provides noncitizens no guidance when their expression "compromises a compelling

27     United States foreign policy interest" while affording Secretary Rubio standardless, limitless

28     discretion to decide when someone's opinion crosses that imaginary line. As to how it leaves

-23-

noncitizens guessing, the Deportation Provision provides no "statutory definitions, narrowing context, or settled legal meanings" as guidance. *United States v. Williams*, 553 U.S. 285, 306 (2008). The core of the vagueness doctrine is that people should not have to "guess" whether they are violating the law, *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964), but that is precisely what the Deportation Provision requires noncitizens to do. The only safe way to avoid its reach is to refrain from criticizing the government, which is a profoundly un-American approach to free speech.

As another court explained in holding the Deportation Provision unconstitutionally vague, the "nation's foreign policy is an ever-changing amalgamation of interests … often known only to the Secretary, himself." *Massieu*, 915 F. Supp. at 701 *rev'd on other grounds*, 91 F.3d 416. That necessitates guesswork. But even *declared* government policies offer insurmountable challenges. If the government seeks warmer relations with China, must noncitizens curtail criticism of China's human rights abuses? Now that tariffs are a significant aspect of American foreign policy, must noncitizens self-censor criticism of their impact on the economy? Regardless of whether the policy is rolled out in the State of the Union Address or classified and known only to a select few, the Deportation Provision makes it impossible for noncitizens to know how to avoid risking deportation.

The Deportation Provision also lacks *any* guidance to ensure the Secretary does not act in an arbitrary or discriminatory way. The vagueness doctrine requires "a legislature establish minimal guidelines to govern law enforcement," *Kolender v. Lawson,* 461 U.S. 352, 358 (1983) (quoting *Smith*, 415 U.S. at 574), to prevent "arbitrary and erratic" applications of the law, *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972). But the Deportation Provision contains no such guidelines. The phrase "compromises a compelling foreign … policy interest" means whatever Secretary Rubio wants it to mean. The administration can thus enforce—and has enforced—the Deportation Provision in any way it wants, going after specific speech it disfavors and conclusorily claiming it implicates a foreign policy interest. *See Khalil*, 2025 WL 1514713, at *42–44; Resp. in Opp. to Mot. for Release Ex. A at 2, *Mahdawi*, 2025 WL 1243135 (No. 25-cv-389), ECF No. 42-1.

Likewise with the Revocation Provision, lacking *any* standard. It gives the Secretary of State power to "at any time, in his discretion, revoke [a] visa or other documentation." 8 U.S.C. § 1201(i). That unchecked power violates the Supreme Court's vagueness doctrine as applied to protected

-24-

speech for the same reasons as the Deportation Provision. *See Kolender*, 461 U.S. at 360. Secretary Rubio's actions towards pro-Palestinian speakers show what happens when the dangers of vague laws become reality: unfettered arbitrary enforcement against critics, and rampant self-censorship. Noncitizens like the Doe Plaintiffs and Stanford Daily's writers self-censor to avoid government retribution. That is no way for our "liberty-loving" society to operate. *Bridges*, 314 U.S. at 263.

### III.    Irreparable harm, the balance of equities, and the public interest favor an injunction.

Because Plaintiffs are likely to succeed on the merits or, at the very least, have raised "serious questions" going to their claims' merits, they have demonstrated irreparable harm. *Cottrell*, 632 F.3d at 1135; *see Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (holding irreparable harm "follows inexorably" from a "conclusion that the government's current policies are likely unconstitutional"). That also shows "both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also X Corp.*, 116 F. 4th at 904 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") Plaintiffs are accordingly entitled to preliminary injunctive relief.

### IV.    The Court should waive the bond requirement.

Because Plaintiffs seek to vindicate their constitutional rights, the Court should not require a bond. Under Federal Rule of Civil Procedure 65(c), courts have broad discretion "as to the amount of security required, *if any*," for a preliminary injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (cleaned up). In cases raising constitutional questions, courts typically exercise their discretion to decline to impose a bond. *See, e.g., Fink v. Kirchmeyer*, 720 F. Supp. 3d 780, 792 (N.D. Cal. 2024) (declining to require a bond when granting a preliminary injunction on First Amendment grounds). If a bond is necessary, Plaintiffs request a nominal $1 bond.

### CONCLUSION

Plaintiffs request this Court grant their motion for a preliminary injunction preventing the government from using the Revocation Provision to revoke the visas or other documentation of Plaintiffs and/or their noncitizen members for engaging in protected speech. Plaintiffs also request preliminary factual findings and legal conclusions that the Revocation and Deportation Provisions are unconstitutional if applied to resident noncitizens' protected speech.

Dated: August 6, 2025

Respectfully Submitted,

/s/ *Marc Van Der Hout*
Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application pending

*Counsel for Plaintiffs*