Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>       *Defendants*. | Case No. 5:25-cv-06618-NW<br><br>**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       November 19, 2025<br>Time:      9:00 AM<br>Courtroom: 3, 5th Floor<br><br>Judge Noël Wise |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ..........................................................................................................1

ARGUMENT ..................................................................................................................3

I.    Plaintiffs have standing to challenge the Revocation and Deportation Provisions. ...............3

    A.    The Doe Plaintiffs have individual standing. ..............................................4

        1.    The Doe Plaintiffs intend to engage in constitutionally protected speech. ...................................................................................... 5

        2.    The Doe Plaintiffs' intended conduct is proscribed by the Provisions. ........ 5

        3.    The Doe Plaintiffs face a substantial threat of future enforcement. .............. 6

    B.    Stanford Daily has associational, corporate, and organizational standing. ...............10

        1.    Stanford Daily has associational standing. ................................... 10

        2.    Stanford Daily has corporate standing. ........................................ 12

        3.    Stanford Daily has organizational standing. ................................. 13

II.    The Revocation and Deportation Provisions violate the First Amendment. ........................14

    A.    The First Amendment prohibits the government from punishing speakers because of their views. ..................................................................14

    B.    The government gets no deference regarding the constitutional scope of immigration authority ...............................................................18

    C.    The Revocation and Deportation Provisions violate the First Amendment with respect to protected speech ...............................................20

III.    The Revocation and Deportation Provisions are unconstitutionally vague. ........................23

IV.    Plaintiffs require a unique order to preserve Claims II and IV for Supreme Court consideration. ...............................................................25

CONCLUSION ...............................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ................................................................................................. 9

4

5

*Act Now to Stop War & End Racism Coal. v. District of Columbia,*
   846 F.3d 391 (D.C. Cir. 2017) ............................................................................... 24

6

7

*Am. Ass'n of Univ. Professors v. Rubio,*
   780 F. Supp. 3d 350 (D. Mass. 2025) .................................................................... 17

8

*Am. Ass'n of Univ. Professors v. Rubio,*
   No. CV 25-10685, 2025 WL 2777659 (D. Mass. Sept. 30, 2025)....................... passim

9

10

*Am. Encore v. Fontes,*
   152 F.4th 1097 (9th Cir. 2025).................................................................. 6, 8, 9, 10

11

12

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
   70 F.3d 1045 (9th Cir. 1995).......................................................... 1, 15, 16, 17

13

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh,*
   970 F.2d 501 (9th Cir. 1991)................................................................................ 10

14

15

*Ashcroft v. ACLU,*
   535 U.S. 564 (2002) .............................................................................................. 14

16

17

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012)............................................................................ 22

18

*Bd. of Cnty. Comm'rs v. Umbehr,*
   518 U.S. 668 (1996) .............................................................................................. 22

19

20

*Biden v. Texas,*
   597 U.S. 785 (2002) .............................................................................................. 25

21

22

*Bluman v. FEC,*
   565 U.S. 1104 (2012) ........................................................................................... 18

23

*Bluman v. FEC,*
   800 F. Supp. 2d 281 (D.D.C. 2011) ............................................................... 16, 17

24

25

*Boutilier v. INS,*
   387 U.S. 118 (1967) .............................................................................................. 24

26

27

*Bridges v. Wixon,*
   326 U.S. 135 (1945) ....................................................................................... passim

28

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ................................................................................................ 12

*Collin v. Smith*,
   578 F.2d 1197 (7th Cir. 1978) ............................................................................... 22

*Columbia Basin Apartment Ass'n v. City of Pasco*,
   268 F.3d 791 (9th Cir. 2001) ................................................................................. 12

*Demore v. Kim*,
   538 U.S. 510 (2003) ................................................................................................ 23

*Dennis v. United States*,
   341 U.S. 494 (1951) ................................................................................................ 17

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................................ 12

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) ................................................................................. 16

*Ex parte Milligan*,
   71 U.S. 2 (1866) ....................................................................................................... 2

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................................................ 12

*FEC v. Cruz*,
   596 U.S. 289 (2022) .................................................................................................. 6

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) .................................................................................. 21

*First Nat'l Bank of Bos. v. Bellotti*,
   435 U.S. 765 (1978) ................................................................................................ 17

*Flaxman v. Ferguson*,
   151 F.4th 1178 (9th Cir. 2025) ............................................................................... 5

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) ................................................................................................ 15

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ................................................................................. 24

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. 461 (2025) .......................................................................................... 21, 22

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................................................ 17

-iii-

*Hellenic Lines, Ltd. v. Rhoditis*,
    398 U.S. 306 (1970) ................................................................................ 16

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ............................................................................ passim

*Humane Soc'y of U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ................................................................ 11

*Ibrahim v. DHS*,
    669 F.3d 983 (9th Cir. 2012) ................................................................. 16

*Ind. Right to Life Victory Fund v. Morales*,
    112 F.4th 466 (7th Cir. 2024) .................................................................. 4

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) .............................................................................. 19

*INS v. Chadha*,
    462 U.S. 919 (1983) ...................................................................... 20, 23

*Isaacson v. Mayes*,
    84 F.4th 1089 (9th Cir. 2023) ................................................................. 7

*Jordan v. DeGeorge*,
    341 U.S. 223 (1951) .............................................................................. 24

*Khalil v. Trump*,
    784 F. Supp. 3d 705 (D.N.J. 2025) ....................................................... 25

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953) .................................................................. 1, 15, 16

*Lew v. Kona Hosp.*,
    754 F.2d 1420 (9th Cir. 1985) ................................................................. 5

*Loper Bright Enterp. v. Raimondo*,
    603 U.S. 369 (2024) .............................................................................. 19

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010) ........................................................... 7, 8, 9

*Mahdawi v. Trump*,
    136 F.4th 443 (2d Cir. 2025) .................................................................. 8

*Mahdawi v. Trump*,
    781 F. Supp. 3d 214 (D. Vt. 2025) ...................................................... 3, 9

*Mahler v. Eby*,
    264 U.S. 32 (1924) ................................................................................ 24

*Marbury v. Madison,*
    5 U.S. 137 (1803) ................................................................................ 18, 20

*Massieu v. Reno,*
    915 F. Supp. 681 (D.N.J.) ................................................................................ 25

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................................ 21

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ................................................................................ 12, 22

*NAACP v. Button,*
    371 U.S. 415 (1963) ................................................................................ 12

*Nat'l Inst. of Family and Life Advocs. v. Becerra,*
    585 U.S. 755 (2018) ................................................................................ 21

*OPAWL v. Yost,*
    118 F.4th 770 (6th Cir. 2024) ................................................................................ 17, 18

*Ozturk v. Trump,*
    779 F. Supp. 3d 462 (D. Vt. 2025) ................................................................................ 8

*Palestine Info. Off. v. Shultz,*
    853 F.2d 932 (D.C. Cir. 1988) ................................................................................ 23

*Peace Ranch, LCC v. Bonta,*
    93 F.4th 482 (9th Cir. 2024) ................................................................................ 5, 6

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador,*
    122 F.4th 825 (9th Cir. 2024) ................................................................................ 5, 7

*Presidio Golf Club v. Nat'l Park Serv.,*
    155 F.3d 1153 (9th Cir. 1998) ................................................................................ 11

*Project Veritas v. Schmidt,*
    125 F.4th 929 (9th Cir. 2025) ................................................................................ 7

*Qatanani v. Att'y Gen.,*
    144 F.4th 485 (3d Cir. 2025) ................................................................................ 16

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................................ 21

*Regal Knitwear Co. v. NLRB,*
    324 U.S. 9 (1945) ................................................................................ 8

*Reno v. Am-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ................................................................................ 16

-v-

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ................................................................................................ 18

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ........................................................................................... 23, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ................................................................................................ 10

*Suri v. Trump*,
  No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) ............................................. 9

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ......................................................................................... 4, 5, 10

*Thomas v. Anchorage Equal Rts. Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) ............................................................................. 4, 10

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ................................................................................. 5, 6

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ................................................................................................ 22

*United States v. Robel*,
  389 U.S. 258 (1967) ................................................................................................ 20

*United States v. Singh*,
  979 F.3d 697 (9th Cir. 2020) ................................................................................... 18

*United States v. Stevens*,
  559 U.S. 460 (2010) ..................................................................................... 2, 8, 9, 23

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ................................................................................... 7

*Vasquez Perdomo v. Noem*,
  148 F.4th 656 (9th Cir. 2025) .................................................................................. 12

