UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORPORATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MARCO RUBIO, et al., <br><br> Defendants. | Case No. 25-cv-06618-NW <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: ECF No. 66 |

Plaintiffs Stanford Daily Publishing Corporation, along with Jane Doe and John Doe, noncitizen students holding F-1 visas issued by the United States, filed an amended complaint alleging claims under the First and Fifth Amendments against Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security (together, the "Government"). First Am. Compl., ECF No. 65 ("FAC").

Jane Doe and John Doe allege that since March 2025, the Government has changed its immigration policy and pattern of enforcement, namely arresting, detaining, and deporting students with F-1 visas when those students voice opinions that express support or empathy for Palestinian people or are critical of Israel's actions regarding Palestine or the conflict in Gaza. Because Jane Doe and John Doe fear that the Government will revoke their visas and deport them for expressing views that the Government may now deem "anti-American or anti-Israel," Jane Doe and John Doe have self-censored. FAC ¶ 2. They have stopped exercising their First Amendment rights when it comes to the subject of Israel and Palestine, including publishing commentary online. They have also changed their social media practices and have avoided wearing clothing that indicates a pro-Palestinian view.

Similarly, Stanford Daily Publishing ("Stanford Daily"), the parent company of campus

newspaper *The Stanford Daily*, fears for its student journalists. Noncitizen student-journalists who hold valid F-1 visas — and are therefore lawfully present in the United States — are asking Stanford Daily to take down their previously published articles about Israel and Palestine. And although they have already expended considerable effort investigating and writing new articles about the Israel-Palestine conflict, noncitizen student-journalists are choosing not to publish those articles because they are afraid the Government will revoke their visas and deport them.

In their amended complaint, Plaintiffs point to the news of Mahmoud Khalil, Rümeysa Öztürk, Mohsen Mahdawi, and other students lawfully in the United States who expressed opinions about Israel and Palestine; the Government then arrested, detained, and transferred those students to immigration jails. Plaintiffs quote public statements by Secretary of State Rubio and the President, including comments he made prior to being elected, warning noncitizens that they will be deported if they express similar views.

Plaintiffs argue that the provisions of the Immigration and Nationality Act ("INA") (8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) and § 1201(i)) that the Government relies on for its authority to cancel student visas and initiate deportation proceedings, are facially unconstitutional. Plaintiffs bring eight claims under the First and Fifth Amendments for declaratory and injunctive relief. *See* FAC.

The Government now moves to dismiss Plaintiffs' complaint solely for lack of standing. Mot. to Dismiss, ECF No. 66. The matter is fully briefed, and the Court held a hearing on January 6, 2026. ECF Nos. 66, 67, and 68. The Court DENIES the Government's motion to dismiss.

**I.      BACKGROUND[1]**

On October 7, 2023, Hamas attacked Israel killing more than 1,200 people. Protests, both planned and spontaneous, erupted across the United States, particularly on university campuses. In the following months, which turned to years, "some students and faculty [who] viewed Israel's response as disproportionate . . . [called] for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios" that supported Israel. FAC ¶ 22.

---

[1] Unless otherwise noted, the background information comes directly from Plaintiffs' operative complaint. *See* FAC.

2

"Some protests featured calls for a 'free Palestine' and included chants such as 'from the river to the sea, Palestine will be free' and 'intifada revolution.'" *Id*. ¶ 23. "Other events featured pro-Palestinian advocates handing out flyers." *Id*. ¶ 24. "Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes," while many protests "remained peaceful." *Id*. ¶ 25. Many individuals, including students, "voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums." *Id*. ¶ 26.

On January 30, 2025, shortly after taking office, President Trump issued a policy statement titled "*Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*," stating:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.

FAC ¶ 38 (quoting *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR).

Plaintiffs allege that the "administration considers '[f]rom the river to the sea, Palestine will be free' to express support for Hamas, capable of justifying action under the [INA] . . . . Likewise, calling Israel 'an apartheid state,' 'calling for an arms embargo on Israel,' or 'criticizing Israel's actions in Gaza' might be sufficient to invoke the [INA]." *Id*. ¶ 39.

