# EXHIBIT 35

7/3/25, 10:17 PM          Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability - United States Department of State

An official website of the United States Government Here's how you know ⌄

## U.S. DEPARTMENT *of* STATE

Home > ... > Secretary of State Marco Rubio and Guyanese Pre...

★ ★ ★

# Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**STATE HOUSE**
**GEORGETOWN, GUYANA**

MARCH 27, 2025

Secretary Rubio holds a joint press availability with Guyanese President Irfaan Ali

Cookie Settings

AAUP-01414

**MODERATOR:** Please remain standing. You may be seated. You will be witnessing the signing of the MOU between Guyana and the United States this morning. I now invite the Ministry of Foreign Affairs representative, Mrs. Peggy McLennan, to give an overview.

**MS MCLENNAN:** Thank you, Marcia. Your Excellency Mr. President, members of cabinet, ladies and gentlemen, today, Minister of Foreign Affairs and International Cooperation Hugh Hilton Todd and Secretary of State Marco Rubio are signing a Memorandum of Understanding between our two countries to deepen security cooperation and address regional challenges, including countering narcotics trafficking and transnational organized crime. Under this mechanism, Guyana and the United States will strengthen information sharing, synthetic drug detection, transnational organized crime investigations and prosecutions, and military-to-military cooperation.

**MODERATOR:** Thank you very much. We now have the signing between the two nations.

(The Memorandum of Understanding was signed.)

(Applause.)

**MODERATOR:** Thank you very much, and now I invite his excellency to address us.

**PRESIDENT ALI:** Good afternoon, all. Secretary Rubio, you are no stranger to Guyana. Secretary Rubio has been and continues to be a strong advocate for Guyana's development, democracy, and peace. He has consistently demonstrated his personal commitment to the national rule of law, democracy, and security.

Guyana and the United States share a long bond of friendship and partnership. Indeed, the best of partnerships are those built on shared values, neutral trust, and a commitment to the rule of law and international order. This is what underpins our bilateral relationship and friendship. The United States is our trusted partner as we continue to build a stable, secure, and democratic society here.

This visit has allowed us to consolidate our bilateral agenda – defining policies and outlining clear intentions in areas of security, trade, energy, investments, infrastructure, democracy, regional peace and stability, human capital deployment, and development. I am very pleased at the reassurance of the U.S. in ensuring the safeguard of our territorial integrity and sovereignty. Our

AAUP-01415

partnership and joint commitment to the safeguard of this region from every disruptive force is key to the maintenance of democracy and adherence to the rule of law.

The threats from Venezuela were specifically discussed.  Their blatant violation of the ICJ order and Argyle Declaration were noted.  Our joint commitment in enhanced partnership in combating transnational crime – inclusive of narcotrafficking, human trafficking, money laundering, and all forms of smuggling – is reflected in an enhanced MOU signed today.

We have reassured our partner that we'll continue to ensure all international and local labor laws are adhered to in the hiring of regional and international labor.  Further, with our expanding healthcare system and critical shortage of human capital, we'll explore areas of collaboration, filling existing gaps.

We were able to identify key infrastructure that are also critical to regional development as possible areas for investment and development.  We have committed to working closely together on the deployment of our energy potential, ensuring greater integration, value creation, and regional energy security, food security, and enhanced trade through joint initiatives to remove hurdles and expand existing areas of interest is key for both countries.  I am confident that the outcome of this visit has further aligned our policy agendas, shared commitment, and partnership that will see enormous benefits for our two countries and the region.

Let me once again thank Secretary Rubio for his personal commitment and that of the U.S. government to Guyana and this region in general.  I thank you.

(Applause.)

**SECRETARY RUBIO:**  Thank you.  Thank you, Mr. President.  And we have been working together and interacting for some time during my time in the Senate, but I told him I wanted to wait until I was Secretary of State to visit, and so here I am.  And I didn't know that was going to happen, but I'm grateful for your – for this visit and for the warm welcome we've received, and it's an exciting time to be here.

I think – and to the people of Guyana, thank you for welcoming us.  I hope you fully appreciate and understand this is one of the most exciting places in the world to be right now, because you have the opportunity, at this moment, to transform this country for generations, and we want to

AAUP-01416

be your partner.  We want to be your partner in making that possible.  We think it's of mutual benefit to see that happen.

I get to visit in this job – already have – a number of countries in the nine weeks.  I've only been on the job for nine weeks, so let the record reflect after nine weeks this was one of my first visits here that I've taken abroad.  But we get to visit a lot of counties and when you visit you have some countries, unfortunately, are facing tremendous challenges and they're just looking to stabilize.  Other countries are looking to improve and make progress.  This country has an opportunity to transform.  And that's rare in the history of nations, to have an opportunity for transformative change.  And what I mean by transformative change is not simply oil and gas fields.  And that's very important – natural resources are critical – but that is just the basic ingredient that allows prosperity to happen.

One of the topics that's talked about all over the world today is data centers and the digitization of the economies, artificial intelligence.  Do you know what you need in order to do that?  You need to have really good scientists, and engineers, and technicians that know how to run it.  But the most important thing you need to be a dominant presence in the world in data centers and artificial intelligence is reliable and affordable energy.  That's just one example, among many others.

You have an opportunity to expand, in a responsible way, agriculture production, not just for the needs of your population but for the region, and to do it in a way that safeguards the beauty and the natural environment, that's pristine.  You have an opportunity to expand in issues of ecotourism.  I'm not a big fan of ecotourism – not – I'm not against ecotourism; I'm not an ecotourist.  I like staying at hotels.  I'll do it; maybe I'll go somewhere.  But there are people that love this stuff.  They love it.  And you have an opportunity to do that in an incredibly responsible way.

I'm just touching on a few things, but – that are opportunities before you.  And that shared prosperity for your country that will come as a result of that is transformative.  The lives of your children, the lives of your grandchildren, your lives are going to look very different in five to ten years under this leadership and under this vision as it continues, and we just want to be a partner.

AAUP-01417

Why do we want to be a partner?  Let's – just to be frank, why does the United States care about it?  Number one, we care about it because we think it creates a level of stability in the region which we share – which we share.  Not just stability here, stability for your neighbors, because we believe prosperity can become contagious.  Just like instability can become contagious, stability and prosperity can become contagious.  It won't just help you, it will help all of your neighboring partners in the Caribbean Basin and the region writ large, and we think that ultimately makes life in America safer and more prosperous as well.  And so we wanted to look for every opportunity possible to partner with you.

But the basic element of any of this, the basic element of progress and transformation and prosperity, is always security.  So number one, we want to make sure that some of the tragic regional problems that exist with crime, transnational crime – we have a huge problem in the world right now with organized gangs and narcotraffickers that destabilize societies – we want to make sure that never reaches here.  And that's why today's MOU and the work we'll do together will – is designed not to stop it, but to prevent it from ever taking root, from ever finding its way here.  Because unfortunately, sometimes crime is attracted by prosperity and targets prosperity.

And the other are regional threats – the regional threats based on illegitimate territorial claims by a narcotrafficking regime.  And I want to be frank, and I've said this during my time as a senator, and I have full confidence in saying now as the Secretary of State:  There will be consequences for adventurism.  There will be consequences for aggressive actions.  And that's why our partnership in that regard will be important.  That is not what we want to be a feature of our relationship, but it is a necessity of our relationship, because you have a very difficult challenge on your hands with a dictator that's making illegitimate territorial claims.

And so you have our full commitment and support – today we're demonstrating it – both in tangible ways, and we're going to look for ways to make it long-term and sustainable ways, to make abundantly clear that we are invested both as a nation and from our people in being your partner in transformation and in prosperity.  And we will not allow illegitimate territorial claims to be an impediment to your dreams and to your right to develop this country into a symbol that I hope will inspire others to follow the example you set, Mr. President.

So thank you.  Thank you for the chance to be with you.  (Applause.)

AAUP-01418

**MODERATOR:**  Thank you very much, Excellency, and Secretary Rubio.  Members of the media, in the interests of time, we will accommodate four questions.  We will feed two questions from the local media, and two from our visiting media.  I recognize Stabroek News from the local media, as well as Mr. Campbell from the local media.  From the visiting media – okay, you represent?  Good.  Great.  And – all right, we'll start with Marcelle from Stabroek News.

**SECRETARY RUBIO:**  Hi.

**QUESTION:**  Good afternoon, sir.

**SECRETARY RUBIO:**  Good afternoon.

**QUESTION:**  Marcelle Thomas from the Stabroek News.  You just spoke of consequences for aggressive actions, and that the U.S. is Guyana's partner.  Given Venezuela's unprovoked aggression towards Guyana, I want to know if your country would stand by Guyana militarily if Venezuela were to attack this country.  And what would be the U.S.'s response should Venezuela attack U.S. oil major ExxonMobil, which is operating in Guyana's waters?

**SECRETARY RUBIO:**  It will be a very bad day for the Venezuelan regime if they were to attack Guyana or attack ExxonMobil or anything like – it would be a very bad day, a very bad week for them.  And it would not end well for them. (Applause.)  I'm not going to get into details of what we'll do; we're not big on those kinds of threats.  I think everybody understands, and I want it to be clear – we've made this clear repeatedly – I think the U.S. Navy today is making it clear and demonstrating our ability to – we have a big navy and it can get almost anywhere in the – it can get anywhere in the world.  And we have commitments that exist today with Guyana.  We want to build on those and expand on those.  And we'll leave it for the appropriate time, but suffice it to say that if that regime were to do something such as that, it would be a very bad move.  It would be a big mistake for them.

**MODERATOR:**  We now invite from our visiting media.  Please remember to identify yourself and the media house you represent.

**QUESTION:**  Hi, thank you.  Hello, Mr. Secretary.

**SECRETARY RUBIO:**  Hi.

AAUP-01419

**QUESTION:** Hello, Mr. President. Thank you for taking questions from us. We appreciate it. Humeyra Pamuk from Reuters. Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents. A year ago she wrote an opinion piece about the Gaza war. Could you help us understand what the specific action she took led to her visa being revoked? And what was your State Department's role in that process?

**SECRETARY RUBIO:** We revoked her visa. It's an F1 visa, I believe. We revoked it, and here's why – and I'll say it again; I've said it everywhere. Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world – let me just send this message out – if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple.

I think it's crazy – I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors – they're visitors – and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people. I don't care what movement you're involved in. Why would any country in the world allow people to come and disrupt? We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that, we're going to take it away.

I encourage every country to do that, by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it. We're just not going to have it. So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave. Every country in the world has a right to decide who comes in as a visitor and who doesn't.

AAUP-01420

If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and spray-painting your kitchen, I bet you you're going to kick me out. Well, we're going to do the same thing if you come into the United States as a visitor and create a ruckus for us. We don't want it. We don't want it in our country. Go back and do it in your country, but you're not going to do it in our country.

QUESTION: A follow-up?

SECRETARY RUBIO: Sure. Just tell me your follow-up and I'll tell every – and depending on your question, I'll answer it or not.

MODERATOR: No follow-up questions. All right. I now invite our Guyanese –

SECRETARY RUBIO: No, no. She had – can I get her follow-up real quick? Go ahead.

QUESTION: Could you confirm – there's new reporting that 300 visas – State Department has revoked 300 (inaudible).

SECRETARY RUBIO: Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa.

QUESTION: It could – you're saying it could be more than 300 visas?

SECRETARY RUBIO: Sure. I hope – I mean, at some point I hope we run out because we've gotten rid of all of them. But we're looking every day for these lunatics that are tearing things up. And by the way, we want to get rid of gang members, too.

So Venezuela sent us a bunch of gang members. I'm sure you've heard of Tren de Aragua, Mr. President – a terrible gang, vicious gang. They flooded in our – yesterday – just so everybody knows, yesterday one of these gang members who was involved in New York City in attacking a police officer was deported back to Venezuela, because they're now taking flights again because of some strong measures we've taken. And this guy lands – this guy's a guy that attacked a police officer in New York City and laughed about it in court with a smirk on his face. When he gets off the plane in Venezuela, he's welcomed by this character named Diosdado Cabello. I don't know if you've heard of this guy. And he welcomes him, hugging the guy. So does anybody have any

AAUP-01421

doubt that these people are pushing these people into the United States to destabilize us and the region?

So yeah, we're looking for people like this, and we want to get them out of the United States, absolutely.

**MODERATOR:**  Thank you.  We'll now field a question from Guyana.

**QUESTION:**  Thank you.  Kurt Campbell, Newsroom.  President Ali, you've already spoken about how President Trump's plans – tariff plans for China's ships could affect regional trade.  I just wanted to know if in your trade talks today if that issue was specifically discussed –

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  – by Secretary of State Rubio.

**SECRETARY RUBIO:**  And I can tell you – oh, you're asking him.  I'm sorry.  (Laughter.)

**QUESTION:**  It's for both of you.  What assurances can you give Guyana and this hemisphere in terms of stemming indirect consequences?

**SECRETARY RUBIO:**  Yes.  Well, that's – look, the goal the President has in doing so is we need to have an ability to build ships in this world that don't just come from China, okay.  I think it's just dangerous to have one country in the world building all the ships.  I assure you that – and we don't want a war, but I mean, they're not going to build ships for us if we get in trouble, right?  So we need to have alternatives to Chinese ships, and we're trying to create a market and a demand for alternatives to Chinese shipping construction.  And I'm the first one to admit that the United States made a terrible mistake when we deindustrialized and we allowed all these industries to leave our country and go to other places.  Now we're paying the consequences, but we have to fix it.

So I do believe – I can't speak – I don't – the trade portfolio does not belong to the Department of State, but I do believe that we will take this back because we've heard this not just here, Mr. President.  We've heard it throughout our visits here in the Caribbean.  And we're going to take it back and explain to those who are in charge of trade policy that there are some implications to applying it to certain nations who are partners and who are seeking to develop their economies

AAUP-01422

Case 5:25-cv-06618-NW     Document 81-2     Filed 03/27/26     Page 11 of 120

7/3/25, 10:17 PM          Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability - United States Department of State

in ways that I think serve the national interest of the United States, not to mention the national interest of our partners nations, and seeing what can happen.

So I can't make a commitment to those exempt, because that's not something we handle in the Department of State.  What I can commit to is that I will most certainly raise this issue as a recurring issue, in multiple places, that it would have a real detrimental effect on economic development.  Maybe in 10 years it won't be an issue because there's been some diversification, maybe in five, but right now it would be problematic.  That message I'll take back to Washington and to my colleagues that are handling the trade portfolio, and we'll see how the President decides to proceed.  But rest assured we will take that message back.

**PRESIDENT ALI:**  And just to echo the sentiments that, yes, we did discuss it and the region would have raised it also.  But there Secretary Rubio is – as he said, will take this back and to see whether there can be any special initiative for the region, given our specific circumstances.

But let me say also that we have a responsibility to our friends.  The U.S. is a great friend of ours.  The U.S. would have made it very clear that they are ready to stand by us in our development, in our economic expansion, in our security, and in our defense.  And I will say very boldly that such friends must have some different and preferential treatment, because a friend who will defend me when I need a friend to defend me, must be a friend that enjoys some special place in our hearts and in our country, and that will be the case.  Thank you.

**QUESTION:**  And just quickly, illegal migration was also listed as a topic of discussion.  Could you say what are the expectations from Guyana in this regard and any discussions on third-country deportations?

**SECRETARY RUBIO:**  Well, we want to work with you on that.  I think that's a problem for you as well.  I mean, obviously, because of the combination of your growing economy, labor needs, and your geography, you have been a place where a lot of people have come in, and I think you want it to be the right people, right?  So I think if we have information that someone has entered your country who has bad intentions, we want to be able to share that with your government because you don't want that.

You don't want those – if we have information on a Tren de Aragua gang member from Venezuela, we want to make sure that we're – we have collaboration and we're sharing that

AAUP-01423

information.  If we have information that some narcotrafficker is taking up shop here and has decided to try to turn this into a base of operation, which could become – could lead to violence and warfare here, gang warfare, we want to be able to share that with you.  We want to prevent these problems from happening.

So from the perspective of Guyana, which is not a source country of migration to the United States per se – illegal migration – but it is a country that receives, unfortunately, you're getting a lot of people.  And not everybody that comes here – I mean, most people are probably here to work hard and so forth, but not everyone.  So if we have information that someone is in your country that we know is a bad person, we want to be able to share it with you.  We want to be able to share it with you very quickly.  So that sort of information sharing has to be a cornerstone of this security agreement that we've signed today and want to continue to expand upon.

**MODERATOR:**  We will now field our final question from our visiting media.

**QUESTION:**  Thank you so much.  Vera with the – Vera Bergengruen with Wall Street Journal.

**SECRETARY RUBIO:**  They're very tough, this Wall Street – be careful.  All right.  (Laughter.)

**QUESTION:**  Secretary Rubio, when you and President Bukele – you mentioned Tren de Aragua several times.  When you and President Bukele negotiated the deal to transfer the U.S. deportees to his prison in CECOT, did you discuss any provisions to ensure that individuals mistakenly identified as gang members would have access to legal recourse and that they can secure their release if they are wrongly brought – wrongfully detained?

**SECRETARY RUBIO:**  Yeah, we have – that list was carefully vetted, provided to us by Homeland Security.  We have confidence in it.  What we negotiated is the reality that they, in El Salvador, comply with all the international requirements for imprisonment.  So we sent them people.  It was a combination of people – gang members, people we knew were involved in activities that were not productive to the United States, all of them removable in terms of our laws, all of them; every single one of them was someone who was removable from the United States irrespective – and MS-13 members, some of – many of whom are Salvadoran that we had identified as MS-13 members, that they had helped us identify as well.  And that – so it was a combination of people that we sent.  And we may send more.  We'll see.  I mean, it's up to their willingness to accept, but we are grateful to them for the opportunity to do that.

AAUP-01424

And remember, one of the reasons why we had to send some of those people there was because at the time Venezuela wasn't taking their people back.  The Maduro regime – I say Venezuela, but it's not – it's the Maduro regime – was not taking their people back.  They refused to take people back, their own people.  They have an obligation.  If you are a country and someone is illegally in another country, you have an obligation to take those people back, whether they're criminals or not.  Venezuela said they wouldn't take them back, so we had to find a place to send them, especially the ones that had records and – or ones that we had strong suspicions and evidence that were involved in illicit activity.

And so we had to send some to El Salvador because of that.  Now they've taken them back.  And one of them yesterday gets off an airplane, and this narcotrafficker Cabello greets him and hugs him on the tarmac.  Now, what I heard ultimately, by the way, is that some of these gang members we sent back were so bad to Venezuela – they were so bad that after hugging them, maybe not this guy but I don't know, they had to put four or five of them back in jail.  Because that's how dangerous these people are, even though they hugged them on the tarmac and put on this show.

These are some really bad people.  Tren de Aragua is one of the most dangerous gangs the world has ever seen, okay?  When they were held temporarily in Guantanamo while being transferred to Honduras because that's when the Venezuelans picked some of them up, the Marines at Guantanamo said these are some of the roughest people we've ever interacted with.  They were worse than the al-Qaida guys that were in their jails.  Think about that.  So that's who we're getting rid of, and we want to get rid of more of them.

**MODERATOR:**  Ladies and gentlemen, members of the media, this brings the end to our media conference.  And I would like to invite his excellency and Secretary Rubio for a photo op right on the stage.  (Applause.)

---

TAGS

Bureau of Western Hemisphere Affairs      Crime      Drugs and Drug Trafficking

Economic Growth and Prosperity      Economy and Trade Policy      Energy      Guyana

Office of the Spokesperson      Official International Travel      The Secretary of State

AAUP-01425

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 14 of 120

7/3/25, 10:17 PM                Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability - United States Department of State

Venezuela



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

AAUP-01426

# EXHIBIT 36

🇺🇸 An official website of the United States Government <u>Here's how you know</u> ⌄

## U.S. DEPARTMENT *of* STATE

<u>Home</u> >  ... > Secretary of State Marco Rubio Remarks to the Pr...

★ ★ ★

# Secretary of State Marco Rubio Remarks to the Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**EN ROUTE MIAMI, FLORIDA**

MARCH 28, 2025

**QUESTION:** Can I ask a non-trip question, because I want to know what's happening with this Ukrainian children grant.

**SECRETARY RUBIO:** Grant?

**QUESTION:** The Ukrainian children who —

**SECRETARY RUBIO:** Oh, the data. The data is secured. We secured the data. We'll transfer it to the appropriate party. We've ensured that. And we'll be able to say that next week. We already notified that. If we haven't, we're about to notify Congress. I think we've gotten some letters.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** So there's no danger to the data that's been collected on that.

**QUESTION:** But is the program back on?



Cookie Settings

AAUP-01427

**SECRETARY RUBIO:**  No, no, the program we're not – the program is not funded.  It was part of the reductions that were made, but we secured the data and we've ensured that we have it and it can be transferred to any appropriate authorities, and we'll issue a congressional – I don't know if it's a notification or just responses to the letters they've written us.

**QUESTION:**  This is the Conflict Observatory?

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  How is the —

**SECRETARY RUBIO:**  You're not going to hit me with that mike like the President got hit? (Laughter.)  Okay.

**QUESTION:**  And when you were answering the – Mr. Secretary, earlier, you said 300 visas?  It's actually —

**SECRETARY RUBIO:**  Well, the —

**QUESTION:**  Are they all student visas or —

**SECRETARY RUBIO:**  No, no, no, you guys – you asked – the question was, was there 300?  I know that number's been cited.  I said it might be more because we're doing them every day, primarily student visas, some visitors visas.

**QUESTION:**  Okay, so just making sure.  Just making sure.

**SECRETARY RUBIO:**  I don't know actually if it's primarily student visas.  It's a combination of visas.  They're visitors to the country.  If they're taking activities that are counter to our foreign – to our national interest, to our foreign policy, we'll revoke the visa.

**QUESTION:**  Are all of those related to pro-Palestinian protests or (inaudible)?

**SECRETARY RUBIO:**  I'm trying to remember – there's a lot of them now, because I've gone through every one of them.  I think there might be a few that are not, that are related to other groups that are – of people – we've also identified – but this actually is – it should be automatically

AAUP-01428

revoked.  We've also identified people that have criminal charges and even while in the country, and still have active visas.  Some are unrelated to any protests and are just having to do with potential criminal activity.

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Huh?

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Yeah, I have to sign every single one.

