# EXHIBIT 213

**UNCLASSIFIED (U)**

# 9 FAM 402.5

# (U) STUDENTS AND EXCHANGE VISITORS – F, M, AND J VISAS

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 402.5-1  (U) STATUTORY AND REGULATORY AUTHORITY

### 9 FAM 402.5-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

### 9 FAM 402.5-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.61; 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

## 9 FAM 402.5-2  (U) OVERVIEW

*(CT:VISA-1970;   04-22-2024)*

**(U)** Except for incidental, short-term courses permitted under a B visa (see 9 FAM 402.5-5(I)(3)-(4)), a noncitizen must have a student visa to study in the United States. The course of study and type of school they plan to attend determines whether they need an F-1 visa (academic) or an M-1 visa (nonacademic, vocational). Exchange visitor (J-1) visas are for individuals approved to participate in exchange visitor programs in the United States, which can range from student to research scholar to camp counselor to physician, among other programs.  Students and exchange visitors must be accepted by their schools or program sponsors before applying for visas.

AAUP-00362

## 9 FAM 402.5-3  (U) Categories of F, J, and M Visas

*(CT:VISA-1828;  09-12-2023)*

**(U)** 22 CFR 41.12 identities the following F, J, and M visas classifications for noncitizens engaged in study or participation in exchange programs:

| | |
|---|---|
| F1 | Student in an Academic or Language Training Program |
| F2 | Spouse or Child of F1 |
| F3 | Canadian or Mexican National Commuter Student in an Academic or Language Training Program |
| J1 | Exchange Visitor |
| J2 | Spouse or Child of J1 |
| M1 | Vocational Student or Other Nonacademic Student |
| M2 | Spouse or Child of M1 |
| M3 | Canadian or Mexican National Commuter Student (Vocational Student or Other Nonacademic Student) |

# 9 FAM 402.5-4  (U) STUDENT AND EXCHANGE VISITOR PROGRAM (SEVP)

## 9 FAM 402.5-4(A)  (U) Background on SEVP

*(CT:VISA-3012;  12-11-2024)*

a. **(U)** The Student and Exchange Visitor Information System (SEVIS) is designed to monitor the academic progress, movement, etc. of foreign students and exchange visitors from entry into the United States to departure. The Student and Exchange Visitor Program (SEVP) manages SEVIS.  SEVP is under the auspices of the National Security Investigations Division of ICE.

b. **(U)** SEVIS monitors schools and programs, students, exchange visitors, and their dependents throughout the duration of approved participation within the U.S. education system.  You can access the SEVIS record associated with the student through the CCD SEVIS report.

c.  **(U)** Contact the Education and Tourism Division CA/VO/F/ET with policy and procedural questions related to F, M, and J visas.

## 9 FAM 402.5-4(B)  (U) Student and Exchange Visitor Information System (SEVIS) Record is Definitive Record

*(CT:VISA-1970;  04-22-2024)*

a. **(U)** While applicants must still present a paper Form I-20 (F or M visa) or Form DS-2019 (J visa) to qualify for a visa, the SEVIS record is the definitive

AAUP-00363

record of student or exchange visitor status and visa eligibility.  You must always check an applicant's SEVIS status before issuing an F, M, or J visa, for two reasons:  (1) You must verify that the SEVIS fee has been paid (see following paragraph); and (2) While presentation of a valid Form I-20 or Form DS-2019 generally indicates that an individual is eligible to apply for a visa, the electronic SEVIS record in the CCD, not the paper form, is the definitive record.

b. **(U)** The electronic SEVIS record will indicate the applicant's current SEVIS status.  You should issue F, M, or J visas only to visa applicants whose SEVIS record indicates a SEVIS status of "initial" or "active."

c. **(U)** On occasion, you may encounter an applicant who presents a hard copy Form I-20 or Form DS-2019 but you are unable to locate the SEVIS record in the CCD.  This may occur because records were not "swept" into the CCD from the SEVIS database as usual.  If the applicant is otherwise qualified, refuse the visa under INA 221(g) for administrative processing and alert the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for assistance in verifying the record.

## 9 FAM 402.5-4(C)  (U) The Student and Exchange Visitor Information System (SEVIS) Fee

*(CT:VISA-2048;   08-15-2024)*

**(U)** All students and exchange visitors, except those exchange visitors who are sponsored by the U.S. government (programs with a serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019), must pay the I-901 SEVIS fee at FMJFee.com before the visa interview.  You must verify SEVIS fee payment through the SEVIS CCD report.  If the applicant's CCD SEVIS record does not show the fee was paid but the applicant states it was, you can easily and accurately verify the SEVIS payment by entering the SEVIS number, the last name of the applicant, and the applicant's date of birth into the FMJfee.com website.  Applicants who cannot demonstrate that they have paid the SEVIS fee should be refused under INA 221(g).  Questions about SEVIS fee payment should be directed to the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who".  Additional details and FAQs on the SEVIS fee can be found on the ICE website and on DHS's Study in the States website.

# 9 FAM 402.5-5  (U) STUDENTS: ACADEMIC AND NONACADEMIC – F AND M VISAS

AAUP-00364

# 9 FAM 402.5-5(A)  (U) Related Statutory and Regulatory Authorities

## 9 FAM 402.5-5(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

## 9 FAM 402.5-5(A)(2)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

22 CFR 41.61.

# 9 FAM 402.5-5(B)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F or M visa is usually required for individuals to enter the United States to attend university or college, public or private secondary school, private elementary school, seminary, conservatory, other academic institution, including a language training program, or vocational or other recognized nonacademic institution.  Also see 9 FAM 402.5-6 below regarding the J visa for exchange visitors, some of whose programs include attendance at a U.S. school.

b. **(U)** Citizens of VWP participating countries who intend to study cannot travel on the VWP or on visitor (B) visas, except to undertake recreational study incidental to their visit.

c. **(U)** Study leading to a degree or certificate conferred by either a U.S. or foreign educational institution is not permitted on a visitor (B) visa, even if it is for a short duration.  For example, distance learning which requires a period on the institution's U.S. campus requires a student visa.

d. **(U)** B-2 visa appropriate for certain students: See 9 FAM 402.5-5(R)(3) below for information on appropriate issuance of B-2 visas to prospective students, 9 FAM 402.5-5(I)(3) on students pursuing a short course of study, and 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for derivative children applying for B-2 status.

# 9 FAM 402.5-5(C)  (U) Qualifying for a Student Visa (F–1/M-1)

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** An applicant applying for a student visa under INA 101(a)(15)(F)(i) or INA 101(a)(15)(M)(i) must meet the following requirements to qualify for a

AAUP-00365

student visa:

(1) **(U)** Acceptance at a school as evidenced by a Form I-20 (see 9 FAM 402.5-4(B) above and 9 FAM 402.5-5(D) below);

(2) **(U)** Intent to enter the United States solely to pursue a full course of study at an approved institution *(see 9 FAM 402.5-5(C)(1) below)*;

(3) **(U)** Present intent to leave the United States at conclusion of approved activities (see 9 FAM 402.5-5(E) below);

(4) **(U)** Possession of sufficient funds to meet the individual's financial needs (see 9 FAM 402.5-5(G) below); and

(5) **(U)** Preparation for course of study (see 9 FAM 402.5-5(H) below).

b. **(U)** If an applicant fails to meet one or more of the above criteria, the appropriate ground of refusal is INA 214(b).

## 9 FAM 402.5-5(C)(1) (U) Intent to Solely Pursue a Full Course of Study

*(CT:VISA-2150;   04-29-2025)*

*a. **Unavailable***

*b. **Unavailable***

  *(1) **Unavailable***

  *(2) **Unavailable***

  *(3) **Unavailable***

*c.  **Unavailable***

  *(1) **Unavailable***

  *(2) **Unavailable***

  *(3) **Unavailable***

# 9 FAM 402.5-5(D)  (U) Form I-20 Certificate of Eligibility for Nonimmigrant (F-1) Student Status - For Academic and Language Students

## 9 FAM 402.5-5(D)(1)  (U) Form I-20 Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A prospective student must have a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, issued by an SEVP-certified school to be issued an F-1 or M-1 student visa.  Only an SEVP-certified school can issue a Form I-20 to students who have been accepted for enrollment.  The Form I-20 constitutes proof of acceptance at an SEVP-certified school and allows the holder to apply for a visa or change of status and admission into the United

AAUP-00366

States.  The Form I-20 has the student's unique SEVIS identification (ID) number on the upper left-hand side with the visa class printed on the top right-hand side.  New forms do not have a bar code.  SEVIS ID numbers are an N followed by 9 digits.  Old Forms I-20 with a bar code ceased to be issued as of June 26, 2015, and became invalid for visa issuance on July 1, 2016.

b. **(U)** An F-1 or M-1 visa may be issued only to an applicant who presents a properly completed and valid Form I-20 from the institution the student will attend and who is otherwise eligible for a visa.  These forms are issued only in the United States by approved institutions to students who will pursue a full course of study.

c. **(U)** F and M visa applicants must present a signed Form I-20 and J Visa applicants a Form DS-2019 before visa issuance.  If there are minor errors on the form (e.g., a program start date that is off by one day) you can process the case using that form.  However, if the form indicates an unrealizable program start date, or has a typographic error in the biographic data, you must verify that the information is correct in SEVIS.  The SEVIS record is the definitive record of student status and visa eligibility.  In most cases, the electronic record can be corrected by the institution without requiring issuance of a new hard copy Form I-20 or Form DS 2019.  You must verify that the SEVIS status is either "initial" or "active".  Make a case note that the electronic record contains corrections, and that the traveler will present the Form I-20 at the POE.  CBP accesses the electronic record using the SEVIS number.

d. **(U)** A Form I-20 must bear the signature of the designated school official (DSO) certifying that:

 (1) **(U)** The student's application for admission has been fully reviewed and is approved;

 (2) **(U)** The student is financially able to pursue the proposed course of study;

 (3) **(U)** Page 1 of the Form I-20 was completed and verified to be accurate before signature; and

 (4) **(U)** If the student will be attending a public high school on an F-1 visa, the school indicates that the student has paid the unsubsidized cost of the education (see INA 214(m)) and the amount submitted by the student for that purpose.

e. **(U)** On November 1, 2021, SEVP published policy guidance outlining the new procedure for the use of electronic signatures and transmission of the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status."  This guidance permits designated school officials (DSOs) to electronically sign and transmit the Form I-20 to initial and continuing international students and their dependents, using software programs or applications or by using electronically reproduced copies of a signature.  Additionally, school officials may scan and email or electronically transmit the Form I-20 via a secure platform, such as a school portal or other secure site, to F and M students

AAUP-00367

and their dependents. DSOs may also choose to still physically sign and mail the Form I-20 to students.

f.  **(U)** A Form I-20 issued by a school system must indicate the specific school within the system that the student will attend.

g.  **(U)** If the applicant submits a Form I-20 that does not contain all the required information, you must refuse the visa under INA 221(g) and require that the missing information be submitted.

## 9 FAM 402.5-5(D)(2)  (U) Student Must Present Form I-20 at Port of Entry (POE)

*(CT:VISA-1970;   04-22-2024)*

a.  **(U)** At the time of admission to the United States, a student must present the entire Form I-20, properly filled out and signed by the DSO and the student. Thus, after the visa interview or after an F-1 or M-1 visa has been issued, you must return the completed Form I-20, together with all supporting financial evidence, to the individual for presentation to the U.S. immigration officer at the POE.  Upon the student's arrival, the immigration officer will examine the documentation and return the financial evidence to the individual.

b.  **(U)** The student must always retain the Form I-20 while in the United States.

## 9 FAM 402.5-5(D)(3)  (U) Suspension of Cases Involving Unrealizable Reporting Dates

*(CT:VISA-2048;   08-15-2024)*

a.  **(U)** Action on the application must be suspended if the program start date specified in the applicant's Form I-20 or Form DS-2019 is already past or you believe that the applicant will be unable to meet that date.  The officer must review the SEVIS record in the CCD to determine whether the DSO (for F and M visas) or responsible officer (J visas) has amended the SEVIS record to change the program start date.  If this has not already been done, the applicant must ask the official to enter a new program start date in SEVIS - one that the applicant can meet.  You may then issue the visa based on the electronic record.

b.  **(U)** You may issue an F or M visa to an applicant who is otherwise qualified, was previously admitted in F or M status, and is seeking to renew the visa to continue participation in a student program, if the status of the individual's SEVIS record is "active."

c.  **(U)** Do not renew F or M visas for individuals whose SEVIS status is in any status other than active, regardless of presentation of a hard copy Form I-20 that may appear to be valid on its face.

AAUP-00368

### 9 FAM 402.5-5(D)(4)  (U) Fraud Related to Form I-20

*(CT:VISA-2048;   08-15-2024)*

**(U)** Fraud, as it relates to F and M cases, often involves the submission of false records to institutions to secure a Form I-20.  You may also observe unusual patterns of Form I-20 issuance from a particular institution.  If any type of fraud is suspected, refuse the visa under INA 221g and refer the case to the Fraud Prevention Manager through ECAS and to CA/FPP.  In addition, notify CA/FPP/ATD student visa portfolio holder and the F/M/J portfolio manager(s) in CA/VO/F/ET.  If a fraud investigation confirms fraud or misrepresentation of a material fact on the part of the applicant, you must consider an ineligibility under INA 212(a)(6)(C).  Questions concerning an applicant's ineligibility under INA 212(a)(6)(C) must be addressed to L/CA.

### 9 FAM 402.5-5(D)(5)  (U) F-1 Form I-20 Sample

*(CT:VISA-432;   08-08-2017)*

**(U)** See Form I-20 Sample.

## 9 FAM 402.5-5(E)  (U) Residence Abroad

### 9 FAM 402.5-5(E)(1)  (U) Residence Abroad Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** INA 101(a)(15)(F)(i) and INA 101(a)(15)(M)(i) both require that an F-1 or M-1 applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant intends to depart upon completion of the approved activity; specifically, they must:

   (1) **(U)** Have a residence abroad;

   (2) **(U)** Have no immediate intention of abandoning that residence; and

   (3) **(U)** Intend to depart from the United States upon completion of approved activities.

b. **(U)** Adjudicating student visa applications differs from those of other short-term visitors in that the residence-abroad requirement should be looked at differently.  Typically, students lack the strong economic and social ties of more established visa applicants, and they plan longer stays in the United States.  The statute assumes that the natural circumstances of being a student do not disqualify the applicant from qualifying for a student visa. You should consider the applicant's present intent in determining visa eligibility, not what they might do after a lengthy stay in the United States.

c. **(U)** If a student visa applicant is residing with parents or guardians, they are maintaining a residence abroad if you are satisfied that the applicant has the present intent to depart the United States at the conclusion of their studies.  The fact that this intention may change is not sufficient reason to deny a

AAUP-00369

visa.  In addition, the present intent to depart does not imply the need to return to the country from which they hold a passport.  It means only that they must intend to leave the United States upon completion of their studies.  Given that most student visa applicants are young, they are not expected to have a long-range plan and may not be able to fully explain their plans at the conclusion of their studies.  You must be satisfied when adjudicating the application that the applicant possesses the present intent to depart at the conclusion of their approved activities.

## 9 FAM 402.5-5(E)(2)  (U) Relationship of Education or Training Sought to Existence of Ties Abroad

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The fact that a student's proposed education or training would not appear to be useful in their homeland is not a basis for refusing an F-1 or M-1 visa.  This remains true even if the applicant's proposed course of study seems to be impractical.  For example, if a student visa applicant from a developing country wishes to study nuclear engineering simply because they enjoy it, they may no more be denied a visa because there is no market for a nuclear engineer's skills in their homeland than they may be denied a visa for the study of philosophy or Greek simply because they do not lead to a specific vocation.

b. **(U)** The fact that education or training like that which the applicant plans to undertake is apparently available in their home country is not in itself a basis for refusing a student visa.  An applicant may legitimately seek to study in the United States for various reasons, including a higher standard of education or training.  Furthermore, the desired education or training in the applicant's homeland may be only theoretically available; openings in local schools and institutions may be already filled or reserved for others.

## 9 FAM 402.5-5(E)(3)  (U) Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Some students must apply for visa renewals if they go home or travel during their period of study.  Where applicable, returning students may be eligible to apply under an interview waiver authority (see 9 FAM 403.5-4(A)(1)). You should usually issue visas to returning students who are qualified unless circumstances have changed significantly since the previous issuance.  Students should be encouraged to travel home during their studies to maintain ties to their country of origin.  If students feel they will encounter difficulties in seeking a new student visa or that they will not be issued a visa to continue their studies, they may be less inclined to leave the United States during their studies and hence may distance themselves from their family and homeland.  Facilitate the reissuance of student visas so that these students can travel freely back and forth between their homeland and the United States and thereby maintain their ties.

AAUP-00370

# 9 FAM 402.5-5(F)  (U) Knowledge of English

## 9 FAM 402.5-5(F)(1)  (U) Notation on Form I-20

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** If the individual's Form I-20 indicates that proficiency in English is required for pursuing the selected course of study and no arrangements have been made to overcome any English-language deficiency, you must determine whether the visa applicant has the necessary proficiency.  To this end, the officer must conduct the visa interview in English and may require the applicant to read aloud from an English-language book, periodical, or newspaper, and to restate in English in the applicant's own words what was read.  The applicant may also be asked to read aloud and explain several of the conditions set forth in the Form I-20.  A student must demonstrate English language proficiency only if an admitting institution has made English language ability a requirement for the intended course of study.

b. **(U)** If a school has admitted an applicant based on the applicant's TOEFL, IELTS, or other English language test scores, the officer must not reevaluate the school's admission decision, even if the applicant seems to know less English than the TOEFL or IELTS score indicates, unless the officer suspects the applicant obtained the results through fraud.  Many students do well on the TOEFL or IELTS but seem to falter in their English when confronted with a face-to-face interview.  Since 2018, hundreds of colleges and universities have started accepting the Duolingo English Test scores as part of their admissions process.

c. **(U)** If the school is aware of a student's lack of English proficiency and has arranged for the student to study English before enrolling in regular courses, then the lack of English skills is not relevant.

## 9 FAM 402.5-5(F)(2)  (U) Courses for Students Taught in a Language Other than English in which the Student Is Proficient

*(CT:VISA-1;   11-18-2015)*

**(U)** Proficiency in English is not required of a student if the enrolling institution conducts the course in a language in which the visa applicant is proficient.

## 9 FAM 402.5-5(F)(3)  (U) English as a Second Language (ESL)

*(CT:VISA-2048;   08-15-2024)*

**(U)** The fact that an ESL or other education program is available locally is not in itself grounds for refusing an applicant.  Many students find language learning enhanced by living in the country where the language is spoken. Students who intend to study in ESL-only programs must present a valid Form I-20 and be found qualified for an F visa.  Postsecondary institutions that require English

AAUP-00371

proficiency for a student to matriculate use a variety of mechanisms, and such arrangements must be evident on the visa applicant's Form I-20.  Contact VO's F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for additional guidance, as required.

# 9 FAM 402.5-5(G)  (U) Adequate Financial Resources

## 9 FAM 402.5-5(G)(1)  (U) Determining Financial Status of F-1 and M-1 Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The sponsoring school is required to verify the availability of financial support before issuing the Form I-20.  Schools may not be as well-versed in local documentation or cultural practices as you may be; therefore, you must still ensure that the student has sufficient funds to successfully study in the United States without being forced to resort to unauthorized employment.

b. **(U) F-1 Student:**  The phrase "sufficient funds to cover expenses" referred to in 22 CFR 41.61(b)(1)(ii) means the applicant must have sufficient funds to successfully study in the United States without resorting to unauthorized U.S. employment for financial support.  An applicant must provide evidence that sufficient funds are, or will be, available to defray all expenses during the entire period of anticipated study.  In addition to personal funds, sources of funding may include scholarships, assistantships, fellowships, and approved on-campus employment.  This does not mean the applicant must have cash immediately available to cover the entire period of intended study, which may last several years.  You must, however, establish, usually through credible documentary evidence, that the applicant has enough readily available funds to meet all expenses for the first year of study.  A student could potentially satisfy this requirement by presenting evidence of an existing student loan, but the mere intention to obtain a loan would be insufficient.  Likewise, a student's plan to use curricular practical training (CPT) or optional practical training (OPT) to cover first-year expenses would be insufficient.  You also must be satisfied that, barring unforeseen circumstances, adequate funds will be available for each additional year of study from the same source or from one or more other specifically identified and reliable financial sources.  Funds derived from CPT or OPT may be considered for returning students, who are authorized to participate.  Mere eligibility and/or intent to engage in CPT or OPT is speculative, both in terms of the amount of money that might be earned and whether authorization to work will be granted and may not be sufficient to demonstrate the necessary funds.  See 9 FAM 402.5-5(N) below for more information on employment for F-1 and M-1 students.

c.  **(U) M-1 Student:**  All applicants for M-1 visas must establish that they have immediately available to them funds or assurances of support necessary to pay all tuition and living costs for the entire period of intended stay.

AAUP-00372

## 9 FAM 402.5-5(G)(2)  (U) Adequate Medical Insurance

*(CT:VISA-1292;   05-27-2021)*

**(U)** F and M students and their dependents are not required to have U.S. medical or travel insurance to qualify for a visa.

## 9 FAM 402.5-5(G)(3)  (U) Funds from Source(s) Outside the United States

*(CT:VISA-2048;   08-15-2024)*

**(U)** When an applicant indicates financial support from a source outside the United States (for example, from parents living in the country of origin), determine whether there are restrictions on the transfer of funds from the country concerned.  If so, you must require acceptable evidence that these restrictions will not prevent the funds from being made available during the period of the applicant's projected stay in the United States.

## 9 FAM 402.5-5(G)(4)  (U) Affidavits of Support or Other Assurances by an Interested Party

*(CT:VISA-1;   11-18-2015)*

**(U)** Various factors are important in evaluating assurances of financial support by interested parties:

(1)  **(U)** Financial support to a student is not a mere formality to facilitate the applicant's entry into the United States, nor does it pertain only when the individual cannot otherwise provide adequate personal support.  Rather, the sponsor must ensure that the applicant will not become a public charge nor be compelled to take unauthorized employment while studying in the United States.  This obligation commences when the visa holder enters the United States and continues until the visa holder's completion of their program of study and departure.

(2)  **(U)** You must resolve any doubt that the financial status of the person giving the assurance is sufficient to substantiate the assertion that financial support is available to the applicant.

(3)  **(U)** You must also carefully evaluate the factors that would motivate a sponsor to honor a commitment of financial support.  If the sponsor is a close relative of the applicant, there may be a greater probability that the commitment will be honored than if the sponsor is not a relative.  Regardless of the relationship, you must be satisfied that the reasons prompting the offer of financial support make it likely the commitment will be fulfilled.

AAUP-00373

## 9 FAM 402.5-5(G)(5)  (U) Funds from Fellowships and Scholarships for F-1 Student

*(CT:VISA-1837;   09-26-2023)*

**(U)** A college or university may arrange for a nonimmigrant student to engage in research projects, give lectures, or perform other academic functions as part of a fellowship, scholarship, or assistantship grant, if the institution certifies that the student will also pursue a full course of study.

## 9 FAM 402.5-5(G)(6)  (U) Post-Doctoral Research Grants for F-1 Student

*(CT:VISA-1;   11-18-2015)*

**(U)** A visa applicant may be issued an F-1 visa for post-doctoral research even if the college or university provides compensation to the individual in the form of a grant.

# 9 FAM 402.5-5(H)  (U) Educational Qualifications for F-1 and M-1 Students

## 9 FAM 402.5-5(H)(1)  (U) Consular Role in Determining Educational Qualifications

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The Form I-20 and SEVIS record are evidence that a school has accepted the applicant as a student.  You should normally not go behind the Form I-20 or SEVIS record to assess the applicant's qualifications as a student for that institution.  If you have reason to believe that the applicant engaged in fraud or misrepresentation to garner acceptance into the school, then that information is an important factor to consider in determining if the applicant has a bona fide intent to engage in study in the United States.

b. **(U)** You are not expected to assume the role of guidance or admissions counselor to determine whether an applicant for an F-1 or M-1 visa is qualified to pursue the desired course of study.  You must, however, be alert to three specific factors when determining whether the applicant qualifies for a student visa:

   (1)  **(U)** The applicant has successfully completed a course of study equivalent to that normally required of a U.S. student seeking enrollment at the same level;

   (2)  **(U)** Cases in which an applicant has submitted forged or altered transcripts of previous or related study or training which the institution has accepted as valid; and

   (3)  **(U)** Cases in which an institution has accepted an applicant's alleged previous course of study or training as the equivalent of its normal

AAUP-00374

requirements when, in fact, such is not the case.

c.  **(U)** Through its school certification process, SEVP evaluates the qualifications of a school to issue Forms I-20.  This process includes a determination as to whether the school is a bona fide, established institution of learning which possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses of study.  Evaluation also involves an on-site visit.  If you have reason to question the authenticity of a school or exchange program, contact the (CA/VO/F/ET) F/M/J portfolio holder and the Office of Fraud Prevention Programs (CA/FPP) so inquiries to ECA or SEVP are appropriately coordinated through CA.

d. **(U)** Many U.S. colleges and universities do not require foreign students to submit SAT, ACT, or other standardized admission test scores, and not all schools require specific grade point averages (GPAs) for admission.  Therefore, you may not require that applicants provide admission test scores, or that applicants have a certain grade point average.  SEVP does not have a role in dictating admissions practices to the schools they approve to issue Form I-20.

# 9 FAM 402.5-5(H)(2)  (U) Choice of Academic Institution

*(CT:VISA-1494;   02-28-2022)*

**(U)** Which school a student chooses is not nearly as important as why they choose it.  The United States has over 4,700 accredited colleges and universities of all types and sizes.  Accreditation is the process that ensures a program or institution meets a certain level of academic standard.  Schools may be public or private; non-profit or for-profit; large or small.  A plan that includes initial attendance at a community college or English language program, and then a transfer to a four-year college is common, for reasons such as affordability, to fulfill academic prerequisites, and due to the flexibility and wide array of options available in the U.S. higher education system.  Some students may seek only to study at community colleges or do short-term programs such as Intensive English Programs (IEP), or pursue studies at specialized institutions, such as medical, business, technology-related, or fine arts schools, which typically award most degrees in a single field.  Attendance at a lesser-known college or university is not a ground of ineligibility and applicants cannot be refused a visa for this reason.  Faced with growing international competition for international students, promoting U.S. colleges and universities is a priority for the Department to ensure that the United States continues to be the top receiver of international students globally.  The Department's EducationUSA network of educational advising centers actively promotes all accredited U.S. colleges and universities, maintaining over 430 advising centers in over 175 countries and territories.  EducationUSA advisers assist international students in identifying accredited U.S. colleges and universities where they may be best positioned for success. There is no legal difference between SEVP-certified community colleges, English language schools, and four-year institutions in terms of their

AAUP-00375

authorization to issue Form I-20.  Resources to identify which institutions are accredited can be found at Understanding U.S. Accreditation.

# 9 FAM 402.5-5(I)  (U) Full Course of Study

## 9 FAM 402.5-5(I)(1)  (U) F-1 Academic Student

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** DHS regulations (8 CFR 214.2(f)(6)(i)) specify that "Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective."  Those regulations state that a "full course of study" as required by INA 101(a)(15)(F)(i) means:

  (1) **(U)** Postgraduate study or postdoctoral study at a college or university, or undergraduate or postgraduate study at a conservatory or religious seminary, certified by a designated school official (DSO) as a full course of study;

  (2) **(U)** Undergraduate study at a college or university, certified by a school official to consist of at least 12 semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter hour systems, where all undergraduate students who are enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or are considered full time for other administrative purposes, or its equivalent (as determined by the district director in the school approval process), except when the student needs a lesser course load to complete the course of study during the current term;

  (3) **(U)** Study in a postsecondary language, liberal arts, fine arts, or other non-vocational program at a school which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

      (a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

      (b) **(U)** A school accredited by a nationally recognized accrediting body, and which has been certified by a DSO to consist of at least twelve clock hours of instruction a week, or its equivalent as determined by the district director in the school approval process;

  (4) **(U)** Study in any other language, liberal arts, fine arts, or other non-vocational training program, certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or to consist of at least twenty-two clock hours a week if the dominant part of the course of study consists of laboratory work; or

AAUP-00376

(5) **(U)** Study in a curriculum at an approved private elementary or middle school or public or private academic high school which is certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

b. **(U)** Notwithstanding paragraphs 8 CFR 214.2(f)(6)(i)(A) and 8 CFR 214.2 (f)(6)(i)(B), a noncitizen who has been granted employment authorization pursuant to the terms of a document issued by USCIS under paragraphs 8 CFR 214.2(f)(9)(i) or 8 CFR 214.2(f)(9)(ii) and published in the Federal Register shall be deemed to be engaged in a "full course of study" if they remain registered for no less than the number of semester or quarter hours of instruction per academic term specified by the Commissioner in the notice for the validity period of such employment authorization.

c. **(U) Institution of Higher Learning:** Under DHS regulations (8 CFR 214.2(f)(6)(ii)), "a college or university is an institution of higher learning which awards recognized associate, bachelor's, master's, doctorate, or professional degrees." DHS holds that schools that devote themselves exclusively or primarily to vocational or business schools are not included in the category of colleges or universities but are categorized as M-1 schools.

d. **(U) Reduced Course Load:** The DSO may advise an F-1 student to engage in less than a full course of study due to initial difficulties with the English language or reading requirements, unfamiliarity with U.S. teaching methods, or improper course level placement. An F-1 student authorized to reduce course load by the DSO in accordance with the provisions of 8 CFR 214.2(f)(6)(iii) is maintaining status. On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

## 9 FAM 402.5-5(I)(2)  (U) M-1 Nonacademic Student

*(CT:VISA-1090;   06-24-2020)*

**(U)** DHS regulations (8 CFR 214.2(m)(9)) specify that "successful completion of the course of study must lead to the attainment of a specific educational or vocational objective." Those regulations state that a "full course of study" as required by INA 101(a)(15)(M)(i) means:

(1) **(U)** Study at a community college or junior college, certified by a school official to consist of at least twelve semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter-hour systems, where all students enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or considered full time for other administrative purposes, or its equivalent (as determined by the district director) except when the student needs a lesser course load to complete the course of study during the current term;

AAUP-00377

(2) **(U)** Study at a postsecondary vocational or business school, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

   (a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

   (b) **(U)** A school accredited by a nationally recognized accrediting body; and which has been certified by a designated school official (DSO) to consist of at least twelve hours of instruction a week, or its equivalent as determined by the district director;

(3) **(U)** Study in a vocational or other nonacademic curriculum, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or at least twenty-two clock hours a week if the dominant part of the course of study consists of shop or laboratory work; or

(4) **(U)** Study in a vocational or other nonacademic high school curriculum, certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

## 9 FAM 402.5-5(I)(3)  (U) B-2 Visa for Visitor Who Will Engage in a Short Course of Study

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Individuals whose principal purpose of travel (see 9 FAM 402.1-3) is tourism, but who also engage in a "short course of study" while in the United States, are properly classified for B-2 visas.  If the student will earn academic credit toward completion of an academic program, then it is not a "short course of study", and B-2 is not the appropriate visa class.  This guidance applies regardless of whether it is a U.S. or foreign educational institution that will grant academic credit for completion of the short course of study.  You should not advise applicants to obtain an I-20 but should refuse the visa under INA 214(b) as not approvable for the planned activities.

b. **(U)** An individual whose principal purpose of travel is non-credit-bearing avocational/recreational study, which can itself be touristic in nature, may be properly classified B-2 visas.  See 9 FAM 402.2-4(B)(9).

c. **(U)** Individuals traveling to the United States to attend seminars or conferences that are required to earn a degree (i.e., the applicant cannot complete the requirements for the degree unless they complete the proposed

AAUP-00378

seminar or conference in the United States) are not eligible for B visa classification.  This  includes students engaged in an online course of study traveling to the United States for academic consultations or to take examinations.  In the case of a noncitizen traveling to the United States to attend seminars and conferences for credit toward a degree, the study is neither incidental to a tourist visit, avocational, nor recreational.

d. **(U)** Individuals traveling to attend professional education, seminars, or conferences that do not result in academic credit may qualify for a B-1 per 9 FAM 402.2-5(B).

e. **(U)** It is common for U.S. colleges, universities, and private organizations to offer summer programs tailored for high school or college-aged students. Though these programs are for academic enrichment and are marketed as "study" and the participants attend "classes" the activities do not meet the definition of "full" or "part-time" course of study and therefore do not qualify for issuance of an I-20.  You may not advise applicants to obtain an I-20 for these programs.  In most cases, the activity, which is more like a summer camp with an academic focus, can be undertaken in B-2 status.  Consult L/CA for an AO on the appropriate visa classification.

## 9 FAM 402.5-5(I)(4)  (U) F-1 or M-1 Visa for Visitor Who Will Engage in a Short-Term Program

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only applicants who present a valid Form I-20 should be adjudicated as F or M applicants.  Do not advise applicants who do not present a Form I-20 to obtain one and return for further adjudication.  Instead, applicants without a Form I-20 should be adjudicated in the most logical category that allows the proposed activities in the United States.  In most cases, this will be a B visa. Consult with L/CA if it is unclear whether the activities proposed are permissible on a B visa.

b. **(U)** An individual may be issued a Form I-20 by a school only if they will engage in a full course of study.

c.  **(U)** If a student is receiving academic credit for the program of study or the program of study is required for their degree, the student must qualify for an F-1 or M-1 visa.  8 CFR 214.2(b)(7) prohibits an individual from enrolling in a course of study on a B-1 or B-2 visa.  See 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for possible limited exceptions.

d. **(U)** Students may enroll in online degree programs that allow them to reside overseas but that may require them to travel to the United States for short programs required for their degree.  Such students should apply for F-1 or M-1 visas and should present a properly executed Form I-20 indicating appropriate program dates for this limited period of school attendance on their U.S. campus.

AAUP-00379

# 9 FAM 402.5-5(J)  (U) Special Types of Students

## 9 FAM 402.5-5(J)(1)  (U) Students Destined to Schools Which are Avocational or Recreational in Character

*(CT:VISA-2048;   08-15-2024)*

**(U)** DHS cannot approve schools which are avocational or recreational in character for issuance of Form I-20, Certificate of Eligibility for Nonimmigrant Student Status.  Students coming to study in such schools may be eligible for B-2 visas if the purpose of attendance is recreational or avocational.  When the nature of a school's program makes determining its character difficult, consult with L/CA on the appropriate visa classification.

## 9 FAM 402.5-5(J)(2)  (U) Elementary School Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only children qualified for a derivative nonimmigrant classification through a principal parent may attend a publicly funded elementary school.  No public elementary schools or school systems are approved by SEVP to issue Form I-20 for attendance in F-1 nonimmigrant status by children in kindergarten through grade eight.  However, any school age student (kindergarten through grade 12) who is otherwise qualified may receive an F-1 visa under INA 101(a)(15)(F)(i) to attend a private school.

b. **(U)** Occasionally, you may encounter situations in which an American citizen/LPR friend or relative, or an institution in the United States, may offer to accept guardianship of a child to provide an indeterminate period of free schooling at a public school.  You may determine that a parent appears to be seeking a B visa for a child or children to facilitate this arrangement.  Keep in mind that study is usually not allowed on a B visa and that even legal guardianship does not constitute a qualifying family relationship for residence in the United States.  See 9 FAM 402.5-5(K)(4) below.  Separately, see 9 FAM 402.1-3 paragraph a and 9 FAM 402.1-5(C) for situations in which a child applies for a B-2 visa to accompany a parent who is the principal applicant.

## 9 FAM 402.5-5(J)(3)  (U) Candidates for Religious Orders

*(CT:VISA-1;   11-18-2015)*

**(U)** Individuals desiring to enter a convent or other institution for religious training of a temporary nature are classifiable as F-1 students under INA 101(a)(15)(F) if the institution has been approved as a place of study and the applicant will return abroad after concluding the course of study or training.

AAUP-00380

## 9 FAM 402.5-5(J)(4)  (U) Student Destined to U.S. Military Training Facility

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Military cadets accepted by any of the U.S. military service academies must be classified as A-2 if attendance is on behalf of a non-NATO foreign government or as NATO-2 if the attendance is on behalf of a NATO country. Military cadets whose attendance is not on behalf of a foreign government are classifiable as F-1 students are required to present Form I-20 and pay the SEVIS fee.

b. **(U)** Military personnel coming to the United States for education or training at any armed forces training facility are to be classified as foreign government officials and issued A-2 visas for non-NATO member military personnel, or NATO-2 for NATO member military personnel.

## 9 FAM 402.5-5(J)(5)  (U) Graduate of Foreign Medical School

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Foreign medical graduates seeking to enter temporarily in connection with their profession are not eligible for F-1 visas.  Such applicants must apply and qualify for IV*s* or for exchange visitor (J) or temporary worker (H) visas.  See 9 FAM 402.5-6(B) below and 9 FAM 402.10-4(B).

b. **(U)** At least one school has been approved to issue Forms I-20 to foreign medical graduates for a review-type continuing education course of study in preparation for taking tests in the field of medicine.  Foreign medical graduates seeking to enter the United States to take such a review-type course of study who present a Form I-20 from an approved school are classifiable as F-1 students.

## 9 FAM 402.5-5(J)(6)  (U) Entering the United States for Nursing Training

*(CT:VISA-1628;   09-13-2022)*

**(U)** DHS has approved several hospital-affiliated nurses' training schools for nonimmigrant students.  In cases where a school has been approved, the application may be considered under INA 101(a)(15)(F).

## 9 FAM 402.5-5(J)(7)  (U) Aviation Training

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** All flight training for initial training or subsequent training that will result in a certificate or rating must be undertaken on an F or M visa.  This includes FAA, EASA, and other equivalent certificates.

b. **(U)** Recurrent or refresher training (training related to an aircraft for which the applicant has already received certification) may be undertaken on a B-1.

AAUP-00381

Recurrent training is the training required for crewmembers to remain adequately trained and currently proficient for each aircraft crewmember position, and type of operation in which the crewmember serves.  It often consists of flight simulator training but may also entail classroom training to update pilots on such things as recent safety issues, trends in aviation, and modifications to aircraft configuration or operating procedures. This assumes that the applicant's employer is covering the recurrent training costs, incidental costs, and that the applicant does not receive a salary or perform labor in the United States.

# 9 FAM 402.5-5(K)  (U) Applying INA 214(m)

## 9 FAM 402.5-5(K)(1)  (U) Public Primary School or a Publicly Funded Adult Education Program

*(CT:VISA-1628;   09-13-2022)*

**(U)** Congress imposed limitations on noncitizen attendance in publicly funded institutions in the 1996 immigration legislation.  As of November 30, 1996, F-1 visas cannot be issued to persons seeking to enter the United States to attend a public primary school or a publicly funded adult education program. See INA 214(m).  This does not, however, bar a dependent of a nonimmigrant in any classification, including F-1, from attendance at a public primary school, an adult education program, or another public educational institution, as appropriate.  Under INA 214(m), primary school means kindergarten through 8th grade.

## 9 FAM 402.5-5(K)(2)  (U) Secondary School

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** INA 214(m) restricts, but does not prohibit, the issuance of F-1 visas to students seeking to attend public high schools.  Secondary school is deemed to be grades 9-12.  As of November 30, 1996, two new additional criteria were imposed on intending F-1 students at public high schools:

   (1)  **(U)** They cannot attend such school for more than 12 months; and

   (2)  **(U)** They must repay the school system for the full, unsubsidized, per capita cost of providing the education to them.

b. **(U)** You may not issue an F-1 visa for attendance at a public high school if the length of study indicated on the Form I-20 exceeds the 12-month cumulative period permitted under INA 214(m).  F-1 visas issued to attend public secondary schools must be limited to 12 months and payment of the full, unsubsidized, per capita cost must be demonstrated before visa issuance.

c. **(U)** It is important to remember that public secondary school attendance in a status other than F-1 (including unlawful status) does not count against the 12-month limit, nor does attendance in F-1 status before November 30, 1996.

AAUP-00382

### 9 FAM 402.5-5(K)(3)  (U) Reimbursement

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A public school system issuing a Form I-20 for attendance at a secondary school must indicate on the Form I-20 that such payment has been made and the amount of such payment.  School districts may not waive or otherwise ignore this requirement.  If the Form I-20 does not include the requisite information, the student must have a notarized statement stating the payment has been made and the amount from the designated school official (DSO) who signed the Form I-20.  If not, the visa must be refused, under INA 221(g), until the applicant provides the necessary documentation.

b. **(U)** Although the per capita costs vary from one school district to another (and sometimes from one school to another within the same district), the averages across the country have ranged from about $8,000 to more than $20,000.  They run somewhat less than that in Puerto Rico and U.S. territories.  These figures are guidelines only and must not be taken as absolutes.  If, however, a Form I-20 indicates a repaid cost radically different (for example, something less than $7,000), contact the F/M/J portfolio holder(s) in CA/VO/F/ET to coordinate an inquiry through SEVP.

### 9 FAM 402.5-5(K)(4)  (U) Noncitizens Under Legal Guardianship of American Citizen Relatives

*(CT:VISA-1292;   05-27-2021)*

**(U)** Schools sometimes advise relatives to declare themselves as the noncitizen's legal guardian.  The school then admits the foreign student as a resident, wrongfully assuming this would exempt the student from the INA 214(m) requirements.  The student's status as a resident of the school district is irrelevant.  Likewise, the fact that the student's U.S. sponsor has paid local property/school taxes does not fulfill the reimbursement requirement of INA 214(m).

### 9 FAM 402.5-5(K)(5)  (U) Student Visa Abusers

*(CT:VISA-1628;   09-13-2022)*

**(U)** INA 212(a)(6)(G) provides sanctions against foreign students who fail to comply with the INA 214(m) requirements.  A noncitizen in F-1 status who violates INA 214(m) is excludable until they have been outside the United States for a continuous period of five years after the date of the violation (see 9 FAM 302.9-9).  Noncitizens who are not subject to INA 214(m) are not subject to INA 212(a)(6)(G).

AAUP-00383

# 9 FAM 402.5-5(L)  (U) Period of Stay

## 9 FAM 402.5-5(L)(1)  (U) For F-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An individual entering as an F-1 student or granted a change to that status is usually admitted or given an extension of stay for the duration of status.  Duration of status means the time during which the student is pursuing a full course of study and any additional periods of authorized practical training, plus 60 days following completion of the course or practical training within which to depart.  Since November 30, 1996, however, the duration of status of an F-1 student in a publicly funded secondary school cannot exceed an aggregate of 12 months schooling (see 9 FAM 402.5-5(K)(2) above).

b. **(U)** An academic student is in status during the summer between terms, if eligible and intending to register for the next term.  The student is expected to resume a full course of study at the commencement of the next term. A student compelled by illness or other medical condition to interrupt or reduce studies is in status until their recovery.  The student is expected to resume a full course of study upon recovery.

c. **(U)** DHS amended its regulations to permit the DHS Secretary to waive the usual limitations, including hours of coursework, on employment for students faced by unexpected severe economic circumstances.  Such circumstances could include substantial fluctuations in exchange rates, loss of on-campus employment, loss of other financial assistance through no fault of the student, etc.  Students granted such waivers are deemed to be in status until the economic emergency is over and the necessity for such reduced studies has passed.

## 9 FAM 402.5-5(L)(2)  (U) For M-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The period of stay for an M-1 student, whether from admission or through a change of nonimmigrant classification, is the time necessary to complete the course of study indicated on Form I-20 plus 30 days within which to depart, not to exceed one year.

b. **(U)** An M-1 student may be granted an extension of stay if it is established that the student:

   (1)  **(U)** Is a bona fide nonimmigrant currently maintaining student status;

   (2)  **(U)** Is able to, and in good faith intends to, continue to maintain that status for the period for which the extension is granted; and

   (3) **(U)** Has compelling educational or medical reasons which resulted in a delay to the course of study.  Delays caused by academic probation or

AAUP-00384

suspension are not acceptable reasons for program extension. Cumulative extensions are limited to three years.

# 9 FAM 402.5-5(M)  (U) Spouse and Child of F-1 or M-1 Student

## 9 FAM 402.5-5(M)(1)  (U) Refusals of Spouse and Child of F-1 or M-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Before issuing an F-2 or M-2 visa to a spouse or child of a principal F-1 or M-1 student, you must be satisfied that the relationship between the principal applicant and the spouse or child exists, and that the spouse or child can be expected to depart from the United States upon completion of approved activities by the F-1 or M-1 principal applicant.  See 9 FAM 402.5-5(E) above. Keep in mind that coming to a different conclusion about family members entitled to a derivative nonimmigrant classification and the principal should be rare.  See 9 FAM 402.1-4(A).  If the derivative F-2 or M-2 is seeking to join an F-1 or M-1 principal applicant already in the United States, you must confirm that the derivative F-2 or M-2 applicants have the requisite nonimmigrant intent and that the family's circumstances have not changed in a way to alter the intent of the principal applicant, to conclude the applicants overcome INA 214(b).  See 9 FAM 402.1-4(C).

b. **(U)** If you doubt an F-1 or M-1 student's intent to return abroad, the student cannot satisfy your doubts by offering to leave a child, spouse, or other dependent abroad.  See 9 FAM 402.2-2(B) paragraph b.

## 9 FAM 402.5-5(M)(2)  (U) Separate Form I-20 and SEVIS Registration Required for Accompanying Spouse and/or Minor, Unmarried Child of F-1 or M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Each F-2 or M-2 dependent is required to have their own properly executed Form I-20 and their own unique SEVIS ID number.  It is not possible to issue dependent F-2 or M-2 visas based on the principal's Form I-20.  The F-2 or M-2 must present this evidence to both you and the immigration officer at the POE. F-2 or M-2 dependents are not required to pay a separate SEVIS fee.  Additional details on the SEVIS fee can be found on the SEVP page at the ICE website.

AAUP-00385

## 9 FAM 402.5-5(M)(3)  (U) Classification of Spouse or Child Who Will Attend School in the United States

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** A spouse qualified for an F-2, M-2, or any other derivative nonimmigrant classification may only study if those studies are incidental to the primary purpose of travel:  to accompany their spouse to the United States.  A spouse in F-2 status, therefore, may only participate in avocational or recreational programs.  A spouse of an F-1 visa holder may only enroll in a full-time course of study if they independently qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student.

b. **(U)** A child qualified for an F-2, M-2, or any other derivative nonimmigrant classification is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal (see 9 FAM 402.1-5(C)).  Moreover, a child in F-1 status could not qualify to attend a public primary school and would be limited to 12 months of attendance at a public high school.  See 9 FAM 302.9-9(B)(1).

# 9 FAM 402.5-5(N)  (U) Employment of F-1 and M-1 Student, Spouse, and Children

## 9 FAM 402.5-5(N)(1)  (U) On-Campus Employment for F-1 Student

*(CT:VISA-1292;   05-27-2021)*

**(U)** An F-1 student may accept on-campus employment with the approval of the designated school official (DSO) in an enterprise operated by or on behalf of the school.  The work must take place either at the school or at an educationally affiliated (associated with the school's established curriculum or part of a contractually funded research project at the postgraduate level) off-campus location.  Work that takes place at the school location could be for an on-campus commercial business, such as a bookstore or cafeteria, if the work directly provides services for students.  Employment located on-campus that does not directly involve services to students (such as construction work) does not qualify as on-campus employment.  Work with an employer that is educationally affiliated with the school is on-campus employment even if the work site is not located on the campus (such as a research lab affiliated with the school).  Such on-campus employment must not displace an American citizen or LPR.  The employment may not exceed 20 hours a week while school is in session but may be full time when school is not in session.  The student must be maintaining status.  An F-1 student who finishes a program, such as a bachelor's degree, and starts another program of study at the same campus may continue on-campus employment if the student plans to enroll in the new program of study for the next term.

AAUP-00386

## 9 FAM 402.5-5(N)(2)  (U) Off-Campus Employment for F-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** An F-1 student may not accept off-campus employment without first applying to U.S. Citizenship and Immigration Services (USCIS) for employment authorization.  An F-1 student may be eligible to apply for off-campus employment authorization after completing one full academic year in F-1 status.  A student who receives authorization from USCIS for off-campus employment may not work more than 20 hours a week when school is in session.  Such employment authorization is automatically terminated if the student fails to maintain status.  A designated school official (DSO) must request off-campus employment for an F-1 student in SEVIS in support of the Form I-765 which must be filed with USCIS, and the request will appear in the electronic SEVIS record.  To recommend off-campus employment, the DSO must certify that:

   (1)  **(U)** The student has been in F-1 status for one full academic year;

   (2)  **(U)** The student is in good standing and carrying a full course of study;

   (3)  **(U)** The student has established that acceptance of employment will not interfere with the full course of study; and

   (4)  **(U)** The prospective employer has submitted a labor and wage attestation, or the student has established a severe economic necessity for employment due to unforeseen circumstances beyond the student's control.

b. **(U)** A student who has received approval from USCIS for off-campus employment will have an employment authorization document (EAD) showing the duration of the employment authorization, which may be up to one year at a time.  The student's electronic SEVIS record will also show approval for off-campus employment.

c.  **(U)** If a student who has been granted off-campus employment authorization temporarily leaves the country during the period when employment is authorized, such employment can be resumed upon return.  The student must, however, be returning to the same school.

## 9 FAM 402.5-5(N)(3)  (U) Employment as Part of Curricular or Alternate Work/Study Practical Training for F-1 Student

*(CT:VISA-1757;   04-17-2023)*

**(U)** A student enrolled in a college or other academic institution having alternate work/study courses as part of the curriculum within the student's program of study may participate in and be compensated for such practical training when authorized for curricular practical training (CPT) by the designated school official (DSO).  Students may not begin such training before endorsement of their electronic SEVIS record by the DSO with such authorization.  Periods of actual

AAUP-00387

off-campus employment in a work/study program are considered practical training.  Students who have engaged in a full year of full-time CPT will not receive authorization to engage in optional practical training (OPT) after completion of the course of study.

## 9 FAM 402.5-5(N)(4)  (U) Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** Students are eligible for practical training only after they have completed a full academic year in an approved college-level institution, except for graduate students whose program requires them to participate immediately in curricular practical training (CPT).  Students in English language training programs are ineligible for practical training.  Optional practical training (OPT) is training that is directly related to an F-1 student's major area of study.  It is intended to provide a student with practical experience in their field of study during or upon completion of a degree program and is authorized through the recommendation of the designated school official (DSO) and the filing of Form I-765 with USCIS and subsequent issuance of an Employment Authorization Document (EAD) by USCIS.  CPT is employment that is an integral part of a student's specified curriculum.  In most cases, CPT involves internships and similar work experience specifically required by the student's program of study.  The DSO must authorize CPT before the student begins work.  See the SEVP website for more information on practical training.

b. **(U)** Any authorization for employment for purposes of practical training is suspended in the event of a certified strike or other labor dispute involving a work stoppage at the place of employment.

## 9 FAM 402.5-5(N)(5)  (U) Optional Practical Training

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F-1 student may apply for OPT in a job related to their major area of study.  OPT may be authorized pre- and post-completion and on a full-time or part-time basis.  During school vacations, either part-time or full-time OPT is permissible. When school is in session, OPT may not exceed 20 hours per week.  An F-1 student may request post-completion OPT after completion of all course requirements not including thesis or equivalent, or after completion of all requirements for graduation.  Post-completion OPT must be full time.  Such training must be completed within 12 months, although certain F-1 students may be eligible for an extension of post-completion OPT based on their major field of study or a pending change of status to H-1B.  In addition to a DSO's request for OPT which will appear in the student's electronic SEVIS record, the student must apply to USCIS using Form I-765 for an Employment Authorization Document (EAD).  If the student makes a brief trip abroad during a period of post-completion OPT, a valid F-1 visa, the unexpired EAD, the endorsed Form I-20, and the electronic SEVIS record will be required for reentry to complete the training.  A letter of employment may

AAUP-00388

also be required.  F-1 students may also travel abroad during the period following the completion of their academic programs while they have a pending request for OPT, which will appear in their electronic SEVIS record, but such travel should be undertaken with caution. USCIS may send a request for evidence to the U.S. address on the OPT application while the applicant is away. Additionally, if USCIS approves the application, the applicant will be expected to have the EAD in hand to reenter the United States. Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** OPT is different from curricular practical training (CPT), which is part of a student's degree curriculum and can only be authorized during a student's course of study.  OPT, by contrast, can be authorized during the student's degree program, as well as after graduation.

## 9 FAM 402.5-5(N)(6)  (U) Extension of OPT for Science, Technology, Engineering, or Mathematics (STEM) Students, and H-1B Beneficiaries ("Cap Gap")

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Effective May 10, 2008, until May 9, 2016, USCIS could grant an OPT extension of 17 months, for a maximum of 29 months, to an eligible F-1 student on post-completion OPT with a degree in a DHS-approved science, technology, engineering, or mathematics (STEM) field.

b. **(U)** Effective May 10, 2016, an F-1 student with a bachelor's or higher degree in a DHS-approved STEM field who is already in a period of approved post-completion OPT may apply to USCIS to extend that period by 24 months, for a maximum of 36 months.  Eligibility for this extension is based upon the Classification of Instructional Programs (CIP) code *f*or the student's degree program as indicated on the Form I-20, on an official transcript, or as shown in SEVIS (including for eligibility based on a previously obtained degree) and whether the CIP code for the degree program is included on the DHS-approved list of qualifying degree program categories for the extension, which can be found on the SEVP website.  Students are also required to complete Form I-983, Training Plan for STEM OPT Students, with their employer and submit it to the DSO.  See the SEVP website for more information on Form I-983.  The DSO must verify the student's eligibility, including ensuring that Form I-983 has been properly completed and executed, recommend the extension through SEVIS, and provide the student with a Form I-20 annotated with the recommendation.  Once the DSO recommends the extension, the student must submit a Form I-765, Application for Employment Authorization, and all appropriate fees to USCIS.  Additional information can be found on the USCIS website.

c. **(U)** F-1 students on post-completion OPT must report all employment and periods of unemployment to their DSOs, who then report the information in SEVIS on the student's record.  F-1 students participating in post-completion OPT are initially allowed an aggregate period of unemployment of 90 days.

AAUP-00389

Students on a 24-month STEM OPT extension are allowed an additional 60 days of unemployment, for a total of 150 days.  This measure allows time for job searches or a break when switching employers.  See the SEVP OPT policy guidance on the SEVP website for more information on how unemployment is counted.

d. **(U)** If the F-1 student has filed a Form I-765 for a 24-month extension in a timely manner before their end of regular post-completion OPT, then the student's OPT employment authorization is automatically extended for 180 days.  This extension ends once USCIS adjudicates the STEM OPT application.  If USCIS approves the STEM OPT extension the student is provided with a new EAD reflecting the extension dates.  If the petition is denied, the student's period of OPT ends.

e. **(U)** As the STEM OPT extension is automatic for the first 180 days following regular post-completion OPT (when the student has properly filed Form I-765), the student may not necessarily have a renewed EAD.  Therefore, any students having automatically authorized employment through filing for the STEM OPT extension may not be able to present a valid EAD when they apply to renew their visa.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the STEM OPT extension, as well as proof that the I-765 petition was filed in a timely manner.  You must confirm that the student's electronic SEVIS record contains the same information as the updated hard copy Form I-20 before issuing a visa.

f. **(U)** The STEM Designated Degree Program List provides degree program categories approved for the 24-month STEM OPT extension and significant additional information.

g. **(U)** If an F-1 student is the intended beneficiary of a timely filed Form I-129 petition for a cap-subject H-1B visa to start on October 1, the F-1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS that allow for receipt or approval of the petition, up to September 30.  The Cap Gap OPT Extension is automatic, and USCIS will not provide the student with a renewed EAD.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the Cap Gap OPT Extension, as well as proof that the Form I-129 petition was timely filed.  Verify that the electronic SEVIS record has also been updated before issuing a visa.

## 9 FAM 402.5-5(N)(7)  (U) Practical Training for M-1 Student

*(CT:VISA-2048;  08-15-2024)*

**(U)** Except for temporary employment for practical training as set forth herein, an M-1 student may not accept employment.  Practical training may only be authorized at the completion of an M-1 course of study.  An M-1 student who desires temporary employment for practical training must apply to USCIS by filing Form I-765.  If approval is granted, DHS will endorse the student's Form I-20 with the dates the authorization for practical training begins and ends.  Because M-1 students are admitted until a certain date, an M-1 student may

AAUP-00390

need to also file Form I-539, Application to Extend/Change Nonimmigrant Status, to apply for an extension of M-1 status in conjunction with the application for employment authorization.  Verify that the electronic SEVIS record has been updated before issuing a new visa.

## 9 FAM 402.5-5(N)(8)  (U) Temporary Absence of F-1 or M-1 Student with Pending or Granted Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** An F-1 or M-1 student authorized to accept employment for practical training who leaves the country temporarily may be readmitted for the remainder of the authorized period.  The student must be returning solely to perform the authorized training.  Additionally, a student may travel abroad and be readmitted while the request for practical training is pending with USCIS, but such travel should be undertaken with caution.  USCIS may send a request for evidence to the U.S. address on the application while the applicant is away.  Additionally, if USCIS approves the practical training application, the applicant will be expected to have the Employment Authorization Document (EAD) in hand to reenter the United States.  Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** A valid F-1 or M-1 visa, the Form I-20, EAD (if issued), and an accurate electronic SEVIS record are required to reenter the United States for practical training purposes.  A letter of employment may also be required.  For individuals attempting to travel abroad and be readmitted while an application for the STEM OPT extension is pending, the Form I-20 should be endorsed for reentry by the DSO within the last six months.

## 9 FAM 402.5-5(N)(9)  (U) Employment of F-2 and M-2 Spouse and Children

*(CT:VISA-1;   11-18-2015)*

**(U)** The F-2 spouse and children of an F-1 student may not accept employment. The M-2 spouse and children of an M-1 student may not accept employment.

## 9 FAM 402.5-5(O)  (U) F-3 and M-3 Nonimmigrant Visa Classifications

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** The Border Commuter Student Act of 2002 (Public Law 107-274), which was signed into law on November 2, 2002, amended INA 101(a)(15)(F) and (J) to create the F-3 and M-3 NIV categories for Canadian and Mexican citizens and residents who commute to the United States for study at a DHS-approved school located within 75 miles of the U.S. border.  These students are permitted to study on either a full-time or part-time basis.  Until further notice, applicants applying to study in the U*nited S*tates who present a valid

AAUP-00391

Form I-20, have an electronic SEVIS record in INITIAL or ACTIVE status, and will commute to school; i.e., not reside in the United States while attending classes, are to be processed as F-1/M-1 students, and the annotation "border commuter" placed on the visa foil.

b. **(U)** The family members of border commuter students are not entitled to derivative F-2 or M-2 status, given that these students do not reside in the United States.

# 9 FAM 402.5-5(P)  (U) Temporary Absence

## 9 FAM 402.5-5(P)(1)  (U) Applicants Who Apply While Abroad for an F-1 or M-1 Visa

*(CT:VISA-1628;   09-13-2022)*

**(U)** Except as provided below, a student making a short trip abroad during an authorized period of study, who needs to obtain a new visa during such absence, must present their Form I-20, properly executed and endorsed.  You must verify that the SEVIS record of the applicant is in ACTIVE status.  If otherwise qualified, the applicant may be issued the appropriate visa.

## 9 FAM 402.5-5(P)(2)  (U) Temporary Absence of Applicants Applying Abroad for Attendance at School Other than Listed on the Visa

*(CT:VISA-2048;   08-15-2024)*

**(U)** A student temporarily abroad who intends to return to study at a United States institution other than the one for which the original visa was issued may seek admission with the original visa, if still valid, and the Form I-20 from the new school.  If the student wishes to apply for a new visa, however, they must present proof that the transfer has been completed and the student is in "initial" or "active" status at the new school.  Verify that the applicant has a valid SEVIS record showing the applicant is in INITIAL or ACTIVE status at the new institution and that the SEVIS fee has been paid on the new record before issuing a new student visa.

## 9 FAM 402.5-5(P)(3)  (U) Renewing F or M Visas for Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning students may be eligible to apply under interview waiver authority (see 9 FAM 403.5-4(A)(1)). You usually should renew F or M visas to returning students who have remained in status and have not had any significant changes in either their academic program or their personal circumstances.  When a foreign student engaged in study takes a short trip abroad and requires a visa to return to the United States, you are encouraged to

AAUP-00392

issue visas, if the student is otherwise qualified, to allow the student to complete their study.  Verify that the student's SEVIS record is in ACTIVE status before issuing a new visa.

# 9 FAM 402.5-5(Q)  (U) Processing F and M Visas

## 9 FAM 402.5-5(Q)(1)  (U) Issue Full Validity Student Visas

*(CT:VISA-2143;   03-26-2025)*

**Unavailable**

## 9 FAM 402.5-5(Q)(2)  (U) Maintenance of Status and Departure Bond

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-8.

## 9 FAM 402.5-5(Q)(3)  (U) Automatic Extension of Validity of Visa

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-4(E).

# 9 FAM 402.5-5(R)  (U) Visa Annotations

## 9 FAM 402.5-5(R)(1)  (U) Name of School and SEVIS ID

*(CT:VISA-2048;   08-15-2024)*

**(U)** An initial F-1 or M-1 visa must be annotated with the SEVIS ID and the name of the institution the student will initially attend.  Ensure that the SEVIS ID is correctly annotated on the visa foil.  Inform an applicant who has been accepted by more than one institution that the visa application will be considered only based on the Form I-20 issued by the school which the applicant will attend.  Also advise the applicant that the immigration inspector at the POE can refuse admission for a student seeking an initial entry with a Form I-20 from a school other than the one named on the visa or if the student indicates an intention to attend a different institution.

## 9 FAM 402.5-5(R)(2)  (U) Entry of Student Before Enrollment

*(CT:VISA-2048;   08-15-2024)*

a. **Unavailable**

b. **(U)** A student who wants to travel to the United States more than 30 days in advance of their program start date must obtain a visa in a different

AAUP-00393

classification and seek admission under that other visa.

c.  **(U)** If a B-2 visa is issued, advise the applicant that, if admitted to the United States as a B-2 visitor, they are required to obtain a change of nonimmigrant status from USCIS to that of an F, M, or J student, as applicable, before their program start date.

## 9 FAM 402.5-5(R)(3)  (U) Entry When School Not Selected

*(CT:VISA-1090;  06-24-2020)*

**(U)** A prospective student applicant who has neither been issued a Form I-20 nor made a final selection of a school may wish to travel to the United States for the primary purpose of selecting a school.  If the applicant qualifies for a visitor visa, and would appear to qualify for a student visa, a B-2 visa may be issued for this purpose of travel.

## 9 FAM 402.5-5(R)(4)  (U) Admitted Student Traveling Without Form I-20

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** A signed hard copy Form I-20 must be presented at the POE for a student to be admitted in F or M status.

b. **(U)** When a student has documentary evidence that admission to a school has been granted, and when circumstances warrant visa issuance before the hard copy Form I-20 has been received, you may issue an F-1 visa based on the electronic SEVIS record.  The electronic SEVIS record must show that the visa applicant is in INITIAL or ACTIVE student status and that the SEVIS I-901 fee has been paid.  Enter a case note stating that you have reviewed the electronic SEVIS record and advised the student to carry the hard copy Form I-20 when travelling.

# 9 FAM 402.5-6  (U) EXCHANGE VISITORS – J VISAS

## 9 FAM 402.5-6(A)  (U) Statutory and  Regulatory Authorities

### 9 FAM 402.5-6(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;  11-18-2015)*

**(U)** INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)).

AAUP-00394

### 9 FAM 402.5-6(A)(2)  Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

# 9 FAM 402.5-6(B)  (U) The Exchange Visitor Program

## 9 FAM 402.5-6(B)(1)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The purpose of the Exchange Visitor Program (J visa program) is to further the foreign policy interests of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchanges.  The goal is to meet this purpose while protecting the health, safety, and welfare of the foreign nationals participating in the Program as exchange visitors.  Only organizations that have been designated by ECA, may participate.

b. **(U)** The Exchange Visitor Program is administered under the oversight of the Deputy Assistant Secretary for Private Sector Exchange.  The Office of Private Sector Exchange Designation, the Office of Exchange Coordination and Compliance, and the Office of Private Sector Exchange Administration are located at:

> Bureau of Educational and Cultural Affairs
> Department of State
> State Annex SA-4E
> 2430 E Street, NW
> Washington, DC  20522

c.  **(U)** Detailed guidance can be found on the Exchange Visitor Program at j1visa.state.gov.

## 9 FAM 402.5-6(B)(2)  (U) Mandatory Exchange Visitor Classification in Certain Cases

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Participants in exchange visitor programs sponsored by USAID (program serial numbers G-1 and G-2, respectively) are supported by U.S. government funding.  These participants must be documented as exchange visitors (J visa) rather than in another visa category (such as F-1 student), even if they qualify for that visa category.  Participants in exchange visitor programs sponsored by other U.S. government agencies (program serial number G-3) or participants in a federally funded national research and development center program (program serial number G-7), must also be documented as exchange visitors if participation is directly financed in whole or in part by the sponsoring agency.  The only exception to these rules requiring J classification is for an applicant who would otherwise qualify for an A-1 or A-2 visa.  Such

AAUP-00395

applicants must always be issued A visas, rather than J visas, regardless of the funding of their travel. See 9 FAM 402.3-4(A) regarding the rule that there is no alternative to A or G visa classification. Contact CA/VO/F/ET for additional guidance, if required.

b. **(U)** You may receive visa applications from individuals seeking to participate in exchange program*s* or conferences that will be funded by a U.S. government agency, but the applicant does not present a Form DS-2019 as the program does not have ECA designation. As such, these applications cannot qualify for J-1 classification. You must determine whether the applicant qualifies for another visa classification appropriate for the purpose of travel, usually a B visa. See 9 FAM 402.2-5(B). Do not instruct applicants that they must apply for a J-1 visa, even if the planned travel is funded by the U.S. government, if the program does not have an ECA designation. Contact L/CA with classification-specific questions.

# 9 FAM 402.5-6(C)  (U) Qualifying for an Exchange Visitor Visa (J-1)

*(CT:VISA-2048;   08-15-2024)*

**(U)** An applicant applying for a visa under INA 101(a)(15)(J) must meet the following requirements to qualify for an exchange visitor visa:

(1) **(U)** Acceptance to a designated exchange visitor program, as evidenced by presentation of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status (see 9 FAM 402.5-6(D) below);

(2) **(U)** Sufficient funds, or adequate arrangements made by a host organization, to cover expenses;

(3) **(U)** Sufficient proficiency in the English language to participate in their program and compliance with the requirements of INA 212(j) (see 9 FAM 402.5-6(G) below);

(4) **(U)** Present intent to leave the United States at conclusion of program (see 9 FAM 402.5-6(F) below);

(5) **(U)** Possession of qualifications for the program offered (see 9 FAM 402.5-6(E) below); and

(6) **(U)** Compliance with INA 212(e) if applicable (see 9 FAM 302.13-2 and 22 CFR 41.63). Annotate the Form DS-2019 (see 9 FAM 402.5-6(D)(2) paragraph b below and annotate the visa (see 9 FAM 402.5-6(I)(6) below) accordingly.

AAUP-00396

# 9 FAM 402.5-6(D)  (U) Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status

## 9 FAM 402.5-6(D)(1)  (U) The Basic Form

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status, is the document required to support an application for an exchange visitor visa (J-1).  It is a two-page document which can only be produced through SEVIS.  SEVIS is the DHS database developed to collect information on F, M, and J visa holders (see 9 FAM 402.5-4 above and 9 FAM 402.5-6(J) below).  The prospective exchange visitor's signature on page one of the Form DS-2019 is required.  Page two of Form DS-2019 consists of instructions and certification language relating to participation.  Form DS-2019 is generated with a unique identifier known as a "SEVIS ID number" in the top right-hand corner, which consists of an "alpha" character (N) and 10 numerical characters (e.g., N0002123457).

b. **(U)** ECA/EC/D designates U.S. organizations to conduct exchange visitor programs.  These organizations are known as program sponsors.  Designated sponsors have access to SEVIS and the capability of generating Form*s* DS-2019 from SEVIS.  Effective April 27, 2023, designated sponsors are permitted to use digital signatures and electronically transmit Form DS-2019 directly to exchange visitors. As of this date, consular sections should accept printed versions of the digitally signed copy of Form DS-2019 for all J applicants.  Sponsors also may print, physically sign paper forms in any color ink, and continue to mail the forms or scan the signed forms (e.g., into portable document format (PDF) files) and transmit them electronically.  Sponsors may also digitally sign and electronically transmit Forms DS-2019 to eligible J-2 spouses or children of an exchange visitor.

c. **(U)** J visa applicants must continue to present a signed paper Form DS-2019 at their visa interview and at the POE when they travel to the United States.  If there are minor errors on the form (e.g., a program begin date that is off by one day), you can process the case using that form.  You must verify the applicant's SEVIS record in the SEVIS report in CCD.  If corrections are needed, they may be made electronically; there is no need to request a new hard copy of the Form DS-2019.  Make a case note to alert CBP that the electronic record has been updated.  Once the visa is issued, however, the SEVIS record cannot be updated until the participant's program is validated ("Active" in SEVIS).  See 22 CFR 62.13(a).  The sponsor is required to update the SEVIS record upon the exchange visitor's entry and no corrections to the record can be made until that time.  In addition, in the event a visa is needed for a spouse or a minor child and the primary's J-1 visa has already been issued, the system will not permit new Forms DS-2019 to be created until after the sponsor validates the primary applicant's SEVIS record.

AAUP-00397

## 9 FAM 402.5-6(D)(2)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status

*(CT:VISA-1741;   03-30-2023)*

a. **(U)** The Form DS-2019, also known as Certificate of Eligibility for Exchange Visitor (J-1) Status, indicates the visa applicant understands all conditions of the stay in the United States in J status and understands also that a consular or immigration officer will make a preliminary determination as to whether the applicant is subject to the two-year home country physical presence requirement.  Before the visa is issued, the applicant must sign the bottom of page one of the Form DS-2019 certifying they agree to comply with that requirement if it is determined to be applicable.

b. **(U)** A consular or immigration officer makes the preliminary determination regarding the applicability to the two-year home country physical presence requirement under INA 212(e) after a personal interview with the individual unless personal appearance has been waived under 9 FAM 403.5-4(A).  The consular or immigration officer signs page one of Form DS-2019 indicating the determination made by the officer.  The Department*'s* Waiver Review Division (CA/VO/DO/W) reserves the authority to make the final determination whether to issue a favorable recommendation to DHS to waive the two-year requirement under INA 212(e).

## 9 FAM 402.5-6(D)(3)  (U) Serial Numbers of Designated Exchange Visitor Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** When ECA/EC/D designates an organization or agency as a sponsor, it is enrolled in SEVIS and assigned a unique program serial number (referred to as the program number) that is used to identify the specific program.  The sponsor number is assigned based upon the following series:

(1) **(U)** G-1—Department of State;

(2) **(U)** G-2—U.S. Agency for International Development (USAID);

(3) **(U)** G-3—Other U.S. Federal agencies;

(4) **(U)** G-4—International agencies or organizations in which the U.S. government participates;

(5) **(U)** G-5—Other national, State, or local government agencies;

(6) **(U)** G-7—Federally funded national research and development center or a U.S. Federal laboratory;

(7) **(U)** P-1—Educational institutions, e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research;

(8) **(U)** P-2—Hospitals and related institutions;

AAUP-00398

(9) **(U)** P-3—Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be classified as a P-3 if they are nonprofit); and

(10) **(U)** P-4—For-profit organizations (business and industrial concerns).

## 9 FAM 402.5-6(D)(4)  (U) Requirement for Form DS-2019 in Case of Spouse and/or Minor, Unmarried Children

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Each accompanying J-2 spouse or child of a principal J-1 is required to have a separate Form DS-2019 issued by the program sponsor and will have their own unique SEVIS ID number.  You may not issue dependent J-2 visas based on the principal's (J-1's) Form DS-2019.

b. **(U)** A minor, unmarried child qualified for J-2 status is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal J-1.  See 9 FAM 402.1-5(C).

c. **(U)** The J-2 applicant must present their Form DS-2019 to you during the visa interview, and to the U.S. Customs and Border Protection (CBP) officer at the POE.

d. **(U)** Participants in the Summer Work Travel, camp counselor, au pair, and high school exchange programs are not expected to be accompanied by dependents.  If you receive a Form DS-2019 supporting a J-2 visa application from an individual claiming such status, contact CA/VO/F/ET for guidance.

## 9 FAM 402.5-6(D)(5)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, at Port of Entry (POE)

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** After a J-1 visa has been issued, return the completed Form DS-2019 to the exchange visitor.  Inform the exchange visitor that they must carry Form DS-2019 on their person for presentation to the CBP officer at the U.S. POE.  At each admission to the United States, an exchange visitor must present the Form DS-2019 along with the visa to the CBP officer.  Upon the exchange visitor's arrival in the United States, the CBP officer will examine the visa, the Form DS-2019, and any supporting documentation and return the documents to the exchange visitor.

b. **(U)** If the exchange visitor is admitted, DHS will return the Form DS-2019 to the individual.  The exchange visitor must always safeguard the form.  If the exchange visitor loses the Form DS-2019, they must obtain a replacement from the designated sponsor.

AAUP-00399

## 9 FAM 402.5-6(D)(6)  (U) Sample Form DS-2019

*(CT:VISA-1090;   06-24-2020)*

a. **(U) J-1 Principal Applicant Sample:**  For a sample of a properly completed DS-2019 for a J-1 Principal, click here, Sample DS-2019 for J-1.

b. **(U) J-2 Dependent Sample:**  For a sample of a properly completed DS-2019 for a J-2 dependent click here, Sample DS-2019 for J-2.

## 9 FAM 402.5-6(D)(7)  (U) Form DS-7002, Training/Internship Placement Plan

*(CT:VISA-1837;   09-26-2023)*

a. **(U)** The Form DS-7002, Training/Internship Placement Plan (T/IPP), is designed to standardize applications in the Trainee, Intern, and College and University Student Intern categories and to increase transparency and accountability and curb potential abuse by having all three concerned parties— the exchange visitor, the U.S. sponsor, and the entity providing the training or internship sign the Form DS-7002 acknowledging the program plan and their regulatory responsibilities.

b. **(U)** You may wish to use the Form DS-7002 to help in formulating interview questions, but you are not required to verify the contents of the form.

c.  **(U)** Electronic signatures (including faxed signatures) are permissible on Form DS-7002, and you should accept these as they adjudicate applications.

d. **(U)** The form requires each participant to have U.S. contact information.  As some prospective exchange program participants may not have this information at the visa interview, you may accept the contact details for the participant's host organization in the United States instead.

## 9 FAM 402.5-6(D)(8)  (U) Sample Form DS-7002

*(CT:VISA-1741;   03-30-2023)*

**(U)** To see the Form DS-7002 see myData.

## 9 FAM 402.5-6(E)  (U) Categories of Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** At present, the Department has 15 exchange categories in which foreign nationals may participate.  Participants may only engage in activities authorized for their program.

b. **(U)** The following sections list these categories in alphabetical order with a brief description of key points.

c.  **(U)** The presentation of a valid Form DS-2019 by the visa applicant constitutes evidence that the individual was determined by the designated U.S. program sponsor to be qualified to participate in the specific exchange

AAUP-00400

program.  Verify the Form DS-2019 in the electronic SEVIS report in the CCD and determine that the applicant's record is in either INITIAL or ACTIVE status and that the SEVIS I-901 fee has been paid.  Also note the program end date as it appears in the electronic record and ensure that the J visa is issued with a validity that corresponds to the program end or to the reciprocity schedule for the country of the applicant's nationality, whichever is shorter.  See 9 FAM 402.5-6(I)(6).

## 9 FAM 402.5-6(E)(1)  (U) Noncitizen Physician

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Noncitizen Physician:**  This category is for foreign national medical graduates pursuing American medical board certification through graduate education and training at accredited U.S. schools of medicine or other U.S. institutions through a clinical exchange program.

b. **(U)** The Educational Commission for Foreign Medical Graduates (ECFMG) is the only program sponsor authorized to use this category.  Foreign medical graduates under this category must successfully complete examinations administered by ECFMG that measure their command of English and the medical sciences.

c.  **(U)** All foreign medical graduates sponsored in the category of Alien Physician are subject to the 2-year home-country physical presence requirement.  See 9 FAM 402.5-6(L) below.

d. **(U) Exception to ECFMG sponsorship:**  A foreign physician may be sponsored by a designated sponsor other than ECFMG (e.g., a U.S. university, academic medical center, school of public health, or other public health institution) as a "research scholar" only if the dean of the accredited U.S. medical school or their designee certifies the following 5 points, and such certification is appended to the Form DS-2019 issued to the prospective exchange visitor Alien Physician:

(1)  **(U)** The program is predominantly involved with observation, consultation, teaching, or research;

(2)  **(U)** Any incidental patient contact will be under the direct supervision of a U.S. citizen or LPR physician who is licensed to practice medicine in the State in which the activity is taking place;

(3)  **(U)** The foreign national physician will not be given final responsibility for the diagnosis and treatment of patients;

(4)  **(U)** Any activities will conform fully with the State licensing requirements and regulations for medical and health care professionals in the State in which the program is being pursued; and

(5)  **(U)** Any experience gained will not be credited towards any clinical requirements for medical specialty board certification.  In such cases, the program sponsor's letter of designation will explicitly authorize the sponsor to issue Form DS-2019 using the Research Scholar category.

AAUP-00401

The duration of participation as a Research Scholar is limited to 5 years unless the Department approves a program extension for a G-7-sponsored exchange visitor.

e. **(U) Duration:**  The duration of participation is limited to seven years, unless specifically authorized by the Department (ECA/EC).  Such authorization will be indicated by an active SEVIS status with the same SEVIS number and an extended program end date.

f. **(U)** Exchange Visitor Program Regulation**:**  See 22 CFR 62.27.

# 9 FAM 402.5-6(E)(2)  (U) Au Pair

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Au Pair:**  This category is for a foreign national age 18-26 entering the United States for a period of one year to reside with an American host family, or the family of an LPR, while participating in their home life and providing limited childcare services.  Au Pair applicants who are 26 years of age at the time of the program start date are eligible to participate in the Au Pair program.  The Au Pair is also required to enroll and attend classes offered by an accredited U.S. postsecondary institution for not less than 6 semester hours of academic credit, or the equivalent.  As a condition of participation, host-families must agree to facilitate the enrollment and attendance of the Au Pair and to pay the cost of such academic course work in an amount not to exceed $500.  Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work they intend to enroll in. Failure to adhere to the education component is grounds for termination of the Au Pair from the program by the sponsor.

b. **(U) EduCare:**  The regulations governing the Au Pair category were amended to create a subcategory called EduCare.  This component is specifically designed for families with school-aged children requiring limited childcare assistance.  Au Pairs participating in the EduCare component may not be placed with families having pre-school-aged children unless alternative arrangements are in place for these children.  EduCare participants may not work more than 10 hours a day/30 hours a week.  They must complete a minimum of 12 semester hours of academic credit, or its equivalent, during their program.  Host families provide the first $1,000 to the Au Pair toward the cost of the educational component.  EduCare Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work, they intend to enroll in.

c. **(U) No Family Placement:**  Au Pairs are not to be placed in the homes of family/relatives, irrespective of the distance in relations (e.g., third cousin, great aunt and/or uncle, etc.).

d. **(U) Duration:**  The duration of participation is limited to one year/one sponsor only, unless specifically authorized by the Department (ECA/EC).

AAUP-00402

Such authorization will be indicated by an active SEVIS status with the same SEVIS number as the applicant's initial Au Pair program, and an extended program end date.

e. **(U) Extension of program:**  Designated Au Pair sponsors may request that an Au Pair be granted an extension of program participation beyond the original twelve months.  Au Pair sponsors may request an Au Pair be granted an additional 6-, 9-, or 12-month extension of program participation.  The applicant's age is not a barrier to program extension if they were 18-26 years of age at the time of the initial program start date.

f. **(U) Repeat Participation:**  A foreign national who successfully completed an Au Pair program is eligible to participate again as an Au Pair, including a participant who was granted an extension of an initial program, if they had resided outside the United States for at least two years following completion (program end date) of their initial Au Pair program.  The repeat participant must qualify as an Au Pair under the same rules as an initial participant.

g. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.31.

## 9 FAM 402.5-6(E)(3)  (U) Camp Counselor

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Camp Counselor:**

   (1)  **(U)** This category is for a foreign national selected to be a counselor in an accredited U.S. summer camp (during the U.S. summer months) who imparts skills to American campers and information about their country or culture.

   (2)  **(U)** Foreign nationals who apply for this program must be bona fide youth workers, students, teachers, or individuals with specialized skills.

   (3)  **(U)** While the minimum age of the foreign national is 18 years, there is no maximum age for this category.

   (4)  **(U)** While it is recognized that some non-counseling chores are an essential part of camp life for all counselors, this program is not intended to assist American camps in bringing in foreign nationals to serve as administrative personnel, cooks, nurses, physicians, or menial laborers, such as dishwashers or janitors.

b. **(U) Duration:**  The duration of participation must not exceed 4 months.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.30.

## 9 FAM 402.5-6(E)(4)  (U) Government Visitor

*(CT:VISA-1;   11-18-2015)*

a. **(U) Government Visitor:**  This category is for a foreign national who is recognized as an influential or distinguished person in their own country, and who is selected by a Federal, State, or local government agency to participate

AAUP-00403

in observation tours, discussions, consultations, professional meetings, conferences, workshops, and travel.

b. **(U)** This category is for the "exclusive use" of United States Federal, State, and local government agencies.

c. **(U) Duration:** The duration of participation must not exceed 18 months.

d. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.29.

## 9 FAM 402.5-6(E)(5)  (U) Intern

*(CT:VISA-2058;   08-29-2024)*

a. **(U) Intern:**

(1) **(U) The Intern category aims:** to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of American techniques, methodologies, and technologies; and to increase participants' understanding of American society and culture.  The requirements in the Intern program regulations are designed to distinguish between a period of work-based learning in the intern's academic field, which is permitted, and casual and unskilled labor, which is not.

(2) **(U)** This category is for a foreign national who is either currently enrolled in and pursuing studies at a degree- or certificate-granting postsecondary academic institution outside the United States or who graduated from such an institution no more than 12 months before their exchange visitor program start date, and who enters the United States to participate in a structured and guided work-based internship in their specific academic field.

c. **(U) Duration:** The duration of participation must not exceed twelve months.

d. **(U) Program exclusions:** Sponsors must not:

(1) **(U)** Place Interns in unskilled or casual labor positions; in positions that require or involve childcare or elder care; or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Interns in the field of aviation;

(3) **(U)** Place Interns in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(4) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen,

AAUP-00404

orient, place, evaluate, or train Trainees or Interns, or in any other way involve such agencies in an Exchange Visitor Program training or internship program.

e. **(U) Program requirements:**  Sponsors must:

   (1) **(U)** Ensure that the duties of Trainees or Interns as outlined in a Trainee/Internship Placement Plans (T/IPP Form DS-7002) will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees or Interns are necessary for the completion of training and internship program assignments; and

   (2) **(U)** Ensure that all "hospitality and tourism" training and internship programs of 6 months or longer contain at least 3 departmental or functional rotations.

f. **(U) Program Fees:**  Program regulations do not address the fee amount that a program sponsor may charge an exchange visitor to participate in Intern programs, and each program sponsor may set its fees based on its business model.

g. **(U) Training/Internship Placement Plan (T/IPP):**  Sponsors must complete and obtain requisite signatures for a Form DS-7002, Training/Internship Placement Plan, for each intern before issuing a Form DS-2019.  Upon request, visa applicants must present their fully executed Form DS-7002 to the adjudicator during the visa interview.  See 9 FAM 402.5-6(D)(7) above for information on the T/IPP.

h. **(U) Repeat Participation:**

   (1) **(U)** A foreign national can participate in additional internship programs to develop more advanced skills or in a different field of expertise if they maintain student status or begin a new internship program within 12 months of graduation from an academic institution outside the United States.

   (2) **(U)** Participants who have successfully completed an internship program and no longer meet the selection criteria for internship programs may participate in a training program after a two-year period of residency outside the United States following their internship program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (9 FAM 402.5-6(L) below).

i. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.22.

j. **(U) Twelve Month Intern Work and Travel (IWT) Program:**

   (1) **(U)** The IWT program began on October 31, 2008, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and Ireland.  IWT was a pilot program initially.  In December 2016, pilot status was lifted.  In January 2023, the MOU was amended to extend the program until January 30, 2028.

AAUP-00405

(2) **(U)** Citizens of Ireland, who have completed Level VI of the Irish Higher Education System, may participate in the IWT Program, which is governed by existing Intern category regulations in 22 CFR 62.22 and applicable program rules, except for participant placement.  A participant must be a bona fide postsecondary student (i.e., an Irish citizen who will commence their program in the United States within 12 months of the conferring date indicated on their scroll) and provide evidence from the appropriate postsecondary institution to this effect.

(3) **(U)** IWT Program participants are not required to have site of activity placement before entering the United States, and as such, applicants without placement will not have a Form DS-7002, Training/Internship Placement Plan, at the time of visa interview.  Program sponsors must ensure that participants have placement within 90 days of arrival.  Sponsors must enter "IWT Program" in the Subject Field Remarks box (box #4) of Form DS-2019.

(4) **(U)** Vocational students pursuing studies at a tertiary level accredited academic institution are not eligible for participation unless such vocational study is part of a structured program leading to a degree or other credential recognized as equivalent to Level VI of the Irish Higher Education System and unless at least 50 percent or their coursework is academic.

(5) **(U)** The maximum program length is 12 months.  No program extensions are permitted.

(6) **(U)** IWT Program participants are not permitted to be accompanied by a spouse or dependent children.

k. **(U) Twelve Month Intern Trainee Program - Austria**

(1) **(U)** The Professional Development and Cultural Exchange Program with the Republic of Austria began on January 31, 2024, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and the Republic of Austria;

(2) **(U)** Austrian exchange visitors will be placed as Interns or Trainees for periods of between six (6) and twelve (12) months at up to two U.S. private companies or non-profit institutions;

(3) **(U)** Austrian exchange visitors must have at least two rotations in their program, evenly divided over the length of their program. The second rotation must build upon the exchange visitor's field of study, a closely related field, or previous rotation and must give the exchange visitor more responsibility than in the first rotation.  The second rotation may be at the same placement institution as the first rotation;

(4) **(U)** Program participants must be citizens of the Republic of Austria, be 18 to 30 years of age, and have a working knowledge of English.  Austrian exchange visitors are permitted to be currently enrolled in or have recently completed (within 12 months of graduation) studies in an

Austrian-accredited post-secondary or dual/vocational education program outside the United States;

(5) **(U)** Austrian exchange visitors are required to have a placement before entering the United States. Upon request, applicants must provide a fully executed copy of Form DS-7002, Training/Internship Placement Plan, at the time of visa interview;

(6) **(U)** The maximum length of program is 12 months. No program extensions are permitted, nor may participants take part in an additional J-Visa training program unless in accordance with 22 CFR 62.22(n); and

(7) **(U)** Austrian participants are not permitted to be accompanied by a spouse or dependent children unless the dependents also are J-1 visa exchange visitors.

# 9 FAM 402.5-6(E)(6)  (U) International Visitor

*(CT:VISA-1628;  09-13-2022)*

a. **(U) International Visitor:**  This category is for the exclusive use of the U.S. Department of State.  It is for an individual who is a recognized or potential leader in their own country and is selected by the Department to participate in observation tours, discussions, consultation, professional meetings, conferences, workshops, and travel.

b. **(U) Duration:**  The duration of participation must not exceed one year.

c. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.28.

# 9 FAM 402.5-6(E)(7)  (U) Professor

*(CT:VISA-1741;  03-30-2023)*

a. **(U) Professor:**  This category is for an individual who is engaged primarily in teaching, lecturing, observing, or consulting at accredited post-secondary academic institutions, museums, libraries, or similar institutions.  The professor may also conduct research and participate in occasional lectures if authorized by the program sponsor.

b. **(U)** The professor's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

c. **(U) Duration:**  The duration of participation must not exceed five years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar exchange programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar programs for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation

AAUP-00407

differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L) below.

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(8)  (U) Research Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Research Scholar:**  This category is for an individual whose primary purpose of travel is to conduct research, observe, or consult in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar institutions.  The Research Scholar may also teach or lecture, unless disallowed by the sponsor.  The Research Scholar's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

b. **(U)** Minimum qualifications for this category are a bachelor's degree with appropriate experience in the field in which research is to be conducted.

c.  **(U) Duration:**  The duration of participation must not exceed 5 years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar program for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L).

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(9)  (U) Short-Term Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Short-Term Scholar:**  This category is for a foreign national who is a professor, research scholar, or person with similar education or accomplishments coming to the United States on a short-term visit to lecture, observe, consult, train, or demonstrate special skills at research institutions, museums, libraries, post-secondary accredited academic institutions, or similar institution.

b. **(U)** Exchange visitors who have recently participated in an exchange program as a Professor or Research Scholar in the United States are not expected to attempt to reenter the United States as a Short-Term Scholar to rejoin their

AAUP-00408

original sponsor as this would be a continuation of their original program objective.

c. **(U) Duration:** The duration of participation must not exceed 6 months. No program extensions are permitted.

d. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.21.

## 9 FAM 402.5-6(E)(10)  (U) Specialist

*(CT:VISA-2069;   09-16-2024)*

a. **(U) Specialist:** This category is for a foreign national who is an expert in a field of specialized knowledge or skill coming to the United States to observe, consult, or demonstrate their special skills except as:

(1) **(U)** Research Scholars and Professors, who are governed by regulations set forth in 22 CFR 62.20;

(2) **(U)** Short-Term Scholars, who are governed by regulations set forth in 22 CFR 62.21; and

(3) **(U)** Alien Physicians in graduate medical education or training, who are governed by regulations set forth in 22 CFR 62.27.

b. **(U) Duration:** Participation must not exceed one year. Within the Specialist category there are nine program numbers with approved exceptions to this one-year duration.

(1) **(U)** The first eight excepted program numbers are for: Israeli Specialists under the Jewish Agency-American Section Inc. (P-3-37641) and the World Zionist Organization (P-3-04530); Japanese language Specialists under the Laurasian Institute (P-3-05588) and the Institute of International Education (P-3-14039); Specialists under the East-West Center (P-3-10434); Specialists under the Middle East Broadcasting Network (P-3-13019); Specialists under the U.S. Agency for Global Media (G-3-00366) and Specialists under the U.S. Department of Energy (G-3-00348). For these eight excepted program numbers, the duration of participation is three years, and the visa should usually be issued for the full three years. Note: the program dates listed on the Form DS-2019 in Box 3 will be one year in length. However, both the Form DS-2019 and the SEVIS record will include a notation that the program has a three-year duration. The visa should be set to expire two years after the program end date listed in Box 3 on the Form DS-2019.

(2) **(U)** The ninth excepted program is the German American Partnership Program (GAPP) (P-3-43541). Participation in the GAPP must not exceed three years and the visa should usually be issued for three years as stated in Box 3 on the Form DS-2019.

(3) **(U)** Specialists under the GAPP (P-3-43541), Middle East Broadcasting Network (P-3-13019), and U.S. Agency for Global Media(G-3-00366) are permitted one three-year repeat of program.

AAUP-00409

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 50 of 406

6/30/25, 3:12 PM    9 FAM 402.5 (U) STUDENTS AND EXCHANGE VISITORS – F, M, AND J VISAS

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.26.

## 9 FAM 402.5-6(E)(11)  (U) Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U) Secondary School Student:**

(1)  **(U)** This category affords foreign secondary school students an opportunity to study for an academic semester or an academic year in a U.S. accredited public or private secondary school while living with an American host family or residing at an accredited U.S. boarding school. Participants in this category must meet the following requirements:

(a)  **(U)** Be a secondary school student in their home country who has not completed more than 11 years of primary and secondary study excluding kindergarten; or

(b)  **(U)** Be at least the age of 15 but not more than 18-1/2 years of age as of the program start date; and

(c)  **(U)** Has not previously participated in an academic year or semester Secondary School Student exchange program in the United States or attended school in the United States in either F-1 or J-1 visa status. Screening by the program sponsor of factors such as English language proficiency, maturity, character, and scholastic aptitude are critical.

(2)  **(U)** Sponsors are required to secure host family placement before the student's departure from their home country.  This does not need to happen before visa issuance because it may occur after the student's visa interview.  As a result, the student's Form DS-2019 may list the sponsor's contact information instead of the host family's contact information.

(3)  **(U) Duration:**  Participation is a minimum of one academic semester or a maximum of one academic year.  Sponsors are permitted to issue a Form DS-2019 for an academic semester or academic year.  When a student is from a country whose school calendar is opposite that of the United States, a sponsor can issue a Form DS-2019 for a calendar year cycle.

b. **(U) College and University/Students:**

(1) To participate, a foreign individual must intend to:

(a)  **(U)** Pursue a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or engage full-time in a prescribed course of study in a non-degree program of up to 24 months duration conducted by a post-secondary accredited academic institution; or

(b)  **(U)** Engage in English language training at a post-secondary accredited academic institution, or an institute approved by or

AAUP-00410

https://fam.state.gov/FAM/09FAM/09FAM040205.html                                                    49/69

acceptable to the post-secondary accredited academic institution where the college or university student is to be enrolled upon completion of the language training.  A Form DS-2019 for language training can only be issued if the student is fully funded by the student's home government.

(2) **(U)** Exchange visitors participating in the College and University Student category must be supported substantially by funding from any source other than personal or family funds.

(3) **(U) Duration:**  Duration of participation is determined by whether the exchange visitor is a degree or non-degree student.  An explanation of each is provided in paragraphs c and d below.

c. **(U) Degree Students:**  College and University Students who are in degree programs ("Student Associate," "Student Bachelors," "Student Masters," or "Student Doctorate," as stated on the Form DS-2019 and in SEVIS) may be authorized to participate in the Exchange Visitor Program for an unlimited length of time, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Pursuing a full course of study as set forth in 22 CFR 62.23(e); and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

d. **(U) Nondegree Students:**  College and University Students who are nondegree students may be authorized to participate in the Exchange Visitor Program for up to 24 months, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Participating full time in a prescribed course of study; and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

e. **(U) Student Intern Subcategory:**

(1) **(U)** Department-designated U.S. colleges and universities can administer internship programs substantially like those detailed herein under their J-1 College/University Student designation.

(2) **(U)** The Student Intern must be in good academic standing with the postsecondary academic institution outside the United States where they are enrolled and pursuing a degree.

AAUP-00411

(3) **(U)** The Student Intern will return to her/his academic program and fulfill and obtain a degree from such academic institution after completion of the student internship program.

(4) **(U)** The program sponsor must fully complete and obtain requisite signatures for a Form DS-7002 for each Student Intern before issuing a Form DS-2019.  The sponsor must provide to each signatory an executed copy of the Form DS-7002.  Upon request, a Student Intern must present her/his fully executed Form DS-7002 to the you during the visa interview.

(5) **(U)** Several colleges and universities currently hold J-1 training designations and can be expected to issue Form DS-2019 and Form DS-7002 to applicants as Trainees per the current rulemaking and the program guidelines described herein.

(6) **(U)** The category of Trainee will be reflected on the Form DS-2019 if the sponsor is authorized for this category.

f. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.25 and 22 CFR 62.23.

## 9 FAM 402.5-6(E)(12)  (U) Summer Work Travel (SWT)

*(CT:VISA-2143;   03-26-2025)*

a. **(U) Qualifying for SWT:**  A participant is defined as a bona fide post-secondary student in the applicant's own or another foreign country if the applicant is currently enrolled and participating full time at an accredited post-secondary classroom-based academic institution at the time of the application, or as that status is defined by the educational system of the country.  Final year students are eligible to take part in this program during the school's major academic break immediately following their graduation if they apply to participate in the program before graduation.

(1) **(U)** An applicant must have completed at least one semester, or the quarter or trimester equivalent, of postsecondary education to be eligible to participate in this program.

(2) **(U)** Participants must demonstrate sufficient proficiency in English to enable them to not only carry out their job duties but also to interact effectively with law enforcement authorities and medical personnel, read rental agreements, carry on non-work-related conversations, etc.  It is appropriate to conduct SWT visa interviews in English to assess the applicant's proficiency.  U.S. sponsors may use video teleconferencing to conduct interviews with potential participants but assertions by the sponsor that an applicant meets the English language requirement are not alone sufficient to meet the burden of proof for this program requirement.

(3) **(U)** Unless they are final year students, participants must demonstrate that they are bona fide students who are maintaining student status and

AAUP-00412

are actively pursuing their degree per their local educational system.

(4) **(U)** Unless the participant is a final year student, they must demonstrate that they will resume activities as a student after participation in the SWT program.

(5) **(U)** It is not necessary for the student to be enrolled in the same institution both before and after participating in SWT.  Students may participate if they are transferring from one school to another, if they have finished an academic program at one school and are going on to another full-time program, or if they are continuing to graduate school. Documentation, satisfactory to you, that applicants have been accepted for and will commence studies upon their return may be accepted to establish status as a continuing student.

(6) **(U)** Students attending vocational schools are usually not eligible for participation in the SWT program unless they can demonstrate that study in the vocational school will ultimately lead to a degree from a full-time post-secondary academic institution.

(7) **(U)** Students may participate in the program every year that they meet the definition of bona fide student but participation each year is limited to the shorter of four months or the length of the long break between academic years at the school they attend.

(8) **(U)** In no case should there be more than one SWT period per year identified in any country without the concurrence of both the Visa Office and ECA's Office of Private Programs.

b. **(U) SWT Sponsor Obligations:**

(1) **(U)** Designated U.S. sponsors of SWT exchange programs must not place program participants in jobs as described in 22 CFR 62.32(h).

(2) **(U)** U. S. sponsors must ensure that 100 percent of their non-Visa Waiver Program country participants have a confirmed, vetted job placement.  Job placements may be secured directly by the U.S. sponsor or through self-placement by the participant.  See Program Date Chart.

(3) **(U)** For SWT participants from Visa Waiver Program (VWP) countries for whom employment has not been pre-arranged, sponsors must:

(a) **(U)** Ensure that participants have sufficient financial resources to support themselves during their search for employment;

(b) **(U)** Provide participants with pre-departure information that explains how to seek employment and secure lodging in the United States;

(c) **(U)** Maintain and provide a roster of bona fide jobs that includes at least as many job listings as the number of participants entering the United States with pre-arranged and confirmed employment;

(d) **(U)** Undertake reasonable efforts to secure suitable employment for participants unable to find jobs on their own after 2 weeks of commencing the job search; and

AAUP-00413

(e) **(U)** Vet the job placement selected by the participant ***before*** the commencement of employment.

(4) **(U)** All SWT participants should be cautioned to comply with their responsibility to inform their U.S. sponsor of their arrival and commencement at work and keep the sponsor informed of their whereabouts, should they change locations.  SWT participants who wish to change jobs or to accept an additional job must inform their U.S. sponsor of the desired job placement and wait for the sponsor to perform the same vetting and approval process as for the initial employment **before** beginning work.

c.  **(U) Duration of SWT Program:**

(1) **(U)** The duration of participation in the SWT program must not exceed four months.  These four months must coincide with the exchange visitor's official academic school break between school years.  *W*hile the program may not be longer than four months, you are permitted to issue visas valid before the program start date.

(2) **(U)** SWT programs are only permitted once a year during the long break between academic years.

d. **(U) SWT Outreach and Fraud Prevention Measures:**

(1) **(U)** Designated U.S. sponsors are responsible for conducting the SWT program under the regulations at 22 CFR 62.32.  The U.S. sponsors play a vital outreach role by explaining to audiences of the receiving state the SWT program's purpose, how it is structured, its economic imperatives, and the checks in place to safeguard the welfare of foreign youth while in the United States.  You should seek to develop a good working relationship with U.S. sponsors, which will allow you to better reach local audiences and deal with any problems that come up later, after program participants have entered the United States; but ECA is responsible for managing the administrative relationship with the U.S. sponsors and will officially notify U.S. sponsors of their compliance responsibilities.

(2) **(U)** The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("Wilberforce Act") requires you to ensure that applicants applying for J visas are made aware of their legal rights under U.S. Federal immigration, labor, and employment laws.  This includes information on the illegality of slavery, peonage, trafficking in persons, sexual assault, extortion, blackmail, and worker exploitation in the United States.  This information is available in the form of a physical "Know Your Rights" information pamphlet or a Quick Response (QR) code, which permits applicants to access an online version of the information pamphlet by scanning the code with their smartphone camera.  During the NIV interview, you must ask applicants if they prefer the QR code, the physical pamphlet, or both, and confirm that the information prepared by the Department has been received, read, and understood by the applicant.  Enter a case note in the NIV system stating the QR code and/or pamphlet was provided, and the applicant has

AAUP-00414

acknowledged receipt and understanding of the pamphlet.  See 9 FAM 402.3-9(C)(1) for more information about Wilberforce Act enforcement.

(3)    **(U)** It is important to ensure your fraud prevention measures stay within the parameters established by regulations.  You must allow any applicant with a valid Form DS-2019 to apply for a visa.  Each local SWT third-party contractor (foreign agent, recruiter, or partner) operating overseas must have executed a written agreement with the designated U.S. sponsor that explains the relationship between the sponsor and the contractor and identifies their respective obligations.  These agreements must include annually updated price lists for the services provided to the U.S. sponsors and confirm that they will not outsource any core programmatic functions or pay or provide other incentives to U.S. host employers.  ECA has created a "Foreign Entity Report" SharePoint site listing, by country, the designated U.S. sponsors and their affiliated local SWT third-party contractors. Sponsors are required to maintain a current listing of all third-party contractors on the Foreign Entity Report.  The Report must contain the names, addresses, and contact information (i.e., telephone numbers and email addresses) of all third-party contractors that assist the sponsors in fulfilling the provision of core program services.  Share information about misconduct by local third-party contractors with the relevant portfolio holders in CA/FPP and CA/VO/F (see the Who's Who pages on the CAWeb).  In turn, they will work with ECA's Office of Coordination and Compliance so that ECA can review and take appropriate action.

(4)    **(U)** When you receive applications from previous SWT participants who failed to return in time for the start of their university classes, this fact may call into question their eligibility (whether they are in fact "bona fide students") for future J-1 visas.  That is the case even when the applicant departed the United States within 30 days of the completion of their exchange program and did not incur a U.S. immigration violation.  Each of these cases must be evaluated on its own merits.

e. **(U) Sample Handout for SWT Participants:**

Congratulations on your acceptance as an Exchange Visitor Program participant in a Summer Work Travel program.  This program is a cultural exchange, and your eligibility for program participation is based on your status as a foreign college/university student.  It is therefore very important that the program does not interfere with your studies and that you return to school in time for the first day of your classes.  Please take a moment to read the following information to ensure that you are familiar with certain requirements of the program.

What do the program BEGIN and END dates on my Form DS-2019 mean?

The program begin and end dates indicate when you may begin work and when you must stop working.  You may begin working at any point on or after the program start date, but you must end your work by the end date of the program.  Working beyond the program end date will impact your ability to participate in the program in future years.

How long before the program begin date may I enter the United States?

AAUP-00415

You may enter the United States up to 30 days in advance of your program begin date but may not begin working until the program begin date is reached.  Please remember that participation in the program cannot prevent you from attending any scheduled classes or taking exams at your university.  If you miss any classes due to participation in the program, you will greatly jeopardize your chances of participating in the program.

How long after the program end date may I stay in the United States?

You have 30 days following the end date of your program to travel and/or to arrange for your return home.  You are not permitted to work during these 30 days, and if you leave the United States during this grace period, you will not be permitted to re-enter the United States on your J-1 visa because you will no longer be in J status.  Please keep in mind that it is your responsibility to return home in time for the start of your scheduled classes, no matter what your program end date is.

Can I switch jobs once I am in the United States?

Please check with your U.S. sponsor before making any changes in your employment.  If you change employment without the permission of your U.S. sponsor your status in the program may be terminated.

If your program is terminated, you must leave the United States immediately.

Can I work more than one job in the United States?

The Exchange Visitor Program regulations do not prohibit a participant from accepting a second job.  However, you must check with your U.S. sponsor before accepting a second job.  Your U.S. sponsor agency must approve and vet all jobs.

What if I have a complaint about the U.S. sponsor or my employer in the United States?

You may register complaints with the Department of State at jvisas@state.gov.  However, your U.S. sponsor has primary responsibility for your program.  If you have a complaint about your employer, you should first contact your U.S. sponsor for assistance.  Contact information for your U.S. sponsor can be found in Box #7 of your Form DS-2019.

What if I have a difficult time finding a job placement once I arrive in the United States, or have concerns about the work conditions?

If you have questions or are experiencing difficulty in finding employment, or have concerns about the work conditions, you should first contact your U.S. sponsor for assistance.  You also may contact the Department of State (jvisas@state.gov).  You may also wish to contact your country's nearest Embassy or Consulate.

If you have other questions not answered here, please consult the following Web page:

J1visa.state.gov or write to the Department of State at jvisas@state.gov.

f. **(U) SWT Pilot Programs for Citizens of Australia and New Zealand:**

(1) **(U)** In September 2007, the U.S. government signed memorandums of understanding (MOUs) with Australia and New Zealand launching 12-month SWT pilot programs.  The MOU with New Zealand became effective on September 10, 2007; the MOU with Australia became effective on October 31, 2007.  The MOUs allow certain Australian, New Zealand, or U.S. citizens who are bona fide postsecondary students or recent graduates (within 12 months of graduation) from postsecondary

AAUP-00416

schools to work and travel in Australia, New Zealand, or in the United States, respectively, for up to 12 months.

(2) **(U)** The guidance for the Australia and New Zealand pilot programs differs from other J-1 SWT guidance (see paragraph a above) in the following respects:  Participants are not required to return home in time for the school year to begin, and qualified postsecondary students can enter the United States at any time.

(3) **(U) Duration:**  The duration of participation in this category must not exceed 12 months.  No extensions of program are permitted.

## 9 FAM 402.5-6(E)(13)  (U) Teacher

*(CT:VISA-2020;   07-03-2024)*

a. **(U) Teacher:**  This category is for an individual teaching full time in a primary or secondary accredited academic institution.  A foreign national must satisfy all the following:

(1) **(U)**

(a) **(U)** Meet the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in their home country; is working as a teacher in their home country at the time of initial application to the sponsor; and has at least two years of full-time teaching experience; or

(b) **(U)** If not working as a teacher in their home country at the time of application, but otherwise meets the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in the home country has had at least two years of full-time teaching experience within the past eight years; and, within 12 months of their application submission date for the program, has or will have completed an advanced degree (beyond a degree equivalent to a U.S. bachelor's degree) in education or in an academic subject matter that they intend to teach or that is directly related to their teaching subject field;

(2) **(U)** Possess, at a minimum, a degree equivalent to a U.S. bachelor's degree in either education or the academic subject field in which they intend to teach;

(3) **(U)** Satisfy the teaching eligibility standards of the U.S. state in which they will teach (e.g., meets minimum educational requirements, has passed teacher training coursework at a sufficiently proficient level, has provided an evaluation of foreign teaching preparation coursework, has demonstrated the requisite prior teaching experience), to include any required criminal background or other checks;

(4) **(U)** Be of good reputation and character; and

AAUP-00417

(5) **(U)** Agree to come to the United States temporarily as a full-time teacher of record in an accredited primary or secondary school. Exchange visitor Teachers may teach a variety of subjects and levels at their host school or schools, if qualified, but at the pre-kindergarten level, may teach only in language immersion programs.

b. **(U) Extension of program:**  Designated Teacher program sponsors may request that an exchange Teacher be granted an extension of program participation beyond the original 3 years.  Teacher program sponsors may request an exchange Teacher be granted up to a 2-year extension. Extensions will not exceed June 30th of any given year to coincide with the U.S. teaching cycle and December 31st for the year-round cycle discussed above.  A Teacher from Germany may be extended an additional 3 years per an agreement between the Department and the government of Germany.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.24.

## 9 FAM 402.5-6(E)(14)  (U) Trainee

*(CT:VISA-1628;   09-13-2022)*

a. **(U) The Trainee category aims:**  to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of U.S. techniques, methodologies, and technologies; and to increase participants' understanding of U.S. society and culture.  The requirements in the Trainee regulations are designed to distinguish between bona fide training, which is permitted, and merely gaining additional work experience, which is not permitted.

b. **(U)** This category is for a foreign national who has either a degree or professional certificate from a postsecondary academic institution outside the United States and at least one year of prior related work experience in their occupational field acquired outside the United States; or five years of work experience outside the United States in their occupational field.

c.  **(U) Program fees:**  Program regulations do not address the fee amount that program sponsors may charge exchange visitors to participate in Trainee programs, and each program sponsor may set its fees based on its business model.

d. **(U) Program exclusions:**  Sponsors must not:

(1)  **(U)** Place Trainees in unskilled or casual labor positions, in positions that require or involve childcare or elder care, or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

AAUP-00418

    (2)  **(U)** Place Trainees in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

    (3)  **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen, orient, place, evaluate, or train Trainees, or in any other way involve such agencies in an Exchange Visitor Program training program; nor

    (4)  **(U)** Place trainees in the field of aviation.

    (5)  **(U)** Designated sponsors must ensure that the duties of Trainee as outlined in the T/IPP will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees are necessary for the completion of training program assignments.

    (6)  **(U)** Sponsor must also ensure that all "Hospitality and Tourism" training programs of six months or longer contain at least three departmental or functional rotations.

e.  **(U) Form** DS-7002**, Training/Internship Placement Plan (T/IIP):** Sponsors must complete and obtain requisite signatures on this form for each trainee before issuing Form DS-2019.  Upon request, a J-1 Trainee visa applicant must present a fully executed Form DS-7002 to the adjudicator during the visa interview (see 9 FAM 402.5-6(D)(7) for more information on the T/IPP).

f.  **(U) Repeat Participation:**  Trainees can participate in additional training programs that address the development of more advanced skills or a different field of expertise after a 2-year period of residency outside the United States following their training program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (see 9 FAM 402.5-6(L) below).

g.  **(U) Exchange Visitor Program Regulation:**  See 22 CFR 62.22.

## 9 FAM 402.5-6(E)(15)  (U) Intern and Trainee Programs with a Management or Supervisory Focus

*(CT:VISA-1292;   05-27-2021)*

a.  **(U)** The occupational category of Management, Business, Commerce, and Finance is up to 18 months for any type of management training, which may include hotel or restaurant management, turf management, office management, etc.  The duration of a trainee's or intern's participation in a training or internship program must be established before a sponsor issues a Form DS–2019.  Except as noted below, the maximum duration of a training program is 18 months, and the maximum duration of an internship program is 12 months.

b.  **(U)** For training programs in the "Hospitality and Tourism" occupational category, the maximum duration is 12 months and must not have less than three departmental or functional rotations for "Hospitality and Tourism"

AAUP-00419

training and internship programs of six months or longer.  Training programs in the field of agriculture are permitted to last a total of 18 months, if in the development of the training plan, as documented in the T/IPP, the additional six months of the program consist of classroom participation and studies.  Program extensions are permitted only within maximum durations if the need for an extended training and internship program is documented by the full completion and execution of a new Form DS–7002.

c.  **(U)** Typical rotational programs offered in hotels or restaurants in a variety of related functions leading to a final rotation in a single supervisory position, such as front desk supervisor or manager, floor supervisor, lead chief or room service manager, would fall under the "Hospitality and Tourism" occupational category and be limited to 12 months.

d. **(U)** Non-management placements on farms or other production facilities fall under 'Agriculture' and are limited to 12 months, or 18 months providing that six months of the program consists of classroom participation and studies.

# 9 FAM 402.5-6(F)  (U) Residence Abroad

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The INA requires that a J visa applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant has present intent to depart the United States upon completion of their exchange visitor program.  Consequently, you must be satisfied when adjudicating the visa that the applicant:

(1)  **(U)** Has a residence abroad;

(2)  **(U)** Has no immediate intention of abandoning that residence; and

(3)  **(U)** Intends to depart from the United States upon completion of the program.

b. **(U)** The context of the residence abroad requirement for exchange visitor visas inherently differs from the context for B visitor visas or other short-term visas.  The statute clearly presupposes that the natural circumstances and conditions of being an exchange visitor do not disqualify the applicant from obtaining a J visa.  It is natural that the exchange visitor proposes an extended absence from their home country (see 9 FAM 401.1-3(E)(2) paragraph a).  Nonetheless, you must be satisfied when adjudicating the visa application that an applicant possesses the present intent to depart the U.S. at the conclusion of their program.  That this intention is subject to change is not a sufficient reason to refuse a visa.  Although exchange visitors may apply to change or adjust status in the United States in the future, this is not a basis to refuse a visa application if the exchange visitor's present intent is to depart at the conclusion of their program.

AAUP-00420

# 9 FAM 402.5-6(G)  (U) Knowledge of English

*(CT:VISA-1628;  09-13-2022)*

**(U)** A prospective exchange visitor must have sufficient proficiency in the English language to undertake the anticipated program successfully.  Successful participation in exchange programs requires that participants interact with Americans both at the participants' sites of activity and in the broader context of daily life, to achieve the cultural goals of these programs.  Some exchange visitor programs provide for an interpreter, and this may be noted on the Form DS-2019.  Participants may not avoid the English language requirement by claiming that their site of activity offers a work environment in their native language.  If the applicant lacks the English skills described above, but the Form DS-2019 is not annotated to reflect the use of an interpreter, and you are unable to determine whether the program permits use of an interpreter, contact the CA/VO/F F/M/J portfolio holder.  Exchange visitors who are deaf or hard of hearing, and who rely on signing, must be proficient in American Sign Language (ASL) or another signing language widely used in the United States.

# 9 FAM 402.5-6(H)  (U) Employment

## 9 FAM 402.5-6(H)(1)  (U) Employment - In General

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** An exchange visitor may receive compensation for employment when such activities are part of the exchange visitor's program.

b. **(U)** DHS is responsible for authorizing the employment of the spouse and any minor unmarried children (J-2 visa holders) of the exchange visitor (J-1 visa holder).  The dependent must file Form I-765, Application for Employment Authorization, requesting permission to work from USCIS.

## 9 FAM 402.5-6(H)(2)  (U) College/University Student Employment

*(CT:VISA-1292;  05-27-2021)*

a. **(U) There are two types of employment authorizations available for College/University Students with J status:**

   (1) **(U)** Student employment (see 22 CFR 62.23(g) for more information on student employment); or

   (2) **(U)** Academic training (see 22 CFR 62.23(f) for more information on academic training).

b. **(U)** In both situations, the responsible officer (RO) must approve the exchange visitor's participation in the activity.

c. **(U)** College/University Students (degree and non-degree) granted permission for student employment (22 CFR 62.23(g)) are limited to twenty (20) hours

AAUP-00421

per week, except during school breaks and annual vacation, unless authorized for economic necessity.

d. **(U) Some examples of student employment and academic training are:**

   (1) **(U) Scholarship, fellowship, or assistantship:**  If the employment is required because of a scholarship, fellowship, or an assistantship, such activity usually occurs on campus with the school as the employer.  In certain circumstances, however, the work can be done elsewhere for a different employer.  For example, an exchange visitor may work in a government or private research laboratory if the exchange visitor's major professor has a joint appointment at one of those locations and the employment is supervised and counts towards the exchange visitor's degree;

   (2) **(U) On campus:**  The Exchange Visitor Program regulations allow for jobs on-campus, whether the job is related to the course of study.

   (3) **(U) Off campus:**  Exchange visitors may be authorized off-campus employment by the program's responsible officer (RO) when "necessary due to serious, urgent and unforeseen economic circumstances" that have arisen since the exchange visitor's sponsorship on the J visa.

## 9 FAM 402.5-6(H)(3)  (U) Summer Employment for College/University Students Transferring to Another Program Sponsor

*(CT:VISA-1292;   05-27-2021)*

**(U)** If a College/University Student intends to transfer sponsors during the summer months but wants to remain at the current program to work during the summer, the current sponsor must delay the transfer procedure until after the period of employment.  To permit the student to stay in the current program, the period of employment must be included in the exchange visitor's program noted on the Form DS-2019.

# 9 FAM 402.5-6(I)  (U) Visa Application Procedures and Conditions

## 9 FAM 402.5-6(I)(1)  (U) Applicant Qualifications

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is the basic document required to support an application for an exchange visitor visa and for maintaining valid exchange visitor program participant status.  The electronic SEVIS record in the CCD will indicate the applicant's current SEVIS status.  Verify that the applicant's SEVIS record is in either INITIAL or ACTIVE status.

AAUP-00422

b.  **(U)** On occasion, you will see applicants who claim they have followed the established procedure, but you cannot locate their SEVIS records in the CCD. When this occurs, contact the F/M/J portfolio holder(s) in CA/VO/F/ET for assistance.  It is important that CA/VO/F/ET and CA/VO/I be made aware of any failure of the records to replicate so that efforts to correct the problem are appropriately coordinated with DHS/ICE/SEVP.

c.  **(U)** Ensure the applicant's information is correct in the electronic SEVIS record (see 9 FAM 402.5-6(J)), and that the SEVIS fee has been paid.  You can also verify SEVIS fee payment at FMJfee.com.

d.  **(U)** If you are uncertain as to whether the applicant's qualifications or planned activities fit within the Exchange Visitor Program or have concerns that the sponsor is not in compliance with sponsor regulations, you should refuse the visa application under INA 221(g) and notify the F/M/J portfolio holder(s) in CA/VO/F/ET who will coordinate with ECA to provide guidance.

e.  **(U)** When an applicant applies for a J-2 visa to follow-to-join a principal J-1 applicant already in the United States, or when a J-2 applicant applies to renew their visa when the principal J-1 applicant is already in the United States, you must be satisfied that the principal applicant is maintaining J-1 status before issuing the visa.  The J-1 principal applicant's SEVIS record is the official record of whether the J-1 principal applicant is maintaining their status.  In some cases, the J-1 applicant's visa may have expired but if the J-1 applicant was approved for an extension of their program, and the dates in SEVIS reflect this program extension, the J-1 applicant has maintained status for the sake of the J-2 visa applicant's eligibility for a visa.

f.  ***Unavailable***

g.  ***Unavailable***

   (1)  ***Unavailable***

   (2)  ***Unavailable***

   (3)  ***Unavailable***

h.  ***Unavailable***

   (1)  ***Unavailable***

   (2)  ***Unavailable***

i.  ***Unavailable***


## 9 FAM 402.5-6(I)(2)  (U) Cases Involving Unrealizable Reporting Dates

*(CT:VISA-1837;  09-26-2023)*

**(U)** If the program start date specified in the applicant's Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is already past or there is reason to believe the applicant will be unable to meet that date, you may assume the applicant may encounter difficulty at POE.  You should determine

AAUP-00423

whether the sponsor has amended the electronic SEVIS record to change the program start date, and make a case note to that effect to alert CBP.  If this has not been done, you should direct the visa applicant to alert the designated U.S. program sponsor.  You should not intervene directly with program sponsors on behalf of visa applicants.

## 9 FAM 402.5-6(I)(3)  (U) Entry of Exchange Visitor Program Participants Before Program Start Date

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** You may issue an exchange visitor visa to an applicant at any time before the program start date if the SEVIS record is in INITIAL or ACTIVE status.  However, the exchange visitor may not enter the United States earlier than 30 days before the program start date.  Applicants continuing an Exchange Visitor Program are not subject to this travel restriction.

b. **(U)** An exchange visitor who desires an earlier entry must obtain a B-2 visitor visa.  If the applicant enters on a B visa, however, they must first obtain a change of status from USCIS, from B status to J status to participate in the exchange program.  The applicant is not allowed to begin the exchange visitor program until USCIS has approved the change of status.  The process to change status may be lengthy and may impact the ability of the applicant to participate in the program.

## 9 FAM 402.5-6(I)(4)  (U) Consecutive Exchange Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** An exchange visitor may participate in consecutive exchange programs unless otherwise limited or prohibited by the Exchange Visitor Regulations.  Do not issue an individual two separate J-1 visas for two different programs that will run back-to-back (e.g., Au Pair then Trainee; or Summer Work Travel then College University Student).  Following completion of the first program, the exchange visitor is usually expected to return home and may apply for another J-1 visa for the subsequent program.  The exception to this is an exchange visitor who receives approval for a change of exchange visitor category (22 CFR 62.41) while in the United States, allowing him or her to begin the second program without returning to the home country.  Exchange visitors with questions about a change of category should be directed to their program sponsors.

## 9 FAM 402.5-6(I)(5)  (U) 30-Day Post-Completion Period

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Exchange visitors are no longer issued a paper Form I-94, Arrival and Departure Record, marked "D/S" (Duration of Status) upon entry into the United States.  CBP now gathers travelers' arrival/departure information automatically from their electronic travel records.  However, CBP will still

AAUP-00424

issue a paper Form I-94 at land border ports of entry.  Visa holders may download a copy of their electronic I-94 at www.cbp.gov/I94.

b. **(U)** The initial period of admission of the exchange visitor will not exceed the period specified on the Form DS-2019 (the start and end dates), plus a period of 30 days "for the purpose of travel" (see 8 CFR 214.2(j)).  DHS established this 30-day period at the successful completion of the program to use for domestic travel and/or to prepare for and depart from the United States, and for no other purpose.  A program extension and/or transfer cannot be done if an exchange visitor's record in SEVIS is not in active status during this period.

c. **(U)** Any validation study of return rates for J travelers must take this authorized grace period into account.

## 9 FAM 402.5-6(I)(6)  (U) Annotation and Visa Validity

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A J-1 or J-2 visa must be annotated to show the program number, program dates, and sponsor name of the applicant's exchange program, as well as the SEVIS number of the individual.  The J visa must also state whether the applicant is subject to INA 212(e).  Keep in mind that you are making a preliminary determination of the applicability of INA 212(e).  An exchange visitor cannot use a J visa for a program other than that specified on the annotation, unless the exchange visitor transfers to another sponsor while on program in the United States.  In this case, the visa remains valid under the same SEVIS ID and the exchange visitor may exit and re-enter the United States on an unexpired J-visa with the current Form DS-2019.  The new Form DS-2019 will include a new program number and a travel validation signature, which may be electronic.

b. **(U)** A new visa is required following the transfer of program when:

(1) **(U)** the exchange visitor travels internationally; and

(2) **(U)** the J-visa has already expired or will expire before the date of U.S. re-entry.

**(U)** Exchange visitors approved for a change of category must obtain a new J-1 visa if/when they exit and want to re-enter the U.S. to continue their exchange program in the new program category.

c. **Unavailable**

d. **Unavailable**

e. **(U)** J-1 visas must be issued for the program dates listed on the Form DS-2019, except as described in para d below or in 9 FAM 402.5-6(E)(10) above or where visa reciprocity only allows for a shorter validity period.  J-2 derivatives are subject to the same visa validity as the J-1 principal applicant unless visa reciprocity only allows for a shorter validity period.

f. **Unavailable**

AAUP-00425

g. **(U)** For those exceptions noted in 9 FAM 402.5-6(E)(10), you are authorized to issue with a visa validity extending for three years.  The visa should be set to expire two years after the listed program end date found in Box 3 on the Form DS-2019.

## 9 FAM 402.5-6(I)(7)  (U) Renewing J Visas for Returning Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning J applicants may be eligible for an interview waiver (see 9 FAM 403.5-4(A)(1)).  You usually should renew J visas to returning exchange visitors who have remained in valid program status and have not had any significant changes in either their program or their personal circumstances. When an exchange visitor engaged in a program takes a short trip abroad and requires a visa to return to the United States, you are encouraged to issue the visa, if the exchange visitor is otherwise qualified, to allow the individual to complete their program if the status of the electronic record in SEVIS is ACTIVE.

# 9 FAM 402.5-6(J)  (U) The Student and Exchange Visitor Information System (SEVIS)

## 9 FAM 402.5-6(J)(1)  (U) Student and Exchange Visitor Information System (SEVIS) - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** For an overview of the Student and Exchange Visitor Program and SEVIS see 9 FAM 402.5-4 above.

b. **(U)** SEVIS is an internet-based database that tracks students and exchange visitors in F, M, and J visa status while in the United States.  Using SEVIS, designated Exchange Visitor Program sponsors enter information into the individual SEVIS record for a prospective exchange visitor, and that information can then be printed on the Form DS-2019.

c.  **(U)** ECA) authorizes designated U.S. sponsor officials - referred to as responsible officers (ROs) and alternate responsible officers (AROs) - access to SEVIS so that they may create and update official records on exchange visitors and their dependents.  SEVIS enables exchange program sponsors to transmit electronic information and event notifications, via the Internet, to the Department and to DHS throughout an exchange visitor's stay in the United States.  The information in SEVIS is updated, as needed, and supersedes information on the printed Form DS-2019.  The SEVIS record is the definitive record of exchange visitor eligibility and you must check it for each applicant.

d. **(U)** Exchange Visitor Program sponsors designated by ECA must use SEVIS. Only a Form DS-2019 that has been issued through SEVIS, and contains a

AAUP-00426

unique SEVIS identification number, may be accepted in support of a J visa application.  The Form DS-2019 must be signed in any color ink by the RO (or ARO).  Digital signatures are also acceptable.  However, the definitive record is the electronic SEVIS record in the CCD (or directly in SEVIS, usually accessible by your FPU).  CBP can also access the electronic record at POE.

## 9 FAM 402.5-6(J)(2)  (U) Responsible and/or Alternate Responsible Officers

*(CT:VISA-1090;   06-24-2020)*

a. **(U)** Exchange Visitor Program sponsors designate individuals to perform the duties attendant to designation.  The responsible officer (RO) is the primary person appointed as being responsible and thoroughly familiar with the Exchange Visitor Program regulations, policies, and SEVIS requirements.  An alternate responsible officer (ARO) is an individual appointed to assist the RO in administering the program.

b. **(U)** The RO (or ARO) is required to ensure that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of their exchange program.  ROs and AROs are also responsible for the security of SEVIS.  Only ROs and AROs are authorized access to SEVIS to issue Form DS-2019.

# 9 FAM 402.5-6(K)  (U) J Visa Fees

## 9 FAM 402.5-6(K)(1)  (U) SEVIS I-901, Fee Remittance for Certain J Nonimmigrants, Fee

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The SEVIS I-901 fee is a one-time fee for persons applying for J-1 visas.  The fee covers the costs of administering SEVIS and related enforcement efforts.  Only principal J-1s must pay the SEVIS I-901 fee.  Even though J-2 derivative applicants have a unique SEVIS ID number, they are not subject to this fee.

b. **(U)** Applicants must pay the SEVIS fee before their visa interviews.  Applicants may schedule interview appointments before paying the fee.  While consular sections must verify that the SEVIS fee has been paid, they are not responsible for collecting it.  Applicants should be referred to FMJFee.com to pay the SEVIS I-901 fee.

c. **(U)** You can verify SEVIS I-901 fee payment through the CCD SEVIS report.  You can also verify SEVIS I-901 fee payment at FMJFee.com if the fee payment information has not yet replicated to the CCD.

d. **(U)** Most exchange visitors will pay the full fee; however, the fee is reduced for some, including those in Summer Work Travel, Camp Counselor, and Au Pair categories.

AAUP-00427

e. **(U)** Exchange visitors and their spouses and/or dependents sponsored by a government program (program serial numbers G-1, G-2, G-3, and G-7) are not required to pay the SEVIS fee.  Publicize and explain on post's website how an exchange visitor participating in one of these government-sponsored programs can reach the consular section to schedule a visa interview appointment without paying either the nonrefundable MRV fee or the SEVIS fee (see 9 FAM 402.5-6(K)(2) below).

## 9 FAM 402.5-6(K)(2)  (U) Fee Waivers for Certain Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** J-1 visa applicants are exempted from the machine readable visa (MRV) fee if they are participating in a USAID, or other federally funded educational and cultural exchange program.  Exchange programs eligible for the MRV exemption have a program serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019.  J-2 derivatives of these J-1 applicants are also exempted from the MRV fee.  All other applicants with U.S. Government funding must pay the MRV processing fee.  You must ensure that post's website provides clear guidance to these visa applicants on how to obtain a visa interview appointment without paying the MRV fee, because the fee, once paid, is usually not refundable (see 7 FAH-1 H-728*)*.

b. **(U)** Applicants participating in a U.S. government-sponsored exchange visitor program who are exempt from the MRV fee as described above in paragraph a, are also exempt from any applicable visa reciprocity fee.

# 9 FAM 402.5-6(L)  (U) INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

**(U)** INA 212(e) and implementing regulations prohibits certain exchange visitors from applying for an IV or for adjustment of status to that of a*n* LPR or from changing status to or receiving a visa as a temporary worker (H),  fiancé (K), or intracompany transferee (L) until the applicant has established that they have resided and been physically present in the country of nationality or last legal permanent residence for an aggregate of at least two years following departure from the United States.

## 9 FAM 402.5-6(L)(1)  (U) Subject to INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** An individual admitted as an exchange visitor under INA 101(a)(15)(J) or who acquires such status after admission is subject to the two-year home-county physical presence requirement under INA 212(e) if:

(1)  **(U)** The program in which the individual is participating was financed in whole or in part, directly or indirectly, by:

AAUP-00428

(a) **(U)** A U.S. Government Agency, or

(b) **(U)** The government of the country of the noncitizen's nationality or last legal permanent residence;

(2) **(U)** The noncitizen is a national or legal permanent resident of a country that has been designated as clearly requiring the*ir* field of specialized knowledge or skill as shown in the 2024 Exchange Visitor Skills List; or

(3) **(U)** The individual entered the United States, or acquired such status, to receive graduate medical education or training.

b. **(U)** Individuals participating in the Au Pair and Summer Work Travel exchange visitor program categories are not subject to INA 212(e).

## 9 FAM 402.5-6(L)(2)  (U) Waiver of INA 212(e) Requirement

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** A noncitizen may seek a waiver of the two-year home-country physical presence requirement if:

(1) **(U)** A U.S. government agency makes such a request for a noncitizen who is actively and substantially involved in a program sponsored by or of interest to that U.S. government agency; (see 9 FAM 302.13-2(D)(4))*;*

(2) **(U)** In the case of an individual who entered the United States, or acquired such status, to receive graduate medical education or training: A U.S. state's Department of Public Health makes such a request (see 9 FAM 302.13-2(D)(5))*.*

(3) **(U)** The noncitizen establishes exceptional hardship to a U.S. citizen or LPR spouse or child, or probable persecution on account of race, religion, or political opinion (see also 9 FAM 302.13-2(D)(3))*;* and

(4) **(U)** The noncitizen has received a statement of "no objection" from their country of nationality or last legal permanent residence (see 9 FAM 302.13-2(D)(1))*.*

b. **(U)** You should refer former exchange visitors who wish to learn more about applying for a waiver of INA 212(e) to Waiver of the Exchange Visitor Two-Year Home-Country Physical Presence Requirement.

## 9 FAM 402.5-6(L)(3)  (U) Department's Policy on Extension of Program Participation While a Waiver of the Two 2-Year Home-Country Physical Presence Requirement Is Pending

*(CT:VISA-3009;   12-09-2024)*

**(U)** Once WRD has recommended a waiver and forwarded to DHS, an exchange visitor is no longer eligible for an extension of program beyond the end date shown on the current Form DS-2019 even though they may not have completed the maximum duration of participation permitted for the category.  If a waiver request was denied, however, and the exchange visitor is still within the

AAUP-00429

maximum duration of participation established by the regulations, an extension may be issued by the sponsor up to the maximum duration of time permitted for that category.

# 9 FAM 402.5-6(M)  (U) Exchange Visitor Skills Lists

## 9 FAM 402.5-6(M)(1)  (U) Exchange Visitor Skill List, 2024

*(CT:VISA-3009;   12-09-2024)*

**(U)** See: 2024 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(2)  (U) Exchange Visitor Skill List, 2009

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  2009 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(3)  (U) Exchange Visitor Skill List, 1997

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1997 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(4)  (U) Exchange Visitor Skill List, 1984

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1984 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(5)  (U) Exchange Visitor Skills List, 1972

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1972 Exchange Visitor Skills List.

**UNCLASSIFIED (U)**

AAUP-00430

# EXHIBIT 214

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 72 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

**UNCLASSIFIED (U)**

# 9 FAM 302.6

# (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1735

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 302.6-1  (U) STATUTORY AND REGULATORY AUTHORITY

### 9 FAM 302.6-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(b)(1) (8 U.S.C. 1101(b)(1)); INA 212(a)(3)(B)(8 U.S.C. 1182(a)(3)(B)); INA 212(a)(3)(F) (8 U.S.C. 1182(a)(3)(f)); INA 212(d)(3)(A) (8 U.S.C. 1182(d)(3)(A)); INA 212(d)(3)(B) (8 U.S.C. 1182(d)(3)(B)); INA 219 (8 U.S.C. 1189).

### 9 FAM 302.6-1(B)  (U) United States Code

*(CT:VISA-55;   02-23-2016)*

**(U)** 18 U.S.C. 2339D(c)(1); 22 U.S.C. 2723.

### 9 FAM 302.6-1(C)  (U) Public Laws

*(CT:VISA-1;   11-18-2015)*

**(U)** Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Public Law 102-138, section 128; Homeland Security Act of 2002, Public Law 107-296; Consolidated Appropriations Act, 2008, Public Law 110-161, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008); An Act to Remove the African National Congress from Treatment as a Terrorist Organization for Certain Acts or Events, Provide Relief for Certain Members of the African National Congress Regarding Admissibility, and for Other Purposes, Public Law 110-257.

AAUP-00431

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 73 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

# 9 FAM 302.6-2  (U) TERRORIST ACTIVITIES - INA 212(A)(3)(B)

## 9 FAM 302.6-2(A)  (U) Grounds

*(CT:VISA-2014;   06-20-2024)*

**(U)** INA 212(a)(3)(B)(i) renders ineligible any applicant who**:**

(1)  **(U)** has engaged in a terrorist activity;

(2)  **(U)** you know, or have reason to believe, is engaged in or is likely to engage after entry in any terrorist activity;

(3)  **(U)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

(4)  **(U)** is a representative of:

(a)  **(U)** a terrorist organization; or

(b)  **(U)** a political, social, or other group that endorses or espouses terrorist activity;

(5)  **(U)** is a member of a designated terrorist organization;

(6)  **(U)** is a member of an undesignated terrorist organization, unless the applicant can demonstrate by clear and convincing evidence that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization;

(7)  **(U)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

(8)  **(U)** has received military-type training from or on behalf of any organization that, when the training was received, was a terrorist organization; or

(9)  **(U)** is the spouse or child of an applicant who is ineligible, if the activity causing the applicant to be found ineligible occurred within the last 5 years.

## 9 FAM 302.6-2(B)  (U) Application

### 9 FAM 302.6-2(B)(1)  (U) Summary

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** INA 212(a)(3)(B) describes visa ineligibilities related to terrorism.  The ineligibilities hinge on terrorism-related definitions that were significantly expanded by post-9/11 legislation, most significantly, the USA PATRIOT Act (2001) and the REAL ID Act (2005).  Due to these expansions, the scope of activities covered by the phrase "engage in terrorist activity" is broad.  As defined in INA 212(a)(3)(B)(vi), the term "terrorist organization"

AAUP-00432

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 74 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

encompasses both organizations that have been designated previously by the Department as terrorist organizations and organizations that have never been so designated by the Department or any other U.S. Government agency, but that have engaged in any of the activities listed in INA 212(a)(3)(B)(iv)(I)-(IV).  Because terms in INA 212(a)(3)(B) are defined broadly, elicit as much pertinent information from visa applicants as possible, including the names of all groups potentially covered by these provisions with which the applicant may be linked, for example, by current membership or past financial contributions or other support.  Inquire into the nature and activities of those organizations, bearing in mind the definition of "terrorist organization" in INA 212(a)(3)(B)(vi), described in 9 FAM 302.6-2(B)(3) paragraph i below and other FAM provisions referenced therein.

b. **Unavailable**

c. *Unavailable*

## 9 FAM 302.6-2(B)(2)  (U) Background

*(CT:VISA-2014;  06-20-2024)*

a. **(U)** The Immigration Act of 1990 (Public Law 101-649) amended INA 212(a) by replacing the previous 43 classes of excludable applicants with nine broad classes, each with subclasses.  New INA 212(a)(3)(B), "Terrorist Activities," incorporated aspects of former 212(a)(27) and 212(a)(29).

b. **(U)** The Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104-132) expanded the scope of INA 212(a)(3)(B) to make ineligible representatives and members of organizations designated by the Secretary under INA 219 as Foreign Terrorist Organizations (FTOs).

c. **(U)** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104-208) amended INA 212(a)(3)(B)(i) again to make ineligible any applicant who, "under circumstances indicating an intention to cause death or serious bodily harm," incited terrorist activity.  The new provision applied retroactively to all such incitement activities, regardless of when they occurred.

d. **(U)** The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") (Public Law 107-56), enacted after the terrorist attacks on September 11, 2001, expanded the scope of INA 212(a)(3) in several important respects:

   (1) **(U)** It gave the Secretary of State new authority to designate organizations as terrorist organizations for purposes of INA 212(a)(3)(B) if certain criteria are met.  Organizations so designated are listed on the "Terrorist Exclusion List" or "TEL";

   (2) **(U)** It defined "terrorist organization" for the first time, creating three categories.  The first category is FTOs designated under INA 219 (see INA 212(a)(3)(B)(vi)(I)) (Tier I); the second is entities designated under

AAUP-00433

the Terrorism Exclusion List (TEL) authority included in the USA PATRIOT Act (Tier II) (see INA 212(a)(3)(B)(vi)(II)).  The third category, referred to as "undesignated terrorist organizations," includes entities that engage in specified "terrorist activities" listed in the INA, but that have not been designated under FTO or TEL authorities (Tier III) (see INA 212(a)(3)(B)(vi)(III)); and

(3) **(U)** It created INA 212(a)(3)(F), "Association with Terrorist Organizations," which made applicants who have been associated with a terrorist organization, and who are engaged or likely to engage in certain activities that endanger the United States, ineligible under certain circumstances.

e. **(U)** The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005 ("REAL ID Act") (Public Law 109-13) at sections 103 and 104 of Division B further expanded the scope of INA 212(a)(3)(B) by:

(1) **(U)** Broadening "terrorist organization" to capture undesignated groups with subgroups that "engage in terrorist activity";

(2) **(U)** Making it harder for an applicant suspected of "engaging in terrorist activities" to escape ineligibility based on an alleged lack of knowledge concerning an undesignated terrorist organization or how any contribution of material support might be used by a terrorist organization (see (5), (6), and (8) below);

(3) **(U)** Making ineligible "representatives" of all three types of terrorist organizations, regardless of applicant's knowledge or intent.  Previously, only representatives of groups designated under INA 219 (Tier I) were specified;

(4) **(U)** Making ineligible all representatives of "a political, social, or other group that endorses or espouses terrorist activity."  Previously the Secretary of State had to find that the group's public endorsement of acts of terrorist activity undermines U.S. efforts to reduce or eliminate terrorist activities;

(5) **(U)** Eliminating the knowledge defense to ineligibility for members of entities designated for the TEL (Tier II) and raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for being a member of an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(6) **(U)** Raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for soliciting funds or members for an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(7) **(U)** Expanding the "material support" bar to admissibility for knowingly providing support to any terrorist organization or its members, except,

AAUP-00434

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 76 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

with respect to undesignated terrorist organizations, where an applicant presents "clear and convincing evidence" that the applicant lacked knowledge of any terrorist activity.  The amendment eliminated the requirement that the applicant intended to support terrorist activity;

(8) **(U)** Making ineligible any applicant who commits an act the applicant knows or reasonably should know provides material support to an undesignated terrorist organization or a member of an undesignated terrorist organization, unless the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization.  Before amendment, the provision did not include material support afforded to a member of an undesignated terrorist organization.  The REAL ID Act added the "clear and convincing evidence" standard for an applicant attempting to prove lack of knowledge of an undesignated group's terrorist activity;

(9) **(U)** Making ineligible any applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization."  Before amendment, the provision covered only persons who used their position of prominence to endorse or espouse terrorist activity or to persuade others to support terrorist activity or a terrorist organization in a way the Secretary of State determined undermines U.S. efforts to reduce or eliminate terrorist activities;

(10) **(U)** Making ineligible any applicant who has "received military-type training" from or on behalf of a terrorist organization; and

(11) **(U)** Applying the terrorism provisions of the REAL ID Act amendments to actions taken by an applicant before, on, or after the date of enactment, May 11, 2005.

f. **(U)** The Consolidated Appropriations Act, 2008, Public Law 110-161, 121 Stat. 1844, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008) amended the discretionary authority of the Secretary of Homeland Security and the Secretary of State, under INA 212(d)(3)(B)(i), to exempt an applicant from most of the terrorism-related bars to admissibility under INA 212(a)(3)(B) and to exempt a group from treatment as an undesignated terrorist organization under INA 212(a)(3)(B)(vi)(III).  The amendment also provided that certain groups should not be considered terrorist organizations based on any act or event occurring before the amendment's enactment on December 26, 2007, and that the Taliban must be considered to be a designated foreign terrorist organization, under INA 212(a)(3)(B)(vi)(I), for immigration purposes.  See 9 FAM 302.6-2(B)(3) paragraph i below.  The amendments were effective upon enactment and apply to acts before or after enactment.

AAUP-00435

Case 5:25-cv-06618-NW   Document 81-6   Filed 03/27/26   Page 77 of 406

6/30/25, 3:18 PM        9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

## 9 FAM 302.6-2(B)(3)  (U) Definitions

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** This section explains terms used in INA 212(a)(3)(B) in alphabetical order.  Where listed terms are specifically defined in the statute, the statutory reference follows immediately after the term.

b. **(U) CLEAR AND CONVINCING EVIDENCE:**

   (1) **(U)** The phrase "clear and convincing evidence" appears several times in INA 212(a)(3)(B) with reference to undesignated terrorist organizations. The INA places the burden of proof on the applicant to establish that they did not know, or should not have reasonably known, that the undesignated terrorist organization was, in fact, a terrorist organization. (Applicants are deemed to know that designated terrorist organizations are terrorist organizations, regardless of their actual knowledge or belief).

   (2) **(U)** Consider the following in determining whether a visa applicant can demonstrate by "clear and convincing evidence" that they did not know, and should not reasonably have known, that an undesignated organization was a terrorist organization:

   (a) **(U)** Facts specific to the individual, such as residence, profession, education, and people with whom and groups with which the applicant has associated;

   (b) **(U)** The public availability of information about the organization and more specifically, about the activities that make it a terrorist organization under the INA's broad definition; and

   (c) **(U)** The extent to which the organization is actively and overtly engaged in the activities that make it a terrorist organization under the INA.

   (3) **Unavailable**

c. **(U) ENDORSING OR ESPOUSING TERRORISM:**

   (1) **(U)** An applicant is ineligible under INA 212(a)(3)(B)(i)(VII) if the applicant endorses or espouses terrorist activity or persuades others to endorse or support terrorist activity or a terrorist organization.

   (2) **Unavailable**

d. **Unavailable**

   (1) **(U)** A safe house;

   (2) **(U)** Transportation;

   (3) **(U)** Communications;

   (4) **(U)** Funds;

   (5) **(U)** Transfer of funds or other material financial benefit;

AAUP-00436

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 78 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

    (6) **(U)** False documentation or identification;

    (7) **(U)** Weapons including chemical, biological, or radiological weapons;

    (8) **(U)** Explosives; or

    (9) **(U)** Training.

e. **(U) MEMBER OF A TERRORIST ORGANIZATION:**

    (1) **(U)** Applicants who are members of designated FTOs or entities on the Terrorism Exclusion List are ineligible. The INA does not require the applicant to know that the organization has been designated.  Members of undesignated terrorist organizations are ineligible, but there is a narrow exception based on lack of knowledge (see 9 FAM 302.6-2(B)(3) paragraph i below).

    (2) **(U)** Evidence of membership in a terrorist organization might include the individual's taking of an oath or performance of some act that is a prerequisite of membership.  A formal induction is not necessary for a finding of membership.

    (3) **(U)** Membership is determined by considering all relevant facts, including, but not limited to, the following:

        (a) **(U)** Acknowledgment of membership;

        (b) **(U)** Frequent association with other members;

        (c) **(U)** Participation in the organization's activities, even if lawful;

        (d) **(U)** Actively working to further the organization's aims and methods in a way suggesting close affiliation constituting membership;

        (e) **(U)** Occupying a position of trust in the organization, past or present;

        (f)  **(U)** Receiving financial support from the organization, e.g., scholarships, pensions, salary;

        (g) **(U)** Contributing money to the organization;

        (h) **(U)** Determination of membership by a competent court;

        (i)  **(U)** Voluntarily displaying symbols of the organization; or

        (j)  **(U)** Receiving honors and awards given by the organization.

    (4) **(U)** No single factor necessarily determines that an applicant was a member of an organization.

    (5) **Unavailable**

    (6) **Unavailable**

    (7) **(U)** Former members will still be ineligible if they have previously provided material support (such as membership fees), raised money, or solicited members for the organization.

f. **(U) INCITEMENT OF TERRORISM:**

AAUP-00437

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 79 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(1) **(U)** "Incitement with intent to cause death or serious bodily harm" renders an applicant ineligible under INA 212(a)(3)(B)(i)(III) if they have incited terrorist activity under circumstances indicating an intention to cause death or serious bodily harm.

(2) **(U)** "Incited" in the context of INA 212(a)(3)(B) is speech that induces or otherwise moves another person to undertake terrorist activity. Normally speech will not rise to the level of "inciting" unless there is a clear link between the speech and an actual effort to undertake the terrorist activity. It connotes speech that is not merely an expression of views but that directs or induces action, typically in a volatile situation.

(3) **(U)** The applicant may have incited terrorist activity even if a terrorist attack does not actually occur (e.g., because an attempt to commit such activity was thwarted).

(4) **(U)** An applicant who has "incited" terrorist activity must also have acted in circumstances indicating an intention to cause death or serious bodily harm to be ineligible under INA 212(a)(3)(B). In other words, the applicant's speech must not only have induced others to undertake terrorist activity but was also made with the specific intent that such activity would result in death or serious bodily injury.

(5) **(U)** Incitement and the requisite intent to cause bodily harm could be inferred in the following situations:

(a) **(U)** Widespread opposition to Country A's policies and actions lead to a series of protests, some violent, outside Country A's embassy in Country B. The applicant goes to the embassy, stands on a box, and shouts to the crowd to join them in standing up to Country A and humiliating it. Shortly afterwards, when they see an embassy vehicle approaching, they yell: "Don't let them in! Make them pay for what they have done!" The crowd blocks the car and removes occupants (including a diplomat working at Country A's embassy), from the car, beating them severely and taking them hostage.

(b) **(U) Analysis:** Diplomatic hostage-taking and violent attacks on diplomats are terrorist activities. Given the applicant's urging the crowd to stop the embassy vehicle and "make them pay," you would have reasonable ground to believe that the applicant's speech incited terrorist activity. The applicant's "make them pay" statement, when viewed against the backdrop of previous violent protests and their general comments about standing up to Country A and humiliating it, would provide you with reasonable ground to believe that the applicant intended to cause death or serious bodily harm.

(c) **(U)** The applicant is an ardent nationalist whose opinions voiced to an audience regularly blame "foreigners" for their country's problems and who argues that the only solution to these problems is that "foreigners" should be driven out of the country. Press reports say that some of those in the targeted audience have been purchasing weapons and seeking to obtain and manufacture explosives. Police

AAUP-00438

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 80 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

notify the applicant or those associated with the applicant that they are investigating several of those in the targeted audience for weapons-related offenses.  At the end of a week of strong anti-foreign sentiment, the applicant gives a special speech entitled "A Call to Action."  With the knowledge that those under investigation are in the audience, the applicant begins their speech with: "The time has come for action!"  They then reiterate throughout their speech that "The only solution to the country's problems is to purge our great land of these foreigners once and for all through whatever means necessary."  Shortly thereafter, some of those in the target audience detonate a truck bomb outside a restaurant frequented by foreign nationals, killing several foreign nationals and injuring many restaurant employees.

(d) **(U) Analysis:** The use of any explosive with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property is a terrorist activity.  In the example, the applicant helps foster anti-foreign sentiments and then, during an especially tense period, urges students to act to drive "foreigners" from the country "through whatever means necessary."  Under these circumstances, you would have reason to believe that the applicant's speech incited terrorist activity.  The fact that the applicant knew that several students likely had access to weapons and/or explosives and that those students attended their special lecture would provide you with reason to believe that the applicant intended to cause death or serious bodily harm.

(e) **(U)** The USA PATRIOT Act amended INA 212(a)(3)(B)'s definition of "engaging in terrorist activity" also to include incitement (see INA 212(a)(3)(B)(iv)(I)).  As a result, a person who is ineligible under INA 212(a)(3)(B)(i)(III) for inciting terrorist activity will also now be ineligible under INA 212(a)(3)(B)(i)(I) for engaging in a terrorist activity.

g. **(U) REPRESENTATIVE:** A "representative" is defined in INA 212(a)(3)(B)(v) as "an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity."

h. **(U) SUBGROUP:** A group (Group X), even if not organized, can be a "subgroup" of another organization (Group Y) if there are reasonable grounds to believe that either (1) Group X as a whole or (2) the members of Group X are affiliated with Group Y.   If a subgroup engages in terrorist activities, then both groups are terrorist organizations.  See 9 FAM 302.6-2(B)(3) paragraph i(1)(c) below.  A subgroup relationship may be found where there are reasonable grounds to believe that Group X is subordinate to, or affiliated with, Group Y and Group X is dependent on, or otherwise relies upon, Group Y in whole or in part to support or maintain its operations.  As an example, Group X would be a subgroup of Group Y if the latter establishes rules or

AAUP-00439

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 81 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

guidelines that Group X generally follows and Group X relies on Group Y as a source of funds for Group X operations.

i. **(U) TERRORIST ORGANIZATION:**

(1) **(U)** "Terrorist organization," as defined in INA 212(a)(3)(B)(vi), includes both designated terrorist organizations (paragraphs (a) and (b), below) and undesignated terrorist organizations (paragraph (c), below):

(a) **(U)** An organization designated by the Secretary of State as a "foreign terrorist organization" (FTO) under INA 219.  This designation has implications beyond the INA, including penalties under U.S. criminal law.  Applicants who engage in certain activities in connection with these organizations can be rendered ineligible under the INA. Organizations currently designated as FTOs and information about the designation process can be found on the J/CT website.

(b) **(U)** An organization designated by the Secretary of State for inclusion in the Terrorist Exclusion List (TEL), pursuant to INA 212(a)(3)(B)(vi)(II).  The TEL designation is for immigration purposes only.  Information about the designation process can be found on the J/CT website.

(c) **(U)** An organization that has not been designated but is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup (see 9 FAM 302.6-2(B)(3) paragraph h above) which engages in, terrorist activities described in the INA 212(a)(3)(B)(iv)(I) – (VI).  With respect to undesignated terrorist organizations:

(i) **Unavailable**

(ii) **Unavailable**

(iii) **(U)** Where a finding of ineligibility would involve an undesignated terrorist organization, the applicant may overcome the finding by demonstrating, by clear and convincing evidence (see 9 FAM 302.6-2(B)(3) paragraph b above), that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization (except with respect to representatives of undesignated terrorist organizations, those who persuade others to support an undesignated terrorist organization, and those who receive military-type training on behalf of an undesignated terrorist organization, for whom there is no such defense); and,

(2) **(U)** Pursuant to section 691(b) of the Consolidated Appropriations Act, 2008, the following groups are not terrorist organizations under INA 212(a)(3)(B)(vi) for acts or events that occurred before December 26, 2007:

AAUP-00440

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 82 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

- **(U)** Karen National Union/Karen Liberation Army (KNU/KNLA)
- **(U)** Chin National Front/Chin National Army (CNF/CNA)
- **(U)** Chin National League for Democracy (CNLD)
- **(U)** Kayan New Land Party (KNLP)
- **(U)** Arakan Liberation Party (ALP)
- **(U)** Tibetan Mustangs
- **(U)** Cuban Alzados
- **(U)** Karenni National Progressive Party
- **(U)** "Appropriate groups affiliated with" the Hmong
- **(U)** "Appropriate groups affiliated with" the Montagnards

(3) **(U)** As a result of this legislation, an applicant who did any of the following before December 26, 2007, is no longer ineligible on account of the following terrorism-related grounds of ineligibility:

- **(U)** Solicited funds or other things of value on behalf of one of these named groups (INA 212(a)(3)(B)(iv)(IV)(cc))
- **(U)** Solicited an individual for membership in one of these named groups (INA 212(a)(3)(B)(iv)(V)(cc))
- **(U)** Committed an act that provided material support, including transfer of funds, false documentation, weapons, or training to one of these named terrorist groups (INA 212(a)(3)(B)(iv)(VI)(dd))
- **(U)** Is a representative of one of these named groups (INA 212(a)(3)(B)(i)(IV)(aa))
- **(U)** Is a member of one of these named terrorist groups (INA 212(a)(3)(B)(i)(VI))
- **(U)** Persuaded others to endorse or support one of these named terrorist groups (INA 212(a)(3)(B)(i)(VII))
- **(U)** Received military-type training from one these named terrorist groups (INA 212(a)(3)(B)(i)(VIII))
- **Unavailable**

(4) **(U)** Pursuant to 691(d) of Division J of the Consolidated Appropriations Act, 2008 as of December 26, 2007, the Taliban is a designated terrorist organization described in INA 212(a)(3)(B)(vi)(I) for purposes of immigration law.

(5) **(U)** Public Law No. 110-257, codified at 8 U.S.C. 1182 note, added the African National Congress to the list of groups in subparagraph b, above, that are not terrorist organizations.

AAUP-00441

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 83 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(6) **(U)** In determining whether an organization may be an undesignated terrorist organization; i.e., that it "engaged in terrorist activities" as described in INA 212(a)(3)(B)(iv)(I) – (VI).  Evaluate information obtained in the visa interview, take advantage of available local resources, as appropriate, and check relevant databases, including:

   (a) **(U)** The United Nations 1267 Committee's list of individuals and entities belonging or related to the Taliban, Osama Bin Laden, and the Al-Qaida organization.

   (b) **(U)** Terrorists and groups identified under E.O. 13224.

   (c) **Unavailable**

## 9 FAM 302.6-2(B)(4)  (U) Ineligibility Under INA 212(a)(3)(B)

*(CT:VISA-2014;   06-20-2024)*

a. **(U) OVERVIEW:**

   (1) **(U)** INA 212(a)(3)(B) generally identifies as grounds for ineligibility "engaging in terrorist activities" and having certain links to "terrorist organizations."  The standards apply even if the relevant acts or associations preceded enactment of the law and regardless of any link to an actual terrorist attack.  The section defines "terrorist activities" to include a broad range of violent acts (see INA 212(a)(3)(B)(iii)), while also making ineligible representatives and members of groups engaging in listed activities; those endorsing, espousing, or promoting terrorism; those who have received military-type training from terrorist organizations; and immediate family members of any covered persons – with certain exceptions.

   (2) **(U)** It also explicitly makes PLO officers, officials, representatives, and spokesmen ineligible.  INA 212(a)(3)(B) next defines "engaging in terrorist activities," which covers a broad range of activities that support or promote the commission of terrorist activities or groups that engage in them (see INA 212(a)(3)(B)(iv)).  See 9 FAM 302.6-2(B)(4) paragraph b below for more detail.

b. **Unavailable**

   (1) **Unavailable**

   (2) **Unavailable**

   (3) **Unavailable**

   (4) **Unavailable**

   (5) **Unavailable**

   (6) **Unavailable**

c. **(U) ENGAGED IN TERRORIST ACTIVITY:**

AAUP-00442

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 84 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(1) **(U)** After defining the violent acts that constitute terrorist activity (see INA 212(a)(3)(B)(iii)), the INA identifies the acts that render applicant's ineligible because of their connections to those violent acts or to those who commit them.  See definition of "engage in terrorist activity" INA 212(a)(3)(B)(iv).

(2) **(U)** An applicant is ineligible on any of the grounds identified below if either the applicant has engaged in terrorist activity in the past or you or the Secretary of Homeland Security or the Attorney General knows or has reason to believe that the applicant currently is engaged in, or likely after entry to engage in, a terrorist activity.  See INA 212(a)(3)(B)(i)(I)-(II).

(3) **(U)** An applicant is ineligible for "engaging in terrorist activity" if the applicant acts, as an individual or as a member of a group, to:

  (a) **(U)** Commit or incite to commit a terrorist activity, under circumstances that indicate an intention to cause death or serious bodily injury;

  (b) **(U)** Prepare or plan a terrorist activity;

  (c) **(U)** Gather information on potential targets for terrorist activity;

  (d) **(U)** Solicit funds or other things of value for a terrorist activity or terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3);

  (e) **(U)** Solicit any individual to engage in terrorist activity, or for membership in a terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3) above;

  (f) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support for the commission of a terrorist activity;

  (g) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity; or

  (h) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to an entity that was a terrorist organization (i.e., engaged in terrorist activity) when the material support was provided or to a member of a terrorist organization, without regard to how the contribution was to be used.  If the terrorist organization was undesignated when material support was provided, (see 9 FAM 302.6-2(B)(3) paragraph i(3) above).

(4) **Unavailable**

(5) **(U)** Current representatives of the following are ineligible:

AAUP-00443

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 85 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(a) **(U)** A terrorist organization (designated or undesignated; there is no defense based on lack of knowledge concerning the organization's activities); or

(b) **(U)** A political, social, or other similar group that endorses or espouses terrorist activity, regardless of whether the group's endorsement or espousing undermines U.S. efforts.

(6) **(U)** Current members of a terrorist organization are ineligible.  See 9 FAM 302.6-2(B)(3) paragraph e above.  If the terrorist organization is undesignated, the applicant is not inadmissible if the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization. See 9 FAM 302.6-2(B)(3) paragraph b above.

(7) **(U)** Endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, whether designated or undesignated renders an applicant is ineligible.  See 9 FAM 302.6-2(B)(3) paragraph c above.

(8) **(U)** Military-type training, received from or on behalf of any organization that, when the training was received, was a terrorist organization, makes an applicant ineligible.  "Military-type training," as defined in 18 U.S.C. 2339D(c)(1), includes training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction.

d. **(U) PALESTINE LIBERATION ORGANIZATION (PLO) AND OTHER PALESTINIAN ENTITIES:**

(1) **(U)** Any applicant who is an officer, official, representative, or spokesperson of the PLO is engaged in terrorist activity and therefore ineligible.  See INA 212(a)(3)(B)(i).  This provision applies only to those individuals who are currently PLO officers, officials, representatives, or spokespersons.  Although not covered by the PLO-specific provisions, past officers, officials, representatives, or spokespersons likely would be ineligible under the other provisions of INA 212(a)(3)(B).  "PLO Officials" would be individuals with substantive or policy-making responsibility in the PLO.  Members of the PLO Executive Committee, PLO Representatives at Missions around the world, and PLO Representatives to the United Nations and other International Organizations clearly would be ineligible under this provision.

(2) **(U)** Applicants who no longer occupy official positions with the PLO and persons who may be viewed as current or former members or employees, but are not officers, officials, representatives, or spokespersons, are not ineligible under the PLO-specific provision.  Be alert to the possibility that applicants with present or past associations with the PLO may be ineligible under INA 212(a)(3)(B) for other reasons.

AAUP-00444

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 86 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(3) **Unavailable**

(4) **(U) Composition of the Palestine Liberation Organization (PLO):**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

        (iii) **Unavailable**

        (iv) **Unavailable**

        (v) **Unavailable**

        (vi) **Unavailable**

        (vii) **Unavailable**

        (viii) **Unavailable**

        (ix) **Unavailable**

        (x) **Unavailable**

        (xi) **Unavailable**

        (xii) **Unavailable**

(5) **(U) Implications for Other Palestinian Entities:**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

e. **(U) SPOUSE AND CHILDREN OF AN INELIGIBLE APPLICANT:**

(1) **(U)** Spouses and children of applicants found ineligible under INA 212(a)(3)(B) are also ineligible if the activity causing the applicant to be ineligible occurred within the last five years.  However, there are exceptions to this ineligibility.  See statutory exceptions for spouses and children at INA 212(a)(3)(B)(ii) and paragraph (6) below.

(2) **Unavailable**

(3) **(U)** This ground only applies to spouses who are currently married to applicants found ineligible under INA 212(a)(3)(B).  It does not include those whose marriage has ended due to divorce or the death of the ineligible applicant.

(4) **(U)** This ineligibility only applies to an applicant who is a child at the time of visa issuance.  INA 101(b)(1) defines "child" as an unmarried person under twenty-one years of age.  A child remains the child of an applicant found ineligible under INA 212(a)(3)(B) even after the death of the

AAUP-00445

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 87 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

ineligible applicant parent, assuming they continue to meet the definition of a child.

(5) **Unavailable**

(6) **(U)** This ineligibility does not apply to a spouse or child who did not know or should not reasonably have known of the applicant's activity that caused the applicant to be found ineligible. It also does not apply if you or the Secretary of Homeland Security finds that there are reasonable grounds to believe the spouse or child has renounced the activity causing the applicant to be found ineligible. The statutory exception to spouse and child ineligibility applicable in cases where the spouse or child didn't know of the terrorist activity or renounced the activity is found in INA 212(a)(3)(B)(ii).

(7) **Unavailable**

## 9 FAM 302.6-2(B)(5)  (U) Exemptions

*(CT:VISA-2014;   06-20-2024)*

a. **(U) EXEMPTION VERSUS WAIVER:** Both discretionary authorities allow an applicant to receive an immigration benefit, even though the applicant would not otherwise qualify for the benefit. One significant difference is that when using a waiver authority, the Department first determines that the applicant is not qualified to receive a benefit (e.g., a visa) and then follows the applicable procedures for obtaining a waiver of the disqualification from DHS. The waiver authority, found in INA 212(d)(3)(A), is available only for NIVs. In contrast, when exemption authority is exercised, the Secretary, following interagency consultations, determines that the disqualification (which must arise under the INA's terrorism-related grounds for ineligibility) "shall not apply" in that case. Exemptions are available for both NIV and IV cases, as well as other immigration-related benefits. These authorities are discussed below.

b. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS UNDER** INA 212(d)(3)(B)(i)**:**

(1) **(U)** Under INA 212(d)(3)(B)(i), the Secretaries of Homeland Security and State, in consultation with each other and the Attorney General, each are authorized to conclude that almost any of the terrorism-related provisions under INA 212(a)(3)(B) should not apply to an applicant. If the applicant is in the United States, however, and removal proceedings have commenced, only the Secretary of Homeland Security has the authority to apply the exemption.

(2) **(U)** INA 212(d)(3)(B)(i) exemptions cannot be granted to:

(a) **(U)** Applicants for whom there are reasonable grounds to believe are engaged in (present activities) or likely to engage after entry in (future activities) terrorist activity (INA 212(a)(3)(B)(i)(II));

AAUP-00446

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 88 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

(b) **(U)** Members of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(V));

(c) **(U)** Representatives of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(IV)(aa));

(d) **(U)** Applicants who voluntarily and knowingly engaged in terrorist activity on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(I), as defined by INA 212(a)(3)(B)(iv));

(e) **(U)** Applicants who voluntarily and knowingly endorsed or espoused terrorist activity or persuaded others to do so on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(VII));

(f)  **(U)** Applicants who voluntarily and knowingly received military-type training from a Tier I or II terrorist organization (INA 212(a)(3)(B)(i)(VIII)).

(3) **(U)** Regarding past activities, the limitations on the exemption authority relate only to applicants with ties to designated (Tier I and Tier II) terrorist organizations.  The exemption potentially may overcome ineligibility for any past terrorist activity associated with an undesignated (Tier III) terrorist organization.

(4) **(U)** By including "voluntarily or knowingly" in the statute, Congress made clear that exemptions may be used to overcome ineligibility for past terrorist activity associated with a designated (Tier I or II) terrorist organization if the applicant acted under duress or without the relevant knowledge.

(5) **(U)** Although exercises of the exemption authority require action by the Secretary following interagency consultations and, therefore, will not be commonplace, you may recommend that the Department pursue an exemption from provisions of INA 212(a)(3)(B) for an NIV applicant, if politically justified, or an IV applicant.  Submit such requests to the Department with a detailed assessment explaining why an exemption is appropriate and any balancing considerations.

(6) **Unavailable**

c. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS ASSOCIATED WITH THE AFRICAN NATIONAL CONGRESS:**

(1) **(U) In General:**

(a) **(U)** Under Public Law No. 110-257, codified at 8 U.S.C. 1182 note, the Secretaries of State and Homeland Security, in consultation with each other and the Attorney General, each are authorized to determine, in their sole and unreviewable discretion, that (2)(A)(i)(I), (2)(B), and (3)(B) (other than clause (i)(II)) of INA 212(a), does not apply to an applicant with respect to activities undertaken in association with the African National Congress in opposition to apartheid rule in South Africa.  This authority operates the same as the general individual exemption authority described in 9 FAM 302.6-

AAUP-00447

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 89 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

2(B)(5) paragraph b, above but for activities that may fall within the scope of this law, only this exemption should be considered. An exemption under the Public Law may cover both terrorism-related and some of the criminal-related grounds of ineligibility. The same law also establishes that the ANC must not be treated as a terrorist organization, for purposes of INA 212(a)(3)(B), based on past actions. See 9 FAM 302.6-2(B)(3) paragraph i above.

(b) **(U)** Effective March 30, 2011, the Secretary of State, following consultations with the Secretary of Homeland Security and the Attorney General, exercised their discretionary authority under Public Law 110-257 to determine that INA 212(a)(2)(A)(i)(I), INA 212(a)(2)(B), and INA 212(a)(3)(B) (other than clause (i)(II)) "shall not apply" to individuals for activities undertaken in association with the African National Congress (ANC) in opposition to apartheid rule in South Africa (the "ANC categorical exemption"). The ANC categorical exemption sets out conditions for eligibility, described below, that must be applied by consular officers and other relevant U.S. Government officials in accordance with the procedures below.

(2) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(3) **(U) Requirements for ANC Exemptions:**

(a) **Unavailable**

(i) **Unavailable**

(ii) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(i)    **Unavailable**

(ii)    **Unavailable**

(4) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(i)    **Unavailable**

AAUP-00448

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 90 of 406

6/30/25, 3:18 PM        9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

        (ii)    **Unavailable**

        (iii)    **Unavailable**

        (iv)    **Unavailable**

    (e)  **Unavailable**

      **Unavailable**

    (f)  **Unavailable**

        (i)    **Unavailable**

        (ii)    **Unavailable**

            (A)    **Unavailable**

            (B)    **Unavailable**

            (C)    **Unavailable**

               (1) **Unavailable**

               (2) **Unavailable**

·   **Unavailable**

·   **Unavailable**

·   **Unavailable**

·   **Unavailable**

(3) **Unavailable**

        (iii)    **Unavailable**

        (iv)    **Unavailable**

d. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS WHO HAVE PROVIDED MATERIAL SUPPORT UNDER DURESS TO A TERRORIST ORGANIZATION:**

(1)  **(U) In General:**

(a) **(U)** On October 26, 2015, the Secretary of State exercised his authority under INA 212(d)(3)(B)(i) to determine that INA 212(a)(3)(B)(iv)(VI) shall not apply with respect to material support provided under duress to a terrorist organization.  This Material Support Under Duress exemption sets out conditions for eligibility, described below, that may be applied by consular officers in accordance with the procedures below.

(b) **(U)** As an example, USCIS guidance indicates that material support under duress could include providing money or a service (such as transporting fighters and supplies) to a rebel group when threatened at gunpoint to comply with such a demand.

(2) **Unavailable**

(a) **Unavailable**

AAUP-00449

Case 5:25-cv-06618-NW     Document 81-6     Filed 03/27/26     Page 91 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

    (b) **Unavailable**

        (i)   **Unavailable**

        (ii)   **Unavailable**

        (iii)   **Unavailable**

        (iv)   **Unavailable**

    (c) **Unavailable**

        (i)   **Unavailable**

        (ii)   **Unavailable**

        (iii)   **Unavailable**

        (iv)   **Unavailable**

    (d) **Unavailable**

        (i)   **Unavailable**

        (ii)   **Unavailable**

        (iii)   **Unavailable**

        (iv)   **Unavailable**

        (v)   **Unavailable**

        (vi)   **Unavailable**

    (e) **Unavailable**

  (3) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

    (e) **Unavailable**

  (4) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

  (5) **Unavailable**

e. **(U) EXEMPTION AUTHORITY FOR KURDISTAN DEMOCRATIC PARTY, IRAQI NATIONAL CONGRESS, AND PATRIOTIC UNION OF KURDISTAN:**

  (1) **(U) Background:**

    (a) **Unavailable**

    (b) **Unavailable**

AAUP-00450

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 92 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

(c) **Unavailable**

**Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(2) **(U) In General:** In September 2009, the Secretary of Homeland Security and Secretary of State granted an exemption under INA212(d)(3)(B)(i) covering the category of individuals who meet certain conditions, as determined by consular or DHS officials, as appropriate, from certain ineligibility grounds in INA 212(a)(3)(B) of the INA with respect to any activities or associations related to the Kurdistan Democratic Party (KDP), the Patriotic Union of Kurdistan (PUK) or the Iraqi National Congress (INC) (hereinafter the "categorical exemption").

(3) **(U) Procedures:**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(f) **Unavailable**

(g) **Unavailable**

(4) **Unavailable**

(a) **Unavailable**

(i)    **Unavailable**

(ii)   **Unavailable**

(iii)   **Unavailable**

(iv)   **Unavailable**

(v)    **Unavailable**

(vi)   **Unavailable**

(vii)   **Unavailable**

(viii)  **Unavailable**

(ix)   **Unavailable**

(x)    **Unavailable**

(b) **Unavailable**

f. **(U) APPLICATION OF EXEMPTION FOR INDIVIDUALS ASSOCIATED WITH KOSOVO LIBERATION ARMY (KLA):**

(1) **Unavailable**

AAUP-00451

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 93 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

    (e) **Unavailable**

(2) **Unavailable**

    (a) **Unavailable**

    (b) **(U)** The applicant is seeking a benefit or protection under the INA, which may include an NIV, and is otherwise eligible for the benefit or protection.

    (c) **Unavailable**

    (d) **(U)** The applicant has fully disclosed, to the best of their knowledge, in all relevant applications and interviews with U.S. government representatives and agents, the nature and circumstances of activities or associations falling within the scope of INA 212(a)(3)(B).

    (e) **Unavailable**

    (f) **(U)** The applicant has not participated in, or knowingly provided material support to, terrorist activities that targeted noncombatant persons or United States interests.  For further information on material support, see 9 FAM 302.6-2(B)(3) above.

    (g) **(U)** The applicant has established to your satisfaction that they pose no danger to the safety and security of the United States.

    (h) **(U)** The applicant warrants an exemption from the relevant ineligibility provisions in the totality of the circumstances.  The exemption gives you broad latitude to consider any relevant factors and determine that an applicant who might otherwise appear eligible for the exemption should not benefit based on the totality of circumstances.

    (i) **Unavailable**

    (j) **Unavailable**

(3) **Unavailable**

    (a) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

        (iii) **Unavailable**

        (iv) **Unavailable**

    (b) **Unavailable**

(4) **Unavailable**

AAUP-00452

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 94 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(f)  **Unavailable**

**(g) Unavailable**

(5) **Unavailable**

(6) **Unavailable**

g. **Unavailable**

(1) **(U)** In addition to those listed in paragraphs d through f above, exemptions have been created for certain individuals associated with or activities related to the following groups:

(a)  **(U)** The All-Burma Student's Democratic Front (ABSDF);

(b)  **(U)** The All-India Sikh Student's Federation - Bittu (AISSF-Bittu);

(c) **(U)** the Democratic Movement for the Liberation of Eritrean Kunam (DMLEK);

(d) **(U)** The Eritrean Liberation Front (ELF);

(e) **(U)** The Ethiopian People's Revolutionary Party (EPRP);

(f)   **(U)** The Farabundo Marti para la Liberation National (FMLN) and Nationalist Republican Alliance (ARENA);

(g) **(U)**The Oromo Liberation Front (OLF);

(h) **(U)** The Tigray People's Liberation Front (TPLF);

(i)  **(U)** Certain Burmese Groups; and/or

(j)  **(U)** 10 groups named in the Consolidated Appropriations Act, 2008 (see 9 FAM 302.6-2(B)(3) paragraph i(2) above.

(2) **Unavailable**

(a) **(U)** Solicitation or Military-Type Training Under Duress (see 9 FAM 302.6-2(B)(5) paragraph d above);

(b) **(U)** Voluntary Medical Care;

(c) **(U)** Participation in the Iraqi Uprisings;

(d) **(U)** Certain Limited or Insignificant Material Support;

(e) **Unavailable**

(f)  **Unavailable**

(g) **Unavailable**

AAUP-00453

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 95 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

### 9 FAM 302.6-2(B)(6)  (U) Reports to Congress

*(CT:VISA-1798;   07-12-2023)*

a. **(U) Report on 3B Denials:**  Section 128 of Public Law 102-138 of October 28, 1991, added to the law a permanent requirement that the Secretary of State report, on a timely basis, to the Judiciary Committees of the House and Senate, the House Foreign Affairs Committee, and the Senate Foreign Relations Committee every denial of a visa "on grounds of terrorist activity," along with a brief description of the factual basis for the denial.

b. **(U) Report on 3B Waivers:**  The Secretary of State also must report on all applicants found ineligible under INA 212(a)(3)(B) to whom the Department issued a visa or failed to object to the issuance of a visa.  This report, required by section 51 of the State Department Basic Authorities Act, as amended by Section 231 of the Foreign Relations Authorization Act, Fiscal Year 2003, must be submitted to appropriate committees on a semi-annual basis. The requirement for these reports may be found at 22 U.S.C. 2723.

c. **(U) Report on Exemptions under** INA 212(d)(3)(B)**:**  Not later than 90 days after the end of each fiscal year, the Secretaries of State and Homeland Security must submit a report to specified congressional committees on all individuals exempted under INA 212(d)(3)(B)(i).  Exemptions for groups must be reported within one week (INA 212(d)(3)(B)(ii)).

## 9 FAM 302.6-2(C)  Unavailable

### 9 FAM 302.6-2(C)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

d. **Unavailable**

e. **Unavailable**

f.  **Unavailable**

g. **Unavailable**

   (1)  **Unavailable**

   (2)  **Unavailable**

   (3)  **Unavailable**

h. **Unavailable**

i.  **Unavailable**

j.  **Unavailable**

AAUP-00454

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 96 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

## 9 FAM 302.6-2(C)(2)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

   (1)  **Unavailable**

   (2)  **Unavailable**

   (3)  **Unavailable**

   (4)  **Unavailable**

   (5)  **Unavailable**

b. **Unavailable**

   (1)  **Unavailable**

      (a)  **Unavailable**

      (b)  **Unavailable**

      (c)  **Unavailable**

   (2)  **Unavailable**

      (a)  **Unavailable**

      (b)  **Unavailable**

      (c)  **Unavailable**

      (d)  **Unavailable**

      (e)  **Unavailable**

      (f)   **Unavailable**

## 9 FAM 302.6-2(C)(3)  Unavailable

*(CT:VISA-1798;   07-12-2023)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

d. **Unavailable**

e. **Unavailable**

f. **Unavailable**

g. **Unavailable**

h. **Unavailable**

i. **Unavailable**

AAUP-00455

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 97 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

### 9 FAM 302.6-2(C)(4)  (U) Exemption Authority for Individuals or Activities Associated with the Kosovo Liberation Army (KLA)

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** On June 4, 2012, DHS Secretary Napolitano, following consultations with the Secretary of State and the Attorney General, exercised her authority under INA 212(d)(3)(B)(i), not to apply certain ineligibility grounds under INA 212(a)(3)(B) for certain activities or associations relating to the Kosovo Liberation Army (KLA).  There are several issues that must be considered before applying this "exemption" to a visa applicant.  These are described below and differ for NIV and IV applicants.

b. **(U)** The exemption cannot be applied to any NIV or IV applicant you know or have reasonable grounds to believe is engaged in or is likely to engage after entry into the United States in any terrorist activity, as defined in INA 212(a)(3)(B)(iv).

## 9 FAM 302.6-2(D)  (U) Waivers

### 9 FAM 302.6-2(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(B).

### 9 FAM 302.6-2(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-2014;   06-20-2024)*

**a. (U)** You may request a finding of INA 212(a)(3)(B) ineligibility be waived for a nonimmigrant found ineligible under INA 212(a)(3)(B).  The waiver request must be submitted to the Department with a detailed assessment explaining why a waiver is appropriate and any balancing considerations.  Where appropriate, the Department will forward the request with a recommendation to DHS to grant the waiver.  Do not request waivers from DHS attachés at post.

**b. (U)** The Department may request a waiver from DHS on its own initiative if it believes a waiver is appropriate under the circumstances in a case.  The Department will advise you whenever a waiver has been approved, and you must annotate the visa in accordance with 9 FAM 403.9-5.

AAUP-00456

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 98 of 406

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

## 9 FAM 302.6-2(E)  Unavailable

### 9 FAM 302.6-2(E)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

### 9 FAM 302.6-2(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-3  (U) ASSOCIATION WITH TERRORIST ORGANIZATIONS - INA 212(A)(3)(F)

## 9 FAM 302.6-3(A)  (U) Grounds

*(CT:VISA-1351;   08-27-2021)*

**(U)** INA 212(a)(3)(F) renders ineligible any applicant who the Secretary of State, after consultation with the Secretary of Homeland Security, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

## 9 FAM 302.6-3(B)  (U) Application

### 9 FAM 302.6-3(B)(1)  (U) Background and Summary

*(CT:VISA-1351;   08-27-2021)*

a. **(U)** INA 212(a)(3)(F) was added by Section 411(a)(2) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of October 26, 2001 (Public Law 107-56) (USA PATRIOT ACT).  Enacted after the terrorist attacks on September 11, 2001, it was proposed by the Executive Branch and modeled in part on former INA 212(a)(27) and (28) to expand the scope and provide a flexible legal basis for denying entry to applicants who have been associated with terrorist organizations and whose travel to the United States would be inconsistent with the welfare, safety, or security of the United States.

b. **(U)** INA 212(a)(3)(F) applies only if the Secretary of State, after consultation with the Secretary of Homeland Security, or Secretary of Homeland Security after consultation with the Secretary of State, determines that the applicant has been associated with a terrorist organization and intends while in the

AAUP-00457

Case 5:25-cv-06618-NW     Document 81-6     Filed 03/27/26     Page 99 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.  The Secretary of State's authority to make such a determination has not been delegated to consular officers.  Therefore, this provision can be used to deny visas only when such use is approved by the Department after a determination is made by the Secretary or an official to whom the Secretary's authority has been delegated.

## 9 FAM 302.6-3(B)(2)  (U) Recommending a Finding

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** The authority to determine whether an applicant is ineligible under INA 212(a)(3)(F) rests with the Secretary of State and the Secretary of Homeland Security, each in consultation with the other.  Accordingly, if you believe that an individual may be ineligible under this provision, you must refer the matter back to the Department for a decision.

b. **(U) Address the following in any request for a determination of ineligibility under this provision:**

   (1) **(U) Terrorist organization(s) involved:**

      (a) **(U)** If the organization involved has been designated as a foreign terrorist organization under INA 219 as a Terrorist Exclusion List (TEL) organization under INA 212(a)(3)(B)(vi)(II), under Executive Order 13224, or has been defined by INA 212(a)(3)(B)(vi)(III) as a Tier III terrorist organization, provide the name of the organization and note the relevant designation(s).  If an organization has not been designated under any of these authorities, you must explain why the organization is a terrorist organization and provide as much information as possible regarding the nature and structure of the organization and its activities.  Include information on the nature, timing, and relevant circumstances surrounding the organization's terrorist activities;

      (b) **(U)** "Terrorist Organization" is defined in INA 212(a)(3)(B)(vi) and references the definition of "engaged in terrorist activity" under INA 212(a)(3)(B)(iv);

   (2) **(U) Nature of the applicant's association:**  The association must be meaningful for an applicant to be ineligible under INA 212(a)(3)(F), so information concerning the following should be provided:

      (a) **(U)** The frequency, duration, and level of the applicant's contacts with the organization;

      (b) **(U)** The nature and purpose of the applicant's contacts with the organization; and

      (c) **(U)** The applicant's awareness of association.  Because terrorist organizations often operate in secret, you must provide your assessment of:

AAUP-00458

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 100 of 406

6/30/25, 3:18 PM        9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

(i)     **(U)** Whether the applicant knew or should have known that the organization was a terrorist organization (see 9 FAM 302.6-2(B)(3) paragraph e above for relevant factors to consider);

(ii)    **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was a member, representative, or affiliate of a terrorist organization; and

(iii)   **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was engaged in terrorist activity;

(3)  **(U) Timeframe:** INA 212(a)(3)(F) applies to an applicant who "has been" associated with a terrorist organization, regardless of when that association occurred.  Therefore, an applicant whose association with a terrorist group occurred before enactment of INA 212(a)(3)(F) could be found ineligible.  On the other hand, the ineligibility can be triggered only if the applicant intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States.

(4)  **(U) Applicant's activities in the United States:**  Provide as much information as possible regarding the applicant's proposed activities in the United States and explain why these activities are cause for concern – i.e., why the determination required under subsection F should be made; and

(5)  **Unavailable**

## 9 FAM 302.6-3(B)(3)  (U) Findings

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** To find an applicant ineligible under INA 212(a)(3)(F), the Secretary of State or Secretary of Homeland Security, each in consultation with the other (or their delegates), must find:

(1)  **(U)** That the applicant has been associated with a terrorist organization; and

(2)  **(U)** That the applicant intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

b. **(U)** Within the Department, CA will normally take the lead in coordinating the necessary interagency consultations and ensuring that a determination, if made, is made by an appropriate Department official with delegated authority.  Generally, a determination will be made only if INA 212(a)(3)(B) is not applicable.

c. **(U)** The Department believes that "associated with" requires a meaningful association.  Generally, to be found ineligible, an applicant must have had contact over time with individuals who the applicant knew or should have

AAUP-00459

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 101 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

known were members or representatives of a terrorist organization.  A single meeting with a terrorist operative could be sufficient for finding that an applicant has been "associated with" a terrorist organization, however. However, the Department would most likely find an applicant was associated with a terrorist organization if the applicant had made a commitment at a single meeting with a known recruiter for a terrorist organization to act on the organization's behalf.

d. **(U)** A finding that an applicant "intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States" can be made in appropriate cases by inferring the necessary intent from the relevant facts and circumstances.  For example, an applicant who has extensive knowledge of explosives who has been meeting regularly with well-known members of a terrorist organization and seeks to travel to the United States could be found ineligible under INA 212(a)(3)(F).  Similarly, an applicant who has received flight training or has received counter-surveillance training from a terrorist organization (as defined in INA 212(a)(3)(B)(vi)) could be found to have such an intent based on these and other relevant facts, and therefore be found ineligible under INA 212(a)(3)(F).

e. **(U)** It is not necessary that the applicant intend to engage in activities that would be illegal or otherwise prohibited under the laws and regulations in the United States for the Department to find the applicant ineligible under INA 212(a)(3)(F).  For example, an applicant who intends to attend flight school in the United States – a lawful activity – could be found ineligible under INA 212(a)(3)(F) if the facts are sufficient to permit the Secretary or their delegate to determine that the applicant has been associated with a terrorist organization and that the applicant's attendance at the flight school could endanger the security of the United States.

## 9 FAM 302.6-3(B)(4)  (U) Not a Permanent Bar

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

# 9 FAM 302.6-3(C)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

# 9 FAM 302.6-3(D)  (U) Waivers

## 9 FAM 302.6-3(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(F).

AAUP-00460

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 102 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

### 9 FAM 302.6-3(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** An INA 212(d)(3)(A) waiver is available for an NIV applicant found ineligible under INA 212(a)(3)(F).

## 9 FAM 302.6-3(E)  Unavailable

### 9 FAM 302.6-3(E)(1)  Unavailable

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

### 9 FAM 302.6-3(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-4  (U) SECTION 306 OF THE ENHANCED BORDER SECURITY AND VISA ENTRY REFORM ACT OF 2002 - 8 U.S.C. 1735 APPLICANTS FROM A STATE SPONSOR OF TERRORISM

## 9 FAM 302.6-4(A)  (U) Grounds

*(CT:VISA-1586;   07-26-2022)*

**(U)** Section 306 of the Enhanced Border Security and Visa Entry Reform Act of 2002 ("section 306"), 8 U.S.C. 1735, prohibits issuance of visas to NIV applicants from a state sponsor of terrorism unless the Secretary of State determines the applicant does not pose a threat to the safety and security of the United States.

## 9 FAM 302.6-4(B)  (U) Application

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

   (1)  **Unavailable**

AAUP-00461

Case 5:25-cv-06618-NW   Document 81-6   Filed 03/27/26   Page 103 of 406

6/30/25, 3:18 PM                9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

(2) **Unavailable**

(3) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

(4) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

# 9 FAM 302.6-4(C)  Unavailable

*(CT:VISA-1586;   07-26-2022)*

a. **Unavailable**

b. **Unavailable**

    (1) **Unavailable**

    (2) **Unavailable**

c. **Unavailable**

# 9 FAM 302.6-4(D)  (U) Waivers

## 9 FAM 302.6-4(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1586;   07-26-2022)*

**(U)** IV applicants are not subject to Section 306.

## 9 FAM 302.6-4(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an NIV applicant ineligible under Section 306.

# 9 FAM 302.6-4(E)  Unavailable

## 9 FAM 302.6-4(E)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

AAUP-00462

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 104 of 406

6/30/25, 3:18 PM          9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1…

## 9 FAM 302.6-4(E)(2)  Unavailable

*(CT:VISA-664;   08-22-2018)*

**Unavailable**

**UNCLASSIFIED (U)**

AAUP-00463

# EXHIBIT 215

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:   CA/VO)*

## 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

### 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

### 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

## 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

## 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

### 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1)  **Unavailable**

(2)  **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

AAUP-00464

(3)  **(U)** The visa has been physically removed from the passport in which it was issued; or

(4)  **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a.  **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b.  **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

(1)  **(U)** Notify the individual of the intention to revoke the visa;

(2)  **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3)  **(U)** Request the individual to present the travel document in which the visa was issued.

### 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a.  **(U) Informing Individual of Intent to Revoke Visa:**

AAUP-00465

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport.  You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

## 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c. **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

AAUP-00466

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See 9 FAM 402.8-8, Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

(1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

(2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

AAUP-00467

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c.  **Unavailable**

## 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;   11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;   10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1)  **(U)** Jeopardize an ongoing investigation;

(2)  **(U)** Prejudice an intended prosecution;

(3)  **(U)** Preclude apprehension of the subject in the United States;

(4)  **(U)** Put informants at risk; or

(5)  **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c.  **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

AAUP-00468

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

# 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

# 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

AAUP-00469

    (1)  **Unavailable**

    (2)  **Unavailable**

    (3)  **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:**  Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record.  Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years.  This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest.  This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle.  Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority.  Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## 9 FAM 403.11-5(C)  Unavailable

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

    (1)  **Unavailable**

    (2)  **Unavailable**

    (3)  **Unavailable**

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

AAUP-00470

## 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

**Unavailable**

(1)  **Unavailable**

(2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3)  **Unavailable**

(4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a. **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1)  **(U)** Canceled.  Adjusted;

(2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

(3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

(4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

(5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

(6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b. **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

AAUP-00471

## 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;   05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1)  **(U)** Counterfeit visa per testimony of individual (file number); or

(2)  **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

AAUP-00472

# EXHIBIT 216



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

April 16, 2025

Maureen Martin
School Code: BOS214F00162000
Harvard University
c/o Harvard International Office
1350 Massachusetts Ave., Rm. 864
Cambridge, MA  02138
Maureen_Martin@Harvard.edu

## Student and Exchange Visitor Program
## Student Records Request

It is a privilege to have foreign students attend Harvard University, not a guarantee. The United States Government understands that Harvard University relies heavily on foreign student funding from over 10,000 foreign students to build and maintain their substantial endowment. At the same time, your institution has created a hostile learning environment for Jewish students due to Harvard's failure to condemn antisemitism. As a reminder, President Donald J. Trump issued Executive Order 14188, which specifies that "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." EO 14188 (Jan 29, 2025).

The Student and Exchange Visitor Program (SEVP) regularly monitors SEVP-approved schools to determine their compliance with governing regulations, and to ensure the accuracy of information in the Student and Exchange Visitor Information System (SEVIS) for such institutions, and for the nonimmigrant students and exchange visitors attending school.  Your continued SEVP certification is contingent upon meeting the requirements of the U.S. Department of Homeland Security (DHS), set out in *Title 8 Code of Federal Regulations* (*8 CFR*).  SEVP may request information regarding nonimmigrant students from certified schools under *8 CFR § 214.3(g)(1)*. Your school must submit the following information to our office on or before April 30, 2025:

1. Provide relevant information regarding each student visa holder's known illegal activity, and whether the activity occurred on campus.
2. Provide relevant information regarding each student visa holder's known dangerous or violent activity, and whether the activity occurred on campus.
3. Provide relevant information regarding each student visa holder's known threats to other students or university personnel, and whether the activity occurred on campus.
4. Provide relevant information regarding each student visa holder's known deprivation of rights of other classmates or university personnel, and whether the activity occurred on campus.

AAUP-00473

Page 2 of 3
Harvard University- BOS214F00162000

5. Provide relevant information on whether any student visa holders have left Harvard University due to dangerous or violent activity or deprivation of rights, and whether the activity occurred on campus.
6. Provide relevant information on whether any student visa holders have had disciplinary actions taken as a result of making threats to other students or populations or participating in protests, which impacted their nonimmigrant student status.
7. Provide relevant information regarding each student visa holder's obstruction of the school's learning environment.
8. Provide relevant information regarding each student visa holder's maintenance of at least the minimum required coursework to maintain nonimmigrant student status.

Providing materially false, fictitious, or fraudulent information may subject you to criminal prosecution under *18 USC § 1001*. Other possible criminal and civil violations may be applicable.

SEVP uses the school's Principal Designated School Official (PDSO) as the main point of contact on any issues that relate to the school's compliance with the regulations, per *8 CFR § 214.3(l)(1)(ii)*. Therefore, any requests from SEVP with relation to compliance with the recordkeeping, retention, reporting and other requirements of paragraphs *(f)*, *(g)*, *(j)*, *(k)*, and *(l)* of *8 CFR § 214.3* must be submitted by the PDSO who must also sign the attached attestation statement. The attestation statement will certify the evidence was submitted by the PDSO.

Failure to comply with this Student Records Request will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*. Therefore, in the event the school fails to respond to this request within the timeframe provided above, SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal.

**Harvard University must confirm receipt of this request immediately via email at** SupportSEVP@ice.dhs.gov.

Any questions regarding this request may be sent to SEVP Support at SupportSEVP@ice.dhs.gov, subject line: **Question: Harvard University - BOS214F00162000 – Student Records Request.**

All requested evidence must be submitted at one time via e-mail to SupportSEVP@ice.dhs.gov, subject line: **Attention: Harvard University - BOS214F00162000 – Student Records Request.** SEVP cannot accept any documentation from a third-party server such as Dropbox or Google Drive. All documents submitted to SEVP should be in a Portable Document Format (PDF). Please visit this website for guidelines to submitting PDF documents.

Sincerely,

Kristi Noem
Secretary of Homeland Security

AAUP-00474

Page 3 of 3
Harvard University- BOS214F00162000

## Evidence Attestation Statement

I, _____, Primary Designated School Official (PDSO) of

_____, an institution certified by the Student and Exchange

Visitor Program (SEVP), attest the following is true:


As PDSO, I am the point of contact for any issues that relate to the school's compliance with the regulations relating to nonimmigrant students and SEVP-certified schools per 8 CFR § 214.3(l)(1)(ii). I understand SEVP may review my institution's certification at any time and may request documentation to establish my institution's eligibility for certification as well as review evidence and records for compliance with the regulations. I am responsible for any requests for documentation or evidence in connection with an out-of-cycle review on behalf of my institution.


Additionally, I attest:

- I have read, understood, and will comply with all federal regulations relating to nonimmigrant students;

- I am a citizen / lawful permanent resident of the United States and maintain copies of a passport, birth certificate and/or green card for myself and all DSOs employed by my institution. Additionally, copies of these documents are readily accessible and are available to the SEVP upon request;

- I understand that willful misstatements may constitute perjury (18 USC § 1621);

- I understand that providing materially false, fictitious, or fraudulent information may subject me to criminal prosecution under 18 USC § 1001. Other possible criminal and civil violations may also be applicable; and

- I prepared the evidence sent to SEVP in response to its Request for Student Records dated April 16, 2025.


_____            _____
Printed name of PDSO                        Signature of PDSO


_____
Date

AAUP-00475

# EXHIBIT 217

 **Homeland Security**

U.S. Department of Homeland Security

# 100 Days of Fighting Fake News

**Release Date:** April 30, 2025

*From Stories on Criminals to Statistics, DHS has been Holding the Media Accountable for Spreading Disinformation to the American people*

WASHINGTON— During President Trump's 100 days in office, the Department of Homeland Security published a non-exhaustive list of facts, to help set the record straight on numerous false and misleading stories that have spread around news coverage and social media.

The list can be found below:

## The Facts on Noteworthy Individuals Deported or Prevented from Entering the U.S.

- **The Deportation Of American Citizens**
  - The media has FALSELY claimed that ICE is deporting US citizen children of illegal aliens. This is false.
  - In both cases the mother made the determination to take her children with her back to Honduras.
  - DHS takes our responsibility to protect children seriously and will continue to work with federal law enforcement to ensure that children are safe and protected.
  - The Trump Administration is giving parents in this country illegally the opportunity to self-deport and take control of their departure process with the potential ability to return the legal, right way and come back to live the American dream. The CBP Home app is a free and easy way to self deport.
- **Kilmar Abrego Garcia - The "Maryland Man"**
  - Garcia is NOT an American citizen. He is a citizen of El Salvador who had been living in the country illegally.
  - In 2019, two courts – an immigration court and an appellate immigration court – ruled that he was not only a member of MS-13, but that he was in our country illegally. There was a deportation order for him dating back to 2019.
  - Further details about Garcia's history prove that he is far from innocent.
    - In 2020, his wife filed a petition for protection citing three separate instances of violence
    - In 2021, his wife filed for a restraining order against him due to domestic violence.
    - In 2022, Garcia was pulled over by Tennessee Highway Patrol with 8 people crammed into one car. Despite telling the officers that they were going on a trip from Houston, Texas to Temple Hills, Maryland, there was no sign of luggage in the car.
    - It was later revealed that the vehicle Garcia was driving during this stop was registered to another illegal alien who had been convicted of human trafficking, Jose Ramon Hernandez Reyes.
  - The media further claimed that the Supreme Court ordered the Trump Administration to return Garcia to the United States. This is another falsehood.
  - The Supreme Court unanimously overturned that judge's ruling but instead said that the United States should "facilitate" Garcia's return. This would only be possible if the government of El Salvador decided to return him, in which case the United States would have to provide transportation.
  - It's up to Salvadoran President Nayib Bukele and the government of El Salvador if they want to return him. But as President Bukele said during his Oval Office visit with President Trump, he has no intention of releasing a terrorist and sending him back to the United States.
  - When President Trump declared MS-13 a foreign terrorist organization, Abrego Garcia became no longer eligible for any form of immigration relief in the United States. He had a valid deportation order.
  - Furthermore, the Supreme Court also held that EVEN IF El Salvador returned this MS-13 member to the United States, we could deport him a second time. NO version of this legally ends with him ever living in the U.S., because he is a citizen of El Salvador.
  - The foreign policy of the United States is conducted by the President – not by a court – and no court in the United States has the power to conduct the foreign policy of the United States.
- **Dr. Rasha Alawieh - "The Brown University Assistant Professor"**
  - Dr. Rasha Alawieh was an assistant professor at Brown University. She was in the United States with an H-1B visa.
  - She was deported back to her home country of Lebanon after she admitted to attending the funeral of Hassan Nasrallah, a brutal terrorist who led Hezbollah and was responsible for killing hundreds of Americans.

AAUP-00476

- The media tried to portray Alawieh's case as an example of a "lawful immigrant" being deported. But they completely ignored her direct and alarming ties to radical Islamic terrorism, including her veneration of a dead terrorist leader.

- **Alfredo "Alex" Orellana - "The Caregiver"**
    - Alfredo "Alex" Orellana has multiple charges on his record from 2012 to 2019, including: distributing drugs, drug possession, assault and battery, failure to appear to court (twice), theft at the second degree, and larceny.
    - He has since been arrested and faces deportation.
    - The New York Times wrote a lengthy article on Orellana's case. Their article painted a picture of a loving 31-year-old caregiver who was the "best friend" of a 28-year-old autistic man. They also pointed to the fact that Orellana had a green card. The press tried to paint him as a victim who was a caretaker, despite violent charges on his record.

- **Jerce Reyes Barrios - "The Venezuelan Soccer Player"**
    - Jerce Reyes Barrios was in the United States illegally. He was a member of the vicious Tren de Aragua gang, and he was deported to El Salvador.
    - He has tattoos that are consistent with those indicating membership in the vicious Tren de Aragua gang.
    - His own social media indicates that he is a Tren de Aragua member.
    - That hasn't stopped the media, however. They tried to whip up a frenzy over this deported criminal gang member, publishing wild claims that he was deported because of a tattoo of a soccer team on his arm.
    - The facts are the facts. Our intelligence assessments go beyond just social media and tattoos. We are confident in our findings.

- **Nascimento Blair - "The Ex-Con"**
    - Blair was an illegal alien living in the United States who was tried and convicted for kidnapping and sentenced to 15 years in prison.
    - The New York Times published a fawning profile about this criminal illegal alien.
    - In 2008, he was ordered removed out of the country. However, because of the Biden administration's open border policies, this criminal illegal alien was released onto the streets of New York.
    - The Trump administration is putting the American people first by getting this criminal illegal alien off the streets and out of our country.

- **"The French Scientist Denied Entry Over His Political Views"**
    - In March, a French scientist was denied entry into the United States.
    - The researcher in question was in possession of confidential information on his electronic device from Los Alamos National Laboratory.
    - This was in clear violation of a non-disclosure agreement - something he admitted to taking without permission and attempted to conceal to authorities.
    - The mainstream media ran with the baseless narrative that this individual was blocked from entering the U.S. because of social media posts that were critical of President Trump.
    - This lie was even echoed by France's Minister for Higher Education, Philippe Baptiste.
    - His political beliefs were not considered at all in his removal.

- **Marie Lepère and Charlotte Pohl – "German Tourists Turned Away on Vacation"**
    - Two German tourists were denied entry after attempting to enter the U.S. under false pretenses.
    - Both claimed they were touring California but later admitted that they intended to work.
    - One used a Visitor visa, while the other used the Visa Waiver Program. Under U.S. immigration laws, work is prohibited for these visas.
    - The media version of events depicted two young women who tried to go on a five-week backpacking trip through the United States. The media claimed that the two – aged 18 and 19 – were "deported" because they simply wanted to go on a fun, loosely-planned trip.
    - These travelers weren't deported—they were denied entry. And the reason for their removal was visa fraud, not because of the planning nature of their so-called "vacation."

- **Jose Hermosillo – "The American Citizen Detained by Border Patrol"**
    - Hermosillo turned himself in to immigration authorities on April 8. He approached Border Patrol in Tucson, Arizona and declared that he had entered the U.S. illegally.
    - He completed a sworn statement identifying as a Mexican citizen who had entered unlawfully. He was processed and appeared in court on April 11. Afterwards, he was held by the U.S. Marshals in Florence, Arizona.
    - A few days later, his family presented documents showing U.S. citizenship. The charges were dismissed, and he was released to his family.
    - The media, instead of reporting the facts, created a false and baseless story that an American citizen was illegally detained.
    - Hermosillio's arrest was the direct action of his own actions and statements. When his citizenship was confirmed, he was promptly released back to his family.

- **Kseniia Petrova - "The Russian Scientist Trying to Cure Cancer"**
    - Kseniia Petrova, a Russian researcher working for Harvard University, was lawfully detained after lying to federal officers about carrying substances into the country. A subsequent K9 inspection uncovered undeclared petri dishes, containers of unknown substances, and loose vials of embryonic frog cells, all without proper permits.
    - Messages found on her phone revealed she planned to smuggle the materials through customs without declaring them.
    - She knowingly broke the law and took deliberate steps to evade it.
    - But upon her detainment, the media rushed to defend her by claiming that her research could help to cure cancer.

AAUP-00477

- The facts of the matter are simple: Petrova broke the law and actively planned to do so. Her research does not make her exempt from the laws of our country.
- **Renato Subotic – "The MMA Coach"**
  - Subotic is an MMA coach who entered the United States under a visa waiver program that prohibits compensation – only travel reimbursements are allowed.
  - When Subotic was detained under American law, the media claimed that he was thrown in prison and deported for no real reason. Here are the facts: Subotic couldn't meet the requirement to prove he wasn't being compensated for participating at a high-dollar, multi-day event.
  - The law is clear: the burden of proof is on the traveler. Since he couldn't provide detailed answers or the necessary documentation for compensation related to the work event, he was held until the next available flight out the following day.
- **Ricardo Jesus Prada Vasquez – The "Disappearing" Delivery Driver**
  - Yet again, the media has manufactured a fake controversy on behalf of a terrorist gang member and criminal illegal alien.
  - Ricardo Jesus Prada Vasquez is a Venezuelan national and confirmed member of Tren De Aragua. He entered the United States illegally on November 29, 2024 at the Brownsville, Texas Port of Entry via the CBP One App.
  - The Biden administration, like it did with so many other dangerous criminals, released Prada Vasquez back into the United States.
  - On January 15th, Prada was encountered trying to enter the U.S. from Canada. He was detained, investigated, and confirmed as a member of TDA and a public safety threat. On February 27, a judge ordered him removed from the U.S. He was then removed to El Salvador.
  - The media, however, has falsely claimed that Prada Vasquez was an innocent delivery driver who was "disappeared" by the government.
  - Prada Vasquez was living and working in the U.S. illegally, he was a member of a criminal gang designated as a terrorist organization, and was deported with full compliance with American law.
- **Jeanette Vizguerra – "The Activist Who Needed Sanctuary"**
  - Jeanette Vizguerra is a convicted criminal alien from Mexico who has a final order of deportation issued by a federal immigration judge. She illegally entered the United States near El Paso, Texas, on Dec. 24, 1997, and has received legal due process in U.S. immigration court.
  - The media, however, has tried to turn her into a martyr. They claim she was an "activist" who needed "sanctuary." In reality, she getting famous and making money for breaking the law.
  - Under President Trump, this is a nation of laws. We will find, arrest, and deport illegal aliens, no matter how famous the media thinks they are.
  - Vizguerra was in the United States illegally. She was convicted of breaking the law. She was deported.
  - If you come to our country illegally, we will deport you, and you will never return. The safest option for illegal aliens is to self-deport, so they still have the opportunity to return and live the American dream.

## The Facts on Those Who Have Abused The Privilege of a Student Visa

- **Yunseo Chung – "The Columbia Student"**
  - Yunseo Chung, who was born in South Korea, is a Columbia University student who engaged in concerning conduct on-campus. This includes her being arrested by NYPD during a pro-Hamas protest at Barnard College.
- **Mahmoud Khalil - "The Activist Leader at Columbia"**
  - Mahmoud Khalil, a former Columbia University graduate student from Syria, is one of the ringleaders of the vicious, anti-American, anti-Semitic protests at Columbia University. His activities are aligned with Hamas, a designated terrorist organization.
  - On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Khalil.
  - But upon his arrest, radical student protesters at Columbia and across the country have attempted to turn him into a martyr, waving signs and banners bearing his likeness.
  - Taking over private buildings, inciting violence, harassing Jewish students, defacing buildings, and passing out terrorist propaganda do not constitute free speech.
  - A judge ruled that Khalil's deportation can move forward. He will be removed from our country.
- **Mohsen Mahdawi – "The Palestinian at Columbia University"**
  - Mahdawi is a Palestinian who has been living in the United States on a visa while he was studying at Columbia University.
  - Like many other anti-Israel student protesters, supporters in the media tried to claim that Mahdawi was a victim of political persecution. But his rhetoric on the war in Israel proves his terrorist sympathies.
  - In the wake of October 7, Mahdawi said he could empathize with Hamas's attack on Israel.
  - He appeared on "60 Minutes" justifying the massacre.
  - He organized and led pro-Hamas protests on Columbia University's campus, harassed Jewish students, and openly displayed his support for a terrorist organization.
- **Leqaa Kordia – "The Palestinian at Columbia University"**

AAUP-00478

- Leqaa Kordia was another Columbia Student who actively participated in anti-American, pro-terrorist activities on campus.
- However, her arrest had nothing to do with her radical activities.
- Kordia was arrested for immigration violations due to having overstayed her F-1 student visa, which had been terminated on January 26, 2022 for lack of attendance

- **Dogukan Gunaydin - "The University of Minnesota Student"**
    - Dogukan Gunaydin, a graduate student at the University of Minnesota, was arrested after a visa revocation by the State Dept. related to a prior criminal history for a DUI.
    - Contrary to the mainstream media's quick speculation that he was arrested due to his involvement in student protests, his protest activity had nothing to do with his detainment.

- **Badar Khan Suri – "The Georgetown Foreign Exchange Student"**
    - Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.
    - The media calls him a "scholar" who was innocent of any wrongdoing, even though he was married to the daughter of a senior advisor for to Hamas terrorist group.

- **Momodou Taal – "The Cornell University Student"**
    - Taal was unapologetic in his pro-terrorist views.
    - Taal, a foreign student studying at Cornell University, participated in pro-Hamas protests on campus.
    - He has a pinned post on his X profile that talks about a so-called "Zionist genocide," and also states "Long live the student intifada!"

## Other Fake News Narratives Corrected

- **The Biden Administration's inflated deportation numbers**
    - DHS uncovered what should be a massive scandal: the Biden administration was cooking the books on ICE arrest data. They were purposefully misleading the American public by categorizing individuals processed and released into the interior of the United States as ICE arrests.
    - Of course, the media ignored this fact. Instead, they falsely claimed that the Biden administration had carried out more arrests than the Trump administration.
    - Tens of thousands of cases recorded as "arrests" were, in fact, instances where illegal aliens were simply processed and released into American communities.
    - Many of these were violent criminals and gang members.
    - The previous administration counted these as arrests even though no immigration enforcement action was taken.
    - During fiscal year 2024, ICE made 113,431 arrests but the vast majority of those were what we call "pass-through" arrests.
    - They are called pass-through arrests because ICE didn't take enforcement actions against these aliens. They just passed through ICE before they were released in the U.S. interior and told to report to an ICE office.
    - None of the arrests made by ICE since January 20th are pass-through arrests.
    - The difference between recent arrests and those from Biden's last year is that, now we're taking enforcement actions against each and every illegal alien arrested.

- **ICE Boston Militia rumors:**
    - The media eagerly fed and spread a false social media rumor that an ICE agent who conducted arrests of criminal illegal aliens in New England was a "militia leader" from Arizona.
    - The reality? He is a federal law enforcement office who has worked with ICE to help keep New England communities safe for years.
    - This claim was not only false, but also inflammatory and places the safety of federal officers in jeopardy.
    - Our ICE officers are facing 300% increase in assaults while carrying out enforcement operations.

- **Due process and treatment rumors in CECOT:**
    - These aliens HAVE had due process – we have a stringent law enforcement assessment in place that abides by due process under the U.S. Constitution.
    - The reality is that prison isn't supposed to be fun. It's a necessary measure to protect society and punish bad guys. It is not meant to be comfortable.
    - What's more: prison can be avoided by self-deportation. CBP Home makes it simple and easy.
    - If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now.

- **DOGE and ICE allegedly collecting sensitive data from the Centers for Medicare and Medicaid Services**
    - The Biden administration flooded the U.S. with tens of millions of illegal immigrants, many of which are exploiting the American taxpayer by illegally getting Medicare and other benefits meant for law-abiding Americans.
    - President Trump consistently promised to protect Medicare for eligible beneficiaries.
    - To keep that promise, DOGE, CMS, and DHS are exploring an initiative to ensure that illegal aliens are not receiving these benefits not meant for them.

AAUP-00479

- The media claimed that ICE is working with the Department of Government Efficiency (DOGE) to access sensitive personal information in order to identify illegal aliens. These claims are meant to frighten the American people, when in reality this process is working to keep them and their benefits safe from exploitation by illegal aliens.

- **ICE HSI presence at schools**
  - ICE's Homeland Security Investigations (HSI) works relentlessly to protect Americans, especially children, who are put in danger by illegal alien activity. This includes investigations into potential child sex trafficking.
  - But the media has tried to spin their investigative work into the idea that they are going to elementary schools to arrest children.
  - **HD Cooke Elementary School, Washington D.C.**
    - At the HD Cooke Elementary School in Washington D.C., ICE did not conduct any enforcement action at the school. HSI agents were present at the school unrelated to any kind of enforcement action.
  - **Russel Elementary and Lillian Elementary in Los Angeles:**
    - At two different elementary schools in Los Angeles, California, HSI officers were conducting wellness checks on children who arrived unaccompanied at the border. It had nothing to do with immigration enforcement.
  - DHS is leading efforts to conduct welfare checks on these children to ensure that they are safe and not being exploited, abused, and sex trafficked.
  - Unlike the previous administration, President Trump and Secretary Noem take the responsibility to protect children seriously and will continue to work with federal law enforcement to reunite children with their families.
  - In less than 70 days, Secretary Noem and Secretary Kennedy have already reunited nearly 5,000 unaccompanied children with a relative or safe guardian.

- **Immigrant children detained at Old McDonald Farm in New York**
  - In early April, a raid was carried out on a dairy farm in New York after the execution of a federal criminal warrant for an illegal alien in possession of + distributing child sexual abuse materials.
  - Upon the execution of the search warrant at Old McDonalds Farm in Sackets Harbor, New York, authorities encountered seven additional illegal aliens on the premises, including a mother and her three children. We immediately began conducting an investigation to ensure these children are not being sexually exploited.
  - But rather than address the very real evidence of child sexual abuse, the media chose to focus on the fact that a woman and her three children were taken into custody.
  - DHS takes its responsibility to protect children seriously and our ICE officers are working every day to remove pedophiles from American communities.

- **TDA members being identified via tattoos**
  - Some have claimed that DHS' assessments of TDA and other gang memberships are based solely on the tattoos that certain illegal aliens have.
  - DHS intelligence assessments go well beyond just gang affiliate tattoos and social media.
  - Tren De Aragua is one of the most violent and ruthless terrorist gangs on planet earth. They rape, maim, and murder for sport. President Trump and Secretary Noem will not allow criminal gangs to terrorize American citizens.
  - We are confident in our law enforcement's intelligence, and we aren't going to share intelligence reports and undermine national security every time a gang member denies he is one. That would be insane.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)

HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)    IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)    BORDER WALL (/KEYWORDS/BORDER-WALL)

CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

DEPARTMENT OF GOVERNMENT EFFICIENCY (DOGE) (/KEYWORDS/DEPARTMENT-GOVERNMENT-EFFICIENCY-DOGE)

DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)    DEPORTATION (/KEYWORDS/DEPORTATION)

HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 05/27/2025

AAUP-00480

# EXHIBIT 218



# Researchers@Brown (/)

(http://brown.edu)

❮ Back to search

Manage your Profile (https://vivo.brown.edu/manager)



# Nadje S Al-Ali

✉(mailto:nadje_al-ali@brown.edu)

Overview

Publications

Research

Background

Affiliations

Teaching

View All

Curriculum Vitae [PDF](http://vivo.brown.edu/docs/n/nalali_cv.pdf?dt=460315214)

# Robert Family Professor of International Studies, Professor of

# EXHIBIT 219

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1182

§ 1182. Inadmissible aliens

Currentness

**(a) Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1) Health-related grounds**

**(A) In general**

Any alien--

**(i)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1]

**(ii)** except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

**(iii)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)--

**(I)** to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

**(II)** to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

**(iv)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

**(B) Waiver authorized**

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

**(C) Exception from immunization requirement for adopted children 10 years of age or younger**

Clause (ii) of subparagraph (A) shall not apply to a child who--

**(i)** is 10 years of age or younger,

**(ii)** is described in subparagraph (F) or (G) of section 1101(b)(1) of this title;[1] and

**(iii)** is seeking an immigrant visa as an immediate relative under section 1151(b) of this title,

if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

**(2) Criminal and related grounds**

**(A) Conviction of certain crimes**

**(i) In general**

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

**(I)** a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

**(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

**(ii) Exception**

Clause (i)(I) shall not apply to an alien who committed only one crime if--

**(I)** the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

**(II)** the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

**(B) Multiple criminal convictions**

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

**(C) Controlled substance traffickers**

Any alien who the consular officer or the Attorney General knows or has reason to believe--

**(i)** is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

**(ii)** is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

**(D) Prostitution and commercialized vice**

Any alien who--

**(i)** is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

**(ii)** directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

**(iii)** is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

is inadmissible.

**(E) Certain aliens involved in serious criminal activity who have asserted immunity from prosecution**

Any alien--

**(i)** who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

**(ii)** for whom immunity from criminal jurisdiction was exercised with respect to that offense,

**(iii)** who as a consequence of the offense and exercise of immunity has departed from the United States, and

**(iv)** who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

is inadmissible.

**(F) Waiver authorized**

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

**(G) Foreign government officials who have committed particularly severe violations of religious freedom**

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of Title 22, is inadmissible.

**(H) Significant traffickers in persons**

**(i) In general**

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General

knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 7102 of Title 22, is inadmissible.

**(ii) Beneficiaries of trafficking**

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

**(iii) Exception for certain sons and daughters**

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

**(I) Money laundering**

Any alien--

**(i)** who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of Title 18 (relating to laundering of monetary instruments); or

**(ii)** who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

is inadmissible.

**(3) Security and related grounds**

**(A) In general**

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in--

**(i)** any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

**(ii)** any other unlawful activity, or

**(iii)** any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is inadmissible.

**(B) Terrorist activities**

**(i) In general**

Any alien who--

**(I)** has engaged in a terrorist activity;

**(II)** a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

**(III)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

**(IV)** is a representative (as defined in clause (v)) of--

**(aa)** a terrorist organization (as defined in clause (vi)); or

**(bb)** a political, social, or other group that endorses or espouses terrorist activity;

**(V)** is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

**(VI)** is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(VII)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

**(VIII)** has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

**(IX)** is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

**(ii) Exception**

Subclause (IX) of clause (i) does not apply to a spouse or child--

**(I)** who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

**(II)** whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

**(iii) "Terrorist activity" defined**

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

**(I)** The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

**(II)** The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

**(III)** A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

**(IV)** An assassination.

**(V)** The use of any--

**(a)** biological agent, chemical agent, or nuclear weapon or device, or

**(b)** explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

**(VI)** A threat, attempt, or conspiracy to do any of the foregoing.

**(iv) "Engage in terrorist activity" defined**

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

**(I)** to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

**(II)** to prepare or plan a terrorist activity;

**(III)** to gather information on potential targets for terrorist activity;

**(IV)** to solicit funds or other things of value for--

**(aa)** a terrorist activity;

**(bb)** a terrorist organization described in clause (vi)(I) or (vi)(II); or

**(cc)** a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(V)** to solicit any individual--

**(aa)** to engage in conduct otherwise described in this subsection;

**(bb)** for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

**(cc)** for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

**(VI)** to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

**(aa)** for the commission of a terrorist activity;

**(bb)** to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

**(cc)** to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

**(dd)** to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

**(v) "Representative" defined**

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

**(vi) "Terrorist organization" defined**

As used in this section, the term "terrorist organization" means an organization--

**(I)** designated under section 1189 of this title;

**(II)** otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

**(III)** that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

**(C) Foreign policy**

**(i) In general**

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible.

**(ii) Exception for officials**

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

**(iii) Exception for other aliens**

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

**(iv) Notification of determinations**

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

**(D) Immigrant membership in totalitarian party**

**(i) In general**

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

**(ii) Exception for involuntary membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

**(iii) Exception for past membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that--

**(I)** the membership or affiliation terminated at least--

**(a)** 2 years before the date of such application, or

**(b)** 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

**(II)** the alien is not a threat to the security of the United States.

**(iv) Exception for close family members**

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

**(E) Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

**(i) Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with--

**(I)** the Nazi government of Germany,

**(II)** any government in any area occupied by the military forces of the Nazi government of Germany,

**(III)** any government established with the assistance or cooperation of the Nazi government of Germany, or

**(IV)** any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

**(ii) Participation in genocide**

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of Title 18, is inadmissible.

**(iii) Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of--

**(I)** any act of torture, as defined in section 2340 of Title 18; or

**(II)** under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note),

is inadmissible.

**(F) Association with terrorist organizations**

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

**(G) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is inadmissible.

**(4) Public charge**

**(A) In general**

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

**(B) Factors to be taken into account**

**(i)** In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's--

**(I)** age;

**(II)** health;

**(III)** family status;

**(IV)** assets, resources, and financial status; and

**(V)** education and skills.

**(ii)** In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph.

**(C) Family-sponsored immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1151(b)(2) or 1153(a) of this title is inadmissible under this paragraph unless--

(i) the alien has obtained--

(I) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 1154(a)(1)(A) of this title;

(II) classification pursuant to clause (ii) or (iii) of section 1154(a)(1)(B) of this title; or

(III) classification or status as a VAWA self-petitioner; or

(ii) the person petitioning for the alien's admission (and any additional sponsor required under section 1183a(f) of this title or any alternative sponsor permitted under paragraph (5)(B) of such section) has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(D) Certain employment-based immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1153(b) of this title by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible under this paragraph unless such relative has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(E) Special rule for qualified alien victims**

Subparagraphs (A), (B), and (C) shall not apply to an alien who--

(i) is a VAWA self-petitioner;

(ii) is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U) of this title; or

(iii) is a qualified alien described in section 1641(c) of this title.

**(5) Labor certification and qualifications for certain immigrants**

**(A) Labor certification**

**(i) In general**

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--

**(I)** there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

**(II)** the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

**(ii) Certain aliens subject to special rule**

For purposes of clause (i)(I), an alien described in this clause is an alien who--

**(I)** is a member of the teaching profession, or

**(II)** has exceptional ability in the sciences or the arts.

**(iii) Professional athletes**

**(I) In general**

A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

**(II) "Professional athlete" defined**

For purposes of subclause (I), the term "professional athlete" means an individual who is employed as an athlete by--

**(aa)** a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

**(bb)** any minor league team that is affiliated with such an association.

**(iv) Long delayed adjustment applicants**

A certification made under clause (i) with respect to an individual whose petition is covered by section 1154(j) of this title shall remain valid with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued.

**(B) Unqualified physicians**

An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession is inadmissible, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C) Uncertified foreign health-care workers**

Subject to subsection (r), any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that--

**(i)** the alien's education, training, license, and experience--

**(I)** meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

**(II)** are comparable with that required for an American health-care worker of the same type; and

**(III)** are authentic and, in the case of a license, unencumbered;

**(ii)** the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

**(iii)** if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.

**(D) Application of grounds**

The grounds for inadmissibility of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph (2) or (3) of section 1153(b) of this title.

**(6) Illegal entrants and immigration violators**

**(A) Aliens present without admission or parole**

**(i) In general**

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

**(ii) Exception for certain battered women and children**

Clause (i) shall not apply to an alien who demonstrates that--

**(I)** the alien is a VAWA self-petitioner;

**(II)** (a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

**(III)** there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

**(B) Failure to attend removal proceeding**

Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.

**(C) Misrepresentation**

**(i) In general**

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

**(ii) Falsely claiming citizenship**

**(I) In general**

Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

**(II) Exception**

In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (i).

**(D) Stowaways**

Any alien who is a stowaway is inadmissible.

**(E) Smugglers**

**(i) In general**

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged,

induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

### (iii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(11).

## (F) Subject of civil penalty

### (i) In general

An alien who is the subject of a final order for violation of section 1324c of this title is inadmissible.

### (ii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(12).

## (G) Student visa abusers

An alien who obtains the status of a nonimmigrant under section 1101(a)(15)(F)(i) of this title and who violates a term or condition of such status under section 1184(l) of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.

# (7) Documentation requirements

## (A) Immigrants

### (i) In general

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission--

**(I)** who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

**(II)** whose visa has been issued without compliance with the provisions of section 1153 of this title,

is inadmissible.

### (ii) Waiver authorized

For provision authorizing waiver of clause (i), see subsection (k).

### (B) Nonimmigrants

#### (i) In general

Any nonimmigrant who--

**(I)** is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

**(II)** is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

is inadmissible.

#### (ii) General waiver authorized

For provision authorizing waiver of clause (i), see subsection (d)(4).

#### (iii) Guam and Northern Mariana Islands visa waiver

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (l).

#### (iv) Visa waiver program

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

## (8) Ineligible for citizenship

### (A) In general

Any immigrant who is permanently ineligible to citizenship is inadmissible.

### (B) Draft evaders

Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency is inadmissible, except

that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

**(9) Aliens previously removed**

**(A) Certain aliens previously removed**

**(i) Arriving aliens**

Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(ii) Other aliens**

Any alien not described in clause (i) who--

**(I)** has been ordered removed under section 1229a of this title or any other provision of law, or

**(II)** departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(iii) Exception**

Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

**(B) Aliens unlawfully present**

**(i) In general**

Any alien (other than an alien lawfully admitted for permanent residence) who--

**(I)** was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) [2] of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

**(II)** has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

**(ii) Construction of unlawful presence**

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

**(iii) Exceptions**

**(I) Minors**

No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(II) Asylees**

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

**(III) Family unity**

No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(IV) Battered women and children**

Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if "violation of the terms of the alien's nonimmigrant visa" were substituted for "unlawful entry into the United States" in subclause (III) of that paragraph.

**(V) Victims of a severe form of trafficking in persons**

Clause (i) shall not apply to an alien who demonstrates that the severe form of trafficking (as that term is defined in section 7102 of Title 22) was at least one central reason for the alien's unlawful presence in the United States.

**(iv) Tolling for good cause**

In the case of an alien who--

**(I)** has been lawfully admitted or paroled into the United States,

**(II)** has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

**(III)** has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

### (v) Waiver

The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

### (C) Aliens unlawfully present after previous immigration violations

#### (i) In general

Any alien who--

**(I)** has been unlawfully present in the United States for an aggregate period of more than 1 year, or

**(II)** has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

#### (ii) Exception

Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

#### (iii) Waiver

The Secretary of Homeland Security may waive the application of clause (i) in the case of an alien who is a VAWA self-petitioner if there is a connection between--

**(I)** the alien's battering or subjection to extreme cruelty; and

**(II)** the alien's removal, departure from the United States, reentry or reentries into the United States; or attempted reentry into the United States.

**(10) Miscellaneous**

**(A) Practicing polygamists**

Any immigrant who is coming to the United States to practice polygamy is inadmissible.

**(B) Guardian required to accompany helpless alien**

Any alien--

**(i)** who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 1222(c) of this title, and

**(ii)** whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.

**(C) International child abduction**

**(i) In general**

Except as provided in clause (ii), any alien who, after entry of an order by a court in the United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, is inadmissible until the child is surrendered to the person granted custody by that order.

**(ii) Aliens supporting abductors and relatives of abductors**

Any alien who--

**(I)** is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

**(II)** is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

**(III)** is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

**(iii) Exceptions**

Clauses (i) and (ii) shall not apply--

**(I)** to a government official of the United States who is acting within the scope of his or her official duties;

**(II)** to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

**(III)** so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

**(D) Unlawful voters**

**(i) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible.

**(ii) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such violation.

**(E) Former citizens who renounced citizenship to avoid taxation**

Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is inadmissible.

**(b) Notices of denials**

**(1)** Subject to paragraphs (2) and (3), if an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be inadmissible under subsection (a), the officer shall provide the alien with a timely written notice that--

   **(A)** states the determination, and

   **(B)** lists the specific provision or provisions of law under which the alien is inadmissible or adjustment [3] of status.

**(2)** The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of inadmissible aliens.

**(3)** Paragraph (1) does not apply to any alien inadmissible under paragraph (2) or (3) of subsection (a).

**(c) Repealed. Pub.L. 104-208, Div. C, Title III, § 304(b), Sept. 30, 1996, 110 Stat. 3009-597**

**(d) Temporary admission of nonimmigrants**

**(1)** The Attorney General shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(S) of this title. The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(S) of this title, if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting removal proceedings against an alien admitted as a nonimmigrant under section 1101(a)(15)(S) of this title for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 1101(a)(15)(S) of this title.

**(2)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(3)(A)** Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds

as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

**(B)(i)** The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II), no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi), and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. Such a determination shall neither prejudice the ability of the United States Government to commence criminal or civil proceedings involving a beneficiary of such a determination or any other person, nor create any substantive or procedural right or benefit for a beneficiary of such a determination or any other person. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D). The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.

**(ii)** Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.

**(4)** Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands and residents thereof having a common nationality with such nationals, or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 1223(c) of this title.

**(5)(A)** The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**(B)** The Secretary of Homeland Security may not parole into the United States an alien who is a refugee unless the Secretary of Homeland Security determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

**(C)** The attorney general of a State, or other authorized State officer, alleging a violation of the limitation under subparagraph (A) that parole solely be granted on a case-by-case basis and solely for urgent humanitarian reasons or a significant public benefit, that harms such State or its residents shall have standing to bring an action against the Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subparagraph to the greatest extent practicable. For purposes of this subparagraph, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.

**(6)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(7)** The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, the Commonwealth of the Northern Mariana Islands, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. [4] Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed in the manner provided by section 1231(c) of this title.

**(8)** Upon a basis of reciprocity accredited officials of foreign governments, their immediate families, attendants, servants, and personal employees may be admitted in immediate and continuous transit through the United States without regard to the provisions of this section except paragraphs (3)(A), (3)(B), (3)(C), and (7)(B) of subsection (a) of this section.

**(9), (10)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(11)** The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of removal, and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title and in the case of an alien seeking admission or adjustment of status as an immediate relative or immigrant under section 1153(a) of this title (other than paragraph (4) thereof), if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of such action was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(12)** The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)--

  **(A)** in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title, and

  **(B)** in the case of an alien seeking admission or adjustment of status under section 1151(b)(2)(A) of this title or under section 1153(a) of this title,

if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.

**(13)(A)** The Secretary of Homeland Security shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(T) of this title, except that the ground for inadmissibility described in subsection (a)(4) shall not apply with respect to such a nonimmigrant.

**(B)** In addition to any other waiver that may be available under this section, in the case of a nonimmigrant described in section 1101(a)(15)(T) of this title, if the Secretary of Homeland Security considers it to be in the national interest to do so, the Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of--

**(i)** subsection (a)(1); and

**(ii)** any other provision of subsection (a) (excluding paragraphs (3), (4), (10)(C), and (10(E)) [6] if the activities rendering the alien inadmissible under the provision were caused by, or were incident to, the victimization described in section 1101(a)(15)(T)(i)(I) of this title.

**(14)** The Secretary of Homeland Security shall determine whether a ground of inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(U) of this title. The Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(U) of this title, if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

**(e) Educational visitor status; foreign residence requirement; waiver**

No person admitted under section 1101(a)(15)(J) of this title or acquiring such status after admission (i) whose participation in the program for which he came to the United States was financed in whole or in part, directly or indirectly, by an agency of the Government of the United States or by the government of the country of his nationality or his last residence, (ii) who at the time of admission or acquisition of status under section 1101(a)(15)(J) of this title was a national or resident of a country which the Director of the United States Information Agency, pursuant to regulations prescribed by him, had designated as clearly requiring the services of persons engaged in the field of specialized knowledge or skill in which the alien was engaged, or (iii) who came to the United States or acquired such status in order to receive graduate medical education or training, shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa under section 1101(a)(15)(H) or section 1101(a)(15)(L) of this title until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States: *Provided,* That upon the favorable recommendation of the Director, pursuant to the request of an interested United States Government agency (or, in the case of an alien described in clause (iii), pursuant to the request of a State Department of Public Health, or its equivalent), or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), or that the alien cannot return to the country of his nationality or last residence because he would be subject to persecution on account of race, religion, or political opinion, the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest except that in the case of a waiver requested by a State Department of Public Health, or its equivalent, or

in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii), the waiver shall be subject to the requirements of section 1184(l) of this title: *And provided further,* That, except in the case of an alien described in clause (iii), the Attorney General may, upon the favorable recommendation of the Director, waive such two-year foreign residence requirement in any case in which the foreign country of the alien's nationality or last residence has furnished the Director a statement in writing that it has no objection to such waiver in the case of such alien.

**(f) Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**(g) Bond and conditions for admission of alien inadmissible on health-related grounds**

The Attorney General may waive the application of--

**(1)** subsection (a)(1)(A)(i) in the case of any alien who--

**(A)** is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa,

**(B)** has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa; or

**(C)** is a VAWA self-petitioner,

in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

**(2)** subsection (a)(1)(A)(ii) in the case of any alien--

**(A)** who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

**(B)** for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

**(C)** under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

**(3)** subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.

**(h) Waiver of subsection (a)(2)(A)(i)(I), (II), (B), (D), and (E)**

The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if--

**(1)(A)** in the case of any immigrant it is established to the satisfaction of the Attorney General that--

**(i)** the alien is inadmissible only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is inadmissible occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status,

**(ii)** the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

**(iii)** the alien has been rehabilitated; or

**(B)** in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; or

**(C)** the alien is a VAWA self-petitioner; and

**(2)** the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

No waiver shall be provided under this subsection in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture. No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the

United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.

**(i) Admission of immigrant inadmissible for fraud or willful misrepresentation of material fact**

**(1)** The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

**(2)** No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).

**(j) Limitation on immigration of foreign medical graduates**

**(1)** The additional requirements referred to in section 1101(a)(15)(J) of this title for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

**(A)** A school of medicine or of one of the other health professions, which is accredited by a body or bodies approved for the purpose by the Secretary of Education, has agreed in writing to provide the graduate medical education or training under the program for which the alien is coming to the United States or to assume responsibility for arranging for the provision thereof by an appropriate public or nonprofit private institution or agency, except that, in the case of such an agreement by a school of medicine, any one or more of its affiliated hospitals which are to participate in the provision of the graduate medical education or training must join in the agreement.

**(B)** Before making such agreement, the accredited school has been satisfied that the alien (i) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States); or (ii)(I) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services), (II) has competency in oral and written English, (III) will be able to adapt to the educational and cultural environment in which he will be receiving his education or training, and (IV) has adequate prior education and training to participate satisfactorily in the program for which he is coming to the United States. For the purposes of this subparagraph, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners examination if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C)** The alien has made a commitment to return to the country of his nationality or last residence upon completion of the education or training for which he is coming to the United States, and the government of the country of his nationality or last residence has provided a written assurance, satisfactory to the Secretary of Health and Human Services, that there is a need in that country for persons with the skills the alien will acquire in such education or training.

**(D)** The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's admission into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that--

**(i)** such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

**(ii)** the alien may, once and not later than two years after the date the alien is admitted to the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

**(E)** The alien furnishes the Attorney General each year with an affidavit (in such form as the Attorney General shall prescribe) that attests that the alien (i) is in good standing in the program of graduate medical education or training in which the alien is participating, and (ii) will return to the country of his nationality or last residence upon completion of the education or training for which he came to the United States.

**(2)** An alien who is a graduate of a medical school and who is coming to the United States to perform services as a member of the medical profession may not be admitted as a nonimmigrant under section 1101(a)(15)(H)(i)(b) of this title unless--

**(A)** the alien is coming pursuant to an invitation from a public or nonprofit private educational or research institution or agency in the United States to teach or conduct research, or both, at or for such institution or agency, or

**(B)(i)** the alien has passed the Federation licensing examination (administered by the Federation of State Medical Boards of the United States) or an equivalent examination as determined by the Secretary of Health and Human Services, and

**(ii)** (I) has competency in oral and written English or (II) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States).

**(3)** Omitted

**(k) Attorney General's discretion to admit otherwise inadmissible aliens who possess immigrant visas**

Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside

foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

**(l) Guam and Northern Mariana Islands visa waiver program**

**(1) In general**

The requirement of subsection (a)(7)(B)(i) may be waived by the Secretary of Homeland Security, in the case of an alien applying for admission as a nonimmigrant visitor for business or pleasure and solely for entry into and stay in Guam or the Commonwealth of the Northern Mariana Islands for a period not to exceed 45 days, if the Secretary of Homeland Security, after consultation with the Secretary of the Interior, the Secretary of State, the Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands, determines that--

**(A)** an adequate arrival and departure control system has been developed in Guam and the Commonwealth of the Northern Mariana Islands; and

**(B)** such a waiver does not represent a threat to the welfare, safety, or security of the United States or its territories and commonwealths.

**(2) Alien waiver of rights**

An alien may not be provided a waiver under this subsection unless the alien has waived any right--

**(A)** to review or appeal under this chapter an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam or the Commonwealth of the Northern Mariana Islands; or

**(B)** to contest, other than on the basis of an application for withholding of removal under section 1231(b)(3) of this title or under the Convention Against Torture, or an application for asylum if permitted under section 1158 of this title, any action for removal of the alien.

**(3) Regulations**

All necessary regulations to implement this subsection shall be promulgated by the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, on or before the 180th day after May 8, 2008. The promulgation of such regulations shall be considered a foreign affairs function for purposes of section 553(a) of Title 5. At a minimum, such regulations should include, but not necessarily be limited to--

**(A)** a listing of all countries whose nationals may obtain the waiver also provided by this subsection, except that such regulations shall provide for a listing of any country from which the Commonwealth has received a significant economic benefit from the number of visitors for pleasure within the one-year period preceding May 8, 2008, unless the Secretary of Homeland Security determines that such country's inclusion on such list would represent a threat to the welfare, safety, or security of the United States or its territories; and

**(B)** any bonding requirements for nationals of some or all of those countries who may present an increased risk of overstays or other potential problems, if different from such requirements otherwise provided by law for nonimmigrant visitors.

**(4) Factors**

In determining whether to grant or continue providing the waiver under this subsection to nationals of any country, the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, shall consider all factors that the Secretary deems relevant, including electronic travel authorizations, procedures for reporting lost and stolen passports, repatriation of aliens, rates of refusal for nonimmigrant visitor visas, overstays, exit systems, and information exchange.

**(5) Suspension**

The Secretary of Homeland Security shall monitor the admission of nonimmigrant visitors to Guam and the Commonwealth of the Northern Mariana Islands under this subsection. If the Secretary determines that such admissions have resulted in an unacceptable number of visitors from a country remaining unlawfully in Guam or the Commonwealth of the Northern Mariana Islands, unlawfully obtaining entry to other parts of the United States, or seeking withholding of removal or asylum, or that visitors from a country pose a risk to law enforcement or security interests of Guam or the Commonwealth of the Northern Mariana Islands or of the United States (including the interest in the enforcement of the immigration laws of the United States), the Secretary shall suspend the admission of nationals of such country under this subsection. The Secretary of Homeland Security may in the Secretary's discretion suspend the Guam and Northern Mariana Islands visa waiver program at any time, on a country-by-country basis, for other good cause.

**(6) Addition of countries**

The Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands may request the Secretary of the Interior and the Secretary of Homeland Security to add a particular country to the list of countries whose nationals may obtain the waiver provided by this subsection, and the Secretary of Homeland Security may grant such request after consultation with the Secretary of the Interior and the Secretary of State, and may promulgate regulations with respect to the inclusion of that country and any special requirements the Secretary of Homeland Security, in the Secretary's sole discretion, may impose prior to allowing nationals of that country to obtain the waiver provided by this subsection.

**(m) Requirements for admission of nonimmigrant nurses**

**(1)** The qualifications referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to an alien who is coming to the United States to perform nursing services for a facility, are that the alien--

**(A)** has obtained a full and unrestricted license to practice professional nursing in the country where the alien obtained nursing education or has received nursing education in the United States;

**(B)** has passed an appropriate examination (recognized in regulations promulgated in consultation with the Secretary of Health and Human Services) or has a full and unrestricted license under State law to practice professional nursing in the State of intended employment; and

**(C)** is fully qualified and eligible under the laws (including such temporary or interim licensing requirements which authorize the nurse to be employed) governing the place of intended employment to engage in the practice of professional nursing as a registered nurse immediately upon admission to the United States and is authorized under such laws to be employed by the facility.

**(2)(A)** The attestation referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to a facility for which an alien will perform services, is an attestation as to the following:

**(i)** The facility meets all the requirements of paragraph (6).

**(ii)** The employment of the alien will not adversely affect the wages and working conditions of registered nurses similarly employed.

**(iii)** The alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.

**(iv)** The facility has taken and is taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants who are authorized to perform nursing services, in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses.

**(v)** There is not a strike or lockout in the course of a labor dispute, the facility did not lay off and will not lay off a registered nurse employed by the facility within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition, and the employment of such an alien is not intended or designed to influence an election for a bargaining representative for registered nurses of the facility.

**(vi)** At the time of the filing of the petition for registered nurses under section 1101(a)(15)(H)(i)(c) of this title, notice of the filing has been provided by the facility to the bargaining representative of the registered nurses at the facility or, where there is no such bargaining representative, notice of the filing has been provided to the registered nurses employed at the facility through posting in conspicuous locations.

**(vii)** The facility will not, at any time, employ a number of aliens issued visas or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title that exceeds 33 percent of the total number of registered nurses employed by the facility.

**(viii)** The facility will not, with respect to any alien issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title--

**(I)** authorize the alien to perform nursing services at any worksite other than a worksite controlled by the facility; or

**(II)** transfer the place of employment of the alien from one worksite to another.

Nothing in clause (iv) shall be construed as requiring a facility to have taken significant steps described in such clause before November 12, 1999. A copy of the attestation shall be provided, within 30 days of the date of filing, to registered nurses employed at the facility on the date of filing.

**(B)** For purposes of subparagraph (A)(iv), each of the following shall be considered a significant step reasonably designed to recruit and retain registered nurses:

**(i)** Operating a training program for registered nurses at the facility or financing (or providing participation in) a training program for registered nurses elsewhere.

**(ii)** Providing career development programs and other methods of facilitating health care workers to become registered nurses.

**(iii)** Paying registered nurses wages at a rate higher than currently being paid to registered nurses similarly employed in the geographic area.

**(iv)** Providing reasonable opportunities for meaningful salary advancement by registered nurses.

The steps described in this subparagraph shall not be considered to be an exclusive list of the significant steps that may be taken to meet the conditions of subparagraph (A)(iv). Nothing in this subparagraph shall require a facility to take more than one step if the facility can demonstrate that taking a second step is not reasonable.

**(C)** Subject to subparagraph (E), an attestation under subparagraph (A)--

**(i)** shall expire on the date that is the later of--

**(I)** the end of the one-year period beginning on the date of its filing with the Secretary of Labor; or

**(II)** the end of the period of admission under section 1101(a)(15)(H)(i)(c) of this title of the last alien with respect to whose admission it was applied (in accordance with clause (ii)); and

**(ii)** shall apply to petitions filed during the one-year period beginning on the date of its filing with the Secretary of Labor if the facility states in each such petition that it continues to comply with the conditions in the attestation.

**(D)** A facility may meet the requirements under this paragraph with respect to more than one registered nurse in a single petition.

**(E)(i)** The Secretary of Labor shall compile and make available for public examination in a timely manner in Washington, D.C., a list identifying facilities which have filed petitions for nonimmigrants under section 1101(a)(15)(H)(i)(c) of this title and, for each such facility, a copy of the facility's attestation under subparagraph (A) (and accompanying documentation) and each such petition filed by the facility.

**(ii)** The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary). The Secretary shall conduct an investigation under this clause if there is reasonable cause to believe that a facility fails to meet conditions attested to. Subject to the time limits established under this clause, this subparagraph shall apply regardless of whether an attestation is expired or unexpired at the time a complaint is filed.

**(iii)** Under such process, the Secretary shall provide, within 180 days after the date such a complaint is filed, for a determination as to whether or not a basis exists to make a finding described in clause (iv). If the Secretary determines that such a basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint within 60 days of the date of the determination.

**(iv)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that a facility (for which an attestation is made) has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per nurse per violation, with the total penalty not to exceed $10,000 per violation) as the Secretary determines to be appropriate. Upon receipt of such notice, the Attorney General shall not approve petitions filed with respect to a facility during a period of at least one year for nurses to be employed by the facility.

**(v)** In addition to the sanctions provided for under clause (iv), if the Secretary of Labor finds, after notice and an opportunity for a hearing, that a facility has violated the condition attested to under subparagraph (A)(iii) (relating to payment of registered nurses at the prevailing wage rate), the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with such condition.

**(F)(i)** The Secretary of Labor shall impose on a facility filing an attestation under subparagraph (A) a filing fee, in an amount prescribed by the Secretary based on the costs of carrying out the Secretary's duties under this subsection, but not exceeding $250.

**(ii)** Fees collected under this subparagraph shall be deposited in a fund established for this purpose in the Treasury of the United States.

**(iii)** The collected fees in the fund shall be available to the Secretary of Labor, to the extent and in such amounts as may be provided in appropriations Acts, to cover the costs described in clause (i), in addition to any other funds that are available to the Secretary to cover such costs.

**(3)** The period of admission of an alien under section 1101(a)(15)(H)(i)(c) of this title shall be 3 years.

**(4)** The total number of nonimmigrant visas issued pursuant to petitions granted under section 1101(a)(15)(H)(i)(c) of this title in each fiscal year shall not exceed 500. The number of such visas issued for employment in each State in each fiscal year shall not exceed the following:

**(A)** For States with populations of less than 9,000,000, based upon the 1990 decennial census of population, 25 visas.

**(B)** For States with populations of 9,000,000 or more, based upon the 1990 decennial census of population, 50 visas.

**(C)** If the total number of visas available under this paragraph for a fiscal year quarter exceeds the number of qualified nonimmigrants who may be issued such visas during those quarters, the visas made available under this paragraph shall be issued without regard to the numerical limitation under subparagraph (A) or (B) of this paragraph during the last fiscal year quarter.

**(5)** A facility that has filed a petition under section 1101(a)(15)(H)(i)(c) of this title to employ a nonimmigrant to perform nursing services for the facility--

**(A)** shall provide the nonimmigrant a wage rate and working conditions commensurate with those of nurses similarly employed by the facility;

**(B)** shall require the nonimmigrant to work hours commensurate with those of nurses similarly employed by the facility; and

**(C)** shall not interfere with the right of the nonimmigrant to join or organize a union.

**(6)** For purposes of this subsection and section 1101(a)(15)(H)(i)(c) of this title, the term "facility" means a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) that meets the following requirements:

**(A)** As of March 31, 1997, the hospital was located in a health professional shortage area (as defined in section 254e of Title 42).

**(B)** Based on its settled cost report filed under title XVIII of the Social Security Act for its cost reporting period beginning during fiscal year 1994--

**(i)** the hospital has not less than 190 licensed acute care beds;

**(ii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of such title is not less than 35 percent of the total number of such hospital's acute care inpatient days for such period; and

**(iii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, is not less than 28 percent of the total number of such hospital's acute care inpatient days for such period.

**(7)** For purposes of paragraph (2)(A)(v), the term "lay off", with respect to a worker--

**(A)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(B)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

Nothing in this paragraph is intended to limit an employee's or an employer's rights under a collective bargaining agreement or other employment contract.

**(n) Labor condition application**

**(1)** No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the application, and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the application--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought, or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H-1B nonimmigrants are sought.

**(D)** The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(E)(i)** In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

**(ii)** An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before [7] by an H-1B-dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after October 21, 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5-year period preceding the filing of the application. An application is not described in this clause if the only H-1B nonimmigrants sought in the application are exempt H-1B nonimmigrants.

**(F)** In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H-1B-dependent employer) where--

**(i)** the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

**(ii)** there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

**(G)(i)** In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application--

**(I)** has taken good faith steps to recruit, in the United States using procedures that meet industry-wide standards and offering compensation that is at least as great as that required to be offered to H-1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

**(II)** has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

**(ii)** The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H-1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 1153(b)(1) of this title.

The employer shall make available for public examination, within one working day after the date on which an application under this paragraph is filed, at the employer's principal place of business or worksite, a copy of each such application (and such accompanying documents as are necessary). The Secretary shall compile, on a current basis, a list (by employer and by occupational classification) of the applications filed under this subsection. Such list shall include the wage rate, number of aliens sought, period of intended employment, and date of need. The Secretary shall make such list available for public examination in Washington, D.C. The Secretary of Labor shall review such an application only for completeness and obvious inaccuracies. Unless the Secretary finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application. The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph. Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.

**(2)(A)** Subject to paragraph (5)(A), the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under such process, the Secretary shall provide, within 30 days after the date such a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1)(E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application--

   **(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

   **(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Attorney General shall devise a process under which an H-1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an application under this subsection to require an H-1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 1184(c)(1) of this title, for which a fee is imposed under section 1184(c)(9) of this title, to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

**(III)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a full-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a part-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

**(III)** In the case of an H-1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 1184(c)(1) of this title, with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

**(IV)** This clause does not apply to a failure to pay wages to an H-1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H-1B nonimmigrant an established salary practice of the employer, under which the employer pays to H-1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

    **(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

    **(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H-1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility

for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and noncash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** If an H-1B-dependent employer places a nonexempt H-1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer--

  **(i)** knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

  **(ii)** has been subject to a sanction under this subparagraph based upon a previous placement of an H-1B nonimmigrant with the same other employer.

**(F)** The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after October 21, 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i)(II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H-1B-dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(G)(i)** The Secretary of Labor may initiate an investigation of any employer that employs nonimmigrants described in section 1101(a)(15)(H)(i)(b) of this title if the Secretary of Labor has reasonable cause to believe that the employer is not in compliance with this subsection. In the case of an investigation under this clause, the Secretary of Labor (or the acting Secretary in the case of the absence of [8] disability of the Secretary of Labor) shall personally certify that reasonable cause exists and shall approve commencement of the investigation. The investigation may be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with this subsection.

**(ii)** If the Secretary of Labor receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor may conduct an investigation into the alleged

failure or failures. The Secretary of Labor may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of Title 5.

**(iii)** The Secretary of Labor shall establish a procedure for any person desiring to provide to the Secretary of Labor information described in clause (ii) that may be used, in whole or in part, as the basis for the commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary of Labor and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iv)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

**(iv)** Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that--

**(I)** originates from a source other than an officer or employee of the Department of Labor; or

**(II)** was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this chapter of[8] any other Act.

**(v)** The receipt by the Secretary of Labor of information submitted by an employer to the Attorney General or the Secretary of Labor for purposes of securing the employment of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title shall not be considered a receipt of information for purposes of clause (ii).

**(vi)** No investigation described in clause (ii) (or hearing described in clause (viii) based on such investigation) may be conducted with respect to information about a failure to meet a condition described in clause (ii), unless the Secretary of Labor receives the information not later than 12 months after the date of the alleged failure.

**(vii)** The Secretary of Labor shall provide notice to an employer with respect to whom there is reasonable cause to initiate an investigation described in clauses[9] (i) or (ii), prior to the commencement of an investigation under such clauses, of the intent to conduct an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary of Labor is not required to comply with this clause if the Secretary of Labor determines that to do so would interfere with an effort by the Secretary of Labor to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary of Labor under this clause.

**(viii)** An investigation under clauses[9] (i) or (ii) may be conducted for a period of up to 60 days. If the Secretary of Labor determines after such an investigation that a reasonable basis exists to make a finding that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing in accordance with section 556 of Title 5 within 120 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 120 days after the date of the hearing.

**(H)(i)** Except as provided in clauses (ii) and (iii), a person or entity is considered to have complied with the requirements of this subsection, notwithstanding a technical or procedural failure to meet such requirements, if there was a good faith attempt to comply with the requirements.

**(ii)** Clause (i) shall not apply if--

**(I)** the Department of Labor (or another enforcement agency) has explained to the person or entity the basis for the failure;

**(II)** the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure; and

**(III)** the person or entity has not corrected the failure voluntarily within such period.

**(iii)** A person or entity that, in the course of an investigation, is found to have violated the prevailing wage requirements set forth in paragraph (1)(A), shall not be assessed fines or other penalties for such violation if the person or entity can establish that the manner in which the prevailing wage was calculated was consistent with recognized industry standards and practices.

**(iv)** Clauses (i) and (iii) shall not apply to a person or entity that has engaged in or is engaging in a pattern or practice of willful violations of this subsection.

**(I)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(3)(A)** For purposes of this subsection, the term "H-1B-dependent employer" means an employer that--

**(i)**(I) has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H-1B nonimmigrants;

**(ii)**(I) has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H-1B nonimmigrants; or

**(iii)**(I) has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H-1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

**(B)** For purposes of this subsection--

**(i)** the term "exempt H-1B nonimmigrant" means an H-1B nonimmigrant who--

**(I)** receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

**(II)** has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

**(ii)** the term "nonexempt H-1B nonimmigrant" means an H-1B nonimmigrant who is not an exempt H-1B nonimmigrant.

**(C)** For purposes of subparagraph (A)--

**(i)** in computing the number of full-time equivalent employees and the number of H-1B nonimmigrants, exempt H-1B nonimmigrants shall not be taken into account during the longer of--

**(I)** the 6-month period beginning on October 21, 1998; or

**(II)** the period beginning on October 21, 1998, and ending on the date final regulations are issued to carry out this paragraph; and

**(ii)** any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as a single employer.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the H-1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an application with respect to one or more H-1B nonimmigrants by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)** The term "H-1B nonimmigrant" means an alien admitted or provided status as a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title.

**(D)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a

temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(E)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed.

**(5)(A)** This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

**(B)** The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

**(C)** If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

**(D)(i)** The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General.

Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

**(ii)** The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of Title 9.

**(iii)** With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

**(E)** If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)--

　**(i)** the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

　**(ii)** the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 1154 or 1184(c) of this title--

　　**(I)** during a period of not more than 1 year; or

　　**(II)** in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

**(F)** The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.

**(o) Omitted**

**(p) Computation of prevailing wage level**

**(1)** In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) in the case of an employee of--

　**(A)** an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity; or

　**(B)** a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

**(2)** With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.

**(3)** The prevailing wage required to be paid pursuant to subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections.

**(4)** Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient thus obtained to the first level and subtracting that quotient from the second level.

**(q) Academic honoraria**

Any alien admitted under section 1101(a)(15)(B) of this title may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6-month period.

**(r) Exception for certain alien nurses**

Subsection (a)(5)(C) shall not apply to an alien who seeks to enter the United States for the purpose of performing labor as a nurse who presents to the consular officer (or in the case of an adjustment of status, the Attorney General) a certified statement from the Commission on Graduates of Foreign Nursing Schools (or an equivalent independent credentialing organization approved for the certification of nurses under subsection (a)(5)(C) by the Attorney General in consultation with the Secretary of Health and Human Services) that--

**(1)** the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

**(2)** the alien has passed the National Council Licensure Examination (NCLEX);

**(3)** the alien is a graduate of a nursing program--

**(A)** in which the language of instruction was English;

**(B)** located in a country--

**(i)** designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; or

**(ii)** designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; and

**(C)(i)** which was in operation on or before November 12, 1999; or

**(ii)** has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

**(s) Consideration of benefits received as battered alien in determination of inadmissibility as likely to become public charge**

In determining whether an alien described in subsection (a)(4)(C)(i) is inadmissible under subsection (a)(4) or ineligible to receive an immigrant visa or otherwise to adjust to the status of permanent resident by reason of subsection (a)(4), the consular officer or the Attorney General shall not consider any benefits the alien may have received that were authorized under section 1641(c) of this title.

**(t)** [10] **Nonimmigrant professionals; labor attestations**

**(1)** No alien may be admitted or provided status as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title in an occupational classification unless the employer has filed with the Secretary of Labor an attestation stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question; or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the attestation; and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the attestation--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought; or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title are sought.

**(D)** A specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(2)(A)** The employer shall make available for public examination, within one working day after the date on which an attestation under this subsection is filed, at the employer's principal place of business or worksite, a copy of each such attestation (and such accompanying documents as are necessary).

**(B)(i)** The Secretary of Labor shall compile, on a current basis, a list (by employer and by occupational classification) of the attestations filed under this subsection. Such list shall include, with respect to each attestation, the wage rate, number of aliens sought, period of intended employment, and date of need.

**(ii)** The Secretary of Labor shall make such list available for public examination in Washington, D.C.

**(C)** The Secretary of Labor shall review an attestation filed under this subsection only for completeness and obvious inaccuracies. Unless the Secretary of Labor finds that an attestation is incomplete or obviously inaccurate, the Secretary of Labor shall provide the certification described in section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title within 7 days of the date of the filing of the attestation.

**(3)(A)** The Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints respecting the failure of an employer to meet a condition specified in an attestation submitted under this subsection or misrepresentation by the employer of material facts in such an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary of Labor shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under the process described in subparagraph (A), the Secretary of Labor shall provide, within 30 days after the date a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary of Labor determines that such a reasonable basis exists, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary of Labor may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), a substantial failure to meet a condition of paragraph (1)(C) or (1)(D), or a misrepresentation of material fact in an attestation--

   **(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary of Labor determines to be appropriate; and

   **(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an attestation, or a violation of clause (iv)--

   **(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary of Labor determines to be appropriate; and

   **(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an attestation, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition or application supported by the attestation--

   **(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an attestation under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Secretary of Homeland Security shall devise a process under which a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an attestation under this subsection to require a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary of Labor shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary of Labor may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a full-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a part-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on the attestation consistent with the rate of pay identified on the attestation.

**(III)** In the case of a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who has not yet entered into employment with an employer who has had approved an attestation under this subsection with

respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States, or 60 days after the date the nonimmigrant becomes eligible to work for the employer in the case of a nonimmigrant who is present in the United States on the date of the approval of the attestation filed with the Secretary of Labor.

**(IV)** This clause does not apply to a failure to pay wages to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title an established salary practice of the employer, under which the employer pays to nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

  **(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

  **(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection to fail to offer to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified in the attestation and required under paragraph (1), the Secretary of Labor shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** The Secretary of Labor may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date on which the employer is found by the Secretary of Labor to have committed a willful failure to meet a condition of paragraph (1) or to have made a willful misrepresentation of material fact in an attestation. The authority of the Secretary of Labor under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(F)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an attestation with respect to one or more nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(D)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Secretary of Homeland Security, to be employed.

**(t)** [10] **Foreign residence requirement**

**(1)** Except as provided in paragraph (2), no person admitted under section 1101(a)(15)(Q)(ii)(I) of this title, or acquiring such status after admission, shall be eligible to apply for nonimmigrant status, an immigrant visa, or permanent residence under this chapter until it is established that such person has resided and been physically present in the person's country of nationality or last residence for an aggregate of at least 2 years following departure from the United States.

**(2)** The Secretary of Homeland Security may waive the requirement of such 2-year foreign residence abroad if the Secretary determines that--

**(A)** departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or an alien lawfully admitted for permanent residence); or

**(B)** the admission of the alien is in the public interest or the national interest of the United States.

### CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 212, 66 Stat. 182; July 18, 1956, c. 629, Title III, § 301(a), 70 Stat. 575; Pub.L. 85-508, § 23, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(b), Mar. 18, 1959, 73 Stat. 13; Pub.L. 86-648, § 8, July 14, 1960, 74 Stat. 505; Pub.L. 87-256, § 109(c), Sept. 21, 1961, 75 Stat. 535; Pub.L. 87-301, §§ 11-15, Sept. 26, 1961, 75 Stat. 654, 655; Pub.L. 89-236, §§ 10, 15, Oct. 3, 1965, 79 Stat. 917, 919; Pub.L. 91-225, § 2, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-484, Title VI, § 601(a), (c), (d), Oct. 12, 1976, 90 Stat. 2300, 2301; Pub.L. 94-571, §§ 5, 7(d), Oct. 20, 1976, 90 Stat. 2705, 2706; Pub.L. 95-83, Title III, § 307(q)(1), (2), Aug. 1, 1977, 91 Stat. 394; Pub.L. 95-549, Title I, §§ 101, 102, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 96-70, Title III, § 3201(b), Sept. 27, 1979, 93 Stat. 497; Pub.L. 96-212, Title II, § 203(d), (f), Mar. 17, 1980, 94 Stat. 107; Pub.L. 96-538, Title IV, § 404, Dec. 17, 1980, 94 Stat. 3192; Pub.L. 97-116, §§ 4, 5(a)(1), (2), (b), 18(e), Dec. 29, 1981, 95 Stat. 1611, 1612, 1620; Pub.L. 98-454, Title VI, § 602[(a)], Oct. 5, 1984, 98 Stat. 1737; Pub.L. 98-473, Title II, § 220(a), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-396, § 14(a), Aug. 27, 1986, 100 Stat. 842; Pub.L. 99-570, Title I, § 1751(a), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-639, § 6(a), Nov. 10, 1986, 100 Stat. 3543; Pub.L. 99-653, § 7(a), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-204, Title VIII, § 806(c), Dec. 22, 1987, 101 Stat. 1399; Pub.L. 100-525, §§ 3(1)(A), 7(c)(1), (3), 8(f), 9(i), Oct. 24, 1988, 102 Stat. 2614, 2616, 2617, 2620; Pub.L. 100-690, Title VII, § 7349(a), Nov. 18, 1988, 102 Stat. 4473; Pub.L. 101-238, § 3(b), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(a), (c), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, § 162(e)(1), (f)(2)(B), Title II, §§ 202(b), 205(c)(3), Title V, §§ 511(a), 514(a), Title VI, § 601(a), (b), (d), Nov. 29, 1990, 104 Stat. 5011, 5012, 5014, 5020, 5052, 5053, 5067, 5075 to 5077; Pub.L. 102-232, Title III, §§ 302(e)(6), (9), 303(a)(5)(B), (6), (7)(B), 306(a)(10), (12), 307(a) to (g), 309(b)(7), Dec. 12, 1991, 105 Stat. 1746, 1747, 1751, 1753 to 1755, 1759; Pub.L. 103-43, Title XX, § 2007(a), June 10, 1993, 107 Stat. 210; Pub.L. 103-317, Title V, § 506(a), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(b)(1), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-416, Title II, §§ 203(a), 219(e), (z)(1), (5), 220(a), Oct. 25, 1994, 108 Stat. 4311, 4316, 4318, 4319; Pub.L. 104-132, Title IV, §§ 411, 412, 440(d), Apr. 24, 1996, 110 Stat. 1268, 1269, 1277; Pub.L. 104-208, Div. C, Title I, § 124(b)(1), Title III, §§ 301(b)(1), (c)(1), 304(b), 305(c), 306(d), 308(c)(2) (B), (d)(1), (e)(1)(B), (C), (2)(A), (6), (f)(1)(C) to (F), (3)(A), (g)(1), (4)(B), (10)(A), (H), 322(a)(2)(B), 341(a), (b), 342(a), 343, 344(a), 345(a), 346(a), 347(a), 348(a), 349, 351(a), 352(a), 355, Title V, § 531(a), Title VI, §§ 602(a), 622(b), 624(a), 671(e)(3), Sept. 30, 1996, 110 Stat. 3009-562, 3009-576, 3009-578, 3009-597, 3009-607, 3009-612, 3009-616, 3009-619 to 3009-622, 3009-625, 3009-629, 3009-635 to 3009-641, 3009-644, 3009-674, 3009-689, 3009-695, 3009-698, 3009-723; Pub.L. 105-73, § 1, Nov. 12, 1997, 111 Stat. 1459; Pub.L. 105-277, Div. C, Title IV, §§ 412(a) to (c), 413(a) to (e)(1), (f), 415(a), 431(a), Div. G, Title XXII, § 2226(a), Oct. 21, 1998, 112 Stat. 2681-642 to 2681-651, 2681-654, 2681-658, 2681-820; Pub.L. 105-292, Title VI, § 604(a), Oct. 27, 1998, 112 Stat. 2814; Pub.L. 106-95, §§ 2(b), 4(a), Nov. 12, 1999, 113 Stat. 1312, 1317; Pub.L. 106-120, Title VIII, § 809, Dec. 3, 1999, 113 Stat. 1632; Pub.L. 106-313, Title I, §§ 106(c)(2), 107(a), Oct. 17, 2000, 114 Stat. 1254, 1255; Pub.L. 106-386, Div. A, §§ 107(e)(3), 111(d), Div. B, Title V, §§ 1505(a), (c)(1), (d) to (f), 1513(e), Oct. 28, 2000, 114 Stat. 1478, 1485, 1525, 1526, 1536; Pub.L. 106-395, Title II, § 201(b)(1), (2), Oct. 30, 2000, 114 Stat. 1633, 1634; Pub.L. 106-396, Title I, § 101(b)(1), Oct. 30, 2000, 114 Stat. 1638; Pub.L. 107-56, Title IV, § 411(a), Title X, § 1006(a), Oct. 26, 2001, 115 Stat. 345, 394; Pub.L. 107-150, § 2(a)(2), Mar. 13, 2002, 116 Stat. 74; Pub.L. 107-273, Div. C, Title I, § 11018(c), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 108-77, Title IV, § 402(b), (c), Sept. 3, 2003, 117 Stat. 940, 946; Pub.L. 108-193, §§ 4(b)(4), 8(a) (2), Dec. 19, 2003, 117 Stat. 2879, 2886; Pub.L. 108-447, Div. J, Title IV, §§ 422(a), 423, 424(a)(1), (b), Dec. 8, 2004, 118 Stat. 3353 to 3355; Pub.L. 108-449, § 1(b)(2), Dec. 10, 2004, 118 Stat. 3470; Pub.L. 108-458, Title V, §§ 5501(a), 5502(a), 5503,

Dec. 17, 2004, 118 Stat. 3740, 3741; Pub.L. 109-13, Div. B, Title I, §§ 103(a) to (c), 104, Title V, § 501(d), May 11, 2005, 119 Stat. 306 to 309, 322; Pub.L. 109-162, Title VIII, § 802, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(b), Aug. 12, 2006, 120 Stat. 762; Pub.L. 110-161, Div. J, Title VI, § 691(a), (c), Dec. 26, 2007, 121 Stat. 2364, 2365; Pub.L. 110-229, Title VII, § 702(b)(2), (3), (d), May 8, 2008, 122 Stat. 860, 862; Pub.L. 110-293, Title III, § 305, July 30, 2008, 122 Stat. 2963; Pub.L. 110-340, § 2(b), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 222(f)(1), 234, Dec. 23, 2008, 122 Stat. 5071, 5074; Pub.L. 111-122, § 3(b), Dec. 22, 2009, 123 Stat. 3481; Pub.L. 111-287, § 2, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 113-4, Title VIII, § 804, Mar. 7, 2013, 127 Stat. 111; Pub.L. 119-1, § 3(d), Jan. 29, 2025, 139 Stat. 4.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

## EXECUTIVE ORDERS

## EXECUTIVE ORDER NO. 12324

Ex. Ord. No. 12324, Sept. 29, 1981, 46 F.R. 48109, relating to high seas interdiction of illegal aliens, was revoked by Ex. Ord. No. 12807, May 24, 1992, 57 F.R. 23133, set out as a note under this section.

## EXECUTIVE ORDER NO. 12807

<May 24, 1992, 57 F.R. 23133, as amended Ex. Ord. No. 13286, Sec. 30, Feb. 28, 2003, 68 F.R. 10625>

### Interdiction of Illegal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title] and whereas:

**(1)** The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

**(2)** The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U.S. T.I.A.S. 6577; 19 U.S.T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

**(3)** Proclamation No. 4865 [set out as a note under this section] suspends the entry of all undocumented aliens into the United States by the high seas; and

**(4)** There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

I, GEORGE BUSH, President of the United States of America, hereby order as follows:

**Section 1.** The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.

**Sec. 2. (a)** The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

**(b)** Those instructions shall apply to any of the following defined vessels:

**(1)** Vessels of the United States, meaning any vessel documented or numbered pursuant to the laws of the United States, or owned in whole or in part by the United States, a citizen of the United States, or a corporation incorporated under the laws of the United States or any State, Territory, District, Commonwealth, or possession thereof, unless the vessel has been granted nationality by a foreign nation in accord with Article 5 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(2)** Vessels without nationality or vessels assimilated to vessels without nationality in accordance with paragraph (2) of Article 6 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(3)** Vessels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels.

**(c)** Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

**(1)** To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

**(2)** To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

**(3)** To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Secretary of Homeland Security, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

**(d)** These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

**Sec. 3.** This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act [section 551 et seq. of Title 5, Government Organization and Employees]), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.

**Sec. 4.** Executive Order No. 12324 [formerly set out as a note under this section] is hereby revoked and replaced by this order.

**Sec. 5.** This order shall be effective immediately.

GEORGE BUSH

**EXECUTIVE ORDER NO. 13276**

<Nov. 15, 2002, 67 F.R. 69985, as amended Ex. Ord. No. 13286, Sec. 1, Feb. 28, 2003, 68 F.R. 10619>

**Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsecs. (f) and (a)(1) of this section], and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

**Section 1.** Duties and Authorities of Agency Heads. Consistent with applicable law,

**(a)(i)** The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

**(ii)** The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

**(b)** The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

**(c)(i)** The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

**(ii)** In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out under this section], regarding interdiction of migrants.

**Sec. 2.** Definitions. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

**Sec. 3. Scope.**

**(a)** Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992.

**(b)** Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

**(c)** This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

**(d)** Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

**(e)** This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13769

Ex. Ord. No. 13769, January 27, 2017, 82 F.R. 8977, relating to protecting the Nation from foreign terrorist entry into the United States, was revoked by Ex. Ord. No. 13780, § 13, March 9, 2017, 82 F.R. 13209.

### EXECUTIVE ORDER NO. 13780

Ex. Ord. No. 13780, Mar. 6, 2017, 82 F.R. 13209, which prevented nationals from certain countries from entering the United States, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### EXECUTIVE ORDER NO. 13815

Ex. Ord. No. 13815, Oct. 24, 2017, 82 F.R. 50055, which related to resuming the Unites States Refugee Admissions Program with enhanced vetting capabilities, was revoked by Ex. Ord. No. 14013, § 2(a), Feb. 4, 2021, 86 F.R. 8840.

### EXECUTIVE ORDER NO. 13940

<August 3, 2020, 85 F.R. 47879>

### Aligning Federal Contracting and Hiring Practices With the Interests of American Workers

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the executive branch to create opportunities for United States workers to compete for jobs, including jobs created through Federal contracts. These opportunities, particularly in regions where the Federal Government remains the largest employer, are especially critical during the economic dislocation caused by the 2019 novel coronavirus (COVID-19) pandemic. When employers trade American jobs for temporary foreign labor, for example, it reduces opportunities

for United States workers in a manner inconsistent with the role guest-worker programs are meant to play in the Nation's economy.

**Sec. 2. Review of Contracting and Hiring Practices. (a)** The head of each executive department and agency (agency) that enters into contracts shall review, to the extent practicable, performance of contracts (including subcontracts) awarded by the agency in fiscal years 2018 and 2019 to assess:

**(i)** whether contractors (including subcontractors) used temporary foreign labor for contracts performed in the United States, and, if so, the nature of the work performed by temporary foreign labor on such contracts; whether opportunities for United States workers were affected by such hiring; and any potential effects on the national security caused by such hiring; and

**(ii)** whether contractors (including subcontractors) performed in foreign countries services previously performed in the United States, and, if so, whether opportunities for United States workers were affected by such offshoring; whether affected United States workers were eligible for assistance under the Trade Adjustment Assistance program authorized by the Trade Act of 1974; and any potential effects on the national security caused by such offshoring.

**(b)** The head of each agency that enters into contracts shall assess any negative impact of contractors' and subcontractors' temporary foreign labor hiring practices or offshoring practices on the economy and efficiency of Federal procurement and on the national security, and propose action, if necessary and as appropriate and consistent with applicable law, to improve the economy and efficiency of Federal procurement and protect the national security.

**(c)** The head of each agency shall, in coordination with the Director of the Office of Personnel Management, review the employment policies of the agency to assess the agency's compliance with Executive Order 11935 of September 2, 1976 (Citizenship Requirements for Federal Employment), and section 704 of the Consolidated Appropriations Act, 2020, Public Law 116-93.

**(d)** Within 120 days of the date of this order, the head of each agency shall submit a report to the Director of the Office of Management and Budget summarizing the results of the reviews required by subsections (a) through (c) of this section; recommending, if necessary, corrective actions that may be taken by the agency and timeframes to implement such actions; and proposing any Presidential actions that may be appropriate.y47880

**Sec. 3. Measures to Prevent Adverse Effects on United States Workers.** Within 45 days of the date of this order, the Secretaries of Labor and Homeland Security shall take action, as appropriate and consistent with applicable law, to protect United States workers from any adverse effects on wages and working conditions caused by the employment of H-1B visa holders at job sites (including third-party job sites), including measures to ensure that all employers of H-1B visa holders, including secondary employers, adhere to the requirements of section 212(n)(1) of the Immigration and Nationality Act (8 U.S.C. 1182(n)(1)).

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## PROCLAMATIONS

### Suspending Entry of Certain Aliens

Suspension of entry of certain aliens into the United States were contained in the following Presidential proclamations:

Proc. No. 10685, Dec. 11, 2023, 88 F.R. 86541, relating to immigrants and nonimmigrants enabling corruption.

Proc. No. 10309, Nov. 16, 2021, 86 F.R. 64797, relating to immigrants and nonimmigrants responsible for policies or actions that threaten democracy in Nicaragua.

Proc. No. 10052, June 22, 2020, 85 F.R. 38263, as amended by Proc. No. 10054, June 29, 2020, 85 F.R. 40085; Proc. No. 10131, § 2, Dec. 31, 2020, 86 F.R. 418; Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847, relating to immigrants and nonimmigrants who present a risk to the United States labor market following the COVID-19 pandemic, expired Mar. 31, 2021.

Proc. No. 10043, May 29, 2020, 85 F.R. 34353, relating to certain students and researchers from the People's Republic of China.

Proc. No. 10014, Apr. 22, 2020, 85 F.R. 23441, as amended by Proc. No. 10052, § 1, June 22, 2020, 85 F.R. 38264; Proc. No. 10131, § 1, Dec. 31, 2020, 86 F.R. 418, relating to immigrants who present a risk to the United States labor market following the COVID-19 pandemic, was revoked by Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847.

Proc. No. 9945, Oct. 4, 2019, 84 F.R. 53991, relating to immigrants who will financially burden the United States healthcare system, was revoked by Proc. No. 10209, May 14, 2021, 86 F.R. 27015.

Proc. No. 9932, Sept. 25, 2019, 84 F.R. 51935, relating to senior officials of the government of Iran.

Proc. No. 9931, Sept. 25, 2019, 84 F.R. 51931, relating to persons responsible for policies or actions that threaten Venezuela's democratic institutions.

Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, relating to persons who participate in serious human rights and humanitarian law violations and other abuses.

Proc. No. 8693, July 24, 2011, 76 F.R. 44751, relating to aliens subject to United Nations Security Council travel bans and International Emergency Economic Powers Act Sanctions.

Proc. No. 8342, Jan. 16, 2009, 74 F.R. 4093, relating to foreign government officials responsible for failing to combat trafficking in persons.

Proc. No. 7750, Jan. 12, 2004, 69 F.R. 2287, relating to persons engaged in or benefiting from corruption.

### Suspending Entry as Immigrants and Nonimmigrants of Persons
### Who Pose a Risk of Transmitting 2019 Novel Coronavirus:

Proc. No. 10315, Nov. 26, 2021, 86 F.R. 68385, relating to noncitizens who were physically present within the Republic of Botswana, the Kingdom of Eswatini, the Kingdom of Lesotho, the Republic of Malawi, the Republic of Mozambique, the Republic of Namibia, the Republic of South Africa, and the Republic of Zimbabwe, was revoked by Proc. No. 10329, Dec. 28, 2021, 87 F.R. 149.

Proc. No. 10294, Oct. 25, 2021, 86 F.R. 59603, relating to certain noncitizens who are nonimmigrants and who are not fully vaccinated against COVID-19 arriving by air, was revoked in part, effective May 12, 2023, by Proc. No. 10575, May 9, 2023, 88 F.R. 30889.

Proc. No. 10199, Apr. 30, 2021, 86 F.R. 24297, relating to noncitizens entering as nonimmigrants who were physically present within the Republic of India, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10143, Jan. 25, 2021, 86 F.R. 7467, relating to noncitizens who were physically present within the Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, and the Federative Republic of Brazil, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10041, May 24, 2020, 85. F.R. 31933, as amended by Proc. No. 10042, May 25, 2020 85 F.R. 32291, relating to aliens present in the Federative Republic of Brazil, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9996, Mar. 14, 2020, 85 F.R. 15341, relating to aliens present in the United Kingdom and Republic of Ireland, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9993, Mar. 11, 2020, 85 F.R. 15045, relating to aliens present in the Schengen Area, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9992, Feb. 29, 2020, 85 F.R. 12855, as amended by Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the Islamic Republic of Iran, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 9984, Jan. 31, 2020, 85 F.R. 6709, as amended by Proc. No. 9992, § 4, Feb. 29, 2020, 85 F.R. 12857; Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the People's Republic of China, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

**PROCLAMATION NO. 4865**

<Sept. 29, 1981, 46 F.R. 48107>

**High Seas Interdiction of Illegal Aliens**

The ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

As a result of our discussions with the Governments of affected foreign countries and with agencies of the Executive Branch of our Government, I have determined that new and effective measures to curtail these unlawful arrivals are necessary. In this regard, I have determined that international cooperation to intercept vessels trafficking in illegal migrants is a necessary and proper means of insuring the effective enforcement of our laws.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and the statutes of the United States, including Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title], in order to protect the sovereignty of the United States, and in accordance with cooperative arrangements with certain foreign governments, and having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States, do proclaim that:

The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of September, in the year of our Lord nineteen hundred and eighty-one, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN

### PROCLAMATION NO. 7359

Proc. No. 7359, Oct. 10, 2000, 65 F.R. 60831, related to the suspension of entry as immigrants and nonimmigrants of persons impeding the peace process in Sierra Leone.

### PROCLAMATION NO. 7750

<Jan. 12, 2004, 69 F.R. 2287>

**To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefitting from Corruption**

**By the President of the United States of America**

**A Proclamation**

In light of the importance of legitimate and transparent public institutions to world stability, peace, and development, and the serious negative effects that corruption of public institutions has on the United States efforts to promote security and to strengthen democratic institutions and free market systems, and in light of the importance to the United States and the international community of fighting corruption, as evidenced by the Third Global Forum on Fighting Corruption and Safeguarding Integrity and other intergovernmental efforts, I have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions where that corruption has serious adverse effects on international activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f) [subsec. (f) of this section], and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Public officials or former public officials whose solicitation or acceptance of any article of monetary value, or other benefit, in exchange for any act or omission in the performance of their public functions has or had serious adverse effects on the national interests of the United States.

**(b)** Persons whose provision of or offer to provide any article of monetary value or other benefit to any public official in exchange for any act or omission in the performance of such official's public functions has or had serious adverse effects on the national interests of the United States.

**(c)** Public officials or former public officials whose misappropriation of public funds or interference with the judicial, electoral, or other public processes has or had serious adverse effects on the national interests of the United States.

**(d)** The spouses, children, and dependent household members of persons described in paragraphs (a), (b), and (c) above, who are beneficiaries of any articles of monetary value or other benefits obtained by such persons.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States.

**Sec. 3.** Persons covered by sections 1 and 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** For purposes of this proclamation, "serious adverse effects on the national interests of the United States" means serious adverse effects on the international economic activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

**Sec. 5.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 6.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary may, in the Secretary's discretion, establish.

**Sec. 7.** This proclamation is effective immediately.

**Sec. 8.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twelfth day of January, in the year of our Lord two thousand four, and of the Independence of the United States of America the two hundred and twenty-eighth.

GEORGE W. BUSH

## PROCLAMATION NO. 9645

Proc. No. 9645, Sept. 24, 2017, 82 F.R. 45161, as amended by Proc. No. 9723, § 1, Apr. 10, 2018, 83 F.R. 15939; Proc. No. 9983, § 3, Jan. 31, 2020, 85 F.R. 6706, which prohibited entry into the United States by nationals of certain countries unless they are approved for a waiver, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### PROCLAMATION NO. 9723

Proc. No. 9723, Apr. 10, 2018, 83 F.R. 15937, which maintained enhanced vetting capabilities and processes for detecting attempted entry into the United States by terrorists or other public-safety threats, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### PROCLAMATION NO. 9983

Proc. No. 9983, Jan. 31, 2020 85 F.R. 6699, which prohibited entry into the United States by nationals of certain countries, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### PROCLAMATION NO. 10773

<June 3, 2024, 89 F.R. 48487, as amended Sept. 27, 2024, 89 F.R. 80351>

**Securing the Border**

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID-19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include

establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken--and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding for

critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

**(a)** over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

**(b)** over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

**(c)** 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

**(d)** shelter and critical services for newcomers in our cities and States; and

**(e)** 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system--the result of outdated laws and inadequate resources--has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2. Applicability of Suspension and Limitation on Entry. (a)** The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to

section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

**(b)** Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

**(c)** [revoked by 89 F.R. 80351, § 2]

**Sec. 3. Scope and Implementation of Suspension and Limitation on Entry. (a)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

**(b)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

**(i)** any noncitizen national of the United States;

**(ii)** any lawful permanent resident of the United States;

**(iii)** any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

**(iv)** any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

**(v)** any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

**(A)** members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

**(B)** noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

**(C)** noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

**(D)** noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

**(vi)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

**(vii)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

**(c)** An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

**(d)** The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

**(e)** Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4. Definitions. (a)** The term "encounter" refers to a noncitizen who:

**(i)** is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

**(ii)** is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

**(iii)** is determined to be inadmissible at a southwest land border port of entry.

**(b)** The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

**(c)** The term "southwest land border" means the entirety of the United States land border with Mexico.

**(d)** The term "southern border" means the southwest land border and the southern coastal borders.

**Sec. 5. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

J.R. BIDEN JR.

## PROCLAMATION NO. 10817

<Sept. 27, 2024, 89 F.R. 80351>

### Amending Proclamation 10773

**By the President of the United States of America**

**A Proclamation**

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained

decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Amendment to Section 2(a) of Proclamation 10773.** Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

**Sec. 2. Revocation of Section 2(c) of Proclamation 10773.** Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4. Effectiveness.** The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 FR 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

**Sec. 5. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

J.R. BIDEN JR.

**PROCLAMATION NO. 10888**

<Jan. 20, 2025, 90 F.R. 8333>

**Guaranteeing the States Protection Against Invasion**

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

An essential feature of any sovereign nation is the existence of territorial boundaries and the inherent authority to decide who and what may cross those boundaries. The Supreme Court of the United States has described this power as a "fundamental act of sovereignty," which "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950). The Supreme Court has recognized the inherent right and duty of the Executive Branch to defend our national sovereignty, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." Id.

The Congress has, in establishing "an uniform Rule of Naturalization," created a complex and comprehensive Federal scheme in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., to control the entry and exit of people and goods across the borders of the United States. In routine circumstances, this complex and comprehensive scheme can protect the national sovereignty of the United States by facilitating the admission of individuals whose presence serves the national interest and preventing the admission of those who do not, such as those aliens who pose threats to public health, section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1); safety, section 212(a)(2) (8 U.S.C. 1182(a)(2)); and national security, section 212(a)(3) (8 U.S.C. 1182(a)(3)). Prospective immigrants who use the visa system are screened for such health, safety, and security concerns while outside of the United States, and are not permitted to enter the United States until they establish that they are eligible to be admitted as a matter of law and should be admitted as a matter of discretion.

But screening under those provisions of the INA can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States.

Due to significant information gaps--particularly in the border environment--and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by section 212(a)(2)-(3) of the INA, 8 U.S.C. 1182(a)(2)-(3). Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.

The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. And the risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.

The same is true for public health, where the Federal Government currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1). Effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as a lawful immigrant would. As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States.

Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States. The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those previously described that are intended to prevent aliens posing threats to public health, safety, and national security from entering the United States. As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide.

This ongoing influx of illegal aliens across the southern border of the United States has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries.

In joining the Union, the States agreed to surrender much of their sovereignty and join the Union in exchange for the Federal Government's promise in Article IV, Section 4 of the U.S. Constitution, to "protect each of [the States] against Invasion." I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States.

The INA provides the President with certain emergency tools. For example, it states that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). This statute "exudes deference to the President in every clause." Trump v. Hawaii, 585 U.S. 667, 684 (2018). Further, the INA renders it unlawful for "any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1).

Historically, Presidents have used these statutory authorities to deny entry of designated classes and categories of aliens into the United States through ports of entry. But if the President has the power to deny entry of any alien into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of aliens into the United States and impose restrictions on access to portions of the immigration system, particularly when the number of aliens illegally crossing the southern border prevents the Federal Government from obtaining operational control of the border.

The INA does not, however, occupy the Federal Government's field of authority to protect the sovereignty of the United States, particularly in times of emergency when entire provisions of the INA are rendered ineffective by operational constraints, such as when there is an ongoing invasion into the States. The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location. Only through such measures can the President guarantee the right of each State to be protected against invasion.

By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

NOW, THEREFORE, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby direct as follows:

**Section 1. Suspension of Entry.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended until I issue a finding that the invasion at the southern border has ceased.

**Sec. 2. Imposition of Restrictions on Entry for Aliens Invading the United States.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that aliens engaged in the invasion across the southern border of the United States on or after the date of this proclamation are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 3. Suspension of and Restriction on Entry for Aliens Posing Public Health, Safety, or National Security Risks.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States, on or after the date of this order, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)-(3) of the INA, 8 U.S.C. 1182(a)(1)-(3), is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended and restrict their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158.

**Sec. 4. Constitutional Suspension of Physical Entry.** Under the authorities provided to me under Article II of the Constitution of the United States, including my control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4, I hereby suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and direct the Secretary of Homeland Security, in coordination with the Secretary of State and the

Attorney General, to take appropriate actions as may be necessary to achieve the objectives of this proclamation, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 5. Operational Actions to Repel the Invasion.** The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order, whether as an exercise of the suspension power in section 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), or as an exercise of my delegated authority under the Constitution of the United States, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

DONALD J.TRUMP

### MEMORANDA OF PRESIDENT

### DELEGATION OF AUTHORITY UNDER SECTIONS 212(f) AND 215(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT

<Sept. 24, 1999, 64 F.R. 55809>

### Memorandum for the Attorney General

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and in light of Proclamation 4865 of September 29, 1981 [set out as a note under this section], I hereby delegate to the Attorney General the authority to:

**(a)** Maintain custody, at any location she deems appropriate, and conduct any screening she deems appropriate in her unreviewable discretion, of any undocumented person she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas through December 31, 2000; and

**(b)** Undertake any other appropriate actions with respect to such aliens permitted by law.

With respect to the functions delegated by this order, all actions taken after April 16, 1999, for or on behalf of the President that would have been valid if taken pursuant to this memorandum are ratified.

This memorandum is not intended to create, and should not be construed to create, any right or benefit, substantive or procedural, legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person, or to require any procedures to determine whether a person is a refugee.

You are authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

### PRESIDENTIAL MEMORANDUM

Memorandum of President of the United States, Mar. 6, 2017, 82 F.R. 16279, which related to increased enforcement of immigration laws, was revoked by Ex. Ord. No. 14013, § 2(b), Feb. 4, 2021, 86 F.R. 8840.

### PRESIDENTIAL MEMORANDUM

<June 14, 2017, 82 F.R. 27965>

### Effective Date in Executive Order 13780

**Memorandum for the Secretary of State[,] the Attorney General[,] the Secretary of Homeland Security[, and] the Director of National Intelligence**

This memorandum provides guidance for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence in light of two preliminary injunctions that bar enforcement of certain provisions of Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States" (Mar. 6, 2017). The preliminary injunction entered by the United States District Court for the District of Maryland, and affirmed in substantial part by the United States Court of Appeals for the Fourth Circuit, bars enforcement of section 2(c) of the Executive Order. The portions of the preliminary injunction entered by the United States District Court for the District of Hawaii that were affirmed by the recent decision of the United States Court of Appeals for the Ninth Circuit bar enforcement of certain provisions of sections 2 and 6 of the Executive Order.

Various provisions of sections 2 and 6 of the Executive Order (as well as sections 3 and 12(c), which delineate the scope of the suspension contained in section 2(c)), refer to the Order's effective date. Section 14 of the Executive Order provides that the Order was effective at 12:01 a.m., eastern daylight time on March 16, 2017. Sections 2 and 6, however, were enjoined before that effective date, and the courts of appeals have affirmed the injunctions with respect to certain provisions of sections 2 and 6. As a result, under the terms of the Executive Order, the effective date of the enjoined provisions (as well as related provisions of sections 3 and 12(c)) is delayed or tolled until those injunctions are lifted or stayed.

In light of questions in litigation about the effective date of the enjoined provisions and in the interest of clarity, I hereby declare the effective date of each enjoined provision to be the date and time at which the referenced injunctions are lifted or stayed with respect to that provision. To the extent it is necessary, this memorandum should be construed to amend the Executive Order.

Because the injunctions have delayed the effective date of section 12(c), no immigrant or nonimmigrant visa issued before the effective date of section 2(c) shall be revoked pursuant to the Executive Order.

I hereby direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to jointly begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after

all applicable injunctions are lifted or stayed with respect to that provision, to ensure an orderly and proper implementation of those provisions. Prior to that time, consular officers may issue valid visas to, and the Secretary of Homeland Security may admit, otherwise eligible aliens without regard to sections 2 and 6. If not otherwise revoked, visas and other travel documents issued during this period remain valid for travel as if they were issued prior to the effective date.

DONALD J. TRUMP

**PRESIDENTIAL MEMORANDUM**

<July 26, 2024, 89 F.R. 61341>

**Deferred Enforced Departure for Certain Lebanese Nationals**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

Humanitarian conditions in southern Lebanon have significantly deteriorated due to tensions between Hezbollah and Israel. While I remain focused on de-escalating the situation and improving humanitarian conditions, many civilians remain in danger; therefore, I am directing the deferral of removal of certain Lebanese nationals who are present in the United States.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 18 months the removal of any Lebanese national subject to the conditions and exceptions provided below.

Accordingly, I hereby direct the Secretary of Homeland Security to take appropriate measures to defer for 18 months the removal of any Lebanese national who is present in the United States on the date of this memorandum, except for those:

**(1)** who have voluntarily returned to Lebanon after the date of this memorandum;

**(2)** who have not continuously resided in the United States since the date of this memorandum;

**(3)** who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

**(4)** who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

**(5)** who are subject to extradition;

**(6)** whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

**(7)** whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Lebanese nationals as the Secretary of Homeland Security determines to be appropriate.

J.R. BIDEN JR.

### PRESIDENTIAL MEMORANDUM

<Jan. 15, 2025, 90 F.R. 6749>

**Extending and Expanding Eligibility for Deferred Enforced Departure for Certain Hong Kong Residents**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

The United States supports the human rights and fundamental freedoms of the residents of Hong Kong. The People's Republic of China (PRC) has continued to significantly erode those rights and freedoms. I am therefore directing an extension and expansion of the deferral of removal of certain Hong Kong residents, regardless of country of birth, who are present in the United States.

By unilaterally imposing on Hong Kong the Law of the People's Republic of China on Safeguarding National Security in the Hong Kong Special Administrative Region (NSL) in June 2020, the PRC has undermined the enjoyment of rights and freedoms in Hong Kong, including those protected under the Basic Law and the Sino-British Joint Declaration. Following the NSL's enactment, the PRC has continued its assault on Hong Kong's autonomy, undermining its remaining democratic processes and institutions, imposing limits on academic freedom, and cracking down on freedom of the press. Since June 2020, at least 200 opposition politicians, activists, and protesters have been taken into custody on politically motivated NSL-related charges including secession, subversion, terrorist activities, and collusion with a foreign country or external elements. On November 19, 2024, Hong Kong authorities also sentenced 45 pro-democracy advocates to prison for their peaceful participation in political activities protected under the Basic Law of Hong Kong.

There are compelling foreign policy reasons to extend Deferred Enforced Departure (DED) for an additional period for those residents of Hong Kong presently residing in the United States who were under a grant of DED until February 5, 2025, as well as to defer enforced departure for other Hong Kong residents who arrived in the United States subsequent to the initial grant of DED. The United States is committed to a foreign policy that unites our democratic values with our foreign policy goals, which is centered on the defense of democracy and the promotion of human rights around the world. Offering safe haven for Hong Kong residents who have been deprived of their guaranteed freedoms in Hong Kong furthers United States interests in the region. The United States will continue to stand firm in our support of the people in Hong Kong.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 24 months the removal of any Hong Kong resident, regardless of country of birth, who is present in the United States on the date of this memorandum, except for those:

**(1)** who have voluntarily returned to Hong Kong or the PRC after the date of this memorandum;

**(2)** who have not continuously resided in the United States since the date of this memorandum;

**(3)** who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

**(4)** who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

**(5)** who are subject to extradition;

**(6)** whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

**(7)** whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, including by extending through February 5, 2027, employment authorization for individuals with current employment authorization under prior grants of DED for certain Hong Kong residents, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Hong Kong residents as the Secretary of Homeland Security determines to be appropriate. The Secretary of Homeland Security shall also provide for the prompt issuance of new or replacement documents in appropriate cases.

The Secretary of Homeland Security is authorized and directed to publish this memorandum in the **Federal Register**.

J.R. BIDEN JR.

Notes of Decisions (2894)

---

**Footnotes**

1    So in original. The semicolon probably should be a comma.

2    So in original. Probably should be a reference to section 1229c of this title.

3    So in original. Probably should be preceded by "ineligible for".

4    So in original.

5    So in original. Probably should be "Secretary's".

6    So in original. Probably should be "(10)(E))".

7    So in original.

8    So in original. Probably should be "or".

9    So in original. Probably should be "clause".

10    So in original. Two subsecs. (t) have been enacted.

8 U.S.C.A. § 1182, 8 USCA § 1182
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 220

United States Code Annotated
   Title 8. Aliens and Nationality (Refs & Annos)
      Chapter 12. Immigration and Nationality (Refs & Annos)
         Subchapter II. Immigration
            Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1184

§ 1184. Admission of nonimmigrants

Currentness

**(a) Regulations**

**(1)** The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States. No alien admitted to Guam or the Commonwealth of the Northern Mariana Islands without a visa pursuant to section 1182(l) of this title may be authorized to enter or stay in the United States other than in Guam or the Commonwealth of the Northern Mariana Islands or to remain in Guam or the Commonwealth of the Northern Mariana Islands for a period exceeding 45 days from date of admission to Guam or the Commonwealth of the Northern Mariana Islands. No alien admitted to the United States without a visa pursuant to section 1187 of this title may be authorized to remain in the United States as a nonimmigrant visitor for a period exceeding 90 days from the date of admission.

**(2)(A)** The period of authorized status as a nonimmigrant described in section 1101(a)(15)(O) of this title shall be for such period as the Attorney General may specify in order to provide for the event (or events) for which the nonimmigrant is admitted.

**(B)** The period of authorized status as a nonimmigrant described in section 1101(a)(15)(P) of this title shall be for such period as the Attorney General may specify in order to provide for the competition, event, or performance for which the nonimmigrant is admitted. In the case of nonimmigrants admitted as individual athletes under section 1101(a)(15)(P) of this title, the period of authorized status may be for an initial period (not to exceed 5 years) during which the nonimmigrant will perform as an athlete and such period may be extended by the Attorney General for an additional period of up to 5 years.

**(b) Presumption of status; written waiver**

Every alien (other than a nonimmigrant described in subparagraph (L) or (V) of section 1101(a)(15) of this title, and other than a nonimmigrant described in any provision of section 1101(a)(15)(H)(i) of this title except subclause (b1) of such section) shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title. An alien who is an officer or employee of any foreign government or of any international organization entitled to enjoy privileges, exemptions, and immunities under the International Organizations Immunities Act, or an alien who is the attendant, servant, employee, or member of the immediate family of any such alien shall not be entitled to apply for or

receive an immigrant visa, or to enter the United States as an immigrant unless he executes a written waiver in the same form and substance as is prescribed by section 1257(b) of this title.

**(c) Petition of importing employer**

**(1)** The question of importing any alien as a nonimmigrant under subparagraph (H), (L), (O), or (P)(i) of section 1101(a)(15) of this title (excluding nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition, shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant. For purposes of this subsection with respect to nonimmigrants described in section 1101(a)(15)(H)(ii)(a) of this title, the term "appropriate agencies of Government" means the Department of Labor and includes the Department of Agriculture. The provisions of section 1188 of this title shall apply to the question of importing any alien as a nonimmigrant under section 1101(a)(15)(H)(ii)(a) of this title.

**(2)(A)** The Attorney General shall provide for a procedure under which an importing employer which meets requirements established by the Attorney General may file a blanket petition to import aliens as nonimmigrants described in section 1101(a)(15)(L) of this title instead of filing individual petitions under paragraph (1) to import such aliens. Such procedure shall permit the expedited processing of visas for admission of aliens covered under such a petition.

**(B)** For purposes of section 1101(a)(15)(L) of this title, an alien is considered to be serving in a capacity involving specialized knowledge with respect to a company if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company.

**(C)** The Attorney General shall provide a process for reviewing and acting upon petitions under this subsection with respect to nonimmigrants described in section 1101(a)(15)(L) of this title within 30 days after the date a completed petition has been filed.

**(D)** The period of authorized admission for--

**(i)** a nonimmigrant admitted to render services in a managerial or executive capacity under section 1101(a)(15)(L) of this title shall not exceed 7 years, or

**(ii)** a nonimmigrant admitted to render services in a capacity that involves specialized knowledge under section 1101(a)(15)(L) of this title shall not exceed 5 years.

**(E)** In the case of an alien spouse admitted under section 1101(a)(15)(L) of this title, who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

**(F)** An alien who will serve in a capacity involving specialized knowledge with respect to an employer for purposes of section 1101(a)(15)(L) of this title and will be stationed primarily at the worksite of an employer other than the petitioning employer or its affiliate, subsidiary, or parent shall not be eligible for classification under section 1101(a)(15)(L) of this title if--

**(i)** the alien will be controlled and supervised principally by such unaffiliated employer; or

**(ii)** the placement of the alien at the worksite of the unaffiliated employer is essentially an arrangement to provide labor for hire for the unaffiliated employer, rather than a placement in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary.

**(3)** The Attorney General shall approve a petition--

**(A)** with respect to a nonimmigrant described in section 1101(a)(15)(O)(i) of this title only after consultation in accordance with paragraph (6) or, with respect to aliens seeking entry for a motion picture or television production, after consultation with the appropriate union representing the alien's occupational peers and a management organization in the area of the alien's ability, or

**(B)** with respect to a nonimmigrant described in section 1101(a)(15)(O)(ii) of this title after consultation in accordance with paragraph (6) or, in the case of such an alien seeking entry for a motion picture or television production, after consultation with such a labor organization and a management organization in the area of the alien's ability.

In the case of an alien seeking entry for a motion picture or television production, (i) any opinion under the previous sentence shall only be advisory, (ii) any such opinion that recommends denial must be in writing, (iii) in making the decision the Attorney General shall consider the exigencies and scheduling of the production, and (iv) the Attorney General shall append to the decision any such opinion. The Attorney General shall provide by regulation for the waiver of the consultation requirement under subparagraph (A) in the case of aliens who have been admitted as nonimmigrants under section 1101(a)(15)(O)(i) of this title because of extraordinary ability in the arts and who seek readmission to perform similar services within 2 years after the date of a consultation under such subparagraph. Not later than 5 days after the date such a waiver is provided, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization.

**(4)(A)** For purposes of section 1101(a)(15)(P)(i)(a) of this title, an alien is described in this subparagraph if the alien--

**(i)(I)** performs as an athlete, individually or as part of a group or team, at an internationally recognized level of performance;

**(II)** is a professional athlete, as defined in section 1154(i)(2) of this title;

**(III)** performs as an athlete, or as a coach, as part of a team or franchise that is located in the United States and a member of a foreign league or association of 15 or more amateur sports teams, if--

**(aa)** the foreign league or association is the highest level of amateur performance of that sport in the relevant foreign country;

**(bb)** participation in such league or association renders players ineligible, whether on a temporary or permanent basis, to earn a scholarship in, or participate in, that sport at a college or university in the United States under the rules of the National Collegiate Athletic Association; and

**(cc)** a significant number of the individuals who play in such league or association are drafted by a major sports league or a minor league affiliate of such a sports league; or

**(IV)** is a professional athlete or amateur athlete who performs individually or as part of a group in a theatrical ice skating production; and

**(ii)** seeks to enter the United States temporarily and solely for the purpose of performing--

**(I)** as such an athlete with respect to a specific athletic competition; or

**(II)** in the case of an individual described in clause (i)(IV), in a specific theatrical ice skating production or tour.

**(B)(i)** For purposes of section 1101(a)(15)(P)(i)(b) of this title, an alien is described in this subparagraph if the alien--

**(I)** performs with or is an integral and essential part of the performance of an entertainment group that has (except as provided in clause (ii)) been recognized internationally as being outstanding in the discipline for a sustained and substantial period of time,

**(II)** in the case of a performer or entertainer, except as provided in clause (iii), has had a sustained and substantial relationship with that group (ordinarily for at least one year) and provides functions integral to the performance of the group, and

**(III)** seeks to enter the United States temporarily and solely for the purpose of performing as such a performer or entertainer or as an integral and essential part of a performance.

**(ii)** In the case of an entertainment group that is recognized nationally as being outstanding in its discipline for a sustained and substantial period of time, the Attorney General may, in consideration of special circumstances, waive the international recognition requirement of clause (i)(I).

**(iii)(I)** The one-year relationship requirement of clause (i)(II) shall not apply to 25 percent of the performers and entertainers in a group.

**(II)** The Attorney General may waive such one-year relationship requirement for an alien who because of illness or unanticipated and exigent circumstances replaces an essential member of the group and for an alien who augments the group by performing a critical role.

**(iv)** The requirements of subclauses (I) and (II) of clause (i) shall not apply to alien circus personnel who perform as part of a circus or circus group or who constitute an integral and essential part of the performance of such circus or circus group, but only if such personnel are entering the United States to join a circus that has been recognized nationally as outstanding for a sustained and substantial period of time or as part of such a circus.

**(C)** A person may petition the Attorney General for classification of an alien as a nonimmigrant under section 1101(a)(15)(P) of this title.

**(D)** The Attorney General shall approve petitions under this subsection with respect to nonimmigrants described in clause (i) or (iii) of section 1101(a)(15)(P) of this title only after consultation in accordance with paragraph (6).

**(E)** The Attorney General shall approve petitions under this subsection for nonimmigrants described in section 1101(a)(15)(P)(ii) of this title only after consultation with labor organizations representing artists and entertainers in the United States.

**(F)(i)** No nonimmigrant visa under section 1101(a)(15)(P)(i)(a) of this title shall be issued to any alien who is a national of a country that is a state sponsor of international terrorism unless the Secretary of State determines, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that such alien does not pose a threat to the safety, national security, or national interest of the United States. In making a determination under this subparagraph, the Secretary of State shall apply standards developed by the Secretary of State, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that are applicable to the nationals of such states.

**(ii)** In this subparagraph, the term "state sponsor of international terrorism" means any country the government of which has been determined by the Secretary of State under any of the laws specified in clause (iii) to have repeatedly provided support for acts of international terrorism.

**(iii)** The laws specified in this clause are the following:

   **(I)** Section 4605(j)(1)(A) of Title 50 (or successor statute).

   **(II)** Section 2780(d) of Title 22.

   **(III)** Section 2371(a) of Title 22.

**(G)** The Secretary of Homeland Security shall permit a petition under this subsection to seek classification of more than 1 alien as a nonimmigrant under section 1101(a)(15)(P)(i)(a) of this title.

**(H)** The Secretary of Homeland Security shall permit an athlete, or the employer of an athlete, to seek admission to the United States for such athlete under a provision of this chapter other than section 1101(a)(15)(P)(i) of this title if the athlete is eligible under such other provision.

**(5)(A)** In the case of an alien who is provided nonimmigrant status under section 1101(a)(15)(H)(i)(b) or 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad.

**(B)** In the case of an alien who is admitted to the United States in nonimmigrant status under section 1101(a)(15)(O) or 1101(a)(15)(P) of this title and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. The petitioner shall provide assurance satisfactory to the Attorney General that the reasonable cost of that transportation will be provided.

**(6)(A)(i)** To meet the consultation requirement of paragraph (3)(A) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(O)(i) of this title (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a peer group (or other person or persons of its choosing, which may include a labor organization) with expertise in the specific field involved.

**(ii)** To meet the consultation requirement of paragraph (3)(B) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(O)(ii) of this title (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the skill area involved.

**(iii)** To meet the consultation requirement of paragraph (4)(D) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(P)(i) or 1101(a)(15)(P)(iii) of this title, the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the specific field of athletics or entertainment involved.

**(B)** To meet the consultation requirements of subparagraph (A), unless the petitioner submits with the petition an advisory opinion from an appropriate labor organization, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization within 5 days of the date of receipt of the petition. If there is a collective bargaining representative of an employer's employees in the occupational classification for which the alien is being sought, that representative shall be the appropriate labor organization.

**(C)** In those cases in which a petitioner described in subparagraph (A) establishes that an appropriate peer group (including a labor organization) does not exist, the Attorney General shall adjudicate the petition without requiring an advisory opinion.

**(D)** Any person or organization receiving a copy of a petition described in subparagraph (A) and supporting documents shall have no more than 15 days following the date of receipt of such documents within which to submit a written advisory opinion or comment or to provide a letter of no objection. Once the 15-day period has expired and the petitioner has had an opportunity, where appropriate, to supply rebuttal evidence, the Attorney General shall adjudicate such petition in no more than 14 days. The Attorney General may shorten any specified time period for emergency reasons if no unreasonable burden would be thus imposed on any participant in the process.

**(E)(i)** The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant artists or entertainers described in section 1101(a)(15)(O) or 1101(a)(15)(P) of this title to accommodate the exigencies and scheduling of a given production or event.

**(ii)** The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant athletes described in section 1101(a)(15)(O)(i) or 1101(a)(15)(P)(i) of this title in the case of emergency circumstances (including trades during a season).

**(F)** No consultation required under this subsection by the Attorney General with a nongovernmental entity shall be construed as permitting the Attorney General to delegate any authority under this subsection to such an entity. The Attorney General shall give such weight to advisory opinions provided under this section as the Attorney General determines, in his sole discretion, to be appropriate.

**(7)** If a petition is filed and denied under this subsection, the Attorney General shall notify the petitioner of the determination and the reasons for the denial and of the process by which the petitioner may appeal the determination.

**(8)** The Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing, with respect to petitions under each subcategory of subparagraphs (H), (O), (P), and (Q) of section 1101(a)(15) of this title the following:

   **(A)** The number of such petitions which have been filed.

   **(B)** The number of such petitions which have been approved and the number of workers (by occupation) included in such approved petitions.

   **(C)** The number of such petitions which have been denied and the number of workers (by occupation) requested in such denied petitions.

   **(D)** The number of such petitions which have been withdrawn.

   **(E)** The number of such petitions which are awaiting final action.

**(9)(A)** The Attorney General shall impose a fee on an employer (excluding any employer that is a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of Title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization) filing before [1] a petition under paragraph (1)--

   **(i)** initially to grant an alien nonimmigrant status described in section 1101(a)(15)(H)(i)(b) of this title;

   **(ii)** to extend the stay of an alien having such status (unless the employer previously has obtained an extension for such alien); or

   **(iii)** to obtain authorization for an alien having such status to change employers.

**(B)** The amount of the fee shall be $1,500 for each such petition except that the fee shall be half the amount for each such petition by any employer with not more than 25 full-time equivalent employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer).

**(C)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(s) of this title.

**(10)** An amended H-1B petition shall not be required where the petitioning employer is involved in a corporate restructuring, including but not limited to a merger, acquisition, or consolidation, where a new corporate entity succeeds to the interests and obligations of the original petitioning employer and where the terms and conditions of employment remain the same but for the identity of the petitioner.

**(11)(A)** Subject to subparagraph (B), the Secretary of Homeland Security or the Secretary of State, as appropriate, shall impose a fee on an employer who has filed an attestation described in section 1182(t) of this title--

　**(i)** in order that an alien may be initially granted nonimmigrant status described in section 1101(a)(15)(H)(i)(b1) of this title; or

　**(ii)** in order to satisfy the requirement of the second sentence of subsection (g)(8)(C) for an alien having such status to obtain certain extensions of stay.

**(B)** The amount of the fee shall be the same as the amount imposed by the Secretary of Homeland Security under paragraph (9), except that if such paragraph does not authorize such Secretary to impose any fee, no fee shall be imposed under this paragraph.

**(C)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(s) of this title.

**(12)(A)** In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1)--

　**(i)** initially to grant an alien nonimmigrant status described in subparagraph (H)(i)(b) or (L) of section 1101(a)(15) of this title; or

　**(ii)** to obtain authorization for an alien having such status to change employers.

**(B)** In addition to any other fees authorized by law, the Secretary of State shall impose a fraud prevention and detection fee on an alien filing an application abroad for a visa authorizing admission to the United States as a nonimmigrant described in section 1101(a)(15)(L) of this title, if the alien is covered under a blanket petition described in paragraph (2)(A).

**(C)** The amount of the fee imposed under subparagraph (A) or (B) shall be $500.

**(D)** The fee imposed under subparagraph (A) or (B) shall only apply to principal aliens and not to the spouses or children who are accompanying or following to join such principal aliens.

**(E)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(v) of this title.

**(13)(A)** In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) for nonimmigrant workers described in section 1101(a)(15)(H)(ii)(b) of this title.

**(B)** The amount of the fee imposed under subparagraph (A) shall be $150.

**(14)(A)** If the Secretary of Homeland Security finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under section 1101(a)(15)(H)(ii)(b) of this title or a willful misrepresentation of a material fact in such petition--

**(i)** the Secretary of Homeland Security may, in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the Secretary of Homeland Security determines to be appropriate; and

**(ii)** the Secretary of Homeland Security may deny petitions filed with respect to that employer under section 1154 of this title or paragraph (1) of this subsection during a period of at least 1 year but not more than 5 years for aliens to be employed by the employer.

**(B)** The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i).

**(C)** In determining the level of penalties to be assessed under subparagraph (A), the highest penalties shall be reserved for willful failures to meet any of the conditions of the petition that involve harm to United States workers.

**(D)** In this paragraph, the term "substantial failure" means the willful failure to comply with the requirements of this section that constitutes a significant deviation from the terms and conditions of a petition.

**(d) Issuance of visa to fiancée or fiancé of citizen**

**(1)** A visa shall not be issued under the provisions of section 1101(a)(15)(K)(i) of this title until the consular officer has received a petition filed in the United States by the fiancée or fiancé of the applying alien and approved by the Secretary of Homeland Security. The petition shall be in such form and contain such information as the Secretary of Homeland Security shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (3)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in paragraph (3)(B)(i). It shall be approved only after satisfactory evidence is submitted by the petitioner to establish that the parties have previously met in person within 2 years before the date

of filing the petition, have a bona fide intention to marry, and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival, except that the Secretary of Homeland Security in his discretion may waive the requirement that the parties have previously met in person. In the event the marriage with the petitioner does not occur within three months after the admission of the said alien and minor children, they shall be required to depart from the United States and upon failure to do so shall be removed in accordance with sections 1229a and 1231 of this title.

**(2)(A)** Subject to subparagraphs (B) and (C), the Secretary of Homeland Security may not approve a petition under paragraph (1) unless the Secretary has verified that--

**(i)** the petitioner has not, previous to the pending petition, petitioned under paragraph (1) with respect to two or more applying aliens; and

**(ii)** if the petitioner has had such a petition previously approved, 2 years have elapsed since the filing of such previously approved petition.

**(B)** The Secretary of Homeland Security may, in the Secretary's discretion, waive the limitations in subparagraph (A) if justification exists for such a waiver. Except in extraordinary circumstances and subject to subparagraph (C), such a waiver shall not be granted if the petitioner has a record of violent criminal offenses against a person or persons.

**(C)(i)** The Secretary of Homeland Security is not limited by the criminal court record and shall grant a waiver of the condition described in the second sentence of subparagraph (B) in the case of a petitioner described in clause (ii).

**(ii)** A petitioner described in this clause is a petitioner who has been battered or subjected to extreme cruelty and who is or was not the primary perpetrator of violence in the relationship upon a determination that--

**(I)** the petitioner was acting in self-defense;

**(II)** the petitioner was found to have violated a protection order intended to protect the petitioner; or

**(III)** the petitioner committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the petitioner's having been battered or subjected to extreme cruelty.

**(iii)** In acting on applications under this subparagraph, the Secretary of Homeland Security shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Secretary.

**(3)** In this subsection:

**(A)** The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

**(B)** The term "specified crime" means the following:

**(i)** Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

**(ii)** Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

**(iii)** At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

**(e) Nonimmigrant professionals and annual numerical limit**

**(1)** An alien who is a citizen of Canada or Mexico, and the spouse and children of any such alien if accompanying or following to join such alien, who seeks to enter the United States under and pursuant to the provisions of Section D of Annex 16-A of the USMCA (as defined in section 4502 of Title 19) to engage in business activities at a professional level as provided for in such Annex, may be admitted for such purpose under regulations of the Attorney General promulgated after consultation with the Secretaries of State and Labor. For purposes of this chapter, including the issuance of entry documents and the application of subsection (b), such alien shall be treated as if seeking classification, or classifiable, as a nonimmigrant under section 1101(a)(15) of this title. For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

**(2)** In the case of an alien spouse admitted under section 1101(a)(15)(E) of this title, who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

**(f) Denial of crewmember status in case of certain labor disputes**

**(1)** Except as provided in paragraph (3), no alien shall be entitled to nonimmigrant status described in section 1101(a)(15)(D) of this title if the alien intends to land for the purpose of performing service on board a vessel of the United States (as defined in section 116 of Title 46) or on an aircraft of an air carrier (as defined in section 40102(a)(2) of Title 49) during a labor dispute where there is a strike or lockout in the bargaining unit of the employer in which the alien intends to perform such service.

**(2)** An alien described in paragraph (1)--

**(A)** may not be paroled into the United States pursuant to section 1182(d)(5) of this title unless the Attorney General determines that the parole of such alien is necessary to protect the national security of the United States; and

**(B)** shall be considered not to be a bona fide crewman for purposes of section 1282(b) of this title.

**(3)** Paragraph (1) shall not apply to an alien if the air carrier or owner or operator of such vessel that employs the alien provides documentation that satisfies the Attorney General that the alien--

**(A)** has been an employee of such employer for a period of not less than 1 year preceding the date that a strike or lawful lockout commenced;

**(B)** has served as a qualified crewman for such employer at least once in each of 3 months during the 12-month period preceding such date; and

**(C)** shall continue to provide the same services that such alien provided as such a crewman.

**(g) Temporary workers and trainees; limitation on numbers**

**(1)** The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year (beginning with fiscal year 1992)--

**(A)** under section 1101(a)(15)(H)(i)(b) of this title, may not exceed--

**(i)** 65,000 in each fiscal year before fiscal year 1999;

**(ii)** 115,000 in fiscal year 1999;

**(iii)** 115,000 in fiscal year 2000;

**(iv)** 195,000 in fiscal year 2001;

**(v)** 195,000 in fiscal year 2002;

**(vi)** 195,000 in fiscal year 2003; and

**(vii)** 65,000 in each succeeding fiscal year; or

**(B)** under section 1101(a)(15)(H)(ii)(b) of this title may not exceed 66,000.

**(2)** The numerical limitations of paragraph (1) shall only apply to principal aliens and not to the spouses or children of such aliens.

**(3)** Aliens who are subject to the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status. If an alien who was issued a visa or otherwise provided nonimmigrant status and counted against the numerical limitations of paragraph (1) is found to have been issued such visa or otherwise provided such status by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of aliens who may be issued visas or otherwise provided such status under the numerical limitations of paragraph (1) in the fiscal year in which the petition is revoked, regardless of the fiscal year in which the petition was approved.

**(4)** In the case of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title, the period of authorized admission as such a nonimmigrant may not exceed 6 years.

**(5)** The numerical limitations contained in paragraph (1)(A) shall not apply to any nonimmigrant alien issued a visa or otherwise provided status under section 1101(a)(15)(H)(i)(b) of this title who--

    **(A)** is employed (or has received an offer of employment) at an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity;

    **(B)** is employed (or has received an offer of employment) at a nonprofit research organization or a governmental research organization; or

    **(C)** has earned a master's or higher degree from a United States institution of higher education (as defined in section 1001(a) of Title 20), until the number of aliens who are exempted from such numerical limitation during such year exceeds 20,000.

**(6)** Any alien who ceases to be employed by an employer described in paragraph (5)(A) shall, if employed as a nonimmigrant alien described in section 1101(a)(15)(H)(i)(b) of this title, who has not previously been counted toward the numerical limitations contained in paragraph (1)(A), be counted toward those limitations the first time the alien is employed by an employer other than one described in paragraph (5).

**(7)** Any alien who has already been counted, within the 6 years prior to the approval of a petition described in subsection (c), toward the numerical limitations of paragraph (1)(A) shall not again be counted toward those limitations unless the alien would be eligible for a full 6 years of authorized admission at the time the petition is filed. Where multiple petitions are approved for 1 alien, that alien shall be counted only once.

**(8)(A)** The agreements referred to in section 1101(a)(15)(H)(i)(b1) of this title are--

    **(i)** the United States-Chile Free Trade Agreement; and

    **(ii)** the United States-Singapore Free Trade Agreement.

**(B)(i)** The Secretary of Homeland Security shall establish annual numerical limitations on approvals of initial applications by aliens for admission under section 1101(a)(15)(H)(i)(b1) of this title.

**(ii)** The annual numerical limitations described in clause (i) shall not exceed--

**(I)** 1,400 for nationals of Chile (as defined in article 14.9 of the United States-Chile Free Trade Agreement) for any fiscal year; and

**(II)** 5,400 for nationals of Singapore (as defined in Annex 1A of the United States-Singapore Free Trade Agreement) for any fiscal year.

**(iii)** The annual numerical limitations described in clause (i) shall only apply to principal aliens and not to the spouses or children of such aliens.

**(iv)** The annual numerical limitation described in paragraph (1)(A) is reduced by the amount of the annual numerical limitations established under clause (i). However, if a numerical limitation established under clause (i) has not been exhausted at the end of a given fiscal year, the Secretary of Homeland Security shall adjust upwards the numerical limitation in paragraph (1)(A) for that fiscal year by the amount remaining in the numerical limitation under clause (i). Visas under section 1101(a)(15)(H)(i)(b) of this title may be issued pursuant to such adjustment within the first 45 days of the next fiscal year to aliens who had applied for such visas during the fiscal year for which the adjustment was made.

**(C)** The period of authorized admission as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title shall be 1 year, and may be extended, but only in 1-year increments. After every second extension, the next following extension shall not be granted unless the Secretary of Labor had determined and certified to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title for the purpose of permitting the nonimmigrant to obtain such extension.

**(D)** The numerical limitation described in paragraph (1)(A) for a fiscal year shall be reduced by one for each alien granted an extension under subparagraph (C) during such year who has obtained 5 or more consecutive prior extensions.

**(9)(A)** Subject to subparagraphs (B) and (C), an alien who has already been counted toward the numerical limitation of paragraph (1)(B) during fiscal year 2013, 2014, or 2015 shall not again be counted toward such limitation during fiscal year 2016. Such an alien shall be considered a returning worker.

**(B)** A petition to admit or otherwise provide status under section 1101(a)(15)(H)(ii)(b) of this title shall include, with respect to a returning worker--

**(i)** all information and evidence that the Secretary of Homeland Security determines is required to support a petition for status under section 1101(a)(15)(H)(ii)(b) of this title;

**(ii)** the full name of the alien; and

**(iii)** a certification to the Department of Homeland Security that the alien is a returning worker.

**(C)** An H-2B visa or grant of nonimmigrant status for a returning worker shall be approved only if the alien is confirmed to be a returning worker by--

**(i)** the Department of State; or

**(ii)** if the alien is visa exempt or seeking to change to status under section 1101(a)(15)(H)(ii)(b) of this title, the Department of Homeland Security.

**(10)** The numerical limitations of paragraph (1)(B) shall be allocated for a fiscal year so that the total number of aliens subject to such numerical limits who enter the United States pursuant to a visa or are accorded nonimmigrant status under section 1101(a)(15)(H)(ii)(b) of this title during the first 6 months of such fiscal year is not more than 33,000.

**(11)(A)** The Secretary of State may not approve a number of initial applications submitted for aliens described in section 1101(a)(15)(E)(iii) of this title that is more than the applicable numerical limitation set out in this paragraph.

**(B)** The applicable numerical limitation referred to in subparagraph (A) is 10,500 for each fiscal year.

**(C)** The applicable numerical limitation referred to in subparagraph (A) shall only apply to principal aliens and not to the spouses or children of such aliens.

**(h) Intention to abandon foreign residence**

The fact that an alien is the beneficiary of an application for a preference status filed under section 1154 of this title or has otherwise sought permanent residence in the United States shall not constitute evidence of an intention to abandon a foreign residence for purposes of obtaining a visa as a nonimmigrant described in subparagraph (H)(i)(b) or (c), (L), or (V) of section 1101(a)(15) of this title or otherwise obtaining or maintaining the status of a nonimmigrant described in such subparagraph, if the alien had obtained a change of status under section 1258 of this title to a classification as such a nonimmigrant before the alien's most recent departure from the United States.

**(i) "Specialty occupation" defined**

**(1)** Except as provided in paragraph (3), for purposes of section 1101(a)(15)(H)(i)(b) of this title, section 1101(a)(15)(E)(iii) of this title, and paragraph (2), the term "specialty occupation" means an occupation that requires--

**(A)** theoretical and practical application of a body of highly specialized knowledge, and

**(B)** attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

**(2)** For purposes of section 1101(a)(15)(H)(i)(b) of this title, the requirements of this paragraph, with respect to a specialty occupation, are--

**(A)** full state licensure to practice in the occupation, if such licensure is required to practice in the occupation,

**(B)** completion of the degree described in paragraph (1)(B) for the occupation, or

**(C)**(i) experience in the specialty equivalent to the completion of such degree, and (ii) recognition of expertise in the specialty through progressively responsible positions relating to the specialty.

**(3)** For purposes of section 1101(a)(15)(H)(i)(b1) of this title, the term "specialty occupation" means an occupation that requires--

**(A)** theoretical and practical application of a body of specialized knowledge; and

**(B)** attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

**(j) Labor disputes**

**(1)** Notwithstanding any other provision of this chapter, an alien who is a citizen of Canada or Mexico who seeks to enter the United States under and pursuant to the provisions of Section B, Section C, or Section D of Annex 16-A of the USMCA (as defined in section 4502 of Title 19), shall not be classified as a nonimmigrant under such provisions if there is in progress a strike or lockout in the course of a labor dispute in the occupational classification at the place or intended place of employment, unless such alien establishes, pursuant to regulations promulgated by the Attorney General, that the alien's entry will not affect adversely the settlement of the strike or lockout or the employment of any person who is involved in the strike or lockout. Notice of a determination under this paragraph shall be given as may be required by paragraph 3 of article 16.4 of the USMCA. For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

**(2)** Notwithstanding any other provision of this chapter except section 1182(t)(1) of this title, and subject to regulations promulgated by the Secretary of Homeland Security, an alien who seeks to enter the United States under and pursuant to the provisions of an agreement listed in subsection (g)(8)(A), and the spouse and children of such an alien if accompanying or following to join the alien, may be denied admission as a nonimmigrant under subparagraph (E), (L), or (H)(i)(b1) of section 1101(a)(15) of this title if there is in progress a labor dispute in the occupational classification at the place or intended place of employment, unless such alien establishes, pursuant to regulations promulgated by the Secretary of Homeland Security after consultation with the Secretary of Labor, that the alien's entry will not affect adversely the settlement of the labor dispute or the employment of any person who is involved in the labor dispute. Notice of a determination under this paragraph shall be given as may be required by such agreement.

**(k) Numerical limitations; period of admission; conditions for admission and stay; annual report**

**(1)** The number of aliens who may be provided a visa as nonimmigrants under section 1101(a)(15)(S)(i) of this title in any fiscal year may not exceed 200. The number of aliens who may be provided a visa as nonimmigrants under section 1101(a)(15)(S)(ii) of this title in any fiscal year may not exceed 50.

**(2)** The period of admission of an alien as such a nonimmigrant may not exceed 3 years. Such period may not be extended by the Attorney General.

**(3)** As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant--

**(A)** shall report not less often than quarterly to the Attorney General such information concerning the alien's whereabouts and activities as the Attorney General may require;

**(B)** may not be convicted of any criminal offense punishable by a term of imprisonment of 1 year or more after the date of such admission;

**(C)** must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of removal, any action for removal of the alien instituted before the alien obtains lawful permanent resident status; and

**(D)** shall abide by any other condition, limitation, or restriction imposed by the Attorney General.

**(4)** The Attorney General shall submit a report annually to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate concerning--

**(A)** the number of such nonimmigrants admitted;

**(B)** the number of successful criminal prosecutions or investigations resulting from cooperation of such aliens;

**(C)** the number of terrorist acts prevented or frustrated resulting from cooperation of such aliens;

**(D)** the number of such nonimmigrants whose admission or cooperation has not resulted in successful criminal prosecution or investigation or the prevention or frustration of a terrorist act; and

**(E)** the number of such nonimmigrants who have failed to report quarterly (as required under paragraph (3)) or who have been convicted of crimes in the United States after the date of their admission as such a nonimmigrant.

**(l) Restrictions on waiver**

**(1)** In the case of a request by an interested State agency, or by an interested Federal agency, for a waiver of the 2-year foreign residence requirement under section 1182(e) of this title on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless--

**(A)** in the case of an alien who is otherwise contractually obligated to return to a foreign country, the government of such country furnishes the Director of the United States Information Agency with a statement in writing that it has no objection to such waiver;

**(B)** in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 30;

**(C)** in the case of a request by an interested Federal agency or by an interested State agency--

**(i)** the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

**(ii)** the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3-year period); and

**(D)** in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency, the alien agrees to practice primary care or specialty medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals, except that--

**(i)** in the case of a request by the Department of Veterans Affairs, the alien shall not be required to practice medicine in a geographic area designated by the Secretary;

**(ii)** in the case of a request by an interested State agency, the head of such State agency determines that the alien is to practice medicine under such agreement in a facility that serves patients who reside in one or more geographic areas so designated by the Secretary of Health and Human Services (without regard to whether such facility is located within such a designated geographic area), and the grant of such waiver would not cause the number of the waivers granted on behalf of aliens for such State for a fiscal year (within the limitation in subparagraph (B)) in accordance with the conditions of this clause to exceed 10; and

**(iii)** in the case of a request by an interested Federal agency or by an interested State agency for a waiver for an alien who agrees to practice specialty medicine in a facility located in a geographic area so designated by the Secretary of Health and Human Services, the request shall demonstrate, based on criteria established by such agency, that there is a shortage of health care professionals able to provide services in the appropriate medical specialty to the patients who will be served by the alien.

**(2)(A)** Notwithstanding section 1258(a)(2) of this title, the Attorney General may change the status of an alien who qualifies under this subsection and section 1182(e) of this title to that of an alien described in section 1101(a)(15)(H)(i)(b) of this title. The numerical limitations contained in subsection (g)(1)(A) shall not apply to any alien whose status is changed under the preceding sentence, if the alien obtained a waiver of the 2-year foreign residence requirement upon a request by an interested Federal agency or an interested State agency.

**(B)** No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

**(3)** Notwithstanding any other provision of this subsection, the 2-year foreign residence requirement under section 1182(e) of this title shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 1101(a)(27)(H) of this title, if--

**(A)** at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

**(B)** the alien's employment ceases to benefit the public interest at any time during the 3-year period described in paragraph (1)(C).

**(m) Nonimmigrant elementary and secondary school students**

**(1)** An alien may not be accorded status as a nonimmigrant under clause (i) or (iii) of section 1101(a)(15)(F) of this title in order to pursue a course of study--

**(A)** at a public elementary school or in a publicly funded adult education program; or

**(B)** at a public secondary school unless--

**(i)** the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and **(ii)** the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

**(2)** An alien who obtains the status of a nonimmigrant under clause (i) or (iii) of section 1101(a)(15)(F) of this title in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 1101(a)(15)(F) of this title shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).

**(n) Increased portability of H-1B status**

**(1)** A nonimmigrant alien described in paragraph (2) who was previously issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(b) of this title is authorized to accept new employment upon the filing by the prospective employer of a new petition on behalf of such nonimmigrant as provided under subsection (a). Employment authorization shall continue for such alien until the new petition is adjudicated. If the new petition is denied, such authorization shall cease.

**(2)** A nonimmigrant alien described in this paragraph is a nonimmigrant alien--

**(A)** who has been lawfully admitted into the United States;

**(B)** on whose behalf an employer has filed a nonfrivolous petition for new employment before the date of expiration of the period of stay authorized by the Attorney General; and

**(C)** who, subsequent to such lawful admission, has not been employed without authorization in the United States before the filing of such petition.

**(o) Nonimmigrants guilty of trafficking in persons**

**(1)** No alien shall be eligible for admission to the United States under section 1101(a)(15)(T) of this title if there is substantial reason to believe that the alien has committed an act of a severe form of trafficking in persons (as defined in section 7102 of Title 22).

**(2)** The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year under section 1101(a)(15)(T) of this title may not exceed 5,000.

**(3)** The numerical limitation of paragraph (2) shall only apply to principal aliens and not to the spouses, sons, daughters, siblings, or parents of such aliens.

**(4)** An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 1101(a)(15)(T)(i) of this title, and who was under 21 years of age on the date on which such parent applied for such status, shall continue to be classified as a child for purposes of section 1101(a)(15)(T)(ii) of this title, if the alien attains 21 years of age after such parent's application was filed but while it was pending.

**(5)** An alien described in clause (i) of section 1101(a)(15)(T) of this title shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

**(6)** In making a determination under section 1101(a)(15)(T)(i)(III)(aa) with respect to an alien, statements from State and local law enforcement officials that the alien has complied with any reasonable request for assistance in the investigation or prosecution of crimes such as kidnapping, rape, slavery, or other forced labor offenses, where severe forms of trafficking in persons (as defined in section 7102 of Title 22) appear to have been involved, shall be considered.

**(7)(A)** Except as provided in subparagraph (B), an alien who is issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(T) of this title may be granted such status for a period of not more than 4 years.

**(B)** An alien who is issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(T) of this title may extend the period of such status beyond the period described in subparagraph (A) if--

**(i)** a Federal, State, or local law enforcement official, prosecutor, judge, or other authority investigating or prosecuting activity relating to human trafficking or certifies that the presence of the alien in the United States is necessary to assist in the investigation or prosecution of such activity;

**(ii)** the alien is eligible for relief under section 1255(l) of this title and is unable to obtain such relief because regulations have not been issued to implement such section; or

**(iii)** the Secretary of Homeland Security determines that an extension of the period of such nonimmigrant status is warranted due to exceptional circumstances.

**(C)** Nonimmigrant status under section 1101(a)(15)(T) of this title shall be extended during the pendency of an application for adjustment of status under section 1255(l) of this title.

**(p) Requirements applicable to section 1101(a)(15)(U) visas**

**(1) Petitioning procedures for section 1101(a)(15)(U) visas**

The petition filed by an alien under section 1101(a)(15)(U)(i) of this title shall contain a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity described in section 1101(a)(15)(U)(iii) of this title. This certification may also be provided by an official of the Service whose ability to provide such certification is not limited to information concerning immigration violations. This certification shall state that the alien "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of criminal activity described in section 1101(a)(15)(U)(iii) of this title.

**(2) Numerical limitations**

**(A)** The number of aliens who may be issued visas or otherwise provided status as nonimmigrants under section 1101(a)(15)(U) of this title in any fiscal year shall not exceed 10,000.

**(B)** The numerical limitations in subparagraph (A) shall only apply to principal aliens described in section 1101(a)(15)(U)(i) of this title, and not to spouses, children, or, in the case of alien children, the alien parents of such children.

**(3) Duties of the Attorney General with respect to "U" visa nonimmigrants**

With respect to nonimmigrant aliens described in subsection (a)(15)(U) of section 1101 of this title--

**(A)** the Attorney General and other government officials, where appropriate, shall provide those aliens with referrals to nongovernmental organizations to advise the aliens regarding their options while in the United States and the resources available to them; and

**(B)** the Attorney General shall, during the period those aliens are in lawful temporary resident status under that subsection, provide the aliens with employment authorization.

**(4) Credible evidence considered**

In acting on any petition filed under this subsection, the consular officer or the Attorney General, as appropriate, shall consider any credible evidence relevant to the petition.

**(5) Nonexclusive relief**

Nothing in this subsection limits the ability of aliens who qualify for status under section 1101(a)(15)(U) of this title to seek any other immigration benefit or status for which the alien may be eligible.

**(6) Duration of status**

The authorized period of status of an alien as a nonimmigrant under section 1101(a)(15)(U) of this title shall be for a period of not more than 4 years, but shall be extended upon certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating or prosecuting criminal activity described in section 1101(a)(15)(U)(iii) of this title that the alien's presence in the United States is required to assist in the investigation or prosecution of such criminal activity. The Secretary of Homeland Security may extend, beyond the 4-year period authorized under this section, the authorized period of status of an alien as a nonimmigrant under section 1101(a)(15)(U) of this title if the Secretary determines that an extension of such period is warranted due to exceptional circumstances. Such alien's nonimmigrant status shall be extended beyond the 4-year period authorized under this section if the alien is eligible for relief under section 1255(m) of this title and is unable to obtain such relief because regulations have not been issued to implement such section and shall be extended during the pendency of an application for adjustment of status under section 1255(m) of this title. The Secretary may grant work authorization to any alien who has a pending, bona fide application for nonimmigrant status under section 1101(a)(15)(U) of this title.

**(7) Age determinations**

**(A) Children**

An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 1101(a)(15)(U)(i) of this title, and who was under 21 years of age on the date on which such parent petitioned for such status, shall continue to be classified as a child for purposes of section 1101(a)(15)(U)(ii) of this title, if the alien attains 21 years of age after such parent's petition was filed but while it was pending.

**(B) Principal aliens**

An alien described in clause (i) of section 1101(a)(15)(U) of this title shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

**(q) Employment of nonimmigrants described in section 1101(a)(15)(V)**

**(1)** In the case of a nonimmigrant described in section 1101(a)(15)(V) of this title--

**(A)** the Attorney General shall authorize the alien to engage in employment in the United States during the period of authorized admission and shall provide the alien with an "employment authorized" endorsement or other appropriate document signifying authorization of employment; and

**(B)** the period of authorized admission as such a nonimmigrant shall terminate 30 days after the date on which any of the following is denied:

**(i)** The petition filed under section 1154 of this title to accord the alien a status under section 1153(a)(2)(A) of this title (or, in the case of a child granted nonimmigrant status based on eligibility to receive a visa under section 1153(d) of this title, the petition filed to accord the child's parent a status under section 1153(a)(2)(A) of this title).

**(ii)** The alien's application for an immigrant visa pursuant to the approval of such petition.

**(iii)** The alien's application for adjustment of status under section 1255 of this title pursuant to the approval of such petition.

**(2)** In determining whether an alien is eligible to be admitted to the United States as a nonimmigrant under section 1101(a)(15)(V) of this title, the grounds for inadmissibility specified in section 1182(a)(9)(B) of this title shall not apply.

**(3)** The status of an alien physically present in the United States may be adjusted by the Attorney General, in the discretion of the Attorney General and under such regulations as the Attorney General may prescribe, to that of a nonimmigrant under section 1101(a)(15)(V) of this title, if the alien--

**(A)** applies for such adjustment;

**(B)** satisfies the requirements of such section; and

**(C)** is eligible to be admitted to the United States, except in determining such admissibility, the grounds for inadmissibility specified in paragraphs (6)(A), (7), and (9)(B) of section 1182(a) of this title shall not apply.

**(r) Visas of nonimmigrants described in section 1101(a)(15)(K)(ii)**

**(1)** A visa shall not be issued under the provisions of section 1101(a)(15)(K)(ii) of this title until the consular officer has received a petition filed in the United States by the spouse of the applying alien and approved by the Attorney General. The petition shall be in such form and contain such information as the Attorney General shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (5)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in subsection [2] (5)(B)(i).

**(2)** In the case of an alien seeking admission under section 1101(a)(15)(K)(ii) of this title who concluded a marriage with a citizen of the United States outside the United States, the alien shall be considered inadmissible under section 1182(a)(7)(B) of this title if the alien is not at the time of application for admission in possession of a valid nonimmigrant visa issued by a consular officer in the foreign state in which the marriage was concluded.

**(3)** In the case of a nonimmigrant described in section 1101(a)(15)(K)(ii) of this title, and any child of such a nonimmigrant who was admitted as accompanying, or following to join, such a nonimmigrant, the period of authorized admission shall terminate 30 days after the date on which any of the following is denied:

**(A)** The petition filed under section 1154 of this title to accord the principal alien status under section 1151(b)(2)(A)(i) of this title.

**(B)** The principal alien's application for an immigrant visa pursuant to the approval of such petition.

**(C)** The principal alien's application for adjustment of status under section 1255 of this title pursuant to the approval of such petition.

**(4)(A)** The Secretary of Homeland Security shall create a database for the purpose of tracking multiple visa petitions filed for fiancé(e)s and spouses under clauses (i) and (ii) of section 1101(a)(15)(K) of this title. Upon approval of a second visa petition under section 1101(a)(15)(K) of this title for a fiancé(e) or spouse filed by the same United States citizen petitioner, the petitioner shall be notified by the Secretary that information concerning the petitioner has been entered into the multiple visa petition tracking database. All subsequent fiance(e) or spouse nonimmigrant visa petitions filed by that petitioner under such section shall be entered in the database.

**(B)(i)** Once a petitioner has had two fiance(e) or spousal petitions approved under clause (i) or (ii) of section 1101(a)(15)(K) of this title, if a subsequent petition is filed under such section less than 10 years after the date the first visa petition was filed

under such section, the Secretary of Homeland Security shall notify both the petitioner and beneficiary of any such subsequent petition about the number of previously approved fiance(e) or spousal petitions listed in the database.

**(ii)** To notify the beneficiary as required by clause (i), the Secretary of Homeland Security shall provide such notice to the Secretary of State for inclusion in the mailing to the beneficiary described in section 1375a(a)(5)(A)(i) of this title.

**(5)** In this subsection:

**(A)** The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

**(B)** The term "specified crime" means the following:

**(i)** Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

**(ii)** Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

**(iii)** At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 214, 66 Stat. 189; Pub.L. 91-225, § 3, Apr. 7, 1970, 84 Stat. 117; Pub.L. 98-454, Title VI, § 602(b), Oct. 5, 1984, 98 Stat. 1737; Pub.L. 99-603, Title III, §§ 301(b), 313(b), Nov. 6, 1986, 100 Stat. 3411, 3438; Pub.L. 99-639, § 3(a), (c), Nov. 10, 1986, 100 Stat. 3542; Pub.L. 100-449, Title III, § 307(b), Sept. 28, 1988, 102 Stat. 1877; Pub.L. 100-525, § 2(l)(1), Oct. 24, 1988, 102 Stat. 2612; Pub.L. 101-649, Title II, §§ 202(a), 205(a), (b), (c)(2), 206(b), 207(b), Nov. 29, 1990, 104 Stat. 5014, 5019, 5020, 5023, 5025; Pub.L. 102-232, Title II, §§ 202(a), 203(b), 204, 205(d), (e), 206(a), (c)(2), 207(a), (c)(1), Title III, § 303(a)(10) to (12), Dec. 12, 1991, 105 Stat. 1737 to 1741, 1748; Pub.L. 103-182, Title III, § 341(b), (c), Dec. 8, 1993, 107 Stat. 2116, redesignated Pub.L. 116-113, Title III, § 311(b), (c) by Pub.L. 116-113, Title V, § 503(b)(1) to (3), Jan. 29, 2020, 134 Stat. 71 and amended by Pub.L. 116-113, Title V, § 503(b)(4)(A), Jan. 29, 2020, 134 Stat. 71; Pub.L. 103-322, Title XIII, § 130003(b)(2), Sept. 13, 1994, 108 Stat. 2025; Pub.L. 103-416, Title II, § 220(b), Oct. 25, 1994, 108 Stat. 4319; Pub.L. 104-208, Div. C, Title III, § 308(e)(1)(D), (2)(B), (f)(1)(G), (H), (3)(B), (g)(5)(A)(i), (7)(A), Title VI, §§ 621, 622(c), 625(a)(1), 671(a)(3)(A), (e)(4)(A), Sept. 30, 1996, 110 Stat. 3009-619 to 3009-621, 3009-623, 3009-695, 3009-699, 3009-721, 3009-723; Pub.L. 105-65, Title I, § 108, Oct. 27, 1997, 111 Stat. 1350; Pub.L. 105-277, Div. C, Title IV, §§ 411(a), 414(a), Oct. 21, 1998, 112 Stat. 2681-642, 2681-651; Pub.L. 106-104, § 2, Nov. 13, 1999, 113 Stat. 1483; Pub.L. 106-311, § 1, Oct. 17, 2000, 114 Stat. 1247; Pub.L. 106-313, Title I, §§ 102(a), 103, 105(a), 108, Oct. 17, 2000, 114 Stat. 1251 to 1253, 1255; Pub.L. 106-386, Div. A, § 107(e)(2), Div. B, Title V, § 1513(c), Oct. 28, 2000, 114 Stat. 1478, 1535; Pub.L. 106-396, Title IV, § 401, Oct. 30, 2000, 114 Stat. 1647; Pub.L. 106-553, § 1(a)(2) [Title XI, §§ 1102(b), (d)(1), 1103(b), (c)(1)], Dec. 21, 2000, 114 Stat. 2762, 2762A-142, 2762A-144, 2762A-145; Pub.L. 107-45, § 1, Oct. 1, 2001, 115 Stat. 258; Pub.L. 107-124, Jan. 16, 2002, 115 Stat. 2402; Pub.L. 107-125, §§ 1, 2(a), Jan. 16, 2002, 115 Stat. 2403; Pub.L. 107-273, Div. C, Title I, § 11018(a), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 107-274, § 2(c), Nov. 2, 2002, 116 Stat. 1923; Pub.L. 108-77, Title IV, §§

402(a)(2), (d)(1), 403, 404, Sept. 3, 2003, 117 Stat. 940, 946, 947; Pub.L. 108-78, Title IV, § 402, Sept. 3, 2003, 117 Stat. 970; Pub.L. 108-193, §§ 4(b)(2), 8(a)(3), Dec. 19, 2003, 117 Stat. 2878, 2886; Pub.L. 108-441, § 1(b) to (d), Dec. 3, 2004, 118 Stat. 2630; Pub.L. 108-447, Div. J, Title IV, §§ 412(a), 413(a), 422(b), 425(a), 426(a), Dec. 8, 2004, 118 Stat. 3351 to 3353, 3356, 3357; Pub.L. 109-13, Div. B, Title IV, §§ 402(a), 403(a), 404(a), 405, Title V, § 501(b), (c), May 11, 2005, 119 Stat. 318 to 322; Pub.L. 109-162, Title VIII, §§ 821(a), (b), (c)(2), 832(a)(1), (2), Jan. 5, 2006, 119 Stat. 3062, 3066, 3067; Pub.L. 109-364, Div. A, Title X, § 1074(a), Oct. 17, 2006, 120 Stat. 2403; Pub.L. 109-463, § 2, Dec. 22, 2006, 120 Stat. 3477; Pub.L. 110-229, Title VII, § 702(b)(1), May 8, 2008, 122 Stat. 860; Pub.L. 110-362, § 2, Oct. 8, 2008, 122 Stat. 4013; Pub.L. 110-457, Title II, § 201(b), (c), Dec. 23, 2008, 122 Stat. 5053; Pub.L. 113-4, Title VIII, §§ 805(a), 807(a), Mar. 7, 2013, 127 Stat. 111, 112; Pub.L. 114-113, Div. F, Title V, § 565, Dec. 18, 2015, 129 Stat. 2523; Pub.L. 116-113, Title III, § 311(b), (c), formerly Pub.L. 103-182, Title III, § 341(b), (c), Dec. 8, 1993, 107 Stat. 2116, redesignated by Pub.L. 116-113, Title V, § 503(b)(1) to (3), Jan. 29, 2020, 134 Stat. 71 and amended by Pub.L. 116-113, Title V, § 503(b)(4)(A), Jan. 29, 2020, 134 Stat. 71; amended Pub.L. 116-113, Title V, § 503(c), Jan. 29, 2020, 134 Stat. 71.)

## TERMINATION OF AMENDMENTS

<For termination of amendment by Pub.L. 108-78, § 107(c), see Sunset Provisions note set out under this section.>

<For termination of amendment by Pub.L. 108-77, § 107(c), see Sunset Provisions note set out under this section.>

<For termination of amendment by Pub.L. 100-449, § 501(c), see Sunset Provisions note set out under this section.>

## TERMINATION OF USMCA (AGREEMENT BETWEEN THE UNITED STATES OF AMERICA, THE UNITED MEXICAN STATES, AND CANADA)

<During any period in which a country ceases to be a USMCA country, this Act and the amendments made by this Act (United States-Mexico-Canada Agreement Implementation Act, Pub.L. 116-113) shall cease to have effect with respect to that country, and on the date on which the USMCA ceases to be in force with respect to the United States, this Act and the amendments made by this Act shall cease to have effect, see Pub.L. 116-113, Title VI, § 621, set out as 19 U.S.C.A. § 4621.>

Notes of Decisions (197)

## Footnotes

1    So in original. The word "before" probably should not appear.

2    So in original. Probably should be "paragraph".

8 U.S.C.A. § 1184, 8 USCA § 1184
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 221

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part III. Issuance of Entry Documents

8 U.S.C.A. § 1201

§ 1201. Issuance of visas

Currentness

**(a) Immigrants; nonimmigrants**

**(1)** Under the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue

**(A)** to an immigrant who has made proper application therefor, an immigrant visa which shall consist of the application provided for in section 1202 of this title, visaed by such consular officer, and shall specify the foreign state, if any, to which the immigrant is charged, the immigrant's particular status under such foreign state, the preference, immediate relative, or special immigrant classification to which the alien is charged, the date on which the validity of the visa shall expire, and such additional information as may be required; and

**(B)** to a nonimmigrant who has made proper application therefor, a nonimmigrant visa, which shall specify the classification under section 1101(a)(15) of this title of the nonimmigrant, the period during which the nonimmigrant visa shall be valid, and such additional information as may be required.

**(2)** The Secretary of State shall provide to the Service an electronic version of the visa file of each alien who has been issued a visa to ensure that the data in that visa file is available to immigration inspectors at the United States ports of entry before the arrival of the alien at such a port of entry.

**(b) Registration; photographs; waiver of requirement**

Each alien who applies for a visa shall be registered in connection with his application, and shall furnish copies of his photograph signed by him for such use as may be by regulations required. The requirements of this subsection may be waived in the discretion of the Secretary of State in the case of any alien who is within that class of nonimmigrants enumerated in sections 1101(a)(15)(A), and 1101(a)(15)(G) of this title, or in the case of any alien who is granted a diplomatic visa on a diplomatic passport or on the equivalent thereof.

**(c) Period of validity; renewal or replacement**

 **(1) Immigrant visas**

An immigrant visa shall be valid for such period, not exceeding six months, as shall be by regulations prescribed, except that any visa issued to a child lawfully adopted by a United States citizen and spouse while such citizen is serving abroad in the United States Armed Forces, or is employed abroad by the United States Government, or is temporarily abroad on business, shall be valid until such time, for a period not to exceed three years, as the adoptive citizen parent returns to the United States in due course of his service, employment, or business.

**(2) Nonimmigrant visas**

A nonimmigrant visa shall be valid for such periods as shall be by regulations prescribed. In prescribing the period of validity of a nonimmigrant visa in the case of nationals of any foreign country who are eligible for such visas, the Secretary of State shall, insofar as practicable, accord to such nationals the same treatment upon a reciprocal basis as such foreign country accords to nationals of the United States who are within a similar class; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States.

**(3) Visa replacement**

An immigrant visa may be replaced under the original number during the fiscal year in which the original visa was issued for an immigrant who establishes to the satisfaction of the consular officer that the immigrant--

**(A)** was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible;

**(B)** is found by a consular officer to be eligible for an immigrant visa; and

**(C)** pays again the statutory fees for an application and an immigrant visa.

**(4) Fee waiver**

If an immigrant visa was issued, on or after March 27, 2013, for a child who has been lawfully adopted, or who is coming to the United States to be adopted, by a United States citizen, any statutory immigrant visa fees relating to a renewal or replacement of such visa may be waived or, if already paid, may be refunded upon request, subject to such criteria as the Secretary of State may prescribe, if--

**(A)** the immigrant child was unable to use the original immigrant visa during the period of its validity as a direct result of extraordinary circumstances, including the denial of an exit permit; and

**(B)** if such inability was attributable to factors beyond the control of the adopting parent or parents and of the immigrant.

**(d) Physical examination**

Prior to the issuance of an immigrant visa to any alien, the consular officer shall require such alien to submit to a physical and mental examination in accordance with such regulations as may be prescribed. Prior to the issuance of a nonimmigrant visa to any alien, the consular officer may require such alien to submit to a physical or mental examination, or both, if in his opinion such examination is necessary to ascertain whether such alien is eligible to receive a visa.

**(e) Surrender of visa**

Each immigrant shall surrender his immigrant visa to the immigration officer at the port of entry, who shall endorse on the visa the date and the port of arrival, the identity of the vessel or other means of transportation by which the immigrant arrived, and such other endorsements as may be by regulations required.

**(f) Surrender of documents**

Each nonimmigrant shall present or surrender to the immigration officer at the port of entry such documents as may be by regulation required. In the case of an alien crewman not in possession of any individual documents other than a passport and until such time as it becomes practicable to issue individual documents, such alien crewman may be admitted, subject to the provisions of this part, if his name appears in the crew list of the vessel or aircraft on which he arrives and the crew list is visaed by a consular officer, but the consular officer shall have the right to deny admission to any alien crewman from the crew list visa.

**(g) Nonissuance of visas or other documents**

No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law: *Provided*, That a visa or other documentation may be issued to an alien who is within the purview of section 1182(a)(4) of this title, if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title: *Provided further*, That a visa may be issued to an alien defined in section 1101(a)(15)(B) or (F) of this title, if such alien is otherwise entitled to receive a visa, upon receipt of a notice by the consular officer from the Attorney General of the giving of a bond with sufficient surety in such sum and containing such conditions as the consular officer shall prescribe, to insure that at the expiration of the time for which such alien has been admitted by the Attorney General, as provided in section 1184(a) of this title, or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States.

**(h) Nonadmission upon arrival**

Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted the [1] United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law. The substance of this subsection shall appear upon every visa application.

**(i) Revocation of visas or documents**

After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance: *Provided*, That carriers or transportation companies, and masters, commanding officers, agents, owners, charterers, or consignees, shall not be penalized under section 1323(b) of this title for action taken in reliance on such visas or other documentation, unless they received due notice of such revocation prior to the alien's embarkation. There shall be no means of judicial review (including review pursuant to section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 3, § 221, 66 Stat. 191; Pub.L. 87-301, § 4, Sept. 26, 1961, 75 Stat. 651; Pub.L. 89-236, §§ 11(a), (b), 17, Oct. 3, 1965, 79 Stat. 918, 919; Pub.L. 97-116, § 18(f), Dec. 29, 1981, 95 Stat. 1620; Pub.L. 99-653, § 5(a)(1) to (3), formerly § 5(a) to (c), Nov. 14, 1986, 100 Stat. 3656; renumbered Pub.L. 100-525, § 8(d)(1), Oct. 24, 1988, 102 Stat. 2617; Pub.L. 101-649, Title VI, § 603(a)(9), Nov. 29, 1990, 104 Stat. 5083; Pub.L. 102-232, Title III, § 302(e)(8)(C), Dec. 12, 1991, 105 Stat. 1746; Pub.L. 104-208, Div. C, Title III, § 308(d)(4)(G), (f)(2)(B), Title VI, § 631, Sept. 30, 1996, 110 Stat. 3009-618, 3009-621, 3009-700; Pub.L. 107-173, Title III, § 301, May 14, 2002, 116 Stat. 552; Pub.L. 108-458, Title V, § 5304(a), Dec. 17, 2004, 118 Stat. 3736; Pub.L. 114-70, § 2, Oct. 16, 2015, 129 Stat. 561.)

Notes of Decisions (63)

## Footnotes

1       So in original. Probably should read "admitted to the".

8 U.S.C.A. § 1201, 8 USCA § 1201
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 222

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1227

§ 1227. Deportable aliens

Currentness

**(a) Classes of deportable aliens**

Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:

**(1) Inadmissible at time of entry or of adjustment of status or violates status**

**(A) Inadmissible aliens**

Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable.

**(B) Present in violation of law**

Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable.

**(C) Violated nonimmigrant status or condition of entry**

**(i) Nonimmigrant status violators**

Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable.

**(ii) Violators of conditions of entry**

Any alien whom the Secretary of Health and Human Services certifies has failed to comply with terms, conditions, and controls that were imposed under section 1182(g) of this title is deportable.

**(D) Termination of conditional permanent residence**

**(i) In general**

Any alien with permanent resident status on a conditional basis under section 1186a of this title (relating to conditional permanent resident status for certain alien spouses and sons and daughters) or under section 1186b of this title (relating to conditional permanent resident status for certain alien entrepreneurs, spouses, and children) who has had such status terminated under such respective section is deportable.

**(ii) Exception**

Clause (i) shall not apply in the cases described in section 1186a(c)(4) of this title (relating to certain hardship waivers).

**(E) Smuggling**

**(i) In general**

Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) in the case of any alien lawfully admitted for permanent residence if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of the offense was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(F) Repealed. Pub.L. 104-208, Div. C, Title VI, § 671(d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-723**

**(G) Marriage fraud**

An alien shall be considered to be deportable as having procured a visa or other documentation by fraud (within the meaning of section 1182(a)(6)(C)(i) of this title) and to be in the United States in violation of this chapter (within the meaning of subparagraph (B)) if--

(i) the alien obtains any admission into the United States with an immigrant visa or other documentation procured on the basis of a marriage entered into less than 2 years prior to such admission of the alien and which, within 2 years subsequent to any admission of the alien in the United States, shall be judicially annulled or terminated, unless the alien establishes to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws, or

(ii) it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant.

**(H) Waiver authorized for certain misrepresentations**

The provisions of this paragraph relating to the removal of aliens within the United States on the ground that they were inadmissible at the time of admission as aliens described in section 1182(a)(6)(C)(i) of this title, whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien (other than an alien described in paragraph (4)(D)) who--

(i)(I) is the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

(II) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.

(ii) is a VAWA self-petitioner.

A waiver of removal for fraud or misrepresentation granted under this subparagraph shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation.

**(2) Criminal offenses**

**(A) General crimes**

**(i) Crimes of moral turpitude**

Any alien who--

**(I)** is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and

**(II)** is convicted of a crime for which a sentence of one year or longer may be imposed,

is deportable.

### (ii) Multiple criminal convictions

Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

### (iii) Aggravated felony

Any alien who is convicted of an aggravated felony at any time after admission is deportable.

### (iv) High speed flight

Any alien who is convicted of a violation of section 758 of Title 18 (relating to high speed flight from an immigration checkpoint) is deportable.

### (v) Failure to register as a sex offender

Any alien who is convicted under section 2250 of Title 18 is deportable.

### (vi) Waiver authorized

Clauses (i), (ii), (iii), and (iv) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

## (B) Controlled substances

### (i) Conviction

Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

### (ii) Drug abusers and addicts

Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable.

**(C) Certain firearm offenses**

Any alien who at any time after admission is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of Title 18) in violation of any law is deportable.

**(D) Miscellaneous crimes**

Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate--

**(i)** any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of Title 18 for which a term of imprisonment of five or more years may be imposed;

**(ii)** any offense under section 871 or 960 of Title 18;

**(iii)** a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

**(iv)** a violation of section 1185 or 1328 of this title,

is deportable.

(E) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and [1]

**(i) Domestic violence, stalking, and child abuse**

Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of Title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

**(ii) Violators of protection orders**

Any alien who at any time after admission is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term "protection order" means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.

### (F) Trafficking

Any alien described in section 1182(a)(2)(H) of this title is deportable.

### (3) Failure to register and falsification of documents

#### (A) Change of address

An alien who has failed to comply with the provisions of section 1305 of this title is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

#### (B) Failure to register or falsification of documents

Any alien who at any time has been convicted--

**(i)** under section 1306(c) of this title or under section 36(c) of the Alien Registration Act, 1940,

**(ii)** of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

**(iii)** of a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18 (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

#### (C) Document fraud

##### (i) In general

An alien who is the subject of a final order for violation of section 1324c of this title is deportable.

##### (ii) Waiver authorized

The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.

### (D) Falsely claiming citizenship

#### (i) In general

Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable.

#### (ii) Exception

In the case of an alien making a representation described in clause (i), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such representation.

## (4) Security and related grounds

### (A) In general

Any alien who has engaged, is engaged, or at any time after admission engages in--

(i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

(ii) any other criminal activity which endangers public safety or national security, or

(iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

### (B) Terrorist activities

Any alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title is deportable.

### (C) Foreign policy

**(i) In general**

An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

**(ii) Exceptions**

The exceptions described in clauses (ii) and (iii) of section 1182(a)(3)(C) of this title shall apply to deportability under clause (i) in the same manner as they apply to inadmissibility under section 1182(a)(3)(C)(i) of this title.

**(D) Participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

Any alien described in clause (i), (ii), or (iii) of section 1182(a)(3)(E) of this title is deportable.

**(E) Participated in the commission of severe violations of religious freedom**

Any alien described in section 1182(a)(2)(G) of this title is deportable.

**(F) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is deportable.

**(5) Public charge**

Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.

**(6) Unlawful voters**

**(A) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.

**(B) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such violation.

**(7) Waiver for victims of domestic violence**

**(A) In general**

The Attorney General is not limited by the criminal court record and may waive the application of paragraph (2)(E)(i) (with respect to crimes of domestic violence and crimes of stalking) and (ii) in the case of an alien who has been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship--

**(i)** [2] upon a determination that--

**(I)** the alien was acting is [3] self-defense;

**(II)** the alien was found to have violated a protection order intended to protect the alien; or

**(III)** the alien committed, was arrested for, was convicted of, or pled guilty to committing a crime--

**(aa)** that did not result in serious bodily injury; and

**(bb)** where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty.

**(B) Credible evidence considered**

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

**(b) Deportation of certain nonimmigrants**

An alien, admitted as a nonimmigrant under the provisions of either section 1101(a)(15)(A)(i) or 1101(a)(15)(G)(i) of this title, and who fails to maintain a status under either of those provisions, shall not be required to depart from the United States without the approval of the Secretary of State, unless such alien is subject to deportation under paragraph (4) of subsection (a).

**(c) Waiver of grounds for deportation**

Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of inadmissibility described in paragraph (2) or (3) of section 1182(a) of this title) shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title based upon circumstances that existed before the date the alien was provided such special immigrant status.

**(d) Administrative stay**

**(1)** If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal under section 1231(c)(2) of this title until

**(A)** the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

**(B)** there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

**(2)** The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

**(3)** During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

**(4)** Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 4, § 237, formerly c. 5, § 241, 66 Stat. 204; July 18, 1956, c. 629, Title III, § 301(b), (c), 70 Stat. 575; Pub.L. 86-648, § 9, July 14, 1960, 74 Stat. 505; Pub.L. 87-301, § 16, Sept. 26, 1961, 75 Stat. 655; Pub.L. 89-236, § 11(e), Oct. 3, 1965, 79 Stat. 918; Pub.L. 94-571, § 7(e), Oct. 20, 1976, 90 Stat. 2706; Pub.L. 95-549, Title I, § 103, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 97-116, § 8, Dec. 29, 1981, 95 Stat. 1616; Pub.L. 99-570, Title I, § 1751(b), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-603, Title III, § 303(b), Nov. 6, 1986, 100 Stat. 3431; Pub.L. 99-639, § 2(b), Nov. 10, 1986, 100 Stat. 3541; Pub.L. 99-653, § 7(c), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-525, §§ 2(n)(2), 9(m), Oct. 24, 1988, 102 Stat. 2613, 2620; Pub.L. 100-690, Title VII, §§ 7344(a), 7348(a), Nov. 18, 1988, 102 Stat. 4470, 4473; Pub.L. 101-649, Title I, § 153(b), Title V, §§ 505(a), 508(a), 544(b), Title VI, § 602(a), (b), Nov. 29, 1990, 104 Stat. 5006, 5050, 5051, 5061, 5077, 5081; Pub.L. 102-232, Title III, §§ 302(d)(3), 307(h), (k), Dec. 12, 1991, 105 Stat. 1745, 1755, 1756; Pub.L. 103-322, Title XIII, § 130003(d), Sept. 13, 1994, 108 Stat. 2026; Pub.L. 103-416, Title II, §§ 203(b), 219(g), Oct. 25, 1994, 108 Stat. 4311, 4317; Pub.L. 104-132, Title IV, §§ 414(a), 435(a), Apr. 24, 1996, 110 Stat. 1270, 1274; renumbered c. 4, § 237, and amended Pub.L. 104-208, Div. C, Title I, § 108(c), Title III, §§ 301(d), 305(a)(2), 308(d)(2), (3)(A), (e)(1)(E), (2)(C), (f)(1)(L) to (N), (5), 344(b), 345(b), 347(b), 350(a), 351(b), Title VI, § 671(a)(4)(B), (d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-558, 3009-579, 3009-598, 3009-617, 3009-619 to 3009-622, 3009-637 to 3009-640, 3009-721, 3009-723; Pub.L. 106-386, Div. B, Title V, § 1505(b)(1), (c)(2), Oct. 28, 2000, 114 Stat. 1525, 1526; Pub.L. 106-395, Title II, § 201(c)(1), (2), Oct. 30, 2000, 114 Stat. 1634, 1635; Pub.L. 107-56, Title IV, § 411(b)(1), Oct. 26, 2001, 115 Stat. 348; Pub.L. 108-458, Title V, §§ 5304(b), 5402, 5501(b), 5502(b), Dec. 17, 2004, 118 Stat. 3736, 3737, 3740, 3741; Pub.L. 109-13, Div. B, Title I, § 105(a)(1), (b), May 11, 2005, 119 Stat. 309, 310; Pub.L. 109-248, Title IV, § 401, July 27, 2006, 120 Stat. 622; Pub.L. 109-271, § 6(c), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-340, § 2(c), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 204, 222(f)(2), Dec. 23, 2008, 122 Stat. 5060, 5071.)

Notes of Decisions (2648)

---

**Footnotes**

1       So in original.

2       So in original. No cl. (ii) has been enacted

3       So in original. Probably should be "in".

8 U.S.C.A. § 1227, 8 USCA § 1227
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 223



Print Editions
Thursday June 12th, 2025

go.grow.grad.tcnj.edu
Earn Your Master's at TCNJ            OPEN >

**OPINIONS**

# When Brown students speak, the University should listen: A faculty letter in support of student activism



> If principled inquiry is our method and the pursuit of knowledge for a better world is our goal, what do we have to fear?

Media by Colleen Cronin | The Brown Daily Herald

By **Brown University faculty members**
April 2, 2019 | 1:25am EDT

We, the undersigned Brown faculty, wish to express our concern about the content and tenor of President Christina Paxson P'19's letter to the Brown community March 22 in response to the overwhelming support for a student referendum that called on the University to "divest all stocks, funds, endowment and other monetary instruments from companies complicit in human rights abuses in Palestine and establish a means of implementing financial transparency and student oversight of the University's investments." Following weeks of campus debate which produced a higher-than-average turnout in a much-watched election, 69 percent —1,939 out of 2,810 voting students — voted in favor of the referendum.

Paxson's response, issued to the entire Brown community the day after the referendum results were announced, diminishes the divestment vote as "polarizing" and something that would "detract from the inclusive, intellectually-vibrant community we aspire to be." Belying her own claim that the University does not take sides on contested issues, Paxson also took this opportunity to reiterate her opposition to the global Boycott, Divest, Sanctions

AAUP-00690

movement, even though the movement itself was not explicitly on the ballot. These strong statements can have the political effect of stifling student activism. They can also be read as an admonishment of students who organized the referendum and, implicitly, of all those who voted in favor of divestment.

We write in defense of student activism and against making Palestine an exception to the right of free speech on campus. Regardless of one's position on divestment, the roughly two thousand undergraduate students at Brown who, exercising their democratic right, voted in favor of the referendum deserve better than the unfounded accusation that they are politically polarizing an otherwise neutral campus. All students deserve respect, protection and a fair hearing when they exercise their legitimate right to pose questions and vote. That must include those who voted against the President's views.

We are deeply concerned by Paxson's statement that "instead" of calls for divestment, the Brown community should "engage in productive discourse on this issue through our teaching, research and contributions to diplomacy." This statement unacceptably narrows the range of legitimate activism by students and other members of the Brown community. By using the phrase "on this issue" it also sets up a double standard, in that it seems to apply only to activism that is critical of Israeli government policies. The 1968 Black Student Walkout, the 1975 student vote to strike in favor of budget transparency, the 1987 Students Against Apartheid demands for divestment from South Africa and more recently, the 2015 student organizing against university inaction on racial and class representation on campus were also entirely peaceful and democratic forms of activism that sought to challenge indifference or political gridlock that existed at the time. Ultimately, they made Brown a better place.

It is precisely such examples of student activism for social justice that have inspired supporters of Brown Divest. The numerous public events they organized during the six months prior to the March 21 referendum contributed positively to informed and lively debate on campus and reaffirmed that all groups, without exception, are entitled to basic human rights. Through the referendum vote, many students have made clear their view that the Israeli government's policies towards Palestinians are diametrically opposed to Brown University's self-proclaimed values, enshrined in its strategic plan, Building on Distinction, which calls for "Creating Peaceful, Just, and Prosperous Societies." And they are not alone. Similar divestment referendums have passed in student government bodies at other campuses such as Stanford University, New York University, Barnard College, the University of Minnesota and George Washington University, among others.

It is not surprising that many Brown undergraduates resorted to a referendum in order to make their voices heard. As she acknowledges in her March 22 letter to the community, Paxson in 2012 rejected the recommendation of Brown's Advisory Committee on Corporate Responsibility in Investment Policies to initiate dialogue about possible divestment from companies that profit from the Israeli occupation of Palestinian Territories. Indeed, Brown Divest students have worked diligently through University processes and have sought dialogue rather than confrontation. In this, they have shown extraordinary courage in the face of not only Paxson's record of rejection on this issue, but also aggressive national campaigns of intimidation and censorship aimed at college students and professors who dare to speak out against Israeli government policies, as well as attempts by President Donald Trump's administration to conflate legitimate criticisms of Israeli policies with anti-Semitism.

It is vital to recognize that students active in Brown Divest have consistently called for upholding the human rights of all people. They have repeatedly condemned anti-Semitism along with any other form of racism and bigotry. Many attended vigils in honor of Jewish and Muslim victims of recent terrorist attacks by white supremacists in Pittsburgh and New Zealand. Several, also, responded constructively to the arguments of students who opposed the referendum — whose voices should and are being heard — in a succession of spirited op-eds in this newspaper. These exchanges highlighted the diversity of opinions among Jewish students on divestment, many of whom supported the

AAUP-00691

referendum. While these students have engaged in productive discourse, Brown's senior administration has yet to condemn egregious blacklisting websites, such as Canary Mission, that have threateningly listed Brown students and professors who criticize the Israeli government's actions and speak up for Palestinian human rights.

At a time when there is as dire a need as ever for moral clarity, transparency and democratic participation in our country, we call on our University administration to take seriously our students' concern about injustices in which our institution may be complicit. Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine? That is the still unanswered question at the heart of last week's campus vote. It is not a question we or anyone else should admonish our students for asking. Rather, let us support and honor all our students — and with it Brown's renowned tradition of rigorous, conscientious and engaged scholarship — by organizing campus-wide discussions and debates on that question and others like it. If principled inquiry is our method and the pursuit of knowledge for a better world is our goal, what do we have to fear?

Respectfully,

*Aliyyah I. Abdur-Rahman, Departments of American Studies and English*

*Faiz Ahmed, Department of History*

*Umer Akbar, Department of Neurology*

*Nadje Al-Ali, Department of Anthropology and Watson Institute for International and Public Affairs*

*Leticia Alvarado, Department of American Studies*

*Iradj Anvar, Center for Language Studies*

*Ariella Azoulay, Departments of Modern Culture and Media and Comparative Literature*

*Timothy Bewes, Department of English*

*Leslie Bostrom, Department of Visual Art*

*Lundy Braun, Departments of Africana Studies and Pathology and Laboratory Medicine*

*Palmira Brummett, Department of History*

*Mari Jo Buhle, Departments of History and American Studies*

*Paul Buhle, Department of American Studies*

*Caroline Castiglione, Departments of Italian Studies and History*

*John Cayley, Department of Literary Arts*

*Tamara Chin, Departments of Comparative Literature and East Asian Studies*

*Nitsan Chorev, Department of Sociology and Watson Institute for International and Public Affairs*

*Mirena Christoff, Center for Language Studies*

*Mark Cladis, Department of Religious Studies*

*Joan Copjec, Department of Modern Culture and Media*

AAUP-00692

*Denise Davis, Pembroke Center for Teaching and Research on Women*

*Kelly Dobson, Department of Modern Culture and Media*

*Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences*

*Beshara Doumani, Department of History*

*Emily Drumsta, Department of Comparative Literature*

*Paja Faudree, Department of Anthropology*

*Masako Fidler, Department of Slavic Studies*

*James Fitzgerald, Department of Classics*

*Scott Frickel, Department of Sociology and Institute at Brown for Environment and Society*

*Lina Fruzetti, Department of Anthropology*

*Leela Gandhi, Department of English and Cogut Institute for the Humanities*

*Alex Gourevitch, Department of Political Science*

*Matthew Guterl, Departments of Africana Studies and American Studies*

*Matthew Gutmann, Department of Anthropology*

*Yannis Hamilakis, Department of Classics and Joukowsky Institute for Archaeology and the Ancient World*

*Françoise Hamlin, Departments of History and Africana Studies*

*Alla Hassan, Center for Language Studies*

*Juliet Hooker, Department of Political Science*

*Lung-Hua Hu, Department of East Asian Studies*

*Evelyn Hu-Dehart, Departments of History and American Studies*

*Jose Itzigsohn, Department of Sociology*

*Lynne Joyrich, Department of Modern Culture and Media*

*Tamar Katz, Department of English*

*William Keach, Department of English*

*Adrienne Keene, Department of American Studies and Ethnic Studies*

*Michael Kennedy, Department of Sociology and Watson Institute for International and Public Affairs*

*Nancy Khalek, Department of Religious Studies*

*Daniel Kim, Departments of English and American Studies*

*Brian Lander, Department of History and Institute at Brown for Environment and Society*

*Robert Lee, Department of American Studies*

AAUP-00693

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 259 of 406

6/12/25, 12:40 PM    When Brown students speak, the University should listen: A faculty letter in support of student activism - The Brown Daily Herald

*Mary Rebecca Leuchak, Center for Language Studies*

*Evelyn Lincoln, Departments of History of Art and Architecture and Italian Studies*

*Catherine Lutz, Department of Anthropology and Watson Institute for International and Public Affairs*

*Amanda Lynch, Department of Earth, Environmental and Planetary Sciences*

*Sreemati Mitter, Department of History and Watson Institute for International and Public Affairs*

*Elias Muhanna, Department of Comparative Literature*

*Monica Muñoz Martinez, Department of American Studies and Ethnic Studies*

*Rebecca Nedostup, Department of History*

*Laura Odello, Department of French Studies*

*Adi Ophir, Cogut Institute for the Humanities and Middle East Studies*

*Emily Owens, Department of History*

*Samuel Perry, Department of East Asian Studies*

*Kevin Quashie, Department of English*

*Thangam Ravindranathan, Department of French Studies*

*Marc Redfield, Departments of English and Comparative Literature*

*Syed Rizvi, Department of Neurology*

*Daniel A. Rodriguez, Department of History*

*Ellen Rooney, Department of Modern Culture and Media*

*Christopher Rose, School of Engineering*

*Tricia Rose, Department of Africana Studies*

*Philip Rosen, Department of Modern Culture and Media*

*Nidia Schuhmacher, Department of Hispanic Studies*

*Robert Self, Department of History*

*Thomas Serre, Department of Cognitive Linguistic and Psychological Sciences*

*Naoko Shibusawa, Departments of History and American Studies*

*Elena Shih, Department of American Studies and Ethnic Studies*

*Daniel Jordan Smith, Department of Anthropology*

*Kerry Smith, Department of History*

*Victoria Smith, Department of Hispanic Studies*

AAUP-00694

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 260 of 406

6/12/25, 12:40 PM                    When Brown students speak, the University should listen: A faculty letter in support of student activism - The Brown Daily Herald

*Susan Smulyan, Department of American Studies*

*Patricia Sobral, Department of Portuguese and Brazilian Studies*

*Silvia Sobral, Department of Hispanic Studies*

*Suzanne Stewart-Steinberg, Departments of Italian Studies and Comparative Literature*

*Lulei Su, Department of East Asian Studies*

*Mark Suchman, Department of Sociology*

*Peter Szendy, Department of Comparative Literature and Cogut Institute for the Humanities*

*Nina Tannenwald, Department of Political Science*

*Peter van Dommelen, Department of Archaeology and Joukowsky Institute for Archaeology and the Ancient World*

*Lingzhen Wang, Department of East Asian Studies*

*William H. Warren, Department of Cognitive, Linguistic, and Psychological Sciences*

*Elizabeth Weed, Pembroke Center for Teaching and Research on Women*

*Deborah Weinstein, Department of American Studies*

*Andre C. Willis, Department of Religious Studies*

*David Wills, Departments of French Studies and Comparative Literature*

*Patricia Ybarra, Department of Theatre Arts and Performance Studies*

*Vazira Zamindar, Department of History*

*Asli Zengin, Department of Anthropology*

An updated list of Brown Faculty signatories can be found here.

***Correction: Due to a miscommunication in the editorial process, an earlier version of this op-ed included the following question: "Is Brown University a beneficiary of investments in companies that profit from companies complicit in human rights abuses in Palestine?" This misstates the authors' original argument and has been corrected to read: "Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine?" The Herald regrets the error.***



**Grand Hotel, Mackinac Island**

Get Lost in the Charms of Mackinac Island. Scenic, Historic and Romantic. Grand Hotel

Book Now ›

About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

Subscribe to our newsletter



The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

𝕏 f 🖂 🔊

6/12/25, 12:40 PM

When Brown students speak, the University should listen: A faculty letter in support of student activism - The Brown Daily Herald

Your Email Address

**Subscribe**

Powered by ⬢WORKS Solutions by The State News

All Content © 2025 The Brown Daily Herald, Inc.

AAUP-00696

# EXHIBIT 224



SINCE 1891

# THE BROWN DAILY HERALD

**Print Editions**

Thursday June 12th, 2025

Lawn Mower Recycle LLC

In All 50 States



OPEN

**OPINIONS**

## Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism

!["It is precisely at such times of crisis, fear and misinformation that we as scholars, faculty and university leaders must demand moral consistency, including the protection of all civilian lives."]

By **Brown University Faculty Members**

November 7, 2023 | 11:28pm EST

*Editors' note: The letter below was first internally circulated to faculty Nov. 2, 2023. This letter has been sent to President Christina Paxson P'19 P'MD'20 with additional signatories who opted not to make their names public.*

We, the undersigned faculty at Brown University, are deeply aggrieved by the catastrophic events unfolding in Israel and Palestine, especially but not limited to Gaza. We unequivocally condemn any attacks on civilians, including the horrific attacks by Hamas on Oct. 7 which killed up to 1,400 Israelis, including children, and we call for the immediate release of all hostages. So, too, do we condemn the Israeli military's appalling siege and bombardment of Gaza that, largely with U.S.-made weapons, has now killed over 8,500 Palestinians, 67% of whom are women and children, and displaced over 1 million Palestinians since Oct. 7.

At a time of such staggering civilian casualties and destruction in Gaza, which is coinciding with unprecedented national and media-driven campaigns to silence or stigmatize voices in support of Palestinian human rights, we call on our colleagues and the administration to draw strength from the core values of Brown and use their power to:

AAUP-00697

1. Join the international calls for an immediate ceasefire and an end to Israel's siege of Gaza so that life-saving food, water and medicine can reach Palestinian civilians.

2. Affirm and advocate for the protection and ability of our students, staff and faculty to speak up for Palestinian human rights without censorship or intimidation.

In this charged national environment, we understand that universities are under pressure to silence criticism of Israeli government actions and activism for Palestinian human rights by equating such speech and activism with antisemitism. Yet, it is precisely at such times of crisis, fear and misinformation that we as scholars, faculty and university leaders must demand moral consistency, including the protection of all civilian lives. It is precisely now that we must affirm the principles of academic freedom and free speech for all on our campus, alongside the rejection of hate speech including antisemitism, Islamophobia and anti-Arab racism. And it is precisely now that we must allow for open, informed and evidence-based discussions so that the most rigorous, scrupulous and compelling arguments on contested issues can come forward.

At this pivotal historical juncture, we respectfully call on our University president to: (1) Urge Rhode Island's senators to support legislation demanding a ceasefire, an end to Israel's siege and a political resolution to this conflict based on justice and equality; (2) issue a public-facing letter decrying the recent threats to freedom of expression and inquiry on American campuses, which have sought to intimidate those addressing the context and root causes of ongoing violence in Israel-Palestine and (3) issue a letter to our University community affirming that — as with any other subject — the University administration will not tolerate efforts to intimidate, censor or punish Brown students, staff and faculty for exercising their constitutional right to free speech, activism and scholarship when it comes to Israel-Palestine. There must be no "Palestine Exception" to free speech at Brown.

As for a ceasefire, some may say it is not the place of university leaders to interfere in thorny questions of foreign policy. What is happening in Gaza is far beyond that. On Oct. 29, Save the Children reported 3,195 Palestinian children have been killed in Gaza by Israel's air strikes and auxiliary operations over three weeks — surpassing the annual number of children killed across the world's conflict zones (over 20 countries) since 2019. Given the critical role of U.S. munitions and political support for Israel's ongoing military operations in Gaza, we firmly believe this is a moral concern that implicates all Americans regardless of ethnicity, religion or political opinion. It is the same moral concern that — long before Oct. 7, 2023 — inspired the acclaimed legal scholar and civil rights activist Michelle Alexander (author of "The New Jim Crow," Brown First Reading for 2015), to declare that America's civic leaders must no longer remain silent on "one of the great moral challenges of our time: the crisis in Israel-Palestine."

We encourage the ongoing efforts of our University administration to cultivate a campus community in which all students, staff and faculty — especially those with loved ones directly affected by the conflict — are supported and heard. However, we cannot and should not support fanning the flames of war by inflicting collective punishment on innocent Palestinian civilians with American weapons and technology. And no one should be allowed to restrict the right of our students, staff or faculty for raising these points loudly and clearly.

Sincerely,

*Signing Members of the Brown University faculty in Alphabetical Order as of Nov. 7, 2023:*

aliyyah i. abdur-rahman, Departments of American Studies and English

Faiz Ahmed, Department of History

Nadje Al-Ali, Department of Anthropology, Center for Middle East Studies and Watson Institute for International and Public Affairs

AAUP-00698

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 265 of 406

6/12/25, 11:51 AM                    Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism - The Brown Daily Herald

Leticia Alvarado, Department of American Studies

Elsa Amanatidou, Department of Classics

Amanda Anderson, Cogut Institute for the Humanities and Department of English

Peter Andreas, Department of Political Science and Watson Institute for International and Public Affairs

Ariella Aïsha Azoulay, Departments of Modern Culture and Media and Comparative Literature

Saleem Ashkar, Department of Music

Joshua Babcock, Department of Anthropology

Muhammad Baig, Warren Alpert Medical School

Tiraana Bains, Department of History

Richard Baldoz, Department of American Studies

Omer Bartov, Department of History

Laura Bass, Department of Hispanic Studies

Reda Bensmaia, Emeritus, Departments of French and Francophone Studies and Comparative Literature

Susan Bernstein, Departments of Comparative Literature and German Studies

Timothy Bewes, Department of English

John Bodel, Departments of Classics and History

Anthony Bogues, Simmons Center for the Study of Slavery and Justice, Departments of Africana Studies and the History of Art and Architecture

Sheila Bonde, Department of the History of Art and Architecture, Joukowsky Institute for Archaeology and the Ancient World

Leslie Bostrom, Department of Visual Art

Cynthia Brokaw, Departments of History and East Asian Studies

Mari Jo Buhle, Emerita, Departments of American Studies and History

Stuart Burrows, Department of English

Stephen Bush, Department of Religious Studies

Vangelis Calotychos, Department of Classics

Prudence Carter, Department of Sociology

Holly Case, Department of History

John Cayley, Department of Literary Arts

Melody Chan, Department of Mathematics

Silvia Chiang, Department of Pediatrics, Warren Alpert Medical School

Tamara Chin, Department of Comparative Literature

AAUP-00699

Mahasan Chaney, Department of Education

Kenneth Chay, Department of Economics

Mark Cladis, Department of Religious Studies

Michelle Clayton, Departments of Hispanic Studies and Comparative Literature

Alexandra Collins, Department of Epidemiology, School of Public Health

Ruth Colwill, Department of Cognitive, Linguistic and Psychological Sciences

Hal Cook, Department of History

Joan Copjec, Department of Modern Culture and Media

Denise Davis, Gender and Sexuality Studies Program, Pembroke Center

Bathsheba Demuth, Department of History and Institute at Brown for Environment and Society

Lisa Di Carlo, Department of Sociology

Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences

Beshara Doumani, Department of History

Carolina Ebeid, Department of Literary Arts

Miled Faiza, Center for Language Studies

Paja Faudree, Department of Anthropology and Program in Linguistics

Linford Fisher, Department of History

James L. Fitzgerald, Emeritus, Department of Classics

Lina M. Fruzzetti, Department of Anthropology

Leela Gandhi, Cogut Institute for Humanities and Department of English

Eva Gómez García, Department of Hispanic Studies

Macarena Gómez-Barris, Department of Modern Culture and Media and Brown Arts Institute

Matthew Guterl, Departments of Africana Studies and American Studies

Matthew Gutmann, Emeritus, Department of Anthropology

Yannis Hamilakis, Joukowsky Institute for Archaeology and the Ancient World and Department of Classics

Françoise Hamlin, Departments of Africana Studies and History

Jae Han, Department of Religious Studies

Susan Harvey, Department of Religious Studies

Alla Hassan, Center for Language Studies

Patrick Heller, Department of Sociology and Watson Institute for International and Public Affairs

Alani Hicks-Bartlett, Departments of Comparative Literature, French and Francophone Studies and Hispanic Studies

Bonnie Honig, Departments of Modern Culture and Media and Political Science

AAUP-00700

6/12/25, 11:51 AM
Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 267 of 406
Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism - The Brown Daily Herald

Evelyn Hu-DeHart, Departments of History and American Studies/Ethnic Studies

Laird Hunt, Department of Literary Arts

Jose Itzigsohn, Department of Sociology

Nancy J. Jacobs, Department of History

Julia Jarcho, Department of Theatre Arts and Performance Studies

Lynne Joyrich, Department of Modern Culture and Media

Ieva Jusionyte, Department of Anthropology and Watson Institute for International and Public Affairs

Coppélia Kahn, Emerita, Department of English

William Keach, Emeritus, Department of English

Adrienne Keene, Department of American Studies

Nancy Khalek, Departments of Religious Studies and History

Michael D. Kennedy, Department of Sociology and Watson Institute for International and Public Affairs

Daniel Kim, Departments of English and American Studies

Stephen Kinzer, Watson Institute for International and Public Affairs

Brian Lander, Department of History and Institute at Brown for Environment and Society

Robert Lee, Emeritus, Department of American Studies

Shelley Lee, Department of American Studies

Wendy Allison Lee, Pembroke Center and Gender and Sexuality Studies Program

Jeremy Lehnen, Center for Language Studies and Portuguese and Brazilian Studies

Leila Lehnen, Portuguese and Brazilian Studies

Myles Lennon, Department of Anthropology and Institute at Brown for Environment and Society

Ainsley LeSure, Departments of Africana Studies and Political Science

Patsy Lewis, Department of Africana Studies

Glenn C. Loury, Department of Economics, Watson Institute for International and Public Affairs

Enongo Lumumba-Kasongo, Department of Music and Brown Arts Institute

Catherine Lutz, Emerita, Department of Anthropology

Brandon Marshall, Department of Epidemiology, School of Public Health

Felipe Martinez-Pinzon, Department of Hispanic Studies

Kevin McLaughlin, Departments of English, Comparative Literature and German Studies, and John Nicholas Brown Center for Advanced Study

Brian Meeks, Department of Africana Studies

Kristina Mendicino, Department of German Studies

AAUP-00701

6/12/25, 11:51 AM

Case 5:25-cv-06618-NW   Document 81-6   Filed 03/27/26   Page 268 of 406

Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism - The Brown Daily Herald

Kiri Miller, Department of American Studies

Ourida Mostefai, Departments of Comparative Literature and French and Francophone Studies

Elias Muhanna, Departments of Comparative Literature and History

Rebecca Nedostup, Departments of History and East Asian Studies

Tara Nummedal, Departments of History and Italian Studies

Mark Ocegueda, Department of History

Mohamed Omer, Department of Pathology and Laboratory Medicine, Warren Alpert Medical School

Adi M. Ophir, Cogut Institute for the Humanities and Center for Middle East Studies

Emily Owens, Department of History

Esra Ozdemir, Center for Language Studies

Robert Preucel, Department of Anthropology

Jason Protass, Department of Religious Studies

Michelle Quay, Center for Language Studies and Center for Middle East Studies

Abrar Qureshi, Departments of Dermatology and Epidemiology, Warren Alpert Medical School and School of Public Health

Momotazur Rahman, Department of Health Services Policy and Practice, School of Public Health

Dixa Ramirez-D'Oleo, Department of English

Stéphanie Ravillon, Department of French and Francophone Studies

Thangam Ravindranathan, Department of French and Francophone Studies

Sherief Reda, School of Engineering and Department of Computer Science

Marc Redfield, Departments of Comparative Literature, English and German Studies

Ravit Reichman, Department of English

Gerhard Richter, Departments of Comparative Literature and German Studies

Lukas Rieppel, Department of History and Science, Technology and Society Program

Katie Rieser, Department of Education

Massimo Riva, Department of Italian Studies

Timmons Roberts, Institute at Brown for Environment and Society and Department of Sociology

Gabriel Rocha, Departments of History and Portuguese and Brazilian Studies

Seth Rockman, Department of History

Daniel A. Rodríguez, Department of History

Noliwe Rooks, Department of Africana Studies

Ellen Rooney, Departments of English and Modern Culture and Media

AAUP-00702

Tricia Rose, Department of Africana Studies, Center for the Study of Race and Ethnicity in America

Poulami Roychowdhury, Department of Sociology and Watson Institute for International and Public Affairs

Stephanie Savell, Watson Institute for International and Public Affairs

Janine Anderson Sawada, Departments of Religious Studies and East Asian Studies

Rebecca Schneider, Department of Modern Culture and Media

Nidia A. Schuhmacher, Department of Hispanic Studies

Lewis Seifert, Department of French and Francophone Studies

Robert Self, Department of History

Roberto Serrano, Department of Economics

Thomas Serre, Department of Cognitive Linguistics and Psychological Sciences

Ahmed Shahab, Warren Alpert Medical School

Matthew Shenoda, Department of Literary Arts and Brown Arts Institute

Naoko Shibusawa, Departments of History and American Studies

Elena Shih, Department of American Studies

Eleni Sikelianos, Department of Literary Arts

Prerna Singh, Department of Political Science and Watson Institute for International and Public Affairs

Ada Smailbegović, Department of English

Kerry Smith, Department of History

Susan Smulyan, Department of American Studies

Patricia Sobral, Department of Portuguese and Brazilian Studies

Tracy Steffes, Departments of Education and History

Michael Steinberg, Departments of History and Music

Suzanne Stewart-Steinberg, Departments of Comparative Literature and Italian Studies

Kera Street, Department of Religious Studies

Cole Swensen, Department of Literary Arts

Peter Szendy, Cogut Institute for the Humanities and Department of Comparative Literature

Nina Tannenwald, Department of Political Science

Sarah Thomas, Department of Hispanic Studies

Alison Tovar, Department of Behavioral and Social Sciences, School of Public Health

Daniel Vaca, Department of Religious Studies

Peter van Dommelen, Joukowsky Institute for Archaeology and the Ancient World and Department of Anthropology

Rajiv Vohra, Department of Economics

AAUP-00703

Lingzhen Wang, Department of East Asian Studies

William Warren, Department of Cognitive, Linguistic and Psychological Sciences

Elizabeth Weed, Pembroke Center for Teaching and Research on Women

Alexander Weheliye, Department of Modern Culture and Media

Annie Wiart, Department of French and Francophone Studies

Andre C. Willis, Department of Religious Studies

David Wills, Department of French and Francophone Studies

Patricia Ybarra, Department of Theatre Arts and Performance Studies

Vazira Zamindar, Department of History

*Affiliations are stated for identification purposes only. An updated list of Brown Faculty signatories can be found* here*.*



About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

Subscribe to our newsletter

Your Email Address

**Subscribe**



The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

𝕏 f ⊙ ⌁

Powered by WORKS Solutions by The State News

All Content © 2025 The Brown Daily Herald, Inc.

AAUP-00704

# EXHIBIT 225

**[.mp4 filed manually]**

# EXHIBIT 226

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 273 of 406

7/3/25, 4:19 PM    Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions - The Tufts Daily

OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions

By **Rumeysa Ozturk**, **Fatima Rahman**, **Genesis Perez** and **Nicholas Ambeliotis**
Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

AAUP-01592

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.

## TRENDING

**SMFA union files unfair labor practice complaint against Tufts following administrative restructure**

By **Josué Pérez** | June 20



## THE PRINT EDITION

AAUP-01593

Case 5:25-cv-06618-NW    Document 81-6    Filed 03/27/26    Page 275 of 406

7/3/25, 4:19 PM                    Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions - The Tufts Daily



SECTIONS

News
Features
Arts
Opinion
Sports

QUICK LINKS

About
Masthead
Contact
Submit a Tip
Join Us

AAUP-01594

7/3/25, 4:19 PM          Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions - The Tufts Daily

Case 5:25-cv-06618-NW          Document 81-6          Filed 03/27/26          Page 276 of 406

Investigative
Science
Magazine
Audio
Video
Newsletter

Advertising
RSS Feeds
Privacy Policy
Terms of Service

SOCIAL

   

CONTACT
The Tufts Daily
PO Box 53018
Medford, MA 02155
daily@tuftsdaily.com

All Content © 2025 The Tufts Daily

Powered by          Solutions by The State News

AAUP-01595

# EXHIBIT 227



# Rumeysa Ozturk

**Status:** Student
**State:** Massachusetts
**Organizations:** BDS
**University:** Tufts, TC



Share:  

---

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.

As of January 2025, Ozturk's LinkedIn profile said she had worked as a graduate research assistant at Tufts since August 2023, and as a course instructor at Tufts from July 2024 to August 2024.

As of the same date, Ozturk's LinkedIn said she was studying for a doctorate in child study and human development at Tufts, slated to graduate in 2026.

Ozturk graduated with a master's degree in developmental and child psychology from Teachers College, Columbia University (TC) in 2020. TC is located in New York, New York.

As of February 2025, Ozturk's LinkedIn said she was located in the Greater Boston area, Massachusetts.

---

1 of 2

AAUP-01568

On March 26, 2024, Ozturk co-authored an op-ed published in the Tufts Daily newspaper titled: "Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions." The authors urged "President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate."

The op-ed referred to the passing of anti-Israel resolutions by the Tufts Community Union (TCU) Senate, which demanded the University "...acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments, and divest from companies with direct or indirect ties to Israel."

On March 4, 2024, Tufts President Kumar published a "Message on TCU Senate Resolutions" addressed to Tufts students, faculty, and staff. Kumar wrote: "...the Tufts Community Union Senate...passed three resolutions, initially proposed by the Coalition for Palestinian Liberation..."

President Kumar's message continued: "...we're disappointed that a majority voted to pass three of the four resolutions. To be clear: as we have done in the past, we reject the Boycott Divestment Sanctions movement, we wholeheartedly support academic freedom and all our academic and exchange programs, and we will continue to work with all companies that we engage with and do business with now."

## ⌃ Social Media and Weblinks

🔗 https://www.linkedin.com/in/rumeysaozturk/

🌐 ResearchGate

🌐 Google Scholar

🌐 Academia.edu

HOME                    ORGANIZATIONS
OUR MISSION             EX-CANARY
ETHICS POLICY           BLOG
CONTACT US              CAMPAIGNS
STUDENTS                CANADA
PROFESSORS
PROFESSIONALS
MEDICAL

Copyright © 2024 Canary Mission Inc.
All rights reserved.

AAUP-01569

# EXHIBIT 228

**[.mp4 filed manually]**

# EXHIBIT 229



# OUR MISSION

Canary Mission documents individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond. Canary Mission investigates hatred across the entire political spectrum, including the far right, far left and anti-Israel activists.

Canary Mission is motivated by a desire to combat the rise in anti-Semitism on college campuses. We pursue our mission by presenting the words and deeds of individuals and organizations that engage in anti-Semitism, racism and bigotry on the far right, far left and among the array of organizations that comprise the anti-Semitic Boycott, Divestment, Sanctions (BDS) movement.

Canary Mission gathers content from publicly available sources. Additionally, we collect and validate materials submitted privately through our website. We aggregate this information into a concise and easily searchable format, providing free access to the general public.

Before publication, all content is verified, meeting our high standards of accuracy and authenticity.

When published content is based on validated information submitted privately, a note indicating this is placed on the page.

The addition of individuals to our database is governed by our Ethics Policy .

Individuals who believe that they should be removed from the Canary Mission website are encouraged to be in touch with us and may become an Ex-Canary.

AAUP-00333

 

we all have the right to know if an individual has been affiliated with movements that routinely engage in anti-Semitic rhetoric and actions, promote hatred of Jews and seek the destruction of Israel.



HOME

OUR MISSION

ETHICS POLICY

CONTACT US

STUDENTS

PROFESSORS

PROFESSIONALS

MEDICAL

ORGANIZATIONS

EX-CANARY

BLOG

CAMPAIGNS

CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

AAUP-00334

# EXHIBIT 230

7/3/25, 4:13 PM                           Mohsen Mahdawi - Canary Mission

Search for a P

# Mohsen Mahdawi

Status: Unknown
State: New York
Organizations: WOL, SJP, JVP, DAR, BDS
University: Columbia, BZU



Share:    🔗

## Mohsen Mahdawi's Arrest, Call for Israel's Destruction, Justification of Hamas Terrorism and Support for the Pro-Hamas Encampment at Columbia University (Columbia)



Mahdawi speaking at an anti-Israel rally

AAUP-01560

03:10

Mohsen Mahdawi is a leading anti-Israel activist who was arrested in April 2025 for his pro-Hamas activism. He has also called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

In December 2023, Mahdawi served as co-president of DAR Palestine at Columbia University (Dar at Columbia), Columbia's Palestinian student union, which is reportedly part of a coalition of 80 anti-Israel student groups. Columbia is located in New York, New York.

Mahdawi was also affiliated with the pro-terror activist group Within Our Lifetime (WOL) in 2023. He was reportedly a member of Students for Justice in Palestine (SJP) that same year.

Mahdawi is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

In December 2023, CBS reported [00:07:10] that Mahdawi "grew up in a refugee camp in the Israeli-occupied West Bank."

As of February 20, 2024, Mahdawi, who also goes by Mohsen Khader Mahdawi, was listed in Columbia's online directory as a student in the Department of Philosophy at Columbia's School of General Studies.

As of March 7, 2024, Mahdawi's since-deleted LinkedIn profile said he was slated to graduate from Columbia in 2024.

As of the same date, Mahdawi's LinkedIn also said he studied computer engineering at Birzeit University (Birzeit) from 2008 to 2014.

Birzeit University's student body has celebrated terrorists since at least 2003. That year, student government elections featured models of exploding Israeli buses, as parties competed on the basis of which Palestinian faction had killed the most Israelis.



7/3/25, 4:13 PM                                Mohsen Mahdawi - Canary Mission

"Hamas is a product of the Israeli occupation," he said. Hamas, which has governed Gaza since 2007, has been designated as a terrorist organization by the U.S. and European Union.

Mahdawi shares the view of many Palestinians that Gaza is a longtime "open-air prison" of Israel's doing.

is rooted in international law, under which occupied peoples have the right to resist the occupation of their land," they wrote. "If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out."

CAPTURED BY CANARY MISSION

On Oct. 12, Mahdawi was among hundreds of pro-Palestinian demonstrators who gathered on Columbia's South Lawn. Supporters were called terrorists and had water thrown at them, he said.

← | 1 of 8 | →

## ⌃ Arrested by ICE

On April 14, 2025, ABC News reported that Mahdawi was arrested by agents from the United States Immigration and Customs Enforcement (ICE) at the Immigration Services office in Colchester, Vermont. After his arrest, ICE began the process of deporting him.

In a court filing concerning the immigration status of Mahmoud Khalil, who co-founded the Palestinian Student Union at Columbia with Mahdawi and also faces deportation, United States Secretary of State Marco Rubio asserted that Khalil should be deported because of his role in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States."

## ⌃ Calling for Israel's Destruction

On November 15, 2023, Mahdawi spoke at an anti-Israel rally titled: "All Out for Gaza at Columbia University," where he led [00:07:07] the crowd in chanting: "From the river to the sea, Palestine will be free!"

"From the River to the Sea, Palestine will be Free" is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

Mahdawi then said [00:07:30]: "We were accused by the administration that we are calling for genocide, while the administration itself is ignoring the current genocide that is taking place in Gaza. Shame on you, Columbia!"

Mahdawi continued [00:09:01]: "[Columbia's] excuse of safety and security is a weaponization of this word, its the same weaponization that Israel has used as a tactic to steal land to con people, to suppress us, to keep us in refugee camps and to commit genocide and apartheid."

Mahdawi's mention of "refugee camps" referred to a policy known as the "right of return."

The "right of return" is a Palestinian demand discredited as a means to eliminate Israel. International law mandates no absolute right of return and UN Resolution 194, which defined principles for "refugees wishing to return to their homes," was unanimously rejected by Arab nations following the 1948 Arab-Israeli War.

The rally, which "ended in front of the university's main entrance," was reportedly co-organized by WOL and the City University of New York (CUNY) School of Law (CUNY Law) chapter of the Jewish Law Students Association (CUNY JLSA).

Mahdawi appeared at the rally wearing a keffiyeh and standing between WOL co-founder and chairperson Nerdeen Kiswani and leading WOL activist Abdullah Akl.

## ⌃ Justifying Hamas Terrorism in 2023

In an October 22, 2023 interview for a local New England newspaper, Mahdawi said: "Hamas is a product of the Israeli occupation."

According to the newspaper, soon after October 7, 2023, Mahdawi and leaders of other anti-Israel student groups at Columbia wrote a statement that said: "We remind Columbia students that the Palestinian struggle for freedom is rooted in international law, under which occupied peoples have the right to resist the occupation of their land."

Anti-Israel activists use the term "resistance" to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: "Resistance by any means necessary!" and "Resistance is justified when people are occupied!" in response to terror attacks.

The statement that Mahdawi reportedly co-authored continued: "If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out."

AAUP-01562

mutilation.

Hamas broadcast videos of their butchery on social media, often to victims' accounts for families to see. Israel retaliated with a war called "Swords of Iron." As of November 10, 2023, approximately 1,200 Israelis, the vast majority of them civilians, were murdered during the attacks. Hamas kidnapped 242 Israelis, including at least 30 children. At least 3,500 people were wounded, many severely.

A terrorist detained by Israel admitted he raped an Israeli woman when he broke into a kibbutz house during the October 7, 2023 attack. In March 2024, a former hostage of Hamas publicly stated she was sexually abused and tortured while in captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

In December 2023, during Israel's war against Hamas, Mahdawi was interviewed [00:06:07] on the television show "60 Minutes" to discuss his campus activism.

During the interview, Mahdawi said [00:08:17]: "When somebody is hurting you, when you see this person is being punched in the face and this feeling, it is: You now feel my pain."

The interviewer replied [00:08:30] back to Mahdawi: "But this Hamas attack wasn't a punch in the face. This was a horrible terror attack."

Mahdawi then said [00:08:43] that he "can empathize" with what Hamas did and continued: "To empathize is to understand the root cause and to not look at any event or situation in a vacuum. This is for me the path moving forward."

## ⌃ Celebrating a Terrorist in 2013

On February 3, 2013, a Facebook user shared a poem Mahdawi wrote that paid tribute to terrorist Dalal Mughrabi. Mahdawi left comments thanking the poster for sharing the text.

The poem said: "I will breathe home… / And fill my shame / And clean my gun / And collect my packages, my bombs / And embrace my gun…"

Dalal Mughrabi, a member of the Fatah faction of the Palestine Liberation Organization (PLO), participated in the 1978 Coastal Road massacre in Israel. She and other terrorists hijacked a bus in an attack that left 38 Israeli civilians dead, including 13 children.

## ⌃ Anti-Israel Activism (BDS)

In January 2024, Mahdawi participated [00:00:04] as a speaker at a "divestment now" rally organized by Columbia University Apartheid Divest (CUAD) and other student organizations. The protest called on Columbia to divest from Israel and promoted [slide 3; 00:00:01] "global intifada."

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On December 5, 2023, Mahdawi posted photos of himself speaking at a November 14, 2023 rally organized by DAR at Columbia and held on the Columbia campus. He wrote on his post: "We come here today to stand tall, to raise our voices, and to lift our spirits… chanting for humanity: Free, free Palestine!"

The aim of the November 14, 2023 rally and another one on November 15, 2023, where he called for Israel's destruction, was to protest Columbia's "unjust suspension" of the university's Jewish Voice for Peace (JVP) and SJP chapters for violating university policies.

## ⌃ Showing Support for the Pro-Hamas Encampment at Columbia

Mahdawi appeared [00:06:02] in an AJ+ video in which he was interviewed during the April 30, 2024 "occupation" of Columbia's Hamilton Hall by encampment participants. Discussing the university administration's decision to call in the New York Police Department (NYPD) to clear the locked, barricaded and vandalized building, Mahdawi claimed [00:06:34]: "This [police action] is a strategy that is used by the oppressor, and Columbia University…are doing the same thing."

On April 30, 2024, participants in Columbia's second pro-Hamas encampment forced their way into the university's Hamilton Hall, barricading themselves in the building and taking three Columbia custodians hostage. Protesters also vandalized [00:00:55] and destroyed university property inside the hall. A police raid on Hamilton found knives, gas masks, ropes and literature that read: "…DESTROY zionist business interests everywhere!…DEATH TO AMERICA!…"

AAUP-01563

building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation…"

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists…They are nazis!… They're supporters of genocide! Why would we want people who are supporters of genocide to live?… Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

NYPD shared on Twitter photos of objects the police found in Hamilton Hall. These included knives, hammers, gas masks, ropes and a pamphlet that read [video 1]: "…DISRUPT/RECLAIM/DESTROY zionist business interests everywhere! DEATH TO ISRAELI REAL STATE! DEATH TO AMERICA!…LONG LIVE THE INTIFADA!"

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

AAUP-01564

00:22

## ⌃ SJP

SJP is the leading student organization engaged in anti-Israel activity on North American college and university campuses. The first chapter of SJP was founded in 2001 at the University of California at Berkeley by Professor Hatem Bazian, who has spread anti-Semitism and defended the Hamas terror group.

SJP organizes anti-Israel campus campaigns, including running annual Israel Apartheid Weeks and pushing the Boycott, Divestment, Sanctions (BDS) movement. SJP activists have reportedly physically assaulted, intimidated and harassed Jewish students, and SJP chapters have often endorsed and campaigned for terrorists.

01:30

AAUP-01565

The Boycott, Divestment, Sanctions (BDS) movement was founded by pro-terror activist Omar Barghouti in 2005 to turn "Israel into a pariah state, as South Africa once was." Barghouti has also called for Israel's destruction and the BDS movement demands would result in that same goal.

BDS initiatives include calling on institutions and individuals to divest from Israeli-affiliated companies, promoting academic and cultural boycotts of Israel, and organizing anti-Israel rallies, protests and campaigns.

The movement's most notable achievement has been infiltrating university campuses through lobbying for "BDS resolutions." In these cases, student governments propose resolutions to boycott or divestment from Israel or Israeli-affiliated entities. BDS activity is often aggressive and disruptive. It has been noted that universities that pass BDS resolutions see a marked increase in anti-Semitic incidents and pro-terror activism on campus.

06:01

## ⌃ Social Media and Weblinks

 https://www.facebook.com/mohsen.k.mahdawi

𝕏 https://twitter.com/MohsenPalestine/ [deleted]

𝕏 https://twitter.com/Mohsen_Mahdawi_ [deleted]

 https://www.instagram.com/mohsen.of.palestine/

 https://www.instagram.com/mohsen.palestine/ [deleted]

 https://www.instagram.com/mohsen__mahdawi/ [deleted]

 https://www.linkedin.com/in/mohsen-m-843046265/

 https://www.threads.net/@mohsen.palestine [deleted]

 https://www.tiktok.com/@mohsenmahdawi1 [deleted]

 https://www.youtube.com/@mohsenmehdawi7848 [deleted]

AAUP-01566

7/3/25, 4:13 PM                                           Mohsen Mahdawi - Canary Mission

HOME                                      ORGANIZATIONS

OUR MISSION                               EX-CANARY

ETHICS POLICY                             BLOG

CONTACT US                                CAMPAIGNS

STUDENTS                                  CANADA

PROFESSORS

PROFESSIONALS

MEDICAL

Copyright © 2024 Canary Mission Inc.
All rights reserved.

AAUP-01567

# **EXHIBIT 231**

| Search for a Medical P | | |
|---|---|---|

# Mahmoud Khalil

**Status:** Student
**State:** New York
**Organizations:** CUAD, BDS
**University:** Columbia



Share:

## PROFILE UPDATE - MARCH 12, 2025

- In March 2025, Mahmoud Khalil was arrested by the U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."
- Khalil has been leading anti-Israel protests at Columbia since at least October 12, 2023—just days after Hamas' attack on Israel. That day, he led a rally where activists chanted "From the river to the sea," a slogan condemned by the U.S. House of Representatives as antisemitic and used by Hamas to call for Israel's destruction.
- Khalil is a leader of the Columbia University Apartheid Divest group (CUAD), the current home for Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP), after they were suspended for pro-terror activities. It is now a coalition of "over 80 student groups."
- Khalil openly justified Hamas terrorism, speaking as a CUAD representative in a video posted on X. He stated, "We've tried armed resistance, which is legitimate under international law, but Israel calls it terrorism."
- On October 7, 2024, the first anniversary of Hamas' terror attack where they murdered 1,200 Israelis, Khalil held a leadership role in a CUAD-organized pro-Hamas protest at Columbia. The next day, CUAD defined this protest by their desire to "bring the war home"—a phrase tied to the movement's broader strategy of bringing about the downfall of the USA. For more information on their war on America, see Canary Mission's campaign "Bringing the War Home."
- CUAD's members wrote on August 16, 2024, that they "must work hard to weaken US imperialism." The New York Post also reported on March 9, 2025, that Khalil's group seeks the "total eradication of Western civilization."
- On March 24, 2024, CUAD co-organized a pro-terror event titled "Palestinian Resistance 101," featuring Khaled Barakat, a senior member of the Popular Front for the Liberation of Palestine (PFLP), a designated terrorist organization.
- Khalil has acted as a lead negotiator for CUAD during several major incidents in 2024 and 2025.
  - In April 2024, Mahmoud Khalil acted as a lead negotiator for the pro-Hamas encampment at Columbia on behalf of CUAD. The Columbia encampment was a violent, pro-Hamas stronghold where activists took over buildings, held workers hostage, and chanted for Israel's destruction. Police found weapons and antisemitic propaganda, while Jewish students faced harassment and threats.
  - Khalil served as a negotiator after pro-Hamas agitators occupied the library lobby at Barnard College on March 5, 2025, in protest of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted and the police were sent to the location citing a "bomb threat."

## Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia) & Arrest for Pro-Hamas Activities

AAUP-01570



Palestinian supporters demonstrate during a protest at Columbia University on Oct. 12, 2023, in New York.

AP Photo/Yuki Iwamura

Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition. He has also expressed support for Hamas terrorism as a CUAD representative.

CUAD is a coalition of "over 80 student groups working toward the goal of collective liberation." CUAD is part of the Boycott, Divestment, Sanctions (BDS) movement. The group's demands included "a ceasefire in the Israel-Hamas war, divestment from Israel… and to reinstate" the pro-terror campus groups Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP) after the Columbia administration suspended them. CUAD members have also declared that their goal is "to weaken US imperialism" and the "total eradication of Western civilization."

In March 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization." Khalil was scheduled to appear before a federal immigration judge.

On October 7, 2024, the first anniversary of Hamas' terror attack on Israel, Khalil participated in a leadership role in a pro-Hamas protest organized by CUAD at Columbia. The next day, CUAD wrote that it was necessary to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted. The police were sent to the location, citing a "bomb threat," making a series of arrests.

On March 24, 2024, CUAD co-organized a pro-terror event that hosted Khaled Barakat, a leader of a foreign terror organization. The event was titled: "Palestinian Resistance 101." The event also featured Charlotte Kates and Nerdeen Kiswani. Kates and Barakat are the

AAUP-01571

across New York City.

**Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia**

On April 24, 2024, the New York chapter of the Palestinian Youth Movement (PYM) posted on Instagram: "THE PEOPLE'S (POPULAR) UNIVERSITY FOR PALESTINE: For the past week, students at Columbia's Gaza Solidarity Encampment have put on alternative programming for those joining on the lawns, from teach-ins to cultural performances…" The post included a video in which Khalil appeared [00:00:31] dancing at the encampment, alongside other anti-Israel activists.

On April 26, 2024, the New York Post reported: "The anti-Israel tent encampment at Columbia University is being led by a cohort of controversial student leaders…these students are the ones negotiating directly with leaders of the Ivy League university – holding campus hostage with dozens of tents and hundreds of protesters splayed out on the lawn…" The article quoted Khalil saying: "The university understood that we cannot operate on timelines. We cannot operate under time pressure."

In an April 27, 2024 Quds News Network (QNN) interview posted on X, Khalil said [00:00:05] in Arabic: "We have been negotiating since last night for more than 11 hours with the university to meet our demands regarding the cutting economic and academic ties with Israeli universities and the universities involved in slaughtering our Palestinian people…"

On April 29, 2024, Bwog Columbia Student News reported: "…Columbia University Apartheid Divest (CUAD) held a press conference to address the end of negotiations and the University's plans to clear the Encampment…" Speaking on behalf of CUAD, Khalil said: "…the students in this Encampment are a gift to Columbia" and "…the University should be proud of its student activists rather than suspend them and 'trample its reputation.'"

On April 30, 2024, a user posted on Instagram a video interview from CNN in which Khalil was asked [00:00:01]: "Are you…going to listen to the University and leave the encampment here?" Khalil replied [00:00:04]: "Of course not! The University is the one who should listen to us. They should listen to their student body who are demanding to end the war that's happening in Palestine. Our…demands are clear…regarding divestment from the Israeli occupation that companies that are profiting [sic] and…contributing to the genocide of our people…"

Asked by CNN [00:00:47]: "How far are you all willing to go here on campus?", Khalil replied [00:01:08]: "…the students will remain here… until they achieve their…demands."

On April 30, 2024, USA Today reported: "The school…suspended graduate student Mahmoud Khalil, lead negotiator for Columbia University Apartheid Divest in talks with the administration that have failed to resolve the crisis."

On May 2, 2024, the BBC, in a news brief titled: "Columbia student has suspension reversed," reported: "…Mahmoud Khalil…was suspended yesterday. Today…Khalil received a surprising message: it was abruptly reversed." Khalil reportedly said: "[They said] that after reviewing the evidence, they don't have any evidence to suspend…"

The BBC report said: "Khalil, a Palestinian international student who was born in [sic] raised in Syria, said that the thought of suspension had 'been stressful,' given that his visa in the US is dependent on his status as a student."

On April 26, 2024, The Verge reported: "Mahmoud Khalil, a Palestinian student who has been involved in the negotiations with Shafik's office, also spoke, saying international students were especially at risk. 'I am here on a foreign visa. That's why for the past six months, I've barely appeared on the media,' Khalil said."

The encampment was also in support of the BDS movement.

  

David lederer
@Davidlederer6

CAPTURED BY
CANARY MISSION

…1 of

On March 8, 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

On March 9, 2025, Marco Rubio, U.S secretary of state, posted on X: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported," and linked to an article about Khalil's arrest.

Khalil was scheduled to appear before a federal immigration judge.

## ⌃ Support for Hamas Terrorism

On October 12, 2023, Khalil led [photo 2] a protest at Columbia where activists chanted [00:00:01]: "..from the river to the sea, Palestine will be free…" Khalil appeared [00:00:05] next to anti-Israel agitator Maryam Iqbal, who led the chant calling for Israel's destruction.

"From the River to the Sea, Palestine will be Free" is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

On March 11, 2025, Khalil was featured in a video posted on X, speaking to a crowd as a CUAD representative.

In the video, Khalil said [00:00:01]: "As you've seen, Palestinians have tried multiple times resistance, whether it is armed, unarmed resistance, peaceful, whatever. But Israel and the propaganda always find something to attack."

Among Palestinians and anti-Israel activists, the term "resistance" is a euphemism for nationalistic terror and is used to glorify and encourage anti-Israel and anti-Semitic violence.

## ⌃ Leading Role in a Pro-Hamas Protest

On October 7, 2024, Khalil participated in a leadership role in a pro-Hamas protest at Columbia. CUAD, which organized the protest, called to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

During the protest, demonstrators held [photos 2 and 4] a newspaper with Hamas propaganda, which included an article [p.12] by convicted Popular Front for the Liberation of Palestine (PFLP) terrorist Walid Daqqa and articles [p.4] by the pro-terror groups PYM and [p.7] National SJP.

Walid Daqqa was convicted and sentenced to life imprisonment for reportedly having been part of a PFLP terror cell that abducted and killed an Israeli soldier in 1984.

Also on October 7, 2024, CUAD promoted on Instagram an event titled: "OCTOBER 7 / WALKOUT." The post said: "…After an entire year of uninterrupted genocide…it is our duty to act, to resist…WALK OUT…join the movement for Palestinian liberation."

During the walkout, protesters chanted [video; 00:00:01]: "Resistance is glorious! We will be victorious!" and held [video; 00:00:35] yellow signs that read: "GLORY TO THE MARTYRS. VICTORY TO THE RESISTANCE." Protesters also chanted [00:00:42]: "Intifada, intifada! Globalize the intifada!"

Anti-Israel activists use the term "resistance" to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: "Resistance by any means necessary!" and "Resistance is justified when people are occupied!" in response to terror attacks.

AAUP-01573

missions.

Also on October 7, 2024, CUAD posted on Instagram a video of the protest and wrote: "...We must recognize our liberations as connected and bring the war home. The Palestinian resistance is moving their struggle to a new phase of escalation, and it is our duty to meet them there...WALKOUT NOW! JOIN US! JOIN THE MOVEMENT FOR A FREE PALESTINE!"

## ⌃ Leading Role in a Library Takeover

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star."

During the protest, anti-Israel activists shared posters that called for the "DEATH TO AMERICA." They also shared posters in support of former Hamas leader Yahya Sinwar.

Yahya (Yehiya) Sinwar masterminded the October 7, 2023 terror attacks on Israel. While serving four life sentences in Israel, he was released to Gaza following the Gilad Shalit prisoner exchange deal. On October 17, 2024, the Israel Defense Forces eliminated Sinwar in Gaza.

Khalil appeared [00:00:27] in a video during the library occupation, as agitators chanted: "Disclose! Divest! We will not stop! We will not rest!"

During the protest, agitators displayed [slide 2] a puppet of Barnard president Laura Ann Rosenbury and chanted: "Intifada, intifada! Globalize the Intifada!"

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On March 5, 2025, the New York Times reported that this was the "second such sit-in to take place at Barnard over the issue," with anti-Israel activists having previously "staged a sit-in at Milbank Hall."

## ⌃ Pro-Hamas Encampment at Columbia University

On April 17, 2024, Columbia students and anti-Israel activists set up a pro-Hamas "Gaza Solidarity Encampment" on the university's main lawn. Many participants were arrested and the encampment featured multiple violent incidents, including taking over a campus building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation..."

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists...They are nazis!... They're supporters of genocide! Why would we want people who are supporters of genocide to live?... Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

AAUP-01574

TO AMERICA!...LONG LIVE THE INTIFADA!¨

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

## ⌃ Background on Pro-Hamas Encampments

The encampment was one of over 140 pro-Hamas and anti-Israel college encampments set up in North America, and over 20 more globally, in the spring of 2024. The first began on April 17, 2024, at Columbia University. The encampments were unofficially known as the "student intifada," borrowing a term associated with terrorist violence.

Protesters harassed Jewish students, blocked Jews from campus facilities and shouted anti-Semitic slogans. They occupied campus grounds, in many cases illegally, caused property damage, violently took over buildings, celebrated terrorism and promoted the Boycott, Divestment, Sanctions (BDS) movement.

Activists set up encampments to oppose Israel's right to wage war against the Hamas terror group following October 7, 2023, when Hamas murdered approximately 1,200 people, including 32 American and 8 Canadian citizens. Hamas also kidnapped 252 people, including 11 Americans and the bodies of 2 murdered Canadians. As of May 26, 2024, 125 hostages remained in Hamas captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

## ⌃ The Columbia Student Intifada

AAUP-01575

00:22

## ⌃ The Pro-Terror & Anti-Israel Movement After 10/7/2023

03:10

## ⌃ Mahmoud Khalil's Work and Education

AAUP-01576

As of the same date, Khalil's LinkedIn said he had worked as a political affairs officer at the United Nations Relief Works Agency (UNRWA)'s office in New York from June to November 2023.

The United Nations Relief Works Agency (UNRWA) has been infiltrated by Palestinian terrorist organizations to wage war against Israel under the guise of UN immunities. UNRWA employs terrorists who indoctrinate children to hate Jews and kill Israelis. UNRWA facilities, schools and medical clinics are systematically used as terrorist command centers and weapons depots. UNRWA also provided electricity to Hamas's main data center and UNRWA employees have kidnapped and held hostage Israeli civilians.

Khalil's LinkedIn said he was located in New York, New York.

## ⌃ Social Media and Weblinks

🔲 https://www.instagram.com/mhod.khalil/ [private]

🔲 https://www.threads.net/@mhod.khalil

🔲 https://www.linkedin.com/in/khalilmahmoud/

🌐 Clubhouse

| HOME | ORGANIZATIONS |
| --- | --- |
| OUR MISSION | EX-CANARY |
| ETHICS POLICY | BLOG |
| CONTACT US | CAMPAIGNS |
| STUDENTS | CANADA |
| PROFESSORS | |
| PROFESSIONALS | |
| MEDICAL | |

Copyright © 2024 Canary Mission Inc.

All rights reserved.

AAUP-01577

# EXHIBIT 232

EXHIBIT

232

tabbies

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

**SUBJECT PROFILE**

### (U) Analysis Findings

- (U//LES) Turkish national Rumeysa OZTURK holds a F1 visa and is a co-author of an Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestine, which was suspended for calls for student intifada.
- (U//LES) OZTURK is currently a post doctorate student at Tufts University in the Child Study & Human Development program with a start date of 1 February 2021 and end date of 23 December 2027. OZTURK completed her master's degree at Columbia University in 2019.
- (U//LES) She has prior U.S. travel on an internship in 2016 at Boston University in Psychology and Brain Sciences under a B1/B2 visa.

### (U) Biographical Information


(U//LES)

- (U//LES) **Name**: Rumeysa OZTURK
- (U//LES) **SSN**: ▮▮▮▮▮
- (U//LES) **DOB**: ▮▮▮▮▮
- (U//LES) **Immigration Status**: F1 Nonimmigrant Student
- (U//LES) **COB**: Turkey
- (U//LES) **COC**: Turkey
- (U//LES) **Current Passport**: ▮▮▮▮▮, Turkey (Expiration: 9 July 2029)
- (U//LES) **Visa Type, Number**: F1, ▮▮▮▮▮ (expiration: 9 December 2025)
- (U//LES) **FIN**: ▮▮▮▮▮

- (U//LES) **SEVIS ID**: ▮▮▮▮▮ (program end date: 23 December 2027)

### (U) Criminal History
(U//LES) No associated criminal history or HSI investigation was located for OZTURK. [NCIC, ICM]

### (U) USCIS Applications
(U//LES) No applications found. [PCQS]

### (U) Residences
- (U//LES) ▮▮▮▮▮, ▮▮▮▮▮ ▮▮▮▮▮ April 2023 – January 2025) [Accurint]
- (U//LES) ▮▮▮▮▮ ▮▮▮▮▮ 02144 (January 2025) [PCQS]

### (U) Communications
- (U//LES) **Phone Numbers**: ▮▮▮▮▮ (cell) (January 2025) [Accurint]
- (U) **Social Media**:
  - (U//LES) ▮▮▮▮▮
  - (U//LES) ▮▮▮▮▮
  - (U//LES) ▮▮▮▮▮
  - (U//LES) X ▮▮▮▮▮ [Commercial]
  - (U//LES) X (Twitter)/ ▮▮▮▮▮ [Commercial]
- (U) **Email**:
  - (U//LES) ▮▮▮▮▮ [AFI]
  - (U//LES) ▮▮▮▮▮ [AFI]
  - (U//LES) ▮▮▮▮▮ [AFI]

### (U) Travel and Border Crossing History
- (U//LES) 28 June 2024: air travel from Istanbul Airport, Istanbul (IST), Turkey to Logan International Airport, Boston (BOS), Massachusetts. [UPAX]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

- (U//LES) 26 May 2024: air travel from BOS to IST. [UPAX]
- (U//LES) 30 December 2023: air travel from IST to BOS. [UPAX]
- (U//LES) 8 December 2023: air travel from BOS to IST. [UPAX]
- (U//LES) 3 July 2023: air travel from IST BOS. [UPAX]

- (U//LES) 9 May 2023: air travel from BOS to IST (IST). [UPAX]
- (U//LES) 9 August 2022: air travel from IST to BOS. [UPAX]
- (U//LES) 29 May 2022: air travel from BOS to IST. [UPAX]
- (U//LES) 31 August 2021: air travel from IST to BOS. [UPA]
- (U//LES) 13 July 2021: air travel from BOS to IST. [UPAX]

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**                                              ICE-HQINT-30159-25

## (U) Social Media and Open Sources

(U)  Canary Mission profile on Rumeysa OZTURK stating her participation in anti-Israel activism in March 2024 -
Posted 06 February 2025
https://canarymission.org/individual/Rumeysa_Ozturk



REPORT AN INDIVIDUAL    REPORT AN EVENT   X   ⓞ

CANARY MISSION    HOME    ABOUT US    PROFILES    BLOG    CAMPAIGNS    CANADA    [DONATE]

Ozturk                                    🔍    ⇄ FILTERS

Last updated: Feb. 6, 2025

Share: 🅯 X G ⌀

# Rumeysa Ozturk

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.



**Rumeysa Ozturk**
Status: Student
State: Massachusetts
Organizations: BDS
University: Tufts, TC

## Sign up for our weekly newsletter

Enter your email

[Subscribe]

Donate

(U//LES) Open Source

*Prepared for/in collaboration with HSI Office of Intelligence*          *ROA Published Date: 17 March 2025*

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

ICE-HQINT-30159-25

(U)  **The Tufts Daily article synopsizing the four resolutions introduced by the Coalition for Palestinian Liberation at Tufts University** – Date 27 February 2024
https://www.tuftsdaily.com/article/2024/02/ng4hfkjplejxe53

*SUBJECT PROFILE*

*Prepared for/in collaboration with HSI Office of Intelligence*

*ROA Published Date: 17 March 2025*

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U//LES) OZTURK, Rumeysa**



# THE TUFTS DAILY

**NEWS | UNIVERSITY**

## TCU Senate to vote Sunday on genocide acknowledgment, university divestment

The Coalition for Palestinian Liberation proposed four resolution drafts to TCU Senate targeting university connections to Israel.

Karen Craven / The Tufts Daily

The Joyce Cummings Center is pictured on Feb. 22, 2023.

 

By Carly Cohen
Published Tuesday, February 27, 2024

On Sunday, the Coalition for Palestinian Liberation at Tufts introduced four full-text resolutions to the Tufts Community Union Senate which, if passed, will call on the Office of the President and other senior leadership to acknowledge Israel's continued assault on Gaza and to end all ties to the country. Senators will vote on finalized versions of all four resolutions at next week's meeting, just two weeks after the introduction of abstracts on Feb. 18.

**(U//LES) Open Source**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

"The Coalition for Palestinian Liberation at Tufts has introduced these four TCU Senate resolutions to emphasize the importance of institutional boycott and divestment from Israel at multiple administrative levels," CPLT wrote in a statement to the Daily. "These resolutions demonstrate that any and all measures that the university and its officials can take to end Tufts' complicity in Israel's genocide on Gaza are crucial to the broader goals of the [boycott, divestment and sanctions] movement."

While resolutions are all based on the shared premise of Israel's human rights violations, each of the four takes a different approach to cut the university's ties to the country.

The first, S.24-1, calls on Tufts Global Education to end approval for external study abroad programs in Israel. According to the Global Education website, the school currently approves programs at Ben Gurion University of Negev, Technion Israel Institute of Technology, University of Haifa, Hebrew University of Jerusalem and Tel Aviv University.

S.24-1 "urges Tufts University to end its study abroad programs in Israel indefinitely" and "to

not approve or offer new study abroad programs in Israel." The resolution, if passed, will solicit a written response from Tufts Global Education within two weeks.

The second, S.24-2, calls for Tufts Dining to end the sale of Sabra, Pillsbury and other products connected to Israel at Tufts. In its proposal, CPLT explained the reasoning behind this request.

"Sabra has documented ties to human rights violations in the Occupied Palestinian

Territories. It is 'a joint venture between PepsiCo and the Strauss Group, a multinational corporation and Israel's largest food and beverage company.' ... The Strauss Group has materially supported the Golani Brigade of the Israel Defense Forces. ... Pillsbury, a food manufacturing corporation owned by General Mills, operates a factory in the Atarot Industrial Zone. ... The factory has displaced Palestinians and profits off of their land, water, and other resources,'" the resolution reads.

The resolution "urges the Tufts Dining office to stop selling any Israeli products immediately and indefinitely" and requests a written response from Tufts Dining within two weeks.

CPLT's third resolution, S.24-3, demands that "[University President Sunil Kumar], Deans, and Provosts release a statement both recognizing [and] condemning the Ongoing Genocide in Gaza." The resolution further calls on the administration to "release a statement apologizing for their previous statements" and "urges the Office of the President and the Deans of the school to hold a public open meeting with the Coalition for Palestinian Liberation at Tufts."

The resolution asserts that the "Tufts Administration and President have made several biased statements in the Fall semester of 2023 about the ongoing genocide, under the name of 'Israel-Hamas War.'" Last semester, the university put out several emails addressing the conflict, and Kumar released a video message on campus discourse at the beginning of the spring semester.

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES)  OZTURK, Rumeysa

In this resolution, the coalition requests a written response from the university president, deans and provosts within two weeks.

The final resolution, S.24-4, takes specific aim at the school's investment portfolio.

S.24-4 "urges the Tufts University investment office to immediately disclose all investments, with emphasis on any and all direct and indirect investments in companies based in or which profit from partnership with Israel." The resolution urges the university "to divest from Israeli Companies [and] to divest from companies invested in Israeli Apartheid and with ties to Israel."

S.24-4, as well as S.24-3, cite a TCU Senate resolution passed in 2017, titled "A Resolution Calling for Tufts University to End Investments in The Israeli Occupation." Despite this, the university has continually reiterated its opposition to the BDS movement and has not publicly shared its full investment portfolio.

"With Tufts continuing to not comply with this resolution, we reiterate that it is more important than ever that we do not invest in companies that provide weapons to Israel, or any Israeli companies that are built on stolen Palestinian land," CPLT wrote in the S.24-4 abstract. "Many groups on campus have expressed concern over the Administration's refusal to disclose what investments they hold in Israel and companies tied to it. We are also concerned about other investments that Tufts holds, which do not comply with their 'Anti-racist' promise, and, in this sense, we are asking for the investment office to disclose all the investments they have so that all students are made aware of where tuition dollars are spent."

Both S.24-3 and S.24-4 also reference Tufts' divestment from South Africa during apartheid, in response to student and faculty activism.

"Just as students fought for and ultimately won Tufts' divestment from apartheid South Africa, Tufts students are once again fighting for the university's divestment from apartheid, occupation, and genocide; by making clear the specific ways in which the university is complicit, these resolutions also make clear that divestment is entirely actionable, and that the student body demands these tangible steps be taken against the occupation of Palestine," CPLT wrote in its statement to the Daily.

S.24-4 requests a written response from Tufts Investment Office and the Office of the Board of Advisors within two weeks.

"Resolutions are a vehicle for students at Tufts to advocate for a given change and may be proposed by anyone in the Tufts Community Union," the TCU Senate Executive Board wrote in a statement to the Daily. "This extensive and exhaustive process allows for students to propose reform which then, based on the vote, is directed towards administration or the appropriate management at Tufts. While the Senate takes necessary steps to follow up, the final onus rests on the administration and management, not us."

(U//LES) Open Source

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

Class of 2026 Senator Anand Patil reiterated that the Senate will carefully examine each of the four resolutions, asking questions and debating before finally voting.

"These resolutions will bring strong opinions and feelings from many members of our community, so all who are planning to attend are strongly urged to treat the resolution process, TCU Senators, and fellow students with the utmost respect and civility," Patil wrote in a message to the Daily.

Senators will vote on the four resolutions at next week's open meeting, taking place on Sunday at 7 p.m. at the Joyce Cummings Center in rooms 160 and 170.

*Matthew Sage contributed reporting.*                                    **(U//LES) Open Source**

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

SUBJECT PROFILE

(U)  **Guest Opinion (Op-ed) co-authored by OZTURK on the Tufts Community Union Senate resolutions for University to acknowledge the Palestinian genocide** – Accessed 18 March 2025

https://www.tuftsdaily.com/article/2024/ 03/4ftk27sm6jkj



OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions




By Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis

Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

**(U//LES) Open Source**

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

THE TUFTS DAILY







The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.          **(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES)  OZTURK, Rumeysa

**(U) Boston.com News Article: Pro-Palestine group disaffiliates from Tufts after being suspended until 2027.** – Accessed 19 March 2025

https://www.boston.com/news/local-news/2024/11/18/pro-palestine-group-disaffiliates-from-tufts-after-being-suspended-until-2027/

Note: (U//LES) This article ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada. Analysts were unable to locate images matching the exact reference to signs.



**Pro-Palestine group disaffiliates from Tufts after being suspended until 2027**

After an interim suspension earlier this fall, Tufts Students for Justice in Palestine was dealt a full suspension for repeatedly violating university policy.

A sign sits at the entrance to a student protest encampment at Tufts in April 2024.

By Ross Cristantiello
November 18, 2024
3 minutes to read

**(U//LES) Open Source**

Tufts University officially suspended a pro-Palestine student organization through January 2027, prompting the group to announce its "formal break and disaffiliation" from the university last week.

Tufts Students for Justice in Palestine has frequently sought to disrupt campus life in the interest of raising awareness about Israel's military practices and any ties between the university and Israel.

A United Nations report released last week found that "Israel's warfare in Gaza is consistent with the characteristics of genocide, with mass civilian casualties and life-threatening conditions intentionally imposed on Palestinians there."

Tufts SJP was officially suspended on Nov. 6. The group was placed on interim suspension in early October after it used images of weapons to promote a protest rally and urged members of the Tufts community to "join the student intifada." That incident was one of five incidents this year that led to the suspension, according to Tufts Executive Director of Media Relations Patrick Collins. Over those five incidents, Tufts SJP was responsible for nine violations of university policy.

ADVERTISEMENT

The group was found to have violated the university's Gatherings, Demonstrations and Protests Policy and its Posting Policy during an October event. It violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. It failed to comply with university officials by refusing to take down threatening posts, violated the demonstration policy in September, did not comply with other officials, and violated the Gambling Policy during a student organization fair at the beginning of the semester, according to Collins.

Tufts SJP "failed to complete sanctions" assigned from previous violations, leading the university to announce a full suspension.

**(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

(U) X.com (Twitter) posting of Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," stating stickers plastered on Tufts University campus by students – Posted 2 October 2024





UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U//LES)  OZTURK, Rumeysa

*(U)  Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U)  Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U)  This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U)  This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

*(U)  This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label* ▨▨▨ *and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

**(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** ▆▆▆▆▆▆▆▆▆▆**.**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

# EXHIBIT 233

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

EXHIBIT
233
tabbies

# (U) Mahmoud KHALIL

**SUBJECT PROFILE**

## (U) Analysis Findings

- (U//FOUO) Mahmoud KHALIL received a B1/B2 visa on 30 January 2018 and entered the United States on 11 March 2018. KHALIL was issued an F1 visa on 12 December 2022 and entered the United States under that visa on 20 December 2022.

- (U//FOUO) KHALIL's status was changed to CR6, Spouse of a United States Citizen, on 16 November 2024 and received an LPR status.

## (U) Biographical Information



(U//LES)

- (U) **Name:** Mahmoud KHALIL
- (U//FOUO) **DOB:** ███████
- (U//FOUO) **COB:** Algeria
- (U//FOUO) **COC:** Algeria
- (U//FOUO) **Current Passport:** ██████ : Algeria (expiration: 21 August 2029)
- (U//FOUO) **Former Passport:** ██████ : Algeria
- (U//FOUO) **SSN:** ██████
- (U//FOUO) **A#:** ██████
- (U//FOUO) **FIN:** ██████

## (U) USCIS Applications

- (U//FOUO) 20 November 2024—Application to Register Permanent Residence or Adjust Status-Family Based (spouse of a U.S. citizen)—Approved.

- (U//FOUO) KHALIL does not have any current pending USCIS applications.

## (U) Residence

(U//FOUO) ████████████████ (December 2024)

## (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) ████████ (cell)
  - (U//FOUO) ████████ (home)
- (U//FOUO) **Email:** ████████████

## (U) Travel and Border Crossing History

- (U//FOUO) 5 February 2025–9 February 2025: round-trip air travel from John F. Kennedy International Airport (JFK), Queens, New York to Licenciado Benito Juarez International Airport, Mexico City, Mexico.

- (U//FOUO) 2 February 2025: air travel from Keflavik International Airport (KEF), Keflavik, Iceland to Stewart International Airport (SWF), New Windsor, New York.

- (U//FOUO) 12 January 2025: air travel from KEF to SWF.

- (U//FOUO) 4 December 2024: air travel from Paris-Only Airport, Paris, France to Newark Liberty International Airport, Newark, New Jersey.

- (U//FOUO) 22 November 2024: air travel from JFK to London Gatwick Airport, London, United Kingdom.

*Prepared for/in collaboration with HSI Office of Intelligence*          *ROA Published Date: 6 March 2025*

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U) Mahmoud KHALIL

### (U) News Articles

- (U) **Facing Trump's threats, Columbia investigates students critical of Israel**—Published 7 March 2025

  https://www.wisn.com/article/columbia-university-student-discipline-israel-criticism/64086002

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the nondisclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- (U) **Columbia investigates students critical of Israel amid Trump's threats**—Published 6 March 2025

  https://www.theguardian.com/us-news/2025/mar/06/columbia-university-students-protest

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the non-disclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- (U) **Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia)**—Published 24 February 2025

  https://canarymission.org/individual/Mahmoud_Khalil

  Entire article concerns KHALIL

  *"Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."*

- (U) **These are the extremist student leaders of the anti-Israel protest camp bringing Columbia to its knees**—Published 26 April 2024

  https://nypost.com/2024/04/26/us-news/the-extremist-student-leaders-leading-columbias-anti-israel-camp/

  KHALIL previously worked for UNRWA.

  *"The leaders later crowed that they were winning: "We are not actually negotiating on the state of the encampment as of now," Palestinian graduate student Mahmoud Khalil, one of the protesters' lead negotiators, told The Post Friday afternoon."*

UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Mahmoud KHALIL

*"Khalil —who did his undergraduate degree in Beirut— told the Columbia Daily Spectator that he has not participated in any of the protests over the past week and a half because he is worried about losing his student visa that allows him to remain in the US."*

*"Khalil was a political affairs officer with UNRWA — the United Nations' agency that supports Palestinian refugees — from June through November 2023, according to LinkedIn."*

*"The university understood that we cannot operate on timelines. We cannot operate under time pressure," Khalil said".*



Mahmoud Khalil is a negotiator for Columbia University Apartheid Divest
CB Media

- (U) **Instagram Posting of CNN News Clip of KHALIL**—Posted 30 April 2024 and **Instagram Posting of Canary Mission of KHALIL**—Posted 6 March 2025

https://www.instagram.com/mosheh/reel/C6ZKrh-r5Zx/?hl=en
https://www.instagram.com/canarymission/reel/DG3FdjiNJ5R/



UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

# (U)  Mahmoud KHALIL

**(U)  X Post of Documenting Jew Hatred on Campus at Columbia U of KHALIL—Posted 6 March 2025**

**(U)  Social Media**

(U)  Linkedin (Currently locked) ~~████████████~~ (No image located)

← Post

Documenting Jew Hatred on Campus at Columbia U ✓
@CamousJewHate

Mahmoud Khalil is a Palestinian who was raised in Syria. He was enrolled at @columbia as of last year; his current enrollment status remains unknown.

Regardless, Khalil served as a key negotiator for the pro-Hamas encampment in the spring. He kept a low profile until recently when Khalil was spotted at the jihadist protest in front of @Columbia's campus on Tuesday and then again yesterday serving as a negotiator for the jihadists inside the Milstein Library.

Khalil was on a student visa as of last year and may still be on one. This is why he has gone on record as saying he takes fewer risks with the jihadist movement to avoid deportation.

In other words, Khalil is fine having others do the heavy lifting and risking their academic and professional careers, but he is unwilling to in order to save himself. In our view, the person who purchases the gun knowing it'll be used to murder someone is just as culpable as the one who pulls the trigger.

Khalil is a key part of the problem. He is the brains of the operation and needs to be flagged by @columbia and @POTUS for his involvement in the terrorists movement overtaking Columbia and in this country.

We demand consequences for all jihadists on college campuses and across this country!

@presirosenbury and @katrinarmstrong, ban Khalil from your campuses now! And if he is on a student visa tied to @columbia, we call on you to revoke it. It should be an honor and privilege to study at an American university, but we are far from that point right now.

@SecRubio
@EdWorkforceCmte
@EliseStefanik
@SenHawleyPress @SenHawleyPR
@RitchieTorres



A 29-year-old Palestinian refugee raised in Syria, Khalil wanted to get involved in the on-campus activism against the war, but he was nervous.

Khalil faced a dilemma common to international students: He was in the United States on an F-1 student visa. His ability to

12:49 PM · Mar 6, 2025 · 5,765 Views

**UNCLASSIFIED**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U) Mahmoud KHALIL

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to

# EXHIBIT 234

**EXHIBIT**

234

tabbies

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

ICE-HQINT-30148-25

### (U)  Analysis Findings

- (U//LES)  Badar KHAN SURI is a research scholar (postdoctoral fellow) sponsored by Georgetown University with a program beginning date of 1 January 2023 and end date of 31 December 2026 and program status listed as active. [SEVIS: 20250312]

- (U//LES)  KHAN SURI entered the United States on a J1 visa issued on 15 November 2022 with an expiration date of 31 October 2023. [SEVIS]

- (U//FOUO)  According to open-source reporting, KHAN SURI is married to U.S. citizen, Mapheze Ahmad YOUSEF SALEH[USPER], a daughter of Ahmed YOUSEF, a senior Hamas figure in Gaza and an advisor to a Hamas leader. KHAN SURI has three children who applied for citizenship based on their mother's U.S. citizenship and were denied in June 2024. [Open Source/ELIS: 20250312]

- (U//FOUO)  According to open-source reporting, KHAN SURI actively spreads Hamas propaganda and promotes antisemitism on social media. [Open Source: 20250311]

### (U)  Biographical Information



- (U)  **Name:** Badar KHAN SURI
- (U//FOUO)  **DOB:** ▓▓▓▓▓
- (U//FOUO)  **COB:**  India
- (U//FOUO)  **COC:**  India
- (U//FOUO)  **Current Passport:** ▓▓▓▓; India (expiration: 16 June 2027)
- (U//LES)  **SSN:** ▓▓▓▓
- (U//FOUO)  **FIN:** ▓▓▓▓
- (U//FOUO)  **SEVIS ID:** ▓▓▓▓
- (U//FOUO)  **Visa Foil:** ▓▓▓▓; USA (expiration 31 October 2023)

### (U)  Criminal History

(U)  No associated criminal history or HSI investigation was located for KHAN SURI. [▓▓▓▓▓▓]

### (U)  USCIS Applications

(U//FOUO)  KHAN SURI has no filings for himself. He did file Application for Certificate of Citizenship for his three children:

- (U//FOUO)  Elia Khan Suri—Applied on 1 April 2024; Denied on 20 June 2024
- (U//FOUO)  Watan Khan Suri—Applied on 31 March 2024; Denied on 11 June 2024
- (U//FOUO)  Arafat Khan Suri—Applied on 31 March 2024; Denied on 11 June 2024

### (U)  Residence

- (U//FOUO)  ▓▓▓▓▓▓▓▓▓▓, Arlington, Virginia 22209 (21 January 2023): [Accurint, SEVIS: ▓▓▓▓]
- (U//FOUO)  ▓▓▓▓▓▓▓▓▓▓, Arlington, Virginia 22209 (February 2023): [Accurint; ▓▓▓▓]
- (U//FOUO)  ▓▓▓▓▓▓▓▓, Virgina 22203 (18 January 2023): [UPAX, SEVIS: ▓▓▓▓]
- (U//FOUO)  ▓▓▓▓▓▓, Washington DC 20057 (December 2022): (University Office): [I-94, APIS, SEVIS, ▓▓▓▓]

### (U)  Communications

- (U)  **Phone Numbers:**
  - (U//FOUO)  ▓▓▓▓ (cell) (August 2024): [SEVIS: ▓▓▓▓]
  - (U//FOUO)  ▓▓▓▓ (home) (October 2022); [CCDI; ▓▓▓▓]
- (U//FOUO)  **Email:**
  - (U//FOUO)  ▓▓▓▓; ▓▓▓▓
  - (U//FOUO)  ▓▓▓▓; ▓▓▓▓
- (U//FOUO)  **Social Media:**
  - (U//FOUO)  ▓▓▓▓▓▓▓▓
  - (U//FOUO)  ▓▓▓▓▓▓
  - (U//FOUO)  ▓▓▓▓▓▓▓▓
  - ▓▓▓▓▓▓

SUBJECT PROFILE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

**(U)  Travel and Border Crossing History**

(U//FOUO)  10 December 2022: air travel from Indira Gandhi International Airport, New Delhi, India to Dulles International Airport, Washington, DC.

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U)  Badar Khan SURI**                                                    ICE-HQINT-30148-25

**SUBJECT PROFILE**

## (U)  Social and Open Sources

- (U)  **For Georgetown Univ. Couple, Terror-Ties are a Family Affair**—Published 24 February 2025
  https://www.meforum.org/campus-watch/for-georgetown-univ-couple-terror-ties-are-a-family-affair

  *"The Middle East Forum think tank has uncovered that Saleh, the daughter of longtime Hamas leader Ahmed Yousef, is married to Georgetown post-doctoral fellow Badar Khan Suri. Even more troubling, Suri—who holds a position at Georgetown's Alwaleed Center for Christian and Muslim Understanding, funded by Saudi tycoon Alwaleed bin Talal—has repeatedly endorsed Hamas terror and actively spreads its propaganda while claiming to specialize in "peace processes in the Middle East."*

  *"Suri isn't just connected to Hamas by family. He actively spreads the terror group's propaganda and promotes virulent antisemitism on social media. In a blatant act of revisionism, he denied well-documented reports of the Hamas-led massacre in southern Israel on Oct. 7, 2023, posting on Facebook: "Three lies by Israeli occupation, no proof whatsoever of babies beheaded, rapes or mass killings at carnival."*

  *In another post, he stated that Palestine's elected government must sustain its resistance, legitimizing Hamas's violent actions. Years ago, he expressed support for Hamas founder Sheikh Ahmed Yassin, posting a video saying, "This is what Hamas argues. Sheikh Yaseen giving the reasons why his group is fighting for their land which was stolen," legitimizing Hamas's violent actions.*

  *Perhaps most disturbingly, Suri posted a video showing Hamas terrorists holding Israeli child hostages and wrote, "This is how Hamas men dealt with kids on Oct. 7." Rather than condemn the horrifying abduction of Israeli children, Suri appeared to defend and even praise how Hamas militants "dealt" with the children."*

- (U)  **Middle East Monitor (MEMO)**—Contributed articles in 2018 and 2023 for the site
  https://www.middleeastmonitor.com/6-author/badar-khan-suri/

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U) Badar Khan SURI



**MEMO**
**MIDDLE EAST MONITOR**

*Creating new perspectives since 2009*

News   Opinion   Reviews   Features   Publications   Multimedia   More       English Edition ⌄  | Free Subscription  | 🔵 X ⊚ⓖ♪🔲🔷 | Q



### Badar Khan Suri

Badar Khan Suri Postdoctoral Fellow School of Foreign Service Georgetown University Washington DC.

### Items by Badar Khan Suri



September 20, 2023 | BADAR KHAN SURI

**Hate against Muslims in India, whether on the streets or in Parliament, is the same**

Hate is the chief ingredient of everyday discourse on the streets and the country's socio-political ..



October 29, 2015 | BADAR KHAN SURI

**Unveiling its vision of apartheid: Israel's Nation-State law**

Democracy never came to Israel Finally, it is here: the masquerade of advocating Jewishness and ...



May 16, 2015 | BADAR KHAN SURI

**Democracy has taken a leap forward in Iraq**

A conversation with Shadi Hamid of Brookings Institution on the performance of Iraqi democracy ...

UNCLASSIFIED  [Open Source]

- (U) **Twitter Posting by Anna Stanley**—Posted on 25 February 2025
https://x.com/_Anna_Stanley_/status/1894358989086842939

  Post claiming KHAN SURI has pro-Hama sympathies and direct link to Hamas via spouse. Anna Stanley lists herself as a Research Associate/OSINT Investigator for the Middle East Forum Think Tank.

𝕏

⟵   **Post**

⚙ Settings

  **Anna Stanley** ✓
@_Anna_Stanley_                                   📋  ···

⚫ Badar Khan Suri's father-in-law, was a top adviser to Hamas chief Ismail Haniyeh. Yet, Suri **teaches future U.S. diplomats** "Middle East peace process" at @Georgetown, while denying Hamas atrocities & spreading terror propaganda. ••

7:09 AM · Feb 25, 2025 · **1,224** Views

- (U) **Instagram Profile Photos**—Posting date is not visible

UNCLASSIFIED  [Open Source]

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

ECT PROFILE

UNCLASSIFIED// LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI



KHAN SURI appears to post pro-Palestine content

- (U) **Georgetown University**—Biographic Information listed for KHAN SURI
  https://acmcu.georgetown.edu/profile/badar-khan-suri/

  *"**Dr. Badar Khan Suri** is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C. He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

  *"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine. He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in  Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) **GUfaculty360.Georgetown.edu**—Biographic Information and Featured Works Profile—Date of Information 10 March 2025
  https://gufaculty360.georgetown.edu/s/contact/0031Q00002e7tV9QAI/badar-khan-suri?searchType=Contact-Info&searchText=khan%20suri UNCLASSIFIED [Open Source]    <span style="float:right">UNCLASSIFIED  [Open Source]</span>

  *Postdoctorial Associate—Email: badarsuri@gmail.com*

  *"Dr. Badar Khan Suri is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C."*

  *"He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

  *"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine."*

  *"He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in  Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) **GUfaculty360.Georgetown.edu**—Courses Teaching—Date of Information 10 March 2025

PROFILE

UNCLASSIFIED// LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

https://gufaculty360.georgetown.edu/s/faculty-teaching?id=0031Q00002e7tV9QAI

### Badar Khan Suri

Postdoctoral Associate

Contact

Email  ██████████

### Teaching

| Title | Semester | Course Number | CRN |
|---|---|---|---|
| Minrmsn&Mnty Rghts in S Asia | Spring 2023 | CMCU-4190-01 | 48530 |

(U) **Coursicle.com**—Course information for classes taught by KHAN SURI—Date of Information 10 March 2025
https://www.coursicle.com/georgetown/professors/Badar+Suri/

# Badar Suri

**Courses**
CMCU 4190    Mltrrnsm&Mnrty Rghts in S Asia

**Course Chat**
Chat with other students in Badar Suri's classes

**Department**
CMCU

**Schedule Planner**
View Badar Suri's Fall 2025 classes

**Email**
██████████

**Recent Semesters Teaching**
Spring 2025

**Typical Class Size**
12

UNCLASSIFIED   [Open Source]

UNCLASSIFIED   [Open Source]

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

*(U)  Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U)  Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U)  This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U)  This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

*(U)  This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to**

# EXHIBIT 235

**EXHIBIT**

**235**

## (U//LES) Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

### (U) Analysis Findings

- (U//LES) Palestinian national Mohsen Khader MAHDAWI holds Legal Permanent Resident (LPR) status through marriage to U.S. citizen in Palestine in June 2013.
- (U//LES) MAHDAWI changed residence status following divorce by spouse in December 2015.
- (U//LES) MAHDAWI submitted N-400 Application for Citizenship on 14 February 2024.
- (U//LES) On January 12, 2019 MAHDAWI was encountered at Derby Line, Vermont POE in possession of LSD, mushrooms (opiate), and methamphetamine.

### (U) Biographical Information

 

- (U) **Name:** MAHDAWI, Mohsen Khader Mohsen
- (U//LES) **Alias:** Mohsen Mehdawi
- (U//LES) **DOB:** ▮▮▮▮▮▮
- (U//LES) **COB:** Israel (Nablus)
- (U//LES) **COC:** Palestinian Territory
- (U//LES) **Current Passport:** ▮▮▮▮, Palestinian Territory (expiration: 25 June 2029) [ADIS]
- (U//LES) **Former Passport:** ▮▮▮▮, Palestinian Territory
- (U//LES) **SSN:** ▮▮▮▮
- (U//LES) **Alien Number:** ▮▮▮▮
- (U//LES) **FIN:** ▮▮▮▮
- (U//LES) **FBI Number:** ▮▮▮▮

- (U//LES) ▮▮▮▮
- (U//LES) **Legal Permanent Resident Card:** ▮▮▮▮
- (U//LES) **Driver's License:** ▮▮▮▮

### (U) Criminal History

- (▮▮▮▮▮▮▮▮▮▮▮▮

### (U) USCIS Applications

- (U//LES) 14 February 2024: N-400 Application for Naturalization – Process pending. [ELIS: 20250311]
- (U//LES) 29 June 2018: I-551 Legal Permanent Resident – Active; expiration 06/27/2028. [CPMS: 20250312]
- (U//LES) 15 November 2016: I-751 Petition to Remove Conditions on Residence - Approved. [ELIS: 20250312]

### (U) Residences

- (U//LES) ▮▮▮▮
- (U//LES) ▮▮▮▮ (July 2023 August 2021
- (U//LES) ▮▮▮▮ (June 2020)
- (U//LES) ▮▮▮▮ (June 2019
- (U//LES) ▮▮▮▮

### (U) Communications

- (U) **Phone Numbers:**
  - (U//LES) ▮▮▮▮ (cell) ▮▮▮▮
- (U) **Social Media:**
  - (U//LES) ▮▮▮▮
  - (U//LES) ▮▮▮▮

*SUBJECT PROFILE*

for/in collaboration with HSI Office of Intelligence

*ROA Published Date: 12 March 2025*

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U//LES) Mohsen Khader MAHDAWI



- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
- o (U//LES)
  [Deleted]
- o (U//LES)
- o (U//LES)
- **(U) Email:**
  - o (U//LES) ▮▮▮▮▮▮▮▮▮ [ELIS: 20240214]

### (U) Travel and Border Crossing History

- (U//LES) 08 August 2024: air travel from John F Kennedy International Airport (JFK) to Athens (ATH), Greece.
- (U//LES) 22 August 2024: air travel from Gardermoen Airport (OSL), Oslo, Norway to Los Angeles International Airport (LAX), California.
- (U//LES) 12 January 2019: inbound border crossing; Derby Line (L026), Vermont in 2013, White Audi/A5; license plate: GTA561, Vermont. [UPAX, NLETS]

### (U) Vehicles

- (U//LES) 1996 Silver BMW Z3: Tag: ▮▮▮▮
- (U//LES) 2010 Ducati Monster: VIN: ▮▮▮▮▮▮▮

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES)  Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

## (U)  Social and Open Sources

- (U)  **Twitter (X) post stating the subject is pro-Hamas, appeared on 60 Minutes justifying October 7th Hamas attack on Israel, calling for the destruction of Israel.**—Viewed 11 March 2025

← Post



COLUMBIA UNIVERSITY

Hello PAM Mam . @TheJusticeDept Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.

Mohsen Mahdawi is an anti-Israel activist leader who called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas is a designated terrorist organization founded in 1987 that is dedicated to destroying Israel and killing Jews. Since 2001, Hamas has launched thousands of rockets at Israel and on October 7, 2023, Hamas murdered approximately 1,200 Israelis and kidnapped over 200

**(U//LES) Open Source**

- (U)  **Mohsen MAHDAWI video posted by TRT World on Twitter (X) accusing Israel of genocide—** Posted 10 October 2024

← Post

TRT World @
@trtworld

Mohsen Mahdawi, a Palestinian studying philosophy at Columbia University in NYC, tells TRT World that his school is complicit in Israel's genocidal war on Gaza given its financial ties with Tel Aviv



12:07 PM · Oct 10, 2024 · **3,359** Views

**(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES)  Mohsen Khader MAHDAWI

- (U)  Twitter (X) posted from Congresswoman Rep. Beth Van Duyne stating the subject praised the death of his "martyr" cousin; implying the cousin may have been a militant. —Posted 5 September 2024

منشور →

… ⎙

🔲 🔹 Congresswoman Beth Van Duyne
@RepBethVanDuyne

There is no denying that Hamas sympathizers have embedded themselves in our educational institutions, from teachers down to the students. The fact that school administrators continue to ignore this is why antisemitism has been allowed to flourish across college campuses since October 7th.

۲۰۲٤ سبتمبر ۵  @CUJewsIs…  ✪ …Columbia Jewish & Israeli Students 🔹
STUDENT TIES TO TERRORISM AT COLUMBIA: Last week @Columbia student and @ColumbiaBDS leader Mohsen Mahdawi praised his "martyred" cousin and his high-ranking Hamas friends on Instagram.
"I received the news of the martyrdom of my cousin....Masra Masharqa, after a clash with a

شرطة إسرائيل



(U//LES) Open Source

- (U)  X (Twitter) post to TheJusticeDept (Department of Justice) and SecRubio (Secretary of State Marco Rubio) posting of Mohsen MAHDAWI—Unknown Date

← **Post** 𝕏 …



Follow

🔲 Hi, Pam. @TheJusticeDept  Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.

 

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE



## (U//LES)  Mohsen Khader MAHDAWI

**(U)  Twitter (X) post showing 60-Minutes interview with a Columbia University student who claims to have heard MAHDAWI speak about Jews in a derogatory way with antisemitic rhetoric—Published 31 January 2025**

←    Post



Mohsen Mahdawi, a Columbia University student on a visa, has been added to the deportation database due to his support for Hamas, including celebrating their October 7 massacre and praising terrorist Dalal Mughrabi.

12:57 AM · Jan 31, 2025 · **3,323** Views

○ 7        ⟲ 12        ♡ 37        🔖        ⬆

💬 Read 7 replies

**(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES)  Mohsen Khader MAHDAWI**

*(U)  Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U)  Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

(U)  This document has been designated by DHS as *UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

(U)  This document contains information that is *UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

(U)  This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label *和* and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

**(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** ███████████████.

# EXHIBIT 236

**UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE**

EXHIBIT
236

## (U//FOUO) Yunseo CHUNG

### (U) Analysis Findings

(U//LES) Yunseo CHUNG is a U.S. Legal Permanent Resident (LPR). CHUNG entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. CHUNG was issued an LPR card on 27 August 2021.

### (U) Biographical Information



(U//FOUO)

- (U) **Name:** Yunseo CHUNG
- (U) **Alias:** unknown
- (U//FOUO) **DOB:** ▮
- (U//FOUO) **COB:** South Korea
- (U//FOUO) **COC:** South Korea
- (U//FOUO) **Current Passport:** ▮; South Korea (expiration: 12 November 2031)
- (U//FOUO) **Alien #:** ▮
- (U//FOUO) **FIN:** ▮
- (U//FOUO) **FBI Number:** ▮
- (U//FOUO) **Criminal Record:** ▮
- (U//FOUO) **SSN:** ▮

### (U) Criminal History

- (U//LES) Obstruct Governmental Administration 2nd Degree—Prevent Official Function; New York County Criminal Court (March 2025)
- (U//LES) Disorderly Conduct—Refusing to Move On; New York County Criminal Court (March 2025)
- (U//LES) Trespass; New York County Criminal Court (March 2025)

### (U) USCIS Application

- (U//FOUO) 21 February 2025—Permanent resident applying to replace permanent resident card on 20 February 2025—In process.
- (U//FOUO) 1 September 2021—Applied for I-485 Employment Authorization Card ▮—Completed.

### (U) Residence

(U//FOUO) ▮

### (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) ▮ (cell)
  - (U//FOUO) ▮ (cell)
- (U) **Possible Social Media:**
  - (U) ▮
- (U) **Email:**
  - (U//FOUO) ▮
  - (U//FOUO) ▮

### (U) Travel and Border Crossing History

| Date | Flight |
|---|---|
| 11 August 2024 | AA 280 (ICN > DFW) |
| 17 July 2024 | AA 281 (DFW > ICN) |
| 14 March 2024 | NK 528 (CUN > FLL) |
| 11 March 2024 | NK 1280 (MSY > CUN) |
| 12 August 2022 | KE 93 (ICN > IAD) |
| 2 July 2022 | KE 94 (IAD > ICN) |
| 12 March 2022 | AA 2248 (CUN > CLT) |
| 5 March 2022 | AA 1778 (CLT > CUN) |
| 26 July 2010 | UA 892 (ICN > SFO) |

(U//FOUO)

**UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE**

*SUBJECT PROFILE*

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U//FOUO) Yunseo CHUNG·**

ICE-HQINT-30144-25

## (U)  News Articles

- (U)  **Anti-Israel protesters arrested at Barnard were mostly privileged youths, including woman whose family started Hamptons Jitney**—Published 6 March 2025

    https://nypost.com/2025/03/06/us-news/arrested-anti-israel-protesters-at-barnard-include-repeat-offender-woman-whose-family-started-hampton-jitney-bus-service/

    Describes her as being part of the protests.

    *"Others hauled off campus by police included Hanna Puelle — whose Instagram identifies her as publisher of Columbia Law Review — and Yunseo Chung, a Columbia women's studies junior, former high school valedictorian and social media editor for Quarto, the university's official undergraduate literary magazine."*

- (U)  **Meet the Columbia Radicals Arrested for Storming a Barnard Building**— Published 6 March 2025

    https://freebeacon.com/campus/meet-the-columbia-radicals-arrested-for-storming-a-barnard-building/

    Describes her as being part of the protests and includes a screenshot of her Linkedin page.

    *"Of the nine individuals arrested after storming Millstein Library, four are Columbia students: Gabrielle Wimer, Hannah Puelle, Yunseo Chung, and Symmes Cannon. One, Tramy Dong, is a Barnard student. Another, Christopher Holmes, attends Union Theological Seminary, a Columbia affiliate, while the remaining three appear unassociated with either school. They were charged with disorderly conduct, trespassing, and obstructing governmental administration, according to an NYPD spokesman..."*

    *"The third, Chung, is a Columbia junior pursuing her bachelor's degree in English and Women's and Gender Studies. According to a screenshot of her LinkedIn taken before it was <u>deleted</u>, she is involved in Columbia's Criminal Justice Coalition and Columbia's Queer Alliance and was the valedictorian of the high school she attended."*

## (U)  Social Media

(U)  Linkedin (currently locked)



UNCLASSIFIED

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

# (U) Yunseo CHUNG

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** ▮▮▮▮▮▮▮▮▮▮▮

# EXHIBIT 237

**[.mp4 filed manually]**

# EXHIBIT 238

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

### 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

### 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

## 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

## 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

### 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1)  **Unavailable**

(2)  **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

AAUP-00464

(3) **(U)** The visa has been physically removed from the passport in which it was issued; or

(4) **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

(1) **(U)** Notify the individual of the intention to revoke the visa;

(2) **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3) **(U)** Request the individual to present the travel document in which the visa was issued.

### 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

AAUP-00465

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport.  You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

## 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c. **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

AAUP-00466

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See 9 FAM 402.8-8, Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

   (1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

   (2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

AAUP-00467

(3)  **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c.  **Unavailable**

## 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;   11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;   10-02-2024)*

a.  **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1)  **(U)** Jeopardize an ongoing investigation;

(2)  **(U)** Prejudice an intended prosecution;

(3)  **(U)** Preclude apprehension of the subject in the United States;

(4)  **(U)** Put informants at risk; or

(5)  **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c.  **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

AAUP-00468

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

## 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

## 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

AAUP-00469

     (1)  **Unavailable**

     (2)  **Unavailable**

     (3)  **Unavailable**

b. **Unavailable**

c.  **(U) Prudential Revocation for Driving Under the Influence:**  Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record.  Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years.  This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest.  This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle.  Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority.  Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## *9 FAM 403.11-5(C)  Unavailable*

*(CT:VISA-2150;   04-29-2025)*

*a. **Unavailable***

*b. **Unavailable***

*c.  **Unavailable***

     *(1)  **Unavailable***

     *(2)  **Unavailable***

     *(3)  **Unavailable***

*d. **Unavailable***

*e. **Unavailable***

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

AAUP-00470

## 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

**Unavailable**

(1)  **Unavailable**

(2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3)  **Unavailable**

(4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a. **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1)  **(U)** Canceled.  Adjusted;

(2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

(3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

(4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

(5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

(6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b. **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

AAUP-00471

## 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;   05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

 (1)  **(U)** Counterfeit visa per testimony of individual (file number); or

 (2)  **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

AAUP-00472

# EXHIBIT 239



| | |
|---|---|
| From: | SMART Core |
| Sent: | Wednesday, June 18, 2025 1:47 PM |
| Cc: | |

Subject:          Action Request:  Expanding Screening and Vetting for FMJ Applicants

**UNCLASSIFIED**

SBU



Action Office:

Info Office:      ALDACS

| | |
|---|---|
| MRN: | 25 STATE 59756    Reply |
| Date/DTG: | Jun 18, 2025 / 181737Z JUN 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O: | 13526 |
| TAGS: | CMGT, CVIS, KFRD |
| Captions: | SENSITIVE |
| Reference: | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| | C) 25 STATE 50220 |
| Subject: | Action Request:  Expanding Screening and Vetting for FMJ Applicants |

1. (U) This is an action request.  See paras. 26-29.

## INTRODUCTION AND SUMMARY

1

AAUP-00348

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants.  In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting.  This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence.  <u>Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly</u>.  **Posts should prioritize expedited FMJ appointment requests as described in para 29.**  Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security.  E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process.  Therefore, we must be vigilant during the visa issuance process.  We must ensure that aliens seeking admission

AAUP-00349

to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States. As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

## WHICH CASES ARE COVERED?

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** new or returning. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

## HOW DO I HANDLE THESE CASES?

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case under INA 221(g). Inform the applicant that his case is refused and requires additional administrative processing to establish his eligibility for the visa. Request that the applicant set all of his social media accounts to "public" and remind the applicant that limited access to, or visibility of, online presence could be construed as an effort to evade or hide certain activity.

## WHO DOES THE VETTING?

3

AAUP-00350

9. (SBU) The <u>same</u> consular officer who interviews the applicant should perform the vetting described below. This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application. It also permits better detection of potentially derogatory information and inconsistencies. Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer. For example, if only FPU staff have access to LexisNexis, FPU staff may conduct that check and return the results to the interviewing consular officer.

10. (SBU) **Vetting is not a fraud assessment.** Do not refer a case to post FPU for vetting or for any portion of the vetting. However, you might discover information during vetting that leads to an FPU referral. Posts should handle such cases according to their FPU referral SOPs and 7 FAH-1 H-940, Overseas FPU Responsibilities.

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases. Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

## WHERE DO I LOOK?

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)). Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview. You should review these in light of your personal knowledge, your expertise, and all sources of information available to you. It should include a review of the applicant's entire online presence -- not just social media activity -- using any appropriate search engines or other online resources. It also should include a check of any databases to which the consular section has access (e.g., LexisNexis or local equivalents).

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence. LE

AAUP-00351

staff can help provide context, including when assessing the credibility of applicants who apparently lack any online presence or who did not provide social media identifiers.

14. (SBU) If it is necessary to sign in to an account to view all of an applicant's activity on a particular social media platform (e.g., Instagram), you must do so using an official account that is publicly attributable to the Department.  <u>Consular sections may create such accounts in accordance with the platform's Terms of Service</u>.  Do not use accounts that are used for public communication.  Follow the guidance on social media use in 7 FAH-1 H-945.4, Social Media Rules of Conduct in Fraud Assessments, but recall that **vetting is not a fraud assessment,** so you should not track such vetting activities in ECAS.

15. (SBU) If you are unable to review any aspect of an applicant's online presence because social media accounts are set to "private" or otherwise limited, you should treat the case as any other where an applicant fails to provide certain information on request.  **You must consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility.**

## WHAT AM I LOOKING FOR?

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant.  You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b).  For example, during an online presence search, you might discover in local media that an applicant had been arrested and charged with a serious crime, a possible 2A1 ineligibility, that he did not disclose on his application.  In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory any indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful antisemitic harassment or

5

violence.  You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a).  For example, during an online presence search, you might discover on social media that an applicant endorsed Hamas or its activities, a possible 3B ineligibility, that he did not disclose on this application.

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview.  You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities.  **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies.  If you find any relevant information online, take screenshots to preserve the record against possible later alteration or loss of the information and upload those screenshots to the applicant's case record in the CCD.

## DOES THE APPLICANT STILL OVERCOME INA 214(B)?

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification.  That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).**  That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not

6

AAUP-00353

respect the terms of his admission to the United States. For example, while vetting applicants, many posts have discovered evidence online that those applicants had worked illegally while in the United States previously, thus seriously undermining their credibility in subsequent visa applications.

22. (SBU) In the same way, indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful anti-Semitic harassment or violence might not lead to an INA 212(a) ineligibility. However, you must consider whether applicants who express such strong animus are likely to respect the terms of their admission to the United States, including respecting all of its laws.

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek. As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

## IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 to request an SAO. This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

7

AAUP-00354

25. (SBU) In any case where an applicant:

- expresses hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States;
- **OR** advocates for, aids, or supports designated foreign terrorists and other threats to U.S. national security;
- **OR** expresses support for or perpetrates unlawful anti-Semitic harassment or violence;
- **AND** overcomes INA 214(b);
- **AND** is not ineligible under any other provision of INA 212(a)(3);
- **THEN** you should pursue a finding that the applicant is ineligible under INA 212(a)(3)(C), where an applicant's entry or proposed activities would have potentially serious foreign policy consequences or compromise a compelling U.S. foreign policy interest. Only the Secretary can make such a finding, which requires an SAO. See 9 FAM 302.14-2 for details.

## ACTION REQUESTS

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press. Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb. The GSS Program Team will instruct vendors to update GSS websites.

## RESUMING FMJ SCHEDULING

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented. However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests. However, among expedited appointment requests for FMJs, posts should prioritize the following groups:

8

- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population, according to the U.S. Department of Education.  CA will post a list of such schools on CAWeb.

## APPLICATION PROCESS CONSIDERATIONS

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

9

AAUP-00356

AAUP-00357

# EXHIBIT 240



AAUP & MESA Political Activity April 17, 2024



AAUP Political Activity April 17, 2025

## Comparison of AAUP Political Activity April 2024 and April 2025





# EXHIBIT 241



# EXHIBIT 242

AAUP v. RUBIO - ATTORNEYS EYES ONLY



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Mahmoud KHALIL

Director Whiting:

I am writing to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Khalil was issued an F1 visa on December 12, 2022, and entered the United States under that visa on December 20, 2022. His status was changed to that of a Conditional Resident (CR6), Spouse of a United States Citizen, on November 16, 2024, and he received Legal Permanent Resident (LPR) status.

Mahmoud Khalil's involvement in the March 6, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." His leadership in these disruptive protests creates a hostile environment for Jewish students, meeting Title VI criteria. Khalil is identified as a former graduate student of Columbia University and a prominent pro-Palestinian activist involved in antisemitic activities. Social media posts and open-source articles document his leadership roles, including the occupation of Columbia University's Hamilton Hall in April 2024. Recent social media posts from March 6, 2025, indicate he was a key figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership roles in antisemitic activities, and leadership in disruptive protests may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization.  As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities



LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

**HOMELAND SECURITY INVESTIGATIONS**
*Re: Mahmoud KHALIL*
*Page 2*

---

consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.

If you require further assistance or additional information, I can be reached at ███████████ .

Respectfully,

ANDRE R WATSON

Digitally signed by
ANDRE R WATSON
Date: 2025.03.07
18:25:26 -05'00'

Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 243

AAUP v. RUBIO - ATTORNEYS EYES ONLY



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Yunseo CHUNG

Director Whiting:

I am writing to provide a summary of the actions by Yunseo Chung that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Chung is a U.S. Legal Permanent Resident (LPR). Chung entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. Chung was issued an LPR card on 27 August 2021.

Yunseo Chung's involvement in the March 5, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." Her involvement in these disruptive protests created a hostile environment for Jewish students, meeting Title VI criteria. Chung is identified as a student of Columbia University and involved in antisemitic activities. Recent social media posts from March 6, 2025, indicate she was a figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership in disruptive protests, involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.



LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

**HOMELAND SECURITY INVESTIGATIONS**
*Re: Yunseo CHUNG*
*Page 2*

---

If you require further assistance or additional information, I can be reached at ████████ .

Respectfully,

ANDRE R WATSON    Digitally signed by ANDRE R WATSON
Date: 2025.03.07 18:18:15 -05'00'

Andre R. Watson
Assistant Director
National Security Division

---

LAW ENFORCEMENT SENSITIVE

# EXHIBIT 244



AAUP v. RUBIO - ATTORNEYS EYES ONLY

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Mohsen MAHDAWI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Mohsen MAHDAWI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

MAHDAWI first entered the U.S. as B2 nonimmigrant visitor for pleasure. MAHDAWI received his CR6 Conditional Legal Resident status in January 2015 after marrying a U.S. Citizen in Palestine in June 2013. His marriage was dissolved in December 2015. He filed a petition to remove the conditions on residence in 2016, after which he received Legal Permanent Resident (LPR) status (IR6). MAHDAWI filed an N-400 Application for Naturalization, which is on hold.

Mohsen MAHDAWI's involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting "Hamas sympathizers." His leadership and involvement in these disruptive protests creates a hostile environment for Jewish students. MAHDAWI is identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events. News media articles refer to MAHDAWI calling for Isreal's destruction and justifying Hamas terrorism in late 2023. They also state that MAHDAWI has openly expressed support for eliminating Israel, leading protests with chants such as "From the river to the sea, Palestine will be free."

A post from stopantisemitism.org states that MAHDAWI's glorification of terrorism was exemplified by a poem posted online and attributed to him that said, "I will breathe home…and fill my shame, and clean my gun, and collect my packages, my bombs and embrace my gun." The poem also praises Dalal Mughrabi, who perpetrated the 1978 Coastal Road massacre, which resulted in the murder of Jews.



LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

**HOMELAND SECURITY INVESTIGATIONS**
*Re: Mohsen MAHDAWI*
*Page 2*

---

MAHDAWI served as co-president of DAR Palestine at Columbia University. MAHDAWI was also affiliated with the pro-terror activist group Within Our Lifetime, (WOL) in 2023 and was reportedly a member of Students for Justice in Palestine (SJP) that same year.

HSI is concerned that MAHDAWI's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at ▮▮▮▮▮▮▮▮ .

Respectfully,

ANDRE R WATSON
Digitally signed by ANDRE R WATSON
Date: 2025.03.14
12:51:37 -04'00'

Andre R. Watson
Assistant Director
National Security Division

---

# EXHIBIT 245

AAUP v. RUBIO - ATTORNEYS EYES ONLY



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Rumeysa OZTURK

Mr. Armstrong:

I am writing to provide a summary of the actions by Rumeysa OZTURK for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

OZTURK is a national of Turkey enrolled at Tufts University (Tufts) pursuing a post doctorate degree in Child Studies and Human Development. OZTURK last entered the United States on June 28, 2024, on a nonimmigrant student visa (F1). The initial student program start date was February 1, 2021, and the program end date is December 23, 2027.

On March 26, 2024, OZTURK engaged in anti-Israel activism in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023. Specifically, on March 26, 2024, OZTURK co-authored an Op-ed article titled Try again, President Kumar: Renewing Calls for Tufts to adopt March 4 TCU Senate resolutions, which was published in The Tufts Daily. The Op-ed was in response to Tufts President Kumar's statement regarding the Tufts Community Union Senate vote on proposed resolutions by the Coalition for Palestinian Liberation at Tufts (CPLT). The CPLT resolutions proposed an end to study abroad programs in Israel, for Tufts dining to stop selling items connected to Israel, for Tufts to acknowledge a "Palestinian genocide, and for Tufts Investment office and administration to disclose all investments and divest from companies tied to Israel.

The authors of the Op-ed, including OZTURK, again called for Tufts to "disclose its investments and divest from companies with direct or indirect ties to Isreal." The authors also state that Graduate Students for Palestine joins Tufts Students for Justice in Palestine (SJP) and other student groups to reject the University's response to the resolutions. Tufts SJP was officially suspended on Nov. 6, 2024, until January 2027 after it used images of weapons to promote a



LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

SECURITY INVESTIGATIONS

*Re: Rumeysa OZTURK*
*Page 2*

---

protest rally and urged members of the Tufts community to "join the student intifada." According to a news article on Boston.com, SJP violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. Intifada is a call for the uprising or rebellion specifically: an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip. On October 2, 2024, an X.com (Twitter) posting by Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," showed stickers claiming to have been plastered on Tufts University campus by students. The post depicts signage placed around Tufts campus with the statement "Bring the war home" with a Palestinian flag and Hamas inverted red triangle above what appears to be a Tufts Police Department vehicle. The post states that this is a call to "bring the war to campus."

HSI is concerned that OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to assess whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C) (8 U.S.C. § 1227(a)(4)(C)). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Additionally, HSI provides the above information relating to OZTURK's nonimmigrant status and activities in the United States for the Secretary of State to assess whether revocation of the visa, effective immediately, is appropriate pursuant to INA § 221(i) (8 U.S.C. § 1201(i)). If the Secretary of State determines that this alien's visa should be revoked effective immediately, the revocation will support a ground of removability under INA § 237(a)(1)(B), codified as 8 U.S.C. § 1227(a)(1)(B).

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at ████████.

Respectfully,

ANDRE R WATSON
Digitally signed by
ANDRE R WATSON
Date: 2025.03.21
07:29:10 -04'00'

Andre R. Watson
Assistant Director
National Security Division

---

# EXHIBIT 246

AAUP v. RUBIO - ATTORNEYS EYES ONLY



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Badar Khan SURI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Badar Khan SURI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

SURI last entered the United States on 12/10/2022 on a nonimmigrant exchange visa (J1) to attend Georgetown University as a research scholar. Suri's student status is currently ACTIVE, scheduled for a program end date of 12/31/2026.

SURI is identified as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads it's propaganda and promotes antisemitism on social media. SURI is married to the U.S. Citizen daughter of a known or suspected terrorist, who is a senior advisor to Hamas.

HSI is concerned that SURI's direct connection to Hamas leadership and involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.



LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

**HOMELAND SECURITY INVESTIGATIONS**
*Re: Badar Khan SURI*
*Page 2*

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at █████████.

Respectfully,

ANDRE R WATSON    Digitally signed by ANDRE R WATSON
Date: 2025.03.14 12:59:02 -04'00'

Andre R. Watson
Assistant Director
National Security Division

LAW ENFORCEMENT SENSITIVE

# EXHIBIT 247

REC1|Approve|3-8-2025|MR
REC2|Approve|3-8-2025|MR
REC3|Approve|3-8-2025|MR
AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025001959



United States Department of State

Washington, DC  20520

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 8, 2025

EXHIBIT
247

**Action Memo for the Secretary**

FROM:        CA – John Armstrong, SBO

SUBJECT:     (SBU) Removal of Yunseo Chung and Mahmoud Khalil, both
             U.S. LPRs, under Section 237(a)(4)(C) of the Immigration and
             Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities
of Yunseo Chung (███████████████████████) have potentially
serious adverse foreign policy consequences for the United States and
would compromise a compelling U.S. foreign policy interest, rendering her
deportable under Section 237(a)(4)(C) of the INA.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 2:** That you determine the presence and activities
of ███████████████████████████████), have potentially
serious adverse foreign policy consequences for the United States and
would compromise a compelling U.S. foreign policy interest, rendering him
deportable under Section 237(a)(4)(C) of the INA.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 3:** That you authorize the transmission of the
attached notification to the secretary of Homeland Security of the
determination(s) as a basis for the removal(s).
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

2025001959

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP V. RUBIO - ATTORNEYS EYES ONLY
-2-

## Background

(SBU) On March 7, DHS/ICE requested that CA seek your determination that Chung and Khalil are deportable under INA section 237(a)(4)(C) in order to initiate removal charges against them. Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Yunseo Chung is an LPR of the United States and a current undergraduate student at Columbia University. Press reporting and social media identify Chung as a participant in protests on March 5 at Barnard College, and specifically as a participant in the occupation of the Barnard's Millstein Library. According to a DHS/ICE summary of Chung, she received three charges of unlawful conduct stemming from the March protests, including charges related to obstructing governmental administration, disorderly conduct, and trespass. On March 7, DHS/ICE provided a summary of Chung's actions to CA, reporting that "Hamas-authored flyers" were distributed at the protests, and that Chung's involvement in the protests "created a hostile environment for Jewish students, meeting Title VI criteria."

(SBU) Mahmoud Khalil is a U.S. LPR and a former graduate student at Columbia University. According to social media and open-source articles, Khalil has been involved in numerous pro-Palestinian protests, including serving as the lead negotiator of an encampment at Columbia in April 2024, and also a key figure in the March 6 Barnard College library occupation, where protestors distributed Hamas-authored flyers. On March 7, DHS/ICE provided a summary of Khalil's actions to CA, reporting that "Hamas-authored flyers" were distributed at the March 6 protests, and that Khalil's leadership in the protests "created a hostile environment for Jewish

2025001959

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP V. RUBIO - ATTORNEYS EYES ONLY
-3-

students, meeting Title VI criteria."  Unlike Chung, we are not aware of any prior arrests or citations for Khalil regarding unlawful activity.

(SBU) The activities and presence of Chung and Khalil in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because their participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world.  Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence.  Allowing Chung and Khalil to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States.  Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and U.S. citizens, and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

(SBU) DHS has not identified any alternative grounds of removability that would be applicable to Chung and Khalil, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity.  We are not aware of any prior exercises of the Secretary's removal authority in INA section 237(a)(4)(C), and given their LPR status, Chung and Khalil are likely to challenge their removal under this authority, and courts may scrutinize the basis for these determinations.

2025001959

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

-4-

**Attachments**

Tab 1 – DHS Letter on Chung

Tab 2 – HSI Subject Profile of Chung

Tab 3 – DHS Letter on Khalil

Tab 4 – HSI Subject Profile of Khalil

Tab 5 – State Notification Letter to DHS

Tab 6 – 8 USC 1227(a)(4)(C)

2025001959

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP v. RUBIO - ATTORNEYS EYES ONLY

-5-

Approved:  CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|--------|------|------------------|
| CA/VO | ███████████ | (ok) |
| CA/VO | ███████████ | (ok) |
| CA/VO/F | ███████████ | (ok) |
| L/CA | ███████████ | (ok) |
| S/P | ███████████ | (ok) |
| C | ███████████ | (ok) |
| M | ███████████ | (info) |
| D | ███████████ | **(info)** |
| P | ███████████ | **(info by request)** |
| NEA/FO | ███████████ | **(info)** |
| EAP/FO | | (info) |

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# EXHIBIT 248

REC1|Approve|3-15-2025|MR
REC2|Approve|3-15-2025|MR AAUP v. RUBIO - ATTORNEYS EYES ONLY



2025002362

United States Department of State

Washington, DC  20520

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 15, 2025



EXHIBIT
248

**Action Memo for the Secretary**

FROM:        CA – John Armstrong, SBO

SUBJECT:     (SBU) Determination of Deportability of Mohsen Mahdawi, a
             U.S. Lawful Permanent Resident (LPR), under Section
             237(a)(4)(C) of the Immigration and Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities
of Mohsen MAHDAW███████████████████████████ have potentially
serious adverse foreign policy consequences for the United States and
would compromise a compelling U.S. foreign policy interest, rendering him
deportable under Section 237(a)(4)(C) ("4C") of the INA.
**Decision:** ☐ **Approve** ☐ **Disapprove** ☐ **Discuss**

**(SBU) Recommendation 2:** That you authorize the transmission of a
notification to the Secretary of Homeland Security of the determination as a
basis for the removal and authorize use of that notification by DHS in
immigration court.
**Decision:** ☐ **Approve** ☐ **Disapprove** ☐ **Discuss**

**Background**
(SBU) On March 14, the Assistant Director of the National Security Division
of DHS/ICE's Homeland Security Investigations referred to CA information
on three aliens in the United States, Momodou Taal, Badar Khan Suri, and
Mohsen Mahdawi, for your determination that they are deportable under
INA section 237(a)(4)(C), in order to initiate removal charges against them.
CA will transmit an action memo to you regarding a 4C determination for

2025002362

AALP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-2-

Suri under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Mohsen Mahdawi is a LPR of the United States and according to information provided by DHS/ICE/HSI, is "identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events."

(SBU) DHS/ICE/HSI reports that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction.  While DHS/ICE/HSI reporting provided only several screenshots of social media activity as evidence of Mahdawi's involvement in anti-Semitic activity, additional open-source reporting indicates that Mahdawi played an active role in fall 2024 student protests at Columbia University, instructing protestors to physically push a small group of pro-Israel students, events that university officials later acknowledged as threatening rhetoric and intimidation.  Open-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force solders as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters.

(SBU) The activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because his

2025002362

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-3-

participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States.  Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence.  Allowing Mahdawi to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States.  Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.  Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) DHS/ICE/HSI has not identified any alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity; however, in September 2015, CA revoked Mahdawi's B1/B2 nonimmigrant visa at the request of CBP's National Targeting Center (NTC) based on derogatory information in reporting in USG interagency holdings that was identified after visa issuance.  At that time, NTC concluded Mahdawi would be inadmissible pursuant to INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activity, as defined in the INA.  At the time of the visa revocation, Mahdawi was already in the United States and had adjusted status to a conditional Lawful Permanent Resident.  A CA search of interagency databases on March 14, did not reveal any record indicating that the interagency currently assesses that Mahdawi has links to terrorism.  In February 2024, Mahdawi filed an application to naturalize, although DHS has not indicated whether that it will deny his application upon pursuing removal.

AALP v. RUBIO  ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

2025002362

-4-

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8, 2025, 4C determination regarding him, as an LPR, Mahdawi is likely to challenge his removal under the 4C authority, including whether the Department in fact has a compelling basis for determination.  Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination.  We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

**Attachments**
       Tab 1 – State Notification Letter to DHS
       Tab 1a – DHS Letter on Mohsen Mahdawi
       Tab 1b – HSI Subject Profile of Mohsen Mahdawi
       Tab 1c – 8 USC 1227(a)(4)(C)

2025002362

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-5-

Approved:   CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes**  ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | | Clearance Status |
|---|---|---|---|
| CA | ▮▮▮▮ | , Acting | ok |
| CA/VO | ▮▮▮▮ | , Acting | ok |
| CA/VO/SAC | ▮▮▮▮ | | info |
| CA/VO/F | ▮▮▮▮ Acting | , | info |
| L/FO | ▮▮▮▮ | | ok |
| L/CA | ▮▮▮▮ | | ok |
| L/CA | ▮▮▮▮ | | ok |
| S/P | ▮▮▮▮ | | ok |
| C | ▮▮▮▮ | | ok |
| M | ▮▮▮▮ | | ok |
| D | ▮▮▮▮ | | info |
| P | ▮▮▮▮ | | ok |
| NEA/FO | ▮▮▮▮ | | info |

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

# **EXHIBIT 249**

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

United States Department of State

Washington, DC  20520

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 15, 2025



**Action Memo for the Secretary**

FROM:        CA – John Armstrong, SBO

SUBJECT:    (SBU) Determination of Deportability of Badar Khan Suri
under Section 237(a)(4)(C) of the Immigration and Nationality
Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities
of Badar Khan Suri ████████████████████ have potentially serious
adverse foreign policy consequences for the United States and would
compromise a compelling U.S. foreign policy interest, rendering him
deportable under Section 237(a)(4)(C) ("4C") of the INA.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 2:** That you authorize the transmission of a
notification to the Secretary of Homeland Security of the determination as a
basis for the removal and authorize use of that notification by DHS in
immigration court.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**Background**
(SBU) On March 14, the Assistant Director of the National Security Division
of DHS/ICE's Homeland Security Investigations referred to CA information
on three aliens in the United States, Momodou Taal, Badar Khan Suri, and
Mohsen Mahdawi, for your determination that they are deportable under
INA section 237(a)(4)(C), in order to initiate removal charges against them.
CA will transmit an action memo to you regarding a 4C determination for

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-2-

Mahdawi under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Badar Khan Suri is an Indian national, currently in J1 nonimmigrant status in the United States as a Postdoctoral Associate at Georgetown University's School of Foreign Service, where he is currently teaching a course on "Majoritarianism and Minority Rights in South Asia."  His J1 visa was issued November 15, 2022, and expired October 31, 2023, but he remains in valid nonimmigrant status.  Suri is married to a U.S. citizen who is the daughter of Ahmed Yousef, a senior Hamas figure in Gaza and a senior advisor to Hamas leadership.

(SBU) According to the assessment provided by DHS/ICE, Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media."  Evidence cited by DHS/ICE includes a post by the "Middle East Forum" think tank referencing two Facebook posts by Suri in fall 2023 that denied certain reports regarding Hamas actions in the October 7 attack, and one expressing support for Hamas founder Ahmed Yassin.  DHS/ICE also notes a 2018 article authorized by Suri in the Middle East Monitor labeling Israel as apartheid, in additional to Instagram photos by Suri that DHS/ICE assesses as "pro-Palestine content."  We have not independently uncovered additional open-source information regarding Suri's involvement in antisemitic conduct or intimidation of Jewish students.

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

<u>SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE</u>
-3-

(SBU) CA did not identify any particularized information on Suri in relevant interagency databases, and Suri's most recent visa application in November 2022 was reviewed by the Department's interagency vetting partners through the National Vetting Center, none of whom returned any derogatory information.  DHS/ICE/HSI has not provided CA with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his relationship with Ahmed Yousef.

(SBU) The activities and presence of Suri in the United States has potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  This conclusion is based on the assessment by DHS/ICE/HSI, to which we defer as ICE is the principal investigative unit of DHS, that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities … [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization."  Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and intimidation.  Allowing Suri to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from intimidation in the United States.  Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning anti-Semitic conduct and intimidation of Jewish students in the United States would severely undermine that significant foreign policy objective.  Moreover, the type of intimidation and incitement attributable Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8 determination regarding him, Suri is likely to challenge his removal under the 4C authority.  Such a challenge would likely question

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-4-

whether the Department in fact has a compelling basis for determination. Given the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination.  We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same.

(SBU) State also requests the opportunity to consult with the DHS on any public statements regarding this determination.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

## Attachments
Tab 1 – State Notification Letter to DHS
Tab 1a – DHS Letter on Badar Khan Suri
Tab 1b – HSI Subject Profile of Badar Khan Suri
Tab 1c – 8 USC 1227(a)(4)(C)

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-5-

Approved:  CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA – Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|---|---|---|
| CA | ███████, Acting | ok |
| CA/VO | ███████, Acting | ok |
| CA/VO/SAC | ██████ | info |
| CA/VO/F | █████████, Acting | info |
| L/FO | ██████████ | ok |
| L/CA | ██████ | ok |
| L/CA | ████████ | ok |
| S/P | ████████ | ok |
| C | ███████ | ok |
| M | ██████ | ok |
| D | ███████ | info |
| P | ██████ | ok |
| SCA/FO | ██████ | info |

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

# EXHIBIT 250

AAUP v. RUBIO - ATTORNEYS EYES ONLY

United States Department of State

Washington, DC  20520

EXHIBIT
250

SENSITIVE BUT UNCLASSIFIED – LAW ENFORCEMENT SENSITIVE

March 21, 2025

**Action Memo for Senior Bureau Official John Armstrong**

FROM:       CA/VO – Stuart Wilson, Deputy Assistant Secretary

SUBJECT:    (SBU) Revocation of F1 Visa for Rumeysa OZTURK

**(SBU) Recommendation 1:** That you approve the revocation of the F1 visa, effective immediately, for ███████████████████████████ ███████████) under section 221(i) of the Immigration and Nationality Act (INA).  Due to ongoing ICE operational security, this revocation will be silent; the Department will not notify the subject.  (Approve/Disapprove by 03/21/25)

**Decision: ☑ Approve ☐ Disapprove ☐ Discuss**
*JA 3/21/25*

**(SBU) Recommendation 2:** That you authorize the transmission of the attached notification to the Department of Homeland Security noting the immediate revocation of OZTURK's visa.  (Approve/Disapprove by 03/21/25)

**Decision: ☑ Approve ☐ Disapprove ☐ Discuss**
*JA 3/21/25*

**Background**

(SBU) On March 21, 2025, the Assistant Director of the National Security Division of DHS/ICE's Homeland Security Investigations referred to CA information regarding Rumeysa OZTURK, a Turkish national, for a possible determination by the Secretary that the alien is deportable under INA section 237(a)(4)(C).  As a nonimmigrant visa holder, such a determination is not necessary for DHS/ICE to pursue removal of OZTURK from the United States, as INA section 237(a)(1)(B) provides that an alien is deportable if their nonimmigrant visa has been revoked under INA section 221(i).

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-2-

(SBU) Under INA section 221(i), the Secretary of State may at any time, in his discretion, revoke a visa. This authority is delegated to you pursuant to Delegation of Authority 367-4. Department policy reflected in 9 FAM 403.11-5(B) provides that a visa may be revoked in cases of a suspected ineligibility, when an individual would not meet requirements for admission, or "in other situations where warranted."

*Has valid visa,*

(SBU) OZTURK was issued an F-1 visa on December 14, 2020, valid until December 9, 2025. According to information provided by DHS/ICE/HSI, OZTURK is a post doctorate degree candidate in Child Studies and Human Development at Tufts University. On March 21, 2025, DHS/ICE/HSI referred information to CA indicating that OZTURK co-authored an op-ed in Tufts' student newspaper. In this article, the authors wrote, "Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response" (to a student government resolution). According to DHS/ICE/HSI, Tufts Students for Justice in Palestine was placed on interim suspension "after it used images of weapons to promote a protest rally and urged members of the Tufts community to 'join the student intifada.'" DHS/ICE/HSI referral concluded that "OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."

*actions, not words*

(SBU) While OZTURK has been involved with/actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that OZTURK has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally. While the report implies a connection between OZTURK and the now-banned Tufts Student for Justice in Palestine (TJSP), the report presents no evidence other than OZTURK's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TSJP. Nor has DHS/ICE/HSI shown any evidence that

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-3-

OZTURK was involved in any of the activities which resulted in TJSP being suspended from Tufts.

(SBU) Through a search on March 21, 2025, on available USG interagency databases, CA/VO identified no reporting specific to OZTURK, and interagency vetting partners did not provide any response to OZTURK's 2024 visa application indicating the existence of derogatory terrorism-related information.

(SBU) DHS did not identify any alternative grounds of removability that would be applicable to OZTURK, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity, and have not indicated whether it plans to consider termination of OZTURK's SEVIS registration. Although information provided by DHS/HSI/ICE does not establish any potential ineligibility for OZTURK, you may, in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances presented indicating that revocation may be warranted.

## Attachments

Tab 1 – DHS Letter on OZTURK

Tab 2 – HSI Subject Profile of OZTURK

Tab 3 – State Notification Memo to DHS

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-4-

Approved:  CA/VO – Stuart Wilson, Deputy Assistant Secretary [SRW]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|--------|------|------------------|
| CA | ███████ | ok |
| CA/VO | ██████████ | Info |
| CA/VO/F | █████████ | info |
| CA/VO/SAC | ████████ | ok |
| CA/P | █████████ | info |
| L/CA | ███████████ | ok |