UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 78

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
        Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
        Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 7, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
   Knight First Amendment Institute at Columbia
   University
   475 Riverside Drive, Suite 302
   New York, NY 10115
   (646) 745-8500
   E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
   Sher Tremonte LLP
   90 Broad Street, 23rd Floor
   New York, NY 10004
   (212) 540-0675
   Email: Cgans@shertremonte.com
   For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
   DOJ-Civ
   P.O. 878
   Ben Franklin Station
   Washington, DC 20044
   (202) 616-9123
   Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
   United States Attorney's Office
   1 Courthouse Way, Suite 9200
   Boston, MA 02210
   Email: Shawna.yen@usdoj.gov
   For Defendants

I N D E X

OPENING STATEMENT BY MS. KRISHNAN................    5

OPENING STATEMENT BY MS. SANTORA................   16

WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

MEGAN HYSKA

  By Mr. Biale           29

  By Mr. Kanellis

E X H I B I T S

    EXHIBIT 65.............................    50

    EXHIBIT 66.............................    60

    EXHIBIT 67.............................    69

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT:  Good morning.  We have, um, or I have authorized zoom access for this proceeding.  That being so, let me say that the rules of court remain in full and effect, and that is that there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings, and you must keep your microphone muted.  If you don't keep your microphone muted, we will, um, in essence turn you off.

Now I'm told that there's various housekeeping matters.  Housekeeping matters will wait until 2:00 this afternoon, I want to get going on the trial as scheduled.  Though I have some rulings to be made, which I think ought be made once we've have the openings.

Since there are many participants in the case, I'll ask you, when you speak for the first time, if you wouldn't introduce yourself, that way the Court Reporter will pick you up, and as, um, if you speak more than once as the trial goes on, we'll have your name, rather than have everyone introduce themselves at this time.

As I said, we'll, um, start, if you wish, with brief openings, not to exceed 15 minutes.  And I'll hear the plaintiff if they wish to open.

MS. KRISHNAN:  Good morning, your Honor, Ramya

Krishnan for the plaintiffs.  I'm just going to head over to the podium to deliver the opening statement.

OPENING STATEMENT BY MS. KRISHNAN:

Plaintiffs challenge a government policy of deporting noncitizens and students -- noncitizen students and faculty based on their pro-Palestinian advocacy.  Not since *Mikaviera* have immigrants been the target of such intense repression of lawful political speech.  The policy creates a codicia of the university communities and it is at war with the First Amendment.

The First Amendment forecloses viewpoint discrimination, it forecloses government retaliation, and it forecloses government threats meant to coerce silence.  Over the course of the trial, plaintiffs will demonstrate first that defendants adopted a policy of ideological deportation, that is a policy of revoking visas and green cards of noncitizens engaged in pro-Palestinian advocacy, and of arresting, detaining, and deporting them.  Second, plaintiffs will show that the policies imposed real and serious burdens on plaintiffs' members and plaintiffs themselves.

Plaintiffs will prove that the policy exists by presenting, among other things, public statements of government officials.  In those statements officials

describe the policy, they even boast about it.  The evidence will show moreover that these statements are taken seriously by the employees tasked with implementing the policy and by the noncitizens forced to live under it.

In addition to presenting these statements, plaintiffs will provide testimony from government employees responsible for executing the policy.  Their testimony will establish that the policy began sometime in February or March, that senior leadership at the Departments of State and Homeland Security launched an operation to identify students and faculty to target, that they developed a new process to effectuate deportation of those identified, and that the agencies continued to issue new guidance to grease the policy's wheels.

Through the testimony of their witnesses, plaintiffs will establish that the policy has harmed their members as well as plaintiffs themselves.  This testimony will show how AAUP's members have been forced to self-sensor, how their citizen members have been deprived of the insights and perspectives of their noncitizen colleagues and students, and how the works and missions of these organizations have been harmed as a result, when they started the policy itself.

The evidence will show that the policy was adopted in response to the campus protests of 2023 and 2024. Thousands of students and faculty attended those protests. They had different perspectives. Some called for a cease fire, others called for institutional divestment from Israel, and still others called for cutting off U.S. support for the war.

In January, President Trump issued two executive orders that took aim at those who protested. In a White House fact sheet, the President characterized those protests as pro-Hamas and pro-jihadist and threatened those who participated in them. In the fact sheet included this morning, quote, "To all the resident aliens who joined the pro-Jihadist protest, we put you on notice, come 2025, we will find you and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses which have been infected with radicalism like never before."

The President's threats were not merely empty words. As the evidence will show, the agencies quickly put those threats into action by adopting the policy. Defendants have already arrested and detained nearly a dozen nonstudents pursuant to the policy and they have revoked the visas of potentially hundreds more.

When ICE arrested Mahmoud Khalil, a recent Columbia graduate, and an outspoken advocate for Palestinian human rights, Secretary Rubio posted to X, quote, "We will be revoking the visas and green cards of Hamas supporters in America so they can be deported.

In a litany of statements made since, officials have referenced and reaffirmed the policy.  They have also made clear that they deem a broad spectrum of pro-Palestinian and antiwar speech to be pro-Hamas and antisemitic.

For instance, when asked on NPI's Morning Edition how Mr. Khalil had supported Hamas, the Deputy Secretary of Homeland Security responded, quote, "Well I think you can see it on TV, right?  This is somebody we've invited, and he's put himself in the middle of the process of basically pro-Palestinian activity."  The defendants' public statements describe the policy and good evidence of its existence.  The plaintiffs will show the defendants have implemented the policy as well.

First, in February or March, the Department of Homeland Security launched an operation to identify students and faculty to target under the policy. Government officials will testify that around that time senior leaders of DHS's Homeland Security investigations began meeting to discuss revoking the visas and green

cards of student protestors.  This group called itself the "Tiger Team."  HSI's Office of Intelligence was instructed to prepare reports on student protestors. And senior officials in HSI provided the office with the names of new protestors on a rolling basis.

The vast majority of these names came from Canary Mission, an organization that maintains public black lists of students and faculty they deem to be anti-American, anti-Israel, or antisemitic.

Some of the names came from Bayta, a group that antidefamation league has labeled as extremist because it openly harasses Muslims.  Government officials will testify that the Office of Intelligence has prepared reports on at least 100 and potentially hundreds of students as part of this operation.  These students include Mr. Khalil, as well as Mohsen Mahdawi, Rumeysa Ozturk, Yuncseo Chung, and Badar Khan Suri.

Second, DHS and the State Department have established an interagency process to deport targets identified through this operation.  Government officials will testify that once HSI's Office of Intelligence prepares a report on a student protester, it shares that report with HSI's National Security Division.  Senior officials in that division then decide whether to refer the case to the State Department.  When they make the

referral, the National Security Division will share the Office of Intelligence's report together with a letter recommending action.

In several of these cases, Secretary Rubio has made a personal determination over the INA's rarely-invoked foreign policy provision. In other cases the State Department has acted to revoke student visas under a different provision of the INA, Section 221(i), without referencing any specific ground of deportability. Third --

THE COURT: Let me interrupt, and your opening flags it. There is this statute, it's been on the books for sometime. Congress has empowered the Secretary personally to revoke visas if, in the Secretary's determination, the presence of the individual embarrasses the foreign policy of the United States. Now -- and from my preparation for the trial, it appears that at least in some cases, if not all, the public officials have relied upon that provision to take action.

How do you deal with that? That's awful, isn't it?

MS. KRISHNAN: It is, your Honor. And I'd start by noting this, which is that the policy that we challenge is effectuated by relying on a variety of the

provisions of the INA.  It is true that in many of these cases Secretary Rubio has invoked the foreign policy provision to which your Honor refers.  In many other cases, including student visas, it's relied on different provisions of the INA, including Section 221(i).  But as regard to the foreign policy provision, whatever Congress intended as to its scope, the First Amendment prohibits the government from deporting noncitizen students and faculty based on their political viewpoint, which is what the government is doing here.

THE COURT:  But my problem -- and you're right to address this right at the beginning, my problem is that the -- that the statute empowers the Secretary of State to take various actions.  Your point is that if those actions are ideologically based, he can't do it?  How do I harmonize the two?

MS. KRISHNAN:  It is possible that the foreign policy provision has some narrow applications that are constitutionally permissible.  For example, if the government sought so deport a foreign government official based on speech activities that would otherwise be lawful.  The budget for the history of this provision shows that Congress intended its scope to be narrow.

THE COURT:  Well that gets me to my second -- and I just throw it out now, and I recognize I've

interrupted you.  Your, um, litigants here, um, are you asking me to declare that the conduct of these public officials, including the Secretary of State, is unconstitutional as applied notwithstanding this statute, is what you're saying?

MS. KRISHNAN:  That is correct.

THE COURT:  Then I've got this problem.  If that's what you're asking, you people -- your litigants, your clients, they're not -- they haven't challenged it, have they?

MS. KRISHNAN:  But to be clear, your Honor, we do not challenge the foreign policy provision -- the constitutionality of the foreign policy provision directly, what we challenge is the policy of relying on a variety of INA provisions in order to deport noncitizen students and faculty based on their political viewpoints.

THE COURT:  Thank you.  About 3 more minutes.

MS. KRISHNAN:  Third, the State Department -- and this goes to the policy's implementation.  Third, the State Department has issued and continues to issue formal guidance to effectuate the policy.

For example, on February 28th, Secretary Rubio issued a cable titled "Catch and Revoke," providing that a visa should be revoked if a visa holder engages in

activities that are inconsistent with their visa status. Later cables, together with the defendants' own public statements, made clear that the State Department deems pro-Palestinian advocacy to be inconsistent with holding a student visa, and also a basis for finding that noncitizens have endorsed or espoused terrorist activity or that their presence here compromises U.S. foreign policy, both of which are grounds of deportability under the INA.  But the most powerful evidence of the policy's existence is the way in which defendants have enforced it.

Despite this Court's clear orders, defendants have produced very little about the targeted -- the five targeted noncitizens as to which this Court has allowed discovery.  But the evidence we will present is unambiguous.  It will show that in each case the government retaliated against -- constitutionally protected advocacy.

In the cases of Khalil, Mahdawi, Chung, and Khan Suri, the government relied on the foreign policy provision to which we've just discussed.  In each case Secretary Rubio made the personal determination required by that provision of the INA citing the individual's constitutionally protected expression.

In Ms. Ozturk's case, the State Department relied

on a different provision of the INA, Section 221(i). But in her case too the government justified its decision by pointing to lawful advocacy, mainly an Op-ed she co-wrote in Tufts Daily criticizing her school's failure to disclose its investments and divest in companies in Israel.

Defendants' public statements confirm that the government sought to deport these noncitizens in retaliation for their speech. They also established that the defendants campaign of retaliation extends far more broadly than these five individuals. And remarks delivered to the press on March 28th, for example, Secretary Rubio confirmed that all but a few of the Trump administration's then 300 student visa, quote, "related to pro-Palestinian protests." Defendants have made clear that further revocations and arrests are to come.

THE COURT: Your time is about up, and I am going to keep time. We need to get this case through in the allotted time.

MS. KRISHNAN: Okay, thank you, your Honor.

THE COURT: Thank you.

Does the defense wish to open now or reserve?

MS. SANTORA: Thank you, your Honor, we'd like to open now.

THE COURT:  And you may.  But if you would first introduce yourself.

MS. SANTORA:  Good morning, may it please the Court, Victoria Santora appearing on behalf of defendants.

THE COURT:  And I'm going to start with one question for you, Ms. Santora.

Do the public officials, defendants here, agree that a noncitizen lawfully in the United States has the same constitutional rights under the First Amendment as a citizen?

MS. SANTORA:  Individuals within the United States have certain rights under the First Amendment.  We'll argue, your Honor, and the evidence will show that the government is not revoking Visas or deporting noncitizens.

THE COURT:  No, no, you need to answer my question.  I'll respect whatever answer you give me, but I'll need an answer.  The same rights as a citizen?  I mean it may be that they don't, that's a possibility.  And this statute, that I pressed the plaintiffs on, bears on that.  But I just want to know going in, what's the position of the public officials here?

MS. SANTORA:  So our position would be that the First Amendment does refer to "persons," um, and that

people in the United States share the same rights under the First Amendment.

THE COURT:  Thank you, that's an answer.  And I'll hold you to that.  And please go ahead.

OPENING STATEMENT BY MS. SANTORA:

Your Honor, plaintiffs claim their speech is chilled and their organizations are harmed because the government is revoking visas and deporting noncitizens on the basis of protected speech.  The government, they say, has created and is deploying what they describe as an "ideological deportation policy."  At this trial the evidence will show that none of that is reality.  The plaintiffs' case is grounded in speculation and supposition, it's a theory, it's an idea, it's conjecture.  And it falls far short of meeting the steep burden the plaintiffs face here.

The plaintiffs ask the Court to apply a traditional First Amendment retaliation analysis.  But because of the issues that play in this case, national security, foreign policy, immigration enforcement, and enforcement discretion, this case is far from a traditional First Amendment retaliation case.

In this case, plaintiffs must first show that the alleged policy they challenge has no legitimate cause or

objective.  Because the evidence will show that the government is enforcing the immigration laws lawfully and justifiably, plaintiffs will fail to clear that high hurdle.  Even if they did, to prove retaliatory conduct that they allegedly fear, plaintiffs must show, one, engagement in a protected activity, two, an adverse action taken again them, and, three, a causal link between the two.

Your Honor, plaintiffs in this case are institutions.  They claim that they, and their noncitizen members have been injured by an alleged policy.  But the reality is, and the evidence will show, that the government has taken no adverse action against any institutional plaintiff or noncitizen involved in this case.

The evidence will undermine all claims that these institutions and people have been adversely affected in any way.  Where's the harm?  The harm is essential to prove the plaintiffs' case?  It's illusory.  There is simply none.

Plaintiffs will offer, as evidence of retaliation and harm, examples of other cases outside of this one where noncitizens were allegedly retaliated against for their unprotected speech.  Such evidence misses the mark because, as your Honor has recognized, we're not here to

relitigate other people's cases which are being fully litigated in other District Courts.  When we focus, as we should, on this case, on the government's policies and practices, the evidence will show that the government is acting lawfully, reasonably, and justifiably, in carrying out the law and pursuing the administration's priorities.

Not only is the retaliation entirely imagined here, the alleged chill is also.  To show chill, plaintiffs must show that speech was actually chilled.  Allegations of a subjective chill are not an adequate substitute for a claim of specific, present, objective harm or a threat of specific future harm.  Your Honor, after the hearing the evidence you will certainly find that plaintiffs have not shown specific subjective harm, present or future.  The reality is that plaintiffs will show no more than subjective chilling, which is insufficient to meet their burden.

Plaintiffs' witnesses will say that they are afraid, but the evidence will refute that and it will show that they shouldn't be.  Plaintiffs' witnesses will say that they changed their behavior, but the evidence will undermine that and it will prove there's no objectively-reasonable basis for them to have done so.  Again plaintiffs' witnesses will contend that they have

been harmed, but the evidence will demonstrate that is nothing more than a theory on which they base their entire case.

Your Honor, this week you will see that plaintiffs' witnesses are academics. You will find them impressive, you will find them intelligent, because they are. You'll learn that they work in the realm of ideas, concepts, theories, and hypotheses. But you'll see too that their case is theoretical and hypothetical. Indeed it is about things that they fear may happen. But the law requires that their case be grounded in facts, the law requires that their case be grounded in reality. It's not.

So if plaintiffs are presenting a theory, a conjecture, what's the reality? The reality is what the government will present in this trial. The work of the government witnesses in this case is grounded in reality, their work is grounded on a daily basis in the sober reality of protecting our national security. You'll see that every one of the government's witnesses has done this important work for decades. This week and next they will discuss the fact that under the law the government may revoke visas and remove noncitizens and it has wide discretion to do so. That's been the case for quite some time.

The government's evidence will show that these legal authorities have existed for decades and that their purpose is to promote safety and security.  The reality is that it is the prerogative of each administration to set immigration enforcements priorities, and the government's evidence will show that this administration set immigration enforcement priorities within the confines of longstanding law.  The reality is that there is no ideological deportation policy or anything like it under any other name.

Your Honor, during that trial you'll hear about two executive orders, Executive Orders 14161 and 14188, they're titled "Protecting the United States from foreign terrorists and other national security and public safety threats," and "Additional measures to combat antisemitism."

Protecting United states citizens, combatting antisemitism rigorously, these are the prerogatives of this administration, objectively-justifiable priorities. Because the evidence will confirm a longstanding need to protect Americans from foreign threats, including through visa vetting and agency prophecies addressed in Executive Order 14161.

The evidence will further confirm, as Executive Order 14188 says, that in the past two years we have

seen, quote, "an unprecedented wave of vial antisemitic discrimination, vandalism, and violence, against our citizens, especially in our schools and on our campuses. The evidence will sadly additionally confirm, as Executive Order 14188 states, "Jewish students have faced an unrelenting barrage of discrimination, denial of access to campus common areas and facilities, including libraries and classrooms, and intimidation, harassment, and physical threats and assaults." Ultimately the evidence will leave no doubt as to the necessity of the executive orders at issue in this trial.  To state the obvious, protecting national security and fighting antisemitic are worthy causes.

You'll also hear evidence concerning how the Department of Homeland Security and states have implemented these executive orders.  Later this week and next week, government officials working in those departments will testify that the executive orders have been implemented using standards and authority that has been in place for decades.  The priorities and emphasis may change, but the standards and authorities remain the same.

The government witnesses will tell you that the reality is that these tools and measures preventing noncitizens from seeking to enter our country, or

already in our country, are developing and are necessary in light of past tragedies. The 1993 World Trade Center Bombing. The terrorist attack of September 11th, 2001. The 2013 bombing of the Boston Marathon. The 2015 San Bernadino shooting. Preventing future tragedies like these, the government officials will testify require vetting noncitizens under longstanding legal standards --

THE COURT: About 5 more minutes. Go ahead.

MS. SANTORA: -- using both existing and evolving standards and methods. The evidence will show that that is exactly what our government is doing in implementing these executive orders, no more, no less.

Within the context of these revocations and visa actions undertaken in the past 6 months, these officials will explain how their agency shared information and how they independently conduct a case-specific fact-based analysis to determine whether a noncitizen's activities rendered him or her removable or his or her visas revocable. The officials' testimony will prove unequivocally that since the administration's inception the decision to revoke visas and to institute immigration enforcement actions have been in accordance with existing statutes, regulations, and procedures. It will affirm the reality that there's no policy to revoke

visas or remove noncitizens on the basis of protected speech or any other unlawful basis.

Next week you'll hear from four senior Homeland Security investigation agents involved in four different of the administration's acts of noncitizens between March and today.  These agents will further develop the plaintiffs' theory that the government is conducting ideologically-motivated and improper arrests.  The agents will testify that their offices conduct all arrests, including the ones plaintiffs attempt to exemplify in this case according to Established HSI protocols and procedures.  By the end of this trial, your Honor, you will understand that the so-called ideological deportation policy is no more than a theory plaintiffs have conjured from a series of suppositions and speculations.

Again, conjecture, supposition, and speculation, is not evidence.  It fails to meet any burden.  The evidence presented at this trial will bear out the reality that plaintiffs are challenging nothing more than the government's lawful enforcement of the immigration laws.  The evidence will show, without question, the reality that there is no immigration enforcement strategy based on protected speech.  The evidence will show, without question, that there have

been no immigration enforcement actions based on protected speech.  The evidence will show, without question, that there is no ideological deportation policy, your Honor.

