UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 74

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, July 8, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


 RAMYA KRISHNAN, ESQ.
 CAROLINE DeCELL, ESQ.
 ALEXANDER ABDO, ESQ.
 SCOTT B. WILKENS, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
 COURTNEY GANS, ESQ.
 NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs



 ETHAN B. KANTER, ESQ.
 WILLIAM KANELLIS, ESQ.
 VICTORIA M. SANTORA, ESQ.
 JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
 SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

I N D E X


WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS


NADJE AL-ALI (Continued.)

    By Mr. Biale            6

    By Mr. Kanellis                  22


MICHAEL J. MATHIS

    By Mr. Wang            47

    By Mr. Kanellis                  51


BERNHARD NICKEL

    By Mr. Biale            53

    By Mr. Kanellis


                    E X H I B I T S


        EXHIBIT 223.............................  11
        EXHIBIT 224.............................  17
        EXHIBIT 225.............................  74

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT:  Good morning.  Because I've allowed internet access to these proceedings, I should say that if you are observing the proceedings on the internet, the rules of court remain in full force and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Further, it is very important that you keep your microphone muted at all times.  If you do not, you will be cut off, because we don't want these proceedings interrupted.

There was a witness on the stand and she may --

Or are you done?

MR. BIALE:  No, your Honor, and I'll call her back in a second.  I just wanted to give the Court a quick update on the evidence.  It will take 30 seconds.

I'm sorry, Noam Biale for the plaintiffs.  Good morning, your Honor.

So the parties were able to work together productively yesterday and we have given the Court a joint numbered exhibit list and you have now all of the numbered exhibits that we have stipulated are coming into evidence.

You also have our lettered exhibits.  I understand the government had a printing problem, but they are working to get a copy of their lettered exhibits to the Court.

So we do have the witness we were examining at the end of the day yesterday.  We're going to have also a couple of our authentication witnesses.  One other, um, professor witness who will testify today.  And there's a chance we will get to our remote witness.  I've spoken with the government about that.  It looks like we're getting there.  We will test out the system during the break.  I just wanted to give the Court a preview.

THE COURT:  Are you going to start with one of these authentication witnesses or recall the witness?

MR. BIALE:  I'm going to recall the witness first.

THE COURT:  She may be recalled.

MR. BIALE:  Okay.  Thank you.

(Pause.)

MR. BIALE:  And just for the record, the plaintiffs recall Nadje Al-Ali.

THE COURT:  She may be recalled.

And if you would remind the witness she's still under oath.

THE CLERK:  Ms. Al-Ali, I remind you that you remain under oath.

Do you understand?

THE WITNESS:  I do understand.

THE COURT:  And you may continue with your interrogation.

MR. BIALE:  Thank you, your Honor.

DIRECT EXAMINATION BY MR. BIALE:  (Continued.)

Q.  Good morning, Professor Al-Ali.

A.  Good morning.

Q.  Thank you for coming back.

Professor Al-Ali, how do you define "antisemitism."

A.    Well as someone who grew up in Germany, um, I encountered antisemitism as the way that Jewish people were seen as inferior and a threat to Germans, but later on more current definitions evolved around prejudice, harassment, discrimination, of Jewish people as Jews, which can be -- I mean that can manifest in various contexts in speech, in action, in policy, and target individuals or institutions or organizations.

THE COURT:  Well I was following, I think, until the end --

THE WITNESS:  Uh-huh.

THE COURT:  -- with the definition.  You, um, were saying that it was an animus towards Jewish people.

THE WITNESS:  Yes.

THE COURT:  And I followed that.  And then you were talking about manifesting itself as to institutions?

THE WITNESS:  Right.  I mean when it's sort of, um, if prejudice or sort of conspiracy theories are being used to describe -- I mean so, for example, I would make a distinction between a critique of the State of Israel in terms of policies, but if someone says, "Well, um, all Jews are responsible for the policies of the state of Israel," if there is a conflation, then that would be antisemitic.  So I make that distinction.

THE COURT:  Yes.  And to see if I understand it, while the line is never perfectly clear --

THE WITNESS:  Yes.

THE COURT:  -- policies of the State of Israel, in your mind, whether you're supportive or hostile, that's not antisemitism?

THE WITNESS:  To critique those, no.

THE COURT:  To critique those.  But animus toward Jewish people, as you use the word, that is antisemitism?

THE WITNESS:  Absolutely, yes.

THE COURT:  And it may be that the two are conflated in someone's mind.

Is that what you're saying to me?

THE WITNESS:  Yes.  Yes.

THE COURT:  All right.

Q.  Thank you for that definition.

With that in mind, in your opinion, Professor, does the United States have a legitimate interest in combating antisemitism?

A.  Yes, I hope so.

Q.  Now, um, I want to go back to -- we spoke yesterday about some of the ways in which the policy, um, that was enacted and manifested in the arrests of, for example, Mr. Khalil and Miss Ozturk, in March of 2025, we talked about how that has affected your behavior.

Do you remember that?

A.  Yes.

Q.  So I want to go back to, um, prior to March 2025 now.

A.  Okay.

Q.  Tell us again, when did you arrive at Brown University?

A.  In January 2019.

Q.  Okay.  And around that time do you recall signing onto an open letter, um, to the Brown, um, administration?

A.  Not directly, just generally.  But I think it was a

few months later, 3 or 4 months later, there had been a referendum on divestment on, um -- many of us felt that the reaction of the President was worrying, so I signed a statement.

Basically it was about -- it referred to -- we wanted to make sure that there would not be a Palestine exception to academic freedom.  We knew that in the past at Brown, there were other forms of political activism, um, that were seen to be part of Brown's legacy, against antiblack racism, for example, and also the legacy of slavery, um, apartheid in South Africa.  And, um, so I don't remember the exact wording of the letter.

Q.  Well why don't I show it to you.

THE COURT:  I just need to be clear.

When you said the "President" --

THE WITNESS:  Oh, sorry, the President of Brown University.  Yes, that is unclear.

THE COURT:  Yes, thank you.

Q.  And just so I can clarify.  When you said it was about a referendum about divestment, what did you mean?

A.  Yes, sorry.  That was, um, the students put together a referendum on the question whether Brown University should divest from all companies that are involved in the, um, occupation of Palestine, so that are contributing to, um, the Israeli military occupation.

Q.   Thank you.   Let me show you what has been marked for identification as Exhibit K.

MR. BIALE:   And for the benefit of my friends on the other side, this is AAUP 690 to 696.

Can you pull that up, Mr. Kumar.

(On screen.)

Q.   Okay.   Take a look at this document, if you can.

A.   (Reads.)   Yes.

Q.   Okay.

MR. BIALE:   And, Mr. Kumar, go to the second page, please.   (Scrolls.)   And now go to the third page.

(On screen.)

Q.   Okay.   Professor Al-Ali, do you recognize this document?

A.   Yes.

Q.   What do you recognize it to be?

A.   I recognize it to be a letter signed by a number of faculty of Brown University addressed to the President of Brown University, um, asking the President to not treat student activism around Palestine differently from other forms of student protest, and specifically this was around the question of the referendum.   And it asked her to not engage in a Palestine exception of academic freedom and protest.

Q.    Okay.   And if you look, I think it's 4 lines down

in the signature block, um, is that your name?

A.    Yes.

Q.    Indicating that you signed the letter?

A.    Yes.

MR. BIALE:  Okay, your Honor, we offer Exhibit K into evidence.

MR. KANELLIS:  No objection.  But, your Honor, it is hearsay.

THE COURT:  Well it is.  But do you object?

MR. KANELLIS:  Yes.

THE COURT:  All right, they object.  And I admit it.

MR. BIALE:  It's not for its truth, your Honor, we're simply introducing it to --

THE COURT:  That's what I thought you'd say.  So why is it relevant?

MR. BIALE:  It's relevant to show that she was signing open public letters prior to the ideological deportation.

THE COURT:  Not for its truth, but it's admitted. It will be Exhibit 100 -- it's 223.

MR. BIALE:  Yes, thank you, Judge.

(Exhibit 223, marked.)

Q.    Okay.

MR. BIALE:  And, Mr. Kumar, if you could please go

back to the first page, um, and pull up the date of the letter, which is on her -- yeah.

(On screen.)

Q.   Okay.  So you see this was sent in April 2019, correct?

A.   Correct, yes.

Q.   And I think you said that this was a few months after you arrived at Brown University?

A.   Yes, correct.

Q.   Did you have any concerns that by signing onto this letter supporting the students who had passed the divestment referendum, that that could cause you any problems with your employer, Brown University?

A.   No, I did not.

Q.   Did you have any concerns that signing onto this letter could affect your immigration status in the United States?

A.   At the time, definitely not.

Q.   Okay.  And when you say "at the time" that would be not, can you elaborate?

A.   Well retrospectively, I mean now I'm worried that these letters might be used against me.

Q.   Okay.

     MR. BIALE:  And you can take that down, Mr. Kumar.

     (Off screen.)

Q.  So we talked a little bit yesterday about how, um, I think the year after you arrived at Brown University you became the Director of the Center for Middle East Studies, correct?

A.  Correct.

Q.  Approximately when was that?

A.  Um, approximately in July of 2020.

Q.  Okay.  And, um, I think we talked a little bit yesterday about how your role there and the, um, activities of the Center changed after October 7th, 2023.  Can you just very briefly remind us?

A.  Well, um, it -- in addition to all that I was doing before, um -- so, first of all, some of the content changed, so there was more emphasis on Israel/Palestine and to the events we organized, but an additional responsibility that I took upon was pastoral care of students who were distressed by the situation and didn't feel they had any other space to go to for organizing, more social-type of events.

Q.  And, um, following the attacks of October 7th and the Israeli military campaign in Gaza, were there protests by students on the campus of Brown University?

A.  Yes, there were several protests.

Q.  Can you just tell us a little bit about what form those protests took?

A.   I mean it took different forms.  I mean the first one that I remember was, um, I think in November.  It was a group of students, um, that were part of Jews For A Cease Fire who engaged in a peaceful, um, sit-in in University Hall, and they were, um, singing and praying.  But that specific protest ended in their arrest, I mean first by campus security, and then campus security handed them over to private police.  That was one.  And later on there were other protest marches.  And there was encampment as well.

Q.   Okay.  And you spoke about a demonstration in November, um, I think you said it was by a Jewish organization on campus?

A.   Yeah, Jews For A Cease Fire.

Q.   Okay.  Did you, um, attend that protest?

A.   No, I did not attend the protest, but I was there.  I had watched on Instagram.  They had sent out like your sort of documentation of the time that they were inside University Hall.  But I then went on campus to watch the way that the students were let out of the building one by one and handed over to the Providence police.

Q.   And based on what you saw on Instagram and then, um, in your personal observations of what it sounds like was the end of the protest, did you see any conduct or hear any slogans that you interpreted to be antisemitic?

A.    No, the opposite.  It was actually a very, um, proud moment for myself to see that the police got involved.  But in terms of the whole atmosphere, there were actually people -- students and faculty singing songs in Hebrew and in Arabic as the students were let out, and it felt like a very peaceful and community-based event.  It was very moving, although it was also very sad.

MR. BIALE:  Mr. Kumar, can you pull up Exhibit 92.  And, your Honor, this is in evidence by stipulation of the parties.

THE COURT:  And to save time, that's my protocol.

MR. BIALE:  So I won't say that.

THE COURT:  It's got a number.  I trust the lawyers, it's in evidence, it will be part of the record.  I'll review it.

MR. BIALE:  Thank you, your Honor.

Q.  Professor Al-Ali, um, can you take a look at Exhibit 92 on your screen.

A.  Yes.

Q.  What is this document?

A.  This was a letter that was published in the student paper, but it was actually a letter that, um, many of us drafted and signed, and I had personally handed to the President of Brown, um, asking or protesting the

involvement of Providence police, and asking the President to reconsider, um, criminal procedures against the students. We felt that they had acted very peacefully. And following me handing in the letter, the President agreed to have a meeting with faculty, which I facilitated.

Q. Okay. And just to be clear, and you may have said this. You said you handed this letter to the President of Brown University. Did you also sign the letter?

A. Yes, I signed the letter as well.

Q. Okay. Around this time, so it looks like this letter was sent, um, November 9th or rather sent by hand-delivery November 9th, 2023, um, around this time did you sign onto any other letters that you recall?

A. To be honest I don't, um, really remember. I just know that, um, the only other thing that I know, at some point I signed, was on a cease fire request for the President of Brown to make a public statement asking for a cease fire.

Q. Okay, so let me show you something, um, that may refresh your recollection.

MR. BIALE: Mr. Kumar, if you can pull up Exhibit L. And folks, this is Bates Number AAUP 697 to 704.

(On screen.)

Q. And take a look at that document, please.

A.   (Reads.)

Q.   Have you taken a look at that?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   What do you recognize this to be?

A.   I recognize this to be a letter drafted by faculty, um, addressing the President, um, of Brown University, Christina Paxson, and asking her to make a statement asking for a cease fire -- a cease fire in the context of the war, Israel and Gaza.

Q.   And is this the letter that you were just referencing in your testimony?

A.   Yes.  Yes, that's letter.

     MR. BIALE:  And, your Honor --

Q.   And what's the date of the letter?

A.   It's the 7th of November, 2023.

     MR. BIALE:  Your Honor, we offer Exhibit L.

     THE COURT:  I take it not for the truth?

     MR. BIALE:  Correct.

     THE COURT:  Any objection?

     MR. KANELLIS:  No objection, your Honor.

     THE COURT:  L will be admitted, Exhibit 224, with that limitation.

     (Exhibit 224, marked.)

MR. BIALE:  Okay.  Thank you.  You can take that down, Mr. Kumar.

(Off screen.)

Q.  Now you mentioned, Professor, that you facilitated a meeting between the faculty of Brown University and the President?

A.  Correct.

Q.  Did you facilitate any other meetings, um, that in any way related to the pro-Palestinian protests?

A.  Um, well, yes, I facilitated, um -- I mean what I remember for sure is that I facilitated a meeting between the President and some students following one of the more pastoral care-mentored lunches and, um, sort of with students saying that they feel alienated, ignored, um, and there was lots of stress and grief.  And so I approached the President and she agreed to meet with a group of 20 students.  And so I told the students, "Well you should self-select and then have a meeting with the President."

Q.  And approximately when did that meeting occur?

A.  So that was pretty early on, I would say, um, the end of October or November of 2023.

Q.  So around the same time as --

A.  Around the same time, yes.

Q.  Okay.  And did you attend that meeting?

A.  I attended the meeting, yes.

Q.  So, um, Professor Al-Ali, we have look at some letters you signed and heard about some meetings that you attended.

Since the arrests of Mr. Khalil and Ms. Ozturk, have you signed onto any letters having anything to do with the situation in Israel and Palestine?

A.  No, I have not.

Q.  Why not?

A.  Because now I'm scared to do so.  Now I'm worried that what I signed before would be used -- and it was, I mean there are -- some of the letters that I signed before are now quoted, um, by several organizations, like Camera, and distorted to portray me as antisemitic and pro-Hamas.

Q.  And I think you mentioned this yesterday, what are those reports by Camera that you're referring to?

A.  Aside from Camera having a list of names of faculty and then links to letters that they signed or articles that they wrote, there are also two reports that specifically focus on Brown and the Center for Middle East studies, um, in which several of my colleagues are mentioned, and I'm obviously the Director, or the former Director of the Center for Middle East studies, um, is also mentioned.  And, I have to say, very outrageous

allegations about me and my work and my politics.

Q.   And you mentioned facilitating these meetings between, um, the Brown administration, on the one hand, and the faculty and students on the other.

Since the arrests of Mr. Khalil and Ms. Ozturk, have you, um, facilitated any such meetings that related in any way to issues around Israel or Palestine?

A.   I have not.

Q.   Why not?

A.   For two reasons.  One, I mean I am not the Director of the Center for Middle East studies anymore.  But nevertheless, I mean I'm still going to other events at the University.  But the -- but the reason is that I'm scared, just the same reason why I'm not signing letters.

Q.   So if an opportunity like that arose for you to be sort of a mediator/facilitator around these issues now, would you accept that opportunity?

A.   I mean it's very hard for me to say yes or no.  But if it was with the University, possibility.  But I would still be worried that there would be people reporting this outside.

Q.   And what about anything that had a public component?

A.   Yeah, I mean right now I'm trying to stay away from anything public that is linked to Palestine and Israel.

Q.   And just to --

A.   Well I'm here now, so --

Q.   Yeah, I'm going to ask you about that in a moment.

A.   Yes.

Q.   You know we've talked about various ways that, um, you, um, have changed your behavior based on fear you've experienced from learning about the ideological deportation policy.

