UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

\*\*\*\*\*\*\*\*

BENCH TRIAL DAY 5

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025

\*\*\*\*\*\*\*\*

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                Official Court Reporter
                United States District Court
                One Courthouse Way
                Boston, Massachusetts  02210
                mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
SCOTT WILKENS
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Ethan.kanter@usdoj.gov
and
SHAWNA YEN
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Shawna.yen@usdoj.gov
    (617) 748-3100
    For Defendants

INDEX


WITNESS                                                            PAGE


MAUREEN SMITH

    Direct Examination By Ms. Strokus                               8
    Cross-Examination By Mr. Wilkens                                20


E X H I B I T S


None

P R O C E E D I N G S

(Begins, 9:02 a.m.)

THE COURT:  Let me say, as I have each day I've authorized Internet access to these proceedings and, therefore, if you are accessing these proceedings via the Internet, have in mind that the rules of court remain in full force and effect.  That means there's no taping, streaming, rebroadcasts or screenshots or other transcription of these proceedings. You must keep your microphone muted at all times.  If you do not, I shall cut you off from access.

With that said, the government may call its first witness.

MR. BIALE:  Can we just briefly raise, before the government calls --

THE COURT:  Well, I see some things that perhaps need attending to.  I plan to do it during the break this morning. I'd like to take evidence.

MR. BIALE:  That's fine, Your Honor.  I just want to say I think timing will work out fine.  We need to address it and get clarity before the second witness testifies, but it's fine to --

THE COURT:  Well, before the second witness, very well.

MR. BIALE:  Thank you, Your Honor.

THE COURT:  Call the first witness, Ms. Santora.

MS. SANTORA:  The government calls Maureen Smith.  Ms. Smith is testifying remotely, and I do understand she is having some trouble logging in, so it might take a second for her to get logged in.

THE COURT:  Well, all right, and that's fine.  And I don't know if she can hear me, but I apologize for not starting early with her, but I appreciate her presence.

And since we're waiting, but as soon as she's ready, do you have someone to signal when she's ready?

MS. SANTORA:  Yes.  I think if we could just pull up the Zoom link, we should see if she's been able to log in.  We have an attorney with her who will be questioning her.

THE COURT:  Very well.  Then we can talk about other matters in the interim is what I'm saying.

So, two matters that I think need addressing and I was going to address during the break.  First of all, with respect to Exhibit A, and I see Mr. Kanter here, the document as to which the government has asserted the Presidential communications privilege.  I have that matter under advisement.

MR. KANTER:  Yes.

THE COURT:  In view now of the coordinate proceedings in the Court of Appeals, I state that document is not going to be used, disclosed, at all until the court, if ever, until the court has concluded its analysis of the government's assertion of that privilege.

Yes, I have looked at it in order to make that determination, and I am considering it.  But you understand that's as far as it's going in these proceedings, unless I were otherwise to order, and I will make the order just as soon as I can.  If I decide that the privilege applies, as I understand the governing law, I should return the document physically, and I will, to government counsel, and it's certainly not part of the record and that's an end of it.

MR. KANTER:  And if Your Honor decides that the privilege does not apply, the result would be --

THE COURT:  Well, look, I think since the matter is in limbo, I'm going to be very cautious what I say, but I'll say this.

MR. KANTER:  It's still under advisement.

THE COURT:  It looks to me like the document is, as to these proceedings, of very peripheral relevance.  So let's say that I decide that the privilege does not apply.  I note it is to be construed narrowly, but let's say I decide it's not to apply.  I don't have any present intention of making any disclosure of it, but I may consider it part of the record.

Does that answer your question?

MR. KANTER:  Thank you, Your Honor.

THE COURT:  Yeah.  All right.  The second thing is about these witnesses and service and the like.  And I had hoped all this could be worked out.  But let me -- and I'm not

going to entertain argument on this.  Let me tell you two lines that I'm following.

One, we're not going to be adding witnesses to this case and so we're limited to the witnesses disclosed in the pretrial order.

Two, the government isn't going to put on, given the fact that the weekend is coming up and witnesses, we're going to have to go through next week and Wednesday we're not going to sit, the government is not going to put on a witness now without making that witness available for deposition if they want, the plaintiffs want to take the deposition.

All right.  Are we ready with Ms. Smith?

COURTROOM CLERK:  Yes, she's on the Zoom.

THE COURT:  Let's go.

MR. BIALE:  Your Honor --

THE COURT:  Let's go with Ms. Smith.

MR. BIALE:  Yes, Your Honor.

THE COURT:  We'll take a break and I'll hear you.

MR. BIALE:  I'll raise it then.

THE COURT:  Do I understand, Ms. Santora, that we're going to have an on camera lawyer interrogate her?

MS. SANTORA:  Yes, I think you can see her on camera now.

THE COURT:  I can.  All right.  Let's start by swearing the witness.

MAUREEN SMITH, Sworn

COURTROOM CLERK:  Can you please state your full name and spell your last name for the record.

THE WITNESS:  Maureen Amanda Smith.

THE COURT:  Thank you.  You don't have to keep your hand up.

THE WITNESS:  Okay.

THE COURT:  And counsel is with you, if she could introduce herself.

MS. STROKUS:  Good morning, Your Honor.  Jessica Strokus on behalf of defendants.  And Your Honor, I have one request.  As we are appearing via Zoom, may I remain seated during examination and objections on cross-examination?

THE COURT:  Of course you may.  Of course you may.

MS. STROKUS:  Thank you, Your Honor.

THE COURT:  Let me say this, Ms. Smith.  I know it would have been more convenient to you if I started early.  All I can say is I have plenty to do, and I appreciate you starting at our usual time.  Very well.  Ms. Gursky, you may inquire.

DIRECT EXAMINATION BY MS. STROKUS:

Q.   Good morning, Ms. Smith.

Where do you currently work?

A.   I work at the U.S. Department of State.

Q.   And how long have you been employed with the State Department?

A.   I have been employed since September of 1999.

Q.   What was your first position with the State Department?

A.   My first position with the State Department was at the United States Consulate General in Guadalajara, Mexico.

Q.   And can you please briefly walk us through the duty stations and positions that you've held.

A.   Yes.  After that I went back to D.C. and I had an orientation class for foreign service generalists.  Then I was given language training in Portuguese.  I went to Recif, Brazil where I was the sole consular officer and deputy principal officer.

     After Recif I went to Merida, Mexico as an entry level officer and after that Santo Domingo, Dominican Republic as the immigrant visa unit chief; after that back to Merida, Mexico as the consular section chief and deputy principal officer; then to Mexico City as American citizen services chief; then back to D.C. for French and Haitian Creole language training.  I went to Port-au-Prince for two years as deputy consul general.  Then after that I went to Guadalajara, Mexico as the nonimmigrant visa unit chief, and after that to Kingston, Jamaica as deputy consul general, which is where I am now.

Q.   Ms. Smith, have you had a change in your employment since February of this year?

A.   Yes.  As of the beginning of February of this year, I went to Washington, D.C. on long-term temporary duty, TDY, until

now.  And I'm in Kingston, packing up to report to a one-year position up in D.C.

So thank you for indulging me in doing the testimony from here virtually, everyone there in the court.

Q.   And what was your temporary duty station that's now going to be your permanent station for the next year?

A.   I am a senior adviser in the Bureau of Consular Affairs front office.

Q.   And are there any roles at the Bureau of Consular Affairs immediately superior to your role?

A.   Yes.  My direct supervisor is Mr. John Armstrong, the senior bureau official for consular affairs.

Q.   Ms. Smith, are you familiar with how decisions at the State Department have historically been made?

A.   Yes, I am familiar with how decisions are made historically.

Q.   And has the State Department's policy evolved in the time that you've been employed?

A.   Yes, it has evolved.

Q.   Has the State Department created an exhibit that would assist you in presenting your testimony today?

A.   Yes.

MS. STROKUS:  Your Honor, I'd like to mark --

MR. WILKENS:  Objection.

THE COURT:  Wait a minute.  Well, she's leading, but

it's background.  I'll let that stand.

MS. STROKUS:  Your Honor, I'd like to mark for identification Exhibit HM.

THE COURT:  Have I got this?

MS. STROKUS:  I believe you do, Your Honor.

THE COURT:  HM for identification.

BY MS. STROKUS:

Q.   And Ms. Smith, are you familiar with this exhibit?

A.   Yes, I am familiar with it.

Q.   Will it help present the evidence to which you are testifying and assist in comprehension today?

A.   Yes, it will assist.

MS. STROKUS:  Your Honor, pursuant to 107(a) and 611, I move Exhibit HM into evidence.

MR. WILKENS:  Objection.  Your Honor, I'd like to voir dire about the how the exhibit was prepared because it hasn't been established.

THE COURT:  Forgive me, but I'll ask you to state your name.

MR. WILKENS:  Scott Wilkens, Your Honor, for the plaintiffs.

THE COURT:  Mr. Wilkens, you're of course welcome, but no voir dire.  I don't understand what the relevance of this is and Ms. Gursky, tell me why you think this is relevant.

MR. WILKENS:  Your Honor, we don't have a copy.

THE COURT:  Well, the government will provide you one forthwith.  I have one.  But Ms. Gurksy, tell me why this is relevant.

MS. STROKUS:  Your Honor, I'm Ms. Strokus, just to clarify.

THE COURT:  Ms. Strokus, yes.  And you must forgive me.  I recognize you.  I just hadn't got your name down yet.  Forgive me that.  Ms. Strokus.  And you've gotten a trip now as part of this case.  Tell me why it's relevant.

MS. STROKUS:  Your Honor, plaintiffs have alleged a new policy which they have termed an ideological deportation policy that they assert that the State Department and the Department of Homeland Security are employing.

THE COURT:  I understand that.

MS. STROKUS:  This witness is going to testify that the State Department's policies and practices, the way it implements law and regulation have been in place for, in some instances, up to 70 years.  And the purpose of this exhibit is to aid, to assist her in presenting her testimony based on her knowledge and aid in the court's comprehension, simply because of the large volume of years to cover for what is currently being implemented today.

THE COURT:  But this goes way back before she was employed there, so she doesn't have personal knowledge, for instance, of what was going on in 2004, and certainly she

doesn't have -- though I can take judicial notice of the Immigration Act of 1924, and she doesn't have personal knowledge of the visa security measures in 1941.

I can take judicial notice of the events, the World Trade Center bombing, September 11 terrorist attacks, one imagines they changed their policies.

MS. STROKUS:  Your Honor --

THE COURT:  Let's proceed this way.  You go ahead and ask her your questions.  I understand that central to this case is an alleged policy, and the government denies that there's any such policy.  But it's pretty clear the government has procedures, and I'm interested to know what she has to say about those procedures.  Let's proceed that way.

I've looked at this.  It's hardly conclusive on anything, but I'll defer ruling.  So go ahead and ask your questions.

MS. STROKUS:  Your Honor, just to clarify, Ms. Smith did just testify that she joined the State Department in 1999. And if I could make a brief offer of proof for all of the testimony that would come before --

THE COURT:  No.  I stand corrected as to when she joined, and I'm appreciative of that, but I don't need an offer of proof at this time.  Go ahead, ask questions.

MS. STROKUS:  Thank you, Your Honor.

BY MS. STROKUS:

Q.   Ms. Smith, when with did the State Department's visa issuance policy originate?

THE COURT:  Which policy?  Excuse me, I didn't hear the type of policy.

MS. STROKUS:  Visa issuance policy.

THE COURT:  Again, forgive me.  Say it again.

MS. STROKUS:  Sure.  My question, Your Honor, was when did today's -- when did the State Department's visa issuance policy originate.

MR. WILKENS:  Objection.

THE COURT:  Overruled.  You may answer.

A.   Thank you, Your Honor.

With the Immigration Act of 1924.

Q.   And Ms. Smith, what did that Immigration Act of 1924 do?

MR. WILKENS:  Objection.

A.   It laid out some basic --

THE COURT:  I'm going to sustain that.  I can look at the Act.  We're back in 1924.  That's over a century ago. Let's come to this case.

MS. STROKUS:  Yes, Your Honor.  Certainly, Your Honor.

BY MS. STROKUS:

Q.   So skipping over some questions that I intended to ask Ms. Smith, Ms. Smith, after World War II, what was the next major development in immigration law?

MR. WILKENS:  Objection.

THE COURT:  No.  Overruled.  She may tell us.

A.    After World War II, the major milestone was the Immigration and Nationality Act in 1952 which laid out rules and regulations on visas and established ineligibilities and what DHS would call inadmissiblities, as well as rules around visa revocation.

Q.    And is the INA still the governing law today?

A.    Yes, it is still the governing law.

MR. WILKENS:  Objection.

THE COURT:  Well, overruled.  I'm the judge of the law, but I'm going to let that stand.  Go ahead.  That's the act that's in effect today.  Go ahead.  Go ahead, counsel.

MS. STROKUS:  Yes.

BY MS. STROKUS:

Q.    Have there been any amendments that have been relevant to the State Department visa security policy in the years following 1952?

A.    Yes.  One in particular stands out in my mind that came into effect right before I started with the State Department, which was in 1996, which established the ineligibilities for illegal presence 212(a)(9)(i) and 212(a)(9)(ii).

Q.    And you started at the State Department when again?

A.    In September of 1999, and I got to my first post in November of 1999.

Q.    What was the next major event that impacted the State

Department's visa security policy?

A.    If I may back up just a little bit because something that impacted the State Department was in 1993, the first World Trade Center bombing when it --

MR. WILKENS:  Objection.

THE COURT:  What's the ground of the objection?

MR. WILKENS:  I mean, she testified that she joined the department in 1999.  Now she's going to back to before she joined, Your Honor.

THE COURT:  Yes, but she has training and the like. To tell you the truth, so far I haven't heard anything that is particularly relevant, but I'd like to move on.  If she doesn't get to something relevant pretty soon, I'll issue a direction. But this is all background and perhaps it's helpful.

Go ahead.  After the World Trade Center bombing, what happened so far as you know?

THE WITNESS:  Yes, Your Honor.

A.    So after the first World Trade Center terrorist bombing, there was a push within Consular Affairs for some system automation as well as limited biometric collection.  And if we fast forward, I started in '99, then the September 11, 2001 terrorist attacks happened.  And that was a major wake-up call for the State Department for Consular Affairs and for the whole U.S. Government in terms of our failure to properly vet visa applicants, since at least a couple of them were in the U.S. on

student visas.  At least one had attended flight school in the United States.

So in the immediate years following the September 11 terrorist attacks, there were several laws that came into effect and major changes in the Bureau of Consular Affairs in terms of full biometric collection.  And, for example, the INS became DHS with all of its different components, HSI, ICE, also consular officers having access to entry and departure data for all aliens.

Another major shift was that before 9/11 foreigners could transit the U.S. without a visa.  And starting in 2002, foreigners needed to obtain a visa in order to even switch planes in the United States.

Also the visa security program was created, which is where HSI has agents co-located in consular sections abroad that conduct additional vetting on visa applicants.  And also in the few years following 9/11 it was mandated that U.S. Government agencies needed to share in a very fulsome way derogatory information on visa applicants.  And also there was sharing of biometric data especially between DHS and Consular Affairs.

