UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 14, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

P R O C E E D I N G S

(Begins, 9:05 a.m.)

THE COURT:  Good morning.

As I've authorized internet access to these proceedings, let me say, as I've said each morning, if you are observing these proceedings via the internet, the rules of court remain in full force and effect, that is to say there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It's very important also that you keep your microphone muted.  If you do not, you'll be cut off.

With that said, we have one witness this morning, which is the only trial time, and then we have matters to discuss.  But let's start with the witness and call the witness.

MS. CONLON:  Your Honor, um, as we previewed in our e-mail to the Court, we would be and now have filed a motion for additional time, because of course we didn't expect a ruling by today, we made a very difficult decision to not call -- and understanding that we won't have the opportunity at a later time to call Mr. Reger, whose testimony we frankly think is important, but we need to be able to cross-examine the government's witnesses with these documents with the

time that it takes.  So we have -- we have withdrawn our request to present testimony out of order and call Mr. Reger.

THE COURT:  I follow that.  So the witness, Reger, is not going to be called?

MS. CONLON:  That's right.

THE COURT:  Then we'll start then with the discussion without -- trial time is not being recorded now and I need your help really, and I have some observations to make about further proceedings in light of the stay, but before we do that, um, two --

Yes, Ms. Strokus, I simply want to offer an apology for not getting your name right.

MS. STROKUS:  No problem, your Honor.

THE COURT:  No, in my mind it's a problem.  By now in the trial I should recognize your name and I have mispronounced it and I apologize.

Thank you.

MS. STROKUS:  Thank you, your Honor.

THE COURT:  And, Mr. Kanellis, I was brusk at 1:00 only to -- it had nothing to do with the trial or the mandamus proceedings, I had someplace to go.  And as you have said, and now I say, I'm apologizing for being brusk.

But let's start with whatever it was you wanted to

say at 1:00 on Friday, and we'll go from there.

MR. KANELLIS:  Thank you, your Honor.

I note that the Court has scheduled the post-trial briefs to be due this Friday.  Is my understanding shared with your Honor?

THE COURT:  I think that's correct.

MR. KANELLIS:  Your Honor, I believe, and I don't -- we've talked about it with the plaintiffs and I'm not sure what their position is, I believe that all parties would be benefitted if we were given a few extra days to capture the final testimony that's going to be presented on --

THE COURT:  Actually I've had a chance to reflect on these things as well.  I'm not disposed to give -- let's start there.  I'm not disposed to give the plaintiffs any extra trial time.  Of course I'm going to devote all the time that we agreed to concluding the trial, which until the stay, and this is not whining, was going swimmingly.

So let's be clear.  This is a case that involves, among other things, motive and intent, and, um, since I've had another of these cases that involve the administration, um, and I thought it appropriate -- and I absolutely thought it appropriate, that right after final arguments I had various important things to say,

um, and then following it up with a written opinion. The *Kennedy* case involving the National Institutes of Health. But this case is not like that. Here's what I expect to happen in this case.

In one part it's a, um, what I hope will happen with respect to the trial. I hope that, with respect to the trial, the stay will be lifted, and either I'll -- either lifted and I'll be allowed to muddle through to the end of the trial or will be lifted with instructions, which of course I will scrupulously follow. But action will be taken promptly by the Court of Appeals and I will get through the trial this month.

Now, um, this is a case in which I'm going to need requests for findings and rulings and I've appreciated the fact that you've ordered daily copy so that I have a full transcript. So, um, there's going to be a period of time, um, once the matter has been taken under advisement and these post-trial filings have been submitted to the Court before the Court -- and we understand we're only in the first phase. The first phase may be the last phase, the case may come to an end after the Court's findings and rulings on the first phase. And, um, contrary-wise the opposite result is possible, that that may result in what we might call a "finding of liability," and then the Court would have to

wrestle with the second phase, which is the issue of redressability, the issue of a correction, if any is possible.

So, um, what Mr. Kanellis -- if we start there, I am, um, perfectly amenable to extending the time for such filings because I have a lot of under-advisement work to do. And, Mr. Kanellis, thank you.

So here I guess is -- what would be helpful to me, now that I have the detailed privilege log -- I will say in a font so small that I need a magnifying glass to read it.

(Laughs.)

I want to talk with you, um -- well let's start the talk like this, because it's a matter of interest to me.

What, um -- on the plaintiffs' -- the plaintiffs have rested but for certain witnesses, and that makes perfect sense, and these witnesses include the cross-examination of Armstrong, Watson, and who else?

MS. CONLON: As far as we know, that's it.

THE COURT: Well --

MS. CONLON: Oh, I'm sorry, I thought you were asking me about whose cross-examinations were affected, in our view, by the documents. Is that not the question?

THE COURT:  I agree that those two are affected by the documents which have been disclosed to the plaintiffs, those two.

MS. CONLON:  Yes.

THE COURT:  So if any event, the stay, however construed, applies until the Court of Appeals permits me to go forward, and that's perfectly fine.  But now I'll ask the broader question.

What else did you observe?

MS. CONLON:  Yeah, I see.  We reserved testimony from our two witnesses who are traveling into the U.S. to testify in this case who will both testify, time-permitting on the 18th.  And that's Veena Dubal, who is the General Counsel to the AAUP, and Cinzia Arruzza, who is a noncitizen member of the AAUP.  And the person we are not able to present, take testimony for, is Jeffrey Reger, who is the Executive Director of MESA.

THE COURT:  Yeah, understood.

MS. CONLON:  Oh, I'm sorry, your Honor, my colleague corrected me.  We also anticipate -- we had told your Honor that we -- rather than asking the law-enforcement witnesses who are set to come tomorrow, these four, um, ICE agents who are of a supervisory level who the government intends to present, we also want the chance to question them potentially more

broadly than the soap of their directs, which the government I think has agreed to rather than asking that we bring them back a second time.  And so to the extent that we need to go outside of their direct, I suppose that's off the part of our case that remains.

THE COURT:  Thank you, that's a helpful answer. And again, just to move things along, as to those witnesses, my custom is to allow you to go beyond the direct.  Of course the rule requires you to take them as though -- on direct as though it is cross.  But I've allowed you to treat those witnesses as adverse because they are employees of, um, one of the agencies where the defendant public official is the top of that agency.  So there's the answer of what the plaintiffs are going to do with the remainder of their time.

What else are we going to hear -- what witnesses, beyond what has been mentioned, do the defendant public officials want to present?

MS. CONLON:  Your Honor, if I may correct myself one more time, my smarter colleagues reminded me of another point, which is that at least -- there's sort of two components to this.

As I understand, we have now questioned one of the agents who will be testifying tomorrow in a deposition and there were many fights about privilege yet again,

um, relating to the scope of the law enforcement privilege, as well as, I think, the deliberative process privilege.  So to the extent that the Court's guidance to the parts on how those privileges apply or don't, with the documents in front of the Court, I think that will potentially affect -- in other words I anticipate --

THE COURT:  To make use of that.