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ..................................................................... 18, 19, 22

*Younger v. Harris*,
  401 U.S. 37 (1971) .................................................................................................. 10

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ........................................................................................... 20, 23

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ........................................................................................... 19, 20

-vi-

**Statutes**

8 U.S.C.
    § 1182(a)(3)(C)(iii) ............................................................................... 3, 6, 7
    § 1201(i) ................................................................................................ 3, 6, 7
    § 1227(a)(4)(C)(i) .................................................................................... 3, 6
    § 1227(a)(4)(C)(ii) ................................................................................... 3, 6
    § 1252(f) ..................................................................................................... 25

**Rules**

Fed. R. Civ. P. 65(d)(2) ....................................................................................... 8

**Treatises**

1 Smolla & Nimmer on Freedom of Speech
    § 10:19 ....................................................................................................... 17

**Congressional Records**

4 Annals of Cong. 934 (1794) ............................................................................ 14

**Other Authorities**

9 FAM
    403.11-5(A) .............................................................................................. 24
    403.11-5(B) .............................................................................................. 24
    403.11-5(B)(a) .......................................................................................... 24

Charles Slack,
    *Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech* (2015) ........ 15

George Parker Winship,
    *Two or Three Boston Papers*, 14 Papers Bibliographical Soc'y Am. 57 (1920) ....................... 15

Hans A. Linde,
    *"Clear and Present Danger" Reexamined: Dissonance in the Brandenburg Concerto*,
    22 Stan. L. Rev. 1163 (1970) ................................................................... 17

Jenny Graham,
    *Revolutionary in Exile: The Emigration of Joseph Priestley to America 1794–1804*
    (1995) ........................................................................................................ 15

Jud Campbell,
    *Natural Rights and the First Amendment*, 127 Yale L.J. 246 (2017) ......................... 14

Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789) ....................... 1, 14

Philadelphia Naturalization Records (P. William Filby ed., 1982) ................................. 15

Stephen D. Solomon,
    *Revolutionary Dissent: How the Founding Generation Created the Freedom of Speech*
    (2016) .................................................................................................................... 15

Thomas Jefferson,
    Kentucky Resolutions of 1798 and 1799, *reprinted in* 4 *The Debates in the Several State
    Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 2d ed.,
    Philadelphia, J.B. Lippincott 1888)............................................................................ 2

PLAINTIFFS' COMBINED RESPONSE AND REPLY          CASE NO. 5:25-cv-06618-NW

**INTRODUCTION**

America is different. Over the centuries, as the world's nations jailed, censored, and exiled unpopular speakers in the name of some pressing interest, we charted a different course. In our country, Thomas Jefferson explained, "the rights of thinking, and publishing our thoughts by speaking or writing" are inalienable rights belonging to the individual and never surrendered to a government's control.[1] To protect those inalienable rights, the Founders crafted the First Amendment, ensuring that "Congress shall make no law" abridging the right of individuals to think and speak for themselves. The Bill of Rights' opening command, forged when noncitizen Europeans were some of the most prolific and controversial commentators of the day, makes no "distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring)).

Simply put: "Freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148. So when Defendants Secretary of State Marco Rubio and Secretary of Homeland Security Kristi Noem tell the Court that legally present noncitizens have only the First Amendment rights the Trump administration gives them, the administration is legally and historically wrong. As the Ninth Circuit explained in holding the Constitution protects against deportation for protected speech, "If aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill" their willingness to speak. *Am.-Arab Anti-Discrimination Comm. v. Reno* (*AADC*), 70 F.3d 1045, 1065–66 (9th Cir. 1995).

The government concedes the Revocation and Deportation Provisions allow it to revoke visas and initiate deportation proceedings based on protected speech, so this Court should enjoin and declare them unconstitutional as to protected speech. The Provisions, coupled with the administration's threat (and record) of revoking visas and trying to deport those who express "anti-Israel" or "anti-American" views, cast a suffocating chill over noncitizens' political expression.

---

[1] Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/4XJC-WFFW.

On September 30, 2025, Senior District Judge William G. Young of the District of Massachusetts, calling the case "perhaps the most important ever to fall within the jurisdiction of this district court," found "by clear and convincing evidence" that Secretaries Rubio and Noem "deliberately and with purposeful aforethought" violated the First Amendment by targeting noncitizens for visa revocation and deportation based on protected speech, like coauthoring a student newspaper editorial criticizing Israel and chanting "from the river to the sea, Palestine will be free." *Am. Ass'n of Univ. Professors v. Rubio* (*AAUP*), No. CV 25-10685, 2025 WL 2777659, at *1–2, *19–20, *25 (D. Mass. Sept. 30, 2025). He called Rubio's and Noem's actions "not only unconstitutional, but a thing virtually unknown to our constitutional tradition." *Id.* at *46.

Plaintiffs Jane and John Doe, who engage in pro-Palestinian advocacy, and the noncitizen writers and editors at Plaintiff Stanford Daily, who publish the Stanford student newspaper that covers the impact of the war in Gaza on campus, fear visa revocation and deportation if their expression lands on the administration's radar. But in a Hail Mary attempt to attack Plaintiffs' standing, the administration promises the Court it will not use the statutes against protected speech. This pledge is hollow. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Thomas Jefferson put it more bluntly: "In questions of power, then, let no more be said of confidence in man, but bind him down from mischief by the chains of the Constitution."[2] In America, the Constitution, not "trust us" assurances from the government, is what guarantees liberty.

The Constitution "is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. 2, 120–21 (1866). Supreme Court and Ninth Circuit precedent make clear that shield extends to noncitizens and protects them from deportation for exercising their freedom of speech. The Court should accordingly grant Plaintiffs summary judgment.

---

[2] Thomas Jefferson, Kentucky Resolutions of 1798 and 1799, *reprinted in* 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 543 (Jonathan Elliot ed., 2d ed., Philadelphia, J.B. Lippincott 1888) [https://perma.cc/Z7ND-FDVL].

PLAINTIFFS' COMBINED RESPONSE AND REPLY    CASE NO. 5:25-cv-06618-NW

**ARGUMENT**

**I.    Plaintiffs have standing to challenge the Revocation and Deportation Provisions.**

Because the Trump administration has promised to use the Revocation and Deportation Provisions to target lawfully present noncitizens like Plaintiffs and their members for protected speech, has used the Provisions to that end, and publicly promises to keep doing so, Plaintiffs have standing to challenge them.[3] In fact, Plaintiffs engage in the very type of protected speech the government has targeted: criticism of American and Israeli foreign policy.

The Court need not take Plaintiffs' word for it. Following a lengthy bench trial featuring testimony from high-ranking State Department and Department of Homeland Security officials, Judge Young found as fact that "Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated." *AAUP*, 2025 WL 2777659, at *46. Likewise, in the case of Mohsen Mahdawi, a Columbia University graduate student the government is attempting to deport for protected pro-Palestinian advocacy, Judge Crawford of the District of Vermont explained, "Legal residents—not charged with crimes or misconduct—are being arrested and threatened with deportation for stating their views on the political issues of the day." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 233 (D. Vt. 2025).

This is precisely what President Trump promised his administration would do. He vowed to deport "any student that protests" and revoke visas of "antisemitic" students. *See* Decl. of Conor Fitzpatrick ("Fitzpatrick Decl.") Exs. A, B, Dkt. Nos. 12–14. Secretary Rubio committed that "people that are supportive of movements that run counter to the foreign policy of the United States" are subject to visa revocation and deportation. *AAUP*, 2025 WL 2777659, at *33. Officials who carry out administration policy testified that a many types of protected pro-Palestinian speech, including chanting "from the river to the sea, Palestine will be free," calling Israel "an apartheid

---

[3] The Revocation Provision provides that "[a]fter the issuance of a visa or other documentation to any alien, the ... Secretary of State may at any time, in his discretion, revoke such visa or other documentation." 8 U.S.C. § 1201(i). The Deportation Provision authorizes the Secretary of State to trigger deportation proceedings against lawfully present noncitizens for protected speech if he "personally determines" their protected activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i)–(ii).

state," and "criticizing Israel's actions in Gaza," are sufficient to justify action under the Provisions. Fitzpatrick Decl. Ex. D, vol. 1, 32–35. Later, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller promised that officials are "working continuously" to revoke noncitizens' visas for protected speech, calling it "patently false" that "no foreign students are being deported by the Trump State Department and ICE for criticizing the US." Verified Compl. ¶ 64. And this month, the administration bragged on X about revoking visas over protected speech about Charlie Kirk. Suppl. Decl. of Conor Fitzpatrick Ex. P, Dkt. No. 44-1.