### A.   Immigration Policy

#### 1.   Revocation and Deportation Provisions of the INA

"Congress passed the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., ("INA") in 1952 [and] delegated to the Secretary of State significant authority to exclude or classify as deportable non-citizens from the United States, and to revoke visas." *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *3 (D. Mass. Sept. 30, 2025). The INA sections relevant to this case are 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision") and § 1201(i) (the "Revocation Provision"), which authorize the Government to revoke student visas and deport visa holders.

3

Under 8 U.S.C. § 1201(i), the Secretary of State has broad, discretionary power to revoke visas:

> **After the issuance of a visa or other documentation to any [noncitizen],** the consular officer or the **Secretary of State may at any time, in his discretion, revoke such visa or other documentation**. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added).[2] After revoking a visa, the Government may place the noncitizen into removal proceedings. *See id.* § 1227(a)(1)(B).

Under 8 U.S.C. § 1227(a)(4)(C)(i), if the "Secretary of State has reasonable ground to believe" that a noncitizen's presence or "activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States," the noncitizen "is deportable." There is an exception, however; noncitizens *shall not be* deportable because of their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States . . . ." 8 U.S.C. § 1182(a)(3)(C)(iii).[3] The exception is then subject to a further exception: noncitizens shall not be deportable because of their lawful "beliefs, statements, or associations" "*unless* the Secretary of State *personally determines* that the [noncitizen's] admission would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added).[4]

While the Secretary of State has the discretion to revoke visas and render noncitizens

---

[2] Unlike the Deportation Provision, the Revocation Provision, 8 U.S.C. § 1201(i), does not contain an exception for revocation of visas based on "beliefs, statements, or associations" that "would be lawful within the United States." *Compare id*. § 1182(a)(3)(C)(iii).

[3] 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable." Section 1227(a)(4)(C)(ii) incorporates this exception into the criteria for when a noncitizen is deportable.

[4] In *Am. Ass'n of Univ. Professors*, the court stated that these "exceptions place profound -- but narrow . . . deportability classification power solely with the Secretary of State." 2025 WL 2777659, at *3.

deportable, the Secretary of Homeland Security has the practical role of carrying out that authority. The Department of Homeland Security ("DHS") and its sub-agency U.S. Immigration Customs and Enforcement ("ICE") have "authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending." FAC ¶ 20.

### 2. Enforcement

In March 2025, DHS and ICE began "aggressively targeting lawfully present noncitizens for protected speech, particularly at universities." *Id*. ¶ 40. Plaintiffs point to the arrests of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi as emblematic of the Government's enforcement strategy.

Mr. Khalil is a lawful permanent resident in the United States and was a graduate student at Columbia University. Mr. Khalil actively participated in the campus protests against Israel's military campaign in Gaza. On the evening of March 8, 2025, DHS agents arrested Mr. Khalil without notice, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him. "The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had 'personally determined' Mr. Khalil's continued presence 'would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest' because of Mr. Khalil's 'participation' in 'antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States.'" *Id*. ¶ 44 (quoting *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025)). Following Mr. Khalil's arrest, Secretary Rubio posted a photo of Mr. Khalil with a comment stating: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id*. ¶ 45 (quoting Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z).

Ms. Öztürk is a PhD student at Tufts University who is lawfully present in the United States on an F-1 student visa. Ms. Öztürk co-authored an opinion article in the Tufts student

5

newspaper that criticized the university's "refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies." *Id*. ¶ 52. On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home, detained her, and transported her to a Louisiana immigration jail. "Four days before Ms. Öztürk's arrest, the State Department, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS spokesperson justified the revocation by asserting Öztürk's editorial '[g]lorif[ied] and support[ed] terrorists.'" *Id*. ¶ 54.