**QUESTION:**  And what is the —

**SECRETARY RUBIO:**  Or the autopen.  I'm kidding.  No autopen.  I'm just joking.

**QUESTION:**  And what does it mean when you say against the foreign policy of the United States?

**SECRETARY RUBIO:**  It runs counter to our foreign – that's how we issue visas coming in.  I think about it this way.  If we knew this information – my standard:  If we knew this information about them before we gave them a visa, would we have allowed them in?  And if the answer is no, then we revoke the visa.

**QUESTION:**  Can I ask you on a different topic, Türkiye?  You had the meeting with the foreign minister a few days ago.  I think yesterday they – yesterday or today they expelled the BBC correspondent.  They arrested an AP photographer.  How concerned are you with how things are going there?

**SECRETARY RUBIO:**  Well, ultimately – and look, we've expressed that we're concerned.  We don't like to see the direction that's going.  It's an ally.  It's a partner in NATO.  Anytime you have instability on the ground, you don't like to see it.  Obviously, they have internal domestic political considerations.  We're not necessarily going to always opine on every single one of them.  To the extent we have deeper concerns, we expect to express them at least privately at the outset, certainly in a new administration when we're trying to establish relations.  But we watch the same news reports everybody else sees about what's going on.  We're certainly concerned about these

AAUP-01429

protests and some of the reports.  But we raised that and – but I haven't seen what – what you referenced in the last day, yeah.

**QUESTION:**  Just on Turkey, in your tweet —

**SECRETARY RUBIO:**  Türkiye.

**QUESTION:**  Yes, Türkiye.  In your tweet —

**QUESTION:**  Are you guys going to change that?  Are you going to back to Turkey?

**SECRETARY RUBIO:**  When we're in Türkiye we're going to say Türkiye.

**QUESTION:**  In your tweet, the final sentence is basically about the arrest of Istanbul mayor.  You're not saying that explicitly, but those are their (inaudible).

**SECRETARY RUBIO:**  Well, I mean, and we talked about that.  I mean, their argument is that the mayor is involved in corruption, that this has been a longstanding issue that it's finally got acted upon, and that he is seeking refuge behind his politics.  I don't know all the facts about it.  Obviously, that's not what the mayor is saying or what the political opposition is saying is that this is a leader that might have won the election had he been allowed to run.

So we're watching it.  We've expressed concern.  We don't like to see instability like that in the governance of any country that's such a close ally, especially, and it —

**QUESTION:**  After your post, Turkish diplomatic sources actually denied that this had come up and you had expressed your concern.  I just wanted to ask you about that.

**SECRETARY RUBIO:**  Well, I did raise it with the foreign minister, and probably exactly in the words that I'm using now, and that is we're watching these reports and obviously it's disturbing to see, and we talked about it in those terms.  But as I said, we don't like to see that kind of instability or these things happening inside countries that we hope to partner with on a bunch of things.  And President Trump had a very good working relationship with President Erdogan in the first administration.  I think they would like to restart that.  But they're a NATO ally, and we would like to cooperate with them in Syria and in other places.  So I think it's possible to raise concerns

AAUP-01430

and at the same time understand we have a lot of other things to partner on as well.  We have – that's the balance of conducting a mature foreign policy.

**QUESTION:**  Can you speak about the European leaders who said today that they – they oppose lifting sanctions on Russia, they don't think it's time to do that?  Are you all considering that?  Can you talk about deliberations?

**SECRETARY RUBIO:**  Well, no, so we met with the Russians.  Our team was over there this week.  They came back and they arrived last night, I think, or early some point yesterday.  So we're going to reconvene.  I had some calls about it today.  We're sort of going to analyze what they're – what they're raising and sort of study what exactly it is.  It's a host of sanctions, including sanctions that are not American.  They've raised potentially a couple – my readout of it – they're not even American sanctions, so we couldn't lift them if we wanted to.  We're going to sort of analyze what our team came back with.  We'll present those options to the President.  The President will make those decisions.  We're not there yet.

**QUESTION:**  Have you received Iran's response to the President's letter?

**SECRETARY RUBIO:**  Have I what?  I'm sorry.

**QUESTION:**  Received it, Iran's response.

**SECRETARY RUBIO:**  Yeah, I'm not going to comment on that yet other than to say the President's letter has been publicly reported.  I expect there will be a response, and obviously, at that point, the President will decide what steps, if any, he wants to take next.

**QUESTION:**  Can we go back to visa issue just for a second?  I mean, a lot of people feel freedom of speech concerns about it.  Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy – say you learn something in your course of study that makes you think that what the policy is wrong – and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

**SECRETARY RUBIO:**  Well, I think there's a little bit of common sense here.  You come to the States and then you decide you don't like those paper straws that some of the stores are selling

AAUP-01431

and you start protesting or complaining about paper straws – I mean, we're obviously not going to yank a visa over that.  I think it crosses a line – think about it this way.  No one has a right to a visa.  These are things that we decide.  We deny visas every day for all kinds of reasons all over the world.  We deny visas because we think people might overstay.  We deny visas because the country they come from are people that historically overstay.  We deny visas every day, and we can revoke visas.  If you have the power to deny, you have the power to revoke.

I would argue that the – what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot – buildings are being taken over, activities going on – this is clearly an organized movement.  And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa.  I think it would make sense to deny your visa.  We're going to err on the side of caution.  We are not going to be importing activists into the United States.  They're here to study.  They're here to go to class.  They're not here to lead activist movements that are disruptive and undermine the – our universities.  I think it's lunacy to continue to allow that.

**QUESTION:**  So expressing any kind of view —

**SECRETARY RUBIO:**  And by the way, I've been saying that since I was in the Senate.  Now I'm just in a position to do something about it.

**QUESTION:**  Mr. Secretary —

**SECRETARY RUBIO:**  Now that's a broad thing to say – any kind of views.  But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.

**QUESTION:**  Mr. Secretary, I don't —

**QUESTION:**  Hamas?

**SECRETARY RUBIO:**  Yeah, there may be others.  I mean, if you come here and join Tren de Aragua, we're going to yank your visa too.  If —

**QUESTION:**  Mr. Secretary?

AAUP-01432

**SECRETARY RUBIO:**  And so there may be other movements, but that's partly the movement we've seen on college campuses.  Let's be clear:  It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages.  That's the group they're aligning with.

But beyond that, they are spray-painting buildings.  They are taking over buildings.  You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it.  When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy.  We're not going to keep doing that.  We're not.  Don't come here.  If you're going to do that, go somewhere else. Don't come here.

**QUESTION:**  And I brought up the protests in Hong Kong in 2019, which I covered, because there were also shutdowns of college campuses back then.  There were foreign students that were involved.  There was graffiti.  They stopped traffic at intersections.  They shut down subway stations.  They were largely peaceful, but there were also these instances that disrupted public life and there were foreign students that were involved there.  And so, like, under your rationale, the Hong Kong authorities or the —

**SECRETARY RUBIO:**  Well, every country in the world can deny visas to whoever they want.  It's that simple.  That's a fact.  Whether we like it or not, they can deny visas.

Number two, that movement was not a movement in favor of a group that slaughtered babies and innocents.  That's not what that – that movement, they were people who were complaining because there was no democracy, but I mean and they were upset about the direction Hong Kong was headed and the Chinese law that was being imposed.  But they have – every country in the world has a right to deny you a visa.  I'm not entitled to a visa.  You're not entitled to a visa. Nobody is entitled to a visa in any other country.  They can determine it and they can revoke it at any time they want.

Now, let's – I think it's important is that there's a clear distinction between protesting against the democratic order and protesting in favor of groups that advocate the slaughter and murder of innocent people, which is what many of these groups are supportive of.  Beyond that, these groups are not just taking over – these are not sit-ins we're talking about.  We are talking about buildings that have been vandalized, defaced, that where they – for months on end in some

AAUP-01433

cases.  We're just not going to continue to allow it.  I don't understand what people don't get.  A visa is a gift.  It's a voluntary thing.  We decide to give you a visa.  We deny visas all over the world every day for a variety of reasons, and that means we can also revoke those visas.  No one is entitled to a visa.

**QUESTION:**  I guess some of the examples have come up like a student at Tufts University, like all they did was write an op-ed for the student newspaper advocating for a certain point of view.  They're not – as far as we can tell, they haven't openly advocated for Hamas.

**SECRETARY RUBIO:**  Well, we will – those – as they go, or if they seek to self-deport they can do that, because that's what we've done.  We're basically asking them to leave the country.  That's why they've been detained.  They can do so tomorrow.  Buy an airplane ticket and leave.  No problem.

**QUESTION:**  Mr. Secretary?

**SECRETARY RUBIO:**  But I would add to this that I would caution you against solely going off of what the media has been able to identify, and those presentations, if necessary, will be made in court.

**QUESTION:**  But for example, in that – the Turkish students, the Tufts student's case, I asked you today did she have – has she committed, like, or has she carried out any of those things that you just listed?

**SECRETARY RUBIO:**  The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States.  If necessary and a court compels us, we'll provide that information.  But ultimately it's a visa.  Judges don't issue student visas.  There is no right to a student visa.  We can cancel a student visa under the law just the same way that we can deny a student visa under the law.  And we will do so in cases we find appropriate.

The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life.  So I just think it's

AAUP-01434

crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.

**QUESTION:**  Right, but are the schools raising these issues with you?  Are these – are there out —

**SECRETARY RUBIO:**  Oh, I'm sure they're —

**QUESTION:**  Are these outside groups that they're raising —

**SECRETARY RUBIO:**  Oh, I don't know.  I mean, I'm sure they are.  I mean —

**QUESTION:**  Like, how does it come to – come to your desk?  Yeah.

**SECRETARY RUBIO:**  Oh, bringing it to us?  Well, we're not – we're not going to talk about the process by which we're identifying it because obviously we're looking for more people.

**QUESTION:**  Have you seen the video of her being detained?

**SECRETARY RUBIO:**  I haven't.  But look, detention is simple.  Your visa is expired, your visa is revoked, you have to leave.

**QUESTION:**  But it's six hooded figures with masks on their face who don't identify themselves until they already grabbed her wrist.  It's quite horrifying.

**SECRETARY RUBIO:**  Yeah, I mean, unfortunately our agents – I mean, I'm not – that's a DHS or ICE, so I don't know what their practices are.  But our agents have had to protect their identity because they've found themselves targeted – targeted for violence, targeted for operations against them.  I would say most of these protesters are wearing masks too, and they're not in law enforcement.

**QUESTION:**  Can I ask you a different topic?  U.S.-funded media.  Radio Martí is something that I believe you've supported in the past.  What do you think of the cut in funding for that entity?

**SECRETARY RUBIO:**  Well, first of all, they're not part of the – they're not – we don't control that. That's a separate entity that does it.  My understanding is that Martí has actually started rebroadcasting today, and a few others.  I think the executive order called for them to be – all

AAUP-01435

these agencies to be reduced to the statutory minimum.  And I think the goal ultimately over time, as I understand it, is to reform these entities so that they provide news that, frankly, favors and advances the national interest of the United States.  We have plenty of independent media outlets, including all of you, and then we are interested in media outlets that present America's point of view from our foreign policy standpoint.  And so that review will be ongoing, but obviously that's outside the State Department.  I don't control those.

**QUESTION:**  What about the cuts (inaudible) —

**SECRETARY RUBIO:**  I wish I did, though, but I don't.  Not yet, anyway.  Maybe we'll see, but I don't know.

**QUESTION:**  What about cuts to some of the other programs in Cuba that were supporting dissidents, that were supporting political prisoners?

**SECRETARY RUBIO:**  Yeah, well, some of them were not.  Some of them will be restudied over time.  I think ultimately we're trying to find programs that are effective.  No one's been —

**QUESTION:**  But no, it – as you know, there's (inaudible) in general always in Cuba right now.

**SECRETARY RUBIO:**  Yeah, but there's – I – there's a bunch that were – that we approved that are on the – not even got waivered, just got restarted and we're doing them.  There's others that we have suspended because we didn't think we were getting the return on the investment.  That money may be repurposed to a program that works better for the same cost.

**QUESTION:**  You mentioned that Marines have said – Marines at Guantanamo Bay have said that the Tren de Aragua members there —

**SECRETARY RUBIO:**  Oh, yeah.

**QUESTION:**  — were more violent than al-Qaida members.

**SECRETARY RUBIO:**  Not just more violent, very well organized.  They were able to communicate with each other, the hand signals, all kinds of – I mean, this is a prison gang, so it doesn't surprise me.  That's how the Tren de Aragua originates from, so it doesn't surprise me that they're very effective in that setting.

AAUP-01436

They're also very dangerous to keep in our country.  When you keep prison gangs in your country, they grow, they metastasize.  MS-13 was actually a group that was started by Salvadoran – either Salvadoran refugees and/or actually people born in the U.S. of Salvadoran descent in prisons.  MS-13 did not originate in El Salvador; they originated in U.S. prisons and spread down and back to El Salvador.  Prison gangs are very dangerous because they recruit and then they – they almost create academies within the prisons that then metastasize and spill out to the general population.

**QUESTION:**  Have you spoken to the Marines down in Guantanamo, or did they (inaudible)?

**SECRETARY RUBIO:**  I spoke to one that was in Guantanamo because I know them through a family friend, but I've also spoken to both Pete Hegseth about this and, if I'm not mistaken, Secretary Noem as well.  And they both – when I asked them, "Is this true?" they both confirmed that's what their officers and people on the ground were telling them.  So actually I heard this from a personal acquaintance, and then I actually had it affirmed to me by two members of the cabinet.

**QUESTION:**  (Inaudible.)

**QUESTION:**  (Inaudible) some of the people sent down to El Salvador to the prison weren't actually gang members, but that, for example, there was a (inaudible) with a tattoo (inaudible) supporting autism, people with autism, but it looked like a gang tattoo to the immigration agent and then (inaudible) mistakes made.  How do you address that?

**SECRETARY RUBIO:**  Well, ultimately that – all of that was the work of the Department of Homeland Security.  They've identified them.  I have confidence in the assessments that they've made.  They're – but I can't speak to any one of the individual cases because we're not involved in compiling them.  But I have no reason – in fact, I have confidence that they compiled a good list. And if we have an opportunity to send more, we will – gang members, MS-13, whatever we can send.

**QUESTION:**  (Inaudible) isn't it an issue of due process?  I mean, was that raised with President Bukele?  Do these people have a right to appeal in some way?

**SECRETARY RUBIO:**  Every single one of them was deportable for reasons even beyond the Alien Enemies Act.  The MS-13 as well.  They were all deportable.  Many of these people had orders of

AAUP-01437

deportation already and were either in custody or had been recently apprehended.  So every single person that was sent there was deportable.

Unfortunately, if they're of Venezuelan descent, up until this week the Venezuelans were not picking anybody up.  They were not allowing anybody to go back.  They're the only country in the hemisphere that was refusing to accept anyone.  They have restarted those suddenly, and hopefully they'll continue and then we won't have to use El Salvador.

**QUESTION:**  So why use the Alien Enemies Act if they were deportable anyway?  Because that just seems to be (inaudible) inviting a challenge to it.

**SECRETARY RUBIO:**  No, I think the expedited nature of it.  These gangs were organized.  They were – they were presenting very real and immediate risks in a number of communities in our country in an organized fashion.  We have reason to believe that they were actually being pushed towards the United States in large numbers by the regime in Venezuela.  You saw just yesterday one of them arrived in Venezuela and was greeted on the tarmac as a hero.  This is an individual that was arrested for – caught on video – attacking police officers in Times Square, (inaudible) to law enforcement after doing so.  So we believe that in many ways the Venezuelan regime has encouraged that flow of these groups towards the United States to create harm in our country.

**QUESTION:**  The reason I ask is that we know (inaudible) Thursday before we left on Friday (inaudible) spoken to President Bukele twice, and this was all arranged, and —

**SECRETARY RUBIO:**  I've spoken to him a number of times.

**QUESTION:**  I know, but this —

**SECRETARY RUBIO:**  Not just the only time you were around.

**QUESTION:**  Well, no, no, no, this was the (inaudible).

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  This was the Thursday – Thursday night.

**SECRETARY RUBIO:**  Yes.

AAUP-01438

**QUESTION:** So now we're into Friday, and it became clear with this transfer of diplomatic notes from El Salvador and the stuff that the State Department was doing to get the money ready – 20 grand per person per year for this initial tranche of (inaudible). And it made clear that the President was going to go in and sign the AEA declaration, and yet it didn't come out until after, so Saturday. Why? Was that —

**SECRETARY RUBIO:** Well, about the AEA declaration, that came from the White House. My conversations with President Bukele were as a follow-up and to finalize in a verbal agreement we had reached in my visit to El Salvador on my first trip as the Secretary, so it was just sort of following up on that and how we were going to proceed with it. We were ready now to execute at some point, and we were working through those arrangements with them. And that's what those calls were about. It was just sort of to finalize what we had agreed on.

**QUESTION:** So you don't think that the White House delayed (inaudible)? Because the President did sign the AEA declaration on Friday.

**SECRETARY RUBIO:** Yeah.

**QUESTION:** (Inaudible) it wasn't (inaudible)?

**SECRETARY RUBIO:** I can't speak to the timing of why they released the one they did. I can tell you – and I think you were on that trip – that the agreement to house criminal aliens was reached with President Bukele back in February.

**QUESTION:** Yes.

**SECRETARY RUBIO:** And so we spoke – I've spoken to him since then, but obviously this – those days that I was there we did because we had a couple of open questions that we wanted answers to and that he wanted answers to, and we were finalizing that.

**QUESTION:** Mr. Secretary, on Russia, about a month ago when we were in Riyadh, you were first starting on speaking with them, and you said something. You said soon enough we're going to find out whether they're acting in good faith or not, we just need to test it out. So a month later where do you stand? Are they (inaudible) —

AAUP-01439

**SECRETARY RUBIO:** Well, I'm not prepared to pass judgment on it. They're meeting with us. They're talking to us. They're making proposals. They're agreeing to ceasefires but with conditions that we need to analyze.

**QUESTION:** So is that dragging their feet, actually?

**SECRETARY RUBIO:** I wouldn't – I'm not prepared to characterize it as one or the other. What I've said almost from the very beginning is, I mean, this war is complex. As you can see, it's now going on three years. And I never said it was going to be simple. There's a lot of work to be done with both sides, in particular the Russian side, which we haven't talked to in years. So —

**QUESTION:** How long do you anticipate these negotiations to continue?

**SECRETARY RUBIO:** We're going to – we're trying to achieve peace. We're committed to trying to achieve peace as long as it takes. That doesn't mean that I can guarantee you that there's going to be an agreement in a week or a month. I just can't put a timeframe on it because it doesn't depend on us. It depends on the Russians and it depends on the Ukrainians. It also depends on our partners in Europe who have sanctions that will have to be taken into account, I believe, as part of any final deal.

But I always think it's progress when at least specifics are being agreed to even though they may not be agreeable to both sides, because we get to determine sort of the negotiating posture and what the impediments are to peace. So I think when you negotiate, when you sit down with people and they – and you talk about these things, they have to memorialize these things in documents, at least it begins to give definition to what the impediments to peace are.

As far as willingness, that'll be tested when the time comes to sign or if – if we've dealt with impediments and there's still resistance from one side or the other, then we'll know. But we're not at that stage yet.

**QUESTION:** Do you anticipate this moving soon beyond the technical level and back to higher-level talks?

**SECRETARY RUBIO:** Well, I think you have to make more progress on a technical level at this point, but we'll see. We're going to analyze it. As I said, when they arrive back from Saudi Arabia I want to sit and talk to our team that was on the ground and get a better sense how those

AAUP-01440

negotiations went, because a lot of it isn't just what was written and what was said over 12 hours.  And by the way, we met with the Ukrainians twice as well, so we want to get that perspective, which we met with them on Sunday and again on Tuesday, and the Russians on Monday.  So I need to hear from them directly a little bit more about how it went, and then we'll present that.  We'll meet with the team and we'll present that to the President, and then decide on a path of what the next steps are.

**QUESTION:**  Can I ask you a different topic?  Sudan.  We've seen certainly an upsurge in violence.  The army says they have kicked out from the presidential palace.  You've seen the strike on the market.  Is there anything diplomatically that the U.S. can (inaudible)?

**SECRETARY RUBIO:**  We're engaged in conversations with a number of countries, with Ethiopia, with Kenya, in just over the last 72 hours where we've been raising that.  And we're very concerned that we're going to backslide to where we were a decade or less ago, and so we don't want to see that.  And so we're trying to figure out and we've been engaging with our partners about soliciting their ideas about what can we do on this matter to – what contributions can the United States make to stabilize it now.  There are a number of places we're doing that.  We're doing that with DRC-Rwanda as well.  So there are a couple of places like that that we find ourselves sort of asking our regional partners how do they believe we can be most helpful and engaging, and with our partners outside the region as well.  We've spoken – I spoke to the foreign minister of the UK yesterday about this topic.

**QUESTION:**  (Inaudible) Iran and the (inaudible) letter (inaudible)?

**SECRETARY RUBIO:**  Oh, he just asked me that, but you couldn't hear.

**QUESTION:**  Oh, sorry.

**SECRETARY RUBIO:**  No, that's okay.  I just have to – now I have to remember the answer, because it has to be identical.  (Laughter.)

**QUESTION:**  You have to (inaudible).

**QUESTION:**  Give us the details.

AAUP-01441

Secretary of State Marco Rubio Remarks to the Press - United States Department of State

**SECRETARY RUBIO:** It's been publicly reported that the – that the President sent a message. I anticipate a response on that, and – but we have nothing else to announce on that. Is that pretty much what I told you? All right.

**QUESTION:** Can I ask —

**SECRETARY RUBIO:** All right. Well, the game is going to start. That's why. (Laughter.)

**QUESTION:** What brought about your hatred for ecotourism?

**SECRETARY RUBIO:** I don't hate ecotourism. It's just —

**QUESTION:** You said —

**SECRETARY RUBIO:** No, no, no, no. I said I'm not a fan of ecotourism, but I'm not against it. People like to do that stuff. But like, to me, a vacation does not involve snakes and spiders. So that's my view. Maybe that'll change. I don't know.