Your Honor, one more point to make, if I may?  I wanted to add one qualification to my answer to the question you posed at the beginning, I apologize if I misspoke earlier.  But I do want to say that there are nuances to the First Amendment and we will address that fully in closing.  Um --

THE COURT:  Like what?

MS. SANTORA:  I'm sorry?

THE COURT:  Like what?  What are the nuances?  I mean I understand, um -- when you say that, here's what I think.  Political speech is at the very core of the First Amendment.  Advertising, for instance, is not.  So that's a nuance.  But both are protected forms of speech.

MS. SANTORA:  Yes.  And the nuance is that, as I addressed in our opening statement, this context involves issues of national security, foreign policy, immigration enforcement, an enforcement --

THE COURT:  And those, you suggest, have less protection?

Now when you say "national security," you know in

World War II, the populous was urged, and for very good reason, for instance, not to disclose ship departure times and the like.  We were in the middle of global war.  One can understand that.  But speech about our foreign policy, speech about matters of national security, I had always thought was political speech, it was of the most protected speech.  And indeed, speech about our immigration policy is political speech.

The President ran on a policy of immigration enforcement, which he's attempted to carry out.  And whether individuals support that or oppose that, all of that seems to me political speech.  I'm just trying to find out what you meant by that?

MS. SANTORA:  So our evidence will show that speech was not the basis for Visa revocations or deportation actions in this case.  As you recognize, your Honor, though this case does involve the foreign policy provision of the INA, um, which addresses when an individual's activity is --

THE COURT:  Well now is not the time, because we haven't heard the evidence, and you've outlined forceful evidence that I'm eager to hear.  But in closing, I imagine we'll be talking about that and seeing if what is only speech can form the basis of the Secretary's determination under that statute.  I'm well aware of the

statute and, um -- I tried to flag, I've got to square that statute, or maybe not, maybe I don't have to. Maybe I shouldn't, because of course they're not the people being challenged, they, um, under this statute. As pointed out, those matters are being litigated in other cases, which I express no opinion on. None. They're not before this court. Those determinations will be made by judges every bit as good and experienced and as thoughtful as I am. So I'll say nothing about that.

But on the issue of whether these plaintiffs can get any relief -- and of course there would have to be a factual basis, you pointed out some of the hurdles before we get there. I did say to plaintiffs' counsel, "Well assuming things went your way." Well you're saying they shouldn't go that way.

You haven't talked yourself out of reliance, because I'm -- honestly, I try to be transparent, you haven't talked yourself out of relying on the statute or any of the statutes. But I'm taking your view that, as a general matter anyway, people lawfully in the country have the same rights to free speech as citizens. You answered "yes" to that.

Am I right on that?

MS. SANTORA: So the question is not necessarily

based on -- the answer I think is not necessarily based on their status in this country, but it's based on again how their status relates to and comes up in this context of these provisions of the INA, which relate to --

THE COURT:  Except that -- again this is not the -- you've made your opening, I want to get to evidence now.  Except that if the Secretary says, personally, under the statute, "This person embarrasses the foreign policy of the United States," under the statute now, that's a basis for revoking their status and immediately expelling them from the United States.  What the Secretary of State had to stay about the speech of a citizen, the identical speech of a citizen counts for nothing because a citizen cannot be expelled from the United States on the Secretary's say so, but a noncitizen can.  So how those two mesh is a real problem in this case.  And I think that's all that may be said now because we need to have a factual record.  And thank you.

All right, I said I was going to rule on matters, but since we're going to talk about housekeeping at 2:00, I can postpone those rulings until then.

You may call your first witness.

MR. BIALE:  Thank you, your Honor.

The plaintiffs call Megan Hyska.

THE COURT:  And your name is?

MR. BIALE:  And my name is Noam Biale.

THE COURT:  And, Mr. Biale, thank you.

MR. KANELLIS:  Your Honor, can we first ask -- we would like the Court's exclusional rule on witnesses.

THE COURT:  Sequestration order?

MR. KANELLIS:  Yes, sir.

THE COURT:  Oh, I understand that.

(Interruption on zoom.)

THE COURT:  You're familiar with the rules of sequestration, they are, that only one witness will be in the courtroom at a time.  Counsel may talk with the witness at any time, but the witnesses are not to talk amongst themselves about the testimony that they've given.  That is the order of the Court.  Witnesses are sequestered on all parties, including the defendant public officials.

And the witness may come forward, please.

THE COURT:  Yes, we will take a short recess first.

(Shorts recess.)

THE COURT:  Please swear the witness.

(MEGAN HYSKA, sworn.)

MR. BIALE:  May I proceed?

THE COURT:  You may.

MR. BIALE:  Thank you, your Honor.

\* \* \* \* \* \* \* \* \* \*

MEGAN HYSKA

\* \* \* \* \* \* \* \* \* \*

DIRECT EXAMINATION BY MR. BIALE:

Q.    Good morning, Professor Hyska.

A.    Good morning.

Q.    Where do you work?

A.    I work at Northwestern University.

Q.    And what's your position there?

A.    Assistant Professor in the Philosophy Department.

Q.    Tell us briefly about your academic work?

A.    So I'm a specialist in the philosophy of language and in some topics in social philosophy.

Q.    And within those disciplines, what are some of the topics that you studied?

A.    So I have studied and written about topics having broadly to do with political communication including questions about the nature of political propaganda, about how political communication is technologically mediated by things like social media or artificial intelligence.  I've also written about social organizing and social movements.

Q.    And why -- you mentioned political propaganda. Why is that a subject of interest for a philosopher of language?

A.    A philosopher of language might broadly be characterized as having an interest in the mechanics by which we get information across to one another.  And a question that has arisen for some people is whether political communication might preferentially use some of those mechanisms rather than others, whether propaganda, for instance, uses some of those mechanisms more than others.

Q.    Thank you.  And do you have any scholarly writings?

A.    I do.

Q.    Can you tell us about those?

A.    Sure.  So I, um, within the subject matters that I mentioned a moment ago, for instance I have a couple of articles about kind of the concept of political propaganda, I have articles on the ways that political speech and political mobilization interact with synthetic media, that is AI-generated media.  I've got some work on the nature of communication per se, and some other work on, um, the nature of social organizing and social movement.

Q.    And other than your scholarly writings, have you

written anything more public-facing?

A.    I have.

Q.    Can you tell us about those publications?

A.    So what comes to mind is two publications which were more public-facing.  One of them was an article in the "Yale Review," this would have been in the fall of 2018.  The second is an Op-Ed in the "LA Times" in 2022.

Q.    Okay.  Let's start with the article in the Yale Review.  What was the topic of that article?

A.    That article was about how, based on public discourse, Americans were conceiving of what propaganda was at that moment in time, and it also engaged with some questions about how propaganda worked alongside other tools of political coercion and control.

It engaged a little bit with an evaluation of whether the Trump administration -- and this was the first Trump administration in its first few years, it engaged a little bit with the question of the ways in which the Trump administration was then using -- using or not using some of the traditional tools in the sort of authoritarian tool box.

Q.    Okay.  And given what you just said, would you characterize that article as critical of the Trump administration?

A.    I would.

Q.    And remind us, when was that published?

A.    That was published in the fall of 2018.

Q.    Okay.  And Mr. Trump was President then?

A.    He was.

Q.    Tell us about the Op-Ed that you wrote in the Los Angeles Times?

A.    So this Op-Ed came not long after Russia's invasion of Ukraine.  The article concerned making sense of what I took to be Russia's propaganda strategies around the invasion, specifically this claim that the Kremlin was making at the time, that they invaded Ukraine so it could "denoxify" it.  That's what I discussed in the article.

Q.    Do you believe that it's important for an academic philosopher to write public-facing articles?

A.    I do.

Q.    Why?

A.    Look, academic philosophers, even those of us who like myself work at private institutions, are the beneficiaries in various more or less indirect ways of public funds, um, for that reason.  Among I think others, we have some responsibilities to kind of return the fruits of our academic labor to the public, to make them accessible.

Q.    Tell us about some of the courses that you teach

at Northwestern?

A.    I regularly teach courses in the philosophy of language, in the history of what we call the "analytic tradition," or broadly "Anglo-American philosophy."  I also teach classes in topics of social philosophy.

THE COURT:  I mean no disrespect, but so far we haven't heard anything about this case.  So let's -- maybe we could come to this case and work these out, because I am at sea.

MR. BIALE:  Yes, your Honor, and I don't mean to belabor any of this, but I do want to set up some of what we will be discussing about this case.  So let me do two more questions and then we'll dive in.

Q.    Do any of your courses touch on political issues, Professor?

A.    They do.

Q.    Can you tell us which ones and what subjects?

A.    Sure.  The one that comes to mind is that in the introduction to the philosophy of language that I standardly teach almost every year, I typically teach a unit on how the history of linguistics interaction -- history of linguistics as a discipline interacts with the history of colonialism and colonial ideas about language and the differences between languages.  So that's one.

I also -- when I've taught, for instance, a graduate seminar on language and politics in the analytic tradition, that some of the key figures in this tradition were socialists and how their socialism might inform, um, their kind of otherwise abstract theories in the philosophy of language.

Q.    Okay.  And separate from your teaching and writing, are you politically active?

A.    I am.

Q.    What have you done?

A.    So I am, for instance, a member of the Democratic Socialists of America, um, and as a member of that organization have engaged with various political campaigns around, um, for instance, housing issues, policing, and some other things.

Q.    Why is it important for, in your view, for a philosopher to be politically active?

A.    Well I mean some philosophers may differ on this but I think of philosophy as investigating some of the basic conditions of our, you know, human existence, that among those conditions is that we are born among and live among other human beings, and the wells-spring of politics as well.  And so in my own education and career as a philosopher, engaging politically has seemed like sort of an inevitable and natural outgrowth of

philosophical investigation.

Q.    Okay, now we're going to come down to earth a little bit, consistent with what the Court would like to hear.

Where were you born?

A.    Edmonton Alberta, Canada.

Q.    And what country are you a citizen?

A.    Canada.

Q.    Did you grow up in Canada?

A.    I did.

Q.    And when did you come to the United States?

A.    I moved to the United States in 2012.

Q.    Why did you decide to come here?

A.    I moved to the United States when I began, um, a graduate program in philosophy at the University of Texas at Austin.

Q.    And why did you decide to pursue graduate study in the University of -- withdrawn.

Why did you decide to pursue your graduate studies in the United States?

A.    I mean the United States has a ton of amazing research universities, um, that's why I came here.  I work at one now too, that's why I've stayed here.

Q.    And what's your current citizenship status?

A.    I am still just a citizen of Canada.

Q.    And how about your immigration status here in this country?

A.    I'm a green card holder.

Q.    When did you obtain your green card?

A.    In April of 2021.

Q.    And, um, I want to ask you, prior to this year, prior to 2025, were you planning to stay in the United States?

A.    I was.  I was planning, for instance, to go up for tenure at the end of this next academic year.  I had signed on to advise students over the next couple of years.  I was planning to stay.

Q.    Now you mentioned earlier an organization, you remember, of the Democratic Socialists of America.  Are you a member of any other organizations?

A.    I am.

Q.    Which organizations?

A.    So I'm a member of the American Association of University Professors, the AAUP.  I am a member of the American Philosophical Association, the APA.  I am also a member, although not very active, um, in an organization called the Chicago Alliance against Racism and Political Repression, or CARPR.

Q.    And just focusing briefly on the AAUP.  When did you join that organization?

A.    I joined, and I believe it was December of 2020.

Q.    And can you tell us why you decided to join AAUP?

A.    Well you know I think, as a general rule, um, I believe it's important for workers to, um, organize collectively to protect their working conditions in a private university.  Like the one I work at, we're not allowed to unionize.  But I'm working through an advocacy chapter, so AAUP can do some of that work for us.  And more specific to higher education, I also think that faculty organizing collectively to advocate for what we take to be the research and education machine of our institution, is important and is something we can do through the AAUP.

Q.    Now I want to ask you about Democratic Socialists of America, when did you join that organization?

A.    I joined that in -- it would have been the late summer or early fall of 2018.

Q.    Okay.  And can you just tell us a little bit about what is the Democratic Socialists of America?

A.    The DSA is a progressive organization that has existed in this country since the 1980s, they're perhaps best known for their electoral work around national candidates, people like Senator Bernie Sanders of Vermont, um, maybe people like Alexander or Catherine Cortez of New York, they're recently --

Q.    And why did you decide to join that organization?

A.    Um, there were a few reasons at the time.  The first is that there were clear commitments, deeply-held political commitments that were in common between myself and the DSA around, for instance, issues having to do with health care.  A further reason is just that at the time that I joined, this was, as I said, the late summer or early fall of 2018, a couple months prior to that in I believe it was June of 2018, Alexander and Cathy Cortez, who I mentioned, a member of Congress from New York, a DSA member, had been elected, and that impressed upon me that DSA nationally was a progressive organization that could actually score electoral wins, that could actually get things done.  And I guess the last reason is that I joined right around the time that I moved to Chicago for my current position, and the Chicago Chapter of DSA was at that time very active doing -- canvassing around a housing issue right in my neighborhood in the North side of Chicago.  And so this struck me as an organization that I shared values with and was doing work in my community.

Q.    I just want to ask you about the first reason you gave.  What about the DSA's position on health care made you politically aligned with the organization?

A.    All right.  So as I said, I'm Canadian and in

Canada we have universal health care.  I might always have had some sort of default preference for a health care system like that, but that political commitment was really intensified for me while I moved to the United States in 2012 for graduate school.

I had, while living in Canada, trained as and volunteered as a sexual assault respondent in emergency rooms.  So the role was to be on-call in emergency rooms, typically during my shifts, um, to come to the hospital if a recent survivor of sexual assault came in, to offer crisis counseling, safety planning, that kind of thing.

Now when I moved to the United States I trained for and served as a volunteer in a very similar role in Austin Texas, where I then lived, and what was immediately clear to me was the contrast in that experience.  Obviously anybody who's showing up at an emergency room, because they've experienced a sexual assault, is having a very bad day, but it was very vivid to me the ways in which that experience was made much worse because of the for-profit insurance system in the United States, and that made me feel very passionate about the need to pass something like Medicare For All, which is also a commitment of the DSA.

Q.    Are you aware, Professor Hyska, whether the DSA

has a position on the Israeli/Palestinian conflict?

A.    I know that the DSA Nationally endorses the BDS, or Boycott Divestment Sanctions campaign.

Q.    And do you personally align yourself with that position of the DSA?

A.    I do.

Q.    Can you explain for us why you support the Boycott Divestment Sanctions initiative of the DSA?

A.    So multiple human rights organizations, including organizations of the UN, have repeatedly found that Israel is violating the human rights of Palestinians in the occupied Palestinian territories.  I take it this is something that the international community has a responsibility to do something about.  I'm strongly committed to using nonviolent means to address the situation.

So the kind of economic tools that are enumerated by the international BDS campaign, tools that are inspired by those that were used, for instance, in the 1980s, and in the decades before during the international movement to end apartheid in South Africa -- and two are familiar from the nonviolent forms of resistance practices during the anticlinal struggle in India and during the civil rights movement in this country.  Those are the explicit influences upon the BDS

campaign.  And this felt attractive to me and struck me as an appropriate way to address ongoing human rights abuses.

Q.    What has your involvement in the DSA entailed, what kind of activities?

A.    So among the activities I've engaged in as a DSA member, um, has been things like sitting on the steering committee for a kind of geographical branch of the Chicago chapter of the DSA, and in that capacity I worked on, for instance, mobilizing other members in that geographical region to take part in Chicago DSA's priority campaigns.

I also, um, sat on the steering committee at one point for a campaign in Chicago concerning a police oversight in the City of Chicago.  And I've done various other like canvassing work around, for instance, housing issues.

Q.    Are those positions on the steering committees that you mentioned, um, leadership positions in the DSA?

A.    Yes, that's fair to say.

Q.    And, um, separate and apart from those positions, have you attended any protests as part of your membership with the DSA?

A.    I have.

Q.    Tell us about some of the protests that you've

42

attended over the last five years?

A.    So definitely the period of time in which I was attending the most protests would be during the summer of 2020, this was during the kind of national uprising, um, after George Floyd was killed in Minneapolis.  I attended a lot of protests that summer which DSA helped organize.  And I continued to attend protests that, in some cases -- in many cases DSA helped organize around issues related to policing and occasionally, um, immigration, abortion rights, and related issues over the subsequent years.

THE COURT:  Mr. Biale, again, um, and I say this with respect, let's come to this case.

MR. BIALE:  So, your Honor, these questions are meant to establish what the witness's past practice was before the implementation of the policy.

THE COURT:  Well you know I find it easier to understand if we talk about matters relevant to this case, and then -- and I don't see them objecting.  But then I'll allow you to move out and relate to past practice.  Let's get to this case.

MR. BIALE:  All right, that's fine, your Honor, I'll invert my order somewhat.

Q.    So, Ms. Hyska, just tell me, um, focus us on 2025, when President Trump was inaugurated in January, um, was

there anything you wanted to do in response?

A.    Yes.  While as I stated a moment ago, I have in the past held leadership positions, and the DSA has been politically active in the City of Chicago, I have taken a bit of a hiatus for a couple years because I was busy personally and professionally, but when President Trump was reelected in November and in the runup to his inauguration in January, it was clear to me that I wanted to become, um, much more active in the DSA in Chicago again and find that political community again.

Q.    Okay.  And did there come a time when you changed your mind about that?

A.    I did.

Q.    When was that?

A.    So that was in, um, mid to late March.

Q.    Okay.  And what prompted you to change your mind about wanting to become more involved in political activism with the DSA?

A.    It became apparently to me after I, um, became aware of a couple high-profile detentions of, for instance, student activists, people like Mahmoud Khalil, who was, like me, a green card holder, people like Rumeysa Ozturk, um, that my engaging in like public political dissent would endanger my -- would potentially endanger my immigration status, that I risked, um,

detention and deportation for being publicly and politically critical of the Trump administration.

Q.    Okay, let me focus you first on Mahmoud Khalil, whom you mentioned.  When did you hear about Mr. Khalil's situation?

A.    So I believe that I heard about it on March 9th of this year.

Q.    And how did you hear about it?

A.    I would have read about it in -- I forget the exact news source, but I know that I both read about it and saw a video of his detention taken, I believe, by his wife.

Q.    Okay, I'd like to show you, um, Exhibit A1. Mr. Kumar, if you could pull that up.

        (Plays video.)

        THE COURT:  We don't have --

        (Plays video.)

        THE COURT:  Wait.  Wait.  Wait a minute.

        MR. BIALE:  I'm sorry, your Honor.

        THE COURT:  Wait.  First, I don't have a joint exhibit list.  And you're telling me, both sides, that you're working on it.  I should have had it this morning.

        Second, I don't know what exhibit -- I do, because it's been placed here, but that A1 is supposed to be.

But under the protocol that the Court follows, A means the exhibit is not admitted.  So on this foundation --

And, Mr. Kanellis, do you object to this being played now?

MR. KANELLIS:  Yes, your Honor.

THE COURT:  Sustained on that foundation.  There's that no foundation for it.

MR. BIALE:  Your Honor, I'm hoping to show the witness the exhibit and establish a foundation for it.  To inquire whether it's the video she saw.  And then we will later, because the government has not stipulated to this video --

THE COURT:  We'll later tie it in if this is in fact accurate?

MR. BIALE:  Yes.  So we will be moving to admit it subject to a connection --

THE COURT:  Yeah, well, I'm -- that doesn't work very well in this court, I'd rather have the connection and then see the video.  She saw the video.  Let's move on.