If that policy were ruled unlawful, would you do anything differently?

A.   Well, I, um -- it would not be like from one day to the next, because I think I would want to see that the change in law would translate into implementation.  Um, but that would certainly allow me to pursue my research and be able to attend meetings and conferences and travel again.  But, yeah, I mean I would first want to see what is actually happening in practice.

Q.   Okay.  And if that were to happen, would you, for example, attend Mesa's annual meeting this year?

A.   Yeah.  Yes.

Q.   And you just mentioned that you're testifying here.  Tell us why you're testifying here?

A.   Well, um, I'm testifying --  I think I started out by saying that one of the things that shaped me in terms of my upbringing in Germany is the awareness that

silence means complicity, and I feel like if I wouldn't participate here, I am complicit on several accounts.

One is that I do feel that I want to speak out on Palestinian, what's happening in Gaza, and Palestinian more broadly. And secondly, I also worry about what's happening in this country, and I -- that's, you know, a big reason. And I mean I want to believe still in the force and the importance of the legal system. So if a judge of this country says there shouldn't be retaliation against witnesses, I want to believe that there is no retaliation against witnesses.

Q. Okay.

MR. BIALE: No further questions.

THE COURT: Mr. Kanellis, you wish to examine this witness?

MR. KANELLIS: Yes, your Honor.

THE COURT: You may.

MR. KANELLIS: Thank you.

William Kanellis for the Justice Department.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Good morning, Professor, how are you?

A. Good morning. Okay.

Q. I'd like to ask you a few questions about the responses you've given here.

A.   Sure.

Q.   You did grow up in Germany?

A.   Correct.

Q.   And in your childhood did you live anywhere other than Germany or did you live primarily in Germany?

A.   I lived primarily in Germany, but traveled to Iraq to visit my family.

Q.   Did you have any time to live in Iraq full-time?

A.   I never lived in Iraq full-time.

Q.   Okay.  I'd like to talk about your reference to an organization called Camera.

A.   Yes.

Q.   You just referenced that.  And then there was a second organization that you referenced that I did not catch the name of.

Do you remember the other organization that was critical of you for supposedly being antisemitic?

A.   I mean I haven't checked all of them, to be honest, so I'm aware of Camera.  I don't remember --

Q.   Well perhaps I misspoke.

Now Camera, is that a -- you indicated yesterday it was run by a particular individual, is that right?

A.   No, I don't think it's run by a particular individual, um, and I -- but there was one specific individual by the name of David Litman who was the main

writer and researcher and that person, um, has lost his position.  I don't know why.  But it's a broad organization.

Q.  Is Camera associated with the United States government?

A.  No.

Q.  Do you believe that Camera is working in any respect with the United States government?

A.  Um, I don't know.

Q.  Do you -- well do you have a belief, one way or another, of whether it is?

MR. BIALE:  Objection.

THE COURT:  No, she was asked about that.  He may ask what --

THE WITNESS:  Okay, yes.

THE COURT:  Say what you think.

THE WITNESS:  Yes.

A.  No, I don't believe that Camera is working for the U.S. government, but I am not sure that, um, the U.S. government is not looking at Camera reports.

Q.  Okay.  You don't know, one way or the other, whether the U.S. government is looking at Camera reports?

A.  Um, well I think that based on -- well, okay, I don't know, let's put it this way.  I don't know.

Q.  You indicated that after these acts of October 7th,

the Center for Middle East studies took on additional responsibilities, correct?

A.   Yes.

Q.   Now one of those responsibilities you referenced is "pastoral care"?

A.   Yes.

Q.   Would you elaborate on what that means?

A.   So usually as an academic and dealing with students, it's about academic mentoring or advising, um, but following the 7th of October, there was sort of a sense of distress and grief and upset and there was a feeling that, um, that there was no specific space dedicated to Muslim students or students of Middle East origin.  And so it meant like providing a space where people could gather, talk, um, and also hear what the words were so that I could transmit that immediately to the administration.

Q.   How did that, if it did, affect the Center for Middle East Studies, that additional pastoral care you described?

A.   I mean only that it increased my work load.  But otherwise it did not affect us.

Q.   And that additional pastoral care began in October or November of 2023?

A.   Yes, I mean additional.  I mean that's always an

element of pastoral care that faculty engages in.  But it was on a very different scale following the attacks of the 7th of October and then the war in Gaza.

Q.  And did that pastoral care, was that administered by AAUP in any respect?

A.  No.

Q.  And was that pastoral care administered by Mesa in any respect?

A.  No.

Q.  You are not the Director of -- I'm going to call it CMES?

A.  That's fine, yes.

Q.  We're talking about that.  That's the program that -- you were the Director of that, did I get that right?

A.  Yes.

Q.  Okay.  And I believe you said you were the Director for about 4 years, correct?

A.  Correct.

Q.  You have, um -- since the beginning of this year, you have participated in public conferences, haven't you?

A.  You mean since January of 2025, this year was a calendar year?

Q.  Yes, ma'am.

A.  Um, I have to think very carefully.  Um, I -- I don't think I attended any conferences.  I gave some talks in Switzerland.  But I can't, 100 percent -- but I don't recall attending conferences.

Q.  Did you give a talk at Washington University this year?

A.  I gave a talk in the fall, I think.  Oh, in February I gave a talk.  Yes, that's true.

Q.  At Washington University?

A.  Yes.

Q.  And then you gave a talk in Switzerland.  And when was that?

A.  So that was in March.

Q.  In March of this year?

A.  Yes.

Q.  Okay.  And then you've also given -- you've been a featured speaker or made presentations in other public events this year too, haven't you?

A.  Yeah, well I had a book lunch.  So I was co-editing a book and there was a book lunch in Berlin in January, and then, um, there was a book lunch in Providence at Brown University as well.

Q.  And that book was related to gender studies, is that generally what it was about?

A.  Yeah, the book, um, looked comparatively at the

importance of anti-gender discourses and policies in far right movements in Europe and the Middle East.

Q.   Okay.  And did that include that influence on, um -- in combat or war situations in the Middle East?

A.   Um, no.

Q.   Okay.  Your conference in Switzerland, what was the subject of that conference?

A.   So it wasn't a conference, it was me giving papers. Actually I gave one paper that was based on the book, and then I facilitated -- I gave a short paper and I facilitated a workshop for graduate students where I held a discussion for other people's papers.

Q.   And prior to this conference, you were aware this conference was being advertised or promoted publicly, correct?

A.   No, the workshop was not promoted publicly.

Q.   You're not aware that there was a -- there's materials on the internet relating to this conference in Switzerland?

A.   There was a workshop that was provided for students. I'm pretty sure it was not advertised.  I'm not aware of it.  And then there was a talk that I gave, a public lecture.

Q.   And where was that public lecture given?

A.   The public lecture was in Brown or -- well I think

in Brown probably.

Q.   Okay.  And there's two public lectures or there was just one?

A.   It was one, one public lecture.

Q.   I see.  And what was the date of that lecture?

A.   I don't know.  I don't remember.  It was in March. It was during my -- it must have been mid March, sort of.

Q.   Yesterday you mentioned that upon the election of the new administration in November, you had a reaction that was, um, I'll characterize it as "somewhat anxious."  Is that a fair characterization of your reaction after the new administration was --

A.   I don't remember speaking about that.  I spoke about, um, statements of President Trump, while he wasn't President, and I think even before election, and after he was elected.  So I think I mentioned that.

Q.   Okay.  Well let me ask you.  After -- and these are statements that Candidate Trump made about immigration, is that fair to say?

A.   Yes, Candidate Trump and President Trump both.

Q.   Okay.  And he made those statements prior to his election?

A.   Prior and following his election.

Q.   Okay.  And that -- and his election was in November

of 2020?

A.   Yes.

Q.   Okay.   And did those statements cause you anxiety?

A.   Yes.

Q.   How?

A.   How?

Q.   Yes.

A.   Well I mean it caused anxiety.  You mean why?  I don't understand what you mean by "How"?

Q.   Well you're indicating that it caused you anxiety.  Can you elaborate on that statement.  How did it cause you anxiety?

A.   Well I, um, my level of worry and, um, sense of concern increased in relation to the possibility that there might be, um, a crackdown or some form of oppression against those of us who engaged in pro-Palestinian speech.  And a fear that once President Trump or -- I mean once the new government would be in place, yeah, that would be put into action.  And that pro-Palestinian speech might be equated with support for Hamas.

         THE COURT:  When -- I'll characterize Candidate Trump's speech as, broad brush --

         THE WITNESS:  Uh-huh.

         THE COURT:  -- I'll characterize it as

antiimmigrant.

Now when first did you feel that a concern for Palestinians was -- the focus of that animus, during the time he was a candidate or after he was President and inaugurated?  If you can tell me.

THE WITNESS:  Yeah, I really can't remember whether I already felt it while he was a candidate, but I certainly felt it after he became President, there were statements.  I might have felt it before.  There was this sort of sense of this more general anxiety, but I don't know how much it was specific at the time.  It certainly became more specific following the inauguration and some of the statements.

THE COURT:  Go ahead from there.

MR. KANELLIS:  Thank you, your Honor.

Q.  Now, with respect to the statements, was your concern amplified in any way by your connection to the Center for Middle East Studies?

A.  Yes.

Q.  Why is that?

A.  Because it's a public role.  I'm not just an academic working tangentially on Israel/Palestine.  I was for 4 years directing a center that's probably known in the U.S. and internationally, and that center had been under attack.  And there were false allegations

made against not just me, but faculty in the Center.  So certainly the fact that I was the director was very significant to this.

Q.  Did you make any statements, in your capacity as a member of AAUP, relating to the issue of Palestine?

A.  No.

Q.  And the same question with respect to Mesa.  Did you make any statements relating to Palestinian in your capacity as a member of Mesa?

A.  I mean not directly, but everything I do I -- I mean I'm a member of Mesa, so I don't know how to distinguish.  But I didn't like go on record, "Mesa Member Al-Ali."

THE COURT:  I think that's what he was saying.

A.  No, I didn't do that.

Q.  You indicated that you, feared being deported, is that a general characterization of the concerns you had after the Trump administration came into power?

A.  Yes, I feared being deported.  But more than fearing being deported is the fear that I'm silent as an academic, as a person, that I can't speak my mind, that I can't do my research, that I can't engage with my students in a free way.  That in some ways is the worst fear that I have.

Q.  Okay.  And one of the things that I think you

indicated yesterday was that you, um, did not follow through on an article that you had written that contained a nuanced criticism of Hamas, is that correct?

A.  Correct.

Q.  And about what time were you thinking about doing this article?

A.  Well I started thinking in January.  I mean it had been on by mind for a while, to be honest, since last summer, I mean the summer of 2024.  But, um, more concretely I started thinking and started reading about it in the beginning of this calendar year.

Q.  Okay.  Did you write anything with respect to that article?

A.  No, I didn't write anything.  I just -- yeah. That's okay.

Q.  I interrupted you?

A.  No, I didn't write anything.  I started reading and, um, you know I sort of reflected on it.

Q.  You also indicated that you didn't attend protests after the Trump administration was in power because of this fear of being deported, is that a fair characterization of what you said?

A.  Yes.

Q.  And you said you didn't attend the No Kings protest, right?

A. Yes.

Q. Do you know, um, how -- how -- what was the No Kings protest, can you describe that briefly for the Court?

A. Yeah, it was, um, a national protest where tens of thousands of, um, Americans and immigrants went on the streets of many cities, um, fighting for democracy and, um, against -- I mean "The king" stands for the idea that there is one person who has all the power and can do whatever he wants. So it was sort of -- I saw it as a protest to save democracy and also linked to that a protest to protest the immigration policies. But this was a wider sort of appeal for democracy in this country.

Q. And you didn't attend the King's protest because you were afraid of being deported?

A. I was afraid that there would be some, I mean -- you know there could be some police altercation and I somehow, against my will, would get involved in it, and then that would lead to me being checked out and then, you know one thing after another. I mean, yes.

Q. So you indicated that tens of thousands of people attended these protests, correct?

A. Yes.

Q. And you believed that the U.S. government was going to single you out?

A.  No, no, not the U.S. government, but you never know what happens.  I mean sometimes peaceful protests, as we've seen for example in LA, I mean the majority of people are peaceful, but then there might be some people who are kind of, you know, not peaceful, and maybe rioting, or there are some altercations with the police, and then things go out of hand.  And I was worried that in that situation I would be very vulnerable.  I didn't think that I would be, out of 10,000 people, singled out.  But if something were to happen, which could happen in a protest, then I think I would have felt -- I would have been more vulnerable than a U.S. citizen or someone who was not formerly the Director of the Center for Middle East Studies.

Q.  You weren't intending on -- no, strike that.
Have you ever rioted?

A.  No, never.  No, I think I made it clear -- I hope I made it clear yesterday that I'm very much, um, a peaceful person who believes in nonviolence.  I've never rioted.

Q.  So it was not your intention in any respect to engage in physical altercations or a riot at any of the protests that you --

A.  It was not my intention, but I know that these things can happen when you -- when people are around

you, and also it could be that the police might be, um, not so friendly.  You know there are examples in many different contexts in this country where we've had issues, where there were clashes.  And I think that, um, I feel it's reasonable to fear that if something were to happen, that I would be more vulnerable than other people, than you, for example.

Q.  You indicated you that attended a protest relating to DOGE?  D-O-G-E.  I don't know how you pronounce it.

A.  Yeah, the one that was, um, about Elon Musk and the cuts.  So, yeah, I, um -- under different circumstances I would have liked to attend it.

Q.  And you didn't attend it because you feared that the government was going to identify you and pick you out of a crowd?

A.  Exactly what I said before.  It's not that I was worried that they would sort of look for me specifically, but I was -- I didn't know whether these were going to be peaceful protests, I don't know what was going to happen, and I was worried that if something was going to happen, I would be in a particularly vulnerable situation.

Q.  Have you -- how many protests have you attended in your lifetime, could you give an estimate?

A.  Um, I don't know, maybe -- I don't know, maybe 30,

40 protests.

Q.  30 or 40?

A.  Yes.

Q.  Have you ever been arrested at a protest?

A.  No.

Q.  Have you ever been detained or questioned at a protest?

A.  No.

Q.  And still thought that that could happen?

A.  I mean most of those were not in the U.S.  I mean I was -- for 25 years I was living in the UK, in London, and most -- I might have attended some protests in Germany while I was still in school.  But most of the protests I attended were in the UK.  But even if I had attended all these protests in the U.S., I mean it's different now precisely because of the -- what I mentioned, the threats to get rid of pro-Hamas students and faculty and, um, the detainment and deportation of pro-Palestinian students.  So that's definitely a shift.

Q.  You indicated that people from Camera had accused you of associating with pro-Hamas causes.  Has anybody from the U.S. government ever accused you of that?

A.  Not that I'm aware of.  No.

Q.  Okay.  And with respect to this article that you indicated that you are refrained from writing.  Your

opinion is that this article would have been viewed by the government as a reason to deport you?

A.   To be perfectly honest, I don't trust the government to make a distinction between a critique of Israel and pro-Palestinian positions and the support for Hamas.  I haven't seen evidence of that distinction.

Q.   Did I hear you correctly yesterday when you indicated that this article that you were thinking of writing you intended to be somewhat critical of Hamas?

A.   Yes, critical of Hamas and critical of the Israel government both.  I don't believe that you have to do one or the other.

Q.   Of course.

THE COURT:  Forgive the interruption.  I want to go back to how you answered the earlier question.

THE WITNESS:  Yes.

THE COURT:  Do I understand you to say that you don't understand the United States government to make a distinction between criticism of the State of Israel and its conduct in Gaza, and with respect to Palestinians, and activities that are pro-Hamas?

THE WITNESS:  Yes, correct.

THE COURT:  I understand that's what you think?

THE WITNESS:  Yes.

Q.   And your opinion, or your belief, your professed

belief, is that if you wrote an article that was critical of Hamas, that might expose you to the heightened risk of deportation?

A.   Correct.  But not because of my criticism of Hamas, because of my -- but also the criticism of the Israeli government.  And because I'm already, um, due to my previous role as Director, and, um, it's not just Camera, I mean it's one person who has an entire blog dedicated to write about the Center of Middle East Studies and has mentioned me.  So overall it's wider than just one organization.

Q.   Those organizations that you indicate --

A.   Yes.

Q.   -- were, um, alleging that you were tied to Hamas or supportive of Hamas in any respect, those weren't government organizations, were they?

A.   No.

Q.   Okay.  And with respect to those, um -- those criticisms, have you heard -- have you had any communication from the United States government, or its agents, regarding any of those publications -- well any of those allegations?