Q.   Ms. Smith, was there anything specific to student visa applicants that occurred following 9/11?

A.   Yes.  Specific to student visa applicants the SEVIS system was created, also referred to as SEVP, Student and Exchange Visitor Program.  And that was literally a database that was

created by ICE to track students from the moment that they are issued their I-20 or DS-2019 form in order to apply for a visa abroad. And it tracks when they report to class in the United States. If they were to flunk out of school, their status would change.

ICE certifies designated school officials at every school that is accredited to issue the I-20 or DS-2019, and the DSO, as they're called, is supposed to update in SEVIS, in the SEVP any and all student movements, including if someone is, for example, adversely terminated at the school.

Q.   Ms. Smith, all of these changes and evolutions that you've mentioned after the September 11 terrorist attacks, are they still being implemented today by the State Department?

A.   Yes, they are still in effect today.

Q.   After the implementation and all of this evolution in response to the September 11 terrorist attacks, was there anything else that occurred that created additional evolution in the State Department's visa security policy?

A.   So for example, in 2013, there was the Boston Marathon bombing that was carried out by a naturalized U.S. citizen and a legal permanent resident. And that brought to the forefront once again for Consular Affairs the need to properly vet all applicants because of serious national and public security concerns.

The next big event was in 2015, the San Bernardino

shooting that was carried out by a Pakistani national who obtained a K-1 fiance visa in order to enter the U.S. to marry a U.S. citizen.  And he had posted on his social media, I think it was the day before or the day of the shooting, he had posted what he was going to do.  And then a review of social media revealed afterwards that he had pro-ISIS postings on his social media.  So this was when the Bureau of Consular Affairs first started to take a really hard look at how to vet social media.

Q.   And for how long has the State Department required visa applicants to provide social media handles for the purpose of visa vetting?

A.   So to mention that in 2016, so about a year after the San Bernardino shootings, FDNS, the Forensic Document National Security director within USCIS started social media vetting of certain subsets of applicants.

And in the State Department, in, it was 2019 or 2020, started to require that all visa applicants, whether nonimmigrant or immigrant visa applicants, were obliged to report their social media handles on their DS-160 or DS-260 electronic application forms.

Q.   And Ms. Smith, following after, say, 2020, has there been additional development in the State Department's visa security policy?

A.   Yes.  There have been further developments in terms of interagency and biometric checks.  Also there have been some

innovations, for example, for a while there was a predictive analytic software that was run as a pilot at some posts on visa applicants based on their biographic and other information. Sort of a first foray into an AI type system on visa applicants.

And another is a focus on data-driven decisions and metrics. So everything on refusal rates, productivity, there have been different innovations over the years since around 2019, 2020, leading up until today and continuing.

Q. Ms. Smith, is the State Department, to your knowledge, continuing to implement the same statutes and regulations today as it has since the passage of the Immigration and Nationality Act in 1952?

A. Yes. The State Department and specifically Consular Affairs continues to uphold everything that is in the INA.

MS. STROKUS: Your Honor, I have nothing further for this witness and tender the witness to the court.

THE COURT: Yes. Thank you.

Mr. Wilkens, do you wish to inquire of this witness?

MR. WILKENS: Yes, I do, Your Honor.

THE COURT: You may.

CROSS-EXAMINATION BY MR. WILKENS:

Q. Ms. Smith, you've talked about, I think you called them everything from sort of major changes to changes over the years to innovations.

And am I correct that when those types of changes have happened, the Department of State and in particular the Bureau of Consular Affairs has regularly issued policy guidance to all posts on how those changes should be implemented?

A.    Yes, that is correct.  One way that the State Department or Consular Affairs issues guidance to the field is via cables, yes.

Q.    And while we're on that topic, in addition to cables, how else does the Department provide policy guidance to visa officers around the world and in Washington?

A.    Another way that the State Department provides guidance is via FAM updates, the Foreign Affairs Manual, 9 FAM in particular, which is everything about how consular officers need to apply the INA abroad, sort of operational instructions.

Another way besides cables and FAM updates, sometimes emails are released until a cable can get fully cleared because any cable that is released from the State Department has numerous layers of clearances both within Consular Affairs as well as throughout the State Department building, many different offices.

And another way that guidance is released to the field is, depending on the topic, Consular Affairs may hold a webinar in order to give information and receive questions from the field.

Q.    And in addition to taking account of the various types of changes that you spoke about earlier, this type of policy

guidance is also issued to implement executive orders no matter what the Presidential administration, correct?

MS. STROKUS:  Objection, Your Honor.

THE COURT:  What's the ground?

MS. STROKUS:  Scope of her prior testimony.

THE COURT:  Overruled.  He may have it.  Is that the practice?

THE WITNESS:  Counsel, can you please repeat the question?  I want to make sure I understand.

THE COURT:  Yes.  His question is, does like policy guidance get issued to consular offices when it's necessary to implement a President's executive orders.

THE WITNESS:  Thank you, Your Honor.

The Consular Affairs would release cables or webinar or hold webinars if an executive order is relevant to visa work or let's say U.S. passport adjudications.  So it really depends on the topic.  We don't hold a webinar or release a cable based on every executive order.  It really depends on what the topic of the executive order is.

Q.   And under this administration, isn't it correct that the bureau has issued policy guidance with respect to executive orders issued by the President?

MS. STROKUS:  Objection, Your Honor.

THE COURT:  I'm not getting into how they've changed the visa applications, if at all and on what basis.  In my

mind, all of those things implicate national security, and that's the line I'm following.  So that question I'm sustaining on that ground.

Q.    So I will come back to a related area in a moment.  Let me just step back for a second about your position, Ms. Smith, which you talked about earlier as special adviser.  You've been in that role since February, right?

A.    That is correct, I've been in that role since February.

Q.    And that is the first role that you've had sort of in the head office, the front office in Washington, D.C. since you joined the Department in 1999, correct?

A.    Yes, that is correct.  That's the first role I've had in the Consular Affairs front office since I joined.

Q.    You've, so to speak, been in the field up until taking that role; is that fair?

A.    Yes, that's correct.  Other than language training, I've been in the field.

Q.    Okay.  And so would it be fair to say that you've been on the receiving end of the policy guidance we've talked about under various cables that are sent or the Foreign Affairs Manual, the emails that you mentioned that are sent prior to some cables being issued; is that right?

A.    Yes, I've been on the receiving end of guidance from D.C.

Q.    And in your current role since February, you've been on the, let's say the generating end, the creation end of the

policy guidance that goes out to consular posts around the world and to the visa office in D.C., correct?

MS. STROKUS:  Objection, Your Honor.

THE COURT:  No.  He may have that.  Is that a proper characterization, ma'am?

THE WITNESS:  I guess what I'd do is I'd caveat it a little bit, because I am one of many people within the Bureau of Consular Affairs who are attempting to faithfully carry out what the President is releasing via executive orders.

BY MR. WILKENS:

Q.   And would it be fair to say that one of the principal responsibilities of your role is to help implement President Trump's executive orders, and in particular, let me refer to a couple of them in particular, Executive Active order 14161, which is titled Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, and Executive Order 14188, titled, Additional Measures to Combat Antisemitism; is that right?

MS. STROKUS:  Objection, Your Honor, scope.

THE COURT:  No.  Overruled.  He may have it.

A.   Yes, that is correct.  As part of my job in D.C. is to help the Bureau of Consular Affairs implement executive orders out of the White House, including the EOs that you mentioned, EO 14161 and the EO on antisemitism.

Q.   And in your role as special adviser since February, you

have in fact undertaken a number of tasks to implement those two executive orders, isn't that right?

MS. STROKUS:  Objection, Your Honor, scope.

THE COURT:  Overruled.

A.    Can you please ask the question again?  I think it's two questions.  So would you mind separating the questions, please.

THE COURT:  Follow that direction.

MR. WILKENS:  I'm trying to remember the question, Your Honor.

THE COURT:  I'll break it down.  He asked about two executive orders.  So since you've had this duty in February, have you worked on the executive order relative to measures to combat terrorism and the like, the first one he mentioned?

THE WITNESS:  Yes, Your Honor.  So EO 14161, I have been a member of the team to help implement that executive order, which basically directed the State Department to find ways to better vet visa applicants abroad.  And so it was left to the State Department and specifically the Bureau of Consular Affairs to envision and implement what that entailed, what that means.

THE COURT:  And his second question was, the executive order dealing with antisemitism.

THE WITNESS:  Yes, Your Honor.  Although I've been less involved with that executive order specifically, I have had some dealings with it but not as much as EO 14161.

BY MR. WILKENS:

Q. Turning you specifically to the antisemitism EO, what guidance are you aware of that has been issued to visa officers, to consular officers to implement the antisemitism EO?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: Sustained. But this is not on scope. We're not getting into the vetting of visa applicants.

MR. WILKENS: Your Honor, let me mark an exhibit to sort of make it clear that some of this material is before the court and has been marked as exhibits that deals with this question.

THE COURT: Maybe it is. So we'll have to work out from there, but that's the line I'm following.

MR. WILKENS: Yes.

Could we pull up Exhibit 64, please. Terrorists.

THE COURT: I have it.

THE WITNESS: I'm viewing it as well.

THE COURT: Thank you.

BY MR. WILKENS:

Q. Ms. Smith, please take a moment to look at that, if you need to.

MS. STROKUS: Your Honor, I'm going to object to the introduction of this exhibit to this witness.

THE COURT: Wait a minute. It's a little too late.

This document is in evidence under the pretrial order.  So we've got a document in evidence, it's redacted, and I'm not changing that.

MS. STROKUS:  I understand, Your Honor.  My objection is under Rule 611(b), the scope of cross-examination.

THE COURT:  Well, that's within the court -- I see, it's scope.  And I overrule the objection.  But yes, maybe -- well, no, she's adverse.  He may inquire.  The matter is within my discretion.  He may inquire, but I'm not getting into changes in practice for vetting visa applicants.  But hope springs eternal, Mr. Wilkens, so go ahead.

MR. WILKENS:  Yes.

BY MR. WILKENS:

Q.   And have you seen this cable before, Ms. Smith?

A.   Yes, I have seen this cable before.

Q.   And is this cable one of the types of policy guidance that's been issued to implement the executive orders we spoke about a moment ago, including the antisemitism executive order?

MS. STROKUS:  Objection, Your Honor.

THE COURT:  Overruled.

A.   Yes, this is one example of how executive orders are implemented.

Q.   Okay.  And just with respect to cables more generally but including this cable, am I correct that cables don't just apply to visa officers located in diplomatic posts around the world

but also can provide policy guidance to the visa officers working here in D.C., isn't that correct?  Well --

THE WITNESS:  Were you going to say something, Your Honor.

THE COURT:  No.

THE WITNESS:  Sorry.

MR. WILKENS:  Sorry.  That was me.  Let me withdraw that.

THE COURT:  Withdrawn.

BY MR. WILKENS:

Q.   I'll ask you, so the cables -- yeah.  This cable applies not just to visa applicants who are applying for visas through posts abroad but also applies to visa holders who are present in the United States, isn't that right?

A.   So the question is whether the cable guidance would apply to visa holders in the United States as well?

Q.   Yes.

A.   I think it's a little bit of a broad question to try and answer because if a student has been admitted to the United States, they are admitted by Customs and Border Protection, S, Ms and Js are categories that are submitted, duration of status.  And so there's certain aspects of their presence here that are -- well, actually, most aspects of their presence in the United States are sort of governed by the Department of Homeland Security and not the State Department.

Q.   The State Department, though, is the agency with the statutory authority to revoke visas, correct?

A.   That is correct, the State Department has the authority to revoke visas.

Q.   And that includes student visas, correct?

A.   That is correct, that includes student visas that the State Department has the authority to revoke.

Q.   And could I ask you to turn to paragraph 11 of this cable, which is on page five of six?

A.   Yes.  Could I have a moment to read it, please.

Okay.

Q.   Okay.  So with respect to paragraph 11, does that make it clear that the cable, the guidance provided by this cable is applicable not just to students applying for visas from abroad at consular posts but also the students in the United States and the possibility that the State Department will revoke their visas?

MS. STROKUS:  Objection.

THE COURT:  Well, the document speaks for itself.  The objection is overruled.  No.  The objection is sustained.  The document speaks for itself.  That's what it says.

MR. WILKENS:  Okay, Your Honor.

BY MR. WILKENS:

Q.   Just to be clear, the questions that I will be asking with respect to policy guidance, I intend to ask those questions

about policy guidance with regard to visa holders in the U.S., not visa applicants abroad who are applying through U.S. diplomatic posts. I just want to be clear about that, that that's what I want to focus on.

So am I correct that in the bureau in which you are a senior adviser that there is a visa office that handles the revocation of visas for students who are already in the United States, student visa holders?

A. Yes, that is correct, there is the visa office in D.C. that would handle the revocation of visas there; yes, that is correct.

Q. And we spoke a moment ago about different types of guidance, policy guidance that is provided by the Department of State and the bureau, which you mentioned, for example, includes the Foreign Affairs Manual, cables, emails in advance of cables being issued and webinars.

And do those types of guidance -- don't those types of guidance also apply to visa officers in Washington who are working on visa revocations?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So I think what you're asking is whether the same standards would apply abroad or domestically in the United States on whether there are grounds to revoke a visa.

So there are certainly rules as it does briefly mention in

paragraph 11 of the cable in Exhibit 64, there is brief mention of that. And so for example, it mentions how in driving under the influence, a consular officer abroad is able to revoke a visa, even if the person is in the United States. But most times it needs to be the visa office in the U.S. that would perform the prudential revocation.

Q.   And could you just briefly explain what the term "prudential revocation" means for the court.

A.   Yes, a prudential revocation is when a visa is revoked but it actually does not take effect until the person departs the United States.

Q.   Okay. And I just want to just back up for one second just to be clear. So the types of guidance we talked about, the Foreign Affairs Manual, cables, emails, webinars, all of that, those types of policy guidance with regard to the two EOs we spoke about apply to students, student visa holders, the revocation of student visas for students who are already present in the United States, correct?

        MS. STROKUS:  Objection.

        THE COURT:  No.  Overruled.

A.   A consular officer, whether they're abroad or in the United States, would need to look at the totality of the circumstances of an applicant's situation, would need to look at all facts their case, any and all criminal history, any aspect of the applicant in order to determine if there are

grounds for revocation or prudential revocation.

Q.    And I want to focus on the question of where the guidance that the consular officer, particularly located in D.C., is relying on.

And what I'm asking is, they also rely on the various types of policy guidance that you mentioned, which includes the Foreign Affairs Manual, cables, emails, webinars, isn't that correct?

A.    Yes, an officer in D.C. would also rely on the Foreign Affairs Manual, cables, webinars.  We are all held to the same standard.

Q.    And I think you mentioned a moment ago that with the exception of sort of DUIs, for example, most visa revocations for visa holders in the United States, student visa holders in the U.S. are handled out of visa officers -- are handled by visa officers located in Washington, isn't that right?