MS. CONLON:  Yes, exactly.

Unlike Mr.(s) Armstrong and Watson, these agents are not, um, senders or receivers of the documents, the affected documents, but we very well may have questions for them based on those documents in terms of the content.  And so I don't -- I'm correcting my having misspoken and saying, "Oh, the documents are totally separate and apart from these agents," I should not have made that representation.  Just to complicate things a little further to the Court.

THE COURT:  No, no, that's very helpful.  Very helpful, and I thank you.

Mr. Kanellis, what are the defendants' public officials going to present?

MR. KANELLIS:  Your Honor, as indicated, tomorrow we will present the four agents, as your Honor has requested, who were at the sites of the arrest.  On

Thursday, we have put aside time for, um, AD Armstrong -- sorry, AD Watson with HSI to describe the HSI's role in these, um -- in these, um, facts at issue.

THE COURT: Thank you.

MR. KANELLIS: We have -- we intend to present a summary witness. It's not extensive, but some summary exhibits through a summary witness. And then there's a witness, you Honor, that falls outside the purview of the Court's jurisdiction, that we will have briefly. That witness is Brian Shuvea's deposition testimony entered pursuant to 804(a) and (b) as an unavailable witness. That is the extent of what we anticipate our case to be.

THE COURT: The deposition testimony -- in other words, he's not going to be a live witness, but you're going to present his deposition?

MR. KANELLIS: Yes, your Honor, it will be very brief, I just think it's significant, so it's important.

THE COURT: I'm sure you do.

So, um, that shouldn't take any time, because the, um, plaintiffs, if you have portions that you think are inadmissible, they can be indicated on the deposition and I will read the transcript and make rulings, and my rulings will decide what's part of the record or not.

All right, let's -- and I appreciate what you've

said, all of this makes sense.  Let's talk then about, um, what I call the core documents that the Court -- and I don't -- well that's an appropriate phraseology.

I see the issues about the submission of documents by the government to fall into three parts.  The core documents, by which I mean the documents which evidence the procedures of the Department of Homeland Security transmitting ROAs to the Department of State and the, um, procedures that the Department of State followed in acting on those documents.  They started out as B through K, which have been subject now to cross-examination.  And, um, they involve, um, without characterizing them in -- or I think it's permissible at least to identify them in light of the stay, Watson letters and, um, also these decision procedures, the "agree," "disagree," um, "discuss," forms that were used to present matters to the Secretary of State, those have been mentioned.  And, um, in reviewing them -- and I want to talk about them as a group.  I consider them core documents here.  I note that certain of them have attorney-written, um, data on the documents.

So not having reviewed the privilege log in detail, um, but I think it's a good place to start, and I think it will be helpful to the Court of Appeals to -- for the Court -- I can address this issue of waiver, and

I intend to, but -- which the Court specifically -- which the Court of Appeals specifically invited me to speak, but I think it would be helpful for us to discuss now where I have agreed to entertain the privilege log and the claims of privilege with respect to the core documents, and that's what I'd like to discuss.  And hopefully rule on.  I'm familiar with these documents. The ones that have been disclosed to the plaintiffs, the plaintiffs are surely familiar with them.  And defense counsel is familiar with them.

So let me, um, identify first, as a place -- because it affects various aspects of what the Court's duties are here, let's identify in the core documents those written statements by attorneys.

Now as to those, I understand that the defense raises the attorney-client privilege.

Is that correct?

MR. KANTER:  Your Honor, I understand you to be referring to the action memo with the -- you refer to "agree," "disagree," "discuss."  So I think we're talking about the same sort of thing, there are some handwritten notations --

THE COURT:  Right.

MR. KANTER:  -- which presumably Mr. Armstrong, who -- this is his action memo.

THE COURT:  No, I understand that.

MR. KANTER:  They'll be able to clear that up, or the meaning or significance of it.  And what I understand you to be asking is what is the nature of the privilege --

THE COURT:  But not as to Armstrong, he's not an attorney.  There is an attorney --

MR. KANTER:  Yeah, there was attorney-client privilege with regard to other e-mails in that core subset.

THE COURT:  That's what I'm talking about.

MR. KANTER:  Yes, discussions of ICE officials with their counsel.

THE COURT:  Right.

MR. KANTER:  And as your Honor knows, redactions -- proposed redactions have been made with respect to that attorney-client privilege.  Obviously, um, CK counsel is to be encouraged in the government.  And, um, this is a matter of some importance, um, I would say -- I would put it this way, on principle.  Because as your Honor also knows, the content -- I remember when you were telling me, "Why" -- "This shows the government in a good light, why would you not want to, in effect, just voluntarily?"  And our response was "That's of course" --

THE COURT:  So you were listening, and it does show that.

MR. KANTER:  That's for the client and the attorney-client relationship to, you know, at a minimum say, "I want to keep it privileged," right?  And as a result, we, um -- we are pursuing that privilege on their behalf.  And --

THE COURT:  That's fair.  That's fair.  And I understand it.  I overrule it.

Now what other privilege applies?  And I'll work out from this with the implication.  And I overrule it on the ground that, um, you cannot give such data to the -- the factfinder and then say, "Here it is, but it's privileged, and therefore you can't consider it." That -- and the basis is that is a knowing and intelligent waiver of the privilege as to that data. That's the ground that the Court's ruling.

Now are there other grounds to seek, um, a privilege?

MR. KANTER:  Over those e-mails?

THE COURT:  Yes.

MR. KANTER:  The proposed redactions reflect the identities of the participants to those exchanges.  Your Honor's initial ruling was only e-mails and phone numbers --

(Interruption.)

THE COURT:  Okay.

MR. KANTER:  Not identities, um, where the government had proposed to redact, including the identities, as law enforcement privileged.  But otherwise putting --

THE COURT:  I guess I don't -- no, no, I hear you. Why should the names of the people be redacted, they're public officers of the United States?

MR. KANTER:  The, um -- your Honor, it has to do with the, um, the individuals and their responsibilities and the nature of their responsibilities.  There are sometimes law enforcement interests that pertain to identity that the government, um, seeks to maintain the integrity -- for example, an analogy would be maintaining the integrity of an investigation.

THE COURT:  Well, of course.  You see that I understand.  But, um, these are in-house people doing their in-house work, um, I don't understand why their names -- we ought not know who they are?

MR. KANTER:  The contents of the communication, um, absent an attorney-client privilege, reflect the nature of the discussion.  The agency, um -- and there are limitations to what I would say in open court.  Your Honor has --

THE COURT:  Well that's fine.

MR. KANTER:  Okay.

THE COURT:  And I -- I hear you, Mr. Kanter.

So again, I'm not disposed to redact the names, absent some showing, um, which may -- an affidavit, which may show the ongoing, um, concern that the identity of a particular person, um, his or her name be redacted.  That may be filed under seal and I will consider it.

Is there anything else?

MR. KANTER:  Yes, there is one other matter that your Honor enumerated, um, related to the action memos, which, um -- the issue here is --

MR. ABDO:  Your Honor, before you move on from this --

MR. KANTER:  May I finish my remark?