Yet now the government's attorneys insist that Plaintiffs lack standing because the Trump administration "do[es] *not* pursue visa revocations and removal proceedings purely based on political speech." Defs. Cross-Mot. and Opp'n ("Opp'n") 15, Dkt. No. 33. In short: Ignore what the Defendants have said—and done—and take on faith that they won't enforce the statute this way. That is not how it works. Courts "reject[] these kinds of just-trust-us arguments" designed to defeat standing. *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024). Plaintiffs engage in exactly the type of speech President Trump, Secretary Rubio, and other officials promise will lead to deportation. Plaintiffs are squarely in Defendants' crosshairs. They have standing.

### A.    The Doe Plaintiffs have individual standing.

The Doe Plaintiffs have standing to challenge the Provisions because they can show traceability, redressability, and injury in fact. The government does not contest that their injuries are traceable to Secretaries Rubio and Noem, who lead the departments charged with enforcement. Nor does it contest that Plaintiffs' injuries would be redressed by an injunction and declaratory judgment against the Provisions by protecting Plaintiffs from having their visas revoked or being rendered deportable based on protected speech. And Plaintiffs demonstrate an injury in fact under the Supreme Court's *Driehaus* test for pre-enforcement challenges because (1) they intend to engage in conduct arguably affected with a constitutional interest, (2) their speech is subject to the Revocation and Deportation Provisions, and (3) there is a credible threat the government will enforce the Provisions against them. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).[4]

---

[4] The government's Opposition tries to frame the Ninth Circuit's *Thomas* decision as the standing test instead of *Driehaus*. Opp'n 14 (citing *Thomas v. Anchorage Equal Rts. Comm'n*, 220

1    **1.    The Doe Plaintiffs intend to engage in constitutionally protected speech.**

2    The Verified Complaint shows the Doe Plaintiffs have engaged in and plan to engage in

3    protected speech about American foreign policy and Israel, including accusing Israel of committing

4    "genocide" and using the slogan "from the river to the sea, Palestine will be free." Verified Compl.

5    ¶¶ 92, 101, 105, 109.[5] The government does not contest that "political speech" is constitutionally

6    protected. *Driehaus*, 573 U.S. at 162. Like past plaintiffs with pre-enforcement standing under

7    *Driehaus*, the Doe Plaintiffs have "specifically plead[ed] [their] intent and allege[d] corroborating

8    past practice." *Peace Ranch, LCC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024).

9    The government tries to characterize Plaintiffs' plans for future speech as "ambigu[ous]."

10   Opp'n 14. But Plaintiffs have no obligation to allege "specific speech they would have made but for

11   the challenged policies." *Flaxman v. Ferguson*, 151 F.4th 1178, 1187 (9th Cir. 2025). Plaintiffs

12   alleged that, prior to the 2025 deportation efforts, they engaged in specific pro-Palestinian speech

13   and that, but for the threat of visa loss and deportation, they would resume.[6] Verified Compl. ¶¶ 92,

14   101, 105, 109. They need not provide a verbatim script of future speech. *Tingley v. Ferguson*, 47

15   F.4th 1055, 1068 (9th Cir. 2022) (Plaintiffs need not "specify 'when, to whom, where, or under what

16   circumstances' they plan to violate the law when they have already violated the law in the past.").

17   **2.    The Doe Plaintiffs' intended conduct is proscribed by the Provisions.**

18   The Doe Plaintiffs' intended pro-Palestinian speech is also "arguably proscribed by" the

19   Revocation and Deportation Provisions. *Driehaus*, 573 U.S. at 162 (cleaned up). That is because, as

20   the government does not contest, the Provisions enable the Secretary of State to revoke a visa and

21   render noncitizens deportable based solely on protected speech about American foreign policy.

22   _____

23   F.3d 1134, 1139 (9th Cir. 2000) (en banc)). But the Ninth Circuit made clear last year that, although
     some decisions "toggled between the *Thomas* and *Driehaus* formulations, we have adopted the

24   Supreme Court's framework in *Driehaus*." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky.
     v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (cleaned up).

25      [5] "A verified complaint may be treated as an affidavit" for summary judgment purposes. *Lew v.
     Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985).

26      [6] The government notes that John Doe has already resumed his protected pro-Palestinian/anti-
     Israel speech. Opp'n 14. A plaintiff that continues speaking has standing to bring a pre-enforcement

27   challenge because the continued speech risks enforcement. *See Flaxman*, 151 F.4th at 1185–86
     (reversing district court's dismissal because professors alleged policies will chill their speech even

28   though they continued engaging in the protected conduct).

The Deportation Provision's plain text allows the Secretary to render deportable lawfully present noncitizens for protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i)–(ii). Noncitizen speakers are thus within its reach if they engage in *any* expression or activity arguably implicating American foreign policy. The Revocation Provision is broader. It allows the Secretary "at any time, in his discretion" to "revoke [a] visa or other documentation." *Id.* § 1201(i). It likewise places no constraints on the Secretary's discretion nor guardrails against revoking visas based on protected speech. "[F]or the purposes of standing, [courts] accept Plaintiffs' interpretation of the statute so long as it is an arguable interpretation." *Am. Encore v. Fontes*, 152 F.4th 1097, 1116 (9th Cir. 2025). And here, the government fails to offer an interpretation placing Plaintiffs' political expression outside the Provisions' reach. *See* Opp'n 3–5. Instead, it expressly adopts Plaintiffs' reading. *See* Opp'n 24 ("That Congress did not limit the discretion to revoke visas and did not define what constitutes 'potentially serious foreign policy consequences' is telling.").

Still, the government insists that the Doe Plaintiffs' protected expression would not "make them subject to visa revocation or removal." Opp'n 14. This is sleight of hand. The government is not arguing that Plaintiffs' expression falls outside the statutes' concededly broad textual scope. Instead, the government is referencing its "trust us" commitment to not enforce those statutes against protected speech. But that pledge is irrelevant to the statutes' reach, the sole concern of *Dreihaus*'s second factor. *See, e.g.*, *Peace Ranch*, 93 F.4th at 489 (discussing *FEC v. Cruz*, 596 U.S. 289 (2022), and rejecting attempt to "defeat standing by conceding that the law does *not* apply" to plaintiffs).

### 3. The Doe Plaintiffs face a substantial threat of future enforcement.

Plaintiffs also face a substantial threat of future enforcement because "the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,'" the Defendants have not "disavowed enforcement," and "there is a 'history of past prosecution or enforcement.'" *Am. Encore*, 152 F.4th at 1118 (quoting *Tingley*, 47 F.4th at 1067).

As shown above, the Trump administration has threatened every noncitizen, which necessarily includes Jane and John Doe, with deportation for engaging in anti-Israel, pro-Palestinian, or anti-American speech. *See* Fitzpatrick Decl. Exs. A–C, E, F, H, O. In September, Judge Young

-6-

found "by clear and convincing evidence" that the administration has "threat[ened] to *continue* detaining, deporting, and revoking visas based on political speech." *AAUP*, 2025 WL 2777659, at *41 (emphasis added). Because Jane Doe is self-censoring to comply with the Provisions, she has a constitutionally recognized injury, even if the government has not threatened her by name. *See Project Veritas v. Schmidt*, 125 F.4th 929, 942 (9th Cir. 2025) (en banc) ("Although Oregon has never threatened Project Veritas with enforcement proceedings, Project Veritas alleges it has self-censored to comply with the statute, which is a constitutionally recognized injury." (cleaned up)). John Doe, too, "may reasonably fear prosecution even if enforcement authorities have not communicated an explicit warning to [him]." *Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 n.5 (9th Cir. 2013) ("[W]e have never held that a specific threat is necessary to demonstrate standing.").

The government argues that "general threats by officials to enforce those laws which they are charged to administer" are insufficient. Opp'n 16 (quoting *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (cleaned up) (citing as an example a sheriff's promise to enforce "all of the laws of San Diego, State, Federal and County")). True, but that general truism does not apply to this case, where the Trump administration explicitly announced it will use, has used, and has promised to keep using the Provisions to revoke visas and initiate deportations based on protected political speech. *See AAUP*, 2025 WL 2777659, at *41; Fitzpatrick Decl. Exs. A–C, E, F, H, O. That is a specific threat, not a general one. *See, e.g.*, *Planned Parenthood*, 122 F.4th at 838 ("Far from a general warning of enforcement, the [enforcer's threat] singled out Idaho health care professionals who perform the specific act of referring patients to abortion providers across state lines." (cleaned up)).