Mr. Mahdawi, an undergraduate student at Columbia University, is a lawful permanent resident in the United States. He made public statements criticizing Israel's military campaign in Gaza on televised news interviews, in news articles, and during protests. On April 14, 2025, when Mr. Mahdawi had completed the United States citizenship exam, masked DHS agents entered the interview room, arrested Mr. Mahdawi, transferred him to a Vermont immigration jail, and initiated proceedings to deport him from the United States. "Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East." *Id*. ¶ 59 (citing Resp. in Opp'n to Mot. for Release, Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025)).

Since March 2025, the Government has continued to revoke visas, arrest, detain, and attempt deportation of lawfully present noncitizens based on their expression related to Israel and Palestine. *See* FAC ¶ 61. Plaintiffs cite to a multitude of public statements the Government has made regarding its current revocation and deportation policy including:

- "[DHS] Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens 'pushing Hamas propaganda,' 'glorifying terrorists,' or otherwise engaging in 'anti-American' conduct 'can expect your visa will be revoked.'" *Id*. ¶ 63 (quoting Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU).

6

- "White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller posted on X that administration officials are 'working continuously' to revoke visas from noncitizens 'who espouse hatred for American [sic] or its people'—not just noncitizens who criticize Israel." *Id.* ¶ 67 (quoting Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM), https://perma.cc/U9JN-FQK7).

- "DHS posted on X: '. . . There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again.'" *Id.* ¶ 79 (quoting Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS) (comment made in the context of arrest of Sami Hamdi, British political commentator who was visiting the U.S.).

- "On November 18, 2025, Stephen Miller said, 'The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more.'" *Id.* ¶ 80.

### B. Plaintiffs

Plaintiffs Jane Doe and John Doe are noncitizen student F-1 visa holders who are lawfully present in the United States.[5] Jane Doe has published commentary online that contains pro-Palestine and anti-Israel sentiments and has peacefully attended pro-Palestinian protests. John Doe has likewise peacefully attended pro-Palestinian protests and academic discussions and has shared pro-Palestine and anti-Israel commentary online.

Because they fear that the Government will revoke their visas and deport them, Jane Doe and John Doe are self-censoring, refraining from voicing their true opinions regarding Palestine and Israel. Jane Doe "no longer attends pro-Palestinian protests, no longer wears a keffiyeh to

---

[5] Jane Doe and John Doe are not current or former Stanford University students and have never been members of Stanford Daily.

7

support the Palestinian cause, no longer engages in direct-action organizing supporting Palestinians, no longer holds up the Palestinian flag, no longer maintains her main social media account, and no longer posts pro-Palestinian content on her other social media accounts." *Id.* ¶ 155. John Doe has made his social media account private, temporarily paused publication of his study related to Israel's actions in Gaza (since published), and avoids wearing apparel that shows a pro-Palestinian message. Additionally, members of John Doe's extended family who are also noncitizens lawfully residing in the United States have "substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy." *Id.* ¶ 170.

"But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision," Jane Doe and John Doe "would resume publishing and voicing [their] true opinions regarding Palestine and Israel." *Id.* ¶¶ 149, 166.

Plaintiff Stanford Daily, a California nonprofit corporation, is the parent organization for *The Stanford Daily*. *The Stanford Daily* is the independent, student-run newspaper of Stanford University. The paper covers news related to Stanford University and "[f]or decades" has covered "student opinions and campus protests related to the conflict between Israel and Palestine." *Id.* ¶ 16. Stanford Daily is a "voluntary membership organization" with "over 150 identifiable members." *Id.* ¶¶ 89-99. Its members include "noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa." *Id.* ¶ 94.

Since March 2025, "many of the paper's noncitizen writers who are lawfully present in the United States have self-censored" due to fears that Secretary Rubio will revoke their visas under the Revocation Provision and render them deportable under the Deportation Provision. *Id.* ¶ 16. These writers have declined to cover pro-Palestinian student protests at Stanford University, refrained from covering topics related to the conflict in Gaza, and requested removal of their previous articles about the topic. Stanford Daily continues to see examples of noncitizen writers altering their expression. *See generally* FAC ¶¶ 132-134.