**MS BRUCE:** All right.

**SECRETARY RUBIO:** All right. Thanks, guys.

---

TAGS

| [Bureau of European and Eurasian Affairs](#) | [Bureau of Western Hemisphere Affairs](#) | [Cuba](#) |

| [El Salvador](#) | [Office of the Spokesperson](#) | [Russia](#) | [The Secretary of State](#) | [Turkey](#) |

[Ukraine](#)

---

AAUP-01442



# EXHIBIT 37



🇺🇸 An official website of the United States Government Here's how you know ⌄

## U.S. DEPARTMENT *of* STATE

Home > ... > Secretary of State Marco Rubio with Donald Trum...

★ ★ ★

# Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**

APRIL 8, 2025

**QUESTION:**  Well, guys, joining me now, Secretary of State Marco Rubio.  Good to have you, Marco.  How's everything?

**SECRETARY RUBIO:**  Thanks for having me.  Thank you.  Thanks for having me on here.

**QUESTION:**  Well, I imagine this is a good day given the outcome of the basketball game last night.

**SECRETARY RUBIO:**  Yeah, yeah, yeah.  It was good to – by the way, that young guy, he's – I think he's the youngest coach maybe since – they were saying last night on TV since Valvano to win a national title.  He's only been there three years.  They hired him from the University of San Francisco.  He played, I think, six or seven years in Israel in basketball and then he came over, and he's done a great job.  And that's a team that's not built with a bunch of like high-number recruits, like five-star famous guys.  He's kind of pieced it together.  So it's great.  It's great for the school.

The only thing that's crazy is you watch the videos of these kids – my son's at the University of Florida – and these kids climbing up on the light poles and stuff like that, it'...  Cookie Settings

AAUP-01444

I don't know.  I don't remember that back in the day.  People just won, they had a parade.  Now they want to tear up the town even the night before.  So that was the only downside of winning, is seeing these people risking their lives over in Gainesville.

**QUESTION:**  Yeah, listen, kids are going to be kids.  I think I'm okay with kids being kids.  I think we need a little bit more of that as well.  But yeah, we've got to be a little careful.

**SECRETARY RUBIO:**  Yeah, I draw the line at life-threatening shows of enthusiasm.  Those are the things that – luckily, my son wasn't the guy on the lightpost.  But I saw that last night, I was like, somewhere there's a nervous mom.

**QUESTION:**  Well, thank you again, Mr. Secretary, for taking the time.  I guess to start off, it was interesting to see the Supreme Court yesterday, in my opinion, smartly lifted the restraining order against the Trump Administration as it relates to the ability to deport Tren del Aragua murderous, drug-dealing gang members to El Salvador.  Can you talk about the significance of this?  I know you've been dealing with this a lot on a daily basis.  I know you were intimately involved, obviously, when they were trying to recall to make sure we couldn't deport murderous thugs.  But can you talk about that historic work coordinating with President Bukele of El Salvador to get these criminals actually off of our streets?

**SECRETARY RUBIO:**  Well, a couple things.  The most important thing about that court ruling is it said you have to file it, you have to go before the judge wherever those people are being held before they're sent abroad.  Because right now, what was happening is these activists were basically just finding a court – they would find – they'd forum shop.  They'd find, "Where can I find a friendly federal judge that gives me the highest probability of victory in court?"  So you have over 600-something District Court judges, and so you have a guy in New Jersey or a guy in New York or a guy in D.C. basically enjoining the entire country.  I mean, one of these federal judges has the power to stop the entire federal government in all 50 states and every one of our territories.

And so I think the most important thing the court said is, number one, if you want to fight these things, you have to fight it in the jurisdiction where they're being sent from or being held – in this case, Texas – which clearly, for whatever reason, these lawyers, they don't want to go to Texas to file it, right?

AAUP-01445

And then the other is just the power of the federal government to conduct foreign policy. We have a judge right now that is basically trying to order the federal government, the Executive Branch, to bring people back. In essence, they are trying to order us to go to the president of El Salvador and tell him you must now send people back to us. So we can't live in a country – it's just not constitutional – where judges are now conducting the foreign policy of the United States.

The trip to El Salvador was one of the first trips I did. I think it was two weeks in, maybe three weeks in, as Secretary of State. I met with Bukele. I've known him for a long time. He's very pro-American, very – likes the President a lot. He's going to be visiting here pretty soon – I think maybe next week it is when he's going to be coming to the Oval Office. And he agreed; he said, look, I've built these prisons and I will house people here. First of all, he wants his MS-13 killers that are in the United States, because they're wanted for crimes in El Salvador too.

And then he's also willing to hold members of this dangerous Venezuelan gang, and he's doing it at a fraction of the cost of what it would cost us here in the United States to hold them. These – this is one of the most dangerous gangs ever, Tren de Aragua, one of the most dangerous gangs you've ever seen. They go in, they take over entire communities, and we want them out of the country. And Venezuela wasn't taking them, so we had to find a place to send them, and he has the perfect place to send them. And that's a deal we cut with him back in early February, and this was the execution of it. We're very grateful.

And since then, we sent another group over there – not as big, but you look at the roster of people, the next – I think nine or ten that we sent. You see the rap sheet on some of these people, it's one of the worse collections of human beings I've ever seen in my life, and I'm glad they're no longer in the United States.

**QUESTION:** Well, watching the leftists try to defend these people, have them released – I mean, it's sort of wild. I can't imagine a civilization that could survive by releasing arguably some of the most violent people in history back into our streets. Have they just lost the plot so badly that this is their hill to die on?

**SECRETARY RUBIO:** Yeah, I think they're so triggered by everything that happens in terms of any sort of removal of people from the country, it's almost automatically assumed that if you are somehow removed from this country you are a candidate for the Nobel Peace Prize or you are

AAUP-01446

some sort of – it's amazing.  You read these articles; these are the greatest people who have ever lived, who just somehow all happen to be illegally in our country.

But it's a very simple and basic point:  What country in the world would assume millions of people in a mass migration, not to mention thousands and thousands of people that you know are members of dangerous gangs and either have criminal records in their home country or here or are part of groups that commit crimes, who would – it's the stupidest thing I've ever heard that some country would want to keep them there.  It would make all the – for a real everyday person in America, if you went to them and said, "Should we kick out people that are in here illegally and are dangerous criminals," that's, like, a no-brainer.  That's got to be like a 90/10 issue in the United States, right?

**QUESTION:**  The fact that there's even a 10 is shocking to me.  I mean —

**SECRETARY RUBIO:**  Right, or maybe it's even higher, right?

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  But these guys consistently fall on the other side of it, right?  They consistently fall on the other side of it.  And what they're basically telling the American people is these people that are in our country illegally, and by the way are dangerous, somehow have the same rights if not more rights than everyday citizens in our country who are law-abiding, were born here or naturalized here or legal citizens of the United States – they basically have the same rights that you have.

It's the same issue with the student visas.  We have this concept that's been built up that this is somehow a right that people are entitled to a visa.  No one is entitled to come into the U.S. illegally, much less remain here, and no one is entitled to a visa.  A visa – we deny visas every day all over the world because we think somebody might overstay, because we have questions about somebody.

So none of these things are right, so it's time – in addition to doing what's good for our country, it's an important opportunity to sort of reset reality on what these things actually are.

**QUESTION:**  Yeah.  I'd argue the Biden administration canceled plenty of visas of people that actually could be the next astronaut, the next nuclear physicist, the next – because

AAUP-01447

they probably weren't reliable Democrat voters.  But I think more importantly, as you and my father have both made very clear, gangs like Tren del Aragua – part of Maduro's narco-terrorist regime who've influenced violence on American citizens, murder, as well as the Venezuelan people – this isn't just a foreign problem; it's an American one, and it's right in our backyard. What else do people need to understand about how deep this really goes?  Because this isn't just, hey, they got rid of a couple people.  I mean, this – this seems to me like a serious op designed to really undermine and hurt America at the base level.

**SECRETARY RUBIO:**  Yeah.  No, there was no doubt that it was used as a tool against us.  I think mass migration's been weaponized against America.  I think as the years go on, as the months go on, as we learn more about it, there'll be evidence and proof of that out there.  There is no doubt there was a concerted effort, among other things.  I mean, there was a lot of people already wanting to come for a lot of reasons.  On top of that, I think you had a concerted effort to push people towards the United States.  It's not unprecedented.  In 1980, Fidel Castro opened up his mental institutions, he opened up his jails, and he basically flooded the United States with criminals from Cuba, and we paid an extraordinary price for it.  So it's not unprecedented.

In the case of Tren de Aragua, that was a prison gang inside of Venezuela.  The Venezuelan regime pushed them out of the country knowing that many of them – first of all, they destabilized all kind of countries neighboring in the region, but ultimately wound their way up here to the United States.  And we saw that trend begin probably in January of 2023 we started to see uptick in people arriving.

It was actually Venezuelans that were telling me this.  People here in the country, they were saying, look, these people that are coming now, they're members of gangs.  And at first you kind of think, well, how do you really know?  But they were right.  They were absolutely right.  And we started to see that.  And you started to see them in the unlikeliest places.  It wasn't like they were all coming to Miami.  They actually were going to places like Chicago and New York and Aurora, Colorado, and sprinkled all over the country.  And then the crimes began.

So there's no doubt that this was a concerted effort by the Maduro regime not just to drive these gang members out of their country but to drive them towards the United States and to inflict a price on this country.  And it's not – it's right out of the Fidel Castro playbook.

AAUP-01448

**QUESTION:**  Yeah.  Well, María Corina Machado won 92 percent of the vote there in an open primary despite brutal repression, censorship.  I mean, I had her on the show two or three weeks ago.  She was talking about – I mean, if she went to a restaurant – because she couldn't even fly, driving to a campaign stop – they'd shut down the restaurant for even serving her.  I mean, she is clearly the choice of the Venezuelan people.  She was banned from the ballot.  But even her surrogate, Edmundo González, still won the election by 40 points.  I mean, that's –

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  That's not like some of these things here where you say, hey, you won by basis points, where are the gains?  I mean, that's pretty decisive even in that regime.  Would you say the Venezuelan opposition today is more unified and credible than perhaps we've seen in the past, and that can actually effectuate real change going forward?

**SECRETARY RUBIO:**  Well, they're as brave as they've ever been, and she in particular.  María Corina Machado is an incredibly brave woman.  I mean, if you – and I'm not criticizing anybody when I say this, right, but if you look at the Venezuelan opposition, a large percentage of the well-known figures in it are now living abroad, because there comes a time where your family's lives is threatened or they force you out of the country or you leave.  You travel overseas to go give a speech and they don't let you back in.  She has stayed.  But she's in hiding.  They're looking – they're hunting her down every day.  Like, they're trying to get a hold of her, they've tried to arrest her a couple times.  Incredible bravery.  One of the bravest people in the world, and I don't think people know enough about her.

But you have to – people have to understand, I mean, being in the political opposition in Venezuela at this point is a life-threatening circumstance to be in.  I mean, they will – they will put you in jail.  They've jailed everybody around her, everybody – and these are not like normal jails.  I mean, these are atrocious conditions that they're in.

So it's not a government.  The Maduro regime is not a government.  They govern territory because they have the guns and they have the security forces, but it basically is a narco-terrorist organization with strong ties to Iran, strong ties to narco-trafficking, and they just happen to control territory.  They don't even control all of Venezuela because the border regions with Colombia are controlled – openly controlled – by narco-guerrilla terrorists.

AAUP-01449

So yeah, I mean, if they had a real election in Venezuela, Maduro would lose – like he did – by a lot.  But obviously, the way they stay in power is they kill and jail the people who don't agree with them.

**QUESTION:**  Well, I know the Biden administration – I mean, these were regimes that were largely on the ropes until we shut down our own energy production, the Keystone Pipeline, and allowed Chevron to make a deal with the Maduro regime which gave them the cash that I'm sure was siphoned off and/or funneled through back to the regime to keep them in power.  I mean, I can't think of a more glaring example of basically giving a lifeline to literally a terrorist dictator than what we saw in the past.

How do we reconcile that that even happened in America, despite sort of party differences?  I mean, it's so flagrant, and the fact that the media won't even talk about that, won't even talk about this; but if we do anything here, they're so vocal about any kind of change in what was ultimately a failed policy that boosted up a dictator.

**SECRETARY RUBIO:**  Look, in foreign policy we want to be mature and realistic about it.  You're going to have to deal with some bad people, right?  You're going to have to deal with people that you don't like, people that you don't agree with, but for the purposes of foreign policy, peace, and all that kind of thing, you have to deal with them, okay?

The problem is you can't do it in a stupid way, and that's what the Biden people did.  They went to Maduro and they said, okay, we're going to do a deal.  You promise to hold elections, free and fair elections in like nine months or whatever, and we will immediately lift sanctions and allow you to start producing oil and getting paid for it.  It was a side deal, by the way, because they didn't – they only announced that they did this deal with Chevron.  What they didn't announce was that Chevron – with a side, secret deal – was allowed to pay the Maduro regime royalties.  It accounted for over 25 percent of all the revenue going into that regime from oil.

So they did that deal.  Well, they didn't have – you talked about the election.  The election was fake.  They didn't have an election.  And after that, after that, they left the deal in place.  They left it in place, even though they violated their word on holding free and fair elections.  I think the way – if they were going to do it – and I don't think at this point you can do it – you say first you have free and fair elections, then we'll lift the sanctions.  And then we'll – but they – and even if you do

AAUP-01450

it the way that the Biden people did, at least if they don't – if they break their word, undo the thing.  Stop getting – allowing them to get money.  But they didn't do any of that.

So I think it's one more example of stupidity in our foreign policy, which other countries look at and say, well, hell, they got away with that; we should – we could be able to get away with whatever we want as well.  It's really both weakness and stupidity.

**QUESTION:**  Yeah.  I mean, I'm not a foreign policy wonk by any stretch, but I know enough about negotiation to say you don't give up all your leverage, you don't give the other side everything that they want before you get to the table to figure out what it is that you want.  You keep maximum pressure on them so you can actually effectuate real policy changes.

**SECRETARY RUBIO:**  Yeah.  Well, if I want to put it in real estate terms, you don't get to say, okay, pay me for the building and I get to keep the building anyways.  (Laughter.)  And that's pretty much the deal they made.  It's like, here's all this money for your – we want to buy your hotel or your property.  We're going to send you all this money for it.  But by the way, you get to keep the hotel and the property.  You get the money and the hotel.  That's what these guys got.  They got to keep their dictatorship and their deal, but obviously President Trump is a very different kind of president, and that's over now.

**QUESTION:**  I agree.  Mr. Secretary, can you talk about the impact of your successful leadership and what appears to be a broader pivot into the Western Hemisphere?  We've seen comparisons to the Monroe Doctrine.  Can you talk about the opportunities to shake up the foundations of communism in the Western Hemisphere and build strong, long-lasting American alliances in our backyard, whether it's with Bukele in El Salvador, Milei in Argentina, María Corina Machado in Venezuela hopefully eventually, and perhaps others?  What does all of that look like to you?

**SECRETARY RUBIO:**  Yeah.  Well, the baseline is the United States wants to be friends with our friends, right?  So for a long time if you were a U.S. or pro-American ally in the region, we kind of ignored you and in some cases actually treated you bad.  But if you were an irritant like Nicaragua or Cuba or Venezuela, then we made all these deals with you to make you happy, right?  So we made deals with the people that hated us and we either neglected or sometimes were outright hostile towards the countries that were pro-American.

AAUP-01451

So we've reversed all of that.  And you – and look, maybe I'll miss a country here, but you talk about places like Guyana, Argentina, Paraguay, Costa Rica; the president of Panama is very pro-American, meaning he wants to be our ally and our partner; El Salvador, the Dominican Republic.  So we've made a concerted effort to reach out to these countries that have governments and leaders that want to be aligned with the United States, not just on regional issues but international issues, and figure out a way – we want those democratically elected leaders to go back to their people and say, hey, there's benefits to being friends of America; here are the benefits.

At the same time, it allows us to clearly define the countries that have governments that are enemies of the United States, unfortunately, in Cuba, in Nicaragua, in – and obviously the regime in Venezuela.  So we identify these.  And then others, we've got some tough issues to work through, like with Mexico.  On fairness, I think the Mexicans are doing more today against the cartels and against migration than they have ever, ever done ever before, and obviously the credit goes to President Trump for being very strong about that.  But that's an example of how positive engagement has allowed us to get things – has allowed us to reach a level of cooperation with the Mexican Government that we never have had before under previous presidents.

**QUESTION:**  How would you like to see that?  Because, I mean, to me that's the biggest thing.  I mean, we spend in trillions in Ukraine; it doesn't matter.  We – I mean, it's not really a clear and present threat to us, we – all of those things.  But, I mean, the Mexican border, whether it's, honestly, a lot of the stuff I'm sure you're probably dealing with on trade as well as the cartels, with the fentanyl trade coming across and then human trafficking and child sex trafficking – I love seeing Mexico do that.  What more can we do to help bolster those efforts?

Because, I mean, I think if we look at it objectively, I imagine there's probably plenty of cartel infiltration into the Mexican military.  You see about X number of presidential candidates in Mexico killed, likely by the cartels.

**SECRETARY RUBIO:**  Yeah, yeah.

**QUESTION:**  There is undue influence.  It's not like a gang in California.  These are very sophisticated, very well-funded paramilitary organizations at this point.  How can we help bolster that?  Because when I look at 100,000 Americans dying a year – two Vietnams a year – indiscriminately across the board with fentanyl, that seems to me like the most obvious clear and

AAUP-01452

present danger to the United States of any foreign issue that we deal with, any war and any conflict.

**SECRETARY RUBIO:** Yeah, no, no doubt. So I think the first is to recognize what you just said, and that is – and I'll tell you why we recognize it. You're absolutely right. I mean, you have judges – like, let's talk about extraditions. There are people that are extraditable, like, they're wanted in the United States; they should be extradited. But they'll literally go to some corrupt judge and say, oh, that's not me, I'm not Jose Sanchez, I'm not Juan Ramirez, that's not me. And they spend 10 years in this process. And then you've got some people in that government that have been very – that want to get rid of those people, that want to take those on, and we just have to understand that in Mexico for those people to stand up and say I'm going to take on a drug cartel, it's not like you might lose the next election or be removed from office. It's like you might be beheaded. You might be killed. Your car might blow up. Your kids might and your family might be killed. Same with journalists that reveal all that.

So I think part of it is capacity building, meaning working with them. The Mexicans have capabilities. I mean, they're not – it's not a Third World country. I mean, they've got institutions there that we partner with. It's intelligence sharing, whether it's them alerting us, hey, these guys we think have crossed your border and they're operating in Tucson; or us letting them know, hey, there's a drug shipment or there's a human trafficking network moving across. Can you guys action that? So all of those sort of – all of that collaboration is going on right now as we speak, and it's more than it's ever been.

Now, there's more that needs to be done. And if you look at the border today, it's the most secure border we've probably ever had in my lifetime, that's for sure. I mean, there's just nobody crossing. In fact, one of the biggest problems we're facing or complaints we're hearing about now is that there are people that were headed here, coming up through Central America; they realized Trump won the election and he was actually serious. They made a U-turn and now they're kind of stuck in these countries along the way, whether it's Mexico or Guatemala, Honduras, whatever. They're making U-turns. So that has stopped, and I think that's – Mexicans deserve some credit for helping us on that front, because they've actually sent more national guard troops to the border than they ever have before.

Look, they've still got big problems. We've still got to deal with the fact that there are parts of Mexico where the drug cartels are way more powerful than the government. In fact, the

AAUP-01453

government might not even be present there.  They are the government.  It's a huge undertaking and it requires – we have to work – it's not just an us issue.  I mean, it's the Department of Defense, it's Kristi Noem in DHS, it's Tom Homan, it's all of these different elements of government that are partnering with the Mexicans.  This is the closest we've ever worked with them.  We have a lot more to do, but this is the closest we've worked with Mexicans, the Mexican authorities, on tackling this problem, and I think there's more to be done.

**QUESTION:**  That's great.  Meanwhile, I guess, the State Department – we talked about visas a little bit earlier, but you guys have been sort of aggressively confronting visa holders tied to terror groups and extremism.  It's sort of shocking to me that that was never done before.  You would think that would be a pretty serious red flag, but apparently it wasn't.  Only people who buy MAGA hats and/or Bibles would be targeted by the Biden administration.  Can you lay out perhaps your mission and priorities as it relates to foreign national here on visas who are acting against America's interests?

**SECRETARY RUBIO:**  Yeah.  So if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, because we don't like or have questions about some of your political activities and your views.  We just won't give you a visa proactively, on the front end.  My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it?  In essence, if we wouldn't – if there are things about you that had we known we would not have given you a visa, we should be taking away your visa.  It's as simple as that.

There's no – no one's entitled to a visa.  I mean, there are all kinds of reasons why people get denied.  There are people that can't tell you why their visa was denied; they just don't know.  It's just we – we're not taking more people from that country, or we just – whatever it may be.  So I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa.  And we're revoking those visas, and they have to leave.

Now, I think everyone would tell you this – if you told me I'm applying for a student visa so I can attend a university, and while I'm at your university I'm going to become a member in support of

AAUP-01454

or even participate in groups that are going to take over libraries, spray paint monuments, start riots, bang drums all day and night, harass Jewish students – if you told me you were going to be linked to any of that stuff, we never should have given you the visa. Now that you're doing it, we should take away your visa. And that's what we're trying to do and that's what we are doing.

I know it's a lot of work, but we – it's something I wanted to do when I was a U.S. senator. I've been talking about this for two and a half years. I think it's the craziest thing I've ever seen. What country in the world – how stupid, how ridiculous is it for some country to say, "Yes, bring more people to our country that are going to disrupt and create riots in our streets and on our campuses." Who would do that? It's idiotic, and we're not doing idiotic things anymore.

**QUESTION:** Yeah. You would think that one of the major disqualifications would be on the application, if you withheld your true intentions for being there, that in and of itself would be disqualifying. And that's clearly what so many of these people are doing. They're coming in under a guise of being a student, but they're far more active in their role as activists for hate than they are actually trying to be students.

**SECRETARY RUBIO:** That's right. And look, I mean, at the end of the day one thing is you're a U.S. citizen, you go on campus, you get wrapped up in these movements – it's very unfortunate, and I think that's a societal problem we have to confront as a country, like why are the citizens of the most prosperous and freest country in the history of the world raising kids that are turning out to hate the country that made all of this possible. But another thing is to say: And by the way, we're also going to invite people into our country as guests who are going to join and foment these movements. It just makes no sense to me.