MR. BIALE:  Yes, your Honor.

Yes, Mr. Kumar, you can take that down.

Q.    When you saw the video of Mr. Khalil's arrest and read about it, how did that make you feel?

A.    I felt extremely shocked and distressed.  I mean,

if the first place, for Mr. Khalil and for his family, his wife in the video is, um, audibly distressed. But frankly also for myself. It was shocking to me that Mr. Khalil's status as a green card holder didn't protect him from this treatment given that the reporting that I was reading at the time, including reporting on statements from officials in the Trump administration suggested to me that it was just on the basis of political speech that he engaged in that he was being detained.

MR. KANELLIS: Objection, your Honor, the witness is --

THE COURT: No, this is not -- we're going to face this frequently. I'm going to take that as her accounting of something that she heard. It is not offered for the truth of what -- and President Trump isn't a defendant in this case, for the truth of something that he, or any administration official, said. But this is what she recalls hearing. And that's how I'm going receive it in evidence. An objection really is not necessary where it's a third-party, that she heard it on the media.

Now, if we want proof of what he said, either we'll do it by agreement or someone who actually heard it and can recall precisely what he said and the like.

Go ahead.

All right, so you heard the news reports and among them, um, you heard something that you believed that the President had said, is that fair?

THE WITNESS:  Yes, your Honor.  I would also just add that I also saw social media posts from the President's social media accounts.

THE COURT:  Yeah, so -- and we'll add that.  Fine. Go ahead.

Q.   Just to put a finer point on it for the record. Do you recall specifically what you, um, heard the President say?

A.   So what I remember seeing from the President specifically was a post he had made on the Truth Social --

(Interference Zoom.)

THE COURT:  Turn the person off.

I must say to those who are accessing via the internet, if you cannot keep the microphones muted, your access will be terminated.  I'm not going to have the trial interrupted.  We have two courtrooms here devoted to this case.  Now microphones must remain muted.

Go ahead, Mr. Biale.

Actually I didn't catch your answer because of the interruption.

Would you say what you recall was said?

THE WITNESS:  Yes, your Honor.

A.    So what I recall seeing was a post that President Trump had made on Truth Social.  I believe I saw some type of a screen shot and reposted on X by the White House's X account in which it said that Mr. Khalil had been detained and would be deported, something to that effect, because he was, um, pro-Hamas or Hamas-linked, and in which the President said that this would be the first of many such arrests.

Q.    And, um, I think you testified how you felt about it.

Did you express to anyone at that time your then existing feeling about witnessing this video or reading about this report?

A.    I did.

Q.    To whom was that?

A.    So I recall, for instance, texting one of my colleagues in the philosophy department at Northwestern the next day, that would have been March 10th, to ask whether she heard about the case and tell her how I was feeling about it.

MR. BIALE:  Your Honor, at this time I'd like to show the witness what's marked as Exhibit E for identification.

THE COURT:  You may show her.

(On screen.)

Q.    Do you recognize this document, ma'am?

A.    I do.

Q.    What is it?

A.    So this is a screen shot, um, of the first sequence of texts from me to my sort of colleague that I mentioned.

Q.    Okay.  And is this a true and accurate copy of the messages that you sent?

A.    It is.

Q.    Okay.

MR. BIALE:  Your Honor, I offer Exhibit E.

THE COURT:  Any objection?

MR. KANELLIS:  Yes, your Honor.  Obviously hearsay --

THE COURT:  If I need argument, I will say so.

MR. KANELLIS:  Hearsay.

THE COURT:  Well some of it comes in under 8033. And on the *Polan* case, it's clear that her then present impression is admissible, and any intention she expressed is likewise admissible.  There are other things -- I mean the start, "it was lovely to see," that's out.  I'll parse it in those circumstances.  And with that limitation, E is admitted.

What's the next number?

MR. BIALE:  So this -- the next number of --

THE COURT:  I assume you've agreed on some things and they have numbers, correct?

MR. BIALE:  Correct, and I believe we're up to 57.

THE COURT:  It is 58, as limited.

MR. BIALE:  59.  I apologize, your Honor.

THE COURT:  59 in evidence.

MR. BIALE:  Actually, your Honor, I'm being told it's actually 65.  I apologize.  We'll get better at this time as we go.

THE COURT:  Well rapidly one hopes.

(Laughter.)

THE COURT:  Tomorrow morning will be sufficient.

(Exhibit 65, marked.)

MR. BIALE:  Fair enough, your Honor.

Q.   Ms. Hyska, you see that there's two text bubbles on this document.  Looking at the second text bubble, if you could read the first sentence of that.

THE COURT:  Why is this necessary?  I can read.

MR. BIALE:  Okay.

Q.   Can you tell us, Ms. Hyska, what you meant by the statement at the beginning of the second text bubble?

A.   Right.  So I meant that I had heard this news about this student protester, Mahmoud Khalil, being

detained, I just described it as making me feel like I was climbing the walls, which is a way of saying that I was feeling extremely stressed out, scared, maybe even trapped.

Q.    Okay.  Now you mentioned another individual who was arrested, Rumeysa Ozturk?

A.    I did.

Q.    What do you remember of Ms. Ozturk's situation?

A.    So I remember that again I saw reporting about Ms. Ozturk and again saw a short video clip of her detention, and this was near the end of March.  What I learned about her was that she was a graduate student at Tufts, and what I saw, for instance in the video clip, is that she was, um, kind of grabbed and detained in what appeared to be the middle of the sidewalk, um, and the reporting that I read said that she was, um, being detained for deportation.  And what I also learned through that reporting is that the main basis for her being detained and deported seemed to be that she had co-authored an Op-Ed in the Tufts campus newspaper the previous year and that Op-Ed spoke in support of some things related to divestment from Israel.

THE COURT:  Just so we're clear and you understand I'm paying attention, I'm receiving that as what she believes or recalls she heard, not as evidence that that

is the reason for her detention, and I will do that throughout, um, without interruption.

Go ahead.

MR. BIALE:  And, your Honor, with this witness we're offering it for that purpose.

THE COURT:  What?

MR. BIALE:  I said we are offering it with this witness for precisely the purpose that the Court just identified.

THE COURT:  Thank you.

(Laughter.)

THE COURT:  That makes me more comfortable with my ruling.

(Laughter.)

THE COURT:  Now why don't you ask her questions.

MR. BIALE:  Yes, your Honor.

Q.   I'm not going to show you the video, Ms. Hyska, but can you tell us how you felt when you saw it?

A.   Yeah, I was extremely disturbed by this video.  I don't believe that the video, at least the version that I saw had any audio, but you can see this young woman, Ms. Ozturk, walking along and sort of like it's startling, she's grabbed by the wrist by some individuals who are not discernible in the video, who I deemed law enforcement, although they weren't clearly

wearing uniforms.  She looked very deeply frightened. And I felt frightened and disturbed upon seeing it.

Q.    And you mentioned that, um, you had heard that she was arrested because she wrote an Op-Ed in the Tufts Daily.

Did you read that Op-Ed at the time?

A.    I did take a look at it at the time, yes.

Q.    Do you remember generally what it was about?

A.    I won't remember specifics, but as I recall, she and her co-authors were urging the university to, um, I believe it was to respect the decision of some sort of -- maybe it was like faculty or a student governance body on campus, as concerned the measures regarding, um, other statements on divestment from Israel, and statements related to the ongoing Israeli bombardment of Gaza at the time.

Q.    Okay, you said that when you saw the video you felt frightened and disturbed.  Why did you feel frightened and disturbed?

A.    So in the first place, because I looked at Rumeysa Ozturk as somebody who could be, um, you know potentially one of my students, someone for whom I feel like -- like a kind of presumptive feeling of caring and concern, and also because she was somebody that I could identify with myself.  And this feeling grew more acute

for me as I learned she was apparently being detained mostly, as far as I could read, entirely on the basis of this Op-Ed, particularly because I myself had recently drafted an Op-Ed that was critical of the Trump administration.

Q.    Okay, and I want to ask you about that in a moment.  But if I could just ask you to elaborate on why you felt identification with Ms. Ozturk?

A.    Like Ms. Ozturk, I had some connection to being critical of, um, let's say Israel's track record on the human rights of Palestinians, um, and so there was a connection between the kind of speech I engaged in and the kind of speech she was being detained for having engaged in.  Like Ms. Ozturk, I'm not a citizen of this country, so it struck me that any treatment she was subjected to could be treatment I could be subjected to for engaging in political expression.

Q.    And you just mentioned a track record of criticism of Israel.  Can you tell us specifically what you have in mind?

A.    Sure.  So for one thing, as I stated earlier, I'm a DSA member, and I take it that DSA membership per se is a kind of connection to, um, a criticism of Israel state policy with respect to Palestinians, because DSA has these national commitments to campaigns like BDS.  I

had also done things like visiting the students', um, encampment on Northwestern's campus the previous spring at which students were making, or for instance calling for a cease fire and making, um, and demanding, um, Northwestern University's divestment from some military funds that were helping continue the bombardment.

Q.    Tell us briefly about that student encampment and about your attendance at that protest?

A.    So in spring of 2024, at Northwestern University, as with many universities across the country, there was an encampment where some of our students camped out on Deering Meadow, the big open space on campus.  I visited that encampment, and did this of course to protest, um, like Israeli, um, attacks on Gaza at the time.  I visited this encampment on two occasions to, um, show support for the students.

Q.    And when you say "show support for the students," what do you mean exactly?

A.    So, first of all, I was in sympathy with some of the students' demands, for instance the demand for a cease fire.  Secondly though, these are students on my campus and I felt that they had a right to be engaging in this, as far as I could tell, this entirely peaceful protest, um, and I wanted to show them, against these kind of threats of being dragged off the field by

police, for instance, that some of their faculty supported them in engaging in their political expression.

Q.    Okay.  Now when you went to these encampments -- or to that encampment in 2024, did you have any concern that, um, attending that protest could affect your immigration status?

A.    That wasn't on my radar, no, I didn't suspect that.

Q.    Did you have any concern that attending that protest could potentially have an adverse consequence on your job at Northwestern?

A.    That was on my radar, that was something that occurred to me as a possibility.

Q.    And why was that?

A.    Um, I mean it's not an entirely new phenomenon, that discussing, um, criticism of say Israeli military engagement in occupied territories is kind of a sensitive topic in U.S. universities.  And so it occurred to me as possible that certainly my administration would rather the students not be there, and my showing of support for the students could be construed as like a kind of adversarial, um, stance towards the university.

Q.    But given that concern with respect to your

employer, you nonetheless attended that protest, correct?

A.    I did.

Q.    Now let me ask you just briefly, and then I want to turn to another topic you mentioned, you spoke also about the national DSAs -- being associated with the national DSA's position on Israel, Palestinian, specifically the Boycott Divest and Sanctions movement, and you testified previously about attending protests as a member of the DSA.  At those protests, was the Israel/Palestinian issues one of the topics that people were protesting about?

A.    It was.

Q.    Let's turn now to the Op-Ed that you mentioned that you drafted.  Tell us about that, when did that occur?

A.    So I drafted this Op-Ed, um, near the end of March, I believe it was March 22nd specifically.  This Op-Ed concerned, as I framed it, what it would look like to draw meaningful red lines.  This is -- what I meant by that is that among those of us who were critical of many of the policies of this federal administration, what it would look like to demarcate certain political events, um, certain incremental moves towards authoritarianism, as I would characterize it, as

significant, and as prompting special action.

Q.    And I think you testified that you in fact drafted this Op-Ed, is that right?

A.    I did.

Q.    Okay.  I'd like to show you Exhibit D for identification.

MR. BIALE:  And, Mr. Kumar, if we could pull that up.

(On screen.)

Q.    Ma'am, do you recognize this document?

A.    I do.

Q.    And what do you recognize it to be?

A.    I recognize it to be the Op-Eds that I drafted in March of this year.

Q.    Okay.  And, um, what you're seeing right now on the page is just the first page.

MR. BIALE:  Mr. Kumar, if you could show the witness how many pages it is.

(Scrolls.)

Q.    Okay.  Is that the entirety of the Op-Ed that you drafted?

A.    It is.

MR. BIALE:  Your Honor, we offer Exhibit D.

MR. KANELLIS:  Your Honor, objection, and let me articulate, it's important.

THE COURT:  Please.

MR. KANELLIS:  *Callasandro* -- this is not 8033, it's the *Callasando* decision, 100 F3rd 203, the First Circuit 1996 says that 8033 applies only to the extent --

THE COURT:  That's why it's offered.

MR. KANELLIS:  There's no other basis?

THE COURT:  Well let me ask a couple of questions.

Whatever became of this, ma'am?

THE WITNESS:  So while I drafted this Op-Ed, I subsequently decided, um, related to the fact that three days later Remeysa Ozturk was detained for having co-authored an Op-Ed, that it would not be safe for me to try to publish it, even though I had in the past published things that are critical of the Trump administration.

THE COURT:  And so where had this resided since that determination and until today?

THE WITNESS:  On my computer.

THE COURT:  All right.

I'm going admit it.  It has nothing to do with hearsay.  This is an example of what was withheld from intellectual discourse.  It's admitted, Exhibit 66 in evidence.

MR. BIALE:  Thank you, your Honor.

MR. KANELLIS:  For clarification, your Honor, is it admitted for the contents?

THE COURT:  No, it's admitted for the fact of its existence.

MR. KANELLIS:  All right, I just wanted to be clear.

(Exhibit 66, marked.)

Q.    Ms. Hyska, if you could take a look at what's now been marked as Exhibit 66, and I'd like you to look at, on Page 2, that sort of final big paragraph.

A.    (Looks.)

Q.    Take a moment to read it.

A.    (Reads.)  Do you want me to read it aloud?

THE COURT:  No, that's not necessary.

Q.    Just refamiliarize yourself with it.

THE COURT:  And again, I don't mean to be disrespectful, but it's now in evidence, so I'm going to read it.

MR. BIALE:  Understand, your Honor.

A.    (Reads.)

Q.    Okay, have you read it?

A.    I have.

Q.    Can you tell us what are some of the things you were referring to in this paragraph?

THE COURT:  Well I guess I don't understand,

especially given the defense's objection here.  This is -- I've admitted it for the facts of its existence.  This is her expression.  Only it's stunted expression, assuming the Court believes her, because of her fear, among other things, of her immigration status.  So assuming, and it appears she writes well, one can understand what she was saying.

MR. BIALE:  Understood, your Honor, and I certainly agree as far as that goes --

THE COURT:  I'm always happy to get your agreement.

(Laughter.)

THE COURT:  Go ahead.

MR. BIALE:  I'm happy to make you happy, your Honor.

I just wanted to establish through the witness with respect to some of what she was talking about why she had specific fear about publishing this Op-Ed.

THE COURT:  And I'll permit that.

MR. BIALE:  Okay.

Q.   So, Ms. Hyska, having read this paragraph again, was there something specific that you were referencing that raised a concern for you?

A.   Yes.  So, um, I mean in this passage what I make reference to is the kind of fear, I think I describe

this as a kind of impersonal fear that some people are experiencing, but this is the very fear that I was experiencing.  Fear that I might -- that it might not be safe for me to engage in certain forms of expression, that, um, it might be risky for me to leave the country and try to come back in, that potentially even ultimately it would be so unsafe for me to engage in political expression that I would have to move abroad. It's personal fears that I'm describing in an impersonal manner here in this passage.

Q.    Okay.  And I think you mentioned you talked a little bit about why you ultimately felt that it was, um, you ultimately decided not to publish the Op-Ed. Can you tell us a little bit more about why you felt that was too risky?

A.    Well, yeah, I'll just say that this Op-Ed was, um, in other passages, aside from the one that I just looked at in particular, was critical, I think of the Trump administration.  The premise of the Op-Ed is the Trump administration is doing bad criticizable things that we should organize against.

Because it was evident to me, on the basis of the detention of people like Mahmoud Khalil and Rumeysa Ozturk, that this administration was potentially willing to use immigration enforcement as a tool to retaliate

against people who criticized it or its preferred policies, it struck me too that I could be potentially detained and deported on the basis of publishing something like that.

Q.    And, um -- and the Court asked you where it's resided.  Just for the record, did you ever publish this Op-Ed?

A.    I did not.

Q.    Now you talked about some of the protests that you attended prior to March, 2025.  Did you attend any protests subsequent to March 2025?

A.    I did not.

Q.    Did you --

A.    Oh, I'm sorry, there was one protest that I attended in early April.

Q.    Okay.  Can you tell us about that protest?

A.    Yeah, this was the Chicago instance of the national Hands-Off protest, this was like a set of national protests that were protesting kind of like a wide range of Trump administration conduct.  And I attended it, as I say, in Chicago.  And it stands out in my mind because I felt an unusual degree of anxiety about attending a protest.  As I said, I've attended a lot of protests in the past, so that wasn't normal for me.  And in this case I took the measure of like wearing

a mask, like a safe-covering surgical mask, to the protest, because I hoped that that meant that I wouldn't be like easily identifiable and photographed if any were taken at the protest.

Q.    And why were you concerned about being identified at the protest?

A.    So being at the protest clearly amounted to engaging in speech that was critical to the Trump administration, issues having to do with Israel and Palestine were among the things that were being protested at that event, along with other things.  I was aware that if I was associated with that kind of like public or political dissonance, that could be the basis for my being targeted for, for instance -- by, for instance, immigration enforcement.

Q.    Prior to that protest in April, had you ever worn a mask at a protest before?

A.    Well I had done so, it was only during the height of the Covid 19 pandemic, so it was for public health reasons, not reasons of wanting to hide my face.

Q.    Okay.  Had you ever worn a mask at a protest specifically to hide your identity before?

A.    No.

Q.    And now other than this protest that we mentioned just now in April, have you attended any other protest

subsequent to the events in March 2025 that we've been discussing?

A.    I have not.

Q.    Were there any protests that you wanted to attend?

A.    There were.

Q.    Can you tell us specifically if any come to mind?

A.    The two that come to mind, um, one was there was a series of protests that were co-organized by Chicago DSA around May Day of this year, so it would have been between May 1st and 5th, there was a protest about labor rights issues, but those were also connected to immigration.  I felt pretty confident that I would have tried to attend one of those, um, but for my feeling that it was now unusually risky for me to attend protests.  And the other that comes to mind is the national No Kings protest that took place in cities around the country, including Chicago, a couple of weeks ago.

Q.    And just to clarify, why did you decline to attend those protests?

A.    Because I felt particularly afraid of being associated with, um, with that political speech.

Q.    I'm sorry, I didn't mean to interrupt you.

We spoke earlier about, um, after Mr. Trump was elected, um, and around the time that he was

inaugurated, you were interested in becoming more involved in the work of the DSA.  Can you tell us a little bit more about that?

A.    Yeah, so I took some initial steps towards getting that deeply involved in the Chicago chapter of the DSA in the early days of this Trump administration.  I started attending like a reading group that DSA members were running.  And I attended in March a general chapter meeting, these are these meetings that we hold quarterly as a chapter.  And at that meeting the chapter -- the chapter membership approved a new priority campaign that they called the Unite and Fight campaign, and this is a campaign that was designed to basically resist the Trump administration's policy on a number of fronts, including immigration and trans rights.  I considered it at that time, because I was feeling deeply passionate about some of those issues, and particularly the immigration immigrant rights issue, putting my name forward just on the steering committee of that campaign.  But this was right around the time that I started to feel that actually that would be too risky a move given my immigration status.