A.   Um, I don't know whether I can speak about this, but there has been an HHS Title VI investigation of Brown and, um, some of this came up.

Q.   Without going into details because --

A.   Yeah, I don't think I should talk about it.

Q.   -- there's concern about possibly intruding upon other litigation, um, apart from that belief, is there anything else that would lead you to believe that the government has associated -- the U.S. government has associated you with pro-Hamas activity?

A.   No.

Q.   Now you indicated that you had traveled overseas in 2025?

A.   Yes, correct.

Q.   Can you help me remember when you left to travel overseas?

A.   Yeah, so, um, I traveled -- first of all, in December 2024, I traveled to, um, spend the break with my, um, family, with my daughter, and, um, I saw my mother in Germany, and my partner, and I was in the UK and then in Germany.  And I came back early -- no, I also spent a week in Berlin.  And I came back early, um, because Brown University asked everyone who was not a U.S. citizen to come back prior to the inauguration, um, there was a worry that there would be -- that there would be issues at the airport.  So I came back.  I think it was the 18th of January.  I don't know exactly, but sometime, um, just a couple of days before the

inauguration, which was on the 20th, I think.

And then I, um, had -- I traveled on the 8th of March.  It was my mother's birthday and my mother was not well, she's in a care home, and my father passed way and I'm the only daughter, so I went and I arrived on the 9th of March, and I arrived to the news of the arrest of Mahmoud Khalil.

And at that point, as I said yesterday, I mean I -- I was quite nervous, but I decided that I had to see my mother, and I did.  And I did go on to Switzerland to give my talk and I didn't go home on the holiday.  And I came back a couple of weeks after I traveled -- I mean after I left the country.

Q.  Was your return to the United States in approximately April of 2020?

A.  No, no, it was like two weeks later.  So it must have been on the 8th or whatever was two weeks later. So it was before the end of March.  I know it was before the arrest of Rumeysa Ozturk, because I remember after I arrived a few days later, I heard about the arrest and then I saw the pictures.  So, um --

Q.  So you've traveled to the United States twice since the Trump administration -- strike that.

You've traveled outside the United States twice since the Trump administration was voted in, correct?

A.   Correct.

Q.   Now when you -- and your concern that you've articulated with respect to your fears about being deported --

A.   Yes.

Q.   -- those are concerns you had, um, since even prior to Trump's election, correct?

A.   No.

     MR. BIALE:  Objection.  Sorry I'll drop it.

A.   Not those concerns.  I mean generally when I came early, it wasn't my concern, it was that the University asked everyone, all students, all faculty, who are not citizens, no matter whether they have spoken out on Palestinian or not to come back before the inauguration.  So I was just following, you know, what Brown wanted.  It wasn't that I was worried coming in.

     It is true that in March when I returned from my travel to see my mother and give the talk -- or give a couple of talks in Switzerland, that, um, I was scared.  I mean by that time, as I said, I left on the 8th and arrived on the 9th, and I think Mahmoud Khali was arrested on the 8th.

Q.   And by that time your views, expressed through your work and the, um, CMES, those were well-known in your opinion?

A.   What do you mean by "well-known."

Q.   You indicated you were the Director of the CMES prior to that point in time?

A.   Yes.

Q.   And then the allegations about, um, you supporting Hamas had manifested publicly prior to that trip to Switzerland?

A.   I mean I don't know what you mean by "manifested publicly."  I have never been at the forefront, the first avante-garde in terms of pro-Palestinian speech or activism, okay?  So I didn't think that I would be like one of the first people.  But I also saw that things are moving in a certain direction and eventually it would be my turn, given my role and what is out there.  And so if someone was going to do some research, as I was answering, or if my name were mentioned, then, yes.  But I didn't think it would be like first-row.

Q.   Where did you fly into after your trip to Switzerland, what airport in the United States?

A.   I always fly into Boston.

Q.   To Boston, Logan?

A.   Uh-huh.

Q.   And when you arrived at Boston, Logan, were you detained by ICE?

A.   No.

Q.  Were you, um -- were you questioned by anybody at CBP regarding your prior scholarship?

A.  No.

Q.  Were you questioned in any way about your prior work or the issue of Palestine?

A.  No.

Q.  Now you're aware that sometimes people who come into the United States are pulled aside for additional questioning, you're aware of that, correct?

A.  Yes.

Q.  And were you -- sometimes they call that "secondary."  Do you understand that term?

A.  Yes.

Q.  Were you called into "secondary" for questioning?

A.  No.

Q.  You weren't.  In fact at no point in time, upon your return from your Switzerland trip, were you ever, by any representative of the United States, questioned about the prior work or your, um, the allegations regarding your connection to Palestine, isn't that right?

A.  Yeah, that's right.  But as I said, I'm not frontline.  So me being able to enter in March doesn't mean that I would be able to enter in November or December.  I mean I -- yeah.

Q.  You believe that eventually the government would

come for you?

A.   Well I hope not.  I mean that's why I'm here.

Q.   Okay.  And that belief was -- I believe you indicated yesterday, informed in part by your upbringing, is that a fair characterization?

A.   Which belief?

Q.   The belief that you were a potential target for deportation?

A.   No, it has nothing to do with my upbringing in Germany.

Q.   Okay.  Yesterday, and perhaps I misheard.

     Yesterday you indicated that you were sensitive to issues regarding immigration because you grew up in Germany.  Did I misremember that?

A.   Yes.  Yes, that is, um -- what I was trying to say is that, um, I, growing up in Germany, I became sensitive to ideas around silence and complicity, because of the history of Nazi Germany and the holocaust, and you know the majority of -- well many many many Germans, the majority of Germans, just stayed silent or pretended that they didn't know, or they didn't speak up, and in my mind that is complicity and contributed to the holocaust.  So that's what I said in terms of it shaped my, um, you know my awareness.

Q.   Okay.  And you did not grow up in the 1940s in

Germany, did you?

A.  No, I did not grow up in the 1940s.  (Laughs.)  But I grew up in the '60s and '70s and '80s where, um, education, beyond history classes, was very much focused on making sure that that history is never going to happen again.  And at the same time I -- as I was enjoying the privilege of living in a democratic country that was trying to come to terms with its past, I also saw how my relatives in Iraq were living under the Bathe regime, the dictatorship, how my relatives were scared to even speak on the phone.  My, um, one of my uncles was executed by Saddam Hussein.  So I saw what a dictatorship should be like.  I feel that I have to use my privilege, as someone who is educated and grew up in Germany, to fight for democracy, freedom of speech, academic freedom, that's where my background comes in.

Q.  Your -- your family's experience in Iraq, that you just described, did that in any way inform your concern that you might be deported from the United States?

A.  Um, no.

        (Pause.)

        MR. KANELLIS:  We tender the witness.

        THE COURT:  Anything else?

        MR. BIALE:  No redirect.

        THE COURT:  You may step down.  Thank you.

Call your next witness.

MR. BIALE:  The plaintiffs call Mike Mathis.

THE COURT:  He may be called.

(MICHAEL J. MATHIS, sworn.)

THE CLERK:  State your full name, spelling your last name, please.

THE WITNESS:  Mr. Michael J. Mathis.  My last name M-A-T-H-I-S.

MR. WANG:  Good morning, your Honor.  I'm Xiangnong Wang for the plaintiffs.


* * * * * * * * * * * * * * * *

MICHAEL J. MATHIS

* * * * * * * * * * * * * * * *


DIRECT EXAMINATION BY MR. WANG:

Q.  Mr. Mathis, good morning, thank you for joining us today.

Where do you live, Mr. Mathis?

A.  I live in --

THE COURT:  Just the city and town.

A.  Somerville, Massachusetts.

Q.  And how long have you lived there?

A.  I moved in June 2019.

Q.  And do you have a security system installed at your

home in Somerville?

A.   Yes, I do.

Q.   And who installed the system?

A.   It's a mixture between the previous owner of my unit and me.

Q.   Okay.  And when did you install the system that you had had a part in installing?

A.   I installed it roughly, um, in 2020.

Q.   Could you please briefly describe the security Camera system?

A.   Yes.  There are two security cameras facing the rear of the house.  Two security cameras facing the front of the house.  And two in the interior.

Q.    And is one of the cameras facing the front of the house, does that show the street or sidewalk in front of your house?

A.   Yes, it does.

Q.   And is that one of the cameras that you yourself installed?

A.   Yes, it is.

Q.   Does your security system record continuously or does it record by motion?

A.   It does both, I have a continuous stream and a motion stream.

Q.   And does your system add a date and timestamp to the

videos that it records?

A.  Yes, it does.

Q.  Do you have footage from your security camera system from March 25th, 2025 at around 5:00 p.m.?

A.  Yes, I do.

Q.  And why do you remember that date and time specifically?

A.  Because there was a large police presence outside my house after that time.  I went to look at the security cameras.  I saw something notable.  So I saved it off.

Q.  And have you reviewed this footage again?

A.  Yes, I have.

Q.  Can you describe what the video footage you're talking about shows?

A.  Yes.  I see two cars parked in front of my house and a group of masked people getting out of the car, approaching a young woman, and moving her into the car, and later driving away.

Q.  And to your knowledge was your system functioning properly at the time?

A.  Yes, I believe it was.

Q.  Did you take any steps to preserve this video that you're talking about today?

A.  Yes, I saved it off to the side.

Q.  And why did you do that?

A.  Oftentimes the secured camera footage will lapse and it will be deleted and I thought that this was notable so I should save it off to the side.

Q.  Did you share this video that you're talking about with anyone else?

A.  Yes, I shared it with, um, various news outlets, I shared it with my Congresswoman's office, Anna Preston, and I shared it with the plaintiffs here.

THE COURT:  I didn't catch the last bit?

MR. WANG:  "And the plaintiffs here."

THE COURT:  Oh, yes.

Q.  Just to confirm that last part, you did share it with counsel in this case?

A.  Yes.

Q.  That's great.

I'm now going to show you what's been premarked as Exhibit B, and that's Bates stamps AUP 01823-1.

A.  (Looks.)

Q.  Do you recognize what this is?

A.  Yes, I do.

Q.  And what do you recognize it to be?

A.  This is the front of my house.

Q.  Yes, there you go.

A.  (On screen.)

Q.  And how do you recognize this to be the front of

your house?

A.   That's my driveway and it's the corner of Electric Ave. and Mason Street.

     MR. WANG:  So with the Court's permission, I'd like to play a couple of minutes of this video.

     THE COURT:  Well he's authenticated it, it seems to me, and you want to offer it?

     MR. WANG:  Yes, I would like to offer Exhibit B.

     THE COURT:  Any objection?

     MR. KANELLIS:  No, your Honor, but I don't see any need to play it --

     THE COURT:  I don't see any need -- again in the interests of time.

     Unless, um --

     MR. WANG:  No further questions.

     THE COURT:  Very well.

     So B is admitted in evidence as Exhibit 225, in evidence.

     Any questions for this witness, Mr. Kanellis?

     (Exhibit 225, marked.)

     MR. KANELLIS:  Just one question, your Honor.


CROSS-EXAMINATION BY MR. KANELLIS:

Q.   Did you personally observe the conduct outside your home separate and apart from what's on the video?

A.  I did not see what was on the video, but I saw the police presence soon after, and that's when I went outside.

Q.  Okay.  Did you -- did you see it and hear it or did you hear it -- I'm sorry, see it?

A.  Are we talking about what's on the video?

Q.  No, the police presence outside.

A.  Yes, I saw it out my window.

Q.  You saw it out your window.  Did you hear -- was there any sound associated with what you --

A.  There was a police officer on my front steps talking to my upstairs neighbor and I heard that.

Q.  Okay.  Did you hear the specific conversation at all?

A.  No, I didn't.

Q.  Okay.  Other than the police officer speaking to a neighbor on your front steps, did you hear anything else?

A.  No, I did not.

MR. KANELLIS:  No more questions, your Honor.

THE COURT:  Nothing further for this witness?

MR. WANG:  Nothing further.

THE COURT:  Thank you.  You may step down.

225 is in evidence.

Call your next witness.

MR. BIALE:  Your Honor, the plaintiffs call Bernhard Nickel.

THE COURT:  He may be called.

(Witness takes stand.)

(BERNHARD NICKEL, sworn.)

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  It's Bernhard Nickel, and the last name is spelled N-I-C-K-E-L.

MR. BIALE:  May I proceed, your Honor?

THE COURT:  You may.


* * * * * * * * * * * * *

BERHARD NICKEL

* * * * * * * * * * * * *


DIRECT EXAMINATION BY MR. BIALE:

Q.  Good morning, Professor Nickel.

A.  Good morning.

Q.  So where do you work?

A.  At Harvard University.

Q.  And what's your position at Harvard University?

A.  I'm a Professor of Philosophy.

Q.  And is that your title?

A.  Yes.

Q.   Have you recently held any other titles or positions at Harvard?

A.   Yes, I've been Chair of the Philosophy Department for the last 3 years.  My term ended at the end of June.

Q.   Um, so where were you born?

A.   In Germany.

Q.   And, um, of what country are you a citizen?

A.   Germany.

Q.   How long have you lived in the United States?

A.   About 30 years now.

Q.   And what's your immigration status here?

A.   I have a green card.

Q.   Approximately when did you get your green card?

A.   About 20 years ago.

Q.   Now, are you familiar with a, um, the following term, the "Ideological Deportation Policy"?

A.   Yes, I am.

Q.   What do you understand that term to mean?

A.   Well it's a deportation policy insofar as it's a policy in either removing or getting people to remove themselves from the United States, um, noncitizens, that is, and it's ideological insofar as it seems to be targeted specifically at people who have a certain ideological profile, specifically people who have spoken up or are politically engaged in pro-Palestinian causes.

Q.  Do you believe that the Ideological Deportation Policy, as you have just described it, is a policy of the current Presidential administration?

A.  Yes.

Q.  In broad strokes, um, Professor Nickel, how has the Ideological Deportation Policy affected you personally?

A.  Well I've stopped going to protests, I've stopped signing on to public letters, and I've cancelled international travel.

Q.  Okay.  I'm going to ask you about the specifics of some of those, but let me go back, if you don't mind, to, um, when you moved from Germany to the United States.  What prompted that move?

A.   So I came to the United States to attend college, I went to college at Cornell, in Ithica, New York, in Upstate New York, and, um, it had been a dream of mine to come to the U.S. for a very long time.  I felt an affinity for the United States for almost as long as I can remember.  I grew up in Germany.  I was born in '75. I'm of the generation that, um, felt deeply grateful for what America did during World War II.  And more specifically in my case, I grew up next to an American Air Force hospital, and so I was exposed to American pop culture a lot, watched American TV, listened to American radio, played basketball with the American service

members and the kids who went to high school there.  And America was always deeply attractive to me, it held the promise of being a place where history isn't quite destiny, where you can be very different things than perhaps your own history or your country's history would have set you up to be.  And that was deeply attractive to me at the time.

Q.  And when you came to Cornell University, did you, um -- did America live up to your expectations?

A.  Yes.  (Laughs.)

Q.  Okay.  What did you plan to study at Cornell?

A.  I came in planning to be an Economy major.

Q.  Okay.  That's economics?

A.  Yes, Economics.

Q.  Did you end up majoring in economics?

A.  I did not.

Q.  Why not?  What happened?

A.  I took a course in economics.  (Laughter.)  But more seriously, one of the things I was very attractive of coming to school in America, as opposed to staying in Germany, is at the American college level one gets a very broad education, one doesn't just sign up for a single major and basically start a MMA program.  And, um, so I was exposed to many different areas of study, including history and philosophy.  And not only did

economics not attract me, other fields did.

Q.  And did you end up majoring in one of those fields?

A.  Not officially, officially I was at Cornell, I was called a "cult scholar," which was designing your own major, but I ended up focusing most of my studies in philosophy.

Q.  And after you graduated from Cornell University, what did you do immediately after college?

A.  I took a gap year and I lived in Southern California, um, in San Diego, volunteering for Habitat For Humanity.

Q.  And I take it you built houses for Habitat For Humanity during that year?

A.  That's right.

Q.  And then after that gap year, what did you do?

A.  I matriculated at MIT, at the Massachusetts Institute of Technology, in their PhD program in Philosophy.

Q.  Okay.  And, um, did you complete the PhD program in philosophy at MIT?

A.  I did.

Q.  And did you write a dissertation?

A.  I did.

Q.  And after you, um, completed your PhD, what did you do next?

A.  First, um, I worked as an Adjunct Professor at Tufts University for a year.  I did that because a couple of weeks before I had to finish my PhD, my daughter was born, and it made sense to me, and given where my wife was career-wise, for me to take a year, basically a gap year, and be a stay-at-home dad.