A.    That is correct.

Q.    Okay.

A.    The majority of visa revocations are performed from D.C.

Q.    If we can just turn back to the first page of this exhibit, 64, and I'm going to direct you to the latter couple of sentences of paragraph two, the summary paragraph.

Do you see where it's quoting from Secretary Rubio there?

A.    Yes, I do see the quote from Secretary Rubio.

Q.    And that quote from Secretary Rubio is guidance to visa

officers, including those who are handling the revocation of visas of students who are in the U.S., right?

MS. STROKUS:  Objection, hearsay.

THE COURT:  No.  The document is in evidence.  It's not hearsay, but I'm sustaining the objection.  The document speaks for itself.  That's what it says.

MR. WILKENS:  Okay, Your Honor.

THE COURT:  Except the identity of who said it is unclear.  So we'll let Mr. Wilkens have that.

You understand that the quoted portion in that paragraph, ma'am, comes from the present Secretary of State, Marco Rubio?

THE WITNESS:  Yes, Your Honor.  That comes from Secretary Rubio.

THE COURT:  Thank you.

By MR. WILKENS:

Q.   And just to be clear, that's part of the guidance, right?

THE COURT:  Well, the document speaks for itself.

MS. STROKUS:  Objection.

THE COURT:  The objection is sustained.  I can read.

BY MR. WILKENS:

Q.   Let me move off of this exhibit, Ms. Smith.

Just briefly, to go back to your role as special adviser, you mentioned that you report to Mr. Armstrong, right?

A.   Yes, that is correct, I report to Mr. John Armstrong.

Q.    And you also work closely with the Office of the Counselor to Secretary Rubio, correct?

A.    Yes, I do work with the office of the counselor.

Q.    And the Office of the Counselor -- well, could you explain just briefly the Department of State sort of organizational structure?

A.    Yes, I can explain.  So the Office of the Counselor -- the consular reports directly to the Secretary of State, and they are responsible for providing guidance, and also they can take on special projects for the Secretary's office.

Q.    And the Office of the Counselor which reports directly to the Secretary has provided you with various tasks related to the implementation of the two executive orders we've discussed, correct?

        MS. STROKUS:  Objection.

        THE COURT:  Overruled.

A.    I do sometimes receive instruction from the office of the consular, but most times it is through the senior bureau official in consular affairs.

Q.    I just want to be clear, in addition to reporting to Mr. Armstrong, you also have this working relationship with the office of the consular, which reports directly to Secretary Rubio, right?

A.    Yes, I do have a working relationship with the Office of the Counselor.

Q.   And you've received tasks regarding the implementation of the two executive orders from Mr. Armstrong and the Bureau of Consular Affairs and also from the office of the consular to Secretary Rubio, correct?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.   Can you clarify which executive orders, please.

Q.   Yes.  The two we were speaking about earlier.

A.   Yes, I have received guidance or instructions for EO 141617 and EO 14188.

Q.   You spoke earlier about the connections, the work between the Department of Homeland Security and the Department of State and how that has changed or increased over time, correct?

A.   Yes, I spoke earlier about how that has evolved over time, become a much closer relationship, starting really with the 1992 World Trade Center bombing and especially after the 9/11 terrorist attacks, in terms of biometric and information sharing.

Q.   And in your role as special adviser, you have worked with the Department of Homeland Security, correct?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.   Yes, in my role as senior adviser, I have worked with the Department of Homeland Security.

Q.   And I want to just focus on two aspects of that,

Ms. Smith.  You have participated in what is referred to as a student visa working group, right?

MS. STROKUS:  Objection.

THE COURT:  I'm not clear can where that falls on the line I'm following, so I'm going to sustain it but without prejudice to you following it up.

Q.   Okay.  Since you became special adviser, some of your work has involved the revocation of visas of students who have engaged in student protests, correct?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.   Can you repeat the question, please.

Q.   Yes.  In your role as special adviser, you have worked on issues related to the revocation of student visas for students who engaged in student protests, correct?

A.   Yes, in my role as senior adviser, I have worked on matters related to the revocation of student visas and also frankly revocation of visas for anyone, whether or not they're a student, who has been arrested or otherwise broken our laws in the United States.

Q.   But you have worked, in your role as special adviser, you have worked on the revocation of student visas for students engaged in protests only since February of 2025, right?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.    In my role as senior adviser since February of 2025, I have worked on cases where applicants have derogatory information in our system.

THE COURT:  Wait.  Excuse me for interrupting, but I'm going to pretty strictly follow my line.  His questions, I understood, don't deal with applicants.  They only deal with people who are here lawfully on visas that have issues.  And I've understood your testimony about revocation of visas to apply to such persons.

This last question, as I heard it, is only this.  You first began working on the revocation of visas of the student protesters after the assumption of your role in February 2025.  Is that true?

THE WITNESS:  So to answer your question more directly, Your Honor, since arriving in February of 2025, my work has included not only student visa holders.  So you're asking, sir, about any visa holder in the United States, including students.  And yes, my work has included that.

THE COURT:  But you're making the point that your work is much broader than that, at least in the revocation of visa area?

THE WITNESS:  Yes, Your Honor, my work, yes.

THE COURT:  Yes, I understand.  Mr. Wilkens.

BY MR. WILKENS:

Q.    Let me focus on two different ways, as I understand it, in

which your work has concerned the revocation of student visas involving student protesters.

One way has been referrals coming from the Department of Homeland Security to the Bureau of Consular Affairs and Mr. Armstrong that recommend -- that have recommended the revocation of the visas of certain students who were engaged in student protests, isn't that right?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.    Would you mind repeating the question, please.

THE COURT:  He says, his question is that one way you've been involved in the revocation of visa-holding student protesters is when a recommendation comes from the Department of Homeland Security advising that such visa should be revoked; is that correct?

THE WITNESS:  Thank you for repeating the question, Your Honor.  That is correct.

We, as I stated during my deposition, we sometimes get information from the Department of Homeland Security about student visa holders or other types of visa holders who are in the United States and there is some sort of derogatory information.

And as I stated during my deposition, my role has been fairly limited with regard to specific visa cases, occasionally checking in our system whether the person has a valid

nonimmigrant visa, if it is an expired nonimmigrant visa, if they are a legal permanent resident, checking if someone is a U.S. citizen.  So it's a little bit more verifying the actual status of the person in the United States.

BY MR. WILKENS:

Q.   And Ms. Smith, with respect to that limited role, you dealt with, in that way, the case of Mahmoud Khalil, correct?

        MS. STROKUS:  Objection.

        THE COURT:  Overruled.

A.   Yes, I do recognize the name Khalil Mahmoud.

Q.   You were asked by the Office of the Counselor to Secretary Rubio to check in the system whether Mr. Khalil was a visa holder or a lawful permanent resident, correct?

A.   I am not sure if it was from the Office of the Counselor or from the Department of Homeland Security, but yes, I did check if Khalil was a visa holder or a legal permanent resident.

Q.   And did you have that sort of involvement in the cases involving Rumeysa Ozturk or Badar Khan Suri or Yunseo Chung?

        MS. STROKUS:  Objection.

        THE COURT:  Overruled.

A.   As I stated during my deposition, I thought I recognized the name Suri, but I thought it was a female, and during the deposition I saw it was a male.  So if I worked on it, it would have been just to verify the visa status or an LPR.

Did you say the other name was Chung?

Q.   Yes.

A.   I do not recognize that name.  And can you repeat the name of the other applicant, please?

Q.   Mohsen Mahdawi.  Sorry, go ahead.

A.   Sorry.  I do recognize the name Mahdawi, but I thought -- I think it's a he --

Q.   Yes.

A.   I thought he was from a different country.  And when I saw it during the deposition, it was a different country than I had remembered.  The name does sound familiar.  But again, my role would have been limited to checking if the person was a valid visa holder or a legal permanent resident, visa status.

Q.   Thanks.  I'll ask about one more name, Rumeysa Ozturk. Were you involved in her case in any way?

A.   I do not remember working on her case, no.

        MR. WILKENS:  Okay.  Thank you.  And Your Honor, I just wanted to raise one thing.  It looked to me like Ms. Strokus maybe had been speaking with someone else in the room.  And if there's someone else in the room, I'd like them to be identified.

        MS. STROKUS:  That's fine, Your Honor.  We have agency counsel here.  We just have a limited screen.

        THE COURT:  I appreciate that.

        MR. ANDERSON:  Carl Anderson, with the State

Department.

THE COURT:  And Mr. Anderson, thank you for identifying yourself.

Is that it for this witness?

MR. ANDERSON:  Thank you, Your Honor.

MR. WILKENS:  Not it for my questions, Your Honor, but yes, thank you for clarifying that.

THE COURT:  And Mr. Anderson, you are certainly welcome.

BY MR. WILKENS:

Q.   I want to -- so you've just spoken about one way in which the Bureau of Consular Affairs has worked with the Department of Homeland Security on revoking the visas of student protesters, and I want to -- I just want to talk about one other way, as I understand it, that the two agencies have addressed or discussed the issue of visa revocations for student protesters.

And you were part of a student working group with DHS in which the issue of the revocation of student visas for students who are engaged in protests was discussed, correct?

MS. STROKUS:  Objection.

THE COURT:  Well, I think that may run afoul of the deliberative privilege.  Sustained.

I'll ask the question.  As part of your job, ma'am, at some time in the period we're talking about, you were part of a

working group within DHS, the Department of Homeland Security, that concerned itself with student protesters.  Is that true?

THE WITNESS:  Your Honor, in my role as senior adviser in Consular Affairs, I did participate in a group with the Department of Homeland Security about student visa protesters and other matters, yes.

THE COURT:  Thank you.

BY MR. WILKENS:

Q.   And I want to ask about what you referred to in your deposition as the Homeland Security Council.  Do you remember talking about that?

MS. STROKUS:  Objection.

THE COURT:  Well, since I don't know -- I don't have the deposition before me, I'll allow her to answer yes or no.

Do you remember mentioning that individual or office in your deposition, ma'am?

THE WITNESS:  Yes, Your Honor, I did mention in my deposition that the Homeland Security Council calls meetings, and I have attended several of those meetings.

BY MR. WILKENS:

Q.   And in those meetings, the attendees, the meetings that you attended, the issue of student protesters and the revocation of their visas came up, didn't it?

MS. STROKUS:  Objection, Your Honor.  Presidential communications privilege.

THE COURT: What? Presidential? Is that --

MS. STROKUS: Yes, Your Honor.

THE COURT: -- the privilege you're asserting?

MS. STROKUS: Homeland Security Council is a direct advisory to the President, Your Honor.

THE COURT: So let me be very clear now. You're asserting the executive privilege of the President of the United States with respect to these meetings?

MS. STROKUS: Yes, Your Honor, the Homeland Security Council is part of the executive, it is part of the White House.

THE COURT: You're all part of the executive, aren't you? You're part the executive.

MS. STROKUS: I am, Your Honor. I mean specifically that this council advises directly to the President. It is part of the Executive Office of the President.

THE COURT: This council we're talking about is part of the Executive Office of the President. What's his or her name?

MS. STROKUS: Yes. Your Honor, it is a council of people who have been collected to advise on Homeland Security. It is termed the Homeland Security Council, and it is part of the Executive Office of the President.

THE COURT: Okay. I appreciate your help. So there's an informal council on Homeland Security.

MS. STROKUS:  No, Your Honor.  It is a formal council.  It is a formal council that is part of the Executive Office of the President.

THE COURT:  And its name is --

MS. STROKUS:  The Homeland Security Council.

THE COURT:  Thank you.  And it's comprised of whom?

MS. STROKUS:  Your Honor, that is part of the Presidential communications privilege.

THE COURT:  So it's a secret council?

MS. STROKUS:  The existence of the council is not a secret, Your Honor.

THE COURT:  But its membership is secret?

MS. STROKUS:  They are staff members of the Executive Office of the President, Your Honor.

THE COURT:  And its membership is secret?

MS. STROKUS:  I would not say that it is secret, Your Honor.  I would say that it is privileged.

THE COURT:  And it's privileged from this court?  I may not know who these people are?  I mean, you tell me that.  Is that what you're saying?

MS. STROKUS:  Given the ongoing issues with privilege in this court, Your Honor, I will maintain that this is the Presidential communications privilege and the identities of the individuals on the Homeland Security Council are privileged.  The discussions that are had within the Homeland Security

Council and agencies are privileged under the Presidential communications privilege because this council is part of the Executive Office of the President and provides direct recommendations, direct advice for the President to take action in his duty under the Constitution.

THE COURT:  Your position is clear.  Let me ask you this, because this pertains to my research on Exhibit A as to which this -- and Mr. Kanter may respond to this as well.  And really it does not come up in the context that counsel has now raised it where at least the name of this secret entity is Homeland Security, which the natural inference is it involves national security.

MR. KANTER:  Homeland Security Council, not secret.

THE COURT:  The name is not secret, no.  But now its members are apparently secret.

MR. KANTER:  Privilege.

THE COURT:  Privilege, you say.  So she takes that position, and I'm not in a position to overrule it, and I'm not going to, at least now.

But go back to Exhibit A.  If I rule that Exhibit A is privileged, my review of that exhibit is, that has nothing to do with or the claim that -- if any claim were raised that it has to do with national security is so peripheral that, to be almost evanescent.  Be that as it may, if it did have to do with national security and the executive privilege of the

President of the United States is invoked, the decided cases indicate that no adverse inference may be drawn from that.  And those are higher courts, and I respect that.  But if it didn't have to do with national security, I'm wondering when such privilege is invoked, whether, as you'll find if you were here in Massachusetts dealing with the attorney-client privilege, under the common law of Massachusetts, where I started and still reside, if you invoke the attorney-client privilege, the factfinder is entitled to draw an adverse inference that the attorney-client privilege is invoked, but you're hiding something.

I wonder whether when national security is not at play, as it appears to be as your co-counsel has invoked it, but with respect to Exhibit A where it appears it doesn't, what's the law on that?

I'm not asking now.  It's a matter that could be briefed if we even get that far because I haven't ruled whether the privilege applies or not, but it's appropriate to raise it now.

Sorry for the detour, Ms. Smith.  We'll let Mr. Wilkens get back to work.

MR. WILKENS:  Thank you, Your Honor.

BY MR. WILKENS:

Q.    So Ms. Strokus and Ms. Smith, I want to return for a moment to the Homeland Security Council with respect to what is

public about it.  And a great deal has been made public by White Houses over time.  And so in particular, the Homeland Security adviser is Stephen Miller, isn't that correct?  That's on the White House website; isn't that right?

A.   Yes, the Homeland Security security adviser is Stephen Miller.

Q.   And can you name the agencies -- I'm not asking for the names of the people but the agencies and agency heads who are as a matter of public record part of the council?

        MS. STROKUS:  Your Honor, objection again.

        THE COURT:  Same grounds?  Same grounds?

        MS. STROKUS:  Yes, Your Honor.

        MR. WILKENS:  Your Honor, I'd like to pull up a White House web page that shows the information that I'm trying to ask about to show that it's public.

        THE COURT:  Well, you may, but then why don't you pull it up and show it to the witness or read it to the witness --

        MR. WILKENS:  Yes, Your Honor.