THE COURT:  Yes, I will hear Mr. Kanter.

Mr. Abdo, I'll hear you in time.

Go ahead, Mr. Kanter.

MR. KANTER:  I'll get right to the point.

THE COURT:  Please.

MR. KANTER:  The lead contention of my friend is if you find that the action memos are not privileged under the deliberative process privilege, then the cross-examination of Mr. Armstrong and Mr. Watson may go

forward, that's their contention, and I would like to address it.

THE COURT:  Yes, and I agree.  I agree that that is a central issue here.  And, um, let's -- but I want to start out with the attorney's, the attorney advice that's here in the e-mail.

I've overruled the -- I've overruled the assertion of the attorney-client privilege because these were voluntarily submitted to the adjudicator, on the basis that that is a knowing and intelligent waiver.  Now the deliberative process privilege, in this Court's mind, is something else again.  And the analogy -- I think in analogies too, and I was talking with the law clerk, that if -- it isn't the same thing as the deliberative process privilege, but courts hold certain things absolutely privileged, and it's roughly the same, how the Court comes to a decision.

So if, for instance, a civil case, like this is a civil case, a motion for summary judgment, before it are briefs and affidavits.  None of those are in a deliberative process privilege, though they are what the parties have served up that will form the basis of the Court's decision.

Then an attorney on the Court's staff takes an affidavit, this happened more often in the covid days

when we were working remotely, and underlines, writes in the margin, advice. We're not deliberating, we're not in a meeting. There was that meeting, for instance, that Hatch attended and I have sustained the deliberative process privilege and allowed him to be asked only what came out of the meeting, which was the classic situation in my mind and easy to follow.

Here when an attorney does that, I think these things fall within the deliberative process privilege. I'm talking about the attorney. And indeed you've -- you've, um, anticipated it.

So it's conceptually, it's easy for me to think about it with these attorney interlineations on e-mail. That's my concern.

So let's say I sustain that because I think that that is within the deliberative process privilege, that is, that's the attorney advising, albeit remotely, the decision-maker to make the decision, the actual policy, what the Secretary of State decided, that's public, and no one -- there's no objection as to that. So it falls within the deliberative process privilege, it seems to me.

We're in the middle of trial. And then we get to the next problem. If I say, "No, that's within the deliberative process privilege," candidly I've dealt --

in jury-waived cases, criminal cases, the stakes are higher where matters were suppressed and I felt perfectly comfortable in putting aside matters which legally had to be suppressed. Perhaps not in every case, but certainly in most cases. And making my rulings on matters properly before me. But this is different because we're in the middle of trial and these have been disclosed to the plaintiffs.

So the truth is, as I always try to speak the truth and be transparent, that as to the lawyer interlineations, I could put those aside. I could characterize them -- well I don't know that I have, and I'll say no more. I can put those aside. But I'll say this, well certainly some of the things that they said are things that occurred to me before I read these documents, that is, "Is this unprecedented?" "Are we concerned about blow-back?" I need not go on. But things which, um, you could readily argue are informed by reading what lawyers, in their lawyer-like way were saying, that both occur to the Court and I'm sure have occurred to, um, plaintiffs.

So suppose, because I'm -- I think I'm prepared to say, we can put those to one side, what the lawyers had to say.

Now when -- because attorneys can fashion

questions that don't depend on it, you can't cross-examine -- "Oh, but do you see here your own lawyer said this and that?"  We can exclude that.  But are you saying that I should curb their cross-examination to questions that don't depend directly on, um, what the lawyers had to say?

MR. KANTER:  I --

THE COURT:  You're following my --

MR. KANTER:  I am following it, and I have -- I've seen your Honor make these distinctions throughout this trial frankly about many matters, admitting evidence, for example, as limited, not for the content but for the reaction, distinctions are made.  This is a bench trial. Your Honor is the judge and the jury, as it were.  And, um, those decisions and distinctions are yours to make.

I think the key, um -- the key aspect of this process for the government, um, was the -- in handing over the core documents to the plaintiffs, your Honor, um, made a very important stipulation, the stipulation was they were attorneys' eyes only, which I understood, and your Honor can correct me if I am mistaken.

(Pause.)

THE COURT:  Go ahead.

MR. KANTER:  However I think your Honor was trying to strike a balance, which is acknowledging either the

asserted privileges of the government or if the matter of waiver is, um, pending before the First Circuit, or there were other considerations related to attorney-client or deliberative or law enforcement, your Honor was striking a balance to enable the trial to proceed and the examinations to proceed, attorneys'-eyes only. And I think in asking me, "Can there be a robust cross-examination based on these core documents?"  I think the government's answer is "Yes."

There may be matters which, for example, I had to talk around in open court and matters for which a sidebar was required, um, but what I'd like to underscore is the plaintiffs have the documents, they have all the documents.  In fact, they have them unredacted.

With respect to the, um, "agree," "disagree," "discuss" memos that your Honor, um, they not only have those unredacted, they have the Secretary of State's decisional memos unredacted.  Why?  Because we gave it to them when we agreed to file it under seal with the Court.  The decision memos are, um, not, um, under seal in full, there's a companion set that is public.

The plaintiffs have the information.  They have the ability to fashion questions.  And if any of those questions were to touch on areas of sensitivity, whether

the Court has ruled directly with respect to the privilege or the government maintains their -- for example, the other day when there was an exhibit, most of which we had no objection to the questions based on that exhibit, we never stood up and objected, but there was one part of that one exhibit, and we brought it to the Court's attention, and you acted immediately, and my friends complied immediately.  I think we were all on the same page there.  But the --

THE COURT:  All right, that's very helpful, Mr. Kantor, and I'm listening to you.

One last question before I hear Mr. Abdo, because I -- you've -- I hear no suggestion in our discussion that, um, while I said I could set aside the attorney interlineations as, um, part of the deliberative privilege, and I want to hear him on that, um -- and if I decide to do that, I can do that, it does not affect the integrity of my factfinding.  No one suggests, when I come to decide this case, because, as you have characterized and I think accurately, these documents cut both ways.  I can't be more transparent.  They do cut both ways.

No one says -- on the government's side, no one says I can't look at the documents, even if I excluded the attorney data, the core documents, isn't that

24

correct?

MR. KANTER:  Yes, that's absolutely correct.

THE COURT:  Thank you.

MR. KANTER:  And if I may?  One last point or not. I can sit down.

THE COURT:  No, no, go ahead.

MR. KANTER:  If the issue is -- what I'm saying is the issue of whether it's deliberative or not is a nonissue in terms of being able to question the witness about it, work around it --

THE COURT:  That's what I heard you say.

MR. KANTER:  That's my main point.

As to whether it's deliberative?  I do have an argument that it is deliberative, even putting aside the delineation, because this action memo is a proposed decision.

THE COURT:  Oh, you're talking about the interlineations of Mr. Armstrong?