Bafflingly, the government also argues Plaintiffs cannot rely on *the Defendants'* threats because the "initial decisions" about visa revocations or removability "are made by staff in various offices at State and DHS." Opp'n 16. But only the Secretary of State can make the "personal determination" to render noncitizens deportable under the Deportation Provision. 8 U.S.C. § 1182(a)(3)(c)(iii). The Secretary likewise has personal authority to revoke visas under the Revocation Provision. *Id.* § 1201(i). In any event, even if the Secretary could delegate his authority and the statutory command to "personally determine" the Deportation Provision's applicability,

-7-

1    Plaintiffs would still have standing "by virtue of the enforcement authority delegated by the

2    Secretary." *Am. Encore*, 152 F.4th at 1118. "[T]he potential for [lower level] workers to expose

3    individuals to [adverse government action] for exercising First Amendment speech that others find

4    offensive creates its own chilling effect," which "presents enough of a collective threat to create a

5    credible or substantial risk of enforcement." *Id.* at 1119. Plus, Secretaries Rubio and Noem lead and

6    set the policy for their departments, so an injunction against them binds everyone at their agencies.

7    Fed. R. Civ. P. 65(d)(2); *see Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

8         The government argues the Trump administration has "disavowed the applicability of the

9    challenged law to the plaintiffs." Opp'n 15 (citing *Lopez*, 630 F.3d at 788). This is not true. The

10   government points to no instance of President Trump or Secretaries Rubio or Noem committing that

11   visas will not be revoked and deportations will not be predicated on protected speech. Instead, as

12   shown above, officials publicly commit to deporting *more* lawfully present noncitizens for protected

13   expression. *See, e.g.*, Verified Compl. ¶ 61. As evidenced by the State Department's recent visa

14   revocations based on protected speech about Charlie Kirk, they are now *expanding* the range of

15   forbidden topics. *See* Suppl. Decl. of Conor Fitzpatrick Ex. P.

16        The government concedes its nonexistent "disavowal" exists only "in this litigation[]" and

17   in similar litigation. Opp'n 15. Government attorneys saying "no, we won't" while the officials with

18   authority promise "yes, we will" is, unsurprisingly, insufficient to defeat standing. *See Lopez*, 630

19   F.3d at 788 ("[T]he government's disavowal[s] must be more than a mere litigation position."). Even

20   in litigation, the government continues to pursue the deportations of Mr. Mahdawi and Ms. Öztürk

21   *solely* for protected speech, with no alternate bases asserted in court. *See, e.g.*, *Mahdawi v. Trump*,

22   136 F.4th 443, 447 (2d Cir. 2025) ("The government does not at this time assert that his speech was

23   not protected by the First Amendment."); *Ozturk v. Trump*, 779 F. Supp. 3d 462, 490 (D. Vt. 2025)

24   ("The only specific act cited by the government so far … is her co-authored op-ed.").

25        The government's gambit to defeat standing by promising that the Doe Plaintiffs will not be

26   deported for protected expression amounts to nothing more than the government "invoking its

27   prosecutorial discretion" to pledge Plaintiffs will not be punished for their speech. *Stevens*, 559 U.S.

28   at 480. Courts will not "uphold an unconstitutional statute merely because the Government promises

-8-

to use it responsibly." *Id.* Rather, a government "assurance that it will apply [a statute] far more restrictively than its language provides is pertinent only as an implicit acknowledgement of the potential constitutional problems with a more natural reading." *Id.*

Past enforcement of the Provisions also supports standing. *See Am. Encore*, 152 F.4th at 1118. The government argues "neither individual Plaintiff claims (much less submits evidence) that they have been subject to enforcement under the statutes." Opp'n 14. Yes, that is why they bring a *pre*-enforcement challenge. When considering past enforcement, "the plaintiffs themselves need not be the direct target of government enforcement." *Lopez*, 630 F.3d at 786. Rather, "past enforcement against parties similarly situated to the plaintiffs" supports pre-enforcement standing. *Id.* at 786–87; *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (noting "history of past enforcement against nearly identical conduct" helped establish a credible threat (quotation marks omitted)).

The government has enforced the Provisions against similarly situated legally present noncitizens who engage in protected expression nearly identical to that of the Doe Plaintiffs. Secretary Rubio invoked the Deportation Provision against Mr. Mahdawi because he used the slogan "from the river to the sea, Palestine will be free" and led "pro-Palestinian protests." Resp. in Opp. to Mot. for Release Ex. A, at 2, *Mahdawi*, 781 F. Supp. 3d 214 (No. 25-cv-389), Dkt. No. 42-1; *AAUP*, 2025 WL 2777659, at *19–22; *see also* Verified Compl. ¶¶ 92, 105 (describing how the Doe Plaintiffs have used and intend to continue using the same slogan). Rubio enforced the Deportation Provision against Mr. Khalil because he participated in pro-Palestinian protests. Reply to Resp. to Mot. for Prelim. Inj. Ex. E, at 7, *AAUP*, 2025 WL 2777659 (No. 25-cv-10685), Dkt. No. 68-6; *see also* Verified Compl. ¶ 104 (describing how John Doe has and intends to continue participating in protests). He enforced the Deportation Provision against Dr. Badar Khan Suri for pro-Palestinian speech and never contested "that [he] detained Suri in retaliation for his First Amendment activity." *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *4 (4th Cir. July 1, 2025); *see also* Verified Compl. ¶¶ 92, 101, 104, 109 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian speech). And his department enforced the Revocation Provision against Ms. Öztürk because she "protest[ed] Tufts' relationship with Israel" in a student newspaper op-ed and engaged in other pro-Palestinian "activities and associations." *AAUP*, 2025 WL 2777659, at *26;

-9-

*see also* Verified Compl. ¶¶ 92, 101, 107, 109 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian advocacy, including through journalism and social media). The Doe Plaintiffs do not want to (and need not) find themselves in the same position facing deportation.

The government, like the unsuccessful respondents in *Driehaus*, relies on *Younger v. Harris*, which involved intervenors who alleged a leafleteer's prosecution "inhibited" their speech but—critically—not that their own prosecutions were "likely, or even that a prosecution is remotely possible." *Younger v. Harris*, 401 U.S. 37, 42 (1971). "That is not this case." *Driehaus*, 573 U.S. at 166. The Doe Plaintiffs have alleged they face a credible and imminent threat of visa revocation and deportation because the government is attempting to deport noncitizens like them for protected pro-Palestinian speech like theirs. That is what *Driehaus* requires for pre-enforcement standing. *See also Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991) (finding standing for individual plaintiffs in First Amendment challenge to immigration statute by distinguishing *Younger* and noting past enforcement under the challenged statute "underscores the government's willingness" to use it against noncitizens for protected and unprotected activities).[7]

## B.    Stanford Daily has associational, corporate, and organizational standing.

### 1.    Stanford Daily has associational standing.

Stanford Daily is a "genuine membership organization" and qualifies for associational standing because it is "a validly incorporated 501(c)(3) nonprofit with [a number of] members who joined voluntarily to support its mission." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 200–01 (2023) (quotation marks omitted). The government's invented limitation—that the doctrine applies only to "an advocacy organization," Opp'n 12—is absent in the law. Rather, in *SFFA*, the Court made clear that "a voluntary membership organization with identifiable members" qualifies for associational standing. 600 U.S. at 201. That's Stanford Daily. Verified Compl. ¶ 66 ("Stanford Daily is a voluntary membership organization.").

Stanford Daily fulfills all three requirements for associational standing. First, its noncitizen members have standing to sue in their own right because they, like the Doe Plaintiffs, face a credible

---

[7] Plaintiffs have standing even if the Court incorrectly uses the *Thomas* test, *see supra* note 3, because *Driehaus* incorporates its "relevant elements," *Am. Encore*, 152 F.4th at 1114 n.8.

threat of future enforcement based on speech and journalism about American foreign policy which is traceable to Defendants and redressable by the Court. *See supra* Subpart A. Even a news article (or, like with Ms. Öztürk, an op-ed) *about* American foreign policy, Israel, or Palestine can provide a basis for revoking the journalist's visa or for the Secretary of State personally determining the news coverage endangers American foreign policy and initiating deportation proceedings against the noncitizen writer. *See* Opp'n 24 ("That Congress did not limit the discretion to revoke visas and did not define what constitutes 'potentially serious foreign policy consequences' is telling.").