## II. LEGAL STANDARD

The First Amendment ensures that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). The right to freedom of speech has generally been accorded to noncitizens living in the United States. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("[f]reedom of speech and of press is accorded [to noncitizens] residing in this country."). First Amendment protections are crucial for protecting people in the United States from Government overreach and for ensuring that individuals "participate in the public debate through political expression." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Freedom of speech is fundamental to our democracy and is at the heart of this case.

Under the "case or controversy" requirement of Article III to the United States Constitution, a federal court has subject matter jurisdiction over a claim only if the plaintiff has standing to bring the claim. *Chandler v. State Farm Mutual Automobile Ins. Co.,* 598 F.3d 1115, 1121 (9th Cir. 2010). To demonstrate standing, a plaintiff must show three things: (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.*

"First Amendment cases raise 'unique standing considerations,' that 'tilt[ ] dramatically toward a finding of standing.'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (cleaned up). In the context of a pre-enforcement challenge, the injury-in-fact "is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). A plaintiff sufficiently alleges a pre-enforcement injury where she demonstrates "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony v. Driehaus*, 573 U.S. 149, 159 (2014). The inquiry focuses on: (1) whether the plaintiffs have a "concrete plan" to violate the law; (2) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings; and (3) whether there is a

history of past prosecution or enforcement.  *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc); *Tingley v. Ferguson,* 47 F.4th 1055, 1067 (9th Cir. 2022) (applying the factors set forth in *Thomas*).  "As the Supreme Court recently reiterated, for a First Amendment pre-enforcement challenge, the plaintiff need only 'show that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Flaxman v. Ferguson*, 151 F.4th 1178, 1185 (9th Cir. 2025) (quoting *Mahmoud v. Taylor*, 606 U.S. 522, 145 (2025).  "[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Planned Parenthood v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)).

"The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007).  In reviewing a motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quotation and citation omitted).

### III.    DISCUSSION

The Government challenges standing for both the Doe Plaintiffs and Stanford Daily.[6]

#### A.    Doe Plaintiffs

Jane Doe and John Doe argue that they have each established standing to challenge the Revocation and Deportation Provisions because they have self-censored based on actual and well-founded fears of the Government's enforcement of the Provisions.  They allege that, but for the Government's threat of visa revocation and deportation under the Revocation and Deportation Provisions, Jane Doe and John Doe "would resume publishing and voicing [their] true opinions regarding Palestine and Israel." FAC ¶¶ 149, 168.  The Court agrees and finds that Jane Doe and

---

[6] In their reply brief and during the hearing, the Government asserted that it was making both a factual and facial challenge to Plaintiffs' standing.  Reply at 1, ECF No. 68; Tr. 15:19 – 16:22.  But the Government failed to assert that it was bringing a factual attack in its motion.  The declaration filed in support of its reply does not convert the Government's argument into a factual challenge.  Accordingly, the Court only addresses the Government's facial challenge.

1   John Doe have established standing.

2         Plaintiffs must demonstrate (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion*, 594 U.S. at 423. To demonstrate injury-in-fact for pre-enforcement First Amendment claims, as here, Plaintiffs need only show that they have "refrained from engaging in expressive activity for fear of prosecution under the challenged statute . . . based on 'an actual and well-founded fear' that the challenged statute will be enforced." *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) (quoting *Cal. Pro–Life Council Inc. v. Getman (CPLC–I),* 328 F.3d 1088, 1095 (9th Cir. 2003). "[T]he Supreme Court has dispensed with rigid standing requirements, and recognized 'self-censorship' as a harm that can be realized even without an actual prosecution." *Id.* (cleaned up).

      Since March 2025, Jane Doe and John Doe have refrained from engaging in expressive activity regarding their opinions about Israel and Palestine. Previously, Jane Doe published pro-Palestine/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid," and using the slogan, "from the river to the sea, Palestine will be free." FAC ¶ 140. Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine at her university.

      Now, "[b]ecause of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government." *Id*. ¶ 154. She has stopped: attending pro-Palestinian protests and holding up the Palestinian flag; wearing a keffiyeh to show her support for Palestine; engaging in direct-action organizing; maintaining her main social media account and posting pro-Palestinian content on her other social media accounts.