By the way, that's not the only visas that are getting revoked. That's – like if you have a DUI – if you're here on a student visa and you have a DUI or you have some other crime, that's an automatic suspension. And they weren't doing that; that wasn't happening. That should be automatic. You commit a crime while you're in this country; your visa's gone. You didn't tell us you were coming here to break the law; you told us you were coming here to study and then go back to your country. And if they're not doing that, that should be the end of the visa. And that was something that wasn't being enforced either.

AAUP-01455

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 46 of 120

7/3/25, 10:18 PM                    Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr. - United States Department of State

**QUESTION:**  Yeah.  And it's not like there's not precedent for that, right?  I mean, you can't get into Canada if you've had a DUI.  I mean, you can't lie about an application to go to Mexico on your passports.  It feels like we've had the most lax immigration laws as probably the country that most people around the world would want to get into, and yet we don't even hold ourselves to the similar standard of our neighbors and, frankly, everyone else around the world.

**SECRETARY RUBIO:**  Yeah.  No one else does it this way.  No one else does it this way.  We're the ones that – I think something has built up in the American mentality that somehow coming to America is a right, that everybody on Earth has a right to come to America legally or illegally if they want.  And that's just not true.  That's never been true.  But that certainly can't be the standard, certainly not the legal standard.  And it also makes no sense.

You – every country in the world has to be able to control who comes in, when they come in, why they came in.  We have to have standards for all of that.  And then you have to enforce those standards.  And we just – we've just completely lost focus on that, and instead sort of created this mentality that I think really spanned both parties, that we should just allow anyone who wants to come in to come in, that our default position is yes, come in, and we'll figure it out later.  And that can't be our default position anymore.

And by the way, you explain this to foreign countries – they completely understand.  At least privately they completely understand.

**QUESTION:**  They're all doing it.  They may be outraged because they want to get rid of their —

**SECRETARY RUBIO:**  Well, and the ones —

**QUESTION:**  —  less than desirables.  But I don't think we can be the world's dumping grounds for criminals and murderers.  I always talk about the statistics under the Biden – 13,000 murderers.  I mean, that's Joe Biden's ICE.  They knew they were murderers and let them in.

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  Sixteen thousand rapists and sex offenders; 600,000 criminals overall.  I mean, that's insane.  They knew it and we're like, "Eh, it's okay."  Spread out 16,000 rapists amongst the 4,000 counties in America, four rapists per county in America.  I mean,

AAUP-01456

it doesn't seem like that would go well.  It's 3.6 murderers per county around the country.  What good could possibly come from these things?

**SECRETARY RUBIO:**  No, nothing good comes up.  But it just tells you we just completely – policymaking in America became completely detached from common sense, completely detached from reality.  We sort of adopted this mentality that we're welcoming – everyone who wants to come in, come in.

You know who else had that mentality?  A bunch of countries in Western Europe that now deeply, deeply regret it.  The Germans made the decision let everybody in, let everybody in.  And now everybody in Germany is like – and all over Europe is like, okay, we made a big mistake here.  Obviously, we're a bigger country, but we've made similar mistakes, right?  And we can't let that continue to happen.

**QUESTION:**  Well, I mean, Europe feels like it's over.  And it feels like they're – actually recognize that, and they can't really do much about it.  But we've had our own issues here as well.  I mean, I know under the previous administration, the State Department made DEI 20 percent of Foreign Service officer performance.  I mean, DEI – I don't know what that has to do with Foreign Service officer performance.  But what did you find out as you got in there, and what are you doing to fix the issue of that?  Because none of that seems accretive to anything that the State Department would actually need to be doing.

**SECRETARY RUBIO:**  Yeah.  I think what you find is that you end up sort of losing focus on promoting people on the basis of merit.  And we have very good, talented people here that never got promoted or got stuck in mid-level ranks.  I mean, they have to wait 25 years to be an ambassador somewhere, or 30 years.  And then it's all because of some – how some supervisor judged you based on some scorecard.

It's like anything else.  People are – you're going to get what you reward.  You're going to get what you value.  It's the reason why we keep – why we score tests.  It's the reason why we have points in sports.  We want to know who won and we want to know – we want to reward good behavior.  We want to award good – we want to reward good qualities and we want to diminish bad ones.

AAUP-01457

So we're changing that standard.  We want to promote people within the State Department on the basis of how good they are at their job.  And there are different jobs people do here.  Some people are on Consular Affairs, which are the ones that review visas.  Some people are diplomats or economic officers, whatever it may be.  But we want people rewarded on how competent they are, how good they are at their job.  And frankly, what I think that opens the door to is the ability to promote people that maybe have been here 10 years instead of 25, but really are better than the people that have been here 25 years.  You know what I mean?

I mean, otherwise, you start to lose talented workforce.  Imagine you're in the Foreign Service.  You're there for 12 years.  You realize there's another 10 years before I get promoted to anything.  And by the way, it all depends on how somebody judged me on some scorecard about whether I hit some DEI metrics.  So we're getting rid of that in terms of how we judge and analyze our workforce, and I think it's going to give us a more accurate way to promote people.  I think it's going to help us with recruiting.  I think we're going to be able to —

**QUESTION:**  Yeah.  Oh, and people need to know that they have a chance.  If you have good talent, to your point, they don't want to know – and you've probably dealt with this in Congress; I saw that all the time.  It's like people who have no business being on the most prestigious committees end up on these committees because they've been there longer and therefore have some sort of tenure, but they're making trillion-dollar decisions about something that they don't understand, whereas a freshman congressman, senator may end up there but they – their life's work was exactly that.  So they actually know what they're talking about, but they have no chance of ending up in these places.

So it's really hard to recruit talent if they know that they may be more qualified than the people that are going to get that job and they've got to sit there for 25 years, not because they don't deserve it but because they just haven't been there long enough.

**SECRETARY RUBIO:**  Yeah, and understand, like, nobody goes into the Foreign Service thinking they're going to become millionaires working for the U.S. Government.  They do it because they want to be involved in foreign policy, they want to get around the world or what have you.  But I think we're going to have trouble attracting people to that career, and I think we're going to have trouble retaining people in that career, given all the other opportunities that now exist out there, if they don't see a pathway to fulfillment, professional fulfillment.

AAUP-01458

**QUESTION:** Yeah.

**SECRETARY RUBIO:** And so I think that's going to help us do that, but I also think it's going to help us place the right people in the right places, because we're going to be judging them on the basis of how good they are at their job, which really should be how we make decisions about everything. I always go back to sports. If you think about it, I mean, how do we judge who gets to – who's on a team or who gets to play? And it's basically very simple, and that is your performance in practice and in games that determine ultimately who you put on the field or on the court or whatever it may be. And that's how we need to do it at all levels, including here in government.

**QUESTION:** Well, yeah, I'm glad that you're making that change. But how do you see all of that – whether it's the DEI stuff, et cetera – how does all of that tie into the scandal surrounding USAID? What's the status of USAID today? Is it gone? Is what's left of it now kind of completely within your authority to oversee? I know you've assembled a tough and courageous team, including top deputy Chris Landau, Acting Under Secretary Darren Beattie, who's been on this show many times, and others. What's it all mean and how do we combat sort of that years of just insanity, actually?

**SECRETARY RUBIO:** Well, I think that foreign aid is something that we need to do and we're going to continue to do, but every dollar we spend in foreign aid has to achieve at least one of three objectives. It has to make America stronger, it has to make America more prosperous, or it has to make America safer. If the program doesn't do one of those three things, it may be a great cause and I encourage the Gates Foundation or charities all over the world to take it up, but it has to be one of those three things.

I think the other big mistake that happened with foreign aid is we turned it into a tool to export our domestic policies of the far left, right? So the far left decided these are things that we think are good and it also became cultural imperialism. We began to use foreign aid not as a way to make America stronger, safer, more prosperous, but as a way to impose – impose – the domestic political agenda of the left onto foreign countries. And it became a vehicle for that.

I think the third thing that developed over time is what I call the foreign aid industrial complex. And I'm talking about dozens and dozens of these nongovernmental organizations, these NGOs, that were raking in hundreds of millions of dollars to run these programs on behalf

AAUP-01459

of the U.S. Government.  And it came out – and this is not me; Samantha Power would have said this – you have to spend – in order to get $12 million to people directly, you have to spend $100 million.  You have to spend 100 million to get 12 million out to – directly, because you have to pay the NGO and then the subcontractor then the sub-sub and the sub-sub-sub.  And before you know it, you're paying Hamas to hand out food or whatever.  And that has to stop and that has to end.

So we conducted a review of 6,000 programs, almost 6,000 programs, at USAID.  We identified close to 900 that we are going to continue to do, either in their current form or amended.  We canceled 5,000-some of those contracts, and now the goal is to bring all of those programs under the State Department so that we can directly review – because remember, USAID was separate from the State Department.  They did whatever they wanted.

**QUESTION:**  Yeah.  Well, it feels like that was on purpose, right?  Once it's at the NGO level, all of a sudden there's no oversight, so who knows where that money is going?  I've always wondered, as you watch – that stuff gets discovered by DOGE, and within three days the top seven people at Act Blue, the big Democrat fundraising apparatus, all of a sudden magically disappear.  And I've always wondered for years:  How is it that they're raising 5x for every congressional seat that – what we can run, how is it that they're raising 10x on some of them?  Do you think there's any ties there to this money basically just being kicked back to Democrat – the fundraising apparatus and/or other shady things?  Because I – I just don't believe in enough coincidence anymore to believe that was just – magically happened at the same time.

**SECRETARY RUBIO:**  Well, some of that's been referred to the Justice Department to look at, but what I can tell you most definitely is that there are people that have made a lot of money by being part of the foreign aid industrial complex, by being part of this network of NGOs who do things.  And then some of it, frankly, just didn't make any sense, right?  Like you – I just came back from a trip to the Caribbean where I went to Jamaica, I went to Guyana, and I went to Suriname – the Caribbean Basin.  And their number one complaint is that USAID-funded NGOs didn't partner with government, right?  And then – and you can even go to embassies.

By the way, this is not really well understood.  There's always been tension between State Department and USAID, because there's some ambassador that's like, okay, I'm trying to get – we're trying to get good relations.  The foreign policy of the U.S. is to have good relations with the

AAUP-01460

leader of this country.  And then USAID, operating out of their embassy, is, like, funding the political opposition of that leader that —

**QUESTION:**  Yeah, or, like, trans Elmo in places where let's just say that's not as popular as it is in California.

**SECRETARY RUBIO:**  Another example, right, these sorts of things that you see.  But in the case of the Caribbean, it's like, okay, they want to spend all this money on these literacy programs out in the countryside – which we're not against as a government – we're fine with that.  The problem is that we can't even get to those schools, kids can't even go to school, until we first, like, get rid of the gangs that are threatening kids from going to school.  So our number one priority, if you want to help us, help us with what we need.  Don't help us with what you want, which is to get into these rural schools, where now you start indoctrinating people on the social priorities of the far left in the United States.  It's part of that exporting of it.

So we're going to realign foreign aid, so we're actually going to be helping countries with what they generally need.  And a lot of these countries, it's security assistance.  What they want to do is they want to be able to build up police departments and security forces so they can become self-sufficient at taking on these gangs and not require foreign aid in the future.  The best foreign aid is foreign aid that ultimately ends because it's successful, because you go in, you help somebody, they build up their capacity, and now they can handle it themselves, and they don't need foreign aid anymore.  That's what foreign aid should be geared towards, not perpetual – these programs exist for 25 years.  If a foreign aid program has been going on for 25 years, it has not achieved its purpose because it hasn't solved the problem.

**QUESTION:**  I think that's very well said.  I think, unfortunately, that machine wants to keep those people employed in whatever else they're doing.  So, yeah, that's what I was wondering, sort of a – it felt like one big sort of grift, kickback apparatus.  Perhaps it's incompetence, but I don't believe that either.  I think these people have been very well entrenched, so I'm really glad to see you taking all of that on.

So as we wrap, because I know your time is a little limited today, I do want to say just what an incredible job I think you're doing with this.

**SECRETARY RUBIO:**  Oh, thank you.

AAUP-01461

**QUESTION:**  It's been so great to see this cabinet, people just getting together, not sort of taking on the positions that they would have otherwise.  And I think even your worldview – JD's worldview, so many of these guys – probably has really evolved over the last 10 years.  I'd love to hear how you see that happening but also how you'd like to sort of assess the almost first 100 days, and what do you see in store for the next 100?

**SECRETARY RUBIO:**  Yeah.  First of all, on your worldview – our worldview should always be under examination because the world is constantly changing.  Like, anyone who has the same worldview today that they had 15 years ago is lost, because the world looks nothing like it did 15 years ago.  So as circumstances change, the way you approach the world has to change.  We're different – we're in a very different era.  Fifteen, 20 years ago, we were the sole uni-power force in the world.  We took on a lot of causes because nobody else could.  The world looks a little different right now for a lot of different reasons.  So I think it's been a very busy – clearly, like I was just saying before we went on the air here with this, that every day here feels like six months' worth of work on every front.

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  As you know, the President is pushing very hard on every front to get everything done, and I think he has two advantages.  The first is he was president, so it's been the fastest transition you've ever seen because this is not – there was no on-the-job learning here.  It was go.

I think the team is also a very good team of people that have known each other for a long time.  I mean, I look at this cabinet meeting, I look around the room; I've known almost everyone in that room for at least a decade, and you have had relationships with them even before they were in government.  I mean, Pete Hegseth I've known for a long time.  You name it.  And you go – Pam Bondi's from Florida.  I've know her for almost 20 years.  These are people you've worked with before, and they're all aligned with the President's vision.

I think the first time, in the first term, not to be critical of anybody, but I think the President, he wins the election and then he sort of said – they sort of bring in people and say, look, these are the people in the Republican Party that do this kind of stuff.  I think now, having the advantage of having been there before and so forth, he had the ability to put together a team of people who are responsive to the President's tasking to the extent that it's not even a problem, to the extent

AAUP-01462

that what I'd say what has been challenge is the challenge is we're moving so fast, there's so much to do, everyone is so eager to deliver, that you need 26 or 27 hours in the day, because we work for someone that apparently has found a way to fit 27 hours in a 24-hour day in terms of how he works.

And so – but it's exciting to be a part of.  You – we truly feel like we are making changes and decisions today in the positions we're in that are going to dramatically improve our country and life in America for two generations.  Like, we feel like we're about – on achieving that, not just here in the State Department but on matters of trade, international relations, domestic economics, rebuilding our industrial capacity.  And I think the President has assembled a great team to do it, and obviously he's always – he's always pushing hard, as you know better than anyone.  It doesn't – what have you done – it's what you did yesterday doesn't matter.

**QUESTION:**  It doesn't matter how many wins you rack up.

**SECRETARY RUBIO:**  Exactly.  (Laughter.)

**QUESTION:**  If you get that call at 6:00 a.m., "What have you done for me lately, Marco?"

**SECRETARY RUBIO:**  That's right.  Why are we not undefeated?  And why didn't we win by 20 instead of 15?  We got the championship, oh, but why didn't we win by 20 or 25?  And it's good.  That's the way you push the envelope and that's the way you achieve excellence.

**QUESTION:**  Well, Secretary Rubio, thank you so much for the time.  I really appreciate it.  Keep up the great work.  I look forward to seeing so many more great things coming out of the State Department and so much more.  Thank you.

**SECRETARY RUBIO:**  Yeah.  Awesome.  Thank you.  Thanks for having me on.

---

TAGS

[Bilateral Relations and Engagement](#)    [Bureau of Western Hemisphere Affairs](#)    [Crime](#)

AAUP-01463

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 54 of 120

7/3/25, 10:18 PM                Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr. - United States Department of State

**Drugs and Drug Trafficking**      **El Salvador**      **Elections**      **Energy**

**Foreign Assistance and Humanitarian Aid**      **Foreign Governments**      **Foreign Policy**

**Office of the Spokesperson**      **Outreach and Engagement**      **The Secretary of State**

**U.S. Agency for International Development (USAID)**      **Venezuela**



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

AAUP-01464

# EXHIBIT 38

 **U.S. Citizenship and Immigration Services**

 **MENU**

[Home](#) > [Newsroom](#) > [All News](#) > [News Releases](#) > DHS to Begin Screening Aliens' Social Media Activity for Antisemitism

# DHS to Begin Screening Aliens' Social Media Activity for Antisemitism

Release Date : 04/09/2025

**WASHINGTON**— Today U.S. Citizenship and Immigration Services (USCIS) will begin considering aliens' antisemitic activity on social media and the physical harassment of Jewish individuals as grounds for denying immigration benefit requests. This will immediately affect aliens applying for lawful permanent resident status, foreign students and aliens affiliated with educational institutions linked to antisemitic activity.

Consistent with President Trump's executive orders on [Combatting Anti-Semitism](#), [Additional Measures to Combat Anti-Semitism](#) and [Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats](#), DHS will enforce all relevant immigration laws to the maximum degree, to protect the homeland from extremists and terrorist aliens, including those who support antisemitic terrorism, violent antisemitic ideologies and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah aka: "the Houthis."

"There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here," said DHS Assistant Secretary for Public Affairs Tricia McLaughlin. "Sec. Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism – think again. You are not welcome here."

Under this guidance, USCIS will consider social media content that indicates an alien endorsing, espousing, promoting, or supporting antisemitic terrorism, antisemitic terrorist organizations, or other antisemitic activity as a negative factor in any USCIS discretionary analysis when adjudicating immigration benefit requests. This guidance is effective immediately.

For more information on USCIS and its programs, please visit [uscis.gov](#) or follow us on [X (formerly Twitter)](#)⧉ , [Instagram](#)⧉, [YouTube](#)⧉, [Facebook](#)⧉ and [LinkedIn](#)⧉.

Last Reviewed/Updated: 04/09/2025

 **Need Help? Chat with Emma™**

AAUP-01465

# EXHIBIT 39

**Aaron Rupar**
@atrupar.com

+ Follow

HEMMER: Will Mahmoud Khalil be deported?

STEPHEN MILLER: Yes he will, as will anyone who preaches hate for America.



April 14, 2025 at 9:34 AM · Everybody can reply

**282** reposts   **224** quotes   **1K** likes

484          506          1K

AAUP-01466

# EXHIBIT 40



## QUESTION:  Joining us on the line, Secretary of State Marco Rubio.  Secretary Rubio, thanks so much for joining the show.  Really appreciate it.

**SECRETARY RUBIO:**  Thank you.  Thanks for having me on.

**QUESTION:**  So let's talk about this major move that you just made at the State Department getting rid of a big chunk of the censorship bureaucracy that had been created and pushed a while back but then exacerbated over the course of the last few years, hidden.  What's the story with what you are doing over at the State Department to get rid of the body formerly known as the Global Engagement Center?

**SECRETARY RUBIO:**  Yeah, I think you have to understand the history behind it.  It's real brief. They started it by saying al-Qaida, ISIS, all these terrible groups are radicalizing people online, we should do something about it.  Back when they came up with that 12 years ago, whatever it was, people were like, well, whatever, it makes sense.

Cookie Settings
AAUP-01467

And then it metastasized and it's like, oh, there's foreign interference in our elections, we need to start going after that.  Well then, by 2020, it became a moment to go after voices inside of American politics and begin to label people.  And they put a guy in charge who basically was going around saying Trump is – Trump speaks just like these foreign terrorists, his supporters speak just like these foreign terrorists – so now you have an individual running a State Department entity that was labeling American speech by Americans as foreign interference.

And then really, the kicker was not only were they doing all that formally from the State Department, but they were taking State Department money and they were giving it to these third-party groups who are supposed to be like independent, verified arbiters of what's true and what isn't, what's good and what's bad.  And these groups were deliberately targeting – I believe you were one of the ones they targeted, I think the Federalist – began putting labels on people.

Now you may say okay, "Well, what's the importance of a label?"  Well, that's not just the issue here.  The issue is not only did they put labels on people; that was then used to go to social media companies, it was used to go to outlets and say you have to deplatform these people or you have to cut back on how much views they're getting, you have to go after them – in essence, silence them.

So in essence, it metastasized and the metamorphosis into a government-run entity that was targeting political speech in America, labeling it disinformation, and silencing it – all paid for by the American taxpayers directly and indirectly.  And that ends.

So what happened when we took – right before we took over, they got rid of this Global Engagement Center, they renamed it, and moved it somewhere else.  But renaming something doesn't change it; you still leave the thing around.

So we've undertaken 12 weeks of looking how do we reorganize this whole thing, how do we get rid of it, how do we – and that's what we're announcing today is we're taking the whole thing down.  And it's about $50 million.  I mean, it's not a small amount of money.  And we're not going to be in the business of doing this anymore.  In fact, we're going to be in the business of promoting free speech in America and around the world as a core American value, and that really is what we're going to be about right now.

And we're also going to go back and look at, as an accountability project, all of the instances in which this was used as a weapon against American political voices.  And the reason why that's

AAUP-01468

important is not just because of accountability; it's to make sure it never happens again.  You document these things so that someone in the future, when they get some bright idea like this, realize why we shouldn't do it, because this is what it turns into.

**QUESTION:**  And Secretary Rubio, it's a really good object lesson in what happens with some of these government agencies which started off decades ago with the right purposes and then gradually are infiltrated by people with a significant political partisan agenda, who then proceed to weaponize these institutions against Americans.  We've seen this in USAID.

**SECRETARY RUBIO:**  Correct.

**QUESTION:**  Obviously we see this here with the GEC turned into another sort of body that was then hidden inside these agencies.  I mean, when people like President Trump talk about the deep state, this is the kind of stuff that he's talking about.

**SECRETARY RUBIO:**  Yeah.  So USAID is another great example.  Humanitarian aid – it was created for development and humanitarian aid.  Where it really went off the rails is when humanitarian aid and development aid was turned into:  How do we infuse domestic political priorities into what we fund around the world?  So when it became a domestic political priority to take on transgender rights, now all of a sudden you've got programs by Americans couched as humanitarian or development aid in other countries around the world.  In essence, they injected domestic political considerations into foreign aid, and the result is now it has to be rolled back.  So it's another example.

We're going to continue to do humanitarian aid.  What we're not going to do is use humanitarian aid to spread a domestic ideological movement globally.  We're not going to do that.

**QUESTION:**  Secretary Rubio, obviously this is a – it's a big move by the State Department.  You've been making a lot of moves over at the State Department that are different than your predecessor's.  That includes moves to get out of the United States people who are terrorist supporters, not just people who say bad things but people who are actual terrorist supporters, act in ways that are conducive to actual terror groups.