Q.    And before we get to that, can I just ask you, um, what steps if any did you take to, um, explore this possibility of getting back onto steering committee?

A.    Uh-huh.  So I did attend one or two initial meetings of this campaign, which was prior to the sort of campaign-specific steering committee being appointed. You know I acquainted myself with the priorities of the campaign as the chapter membership had rendered them.  I had some initial discussions with other members of the chapter.

THE COURT:  Mr. Biale, my practice is to take a morning recess at about 10:45.  But I can stay longer if you're about done.

How much more have you got?

MR. BIALE:  So, your Honor, I would estimate that I've got 10 to 15 minutes left.

THE COURT:  Make it 10 and we'll stay.

MR. BIALE:  I will do my level best, your Honor.

Q.    And so just tell us, you mentioned it before, but what happened with those steering committee positions that you, um, explored taking on with the DSA?

A.    I, in the end, did not put my name forward.  And the same can be said for another leadership opportunity with the DSA that I'm refraining from applying for.

Q.    Why did you not put your name forward for those two leadership positions?

A.    Because when I was just possibly attending meetings struck me as low profile and low risk, but

sitting on a steering committee, being a delegate to the national DSA convention -- that's the second leadership opportunity that I didn't end up pursuing, those struck me as potentially more high-profile things, things that might make me more public-facing on behalf of the DSA and for things that might be riskier to engage in with respect to my immigration status.

Q. Now I want to ask you, and I'm going to try to go quickly here.

Prior to March of 2025, had you signed on to any public statements, um, that touched on in any way the Israel/Palestinian situation?

A. Yes.

Q. Okay. I'd like to show you what's been marked for identification as Exhibit C.

Do you see that?

A. I do.

Q. What do you -- do you recognize this document?

A. I do.

Q. What do you recognize it to be?

A. I recognize it to be an open letter that was addressed to the President and provost of my university, Northwestern and, um, basically calling on higher administration to like, as it says in the title, not ban protests at Northwestern. This was with reference to

student encampment.  It was asking our administration to respect the students' rights to engage in protest.

Q.    Okay.  And did you sign this letter?

A.    I didn't.

MR. BIALE:  Your Honor, I would offer Exhibit C.

THE COURT:  Any objection?

MR. KANELLIS:  Well it's hearsay, but we won't object as a courtesy.

MR. BIALE:  I appreciate it.

THE COURT:  Since there's no objection, it's Exhibit 67 in evidence.

(Exhibit 67, marked.)

Q.    Now, subsequent to the, um, events that we discussed in March of 2025, did you sign on to any public letters about the Israel/Palestinian situation or in any way related to it?

A.    Subsequent to March 2025, I signed on to a couple of open letters, um, one of which could be construed as I think connected to Israel/Palestinian specifically.

Q.    Okay, and tell us why you signed on to that letter?

A.    So the letter I have in mind is one, um, that was sort of protesting or taking issue with a tenure denial that took place at one university.  Um, it was widely felt, and I share this feeling, that although this is

not the reason given by the university, the faculty member whose tenure was denied is somebody who had been very publicly associated with defending the students at the encampment the spring before, um, and it was felt that his tenure was denied in retaliation for the political speech engaged on the campus.

Q.    Now is there any distinction in your mind between that letter and this letter, Exhibit 67, in terms of why you signed it?

A.    I mean they address slightly different situations, but otherwise, um, I think they have some of the same features.

Q.    Okay.  And was the letter that you mentioned regarding tenure, was that, um, a public letter, was that published?

A.    So that was, um -- yes, that letter, um, was not one the primary intention of which I understood to be -- that it would be like published along with all the signatories in, for instance, the Daily Northwestern, the campus newspaper.  When I signed on to this statement from December 2024, I understood that my signature would be made public.

Q.    Did you feel comfortable signing a letter where your signature would be made public after March of 2025?

A.    I began to feel much less comfortable about it.

Q.    Okay.  And, um, putting aside the letter about tenure, did you sign any, um, letters or petitions that were published on the internet after March of 2025?

A.    I did, yes, and in fact one in particular that I can remember that was quite clearly connected with issues related to Israel/Palestinian.  Shortly after Mahmoud Khalil's detention, I encountered an online petition that concerned like, um, called for his release basically, and what I remembered feeling strongly about, is that I really wanted to sign on to like add my voice to this sentiment, so far as I could, but that I was now very worried that being associated with Mr. Khalil, with pro-Palestinian politics publicly in that way, was very risky.  So I took the unusual step of signing under a pseudonym, I used my mother's maiden name.

Q.    And you say it was unusual.  Have you ever signed any other letter using your mother's maiden name?

A.    Not in a political context.

Q.    Okay.  Now we talked a little bit about -- at the very beginning about courses that you teach that touch on political issues.  Are you planning to revise any of your syllabi in light of the issues that we've discussed today?

A.    For a while I've been on research leave and so I haven't taught since the beginning of the current

administration, but this is something I had on my to-do list, to revisit those places where I discuss, for instance, um, colonialism, a topic that it's hard to discuss these days without it being connected to discussions of the characterization of Israel settling its colonial state, for instance, whether that's now sort of too hot a topic, too risky a topic to teach in my classroom.  To revisit those cases where I talk about socialism, racism, things like that in the class as well.

Q.    And when you say you're going to revisit them, what do you anticipate you're going to do?

A.    I anticipate it's possible that I decide to cut those things from any syllabus.

Q.    Now you spoke in your Op-Ed about issues of travel.  Have the events we discussed of March 2025 affected your travel plans in any way?

A.    They have.

Q.    How so?

A.    I -- if determined that, um, as long as this risk of sort of political retaliatory immigration enforcement remains, I will not leave the country, um, because I fear extra scrutiny upon trying to reenter it.  And so while I routinely, for instance, travel internationally for work, I've decided not to pursue international

opportunities to present my work for the foreseeable future.

Also on a personal note, my mother's retirement was this May and I wanted to go back to Canada to celebrate, but did not do so, because I feared the risk of scrutiny upon reentering the country, that I would have my green card revoked.

Q.    And what do you fear will happen when you reenter the country?

A.    So I fear that my name will be run through a system that will be associated with some of the political speech that I've already engaged with -- engaged in rather, um, and that for that reason I'll be denied entry, potentially be detained and be deported.

Q.    And more broadly --

MR. BIALE:  I've got maybe three more questions, your Honor.

Q.    More broadly, have the, um, policies and practices that we've been discussing affected your future plans?

A.    They have.

Q.    How have they affected them?

A.    So I am very happy in my current position at Northwestern University, I -- as I stated earlier, I had intended to remain at Northwestern, to go for tenure the next year, to continue supervising graduate students

there, but I have felt such acute, um, stress and fear about the prospect of engaging in political speech in this country that I've concluded that I want to go on the job market this coming fall to hopefully find employment outside of the United States.

Q.    And have you begun to take any steps to do that?

A.    I have.  I, for instance, contacted, in one case, a potential reference letter writer.

THE COURT:  Sorry, I've didn't understand that. You've contacted a --

THE WITNESS:  A reference letter writer.

THE COURT:  Yes, thank you.

Q.    And that's one of the supervisors of your dissertation?

A.    Yes, it's one of the committee members of my dissertation.

Q.    Now are you familiar with the term "ideological deportation policy"?

A.    I am.

Q.    What do you understand that term to mean?

A.    I understand it to refer to the policy of targeting, um, individuals for immigration enforcement and deportation because of their expressed political belief, their political speech.

Q.    And has any of what we've discussed today, any of

the events we've discussed today, constitute examples of that policy in your mind?

A.    In my mind the detention of people like Mahmoud Khalil, like Rumeysa Ozturk, um, like others we haven't discussed, um, yes, those are instances of that policy being applied, in my mind.

Q.    And if that policy were to be declared illegal and enjoined, would that affect your behavior in any way?

A.    It would.

Q.    How would it affect your behavior?

A.    Well I would be very happy, for instance, not to apply out for other positions and just to remain in my current job here in the United States, I would feel comfortable doing that if I didn't think that I was at risk of losing my immigration status because of my political speech, if that was enjoined by the Court.  I think I would also feel comfortable going back to engaging more thoroughly in DSA work, potentially in leadership positions, and in writing and submitting for publication things like the Op-Ed that I drafted back in March.

Q.    A final question.  You've talked about the fears that you have and the concerns that you have.  Why did you decide to testify in this case, which is being heard in a public courtroom?

A.   I -- yeah, I've experienced considerable trepidation about participating in this case, um, because, as you say, it involves very public, political speech.  I take comfort from the fact that the judge has -- he very explicitly in this case told the government they may not retaliate against people for being witnesses in this case.  I do have remaining concerns for my safety.

The difference though between participating in this case and the other forms of speech that I said I regarded as too risky, as not ones I was willing to participate in, was in this case I felt like I understand the nature of the case and what was required, in order for it to move forward, was for noncitizens to be able to speak to what it's like to be in this country right now, what it's like to experience this level of fear over political speech that we would like to engage in.  The other kinds of political speech that I wanted to engage in these past months, I felt like "Well I guess a citizen could do that and do it with less risk than I face."  But in the case of this court case, I feel that's not so.  If noncitizens aren't willing to take the risk, then it wouldn't move forward at all.  So although I've experienced a lot of anxiety around it, I felt like it was something that, based on my political

beliefs and moral commitments, I have to do.

THE COURT: Thank you.

Do you wish to examine this witness?

MR. KANELLIS: Yes.

THE COURT: We'll do that after the recess.

We'll take the recess now until 20 minutes after 11:00. We'll stand in recess.

MR. BIALE: And may the witness stand down from the witness stand?

THE COURT: Oh, she may. She need not sit there.

(Laughter.)

MR. KANELLIS: Your Honor, I'm sorry, did you say 20 after 11:00?

THE COURT: That's what I said.

MR. KANELLIS: Thank you.

THE COURT: We'll recess.

(Recess, 10:45 a.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Monday, July 7, 2025, to the best of my skill and

ability.




/s/ Richard H. Romanow 07-7-25
_____
RICHARD H. ROMANOW  Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY


AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
            Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
            Defendants


********


BENCH TRIAL DAY 1 - VOLUME 2

July 7, 2025
11:22 a.m.


BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE



United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210



********



Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
     Knight First Amendment Institute at Columbia
     University
     475 Riverside Drive, Suite 302
     New York, NY 10115
     (646) 745-8500
     Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
     Sher Tremonte LLP
     90 Broad Street, 23rd Floor
     New York, NY 10004
     (212) 540-0675
     Nbiale@shertremonte.com
     Cgans@shertremonte.com
     For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
     DOJ-Civ
     P.O. 878
     Ben Franklin Station
     Washington, DC 20044
     (202) 616-9123
     Ethan.kanter@usdoj.gov
and
SHAWNA YEN
     United States Attorney's Office
     1 Courthouse Way, Suite 9200
     Boston, MA 02210
     Shawna.yen@usdoj.gov
     For Defendants

INDEX

WITNESS                                              PAGE


MEGAN HYSKA

    Cross-Examination By Mr. Kanellis              82
    Redirect Examination By Mr. Biale             120

NADJE AL-ALI

    Direct Examination By Mr. Biale               123



        E X H I B I T S


Exhibit No.                    Received


    68                              114

    69                              116

P R O C E E D I N G S

(Resumed, 11:21 a.m.)

MR. KANELLIS:  Your Honor, William Kanellis for the Justice Department.

CROSS-EXAMINATION BY MR. KANELLIS:

Q.   Let's start this off the right way.  Hyska, Professor Hyska?

A.   That's correct.

Q.   Let's talk a little bit about your background.  You are a professor of philosophy at Northwestern?

A.   Correct.

Q.   And you teach, among other things, about the philosophy of language?

A.   I do.

Q.   Okay.  Continental school or analytic school?

A.   Analytic.

Q.   Analytic, so more Frege than Husserl?

A.   Correct.

Q.   Very good.

You talked about political propaganda, and I believe, if I have you correctly, you discussed that you teach about the mechanisms by which we get messages across to one another; is that right?

A.   Sure, yes.

Q.   That's one of the things that you teach about.  And words

are among the things that we use to get messages across to one another, right?

A.   Sure.

Q.   I mean, you teach about semantics, so words are very important to you, correct?

A.   Sure.

Q.   Now, one of the words that was discussed in your direct examination was ideological deportation policy.  Do you remember that discussion?

A.   I do.

Q.   And the ideological deportation policy, in your mind, and correct me if I'm wrong, is based upon your interpretation of events happening within the U.S. Government, right?

A.   Events happening, you know, out in the world as well, insofar as these detentions are part of what I see as the expression of that policy.

Q.   And that policy is manifested in words of various sorts, right?

A.   It's partially manifested in words and also in actions.

Q.   And what words do you refer to or do you mean to refer to in the thinking about what is this ideological deportation policy?

A.   Well, I'm thinking about what I alluded to earlier, for instance, where there are statements made by officials within the Trump administration, statements using words that seem to

communicate that it was on the basis of speech that these high profile detentions were made, for instance.  So those words I guess are part of the policy.

Q.    Okay.  And those words were words you read on the internet?

A.    Correct.

Q.    And those words were video reports of things that people said about what was said by the administration?

MR. BIALE:  Objection.

THE COURT:  Well, no.  He may ask the question in that form.

A.    If the question is was there an instance where it's a video of a Trump administration official that was the basis for my conclusion of that this policy was in place, I can't remember an exact instance where that would have been the case.

Q.    Okay.  What about executive orders; do you know what executive orders are?

A.    I do.

Q.    Have you heard about executive orders relating to what you describe as the ideological deportation policy?

A.    I'm not familiar with a specific executive order.

Q.    Other than what you've read on the internet and what you may have seen in media, do you have any other basis to assign this ideological deportation policy to the U.S. government?

A.    I just know what I see in reporting.

Q.    You know what you see in reporting.  You're not a member of the United States Government; you never have been, correct?

A.    Correct.

Q.    You aren't privy to the internal communications of the United States Government regarding the arrests and revocations of visas of students that you described in your direct examination, right?

A.    That's correct.  The only note I would make is that in one case that I can think of some internal communications was reported on, so I know about it indirectly.

Q.    Okay.  Do you believe the United States has a legitimate interest in combatting antisemitism?

        MR. BIALE:  Objection.

        THE COURT:  I'm not clear what's meant by antisemitism here.

        MR. KANELLIS:  I can clarify.  I can lay that foundation.

        THE COURT:  You go right ahead.

BY MR. KANELLIS:

Q.    Do you have an opinion about what the word "antisemitism" means?

        THE COURT:  You're asking her view of what that word is.

        MR. KANELLIS:  Yes, sir.

A.    Yeah.  I mean, I take antisemitism to refer to hatred of

Jewish people.

Q.   Okay.  And if there was a U.S. Government policy that was attempting to combat antisemitism, would you have a problem with that personally?

          MR. BIALE:  Objection.  I'll withdraw the objection.

          THE COURT:  It's withdrawn.

A.   Well, to be clear, I have a great problem with antisemitism myself.  I think it's of course an abhorrent ideology.  I would of course have questions about what means the U.S. Government was using to combat antisemitism.

Q.   Of course.  You indicate -- sorry.  Did you have -- okay.  You indicated that you are a member of the DSA?

A.   That's correct.

Q.   And that's the Democratic Socialists of America?

A.   Correct.

Q.   Bernie Sanders and AOC are both members --

A.   Correct.

Q.   You talked about, I think what I would characterize as your decision to restrict your involvement with the DSC in March or so of 2025.  Did I get that right?

A.   Correct.

Q.   Okay.  And with respect to your decision, that was your decision.  No one forced you to withdraw your participation in that organization, did they?

A.   Certainly nobody told me I had to, but I did feel like I

was under pressure from external forces.

Q.   You were under pressure from external forces.

Did anybody from the government write you a letter and express concern about your involvement with the DSC?

A.   They did not.

Q.   Did anybody from the government send you a message of any kind that would lead you to believe that you were being pressured to lessen your involvement with the DSC?

A.   So certainly nobody from the government addressed a letter to me in which they said something like that.  But if the question is do I feel like I was on the receiving end of messages from the federal government to that effect, I think I would say that I did.

What I have in mind here is, for instance, President Trump made publicly communicating on social media about how, for instance, Mr. Khalil's arrest was the first of many arrests to come.

Q.   Okay.  And do you have an understanding of the basis for Mr. Khalil's arrest?

A.   I believe I have some understanding.

Q.   You have some understanding.  Do you have -- were you privy to any of the internal communications of the United States regarding why Mr. Khalil was arrested?

A.   So I was not.  But of course I did follow the trial concerning Mr. Khalil's eventual release from detention, in

which, as I understand it, the government had some reason to present what their reasons for his detention were, and in which, as I recall, the judge concluded that there was something to the idea that Mr. Khalil had been detained on the basis of his speech.

Q.   And has that litigation been resolved to your understanding?

MR. BIALE:  Objection.

THE COURT:  He may have it.  Just what she understands.

A.   I understand that Mr. Khalil has been released from detention.  I don't know whether -- I don't understand whether that is the full legal matter having been resolved.

Q.   And with respect to the messages that were sent to you by the United States Government, what other messages did the U.S. Government send to you that caused you to lessen your involvement with DSC?

MR. BIALE:  Objection.  Misstates the testimony.

THE COURT:  No.  He's using it in the broadest sense, at least that's how I understand it.  And if the witness understands it, she may answer.

A.   So if the question is appropriately understood as what are the things that have been said publicly that I've taken as indications --

THE COURT:  Actually, I'm interested in public or

communicated from peers or the like, that type of thing.

What things that you -- if I think he's asking and I'm interested, what things that you take are expressions of United States Government policy that got to you, affect you in the way that you've testified.

A.    Right.  So things that come to mind.  First of all, there are like clusters of social media posts around the detention of Mr. Khalil.  As I've mentioned already, President Trump's post on Truth Social.  There were also posts by the White House's X account, in which they -- which said something similar.  I believe the Department of Homeland Security also had an X account where they publicized Mr. Khalil's detention.

I'm also thinking, though, of like a kind of range of policies that the Trump administration is engaging in where I feel like their officials have communicated a kind of attitude toward noncitizen speech.

So what I have in mind here, for instance, is that over the last few weeks, as I understand it, the State Department has put into place a new additional set of screening mechanisms for international students and scholars who are applying for visas to come to this country.  And in a message to, like, foreign diplomatic missions, I've read a reporting indicating that Secretary of State Marco Rubio instructed consular officials to screen students on the basis of whether they expressed, say, on their social media, hostility toward the

United States, which included hostility toward the United States Government and instructed them to vet on the basis of whether those students had engaged in political activism.

Now, that to me suggests that this administration is interested in using a wide range of tools at its disposal to prevent noncitizens from engaging in political dissent on a pretty wide range of topics, actually.

Q.   All right.  And with respect to the communications you feel were directed at you, other than that, you haven't received anything, a personal message from the government to tell you to withdraw or refrain from engaging in political speech of any kind; isn't that right?

A.   No.  Correct.

Q.   Let's talk about social media.  You have several social media accounts, don't you?

A.   I do.

Q.   Okay.  And let's just go through a few.  Well, before we get there, let's talk about your professional publications.  You've described a few of them in your direct examination.  The government hasn't in any way prevented you from publishing anything since 2025, has it?

A.   Well, as I stated in my direct examination, I do feel that in a sense I was prevented from feeling safe in publishing this op-ed that I had drafted.