Q.  And then after your position as an Adjunct at Tufts, did you obtain a full-time position at a university?

A.  I did, I obtained a tenure-track position at Harvard.

Q.  Okay.  And what year was that?

A.  2006.

Q.  Okay.  And you've been at Harvard ever since then?

A.  That is correct.

Q.  And I take it you were able to get tenure?

A.  I did.

Q.  Tell us, Professor Nickel, about your scholarly, um, writing?

A.  So my areas of specialization are in the philosophy of language and linguistics, and very broadly speaking I'm very interested in the way that, using the tools of linguistics and understanding language, to illuminate much broader concerns about human nature, about communications, how we're going to make sense of the world, and my case study was the focus of my work.  It

concerns what I called the "language of stereotypes," generalizations about the natural and social world that you might call the "Rule of Thumb," like ravens are black, tigers have stripes, lions have manes, Germans don't have a sense of humor.  (Laughter.)  And those generalizations aren't purely statistical generalizations, it doesn't seem, for one thing they mean very different things.  Most ravens are black, but it's certainly not true that most lions have manes.

But more importantly, if I think about the kinds of generalizations about national groups, about racial groups, ethnic groups, genders, very often those come in clusters.  So along with the nonhumorous aspect of being German, there's the idea of being detail-oriented, which is why you get precision German engineering.  There's an idea of being good at planning, but perhaps not very creative, and perhaps also aggressive, which is perhaps part of the explanation as to why Germany started a couple of world wars in the previous century.  Not that these explanations are any good, but the idea that seems reliable is that there's something like a nature that explains various other features, and I'm interested in understanding what those claims really amount to.

Q.  So if you'll permit me, and this may be dumbing it down way too much, but essentially you study the

structure of language and you look at how that informs us about broader issues, including issues of history and politics, is that fair?

A. Yes.

Q. Okay. What courses have you taught at Harvard?

A. So I've taught a broad range of courses. Almost immediately after coming to Harvard I took over one of the main introductory courses, which is a course named "First-year students, to introduce them to the field." I've taught just about every year that I've been on staff, except for those years I was on sabbatical. I've also taught survey courses in my own area of specialization, the philosophy of language. I've recently started teaching an introductory logic course. And then I've taught smaller seminars on far more specialized topics.

Q. Do any of your courses or, for that matter, any of your scholarly writings touch on issues related to the Israeli/Palestinian conflict?

A. No.

Q. Separate and apart from your work as a scholar and your work as a teacher, have you be politically active since you came to the United States?

A. To some extent, yes.

Q. Tell us about what you've done?

A.  Well in the more distant past, I've gone to some protests, especially as America started to wrestle much more with its history as it concerns race and also structural issues around gender, and so I took my daughter to some Pink Hat protests.  I also went to some Black Lives matter protests in Boston.  And more recently, I was more politically active signing on to public letters having to do with political issues, and also, um, going to some more protests.

Q.  And so you mentioned public letters that you've signed more recently.  Did any of those letters have to do with the Israeli/Palestinian conflict?

A.  Yes.

Q.  Okay.  Before we get more deeply into that, let me just ask you, are you a member of any organizations?

A.  Yes.

Q.  What organization?

A.  I'm a member of the AAUP, and the Harvard Chapter. I'm also a member of the American Philosophical Association.

Q.  And when did you join AAUP?

A.  Right around the time that the Harvard Chapter was founded, so I believe it's been about a year now.

Q.  Okay.  So the Harvard Chapter of AAUP is relatively new?

A.   Yes.

Q.   And you joined, fair to say, right around the time it started?

A.   About then, yes.

Q.   Why did you decide to join the AAUP Harvard Chapter?

A.   Um, over the past couple of years, you know over the past 2 years, 2 1/2 years, questions of faculty governance have become very important at Harvard. Harvard is one of the very few schools that doesn't have a faculty Senate.  And the AAUP, as an Association of University Professors, is one way for faculty to organize in order to make their voices heard in a more concerted way.

Q.   Okay.  I want to get now into some of the letters that you talked about that you signed.

     MR. BIALE:  Mr. Kumar, can you pull up Exhibit 83 in evidence.

     (On screen.)

Q.   And, Professor Nickel, could you take a look at the, um, first page of that document.

A.   (Looks.)  Yeah.

Q.   Okay.  And what's the date of the letter?

A.   July 1, 2019.

Q.   Okay.  And it looks like, um, it has some authors at the top.  But in addition to those individuals, did you

also sign this letter?

A.   I did.

Q.   Okay.  Tell us generally what this letter is about?

A.   It is about a strategy of historiography concerning the holocaust.  And, um --

Q.   I'm sorry?

A.   Is it possible to scroll to another page?

Q.   Yes.

MR. BIALE:  Mr. Kumar, if you could go down.

(Scrolls.)

THE COURT:  Let us know where we should stop.

THE WITNESS:  Yes, that's good.  Thank you.

(On screen.)

A.   So there's -- okay.  So the policy that's under discussion is "Unequivocally Rejecting Efforts to Create Analogies Between the Holocaust and Other Events, Whether Historical or Contemporary," and the letter demands that this, um, not be followed -- or asks that this not be followed.

Q.   And why did you sign a letter advocating, um, that a policy of not making analogies between the holocaust and other events be followed?

A.   So in Germany there certainly was a very strong historiographical tradition that, um, treated World War II, and the Nazi regime, the Third Reich, and the

holocaust, as sue generis, a "thing unto itself," something that cannot be understood, perhaps with the ordinary tools of historiography. And I certainly understand why that might seem appropriate insofar as, um, the horror of the holocaust are almost incomprehensible. At the same time I think this also led to not thinking about the times before and after the Third Reich, the things that led up to it, and its effects.

And so for somebody like me, who grew up in Germany in the '70s and '80s, it is often very difficult to understand the longer-term effects of World War II, of the Nazi seizure, of power and its maintenance of power, because I knew that there were the Nuremberg trials, the very top echelon of the Nazi hierarchy was eliminated. Of course Hitler didn't make it to the trials. But so much of the underlying structure was still there. And I think it's important that we understand, or at least that it's a possible avenue of understanding, that we think of, even something as horrific as the holocaust, as something that was brought about by people in all walks of life.

In fact, right around the time that I came to Cornell in the mid '90s, um, an American historian, Daniel Jonna Goldhagan had published a book, "Hitler's

Growing Executioners," in which he documented, quite extensively the way that ordinary Germans were part of the Nazi machinery, and he was celebrated in Germany, not because he made Germans feel good about themselves, anything but, but I think because it allowed many Germans to begin to wrestle with their past, because many of us have parents, grandparents in my case, who were members of the party.

Q.   Let me just ask you.  You've mentioned a term "historiography," just to make sure that we're all on the same page.  Would you explain what that means?

A.   Oh, the way that I use it, I just mean approaches to how to pursue historical inquiry and how to write history.

Q.   And, um, you talked about sort of a broader understanding of the forces that brought about the holocaust and the lingering effects in Germany.  And can you just explain to us how, um, those concerns apply to this idea of analogizing the holocaust to other events?

A.    Well the holocaust, as a major event, was the effect of many people working more or less in concert, making lots of decisions, and I think it's one form of analogy to ask where does something like that -- where else does something like that happen?  I think that's a form of analogy that, given the statements here, would

be, um, forbidden.

THE COURT:  That would be --

THE WITNESS:  Forbidden.

THE COURT:  Forbidden.

Q.  And in your view that's a form of analogy that should be permitted?

A.  Yes.

Q.  Did you have any concerns, um, when you signed on to this letter, about how it could affect your employment in the philosophy department at Harvard?

A.  No.

Q.  Did you have any concerns, when you signed onto this letter, about how it could affect your immigration status in the United States?

A.  No.

Q.  Let me show you another document.  This is Exhibit 84 in evidence.

A.  (Looks.)

Q.  And I'm happy to show you additional pages of it, if that would be helpful.  Just let us know.

A.  (Reads.)  Okay.

Q.  What's this document?

A.  It's a Harvard faculty statement in support of Palestinian liberation.

Q.  And did you sign onto this document?

A.   I did.

Q.   Why did you sign onto this document?  I'm sorry, before we get there, can you just tell the date of this document.

A.   Yes, it's dated May 20th, 2021.

Q.   Okay.  And now tell us why you decided to sign on to this statement and generally what the, um, what the gist of the statement was?

A.   (Reads.)  Would you mind scrolling down just a little bit.  (Scrolls.)  Thank you.

     The demand, at the end of the statement, is an end to U.S. support for Israel's apartheid regime and the condemnation of state aggression.

Q.   Okay.  And why did you decide to align yourself with this particular statement?

A.   I've become aware of, um, the conditions in Gaza and, um, I became aware that the conditions are horrifying, and it seemed important to try to support and, um, mark this fact, and express my support for people who are living under these horrifying conditions.

Q.   And did you, um -- and was this letter, um, released publicly?

A.   Yes.

Q.   And were the signatories publicly identified?

A.   Yes, I believe so.

Q.  Did you have any concerns, when you signed this letter, that public identification of your name with this message could lead to, um, problems with your employer?

A.  No.

Q.  Did you have any concerns, when you signed this letter, that your name being associated with it could lead to problems with your immigration status?

A.  No.

Q.  Okay.  I want to just talk to you briefly and then I guess I will show you one more letter.  I want to just talk about the attack of October 7th, 2023, um, and ask you about, um -- and the subsequent Israel military campaign in Gaza.  I'm going to ask about your personal reaction to those events and what the reaction was like on the Harvard campus?

THE COURT:  Well that's something of a compound question.  Let's break it down.  First, your reaction -- but the questions are appropriate.

First, your reaction to the events of October 7th?

A.  So the, um, the attack by Hamas, um, horrified me, just it -- it's just viscerally, it's almost incomprehensible the brutality of the attacks.

Q.  And how about the, um, subsequent Israeli military campaign that was a response to the attack?

A.  Well I was also deeply saddened and also horrified by all this blood and casualties that the campaign caused.

Q.  And now -- and I appreciate the Court's objection to my question, now you can talk about the reaction on the Harvard campus to those events?

A.  I think it probably makes sense to start with a statement released by several student groups shortly after the Hamas attack, holding Israel alone responsible for the events, for the attack.

MR. KANELLIS:  Your Honor, I apologize for the interruption, but an objection to the extent this calls for hearsay.  He's quoting a letter by --

THE COURT:  He is.  I'm not clear -- I have a more fundamental concern.  I've allowed all this on the issue of bias, because people's motivations are at issue here.  Why -- in my subsequent events really, why do we need this testimony here?  How does it help us in the issues in this case?

MR. BIALE:  Understood, your Honor.  Let me cut to the chase.

Q.  Did there come a time, Professor Nickel, that there was an encampment on Harvard's campus?

A.  Yes.

Q.  Okay.  And what was that encampment about?

A.   It was, um, an encampment that, um, asked for, um, and demanded Harvard's divestment from Israel and condemnation of the military campaign.

Q.   Did you attend the encampment at any point?

A.   Yes.

Q.   Approximately how many times did you attend the encampment?

A.   I guess around 10.

Q.   And just so we can get a timeframe, do you remember around what time period this was?

A.   I believe it was, um, starting about 5 or 6 weeks before the end of the spring semester of 2025, and it lasted, I believe, for about 4 -- 4 weeks or so.

Q.   And just to make sure, you said 2025.  Was this the spring semester -- you mean the semester that just ended or are we talking about the spring of 2024?

A.   Um --

Q.   In other words, was this a year ago or was this in the last couple of months?

A.   Oh, no, I'm sorry, you're right.  It's 2024.

Q.   Thank you.

A.   Yes, of course.

Q.   Why did you go to the encampment approximately 10 times, as you testified?

A.   For a couple of reasons.  At first I went because,

um, I knew some of the students at the encampment, they had been students in my classes, um, and some of them were philosophy majors.  And then later on, when the university began to start disciplinary proceedings against some of the students, I met with students there, because as part of the disciplinary process at Harvard, students that are brought before the administrative board are entitled to a faculty advisor, and I served as the faculty advisor for a couple of the students.

Q.  And did you, um, other than going to visit your particular students, did you wish to express sympathy or support for any of the positions that the protesters were talking at the encampment?

A.  Yes.  I mean it was a -- a somewhat complicated thing, because on the one hand, to the extent that the protesters were drawing attention to the continuing, um, terrible human toll that the war took, um, I thought that was very important, and I supported that.  On the other hand, my own attitudes towards thinking about the university specifically, the best thing, as a means of bringing about broader political change in the world, um, I mean I don't find that all that compelling.  And so that part of it, um, I probably wasn't deeply in support of.

Q.  Did you see anything at the encampment or hear about

anything that occurred there that you, um, would deem to be antisemitic?

A.  Yeah, unfortunately.

Q.  What was that?

A.  Um, I saw a large-scale caricature of what looked to me like our then interim President Garber, um, with, I believe, the Devil's horns and a Devil's tail.  And that's just a very, from now on, antisemitic trope.

Q.  And I think you sort of alluded to this in your answer, but did you approve of that, um, the use of that image in the students' protest?

A.  No.

Q.  Okay.  Now, um, when you, um, went to the encampment, did you have any concerns that your presence there would cause you problems with your employer, Harvard University?

A.  No.

Q.  Did you have any concerns that your presence there would, um, create problems for your immigration status?

A.  No.

Q.  I want to turn your attention to, um, the election in 2024.

So after President Trump was elected, did you send --

THE COURT:  I interrupt only because I'm going to

take a recess at quarter to 11:00.  Do you want to take it now and then pick up half an hour out?

MR. BIALE:  I think that makes sense, your Honor, I have a little bit more with the witness.

THE COURT:  I'm not crowding you, it's just you said "turning to another point in time," that's why I interrupted.  It's your call.

MR. BIALE:  I think it's a good time to take a break, your Honor.

THE COURT:  We'll take the morning recess.  We'll start at 10 minutes after 11:00.

We'll recess.

THE CLERK:  All rise.

(Recess, 10:40 a.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Tuesday, July 8, 2025, to the best of my skill and

ability.




/s/ Richard H. Romanow 07-8-25
_____
RICHARD H. ROMANOW   Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 75 - 148

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
         Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
         Defendants

\*\*\*\*\*\*\*\*

BENCH TRIAL DAY 2

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 8, 2025

\*\*\*\*\*\*\*\*

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEX ABDO
        Knight First Amendment Institute at Columbia
        University
        475 Riverside Drive, Suite 302
        New York, NY 10115
        (646) 745-8500
        ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
        Sher Tremonte LLP
        90 Broad Street, 23rd Floor
        New York, NY 10004
        (212) 540-0675
        cgans@shertremonte.com
        For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
        DOJ-Civ
        P.O. 878
        Ben Franklin Station
        Washington, DC 20044
        (202) 616-9123
        ethan.kanter@usdoj.gov
and
SHAWNA YEN
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        shawna.yen@usdoj.gov
        (617) 748-3100
        For Defendants

INDEX

WITNESS                                                                PAGE


BERNHARD NICKEL

   Direct Examination By Mr. Biale (continued)            78
   Cross-Examination By Mr. Kanellis                      93
   Redirect Examination By Mr. Biale                     116

SARA JOHNSON

   Direct Examination By Mr. Abdo                        121


NADIA ABU EL-HAJ

   Direct Examination By Ms. Conlon                      131


        E X H I B I T S


Exhibit No.                    Received


   226                           125

   227                           129

P R O C E E D I N G S

(Resumed, 11:12 a.m.)

THE COURT:  Mr. Biale, you may continue.

MR. BIALE:  Thank you, Your Honor.

BY MR. BIALE:

Q.    Professor Nickel, when we left off at the break I was about to ask you about the November 2024 election of President Trump.  You recall that event?

A.    Yes.

Q.    Let me ask you, without getting into your personal views, at the time you were chair of the philosophy department, right?

A.    That's correct.

Q.    And so as a faculty member and university administrator, what was your reaction to the election?

A.    Well, especially in my role as chair, I think it's part of my job to help the community and help hold the community together, create community as much as possible.  So I, as part of that, I would at times send out emails to the community at large to talk about things that concerned all of us.

Q.    And when you say "the community," what are you referring to?

A.    I mean, my colleagues in the department, the graduate students in the department and our undergraduate majors.

Q.    Okay.  So you mentioned that you sent out emails.  Do you recall if you sent out one of these emails to the department or

to the department community, I'll say, around the time of the election, shortly after the election?

A.   Yes, I did.

MR. BIALE:   Okay.  Mr. Kumar, if you could pull up Exhibit 77 in evidence.