        THE COURT:  -- because you have it, and let's see what she says about it.

        MR. WILKENS:  Yes, Your Honor.  We'll pull it up now.

        MS. STROKUS:  Your Honor, I'm going to object to this. This was not produced to the defendants in discovery.

        THE COURT:  True.  But I'm going to allow him to do it if it's on the White House website.  Now, a privilege has been

invoked.  I think I might want to take a look at it, and it would be helpful, can you people print things out?  Why don't you take a screenshot of it and print it out?  I'm swimming in paper here.

MS. CONLON:  I know.  Unfortunately, we have no printer access in the courthouse, but we'll put it on the screen in a second.

THE COURT:  All right.  Let's put it on the screen.

MR. WILKENS:  Pre-marked as EP.

THE COURT:  Okay.  Now, EP, this is one of your newer documents.  So this is EP.

MS. STROKUS:  Your Honor, may we have a quick recess so that we can determine what is public and what is not?  We have not seen this before, and my understanding --

THE COURT:  I don't see the need for a recess.  It's sufficiently public that they can get their hands on it.  And it's represented to the court that this is the White House's own website.  I'm reading it, it says Homeland Security Council.

MS. STROKUS:  Your Honor, I would just point out that at the top of the page it says, "Under President George W. Bush," and that this is frozen in time, it is not current.

THE COURT:  All right.  That's fine.  And therefore, the way we'll proceed is you're going to have to move on, Mr. Wilkens, because she says that this is not the current

council.  When you can get to a printer, print that out, and let me have it.

BY MR. WILKENS:

Q.    Can I ask you, Ms. Smith, if you read that --

THE COURT:  She can't read it.

MS. STROKUS:  Objection on.

THE COURT:  Wait a minute.  He hasn't asked his question yet.  Let him ask the question.

BY MR. WILKENS:

Q.    What I want to ask is, is the description of the Homeland Security Council and its agency members an accurate description of the current Homeland Security Council?

THE COURT:  She doesn't have the document before her. She does?  She has it before her.

MS. STROKUS:  Objection, speculation, foundation. This has not been produced in discovery.  It's a historical document.

THE COURT:  Yes, he knows that.  And so what he's asking her is, is the historical document, is the composition the same today?  You object to that, asserting the same privilege, I take it?

MS. STROKUS:  Yes, Your Honor, under the privilege and also because it's speculative.

THE COURT:  Look.  I've heard you.  I understand the grounds of the objection.

Now, I'm in the middle of the trial.  I need to sort this out.  So without sustaining this objection in any way, I'm going to direct you to move on, because if the assertion of privilege is correct, the question you ask, since you can only come up with one from a prior administration and that's some time ago, calls for her divulging matters as to which such a claim has been made, an interesting claim.  Anything else?

MR. WILKENS:  Yes, Your Honor.

BY MR. WILKENS:

Q.   I'd like to just briefly focus on a few cables of the type that you testified about earlier, cables that the Bureau of Consular Affairs issued as part of its implementation of the two executive orders that we spoke about.

MR. WILKENS:  And I will go through them as quickly as I can, Your Honor.

Q.   Let me direct you to, if we can pull up Exhibit 51, please.

MS. STROKUS:  Your Honor, I'm going to object to this, make a scope objection.

THE COURT:  Your objection is scope.  Overruled.

A.   Okay.  I see Exhibit 51.  I would appreciate a minute or two to read through it, please.

Okay, I am ready, sir.

Q.   Okay.  Thank you.  Do you recognize this cable?

A.   Yes, I do recognize this cable.

Q.    Is it one of the cables that you were referring to earlier with respect to providing policy guidance about the implementation of the executive orders?

A.    As we can see in the summary paragraph on page one, it does mention EO 14161, and the cable, to summarize it in a sentence or two, directs visa hosts abroad to catch up on their backlog of what are called system messages.

System messages are derogatory information that appears in our systems abroad when there's a visa holder.  So it's someone who already has a visa, and then it's derogatory information that pops into our system once they've been arrested, or other derogatory information.

Q.    If I could ask you just briefly, based on your understanding -- well, sorry.  Strike that.

If you could turn to paragraph three, please, on page two of seven.

A.    Okay, I see it.  Can I just have a minute to read through it, please?

Q.    Sure.

A.    Okay.

Q.    Okay.  I want to direct your attention to most of the way down the paragraph where the sentence begins, "Visa holders who overstay their admission period."  And in that sentence, I just want to focus on the phrase -- well, it says, "engage in conduct that poses a threat to U.S. national security or

otherwise misuse their visas should have their visas revoked under INA 221(i)."  Do you see that?

A.    Yes, I do see that.

Q.    This is not a statutory exam, but could you briefly describe your understanding of INA 221(i)?

A.    I have not read INA 221(i).  I'm not an expert on that, I apologize.

Q.    Okay.  So with respect to the phrase "or otherwise misuse their visas," where can a visa officer in Washington who is looking at the revocation of student visas, where could they go to determine what it means to misuse a visa?

A.    Well, my first look as a consular officer would be to the 9 Foreign Affairs Manual which has all of the rules about how to implement visa law and to, as I've said before and as I said during my deposition, to look at the facts for each and every case.  Each and every case is analyzed individually.  As a consular officer, my job is to took at the totality of circumstances and all of the facts for each and every visa applicant or each and every visa holder.

Q.    Okay.  Let me direct you to paragraph 11 on page five which is under a heading, "Revocation if the alien is still in the United States."

A.    Yes, I see that paragraph.

Q.    Okay.  Obviously you see that most of it is redacted for law enforcement, but I just want to ask about the unredacted

part.

What do you understand it to mean, that requests for revocation of visas when the individuals in the U.S. have to be sent to what's called here the revocation team?

A.   So it's exactly what it says there, that hosts abroad need to refer to the team in D.C. when they think that a visa merits revocation.

THE COURT:  What do the initials mean, since I'm unfamiliar with your organization, VO, I assume means visa office.  SAC means what?

THE WITNESS:  I believe that SAC is security advisory and clearances, and I am not sure what RC stands for.  But you are correct, Your Honor, it's a team within the visa office.

THE COURT:  Yes.  And that's the visa office in Washington?

THE WITNESS:  That is correct, sir, it is the visa office in Washington.

THE COURT:  Thank you.

BY MR. WILKENS:

Q.   A moment ago you spoke about a visa officer, including you, looking at the totality of the circumstances in deciding whether a visa should be revoked, right?

A.   Yes.  Each case would be looked at individually to gather all of the facts in order to make a decision on a visa revocation.

Q.   And under the two executive orders we've been talking about and the policy guidance with regard to how they should be implemented, the facts, the totality of the circumstances include a student engaging in a student protest, correct?

MS. STROKUS:  Objection.

THE COURT:  If I understand, your question is a hypothetical.  Ask it again.

MR. WILKENS:  Sorry, Your Honor.

BY MR. WILKENS:

Q.   Since -- when you are considering the totality of circumstances, is engaging in a campus protest inconsistent with a student's visa status?

MS. STROKUS:  Objection.

THE COURT:  Overruled.  She may give us her opinion.

A.   Well, I think it's a bit of a hypothetical question, but we would need to look at all of the facts of the case.  I mean, I don't want to veer off into, you know, if this, then that. But, you know, if it were someone, a visa holder who engages in violent activity, whether it's during a protest or not, if they were arrested for that violent activity, then that is something that we would consider for possible visa revocation.

Q.   So I'm not -- so putting aside student visa holders who engage in some kind of violence or have been arrested, putting that to one side, isn't it accurate to say that engaging in a campus protest -- sorry.  Isn't it accurate to say that when

you are looking at the totality of the circumstances, engaging in a campus protest is inconsistent with a student's visa status?

MS. STROKUS:  Objection, asked and answered.

THE COURT:  Well, she hasn't answered it, but he stated it the other way.  He's asking --

THE WITNESS:  Can you repeat the question, please, counsel.

THE COURT:  Well, the information ultimately is coming to me, and I guess what he's trying to get at is, do you think that engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status?  Do you think that?

THE WITNESS:  I think it's a difficult question to answer.  If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem.  I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest.

THE COURT:  Thank you.

THE WITNESS:  Again, I think we'd have to look at the totality of the circumstances for the individual applicants.

MR. WILKENS:  Just one moment, Your Honor.

THE COURT:  Of course.

While we're waiting, I've waffled on the document, HM for identification, which was proffered by the defendants as admissible evidence under 611.  Reviewing it and on reflection, it's not.  It doesn't meet the criteria of 611, but the court receives it as a chalk or demonstrative aid, illustrative of the witness's testimony.

MS. STROKUS:  Your Honor, just to clarify, it was also offered under 107(a).

THE COURT:  And I am excluding it.  Thank you for your precision.  Your rights are saved.

Is that it for this witness?

MS. CONLON:  No.

MR. WILKENS:  Your Honor, we're trying to pull up a document.  We're going to return for a moment, but it will be brief, to the Homeland Security Council and a current White House document that describes, it's a Presidential memorandum from President Trump issued since he entered office that describes the National Security Council and also describes when that becomes the Homeland Security Council through the change of agency heads who are part of the Homeland Security Council but not the National Security Council.

THE COURT:  Well, you know, where does it come from?

MR. WILKENS:  The Whitehouse.gov.  It's an executive -- it's in the same part of the Whitehouse.gov website that has the executive orders that we've been talking

about.

THE COURT:  If it does, I mean, I suppose it's something of which I could take judicial notice.  I mean, you proffered something that was not current, so the objection was very well taken.  But if you have something current, I don't know what this witness can add to it because, at least for presiding here in the midst of trial, I'm not going to take it upon myself to overrule the objection that's been stated as to Presidential communications.  I am going to reflect on it.

MR. WILKENS:  Yes, Your Honor.  We would like to just offer it.  It's EQ for identification.

THE COURT:  Where is it physically?

MR. WILKENS:  It's coming up.

MS. STROKUS:  Your Honor, I object.

MR. WILKENS:  It will come up on screen.

MS. STROKUS:  Objection.

THE COURT:  Yes.  And your objection is sustained because that's too evanescent for this old guy, a ruling not found in the Federal Rules of Evidence.

Look, when you get me a paper copy, life goes on, then I'll take a look at it.

MR. WILKENS:  Yes, Your Honor.  We'll do that over the break.

THE COURT:  And it seems to me that it's a type of thing as to which I can take judicial notice.  It doesn't have

to be marked as an exhibit, unless of course there's some dispute that that is in fact what the White House website itself is putting out.

BY MR. WILKENS:

Q.   So Ms. Smith, just returning to the issue of student -- a student protest and a student visa holder who is present at a student protest, when that is inconsistent with the student visa status, which we spoke about a couple of minutes ago, I want to ask you, so a nonviolent protest but a protest that can be considered pro-Hamas, that is consistent with a student's visa status, correct?

MS. STROKUS:  Objection.

THE COURT:  Sustained.  These questions are argumentative.  The language is what it is.  She's an employee of the agency, and therefore you may argue that's a statement of the agency, but these matters are all subject to argument here.

No.  Sustained.  And I've allowed her to give her answer, not on your specific question, but as to how she would go about it.

MR. WILKENS:  Thank you, Your Honor.  Let me just quickly go --

THE COURT:  How much more have you for her?

MR. WILKENS:  Just, I think, Your Honor, we're going to break soon.  I think I just need ten, ten more minutes.

THE COURT:  I think I can go ten more minutes.  Go ahead.

MR. WILKENS:  Thank you, Your Honor.

BY MR. WILKENS:

Q.   So if we could turn to Exhibit 50 and pull that up, please.

A.   Okay.  I have Exhibit 50 open.  The subject is "Caught and revoked."

Q.   Okay.

A.   Could I have a minute to read through it, please?

Q.   Oh, yes.  Please go ahead.

A.   Okay, I'm ready.

Q.   Okay.  And do you recognize this cable?

A.   Yes, I recognize this cable.

Q.   And is it one of the cables that we referred to earlier that was put in place as policy guidance to implement the executive orders?

MS. STROKUS:  Objection, scope.

THE COURT:  Overruled.

A.   Yes, it is related to EO 14161 as it mentions in the opening line of the cable.

Q.   Okay.  And one thing we didn't do when we looked at Exhibit 51, and maybe we can do this without turning to it, but that exhibit, the cable is titled "Catch and Revoke, National Security Through Timely Processing of Visa Systems Messages."

This one, as you mentioned, is titled "Caught and Revoked, Updated Guidance."

Is it fair to say that this cable here is an update, updated guidance to the cable that we were speaking about earlier, Exhibit 51, "Catch and Revoke"?

A.    I'd just like to check Exhibit 51 to make sure that we're referring to the other one.

Q.    Sure.

A.    Just a moment.  Yes, Exhibit 51 is "Catch and Revoke" and Exhibit 50 is, "Caught and Revoked."  So yes, that is correct that it is a follow-up cable to Exhibit 51.

Q.    Thank you.

Let me just quickly address two more cables.  If we can turn to Exhibit 53, please.

A.    Okay, I see Exhibit 53.  Let me just open it and review it, please.

Q.    Sure.

A.    Okay, I'm ready.

Q.    Thank you.  Do you recognize this cable as well, Ms. Smith?

A.    Yes, I do recognize this cable.

Q.    Okay.  And just quickly to confirm, this is also one of the cables that provides policy guidance on the implementation of the two executive orders we've been talking about, correct?

MS. STROKUS:  Objection to scope.

THE COURT:  Well, I've been overruling scope objections, and of course this is an agreed-upon exhibit, but this one seems directed entirely to visa applicants, so I'm just not going to permit it, because of the implications for national security.  Sustained.

MR. WILKENS:  Objection.

BY MR. WILKENS:

Q.   If I could pull up Exhibit CG, which is another cable.

A.   Okay.  I am clicking on it now.  I'm going to look at it. I need a minute to read through.

Q.   Yes.

MS. STROKUS:  Your Honor, I'm going to object to this exhibit.  It doesn't appear that -- it has been pointed out to me by the witness that there's something in this document that is incorrect.

THE COURT:  Well, it can be corrected then, if it's necessary.  The document has been marked for identification. She can be inquired of.

MS. STROKUS:  Your Honor, it has been pointed out to me that this exhibit is marked by the plaintiffs.  It appears to be a leaked cable.  It was not produced by the defendants in discovery, and therefore we cannot verify the accuracy of this exhibit.

THE COURT:  Well, that may be.  He may inquire about it.  You're saying it may not be authentic.  I can follow that.

BY MR. WILKENS:

Q.   Ms. Smith, you have seen this cable before, correct?

A.   Let me -- so the other documents that are produced here in AgileLaw have a REF number at the bottom, and this one does not.  This one has a number in the bottom right-hand side.  And there are some -- it looks, as Jessica said, it looks to be a leaked cable because someone provided it from their email I can see.  So I really can't attest to the veracity of the document.

There's also some, I can see, like, for example, on the bottom of page one and the top of page two, there appear to be some sort of like black fuzzy markings.  So I'm not sure I feel comfortable attesting to the veracity of this document.