MR. KANTER:  Mr. Armstrong's memo -- the whole memo is a proposal to the Secretary of State.  It's not a decision, it's an offer recommending approval.

So "approve," right, can, like your Honor said, things can be -- have two meanings at once.

THE COURT:  Well that intrigues me.  So we're talking about these action memos now.

MR. KANTER:  Yes.

THE COURT:  In which there are interlineations by Mr. Armstrong, the witness here at trial.  We've all seen them in their unredacted form.  But you now make an argument that the memo, because it has the interlineations, is, um, part of the deliberative privilege.

MR. KANTER:  Yes, I do.

THE COURT:  Yes, I understand.

MR. KANTER:  And I think my friend helped me with my argument for the following reason.

THE COURT:  Well we'll let them make their own arguments.

MR. KANTER:  Okay, then I won't say that.

THE COURT:  All right.

MR. KANTER:  They made an argument that it's not deliberative when it becomes final.  Those are two different things actually, but they make the critical point that they're virtually identical in content, right?

THE COURT:  Yeah, let me.  Let me hear their argument from them.

MR. KANTER:  Thank you, your Honor.

THE COURT:  Mr. Abdo, we've talked about the attorney -- the attorney statements and e-mails, we've

talked about these memos of -- we're pretty clear what they are, that Mr. Armstrong gives to the Secretary of State.  Please address both.

MR. ABDO:  Thank you, your Honor.  And before I address those, if I could just say one thing.

Last night, as you may know, we e-mailed Ms. Belmont with a filing that we had hoped to file under seal later today.  We provided a copy to opposing counsel.  And if your Honor would like to have a copy of it, I'd be happy to approach and provide it.

THE COURT:  I have it, don't I?

MR. ABDO:  Well I don't know if you have the printout.  But if you don't, I'm happy to provide you one.

THE COURT:  Oh, I have a printout.

MR. ABDO:  Oh, okay.  So let me just -- a few points your Honor.

First, with respect to the attorney-client privilege, we understand your Honor's ruling.  We would just encourage you to overrule the assertion of privilege for the additional reason that, with the exception of maybe one or two sentences in the e-mail thread that we're talking about, nothing in that e-mail thread is plausibly protected by that privilege.  Most of it concerns, um, decisions already made, not sought

-- you know not offered in the context of seeking legal advice or received in that context.

The fact that attorneys happened to have been copied on the e-mail is relevant, but it certainly isn't dispositive to the assertions of privilege, and we'd ask you to base your ruling on that additional basis, which we think would, you know, clear up the record.

A second point with respect to, um, the interlineations. I think I now understand where things, um, have landed, but just to be clear. The interlineations we're talking about, and I believe Mr. Kanter was talking about, were ones made apparently by Mr. Armstrong on the action memo, not by a lawyer.

THE COURT: I -- I never was under a misapprehension as to that. The problem is we're being cautious about documents, and he started off talking about interlineations by Mr. Armstrong, I said, no, no, no, and he moved to e-mails. We talked about e-mails, I allowed him to expand now to interlineations, undisputed apparently by Mr. Armstrong on this decision memo. And, um, I've heard his argument. I'll hear yours.

MR. ABDO: Thank you.

And then a third point, your Honor, has to do with the deliberative process privilege and connects to the action memo that we were just talking about. As you'll

have seen from our filing, we don't think the deliberative process privilege covers any of the documents that have been turned over to plaintiffs for a variety of reasons.  We explained four in the memo.  I won't repeat them here.  But let me just highlight two of them.

One is that all of the documents we're talking about have been adopted, including especially the action memo that we were just talking about.  Mr. Armstrong -- well I don't want to go into any details, but I think a review of the document on its face makes clear that it was adopted, and once a document is adopted as a decision of the government, whatever predecisional and deliberative character it had before that might have justified invocation of the privilege falls away.

So, you know, we think it would be proper to overrule all the government invocations for that reason.

THE COURT:  There have been opinions of this Court which, if you looked at the draft, which otherwise was privileged, I -- I don't know as I'll use the word "confess," the only changes I made were to avoid split infinitives, which is an issue of mine, and to move a few, um, commas.  So that reveals that the draft, by the law clerk, was 95 percent acceptable to the responsible judicial officer when I signed my, um, my -- put my

signature on it.

I do not conceal from the bar that in the main, um, I delegate to clerks and interns initial drafts. Frequently I do rewrite or add sections and subtract, and all of that business. But, um, it does add a little more information if you were to know the last draft before the judge put, in my case, his signature on it. And I always thought that was privileged.

I think that's correct, your Honor, but two points about that. One is that once you put your signature on the document, then it is expressly adopted.

THE COURT: Exactly.

MR. ABDO: I don't think there's any debate in the doctrine about that proposition.

And the second point is that, even with respect to documents that were once predecisional and deliberative, if they were incorporated by reference into the decision, or relied upon, as many of these documents were expressly in the decisional document, that incorporation waives whatever deliberative process privilege there would be.

So just to be very concrete. In the decisional memos we have, in the certified administrative record, you know the ones from the Secretary, those memos expressly base their decision on underlying memoranda

setting out the factual understanding of the Department of State or the Department of Homeland Security. They quote them. They site them. They list them as attachments. That incorporation also waives whatever predecisional and deliberative character the underlying memos might otherwise have had prior to the final decision.

And we think that applies to the bulk of -- and between those two arguments, we think it covers all of the documents over which the government has asserted the privilege.

THE COURT: And I'm saying it back to you now. At some stage I will write an opinion here, and in legal writing they'll be citations, and the citations will be to the record, or to opinions and the like, all of which -- and your point is, "If you do that, Judge, all of those necessarily are public, because, in legal writing, that is explication of what you relied on, it shows your reasoning."

MR. ABDO: Precisely, that is the basis for your decision. And the bases cannot be withheld under the deliberative process privilege.

THE COURT: Okay.

MR. ABDO: One final point, your Honor, has to do with our ability to cross-examine on the basis of these

documents.  And to that I'd like to turn it over to Ms. Conlon.  If that's okay?

THE COURT:  Of course it is.

MS. CONLON:  I have a very extra-vested interest because I am, as you know, have begun the cross-examination of Mr. Armstrong.

So our friends on the other side make the point that even if the documents couldn't be used by us in terms of entered into evidence or shown to a witness, that we wouldn't be hampered because we could ask important, you know well-crafted questions.

THE COURT:  He didn't say you wouldn't be hampered, he says you can think of ways around it.

MS. CONLON:  And I want to let the Court know some important context that there's no reason the Court would have known, which is this.

I sat in a room with Mr. Armstrong for a whole day.  He did not recall and could not answer a single question about the basis for any of these decisions, even the manner of these decisions, and he repeatedly said, "Please show me the documents."  I cannot tell you how many times he asked me to show him the action memo and the Watson letter, and of course I didn't have them because, until the Court shared them with us, we had never seen them.  We could not effectively get at the

truth without them.