Second, the free speech interests Stanford Daily seeks to protect—the ability to write and publish without fear of adverse immigration action—are germane to its purpose as a newspaper, which is "to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions." Verified Compl. ¶ 69. Stanford Daily's "individual members' interests" in covering all campus issues, including ones related to American and Israeli foreign policy, "are largely identical to the organization's goals." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998). The government argues Stanford Daily needs a "special focus on international students or immigration issues" for its interests to be germane. Opp'n 12–13. But the government cites no authority requiring such a showing. Stanford Daily, like many news organizations, covers a wide variety of stories. There is no specialization prerequisite for standing because "the germaneness requirement" requires "mere pertinence between litigation subject and organizational purpose," which the Ninth Circuit stresses is an "undemanding" standard. *Presidio Golf Club*, 115 F.3d at 1159 (quoting *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). Ensuring Stanford Daily's noncitizen writers and editors will not face deportation for covering the news is "pertinent" to its purpose of reporting news and conveying student opinion.

Finally, Stanford Daily's members' participation is unnecessary. Its harms are based on its noncitizen members refusing assignments and quitting the paper to avoid writing about the war in Gaza out of fear the Trump administration will revoke their visas or target them for deportation. Verified Compl. ¶¶ 72–88. Neither the constitutional question (whether the government can render noncitizens deportable or revoke visas based on protected speech) nor the requested relief (declarations and injunctions) require Stanford Daily members' individual participation. *See*

-11-

1   *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) ("Because

2   [injunctive and declaratory] relief do not require individualized proof, the third [requirement] is

3   satisfied."); *Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025) ("As a general matter,

4   membership organizations may bring constitutional claims on behalf of their members.").[8]

5   **2.   Stanford Daily has corporate standing.**

6   Stanford Daily, "which [is] composed of human beings with First Amendment rights,

7   possess[es] First Amendment rights [itself]." *Moody v. NetChoice, LLC*, 603 U.S. 707, 746–47

8   (2024) (Barrett, J., concurring). So when the government infringes on the rights of noncitizens "who

9   are associated with [Stanford Daily] in one way or another," Stanford Daily has standing "to protect

10   the right[s] of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014);

11   *see also NAACP v. Button*, 371 U.S. 415, 428 (1963) (holding corporation can "assert [its members']

12   right on its own behalf, because, though a corporation, it is directly engaged in those activities,

13   claimed to be constitutionally protected, which the statute would curtail"). Its corporate standing is

14   not premised on "intervening third-party decisions," as the government wrongly claims, Opp'n 13;

15   it is premised on the effect the government's use of the Provisions against noncitizens for protected

16   speech has on Stanford Daily's writers and editors. These people are not third parties but "the human

17   beings" without which Stanford Daily "cannot do anything at all." *Hobby Lobby*, 573 U.S. at 707.

18   Even if its writers and editors are third parties, Stanford Daily still has standing because its

19   injuries remain traceable to Defendants, which in this context requires only that "third parties will

20   likely react in predictable ways" to the government's action. *Dep't of Com. v. New York*, 588 U.S.

21   752, 768 (2019). And third parties' predictable reaction to the government's enforcement of the

22   Revocation and Deportation Provisions has been self-censorship, harming Stanford Daily's ability

23   to associate with noncitizen writers, editors, and interviewees. *See* Verified Compl. ¶¶ 72–85.

24

25   ───────────────

    [8] The government also asserts "[t]here are reasons to doubt the continued viability of the

26   associational-standing doctrine," citing Justice Thomas's concurrence in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 398 (2024). Opp'n 12. No other Justice has publicly shared

27   Justice Thomas's doubts, and Justice Thomas admits "the Court's precedents" permit associational standing. *All. for Hippocratic Med.*, 602 U.S. at 398. The Ninth Circuit has continued to uphold

28   associational standing. *See, e.g.*, *Vasquez Perdomo*, 148 F.4th at 676–77.

-12-

Garry Kasparov's and Uriel Epshtein's declarations provide additional evidence of noncitizens' predictable reactions. Kasparov is one of the most prominent Russian dissidents of the last century and fled Russia after his criticism of the country's slide towards autocracy under Vladimir Putin caused him to fear for his safety. Decl. of Garry Kasparov ¶¶ 2–5, Dkt. No. 23-1. Kasparov founded the Renew Democracy Initiative ("RDI") in the United States, which provides a platform for dissidents around the world to share their accounts of fighting against authoritarians and comment on American and international policy. *Id.* ¶¶ 6–7. Kasparov's declaration explains that after the Trump administration began revoking visas and targeting noncitizens for deportation based on protected speech, many of RDI's contributing dissidents who fled to the United States have "been increasingly afraid to share their views on American foreign policy or about the United States government, fearing it will target them next." *Id.* ¶10. Epshtein, RDI's CEO, confirms this chilling effect, adding that some of RDI's noncitizen contributors have requested that the organization remove their prior criticism of the Trump administration's foreign policy from the RDI website. Decl. of Uriel Epshtein ¶¶ 1–2, 7–14, Dkt. No. 23-2.

Self-censorship is the predictable and intended effect of the administration's actions. Judge Young concluded by "clear and convincing evidence" that Secretaries Rubio and Noem targeted noncitizens for deportation based on protected speech "to strike fear into similarly situated non-citizen pro-Palestinian individuals," "curbing lawful pro-Palestinian speech and intentionally denying such individuals … the freedom of speech." *AAUP*, 2025 WL 2777659, at *2, *54; *see also* Fitzpatrick Decl. Ex. A (quoting then-candidate Trump, who said, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."). For the administration, the chill is the point.

### 3.    Stanford Daily has organizational standing.

Stanford Daily also has organizational standing because it has established that the government's use of the Revocation and Deportation Provisions against protected expression has affected and interfered with the paper's reporting, its core business activity. That interference has been the result of the challenged statutes' chilling effect on Stanford Daily's noncitizen members and the predictable effect of the government's use of those statutes against protected speech.

-13-

1  Stanford Daily submitted evidence supporting the direct interference it has suffered, like losing

2  members, being unable to publish pieces, being unable to interview sources, and having to remove

3  articles. Verified Compl. ¶¶ 72–88. It has therefore established standing three different ways.

4  **II.    The Revocation and Deportation Provisions violate the First Amendment.**

5      **A.    The First Amendment prohibits the government from punishing speakers**

6           **because of their views.**

7      The government's Opposition ignores Plaintiffs' core argument: The First Amendment

8  prohibits Congress from enacting, and the executive branch from enforcing, laws penalizing

9  speakers because of their opinions. Therefore, the Revocation and Deportation Provisions, which

10 the government concedes allow it to revoke noncitizens' visas and render them deportable for

11 expression the government disfavors, are unconstitutional as applied to protected speech.

12     The First Amendment's guarantee that "'Congress shall make no law … abridging the

13 freedom of speech' … embodies our profound national commitment to the free exchange of ideas."

14 *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up). This commitment traces back to the

15 founding belief in free speech as an inalienable right. Two years before the First Amendment's

16 ratification, Thomas Jefferson explained, "There are rights which it is useless to surrender to the

17 government, and which yet, governments have always been fond to invade. These are the rights of

18 thinking, and publishing our thoughts by speaking or writing." Letter from Jefferson to Humphreys,

19 *supra* note 1. And three years after ratification, James Madison put the First Amendment's command

20 in plain terms: "Opinions are not the objects of legislation." 4 Annals of Cong. 934 (1794); *see also*

21 Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 281–82 (2017)

22 (explaining that the Founders "broadly recognized" the "inalienability of this liberty").

23     The government's Opposition points to no history suggesting the Framers intended the First

24 Amendment's protection of this inalienable right to apply only to American citizens. Rather, many

25 of the most prominent (and controversial) voices at the founding were noncitizens. With financial

26 support from Thomas Jefferson, Scotland's James Callender "discharged his pen against the

27 Federalists," exposed Alexander Hamilton's extramarital affair, and, after a falling out with

28 Jefferson, was the first to publish the scandalous "allegations that Jefferson had fathered children

-14-

with one of [Jefferson's] slaves." Stephen D. Solomon, *Revolutionary Dissent: How the Founding Generation Created the Freedom of Speech* 271, 284, 293 (2016); Charles Slack, *Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech* 62 (2015).[9] Englishman (and, later, French citizen) Joseph Priestley was a vocal proponent of republicanism whose writings were widely circulated in Jeffersonian circles. *See* Jenny Graham, *Revolutionary in Exile: The Emigration of Joseph Priestley to America 1794–1804*, at 1–3, 96, 141 (1995) [https://perma.cc/Y66M-E9T3]. And Frenchman Joseph de Nancrède published the influential *Courier de Boston* newspaper for newly arrived French immigrants, urging Americans to sever ties with England and adopt the French language. George Parker Winship, *Two or Three Boston Papers*, 14 Papers Bibliographical Soc'y Am. 57, 69–76 (1920) [https://perma.cc/N2X2-HD7N]. The government provides nothing suggesting the Founders intended to exclude them from the First Amendment's protection.