      John Doe studies journalism. A primary reason he chose to study in the United States "is its strong protection for freedom of speech and freedom of the press." *Id*. ¶ 158. Consistent with those freedoms, he previously and frequently published pro-Palestine/anti-Israel commentary online. He attended pro-Palestinian protests where he participated in chants including, "'[f]rom

11

the river to the sea, Palestine will be free,' as well as chants accusing Israel of committing 'genocide,' and chants calling Israel a 'terrorist state.'" *Id*. ¶ 163.

Because of his fears of visa revocation and deportation, John Doe delayed "publishing his findings containing criticism of Israel's actions in Gaza." *Id*. While he has resumed some commentary, his fears have prompted him to alter and reduce his expression. He avoids wearing "Palestinian Youth Movement" apparel. He has made his "social media account, which contains pro-Palestinian/anti-Israel commentary, private." *Id*. ¶ 169. "Additionally, because of the Trump administration's tactics when pursuing noncitizens for protected speech, . . . some members of John Doe's extended family who are noncitizens but lawfully reside in the United States fear associating with him and have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy." *Id*. ¶ 170.

Based on their fear that the Government will revoke their visas and deport them, Jane Doe and John Doe, through the time they filed their amended complaint, have continued to refrain from expressing their opinions regarding Israel and Palestine. Their fears stem from a plethora of examples alleged in their complaint where the Government has engaged in enforcement actions since March 2025, and myriad Government statements that threaten immigration enforcement against noncitizens who express opinions critical of Israel or its actions in Gaza, or who express support for Palestine or anguish over the conditions for Palestinian people living in Gaza.

Jane Doe and John Doe are concerned that their speech and behavior related to Israel and Palestine was substantially like the speech and behavior of noncitizens who the Government arrested, detained, and sought to deport. For example, the Government invoked the Deportation Provision against Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi because they participated in pro-Palestinian protests and engaged in pro-Palestinian associations. *See id*. ¶¶ 140-166.

Jane Doe has read about the "detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech." *Id*. ¶ 148. She read the Government's public statements about its intentions to revoke visas and

deport visa holders. Jane Doe was listed on the Canary Mission website, which is an anonymously and privately run website that publishes personal information of individuals and organizations that the Canary Mission personally deems "anti-Israel." In their motion and during the hearing, the Government explained that DHS had asked ICE to generate "reports" for the State Department on individuals listed on the Canary Mission website to aid in decision-making about visa revocations. Mot. at 7. Notably, before the Government brought enforcement actions against them, Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi all had profiles published about them on the Canary Mission website.

John Doe has read news articles "about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri[7] for engaging in protected pro-Palestinian speech," and has read "articles quoting government statements about the detention and deportation of these noncitizens." *Id*. ¶ 165. John Doe received advice from one of his professors that he should "reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status." *Id*. ¶ 164.

Jane Doe and John Doe have sufficiently alleged that their behavior falls into the crosshairs of the Government's stated enforcement priorities. The Government has also not disavowed plans to continue invoking the Revocation and Deportation Provisions. "On November 18, 2025, Stephen Miller said, 'The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more.'" *Id*. ¶ 80. The Government continues to regularly comment about revoking visas of those non-citizens it perceives as supporting anti-Semitism. For instance, on November 5, 2025, DHS posted on X:

> The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again.

---

[7] Plaintiffs also referenced Badar Khan Suri, another non-citizen who participated in pro-Palestine expression and who was arrested pursuant to the Revocation and Deportation Provisions. *See* FAC ¶ 173.

*Id*. ¶ 79 (quoting Department of Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS).

Jane Doe and John Doe have adequately alleged facts to support their fear that the Government may interpret their pro-Palestine expression to be counter to the Government's current stated policies, similar to how the Government viewed the expression of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi. Further, Jane Doe and John Doe have credibly alleged that when they read the Government's repeated public statements threating to enforce the Revocation and Deportation Provisions against noncitizens who participate in pro-Palestinian protests or express pro-Palestine/anti-Israel views, Jane Doe and John Doe "fear[] adverse immigration action for engaging in [similar] protected speech." *Id*. ¶¶ 150, 172.