I wanted to give you a moment to sort of explain the approach that the State Department is taking in taking a look at, for example, student visa holders.

**SECRETARY RUBIO:**  Right.

AAUP-01469

**QUESTION:** What are the standards that are being used to determine whether somebody should stay in the United States or should go? Because obviously opponents of the administration are arguing it's violations of free speech, people have the ability to say what they want. That's not an argument that the administration is actually arguing with. The administration is not trying to crack down on free speech. You're trying to actually stop something else.

**SECRETARY RUBIO:** Yeah. Well, let's start with a baseline, okay? No one is entitled to a student visa to the enter the United States. No one. It's not a constitutional right. It's not a law. Every day, consular officers on the ground in face-to-face interviews are denying people visas for all kinds of reasons – because we think you're going to overstay, because we think your family member is a member of a drug ring, whatever it may be. We deny visas every day all over the world. No one is entitled to a visa. Let's start with that, because I hear some of this reporting out there like if somehow we – you're allowed to have a visa unless we can come up with a reason why you shouldn't have one. That's not true. The burden of proof is the other way.

Now, let's say you go to a window somewhere in the world and say, "I want to go to the United States to study at a university," and as part of that interview it comes out you think Hamas is actually a good group. We probably would not let you in. I would hope we wouldn't let you in. Okay?

But let's say we don't ask you that question and you get into the U.S. on a student visa, and all of a sudden it becomes obvious you think Hamas is a good group. Well, then we should revoke your visa. In essence, if we would have denied – if we had learned things about you once you're here that would have caused us to deny you a visa when you were overseas, that's grounds for revocation. It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them. That's not in our national interest.

So we have a right to deny visas before you get here, and we have a right to revoke them if we believe that your presence in our country undermines our national interest, our national security, and our foreign policy. And that's what we intend to do.

AAUP-01470

Now listen, there are other student visas that are being canceled that have nothing to do with us, by the way.  And that has to do with someone, for example, who is here on a student visa and has a DUI.  And I don't know – that's not us.  That's DHS.  But I don't know if people realize if you commit a crime while you're in the U.S., that's an automatic grounds for revoking your visa.  And no one was ever doing it.  They weren't doing it.  They weren't cross-referencing the system.  Now they're starting to do that.

So that's the majority of these, but we have identified – I can't tell you the exact number because it's static and it's constantly moving, but when someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country.  You're not going to be here; it's just that simple.  What a stupid thing, what a ridiculous thing, to invite people in your country so they can be part of these movements that are terrorizing fellow students, tearing up campuses, shutting down campuses.  We have campuses in America that couldn't even operate for weeks.  People couldn't go to class.  Are we – are we crazy?  What other country in the world would allow this?  We shouldn't allow it.

QUESTION:  Secretary Rubio, I think that the controversy that's arisen over, for example, the detention of Mahmoud Khalil, who is one of the students at Columbia University who has a green card but who was also engaged in protest activities that violated the law, who obviously was sympathizing openly with terror attacks by Hamas and all the rest of this, that the sort of controversy here, there's a common thread to the opposition to the Trump Administration on this stuff, which is, as you mentioned, this bizarre idea that people are somehow owed entry to the United States.

I think that ties in very strongly to the Democrats' new approach to what's going on with this Salvadoran migrant who's now been deported to El Salvador.  The administration has taken a legal position that basically, now that he's in Salvadoran custody, that it's up to the Salvadorans whether to return this person to the United States or not for further due process concerns.

But that's really not the case that's being made by opponents of the administration.  Many of the opponents of the administration are making a more significant case, which is the idea that basically, if you get into the United States, you are somehow owed a permanent status in the United States.  And you're seeing this across the board, ranging from the Trump Administration's moves to get rid of temporary protected status for people who have entered en masse under the Biden administration, to the resistance to DHS or the State Department making moves with regard to the tens of millions, possibly, of illegal immigrants who have brought into the country

AAUP-01471

by the Biden administration.  There is this bizarre supposition that everyone on Earth is somehow owed passage to the United States and permanent membership in our society.

**SECRETARY RUBIO:**  Yeah, and I think it explains to you why we have the immigration crisis that we had.  And it was the belief – they would all say we believe we should have immigration laws, of course, but if you get into the United States you should be allowed to stay; if you make it here illegally, no matter how you got here, then you should be allowed to stay.  I mean, I think that that mindset that's being revealed in these cases tells you how you get 12, 13, 14, 20 million people entering the country unlawfully and illegally over the last few years, because of this mindset that, yeah, we have immigration laws, but we don't really mean it; once you get in, you should be allowed to stay here indefinitely, and we have some sort of obligation to accommodate you here in the country.  That's how you create this mindset that led to that crisis, and people know it.

It's all incentive based.  People believed under Joe Biden – rightfully, they believed – if I could just get across the border, I'm going to get to stay.  And in 90-something percent of the cases they were absolutely right, and that's why more people kept coming.  There's a reason why no one's coming now.  You know one of the problems I'm facing right now with countries in Central America and the Western Hemisphere?  U-turns.  A lot of people were headed here, they realized Trump was serious, they made a U-turn, and now these countries are complaining, oh, they're stuck in my country.  Well, you facilitated their transit for years.  And now they're stuck with them as a result of it.

But that's actually happening.  Why?  Because the incentives are no longer to come; the incentives are not to come.  It's been successful.  It's the most secure border we've had in my lifetime, I mean, if you just think about it.  And it's not just because there are people there.  It's because people aren't coming anymore because they know that the President is serious about enforcing our immigration laws.

**QUESTION:**  Well, Secretary of State Marco Rubio, really appreciate your time.  Thanks for what you're doing inside the State Department to get rid of shadow organizations designed to crack down on free speech, as well as to move people out of the United States who actually don't like America very much.  Secretary of State Rubio, thanks so much for stopping by.

**SECRETARY RUBIO:**  Thank you.  Thanks for having me.

AAUP-01472

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 66 of 120

7/3/25, 10:22 PM     Secretary of State Marco Rubio with Ben Shapiro on the Ben Shapiro Show - United States Department of State

---

TAGS

[Office of the Spokesperson](#)    [The Secretary of State](#)

---



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

AAUP-01473

https://www.state.gov/secretary-of-state-marco-rubio-with-ben-shapiro-on-the-ben-shapiro-show/     7/7

# EXHIBIT 41



**Tricia McLaughlin** ✅
@TriciaOhio

When you advocate for violence, glorify and support terrorists that relish the killing of Americans and harass Jews, that privilege should be revoked and you should not be in this country.

We have the law, facts and commonsense on our side.

No judge, not this one or another, is going to stop the Trump Administration from restoring the rule of law to our immigration system.

x.com/cbsnews/status...

This post is unavailable.

Last edited 1:27 PM · Apr 30, 2025 · **17.2K** Views

37        81        332        10

AAUP-01474

# EXHIBIT 42

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 70 of 120

7/3/25, 10:21 PM    Federal court rules Rümeysa Öztürk must be transferred to Vermont to challenge immigration detention : NPR





npr                                                                    DONATE

NATIONAL

# Federal court rules Rümeysa Öztürk must be transferred to detention in Vermont

UPDATED MAY 7, 2025 · 1:36 PM ET

 Sergio Martínez-Beltrán



People take part in a rally and a protest in solidarity with Rumeysa Ozturk and Mohsen Mahdawi outside New York Federal Court as the court hears the U.S. government request to appeal the decisions in their cases in New York, United States on May 06, 2025.

*Mostafa Bassim/Anadolu via Getty Images*

A federal appeals court in New York Wednesday ordered the Trump administration to transfer Rümeysa Öztürk, a Tufts University doctoral student, from Louisiana to

AAUP-01475

Vermont to continue her immigration detention in that state while a judge there decides whether to release her on bail.

The Trump administration has one week to comply with the transfer, a three-judge panel of the 2nd U.S. Circuit Court of Appeals ruled.

"The District of Vermont is likely the proper venue to adjudicate Öztürk's habeas petition because, at the time she filed, she was physically in Vermont," the panel wrote in its ruling.



**Sponsor Message**

Öztürk has been detained at a federal facility in Louisiana after being arrested on the street in Somerville, Massachusetts on March 25 by six federal plainclothes immigration agents. The Department of Homeland Security later accused her of engaging "in activities in support of Hamas."

Last year she wrote an opinion essay in a university paper criticizing the school for its handling of a handful of resolutions passed by the student senate related to the Israel-Hamas war in Gaza, including one calling on the university's president to acknowledge and condemn "the Ongoing Genocide in Gaza."

Her attorneys say she's being held in violation of her free speech and due process rights and that the government has not shown any evidence she supports terrorism. She has not been charged with any crime.

AAUP-01476

"No one should be arrested and locked up for their political views," said Esha Bhandari with the ACLU, which is representing her in federal court. "We're grateful the court refused the government's attempt to keep her isolated from her community and her legal counsel as she pursues her case for release."

In a statement to NPR, DHS Assistant Secretary Tricia McLaughlin said having a visa to live and study in the U.S. "is a privilege not a right."

"Today's ruling does not prevent the continued detention of Ms. Ozturk, and we will continue to fight for the arrest, detention, and removal of aliens who have no right to be in this country," McLaughlin said.

In court documents, the Trump administration has claimed that ICE sent Öztürk and other students to Louisiana because there was not enough detention space in immigration facilities where they were arrested.

But a federal judge in Massachusetts found earlier last month that there were detention beds available in Maine, a state closer to Vermont than Louisiana.

Wednesday's ruling by the 2nd Circuit Court of Appeals is a win for Öztürk. Legal experts have said that fighting deportation is more challenging in Louisiana than in Vermont. Any appeal from the southern state would be considered by the 5th Circuit Court of Appeals, one of the most conservative courts in the nation.

Öztürk's attorneys say she suffers from asthma attacks that have worsened in detention.

AAUP-01477

She is one of several international students arrested by the Trump administration as part of its crackdown on foreign students who express what the administration claims is support for terrorism and create a hostile environment for Jewish students.

A federal judge in Vermont has scheduled a bail hearing for Öztürk for Friday.

us immigration      donald trump      student activism      israel-hamas war

## The White House is one step closer to defunding public radio.

The House has voted to claw back all federal funding for public media, and the proposal now moves to the Senate.

**We're running out of time to protect public radio's essential news, music, and emergency broadcast services to communities across the nation.**
Those in rural areas — with few other options to get their news and information — will likely be the hardest hit.

But you can still stand up for public radio.

**Spend 10 seconds at the link below.**
The consequences of this vote fall directly on the Americans who rely on local, independent stations serving communities across the country. Take action.

**SAVE PUBLIC MEDIA**

### READ & LISTEN

**Home**

**News**

**Culture**

**Music**

### CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

AAUP-01478

**Podcasts & Shows**

**Public Editor**

**Corrections**

**Transcripts**

**Contact & Help**

ABOUT NPR

GET INVOLVED

**Overview**

**Support Public Radio**

**Diversity**

**Sponsor NPR**

**NPR Network**

**NPR Careers**

**Accessibility**

**NPR Shop**

**Ethics**

**NPR Events**

**Finances**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2025 npr

AAUP-01479

# EXHIBIT 43

Case 5:25-cv-06618-NW    Document 81-2    Filed 03/27/26    Page 76 of 120



**Secretary Marco Rubio** ✔ ◎
@SecRubio

We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library.

Pro-Hamas thugs are no longer welcome in our great nation.

9:44 PM · May 7, 2025 · **2.1M** Views

💬 5.2K          ↻ 14K          ♡ 96K          🔖 1.2K          ↑

AAUP-01480

# EXHIBIT 44



**Tricia McLaughlin** ✓
@TriciaOhio

If you are in this country on a visa, green card or otherwise, you are a guest.

Act like it.

If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked.

**Eden Yadegar** ✓ @edenyadegar · May 7
RIGHT NOW AT COLUMBIA: Masked anti-Israel students just broke into the library during finals week.

Columbia Public Safety unsuccessfully attempted to stop them.



0:17

10:26 AM · May 8, 2025 · **54K** Views

💬 62        🔁 181        ♡ 775        🔖 16        ⬆

AAUP-01481

# EXHIBIT 45



**COMBATING ANTI-SEMITISM IN THE UNITED STATES:** Today, President Donald J. Trump signed an Executive Order to Combat Anti-Semitism.

- Expanding on his Executive Order 13899, President Trump's new Order takes forceful and unprecedented steps to marshal all Federal resources to combat the explosion of anti-Semitism on our campuses and in our streets since October 7, 2023.

- Every Federal executive department and agency leader will review and report to the White House within sixty days on *all* criminal and civil authorities and actions available for fighting anti-Semitism.

- Immediate action will be taken by the Department of Justice to protect law and order, quell pro-Hamas vandalism and intimidation, and investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities.

- The Order demands the removal of resident aliens who violate our laws.

**GOING ON OFFENSE TO ENFORCE LAW AND ORDER AND TO PROTECT CIVIL RIGHTS:** Immediately after the jihadist terrorist attacks against the people of Israel on October 7, 2023, pro-Hamas aliens and left-wing radicals began a campaign of intimidation, vandalism, and violence on the campuses and streets of America.

- Celebrating Hamas' mass rape, kidnapping, and murder, they physically blocked Jewish Americans from attending college classes, obstructed synagogues and assaulted worshippers, and vandalized American monuments and statues.

- The Biden Administration turned a blind eye to this coordinated assault on public order; it simply refused to protect the civil rights of Jewish Americans, especially

AAUP-01482

students. According to a December 2024 U.S. House of Representatives Staff Report on anti-Semitism, "the failure of our federal government departments and agencies is astounding."

**PRESIDENT TRUMP KEEPS HIS PROMISES AND BUILDS ON HIS SUCCESS:** In his first term, President Trump kept his biggest promises:

- He moved the American Embassy in Israel to Jerusalem: After decades of broken promises and despite much criticism, President Trump was the President who finally kept his commitment to Israel to move the American embassy from Tel-Aviv to Israel's true and rightful capital: Jerusalem.

- He established the Abraham Accords: President Trump delivered the greatest breakthrough for peace in the Middle East in decades by brokering the normalization of ties between Israel and the United Arab Emirates, Bahrain, Sudan, and Morocco, protecting Israel and Jews and spreading security and prosperity to the entire region.

Now, President Trump has promised that the Federal Government will:

- Protect the civil rights of our Jewish citizens: "My promise to Jewish Americans is this: With your vote, I will be your defender, your protector, and I will be the best friend Jewish Americans have ever had in the White House."

- Aggressively enforce the law, protect public order, and prosecute anti-Semitic crimes: "I will issue clear orders to my Attorney General to aggressively prosecute terroristic threats, arson, vandalism and violence against American Jews."

- Deport Hamas Sympathizers and Revoke Student Visas: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

NEWS

AAUP-01483

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

| Your email | SIGN UP |
|---|---|

 Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

 

AAUP-01484



AAUP-01485

# EXHIBIT 46

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Privacy Impact Assessment

### for

### Immigration and Customs Enforcement Operational Use of Publicly Available Information Including Social Media Information for Law Enforcement Investigations

### DHS Reference No. DHS/ICE/PIA-064

### December 15, 2023



DEF-001



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 1

## Abstract

The U.S. Department of Homeland Security (DHS) U.S. Immigration and Customs Enforcement (ICE) has a statutory mission to enforce the nation's immigration laws and combat transnational crime. To achieve its mission, ICE personnel collect information from a variety of sources, including publicly available information on the internet and on social media platforms. ICE personnel use publicly available information found on the internet, including on social media platforms, in support of ICE's law enforcement mission. ICE is conducting this Privacy Impact Assessment (PIA) because some of the publicly available information that its personnel collect, maintain, or share may include personally identifiable information (PII).[1] This Privacy Impact Assessment focuses on the collection and use of publicly available information including social media information for law enforcement investigations, leaving in-depth analysis of maintenance and sharing to the respective Privacy Impact Assessments for ICE systems in which the data is ultimately stored. These systems are listed in the Appendix to this Privacy Impact Assessment.

## Introduction

To fulfill its statutory mission, ICE uses a variety of sources from which it collects information related to criminal investigations and immigration enforcement matters. Accordingly, ICE may access, collect, and use information available on the internet and social media platforms,[2] including publicly available information as one of its information assets.[3] ICE maintains compliance with DHS Directive 110-01, *Privacy Policy for Operational Use of Social Media,*[4] and

---

[1] DHS defines "personally identifiable information" as any information that permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the United States, or employee of or contractor to the Department. *See* DHS INSTRUCTION MANUAL 047-01-007, REVISION 3 (2017), HANDBOOK FOR SAFEGUARDING SENSITIVE PERSONALLY IDENTIFIABLE INFORMATION (PII), *available at* https://www.dhs.gov/publication/handbook-safeguarding-sensitive-personally-identifiable-information.

[2] DHS defines "social media" as the sphere of websites, applications, and web-based tools that connect users to engage in dialogue, share information and media, collaborate, and interact. Social media takes many different forms, including but not limited to, web-based communities and hosted services, social networking sites, video and photo sharing sites, blogs, virtual worlds, social bookmarking, and other emerging technologies. The definition of "social media" does not include internal Department intranets or applications. *See* DHS LEXICON, REVISION 2 (2017), *available at* https://www.dhs.gov/publication/dhs-lexicon.

[3] DHS defines "publicly available information" as "unclassified information that has been published or broadcasted in some manner to the general public, is available to the public by subscription or purchase, could lawfully be seen or heard by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public." "Open source" information is a form of publicly available information and defined as "unclassified information that has been published or broadcast in some manner to the general public, could lawfully be seen or heard by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public." *See* DHS LEXICON, REVISION 2 (2017), *available at* https://www.dhs.gov/publication/dhs-lexicon.

[4] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY POLICY DIRECTIVE 110-01, OPERATIONAL USE OF SOCIAL MEDIA (2012), *available at* https://www.dhs.gov/privacy-policy-guidance.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Homeland Security**

its accompanying Instruction, 110-01-001.[5] These policy documents establish privacy policy and requirements for DHS and its components for the access, collection, use, maintenance, retention, disclosure, deletion, and destruction of personally identifiable information in relation to the operational use of social media. Due to the trend toward including interactive, social media-style features on "traditional" internet sites, ICE has determined DHS's Privacy Policy governs the collection of personally identifiable information online on all internet sites,[6] not only on social media platforms.

ICE may only access information online from open source sites (e.g., blogs, news sites, public record repositories) and on social media platforms that is publicly available.[7] This includes any public messages, posts, and media (e.g., photos, documents, geolocation information).[8] The ICE offices that access publicly available social media information as part of their law enforcement activities include the following:

- Office of Homeland Security Investigations (HSI): HSI is the primary investigative arm of DHS and combats criminal organizations exploiting U.S. trade, travel, financial, and immigration systems.

- Office of Professional Responsibility: The Office of Professional Responsibility is responsible for upholding ICE's professional standards through a multi-disciplinary approach of security, inspections, and investigations. The Office accomplishes its mission by investigating allegations of employee misconduct; conducting independent reviews and audits of ICE programs, offices, and detention facilities; measuring compliance with applicable policies, regulations, and laws; and administering ICE's internal security program to protect and secure people, information, and facilities.[9]

This Privacy Impact Assessment covers the following items related to ICE employee and contractor use of publicly available and social media information in law enforcement investigations:

- ICE's operational uses of publicly available online content and social media information;

- ICE's use of technology and tools that collect and analyze publicly available information including social media information;

---

[5] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY INSTRUCTION 110-01-001, OPERATIONAL USE OF SOCIAL MEDIA (2012), *available at* https://www.dhs.gov/privacy-policy-guidance.
[6] This Privacy Impact Assessment only assesses ICE's collection and use of publicly available information including social media information for law enforcement investigations. This Privacy Impact Assessment does not cover ICE undercover operations, which are governed by separate legal and privacy guidelines.
[7] *Id*.
[8] Geographic data may come from publicly shared social media information.
[9] This Privacy Impact Assessment does not address use of publicly available and social media information by ICE Office of Professional Responsibility in support of its internal security program to protect and secure people, information, and facilities.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Homeland Security**

- ICE's use of the deep and dark webs;

- ICE's policy and Rules of Behavior (ROB) for ICE personnel use of social media information;

- First Amendment and Equal Protection restrictions placed on ICE online collections;

- Select mitigation measures for the use of tools to access, collect, and/or analyze publicly available information, including social media information; and

- identification of privacy risks and steps that ICE takes to mitigate risks to personally identifiable information.

## ICE's Operational Uses of Publicly Available Information, including Social Media Information

This section details how each ICE program engages with social media and how publicly available information obtained from social media or other publicly available online content is used in furtherance of ICE's law enforcement mission.

### HSI Use of Publicly Available Online Content and Social Media Information

ICE HSI investigations cover a broad range of topics, including, but not limited to, national security threats, financial and smuggling violations (including illegal arms exports), financial crimes, commercial fraud, human trafficking, narcotics smuggling, child sexual abuse/exploitation, and immigration fraud. Given HSI's vast portfolio, its agents and support personnel rely on a variety of sources of information to generate leads, including information from publicly available sources and social media. Generally, HSI searches of publicly available information will have a nexus to an existing investigation; however, if the information or social media posting is indicative of a criminal violation enforceable by ICE HSI (e.g., child sexual abuse material, an online marketplace for narcotics), that information can be used to initiate an investigation. The following examples provide a comprehensive list of the ways in which HSI personnel use publicly available content and social media information. In the future, if HSI's use of such information deviates from the list below, this Privacy Impact Assessment will be updated to provide additional transparency on the new uses as well as assess any potential privacy risks and appropriate mitigation measures.

HSI uses social media and publicly available information for tactical planning activities prior to a specific law enforcement action to ensure safety of officers and other individuals at or near the scene. Any information that HSI uses in this context is documented in the Investigative Case Management system (ICM) and in the Repository for Analytics in a Virtualized Environment (RAVEn).[10] HSI also uses publicly available information, including social media

---

[10] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact



information, to enhance information from various government and law enforcement databases in furtherance of its law enforcement investigations.[11]

Social media searches are conducted as needed and must be associated with a specific case, operation, or mission-related purpose, such as combatting human trafficking or money laundering.

HSI may consolidate corroborated open source and social media information with information maintained in government databases and create a report that is entered into an ICE case management or lead generation system.[12] The information may then be shared within HSI for investigative action.