Q.   And that's your feeling, correct?

A.   That's my feeling based on statements made by government officials that have been reported on.

Q.   Okay.  But with respect to your professional publications, you've been quite active in 2025, haven't you?

A.   I hope so.

Q.   Things are going well for you, aren't they?

A.   We'll see what the tenure committee thinks.

Q.   Fair enough.

In January of 2025, you spoke about an article on "The politics of past and future:  synthetic media showing and telling," isn't that right?

A.   Can you repeat the question.  Did I give a presentation on that in January of this year?

Q.   Yes.

A.   Forgive me.  I'm just remembering the order of presentations.  Can you remind me where I would have given that presentation?

Q.   If you don't remember, ma'am, that's fine.  We'll move on to some others.

In February you spoke at the University of Chicago, correct?

A.   Oh, I was invited to give a talk at the University of Chicago in February.  I in fact had to pull out at the last minute.

Q.   Okay.  Was that pulling out, did that have anything to do

with the Trump administration?

A.    It did not.

Q.    Okay.  Now, in May of 2025, May of 2025 is after you claim you were aware of this ideological deportation policy, correct?

A.    Correct.

Q.    In May of 2025, you gave a public presentation at Virginia Tech, correct?

A.    Correct.

Q.    That relates to your professional work you do as a philosopher, correct?

A.    It does.  I might mention that the work I was presenting there didn't strike me as particularly politically sensitive, though.

Q.    Okay.  In June you spoke at a Brown conference, correct?

A.    I did.

Q.    Brown University?

A.    I did.

Q.    And you spoke about deep fakes and political mobilization; isn't that right?

A.    I did.

Q.    Those are subjects that you spoke about publicly.  And those subjects were, you addressed publicly after this ideological deportation policy came into effect in your opinion, right?

A.    So while it is correct, I would just note that there's

public and then there's public, right?  An op-ed in a major national newspaper is going to reach an audience of a different size than a talk to a small room full of students at Brown University.

Q.   Did you talk to the people at Brown about who was or was not going to be admitted to the talk at Brown?

MR. BIALE:  Objection.

THE COURT:  Overruled.

A.   Sorry.  Can you repeat the question?

THE COURT:  His question is did you have anything to say about who was admitted to the talk you gave at Brown.

A.   No, I did not.

Q.   Did you try to limit the participants in this talk you gave at Brown?

A.   No, I did not.

Q.   That was a few weeks ago, wasn't it?

A.   Correct.

Q.   Right.  And with respect to any of the other presentations that you've given this year, did you try to limit the participants in those conferences?

A.   I did not.

MR. KANELLIS:  Bear with me, Your Honor, my phone somehow disabled my line of questions.

THE COURT:  It's happened to me, too.

Q.   You have several internet accounts, correct?  Internet

social media accounts, I apologize.

A.    Correct.

Q.    One of them is a Twitter account?

A.    Or as well call it now an X account, yeah.

Q.    An X account.  And prior to 2025, you had not engaged in any messaging about Palestine or Israel on your X account, correct?

A.    Correct.  Though I'll just note that I haven't actively used my X account in some years on any topic.

Q.    Okay.  But you didn't, certainly if you haven't used it in several years, the conflict in Palestine goes back many, many years, correct?

A.    Correct.

Q.    And at no point in time --

      MR. KANELLIS:  I apologize, Your Honor.  I don't know what's happening.

      THE COURT:  Cut to the chase, when he's asking the question, have you spoken about that conflict on any of your social media accounts?

      THE WITNESS:  I have not.

      THE COURT:  I mean before or after the matters you've testified about here.

      THE WITNESS:  Yeah.  Neither before nor after was I in the habit of using social media to talk about this.  I have hardly used social media at all in some years, I'll just note.

MR. KANELLIS:  Your Honor, thanks for cutting to the chase.

BY MR. KANELLIS:

Q.   That was exactly my point.  You have a Bluesky account, correct?

A.   Correct.

Q.   You have a Facebook account, correct?

A.   Correct.

Q.   You have an X account and you have an Instagram account, correct?

A.   That's correct.

Q.   And on none of those accounts at any point in time have you referenced Palestine or Israel; isn't that correct?

MR. BIALE:  Objection.

THE COURT:  Overruled.

A.   That's correct.  In general, social media is not how I choose to engage in political speech on any topic.

Q.   Okay.  You do continue to engage in protests, though, don't you?

A.   As I stated in my direct, I haven't attended a protest since early April.

Q.   Early April.  Well, in March of 2025, this year, that's when you became aware of the arrests of Khalil and Ozturk, correct; that's what you testified?

A.   Correct.

Q.   So you were aware of this threat that you described in March.  And in March of this year, you attended a Unite and Fight meeting, correct?

A.   I believe that what -- I believe that's correct.  I don't remember whether the Unite and Fight campaign meeting was the end of March or beginning of April, but yes, that's correct.

Q.   And that was after you became aware of these arrests that you've complained about your direct examination, right?

A.   That's correct.

Q.   And Unite and Fight relates to, was designed to mobilize chapter membership in some issues of particular relevance during the current presidential administration, including immigration and trans rights?

A.   Correct.

Q.   Right?  Fair summary of this Unite and Fight movement that you've participated in?

A.   The Unite and Fight campaign of Chicago DSA, yes.

Q.   And that was, again, after the arrests that you claim frightened you?

A.   Correct.

Q.   You claim these arrests caused you to withdraw from a number of your political activities?

A.   Correct.

Q.   And yet you continued to attend a meeting that was specifically designed to fight against this administration and

its immigration policies, correct?

A.    Correct.

Q.    Okay.  You attended meetings regarding Unite and Fight relating to the deportation of immigrants; isn't that right?

A.    That was among the issues that would have been discussed, yes.

Q.    And that meeting generally concerned ICE raids and deportation of immigrants that people were concerned with and concerned with planning to protest.  That was the subject of the meeting you attended after the arrests of Khalil and Ozturk, right?

A.    That's correct.

Q.    Okay.  And your participation in political speech didn't end there.  You attended book clubs and book club meetings, correct?

A.    I certainly attended book club meetings in the early months of 2025.  I can't recall the exact date of the last book club meeting right at the moment.

Q.    Let's talk about the DSA and the, in your words, if I'm characterizing them correctly, you mitigated your participation in DSA activities because of this ideological deportation policy.  Fair summary?

A.    What I would add is I've specifically pulled back from, like, leadership opportunities within the DSA.  So ways of participating that I anticipated being high profile or

public-facing.

Q.    And is it fair to say that your activity within the DSA, that was the political organization that you were most involved with of all the political organizations that you've described in your direct testimony?

A.    I think that's fair to say.

Q.    Fair to say.  Not AAUP but DSA?

A.    I think that's correct.

Q.    Okay.  Now, by contrast, your participation in AAUP has not been very active.  Is that a fair characterization of your --

A.    While I have been mostly a sort of passive or dues paying but not meeting-attending member of the AAUP since I joined it in 2020, I have recently attended several AAUP meetings.

Q.    You've recently attended in the spring of this year, correct?

A.    Correct.

Q.    That was after the arrests of Khalil and Ozturk, correct?

A.    Correct.

Q.    Okay.  You have no leadership role in AAUP?

A.    Correct.

Q.    In fact, you spend now about 1.5 hours a month on activities relating to AAUP?

A.    I'm assuming that this trial doesn't count, given that AAUP is the plaintiff --

Q.   Other than your preparation for your testimony today, about 1.5 hours total per month is all the work you do for AAUP.  Fair statement?

A.   Fair.

Q.   Okay.  And now, one thing you have done with respect to AAUP is attempt to increase its membership.  You were involved in a membership drive.

A.   I've been involved, yes, in early discussions about a membership drive to take place in the future.

Q.   Okay.  You're trying to draw more members to AAUP?

A.   Correct.

Q.   Why do you do that?

A.   I mean, AAUP is a membership-based organization.  We're more powerful when we have more members.

Q.   It helps AAUP if you have more members than less members.  Fair statement?

A.   Fair.

Q.   It helps AAUP if you are drawing attention to AAUP, right, more publicity to AAUP.  Would you say that's accurate?

A.   I'm not sure I have an opinion on that.

Q.   Okay.  You don't have an opinion either way?

A.   Correct.

Q.   Let's talk about your scholarship a little bit and its relation to Palestine and Israel.  Have you published anything in your public -- I think you said -- let me step back.

You talked about a public face, I think earlier, and you talked about how you think it's important that a philosopher have a public face, right?

A.   I did.

Q.   And to speak out on issues that are pertinent to contemporary society.  Fair statement?

A.   Fair.

Q.   Okay.  Your public face is manifested through your scholarship and public writings.  Fair statement?

A.   Certainly those are among the things that compose it, yeah.

Q.   I mean, the public is not going to see anything you write privately and don't share?

A.   Sure.

Q.   Let me ask you a question.  Have you ever Googled yourself?

A.   At some point I probably have.

Q.   Have you Googled yourself recently?

A.   I can't recall whether I have.

Q.   Okay.  Would you be surprised to learn that there are virtually no Google returns with your name associated with the word "Palestine"?

MR. BIALE:  Objection.

MR. KANELLIS:  I asked if she would be surprised, Your Honor.

MR. BIALE:  What's the relevance?

THE COURT:  Just a moment.  First of all, I'm listening.  I know what you asked.  If I need argument, I'll request it.  And I'll sustain that objection.  Go ahead.

Q.  Are you aware of how many public posts are available in Google, relating to your name and the word "Palestine"?

MR. BIALE:  Objection.

THE COURT:  Sustained.

MR. KANELLIS:  What's the basis for the objection, Your Honor?

THE COURT:  It's irrelevant.

MR. KANELLIS:  It is relevant.

THE COURT:  Well, you say so.  I've made my ruling.

BY MR. KANELLIS:

Q.  You don't have any professional writings that touch upon the subject of Palestine, do you?

A.  While I'm not like an academic subject matter expert about issues related to Israel/Palestine, that's true.  I believe in one paper I do in passing discuss some, like, media around the conflict in Israel/Palestine.

Q.  Okay.  That one instance, other than that one instance, do you recall writing anything else about the issue of Palestine in your professional scholarship?

A.  No.

Q.  You've never been detained by the government, have you?

A.   No.

Q.   You've never been arrested?

A.   No.

Q.   You've never been questioned by government officials?

A.   Can you clarify.

Q.   I can clarify.  In the last six months, since the beginning of 2025, have you been questioned by a government official in any capacity?

A.   Oh, I mean, like, when crossing back into the country in early January, of course a customs official asked me where I was coming from, but aside from that, no.

Q.   And besides from questioning about where you were coming from, have you had any other questions from the government about anything?

A.   I personally haven't.  I will note that my employer has been under heavy scrutiny from the federal government, and I don't know whether that would have concerned questions about me.

Q.   I'm just asking you, in your experience because that's what matters.

     You discussed in your direct examination your writings and letters that you've written.  Do you remember that?

          MR. BIALE:  Objection.

          THE COURT:  That question, he may have.  Do you remember what you've testified to earlier.

A.    I remember that I testified to writing a range of things. I was pausing at the word "letters," but if that refers to an op-ed, then yes, I recall that.

Q.    Okay.  You remember talking about public writings that you've had?

A.    I do.

Q.    And opinions that you've adopted that were shared publicly.  That's what I'm referring to.

A.    Yes.

Q.    Okay.  And I believe that you said in your direct examination that you did not publish that one particular op-ed because you thought you could be detained and deported?

A.    Correct.

Q.    And you said you were frightened and that, because you were frightened, this article sits on your computer, correct?

A.    Correct.

Q.    But in fact, Professor Hyska, you have not been afraid to speak out against the Trump administration since March of 2025; isn't that right?

A.    Well, I have been afraid to speak out, as I testified earlier.

Q.    Okay.  You actually have engaged in public speech against the Trump administration and its immigration policies, haven't you?

A.    Can you clarify what you're referring to?

Q.    We're about to do that.

MR. KANELLIS:  Your Honor, may I approach?

THE COURT:  You may.

MR. KANELLIS:  Let the record reflect, Your Honor, we have paper copies, so if you'll permit me, I have a copy for you.  I have a copy for the witness.  I have a copy for plaintiffs' counsel.  May I approach?

THE COURT:  You may.

MR. KANELLIS:  Let the record reflect the witness has been handed what has been identified as Exhibit GM.

BY MR. KANELLIS:

Q.    Ms. Hyska, if you'll take a moment and familiarize yourself with this document.  I have a few questions on foundation to lay with you.  And when you're done, just please let us know.

A.    Okay, I have briefly re-familiarized myself.

MR. KANELLIS:  Your Honor, I'm going to note that I have a correction to make with respect to this exhibit that she's looking at.  I realize that this exhibit contains -- part of it is not supposed to be attached to this exhibit.

THE COURT:  And is that the part that starts "Supporting"?

MR. KANELLIS:  Yes, sir.  My apologies.

THE COURT:  All right.  We'll take that off.  Go ahead.

BY MR. KANELLIS:

Q.   Professor Hyska, if you can go to the page that states "Supporting Dr. Steven Thrasher."  We're not going to be referring to this at this juncture.

MR. BIALE:  Your Honor, just to be clear, we're removing the last --

THE COURT:  He isn't removing anything yet.  He wants us to look at the GM, which I take it refers only to the Board of Trustees' chair letter.

MR. KANELLIS:  That's correct.

THE COURT:  All right.  He may inquire.  It's not in evidence yet.

Q.   Professor Hyska, can you go to page 0020 and look to the center of that page.

A.   Okay.

Q.   Do you see your name?

A.   I do.

Q.   That name signifies your signature of this document, correct?

A.   It does.

Q.   That name signifies that you more or less adopted the contents of this statement in this letter as you wrote it, correct?

A.   That seems fair, yes.

MR. KANELLIS:  Your Honor, we move in, pursuant to

801(d)(2)(D) and (B), what has been identified as Exhibit GM.

MR. BIALE:  Your Honor, I object.  This exhibit was not listed on the defendants' exhibit list that they provided to us prior to trial.

MR. KANELLIS:  Your Honor, we did provide a list that included this exhibit among the exhibits.

THE COURT:  Well, sort it out.  You can work that out before 2:00.  He may, he can use it for impeachment in any event.  He may ask about it.  Whether it gets in evidence will turn on whether in fact it was given to the plaintiffs.  Ask your question, Mr. Kanellis.

BY MR. KANELLIS:

Q.    This is a statement you signed on to, correct?

A.    Correct.

Q.    And you read this before you signed on to it, right?

A.    I did.

Q.    There was no confusion about what was being said here?

A.    Correct.

Q.    And this, you understood when you signed this that this letter was going to be public; isn't that right?

A.    No.

Q.    You didn't know it would be public?

A.    No, I did not.  I understood this to be a letter that was addressed to the higher administration of my university from its employees.  I was not -- I'm not aware, in fact, whether

this letter ever was made public with the signatures attached in any case.

Q.    Well, the purpose of this letter, which is contained in the first full paragraph, is that you're an ad hoc group of concerned Northwestern faculty.  Do you see that?

MR. BIALE:  Your Honor, objection.  Reading from the exhibit that's not in evidence.

THE COURT:  Well, but --

MR. KANELLIS:  This is an admission, Your Honor.

THE COURT:  Just a moment.  Whatever peripheral relevance this may have is not going to be disturbed by his references to the letter.  I'm reading from it, too.

All right.  And your question is?  She said she wasn't sure whether it was to be made public.

BY MR. KANELLIS:

Q.    But this was a statement that you signed on to, correct?

A.    Correct.

Q.    And it was written to the chair of the Northwestern's Board of Trustees, correct?

A.    Correct.

Q.    And this related to an emergency with respect to what you perceive are issued threats to higher education, right?

A.    Correct.

Q.    You signed on to that, correct?

A.    Correct.

Q.   Now go down to the bottom of the page because that references speaking with one voice, correct?

A.   Which page am I on?

Q.   The first page.

THE COURT:  The first page of the document.

Q.   And in that third paragraph that you signed on to, you state that the Trump administration is breaking laws and trampling on government norms.  That's what you said, right?

MR. BIALE:  Objection.

THE COURT:  Overruled.  She signed on to this.  If that's her view, again, she's entitled to her view and she may be asked about it.

THE WITNESS:  Can you repeat the specifics of the question?

THE COURT:  This part right here, he wonders do you in fact adopt that statement.  He asked you whether you read this. Is that your view, that sentence there?

THE WITNESS:  Yes, I think this describes my view.

BY MR. KANELLIS:

Q.   "The Trump administration is breaking laws and governing norms as fast as possible."

THE COURT:  And "trampling on government norms."

MR. KANELLIS:  My apologies, Your Honor.

Q.   "Trampling on government norms," that's your view?

THE COURT:  And she answered yes.  Let's move on.

Q.   You describe the administration's actions as wildly illegal, didn't you?

A.   So the drafters of the letter drafted it this way, and I signed on, which signaled that I agreed, yeah.  I just want to make it clear I didn't myself draft the letter.

Q.   You didn't draft the letter, but you signed on to it?

A.   Correct.

Q.   Let's go to what has now been marked as Exhibit 67.

     MR. KANELLIS:  And this, Your Honor, we have marked this as Exhibit 67.  It's been introduced in the direct examination.  Our copy is going to be a paper copy of that exhibit, and our copy is denominated GN.

     THE COURT:  Well, it's Exhibit 67.  Let's not complicate things.

     MR. KANELLIS:  I'm just noting the copy I'm giving you is different.

     THE COURT:  Right, fine.

     MR. KANELLIS:  May I approach?

     THE COURT:  You may.

     MR. KANELLIS:  Do you have a copy?

     MR. BIALE:  Yeah.

BY MR. KANELLIS:

Q.   You testified this is another letter you signed on to, correct?

A.   Correct.

Q.   This was published on April 24, 2024.  Okay?  And in this letter you're making note of your disagreement or your desire to have students peacefully protest on campus?

A.   Correct.

Q.   This letter doesn't mention anything about Palestine, does it?

THE COURT:  Well, it says what it says, and it's in evidence, and I'll read it.

A.   I would have to take a moment to revisit the letter to remember precisely what it says.

THE COURT:  We're going to move on in the interest of time.

MR. KANELLIS:  Your Honor, may I approach?

THE COURT:  You may.

MR. KANELLIS:  Let the record reflect that I am handing the witness what has been marked as Exhibit GQ.

BY MR. KANELLIS:

Q.   Ma'am, please take a moment and look at that documents.

     Have you had an opportunity to -- do you recognize this document?

A.   I do.

Q.   Okay.  And this document is entitled "Supporting Steven Thrasher," correct?

A.   Correct.

Q.   Let's go to page -- I'm laying the foundation.

Let's go to page, at the bottom right you'll see enumerated AAUP 00038.

A.    Okay.

Q.    And do you see your name written on this page?

A.    I do.

Q.    Okay.  So you signed this document as well?

A.    I did.

THE COURT:  What's the relevance of this?  These are people who are disappointed that a professor didn't get tenure.

MR. KANELLIS:  That's correct, Your Honor, the relevance is these are public statements.

THE COURT:  What is it?

MR. KANELLIS:  Public statements of the witness after the ideological deportation policy.

THE COURT:  I've allowed, as I think I should, the hostility to the policies of defendants in this case.  What in here pertains to anyone involved in this case?

MR. KANELLIS:  Your Honor, this relates to the professed injury that was discussed on direct examination.  The witness has testified that she was afraid of making public statements after the arrests.

THE COURT:  This is a public statement that has nothing to do with this case or any of the issues in this case.

MR. KANELLIS:  Well, it does, Your Honor, because it shows her participation in public statements about a

demonstration, supporting students in a demonstration about Israel and Palestine.  It's 100 percent related.