Q.   Professor Nickel, take a moment to look at that document on the screen.

Is this the email that you sent to the philosophy department community shortly after the 2024 election?

A.   Yes.

Q.   Okay.

THE COURT:   Say again the exhibit number, excuse me?

MR. BIALE:   Sure, Your Honor.  It's Exhibit 77.

THE COURT:   Thank you.

Q.   Now, if I can direct your attention -- let me just, just focusing quickly on the date, when was it sent?

A.   November 7 of 2024.

Q.   Okay.  And we won't get into it what day of the week that was, but you see at the beginning it says, "In the wake of Tuesday's election."  So fair to say this was sent shortly after the election?

A.   Yes.

Q.   Okay.  I want to direct your attention to the second paragraph, and you say there, "I take the campaign's rhetoric about, among other things, deportations and using the resources

of the state to go after political opponents both seriously and literally." What did you mean by that?

A.   Well, during the campaign there were statements by both Candidate Trump and others in the campaign, including Vice President Vance, arguing that -- Vice President Vance, for instance, said that the universities are the enemy, and Candidate Trump at various points suggested that if he were elected he would use the powers of the state to prosecute his enemies, his political opponents.

Q.   When you say "political opponents," in that context, who are you talking about?

A.   You know, unfortunately a very broad range of people, but they certainly included people who might have been politically active, especially in pro-Palestinian causes, in large part because in many of the statements he made concerning the campus protests that had preceded the election, the protesters seemed to be characterized as antisemitic quite broadly and pretty much universally.

And to the extent that antisemitism is a very good ground for bringing the powers of the state to bear, it seemed that that was a case where a lot of students potentially might be threatened.

Q.   And when you said "deportations," is it that issue specifically that you had in mind, student pro-Palestinian protesters?

A.    It's certainly one of them I had in mind.  I'm not sure if that's the only one.

Q.    And then in the next sentence you said, "I'm also keenly aware of the chilling effects on freedom of expression."

Just tell us a little bit about what you were thinking of when you wrote that.

A.    So I think as an international student one is particularly vulnerable.  When I came to America, I came here on an F-1 student visa before I got my green card.  And even me who was coming usually from Europe, whenever I had to go through immigration, it was a moment of deep anxiety because I felt very much at the mercy of a bureaucracy that may or may not -- that I may or may not have protections from.

So I felt it especially to the extent that international students would be the targets of some of these activities, I could easily imagine them wanting to keep a very low profile and not speak up in favor of not just pro-Palestinian causes, certainly those as well but others as well that might run afoul of the administration.

Q.    Okay.  Mr. Kumar, you can take that down.

I asked you at the beginning of your testimony about the ideological deportation policy.  In your view, has the Trump administration since being inaugurated put that policy into effect?

A.    Yes.

Q.   What have you seen or heard about that makes you believe that the administration has done that?

A.   Certainly the arrests of Mr. Khalil and Ms. Ozturk, along with broader statements that were covered in the press to the effect that protest is not something that is welcomed, certainly not all forms of protest.  And so there are the statements and then there are the arrests.

Q.   So I want to ask you about each of those.  Just first focusing on the statements, is there a specific statement that you have in mind or a specific government official that you have in mind who made a statement, if you remember?

A.   No.  At this point I don't remember.

Q.   Okay.  Let me ask you then about the arrest of Mr. Khalil. How did you hear about that?

A.   In the media.  I read it in the newspaper.

Q.   What did you read?

A.   That he was arrested, apparently very close to his -- I don't recall if it was in his home or close to his home.  And that this was in the presence of his, I believe, at the time pregnant wife.

Q.   And what about that incident that you learned at that time led you to believe that this was a manifestation of the ideological deportation policy?

A.   Nothing in the coverage of this case indicated that he had done anything other than exercising his political speech.  He

was very active.  He was, as far as I could tell, one of the leaders of some of the campus protests at Columbia, but that was the extent of it.

Q.   Okay.  And did you read at the time about what Mr. Khalil's immigration status was in the country?

MR. KANELLIS:  Objection, Your Honor.  We're getting into a lot of hearsay.

THE COURT:  Again, that's not for the truth but what he came to understand was his status and then this individual himself.  So I'll allow it but not for the truth.

So what did you come to think his immigration status was?

THE WITNESS:  I believed that he had a green card.

Q.   Okay.  Based on what you heard about Mr. Khalil, his arrest, his prior activities and his immigration status, how did learning about all that make you feel?

A.   It scared me because I didn't think that those kinds of -- yeah, I didn't think that those kinds of arrests would happen in America, but they did.

Q.   And other than how it made you feel about America generally, did it affect you personally in any way?

A.   I mean, that, although I think this became much more sharp, this came much more sharply into focus a little while later when Ms. Ozturk was arrested in the way that she was.

So I told you earlier that I came to America because I

have something like an affinity, and I hadn't planned to be an immigrant.  I thought I'd come here for four years, maybe six, maybe do a master's and then go back to Germany.

Of course that didn't happen.  I ended up going to college, finding my career here and meeting my wife, having a kid.  And I did that in part because I actually love this country.  And it's the kind of love that other immigrants who have been in the situation where they could just affirmatively choose to move here had.

And throughout all the ups and downs and all the different parts of my life and certainly all of the different ways that America came to wrestle with itself and think about the ways it could try to create a more perfect union, that love never changed.

And as my fear of political reprisal grew, I just don't feel that way about the country in quite the same way.  That's depressing and it's destabilizing.

Q.    So let me ask you, you said that that sort of came into sharper relief with Ms. Ozturk's arrest.  How did you hear about that incident?

A.    Also in the media.

Q.    Okay.  And just tell us what you remember hearing.

A.    So first I just read accounts in the newspapers saying that she was picked up in broad daylight off the street.  And what I remember is that the only thing that she had done which

could have anything to do with the arrest was publishing a piece in the Tufts student newspaper.

Q.   And you mentioned that she was picked up on the street. Do you recall seeing a video of that incident?

A.   I did.

Q.   Approximately when did you see that video?

A.   Probably like two or three days after it happened.  I read accounts of what was in the video.  And I didn't really want to see it.  I thought it would be really disturbing.  But then after a while I thought it's important that I see it, and so I did see it.

MR. BIALE:  So let me ask you, Mr. Kumar, to pull up Exhibit 225.  And Your Honor, we're not going to play the whole video.  I just want to play a couple of seconds of it so the witness can see it.

THE COURT:  You may.

MR. BIALE:  Mr. Kumar, if you can take us to 2 minutes and 30 seconds and play maybe five seconds of the video.

(Video played.)

MR. BIALE:  Okay.  Thank you, you can pause it.

Q.   Professor Nickel, is this the video that you saw that you were just talking about?

A.   Yes.

Q.   Okay.  By the way, you mentioned Mr. Khalil's arrest.  Do you recall ever seeing a video of that arrest?

A.    No.

Q.    Okay.  Now, after you learned about these two incidents and saw the video of Ms. Ozturk's arrest, did you start to think about how you might change your behavior?

A.    Yes.

Q.    Okay.  And we covered that a little bit, but if you can just tell us again, what were the specific things you did?

A.    So for me, the arrest of Ms. Ozturk was the turning point. That was the moment that I actually just decided on a blanket policy that I would keep my head down completely.  I would not go to protests.  I would not write, I would not sign on to public letters, and any other potential forms of publicity I would just avoid.

Q.    And did you attend any protests between Mr. Khalil's arrest and Ms. Ozturk's arrest?

A.    I did.

Q.    Tell us about that protest.

A.    There was one on the grounds of Harvard University in the yard.  I believe it was organized by the AAUP in support of Mr. Khalil.  And I was -- I had begun to be somewhat scared because of the arrest, but I decided I could still go to the protest.  I wouldn't be in the front row, and I have to admit I was glad that I wasn't in the picture that was published in the Harvard student newspaper when that protest was covered.

Q.    Why were you glad that you were not in the picture that

was published in the student newspaper?

A.    I didn't want to draw attention to myself.

Q.    Why not?

A.    Well, I thought that if I drew attention to myself, I might potentially be the target of something.  Specifically I had been hoping to do some international travel and go to Europe a couple of times earlier this year, well, once earlier this year and once right around now.  And I was worried about potentially being detained at the border.

There had been stories about people being detained at the border and then moved to a detention center in Louisiana or being turned away and being sent back to Germany.  And I was worried about those possibilities.

Q.    Let me ask you about the planned travel.  So you said there was one that you planned to take earlier this year and one that you would have gone on around now.

Tell us about the first trip.  Where did you plan to go and what was the purpose of your travel?

A.    I planned to go back to Germany pretty close to where I grew up because I wanted to see my half brother, and I wanted to take my daughter to see him.  He's about ten years older than me, and earlier this year he was diagnosed with terminal cancer.  Right now he probably has about nine or ten months to go.  And the trip in May would have been a chance for me to see him and for my daughter to spend some time with him.

He's at this point the only family I have left.  I'm an only child.  Both of my parents are gone.  I don't really have connections with my extended family.  And so this was important for me and would have been important for my daughter.

MR. BIALE:  Mr. Kumar, can you show us what's in evidence as Exhibit 170.

Q.    Professor Nickel, can you take a look at this exhibit?

A.    Okay.

Q.    I'm not going to ask you to -- it's in German.  I'm not going to ask you to translate it, but can you just tell us the date and tell us what this email is.

A.    So the date is March 11 of this year, and it's an email that I sent to my brother.  And there's some chitchat, but the basic point was to say that my daughter's summer plans had become more fixed and so I would be available to travel -- we would both be available to travel between the middle of May and the middle of June, from the 15th of May to the 15th of June.

Q.    So this was March 11, so this was I guess a couple of days after Mr. Khalil was arrested; is that right?

A.    Yeah.

Q.    But before Ms. Ozturk was arrested?

A.    That's right.

Q.    And so after Ms. Ozturk was arrested, did you change your plan?

A.    Yes.

Q.   Tell us what happened.

A.   Well, I decided not to go and see him.  And instead my daughter and I still took a trip here in the U.S.  Just because it was nice to spend some time with her after both of our semesters were over, but we very consciously took a domestic trip.

Q.   And I take it you were not able to see your brother on that domestic trip, right?

A.   That is correct.

Q.   And let me ask you then about the trip that you planned to be on now.  What was the purpose of that trip and where were you going to go?

A.   I was planning on going to Edinburgh in the U.K. for an academic conference.  And depending on exactly how my plans shaped up, I had planned to see some other people who work in the same area as I do, same discipline area I mean.

Q.   Was that a conference you were invited to?

A.   As a participant, yeah.  It's put on by several fairly close friends of mine.

Q.   Have you previously, I'm talking now before March of 2025, previously attended conferences, academic conferences outside of the United States?

A.   Yes.

Q.   Approximately how many?

A.   Well --

Q.   That may be an unfair question.

Is that something that you used to do frequently?

A.   Fairly frequently, yes, certainly once COVID ended.

Q.   Okay.  And this trip to Edinburgh for the academic conference, did you go on that trip?

A.   No.

Q.   Why not?

A.   Because I was worried about international travel, and specifically I was worried about potentially being detained at the border when I tried to re-enter.

MR. BIALE:  Okay.  Now, if I can just have a moment, Your Honor.

Q.   I want to go back now -- Mr. Kumar, you can take that down -- to, you said that after the arrest of Ms. Ozturk you decided as a blanket policy not to sign on to any more public statements, right?

A.   That's correct.

Q.   Were you still chair of the philosophy department at that time?

A.   I was.

Q.   And did you still engage in your practice of at times sending emails to the department community?

A.   Yes.

Q.   Did you consider that to be making a public statement?

A.   No.

Q.   Why not?

A.   It's an email.  So usually I sent these emails, and they're emailed to a very specifically defined group of people, the faculty, graduate students and undergrads in the department.

Q.   And in some of those emails, if you recall, did you say anything that was critical of the Trump administration and its policies?

A.   Yes.

Q.   Why did you feel comfortable doing so in that medium?

A.   I wouldn't quite say that I felt comfortable.  I did feel like I had to do it.  I think it was -- I thought it was important to do it.  And I chose to do it because I thought that these are emails that are not public but are aimed at a very specific community, within which we all know each other fairly well.

Q.   And if you recall, was an excerpt from one of those emails at some point printed in The Harvard Crimson, the student newspaper?

A.   Yes, it was.

          MR. BIALE:  Mr. Kumar, if you can pull up Exhibit 81.

          THE COURT:  81?

          MR. BIALE:  81, 8-1.

Q.   This is -- I apologize for the big advertisement for the D. E. Shaw Group, but this is an internet printout of the

article.  Mr. Kumar, if you can just go down to page 2 and if you can enlarge the second paragraph.

So this is quoting something you said.  It says, "Philosophy Chair Bernhard Nickel wrote to his department."

Is this quotation from one of the emails that you sent, private emails, to the philosophy department community?

A.   Yes.

Q.   When you sent that email, did you anticipate or intend -- strike that.

When you sent the email, did you intend that your words would be publicized more broadly?

A.   No.

MR. BIALE:  Okay.  You can pull that down.

Q.   So Professor Nickel, you've testified about some of the concrete ways in which the ideological deportation policy has affected your plans and your activities, and you testified about how it's affected your feelings about this country.

Is there any other way that it's affected you that you think is important for this court to understand?

A.   I mean, I can share with you because of my role as chair but also my job as just a faculty member, I've spoken to students, students who at some points were also worried about this, this policy.  And there's just there's a fair amount of fear among our student body, to the extent that I feel for them.  I suppose that's a way that it's affected me.  And I

don't want to make it about myself.

Q.   I understand.  Well, to ask you one more question about yourself.  Why have you decided to come testify as a witness in this trial?

A.   You know, anybody can sign on to an open letter.  Anybody can go to a protest.  My sense was that, in this trial, somebody in my quite specific situation, somebody who is a senior scholar with a secure position at Harvard and who was not a citizen and who felt the effects of the policy, I don't know that there are that many people who could have done this.  So I thought this is something that's worth it.

     And frankly, I told you how my feelings have changed.  This is still, this is where I live, and I want this to be a country and a nation of laws, not of men.  And so I believe in these kinds of processes and procedures.  And this is me doing my part.

          MR. BIALE:  Thank you.  No further questions.

          THE COURT:  Mr. Kanellis, do you wish to question?

          MR. KANELLIS:  Yes, sir.

          THE COURT:  You may.

CROSS-EXAMINATION BY MR. KANELLIS:

Q.   Professor Nickel, good to see you again.

A.   Hi.

Q.   I'd like to ask a couple of questions about your membership in AAUP.  You indicated that you joined AAUP about a

year ago?

A.   I think that's about right.

Q.   Roughly.  And do you have a leadership position within the AAUP?

A.   I do not.

Q.   Okay.  And you mentioned a protest that you attended on behalf of AAUP this year, correct?

A.   I believe it was organized by AAUP.  I think it was on behalf of Mr. Khalil.

Q.   And with respect to other meetings of AAUP, beyond that protest, have you attended any of those?

A.   Yes.

Q.   How many?

A.   So these are meetings, like chapter meetings, as opposed to public protests.  Probably two or three.

Q.   Two or three in the last year?

A.   Yeah.

Q.   And outside of attending the public protest and those AAUP chapter meetings, have you done anything else on behalf of AAUP?

A.   I think I may have when I first -- when AAUP, when the Harvard chapter was first founded, I may have mentioned to my colleagues that the chapter is now founded and that they could consider joining.

Q.   Okay.  Other than that, have you done anything else

related to AAUP other than what you've described?

A.    No.

Q.    Let's talk about your scholarship for a little bit. You've been here in the United States, did you say, for 30 years?

A.    Just about.  I came here in the fall of 1996.

Q.    Okay.  And you've been a green card holder for 20 years? Did I hear that correctly?

A.    About that, yes.

Q.    Okay.  In the 30 years, just to be clear, you've never taught a course relating to the subject of Palestine, have you?

A.    That is correct.

Q.    In the 30 years you've been here you've never taught a subject relating to the topic of Israel, have you?

A.    That is correct.

Q.    With respect to seminars or other teaching opportunities you've had, have you led a seminar or engaged in any other teachings relating to the subject of Palestine or Israel?

A.    No.

Q.    You did, you have written letters, though, correct?

A.    I've signed on to letters.

Q.    Signed on to letters, and we've discussed a few of those. And we talked about a few letters that you had written regarding the Holocaust Memorial Museum?

A.    You're saying I wrote the letter?

Q.   That's fair.  Strike that.  Let me correct that.

You've signed on to letters relating to -- public letters that could be interpreted as relating to Palestine.  Fair statement?