THE COURT:  Well, I take your testimony, ma'am, and I appreciate it.  But his question was have you seen this cable?  Do you recognize it?

THE WITNESS:  Let me just take a minute to look at it, please.  Okay.  Yes, Your Honor, this cable does look familiar.

BY MR. WILKENS:

Q.   All right.  And when you say it looks familiar, you recall seeing this cable with the subject line "Action Request Expanding Screening and Vetting For FMJ Applicants," correct?

THE COURT:  I don't see anything here that goes to people who are valid visa holders in the United States.  This concerns itself with increased scrutiny of the issuance of visas.  And so I'm going to sustain it, consistent with my

other rulings, though it appears to be an authentic document, albeit perhaps leaked.

MR. WILKENS:  Your Honor, this cable states at paragraph two, the bottom of paragraph two it states that it -- "This guidance supersedes REF B."  And if you look at page one of the cable, where it says "Reference," REF B is a cable that we earlier, the witness earlier talked about and put into evidence, which is 25 State 26168.  That's Exhibit 64, which applies to the revocation of visas.  So this cable that the witness has just --

THE COURT:  But it doesn't talk about that.

MR. WILKENS:  So the specific relevance of what's in this cable to revocation of visa holders is that it addresses activities that are inconsistent with holding a visa.

THE COURT:  Where?  Where does it do that?

MR. WILKENS:  Let me -- it's -- maybe, let me just come at this it a different way, Your Honor.

THE COURT:  All right.

BY MR. WILKENS:

Q.   Ms. Smith, am I correct that -- am I correct that one ground for revoking a visa of someone present in the U.S. is if the visa officer considers that they would not have been granted a visa in the first instance?

A.   Okay.  So just to clarify, are we moving on from Exhibit CG?  Because I thought we were talking about Exhibit CG.

THE COURT:  We are.  I'm moving on from it.  We'll see where we go.  He's over ten minutes now.  Final few questions, Mr. Wilkens?

But you can answer that.  Is it a valid ground to revoke a visa that never should have been issued in the first place?

THE WITNESS:  Yes, that is a valid ground.  If we see that a consular officer should not have issued a visa in the first place, that there are facts to support that, yes, that would be grounds to revoke a visa.

THE COURT:  All right.

MR. WILKENS:  Your Honor, could we -- I may have just very few questions.  If we could take a break now, I will quickly determine whether --

THE COURT:  Very few questions?  You told me ten minutes.  You're at 13 by my counting.

MR. WILKENS:  I apologize, Your Honor.

THE COURT:  We'll take the recess for one half hour.

MR. WILKENS:  Thank you, Your Honor.

THE COURT:  Understand, we are not getting into the application for visas.  That's an inventive strategy, I follow that.  I'm not going to let her answer questions now because they could now, under their heightened scrutiny, use it to revoke a presently existing visa.  So far in this case I haven't seen that ground asserted at all, but the very few I

take it, and you will represent to the court, will not exceed five minutes, right, not exceed five minutes?

MR. WILKENS:  I'll do my best, Your Honor -- yes.

THE COURT:  I hear the answer yes.  We'll recess until 25 minutes after 11:00.  We'll recess.

(Recess, 10:56 a.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this  11th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 66 to 131

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 11, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

INDEX


WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS


MAUREEN SMITH   (By Zoom, continued.)

   By Ms. Strokus

   By Mr. Wilkens                  69


JOHN ARMSTRONG

   By Ms. Santora        78

   By Ms. Conlon                   124



                    E X H I B I T S


      EXHIBIT 238.............................. 72

      EXHIBIT 239.............................. 76

P R O C E E D I N G S

(Resumed, 11:30 a.m.)

THE COURT:  Mr. Wilkens, go ahead, for your 5 minutes.  I have been given a document, the heading is the "White House Organization of the National Security Council and Subcommittees," January 20th, 2025.

Go ahead.

MR. WILKENS:  Yes, your Honor, and I will come back to that in a little while.  I want to focus --

THE COURT:  In your 5 minutes?

MR. WILKENS:  Yes.  I want to focus my 5 minutes on Visa revocations, not applications for Visas.  But with respect to Visa revocations, why the cable that we were talking about, marked as CG, is relevant to Visa revocations.

CROSS-EXAMINATION BY MR. WILKENS:  (By Zoom, Continued.)
Q.  So you earlier, several times today, have spoken about the Foreign Affairs Manual.  Do you remember that?
A.  Yes, I have referred several times to the Foreign Affairs Manual today.
Q.  Okay.

MR. WILKENS:  And if we can pull up Exhibit CK, please.

(On screen.)

A.    Okay, I see the document.  I'm going to open it and review it.  I just need a minute or two.

Q.    Sure.  And I'm going to only ask you about one specific provision, but -- on Page 6.

A.    Oh, okay.

Q.    And I can tell you which number.

MS. STROKUS:  Your Honor, I'm going to object again on the same grounds as the prior document.

THE COURT:  I haven't got it yet.  I haven't got it.

It's on Page 6?

MS. STROKUS:  This document was not produced by the government in discovery, and we therefore cannot attest to its authenticity.  It appears to be a leaked version.

THE COURT:  Yeah, once again this is allegedly a "leaked version" of a government document.

All right, um, so you're going to have to prove authenticity, and that's fine.  Go ahead.

MR. WILKENS:  Your Honor, if I could?  In the bottom left this shows that it's the public version of the FAM.  There is a nonpublic version, but this is from the state.gov website, that's where it comes from.  And it was produced by the plaintiffs in this case.

THE COURT:  Yeah, all right.

MS. STROKUS:  I'll withdraw my objection that it is, um -- that it is leaked.  However, I continue to state that the government did not produce this document.

THE COURT:  It isn't even offered yet, so let's see his question.  But we'll take it as authentic.

Q.    Ms. Smith, do you recognize this document?

A.    Yes, this appears to be a section of 9 FAM.

Q.    Okay.  And you're aware that portions of the 9 FAM are publicly available, correct?

A.    Yes, that is correct.  There is one version online for the public that has some sections that are labeled unavailable, um, and we have the full version internally in Consular Affairs.

A.    Okay.  And you'll see the heading here, that this 9 FAM 403.11 deals with or covers Visa revocations, correct?

A.    That is correct, 9 FAM 403.11 does cover Visa revocations.

Q.    Okay.  And let me ask you to turn to -- oh, um, let me first move this into evidence.

What exhibit number?

MS. STROKUS:  Objection, your Honor, proper foundation.  Foundation and authenticity.  Again, it was not produced by the government in discovery.

THE COURT:  Understood.  But I thought you waived

the foundation when you agreed that it was part of the public manual, the Foreign Affairs Manual?

MS. STROKUS:  Your Honor, it was not stipulated to as part of the exhibit list.

THE COURT:  Isn't it marked as one of the, um, unagreed-to exhibits?

MS. STROKUS:  It is not agreed to.

THE COURT:  I know it's not agreed to, but it was marked for identification as a nonagreed-to exhibit, isn't that correct?

MS. STROKUS:  Yes, your Honor.

THE COURT:  Overruled.  It may be admitted and it will be Exhibit 200 and --

MR. WILKENS:  238, your Honor.

THE COURT:  238.  Thank you.

(Exhibit 238, marked.)

Q.    If I could direct you, Ms. Smith, to Page 6 of Exhibit 238, and to the provision at the bottom, which is titled 9 FAM 403.11-5(b), "Prudential Revocations." Do you see that?

A.    I do.  I would like a minute to read through that paragraph, since you're focusing on that one.

Q.    Sure.

A.    (Reads.)  Okay.

Q.    Okay.  And just looking at this paragraph, um, if

you go down to the third line, after that first word classification, there's a comma, it says, "The Department may revoke a Visa if an ineligibility or lack of entitlement is suspected when an individual would not meet requirements for admission or in other situations where warranted."

Do you see that?

A.    Yes, I do see that text.

Q.    Okay.  And so based on that text, isn't it correct that the bases for eligibility or for admission and the reasons for ineligibility for admission are relevant to the prudential revocation of a Visa?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.    So, um, I'm not qualified to talk about admission because that is a Customs and Border Protection decision, they deal with inadmissibility.  So would you mind repeating the question, um, focusing on what you would like me to answer, please?

Q.    Yes.  So with respect to the granting of Visas, um, isn't this passage indicating that with respect to the revocation of Visas, the factors that a Visa officer can look at for the, um, eligibility of a person for the granting of a Visa are relevant to Visa revocations?

MS. STROKUS:  Objection.

THE COURT:  No, overruled.  I'll let him have that question and one more.

A.    Well I think it's a complicated question to answer because Visa eligibility is covered in other sections of the FAM.  This citation that you're noting on Page 6 of Exhibit CK is related to, um, revoking a Visa, and as it, you know, pretty simply states in the text, if, um -- the Department can revoke a Visa if ineligibility is um, you know, identified, um, or if an -- if the person is believed to no longer be entitled to their Visa.  And so, um, I hope that answers the question.

THE COURT:  All right.  One more.

MR. WILKENS:  Yes, your Honor.

Q.    If we could turn to Exhibit CG, the cable that we were speaking about earlier, please.  Oh, sorry.  Yes, CG.

A.    Yes, I'm bringing that up now.  Just a moment. Okay.  I am ready.

Q.    Okay.  And if we turn to a Page 6 of that exhibit, and, um, the paragraphs, um -- well beginning with 20, that describe, um, factors that can be taken into account for the eligibility or ineligibility for the granting of a Visa.

A.    Okay, I'll read through Paragraphs 20 and 21. Just a moment, please.

Q.    Yeah.

A.    (Reads.)  Okay.

Q.    Am I right that these factors, identified here in this cable, can be taken into account in revoking a Visa?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Overruled.

A.    Yes, the information contained in Paragraphs 20 and 21 of Exhibit CG can be taken into account when a decision is made to revoke a Visa.  Paragraphs 20 and 21 talk about if an applicant is not credible, um, if their activities are inconsistent with, um, their Visa class, um, if there are inconsistencies or derogatory information that is discovered during vetting, and so all of these factors could be relevant to a Visa revocation.  And as I've stated prior, a Consular officer always looks at the totality of circumstances, um, and all facts for every case, um, before making, um, a decision to revoke a Visa.

Q.    Okay.

MR. WILKENS:  Your Honor, I would move this exhibit into evidence.

THE COURT:  Do you object?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Overruled.  It may be admitted,

Exhibit 239.

(Exhibit 239, marked.)

THE COURT:  Now do you have any further questions for this witness?

MR. WILKENS:  I do not, your Honor.

THE COURT:  I take it you do not.

(Laughter.)

THE COURT:  And counsel for the government, any further questions for the witness?

MS. STROKUS:  No, your Honor, and cognizant of the Court's time.

THE COURT:  Thank you.  And thank you, Ms. Smith.

Very well.  Call your next witness.

MS. SANTORA:  Your Honor, the government calls John Armstrong.

MR. BIALE:  And, your Honor, before this witness comes in, and this is just the issue I raised at the beginning --

THE COURT:  Yes, and I'll hear you.

MR. BIALE:  With respect to -- you know we have a dispute about what documents can be used.  Our plan is to cross-examine this witness, Ms. Conlon will cross-examine this witness using some of the documents that were initially produced in-camera --

THE COURT:  I understand.  I'm not surprised.

MR. BIALE:  I just want to make that clear, so we don't have a fight about it in the middle of the testimony.

THE COURT:  Well they can object, but I intend, having given the documents to you, if they pertain to his cross-examination, they may use them.

MR. BIALE:  Thank you, Judge.

THE COURT:  Mr. Armstrong may be called.

(Witness takes the stand.)

(JOHN ARMSTRONG, sworn.)

THE CLERK:  And please state your full name, spelling your last name for the record.

THE WITNESS:  John Armstrong, A-R-M-S-T-R-O-N-G.

THE COURT:  And if I may start, um, welcome.  I had originally thought we were going to hear your testimony remotely because you were or are on your way to the United Kingdom?

THE WITNESS:  Um, no, that is not me, sir.  I just run things in Washington.  Although we do have official travel from time to time.

THE COURT:  Okay, I am mistaken.  But you are welcome.

THE WITNESS:  Thank you, sir.

THE COURT:  Ms. Santora, go right ahead.

MS. SANTORA:  Thank you, your Honor.

\* \* \* \* \* \* \* \* \* \* \* \* \*

JOHN ARMSTRONG

\* \* \* \* \* \* \* \* \* \* \* \* \*


DIRECT EXAMINATION BY MS. SANTORA:

Q.   Hello, Mr. Armstrong, thank you for being here today.

Can you tell us your current role at the State Department?

A.   My current position is Senior Bureau Official in the Bureau of Consular Affairs.

Q.   And how long have you been in that role?

A.   I assumed it on the 27th of February of this year.

Q.   How long have you worked for the State Department?

A.   It's, um, over 30 years.  It will be 31 in October.

Q.   So when did you first start working for the State Department, in what year?

A.   1994, in October, I believe.  It was October 14th.

Q.   And in what capacity?

A.   When I began, I started as a Foreign Service Officer.  I continue to be one today.

Q.   Can you briefly tell the Court about your assignments starting with your first and going up

through your current role?

A.    I'd be happy to.  Initially when I came in in October of 1994, I was assigned, um, following basic training, to take consular training, and then Rumanian language, and then sent to Rumania for 2 years as a Vice Consul where I ran the nonimmigrant Visa section and the fraud prevention section.

After Rumania, I went to Warsaw Poland where I served as the trade officer on -- working on trade issues for two years.

And then from there, I went back to Washington D.C. where I served as the Belarus desk officer in the Office of Western Slavic and Moldovan Affairs.

Following that position -- just a moment, I have to think.  I went back to Warsaw for four years, where I was a political officer and I was also the labor officer.

Following that time in Warsaw, I went to the Russia desk, the Office of Russia Affairs, where I was a Senior Political Officer for two years.

After that I studied Ukrainian for a year and then went to Kyiv Ukraine to our embassy where I was the Deputy Consul General.

Following Kyiv, I went to -- my next posting was in the Bahamas, at Embassy Nassau, where I was the

Consular Section Chief, which I did for a year, and then I was Acting Deputy Chief Admission, the Number 2 position, for two years.

Following that, I returned to Washington D.C. where I was the Director of the Washington Passport Agency for three years.

After that, I went to Embassy Warsaw in Poland where I was the Economic Counselor running the Economics Section for three years.

After that, in 2020, during covid, I returned to Washington and was the Director of the Office of Eastern European Affairs which deals with Ukraine, Belarus, and Molodova.

Following that position, where I was for two years, I was a Senior Advisor in the Office of Sanction Coordination, also at the main building of the State Department.

Following that, I studied Spanish and went to Lima, Peru, where I was Consul General, and I served until returning to Washington in the middle of February of this year, and I was briefly the Deputy Assistant Secretary for Overseas Citizen Services.

And then I assumed my current position on February 27th of this year.

Q.    And are you -- is there anyone senior -- can you

remind the Court of what is your current position?

A.    My current position is Senior Bureau Official in the Bureau of Consular Affairs.  I'm the top official in the Bureau of Consular Affairs.