THE COURT:  Wait.  Now, um -- I'm going to cut you off, Ms. Conlon, but only for this witness.  My ask to the Court of Appeals is that they lift their stay, um, not really that they, um, dismiss -- and I don't know that it properly is before me, that they dismiss the petition, that's up to counsel arguing the several positions.

But at their invitation, I am going to ask that they lift the stay, and as I put it, "allow me to muddle through to the end of the evidentiary process."  Mr. Kanter referred to it, and respectful to plaintiffs' counsel, deservedly so.  And I -- the counsel I have here in the courtroom before me, I have genuine respect for you all.  We have worked cooperatively and I have been able to make rulings that I have thought prudential.

I'm talking to the -- I can't decide -- I'm having this discussion.  We have daily copy.  You can transmit it all to the Court of Appeals.  But I can't -- I put on the record that I'm ruling that the assertions of attorney-client privilege are, um, overruled on the basis of waiver, because they were put before the factfinder.

I am ruling that the, um, claim of deliberative

privilege as to -- I want to reflect on what Mr. Abdo said, but as to so much of the e-mails that actually reflect attorney advice is sustained, so long as we are clear, as Mr. Kanter has made it clear, that the Court may look at those things, draw inferences and the like. But I'm going to treat those as having sustained, um, that on the deliberative process privilege.

Beyond that, I'm not making any rulings as to the reach of the deliberative process privilege because the process Mr. Kanter has described is, um, both acceptable to the Court and workable. And if the Court of Appeals will allow me to proceed with Mr. Armstrong and Mr. Watson, um, I don't think there's any more I can say. I've tried to be transparent to counsel and to the Court of Appeals.

Yes?

MS. STROKUS:  Your Honor, I just wanted to put on the record before you that Ms. Conlon has mischaracterized what occurred at Mr. Armstrong's deposition. I was also there the entire day. And plaintiffs repeatedly asked him to speculate on documents that they could not produce to him. So he's under oath --

THE COURT:  Well because they --

MS. STROKUS:  So he's under oath. It's important

that he tell them, "I'm not going to speculate on the contents of these documents."

THE COURT:  I'm not drawing any conclusions.  If the Court of Appeals will allow him to resume the stand, I can handle the examination.

Now that --

Yes?

MS. CONLON:  Your Honor, may I ask you a question?

THE COURT:  Oh, of course you may.  We're talking now.  And I'm fine with talking, but I can't -- I've made the rulings I've made to try to be helpful, because I have enough of a basis to make those rulings.  Beyond that, I'm asking that they let the trial go on, and a trial is a trial.

MS. CONLON:  And when your Honor said, "If the trial is permitted to continue with examinations of Mr. Armstrong and Mr. Watson, that we can use the process we have used so far," which I understand -- that's the part I wanted to get clarification on.  I take that to mean to deal with things as they come up.

THE COURT:  Yes.

MS. CONLON:  Okay.  We have discussed the action memos today and we've discussed the e-mails, but we have not discussed, unless I missed it, the letters from Mr. Watson to the State Department.  I wanted to make

sure that that's also something we're addressing today to the extent that the Court is willing.

THE COURT:  I am willing, because I consider them core documents.  And, um, maybe I should go back to Mr. Kanter to be -- to see if, um, there's any ruling I can make.

Mr. Kanter, as to the Watson letters?

MR. KANTER:  Yes.

The Watson letters are referrals from one agency to another, and, um, the government stands on the, um, log entries as to those documents we submitted to the Court.

THE COURT:  Yeah, but they really are very fine points.

MR. KANTER:  (Laughs.)  Fine?

THE COURT:  What are your objections?

MR. KANTER:  You're right, and I apologize for that.

THE COURT:  No, no, that's all right.

MR. KANTER:  I strained to read them myself.

THE COURT:  I have a magnifying glass.

MR. KANTER:  Um -- okay.

In my recollection, the referral letters are law-enforcement sensitive, they were the subject of a motion to compel by the plaintiffs, which your Honor

36

denied.  They were among the documents that your Honor held the privilege had been waived.

We have not changed the assertions as to those documents.  They remain law-enforcement sensitive.  Your Honor handed them to plaintiffs with the AEO stipulation.  We, um, believe that is a compromise that enables the trial to proceed.

THE COURT:  Thank you.  Yeah, I think that's well-said.

MR. ABDO:  Your Honor, if I may just add one note with respect to those?

THE COURT:  Yes, please.

MR. ABDO:  You know those documents appear on the chart that we provided to the Court last night.  Among the first, I think 9 or 10, all withheld only under the law-enforcement privilege.  And we understand your court to have overruled that assertion of privilege with respect to these documents based on your Court's conclusion, which we fully agree with, that the government had interpreted that privilege far too broadly to cover not just information that was disclosed with compromise and investigation, but the sort of information we've seen from these memos, which is largely factual information.  And using techniques that have already been disclosed to the public and described

in open court, mainly the collection of social media information and the like.

So we think the Court has already ruled with respect to those documents on the merits, not on the basis of waiver, such that the First Circuit's order doesn't even implicate our use of these documents at trial.

THE COURT:  Actually you've stated it better than I.  But the use of the word "waiver" there, by the Court, was infelicitous, because while I went on to explain my focus on the law-enforcement privilege and explain what I believed was the scope of the law-enforcement privilege and functionally overrule that privilege as to these documents, as you have properly said and more effectively described, the use of the word "waiver" was infelicitous.  And now that I've gone back and looked at the transcript, I said, "You may submit law-enforcement privileged data and I used words much like "and I will honor it."  And that's their basis for saying, in effect, that they were snookered.  They were not snookered.  That didn't estop the Court from making a ruling on the privilege.  I made the ruling on the privilege.  But they did not waive it by asserting it and giving me the documents.

What they did was give me the documents, allow me

to rule on the privilege, I overruled it, and as a matter of trial management, have decided, and persist in that decision, that they may be used to get in the trial.  Everyone agrees I may look at them.  But I think that, um, I may look at them more effectively if I permit cross-examination, which has been the Court's reason and process for turning things over under the stipulation of attorneys'-eyes only.  Thank you.

MS. CONLON:  Your Honor, I'm so sorry, may I ask you a question?

THE COURT:  Don't apologize.  You know we're talking.

Go ahead, Ms. Conlon.

MS. CONLON:  Okay.

So understanding the Court's point that if we can continue, we will use the process that we have used, which is collaborative with the Court and the government, the concern that I hope was clear in our application for time is that that process takes time, meaningful time, and I am deeply concerned that with only several hours we will not be able to even finish this process.

THE COURT:  I'm sure you're concerned, but that was clearly to be anticipated in a trial of this sort. No additional time.

Now, um, there's one other document and we haven't talked about it and I actually talked about it in trial, but we haven't talked about it here.  And I think my, um -- I think, one, the document, as I understand it, is not implicated in this application for a writ of mandamus, and that is the single document marked A as to which the government has asserted the Executive Privilege.  They call it the "Presidential Privilege," which has thrown me a little bit, but it's the same thing as the "Executive Privilege," which I am somewhat familiar.