That explains why the Supreme Court has repeatedly recognized the First Amendment's protection for free speech applies to noncitizens, noting that:

> [O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments … They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority.

*Kwong Hai Chew*, 344 U.S. at 596 n.5 (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)). "Freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

That protection prevents the government from jailing noncitizens for protected speech and deporting them because of their opinions. As the Ninth Circuit explained, "although Congress and the President may regulate aliens' admission and residence in the country, that regulation must be 'consistent with the Constitution.'" *AADC*, 70 F.3d at 1065 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 712 (1893)). "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Id.* (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)). Even in a decision the government cites, *Bluman v. FEC*, 800

---

[9] Philadelphia records reflect that Callender petitioned for naturalization in 1798 but do not indicate that he took the oath of allegiance and became a citizen prior to his death in 1803. Philadelphia Naturalization Records ix, 77 (P. William Filby ed., 1982).

F. Supp. 2d 281, 286 (D.D.C. 2011), then-Judge Kavanaugh's opinion cited *Wixon*'s confirmation that "resident aliens [are] protected by the First Amendment in the context of deportation."

The government's attempt to evade the plain commands of *Wixon* and *AADC*—which are binding and compel a result in Plaintiffs' favor—is futile. To attack *Wixon*, the government relies on a solo Third Circuit dissent asserting that *Wixon* "[a]t most … suggests that lawful resident aliens, what we today would call LPRs, can potentially invoke the First Amendment in some criminal prosecutions." Opp'n 18 (quoting *Qatanani v. Att'y Gen.*, 144 F.4th 485, 516–17 (3d Cir. 2025) (Matey, J., dissenting)). But that contravenes the Supreme Court's adoption in *Kwong Hai Chew* of Justice Murphy's statement in *Wixon* that the First Amendment "extend[s] [its] inalienable privileges to 'all persons.'" 344 U.S. at 596 n.5 (quoting *Wixon*, 326 U.S. at 161); *see also Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309 n.5 (1970) (same); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 691 (6th Cir. 2002) (explaining that Justice Murphy's statement that the First Amendment's privileges apply to "all persons" has "since been adopted by the full [C]ourt"). It also contradicts the Ninth Circuit's holding that visa holders are "able to assert claims under the First [Amendment]" because "[i]t is well established that aliens legally within the United States may challenge the constitutionality of federal and state actions." *Ibrahim v. DHS*, 669 F.3d 983, 994 (9th Cir. 2012) (collecting Supreme Court cases).

The government attempts to avoid the Ninth Circuit's holding in *AADC* that the First Amendment applies "to the deportation setting," 70 F.3d at 1064, by incorrectly suggesting the Supreme Court overturned that principle in later proceedings. Opp'n 18 (citing *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999)). Nothing in *Reno* suggests protected speech can be an *independent* basis for deportation, and the government supplies no case interpreting *Reno* that way. Instead, *Reno* held that noncitizens illegally in the United States cannot assert a First Amendment selective enforcement defense to deportation because sustaining it would "permit and prolong a continuing violation of U.S. law." 525 U.S. at 490. Even then, the Court cautioned that it "need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous" the First Amendment would *still* bar the deportation. *Id.* at 491. In any event, this is not a selective enforcement case—Plaintiffs and their members are lawfully present noncitizens.

-16-

The government misinterprets *Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952), as blessing ideological deportations for protected speech. It does not. *See Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 382 (D. Mass. 2025) (rejecting identical argument from the government earlier this year); *AAUP*, 2025 WL 2777659, at \*45–46 (rejecting it again). *Harisiades*, applying the First Amendment jurisprudence at the time, concluded the Constitution did not prohibit deportation for being a Communist Party member because citizens could be punished for the same affiliation. 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also* 1 Smolla & Nimmer on Freedom of Speech § 10:19 (detailing how subsequent Supreme Court precedent limited *Dennis*); Hans A. Linde, *"Clear and Present Danger" Reexamined: Dissonance in the Brandenburg Concerto*, 22 Stan. L. Rev. 1163, 1186 (1970) (same). As the Ninth Circuit explained, "read properly, *Harisiades* establishes that deportation grounds are to be judged by the same standard applied to other burdens on First Amendment rights." *AADC*, 70 F.3d at 1064 (quotation marks omitted). The government does not and cannot supply any decision allowing deportation of a lawfully present noncitizen for speech that would be protected if uttered by an American citizen.

The government then relies on three cases holding that noncitizens are subject to *one* unique abridgment of First Amendment rights, the ability to financially contribute to an election campaign, and leaps to the conclusion that this narrow limitation means noncitizens have *no* First Amendment rights. The government is wrong. It chiefly points to then-Judge Kavanaugh's opinion in *Bluman*, 800 F. Supp. 2d 281. But there, Judge Kavanaugh explicitly cited *Wixon* as mandating that "resident aliens [are] protected by the First Amendment in the context of deportation." *Id.* at 286 (citing *Wixon*, 326 U.S. at 148). He reasoned that because noncitizens cannot vote, prohibiting them from contributing money to campaigns furthers the goal of "preventing foreign influence over the U.S. political process." *Id.* at 288. And he explicitly cautioned that "speaking on issues of general public interest is a quite different context from participation in a political campaign for election." *Id.* at 290 (cleaned up) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788 n.26 (1978)).

The next case on which the government relies, *OPAWL v. Yost*, 118 F.4th 770, 776–80 (6th Cir. 2024), simply adopted Judge Kavanaugh's reasoning in *Bluman*. And like *Bluman*, the Sixth Circuit cited *Wixon* and reiterated that "[f]reedom of speech and of press is accorded aliens residing

-17-

in this country." *Id.* at 776 (quoting *Wixon*, 326 U.S. at 148). The Ninth Circuit in *Singh* also applied *Bluman* and deemed itself bound by the Supreme Court's summary affirmance of it. *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020) (citing *Bluman v. FEC*, 565 U.S. 1104 (2012)). None of the government's authority, least of all *Bluman*, suggests lawfully present noncitizens can face visa revocation or deportation solely for protected speech.

At bottom, the government's position cannot be squared with *Wixon*'s plain command that lawfully present noncitizens enjoy freedom of speech and of press as a "right," not a privilege. 326 U.S. at 148. Free speech is not a right if the government can pick and choose which views noncitizens may express and deport those who refuse to parrot and publish the government's narrative. The First Amendment protects the writers and editors at Stanford Daily, Jane Doe, and John Doe from having their visas revoked or being deported solely for protected speech.

### B.    The government gets no deference regarding the constitutional scope of immigration authority.

The Opposition rests on the false foundation that because this action involves immigration and foreign policy, the government's "authority is at its zenith" and its arguments are "entitled to the most deference from the courts." Opp'n 20. The government is wrong. It is basic high school civics that the political branches get no deference on the scope of their authority because "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The political branches get deference on *policy decisions* regarding immigration and foreign policy, not the limits of the Constitution.

The Supreme Court has explained that "[o]ur precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Likewise on immigration, where the Ninth Circuit warns that "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration or are not subject to the Constitution when policymaking in that context." *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017) (collecting cases); *see also Republic of Austria v. Altmann*, 541 U.S. 677, 701–02 (2004)

1   (explaining that while the government's views on a "question of foreign policy" are entitled to

2   deference, its position on the "interpretation of the Foreign Sovereign Immunity Act" involved a

3   "pure question of statutory construction … well within the province of the Judiciary" and "merit[ed]

4   no special deference" (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 448 (1987))); *cf. Loper*

5   *Bright Enterp. v. Raimondo*, 603 U.S. 369 (2024) (no deference due to agency interpretation of law).