The Government argues that Jane Doe and John Doe have not demonstrated a substantial threat of visa revocation or deportation because they failed to allege that they have been personally targeted for enforcement. Mot. at 17. Additionally, the Government states that it has completed its review of 5,000 campus protester "leads," and that less than 1% of such leads led to a visa revocation. Mot. at 8. The Government concludes that Jane Doe and John Doe are therefore unlikely to face enforcement. *Id*. The Court finds the Government's arguments unavailing. As an initial matter, the Government provided no details that would allow the Court to interpret how the Government's alleged 1% enforcement rate applies to the facts alleged in this case.[8] Further, the Government has not disavowed that it would take future enforcement actions under the Revocation and Deportation Provisions for noncitizens who engage in pro-Palestine/anti-Israel speech. The Court is unpersuaded that the mere fact that Jane Doe and John Doe have not yet been targeted for Government enforcement means the Government is unlikely to target them in the future — particularly if they fail to rigorously self-censor their views that are supportive or empathetic to Palestinians. Finally, while the Government argues that the "review" of campus

---

[8] For example, the Government did not explain: how or why it received the 5,000 campus protester leads; how many of those 5,000 individuals were expressing opinions that the Government viewed as being supportive versus critical of Israel; how many of those 5,000 leads were for noncitizens; or what percentage of the overall noncitizens were targeted for visa revocation or deportation.

protesters has concluded, the Government provided no assurance that it would not "review" future campus protests.

The Court finds that Jane Doe and John Doe have established an injury in fact because they have adequately alleged that they refrained from expression based on an actual and well-founded fear of the Government's enforcement action. *Driehaus*, 573 U.S. at 157-58 (a plaintiff must adequately allege "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.") (cleaned up). Jane Doe and John Doe have sufficiently demonstrated a causal connection between their injury of self-censorship since March 2025 and the Government's threats of enforcement and actual enforcement of the Revocation and Deportation provisions against similarly situated individuals during that time. Interpreting the facts in the light most favorable, as the Court must, Jane Doe and John Doe have adequately shown that their injuries are redressable because an order declaring unlawful and enjoining the Government from invoking the Revocation and Deportation Provisions to revoke visas or initiate deportation on the basis of their pro-Palestine expression would ameliorate Jane Doe and John Doe's fears of engaging in such expression.

### B.     Stanford Daily Publishing

Stanford Daily contends that it has standing under three separate doctrines: (a) associational standing, (b) organizational standing, or (c) corporate standing. The Government challenges all three theories that Plaintiffs advance. The Court finds that Stanford Daily has plausibly pled that it has standing under the associational and organizational standing theories and does not reach the corporate standing arguments.[9]

An association has associational standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt v.*

---

[9] "[O]nly one plaintiff with standing is sufficient for Article III" purposes. *Vasquez Perdomo*, 148 F.4th at 674.

*Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). "The first prong . . . requires only 'that at least one of the group's members have standing as an individual.'" *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 375 (D. Mass. 2025) (quoting *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016)).  However, the organization need not "'identify by name the member or members injured'" "'[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury.'" *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025) (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)).

Here, Stanford Daily has alleged sufficient facts to show that noncitizen members of Stanford Daily satisfy Article III standing on their own due to well-founded fears of immigration consequences for engaging in pro-Palestine expression.  "[I]t is relatively clear" that at least one of Stanford Daily's legally present noncitizen members has "been or will be adversely affected" by the Government's practices. *Vasquez Perdomo*, 148 F.4th at 676.  The interests Stanford Daily seeks to protect – First Amendment rights – are germane to Stanford Daily's purpose, namely "striv[ing] to serve the Stanford community with relevant, unbiased journalism [that] provides its editorial, tech and business staffs with unparalleled educational opportunities." *Id*. ¶ 84.  Stanford Daily alleges that, "[a]s part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation." *Id*. ¶ 85.  Finally, Stanford Daily has adequately established its ability to litigate this matter.  Neither the claims asserted nor the relief sought in the amended complaint requires the individual members' participation.  Plaintiffs requested relief does not require individual proof, and Plaintiffs' claims do not raise individualized questions.  Stanford Daily has therefore established associational standing.