HSI may also conduct open source and social media research on schools as part of the certification[13] and recertification[14] compliance process of the Student Exchange and Visitor Program (SEVP).[15] For example, HSI may use publicly available information to verify a school's petition as part of the Student Exchange and Visitor Program certification, recertification, or unannounced review (e.g., following up on tips received from federal agents or the Field Representative Units).  HSI does not target[16] individuals, such as school officials or students, when researching schools to determine the institutions' compliance with SEVP certification requirements.

HSI personnel also will access and use publicly available information online to verify data contained on a school's Form I-17, "Petition for Approval of School for Attendance by Nonimmigrant Student."[17] HSI will use online content, including social media information, to verify the accuracy of the school's official name and other data listed on the Form I-17, such as

---

Assessment for the Investigative Case Management System (ICM), *available at* https://www.dhs.gov/privacy-documents-ice. Any information introduced as evidence in a prosecution would be obtained directly from the social media platform via subpoena or search warrant. *See also* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for the Repository for Analytics in a Virtualized Environment (RAVEn), DHS/ICE/PIA-055, *available at* https://www.dhs.gov/privacy-documents-ice.

[11] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR LEADTRAC, DHS/ICE/PIA-044, and INVESTIGATIVE CASE MANAGEMENT SYSTEM (ICM), DHS/ICE/PIA-045, *available at* www.dhs/gov/privacy-documents-ice.

[12] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR LEADTRAC, DHS/ICE/PIA-044, and INVESTIGATIVE CASE MANAGEMENT SYSTEM (ICM), DHS/ICE/PIA-045, *available at* www.dhs/gov/privacy-documents-ice.

[13] The Student and Exchange Visitor Program's (SEVP) School Certification Unit certifies schools to accept F (academic) and M (vocational) visa holder students.

[14] Designated School Officials, acting on behalf of SEVP-certified institutions, must complete recertification every two years to confirm compliance with SEVP eligibility, record keeping, and recording requirements on F and/or M visa holder students at various types of schools.

[15] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE STUDENT EXCHANGE AND VISITOR PROGRAM (SEVP), DHS/ICE/PIA-001, *available at* www.dhs/gov/privacy-documents-ice.

[16] ICE SEVP does not target individuals outside of HSI's regulatory requirements to vet and conduct routine background checks on school officials/students and refer potential visa violators for further investigation.

[17] Form I-17, Petition for Approval of School for Attendance by Nonimmigrant Student, *available at* https://studyinthestates.dhs.gov/sevis-help-hub/school-records/school-certification/form-i-17-initial-certification.

the school's county, city, state, and address.

HSI may also review the school's social media homepage and school website to verify information on the Form I-17, including program(s) of instruction information (e.g., listed courses, course descriptions, schedules, graduate requirements). If HSI finds discrepancies between the information posted on the Form I-17 and what is publicly available, HSI will generate a lead to the field for further investigation.

Additionally, HSI may use publicly available information to investigate F-1 and M-1 student visa holders who are suspected of overstaying their visas or otherwise violating the terms of their admission into the United States.[18]

Further, HSI uses publicly available information, including social media information to investigate suspected illegal activity by foreign students on college campuses,[19] or other administrative issues related to a foreign student's non-immigrant status. As described above, any HSI use of social media information must have a nexus to an authorized investigation or the social media information itself be indicative of a crime enforceable by ICE HSI.

All information HSI retrieves from social media will be documented in the appropriate ICE case management or lead generation system.[20]

HSI also assists the Department of State in conducting the initial vetting of visa applicants.

*ICE Office of Professional Responsibility Use of Publicly Available Online Content and Social Media Information*

The ICE Office of Professional Responsibility will complement its investigations of allegations of criminal violations or misconduct by ICE personnel with publicly available information. ICE Office of Professional Responsibility will review publicly available postings on the social media accounts associated with ICE employees under investigation to further investigate any claims of criminal or administrative misconduct submitted to the Office by the public or other ICE employees. ICE Office of Professional Responsibility collects any information relevant to the investigation, documenting it in the Office's case management system, the Joint Integrity Case

---

[18] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for LeadTrac, DHS/ICE/PIA-044, and U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for Student and Exchange Visitor Program (SEVP), DHS/ICE/PIA-001, a*vailable at* www.dhs/gov/privacy-documents-ice.

[19] For example, foreign students suspected of stealing intellectual property to provide to their home countries.

[20] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE INVESTIGATIVE CASE MANAGEMENT SYSTEM (ICM), *available at* https://www.dhs.gov/privacy-documents-ice. Any information introduced as evidence in a prosecution would be obtained directly from the social media platform via subpoena or search warrant. *See also* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE REPOSITORY FOR ANALYTICS IN A VIRTUALIZED ENVIRONMENT (RAVEn), DHS/ICE/PIA-055, *available at* https://www.dhs.gov/privacy-documents-ice.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Homeland Security**

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 6

Management System (JICMS).[21]

## ICE Use of Technology and Tools that Collect and Analyze Publicly Available Information Including Social Media Information

ICE uses commercial databases and analytical products to help search, monitor, and process publicly available data from online, public records data sources, and social media platforms pursuant to ongoing investigations. ICE offices and programs may use one or a combination of tools to accomplish their mission. Prior to its use of any technology or tool that accesses, collects, and/or uses personally identifiable information, an ICE program must submit a Privacy Threshold Analysis (PTA) to ICE Privacy to assess the technology or tool's impacts on individual privacy. All Privacy Threshold Analyses must be submitted to and approved by the DHS Privacy Office. All personnel who use a technology or tool must be trained on the appropriate uses of that instrument. The following is a description of the tools that ICE uses to achieve its statutory mission using publicly available information. Each tool may raise unique privacy risks, which are assessed using the Fair Information Practice Principles as discussed later in this Privacy Impact Assessment.

### Analytical Search Engines and Data Aggregators

ICE also uses tools that collect and compile information from multiple publicly available sources across the internet in support of open law enforcement investigations. These aggregator tools retrieve data from credit bureaus, government public records, news sites, and other publicly available information resources. The data the aggregator retrieves is available to the public, either through internet searches or purchase. Data aggregators present data from search queries in a format that is meaningful or useful to the user. Data aggregators used by ICE are specifically designed to search public records and publicly available social media information, filter duplicate information, and present returned information in a manner that is useful to ICE personnel and directly related to an ICE investigation.[22]

ICE users will access data aggregator tools via a web portal and enter the search terms directly related to a person of interest (e.g., fugitive, suspect).[23]

### Link Analysis Applications

Link analysis applications capture digital connections. ICE may use link analysis

---

[21] The Joint Integrity Case Management System (JICMS) is owned by U.S. Customs and Border Protection and is used by ICE. For more information, *see* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, PRIVACY IMPACT ASSESSMENT FOR THE JOINT INTEGRITY CASE MANAGEMENT SYSTEM (JICMS), DHS/CBP/PIA-044, *available at* www.dhs.gov/privacy-documents-cbp.

[22] ICE is prohibited from using data aggregators or other tools to access, collect, or use data that ICE is otherwise prohibited from accessing, collecting, or using.

[23] Persons Of Interest (POI) may include individuals who are reasonably suspected of a crime, are the subject of investigative interest based on the individuals' association with illegal cross-border activity or another criminal network, such as terrorist groups, are wanted in connection with a crime (e.g., arrest warrant), or for whom there is investigative evidence linking the individual to criminal acts within ICE's mission to enforce (e.g., bombing).



applications in support of open investigations. These applications aggregate connected online accounts and social media data to assist investigators with identifying possible connections to an investigation. This is also known as "link analysis." Link analysis helps investigators identify and assess suspected criminal networks by detecting similarities.[24]

The data must be reviewed by an ICE investigator, who is required to assess the information and corroborate it before it can be used in an investigation.

*Automated Collection Tools*

ICE may use automated applications or tools that collect information from publicly available websites and chatrooms identified as relevant to ICE investigations. This process, sometimes referred to as "scraping" is an automated process that copies and collects website data that has been pre-designated by a user as related to an investigation, on a recurrent basis, then loads the copied data into a database for later analysis and use.

ICE personnel will use all available and relevant information such as witness statements, investigative reports, and other documentary evidence, to assess the accuracy and authenticity. ICE is not permitted to collect entire websites or information unrelated to an investigation. The site selection must be submitted to an ICE supervisor for approval before it can be subject to an automated collection tool.

The ICE supervisor must verify that the website or chatroom contains relevant and credible evidence of suspected violations within ICE's statutory law enforcement mission and that the parameters of collection are narrowly tailored to collect only that information directly relevant to a law enforcement investigation. As noted, collection and analysis is only permitted on subjects and information determined to be relevant to and within the scope of an investigation.

Automated collection tools do not modify data in any way. All collection by the tool is passive. These tools  do not violate or circumvent privacy settings and protections placed on the information by a website or chatroom. These tools do not "friend" or "follow" social media accounts, may not post content on social media websites, and may not prompt the collection of information from other individuals or accounts. All collections are manually reviewed by ICE personnel for credibility and relevance to the open investigation. If data collected by these tools is deemed irrelevant, then ICE deletes the information, and it will not be stored or retained in the repository. Any information retained by ICE will be documented in the relevant case file, including the tools that were used to acquire the information and the source of the information. If at any point a site is determined to no longer be relevant to the ICE investigation for which its use was initiated,

---

[24] Link analysis tools also can sort, match, and link multiple open-source databases. The link analysis tool user interface platforms can provide further attribution to the subject of an authorized, ongoing investigation. HSI will use link analysis tools to identify the following information directly related to an open investigation: criminal suspects, witnesses, the location of at-large individuals, businesses, and assets of targets of investigations for potential arrest, seizure, and forfeiture. HSI can access link analysis tools through a web-based portal (username/password) and/or submit queries directly to the tools via Short Messaging Service (SMS) text.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 8

the collection will be immediately discontinued. Similarly, if ICE becomes aware that a site may no longer present credible information, then automated collections will be discontinued immediately.

*Recurrent Query Platforms/Tools*

ICE uses web-based platforms/tools to recurrently query open source websites and publicly available social media accounts for information directly related to ICE investigations. A platform must only retrieve information that would be accessible to the public through basic internet searches (e.g., a web browser search); therefore, recurrent query platforms/tools may not be used to access information that requires an account (e.g., a social media profile).  ICE uses the information gathered through use of the  platforms/tools to generate investigative leads. Prior to the procurement or development of a query platform/tool, ICE Privacy, through the Privacy Threshold Analysis process, will confirm that the platform/tool does not violate any website or social media account's privacy settings on which the tool is intended to be used.

ICE personnel must review responsive information to determine whether it is accurate/corroborated and whether the information is  relevant to an investigation. Users can select relevant information in the results that will then automatically be added to a report that can be exported from the web portal for later ingestion into an ICE system. Information not selected (because it is determined not to be relevant to the specific investigation) will be deleted from the portal by the vendor. By selecting information as relevant to an investigation, the platform search algorithms are enhanced for future searches. If a report is exported, the ICE user will re-initiate checks against government systems and again manually search for additional open source information for corroboration prior to entering information into any ICE system or generating a lead.

**ICE Policy for Using Publicly Available Online Content and Social Media Information**

In 2012, the then-ICE Director issued a memorandum to all ICE personnel titled "Use of Public and Non-Public Online Information"[25] outlining core principles for ICE law enforcement use of online information (hereinafter "Morton Memo"). The memorandum laid out key principles under which ICE personnel are allowed to use social media for operational purposes. ICE use of publicly available information for operational purposes must abide by the 2012 Morton Memo and DHS Privacy Policy 110-01. Key principles of the 2012 Morton Memo include the following:

- Obtaining Information from Unrestricted Sources: Law enforcement personnel may obtain information from publicly accessible online sources and facilities under the same conditions as those by which they may obtain information from other sources generally

---

[25] U.S. Immigration and Customs Enforcement, Policy Guidance Memorandum 100821.1 Use of Public and Non-Public Online Information (2012), on file with ICE Privacy. This memorandum is also referred to as the "2012 Morton Memo." This memorandum is being reviewed and may be updated or superseded as needed.





open to the public. This principle applies to publicly accessible sources located in foreign jurisdictions as well as those in the United States.

- Obtaining Identifying Information about Users or Networks: Law enforcement personnel may use available software tools in their intended lawful manner under the same circumstances in which ICE guidelines and procedures permit them to look up similar identifying information (e.g., a telephone number) through non-electronic means. However, law enforcement personnel may not use software tools, including those which are generally available as standard operating system software, to circumvent restrictions placed on system users.

- Real-Time Communications: Law enforcement personnel may passively[26] observe and log real-time electronic communications open to the public under the same circumstances in which they may attend a public meeting.

- Accessing Restricted Sources: Law enforcement personnel may not access restricted online sources or facilities absent legal authority permitting entry into a private space.

- Online Communications Generally: Law enforcement personnel may use online services to communicate in the same manner as they may use other types of communication tools, such as the telephone and the mail. Law enforcement personnel should retain the contents of a stored electronic message if they would have retained that message had it been written on paper. The contents should be preserved in a manner authorized by ICE procedures governing the preservation of electronic communications.

Any update to these principles will necessitate a corresponding update to this Privacy Impact Assessment.

Additionally, ICE Privacy works with relevant ICE program offices to ensure that ICE guidance and policy remains current and consistent with the evolution of internet use in law enforcement operations. As new publicly available information programs or tools are used, procured, or developed by ICE, ICE Privacy may require more focused and tailored rules of behavior and other safeguards for ICE's uses of publicly available information. Rules of behavior are reviewed for compliance with DHS and ICE policy, including the 2012 Morton Memo. ICE Privacy, ICE Office of the Principle Legal Advisor, and the DHS Privacy Office must approve new and updated ICE rules of behavior.

**First Amendment and Equal Protection restrictions**

---

[26] As discussed in this Privacy Impact Assessment, passive observation includes a prohibition on communicating directly with an individual, eliciting websites to collect information, responding to an individual's posts, or posting content meant to elicit a response from an individual.



In 2019, the then-DHS Secretary reaffirmed that DHS personnel would observe and protect individuals' First Amendment rights, regardless of the medium through which those rights are exercised.[27] ICE, as a Component of DHS, will not collect information regarding an individual's religious beliefs; political and personal beliefs; lawful associations; or protest unless, consistent with the Privacy Act, the information is pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity (e.g., a crime within the scope of ICE law enforcement authorities). ICE use of social media information is directly related to an open investigation and often subject-focused, meaning that searches and collections are centered around targets of investigation or information that is, on its face, relevant to an open criminal, civil, or administrative investigation undertaken pursuant to ICE law enforcement authority (e.g., child sexual abuse material).

In addition, the Privacy Act of 1974[28] generally prohibits ICE from collecting records describing how an individual, defined as a U.S. citizen or Lawful Permanent Resident, exercises rights guaranteed by the First Amendment. There are exceptions, however, if the record is "pertinent to and within the scope of an authorized law enforcement activity," or if either a law or the individual about whom the record is maintained expressly authorizes such maintenance.[29] ICE personnel must successfully complete social media training, created by ICE Privacy in consultation with the ICE Office of the Principle Legal Advisor and the DHS Office for Civil Rights and Civil Liberties, on how to identify First Amendment activity, ensure there is a lawful basis to collect the information, and confirm the collection will be performed using the least intrusive means[30] possible to accomplish the authorized law enforcement action or activity.

DHS also prohibits the consideration of protected individual characteristics (i.e., race, ethnicity, gender, national origin, religion, sexual orientation, gender identity, and disability) in investigation, screening, and law enforcement activities in all but the most exceptional instances. The Department of Justice "Guidance For Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, Gender Identity, and Disability" (DOJ Guidance)[31] is the policy of DHS as it applies to federal law enforcement

---

[27] *See* SECRETARY OF HOMELAND SECURITY MEMORANDUM, INFORMATION REGARDING FIRST AMENDMENT PROTECTED ACTIVITIES (2019), *available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

[28] 5 U.S.C. § 552a.

[29] 5 U.S.C. § 552a(e)7.

[30] "Least-Intrusive-Means" doctrine refers to the requirement that ICE begin with a collection method that is less invasive for the individual, and only increasingly so if no other less invasive collection methods exist. For example, ICE requires its investigators to use information available via public internet searches.

[31] *See* U.S. Department of Homeland Security Policy Guidance Memorandum: Guidelines for Enforcement Actions In Or Near Protected Areas (2021); The Department of Homeland Security's Commitment to Nondiscriminatory Law Enforcement and Screening Activities (2013), *available at* 21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf (dhs.gov). *See also* U.S. DEPARTMENT OF JUSTICE, GUIDANCE FOR FEDERAL LAW ENFORCEMENT AGENCIES REGARDING THE USE OF RACE, ETHNICITY, GENDER, NATIONAL ORIGIN, RELIGION,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Homeland Security**

personnel and federal non-law enforcement personnel engaged in or supporting federal law enforcement activity and intelligence activity conducted by Federal law enforcement agencies.[32] Consideration of race, ethnicity, gender, national origin, religion, sexual orientation, gender identity, and disability in DHS law enforcement activities occurs only in strict accordance with DOJ Guidance.[33]

DHS personnel may use protected individual characteristics only when a compelling governmental interest is present, and only in a manner narrowly tailored to meet the compelling interest. The Department of Justice Guidance does not apply to (1) interdiction activities at the border or its functional equivalent (such as airports, seaports, and other ports of entry) and related traveler and cargo vetting activities, as well as protective and inspection activities; (2) non-law enforcement screening activities; and (3) all activities that use country of birth or nationality as a security screening, enforcement, or investigative criterion.[34] These activities remain subject to Department of Homeland Security's 2013 policy.[35]

Further, information collection supporting HSI administrative immigration enforcement activities is governed by the DHS policy "Guidelines for Enforcement Actions in or Near Protected Areas," that superseded previous ICE policy.[36] The policy discourages actions that may detrimentally affect the willingness of an individual to seek essential services, including the monitoring of social media accounts associated with protected areas. Protected areas include churches, schools, and healthcare facilities. The policy specifically constrains "immigration enforcement surveillance" at these locations. ICE personnel are required by policy to conduct enforcement actions and information gathering activities in support of an enforcement action, in such a manner as to avoid targeting these protected areas.[37]

**Select Mitigation Measures for the Use of Tools to Access, Collect, and/or Analyze Publicly**

---

SEXUAL ORIENTATION, GENDER IDENTITY AND DISABILITY (May 25, 2023), *available at* https://www.dhs.gov/publication/guidance-federal-law-enforcement-agencies-regarding-use-race-ethnicity-gender-national.

[32] *See* U.S. Department of Homeland Security Policy Statement 500-02 Reaffirming the Commitment to Nondiscrimination in Department of Homeland Security Activities (May 25, 2023), *available at* https://www.dhs.gov/publication/department-homeland-security-commitment-nondiscriminatory-law-enforcement-and-screening.

[33] *Id.*

[34] *Id*.

[35] *See* U.S. Department of Homeland Security Memorandum For Component Heads, the Department of Homeland Security's Commitment to Nondiscriminatory Law Enforcement and Screening Activities (April 26, 2013), *available at* https://www.dhs.gov/sites/default/files/publications/secretary-memo-race-neutrality-2013_0_1.pdf

[36] *See* U.S. DEPARTMENT OF HOMELAND SECURITY POLICY GUIDANCE MEMORANDUM: GUIDELINES FOR ENFORCEMENT ACTIONS IN OR NEAR PROTECTED AREAS (2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.

[37] *See* U.S. HOMELAND SECURITY POLICY MEMORANDUM: GUIDELINES FOR ENFORCEMENT ACTIONS IN OR NEAR PROTECTED AREAS (2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.



**Available Information, Including Social Media Information**

The following are additional safeguards applicable to the use of tools, known at the time of this Privacy Impact Assessment, to facilitate ICE's use of publicly available and social media information. If ICE proposes to use additional services/platforms/tools/applications in the future, it will complete required Privacy Threshold Analyses and update this Privacy Impact Assessment as appropriate.

### Use of Application Programming Interfaces/"Scraping"

The use of application programming interfaces (APIs) and/or scraping can be inconsistent with a website or social media platform's terms of service. Therefore, ICE's use of tools/applications that facilitate their use could impact personal privacy. Accordingly, some mitigation measures are in place, as discussed above, for the use of these tools/applications.

The use of APIs that facilitate scraping is akin to the use of automated collection tools. Therefore, the use of scraping tools/applications must satisfy the requirements for use of automated collection tools as discussed above.

For example, users must first assess the accuracy and authenticity of the information sought for collection and then receive supervisory approval to use this tool/application. The supervisor must verify that the site or platform targeted for collection contains relevant and credible information of suspected violations related to an open investigation and that the parameters of collection only collect information directly relevant to the investigation.

ICE is not permitted to collect entire websites or information unrelated to the investigation. Further, use of these tools/applications will be in a manner that respects all privacy settings. And, if at any point a site or platform is determined to no longer be relevant to the ICE investigation for which its use was initiated, or it may no longer present credible information, the collection by the tool/application will be immediately discontinued.

**Network Analysis**

Network analysis tools/applications are the same as link analysis applications discussed above. Therefore, use of these tools/applications will be in a manner consistent with the parameters outlined above. Additionally, there is a privacy risk associated with analyzing a person's network, including that the individuals who are a part of that network may have no connection to the suspected individual and/or illegal activity. For example, simply liking a post, tagging or being included in a photo, or having a relationship with a suspected individual does not indicate a connection to criminal activity under investigation. To mitigate this risk, establishing parameters around perceived relationships is critical, such as limiting collection on the number of connections out from the suspected individual (i.e., "hops") and ensuring a direct connection to the person under investigation and criminal activity by the connected individual.



Supervisors will review and confirm the user's written justification. Also, supervisors will verify ICE personnel compliance with agency-wide and tool-specific training and adherence to the applicable rules of behavior. Supervisors may require additional safeguards if they identify inconsistencies or other concerns.

**Keyword Queries:**

Use of keyword queries by a tool/application is the same as use of recurrent query platforms/tools discussed above. Therefore, use of keyword queries in tools/applications will be in a manner consistent with the parameters outlined previously. For example, information sought through keyword queries must be directly related to an ICE investigation. Only information accessible to the public through basic internet searches can be retrieved; therefore, the keyword queries tool/application cannot be used to access information that requires an account (e.g., social media profile). Users must review responsive information to assess its accuracy and direct relevance to an open investigation. Further, users must corroborate the information before it may be used. If information is retrieved that is not directly relevant to an open investigation, then it must be deleted and the collection discontinued.