THE COURT:  Where is that?

MR. KANELLIS:  Well, that's what underlies the facts; that's the purpose of this letter.  The witness will testify, I'm confident --

THE COURT:  Well, we'll see.

MR. KANELLIS:  -- that Professor Thrasher was involved in a student protest relating to Palestine and Israel, 100 percent.

THE COURT:  Well, let's go there rather than --

MR. KANELLIS:  That's what I'm getting to.

THE COURT:  Let's go there.

Q.   You understand that Professor Thrasher was denied tenure at Northwestern; isn't that right?

A.   I do.

Q.   And you believe that Professor Thrasher, a Northwestern professor, was denied tenure because of his support of students protesting the issues in Palestine and Israel, among other things, correct?

A.   I think that was probably related to his tenure denial, yes.

THE COURT:  Now that I'm coming up to speed, that's the second paragraph in the letter.  So that's why -- I understand, Mr. Kanellis.  All right.

MR. KANELLIS:  It's Kanellis, Your Honor.  Thank you.

BY MR. KANELLIS:

Q.   And this letter was published or was written on March 20, correct?

A.   I see that date at the top of the letter, yes.

Q.   March 20 of this year?

A.   I see March 20, 2025 written at the top, yes.

Q.   And March 20 of this year is after the arrest of Mr. Khalil; isn't that right?

A.   Correct.

Q.   It was after you were aware of this alleged ideological deportation policy, correct?

A.   Correct.

Q.   And you thought it was wrong.  You were speaking out on behalf of this professor's right to defend students who are engaged in protests relating to Palestine and Israel.  That's what you were doing here; isn't that right?

A.   I was taking issue with a decision made by the institution that employed me with respect to Professor Thrasher.  That much is correct.

THE COURT:  You're offering this, Mr. Kanellis?

MR. KANELLIS:  Yes, Your Honor.

THE COURT:  Any objection?

MR. BIALE:  Yes, Your Honor.  I object.

THE COURT:  Overruled, overruled.  It's Exhibit 68.

MR. BIALE:  Your Honor --

THE COURT:  What?  This has not been disclosed?

MR. BIALE:  Correct.  It was not included on their exhibit list.

MR. KANELLIS:  Your Honor --

THE COURT:  Just a moment.  It's included on yours, isn't it?  I have it down here as Exhibit G.  I'm admitting it.  It's admitted, Exhibit 68.

(Exhibit 68 admitted into evidence.)

Q.   There were a number of people who signed this letter, correct?

A.   Yes.

Q.   And your opinion is that after the ideological deportation policy that you've described was put into effect, you were fearful and scared of being deported for making public statements.  Is that your testimony?

A.   I was fearful of deportation on the basis of high profile public speech that expressed dissent with the Trump administration or its policies.  That's my testimony.

Q.   And the policies include Israel, its policies on Israel and Palestine.  Fair statement?

A.   Fair.

Q.   Okay.  Now, there were over a thousand people who signed this document, correct?

A.   I'm double-checking but that sounds right.

Q.    If you look at the last page --

A.    Yes, I see that.

Q.    1,968 people signed this document.

And you believe, it's your testimony that you were fearful that you would personally be singled out for your public speech as a result of the Trump administration's ideological deportation policy?

A.    I was fearful that the forms of speech like writing an op-ed and like being a very public-facing leader of Chicago DSA activities, for instance, is the kind of thing that could result in retaliatory immigration enforcement.

MR. KANELLIS:  Your Honor, may I approach?

THE COURT:  You may.

MR. KANELLIS:  Let the record reflect I am handing the witness what has been marked as GW.

Q.    Please take a moment and review this document.  Let me make sure it's the right one.  Here we go.

A.    Thank you.

Q.    Professor Hyska, have you had an opportunity to look at this document?

A.    I briefly skimmed the first two pages.

Q.    Do you recognize this document?

A.    I do.

Q.    In fact, this is another document that you signed, isn't it?

A.   That's correct.

Q.   You adopted the contents of this document when you signed it, correct?

A.   I endorsed in broad strokes the message in this document.

Q.   You endorsed it?

A.   Yeah, in broad strokes.  I didn't draft it.

Q.   You didn't draft it, but you read it before you signed it, correct?

A.   I did.

MR. KANELLIS:  Your Honor, we move into evidence Exhibit GW and ask for an exhibit number for identification purposes.  I believe, Your Honor, just for housekeeping purposes, I don't know that we assigned a number to the prior exhibit.

THE COURT:  The prior exhibit I marked as Exhibit 68.

MR. KANELLIS:  68, I apologize.

THE COURT:  And this one, any objection?

MR. BIALE:  No objection.

THE COURT:  No objection.  This one I'll admit, Exhibit 69.

(Exhibit 69 admitted into evidence.)

Q.   Professor Hyska, you're aware of something called a National Day of Action, correct?

A.   I believe so, yes.

Q.   What is your understanding of a National Day of Action?

A.   Can you clarify?  Is the question in general or about a specific National Day of Action?

Q.   I'll ask you about your understanding of a specific National Day of Action.

A.   Which specific day of national action?

Q.   Are you aware that there was a National Day of Action that occurred across universities across the United States on April 17, 2025?

A.   Yes, I'm aware of that.

Q.   In fact, Northwestern itself had an event focused on the National Day of Action, correct?

A.   I believe so.  I wasn't in attendance.

Q.   Okay.  And you understand this is also, this letter is dated April 17, 2025?

A.   Yes.

Q.   Okay.  And this letter relates to certain steps that were being taken urging other signers, urging Northwestern to take steps about attacks on higher education, correct?

A.   (Nods.)

Q.   And among those attacks on higher education were attacks on what you perceived to be students for their participation in political protests, correct?

A.   Is there a passage in particular where it says that?

THE COURT:  The only thing I see is on the second page, paragraph three on the first page and then the fourth

line down talking about detention and/or deportation.

THE WITNESS:  Okay, yes, I do see that.

THE COURT:  Students and scholars.  That's the reference.

MR. KANELLIS:  Yes, sir.

Q.   In fact, you were urging on April 17, 2025, you were urging people to avoid voluntarily cooperating with ICE, correct?

A.   I'm again just looking at the precise words that are used here to see if that exact expression is used.

Q.   I can help by pointing you to the top -- sorry, the bottom of page three --

A.   Yes.

Q.   Sorry, on page one going on to the top of page two?

A.   Okay.  Yes, I do see and I did endorse at the time the statement that asks the university to avoid voluntary cooperation with ICE.

Q.   You're also advocating that people not share information with ICE, correct?

A.   Yes, I believe that's among the things that the drafters of this letter included.

Q.   And you're also advocating that people stop cooperating with other federal agencies, correct?

A.   I'm just taking a moment again to find the passage.  Could you point me to where it mentions other federal agencies?

Q.   The very top line of page two.

THE COURT:   Actually, it's modified by "other federal agencies charged with facilitating deportation or other forms of immigration enforcement," up to the comma.   That's what he's asking.

A.   Yes, that seems accurate, yes.

Q.   That was written in April of 2025?

A.   Correct.   It was written in this letter which was addressed to the higher administration of my institution.

Q.   And that was a public letter, wasn't it?

A.   No.   To my knowledge, this was not designed to become public, not with the signatories, at least.

Q.   Okay.   And there are hundreds of signatures on this, correct?

A.   It appears so, yes.

Q.   And this was written three months into the Trump administration, correct?

A.   Correct.

Q.   You're exercising your right to protest here, aren't you?

A.   Certainly what I would qualify my answer with is that this was speech that I understood myself to be undertaking addressed to my employer.   As I said, I didn't understand this to be public political speech.   So I regarded this as quite different in kind from, for instance, publishing an op-ed in a major newspaper.

Q.   Okay.  Did you hear my question, ma'am?

A.   Can you repeat it back to me.

Q.   Yeah.  My question was, you were exercising your right to protest here, weren't you?

MR. BIALE:  Objection.  Asked and answered.

THE COURT:  He may have it a second time.  You understood that's what you were doing.

A.   Yes, I think that's fair.

Q.   Okay.  You're fighting the power here, aren't you?

MR. BIALE:  Objection.

THE COURT:  He may have that question.  Is that what you thought you were doing?

A.   I'm not sure I would put it that way.  Look, what I'm in the first place objecting to here or urging here is a set of conduct from my university.  And it's true of course that that conduct is related to conduct of the federal government.  But it's in the first place my university administration's conduct that I sought to kind of like affect here.

MR. KANELLIS:  Your Honor, we tender the witness.

THE COURT:  Nothing further.

MR. BIALE:  Very brief redirect, Your Honor.

THE COURT:  Very well.

REDIRECT EXAMINATION BY MR. BIALE:

Q.   Ms. Hyska, you were asked some questions on cross-examination about your academic publications.  Do your

academic publications contain political advocacy?

A.    I think that would be fair to say.

Q.    How would you characterize it?

A.    Well, my academic publications discuss a variety of political topics related to social organizing, social movements.  Although they are generally more sort of abstract in character than something like an op-ed would be, they certainly touch on politics, and I think a political perspective could be discerned in them.

Q.    And with respect to the talks that you gave at Virginia Tech and Brown University that you were asked about, were those talks about philosophy or politics?

A.    They were talks about political philosophy.

Q.    Let me ask you, you were asked about a meeting you attended regarding Unite and Fight.  Was that meeting a public protest?

A.    No.

Q.    Was it a public meeting?

A.    In the sense that, like, the door wasn't barred to anybody.  I suppose members of the public could have come in, but I didn't attend it with the understanding that anybody but other DSA members would be there.

Q.    And then you were asked also about AAUP meetings that you attended.  Were those meetings forms of public protest?

A.    No.

Q.   Were those public meetings?

A.   Again, there was no policing, kicking people out, but I attended with the expectation that only a small group of AAUP members of the university would be there.

Q.   And then, finally, you were asked at the end of the cross-examination about several letters that you signed on to after the arrest of Mr. Khalil, and we looked at some of those.

Why did you feel safe signing your name to those letters?

A.   So there were two things that affected my decision here that I might highlight.  One is, as I mentioned, I didn't understand these letters to be public statements.  I understood them to be addressed to the administration of my university, so to my employer from its employees.

That's very different in kind from something like an op-ed, for instance, so that made me feel more comfortable.  I think probably there was also a sort of strength-in-numbers principle that I had in mind.

As was mentioned, there are hundreds and in some cases thousands of signatories to these letters.  That meant by signing on them to them that was very different from my name being alone on a byline, which is what I worried about in the case of an op-ed.

MR. BIALE:  If I could just have one moment to confer, Your Honor.

THE COURT:  You may.

MR. BIALE:  No further questions.

THE COURT:  Nothing further for this witness.  Thank you.  You may step down.  Call your next witness.

MR. BIALE:  Your Honor, plaintiffs call Nadje Al-Ali.

THE COURT:  The witness may be called.

NADJE AL-ALI, Sworn

COURTROOM CLERK:  Can you please state your full name and spell your last name for the record.

THE WITNESS:  Nadje Al-Ali, A-l, hyphen, A-l-i.

COURTROOM CLERK:  Thank you.

MR. BIALE:  May I proceed?

THE COURT:  You may.

DIRECT EXAMINATION BY MR. BIALE:

Q.   Good afternoon, Professor Al-Ali.

A.   Good afternoon.

Q.   Where do you --

THE COURT:  Let me interrupt.  Be comfortable in the chair but pull that microphone a little closer to your mouth.  That's better.  It amplifies it.  Go ahead.

Q.   Where do you teach, Professor?

A.   I teach at Brown University.

Q.   And what's your title there?

A.   My title is Robert Family Professor of International Studies and professor of anthropology and Middle East studies.

Q.   And where did you teach before Brown?

A.    Before Brown I taught at the University of London.

Q.    And when did you come to the United States?

A.    In January of 2019.

Q.    Tell us a little bit about your personal background.
Where are you from?  Where did you grow up?

A.    I grew up in Germany, with a German mother and an Iraqi
father.  I went to school in Germany.  I spent three years
doing my undergraduate degree in the States in Tucson, Arizona.
I worked in -- I studied in Cairo and then I lived in London
for 25 years prior to coming to the States.

Q.    Has growing up in Germany informed your political views at
all?

A.    Very much so.  I mean, I grew up, I mean, in the '60s and
'70s as many people of my generation much with the awareness,
the historical awareness of the Holocaust in Nazi Germany, so
that has very much informed my thinking, my interest it in
terms of academia and my morals, especially in terms of this
kind of knowledge that being silent could mean complicity in
certain situations.

Q.    Let me ask you about, you just mentioned your academic
interests.  What's your area of study?

A.    So I'm an anthropologist by training, but I work in an
interdisciplinary manner across history, politics, cultural
studies, and I'm particularly interested in the way that women
in the context of the Middle East struggling for greater

justice, equality and also against gender-based drives, how these struggles are linked to wider struggles for democracy, for human rights and also against authoritarianism and sectarianism.  And I've done that particularly with reference to Egypt, Iraq, Turkey, Lebanon and the Kurdish regions.

Q.    Have -- sorry, withdrawn.

Have you published academic books?

A.    Yes, I've published books.

Q.    How many books?

A.    Three single-authored books, two co-authored, and I think five edited volumes.

Q.    And how about scholarly articles?

A.    Yeah, I've published many.

Q.    Okay.  I won't ask you to count them.

A.    I don't know the number.

Q.    Has any of your academic work, whether research or writing, related to the issues of Israel and Palestine?

A.    There has been a little bit of an overlap.  So one edited book looked at Women and War in the Middle East, and it mainly drew examples from Iraq and Palestine.

And I also had one article published, which is actually based on a roundtable discussion, about feminist approaches to BDS, that's the Boycott and Divestment and Sanctions movement.

Q.    And let me just ask you about that for a moment.  Are you a supporter of the BDS movement?

A.    I am.

Q.    And have you publicly declared your support for that movement?

A.    I've signed several statements to that extent, yes.

Q.    And why do you support the BDS movement?

A.    Because I believe this is a non-violent form to resist the systematic oppression and marginalization of Palestinians and I believe in non-violent strategies.

Q.    Can I ask you just briefly about the courses that you teach at Brown.

A.    Yeah.  So I'm teaching a number of undergraduate courses. One course on gender in the Middle East.  Another course on gender migration and diaspora that doesn't focus specifically on the Middle East but draws heavily on empirical case studies from the region.  I'm focusing, teaching a course on the anthropology of the Middle East.

Then in terms of credit courses, I'm doing a master's course in the anthropology department as well as a course on transnational feminism.

Q.    Now, you stated that you came to Brown in 2019.  Is that when you moved to the United States?

A.    That's correct.

Q.    And where did you live before that?

A.    I lived in London for 25 years, and before that in Cairo for five years, and before that in Tucson for three years, and

before that I grew up in Germany, in Krefeld.

Q.   And what's your citizenship status?

A.   So I'm a German citizen and I have green card here in this country.

Q.   Okay.  When did you obtain your green card?

A.   In October 2021.

Q.   Now, separate from your teaching and your professorship, have you held any other roles at Brown University?

A.   I was, for years I was directing the Center for Middle East Studies at Brown University.  It was a three-year post originally, but I agreed, I volunteered when I was asked to extend it for another year.

Q.   And approximately what were the years that you were the director of the Center For Middle East Studies?

A.   So from 2020 to 2024.

Q.   And just tell us briefly, what does the Center for Middle East Studies do?

A.   The center is both a research and teaching unit that inhabits a concentration in Middle East studies for undergraduate students.  About 40 faculty who are based in different departments at Brown contribute to both the teaching and the research in Middle East studies, so across different disciplines and different approaches.  And the center is both -- oh, it's also very much trying to connect graduate students who are based in different departments but are working on the

Middle East.

And aside from providing sort of a center for those activities and concerns on campus, the Center for Middle East Studies is also trying to engage a wider public in national/international academic contexts, so events, conferences, workshops, teachings and so on, online and in person.

Q.    I want to ask you one more question about the Center for now.  Did the Center For Middle East Studies' activities change at all from before October 7, 2023 to after October 7, 2023?

A.    Yes.  I mean, on one level it was consistent, but there were additional events and responsibilities.  In terms of content, there was a shift towards more focus and attention towards Palestine and Israel.

And also the Center, particularly myself and other colleagues, we started to play a role as well in terms of providing pastoral care for students, so particularly students of Middle East background who felt, you know, quite concerned, worried, stressed by the situation and they didn't feel that there was a specific space they could go to.  So as a result I decided, you know, my colleagues, the committee, we decided to organize lunch events for students, gatherings, more social gatherings at which students could express their concerns.

Q.    Okay.  And are those the kind of activities that you think of when you use the term pastoral care?

A.   Yes, yes, as opposed to focused on strictly academic advising and mentorship, a more holistic approach to the welfare of students.

Q.   And you mentioned some events that the Center had after October 7.  What was your role in those events?

A.   I was involved in organizing them, conceiving them and deciding, or deciding alongside other colleagues, who would be invited.  And I also chaired these events, which meant like I introduced them.  I welcomed everyone, and I also facilitated the discussion after the contributions.

Q.   Turning to a different topic, are you a member of any organizations?

A.   I'm a member of the Middle East Studies Association of North America, MESA.  Been for long time, since I'm a graduate student.  More recently I joined AAUP.  So I think it's sort of a couple of years after I arrived in the States.  I'm also a member of the Association of Middle East Women's Studies, which is an affiliate organization to MESA.  Oh, and on and off, I'm still a member of the British Middle East Studies Association.

Q.   Let me ask you about the first organization that you mentioned, the Middle East Studies Association of North America, which I'll call MESA.  You mentioned you joined as a graduate student.  Why did you join MESA?

A.   Because MESA, while being based in the U.S., is really the largest international organization that focuses on Middle East

studies.  And I knew that this would be, in terms of my academic development, would be an important context to attend on conferences, listen to colleagues, but also network, get to know people.  And I know that it is also for graduate students often a way to start to meet publishers and get advice about how to find jobs.

Q.  And over the years -- and I'm going to talk now about prior to January 2025.  So before that, over the years, what are some of the activities that you've participated in as a member of MESA?

A.  I attended most of the annual meetings, even though I was based outside.  I mean, I would try to come at least for that once a year to the U.S.  I think I missed one when it was in Alaska.  But I was also, for a couple of years -- I don't exactly remember the time, but it was around 2012, '13, '14, for two years I was an elected board member of MESA.

Q.  Okay.  And then you mentioned an organization, and I apologize.  You'll have to remind me of the name.  You said it's an affiliate of MESA?

A.  Yeah, it's the Association of Middle East Women's Studies, AMEWS.

Q.  Tell us just a little bit about that organization.

A.  So that organization focuses specifically on the Middle East with reference to women's studies, gender studies.  And I joined that also early on because many of the scholars whose

work I've been reading as a graduate student were members, and I would get to know them at meetings.  And I also got involved, I was an elected board member, and I was also president of AMEWS for a couple of years.  This was also prior to moving to the States.

Q.    Okay.  And I want to ask you about AAUP.  I think you said you joined AAUP shortly after you moved to the United States?

A.    It wasn't immediate.  It was a few years afterwards.  I don't recall exactly, but I am pretty sure that I've been a member for at least two or three years now.

Q.    Okay.  And why did you decide to join AAUP?

A.    Well, first of all, in principle, as someone who grew up in Germany where unions are very much part of society, I respected that.  And I was actually chair of the union at the University of London.  And then I also noticed that AAUP was quite active in terms of academic freedom and rights with respect to academics, and I thought it was important for me to support them and signal that I'm supporting their work.