A.   Yes.

MR. KANELLIS:  Okay.  Can you pull up, whoever is handling the exhibits, Exhibit 83?

Your Honor, may I approach the witness?

THE COURT:  You may.

MR. KANELLIS:  Actually, if you're able to pull it up. I can shortcut this, Your Honor, and bring it up.  This will be very brief.

THE COURT:  Yes.  We should help each other.

Q.   You referenced this briefly in your direct examination. This is a letter you wrote in 2019, correct?

A.   No, I did not write this letter.

Q.   This is a letter you signed on to in roughly 2019, correct?

A.   Yes.

Q.   Okay.  When signing on to that letter, that reflected to some degree your agreement with at least some of the statements in the letter.  Fair statement?

A.   Yes.

MR. KANELLIS:  Okay.  Can we go to the -- can we actually flip through the pages.  This may go quicker, Your

Honor, if I just give the witness the document so he can --

THE COURT:  However you --

MR. KANELLIS:  May I approach?

THE COURT:  You may.

Q.   Professor Nickel, please just take a moment and review that document just to make sure it's what you remember it to be.

Have you had an opportunity to review that?

A.   Yes.

Q.   Can you go to the last page, please.  And can you describe -- the last page reflects the number of signers to the letter.  Do you see that?

A.   At least on my printout there aren't any numbers.  I'm willing to be instructed on this.

Q.   I'm sorry.  Go to the penultimate page.  Okay.  There aren't numbers.

How many pages are in this entire document; can you count them?

A.   23 pages of signatories.

Q.   And is it fair to say that the majority of those pages are filled up with the names of signers of that document?

A.   Yes.

Q.   Would you estimate that the number of signers of that document is over 100 people?

A.   Yes.

MR. KANELLIS:  Okay.  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   Now, Professor Nickel, is it your opinion that your signature on this document relating to an open letter to the director of the U.S. Holocaust Memorial Museum was one of the factors that caused you concern after the Trump administration took over in November of 2024?

MR. BIALE:  Objection.

THE COURT:  No.  Overruled.  He may have it.

A.   Not at the time.

Q.   Not at the time.  How about after the fact, and I'll ask that question just to be clear.  After the fact, now that the Trump administration has come into power, do you believe that your signature on this letter could be a cause for the Trump administration to target you for purportedly pro-Palestinian views?

A.   Yes.

Q.   Okay.  And so there are hundreds of signatures on this document, and your testimony is you believe that you will be singled out for potential deportation because of your signature on this letter?

A.   That is not my testimony.

Q.   Okay.  Well, do you believe that there is a heightened risk that, because you signed this letter, that the Trump

administration would target you for deportation?

A.   That I do believe.

Q.   And your signature on this letter was one of hundreds?

A.   Yeah.

        THE COURT:  Okay.  And your signature on this letter was?

        MR. KANELLIS:  Exhibit 83.

        THE COURT:  No.  I didn't hear the last part of your question.  "And your signature on this is letter was."

        MR. KANELLIS:  Thank you, Your Honor.

Q.   It was one of hundreds of signatures on this document?

        THE COURT:  Thank you.

Q.   Correct?

A.   Yes.

Q.   You also signed what has been entered into evidence as Exhibit 84.  It's a Harvard faculty statement in support of Palestinian liberation.

     Do you remember your testimony regarding that letter?

A.   Yes.

Q.   Okay.  I have a quick question for you.

        MR. KANELLIS:  But, Your Honor, may I approach?

        THE COURT:  You may.  While he's doing that, 83 is an example of your view of historiography relative to the Holocaust, 83?

        THE WITNESS:  Mm-hmm.

THE COURT:  It's better if you say yes or no.

THE WITNESS:  Yes.  Sorry, yes.

BY MR. KANELLIS:

Q.   And with respect to -- is that Exhibit 84?

A.   Yes.

Q.   Okay.  With respect to be Exhibit 84, can you just flip through there and tell the court how many people signed that letter?

MR. BIALE:  Sorry, Your Honor.  Can we just have him pull it up.

THE COURT:  I have copies of these and I'm looking at it.

MR. BIALE:  I know, but I don't have a copy so I just want to make sure it's on the screen once we're talking about it.

THE COURT:  Well, I can answer this question.  This has 66, so the document speaks for itself.  Go ahead.

Q.   There are 66 signatories on the letter, correct?

A.   That's correct.

MR. KANELLIS:  May I approach, Your Honor?

THE COURT:  That at least is what it says.  Go ahead.

Q.   Same question about this letter, Exhibit 84.  Do you believe, now believe that your signature along with 65 other individuals on this letter written in 2021 would lead to the Trump administration deporting you?

A.   Do I believe that this signature by itself would cause the administration to deport me?

Q.   Yes.

A.   Categorically?  I believe that it creates a risk.  That it would definitely happen?  No.

Q.   It creates a risk that it would definitely happen?

A.   No.  It creates a risk, yes.  That it would definitely happen, no.  I do not believe that it will definitely happen.

        MR. KANELLIS:  Okay.  Could can we pull up Exhibit 77, please.

Q.   This is an exhibit you saw -- do you see your screen.  This is an exhibit that you wrote on -- an exhibit -- this is an email you wrote on November 7, 2024, correct?

A.   Yes.

Q.   This was immediately after the Trump administration was elected into office, correct?

A.   Yes.

Q.   Okay.  And immediately after the Trump administration was elected, you were issuing cautions to students relating to the potential adverse effects of the Trump administration, correct?

        MR. BIALE:  Objection.

        THE COURT:  I beg your pardon?

        MR. BIALE:  Objection.

        THE COURT:  He may press the question in that form.

        Can you answer the question?

A.   I don't know that I'd treat this as a caution.

Q.   Setting aside what's written in this letter, were you writing statements to students at Harvard after the Trump administration was elected that expressed your anxiety about the potential effects on students of the Trump election?

A.   To some students, yes.

Q.   To some students, all right.

MR. KANELLIS:  Your Honor, may I approach?

THE COURT:  You may.

MR. KANELLIS:  Let the record reflect -- one moment, Your Honor.

Your Honor, we're checking to make sure this hasn't already been admitted.  Otherwise I'll lay a foundation.

Q.   Can you take a look at that, sir.

MR. KANELLIS:  Your Honor, I have not provided you a copy.  I think that would help.  Sorry about that.  Let the record reflect the witness has been handed an exhibit I marked for identification as HB, and I believe it's in --

MR. BIALE:  We're just going to confirm it's in evidence.  We believe it's in evidence as Exhibit 78.

THE COURT:  I have it.  It is Exhibit 78 in evidence.

MR. KANELLIS:  My apologies for the confusion on my behalf, Your Honor.

THE COURT:  No problem.  Go ahead.

Q.   Mr. Nickel, this is a letter or email you wrote on

February 13, 2025, correct?

A. Yes.

Q. And you're touching upon, among other things, on the impact of the inauguration of the new administration. Fair statement?

A. I'm sorry. Did you ask me if it's the impact of the inauguration itself?

Q. I'll put another question. If you look at the second paragraph, you're discussing attacks on our institutions. Do you see that?

A. Yes.

Q. And what do you mean by "attacks on our institutions"?

A. So specifically -- well, I have to admit I'm not sure whether I meant higher education specifically or also things like the legal system more generally.

Q. All right. Fair enough.

If you go to the To line at the top of the page, do you see it says "Fill grad-list."

A. Yes.

Q. Was that an internet group that was set up at Harvard to communicate with members of certain communities at Harvard?

A. It's a mailing list that was up that includes all and only the graduate students in the philosophy department.

Q. With respect to that list, how many people were on that list; do you remember?

A.   I would think about 45.

Q.   45 people.  And anywhere on this document do you indicate that you don't want this document shared with other people?

A.   No.

Q.   So you understood when you wrote this email that it was possible that people may share this document here with third parties.  Fair statement?

A.   Yes.

Q.   And this document is critical, would you say, of the Trump administration?

A.   Yes.

        MR. KANELLIS:  Let's go to -- and I appreciate you doing this -- can we go to Exhibit 171, please.  The type here is very small.

        MR. BIALE:  You can zoom.

        MR. KANELLIS:  If you want to zoom in, that may help.

Q.   Do you recognize this document, Mr. Nickel, Professor Nickel?

A.   Yes.

Q.   And what is the purpose of this email that's sent by you?

A.   Yes.  It's an email that I forwarded to the faculty members in my department informing them of information that's made available by the Harvard International Office.

Q.   Okay.  And it's --

A.   Actually, I'm sorry.  It was actually, the thing that I

forwarded was written by our graduate school, but most of the resources point to the HIO, the Harvard International Office.

Q.    And this was written on March 31, 2025, correct?

A.    That is correct.

Q.    And why did you send this email to the faculty members of your department?

A.    Because, unfortunately, during the semester, the past semester, spring of 2025, information wasn't widely shared between different elements of our administration, and so the graduate school might sometimes send things just to the chair of the department, just to the director of graduate studies, even though the information would be very helpful to any faculty member who advised graduate students, for instance.

So the purpose of this email was to forward some of the information that I received to make sure that faculty members in my department had access to the information as well.

Q.    And when you wrote this, you intended that they distributed it to their students, the recipients of these emails -- the recipients of these emails; is that right?

A.    I did not intend for them to forward the email to the students.  I intended for them to make use of the resources that were in the email that I forwarded.

MR. KANELLIS:  Can we pull up Exhibit 172, please.

Let the record reflect the witness is being shown Exhibit 172, it's in evidence, from Bernhard Nickel, Subject:

Additional Conversation on April 2, 2025.

Q. Do you see, did you have an opportunity to review this document, sir?

A. I did.

Q. And what's the purpose of this document that you sent on April 2, 2025?

A. It's an invitation to the current graduate students but also prospective graduate students. So this was written at a time when students who had been offered admission to our Ph.D. program were on campus for a campus visit to determine if Harvard would be a good fit for them.

And during that time, I invited both the current grads and the prospective grads who were on campus to attend a conversation that I would facilitate but where they would be able to ask me questions but also talk to each other.

Q. Did you end up having such a conversation you've just described?

A. I did.

Q. You did. And when was that?

A. At the time that I indicated in the email, so whenever the following Thursday, I guess that would be April 3, at 5:00 p.m.

Q. Did you instruct any of the recipients of this email not to share this email --

A. No.

Q. -- with third parties?

A.    I did not.

Q.    So you knew it was a possibility that this email also could be shared with the public, correct?

A.    You know, it's a possibility that any email that I write could be shared.

Q.    Thank you.

And that email is warning of threats of the Trump administration, correct?

A.    I don't think that it's a warning.  It's a chance to discuss attacks and threats, yes.

MR. KANELLIS:  Apologize for doing this.  Can we confirm that this has not been admitted?  Our paralegal is printing documents, so we have to rely on this.  I just want to make sure.

While, we're waiting for that confirmation, may I approach, Your Honor, to facilitate things?

THE COURT:  You may.

MR. KANELLIS:  Professor Nickel, let the record reflect, is being handed what has been marked as for identification as HC, and we will confirm whether this has been admitted into evidence in just a moment.

MR. BIALE:  Your Honor, I'm being told by my expert team here that it's in evidence as Exhibit 79.

THE COURT:  Exhibit 79.

MR. KANELLIS:  Yes, sir.  So the document you're

reading --

THE COURT:  HC is in evidence, Exhibit 79.

BY MR. KANELLIS:

Q.   Professor Nickel, have you had an opportunity to review this document?

A.   Yes.

Q.   And this document discusses that you are facing serious threats as a community.  That's in the second paragraph, correct?

A.   That is correct.

Q.   And this document was written to whom; what groups are identified in the To and CC lines?

A.   So in the To lines, it is the graduate students in the philosophy department and our undergraduate majors at Harvard, they're called concentrators, which is the list is called "conc" for concentrators.  The CC is the list of faculty members of the department.

Q.   About how many recipients are on all of these lists combined, if you can estimate it?

A.   Maybe about 200.

Q.   200 recipients of this email?

A.   Yes.

Q.   And this email warns -- strike that.

And this email is very critical of the Trump administration.  Fair statement?

A.   It's critical of the administration, yes.

Q.   So all of these emails that we've discussed were written after the Trump administration took office in 2025, correct?

A.   Yes, I believe so.  I'm sorry, you've shown me several emails.  I had to think about it for a while.

Q.   You discussed how, after the attacks of October 7 in 2023, you were horrified by the Hamas attacks?

A.   Yes.

Q.   And did you publicize in any respect the fact that you were troubled by the Hamas attacks?

A.   Publicize?

Q.   Did you make public your views that you were troubled by the Hamas attacks?

A.   In the media?

Q.   In any respect.

A.   I sent emails to the philosophy department.

Q.   Okay.  Now, you also indicated that there was an encampment on Harvard campus in 2024 that you attended.  Do you remember that?

A.   Yes, I remember.

Q.   Did you publicly announce your attendance at this?

A.   No.

Q.   Okay, you kept that private.

     And to your knowledge, was anyone from the federal government monitoring that encampment?

A.    To my knowledge, no.

Q.    Okay.  You wanted to show your sympathy and support for protesters, right?

A.    Yes.

Q.    Okay.  And with respect to that sympathy and support for protesters, did you publicize that?  Did you make that sympathy public?

A.    I believe that I signed on to some public letters that could be construed as making -- as expressing that kind of sympathy and support.

Q.    And is it your concern that your signature on those public letters would cause the Trump administration to target you for deportation?

A.    Yes, it's among the causes.

Q.    You indicated that in response to the arrests of Mr. Khalil and Ms. Ozturk, it scared you.  Is that a fair summary of your reaction to that, those arrests?

A.    Yes.

Q.    Now, just to be clear, you didn't work for the United States Government; you've never worked for the United States Government, right?

A.    That is correct.

Q.    And so you are unable to say with certainty that the arrests were for a reason other than the political speech of those individuals.  Fair statement?

MR. BIALE:  Objection.

THE COURT:  If he understands that.  In other words, here is how I understand it, which I think is a proper question.

So far as you know, and you formed the opinion that the arrest of these two individuals named were for their expression of political beliefs.  That's what you thought; is that right?

THE WITNESS:  Yes, that's right.

THE COURT:  And that was your question?

MR. KANELLIS:  Yes.

THE COURT:  You go ahead, feel free.

MR. KANELLIS:  Thank you, sir.

BY MR. KANELLIS:

Q.   You indicated that you watched a video, correct?

A.   Yes.

Q.   And the video was of the arrest of Ms. Ozturk?

A.   That is correct.

Q.   Okay.  Had you ever seen anyone arrested before?

A.   Have I seen -- no.

Q.   Okay.  Do you have any basis for an opinion that the arrest of Ms. Ozturk, based upon your observation, was contrary to law enforcement practices in the federal government?

MR. BIALE:  Objection.

THE COURT:  Sustained on this foundation.  We may get

into those practices, but his opinion neither adds nor detracts anything because I don't know what are the practices.

Q.   Do you have any basis for an understanding of what federal law enforcement practices are with respect to arrests?

A.   No.

Q.   You indicated that you attended a protest in the yard that was sponsored by AAUP.  Do you remember that testimony?

A.   I do, I do.

Q.   By "the yard," what is the yard?

A.   It's part of the grounds of Harvard College.

Q.   Okay.  And that was a public protest, correct?

A.   That is correct.

Q.   Was that the only protest that was sponsored by AAUP to your knowledge?

MR. BIALE:  Objection.  If we can get a more specific timeframe.

THE COURT:  I think that's fair, but he may press the question.

MR. KANELLIS:  Certainly.  I can fix it, Your Honor. Not a problem.

Q.   In the last year, are you aware of any other protests other than this one that were sponsored by AAUP at Harvard?

A.   I don't recall.

Q.   You don't know of any?

A.   I don't recall.

Q.   So the only protest that you're aware of that was sponsored by AAUP was done this year in 2025, correct?

MR. BIALE:  Objection.

THE COURT:  No.  He can have it.

A.   The only one that I recall.

Q.   And that was after the Trump administration was already in power, correct?

A.   That is correct.

Q.   And you attended that public protest, didn't you?

A.   I did.

Q.   And you were aware that other people could see you attending that protest; isn't that right?

A.   Yes.

Q.   I'd like to talk about, you said you had feelings in reaction to what you interpret as the ideological deportation policy.  And I want to ask you about how you felt.  Did you have anxiety?

THE COURT:  I guess I don't understand.  They explored this, and of course you may.  You're saying when he had what he conceived of as that policy in mind, did he have anxiety.  Is that your question?

MR. KANELLIS:  Yes, sir.

THE COURT:  And you may answer it.