Q.    And who is senior to you at the State Department?

A.    The Undersecretary for Management.

Q.    Anyone else senior to you at the State Department?

A.    Um, yes.  Well there's the two Deputy Secretaries, the Deputy Secretary, and then the Deputy Secretary for Management and Resources.  And above them is the Secretary of State.

Q.    What does the Bureau of Consular Affairs do?

A.    Basically we have three missions.  First of all, we're responsible for passport issuance throughout the United States at 29 passport bureaus and centers.  It's approximately 25 million passport products a year.

Secondly, we are in charge of, um, processing Visas at Foreign Missions -- our Foreign Missions abroad or diplomatic posts, that's over 200 of them, and there's approximately 14 million applications a year.

And then finally, we are responsible for the welfare of American citizens abroad and providing them services they need.  If they're in need, we try to help them.  Overall we have a staff of approximately 13,000 and a budget of $5.5 billion.

Q.    What are your responsibilities as a Senior Official in the Bureau of Consular Affairs?

A.    I am responsible for the operations of the Bureau. The buck stops with me.

Q.    And that includes being responsible for the Visa section that you mentioned?

A.    Yes, ma'am.

Q.    Are you aware of the policies applicable to Visas?

A.    Yes.

Q.    Would you say that you're aware of all policies applicable to Visas?

A.    In general, yes, I would say that.

Q.    Would you say it would be possible for a policy related to Visas to exist without you knowing about it?

        MS. CONLON:  Objection, your Honor.

        THE COURT:  She may have it in that form.

A.    I would be very surprised if there was such a policy.  I have a good hand on the pulse of what's done by the Visa office, your Honor.

Q.    Does the Bureau of Consular Affairs get involved in issuance of Visas, is that correct?

A.    Could you repeat the question please?

Q.    Is the Bureau of Consular Affairs involved in the issuance of Visas?

A.    Yes, it is, we are responsible for that overseas.

Q.    And are there different types of Visas?

A.    Yes, there are.  There are two basic types, or the nonimmigrant Visa and the immigrant Visa.

Q.    What is a nonimmigrant Visa?

A.    Nonimmigrant Visas are for people who are coming for temporary purposes in the United States and will be leaving and returning -- leaving the United States for another destination, students, tourists, um, people coming to work, um, journalists.

Q.    And how is an immigrant Visa different from that?

A.    Immigrant Visas are for people who are coming to remain in the United States, permanently.

Q.    Are you familiar with the allegations in this case?

A.    I have some knowledge, but I haven't ever seen all of them.

Q.    Is it fair to say, based on your knowledge, that this case does not involve immigrant Visa holders?

A.    Yes.

Q.    So when I ask you questions about Visa holders, if I don't specify, I'm referring to nonimmigrant Visa holders.  Okay?

A.    I understand.

Q.    I believe you mentioned this, but what type of Visa, nonimmigrant or immigrant, is a student Visa?

A.    Student Visas are nonimmigrant Visas, they're Fs, Ms, and they can be Exchange Visitors, which are Js.

Q.    What standards apply to the issuance of nonimmigrant Visas?

A.    Could you clarify the question?

Q.    What legal authorities apply to the issuance of nonimmigrant Visas?

A.    The applicant for the Visa has to, um, show that they are qualified for that Visa.  In some cases they need a petition.  In others they need forms, like students will need a form from an accredited university. Students also, as do tourists, have to overcome Section 214(b) of the Immigration and Nationality Act, which is an intending immigrant.  They have to show that they do not intend to remain in the United States to the satisfaction of a Consul Officer at an interview.  The law, which we all follow very strictly, places the burden of proof on the applicant, on the alien.  If our Consul Officer is not convinced, the Consul Officer -- of that, they must refuse that application.

Q.    Does the Bureau of Consular Affairs deal with the revocations of nonimmigrant Visas?

A.    Yes, we do.  Yes.  And it has for years.  It's in the Immigration and Nationality Act, I believe it's Section 221(i).

Q.    And what standards apply -- I believe you just mentioned one, what legal authorities apply to Visa revocations?

A.    The key legal authority for a revocation is Section 221(i) of the Immigration and Nationality Act, which if I remember correctly, your Honor, gives the Secretary of State and any Consular Officer the ability to revoke a Visa at any time for any reason.  We treat this seriously.  And of course some sort of evidence is needed.  We don't go do this on a whim.  We review each case individually and carefully.

Q.    Does the Bureau of Consular Affairs make removability determinations?

A.    I'm sorry?

THE COURT:  I didn't catch it either.  Would you ask the question again.

MS. SANTORA:  Sure, I'll rephrase it a little bit.

Q.    Does the State Department make removability determinations?

THE COURT:  Removability determinations.

A.    Yes, the Secretary of State can make those determinations, I believe it's, um -- it's also in the INA.  We call it 4(c) is the section.  But it's a longer section citation.

Q.    Would that be INA Section 237(a)(4)(c)?

A.    I believe that's it, yes.

Q.    Okay.  Are you familiar with the State Department's process and protocols for, um, the revocations of Visas, which we talked about a few questions ago?

A.    Yes, I am.

Q.    And are you familiar with the State Department's process and protocols for making determinations under 237(a)(4)(c), the statute you just referenced?

A.    Yes, ma'am, I am.

Q.    How are you familiar with those, um, processes and protocols?

A.    It's part of my job.  I have to know about these things in order to lead the Bureau of Consular Affairs.

Q.    Have you prepared a chart to assist the Court with explaining how the process and protocol works?

A.    My staff and I have reviewed the chart, yes.

Q.    Okay.

MS. SANTORA:  Your Honor, I would like to identify Exhibit H, or mark for identification Exhibit HN.  This is the chart that Mr. Armstrong referred to.

THE COURT:  Um, do I have it?

MS. SANTORA:  It should be in a binder.

THE COURT:  Yes, well I have -- yes, I do have it.  Yes.  HN.  And I will permit this chalk to be used as --

I will permit this chart to be used as a chalk.

Go ahead.

MS. SANTORA:  Thank you.

Q.    Mr. Armstrong, I think we're going to pull the chart up on the screen.

(Technical difficulties.)

MS. SANTORA:  Your Honor, may I approach?  I can also give him a paper copy.

THE COURT:  He can use mine.  But of course you may.

THE WITNESS:  I'll take this one, sir, so you can also see it.

THE COURT:  Thank you.

(Hands up.)

THE COURT:  A question I have, and I've seen these initials come up.  I'm roughly familiar with this chart. But do you see, um, the Bureau of Consular Affairs is there roughly in the center.  And then to the right, there's two little boxes, "NIV" and "LPR."  What do those initials stand for?

THE WITNESS:  Your Honor, "NIV" is "Nonimmigrant Visa," and "LPR" is "Legal Permanent Residence."

THE COURT:  Yes, understood.

Proceed.

THE WITNESS:  No problem.

Q.    Okay, it looks like we might not be able to pull the chart up on the screen, so, um -- um, okay.

Mr. Armstrong, is this the chart that you were just referring to when I asked if you had prepared a chart?

A.    Yes, it is.

Q.    Okay.  Based on your experience at the Bureau of Consular Affairs, does the chart accurately represent the State Department's process and protocol for Visa revocations and foreign policy determinations under INA Section 237(a)(4)(c)?

A.    It accurately represents that in the case of referrals from the Department of Homeland Security.

Q.    Okay.  So does the State Department rely on information when it is revoking a nonimmigrant Visa or making a foreign policy determination under INA Section 237(a)(4)(c)?

A.    I'm sorry, I don't understand the question.  Do we rely on information?  From various sources.  We do rely on information from various sources, including it may come from the Department of Homeland Security, it may come from sources that we have, it may come from law enforcement, diplomatic sources abroad, the media.  So a variety of sources.  Yes, we do actually look at information.

Q.    Okay, let's focus on information that you received from, you mentioned, the Department of Homeland Security.  Do you see them referenced in the chart?

A.    Yes, on the left-hand side, the big blue box.

Q.    Okay.  And how does information come, if it does, to the Bureau of Consular Affairs from the Department of Homeland Security?

A.    From my experience it comes in the form of an e-mail, which serves as a cover letter, and then an attachment with additional information about the case.

Q.    And is that attachment referred to as a "referral"?

A.    Yes.

Q.    And when the Bureau of Consular Affairs receives the information, um, what do they first determine about the individual?

A.    Well the first thing they do is confirm receipt to DHS, that we have actually received this, your Honor, and that we are acting on it.  After that, um, the -- as related to your Honor's question, the question is whether it's a nonimmigrant Visa or whether it's a legal permanent resident.  Nonimmigrant Visas go for processing and review to the Visa office.  The legal permanent residents take a different track and go up to the Secretary of State if we find that the evidence is

sufficient to take action.

Q.    Okay, let's stick with the nonimmigrant Visas first.  You said they go to the Visa office.  What does the Visa office then do with the referral after they receive it?

A.    The Visa office examines the information, seeing if it's serious enough to enact a revocation.  It will also consult with, um, lawyers at the State Department who work for the Legal Advisor, they don't work for Consul Affairs directly, but there are lawyers assigned to look at it from a legal point of view.

After that, if the Visa office finds it's sufficient, they'll discuss it with whoever received the, um, referral from DHS, and if that person agrees, then it will go into the revocation process and the Visa will be revoked.  If not, um, then -- well actually in either case, whether it's revoked or whether it's not, there'll be a communication back to DHS telling DHS what was done in that case.  Or there's one other possibility.  If I may?

Q.    Sure.

A.    There may be a request for more information.

Q.    And who would they request more information from?

A.    They would write back to whoever in DHS had sent the referral.

Q.   Okay.  Let's talk now about the other part of the chart, relating to this "LPR" on the chart.  That's a "Lawful Permanent Resident"?

A.   Yes.

Q.   And how is a lawful permanent resident different from a nonimmigrant Visa?

A.   Um, first of all, we cannot revoke the status of a lawful permanent resident.  Um, the Secretary of State can have a finding that that person is removable, but we cannot do that in the -- in the Bureau of Consular Affairs.  So what happens in that case, after an analysis of information -- and this is done in each case individually, an action memo, um, sometimes called a "decision memo," is sent to the Secretary of State, and the Secretary of State will have a choice then, and from my experience in most cases there are three choices.  One, agree and find the person removable, usually under, um, 4(c), as we talked about.  Um, disagree and find the person not removable.  Or discuss, in other words ask for more information.

Q.   And in the event that the Secretary of State finds the person removable, um, what happens after that?

A.   Um, the, um, Department of Homeland Security is informed of this, and this usually take two routes.  There will be an informal notification back to the

person who sent the original referral, as a courtesy, but the official notification goes from the Secretary of State to, um, the DHS secretary, because the DHS secretary is his interlocutor.

Q.    And I believe you also mentioned that it's possible for the Secretary of State to determine that the person is not removable, correct?

A.    That's correct.  And in which case the Bureau of Consular Affairs would contact the person in DHS who made the referral and say the Secretary has found -- has disagreed and does not fine the person removable.

Q.    Okay, I want to go back to --

THE COURT:  Just to get a feel for this.

THE WITNESS:  Yes, sir.

THE COURT:  With respect to, um, legal permanent residence.

THE WITNESS:  Yes, sir.

THE COURT:  Under the statute, this is a determination that is, um, by statute, given to the Secretary, that officer in the government, that cabinet Secretary himself or herself?

THE WITNESS:  Yes.

THE COURT:  And then as I'm listening to you, pretty much as a matter of courtesy, since it's a Cabinet Secretary who's made that determination, the

communication as to the result, goes to the Cabinet Secretary in the Department of Homeland Security, and in today's world, she, then takes action, because action falls within the Department of Homeland Security.

Is that right?

THE WITNESS: That is correct, sir. The actual formal -- Homeland Security will not take action in those cases until they receive the official notification Secretary to Secretary. What we would send to Consular Affairs is a courtesy that, yes, the Secretary has made this finding. Then the official notification will go from Executive Secretary to Executive Secretary.

THE COURT: Thank you.

THE WITNESS: Certainly.

Q. I want to go back, for a second, to nonimmigrant Visas.

Does the Visa office independently analyze the referral that it received from DHS?

A. Yes, most definitely, that's our job. We're not a rubber stamp for DHS.

Q. Do all referrals of nonimmigrant Visa holders from DHS that go to the Visa office result in Visa revocations?

A. No.

Q. Do you have any idea of the percentage that does

result in Visa revocations?

A.    Based on my time in my current position, I would say approximately 25 to 30 percent are sent back without action be taken, either to ask for more information or we just find the information not significant enough to take action.

Q.    Okay.  And you've been in your position since February of 2025, correct?

A.    Yes, ma'am.

Q.    And has the Bureau of Consular Affairs handled DHS referrals consistently with this chart that we've been discussing since that time?

A.    Yes, and it's my understanding even before.  We do not create any policy or procedure here.

       MS. CONLON:  Objection, move to strike as nonresponsive.

       THE COURT:  Overruled.  That may stand.

Q.    Does this chart depict how the Bureau of Consular Affairs handles all referrals from DHS?

A.    Yes.

Q.    Does it accurately depict how the Bureau of Consular Affairs would handle a DHS referral involving protesters?

A.    Yes, all referrals from DHS.

Q.    Okay.  So the chart focuses on a referral from

DHS, but you mentioned that the State Department, in revoking Visas and, um, making removability determinations, can rely on information from other sources, correct?

A.    That is correct.

Q.    And, um, what are those other sources?

A.    For example, the media.  There can be derogatory information that comes up after a Visa was issued, some action the Visa holder took or is planning to take, and if it's significant enough, that could lead to a, um, revocation of the Visa.  Information received from law enforcement.  Information that happens that is, um, sent by the public.  Poison pen letters.

I, in fact, know of a case like this, when I was in Ukraine, of a security guard who worked at the embassy, who supposedly was going as a tourist, but one of his colleagues revealed his true intention, which was to remain in the United States.  And we revoked that Visa and fired him.

Q.    And so would you say that some of the information, um, is internal information to the State Department?

A.    It can be, yes.

Q.    And in the case of information that it not based on a referral, um, say we're talking about a nonimmigrant Visa holder, so it goes to the Visa office

and the Visa office determines that the Visa should not be revoked.  In those circumstances, again where there's no referral, does the Visa office tell DHS about the Visa revocation?

A.    No, DHS is not involved in this.

Q.    Okay.

(Pause.)

MS. SANTORA:  Your Honor, I move to introduce into evidence this chart.

MS. CONLON:  Your Honor, we understand it doesn't aid or assist with testimony, so we object for it coming in for sort of its truth, but to the extent that it's a demonstrative aid, I don't even know that it needs to be admitted.

THE COURT:  I think that's a proper characterization.  If he says this is accurate and it's been accurate throughout his tenure, as I understand it, it will be part of the record, but as HN, a chalk.  And the difference is, as factfinder, I have to decide whether to believe, disbelieve, or believe in part any witness's testimony.