As to that document, I have characterized it in open court saying, "It appears to be peripherally relevant."  Here's how I'm going to handle that document, if it hasn't been clear.  And again all of this I fact expect you to transmit to the Court of Appeals should you take a position with respect to it or have issue with it.

The Executive Privilege has not in any way been waived, and has been asserted, and timely asserted.  The matter was and is under advisement by the Court without respect to the, um -- without respect to the mandamus proceedings.

It seems to me there are three possible outcomes. The Court determines that the privilege applies.  If

that happens, the document itself will be returned to the government forthwith. But notification will be put either by my saying so during the trial or if it's in the under-advisement period, um, by notification on the docket.

Second, that, um, the ruling, whether it applies, um, is deferred by the Court until the, um, time I am writing up the opinion and I decide that while relevant, it's so peripheral that no mention of the document need be made in the opinion, nor reference to it. If that happens, the document at that point will be returned to the government forthwith, physically, no copies retained in the file of the Court at all. It's treated in our procedures as a highly-sensitive document. I have custody of it.

The third possibility is that the Court finds that the privilege -- rules that the privilege does not apply, and further, um, wants to cite. The second option, I don't have to decide whether the privilege applies, if I'm not going to cite it, I'll give it back, because I'm not relying on it in any way. If I find that the rule -- that the privilege does not apply, and the -- and I'm going to cite it or use it, in that case I will give notice, and then I would think that would be ripe, um, and indeed -- why don't I say it right now, I

will not do anything for -- I will automatically, I'm putting it on the record now, stay any further action as to the document for 7 days so that the government may, um, seek to protect the document.

I have said one thing that, on reflection, I want to retract, and I'm looking for you, Mr. Kanter, who's arguing these privileges. I suggested the possibility that assertion of the privilege could be a basis, even if it wasn't national security, for an adverse inference. That's error. And I would not do that. And the reason, on the record, is there is an institutional, um, reason, wholly apart from this case, for the Office of the President of the United States to assert the Executive Privilege and vigorously to patrol its parameters to preserve the Office of the President of the United States, both as to Congress and the courts and the public. That's established in the case law. I fully respect it. And, um, the privilege asserted here, I can readily conceive of reasons why the government, as an institutional matter, would assert it, utterly regardless of any issue laid before the Court.

So any adverse inference from asserting it is -- will be improper, and I assure you I would draw no such inference. That's how I'm going to handle that. So we're clear on that.

Now with that I think I -- let me tell you what I plan to do. I plan to go back and talk to the law clerk, um, we'll say a 20-minute recess. Then I'm going to come back and I propose, really briefly, to -- subject to Mr. Abdo being heard here, to briefly, um, accept the Court of Appeals invitation and to explain myself on the record. Again, this is not a brief. I will just explain how I -- if permitted, I will ask to have the stay lifted, but the writ I take no position on, the proceedings for the writ could depend, um, and that will constitute my response. And I will, because we've got daily copy, I will transmit a copy of my remarks, soon to be made, to the Court of Appeals.

I do want to add, with thanks, the Chalk HN, it really sort of walks through the -- what I've described as the "Core" documents. And, um, I should append it to my remarks and I'll see that that's done. So I'll ask you to wait for that because I think it will be helpful for you to, um -- my whole reason for doing it this way is for you to hear it.

And, Mr. Abdo.

MR. ABDO: Thank you, your Honor, just one brief point.

We obviously don't have Exhibit A, the document for which the government has asserted the Executive

Privilege or the Presidential Communications Privilege. Just one note about that document, if the Court determines it is relevant and is weighing the question of whether it is properly privileged.

One of the key elements of the Presidential Communications Privilege is that the information in the document at issue not have been distributed beyond the President's close advisors involved in the decision-making at issue. Mr. Lapowski's declaration which asserted the privilege does not address the distribution of this document. And so it is our position that the government has not yet met its burden of invoking that privilege. We obviously have no basis to know the distribution of the document, but it's our position that they have yet to satisfy that element of the burden. And so we'd ask them, at the very least, to supplement their filing in that regard.

THE COURT:  Thank you.

I thank you all.  We'll take a recess for 20 minutes and, um, the Clerk will advise you as to what will next happen.  But I'm hopeful to come back and briefly accept the invitation of the Court of Appeals and, um, so that you may all support or take issue with it and the like.

And with that done, I think that would, um,

conclude the proceedings for today.  Because when I'm done, I'm going to recess.  So let me go around.

Is there anything else that you think we ought be discussing today?  I've told you what I'm going to ask for.

(Silence.)

MS. CONLON:  Um, to make sure we understand we're proceeding tomorrow.  If there is no ruling from the First Circuit with respect to the, um --

THE COURT:  If there is no ruling, then, um, I understand the boundaries of the stay and I will scrupulously adhere to them.

MS. CONLON:  And to make sure that I understand that same understanding, when we are questioning the ICE agent tomorrow, so that we don't run afoul of anything here, um, if there is no ruling from the Court of Appeals, are we permitted to ask questions that rely upon information that we know from those documents?

THE COURT:  It depends upon how you ask them.

MS. CONLON:  Okay.

THE COURT:  I don't, in any way, mean to be coy.  We can't unring the bell.  For good and sufficient reason, I have turned the documents over to you because candidly I wanted them, um, to subject them to cross-examination so that I could better understand the full

context.  That's where we are in this case.

MS. CONLON:  A related question, your Honor.

These documents, in particular the Watson letters and the action memos, does the Court understand and review them as part of the record that's in evidence that the Court may consider in reaching its findings or are these from the Court's perspective outside of the --

THE COURT:  No, the Court -- that I think I made clear, and I don't think the government has an objection to that.

I take these documents, with the exception of attorney, um, volunteering of, um, or giving -- I shouldn't say "volunteering," giving legal advice, as to which I am prepared to exclude as part of the deliberative process, I'm not saying the whole e-mails, um, and I'm going to put that to one side.

MS. CONLON:  Okay.

THE COURT:  Having said that, everything else -- and I don't hear defense counsel objecting to it, unredacted, is part of the record on which -- except perhaps for this Executive document as to which Executive Privileges -- well let me start again.

As to the core documents -- I'm speaking to the core documents.  As to the core documents, I can look and rely upon them all, with the one exception that I've

just now stated in open court.  As to the document as to which Executive Privilege is asserted, I've told you how I'll handle that.

As to the other documents, if there are more, um, I take the position -- we haven't discussed it here today, but I take the position that the privileges that I have allowed now to be asserted are asserted with respect to those documents, and I will rule upon them.  Rather broadly I have, um, overruled the assertion of the attorney-client privilege.  I intend to sort through them, in the deliberative process, post-trial and, um -- it's a benal phrase, "Let the chips fall where they may."  If I accept the privilege, I won't rely on it.  If I don't, I will.  And it should be clear.

Has that answered your question?  That is a good question.  And that's what I intend to do.

MS. CONLON:  Nearly.  Nearly.  I think I nearly have an understanding.