6           The government is entitled to deference on certain policy decisions because "when it comes

7   to collecting evidence and drawing factual inferences … the lack of competence on the part of the

8   courts is marked and respect for the Government's conclusions is appropriate." *Holder*, 561 U.S. at

9   34 (cleaned up). So, here, if Plaintiffs were challenging a factual determination that a particular

10  noncitizen's speech "compromise[d] a compelling United States foreign policy interest," that

11  decision might receive some deference. But Plaintiffs' claim is that the Provisions violate the First

12  Amendment by statutorily allowing adverse immigration action based on protected speech.

13          And on that issue, the judiciary, not the political branches, has the final say. The Ninth

14  Circuit's decision in *Washington* is instructive. There, the court addressed a challenge by

15  Washington and Minnesota to President Trump's Executive Order 13769, which "ban[ned] for 90

16  days the entry into the United States of individuals from seven countries." 847 F.3d at 1156. The

17  states asserted the Order "violat[ed] the First and Fifth Amendments" and statutes including the

18  Immigration and Nationality Act. *Id.* at 1157. The government, as here, argued that "the President's

19  decisions about immigration policy, particularly when motivated by national security concerns, are

20  *unreviewable*, even if those actions potentially contravene constitutional rights and protections." *Id.*

21  at 1161. The Ninth Circuit disagreed: "There is no precedent to support this claimed unreviewability,

22  which runs contrary to the fundamental structure of our constitutional democracy." *Id.*

23          *Zivotofsky* is also instructive. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012).

24  There, the Supreme Court addressed a challenge to a statute "providing that Americans born in

25  Jerusalem may elect to have 'Israel' listed as the place of birth on their passports." *Id.* at 191. But

26  the "State Department declined to follow that law," arguing it intruded on the executive's authority

27  to determine foreign policy. *Id.* The Court explained that determining the constitutionality of a law

28  is the sole province of the judiciary and distinguished that inquiry from policy judgments pursuant

1   to lawful statutes, which are entitled to deference. *Id.* at 196. "[B]ecause the parties do not dispute

2   the interpretation of [the statute], the only real question for the courts is whether the statute is

3   constitutional. At least since *Marbury* … we have recognized that when an Act of Congress is

4   alleged to conflict with the Constitution, '[i]t is emphatically the province and duty of the judicial

5   department to say what the law is.'" *Id.* (quoting *Marbury*, 5 U.S. at 177); *see also INS v. Chadha*,

6   462 U.S. 919, 940–41 (1983) (striking down immigration statute and rejecting government's

7   argument that the political branches' plenary authority over immigration deprived the courts of the

8   authority and responsibility to determine "whether Congress has chosen a constitutionally

9   permissible means of implementing that [immigration] power").

10       So too here. Plaintiffs are not asking this Court to supplant a decision by the political

11  branches regarding whether to revoke a particular visa or if a particular noncitizen compromises

12  America's foreign policy. Instead, this Court "must decide if [Plaintiffs'] interpretation of the statute

13  is correct, and whether the statute is constitutional." *Zivotofsky*, 566 U.S. at 196; *see also Zadvydas*

14  *v. Davis*, 533 U.S. 678, 695 (2001) (reaffirming that the political branches' plenary authority over

15  immigration "is subject to important constitutional limitations").

16       The Constitution does not disappear when important issues are at stake. "Even the war power

17  does not remove constitutional limitations safeguarding essential liberties." *United States v. Robel*,

18  389 U.S. 258, 264 (1967) (cleaned up) (invalidating national security statute on First Amendment

19  grounds). The point of a written constitution is to prevent the political branches from declaring the

20  limits of their power. It is a "fundamental principle[]" of America's democracy that "an act of the

21  legislature, repugnant to the constitution, is void." *Marbury*, 5 U.S. at 177. Here, contrary to the

22  government's attempted constitutional upheaval, it is for the courts to decide whether the Provisions

23  violate the First Amendment. *Id*. They do, and this Court should so hold.

24       **C.    The Revocation and Deportation Provisions violate the First Amendment with**
                 **respect to protected speech.**
25

26       The Revocation and Deportation Provisions' allowance of visa revocation and deportation

27  based solely on protected political speech violates the First Amendment. Plaintiffs' opening brief

28  explained that both provisions constitute viewpoint and content discrimination because they permit

-20-

PLAINTIFFS' COMBINED RESPONSE AND REPLY          CASE NO. 5:25-cv-06618-NW

the government to impose adverse immigration consequences on lawfully present noncitizens simply because the Secretary of State dislikes their political speech. Mot. for Summ. J. ("Mot.") 17–20, Dkt. No. 32-1. The government does not dispute that the Provisions are viewpoint and content discriminatory. *See generally* Opp'n. Nor does it dispute that viewpoint- and content-discriminatory laws "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Nor even does the government dispute that such laws are subject to strict scrutiny, an "unforgiving" analysis "because it is the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). Laws subject to strict scrutiny survive "only if the government proves that they are narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163, and they are "the least restrictive means of achieving" those interests, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Earlier this year, the Supreme Court explained that "strict scrutiny is designed to enforce 'the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Free Speech Coal.*, 606 U.S. at 484–85 (quoting *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). Strict scrutiny "succeeds in that purpose if and only if, as a practical matter, it is fatal in fact absent truly extraordinary circumstances." *Id.*

The government's attempt to defend the Revocation and Deportation Provisions from that "unforgiving" analysis falls flat. As an initial (and dispositive) matter, the government does not argue that the Provisions are narrowly tailored or the least restrictive means of achieving its interests. That is a fatal omission. *See, e.g.*, *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) ("Because the District has failed to offer any showing that it has even considered less restrictive measures … it fails at least the tailoring prong of the strict scrutiny test.").

Even the government's attempt to assert a compelling government interest fails. The government offers only that "regulating who comes to and lives or resides in the United States is, itself, a compelling government interest." Opp'n 20. That is circular. Were the government's position correct, then the mere fact an immigration law is an immigration law would constitute a compelling interest. But the "First Amendment requires a more careful assessment and

-21-

characterization of an evil" to justify a "sweeping" regulation of protected speech. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 819 (2000); *see also Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012) (striking down statute on First Amendment grounds because the government did "not identify any *actual problem* the challenged [law] seeks to solve").

If the government seeks to rely on its asserted interests in "countering support for terrorist groups and addressing antisemitism" to survive strict scrutiny, Opp'n 19, those likewise fail. Philosophical support for terrorist groups and antisemitism is protected speech. *See, e.g.*, *Holder*, 561 U.S. at 25–26 (distinguishing between the protected advocacy of "speak[ing] and writ[ing] freely" in support of terrorist organizations and unlawful "material support" for terrorism); *Collin v. Smith*, 578 F.2d 1197, 1210 (7th Cir. 1978) (affirming the First Amendment protected Nazis' right to march in Skokie, Illinois, explaining that "if civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises"); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 700 (1996) (Scalia, J., dissenting) ("An organization … is undoubtedly entitled, under the Constitution, to maintain and propagate racist and antisemitic views."). The government's asserted interests are thus not only insufficient but disqualifying, because "suppression of free expression … is not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

Unable to save the Provisions from the "unforgiving" nature of strict scrutiny, *Free Speech Coal.*, 606 U.S. at 484, the government chiefly relies on an argument already rejected by the Ninth Circuit: that immigration statutes are uniquely exempt from the normal scrutiny doctrine and survive if "the government has articulated a facially legitimate and bona fide justification for their use." Opp'n 19. *Washington* forecloses that position. There, the Ninth Circuit made clear that standard applies only "to lawsuits challenging an executive branch official's decision to issue or deny an individual visa based on the application of a congressionally enumerated standard to the particular facts presented by that visa application." 847 F.3d at 1162. It thus held reviews of the constitutionality of the political branches' "policymaking authority" are "plainly not subject to th[at] standard; as cases like *Zadvydas* and *Chadha* make clear, courts can and do review constitutional challenges to the substance and implementation of immigration policy." *Id.* at 1162–63 (first citing

-22-

1    *Zadvydas*, 533 U.S. at 695; and then citing *Chadha*, 462 U.S. at 940–41). This Court can, and should,

2    hold the Revocation and Deportation Provisions violate the First Amendment as to protected speech.

3    **III.    The Revocation and Deportation Provisions are unconstitutionally vague.**

4          The Provisions are unconstitutionally vague because they grant Secretary Rubio unfettered

5    discretion to revoke visas (at "any time, in his discretion") and initiate deportations based on

6    protected speech (that he "personally determines" harms "foreign policy"), while also failing to

7    provide noncitizens notice of what speech could lead to those actions. Mot. 23–25. The government

8    hardly argues otherwise. Instead, it tries to dissuade this Court from scrutinizing the Provisions by

9    insisting the Secretary's "significant discretion … must be respected" and promising he will only

10   revoke visas "where warranted." Opp'n 20–25. But courts "would not uphold" a vague statute

11   "merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480.