While Stanford Daily needs only one path to establish standing, the Court finds that Stanford has also sufficiently pled facts to establish organizational standing.  An organization has standing to sue when it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the

16

organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

The Court finds that Stanford Daily has sufficiently alleged that its mission has been frustrated by the Government's threats of immigration enforcement, which has chilled student speech. The chilling effects have caused concrete and demonstrable injury to Stanford Daily's activities, including decreased "quantity and diversity of opinion pieces" in *The Stanford Daily*; "substantially reduced participation from noncitizen contributors"; fewer and less-diverse on-the-record sources for articles; and numerous requests from noncitizen members for articles to be published anonymously, not to be published at all, or for articles already published to be taken down. Stanford Daily also reported that due to the Government's threats and actual enforcement against noncitizens who express pro-Palestinian views, its members have quit. *See* FAC ¶¶ 112-134. By example, a lawfully present noncitizen editor "decided to quit Stanford Daily" because they feared "visa revocation, arrest, and deportation for association with articles about Israel or Palestine." *Id*. ¶ 114. Another noncitizen student with a valid visa who was on staff signed up to write an article, attended an event, took notes, and interviewed sources, but due to "fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id*. ¶ 116. Other students have "asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine." *Id*. ¶ 118.

The Court finds that like Jane Doe and John Doe, Stanford Daily has established an injury in fact, has sufficiently alleged that the Government caused the injuries by threatening enforcement of the Revocation and Deportation Provisions, and that Stanford Daily's injuries are redressable at this stage by the injunctive and declaratory relief sought in the amended complaint.

\* \* \*

Plaintiffs have sufficiently alleged standing, and the Court accordingly denies the Government's motion to dismiss.

The Court notes that the Government made an argument, both in its briefs and during the

17

hearing, that does not clearly fit within the Court's standing analysis but is worthy of acknowledgement. Specifically, the Government challenges the scope of the "protected speech" alleged by Plaintiffs and implies that Plaintiffs' claims would be more aptly framed, and perhaps only have the possibility of success, as an as-applied rather than a constitutional facial challenge. The Government's argument is well-taken but ill-timed.

In denying the Government's motion to dismiss, the Court concludes that Jane Doe, John Doe, and Stanford Daily sufficiently demonstrated *their individualized standing* based on *their* credible, well-founded fear of immigration enforcement against *themselves* (Jane Doe and John Doe) and noncitizen student members of Stanford Daily, who engage in pro-Palestine expression. Plaintiffs provided concrete examples of the Government's threats and actions chilling *their* First Amendment expression related to pro-Palestine topics.

Going forward, however, Plaintiffs ask the Court to hold unconstitutional two statutes (the Revocation Provision and the Deportation Provision) of the INA, because they infringe upon "protected speech" — the scope of which Plaintiffs did not define in the hearing. FAC ¶ 8; *see also* Tr. 56:16 – 57:14. When a court is asked to review the constitutionality of a law "facially . . . *only* with respect to protected speech," *see* FAC ¶¶ A–H, the court is required to "determine what the law covers" and "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody v. NetChoice, LLC*, 603 U.S. 707, 725 (2024). As currently pled, Plaintiffs' claims will require the Court to determine if either of the INA's Revocation and Deportation Provisions — laws that broadly implicate U.S. immigration policy and national security — infringe on First Amendment "protected speech," not just as applied to Plaintiffs, but facially, meaning in all situations.

The Court acknowledges the Government's argument but does not reach that issue today.

/ / /

/ / /

/ / /

18

## IV. CONCLUSION

The Government's motion to dismiss is DENIED. The Government shall file an answer to Plaintiffs' complaint within 28 days of this order. The parties are encouraged to meet and confer regarding next steps and a proposed case schedule.

**IT IS SO ORDERED.**

Dated: January 16, 2026

_____
Noël Wise
United States District Judge