Additionally, there is a risk that using certain keywords to search an individual's publicly available information may implicate the "purpose specification" principle. Accordingly, any keywords used to query publicly available information will be designed in such a way as to not profile, target, or discriminate against any individual for lawfully exercising their First Amendment rights. Keywords will be directly relevant to the suspected criminal actions of the person of interest, specific events, or specific locations directly related to the investigation. To ensure that keyword searches are conducted in an authorized manner, keywords used to query publicly available information will be documented and subject to periodic review by the Office of the General Counsel, ICE Privacy, DHS Privacy, and the DHS Office for Civil Rights and Civil Liberties. Additionally, ICE Privacy will meet monthly with the program to assess how keywords are being used.

**Vendor Limitations**

There is a risk that ICE's use of vendors or contractors could implicate the "purpose specification" principle. As noted previously, ICE may not use a vendor-provided tool or application, nor may a contractor perform work on behalf of ICE, in a manner inconsistent with governing law and policy. Contractors and vendors should not collect, use, maintain, or disseminate personally identifiable information that ICE does not have the authority to collect, use, maintain, or disseminate. For example, while contractors may collect personally identifiable information related to First Amendment protected activity when operating independent of any government involvement, contractors may not collect such personally identifiable information to fulfill any obligations to the government.



Additionally, there is a risk that a vendor could have access to personally identifiable information ICE users input into the tools/applications and ICE sensitive law enforcement activities. Accordingly, while vendors will retain administrative functions within a tool/application, ICE will maintain control of all use restriction and auditing capabilities, unless any additional functions assigned to the vendor are detailed in the contract or agreement and are performed under general ICE direction. Additionally, the vendor may not use personally identifiable information input into the tool/application by an ICE user to further refine and/or train the tool or its model(s).

### **Other tools/applications**

The platforms or tools that ICE uses on publicly available information, including social media information, for investigations may include other applications or functions that are not permitted for use at this time. For example, ICE may not use emotional or sentiment analysis tools/applications, "risk profile," facial recognition, or reverse image searching tools in this context. If in the future ICE wishes to reevaluate the tools it uses in this context, it will coordinate with the DHS Privacy Office and the Office for Civil Rights and Civil Liberties to assess the proposed tool's efficacy and assess any related potential privacy, civil rights, and civil liberties risks.

## Fair Information Practice Principles (FIPPs)

The Privacy Act of 1974[38] articulates concepts of how the Federal government should treat individuals and their information and imposes duties upon Federal agencies regarding the collection, use, dissemination, and maintenance of personally identifiable information. The Homeland Security Act of 2002 Section 222(2) states that the Chief Privacy Officer shall assure that information is handled in full compliance with the fair information practices as set out in the Privacy Act of 1974. [39]

In response to this obligation, the DHS Privacy Office developed a set of Fair Information Practice Principles (FIPPs) from the underlying concepts of the Privacy Act to encompass the full breadth and diversity of the information and interactions of DHS. [40] The FIPPs account for the nature and purpose of the information being collected in relation to DHS's mission to preserve, protect, and secure.

DHS conducts Privacy Impact Assessments on both programs and information technology systems, pursuant to the E-Government Act of 2002 Section 208 and the Homeland Security Act of 2002 Section 222.[41] Because ICE use of publicly available and social media information is not

---

[38] 5 U.S.C. § 552a.
[39] 6 U.S.C. § 142(a)(2).
[40] U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY POLICY GUIDANCE MEMORANDUM 2008-01/PRIVACY POLICY DIRECTIVE 140-06, THE FAIR INFORMATION PRACTICE PRINCIPLES: FRAMEWORK FOR PRIVACY POLICY AT THE DEPARTMENT OF HOMELAND SECURITY (2008), *available at* https://www.dhs.gov/privacy-policy-guidance.
[41] 6 U.S.C. § 142.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 15

an information technology system, this Privacy Impact Assessment is conducted as it relates to the DHS construct of the Fair Information Practice Principles. This Privacy Impact Assessment examines the potential privacy impact of ICE use of publicly available and social media information.

## 1. Principle of Transparency

Notice of ICE operational use of publicly available information including social media information for law enforcement investigations is provided by the publication of this Privacy Impact Assessment and relevant system of records notices governing systems in which social media information collections are maintained.[42] ICE also includes notice of other instances of its use and maintenance of publicly available information including social media information in an ICE system via that system's Privacy Impact Assessment.[43] Since ICE collection and use of publicly available and social media information collections are law enforcement activities related to law enforcement investigations, it may not be feasible to provide direct notice to individuals at the time their information is collected from publicly available sources because to do so could provide notice of sensitive, ongoing law enforcement investigations.

**Privacy Risk:** There is a risk that individuals who use publicly available platforms, including social media platforms, may not know that the information they publicly share on the platform may be collected by ICE to support an open law enforcement investigation.

**Mitigation:** The risk is partially mitigated. To the extent information in this Privacy Impact Assessment is made publicly available, this Privacy Impact Assessment provides notice of ICE's collection, use, and maintenance of publicly available information, including social media information, to support law enforcement investigations.

While publicly available sources, including social media platforms, may provide notice of the potential use of information posted to the sites for law enforcement investigations pursuant to lawful process, notice of ICE's use of publicly available information as discussed in this Privacy Impact Assessment often is not provided by the platform. Further, as noted previously, ICE cannot notify an individual when their information is collected by ICE from publicly available sources because doing so could risk informing a target of an active law enforcement activity of an open investigation.

To mitigate this risk, ICE personnel may only view information that is available to the public (e.g., not behind added privacy walls). ICE assumes the individual is on notice that their information, not subject to additional privacy restrictions, is viewable by anyone that has access to the publicly available source/social media platform.  In other words, ICE will only access publicly available sources to collect and analyze data that is available (either for free or for

---

[42] For a list of all ICE system Privacy Impact Assessments, *see* www.dhs.gov/privacy-documents-ice. For a list of Systems of Records Notices published by ICE, *see* https://www.dhs.gov/system-records-notices-sorns.
[43] *See* the Appendix to this Privacy Impact Assessment for a list of ICE systems that contain publicly available and social media information.

purchase) to the public and directly relevant to an open law enforcement investigation.

**Privacy Risk:** There is a risk that a third party may post an individual's information to a website or social media platform without the individual's consent and that information is then used by ICE in a law enforcement investigation.

**Mitigation:** This risk cannot be mitigated. At the time of collection, ICE cannot determine whether an individual provided a third party with consent to publicly post their information to a website or social media platform. Similarly, ICE cannot determine whether an individual understands the privacy policies and settings of a social media platform before they posted the information to a publicly available source.

**Privacy Risk:** There is a risk that individuals will not know that their information was obtained by ICE to support an open law enforcement investigation.

**Mitigation:** This risk is partially mitigated.

Targets of investigations and their associates who are directly related to the law enforcement matter being investigated may not be aware ICE is actively collecting their information from publicly available sources/social media platforms. Providing notice to these individuals could inform them that they are the target of an actual or potential law enforcement activity or reveal ICE's investigative interest in them.

All individuals present in the United States, however, have constitutional protections in criminal proceedings entitling them to discovery production.[44] The discovery obligations of federal criminal prosecutors established by the Federal Rules of Criminal Procedure include Rule 16, and Rule 26.2. Additionally, the requirements of 18 U.S.C. § 3500 (the Jencks Act), *Brady v. Maryland*,[45] and *Giglio v. United States* apply.[46] In court, each party is responsible for producing evidence upon which it seeks to rely in the litigation. Therefore, if ICE seeks to use publicly available information or evidence derived from such information to sustain any charge or otherwise use as evidence, it would be required to produce that information to the defendant.

Further, as noted previously, ICE may not collect information that is not directly relevant to an open law enforcement investigation, which helps mitigate the number of individuals potentially impacted by ICE's use of publicly available information to support law enforcement investigations.

## 2. Principle of Individual Participation

As with notice, ICE cannot involve the individual in the process of using their personally

---

[44] Discovery is the pre-trial process parties use to gather information in preparation for trial. Parties may obtain discovery regarding any nonprivileged matter in the form of records, testimony, and other information, that is relevant to any party's claim or defense. *See* Fed. R. Civ. P. 26-37, and Fed. R. Crim. P. 16 and 26.2, *available at* https://www.uscourts.gov/rules-policies/current-rules-practice-procedure.
[45] 373 U.S. 83 (1963).
[46] 405 U.S. 150 (1972).



identifiable information to support open investigations. To seek consent for the collection, use, dissemination, and maintenance of their personally identifiable information could risk exposing an ongoing law enforcement investigation. To mitigate this risk, ICE is not permitted to access and use information from publicly available sources that is subject to additional privacy safeguards. For instance, social media platforms may allow individual users to set privacy restrictions on who may access and see their content. If these restrictions are in place, ICE may not access that information. Additionally, individuals may edit, correct, or update information shared in their own posts or in comments they made to the posts of others.

An individual's ability to access or amend information in ICE law enforcement information systems is limited by law and policy due to the need to protect the integrity of national security or law enforcement sensitive information.[47] Access to ICE records might also permit the individual who is the subject of a record to impede the investigation, to tamper with witnesses or evidence, harm victims, or avoid detection or apprehension. Individuals may submit requests for information access and correction as permitted by the Privacy Act, and the requests will be reviewed on a case-by case basis. Individuals seeking to correct records, or seeking to contest their content, may submit a request in writing to the ICE Office of Information Governance and Privacy by mail:

U.S. Immigration and Customs Enforcement Office of Information Governance and Privacy
Attn: Privacy Unit
500 12th Street SW, Stop 5004
Washington, D.C. 20536-5004
http://www.ice.gov/management-administration/privacy

**Privacy Risk**: There is a risk that individuals cannot access and amend inaccuracies in ICE systems that maintain publicly available information, including social media information.

**Mitigation**: The risk is partially mitigated. For example, vendors of commercial data should endeavor to ensure their information collections contain near real-time data for the efficacy of the product that ICE would utilize. However, if a vendor collects data from publicly available sources, any edit, correction, or update the individual makes to the information in the data sources might be delayed before it is reflected in the vendor database. Moreover, vendors may not notify ICE when an edit, update, or correction occurs within its own proprietary database. Likewise, information ICE accesses from other publicly available sources, including social media information, may be amended without notice to ICE.

In accordance with ICE policy, ICE users will research and corroborate the source data to ensure that the information is as accurate, timely, and complete prior to using the data to generate an investigative lead or pursuing a law enforcement action. Likewise, as noted above, users will

---

[47] *See* DHS/ICE-009 External Investigations, 85 FR 74362, (November 20, 2020), Final Rule for Privacy Act Exemptions, 74 FR 4508 (August 31, 2009), *available at* https://www.dhs.gov/system-records-notices-sorns.



document the source(s) of information, including whether a vendor was used to obtain the information, in the relevant investigative case file.

## 3. Principle of Purpose Specification

ICE is authorized to collect information under Section 701 of the USA PATRIOT Act; 6 U.S.C. § 112; 8 U.S.C. §§ 1105, 1103(a)(4), 1357(a) and (b); and Executive Order 13388. Pursuant to the Homeland Security Act of 2002 (HSA), as amended, Pub. L. 107-296, 116 Stat. 2135 §§ 102, 403, 441 (Nov. 25, 2002), the U.S. Secretary of Homeland Security has the authority to enforce numerous federal criminal and civil laws. These include laws contained in Titles 8, 18, 19, 21, 22, 31, and 50 of the U.S. Code. The Secretary delegated this enforcement authority to the Director of ICE in DHS Delegation Order No. 7030.2, Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement (Nov. 13, 2004), and the Reorganization Plan Modification for the Department of Homeland Security (January 30, 2003). Through these statutes and orders, ICE has broad legal authority to enforce an array of federal statutes including responsibility for enforcing customs authorities and federal criminal authorities.

As noted previously, this Privacy Impact Assessment addresses ICE's operational use of publicly available information, including social media information to identify, investigate, locate, arrest, and support prosecution of individuals suspected of violations of laws.

**Privacy Risk:** There is a risk that ICE may use publicly available information including social media information for purposes beyond what is described in this Privacy Impact Assessment.

**Mitigation:** This risk is mitigated. ICE mitigates this risk through training, privacy compliance processes (e.g., Privacy Threshold Analysis), auditing, and oversight. ICE Privacy has created mandatory training and rules of behaviors for ICE personnel that detail the restraints and safeguards outlined in this Privacy Impact Assessment. Additionally, new tools used to collect and use publicly available and social media information must be submitted to ICE Privacy and the DHS Privacy Office for review to ensure that the proposed use and function comply with DHS social media policy and this Privacy Impact Assessment. Prior to adoption of a new tool to access, collect, use, and maintain publicly available information, including social media information to support ICE law enforcement investigations, an ICE program or office must document the purpose of the tool's use through the Privacy Threshold Analysis process. At that time, any restrictions on its use to safeguard privacy may be set by ICE Privacy or DHS Privacy. Further, ICE supervisors audit ICE case files to ensure that the source of data and the use of publicly available and social media information in law enforcement investigations complies with the principles stated in this Privacy Impact Assessment. ICE personnel who operate in contravention to the relevant rules of behavior and this Privacy Impact Assessment may have their access to tools used on publicly available information, including social media information, revoked and could potentially face disciplinary action.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 19

**Privacy Risk:** There is a risk that the use of certain keywords or recurrent query tools to collect and use publicly available and social media information may be inconsistent with ICE's authority to collect such information.

**Mitigation:** This risk is partially mitigated. Any information sought through keyword queries must have a direct nexus to an authorized law enforcement investigation or activity. Further, any keywords used to query publicly available information will be designed in such a way as to not profile, target, or discriminate against any individual for lawfully exercising their First Amendment rights. To ensure that keyword searches are conducted in an authorized manner, keywords used to query publicly available information, including social media information, will be documented and may be periodically reviewed by the Office of the General Counsel, ICE Privacy, the DHS Privacy Office, and the DHS Office for Civil Rights and Civil Liberties. Additionally, ICE Privacy will meet monthly with the respective program to assess how keywords are being used to ensure compliance with this Privacy Impact Assessment and DHS and ICE policies.

**Privacy Risk:** There is a risk that ICE will use a third-party vendor or contractor to collect publicly available information that it otherwise would not be authorized to collect.

**Mitigation:** This risk is mitigated. ICE may not use a vendor or contractor to collect, use, maintain, or disseminate personally identifiable information that ICE does not have the authority to collect, use, maintain, or disseminate. Prior to collection, ICE ensures vendors do not collect First Amendment protected information on their behalf by providing to the vendor guidelines on permissible and prohibited collection activities. After collection, ICE personnel routinely conduct oversight of any information collected by an ICE vendor or tool to ensure the information has a direct nexus to an open investigation, is accurate, and does not run afoul of any First Amendment protections.

## 4. Principle of Data Minimization

ICE will collect only the minimum amount of personally identifiable information necessary and relevant to an ICE law enforcement investigation and safeguard that personally identifiable information as required by law, regulation, and/or Department or ICE policy. Further, information found on a publicly available website or social media platform that is used in an investigation will be saved in appropriate case files and ICE systems, including information about which vendor the information was first identified (if applicable). The data will be maintained in accordance with the relevant Systems of Records Notice(s) and Privacy Impact Assessment(s), as well as the NARA-approved retention schedule(s). Relevant case files and case systems are periodically audited by supervisors and the ICE Records and Information Management Unit to ensure proper record retention and disposition.

**Privacy Risk:** There is a risk that ICE will collect and retain more publicly available information, including social media information, than necessary or relevant to support an open law enforcement investigation.

**Mitigation:** This risk is mitigated. Pursuant to ICE policy, ICE may only collect information relevant to an authorized law enforcement investigation. Because collection of publicly available information, including social media information, may implicate First Amendment protected activities, ICE personnel would not collect information about how an individual exercises their First Amendment rights "unless expressly authorized by statute, or by the individual about whom the record is maintained, or unless pertinent to and within the scope of an authorized law enforcement activity" as prescribed by the Privacy Act. As previously discussed, ICE personnel document how information relates to an investigation or specific violation of law investigated and enforced by ICE prior to its collection.

Further, if ICE personnel discover that collected information is irrelevant to an open law enforcement investigation, they will not use or maintain it. Similarly, if information discovered not to be relevant was previously added to a case file, responsible ICE personnel will remove such information. Additionally, as noted previously, there are safeguards in place to ensure that targeted collection of publicly available information, including social media information, is directly relevant to an open law enforcement investigation. Supervisory approval is required before ICE users may automatically collect information from websites. And ongoing collection must be continually evaluated to ensure that only information directly related to an investigation is being collected. If the information is determined to be inaccurate, no longer credible, and/or no longer relevant, collection must end immediately, and such information may not be used or retained.

**Privacy Risk:** There is a risk that ICE will collect First Amendment-protected information.

**Mitigation:** This risk is partially mitigated. The Privacy Act generally prohibits the collection of records describing how an individual exercises rights guaranteed by the First Amendment.[48] There are exceptions, however, including if the record is "pertinent to and within the scope of an authorized law enforcement activity." ICE personnel receive social media training created by ICE Privacy, ICE Office of the Principle Legal Advisor, and the DHS Office for Civil Rights and Civil Liberties on how to identify protected First Amendment activity and determine if publicly available content is pertinent to and within the scope of an authorized ICE law enforcement investigation. If the information does not meet this standard, then ICE may not collect or use it. Additionally, ICE personnel manually review publicly available information, including social media information, to assess its accuracy, credibility and timeliness and corroborate it by, for example, comparing it to other information maintained in government databases and other credible sources. ICE personnel will also determine and document the relevance of the information collected to the authorized law enforcement activity and whether it contains protected speech. ICE

---

[48] 5 U.S.C. § 552a(e)(7).

DEF-021



personnel may contact ICE Privacy and the Office of the Principle Legal Advisor to aid in this determination.

This determination will be periodically reviewed by the supervisory investigative agent to ensure ICE personnel adhere to the Privacy Act and do not collect First Amendment-protected information. Protected speech that is either not pertinent to or outside the scope of an ICE law enforcement activity must not be collected, used, and/or retained.

**Privacy Risk:** There is a risk that ICE use of automated collection and query tools (e.g., "scraping" tools) to support law enforcement investigations will collect information on or about individuals who are not suspected of violations of laws enforced by ICE.

**Mitigation:** This risk is partially mitigated. ICE's use of tools, such as recurrent query platforms or automated collection tools, is subject to the polices and safeguards discussed above, to minimize the risk of collecting information irrelevant to a law enforcement investigation and focus collections on information that is directly relevant to an ICE law enforcement investigation. Prior to a tool's implementation, an ICE program or office must document the purpose of the tool's use through the Privacy Threshold Analysis process. At that time, any restrictions on and privacy safeguards required for its use may be set by ICE Privacy or the DHS Privacy Office. Once in use, automated collection tools are only used for sites or chatrooms verified by ICE supervisors to contain information of suspected violations directly relevant to an authorized open investigation.

Similarly, ICE only uploads known suspect information to recurrent query platforms. Therefore, the returns created by these tools are designed and expected to be directly related to an open ICE law enforcement investigation. ICE does not use information about individuals who are not the targets of ICE law enforcement activities. Any returns are also assessed by ICE personnel to verify their accuracy and relevance to an ongoing ICE case. That verification is required before the data is loaded into an ICE case file or ICE case management system. Any data that is deemed irrelevant, inaccurate, and/or unreliable, is purged from the tool and may result in a determination to end collection on a designated site or platform.

## 5. Principle of Use Limitation

ICE personnel collect publicly available information, including  social media information to support open law enforcement investigations. As discussed previously, search techniques and queries are governed by ICE and DHS policy, including applicable rules of behavior and this Privacy Impact Assessment.

ICE also uses tools, such as data aggregators, anonymizers, recurrent query platforms, and/or automated collection tools, to collect publicly available information directly relevant to an open law enforcement investigation. Some of these tools automate methods for detecting, summarizing, and graphically representing patterns of relationships between entities within the parameters discussed above. This allows ICE personnel to identify potentially criminal and fraudulent behavior directly related to a law enforcement investigation and assists them in



detecting crimes enforceable by ICE. ICE personnel will use these tools either alone or in combination to research and identify individuals, businesses, and business assets as targets of open law enforcement investigations. For every new tool that ICE plans to use, the relevant ICE program must submit a Privacy Threshold Analysis to ICE Privacy for review to ensure its use complies with law and policy and this Privacy Impact Assessment. At that time, ICE Privacy may recommend additional mitigation strategies to protect individual privacy. The Privacy Threshold Analysis must also be reviewed and approved by the DHS Privacy Office, which may also include additional privacy safeguards as a condition to use the tool.

In addition, ICE will not share personally identifiable information collected from publicly available information including social media information with third parties or external agencies unless directly related to an ICE law enforcement investigation. For example, after ICE has corroborated information and determined its accuracy, relevance, and timeliness, ICE may generate a shareable lead. Leads generated from publicly available information, including social media information may ultimately be shared with federal, state, tribal, local, and foreign law enforcement agencies, as well as relevant law enforcement fusion centers with which ICE has pre-existing information sharing agreements. ICE data may be shared only if the recipient agency has a need to know the information, sharing will further U.S. law enforcement and/or national security efforts, and disclosure is consistent with applicable law and agency policies. Sharing may be done manually by ICE personnel (e.g., via secure email or file transfer) or via system-to-system connections between ICE systems and a third-party system. Prior to sharing, ICE will ensure that the transfer is compatible with the original purpose of the collection (i.e., pursuant to a law enforcement investigation) and meets a routine use(s) of the applicable ICE system's System of Records Notice. ICE will share information outside the agency in accordance with the procedures and safeguards of the relevant ICE system in which the information is maintained, as described in the system's Privacy Impact Assessment and System of Records Notice[49] and consistent with information sharing agreements and applicable privacy safeguards.

**Privacy Risk:** There is a risk that ICE personnel without a legitimate need to know may access publicly available information, including social media information, including through access to a tool or database used by ICE in support of its law enforcement investigations.