Q.    Okay.  I now want to move us forward to this year, to January 2025.

A.    Okay.

Q.    Can you tell us a little bit about what you were doing in January 2025 in terms of your research agenda, your plans to attend conferences and other academic activities?

A.    So this academic year, including January 2025, I was on a

sabbatical following my four years as director.  And my main plan was to spend time in both Beirut and Baghdad to engage in research.  This was part of a larger project on women artists and gender-based violence and war in the Middle East.  And I had received funding from the Watson Institute at Brown to do so.  And I couldn't go in the fall because it was too dangerous in terms of, I mean, one couldn't travel to Beirut, and I didn't want to go to Baghdad, but I was planning to go in the spring of 2025.

In fact, I had a fellowship postponed from October, November of 2024 to May and June of 2025.  This was a fellowship in Beirut at the German Orient Institute.  During that time I was supposed to attend two conferences.  And then I thought I would combine my research trip to Baghdad with Beirut.  I have family in Baghdad, so I was going to stay with relatives.  That was one thing.

And then the other thing, in January I was thinking in terms of writing that I -- I had been thinking quite a bit about sort of this question of is there space for a feminist's critique of Hamas, so I started to think about it and started to do some reading.

Q.   And can you tell us a little bit about, when you say "a feminist's critique of Hamas," what did you have in mind?

A.   Well, I had in mind that, you know, the debates, including the feminist debates about Israel, Palestine and Gaza and

Hamas, were extremely polarized, so people, you know, talking about the allegations of sexual violence and gender-based violence on the 7th of October during the devastating attack on civilians.

And then, on the other hand, people speaking about the gender-based violence and sexual violence that Palestinian political prisoners are experiencing in Israeli prisons.  And I really wanted to see if it was possible to engage in a nuanced critique that would both point to the structural and systemic oppression and inequalities based on the Israel occupation while also being critical of the ideology, especially the gender ideology, but the militarism linked to Hamas.

Q.   And on that project, I think you said you had begun to research it.  Can you tell us what had you begun to do?  What had you read to start developing this project?

A.   Well, I mean, I'm an anthropologist, so one element of my research is sort of engaging people.  So I started to informally talk to people, but then I started to read -- I mean, a couple of colleagues at Brown, I had been in constant conversation with them, and I started to read more specifically about the, you know, very polarized positions that I was describing.

Q.   Can you just give us specifically any of the sources that you were looking at for this project?

A.   Okay.  That's a bit challenging.  What comes to mind

immediately, people like Nada Elias, who has written quite extensively on, in her perception, the false allegations of sexual violence in terms of what Hamas and Hamas-affiliated men did.

Nadera Shalhoub-Kevorkian had a very much more sort of nuanced approach.  I also read several reports by Israeli human rights organizations that listed the alleged sexual violence.

Q.   Okay.  So we talked about the fellowship that you were planning to do in Beirut and in Baghdad and this research project.  Did there come a time when those plans changed?

A.   Yes, definitely.  So as I said, I was supposed to go to Beirut in May and June.  I wasn't sure whether I would go to Baghdad just before in April or afterwards.  But definitely following the arrest and the detention and the threat of deportation of several students, graduate students, and also I think one post doc, I mean, most prominently Mahmoud Khalil but others as well, I started to think that it is not a good idea.  I felt that it was too risky for me to do research in the Middle East, come back, and then my pro-Palestinian speech would be flagged.  And as a green card holder and also as a prior director for the Center For Middle East Studies that had been under attack, and there are a lot of sort of false allegations about, I felt very vulnerable.

Q.   Okay.  I'm going to ask you to break that down a little bit.  So first, just tell me what did you hear about or see

regarding the arrest of Mr. Khalil and the other individuals you mentioned?

A.    I left the U.S. on March 8 to go to Germany to see my mother, who is in a care home and had a stroke and wasn't well, and it was her birthday.  I arrived in the morning of March 9 to come to then see the news about the arrest of Mahmoud Khalil and immediately felt, oh, my God, I just left the country, what's going to happen when I get back?

I don't know exactly when I saw the pictures of him being arrested at home.  I know that there was this controversy whether he resisted or not.  But I remember then later in the month when Rumeysa Ozturk, I think the graduate student at Tufts -- yeah, the graduate student at Tufts was detained on the street.  I mean, seeing that was also very scary.  I mean, everywhere I looked you saw this -- not everywhere I looked but I mean, I saw it several times.

Q.    When you say seeing that with regard to Ms. Ozturk, did you see a video of her arrest?

A.    Yes.

Q.    And around when did you see that?

A.    I mean, shortly after she was arrested.  So I can't remember, I can't give you a date, but it was shortly after.

Q.    That's fine.  And you also mentioned pictures of Mr. Khalil's arrest.  Do you recall if you saw a video of that arrest?

A.    Yes.  I think initially it was just pictures, but at some point a video emerged where that showed that he did not actually resist arrest.

Q.    And how did hearing these stories and watching these videos affect you?

A.    I mean, it was very scary, and I thought, Okay, here we go.  I mean, it's not that it was entirely surprising because I don't know exactly when but already I think in 2024 when now President Trump was candidate, there was some statements to the extent that people who engaged in pro-Palestinian speech and protest might be targeted.  So that was on my mind.

       And I'm pretty sure that by the time people got arrested, I had heard that that was what was on the agenda.  So I thought, Okay, this is now actually happening, but it was still -- although kind of it wasn't like a total shock, it was still shocking to see the pictures, especially someone in broad daylight being picked up from the street.

       You know, I'm someone -- you asked me about Germany.  I also have the Iraqi side, so I know about dictatorship and repression and my relatives in Iraq lived with that fear of being picked up from the street, so it really reminded me of that.

Q.    And did you feel targeted in any way by these actions of the government?

A.    Although these were students, I felt like, Okay, next in

line will be faculty, and so I definitely felt vulnerable and targeted as a result.

Q.   Are you aware of any faculty members who have been targeted?

A.   I mean, this was a slightly different issue, but a colleague at Brown who is a doctor, Lebanese, she was not able to enter the country, but I think it's on a slightly different issue.  Then there was one post doc amongst the people who was detained and threatened with deportation and who was actually teaching, a faculty member as well.

Q.   Do you remember that person's name?

A.   Sorry, I --

Q.   No problem.  So you mentioned, so you were out of the country when you heard about Mr. Khalil's arrest.  And you said that that made you scared about your return?

A.   Yeah, that made me scared about my return.  And I was thinking whether I should come back right away, but as I said, my mother was not in a good way.  My father passed away actually now a year ago exactly today.  And I felt like I had to see her, and so I did.

And then I had a couple of talks scheduled in Switzerland.  So it was also back and forth, should I go, should I not go, and I ended up going and I gave those talks.  And then the last part of my trip was supposed to be the fun bit where I was going to go cycling in Sicily with friends, and I decided that

I couldn't do that.  I felt like if something was going to happen at the border and I would have to say that I just came back from a cycling trip to Sicily, that would just not be good.

So yeah, I canceled that trip and I came back, but I was scared and I, for the first time ever, contacted an immigration lawyer to track me as I was coming back.

Q.   Can I just ask you, what were you scared was going to happen when you came back into the United States?

A.   I was scared that I would be called into secondary interrogation and that they would start Googling and would find reports of allegations against the Center and me as a director and associating me with pro-Palestinian speech, and worse than that, not just pro-Palestinian speech but that often these days gets translated into antisemitism or support for Hamas.

Q.   Let me just ask you to break those down a little bit.  So with respect to pro-Palestinian speech available about you on the internet, did you have specific things in mind?

A.   Well, in terms of my scholarship, as I said, there was the roundtable discussion, the feminist approaches to BDS, then there was the book, the edited book.  But to be honest, I wasn't so much worried about that.  I was more worried about reports by I would say sort of extreme organizations, most prominently CAMERA, that had written reports about me in my role as director of the Center for Middle East Studies and made

allegations about me and my politics and the Center more broadly as well.

Q.    And those allegations, those reports have accused you of antisemitic speech or antisemitic conduct?

A.    Yes, and also Hamas, in support of Hamas.

Q.    Sorry, what is CAMERA?

A.    Yeah.  CAMERA is an organization, and I don't even know what the acronym stands for, but it's what I would call like an extreme pro-Israel organization that has a long history of targeting media, I mean, including CNN, the UN, academics, universities, in terms of their pro-Palestinian positions and also making accusations of support for terrorism or Hamas.

And I should say that the main person, I think his name is David Litman who has been writing all these reports.  He was recently fired from CAMERA, but I don't know what the reason is; I have no idea.

Q.    Okay.  And these reports that it sounds like accused you of both antisemitism and support for Hamas and other jihadist organizations, would you like to respond to those allegations and tell us what your views are on those topics?

THE COURT:  Here?

MR. BIALE:  Well, yes.  I'd like -- she said there was false allegations, so I would like to hear what her position is on those.

THE COURT:  That's not at issue in this case.

MR. BIALE:  Understood.  I'll move on.

Q.   Now, so you mentioned that was your concern when coming back into the country.  So you canceled the bike trip and came back to the country.  And then what happened next?

A.   Well, then I after some thinking, reflection and close observation of what was going on and the speech around it, I mean, I think following the arrest of Mahmoud Khalil, President Trump -- and I don't know exactly when, but I do remember reading, I think it was in the New York Times, the quote by him saying this is one of many.

So at some point I think in April I decided that it was too dangerous for me to travel to the Middle East and do research there.  Not because -- at this point not because I was worried about what would happen in Beirut or in Baghdad, but I was worried that upon re-entry to the U.S. which stems from those countries that that would raise red flags and would make me more suspicious.

Q.   So did you cancel those trips?

A.   Yeah.  I mean, I canceled those trips.  I canceled the fellowship.  I did not participate in the conferences, the two conferences in Beirut.

Q.   Let me show you what's been marked for identification as Exhibit I.

MR. BIALE:  Mr. Kumar, if you can pull that up, please.

Q.    Do you have that?

A.    Yes.

Q.    Do you recognize this document?

A.    Yeah.  That was a quite recent email that the director, the German director of the German Orient Institute sent to me, you know, to express his regret that I wasn't there but also asking me if I would contribute to a publication based on the conference that I did not attend.

Q.    Just to be clear, this is one of the conferences that you were just testifying about?

A.    Yes, yes.

        MR. BIALE:  Okay.  Your Honor, we offer Exhibit I.

        THE COURT:  Any objection?

        MR. KANELLIS:  Your Honor, objection, hearsay.

        THE COURT:  Sustained on that ground.

        MR. BIALE:  Okay.  You can take that down.

BY MR. BIALE:

Q.    Let me ask you, so that was the fellowships.  You also talked about your research project that you had begun to undertake.  What became of that?

A.    Well, so the two research projects, one was a project about female artists in context of war and conflict and how through the artwork and cultural expressions that deal with this -- I'm sure you don't want the details.  So that project I had to put on hold because I wasn't able to go to Beirut and

Baghdad.

And then in terms of the article that I had started to think about, I also felt that it was too risky because even though the focus was supposed to be a feminist's critique of Hamas, as part of it, I would have also provided a feminist critique of Israeli government policies, especially in relation to what's happening in Gaza, and so I felt that was too risky.

Q.   And when you say it was too risky, what was the risk that concerned you?

A.   Well, in the current context I thought that that would increase my visibility and profile and the risk that I would be associated with pro-Palestinian speech and hence targeted.

Q.   Targeted for what?

A.   Well, targeted for attacks.  But then more concretely, you know, threat of deportation, be detained, and also along the line, I mean, I was thinking to get citizenship at some point. I thought that I don't want to risk that as well.  So the initial was deportation threat.

Q.   Okay.  So did you abandon that research project?

A.   Yeah, for now, yes.

Q.   Just going back in your career, are there other research projects that you can think of that you've begun where you abandoned them because you were afraid to publish on the topic?

A.   No, no, never, never.  I mean -- okay -- yeah.  No, I've never had that situation before.

Q.   Now, we talked a little bit about your affiliation and involvement with some of the organizations like MESA.  Did the events that we've talked about, Mr. Khalil's arrest and other arrests, affect your involvement in those organizations?

A.   Well, I'm not involved in terms of the -- I'm not on the board anymore, but I was planning every year to attend the annual meeting.  And following the arrest I started to worry a bit in terms of going to a conference in which you would have like a large gathering of Middle East scholars.  And then a colleague posted on Facebook, who is a citizen himself who is American, I mean, not even naturalized, but he said, Well, if I was a green card holder I would not go to MESA because that would be a great way to just target a whole bunch of people on green cards.

     And so then I thought, Well, I have to think about that carefully, and I did I think share that at some point with the president of the organization that I have this fear.

Q.   And who is the president of MESA?

A.   Asli Bali.

Q.   And what typically happens at the annual meeting?

A.   So mainly it is different panels.  So papers are given along, I mean, based on a particular theme.  Some are formal panels, and there are roundtables, but you also have meetings of the association.  So, for instance, the Association of Middle East Women's Studies would have their board meeting and

would have a reception.  So aside from attending academic papers and interventions, it's also a chance to meet each other and catch up.

Q.   Okay.  And I think you testified that you've attended pretty much every year except for once when it was in Alaska.

A.   Maybe one more year.  But I mean, I tried to go almost every year, yes.

Q.   And have you ever declined to attend MESA's annual meeting before because of fear of government retaliation?

A.   No, no.

Q.   Okay.  And you do have that concern now, correct?

A.   Yes.

Q.   Let me ask you, with respect to the Women's Association of Middle East Studies, have you done anything differently with respect to your role with that organization?

A.   Well, I was very active with them for a while, and then as I moved to the States and was dealing with the transition, I kind of moved out.  And then I thought it would be good for me to be involved again.

And they approached me at some point, I think it was around February of this year, 2025, and they asked if I would chair the human rights committee.  And it's the kind of work that under different circumstances I would be very interested in doing, but I declined because I thought, again, it would be too risky to chair a human rights committee that would

definitely deal with cases linked to academic freedom, pro-Palestinian speech, allegations of antisemitism and so on.

Q.    And have you taken on any role with the association?

A.    Well, I ended up becoming chair of the membership committee, which is very boring.

Q.    Let me just ask you a few other topics.  Have there been any public protests that you wanted to attend in the last few months?

A.    There were a few I would have ideally liked to attend, yes.

Q.    And which specific protests come to mind?

A.    So the one that comes to mind, I mean, two come to mind immediately.  One was the DOGE Elon Musk cuts.  It was taking place in different cities.  And I think I was in New York at the time, and I would have liked to participate but I was worried that I would be caught on camera.  Then more recently the No Kings protest.  And there were a couple of protests in Providence that I would have liked to attend that I did not.

Q.    Okay.  And just for clarity of the record, why did you not attend those, the No Kings protest and the other protests in Providence?

A.    Again, because I was worried that my identity would be captured as part of the protest and that I would be risking increasing my vulnerability in terms of being targeted.

Q.    And again, I apologize, but targeted specifically for

what?

A.    Well, targeted in terms of associating -- I mean, looking into my profile, making allegations about my pro-Palestinian positions being equated to antisemitism or, even worse, support for Hamas, and that would then translate into me being held at the border or detained on the street and threatened with deportation, yes.

Q.    Let me ask you briefly about social media.

A.    Mm-hmm.

Q.    Did the events that we are talking about affect your activity on social media at all?

A.    I mean, I'm not a very active social media person.  I mainly use social media to check news and read what others are posting.  But I guess there are two instances.  They're kind of minor, but one is that on Facebook I had put -- I had changed my profile picture to just black, a black square in October of 2023.  And when I was traveling back after visiting my mother and going to these talks in Switzerland in March of 2025, before entering the country, I changed the profile picture to put a picture of my mother and my daughter because I thought that, you know, if my social media is checked, that that might raise red flags, having the black picture.

       And the other thing that I did is, you know, although I'm not posting on Palestine myself, I have lots of just news streams, like The Guardian, New York Times, I mean, all kinds

of news that would bring up things about Palestine.  I was so worried that by the time I entered the U.S. in March returning back, my Instagram feed was all dogs, cats and recipes.  I mean, everything else was deleted.

Q.   And let me ask you one more question, and then I will look to the court to see if we're ready for a break.

Other than what we have talked about so far, have the events of March 2023 and the arrests and detentions of Mahmoud Khalil and others, has that affected you in any other way?

A.   Yeah.  I mean, what we've talked about so far is kind of quantifiable.  But I mean, I'm generally a quite disciplined and focused person, and this is for the first time in my academic life or life in general that I feel I can't focus on my work, that I'm, you know, constantly checking the news.  It has really had a detrimental impact on my ability to engage in research and focus.

THE COURT:  Thank you.  You suggested this was a good time to stop?

MR. BIALE:  Yes, Your Honor.

THE COURT:  Have you got more for this witness?

MR. BIALE:  I've got maybe 15 or 20 minutes.

THE COURT:  Fine.  We'll stop at this point, and you may step down.  Thank you.

Total elapsed time is, the plaintiff has used up two hours and 15 minutes, the defense has used up one hour and 15

minutes.  Each trial day is figured at three and one and a half hours.

On Wednesday we're going to have to stop at 12:00. We'll take a shorter recess to keep on track.  We will resume but not on the clock at 2:00 p.m., not taking evidence but handling housekeeping matters, and I have a couple of I guess housekeeping orders to enter.  Thank you.  We'll recess until 2:00.  We'll stand in recess.

(Recess, 12:58 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 7th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 3, Page 149 to 174

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs


vs.


MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


*********


For Bench Trial Before:
Judge William G. Young



United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 7, 2025


*******



REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

P R O C E E D I N G S

(Resumed, 2:00 p.m.)

THE COURT:  Well let's start with the question that was raised.  Ms. Belmont brought to my attention a concern about timing, and you're right to be concerned, because you're not going to get through if you proceed at the slow pace that the trial begins.  But that's routine in a trial, that the first couple of witnesses always take longer because we're feeling each other out, learning how a trial, with the specific players, including the judge, works.

So here's the rule on timing.  We said it was a 9-day trial, so you're entitled to nine 3 1/2 hour days.  If we lose time for technology, that's part of the human condition, it's just going to be lost to you.  If I -- Wednesday's an example, drop an hour, you haven't lost it, that's on me, and I take that very seriously.  I still think we can get done within that time, um, and I intend to.  There's a lot of material, written material that, um, properly is before the Court.

So, um, I keep time, there's no appeal, it's divided equally, and I will announce it at the end of every day.  So that's as to time.

Now the only other thing I wanted to say, other than generally, I'm happy to be off and running, I think

the openings were very helpful and the examination of witnesses are professional, and other than you ought to pick up the stroke, it's fine.

I've got this problem, and it is a problem. The government has made three ex-parte submissions of a mass -- not an unmanageable mass, but a large number of documents, in response to the Court's invitation that I would receive such documents, um, and honor the law enforcement privilege. They've taken advantage of that. The most recent, um, submission was this morning. There was one late Wednesday, and the original one was earlier than that, as I told you, um, in camera, in this session of the Court, meaning I'm the only one who's looked at it.

So the one that was submitted Wednesday late, it got to me on Thursday and I took it home over the weekend. I've looked it over. I don't purport to say that I've looked it over page by page, but I've looked it over. And it started with a rather interesting cover sheet which said, "These materials have not been filed in any other case." Interesting. And then it says, "And we reserve all the privileges that we have, attorney-client, the government deliberative privilege and the like."

Now look, that's not the way it works. All those

supposedly reserved privileges, they're all waived.  You can't dump a bunch of documents on the Court and say, "Well you go through them and really decide what our privileges are."  Never asserted.  They're all waived.