A.   Yes.

Q.   You had anxiety.  You're a philosophy professor, correct?

A.    Yes.

Q.    Okay.  And you know what Kierkegaard said about anxiety, right?

A.    Actually, I don't.

Q.    You don't?

A.    I'm not that kind of philosopher.

Q.    Angst ist der Schwindel der Freiheit.  Anxiety is the dizziness --

THE COURT:  Perhaps more to the point, I don't know what --

MR. KANELLIS:  I'll say it in English.

THE COURT:  But I'm open to be instructed.

MR. KANELLIS:  I can ask, it's very easy, Your Honor.

Q.    Angst ist der Schwindel der Freiheit.  That means anxiety is the dizziness of freedom.  Did I translate that correctly?

A.    I don't even speak Danish, you know.  So to the extent that's a German translation of Danish and into English, close enough.

Q.    Close enough.  Thank you.

Your German is obviously better than mine.  Let me ask you, do you disagree with that sentiment?

MR. BIALE:  Objection.

THE COURT:  No.  I'm going to let him have it.

MR. BIALE:  Okay.

THE COURT:  Do you agree?

THE WITNESS:  I don't even know what that means.

BY MR. KANELLIS:

Q.   Fair enough.  In the 30 years that you've been in the United States, have you ever been contacted by the federal government about political views that you've expressed?

A.   No.

Q.   And in the 30 years that you've been in the United States, has anyone at the federal government expressed to you that they have been monitoring political speech that you've engaged in?

A.   No.

Q.   Since November of 2025, have you received any communication in any form from anyone in the government regarding your political participation?

A.   I'm sorry, did you say November of '25?

Q.   Since November of 2024, thank you.  I'll re-ask.

     Since November of 2024, have you received any communication from anyone in the government relating to political speech that you've engaged in?

A.   No.

Q.   And since November of 2025, have you received any indication or suggestion that the government has been monitoring your political speech?

A.   I'm sorry, I think you asked me about November '25 again.

Q.   I should fix that, shouldn't I?

     Since November of 2024, have you received any indication

or communication that the government has been monitoring your political speech?

MR. BIALE:  Objection.  Compound question.

THE COURT:  Not really.  Overruled.  You may answer.

A.   No.

MR. KANELLIS:  We tender the witness.

THE COURT:  Anything further?

MR. BIALE:  Brief redirect.

THE COURT:  You may.

REDIRECT EXAMINATION BY MR. BIALE:

Q.   Professor Nickel, you were asked a number of questions on cross-examination about how your feelings and actions had changed since -- I believe the question was since the Trump administration came to power.

To be clear, what is the event that you discussed on your direct testimony that you said is the most critical that's changed your behavior and feelings?

A.   It's the arrest of Ms. Ozturk.

Q.   And when did that occur, approximately?

A.   I believe it was the end of March.

Q.   Now, and as to that, you were also asked about a protest that you attended on Harvard Yard that was organized by AAUP?

A.   That is correct.

Q.   Did that occur prior to the arrest of Ms. Ozturk?

A.   Yes.

Q.   Now, you were shown a number of emails that you sent to graduate students in the philosophy department, right?

A.   Yes.

Q.   And to your fellow faculty members in the philosophy department?

A.   Yes.

Q.   How many faculty members are there in the philosophy department?

A.   About 25.

Q.   And do you know them all personally?

A.   Yes.

Q.   Do you know all the graduate students personally?

A.   Yes.

Q.   Did you intend for those emails that you sent to those groups to be shared with third parties, as the question was put to you?

A.   No, I did not.

Q.   Did you anticipate that any of those people who you know who you sent those emails to would share them with third parties?

A.   No.

Q.   Let's bring up Exhibit 171.  You were asked about this document.  And Mr. Kumar, if you can just pull up the part that the witness wrote.

     So you were shown this document and asked some questions

about this email, right?  And I think you testified that you wanted to pass along information for resources such as the legal representation clinic and know your rights resources for faculty who are here on visas or green cards?

A.    Yes.

Q.    Why did you think it was important for faculty who were here on visas and green cards to be in touch with the legal representation clinic and to know their rights?

A.    Because I thought that some of them might be targeted by the administration.

Q.    And some of them might be targeted for what?

A.    For their political speech, including potentially their pro-Palestine speech.

Q.    Now, you were asked questions about any communications that you have received personally from the government regarding -- well, sorry, withdrawn.

You were asked questions about any communications you received from the government.  Do you remember that?

A.    Yes.

Q.    Are you aware of any communications that Harvard University has received from the government?

A.    Yes.

Q.    Okay.  Are you aware that -- well, let me show you what's in evidence as Exhibit 216.

THE COURT:  Wait a minute here now.  This is redirect,

and I don't think he's opened up any -- there is this investigation and this back and forth between Harvard and the administration, but I don't think that's been opened up.

MR. BIALE:  Your Honor, let me ask it this way.

Q.    You were shown some emails that you sent to the philosophy department that referenced specific threats to Harvard.  Do you remember that?

A.    Yes.

Q.    Okay.  And did you feel more vulnerable as a noncitizen who had spoken out about pro-Palestine issues who was also a professor at Harvard?

MR. KANELLIS:  Objection, leading, Your Honor.

THE COURT:  Sustained on that ground.  How did that make you feel?  Look, it's not a game, but following the rules, he's correct.  So he sets up the situation.  You're a long-time green card holder, lawful permanent resident to the United States.  You're also a professor at Harvard.  The situation between Harvard and the administration I think is an expansion beyond what anyone's asked you.  We're not going there on redirect.

Having that in mind, how do the two events, the two situations make you feel?

THE WITNESS:  I'm sorry.  The reason I took a moment is because this is very serious, and there was a moment of laughter --

THE COURT: And his question --

A. -- and so I wanted to just go back and --

THE COURT: -- posited two situations. You occupy both, tenured faculty member at Harvard, green card holder.

THE WITNESS: Yes.

THE COURT: But I think it's an appropriate question, if you can answer it.

THE WITNESS: Yes. I felt, as a green card holder, I felt more exposed than simply in my role as not just faculty member but also department chair of a department.

Q. And how about specifically in your role in having those titles at Harvard University?

A. I certainly felt like -- I felt very exposed, and it made me very worried about, for instance, engaging in international travel.

Q. Okay. And you've testified to this, but just tell us why.

A. Because I was concerned that between being department chair and also having been politically active in the ways that I have, I might be identified at the border and either detained or sent back.

MR. BIALE: If I can just have a moment to confer with co-counsel.

THE COURT: Of course you may.

MR. BIALE: No further questions.

THE COURT: Nothing further for this witness?

MR. KANELLIS:  No, Your Honor.

THE COURT:  You may step down.  Thank you.  Call your next witness.

MR. ABDO:  Good morning, Your Honor.  Alex Abdo for the plaintiffs.  The plaintiffs call Sara Johnson to the stand.

SARA JOHNSON, Sworn

COURTROOM CLERK:  Can you please state your full name and spell it for the record.

THE WITNESS:  Sara Johnson.  S-a-r-a, J-o-h-n-s-o-n.

COURTROOM CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION BY MR. ABDO:

Q.  Good afternoon, Professor Johnson.  Can you tell us your name for the record.

A.  Sara Johnson.

Q.  And what do you do, Professor Johnson?

A.  I am a professor in the Eliot-Pearson Department of Child Study and Human Development at Tufts University.

THE COURT:  Where do you work at?

THE WITNESS:  Tufts.

THE COURT:  Tufts, thank you.

BY MR. ABDO:

Q.  How long have you had that position at Tufts university?

A.  Since August 2016.

Q.  Are you familiar with someone named Rumeysa Ozturk?

A.  Yes, I am.

Q.   Who is she?

A.   She's one of my doctoral students.

Q.   How long has she been your student?

A.   She's been my student since January 2023.

Q.   Have you known her since then?

A.   I've actually known her since September of 2020, which is when she started as a student in our doctoral program.

Q.   Is Rumeysa Ozturk your student the same Ms. Ozturk who has been in the news recently?

A.   Yes.

Q.   And what has she been in the news for?

A.   She has been in the news for being detained in Louisiana.

Q.   Have you seen any videos of her detention?

A.   Yes, I have seen the video.

        MR. ABDO:  Mr. Kumar, if you could pull up --

        THE COURT:  Well, "the video," the one we have in evidence here is of her apprehension by ICE.

        THE WITNESS:  Yes.

        THE COURT:  Is that the video?

        THE WITNESS:  That is the video, yes, Your Honor.

        MR. KANELLIS:  Your Honor, just one quick question, a question about relevancy.  I'm not sure why this witness watching a video is relevant to this proceeding.

        THE COURT:  No one said that it was.  I just want to be clear what she's seen.  All right.  We'll see what questions

Mr. Abdo asks.

MR. ABDO:  Mr. Kumar, if you wouldn't mind pulling up Exhibit 225.  And Your Honor, with your indulgence, I'd like to show the witness about 10 to 15 seconds of the video as the foundation for her testimony.

THE COURT:  And what's the relevance of it?

MR. ABDO:  The relevance is her identification of Ms. Ozturk in the video.  The government has refused --

THE COURT:  It's not disputed.

MR. ABDO:  The government has refused to stipulate to that, is my understanding, Your Honor.

THE COURT:  If they dispute it, I take that as essentially undisputed.  Let's go on.

MR. KANELLIS:  Your Honor, we can stipulate.

THE COURT:  There, there.  Trials have a purpose.  So stipulated.

MR. ABDO:  Thank you, Your Honor.

THE COURT:  It is Ms. Ozturk on the video.  Now that that is taken care of, go ahead.

MR. ABDO:  Thank you, Your Honor.

Q.   Professor Johnson, are you generally familiar with the public writings of the students you advise?

A.   Yes, I am.

Q.   And why is that?

A.   Public writings are one component of the skills that our

doctoral students are required to develop during the program.

Q.   And are you generally familiar with Ms. Ozturk's public writings in particular?

A.   Yes.

Q.   Are you familiar with any op-eds she's written?

A.   I'm familiar with one op-ed that she wrote in The Tufts Daily.

MR. KANELLIS:  Your Honor, I have to object because I think we're now intruding into the specific facts of matters that may be litigated in District Court.

THE COURT:  They may be, but overruled.  I've said I'm making no rulings on any of these things.  I didn't say I wasn't going to take evidence.  I am.  Go ahead, go ahead, Mr. Abdo.

MR. ABDO:  Thank you, Your Honor.

Q.   When did you become aware of Ms. Ozturk's op-ed in The Tufts Daily?

A.   In March of 2024.

Q.   Do you remember how you became aware of it?

A.   I saw it in The Tufts Daily.

Q.   Did you look at it at the time?

A.   Yes.

Q.   I'm going to show you, Professor Johnson, what's been marked as Exhibit AG for identification.  Do you recognize this exhibit?

A.   I do.

Q.   What do you recognize it to be?

A.   It looks like the op-ed that Rumeysa was a co-author on that I saw in The Tufts Daily.

MR. ABDO:  Your Honor, we would offer into evidence Ms. Ozturk's op-ed from the Tufts Daily.

MR. KANELLIS:  Classic hearsay.

THE COURT:  He's not offering it for the truth.  He's offering it for the fact of its existence, isn't that correct?

MR. ABDO:  That's correct, Your Honor.

THE COURT:  Overruled.  It may be admitted.  It will be exhibit -- so what are we up to now?  226, in evidence.

(Exhibit 226 admitted into evidence.)

Q.   Professor Johnson, did you ever discuss this op-ed with Ms. Ozturk?

A.   I did.

Q.   And when was that?

A.   That was in March 2025.

Q.   Without yet going into what she told you or what you spoke to her about during that conversation, can you tell us the circumstances of that conversation?

A.   The circumstances of that conversation were when she came to my office for our weekly advising meeting and appeared very upset.

Q.   Can you explain what you mean by, "She appeared very

upset"?

A.   She had -- her eyes were red.  Her face was puffy.  She was clearly trying to hold back tears with a fistful of Kleenex.

Q.   And what did she say to you at that time?

A.   I said --

MR. KANELLIS:  Objection, calls for hearsay.

THE COURT:  Yes, it does.

MR. ABDO:  Your Honor, it's not offered for the truth of the matter.

THE COURT:  Why is what she said at that time relevant?

MR. ABDO:  It will be relevant to the effect on the witness, Your Honor, for a foundation for what she did next.

MR. KANELLIS:  That turns upon the statement itself.

THE COURT:  It does indeed.  As a result of that conversation, what did you do?

THE WITNESS:  I asked her to come into my office and asked her whether she was okay, and she said no.  And then I asked her if she wanted to talk about it.

THE COURT:  I'll let that stand.

MR. ABDO:  Thank you, Your Honor.

Q.   Professor Johnson, did Ms. Ozturk explain to you why she was upset?

A.   Yes.  She came, it took --

MR. KANELLIS:  Objection, Your Honor.

THE COURT:  He's objecting.  You know, how do you think you can get that in?

MR. ABDO:  Your Honor, this should come in under 803.2 as an excited utterance.  I think Ms. Ozturk was clearly in a state of distress at the moment.

MR. KANELLIS:  Your Honor, an excited --

THE COURT:  Wait a minute.  When I need argument, I'll take the time for it.  Sustained.

MR. KANELLIS:  Thank you.

THE COURT:  No thanks is necessary.  Go ahead.

BY MR. ABDO:

Q.   Professor Johnson, did you come to learn during this conversation with Ms. Ozturk of any basis for why she might be upset?

THE COURT:  Well, you know, I have to follow the rules of evidence here, and now he is objecting to this.  I haven't got a basis for getting into the substance of this conversation.  I mean you no disrespect at all, but this has got them on their feet, so I have to play my bit part here.  Go ahead.

MR. ABDO:  Understood, understood.

THE COURT:  Go ahead.

BY MR. ABDO:

Q.   Professor Johnson, as a result of this conversation, what

did you do?

A.   As a result of this conversation I looked on the website Canary Mission for Rumeysa's profile.

Q.   And did you read the profile that you saw?

A.   I did.

Q.   Were you previously familiar with the Canary Mission website?

A.   No, I was not.

Q.   Did you come to an understanding of what the website was when you reviewed it?

A.   My understanding is that the website is where the organization posts profiles of individuals who they believe have engaged in antisemitic activity.

Q.   Do you recall what you saw when you reviewed Ms. Ozturk's profile on the website?

         MR. KANELLIS:  Objection, hearsay.

         MR. ABDO:  It's not offered for the truth of the matter, Your Honor, just to demonstrate its existence.

         THE COURT:  Well, am I going to see it?

         MR. ABDO:  Yes, Your Honor.

         THE COURT:  Well, then let's get to it.

         MR. ABDO:  Great.

         Mr. Kumar, if you wouldn't mind pulling up, as you have, Exhibit CZ for identification.

Q.   Professor Johnson, do you recognize this exhibit?

A.    I do.

Q.    What do you recognize it to be?

A.    This is the profile of Rumeysa on the Canary Mission website.

Q.    And if you wouldn't mind taking a moment to review it. Does it reflect a true and --

THE COURT:  Are you going to offer it?

MR. ABDO:  Momentarily, Your Honor, yes.

Q.    -- true and correct copy of what you saw when you reviewed it shortly after or during your conversation with Ms. Ozturk?

A.    Yes.

MR. ABDO:  Your Honor, we would offer this into evidence, not for the truth of the matter.

MR. KANELLIS:  Objection, to the extent the contents are admitted.  We have no objection to --

THE COURT:  He's offering it not for the truth but for the fact of its existence, which I do deem relevant, so as limited, CZ is admitted, Exhibit 227, as limited.

(Exhibit 227 admitted into evidence.)

MR. ABDO:  Thank you.  No further questions, Your Honor.  Thank you.

THE COURT:  Thank you.  Any questions for this witness?

MR. KANELLIS:  No, Your Honor.

THE COURT:  You may step down and thank you.

Call your next witness.

MR. BIALE:  Your Honor, this is the remote witness, so it will just take a moment.

THE COURT:  I understand and that's fine.

While you're doing that, just to save time, because there is something I was going to do at 2:00, but you keep setting up.  Actually, counsel, it's you that reminded me to do this now.  You made a request about documents that I might turn over to you.  I have a packet of documents, which I'm not going to turn over to you, but I'm going to give copies which I've made to the government.  And while we're only going to take a brief recess tomorrow, if you have any particular objection to these documents, I will hear you during the recess tomorrow.  I have final arguments in another case at 2:00 this afternoon. If we're ready, let's go on.