Here the chart depends on my belief of this witness's testimony, it doesn't stand alone.  They created it for this trial.  And I accept it in that fashion.  I mean no disrespect, that's just my

responsibility.  Actually I find this helpful and I will be referring to it.  But it was created for the witness, for his testimony, and so what he has to say about it really governs.

Go ahead.

MS. SANTORA:  Thank you, your Honor.

Q.    Mr. Armstrong, I'm going to show you a document that is an exhibit in this case, this is Exhibit 70.

MS. SANTORA:  Your Honor, may I approach to hand this document to the witness?

THE COURT:  Of course.

(Hands to witness.)

THE WITNESS:  Thank you.

May I familiarize myself with it?

THE COURT:  Of course.

THE WITNESS:  Thank you, sir.

A.    (Reads.)  I have finished my review.

Q.    Okay, thank you.  Have you seen this document before?

A.    Yes.

Q.    And what is it?

A.    It's an Executive Order from the President.

Q.    What is the title?

A.    "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

Threats."

Q.    In what capacity have you seen it?

A.    In my official capacity as the top official in the Bureau of Consular Affairs.

Q.    What is the purpose of the document?

A.    The purpose is to protect the United States and the American people from foreign threats.

Q.    Have you relied on this document to do your job?

A.    Yes, we have referred to this document in doing my job, as have other people in the Bureau of Consular Affairs, and not only.

Q.    How would you use it with respect to doing your job?

A.    Well I think the key thing is, um, to summarize this document, is it instructs all of us to use existing procedures to maximize the security of the American people.

Q.    Does it require anything of the State Department?

A.    It requires quite a few things of the State Department.  They're enumerated.  Again, to summarize, it's increasing our vigilance and to make sure we're using all existing mechanisms, procedures, and policies that we have to ensure the security of the American people.

Q.    Did it create new legal authorities related to the

State Department's work?

A.    To my knowledge, no.

Q.    Did the State Department do anything in response to the Executive Order?

A.    Yes, we take our orders from the President, whoever that is, and we increase our use of the -- it reviewed actually what we were doing, and that review is actually ongoing.

Q.    And can you explain what exactly, if anything, the State Department did in response to this Executive Order?

A.    Well one thing I can actually say, and it's -- it's a bit of "Inside Baseball," your Honor, if I may? Um, there's -- in our nonimmigrant Visa system, there are messages that come when derogatory information appears, and a lot of our posts are very -- have a lot of work to do, a lot of people to interview, they have backlogs, and they don't always review those messages in a timely manner and act upon them.  We noted this and we emphasized to our diplomats overseas that they need to review this information, and when justified, to revoke Visas, not to let it build up.  It needs to be kept up. Because people -- if there is negative information and they have a Visa and it should be revoked, we need to do that, and not delay.  I think this was talked about,

some people have called it the "Catch and Revoke Policy."

Q.    I'd like to show you -- okay, I'd like to show you the document, um, you just referred to.

MS. SANTORA:  Your Honor, may I approach?

THE COURT:  You may.

MS. SANTORA:  This is Exhibit 21 for the record, and I'm going to show it to the witness.

(Hands to witness.)

THE WITNESS:  Thank you.

THE WITNESS:  May I review it?

THE COURT:  Of course.

THE WITNESS:  Thank you.

A.    (Reads.)  I've completed my review.

Q.    Okay.  Is this the document you were referring to?

A.    Yes.

Q.    And can you explain what it is?

A.    This is an instruction, a guidance to our diplomatic posts abroad, over 200 posts.  In particular you can see that because it says "All diplomatic and consular posts collective," it's known as an "all-back." It was sent out talking about this very thing I spoke about, about the need to review systems messages on a regular timely basis, and to take action where warranted.

Q.    Okay.  And is this document implementing the Executive Order we were just talking about, Executive Order 14161?

A.    Yes, it even refers to it in the second paragraph.

Q.    And how does it implement the Executive Order?

A.    By increasing the emphasis on and the vigilance in reviewing systems messages which carry -- can carry significant negative information about Visa holders, and then when justified, revoking these Visas, which is done at the diplomatic posts.

Q.    Does it provide new legal authority for revoking Visas?

A.    No, not -- no, it's using the 221(i).

Q.    So in revoking Visas under this guidance, the State Department is relying on existing legal authority, correct?

A.    Yes, I believe so.  I believe 221(i) has been in the INA since the beginning, 70 years ago.

Q.    Okay.  Are you aware of anything else that the State Department has done in response to Executive Order 14161?

A.    We've issued guidance to the field, again emphasizing the importance of security and the importance of reviews, for example the importance of 214(b) has been an issue that we've raised with the

field.  Again, these are using existing policies and authorities, it's nothing new in that regard.

Q.    I'd like to show you another document.

MS. SANTORA:  This has been entered into evidence as Exhibit 53 in this case, your Honor.

THE COURT:  Say again the document number?

MS. SANTORA:  Exhibit 53.

THE COURT:  53.

MS. SANTORA:  No, I'm sorry, your Honor, it actually is Exhibit 64.

THE COURT:  64.

MS. SANTORA:  May I approach to give a copy of this document --

THE COURT:  You may.

(Hands to witness.)

THE WITNESS:  Thank you.

May I review it, your Honor?

THE COURT:  Of course.

THE WITNESS:  Thank you, sir.

A.    (Reads.)  I've completed my review.

Q.    Okay.  Do you recognize that document?

A.    Could you repeat the question please?

Q.    Do you recognize that document?

A.    I do recognize this document.

Q.    What is it?

A.   It is a guidance to the field.  As discussed previously, it is an all-back, it's sent out to all our posts abroad.

Q.   And, um, what is the guidance related to?

A.   It's related to, um, social media and online screening of students and exchange visitors, the F, M, and J Visa classes.

Q.   And is it guidance that was issued in response to the Executive Order we were just talking about?

A.   Yes.

Q.   And how does it implement that Executive Order?

A.   It increases the vetting of, um, a class of Visa applicants.

Q.   Why does it do that?

A.   In order to improve the security of the United States.

Q.   What class of Visa applicants does it increase vetting to?

A.   Students and exchange visitors.

Q.   And that's social media vetting, correct?

A.   Yes.

Q.   And why does it focus on students and exchange visitors?

A.   Well I can think of a couple of reasons.  First of all, the social media is -- when the INA was written --

and in the past this hasn't been considered, it didn't exist, but it's a gold mine of information. And also, um, people who are younger, students, and most students and exchange visitors are -- I'm 60 and I don't use social media much, but they do use social media a lot. So they're a group that uses all that information and those tools. And so it makes it available to us.

Q. Does it create new legal authority, um, for vetting through social media chats?

MS. CONLON: Objection, your Honor, these questions about legal authority seem to call for a legal conclusion.

THE COURT: No, I want to hear his view.

You may answer, sir.

THE WITNESS: Thank you, your Honor.

A. No, it doesn't. It talks about Section 214(b) of the Immigration and Nationality Act, and also, um, Section 212(a)(3)(b), which is, um, support for terrorist organizations. These are not new.

Q. And how do those sections that you just referred to relate to vetting?

A. In the vetting one could find information that would lead to a 214(b) refusal under an intending immigrant, for example, if someone talks about their previous unauthorized work in the United States. Or it

could lead to a finding on support for a terrorist organization, someone brags about how they've given money to Hamas.

Q.   And both of those would bear on someone's eligibility for a Visa?

A.   Most definitely.

Q.   Are you aware of anything else that, um, the Department of State did in response to Executive Order 14161?

A.   There were, um -- there was a review, um, at least a partial review of 3(c) policies, and, um, that's a foreign policy ground for refusal under the INA, um, and there were some that the Secretary authorized to be added.  One, for example, for, um, government officials who assist in a legal migration to the United States.

Q.   You said 3(c) policies.  Are you referring to a section of the INA when you say that?

A.   Yes, ma'am.

Q.   What section is that?

A.   I don't know the whole number, we call it "3(c)." It's the foreign policy section.  Ineligibility on foreign policy grounds.

Q.   Okay.

(Pause.)

MS. SANTORA:  Your Honor, I'd like to mark for

identification Exhibit JJ, the statute that the witness just referred to.

THE COURT:  The statute?

MS. SANTORA:  Yes.

THE COURT:  I see no reason for adding statutes in.

MS. SANTORA:  Okay.

THE COURT:  A citation to them is sufficient.

MS. SANTORA:  Okay.  May I approach to show the witness a copy of the statute to refresh his recollection?

THE COURT:  Of course.

(Approaches, hands document to witness.)

THE WITNESS:  Thank you.

May I review it, your Honor?

THE COURT:  Well it's pretty thick, I don't even know what she's going to ask here.  But of course take a look at it.

THE WITNESS:  May I ask which part you're referring to?  It is rather thick.

MS. SANTORA:  Yes, I was referring to the section you referenced, which I believe is Section (a)3(c), it's INA 312 of 1182, the statute.

A.    (Looks.)  Is this, ma'am, the section that says "See foreign policy"?

Q.    Yes.

A.    Yes, I believe that is it.

Q.    Okay.  Can you take a moment to review it.

A.    (Looks.)  I've reviewed it.

MS. SANTORA:  If you don't mind, may I approach also to get it back?

(Approaches witness to get document back.)

Q.    So the statute you just reviewed, Mr. Armstrong, was that the statute you were referring to when you referred to "3(c) policies"?

A.    Yes.

Q.    And do 3(c) policies apply to, um, Visa holders or to Visa applicants?

A.    It could be both actually, um, if a Visa holder was outside the United States.  But also an applicant could be found ineligible under 3(c).

Q.    Okay.  So 3(c) policies do not apply to Visa holders in the United States?

A.    No.  That's my understanding.

Q.    Okay.  I'd like to show you another document.

MS. SANTORA:  If I could approach?  This has been marked as Exhibit 71 in this case.

(Approaches witness with document.)

THE WITNESS:  Thank you.

A.    (Looks.)  I'm familiar with this document.

Q.    Okay, what is the document?

A.    It's an Executive Order from the President of the United States.

Q.    And what is it titled?

A.    "Additional Measures to Combat Antisemitism."

Q.    And how are you familiar with that document?  In what capacity have you seen that document before?

A.    In carrying out my job.

Q.    And how have you relied on it to do your job?

A.    It makes clear that the official policy of the United States is to combat antisemitism both at home and abroad.

Q.    Did the State Department rely on this document to revoke Visas?

A.    We would rely on the Immigration and Nationality Act.  It doesn't give us any authority here, it instructs us and emphasizes.  It's a document that informs what we're doing, yes, but not as a part of the law that we would use to revoke a Visa.

Q.    Okay.  Did the document change the State Department's authority to revoke Visas?

A.    It's my understanding it didn't.

Q.    Did the document change the State Department's process and protocols for revoking Visas?

A.    No.

Q.    Did the document change the State Department's authority to make removability determinations?

A.    No.

Q.    Did the document change the State Department's process and protocols for making removability determinations?

A.    No.

Q.    I'd like to show you a few more documents.

MS. SANTORA:  Your Honor, the documents that I'm intending to show the witness are not privileged but have been marked as confidential, um, based on the protective order signed between the parties.  We would ask that the courtroom be cleared of the public for the purposes of putting on this document.

THE COURT:  I'm not going to clear the courtroom unless I see what the documents are.

MS. CONLON:  What documents are we talking about?

MS. SANTORA:  So they are -- the documents will be Exhibits 8, 12, 16, 19, and --

THE COURT:  8.

MS. SANTORA:  8.  12.

THE COURT:  Wait a minute.

MS. CONLON:  Sorry, are these the documents from the certified administrative record in this case, are those all from that record?

MS. SANTORA:  They're from the sealed version of the administrative record.

MS. CONLON:  I see.  So 8, 12 --

MS. SANTORA:  So 16, 19, and 21.

THE COURT:  Well I'm not disposed to clear the courtroom, there's a constitutional right --

MS. CONLON:  And we would object to that.

THE COURT:  -- to have a public courtroom for public trials.  So, um -- and these have been marked in evidence in this case, which means they are documents upon which I may, and I may be required, to make my decision.  So that request is denied.  You see -- I'm not doing it.

MS. SANTORA:  Thank you, your Honor.

Q.   Mr. Armstrong, I would like to show you a document, I'll show you one at a time.

MS. SANTORA:  If I may approach?

Q.   The first has been marked as Exhibit 8 in this case.

(Approaches witness, hands document.)

THE WITNESS:  Thank you.

May I review it?

MS. SANTORA:  Sure.

THE WITNESS:  Thank you.

A.   (Reads.)  I've completed my review.

Q.    Okay.  Do you recognize this document?

A.    I do.

Q.    What is it?

A.    It's a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q.    And in what capacity have you seen this document?

A.    In doing my job, my official duties at the State Department.

Q.    What does the memorandum relate to?

A.    The memorandum informs, um, the Secretary of Homeland Security of Secretary Rubio's finding in a case of a particular alien, finding the person, um, removable under 273(a)(4)(c) of the Immigration and Nationality Act.  Actually two people, one is blacked out.

Q.    Okay.  Who is the person whose name is not redacted?

A.    Mahmoud Khalil.

Q.    And can you summarize what the document finds with respect to Mr. Khalil?

A.    That section of the INA deals with foreign policy grounds for finding removability, which the Secretary of State does, or if given a different document.  It informs of it here and then talks about Mr. Khalil's antisemitic -- role in antisemitic protests and disruptive activities that foster a hostile environment

for students in the United States.

Q.    And it provides that as the basis for finding Mr. Khalil removable?

A.    Yes, it describes it on the back, on the second page.

Q.    What does it say about Mr. Khalil's activities?

THE COURT:  Well in view of your objection, remember it's in evidence.  I've read it.

MS. SANTORA:  Okay, thank you, your Honor, we can move on.

Q.    Mr. Armstrong, I'd like to show you another document.

MS. SANTORA:  If I may approach?  This has been marked as Exhibit 12 in this case.

(Approaches witness, hands document.)

THE WITNESS:  Thank you, your Honor.  May I review it?

THE COURT:  Of course.

THE WITNESS:  Thank you.

A.    (Reads.)  I've completed my review.

Q.    Do you recognize this document?

A.    I do.

Q.    Have you seen it before?

A.    I have, in performance of my official duties in leading the Bureau of Consular Affairs.

Q.    Okay.  And what is the document?

A.    The document's similar to the previous one, it's a memorandum from the Secretary of State informing the Secretary of Homeland Security of a decision made regarding the removability of an alien.

Q.    What alien does it refer to?

A.    It refers to Mohsen Mahdawi.

Q.    And what does it find with respect to Mr. Mahdawi?

A.    Oh, sorry I pronounced it wrong.  The Secretary of State informs us that he found Mr. Mahdawi removable under Section 237(a)(4)(c)(1) of the Immigration and Nationality Act.

Q.    And does the document provide the Secretary's rationale for that finding?

A.    It does, on the second page.  That rationale was Mr. Mahdawi's involvement and leadership of disruptive protests at Columbia University, and that included antisemitic conduct and calling for the destruction of Israel.  The Secretary also noted that this is clearly against U.S. policy to counter antisemitism.  And Mr. Mahdawi's activities undermine the peace process in the Middle East, including coming to a peaceful resolution of the ongoing conflict in Gaza.

Q.    Thank you.  I'd like to show you another document.

        MS. SANTORA:  If I can approach?  This is Exhibit

Number 19.

THE COURT:  Say again the number?

MS. SANTORA:  19.

THE COURT:  Thank you.

(Approaches, hands to witness.)

THE WITNESS:  Thank you.

May I review it, your Honor?

THE COURT:  Of course.

THE WITNESS:  Thank you.

A.    (Reads.)  I've completed my review.

Q.    Do you recognize this document?

A.    I do.

Q.    Have you seen it before?

A.    I have, in performance of my duties as the senior Bureau official of the Bureau of Consular Affairs at the State Department.

A.    What is the document?

A.    The document is a communication, a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q.    And what is the memo about?

A.    The memo informs Secretary Noem that Secretary Rubio has found two aliens, um, one is Yunseo Chung, and the other one is blacked out, so I don't know who the person is, um, to be removable under the foreign policy section of the INA, Section 237(a)(4)(c)(1).

Q.    And does the document provide the Secretary's rationale for this determination?

A.    Yes, it does.  It found that Ms. Chung and the other unnamed person were involved in, um, participation and apparently leadership roles in antisemitic protests and disruptive activities.  It created a hostile environment for Jewish students in the United States.

Q.    Thank you.  I'd like to show you another document.

MS. SANTORA:  If I could approach.  This is labeled as Exhibit 21 in this case.

(Approaches, hands witness document.)

THE WITNESS:  Thank you.

Your Honor, may I review it?

THE COURT:  Yes.

THE WITNESS:  Thank you.

A.    (Reads.)  I've completed my review.

Q.    Do you recognize this document?

A.    I do.

Q.    And have you seen it before?

A.    Yes, I have, as in my leadership role of the Bureau of Consular Affairs at the Department of State.

Q.    What is the document?

A.    The document is a memorandum from Secretary Rubio informing Secretary Noem, the Secretary of Homeland Security, of Secretary Rubio's decision to find Badar

Khan Suri deportable under INA Section 273(a)(4)(c)(1), which is the foreign policy section.

Q.   And does the memo provide the rationale for the Secretary's determination?

A.   Yes, it does, it cites Mr. Suri's direct connection to Hamas leadership as well as his involvement in antisemitic activities that created a hostile environment for Jewish students in the United States.

Q.   Okay, I have one more document to show you.

MS. SANTORA:  If I could approach?  This is Exhibit 16.

(Approaches, hands to witness.)

THE WITNESS:  Thank you.

Your Honor, I'd like to review?

THE COURT:  Sure.

THE WITNESS:  Thank you.

A.   (Reads.)  I've completed my review.

Q.   Do you recognize the document?

A.   I most certainly do.

Q.   What is it?

A.   It's a communication, um, a memorandum from me to Andre Watson, who's the Assistant Director of the National Security Division of ICE, at DHS.

Q.   And you wrote that in your official capacity as

the Senior Bureau Official at the Bureau of Consular Affairs, correct?

A.    I did not write it, I signed it.  Other people drafted the document.

Q.    Okay.  But you have reviewed what the memo said, correct?

A.    I did, before signing it, yes.

Q.    And, um, what is the purpose of the memorandum?

A.    The purpose is to inform Mr. Watson of the decision made to, um, revoke, um, Rumeysa Ozturk's Visa due to her activities in the United States, and it was revoked under Section 221(i) of the Immigration and Nationality Act.

Q.    And --

A.    And I signed it on the back.  That's me.

Q.    Thank you.

      What was the basis for your determination?

      THE COURT:  His determination?

Q.    What was basis for your determination that the Visa should be revoked?

      THE COURT:  He may answer.

      THE WITNESS:  Thank you, your Honor.

A.    The basis was her antisemitic activities in the U.S., as detailed.  It talks about creating a hostile environment for Jewish students, and indicating support

for a designated terrorist organization.  I believe it was Hamas, but it might have been Hezbollah.  I don't remember exactly.

Q.   I want to direct your attention to the last line, the last line of the first paragraph of the memorandum. It says, "Due to ongoing ICE operations, security of this revocation will be silent.  The Department of State will not notify the subject of the revocation."

Does the Department of State, when it revokes nonimmigrant Visas, typically inform the Visa holder that their Visa has been revoked?

A.    Yes, we usually do.

Q.    And in this case you did not?

A.    That is correct.  And judging from the context, ICE had made a request that we not inform so that they could take action to remove Ms. Ozturk from the United States.

THE COURT:  Let me ask you a couple of questions here, but I'm going back to the other four that you've been shown, and I'm talking about the chart.

You know about the Secretary's actions because, as I understand it, your involvement here, as the Director of the Bureau of Consular Affairs, you're the one who causes the memo or in fact sends the memo to the Secretary of State saying "Agree," "Disagree,"

"Discuss"?

THE WITNESS:  Yes, I'm the last one who looks at it, yes.

THE COURT:  All right.  So, um, my question is broader than the, um, what you've been shown.

But since you've been there, in your official capacity, can you estimate how many such memos involve student protests, protesters, and concerns about antisemitism, limit it as to that.  About how many such memos have you sent to the Secretary of State?

THE WITNESS:  I would estimate the number of such memos would be between 15 to 20.

THE COURT:  All right.  And of those 15 to 20, if you can break down how many were agreed and executed, how many were disagreed, how many were discussed?

THE WITNESS:  In my recollection, almost all were agreed.  There may have been one that was not.  I'm the not sure.  And there may have been another one that was discussed and later agreed to.

THE COURT:  Yeah, just asking for your best recollection.

Go ahead, Ms. Santora.

Q.    And related to those memos that your Honor was just discussing, um, the -- your office, before sending an action memo to the Secretary, independently analyzes

the information in referrals, correct?

A.    That is correct, we analyze it.  The Visa office, along with legal counsel, analyze it, um, independently of DHS, the information.

Q.    And then makes a recommendation on removability to the Secretary, correct?

A.    That is correct.  And the recommendation is reviewed by many people.  And then I -- or whoever is sitting in the position I am currently in, makes the final determination of whether it goes forward to the Secretary or not.  My practice is to read the whole memo.

Q.    And the Secretary, um, makes the ultimate determination on removability, correct?

A.    That is correct, the Secretary of State, Marco Rubio.

Q.    You said before that you were familiar with the allegations in this complaint, correct?

A.    I have some knowledge of them, I have not read the complaint.

Q.    Are you familiar with the fact that the plaintiffs in this case allege that the government is implementing an ideological deportation policy?

A.    I have heard that --

MS. CONLON:  Objection, your Honor.

THE COURT:  No, she may so characterize it.  And she may ask the question.  And his answer may stand.

A.    I have heard that accusation.  I believe it's groundless.

Q.    So is there an ideological deportation policy?

A.    No.

Q.    How do you know?

A.    I run the Bureau of Consular Affairs.  I'm responsible for everything those 13,000 people do.  At the end of the day, the buck stops with me.  I would know if there was an ideological deportation policy going on that involved the Bureau of Consular Affairs or the State Department for that matter.  It's silly to suggest that there's such a policy that I didn't know about.

Q.    Does the State Department have any policy to revoke Visas based on protected speech?

A.    No.

Q.    Does the State Department have any policy to find people removable based on protected speech?

A.    No.

Q.    Does the State Department have any policy to revoke Visas based on political viewpoints?

A.    Um, if you're supporting a terrorist organization, yes, in that case.  And it's been made clear by the

statements of Marco Rubio and, um -- this is not something that we started with Marco Rubio.  If you support terrorism, you can have your Visa revoked.

Q.    And is that a provision of the law?

A.    It's in the law.  There's the ineligibility, the 3(b) that we talked about.  And actually that example you gave me, right before 3(c), they have 3(b) that goes into several pages of discussion of this.  These officers abroad are required to put in a security advisory opinion on any case that they think that there's any indication of support for terrorism.  We treat this very seriously.

Q.    Has anyone ever told you to revoke the Visas on the basis of protected speech?

A.    No.

Q.    As anyone ever told you to find someone removable on the basis of their protected speech?

A.    I can't find anyone removable, but no one has instructed me to prepare the materials for the Secretary to make that finding.

Q.    Could the State Department be deploying an ideological deportation policy in secret without your knowledge?

        MS. CONLON:  Objection.

        THE COURT:  Based upon the entire record, I'm

going to sustain that.

(Pause.)

Q.    To be clear, it's your testimony that it would not be possible for an ideological deportation policy to be implemented at the State Department without your knowledge, correct?

A.    That is my --

MS. CONLON:  Objection.

THE COURT:  No, no, he can -- and I sustained the earlier objection because the whole gravamen of the case is that it is an avowedly public operation supported by the statements of the -- here the defendant public officials.  And I'll let his testimony stand.

Anything else for this witness?

MS. SANTORA:  No, that's it.  Thank you, your Honor.

THE COURT:  All right.

Ms. Conlon?

MS. CONLON:  Yes, may I, um, go to the podium?

THE COURT:  You may.

THE WITNESS:  Your Honor, may I stand up for a minute?

THE COURT:  Of course you can.

THE WITNESS:  Thank you, sir.

(Stands.)

(Then Sits.)

CROSS-EXAMINATION BY MS. CONLON:

Q.    Good afternoon, Mr. Armstrong.

A.    Good afternoon.

Q.    Okay.  So you were asked --

THE COURT:  Wait.  Wait a minute.  Wait a minute.
I have, at this moment, received an order from the Court
of Appeals, so let me read it.

(Reads.)

THE COURT:  Here's how we're going to proceed.
Let me read this in open court and you'll all have
copies.  This is entered and I received it as you hear
it, and this is the order of the Court of Appeals in the
First Circuit.

"The government has filed a mandamus petition and
accompanying request for interim relief.  Plaintiffs
have opposed.  After initial review of the parties'
submissions and relevant portions of the record, we
grant the government's request for a stay of any further
disclosure of documents for which the government says it
has claimed privilege and where waiver is the only basis
stated for rejecting the claim of privilege.  Plaintiffs
may file a more fulsome answer to the petition by
Monday, July 14, 2025, at 5:00 p.m.

The District Court is invited to address the petition by Tuesday, July 15, 2025 at 5:00 p.m.  The Court's response should identify what the reason was for the in-camera review and detail the rationale for its waiver rulings on the government's assertion of certain privileges.  The motion for administrative stay is denied as moot.  The Court will rule promptly on the petition."

In light of the order of the First Circuit, and because it's 5 minutes to 1:00, I think we'll suspend proceedings at this time.

Ms. Conlon?

MS. CONLON:  Could I begin my examination, with the 5 minutes remaining, without anything that will affect the order from the First Circuit just so we can get started?

THE COURT:  Well I'm deferential to their order. I've got to reflect on what it reaches.  But for my review of this order, it reaches everything that has been -- that this Court has disclosed to you as to which the government has objected.

And you've got 5 minutes.

MS. CONLON:  5 minutes to argue it or 5 minutes to --

THE COURT:  No, no, 5 minutes to question him.

MS. CONLON:  Okay.  Just for the clarity for the Court and the record, our understanding, I think, is different in terms of the group of documents that we understood the government to be filing the petition about, um, but I am certainly able to start examining this witness without using any documents at all.  So I just wanted to be clear, because I hear the Court saying that the Court thinks that the documents that I might use in this examination, which is to say the ones we received from the Court yesterday, are implicated by the government's petition, and I want to be clear that our understanding is that they are not, and that that relates to documents that have yet to be disclosed to us.  But I understand the Court needs to review the document that's in front of you more thoroughly.  So if I may begin the examination --

THE COURT:  It's not a document, it's an order.

MS. CONLON:  Correct, the binding order.  So I will not -- I have no intention, in this remaining minute --

THE COURT:  Right.  You have 4 minutes.  Go ahead.

MS. CONLON:  Thank you, your Honor.

(Pause.)

Q.    Mr. Armstrong, you testified on direct examination about certain noncitizens, um, by name, that the

government asked you about.  To be clear, um, you had personal involvement in the decisions with respect to all of them, is that right?

A.    That's my recollection, because in the case of the ones that went to the Secretary of State for decision, the action memo would have gone through me before it went up.  And in the one remaining case, I -- as I recall, the action memo actually went to me from one of the Deputy Assistant Secretaries.  So, yes, I was involved, in my professional duties, in these cases.

Q.    And when you say that it went to you before it went up to Secretary Rubio, it's the case that you actually had to clear the document to go to Secretary Rubio, is that right?

A.    That's correct.  I'm the -- for the action memo, before it can leave the Bureau of Consular Affairs, it comes from -- it's actually from me, um, the decision -- the action memo is from me.  And as I stated, it's my practice to read, um, the documents before they go up. I treat it seriously, I treat my duties seriously to read it in full.  And make corrections, if needed, I may add.

Q.    And when you say "corrections," what kind of corrections?

A.    Um, there's any number.  It's part of the

clearance or the approval process.  It's serious business.  For example, sometimes, despite best efforts, there's simple grammatical errors or punctuation errors. I can't send something to the Secretary with not enough commas or a semicolon in the wrong place.  Sometimes it's more serious, there are what I believe, in my position, I judge to be something that is not phrased in the clearest way to get across our point or, for example, not the best evidence is used to make our point.  Sometimes I disagree completely and send the document back to the drafter and I say, "This can't stand, you have to fix this."

Q.    You're describing a sort of searching review before it goes to the Secretary, is that right?

A.    That's correct, much of my time is spent doing such activities.

Q.    With respect to the five individuals whose documents you just reviewed with the government, you didn't make any corrections about those, right?

A.    I -- I'm trying to be helpful, but I review in a week, you know, sometimes 10, 15, or more action memos that go to other parts of the State Department, and I can't recall what I did on a memo that was, you know, several months ago.

Q.    You don't have an independent recollection of the

back and forth on these memos that the government showed you, is that right?

A.    I do not.  But my general practice is that I review things thoroughly and judiciously before I sign them.  I have to sign off on it, and that's my responsibility, even if it's someone else's fault.

Q.    And if you disagreed with a memo that came to you that was intended for the Secretary, you could stop it from going to him, right, by not clearing it?

A.    That's correct, I could send it back.

Q.    You didn't do that for any --

THE COURT:  I think that's a good place to stop.

MS. CONLON:  Okay.

THE COURT:  We'll stop taking testimony today. We'll start promptly at 9:00 a.m. on Monday next week.

The total elapsed time is, um, for the plaintiffs, 3 days, 55 minutes.  For the defense, 1 day, 1 hour, um, 35 minutes.

Understand you've only got four days -- four and a half days for the plaintiffs, and I thought that that included -- I intend that that include closing arguments.  So assuming you want some cross-examination here, um, time is of the essence.

Now have a good weekend.

MR. KANELLIS:  Your Honor, I apologize.

THE COURT:  Well now the apology is properly sought.  I said we're stopping at 1:00.  We're stopping.  We'll recess.

(Adjourned, 1:00 p.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Friday, July 11, 2025, to the best of my skill and

ability.



/s/ Richard H. Romanow 07-11-25
_____
RICHARD H. ROMANOW   Date