A concern, your Honor, or a related question, is, um, if we spend time of our remaining time questioning witnesses about the content of certain documents -- and I'll call them the "core documents," forgetting the e-mails, putting aside the e-mails, the "core documents," being the Watson letters and the action memos.  If we spend time questioning witnesses on them

and the Court later concludes those materials are under some sort of a privilege and therefore the Court can't rely on them or use them, you can see how it puts us -- all of us, I think, in a difficult position if we've elicited all of this testimony --

THE COURT:  We're all in a difficult position.

MS. CONLON:  You too, of course.  And in particular, because the Court knows I'm quite focused on this time issue, it puts us in the hard position of potentially having used all our time on stuff that I think the Court can't even consider.  And so --

THE COURT:  No, what I've heard from them, I can consider them.  I'm going to consider them, the core documents.  I'm going to consider them all.  Whatever your cross-examination, I'm going to consider them. With the exception of what attorneys may have advised -- may have advised, but as we've said in open court, those were logical questions which I was asking before I'd even looked at the documents.  But I am permitted, they are part of the record on which the Court will make its decision.  Part of the record.  If I cite them, implicit in that is I've overruled any privilege of any sort.

MS. CONLON:  And the Court will likewise consider testimony from witnesses about those documents?

THE COURT:  Of course.

MS. CONLON: Okay.

THE COURT: Well I don't understand -- well the Court of Appeals can instruct me as it wishes. I would be -- look, I'd be very surprised. The Court of Appeals, because I've made clear to the government I'm going to -- with one exception, I am going to look at the core documents. If the Court of Appeals were to instruct me otherwise, I would have seriously to -- to strike some or most or, um, but a significant part of the core documents, if I have made such a mistake, I would seriously have to consider recusal. Because if this -- then if this case comes out and plaintiffs lose, the integrity of the Court's factfinding will always be suspect, truly suspect, that if only I had considered those things, you would win.

Contrary-wise, if I were to find these high, significant, the President of the United States, among others, liable for infringing core constitutional rights on such a truncated record, it will always be believed that this Court didn't put it aside, as I've asserted, all the attorney stuff I could put aside. I was asking those questions. And I'm not going to be put in that position. I should recuse and we'll start over in accordance with the, um, decisions of the Court of Appeals, which of course I will follow scrupulously.

So if I've made that mistake, um, I'd seriously considering recusal. But I don't hear anyone saying that. Now maybe I'm mistaken.

MS. CONLON: No, your Honor.

THE COURT: Yes? Mr. Kanellis, before I take the recess.

MR. KANELLIS: Just briefly, your Honor. That instruction we will plan on presenting four witnesses tomorrow, one of them testifying from London.

THE COURT: Oh, he was the one from London. And that's fine, that's worked well.

MR. KANELLIS: Thank you, sir.

THE COURT: All right. 20 minutes, we'll recess. Thank you.

THE CLERK: All rise.

(Recess, 10:25 a.m.)

(Resumed, 10:55 a.m.)

THE COURT: The Court takes this opportunity, on the record, in the presence -- in open court, in the presence of counsel, to accept gratefully the invitation of the Court of Appeals to address the, um, mandamus petition both generally and expressly to address the issue of waiver with respect to that petition.

I'm going to start by, um, making a request to the Court of Appeals. I'm not going to argue in any way the

substance of the petition.  That's for the parties.  The Court's conduct is all a matter of record.  And the transcript governs and is more, um, important than anything I say now.  But I'm going to start with the request, simply as a matter of case management, that I would make of the Court of Appeals.  And it is this.

I request the Court of Appeals to lift the stay, though I express no opinion on the disposition of the petition for mandamus, and it might well, um -- it's entirely up to the Court of Appeals, it might well make sense to let the petition survive so that it may have the benefit of further proceedings in this court.

But I would ask the Court of Appeals to lift the stay so that the evidentiary portion of this first phase of this jury-waived trial might complete.

We are in the, um, second week of a two-week -- 9-day trial, and once that trial is over, or the evidentiary portion is over, it's appropriate for this Court to sketch what I anticipate will be the necessary further proceedings.

This is a case -- and I know the Court of Appeals appreciates this, but this is a case where intent and motive play a significant role, and once the evidence is fully before the Court, it's the Court's intention to take the matter under advisement.  This is not a case

where even as to a portion of the case the Court expects that, because of the evidence, to be in a position to make any ruling from the bench, rather the Court expects to take the case under advisement, seek, um, requested findings and rulings from all parties, carefully review the record, and then issue a full written opinion.

The actual likelihood of that opinion emerging before September is unlikely.  So the urgency to fully decide the, um, petition is, um, not grave.  Given the fact that what's done is done, the plaintiffs have access to the material which the Court deemed appropriate to subject to cross-examination during the trial, and I adhere to that decision and expect to adhere to it, subject to a proper, um, a claim of privilege during the course of the remaining proceedings.  And I'll speak to that in a moment.

And one can anticipate, of course, that as this is only the first phase of this case, if the case were to resolve in favor of the defendant public officials, then of course the plaintiffs would have the right to a plenary appeal.  Contrary-wise, if the case were, at least on what I'll call the "liability phase," resolved against one or more, and I treat them separately, of the defendant public officials, um, that would afford an opinion -- that would afford a place for an

52

interlocutory appeal, should the Court of Appeals wish to evaluate the propriety of that decision while this Court wrestled with the very real problem, even if that's how it were to play out, of redressability, something this Court has not addressed in the -- its hearings thus far.  So that's the Court's approach to the management of this case.

Let me then, without arguing the point, um, explain the Court's position with respect to matters to be considered on the petition for mandamus.  And I think it's important to understand that the Court, and I believe the parties, place the documents in question, because at bottom, this is an issue over evidentiary rulings mid trial as to certain documents produced.

I separate the documents into three buckets.  What I've called the "core documents," these documents are documents that evidence the transmission of materials about certain target subjects, which I've required the plaintiffs to designate, which they are arguing are exemplars of their so-called "ideological deportation policy."  The Court of Appeals will understand that the defense asserts there is no such policy and that the proceedings of the government agencies were lawful in every relevant part.

So the core documents are the "ROAs," so-called,

and transmittal letters, um, e-mails commenting thereon, that were transmitted from the Department of Homeland Security to the Department of State, specifically to the Bureau of Consular Affairs, and certain of those, the transmittal letters that so transmitted them, and, um, thereafter the "decision memos," so-called by this Court, that the Director of the Bureau of Consular Affairs transmitted most, but not all, of the packet to the Secretary of State for decision, as required under the law.

The actual interplay is -- and the standard procedure is best illustrated in a chalk that the Court has marked HN, and will attach to the cover letter sent to the Court of Appeals, which, um, so far as this Court can see, accurately describes the standing procedure of both executive departments in handling matters.  It of course does not answer the key question which concerns the content of the materials so transmitted.  So those core materials are the materials that I understand the petition to center upon, and I'll come back to them.

There are two other packets of materials that I transmitted in bulk to the Court all together, but I've broken them out for this discussion.  As to one document, which I'll call Exhibit A, the government has properly, and the Court recognizes the proper --

"proper" in the sense that I recognize that it's been properly asserted and not waived, the government has asserted an Executive Privilege. That's a, in this Court's eyes, a difficult issue and one the Court has not resolved and which the Court understands it is free to resolve as the case goes on. So it's appropriate to indicate to the Court of Appeals what I've told the parties about how it will be resolved.

It seems to this Court that there are three possible resolutions. First, that the Court resolves that the specific document in question is subject to an Executive Privilege. If it is, whenever the Court makes that determination, it physically forthwith will return the document to defense counsel and make a notation on the record.

The second possibility is that, without deciding whether the document is, um, subject to an Executive Privilege, the Court, as it comes to analyze the case -- I've read the document and I largely understand it, um, it makes no difference to the decision and the Court needs not cite it. If that is, um, decided, the Court will immediately return it to the defense counsel and again make a notation on the record.

The third possibility is that the Court, um, rejects, overrules the assertion of an Executive

Privilege and also decides that the document, which the Court has thus far characterized as "peripherally relevant," is in fact relevant to some conclusion the Court determines to make.  In that case, if the -- if this present petition were, um, still pending, a dispute over this document might be beholden to that petition.  And I've told counsel, if I make that decision, I will stay it for 7 days so that they may take action with respect to that document.

The third packet of documents are documents as to which I have now allowed privileges to be asserted, and they have been, but which will not figure in the, um, oral testimony as no further documents are going to be produced to the plaintiff -- the plaintiffs by the Court, but which all parties agree the Court may look at, determine privileges, as it goes forward, and I shall do so.

Again, if I decide to rely upon and cite a document, implicitly or explicitly, it will be clear that I have overruled the privilege.  If I don't cite the document, it, um -- no ruling is necessary and those documents no longer figure in the case.

The written -- were a decision on the petition of mandamus -- for mandamus to await either appeal or allow an interlocutory appeal, again that could all be

reviewed in the ordinary course, and evidentiary error will be reviewed, and of course it is, as to whether it makes a substantial difference in the outcome.  And I would have the liberty of, on a full record, to make the findings and rulings that, um, I believe either have or have not been proved by a fair preponderance of the evidence.

So let me conclude simply by focusing on the core documents and reiterate -- which do seem central to the issues raised by the petition for mandamus, and, um, respond directly to the Court's use of the word "waiver," which the invitation expressly sought the Court's further explanation.

The use of the word "waiver," upon reflection, was infelicitous, so, um, it caused no prejudice to anyone, because the Court followed it up with an explanation. Here is the Court's view of what has happened.

The -- during a discussion on the plaintiffs' motion to compel certain documents for, um, which the plaintiffs claim were part of the record of decision of its so-called "ideological deportation policy," the Court declined to, um -- the Court denied the plaintiffs' motion.  But did say -- and again the transcript of what I actually said at the time governs, but I'll characterize it, said, "But I would receive

documents as to which the law-enforcement privilege was asserted and I would honor it."

Now again the transcript governs.  What happened happened, was that ultimately over 300 documents were submitted to the Court where the defense asserted not only the law-enforcement privilege, but various privileges, and, um, took, with respect to -- when you look at these documents, a very aggressive, um, position.  The Court's -- the Court's review of the documents became more, um, thorough as trial approached and as the acting trial became to the front burner and trial commenced, and the Court, as to these core documents, um, came to the conclusion that the law-enforcement privilege was inapplicable and was asserted extraordinarily overbroadly.  The Court therefore was in a quandary.

Should, having overruled the -- that privilege, should the documents be disclosed to the defense?  And the Court determined, to have the fairest possible trial, that such disclosure was in the interests of justice, and I did disclose it.  Disclose them.

Various minor issues with respect to the -- I shouldn't call them "minor," but with respect to those -- to that disclosure have been worked out, I believe, to the satisfaction of the parties.  The

documents in their raw form I anticipated and expected redaction of e-mails and telephone numbers. The defense wants more. The, um -- there was indeed one reference to something that, in all fairness, in fact bore on the law-enforcement privilege, despite the Court's ruling. That was corrected by full cooperation between all parties, and the proper redaction made.

I say the use of the word "waiver" was infelicitous because the Court did ask the defense to submit the documents with respect to which it claimed a law-enforcement privilege. The government now says that they were -- they don't say this expressly, but their position is they were snookered, and I got the documents just to disclose them. Well that's not so. I certainly never conceived that anything I said could be thought to estop the Court from making proper rulings with respect to the documents. And again, the transcript will govern. But it's the Court's position that proper rulings have been made.

One last point which, um, I state again simply to be of assistance to the Court of Appeals. Today the parties and the Court have had a very productive discussion, the full transcript is of course available to the Court of Appeals, and I recite only determinations that I believe I am still authorized to

make with respect to these core documents. And I have made the following.

Actually I've made the following with respect to the assertion of the attorney-client privilege. Having reviewed the documents and the arguments, I do rule that the attorney-client privilege has been waived. It simply is inapplicable in a situation where counsel has provided documents to the factfinder, um, on the theory that these documents are relative -- are relevant to the decision, as certainly the core documents are. That constitutes a waiver of the attorney-client privilege, and the Court, less there be any doubt about it, so rules.

In one respect the Court sustains the, um, claim of deliberative process privilege and I have sustained it as to, um, certain provision of legal advice by attorneys in certain e-mails that form a portion of the core documents. Beyond that sustaining, after discussion with counsel, I make no further rulings as to the deliberative process privilege, or any other privilege, as to the core documents. And, um, I won't say it's by agreement, but we've worked out that if permitted to continue the trial, I will make what the Court considers appropriate rulings on a question-by-question basis.

Essentially the issues relate to the Director of the Bureau of Consular Affairs, Mr. Armstrong, whose testimony had just commenced cross-examination when the stay, um, was transmitted, and a Mr. Watson, who wrote, um, the transmittal letters from the Department of Homeland Security to the State Department.

One other thing is significant and I will state it. I understand that whatever ruling the Court makes as to cross-examination in the course of the trial, the Court is empowered, without objection by the government, to review all the records in its possession, make proper privilege rulings, and rely upon those which it rules the privilege or qualified privilege does not apply.

With those explanations, which I truly hope are helpful, the Court will respectfully submit this transcript, just as soon as I get my hands on it, to the Court of Appeals, respectfully and with appreciation for being given the opportunity to comment on these proceedings.

All right. So much for reporting to the Court of Appeals.

Is there anything else we should discuss before tomorrow at 9:00?

MR. ABDO: No, your Honor.

THE COURT: The defense?

MR. KANELLIS:  No, your Honor.

THE COURT:  Thank you.

All right, 9:00 tomorrow morning.  It's good to see you all.

We'll recess.

(Adjourned, 11:20 a.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Monday, July 14, 2025, to the best of my skill and

ability.




/s/ Richard H. Romanow 07-14-25
_____
RICHARD H. ROMANOW   Date