12         Contrary to the government's assertion, Opp'n 20–22, the Constitution's prohibition against

13   vague statutes makes no exception for immigration laws. The Supreme Court expressly rejected this

14   argument in *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality op.) (rejecting government's

15   argument that because "the removal of an alien is a civil matter … the need for clarity is not so

16   strong"). The Court "reiterated that deportation is a particularly severe penalty, which may be of

17   greater concern to a convicted alien than any potential jail sentence." *Id.* at 157 (quotation marks

18   omitted). So immigration laws are subject to "the most exacting vagueness standards." *Id.* at 156–

19   57 (holding immigration provision unconstitutionally vague). The government's citation to a

20   vacated district court opinion from 1984—which predates *Sessions* by decades—does not establish

21   otherwise. *See* Opp'n 22. And the government's attempt to distinguish *Sessions* by asserting that

22   vagueness doctrine cannot apply to an immigration "statute" but only an immigration "clause," *id.*,

23   lacks any reasoned principle or citation to supporting precedent. For all its talk of "deference," the

24   government fails to note that almost all its proffered authority either does not involve the vagueness

25   doctrine, *e.g.*, *Demore v. Kim*, 538 U.S. 510, 523 (2003), or does not involve immigration laws, *e.g.*,

26   *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988). Opp'n 20–22.[10]

27

28          [10] To the extent the government suggests otherwise, Opp'n 22–25, *Holder* is no impediment to this challenge. 561 U.S. 1. Although a plaintiff whose conduct "is clearly proscribed" generally

-23-

On the merits, the government does not identify any aspect of the Provisions that cabin discretion and provide fair notice. Rather—and even then *only* for the Revocation Provision—the government cites a State Department manual that instructs staff to revoke visas "where warranted" based on "derogatory information."[11] *See* Decl. of Kelsey J. Helland Ex. 1, 9 FAM 403.11-5(A) and (B), Dkt. No. 33-1. But governmental guidance cannot "insert missing terms into the statute" to defend against vagueness. *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998). Worse, the manual does not define "derogatory information," nor when information is sufficiently "derogatory" to "warrant" a revocation. It is a blank check to revoke visas when the Department feels like it. The manual provides no guidance to noncitizens for how to keep their visa and no guardrails for the government to ensure "derogatory" information leading to a revocation is not protected speech.

The government's authority rejecting vagueness challenges, *see* Opp'n 24–25, are inapposite because each involved statutory provisions far more discrete and well defined than the Revocation and Deportation Provisions. In *Mahler v. Eby*, the term "undesirable residents" was not vague because the statute specifically defined the term, which encompassed, for example, noncitizens convicted under specified statutes. 264 U.S. 32, 40 (1924). In *Jordan v. DeGeorge*, the term "crime of moral turpitude" was a legal term of art with "deep roots in the law" that had been construed in numerous judicial decisions. 341 U.S. 223, 225, 232 (1951). And in *Boutilier v. INS*, legislative history clarified "beyond a shadow of a doubt" the meaning of the statutory term "psychopathic personality." 387 U.S. 118, 123 (1967). None of these statutes granted unfettered discretion or left key terms with no limiting construction. And none allowed the government to act against a

---

cannot complain of vagueness as applied to others, *id.* at 18–19, this principle does not apply when unbridled discretion (rather than only lack of notice) is at issue. *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017). Regardless, the statutes are vague as to *Plaintiffs'* speech and other noncitizens' and affected organizations' speech alike. Moreover, the principle that a court cannot consider "the statute's application to facts not before it" does not apply to facial challenges. *See Holder*, 561 U.S. at 19; *see, e.g.*, *Sessions*, 584 U.S. at 173 (considering in facial vagueness challenge various applications of statute not before the Court).

[11] The government claims this manual instructs staff to "only revoke a visa 'where warranted' for *various specified reasons*." Opp'n 23 (emphasis added) (citing 9 FAM 403.11-5(B)(a)). But those "specified reasons" are a mystery. The manual provision the government cites discusses revoking visas in "the conditions described in 9 FAM 403.11-5(A)," but that cross-referenced provision is heavily redacted. Nonpublic criteria, by definition, do not provide notice to the public.

1  noncitizen "at any time, in his discretion," as the Revocation Provision does, or based on an

2  untethered "personal[] determin[ation]" of a "policy" danger, as the Deportation Provision does.

3      Here, the Revocation Provision lacks *any* standard, and the Deportation Provision lacks *any*

4  definition of "foreign policy interest" that limits discretion and provides notice, as the vagueness

5  doctrine requires. *Khalil v. Trump*, 784 F. Supp. 3d 705, 737–39 (D.N.J. 2025) (distinguishing the

6  statutes in *Jordan*, *Mahler*, and *Boutilier* as far clearer than the Deportation Provision). The

7  government agrees "Congress did not limit the discretion to revoke visas and did not define what

8  constitutes 'potentially serious adverse foreign policy consequences.'" Opp'n 24. That concession

9  is fatal. Such "unfettered and unreviewable discretion to deport any alien lawfully within the United

10  States" violates the Constitution's prohibition against vague laws. *Massieu v. Reno*, 915 F. Supp.

11  681, 686 (D.N.J.) (holding Deportation Provision unconstitutionally vague), *rev'd on jurisdictional

12  grounds*, 91 F.3d 416 (3d Cir. 1996). The Provisions are void for vagueness as to protected speech.

13  **IV.    Plaintiffs require a unique order to preserve Claims II and IV for Supreme Court**

14  **consideration.**

15      For the above reasons, the Court should grant Plaintiffs summary judgment and issue an

16  order consistent with the Prayer for Relief in the Verified Complaint enjoining and declaring the

17  Provisions unconstitutional as applied to protected speech. However, pursuant to 8 U.S.C. § 1252(f),

18  only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation

19  Provision. *See* Verified Compl. 30 n.4; *Biden v. Texas*, 597 U.S. 785, 800–01 (2002) (explaining

20  Section 1252(f) bars only injunctive relief, not declaratory relief). Therefore, to ensure Plaintiffs

21  have a vehicle to obtain from the Supreme Court the relief sought in Claims II and IV (permanent

22  injunctive relief against the Deportation Provision), Plaintiffs inform the Court it should deny

23  Plaintiffs' motion on Claims II and IV on the basis that Section 1252(f) bars this Court from

24  awarding the relief requested. Plaintiffs respectfully request that, if the Court rules in Plaintiffs'

25  favor on Claims I and III (the corresponding declaratory judgment claims), the Court note in its

26  Opinion and Order that Plaintiffs are likely to succeed on the merits of Claims II and IV.

27                                    **CONCLUSION**

28      The Court should grant Plaintiffs' motion in a manner consistent with Section IV, *supra*.

-25-

1   Dated: October 20, 2025

2                                                Respectfully Submitted,

                                                 /s/ *Conor T. Fitzpatrick*
3   Marc Van Der Hout (Cal. Bar #80778)          Conor T. Fitzpatrick (Mich. Bar #P78981)*
    Johnny Sinodis (Cal. Bar #290402)            Daniel A. Zahn (D.C. Bar #90027403)*
4   Oona Cahill (Cal. Bar #354525)               **FOUNDATION FOR INDIVIDUAL**
    **VAN DER HOUT LLP**                          **RIGHTS AND EXPRESSION (FIRE)**
5   360 Post Street, Suite 800                   700 Pennsylvania Avenue SE, Suite 340
    San Francisco, CA 94108                      Washington, DC 20003
6   Telephone: (415) 981-3000                    Telephone: (215) 717-3473
    Facsimile: (415) 981-3003                    Email: conor.fitzpatrick@thefire.org
7   Email: ndca@vblaw.com                        Email: daniel.zahn@thefire.org

8                                                Colin P. McDonell (Cal. Bar #289099)
9                                                **FOUNDATION FOR INDIVIDUAL**
                                                 **RIGHTS AND EXPRESSION (FIRE)**
10                                               510 Walnut Street, Suite 900
                                                 Philadelphia, PA 19106
11                                               Telephone: (215) 717-3473
                                                 Email: colin.mcdonell@thefire.org
12
13                                               *Admitted pro hac vice
14
                                                 *Counsel for Plaintiffs*
15

-26-
PLAINTIFFS' COMBINED RESPONSE AND REPLY        CASE NO. 5:25-cv-06618-NW