**Mitigation:** This risk is mitigated. In addition to supervisors nominating and approving ICE personnel to use the tools discussed in this Privacy Impact Assessment, ICE personnel must apply to the ICE administrator of a tool or platform to be granted access to it. ICE supervisors must review every application before it is approved. Only authorized ICE personnel with a need to know and who have completed, and are current on, the prerequisite privacy and other training will be granted access to a tool or platform, including access to publicly available information accessed through the tool or platform. Lists of authorized users are reviewed periodically by ICE

---

[49] *See* the Appendix to this Privacy Impact Assessment for a list of ICE systems that contain publicly available and social media information and their associated Privacy Impact Assessments and System of Records Notices.



supervisory personnel to ensure a user's ongoing need to access the tool. Additionally, DHS Directive 110-01 requires that access authority be renewed annually consistent with annual training requirements. Access is contingent upon ICE personnel's successful completion of privacy and other training for operational use of publicly available information and social media information.

**Privacy Risk:** There is a risk that ICE may share information with parties who do not have a need to know or in a manner inconsistent with law and policy.

**Mitigation:** This risk is partially mitigated. If publicly available information, including social media information, is discovered in the course of an ICE law enforcement investigation and requires action by a federal, state, local, or international agency, ICE may share that information in a manner consistent with ICE policy and only for purposes permitted in the relevant System of Records Notice. ICE personnel are trained regarding whether information sharing is compatible with the purpose for which the information was originally collected. Personnel may also contact ICE Privacy for advice and guidance regarding permissible disclosures of personally identifiable information. Further, ICE personnel must document instances of information sharing in the relevant case file(s) and ICE case management systems. Instances of unauthorized disclosure are referred to the ICE Office of Professional Responsibility.

## 6. Principle of Data Quality and Integrity

There is a risk that information collected from publicly available sources, including social media information, may be inaccurate, incomplete, and/or irrelevant to an ICE law enforcement investigation. Accordingly, ICE must corroborate any publicly available information collected to support an open ICE law enforcement investigation to ensure that the information is accurate, relevant, timely, and complete. Additionally, if at any time ICE learns that it has received or is in possession of inaccurate information, it will correct, annotate, block or delete the incorrect information and will not use or disseminate the incorrect information. Further, ICE personnel may corroborate social media information with other data from public records data sources, information available in commercial and government databases, or information obtained from other governmental partners. ICE may not rely solely on information obtained from social media to take law enforcement action against any individual. ICE only uses this information to generate a possible lead and must corroborate the information before taking such action, including applying for a warrant or subpoena.

Finally, to ensure ICE is complying with the data quality safeguards articulated in this Privacy Impact Assessment, ICE, in coordination with ICE Privacy, will routinely review and audit all ICE offices that access publicly available information, including social media information as part of their law enforcement activities. Additionally, the DHS Chief Privacy Officer may choose to conduct a Privacy Compliance Review of ICE's use of publicly available information for law enforcement investigations.



**Privacy Risk:** There is a risk that information collected by ICE from publicly available sources, including social media sites, will be inaccurate and unverifiable.

**Mitigation:** This risk is partially mitigated. ICE uses traditional investigative methods to assess the accuracy and reliability of any publicly available information collected to support an open law enforcement investigation prior to generating a lead or entering the data into an ICE system. This includes using the totality of the information available and reviewing information from multiple sources, including public records data sources and government databases. To use publicly availability information, including social media information to support open ICE law enforcement investigations, ICE users must complete relevant training, including privacy training, to learn to analyze information and determine its reliability. ICE only considers corroborated information derived from social media to support a law enforcement investigative lead. ICE does not take any law enforcement action based solely on social media posts.

## 7. Principle of Security

ICE limits social media access to users who have completed annual social media training, show a need to access social media for their work, have agreed to specific rules of behavior associated with access to social media tools, and are approved to use it by a supervisor. All relevant publicly available information, including social media information, collected by ICE personnel will be stored in an ICE system(s) with built in audit controls. Users are granted access on a "need to know" basis. ICE operates its systems in compliance with the information security requirements of the Federal Information Security Modernization Act of 2014.

DHS/ICE policies and rules of behavior ensure appropriate online behavior and limit how information collected from the internet can be used for ICE operational purposes. Only ICE personnel whose official duties necessitate access to social media to support an open law enforcement investigation will be allowed to input information collected from publicly available sources, including social media platforms, into ICE systems. ICE supervisors monitor and approve which users are designated to collect publicly available information, including social media information, to support open law enforcement investigations, and that their training is current.

Supervisors must also monitor who is given access to tools and aggregators to collect publicly available information to support an open law enforcement investigation.

Access roles are assigned by a supervisor based on the user's job responsibilities and are reviewed periodically to ensure that users have the appropriate level of access. Individuals who no longer require access are removed from the access list by program managers and/or system administrators. Programs have limited numbers of accounts to access a tool, and operational needs will require a manager to transition access between and among ICE personnel needing access to a given tool. Additionally, tools are acquired on a license basis, and each instance of use must be justified each contract or option year. This is an additional opportunity for supervisors and program managers to determine which ICE personnel need access to a tool. It is incumbent upon the ICE



supervisors to maintain log files containing this information and make them available for ICE Privacy for inspection or for ICE Office of Professional Responsibility to conduct a complete audit.

ICE systems that contain publicly available information, including social media information, are restricted to personnel that have a need to know the information according to their job duties. When investigative data is imported into ICE systems, ICE personnel are required to either manually or electronically share this data with their supervisors for review.[50] ICE personnel are also required to record a description of the data being uploaded, such as source name/category and date retrieved, and the tool used to collect the information, which helps the supervisor evaluate whether the upload complies with ICE policy and helps other users better understand and evaluate the data. Supervisors are responsible for identifying any data imported into ICE systems in contravention of DHS/ICE policy. Supervisors may request that the system administrator delete any improperly uploaded data in an ICE system.

**Privacy Risk:** There is a risk that an unauthorized individual without a legitimate need to know may access publicly available information including social media information maintained in ICE systems.

**Mitigation:** This risk is mitigated. ICE system security measures are determined on a system-by-system basis, and all systems have varying degrees of access controls. Additionally, all ICE systems must abide by ICE and DHS security policies.[51] Moreover, because these systems contain law enforcement sensitive information (information that, if disclosed, could be detrimental to ICE law enforcement activities), additional scrutiny is placed upon user access restrictions in the systems to ensure that only authorized users are granted access. These systems go through security accreditations and Privacy Impact Assessments to ensure that only authorized users with a need to know will have access to data stored in the system, including social media information and publicly available data.

## 8. Principle of Accountability and Auditing

ICE ensures compliance with this Privacy Impact Assessment by instituting rigorous standards for training, rules of behavior, information sharing, auditing, and supervisory oversight. Additionally, rules of behaviors for ICE users of social media platforms to support open law enforcement investigations have been created in consultation with ICE Privacy and ICE Office of the Principle Legal Advisor to ensure the practices protect the privacy, civil rights, and civil liberties of individuals. ICE users who collect data from social media platforms certify annually that they have read and understand ICE policy and privacy guidance on the use of social media information.

---

[50] System specific controls are found in the system's Privacy Impact Assessment. ICE systems that contain publicly available and social media information can be found in the Appendix to this Privacy Impact Assessment, and are available at www.dhs.gov/privacy/documents-ice.

[51] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, 4300A SENSITIVE SYSTEMS HANDBOOK, VER. 13.1 (2017), *available at* https://www.dhs.gov/privacy-policy-guidance.

 
A mandated training program is also in place to teach ICE personnel how to properly collect information from publicly available sources, including social media platforms and to do so in accordance with ICE and DHS policies. This training is an annual requirement for ICE personnel with a need to collect personally identifiable information from publicly available sources, such as social media, for an operational purpose to support an ICE law enforcement investigation, and each user must sign a confirmation that they received and understood the training.

Most, but not all, tools used to collect publicly available information, including social media information provide auditing and accountability mechanisms, and provide a log of the date, time, user identity, and search terms that are queried. In these instances, ICE has access to the logs to ensure that the use of the systems is compliant with ICE and DHS policy. Otherwise, supervisors must create a local logging and auditing regime to mimic these requirements. ICE Privacy will work with supervisors to create appropriate logging and auditing capabilities.

ICE Privacy will develop and periodically administer an inspection mechanism to assess whether ICE's use of publicly available information, including social media information to support ICE law enforcement investigations is in compliance with the terms of this Privacy Impact Assessment. ICE Privacy will regularly evaluate the operations of program offices to ensure social media information users have completed required training and have agreed to follow the terms outlined in the corresponding rules of behavior. ICE Privacy will also assess a program's monitoring/auditing processes to ensure their efficacy and advise on best practices. Finally, ICE Privacy, in coordination with the DHS Privacy Office, through the Privacy Threshold Analysis process, will assess whether the use of publicly available information and associated tools to support ICE law enforcement investigations is consistent with this Privacy Impact Assessment and the safeguards described herein.

Additionally, ICE cybersecurity policies require personnel to use government furnished equipment for official operations. Tools that collect publicly available information, including social media information are accessed via government furnished equipment that is equipped with logging and oversight mechanisms to ensure the proper use of government IT systems. This equipment is assigned to specific ICE personnel who agree to be monitored regarding the equipment's use. Any interaction  these tools may have with government furnished equipment (e.g., URL access, downloads, uploads) would therefore be logged and may be audited by ICE system administrators.

Further, audit logs are created when social media information is entered into ICE systems. Per the 2012 Morton Memorandum,[52] ICE personnel will retain any information derived from online sources in the same manner as if that content had been derived from a hard copy document or other data source (e.g., database). This includes noting the information collection or uploading the information into ICE systems prior to using the information for operational purposes.

---

[52] *See* U.S. Immigration and Customs Enforcement, Policy Guidance Memorandum 100821.1 Use of Public and Non-Public Online Information (2012).

Generally, such documentation would include the date, time, and name of the user who uploaded the data into the system, the origin of the information collected, such as the date the information was collected and the site(s) accessed, as well as any tool used to access the information. Automated documentation mechanisms are system-specific and are detailed in the system's respective Privacy Impact Assessment.[53]

ICE supervisors routinely check these logs and their accompanying data to ensure that the data entered does not violate ICE policy or system requirements. The electronic records are preserved and maintained in accordance with an applicable National Archives and Records Administration (NARA) General Records Schedule (GRS) or a NARA-approved agency-specific records control schedule. If the records are subject to a litigation hold, they may not be disposed of under a records schedule until further notification.

**Privacy Risk**: There is a risk that ICE personnel will collect publicly available information without the appropriate training or oversight.

**Mitigation:** This risk is partially mitigated. While the internet allows easy access to publicly available information, ICE users must follow all policies and procedures, including as discussed in this Privacy Impact Assessment before they may use publicly available information, including social media information in an ICE law enforcement investigation. This includes completing required privacy and other training, reviewing and agreeing to follow applicable rules of behavior, obtaining required supervisory approval, and making any required relevancy determinations as discussed previously. Additionally, publicly available information must be corroborated for accuracy and reliability before it may be used in an investigation, and no law enforcement action may be based solely on information obtained from social media.

Information relevant to a law enforcement investigation must be documented in the appropriate case file. Access, collection, use, and retention of publicly available information is subject to supervisor review. These checks help ensure ICE users have a need to acquire publicly available information to support an ICE law enforcement investigation and abide by ICE and DHS policy regarding training and oversight. Any user found to be using social media platforms or tools for a purpose that is inconsistent with law, regulation, or policy will have their access revoked and could face disciplinary action, in addition to deletion of the information.

**Privacy Risk:** There is a risk that a third-party vendor could have access to personally identifiable information ICE users input into vendor-provided tools or applications.

**Mitigation:** This risk is mitigated. While vendors may need to retain some administrative functions within the tools and applications, ICE will maintain control of all use restrictions and auditing capabilities, unless any additional functions assigned to the vendor are detailed in the contract and performed under general ICE supervision. Additionally, the vendor may not use personally identifiable information input into a tool or application by an ICE user to further refine

---

[53] For more information see the Appendix to this Privacy Impact Assessment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Information To Include Social Media
Page 28

or train its tools/models.

## Conclusion

ICE uses publicly available information, including social media information, in its law enforcement investigations. ICE also uses tools to assist with its collection and analysis of this information. ICE ensures that individual privacy, civil rights, and civil liberties are respected by ensuring appropriate safeguards are in place for the use of this information and maintaining compliance with DHS policy for the operational use of social media. Through proper training and oversight, ICE ensures its personnel collect, use, and maintain information collected online in a lawful and responsible manner.

## Responsible Officials

Peter J. Hatch
Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement

Kenneth N. Clark, Ph.D.
Assistant Director
Management and Administration
U.S. Immigration & Customs Enforcement

## Approval Signature

Original, signed version on file with the DHS Privacy Office.

_____

Mason C. Clutter
Chief Privacy Officer
U.S. Department of Homeland Security
(202) 343-1717

DEF-029

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Social Media
Page 1

# Appendix

## ICE Systems that maintain Publicly Available Information and Social Media Information for Law Enforcement Investigations

| Name of System | Privacy Impact Assessment Citation | Associated System of Record Notice | Retention Schedule/Period |
|---|---|---|---|
| Student and Exchange Visitor Information System (SEVIS) | DHS/ICE/PIA-001-Student and Exchange Visitor Program (SEVP) | DHS/ICE-001 Student and Exchange Visitor Program (SEVP) | DAA-0567-2016-0004-0003. Retention Period: Destroy when no longer needed for reference or 10 years after cut off, whichever is later. |
| Law Enforcement Intelligence Fusion System (IFS) | DHS/ICE/PIA-007 Law Enforcement Intelligence Fusion System (IFS) | DHS/ICE-006 ICE Intelligence Records (IIRS) | N1-567-09-08 Item 1A(2) Retention Period: Destroy 75 years after cutoff, and only after verification that it is no longer needed to conduct agency business. |
| Significant Event Notification System (SEN) | DHS/ICE/PIA-023 Significant Event Notification System (SEN) | DHS/ICE-006 - IIRS DHS/ICE-009 - External Investigations | N1-567-2011-004 Retention Period: Destroy 75 years after cutoff. |
| ICE Subpoena System | DHS/ICE/PIA-027 ICE Subpoena System | DHS/ICE-009 - External Investigations | N1-567-2011-011. Retention Period: Destroy 10 years after cutoff. |
| National Intellectual Property Rights Coordination Center | DHS-ICE-PIA-041 National Intellectual Property Rights Coordination Center | DHS/ICE-009 - External Investigations | A retention schedule is currently under development. ICE is proposing a 5 year period for unpursued claims and a period for investigations of 25 years after the case is closed |
| ICE SharePoint Sites | DHS/ICE/PIA-043 SharePoint Matter Tracking Systems | SORN will be dependent on the program the SharePoint site is supporting (see PIA) | Determined by the purpose for the original collection |
| LeadTrac System | DHS/ICE/PIA-044 | DHS/ICE-009 | DAA-563-2013-0001-0006. |

DEF-030

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



**Privacy Impact Assessment**
DHS/ICE/PIA-064
ICE Use of Publicly Available Social Media
Page 2

|  | LeadTrac System | External Investigations DHS/ICE-015 LeadTrac System | Retention Period: Destroy 75 years after cutoff. |
|---|---|---|---|
| ICE Investigative Case Management (ICM) | DHS/ICE/PIA-045 ICE Investigative Case Management (ICM) | DHS/ICE-009 External Investigations | N1-36-86-001 Retention Period: Destroy when 20 years old. |
| Pre-Adjudicated Threat Recognition Intelligence Operations Team Tracking System (PATRIOT) | DHS/ICE/PIA-052 Visa Security Program Pre-Adjudicated Threat Recognition Intelligence Operations Team Tracking System | DHS/ICE-012 Visa Security Program Records | N1-567-10-005. Retention Period: Destroy 25 years after cutoff for Visa Security Reviews without a nexus to terrorism. Destroy 75 years after cutoff for Visa Security Reviews found to be a nexus to terrorism. |
| Repository for Analytics in a Virtualized Environment (RAVEn) | DHS/ICE/PIA-055 Repository for Analytics in a Virtualized Environment (RAVEn) | DHS/ICE-018 Analytical Records | Determined by the purpose for the original collection |

# EXHIBIT 47

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Policy Number: 10082.1
FEA Number: 360-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



**JUN 2 8 2012**

**U.S. Immigration and Customs Enforcement**

MEMORANDUM FOR:            Law Enforcement Personnel

FROM:            John Morton
Director

SUBJECT:            Use of Public and Non-Public Online Information

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) law enforcement personnel guidance on the acceptable use of online information within the scope of their law enforcement duties.

Background

On December 8, 2010, Secretary Napolitano approved a decision memorandum titled, "Use of Public and Non-Public Online Information for Law Enforcement, Situational Awareness, and Intelligence Purposes," ("The Online Information Memorandum") that adopted a recommendation whereby the Department of Homeland Security (DHS), except members of the Intelligence Community governed by Executive Order 12333, would "follow the Department of Justice (DOJ) 1999 guidelines for online investigative and situational awareness activities." The Online Information Memorandum also suggested that DHS Components develop supplementary guidance, as necessary, for their mission-specific purposes consistent with DHS policy.

Discussion

Pursuant to the Online Information Memorandum, ICE law enforcement personnel should follow the below principles for the use of public and non-public online information, which have been adapted from the online investigative principles outlined in DOJ's 1999 Online Investigative Principles for Federal Law Enforcement Agents.[1]

---

[1] Law enforcement personnel are ICE employees who conduct and support criminal, civil, and administrative law enforcement investigations and operations. Examples include special agents and other law enforcement officers, law enforcement investigative support personnel, intelligence research specialists, criminal research specialists, and attorneys prosecuting criminal, civil or administrative matters.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

To implement these core principles, ICE directorates and program offices may establish guidance and/or modify existing guidance, as necessary, or reference the DOJ guidance as applicable to the activities in question.

ICE Principles for Law Enforcement Use of Public and Non-Public Online Information:

1. Obtaining Information from Unrestricted Sources. Law enforcement personnel may obtain information from publicly accessible online sources and facilities under the same conditions they may obtain information from other sources generally open to the public. This principle applies to publicly accessible sources located in foreign jurisdictions as well as those in the United States.

2. Obtaining Identifying Information about Users or Networks. There are widely available software tools for obtaining publicly available identifying information about a user or a host computer network. Law enforcement personnel may use such tools in their intended lawful manner under the same circumstances in which ICE guidelines and procedures permit them to look up similar identifying information (e.g., a telephone number) through non-electronic means. However, law enforcement personnel may not use software tools, even those generally available as standard operating system software, to circumvent restrictions placed on system users.

3. Real-Time Communications. Law enforcement personnel may passively observe and log real-time electronic communications open to the public under the same circumstances in which they may attend a public meeting.

4. Accessing Restricted Sources. Law enforcement personnel may not access restricted online sources or facilities absent legal authority permitting entry into private space.

5. Online Communications Generally. Law enforcement personnel may use online services to communicate as they may use other types of communication tools, such as the telephone and the mail. Law enforcement personnel should retain the contents of a stored electronic message if they would have retained that message had it been written on paper. The contents should be preserved in a manner authorized by ICE procedures governing the preservation of electronic communications.

6. Undercover Communications. Law enforcement personnel communicating online with witnesses, subjects, or victims must disclose their affiliation with law enforcement when ICE guidelines would require such disclosure if the communication were taking place in person or over the telephone. Law enforcement personnel may communicate online under a non-identifying name or fictitious identity if ICE guidelines and procedures would authorize such communications in the physical world. For purposes of ICE undercover guidelines, each discrete conversation online constitutes a separate undercover activity or contact, but such a conversation may comprise more than one transmission between the law enforcement personnel and another person.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7. Online Undercover Activities. Just as law enforcement agencies may establish physical-world undercover entities, they also may establish online undercover facilities, such as bulletin board systems and Web sites, which covertly offer information or services to the public. Online undercover facilities, however, can raise novel and complex legal issues, especially if law enforcement personnel seek to use the system administrator's powers for criminal investigative purposes. Further, these facilities may raise unique and sensitive policy issues involving privacy, international sovereignty, and unintended harm to unknown third parties. Because of these concerns, a proposed online undercover facility, like any undercover entity, may be established only if the operation is authorized pursuant to ICE's guidelines and procedures for evaluating undercover operations.

8. Communicating Online Through the Use of the Identity of a Cooperating Witness, with Consent. Law enforcement personnel may ask a cooperating witness to communicate online with other persons in order to further an investigation if agency guidelines and procedures authorize such a consensual communication in person, over the telephone, or through other non-electronic means. Law enforcement personnel may communicate online using the identity of another person if that person consents, if the communications are within the scope of the consent, and if such activity is authorized by ICE guidelines and procedures. Personnel who communicate online through the identity of a cooperating witness are acting in an undercover capacity.

9. Appropriating Online Identity. "Appropriating online identity" occurs when law enforcement personnel electronically communicate with others by deliberately assuming the known online identity (such as the username) of a real person, without obtaining that person's consent. Appropriating identity is an intrusive law enforcement technique that should be used infrequently and only in serious criminal cases. When assuming an online identity, law enforcement personnel must follow all applicable ICE policies and guidelines.

10. Activity by Law Enforcement Personnel during Personal Time. While not on duty, law enforcement personnel are generally free to engage in personal online pursuits. If, however, the off-duty online activity directly and substantially relates to a law enforcement investigation, operation, or prosecution, law enforcement personnel are bound by the same restrictions regarding the use of online information as would apply when on duty.

11. International Issues. Unless gathering information from online facilities configured for public access, law enforcement personnel conducting investigations should use reasonable efforts to ascertain whether any pertinent computer system, data, witness, or subject is located in a foreign jurisdiction. Whenever an item or person is located abroad, law enforcement personnel should follow ICE's policies and procedures for international investigations.

Personnel who conduct and support criminal and civil law enforcement investigations and/or operations must adhere to the above principles when using information gathered online in support of an official agency criminal or civil law enforcement investigations and/or operations.

DEF-034

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

The principles that address the use of the Internet for undercover activities apply only to ICE personnel with the authority to conduct undercover investigations.

Personnel who conduct civil and criminal law enforcement activities for Enforcement and Removal Operations should also adhere to the above principles when using information gathered online in support of their law enforcement activities. Such personnel should remain mindful that the principles that address the use of the Internet for undercover activities apply only to those vested with such authority.

Attorneys with the Office of the Principal Legal Advisor should also adhere to the above principles, except those that are applicable to undercover activities, when using information gathered online in support of their handling of criminal, civil, or administrative matters.

No Private Right of Action

This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.