As to the law enforcement privilege, in one respect, and I have received such materials, as it's played out, they may well be peripheral, but maybe not. I received materials about the State Department's upping, or changing, or making more details, their management of the grant of visas.  That's inextricably intertwined with national security.  I honor that absolutely.  Nobody's going to look at any of that, except me.  And as yet, I'm not sure how that figures in this case at all.  I'll absolutely protect those.

As to the rest of it, you've taken -- and I speak to the government's attorneys, far too broad a position on what's entitled to the law enforcement privilege. When I said I would honor that, what I meant was, and I think the law, um, backs it up, I meant like disclosure of things that would, um, frustrate or inhibit or foul up an ongoing government investigation, like if there's -- and what I say now is not from my review of the materials, I'm making this up.

Let's say there's some human intelligence out there, undercover officers out looking around, um,

that's fine.  If that's disclosed to the Court, I would treat that completely confidential.  Likewise, if there's some technology that, um, we don't know about, pole cameras, um, I'm making this up, drones that fly over crowds with super, um, fascinating face-recognition um, material, boy, I'd be interested in that, but that's something new that the government has.  I've never heard about it and I just made it up.

About the only other example I can think of, but I don't mean this to be exhaustive, is, um, if you have any Title III data in there, since that's so private. If you have any wiretap data.  But I saw none.  That is entitled, it seems to me, to, um, have that privacy maintained, um, with some limitations.

So what do I do with the rest of it?  And, um, I'm candidly not clear.  I think, because I have every reason to believe that defense counsel have acted in complete good faith, I'm not going to say, "Well, I'm going to go through it and everything that I don't see fits, I'm just turning over to the plaintiffs."  I'm not.  If you think, as I have more expressly explained the limits of the law enforcement privilege, that I've missed something, and I could well have, my review is far from complete, um, you can -- in sort of a privilege log after the horse is out of the barn, by Friday at

noon, detail it for me.  "This page reveals whatever." And it had better be specific or I'll rule that you've waived it.  If it's only part of the page, the privilege can be asserted only as to Paragraph 3, or Paragraph 3 of the first paragraph.  And I will look at it and I will see whether I agree.

Now my guess is, from what I've looked at -- for instance, things that I thought the government was going to -- the public officials were going to disclose, I mentioned them at our very first meeting, I see some operations orders for arrests.  That interests me.  I think that should be disclosed.  Nothing I'm saying now prevents it from being disclosed.  But I'm not ordering that it be disclosed today.  Trial is not going to stop while we sort through these materials.

Given the ruling I just made, everything except for new visa business, I'm going to share with my own team, my chambers team, my law clerks, and we're going to have to index it, um, I don't know, by alleged target individual or by alleged -- not alleged, but by, um, information, if there's information of a witness, by witness, and I'm going to treat it as follows.

It's -- this material came from the defendant.  I am going to presume it's authentic.  And I'm going to treat it as an admission.  Um, to the extent that it

helps the plaintiffs, and I'm not saying it does, I'm going to treat it all as an admission. And it can be used by the Court to fill in any blanks that might exist in the plaintiff's case. I'm making no normative judgment here. I'm justifying -- because I'm not disclosing it after weeks gone by, and I expect the plaintiffs to have most of their case in by then, and then we'll see.

Once I've got it indexed, if anyone takes the stand -- the opening suggests there will be government witnesses taking the stand, um, having done numerous criminal cases, I'm going to use it like prior statements of that witness, and it's within the Court's power to disclose it at that time, if I think it will help cross-examination. But if it's all in accord with what I'm being shown, um, I will understand that.

I'm not confident of that ruling. I don't fault the defendant public officials, and as I've said, I think they've acted in complete good faith, but I'm not clear what to do with it. But I am going to be looking it over very carefully.

Two small points. There's another assented-to, um, amendment to the protective order. That's allowed. And I was given -- and I haven't looked at it, except, um, briefly, plaintiffs' pretrial brief. But when

Ms. Belmont gave it to me, she said, "This is filed under seal." What do you mean? It looks to me like the same brief I've already read. But maybe there's a little more. And I don't see why anything now is filed under seal. I'm trying to honor that.

I'll stop now. Now is the time for questions and clarifications. What's you've heard, up to this point, are rulings. And we'll start with the plaintiffs.

MS. CONLON: Thank, your Honor, and good afternoon. We haven't met. I'm Alex Conlon for the plaintiffs. That's Conlon, C-O-N-L-O-N.

THE COURT: Yes, Ms. Conlon.

MS. CONLON: Okay. So a couple of things on the materials your Honor alluded to, including our brief, but I'll go in the order you addressed them.

THE COURT: Please proceed.

MS. CONLON: Because we are, as you know, having to take certain witnesses out of order, the government officials, some of them are testifying Wednesday of this week, that is Peter Hatch from the Office of Intelligence, which is within the Homeland Security Investigations Division of the Department of Homeland Security, and I raise that because I expect, though of course don't know, that materials the Court has received are likely relevant to his work.

THE COURT:  That's information I need to know and very helpful.  Keep going.

MS. CONLON:  There's more.

On Friday, John Armstrong, who is the Senior Bureau Official --

THE COURT:  His name was mentioned before, right?

MS. CONLON:  Yes, in the Bureau of Consular Affairs, within the State Department, is also testifying.

THE COURT:  All right.

MS. CONLON:  As is Marian Smith, who I understand also works in the Bureau of -- I think of Consular Affairs, as a Special Advisor, or Senior Advisor, and having deposed some of them and been present for all of them, I expect we will ask them about things that are relevant to this issue your Honor has raised, about documents.

THE COURT:  Thank you.

MS. CONLON:  That's the first thing to flag.

Second, um, and jumping forward to the pretrial brief, that was filed under seal because it was before trial began and the protective orders governed all pretrial submissions.  And so in adherence to that protective order we filed, it's under seal.

THE COURT:  So now it need not be under seal?

MS. CONLON:  That would be our position, yes.

THE COURT:  Fine.  And we'll treat it as not under seal.  Thank you.

MS. CONLON:  Yes.

We did have other housekeeping matters, but we should stick with this, right?

THE COURT:  Let's stick with this, because I saw Ms. Santora, and then we'll go to housekeeping issues in general.

MS. CONLON:  Thank you.

THE COURT:  All right.  Ms. Santora?

MS. SANTORA:  Thank you, your Honor.  Just a clarifying question from the government.

When you were discussing the ex-parte materials and asking us to submit a privilege log to you, were you referring to all of the ex-parte materials we filed or just the ones we filed on Wednesday?

THE COURT:  I was referring to all because I, um -- naturally I'm going to look at all of them, and if I've missed something.  See my concern is -- I guess I'm faulting you, but not really, my concern is I am going to honor everything I said I would honor.  I'm giving you a week's chance to point out specifically to me some of the law enforcement privilege or national security privilege that I should honor.

Does that answer your question?

MS. SANTORA:  Yes, thank you, your Honor.

THE COURT:  All right.

Now --

MR. ABDO:  Your Honor, if I could just make a -- just a note on the timing, and I apologize for standing up.  I'm another "Alex," Alex Abdo, spelled A-B-D-O.

Just with respect to the timing, it would be extraordinarily helpful if we had an understanding from the government, before the testimony on Wednesday from one of the officials, whether there's additional information they're planning on releasing to us so we can rely on it in taking the testimony of those individuals.

THE COURT:  It would be.  I live in the real world.

MR. ABDO:  Well it's one small subcategory.  We have access to the certified administrative record, about 30 pages of the 50 have been filed under seal.  We have been planning on relying on that record during some of the examination of the witnesses, and on review of those 30 pages, it's hard to imagine that the government could possibly satisfy the stringent standards for sealing.  The government itself has filed, I think, three of the relative documents in other proceedings

publicly.

THE COURT: I will do the best I can.

MR. ABDO: Thank you, your Honor.

MS. SANTORA: Your Honor --

THE COURT: We're not arguing about this, he questioned it and I answered.

MS. SANTORA: No, no, I have another point, your Honor, just on the privilege log.

Are we also able, in that privilege log, to identify material that, um, the Court has said would be deliberative?

THE COURT: No, and the reason for that is, um, I thought -- there's no basis for dumping material on me and then saying, "Oh, by the way, this is deliberative, take a look at it ex-parte in camera." No.

All right. Now housekeeping. We'll start with the plaintiffs.

MS. CONLON: Oh, sorry.

THE COURT: No, please don't say "Sorry." As the great Henry Friendly used to say, and I'm not great, he would say, "This is what they pay me for."

(Laughter.)

THE COURT: So here we are. Go ahead.

MS. CONLON: Okay.

So recognizing the reality of the material the

Court must review and the government needing time to submit this privilege log to the Court, I have two requests that I'd ask you to consider.

The first is either arranging -- you know encouraging the government to present all of its officials in the second week, so that we can have the benefit of whatever documents we will receive, or alternative having an agreement -

THE COURT:  I didn't say that you're going to receive any.

MS. CONLON:  To the extent that we would, or alternatively, and what seems more expedient, would be that to the extent we question someone whose testimony is relevant to materials we later receive, and have subsequent questions, that we be permitted to make an application to your Honor to ask that the person come back, if there's something they need to be asked about with respect to those documents.

THE COURT:  The honest answer is this.  Of course you may make an application.  This is a live case.  I'm very keen that we get the case before me in the 9 days allotted.  What happens then is, um, as transparent as I can be, is unknown to the Court.  I think the spectrum is I'll think that I can say something, um, I'll think that I need to order, given your point, some further

hearing, and I have -- you can't take up the rest of the month, but you're top of mind during this month, or, sort of the other end of the spectrum, I will be satisfied with the evidentiary presentation, but the issues are such that I will say -- and you'll want to do this in the second week -- again, all of you, or at least you plaintiffs, you're interested in expedition, and I don't in any way suggest that the public officials are delaying things, I don't think they are, but you'll want to be proselytizing me with proposed findings and rulings.

So we get done, we get done with the final arguments, which are within these time limits, and I say "Thank you very much, it's under advisement." And then the burden is on me and I can sort out justly whatever I think I need to sort out. I think that's the spectrum.

So of course you may make application, because you will have lived the trial over these two weeks, and I will entertain it, um, given all the evidence set before me.

Does that answer the question?

MS. CONLON: I think it does. Thank you.

THE COURT: Okay.

Other housekeeping matters from the plaintiff?

MS. CONLON: Yes, I have some more. Some are

easy.  I'll skip to those first.

There are, as your Honor knows, certain witnesses who will be testifying remotely, and we are asking for a time that we can work with the Court's Deputy to make sure that we all are able to do that properly, so we don't slow anything down.

THE COURT:  She will make herself available.

MS. CONLON:  Thank you, your Honor.

With respect to exhibits, I just wanted to address something that happened earlier today and give the Court a little context, which is just to say, as your Honor I think has observed, the parties are still working through the process of identifying what can get a number, because it is agreed to.  As a consequence, um, certain things that currently have a letter, are lettered differently by both sides, because we haven't -- lead plaintiffs haven't had an opportunity to finish reviewing what we received yesterday.  So I want to apologize to the Court about that.

THE COURT:  No apology is necessary.  We've tried cases before.  What makes a difference to me, and my practice, when something is offered, is to, um, admit it, if I do admit it, and repeat -- or not repeat, give it the number or ask counsel to give the number.  That's what the Courtroom Deputy is taking down.  That's what's

on the record for the Court of Appeals, believing I should make an adequate record.

MS. CONLON:  Right.

THE COURT:  On those that are offered, I -- that I do not accept -- "I" was an example, I said, "No, it's excluded, I."  So whatever letter you've given it, I will repeat, and that will be the record that the Court has both for its work -- in other words for identification, is not going to form the basis of the finding of a fact.

MS. CONLON:  Right.

THE COURT:  And again, to make things plain to the Court of Appeals, I've looked at it and relied on it or not.

Go ahead.

MS. CONLON:  Thank you, and that is helpful, and we are going to work on it with opposing counsel this afternoon.

THE COURT:  I can tell you a funny story about a lengthy case where we got into two letters, but I will not.  You can --

MS. CONLON:  Okay, your Honor.  Now I have two more issues to address.  Maybe it's three.

First, because we are doing some witnesses out of order, um, you will find, for example, a video we sought

to introduce earlier today, we're seeking to present an authentication witness for tomorrow.  This is a function of scheduling only.  Mr. Biale had tried to offer it for a subject connection, of course your Honor had no information about the witness schedule or anything else.

Is it helpful to the Court if we flag this sort of thing to you ahead of time in terms of the witness order?  I would think so.

THE COURT:  Yes, I will accept all the help I can get.

MS. CONLON:  And speaking of the witness order, in an effort to ensure that we don't have down time, which is to say, with plaintiff witnesses in part and government witnesses in part going out of order, we're cognizant there may be certain gaps of time that we can't fill.

THE COURT:  No, no, no --

MS. CONLON:  We're trying to fill them is my point.

THE COURT:  Yeah, fill them.  In other words, we can start with a witness and stop with that witness and jump to another witness.  I want to come on the bench at 9:00, stay on the bench till 10:45, if I can, take a recess -- I need the recess, and come back on the bench at 11:15, and stay on the bench till 1:00.  We did very

well today.  Obviously I can work that half-hour. Wednesday, you lose an hour, that's my concern, a 15-minute break, so we've made up 15 minutes out of that hour that you've lost.  And so on.

MS. CONLON:  So this -- I'm sorry, I didn't mean to interrupt you.

THE COURT:  No.

MS. CONLON:  So in an effort to expedite this, we have told the government when we are putting on our witnesses and when we know there will be availability for a government witness to testify, which is how I know that certain government officials are meant to go this week.  I understand your Honor doesn't want to referee disputes between the parties about ministerial things, so I am asking on the record for the government to disclose their schedule as soon as possible for the second week, because we also have out-of-order witnesses for the second week, so we can collaborate on that.

THE COURT:  That would be helpful.

MS. CONLON:  So two things.

First, thank you for explaining the Court's process with respect to time and time limits, and obviously the parties were not aware that there is any tracking of which amount of time was used by which party on any given day.

THE COURT: You could have found out by asking the Courtroom Deputy.

MS. CONLON: No, we did not think to do that obviously, and have regrets, clearly. But my question is this, going forward.

Is it the Court's practice, that if there is time remaining in the schedule, that one party has hit their limit -- so I'm thinking about us, because we bear the burden here, and I expect, as you saw today, that our witnesses' direct examinations may take longer than their cross-examinations do, and I'm wondering how the Court manages -- how sort of strictly delineated is the --

THE COURT: Pretty strictly.

MS. CONLON: Okay.

THE COURT: For instance, I've heard -- we're not entirely done with Witness Number 2 and I recognize that we're just getting off the ground.

MS. CONLON: Yes.

THE COURT: So I understand the gravamen of those witness's testimony, we get one who's a professor, we get a second one who is also a professor, but she is in Mesa as well. So sort of under 403, this is not an invitation to anything, but these are the questions you should be asking. I imagine you can call another one

who's much the same as what we've heard, obviously there will be some differences, but you call another.  Once I've had three, that's pretty much it for that type of thing.

MS. CONLON:  Right.

THE COURT:  That of course is flexible, but that's true of others as well, other types of witnesses.  That's the best I can say.

But you want to know if you can get extra time?  Not likely.

MS. CONLON:  If it's available.

THE COURT:  Not likely.  If you can finish the case earlier, so much the better, because we come to the part that is most clearly my responsibility.  Look, you're trying a fine case, but I take it very seriously, and I'm saying that this case is novel and complex and I'm, um -- there may be things I want you to brief.  Well I can think of one, um, just jumping ahead.

MS. CONLON:  Please.

THE COURT:  I wasn't too taken by this "nuances of the First Amendment answer" that I got from defense counsel, so I want to be very clear on whether a lawful noncitizen has the same right to free speech as does a citizen of the United States?  And I don't suggest that because the First Amendment speaks of "persons," that

that answer is unequivocally "Yes."  I said that earlier.  But I want to know all the law on that.

And while you've tweaked me as to things that I want to know, I want to know, um -- I'll be asking this, and this more or less goes to the government, um, officials, I want to know whether anywhere in any of these papers there's some -- on the part of the alleged targeted individuals, there is some, um, criminal activity other than embarrassment to the foreign policy of the United States?  Though you pretty much have to understand that I think the facts of that Congressional enactment plays a significant role here.  I'm not hesitant in telling you what's on my mind.  But believe me when I say, the Court is completely without an agenda here, that I am eager for the vigorous presentation of counsel.

Go ahead.

MS. CONLON:  I think that's it, from us.  Thank you so much.

Go ahead.

THE COURT:  Yes.  Good afternoon, your Honor, my name is Jessica Strokus on behalf of defendants.

THE COURT:  Thank you.

MS. STROKUS:  I heard your Honor mention that you would like to start at 9:00 a.m., and we have a request

for you, that this Friday, can we begin at 8:30 a.m.? We have a witness who will be testifying remotely from Jamaica, and because of her schedule she has limited time to present her testimony and really only this day is available.  If the Court would be amenable to starting at 8:30 a.m.?  And that is 7:30 a.m., Jamaica time.  And it would allow for sufficient time for both direct and cross, we believe.

THE COURT:  Why can't she give us time in the ordinary hours that the Court sits?

MS. STROKUS:  I understand, your Honor.  She is a State Department official who will be at the end of a patch-out.  She is on TDY, on Temporary Duty Station, in Washington, D.C., she is moving from Jamaica, um, and that is the day that she is able to testify.

THE COURT:  Well I intend to start -- I've kept going for a number of years on my schedule.

MS. STROKUS:  I understand.

THE COURT:  You've made the request.  I think a half an hour, she can give it to us.  Promptly 9:00.

MS. STROKUS:  Thank you, your Honor.

THE COURT:  Any other housekeeping matter?

MS. CONLON:  I'm reminded of one last one.  So as your Honor may recall from the pretrial memo in which each side laid out its anticipated witnesses, the

government identified four officers who are referred to ASAC, A-S-A-C, or DSAC, D-S-A-C, who we understand to be supervisory ICE agents, who we understand were involved in the arrest of four of the five targeted noncitizens. Those witnesses have, for scheduling reasons, not been available to be deposed until this week and next, and the government is making them available, for which we are grateful, but we have hit -- we are going to hit our 10th deposition, which is what's permitted under the local rules, and there are four people remaining, which would take us to 11.

THE COURT:  By agreement, I have no comment.

MS. CONLON:  No, there is no agreement.  We are making a request, but as I understand it -- and I will of course let Mr. Kanellis speak, there's no agreement on the last deposition that we're seeking.

MR. KANELLIS:  Your Honor --

THE COURT:  We're talking about one deposition, right?

MS. CONLON:  One deposition, 4 hours long.

MR. KANELLIS:  Your Honor, we sought a deposition because we were unable to travel here the other day. That was not -- that was not permitted to us.  We have asked for them to identify witnesses and they waited.  I see no desire on our behalf to suddenly extend this

comity that we sought to them when they denied us the ability to depose the witness who testified today.  So that's --

THE COURT:  It seem to me that you can work it out.  We'll receive the testimony of the witness, but whether you get a deposition or not, that's something you can work out.

All right, thank you all.  9:00 tomorrow morning. And we'll recess.  At which time there will be a joint exhibit list, start to finish.

Thank you.

(Ends, 2:45 p.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Monday, July 7, 2025, to the best of my skill and

ability.




/s/ Richard H. Romanow 07-9-25
_____
RICHARD H. ROMANOW  Date