MS. CONLON:  To be clear, Your Honor, you meant if the government has objections to the court --

THE COURT:  You're not asked to do anything.  I'm giving them, really I'm giving them every chance.  I'm letting them look at what, if I overrule the objections, I will then hand to you at about 10:45, 11:00 tomorrow.

MS. CONLON:  Okay.  Great.  Then I will go to the podium.

THE COURT:  Yes, if we're ready.  Alexandra Conlon for the plaintiffs.

I did just see our witness a second ago.  Okay. Ms. Abu El-Haj, are you there?  I think if you speak we may then see you on the screen.

THE WITNESS:  I am, I'm trying to start the video. There we go.

MS. CONLON:  Are you able to see us, just before you're sworn?  Are you able to see the courtroom and to see the judge?

THE WITNESS:  Yes, I am.

THE COURT:  Let's swear the witness.

NADIA ABU EL-HAJ, sworn

(Witness testifying via teleconference.)

COURTROOM CLERK:  Can you please state your name and spell your last name for the record.

THE WITNESS:  Nadia Abu El-Haj, A-b-u, E-l, apostrophe, H-a-j.

DIRECT EXAMINATION BY MS. CONLON:

Q.   Okay.  Ms. Abu El-Haj, can you hear us clearly on the Zoom link?

A.   Yes, I can.

Q.   And you can see everybody as best you can tell?

A.   Yeah, yes.

Q.   I know you can't see my face, but you can hear my voice; is that right?

A.   Yes.

Q.    Okay.  So please tell us where you work.

A.    I am a professor at Barnard College and Columbia University.

Q.    Okay.  And you are a professor of what subject?

A.    I am a professor of anthropology, and I am the co-director of the Center for Palestine Studies.

Q.    Staying for a moment with your background, what kind of anthropology do you teach?

A.    I am a sociocultural anthropologist, and I work regionally on the Middle East, specifically on Israel and Palestine, although I've also written a book on the U.S.

Q.    And approximately when did you begin working as an anthropologist on Israel and Palestine?

A.    The late 1980s, when I was in a Ph.D. program.

Q.    Did you do a dissertation on Israel and Palestine?

A.    Yes, I did.

Q.    And what in particular was that about?

A.    The dissertation looked at the practice of archeology, both Biblical archeology and Israeli archeology, in terms of transforming the land of Palestine into the land of Israel and then the consequences for Israeli nationalist ideology.

Q.    Now, you mentioned in addition to your work as a professor that you are a co-director of the Center for Middle East Studies -- or Center for Palestine Studies, rather.

      Can you tell us about the Center, please?

A.    Yes.   The Center was founded I think about 12 years ago by a group of faculty.   I was involved from the beginning.   We wanted to create a space where we could both foster a more serious sort of discussions and scholarship in Palestinian studies.   It is a -- it's a center that is not a teaching center at the university.   So we run programs.   We have a postdoctoral fellowship.   We run some public programs as well as workshops, which are sort of more closed spaces where students and professors get together and discuss the people's work.

Q.    You said that the center is not a teaching center; is that right?   What does that mean?

A.    Well, it means that we do not -- we do not -- we do not offer classes.   At Columbia only institutes offer classes, not centers.

Q.    But the center puts on programming for students; is that right?

A.    Yes, yes.

Q.    Now, what in particular do you do for the Center for Palestine Studies?

A.    I'm the co-director.

Q.    So what does that mean your work entails?

A.    It entails overseeing the programming with my co-director and the administrative director.   I can't remember the exact title.   It means vetting the postdoctoral applications for our

postdoctoral fellowships, and it means working with other faculty who want to -- who propose events to us that we host and fund.

Q.   Are there any faculty affiliated with the Center, other than you?

A.   Yes, there are.

Q.   About how many people?

A.   I'd say maybe 15 to 18.  Could be more.  I haven't looked in a while, honestly.

Q.   Do they all teach in the area or research in the area of Middle East studies?

A.   No.  Actually, some do and some do not.

Q.   And are they all at Columbia?

A.   Almost everyone is at Columbia.  We have over the years had a few people like poets or unaffiliated scholars who have been affiliated with us.  But for the most part it is Columbia faculty and Barnard faculty.

Q.   Now, you're testifying remotely.  Where are you in this moment testifying from?

A.   I'm in Beirut, Lebanon.

Q.   And are you a full-time resident of Lebanon?

A.   No.

Q.   Were you born in Lebanon?

A.   I was not.  I was born in New York.

Q.   So it's fair to say you're a United States citizen?

A.    Yes, I am.

Q.    Are you in Beirut for work right now?

A.    I'm in Beirut for a combination of personal and work reasons.

Q.    And what is the work you're doing in Beirut?

A.    I am affiliated with the German Orient Institute.  I'm a visiting fellow there, and I'm just writing some essays on the war in Gaza.

Q.    Now, I want to turn to AAUP.  Are you familiar with the American Association of University Professors?

A.    Yes, I am.

Q.    How are you familiar with AAUP?

A.    Well, I've known about AAUP for decades, and I joined about a year and a half ago when the chapter at Columbia, which isn't that old, really expanded a year and a half ago as part of faculty attempt to push back against the administration, the Columbia administration.  Sorry.

Q.    You anticipated exactly what I was going to ask.  What made you personally decide to join the AAUP at that time?

A.    It felt both like the university administration was cracking down on issues that are central to the AAUP, such as academic freedom and faculty governance, and it was also because there had been Congressional hearings in December of 2023.  And then we knew that the Columbia president was going to be testifying as well.

It also felt like there was increasing pressure from Congress on the administration to crack down on faculty governance and academic freedom.  So it felt like the best way to counter the administration as a collective faculty.

Q.   Do you pay dues to AAUP?

A.   I do.

Q.   Are you familiar with the Middle Eastern Studies Association?

A.   Yes.

Q.   I'm going to call it MESA.  Are you a member of MESA?

A.   I am.

Q.   And how long have you been a member?

A.   So this round, it's going on two years.  I've been a member off and on for, you know, through my career.

Q.   What is your understanding of what MESA does, what its purpose is?

A.   Well, MESA is the sort of major -- is the major and most important organization of Middle East scholars both in the U.S. and beyond.  It brings together faculty.  I mean, there's an annual meeting which is its biggest event, which is an important event for faculty, who get to know each other and meet each other and participate in intellectual conversations, but also quite centrally for graduate students who are just entering the field, and that's where they initially present their work and also begin to get to know members of the field,

including fellow graduate students and, quite importantly, established faculty members as well.

Q.    Have you attended MESA's annual meeting before?

A.    I have.

Q.    And do you have an understanding of the purpose of MESA apart from the sort of networking?  And if you don't, that's fine.

A.    Well, I mean, it's not just a networking thing.  It's a place where -- I mean, it's really, it's an intellectual hub for people who work on the Middle East as well.

Q.    Now, when you say "an intellectual hub for work on the Middle East," I am silly asking, but I just want to confirm that relates to scholarship related to Israel and Palestine?

A.    Yes, absolutely.

Q.    Based on your experience as a member of MESA, are you aware of whether -- well, withdrawn.

How would you describe MESA's membership generally in terms of where the other members are from?

MR. KANELLIS:  Objection, Your Honor.  Relevancy. This is a U.S. citizen.

THE COURT:  Yes, well, she is.  I'm not -- why is that relevant?

MS. CONLON:  Well, Your Honor, MESA is the plaintiff. This is a witness.  So we're trying to establish that MESA's membership, who we represent, include both citizens and

noncitizens and the extent to which they have both been chilled as a result of the policy that we challenge.

THE COURT:  All right.  I understood really from the motion to dismiss that MESA had both citizen and noncitizen members indeed.  I understood that the other plaintiff associations in the different universities have both citizen and noncitizen members.  This court reaches the standing of the noncitizen members, not further.  But I'm going to sustain that objection, and I'll give you some brief time with this witness.  Go ahead.

BY MS. CONLON:

Q.   Do you engage, Ms. Abu El-Haj, with noncitizen members in MESA in your work with MESA?

A.   I do.  I mean, when I've participated in the -- for example, the conference I was at in the fall of 2023, I was on a panel with noncitizen members.

Q.   And to your understanding -- withdrawn.

Can you describe generally whether, are the other members of MESA, for example, only from U.S. universities, or are you aware of members from international universities?

A.   I am aware of members from international universities, yes.

Q.   Now, just a moment.  Turning back for a moment to the Center For Palestine Studies, you described programming and events that the Center puts on generally.  Did there come a

time this year where the Center's approach to its work changed?

A.   Yes.

Q.   And around when did that happen?

A.   It happened around mid March after Mahmoud Khalil's arrest.

Q.   Did it only begin to happen in March?

A.   We were aware of the rhetoric coming out of the newly inaugurated Trump administration that was threatening to deport student activists who were protesting on behalf of Palestine and against the war in Gaza.  But we did not -- so that was in the background, but we weren't sure what was going to happen with that, and it was sort of on our radar, but it didn't affect what we did until after first Ranjani Srinivasan -- I think that's her last name -- who was a graduate student in the graduate school of architecture at Columbia went into hiding because she was fleeing an ICE detention -- or ICE was trying to detain her, and then the following day Mahmoud Khalil's arrest, and then things changed.

Q.   You mentioned a student who had gone into hiding.  Can you say their name again for the record?

A.   Ranjani Srinivasan I think is her last name.  I do not know her.

        MR. KANELLIS:  Objection, Your Honor.  Now we are going beyond the five individuals --

        THE COURT:  We may.  That was the discovery order.

She may inquire.

BY MS. CONLON:

Q.    And what was your understanding as to why Ranjani Srinivasan went into hiding at the time?

A.    ICE agents knocked on the door of her apartment in a Columbia graduate student housing building.  She was not home at the time.  Her roommate told her --

MR. KANELLIS:  Objection, foundation.

THE COURT:  It's not timely, but I'll entertain it at this time.  It was all hearsay, but we'll let the first part stand.

Go ahead, Ms. Conlon.

MS. CONLON:  Your Honor, this is for the effect on the listener.  We anticipate that Ms. Abu El-Haj will testify about the effect of these ICE actions on campus on the noncitizen students she teaches, noncitizen colleagues --

THE COURT:  Well, then get to it.

MS. CONLON:  We are trying to do so expeditiously, Your Honor.

THE COURT:  I'm not troubled with the timing because I've set my time limits.  When they're up, they're up.  And I want you to try your case.  But as I've tried to follow, I have to follow the rules of evidence.

Now, you can get in effects on a relevant community.  So I -- well, I don't give advisory opinions, but then let's

get to it.

MS. CONLON:  Your Honor, I apologize for interrupting. Just to be clear, I want to make clear to this court that it's our understanding and view that the relevant community is not only the noncitizens but also, as Your Honor may recall, we have advanced a theory of standing for citizens who have been prevented from affiliating with and hearing from noncitizens, and so that is important --

THE COURT:  You have.

MS. CONLON:  Yes.

THE COURT:  And respectfully, I have rejected it, saying that's a step too far.  And I'm not taking -- they don't have standing.  Citizens don't have standing.  I could be in error, and I've been known to be in error, but the record is clear, and I'm not spending trial time on matters as to which I've got to make rulings and findings.  So let's go to noncitizens' concerns about these events.  She's in a position to know.

MS. CONLON:  Your Honor, just to close the loop on this, it was our understanding from your order that we were permitted to advance this theory through the testimony of one or two people and that Your Honor had not foreclosed this theory of standing, though Your Honor had found that we had sufficiently alleged standing on another basis, so we are doing as we suggested that we ought to do and that we understood the

court was open to us doing, and this is the only person through which we are trying to do that, just to be transparent about the effort here.

THE COURT:  I always appreciate transparency, but I've now made my ruling.  If I have ruled erroneously, a higher court can correct me.

Now, let's find out if she has anything to say about the feelings of noncitizens who would have standing to personally be concerned about actions of these official defendants and those who work for them.

BY MS. CONLON:

Q.   Okay.  Ms. Abu El-Haj, we were just speaking about Ms. Srinivasan.  You mentioned that things changed as well after Mahmoud Khalil's arrest, so I want to turn to that.

Are you personally familiar with Mr. Khalil?

A.   Yes, I am.

Q.   And how do you know him?

A.   I know him as, I got to know him as a participant in the student activist movement, particularly in the academic year '23-'24 and because he emerged as a leader within that movement.  And, yeah, I just got to know him in that capacity.

Q.   When you say the student activist movement in '23 or '24, you are referring to the student activist movement regarding the rights of Palestinians; is that correct?

A.   Correct.

Q. And you said he emerged as a leader. What do you mean by that? What did you observe of him?

A. He was someone -- I mean, a leader not in an organizational sense. He is a graduate student, so he is somewhat older than many of the students who participated, and he really was someone a lot of the undergraduates, I think, particularly the Palestinian undergraduates, turned to and relied on for emotional support.

He also was one of the handful of people who were willing to be public and make statements, talk to the press without being masked. And he was one -- he was the key negotiator between the administration, Columbia administration and the students during the encampment.

Q. Turning to the statements you mentioned, are you familiar with any of the public statements he made about the protests at Columbia?

A. Yes. I mean, I can't quote them verbatim, but yes.

Q. Did you see him speak publicly?

A. I saw him give a few -- I mean, I saw him when he was being interviewed by the press a few times during the encampment.

Q. And you also mentioned his role as a negotiator with the school. What was it that he was negotiating?

A. He was negotiating a peaceful end to the encampment. He was trying to reach, to find an agreement that would bring the

students and the administration close enough together that the students would voluntarily leave the encampment before the university called the police in for the second time.

Q. You've mentioned the encampment. Did you observe the encampment yourself in person at any point?

A. Yes. I spent a lot of time there while it was ongoing.

Q. Did you have an opportunity to observe Mr. Khalil in person at any encampment or protest at Columbia?

A. Yes.

Q. Now, what did you see about his conduct on campus when you observed him?

A. I found him very, very thoughtful, very calm and really, you know, politically savvy in many ways. He was certainly not an agitating presence in any way. He was never arrested. He never broke any rules. I mean, he never committed any crimes or was accused of any crimes. And I found him a really thoughtful person who was quite mature for someone who was his age, which at the time was 29.

Q. And did you have an understanding of his citizenship status?

A. I knew he was not a citizen. I'm not sure, I don't recall if I knew he had green card status at least last spring.

Q. Now, you said that his arrest changed things. What did you observe about how Mr. Khalil's arrest affected first the students that you teach and interact with at Columbia?

A.    I mean, students were really terrified.  Mahmoud had been out front, again, he never masked up, even after other students did.  And I want to be clear, students were masking up because they were being doxed really badly initially and then now increasingly because they're worried about being identified by the federal government.

But he never did because he never thought he was at risk.  He never said anything violent or promoted violence.  And he really understood himself, and the other students did too, that his speech would be protected because he had a green card.  He was --

MR. KANELLIS:  Objection.

A.    -- not a U.S. citizen, but he had a green card.

MR. KANELLIS:  Objection, foundation, hearsay.

THE COURT:  I will strike so much -- that's not for the truth.  And further, I will strike her statement because and what follows as to why they were afraid, but I will let stand the business about they were already masking up and they, in her words, were terrified.  I'll let that stand.  Go ahead, Ms. Conlon.

BY MS. CONLON:

Q.    You used the word "doxed."  What does doxed mean to you?

A.    Students were, their private phone numbers and addresses were listed online.  They were threatened.  I had one student, non-U.S. citizen who had a note slipped under her door that

said "We know where you live.  Sleep with one eye open."  Some were accused of being antisemitic and pro-Hamas supporters and the blow-back was often a lot of threatening emails and sometimes, you know, more than that.

MR. KANELLIS:  Objection, Your Honor.  Again foundation.

THE COURT:  Well, it wasn't timely.  I'm going to let it stand.

Q.   Did you have direct conversations with any noncitizen students after Mr. Khalil was arrested?

A.   Yes, I did.

Q.   Is that how you learned about what you've testified to just now with respect to their fears?

A.   Yes.

Q.   Did noncitizen students convey fears apart from being doxed after Mr. Khalil's arrest by ICE?

A.   Yes.

Q.   What other fears did they convey to you?

A.   Fears of being detained.

Q.   Detained by who?

A.   By ICE.

THE COURT:  All right.  It's 1:00.  I have a meeting, and so we'll stop at this time.  We'll start promptly at 9:00 a.m.

Professor, I apologize for the time differences, but I

appreciate your testimony, and we will resume at 9:00 a.m. tomorrow morning.

Total elapsed time out of the four and a half days available to each side, the plaintiffs have used up one day, one hour, five minutes.  The defense has used up two hours, 25 minutes.  Tomorrow we will stop at noon.  We'll recess.

(Adjourned, 12:58 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 8th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter