UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 82

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

* * * * * * * *

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, July 15, 2025

* * * * * * *

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
   Knight First Amendment Institute at Columbia
   University
   475 Riverside Drive, Suite 302
   New York, NY 10115
   (646) 745-8500
   E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
   Sher Tremonte LLP
   90 Broad Street, 23rd Floor
   New York, NY 10004
   (212) 540-0675
   Email: Cgans@shertremonte.com
   For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
   DOJ-Civ
   P.O. 878
   Ben Franklin Station
   Washington, DC 20044
   (202) 616-9123
   Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
   United States Attorney's Office
   1 Courthouse Way, Suite 9200
   Boston, MA 02210
   Email: Shawna.yen@usdoj.gov
   For Defendants

                          I N D E X


 WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS


 WILLIAM CROGAN   (By Zoom)

    By Ms. Safavi (By Zoom)5

    By Ms. Conlon                      33


 PATRICK CUNNINGHAM

    By Ms. Santora        39

    By Mr. Tremonte                    63


                       E X H I B I T S

                       (None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT:  Good morning.  As I've allowed internet access to these proceedings, let me say if you are attending this session of the court via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these materials.

It is very important that you keep your microphone muted.  If you do not, I shall have to cut off your access.

I believe we're ready to go.  The first witness is remote.  And if the witness is available, let's swear the witness.

(WILLIAM CROGAN, sworn.)

THE CLERK:  And can you please state your full name and spell your last name for the record.

THE WITNESS:  My name is William Crogan.  My last name is spelled C-R-O-G-A-N.

THE COURT:  Thank you.


* * * * * * * * * * * * *

WILLIAM CROGAN

* * * * * * * * * * * * *

DIRECT EXAMINATION BY MS. SAFAVI:  (By Zoom:)

Q.   Good afternoon, Mr. Crogan.

       (Interruption by Court Reporter.)

       THE COURT:  Just a moment.  The Court Reporter needs you to state your name again.  And I'm talking to the attorney, Ms. Safavi.

       Would you state your name so the Court Reporter may make a complete record.

       MS. SAFAVI:  Sure.  My name is Nancy Safavi.

       THE COURT:  And you are an attorney for the government?

       MS. SAFAVI:  Yes.

       THE COURT:  And now you may proceed.

       MS. SAFAVI:  Thank you.

Q.   Mr. Crogan, good afternoon.  I'd like to ask you some questions about your background and your employment with the U.S. government.

       When did you first start working for the government?

A.   I began my career with the government in 2004 when I was hired by Homeland Security Investigations.

Q.   And why did you decide to enter into a career with the federal government?

A.   I wanted to work in public service and work as a

criminal investigator.

Q.    And what was your first job with the federal government?

A.    As a Special Agent with HSI.

Q.    And where were you located?

A.    I was assigned to Philadelphia, Pennsylvania.

Q.    And what were your day-to-day duties in that position?

A.    I worked as a Special Agent and I was assigned to a narcotics investigation group where I investigated narcotics smuggling and other violations related to drug activity.

Q.    And how long were you there?

A.    I worked in Philadelphia for 12 years where I was also promoted to Supervisory Special Agent where I also investigated financial crimes as well as crimes against children.

Q.    Okay.  And then what was your next role?

A.    I was transferred to headquarters for Homeland Security Investigations in Washington D.C. where I worked in multiple capacities including an Operations Chief for the Northern region of the United States.  I worked as a liaison for the U.S. Department of Justice. And I also worked in our International Operations Division.

Q.    And, um, how long were you there?

A.    I was assigned to Washington D.C headquarters for approximately 4 years.

Q.    And then, um, where did you go after that?

A.    After my headquarters tour, I was assigned to Homeland Security Investigations in New England where I worked as an Assistant Special Agent in charge, which assigned me responsibility for HSI operations in the states of Vermont, New Hampshire, and Maine.

Q.    Okay.  And, um, how long were you there?

A.    I was assigned in the ASAC role for approximately 5 years.

Q.    Okay.  And where did you go after that?

A.    I recently reported to HSI International Operations and I'm working at the embassy in London in the United Kingdom.

Q.    And what is your current title?

A.    Attache.

Q.    And what are your day-to-day duties as an HSI Attache?

A.    I represent HSI's interests, as well as the Department of Homeland Security, here at the embassy with the Department of State, and I work as a liaison with members of the United Kingdom's law-enforcement community.

Q.    Okay.  So now I'd like to ask you about the training that you've received throughout, um, your service as an agent.

What was the first training that you received when you, um, entered on duty?

A.    The first training I received upon duty was attending the Federal Law Enforcement Training Center, where HSI runs its academy, which is approximately 6 months long, and it introduces instruction on constitutional law, criminal justice matters, and instruction on HSI policies and procedures.  The goal of the academy is to train future Special Agents to work in the capacity as criminal investigators.

Q.    Okay.  And after that, um, what other types of training have you received?

A.    I've received different types of training throughout my career, and it's maybe prompted by an assignment to a particular investigative group.  I've received training in advanced financial crimes and fraud, in asset forfeiture, I've received training in cyber crimes and investigations, as well as national security matters.  I've also attended multiple trainings for management and leadership.

Q.    So you have been trained in, um, basic law-enforcement techniques and HSI procedures and

protocols?

A.    Yes.

Q.    And is the training continuous?

A.    The training is, um, periodically introduced per policy.  So some policies by HSI require maintenance and proficiency on a regular basis to be displayed for the use of firearms.  Or there's other regular trainings regarding other policies that occur throughout the career.

Q.    So how often would you say that you received training?

A.    Regularly.

Q.    Okay.  And, um, how long were the trainings usually?

A.    A training can take many shapes and forms, sometimes it can take place over an hour, and it can be in a classroom environment or online.  Or it can take place over a matter of weeks in a more intensive classroom instruction environment as well.

Q.    And, um, throughout your 20 years of federal service and receiving, um, these various trainings on, um, protocols and procedures, has anything substantially, um, changed in terms of how to make an arrest?

        MS. CONLON:  Objection.

THE COURT:  No, overruled.  We'll let him answer.

A.    HSI's practices in terms of affecting arrests have stayed relatively stable throughout my career.  The fundamentals of what HSI does to maintain safety and accountability, in my experience, has been very consistent.

Q.    Okay.  And this would be the case as well as for the past 5 years?

A.    Yes.

Q.    And what about the past 6 months?

A.    Yes.

Q.    Okay.  So now I'd like to turn to your role at HSI.

Currently as an Attache, um, are you a supervisor?

A.    Yes.

Q.    So how many individuals do you supervise?

A.    I supervise approximately 12 to 14 employees that are based in the UK and, um, other parts of Western Europe.

Q.    And when you say "employees," are they all Special Agents?

A.    It's a mix of employees.  It's mostly Special Agents as well as some locally-employed staff.

Q.    Okay.  And prior to this when you were an ASAC, did you supervise employees?

A.    I did, yes, I supervised approximately 80 employees across the three-state region for which I was responsible for.

Q.    Okay.  And of those employees, were they all Special Agents?

A.    No.  The -- similar to by current position, it's a mix of different employees and positions.  In the capacity as an ASAC, the majority of the employees were HSI Special Agents, but we also host Task Force Officers, which are police and law-enforcement officers hailing from different police organizations, as well as support staff, which includes Mission Support Specialists, clerical staff, and analysts as well.

Q.    So in supervising the Special Agents, both as an ASAC and as an Attache, do all of the Special Agents receive the same training you have on law-enforcement techniques?

A.    Yes.

Q.    Okay.  And you are aware of those, correct?

A.    I am.

Q.    Okay.  And, um, what steps do you take to insure that those protocols and law-enforcement techniques are followed by your Special Agents?

A.    It's my responsibility, as a leader and a manager, to review operational planning, to engage in regular

discussions with, um, agents and supervisors under my command as to their activities and what they're planning.  So this takes shape in, again, different forms, in regular conversations, but it's also prompted by law enforcement actions that are planned, which require us to, um, make plans, organize, um, manpower to affect operations.  So all of these things take place very regularly, almost on a daily basis.

Q.    Okay.  And in part of those operations you're describing, um, when you were an ASAC and currently as an Attache, um, do any of your Special Agents conduct Title VIII investigations?

A.    Yes, as an ASAC, Title VIII investigations were part of our investigative workload.

        THE COURT:  What's a "Title VIII investigation"?

        THE WITNESS:  Your Honor, "Title VIII" is a reference, in our vernacular, to the INA.  So any, um, either criminal or civil immigration violation.

        THE COURT:  Thank you.

Q.    Okay.  And so now I'd like to ask you, um, some specific questions about HSI's policies or protocols for making arrests.

        Would you explain, for the Court's benefit, what "operational security" is?

A.    Yes, "operational security" can be a broad

concept, but it's essentially the priority to protect the, um, the presence of an operation or an initiative from opponents, or a bad actor.  So when HSI talks about "operational security," we talk about discretion, and we talk about, um, keeping or protecting government information.  So the presence of an investigation may not be revealed unnecessarily or before the government wants to make an official act.  That's what "operational security" means to me.

Q.    Okay.  And so Agent Crogan, you mentioned a "bad actor."  Do -- in terms of operational security, do Special Agents factor into account, um, a subject's history of violence?

A.    Yeah, as law-enforcement officers, when we're conducting an investigation, um, many times a, um, person of interest or the subject of an investigation may already have a criminal history that, um, details crimes of violence.  We also investigate people that may have never been arrested or convicted of a crime, but are participating in violence.  And whether or not the indication comes from a criminal record or comes from an observation or information we received, one of the factors we, um, prioritize and consider is any and all information we have about someone's indicators for violence, about things they do, or things they may have

said, or planned to do.  We're very vigilant for that because then that informs how we would handle a potential interaction with said subject.

Q.    So in terms of, um, how you would handle a specific subject, are there variations then based on the specific circumstances?

A.    There are, there are many variables, and it can be influenced also by environmental factors.  If someone were to be placed under arrest or planned to be placed under arrest, the location is also a critical factor. The number of other subjects or people around or maybe aligned with the person is a factor as well.  And these are all things we consider.  Because, um, it's a priority for myself and other HSI agents to conduct our business in a safe and accountable manner.  No one wants to get hurt.

Q.    You mentioned conducting an arrest in a safe and accountable manner.

So what would be the circumstances for an agent to use handcuffs during an arrest?

THE COURT:  Well wait a minute.

A.    These --

THE COURT:  Wait a minute.  I'm allowing all of this, but it seems somewhat theoretical, now you're asking subjunctive questions, "What would be the

circumstances?"  Let's tie it to something, and then I'll allow you to expand it into these areas.

Go ahead.

MS. SAFAVI:  Yes, your Honor.

Q.    Agent Crogan, you familiar with Mr. Mahdawi?

A.    Yes, I am.

Q.    Were you -- did you play a role in his arrest?

A.    I was present for Mr. Mahdawi's arrest and I was aware of the investigation of him and the planning for his arrest.

Q.    In terms of planning for an arrest with Mr. Mahdawi, um, what factors would an agent consider for using handcuffs?

THE COURT:  No, I have a problem with "would." What factors did or were considered?  And of course I'll let you have that.

MS. SAFAVI:  Okay, thank you, your Honor.

THE COURT:  In this case.  Do you want to ask it? Let's ask it.

In this case what factors were considered, sir, with respect to the use of handcuffs?

THE WITNESS:  Yes, your Honor.

A.    The factors that contributed to the use of handcuffs were our training and experience as agents, the policy and practice of HSI to restrain individuals

who were being arrested for violations of law, and the transportation, the movement of the subject from one location to another.

When we arrest somebody, we, um, put them under restraints, typically it's a set of handcuffs, and that subject is patted down. We check a subject to make sure they don't have any dangerous items on their person, that they could use to hurt themselves, or the officers, or a member of the public. And it's also our policy, when a subject who is under arrest is transported, they are restrained, during that transportation, to again protect subjects and the officers.

Q. Okay. What factors did you consider in, um -- actually withdrawn.

How many agents, including yourself, were a part of Mr. Mahdawi's arrest?

A. I don't recall the exact number, but I was certainly present. I would say approximately 10 to 15.

Q. Okay. What factors did you consider in determining the number of agents who would be involved in the arrest?

A. The -- the location of the arrest. And again, as I mentioned earlier, the environment that the arrest is anticipated to take place in is a major factor. And the location was a -- a public, um, building and a CIS

office that, um, had a three-sided parking lot, and, um, it required, um, elements of surveillance, so we could observe the exterior of the building as well as an arrest team that would be located inside the building. So these are all factors that contribute to the approximate number of law enforcement officers that would be present for the -- for the operation.

Q.    Is that a typical number for an arrest?

A.    It's hard to say what's typical for an arrest, but for one subject and a, um, physical location of that type, in my experience that is consistent, um, that number.

Q.    What factors, um, were considered, um, in terms of the agents deciding to wear masks during the arrest of Mr. Mahdawi?

A.    The use of masks, um, is a decision that's made by the Special Agent or the officer at -- you know at the time of the planning of the arrest.  And this is a more common practice, in my experience it's occurred in the past, that it's not necessarily a new thing in my experience.  We've traditionally done this for undercover agents who may be acting or are acting in an undercover capacity and we don't want to betray their true employment as law-enforcement officers, but they also have to go out and help out and perform an arrest

and --

THE COURT:  Who makes the decision here?

THE WITNESS:  The individual employees, your Honor.

THE COURT:  And how was that choice conveyed to them?

THE WITNESS:  It was articulated to me, your Honor, by the individual employees because of a concern of their faces being put in the public eye and being victims potentially of doxxing or harassment, because these employees --

THE COURT:  How many of them expressed that concern?

THE WITNESS:  For this operation?  I'd say two or three of the agents expressed that concern to me.

THE COURT:  And at the time the operation went down, how many were masked?

THE WITNESS:  Two were masked, your Honor, and a third agent, I recall, pulled a baseball cap low over his head and put a hood over his head.

THE COURT:  Now you talked about the instance of this in the past and you gave, as an example, people you were using undercover.

When before this -- and I don't need specifics, we're focused on this case, but you were the ASAC there

for a while.

When before this, um, were masks used in an arrest?  And we're not going into the subjects, I just want to know when was the last time before this?

THE WITNESS:  I recall in, um, years past.  So within the 5-year time period, your Honor, as working as an ASAC.

THE COURT:  Thank you.

THE WITNESS:  Yes, sir.  I recall an undercover agent who was under my command.

THE COURT:  But that's an undercover agent.  Other than undercover agents, when before this?

THE WITNESS:  I recall other instances in the more recent past where agents are out in the public eye conducting other operations and media was anticipated and they were masked there.  These are multiple occasions since I was an ASAC.

THE COURT:  All right.  And am I correct in assuming that these were Title VIII investigations, Title VIII arrests?

THE WITNESS:  Yes, your Honor, some of these were Title VIII, and some of these were also criminal investigations, like narcotics investigations.

THE COURT:  And in narcotics investigations, um -- and again I'm not wanting any specifics, but in

narcotics investigations when you, um, mask-up, um, when was that done, um, other than in undercover situations, in the past 5 years, while you were an ASAC here in New England?

THE WITNESS:  I only specifically remember the undercovers, your Honor.

THE COURT:  Thank you.

All right, go ahead Ms. Safavi.

MS. SAFAVI:  Thank you, your Honor.

Q.    During the arrest of Mr. Mahdawi, did the Special Agents wear, um, plain clothes?

A.    Yes, the Special Agents wore plain clothes, which is a common and frequent practice for an operation where the individual was going to be observed before the arrest was initiated.

We have some operations, um, for the Court I would explain it as a search warrant or arrest warrant execution of a residence with a warrant in hand, and the agents may not be in plain clothes, they may be donning their garments that are labeled with "Police."  But very frequently, and in many different forms of investigations, we don't have the luxury of identifying the target or the subject positively right away, and we have to, um, surreptitiously or discreetly observe from a distance or in plain clothes.  And --

THE COURT:  I think I understand, and forgive me for the interruption, but you used the word "search warrant."

On those occasions where, um, HSI officers, which you supervise, Special Agents, are executing a search warrant, where does the search warrant come from?

THE WITNESS:  A court of law, your Honor.

THE COURT:  Yes.  All right.

Now when you are, um -- well let's come to Mr. Mahdawi's situation.

When Mr. Mahdawi was taken into, um, custody, what was the authority for taking him into custody?

THE WITNESS:  Your Honor, the authority was conducted with an I200 arrest form, which is a civil and administrative arrest form, that, um, was produced after a body of facts were reviewed by the ICE, the Office of Principal Legal Advisor, and --

THE COURT:  Yeah, actually, thank you, that answer is very helpful to the Court.  Let me, um -- really I just want to repeat it to you and see if I understand it, because I have not understood this.

Because this is a civil proceeding -- though obviously you have the right to detain, deprive someone of their liberty, there's a form, and it's an ICE 200 form?

THE WITNESS:  Yes, your Honor.

THE COURT:  And that form, um, goes to -- it is reviewed, you said, by an ICE legal officer?

THE WITNESS:  Yes, your Honor.

THE COURT:  Okay.  Now, um -- and -- all right, that's helpful.

Go ahead, Ms. Safavi.

MS. SAFAVI:  Okay, thank you, your Honor.

Q.    In terms of Mr. Mahdawi's arrest, did the agents use a marked vehicle?

A.    No, HSI does not typically have or use marked vehicles, and again akin to the same principle of plain-clothes operations, because criminal investigators are not a uniformed police service who respond to or react to calls for service, whereas it's implied that a law-enforcement officer needs to very clearly and overtly label and present as a law-enforcement officer. We are investigators, and by that nature much of what we do starts out in a discreet and again surreptitious manner.  So the vehicles are much of the same.

We do, um, equip our vehicles with lights and sirens that comply with local codes of law, and those are used in enforcement situations when we need to, um, basically identify ourselves in the vehicle as law-enforcement officers.

Q.    So in terms of when the Special Agents, um, make an arrest, when would they identify themselves as law enforcement?

THE COURT:  Well again I'm having trouble, Ms. Safavi, with the "would."  We're focusing on Mr. Mahdawi's arrest, properly, and if he knows, I'd like to know when did they?

MS. SAFAVI:  Okay, so I'll rephrase.

Q.    When did they identify themselves as law enforcement?

A.    Immediately.  I was present for, um, our encounter with Mr. Mahdawi at the conclusion of his interview with CIS and I identified myself as an HSI Special Agent, I presented, um, my credentials, and I was accompanied by three other Special Agents who presented their credentials, and this occurred in a small office inside of the CIS work space.

THE COURT:  When you say you "presented your credentials," can you describe what that means?  Is that an identification card?  Do you have a badge?  Both? Don't let me suggest.  You tell me what you meant by that.

THE WITNESS:  Yes, your Honor.  When I refer to "credentials," I refer to my agency-issued ID card and badge that corresponds to my HSI identification number.

THE COURT:  Are you able to tell me whether the other Special Agents present had the same identification that you just described you had, and produced it?

THE WITNESS:  Um, I don't recall exactly, your Honor, but what I do recall is that it was clear that the other three agents were with me.  And, um, because we were in plain clothes, um, sometimes agents wear belt badges, which is essentially a badge affixed to someone's waist.

THE COURT:  And these folks who now, in this small office, how many of them, if any, were masked, and were you masked?

THE WITNESS:  No, sir, I was not masked.

THE COURT:  How about the agents?

THE WITNESS:  I recall that, um, 2 of the 4 of us eventually placed masks on.  I don't recall exactly when they donned their masks.  But, um, they -- I'd presume they placed them on when they were -- between the time when they left the office and when they were outside in a public area where the HSI transport vehicle was waiting.

MS. CONLON:  Objection, move to strike the last portion as speculation.

THE COURT:  No, I'm going to let it stand.

And proceed, Ms. Safavi.

MS. SAFAVI:  Thank you, your Honor.

Q.    Mr. Crogan, um, was there -- I'm sorry, Agent Crogan, were there any, um, other things, um, that you, um, participated in in terms of Mr. Mahdawi's arrest?

THE COURT:  I don't understand the question?  Well evidently he does.

(Laughter.)

THE COURT:  Well if you understand it, sir, go ahead and answer.

THE WITNESS:  Yes, your Honor.

A.    I understand it to be as my involvement was part of the planning and the supervision of the planning for Mr. Mahdawi's investigation, which came first, um, and eventually the arrest, when that was authorized.

Q.    And when did you first learn of Mr. Mahdawi, when did he first come to your attention?

A.    Um, approximately mid March of 2025.

Q.    And, um, did you receive a communication informing you about this subject?

A.    Yes, I did.  My supervisor communicated to me that the State Department may be providing a finding against Mr. Mahdawi, and then eventually a finding was transmitted to me via e-mail, where I recall there was an attached document, um, produced by the U.S. Department of State, referencing Mr. Mahdawi.

Q.    Was there any other communication involving Mr. Mahdawi that you received?

A.    Yes, I also, um, engaged with the HSI New York office, um, on Mr. Mahdawi, and the HSI New York office provided information about Mr. Mahdawi's, um, alleged activities and engagement with, um, police and law enforcement in the past.  And, um, yeah, I believe that's, you know, most of what I recall.

Q.    And after receiving --

THE COURT:  Wait a minute.

And how did the New York office communicate this data to you, sir?

THE WITNESS:  The New York office provided information, your Honor, regarding, um, Mr. Mahdawi's interactions with the FBI of being --

THE COURT:  My question was not for you to characterize it, but how did you get it?  E-mail?  Snail mail?  Telephone call?  That type of thing.

THE WITNESS:  Yes, your Honor.  I received it principally by e-mail and also phone calls.

THE COURT:  Thank you.

Q.    And after receiving the communications, what did you do next?

A.    I ensured that agents at the HSI Vermont office were proceeding with their investigation and following

up with the information that came from New York.

Q.    Was Mr. Mahdawi, um -- was there surveillance operations?

A.    There were -- inside of that information package, if you will, there were addresses for Mr. Mahdawi in Vermont.  I believe that's why we were contacted, because the government records had addressed this for Mr. Mahdawi in New York and in Vermont.  And as a matter of routine investigative procedure, agents checked the addresses in Vermont, um, trying to determine if Mr. Mahdawi was present in the district.

Q.    And, um, when did you -- what date did you make the arrest?

A.    The arrest of Mr. Mahdawi occurred in mid April of 2025, I believe April 14th.

Q.    And where did it occur?

A.    It occurred at the CIS office in Colchester, Vermont.

Q.    Okay.  And, um, in terms of Mr. Mahdawi's arrest, um, as the supervisor, was the arrest consistent with HSI's procedures and policies?

A.    Yes, it was.

THE COURT:  Did I hear an objection?  No.  Very well.

Proceed.

MS. SAFAVI:  Thank you, your Honor.

THE COURT:  Go ahead, Ms. Safavi.

MS. SAFAVI:  Thank you, your Honor.

Q.    And, um, in your oversight of the arrest, um, was there anything inconsistent, um, that the agents did in terms of arresting Mr. Mahdawi?

A.    Um, no, not that I recall.

Q.    And, um, were you -- did anyone ever communicate to you or ever suggest that Mr. Mahdawi's arrest was because of his pro-Palestinian views?

MS. CONLON:  Objection.

THE COURT:  No, overruled.

A.    No, I don't recall that either.  No.

Q.    Did anyone ever tell you or suggest that Mr. Mahdawi's arrest was, um, based on his criticisms of Israel?

A.    No.

Q.    Did anyone ever communicate to you or suggest that Mr. Mahdawi's arrest is based on his political views?

A.    No.

MS. CONLON:  Objection, asked and answered.

THE COURT:  Overruled, and his answer, "No," may stand.

Q.    And, um, in terms of, um, after the -- Mr. Mahdawi was arrested, in your role as, um, ASAC, are you

involved with any of the decisions regarding the detention of Mr. Mahdawi?

A.    No, HSI relies on other elements of ICE and Homeland Security to maintain custody or detention of someone who's arrested for a civil immigration violation.

THE COURT:  Well let me just follow that up because I'm not clear what you know.

So you make the arrest in the little CIS office there in Colchester, Vermont.  You, um -- he's handcuffed.  You take him out to a -- to an HSI vehicle. A couple agents put masks on because you go into the public area.  And then what happens to your --

THE WITNESS:  Yes, your Honor.

THE COURT:  Wait a minute.

THE WITNESS:  Yes, your Honor.

After Mr. Mahdawi is placed, escorted to a vehicle, the vehicle drives to the HSI office and --

THE COURT:  Which is where?

THE WITNESS:  Which is in South Burlington, Vermont.

THE COURT:  Okay.  All right.

THE WITNESS:  I --

THE COURT:  Do you -- all right, keep going.

THE WITNESS:  Yes, your Honor.

Eventually I also travel to the South Burlington office, um, and Mr. Mahdawi is presented paperwork, um, to finish essentially what we term as "processing," his paperwork is processed, and he is then transferred to the custody of Enforcement and Removal Operations, commonly referred to as "ERO."

THE COURT:  So as -- as HSI is organized here, um, evidently that -- that ends your part of it, and Enforcement and Removal Operations takes over, is that -- do I have it right?

THE WITNESS:  Yes, your Honor.

THE COURT:  And where did that -- to your knowledge, this is what you personally know.  Where did that take place?

THE WITNESS:  I did not, um, directly observe Mr. Mahdawi's transfer, um, from HSI to ERO, but it's my understanding it happened at the HSI office in South Burlington.

THE COURT:  All right.  So -- and do you know where he went from there?

THE WITNESS:  Yes, your Honor.

THE COURT:  Where?

THE WITNESS:  Mr. Mahdawi, it's my understanding, was transported by ERO, from the South Burlington office, to the airport in Burlington, and they attempted

to fly out of the district.

THE COURT:  Why?

THE WITNESS:  I don't know.  I don't have any involvement with custody location or determination.

THE COURT:  I see.  All right.

Go ahead, Ms. Safavi.  Anything else for this witness?

MS. SAFAVI:  Your Honor, at this time the defendants pass the witness.

THE COURT:  Well I have a question.  I don't know -- I'm going to ask it of the defense team generally.

The written records here, the, um, the ICE 200 form, the State Department authorizations, the e-mails from the New York office, have I got all of those?  Can anyone answer that?  Including Ms. Safavi.

MR. KANELLIS:  Your Honor, I'll do my best.

I'm not sure about the latter, the e-mail from the New York office.  I don't recall that information being even -- yeah, I don't recall that that information is --

THE COURT:  Well he's so testified, and I heard him testify in the plural.  So you're not speaking to that.

But the others?

MR. KANELLIS:  I believe those are -- those are in

the administrative record.  The bases for -- if you're asking what the bases --

THE COURT:  Well the documents to which he referred.

MR. KANELLIS:  I believe they are.

THE COURT:  Thank you.

Ms. Conlon?

Or excuse me?

MR. TREMONTE:  I wish I were as good as Ms. Conlon.  This is Michael Tremonte, your Honor, for the plaintiffs.

THE COURT:  Thank you, Mr. Tremonte, you did just right.  I expected her to be standing there.  I still can see that far.

(Laughter.)

THE COURT:  Mr. Tremonte.

MR. TREMONTE:  Thank you, your Honor.

So at least 2, if not 3 of the 4 depositions, we specifically requested the production of the documents that your Honor is focused on, in addition to other documents that these witnesses have mentioned in connection with their sworn testimony.  Some of the -- a very small subset I believe we have, the rest we do not.  And if it would help the Court, we would be pleased to prepare a list before the end of the day of the

documents that we have requested but still have not received.

THE COURT:  All right.

MR. TREMONTE:  And to be clear, we requested them before testimony today and we did not receive them.

THE COURT:  Well prepare such a list.

Very well.  And it's your witness.

Who's going to -- yes, Ms. Conlon.

MS. CONLON:  Yes.  And, your Honor, I'll question from here since the witness is --

THE COURT:  Of course you may.

MS. CONLON:  Okay.

CROSS-EXAMINATION BY MS. CONLON.

Q.    Good morning, Mr. Crogan.

A.    Good morning.

Q.    Okay.  So going back for a moment.

You were just asked by the Court about, um, what happened to Mr. Mahdawi after you tendered him to ERO and indicated that he was going to be flown out of the district.

He was going to be flown, so far as you know, to Louisiana, right?

MS. SAFAVI:  Objection.

THE COURT:  No, overruled.

A.    Yes, I recall one of the documents I was shown yesterday, that there was an address in Louisiana on custody-type paperwork for Mr. Mahdawi.

Q.    Okay.  Now going back to your learning about Mr. Mahdawi.

When you learned of Mr. Mahdawi, you were told to prioritize his investigation, right?

A.    Yes, I think that's fair to say.

Q.    You were told that by people senior to you in HSI, correct?

A.    That was my understanding from my supervisor.

Q.    Right, the supervising agent or the Special Agent in charge, is that right, that's who supervised you at the time?

A.    Yes.

Q.    And you had multiple follow-up conversations about the status of that investigation with your Special Agent in charge, right?

A.    Yes.

Q.    And it was your understanding that the order to prioritize Mr. Mahdawi came from above the Special Agent in charge, from someone senior to him, correct?

A.    That's the impression I was working under, yes.

Q.    Okay.  Now the decision to arrest Mr. Mahdawi at his citizenship interview was made in coordination with

HSI New York, right?

MS. SAFAVI:  Objection.

THE COURT:  Overruled.

A.    I recall that the HSI New York office made us aware, they shared information about Mr. Mahdawi's appointment they learned from their communications with CIS.

Q.    In other words, HSI New York had looked for him, had not found him, and then let you know that he was going to have an interview at a CIS office in Vermont, correct?

MS. SAFAVI:  Objection.

THE COURT:  Well I do -- that assumes a lot.

Is that what the New York office told you?

THE WITNESS:  No, your Honor.  Um, what I characterize it as the HSI office in New York, and HSI collectively in the New England area, shared information about Mr. Mahdawi as routine practices, and they made me aware of his possible presence at this appointment in Vermont with CIS.  I -- I haven't observed myself, but it's my understanding that, like surveillance and address checks that we performed in the District of Vermont, I also understand it that HSI New York also did address checks for Mr. Mahdawi in their AOR as well.

THE COURT:  Thank you.

Go ahead, Ms. Conlon.

Q.    So you said you learned about his possible presence at the CIS interview.  You say "possible presence" because that was a voluntary decision for Mr. Mahdawi, correct?

A.    I don't know what the decision was for Mr. Mahdawi.  I don't know what he decided.

Q.    It's your understanding that he was invited to attend an interview at the CIS building in Vermont, right, for his citizenship?

A.    I know he had an appointment with CIS that had to do with his immigration process.

Q.    He wasn't brought there in handcuffs, right?

MS. SAFAVI:  Objection.

THE COURT:  Well I really don't know where this is going, it's undisputed that he went there for a naturalization interview or as part of the potential naturalization process.  Now I guess that I get that from, um, the newspapers, but that's what I understand.  And that was the -- so he came there voluntarily.  Unless that's disputed, and I don't think anyone does dispute it, I accept it and as a basis for going forward.

MS. CONLON:  Okay, then I can move on from that.

Q.    Now Mr. Mahdawi entered the CIS building through

the metal detector and security procedures they have in the lobby of that building, right?

A.    Yes.

Q.    In other words, he was processed like any person would be in that building to make sure that he had no weapons on his person?

A.    Yes.

Q.    And Mr. Mahdawi was there with his lawyer, right?

A.    Yes.

Q.    Now after Mr. Mahdawi had gone through security, he and his lawyer were alone in a room with a CIS officer doing the interview, right?

A.    Yes.

Q.    There were no special security precautions taken about Mr. Mahdawi being alone in this room with the CIS agent, right?

A.    No, it's my understanding that it was a routine entry into the states, like you mentioned, anyone else, and he proceeded with his scheduled interviewer meeting.

Q.    And in fact you waited to arrest him until he had done his entire interview to become a citizen, right?

A.    Yes.  We also learned that it was -- he was positively identified by the CIS employee, um, as a matter of the interview.  When they proceed with the interview, the CIS employee checks the identity of the

subject who appears.  So we also knew that by waiting.

Q.    Now to be clear, this arrest was not a criminal violation arrest, right?

A.    No, this arrest was based on the A4(c) citation that came from the Department of State.

Q.    And speaking of that determination, in your 20 years of law enforcement, you have never seen a determination under 4(c) of the INA before, isn't that right?

A.    Yes, I believe so.  Yes.

Q.    You have never seen a memo like the one you received about Mr. Mahdawi from the Secretary of State's Office before, have you?

A.    No.

Q.    You have never seen a removal from the United States based on similar facts to those alleged about Mr. Mahdawi, correct?

A.    I -- I don't recall others.

Q.    Thank you.

        MS. CONLON:  Nothing further.

        THE COURT:  Nothing further, Ms. Safavi?

        MS. SAFAVI:  Um, no, your Honor.

        THE COURT:  Very well.

        Thank you, Mr. Crogan.  And you are excused.

        And the government may call its next witness.

Yes?

MS. SANTORA:  Your Honor, the defendants call Special Agent Patrick Cunningham.

THE COURT:  He may be called.

(Witness takes the stand.)

(PATRICK CUNNINGHAM, sworn.)

THE CLERK:  Can you please state your full name and spell your last name.

THE WITNESS:  My name is Patrick Cunningham, my last name is C-U-N-N-I-N-G-H-A-M.

THE CLERK:  Thank you.

THE COURT:  Ms. Santora, you may proceed.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PATRICK CUNNINGHAM

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DIRECT EXAMINATION BY MS. SANTORA:

Q.    Good morning, Special Agent Cunningham.  Thank you for being here today.

A.    Good morning.

Q.    Where do you currently work?

A.    I'm currently an Assistant Special Agent in charge with HSI Homeland Security investigations here in Boston.

Q.    And how long have you held that role?

A.    About one year.

Q.    What are your responsibilities?

A.    I oversee three investigative groups.  Within those groups there's first-line supervisors and then Field Special Agents as well as Intel Analysts and Task Force Officers.

Q.    When did you begin working for the United States government?

A.    I started as an student intern in 2006 and I became a Special Agent in 2008.

Q.    And you were an intern of HSI?

A.    Correct.  At the time it was "ICE Investigations," but we rebranded to "HSI."

Q.    And where was your first job after you were an intern with HSI?

A.    I was a Special Agent in our San Diego field office.

Q.    What were your responsibilities in that job?

A.    Mainly narcotics investigations.

Q.    Did you receive training before entering into that job?

A.    I did.

Q.    And where did you receive that training?

A.    At the Federal Law Enforcement Training Center in

Brunswick, Georgia.

Q.    And what type of training did you receive there?

A.    All types of training pertinent to the job. Everything from basic investigative techniques to, um, entry tactics, arrest tactics, handcuffing, um, driving, Things of that nature.  Firearms.

Q.    You testified that after that training you worked as a Special Agent in San Diego.  How long did you work there?

A.    I was there from December of 2008 until February of 2018.

Q.    And in 2018, what was your next job?

A.    I transferred here to Boston.

Q.    And what was your role there?

A.    Um, first, it was a Special Agent.

Q.    And following your role as a Special Agent in Boston?

A.    So I was a Special Agent in our drug smuggling group, or strike force, and about 6 months later I became the acting group supervisor of that group.

Q.    And following that, what was your next role at HSI?

A.    I became the full-time group supervisor of that group, um, and then I spent some time as a, um, acting Assistant Special Agent in charge.

Q.    And you were acting in a supervisory capacity in that role?

A.    I was.

Q.    What did you do after acting as an ASAC?

A.    I became the group supervisor of our Cyber Crimes Group here in Boston.

Q.    And following that?

A.    Following that, in November of '22, I took a headquarters assignment in Sterling, Virginia.

Q.    And what was that assignment?

THE COURT:  A headquarters assignment in?

THE WITNESS:  Sterling, Virginia.

THE COURT:  Thank you.

A.    That assignment I was assigned to the National Targeting Center Investigations, um, working mainly as a liaison to Customs and Borders Protection, as well as providing assistance to HSI agents in the field.

Q.    And following your role in Sterling, Virginia, what did you do after that?

A.    I came back here as an Assistant Special Agent in Charge.

Q.    And that's your current role?

A.    Correct.

Q.    All right.  Does your office do work involved in enforcing criminal laws?

A.    Yes.

Q.    Does HSI's work also involve enforcing Title VIII?

A.    Yes.

Q.    What is Title VIII?

A.    Title VIII is immigration law.

Q.    In the time that you have worked for HSI, has HSI always had the authority to enforce Title VIII?

A.    Yes.

Q.    In you time working at HSI, have you made arrests?

A.    Yes.

Q.    Have you supervised people who have made arrests?

A.    Yes.

Q.    And do the agencies supervised to make arrests receive the same training that you describe receiving at --

A.    Yes.

Q.    Are you familiar with HSI arrests, protocols, and procedures?

A.    I am.

Q.    Where are those found?

A.    Um, they're in the Special Agent manual.  There's also a manual, "Specifics for Arrests, Calls, and Procedures."

Q.    Are you agents that you supervise familiar with HSI arrest protocols and procedures?

A.    They would be trained on those, yes.

Q.    Have arrests -- HSI's arrests, protocols, and procedures, changed since you received, um, the training that you described receiving on arrests when you first started as an agent?

A.    Protocols and procedures not so much.  Maybe techniques have changed in the ways that, you know, people are, you know, reapplying handcuffs, or things of that nature, there's been ways that's evolved.  But in terms of procedures and stuff like that, they're, um, mostly the same.

THE COURT:  How has applying handcuffs evolved?

THE WITNESS:  So basically the way that we would be instructed to put a -- a target in a position of disadvantage has changed.  So when I came on the job, we learned to like have their hands out like an airplane and apply a cuff and then bring the cuff to the lower back.  But now we're trained to put the hands behind the head in some cases or -- and sometimes in the field it comes down to just the most effective way to apply the handcuffs.  But the way that, you know, it's trained in training that we're drilled on --

THE COURT:  You're just pointing out that that's --

THE WITNESS:  -- a technique that --

THE COURT:  You're answering as to -- and the idea is to protect the safety of the officers and effectuate the restraint?

THE WITNESS:  Correct.  Correct.

THE COURT:  Go ahead, Ms. Santora.

Q.    All right.  I'd like to talk to you about a particular arrest.

Were you involved in the arrest of Rumeysa Ozturk?

A.    I was involved and aware of it, yes.

Q.    What was your role in that arrest?

A.    So I received the information from headquarters, um, passed down to the chain of command, um, that Ms. Ozturk had had her Visa revoked by the State Department.  And from there my role is mainly to apply resources and, you know, delegate agents on the street and -- and help to delegate agents on the street to locate Ms. Ozturk and effectuate her arrest.

Q.    Um --

THE COURT:  Well let me pause there.

Everyone who has a Visa revoked is not taken into custody, are they?

THE WITNESS:  Everyone?  I'm not sure.

THE COURT:  All right, that's your answer.

But that was the cause that you had been given to take her into physical custody, because she had lost her

Visa?

THE WITNESS:  Correct.  Right, we received information that her Visa had been revoked by the State Department and that was the cause that we went with to take her into custody.

THE COURT:  I understand.

Q.    Generally speaking, when HSI is informed -- well withdrawn.

You said his HSI enforces Title VIII, correct?

A.    Correct.

Q.    And if someone's Visa has been revoked, are they in violation of Title VIII?

A.    Yes.

Q.    So if you are informed that a Visa has been revoked, would HSI have the authority to arrest that person?

A.    If it meets the legal --

MR. TREMONTE:  Objection.

THE COURT:  Well, that's the problem, if it meets the legal standards.  Here's what I understand.  If he's got to the knowledge to correct anything, let me know.

My understanding is that not everyone who has their Visa revoked is arrested.  Now if they don't leave or if there are other reasons, it appears they are subject to arrest and detention and removal.  That's

where I'm starting from, but I have to reflect on that.

Go from there, Ms. Santora.

(Silence.)

THE COURT:  And to come to this case, um, I don't think it's an issue whether the -- there was legal authority to take Ms. Ozturk into custody.  The question is a broader question as to the reasons for all that.

But you go ahead.

Q.   I want to ask you some specifics about Ms. Ozturk's arrest.

First of all, did you act as the supervisor for her arrest?

A.   So, as I mentioned last week, there are -- there were a lot of hands in the fish bowl.  I was a supervisor.  And so, um, at the time, you know, we received the information, I was in a position to delegate that information down to the field, um, and also to, um, socialize what information we knew to be able to effectively put agents on the street and try and locate her.

Q.   Okay.  Stepping back for a second.

So does HSI -- does HSI receive information, um, that Visas have been revoked, generally speaking?

MR. TREMONTE:  Objection.

THE COURT:  No, if he knows.

48

A.    Generally speaking?  I know we received the information in this case.  Generally speaking, I can't answer that.

Q.    Does HSI receive information that people are out of immigration status?

MR. TREMONTE:  The same objection.

THE COURT:  Well we'll see what he knows.

Are you able to answer that?

THE WITNESS:  Well what we'll do is we conduct investigations, HSI's an investigative agency.  So if during the course of that investigation you might learn that someone is out of status as far as immigration goes, that might be something that we would look into further -- into potentially enforcing those violations.

MR. TREMONTE:  Objection.  And I'm going to move to strike.  He's speculating.

THE COURT:  No, we'll let that stand.

Q.    Going back to Ms. Ozturk's arrest.

Were you physically present at the arrest?

A.    No.

Q.    Um, when was she -- do you know when she was arrested?

A.    She was arrested on, I believe, um, it was March 25th, 2025.

Q.    And do you know if agents handcuffed her when she

was arrested?

A.    I believe that they did.

Q.    Do you know why?

A.    Um, per our policy, you know, anyone -- per HIS's policy, anyone that is going to be arrested, whether it be a criminal violation or an administrative violation, would be restrained in handcuffs.

Q.    So everyone that HSI arrests is handcuffed?

      MR. TREMONTE:  Objection.  Mischaracterizes it.

      THE COURT:  No, it may stand.

A.    It's HSI's policy to handcuff those that we arrest, yes.

Q.    And why is that HSI's policy?

A.    Um, officer safety is the main concern really.  As I alluded to earlier, in training we're taught that an individual's hands are dangerous.  Basically it's just to ensure the safety of those involved.

Q.    Were agents present at Ms. Ozturk's arrest wearing masks?

A.    As far as I know, yes.

Q.    Does your office have a policy on agents masking?

A.    There's no policy I'm aware of.

Q.    Are agents allowed to wear masks?

A.    Yes.

Q.    Why are they allowed to do that?

A.    Various reasons.  Um, it's up to the personal, you know, um, choice of the agent really.  But, um, they might wear them because they want to protect their identity.  You know HSI's in a position now where we're on the street quite often working not just Title VIII cases, but, um, really any case.  In the age of camera phones and the ability of people to identify, you know, those agents, that people would want to protect themselves if they're members of this community, or they live here, have families here, that sort of thing.

Another reason might be, um, if agents are working undercover -- in an undercover capacity in another case, they might want to protect their identify for that reason.  Or if simply they're working that area and they want to, you know, not have their identity revealed to the general public to know that they were in this area and are working as an HSI agent.

Q.    Do you know how many HSI agents participated in Ms. Ozturk's arrest?

A.    The exact number?  I don't know.

Q.    Was there more than one?

A.    I believe -- I know of at least two or three people that were out there, yes.

Q.    Does HSI have a policy on the number of agents that should conduct an arrest?

A.    So a minimum number of agents to conduct an arrest, per policy, is 2.  However, that will fluctuate on a case-by-case basis.

Q.    Are there commonly more than two agents to make an arrest?

A.    Yes.

Q.    Why is that?

A.    It all goes back to officer safety.

Q.    If HSI is arresting someone with a criminal history, does that factor into how the arrest is done?

A.    That's one of the factors.

Q.    Even if HSI is arresting someone who does not have a criminal history, is it necessary to take any precautions with respect to an arrest?

A.    Yes, I mean you always take precautions with respect to an arrest.

Q.    Why is that?

A.    You just don't know what type of situation you're going to encounter, you don't know who might be in the area, you don't know who else might be involved.  It's just really to make sure -- to ensure the safety of everyone, including the general public, including the people we're arresting.

Q.    Did the agents who arrested Ms. Ozturk wear uniforms?

A.    I don't believe.  No.

Q.    Why not?

A.    We don't have a uniform with HSI.

Q.    So were they wearing plain clothes?

A.    Yes.

Q.    And do you know if the agents identified themselves as agents when they made Ms. Ozturk's arrest?

A.    I mean again I was not there.  I -- I have seen video of Ms. Ozturk's arrest, but I don't know what was said to her, I don't know -- I mean it would be common practice for agents to identify themselves.

Q.    So it's the common practice of your office to identify -- for agents to identify themselves before making an arrest?

A.    Yes.

Q.    And, um, do you have any information that that did not happen to Ms. Ozturk's arrest?

A.    I do not.

Q.    Did HSI transport Ms. Ozturk following her arrest?

A.    Yes.

Q.    And in what vehicle did they transport her?

A.    It would have been a government vehicle.  I'm not sure which.

Q.    Would it have been a marked vehicle?

A.    No.

Q.    Does HSI have marked vehicles?

A.    We have a marked Special Response Team vehicle, it's a large, um, armored vehicle.  That's the only one that I know of that's marked.  Otherwise agents are assigned vehicles that do not have markings.

Q.    Why do the HSI vehicles not have markings?

A.    Um, we're investigators, so I mean over the course of an investigation you're not trying to give up your, um, you know your cause or your reason for being out on the street, you don't want to necessarily identify yourself as police until it's time.  And, um, those are the reasons why we wouldn't have police markings.

Q.    Does that relate to officer safety?

A.    It relates to officer safety, it also relates to protecting the integrity of investigations.

Q.    Where did HSI transport Ms. Ozturk?

A.    She was transported to Vermont.

Q.    And what happened when she got to Vermont?

A.    My understanding, um, was that after she was in Vermont -- the transport was out of my purview, but she was processed and detained in Vermont.

THE COURT:  Why was she transported from Somerville to Vermont?

THE WITNESS:  So the way it was explained to us -- and this is from ICE Enforcement and Removal Operations,

they determine, um, where, um, detainees are housed, my understanding at the time was that there was no bed space for her in Massachusetts.

THE COURT: When did you get that understanding?

THE WITNESS: Um, the night -- the -- I'm trying to remember exactly. I believe it was the night that she was taken into custody. It might have been before, when we knew that -- well when the plane was in place to arrest her and we were making a plan to arrest her, I think it was socialized that we were going to take her to Vermont.

THE COURT: When you say it was "socialized," you mean it was discussed with the appropriate authority?

THE WITNESS: Correct.

THE COURT: That's fine to use the word, I just want to be clear what you mean.

So as part of those discussions, so she's arrested, um, you understood they don't have a bed for her here in Massachusetts, so they drive her up to Vermont?

THE WITNESS: Correct.

Q. And you said that was a determination of Enforcement and Removal Operations, that they did not have a bed for Ms. Ozturk?

A. Yes.

MR. TREMONTE:  Objection, hearsay.

THE COURT:  Well I'm not going to admit it for the truth, but the facts of what was being discussed, I think are relevant and I'm allowing it, as limited.

A.    Can you repeat the question, please?

Q.    Yes.  The determination that there was no bed space for Ms. Ozturk in Massachusetts was made by ICE Enforcement and Removal Operations?

A.    Correct, they explained to me the day after -- the morning after actually, the specific reasons why.  But, um, the decision was impressed upon us by them to transport her to Vermont.

Q.    And at what point was HSI no longer in custody of Ms. Ozturk?

A.    It would have been after she was processed in the Vermont AOI, I don't know exactly at what point.

Q.    Okay.  Were you ever told that Ms. Ozturk was being arrested because of her support of Palestine?

A.    I was always -- I was understanding that the cause for her arrest was the revocation of her Visa, that she no longer had status.

Q.    Were you ever told that Ms. Ozturk was being arrested because of her criticism of Israel?

A.    Again the basis of her arrest was the revocation of her Visa by the State Department.  The reason for the

revocation, um, that's the State Department. I mean we were given, you know, the kind of the causes behind that, and I don't know if I had all of them, but I understood, you know, she was arrested -- in what our plan in place was, from my level, was that the legal ground we had to stand on was that, um, she had her Visa revoked.

Q. Thank you.

MS. SANTORA: No further questions.

THE COURT: Now before we go any further, um, I have the, um, the Form 200 with respect to her, and I have various documents with respect to her arrest, some of which, um, the attorney-client privilege is asserted, and which include attorney comments and advice, and I have a couple of documents that share information among the, um, parties.

But other than the, um, Form 200, which appears to bear, in its completed form, his, um, name as the, um, authorized immigration officer, none of them appear to involve him. So, um, does the -- having overruled the attorney-client privilege, it would seem to me that I should show them to the plaintiffs.

What does the defense say, Ms. Santora, or whoever?

MS. SANTORA: Your Honor, to be clear, these

documents are an arrest warrant.  Can you repeat what the other documents are?

THE COURT:  (Laughs.)  These are the documents you gave me.

MS. SANTORA:  I'm sorry.  We've given you a lot of documents.

THE COURT:  Yes, you have, all in undifferentiated form, and I have criticized you.  Now I have this extensive privilege log in a font too hard to read.

But other than that, these are documents that pertain to her arrest.  Some of them, um, if this were pretrial and it had been timely asserted, um, they have attorney comments, they have the name of someone called a "deportation officer, Fugitive Operations."  The documents discuss the basis for her arrest.  But only, um -- there's a gentleman, "Assistant Chief Counsel, Office of the Principal Legal Advisor, Boston."  But only the Form 200 has Mr. Cunningham's name on it, as best I can, um, ascertain.

MR. KANTER:  Your Honor?

THE COURT:  Yes?

MR. KANTER:  I think we are -- we are all, um, searching our recollection as to comparing what you are describing against the --

These documents were submitted in-camera to your

Honor, correct?

THE COURT:  That's correct.

MR. KANTER:  Okay.

THE COURT:  That's how they came into my hands.

MR. KANTER:  The arrest warrants for each of the five noncitizens, um, are in the certified administrative record.  What your Honor is describing as e-mails and communications --

THE COURT:  In other words, that's this Form 200, it's --

MR. KANTER:  Yes.

THE COURT:  -- its title is "Warrant for Arrest of Aliens"?

MR. KANTER:  Yes.

THE COURT:  And they have those, the plaintiffs?

MR. KANTER:  Yes, they are in the certified administrative record.

I recall that we filed part of the record under seal.  Whether there's a portion of those arrest warrants that was the subject of sealing, I don't recall.

THE COURT:  Okay, Ms. Conlon can answer.

Do you have these or not?

MS. CONLON:  My understanding is that we have the I200s with redactions.  I suspect what the Court has is

unredacted.  And that may be the reason for the difference, why you received them in-camera.

THE COURT:  Yeah, thank you.

MR. KANTER:  And I will inquire on the reason -- the particular reason for the redaction.

THE COURT:  That's actually helpful, because I -- I propose the following.

Because -- again I'm in the middle here, since these documents have all been dumped on me.  I did take the precaution of reordering them, so I have a little file on things that I think pertain to Ms. Ozturk.

Now I see what witness is called.  I don't see what he can add.  Counsel might think there's something to be added, but I don't see what he can add to these documents.  But whether you get to see them before closing argument or not, that is an issue.

And also the stay is still in effect, I granted that that seemed to apply to Mr. Watson and to Mr. Armstrong, but among the report that I made with the Court of Appeals, again because we're doing things in the middle here, I said, because I believed, that no further production was contemplated.  Well now I'm contemplating one.

I've overruled the attorney-client privilege.  I just don't see what additional cross-examination can be

garnered if I do the documents now.  But of course I'm not -- I'm no longer an advocate.

Mr. Tremonte?

MR. TREMONTE:  Your Honor, I of course don't know what your Honor has --

THE COURT:  It always makes it sound like a smoking gun, since I'm sitting here with a file folder.

MR. TREMONTE:  But as to the question, your Honor, of whether or not this witness can add to the Court's understanding of relevant documents, may I conduct the briefest of voir dires to figure out whether or not no such document is in their possession.

THE COURT:  They were done.  They were done and I am going to give you cross-examination, that's in essence why I spoke now, I invite you to do so.  It's within, I think, appropriate examination, cross-examination of this witness.  But I'm not passing the documents out --

MR. TREMONTE:  Understood.

THE COURT:  -- in part because I want to scrupulously honor the stay and, um, Mr. Kanter is reflecting, and appropriately so, because we may reach some sort of agreement.

MR. TREMONTE:  May I just ask a handful of questions, then I think my purpose will become clear.

THE COURT:  You go ahead with your questions, we'll see if they do.

MR. TREMONTE:  Thank you.

Mr. Cunningham, we met at your deposition, correct?

THE WITNESS:  We did.

MR. TREMONTE:  Okay.  And at your deposition -- strike that.

In advance of the arrest of Ms. Ozturk, you received an e-mail communication from somebody named Eulia Garolini, correct?

THE WITNESS:  Correct, she was involved in the e-mail traffic.  I can't recall -- I know I said it was from her.  Her name stands out to me, because I've known her for over a decade.  But I can't recall if it was directly from her to me or if it was through my chain of command.

MR. TREMONTE:  But you do remember receiving the e-mail?

THE WITNESS:  Yes.

MR. TREMONTE:  And Mr. Garolini, at the time, was the Desk Officer for Domestic Operations at HSI headquarters?

THE WITNESS:  So to clarify that, she oversaw the Desk Officer.  The Desk Officer is someone that we, um,

that works at a headquarters' capacity, that represents our office at headquarters.  There's an Op-Chief that supervises them.  My understanding is that was her position.

MR. TREMONTE:  Okay.  And the e-mail that you received from Ms. Garolini included attachments, correct?

THE WITNESS:  Correct.

MR. TREMONTE:  And those attachments, um, were first a memo from someone at the State Department, correct?

THE WITNESS:  One of the attachments was a memo from the State Department.

MR. TREMONTE:  And second was the Op-Ed that Ms. -- was an Op-Ed that Ms. Ozturk had authored?

THE WITNESS:  The Op-Ed was included in the attachments.

MR. TREMONTE:  Thank you.

Your Honor, I ask those questions because I think it may assist the Court in determining whether or not it has documents in its file folder that this witness may be in a position to shed light on.

THE COURT:  I fully understand that and it doesn't look like these documents are those.

Any other questions for this witness?

MR. TREMONTE:  I do, your Honor.

THE COURT:  And of course you may proceed.

MR. TREMONTE:  Thank you.

CROSS-EXAMINATION BY MR. TREMONTE:

Q.    So you were asked on direct examination, um, whether or not HSI has always had the authority to enforce Title VIII violations, correct?

A.    I was asked that question.

Q.    Okay.  I'd like to get some precision on the particulars of your expertise and responsibilities, because HSI is a very broad term in that question, you would agree?

A.    I would agree with that.

Q.    Okay.  In fact, it is generally the remit of ERO to effectuate arrests for Title VIII violations, correct?

A.    So ERO, that's their primary responsibility, yes. HSI has those authorities.

Q.    Okay.  And you are not now and have not been a member of ERO, correct?

A.    I am not now and have never been a member of ERO.

Q.    Okay.  And at the time of Ms. Ozturk's arrest, you were not a member of ERO?

A.    I was not a member of ERO at the time of

Ms. Ozturk's arrest.

Q.    You were involved with HSI, correct?

A.    That's correct.

Q.    And HSI's scope of responsibility has to do with criminal investigations, right?

A.    Correct, however, you know, we do enforce Title VIII violations as well.

Q.    I understand that you're eager to correct me that there is some role for Title VIII enforcement, but that is really a very limited component of what HSI does, correct?

A.    Well, um, prior to this administration I would say it was a -- it was a component that, you know, was part of our portfolio.  But I'd say in the last 6 or 7 months we've been prioritizing Title VIII more than we had since I can remember in my 17 years on the job.

Q.    Right, and when you say "we," you specifically mean HSI, correct?

A.    I mean HSI, yes.

Q.    You are an ASAC in HSI, right?

A.    I am an ASAC with HSI.

Q.    Okay.  And what was unusual about the new focus since the inauguration is that HSI has so much work relating to Title VIII, correct?

MS. SANTORA:  Objection.

THE COURT:  Overruled.

A.    So the -- let me understand your question.  Can you please ask it one more time?  I'm sorry.

THE COURT:  Here's what he's getting at.

He's saying now, in the last 6 months, HSI has a lot more work as to Title VIII in addition to the work it's always done?

A.    Correct, yeah, I mean we've always had the authority, um, but the prioritization of that work has certainly increased.

Q.    And you were asked questions about how HSI generally plans for arrests, correct?

A.    In general?

Q.    Yeah, you were asked questions about that on direct, right?

A.    I was.

Q.    And you gave answers at a general level, correct?

A.    (Silence.)

Q.    But isn't it -- strike that.

Isn't it true that until very recently you had no familiarity with how ERO plans for and conducts administrative Title VIII arrests because you'd never done one, correct?

MS. SANTORA:  Objection.

THE COURT:  Overruled.

A.    I've -- I've -- um, I've been wracking my brain over the years about the Title VIII enforcement that I --

Q.    And you have to really wrack your brain because you really haven't done any, correct?

MS. SANTORA:  Objection.

THE COURT:  No, no, he may inquire and he may do it in that form.

Is that why you have to wrack your brain?

A.    Yeah, I mean most of my career as an agent, as a supervisor, has been in the enforcement of drug laws, drug smuggling, money laundering, that sort of thing.

Q.    Right, drugs and financial crimes, right?

A.    Well, yeah.  Partially, yes.

Q.    And crimes, as opposed to civil violations with the immigration laws, correct?

A.    Correct.  But that's changed recently.  But, yes.

Q.    Okay.  And with the shift that resulted after the inauguration, meant that your group at HSI has been prioritizing immigration-related cases and arrests, right?

A.    Immigration enforcement, yes.

Q.    Okay.  And that wasn't your idea, correct?

A.    No, it was not.

MS. SANTORA:  Objection.

THE COURT: Overruled. I understand the question was those were instructions, is that correct?

THE WITNESS: That's correct.

Q. Right, the new focus on immigration cases came from above your level in the chain of command, right?

A. That's correct.

Q. In fact it was the Special Agent in charge of HSI who told you about this new focus, right?

A. Yes, the information usually comes from his level and is delegated down.

Q. And when you say "his," you mean specifically Mike Krol, he's the one, your SAC, who told you you were going to prioritize Title VIII immigrations enforcement?

A. Yes, we had a meeting shortly after the inauguration, um, maybe several meetings actually, that impressed upon us that Title VIII enforcement was going to be prioritized.

Q. Okay. And, um, you characterized that work, since the inauguration, this new focus, as a "surge" of effort directed on immigration cases, right?

A. Well I think the "surge" is specific to, um, an enforcement action that we were doing in the midst of receiving the information from Ms. Ozturk. What I would describe as the time prior to that surge operation would be just the reprioritization to Title VIII enforcement.

Q.    You said at the time of the arrest of Ms. Ozturk, correct?

A.    At the time I received the information regarding Ms. Ozturk.

Q.    Okay.  But the arrest of Ms. Ozturk on March 25th, 2025, the instructions with respect to Ms. Ozturk came from headquarters, right?

A.    That's correct.

Q.    And that was separate from the surge operation, correct?

A.    That's correct.

Q.    Okay.  So I just want to be crystal clear about that.

THE COURT:  I'm sure he does.

But how is headquarters different than Mr. Krol, um, your SAC?

THE WITNESS:  So headquarters oversees all federal domestic field offices.  Our Special Agent in Charge would have a first-line supervisor who sits at HSI headquarters.

THE COURT:  And headquarters is in Washington or Sterling, Virginia?

THE WITNESS:  Washington D.C.  My job at headquarters was at Sterling, but, um --

THE COURT:  So headquarters is Washington?

THE WITNESS:  Yes, correct.

THE COURT:  So is ours.

All right.

Q.    And so the instructions with respect to Ms. Ozturk, which were separate and apart from anything else, as we discussed, you learned about initially in this e-mail from Ms. Garolini, correct?

A.    That's correct.

Q.    Okay.  And as you testified earlier, that e-mail included a communication from the State Department, right?

A.    That's correct.

Q.    Okay.  And it included the Op-Ed or an Op-Ed that Ms. Ozturk had written, correct?

A.    It included the Op-Ed.

Q.    And you read those attachments, right?

A.    I read, um -- I opened the attachments.  I read through them.  I didn't study them.  But I did read through them.

Q.    You familiarized yourself with them?

A.    I sure did.

Q.    Okay.  Because obviously it was part of your responsibility as a supervising agent to understand the communication to you on this matter of importance to headquarters, right?

A.    Correct.  And you also want to ensure that, you know, if I'm the one that's pushing the information out to the field, that, um, they have the information that's relevant to what they need to know.

Q.    And this matter had special sensitivity, didn't it, because you've never received a communication like this before?

MS. SANTORA:  Objection.

THE COURT:  Overruled.

A.    Um, I can't recall receiving a communication like this.

Q.    (Pause.)  And the instruction that you gave, in response to this unique directive, was to find a good address for Ms. Ozturk, correct?

A.    Well that was part of the -- that was part of what we needed to do.  If we were going to prioritize the arrest, we would first need to locate where she was.

Q.    Okay, well since I haven't seen the e-mail communication from Ms. Garolini yet, um, was the instruction to find an address for and arrest Ms. Ozturk contained in that communication?

A.    I don't believe that it was, I believe that would have been an intelligence workup.  That at the time last week when we first discussed it, I didn't recall actually all the information detailed within those

attachments.  I did see, um, a document yesterday, when I was preparing for trial, that refreshed my memory on that information.

Q.    Okay, what was that document?

A.    That was an analysis report that included -- it also included the Op-Ed, and it included, um, certain information like most recent known addresses, um, her criminal history, or lack thereof, I should say, and, um, additional information that may help locate Ms. Ozturk.

Q.    Okay.

MR. TREMONTE:  As I don't have the deposition, I'm going to make a request of the defense that we receive a copy of that document, um, before this examination is done.

MS. SANTORA:  Your Honor, we believe that plaintiffs have that document.

THE COURT:  I assume -- I assume that that is in the materials that the Court ordered disclosed as the ROA.

Can you confirm that?

MS. SANTORA:  Yes, we can confirm that that is the document.

THE COURT:  All right.  Thank you.

Q.    Some of the communications that you -- so the

e-mail from Ms. Garolini, just referring back to that.

Some of the communications you received at that time about Ms. Ozturk were e-mail-forwards, correct?

A.    I believe so.

Q.    Okay.  All right.  And, um, after you received this, um, set of instructions and these materials, um, a decision was made to effectuate an arrest of Ms. Ozturk, is that right?

A.    A decision was made to try and locate her, and, you know, we were then, um --

Q.    Whose decision was that?

A.    So as I mentioned that surge operation, we were -- it was a pure coincidence that Ms. Ozturk's information came in at that same time we were doing that.  I was in a room with my Special Agent in Charge and other senior officials from other agencies.  So we were all talking. And it was like, "Okay, go" --

Q.    So you just happened to be with all these other officials at the time when the direction from headquarters came in?

A.    That's correct.

Q.    Okay.  And was it a group decision to effectuate the arrest?

A.    I mean the decision ultimately lies with the Special Agent in Charge to impress upon us to go out and

effectuate the arrest.

Q.    So we have clarity, was it the Special Agent in Charge who directed you to arrange for the surveillance and arrest of Ms. Ozturk?

A.    It was his direction to prioritize it and, yes, to, you know, put resources towards Ms. Ozturk.

Q.    Okay.  And at some point after that instruction was given to you, you separately consulted with one of HSI's lawyers in your office, didn't you?

A.    I did.

Q.    And you did that to make sure that the arrests that you have been instructed to make was legally appropriate, correct?

A.    As I mentioned last week --

MS. SANTORA:  Objection, this is attorney-client privileged, your Honor.

THE COURT:  It is.  I sustain it.

MR. TREMONTE:  I'm not asking for the contents of the communication, your Honor.

THE COURT:  Well, you're asking as to why.

MR. TREMONTE:  Yes.

THE COURT:  Of course.  So the privilege covers both the request for legal advice and the legal advice that is, um, given.  And it's -- I sustain the privilege.

Of course there may be a cost for that, but that can be briefed, in the sense of an adverse inference.  I don't say I'm drawing one, and that's only the Commonwealth of Massachusetts, but I do mention it.

Go ahead.

Q.    Mr. Cunningham, at your deposition you testified that the reason why you consulted with a lawyer was to ensure that the arrest that you'd been instructed to make was legal and appropriate, didn't you?

A.    I testified to that.  I did also testify to the fact that, you know, when you receive information from headquarters, at this level, top down, um, it -- you make the assumption that it's legally sufficient.  But I did contact our legal counsel to ensure that we were on solid legal ground.

Q.    Right, because for whatever reason, under these unique circumstances with which you had no prior experience, you thought it was important --

        MS. SANTORA:  Objection.

Q.    -- to have a lawyer weigh in, even though you'd been given a direct demand by your headquarters?

        MS. SANTORA:  Objection, mischaracterizes --

        THE COURT:  Sustained, but not on that ground.  Sustained, because it goes beyond what he testified as to the reasons for consulting the lawyer.

Who's the lawyer here?

THE WITNESS:  It was a lawyer from the Office of the Principal Legal Advisor.

THE COURT:  And what's his or her name?

THE WITNESS:  His name is Lincoln Jalalian.

THE COURT:  Thank you.

Q.   And absent consulting with a lawyer, you were not in a position to make an independent judgment about the lawfulness of the arrest, correct?

A.   No, with my basis of knowledge in, you know, immigration law, I would defer to legal counsel before taking any action.  And the same thing with criminal law.

Q.   And again, an administrative civil arrest based on a Visa revocation was not within the heartland of your experience as an agent, correct?

A.   It was not something that I had, um, much experience with, no, if any.

Q.   Right.  And all you knew was that Ms. Ozturk's Visa had been revoked, correct?

A.   I knew that her Visa had been revoked, um, and also the contents of the e-mail, the additional information.  But the most important portion of it was that her Visa was revoked and that was the grounds for, you know, the apprehension.

Q.   Okay, you knew her Visa had been revoked, you knew that she authored this Op-Ed, correct?

A.   I did.

Q.   And you knew that in the State Department memo there was a reference to "Ongoing ICE operation security, as a result of which the revocation would be silent," correct?

A.   That's what the memo states.  I don't have the memo in front of me, but I remember reading that.

Q.   And you understand that as a consequence of that information, you could not reveal to Ms. Ozturk in advance that her Visa had been revoked, correct?

A.   I don't know that I can say it could not be, um, I never -- I don't recall receiving instructions saying she could not be, but it was a determination made that she would not be.

Q.   Your determination?

A.   I mean that was also -- again we were in a room with a Special Agent in Charge.  The operation kind of developed pretty quickly where it was just, "Okay, what's the" -- "pull resources to find her."  I don't remember having a discussion like that to talk about notifying her or anything like that.

Q.   Okay, there was a decision made to keep that information secret from Ms. Ozturk, that her Visa had

been revoked, correct?

A.    We did not plan on alerting her to the fact that her Visa had been revoked.

Q.    So I take that as a "Yes"?

A.    Yes.

Q.    Okay.  To your understanding the State Department memo did not establish that Ms. Ozturk had committed a criminal offense?

        MS. SANTORA:  Objection.

        THE COURT:  Well I think we're talking about the same memo and it speaks for itself, and I've read it.

Q.    To your knowledge there is no basis for concluding Ms. Ozturk had committed any criminal offense?

        MS. SANTORA:  Objection.

        THE COURT:  No, he may be asked that, that's not conclusive on the issue of whether she's deportable lawfully.

        Did you have any knowledge of a criminal offense that she had committed?

        THE WITNESS:  I had not.

Q.    And in fact you did not independently develop any evidence, any information at all to indicate that she had committed a crime?

A.    No, the only information was that her Visa had been revoked and she was now subject to apprehension,

she no longer had status in the United States.

Q.    And then, um, turning now to the Op-Ed.

You said you read it and you saw nothing in the Op-Ed suggesting that Ms. Ozturk had committed a crime, correct?

A.    I didn't see anything in the Op-Ed that suggested she committed a crime.

Q.    And in fact, you did not believe, based on anything in the Op-Ed, that Ms. Ozturk posed a national security risk, correct?

MS. SANTORA:  Objection.

THE COURT:  Well I'm going to sustain that, that's not -- and I have great respect for all witnesses, but he's not asked that question.  So sustained.

(Pause.)

Q.    You weren't asked to sign an arrest warrant for Ms. Ozturk's, um, being taken into custody, were you not?

A.    So the arrest warrant was forwarded to me as a Supervisory Agent at the scene and I -- I, um, I signed that arrest warrant.

THE COURT:  And so I'm clear, because we're talking about it, this is this ICE 200 form?

THE WITNESS:  That's the I200, correct.

THE COURT:  All right.

Q.    And you understood it was urgent, it was a matter of urgency to find Ms. Ozturk, correct?

MS. SANTORA:  Objection.

THE COURT:  Overruled.

A.    A matter of urgency in what sense?

Q.    That your supervisors wanted it.

A.    Yeah, the supervisors were -- headquarters was inquiring about it, um, asking questions, and we were, um, then putting resources towards that.

Q.    And, um, you prioritized the arrest of Ms. Ozturk because of the headquarter's oversight, in fact, right?

A.    We did, we prioritized it.  You know headquarters, like I said, I can't recall a time that it's come top-down like this with a Visa revocation, um, under my purview anyway.  And so with the superiors that were, you know, inquiring about this, it made it a priority, because we worked for them.

Q.    And I'll take that also as a "Yes."

A.    That's a "Yes," yeah.

Q.    Okay.  And finally you were asked on direct about the reasons why your office took Ms. Ozturk into custody, correct?

A.    I was.

Q.    And you testified about "officer safety," correct?

A.    I did.

Q.    And you testified that with respect to an individual's hands, they are often "dangerous," correct?

A.    That -- well we're trained that an individual's hands, that makes them -- whatever item can be accessible is accessible.  You want to control the hands.

Q.    In this matter you did not completely abdicate your responsibilities as an investigative agent, did you?

        MS. SANTORA:  Objection.

        THE COURT:  No, on this foundation I'm going to sustain that.

Q.    You had developed no evidence whatsoever to suggest that Ms. Ozturk, a graduate student who had written an Op-Ed, would be dangerous to your agents with her hands, did you?

        MS. SANTORA:  Objection.

        THE COURT:  I'm going to sustain that.

        MR. TREMONTE:  No further questions.

        THE COURT:  Very well.

        Nothing further for this witness?

        MS. SANTORA:  Nothing further.

        THE COURT:  You may step down and thank you.

        (Witness steps down.)

        THE COURT:  All right, we're going to take the

morning recess.  It's a good time, there are four such witnesses, we have done two.  Each one is going, I hope, faster than the last.  And we'll resume at 11:15.

We'll recess.

(Recess, 10:45 a.m.)

C E R T I F I C A T E


I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, July 15, 2025, to the best of my skill and ability.




/s/ Richard H. Romanow 07-15-25
_____
RICHARD H. ROMANOW  Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 83 - 127

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

********

BENCH TRIAL DAY 7

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 15, 2025

********

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEXANDER ABDO
SCOTT B. WILKENS
XIANGNONG WANG
      Knight First Amendment Institute at Columbia
      University
      475 Riverside Drive, Suite 302
      New York, NY 10115
      (646) 745-8500
      Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
      Sher Tremonte LLP
      90 Broad Street, 23rd Floor
      New York, NY 10004
      (212) 540-0675
      Cgans@shertremonte.com
      For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
      DOJ-Civ
      P.O. 878
      Ben Franklin Station
      Washington, DC 20044
      (202) 616-9123
      Ethan.kanter@usdoj.gov
and
SHAWNA YEN
      United States Attorney's Office
      1 Courthouse Way, Suite 9200
      Boston, MA 02210
      Shawna.yen@usdoj.gov
      (617) 748-3100
      For Defendants

INDEX

WITNESS                                                          PAGE


DARREN MCCORMACK

    Direct Examination By Ms. Santora                            86
    Cross-Examination By Ms. Conlon                             101


CHRISTOPHER HECK

    Direct Examination By Ms. Strokus                           110


E X H I B I T S

None

(Resumed, 11:18 a.m.)

THE COURT:  Call your next witness.

MS. SANTORA:  Your Honor, defendants call Special Agent Darren McCormack.

THE COURT:  He may be called.

DARREN MCCORMACK, Sworn

COURTROOM CLERK:  Can you please state your full name and spell your last name for the record.

THE WITNESS:  Darren McCormack, M-c-C-o-r-m-a-c-k.

THE COURT:  Ms. Santora, you may proceed.

DIRECT EXAMINATION BY MS. SANTORA:

Q.   Good morning, Detective McCormack.  Thank you for being here today.  Where do you currently work?

A.   HSI New York.

Q.   What is your job title?

A.   Deputy special agent in charge.

Q.   How long have you held that role?

A.   Approximately three years.

Q.   What are your responsibilities in that role?

A.   Operational and administrative oversight of Division 1, which was comprised of criminal investigators, special agents, administrative staff and intel.

Q.   When did you begin working for United States Government?

A.   2005.

Q.   In what capacity?

A.    As a special agent with HSI.

Q.    Where were you located?

A.    My first duty assignment was Newark, New Jersey.

Q.    Did you receive training before you started that duty assignment?

A.    I did.

Q.    Where did you receive training?

A.    The Federal Law Enforcement Training Center in Glynco, Georgia.

Q.    Can we refer to that as FLETC?

A.    Yes.

Q.    What training did you he receive at FLETC?

A.    I received three months of criminal investigative training and three months of ICE-specific special agent training.

Q.    And you said that following that you worked as a special agent in Newark, New Jersey?

A.    Yes.

Q.    How long were you there?

A.    Approximately seven years.

Q.    And what was your job after that?

A.    From there I went to HSI headquarters in Washington, D.C. and worked on a technical development project as a special agent.

Q.    How long were you there?

A.    Approximately three years.

Q.    And what was your job after that?

A.    Following that I was the assistant attache in the U.S. embassy in Vienna, Austria.

Q.    How long were you in Vienna?

A.    Four years.

Q.    And after Vienna?

A.    After Vienna, back to Newark, New Jersey, as a supervisory special agent for approximately a year and a half to two years.

Q.    And following that?

A.    Following that to New York, HSI New York as an assistant special agent in charge for approximately two years.

Q.    And following that?

A.    My current role.

Q.    Your current role.  Does your office's work involve enforcing criminal laws?

A.    Yes.

        THE COURT:  Let me interrupt.  I'm one question behind here.  So you were assistant to special agent in charge, and now you're an assistant special agent in charge, but they're different.  Can you explain that to me.

        THE WITNESS:  I was an assistant special agent in charge, and now I'm a deputy special agent in charge.

        THE COURT:  Which is higher.

        THE WITNESS:  One rank higher.  And then one above that is the special agent in charge, which is essentially the

CEO of the office.  That's the number one of the office.

THE COURT:  Thank you.

THE WITNESS:  Yes.

BY MS. SANTORA:

Q.   Does your office's work also involve enforcing Title 8?

A.   Yes.

Q.   What is Title 8?

A.   Criminal immigration law.

Q.   In the time that you have worked at HSI, has HSI always had authority under Title 8?

A.   Yes.

Q.   How many people do you supervise as a deputy special agent in charge?

A.   Approximately 120 to 130 special agents, plus task force officers, plus mission support, plus intelligence officers.

Q.   Do the agents that you supervise make arrests?

A.   Yes.

Q.   And in your career working at HSI, have you made arrests?

A.   Yes.

Q.   Do the agents who work for you who make arrests receive the same training that you received at FLETC?

A.   Yes.

Q.   And does that include training on making arrests?

A.   Yes.

Q.   Is making arrests important to HSI's work?

A.   Making arrests is a fundamental function of a criminal investigator.  So special agents are charged with running criminal investigations, which ultimately should yield arrests and seizures.

Q.   Are you familiar with HSI's protocols and procedures for making arrests?

A.   For the most part.

Q.   Where are those procedures found?

A.   In the special agent handbook.

Q.   And are the agents who you supervise familiar with those processes and procedures?

A.   Yes.

Q.   And how are they familiar with them?

A.   Through training.

Q.   Have protocols and procedures changed in any material way since you received training at FLETC in 2005?

A.   Not that I'm a aware of.

Q.   I want to talk to you about a particular arrest.  Were you involved in the arrest of Mahmoud Khalil?

A.   Not personally involved but had some operational oversight of it.

Q.   What was your role in that arrest?

A.   My role was disseminating information that I received from headquarters to field agents.

          MS. CONLON:  Your Honor, I apologize for interrupting.

If we could ask the witness to put the microphone closer to him so we can hear him more easily.

THE WITNESS:  Sure.

THE COURT:  It moves.  You be comfortable.

THE WITNESS:  Thank you.  Is that better?

THE COURT:  It is.

MS. CONLON:  That's much better.  Thank you.

BY MS. SANTORA:

Q.   What information did you receive about Mr. Khalil?

A.   I received an intelligence packet that had some biographical information on Mr. Khalil, along with some social media posts and some pertinent intelligence information, which is typical for any sort of law enforcement subject of investigation or person of interest.

I received that from my headquarters with instructions. And with the instructions at the appropriate time, I disseminated that intel packet to the appropriate people.

Q.   Did you determine that Mr. Khalil was amenable to arrest?

A.   At some point I confirmed that Mr. Khalil was amenable to arrest.

Q.   And why was he amenable to arrest?

A.   Because his immigration status had changed pursuant to the Department of State.

Q.   I want to ask you about some specific issues related to his arrest.

What date was he arrested?

A.   March 8, 2025.

Q.   And do you know if he was handcuffed when he was arrested?

A.   He was handcuffed.  Eventually he was handcuffed, yes.

Q.   Was he not initially handcuffed?

A.   He was not initially handcuffed.  When he was encountered by special agents, he was free to move freely in the vestibule of his apartment building for a period of time until ultimately the time came that he had to be handcuffed and taken for processing.

Q.   And does HSI have a policy on handcuffing people who are arrested?

A.   Yes.

Q.   What is that policy?

A.   Two people, two are present when an individual is placed in custody in handcuffs.  Based on the fact and circumstances, safety or otherwise, handcuffed for the safety of the individual and but also for the safety of officers.  Hands will be handcuffed either in the front or in the person's back.

Q.   And all individuals who are arrested by HSI are handcuffed?

A.   Yes, absent some exigent circumstance like a potentially pregnant woman or some other outstanding health issue.

Q.   And why is that HSI's policy?

A.   For the safety of officers and the people we arrest.

Q.   And I think you just said that HSI has a policy that two officers must participate in an arrest?

A.   Correct.

Q.   Can more officers participate in an arrest?

A.   Yes.

Q.   What determines how many officers participate in an arrest?

A.   It's situational.  Every case is different.  Because generally we are making criminal arrests, criminals tend to have violent tendencies or violent criminal histories, so more is always better for safety of the agents and for the people present, and there may also be bystanders who are present, depending on where the arrest takes place.

Q.   In the event that a person does not have a violent or criminal history, would precautions still be taken with regard to the arrest?

A.   Yes, always.

Q.   And why is it that you always take precautions with respect to an arrest?

A.   Because you're placing somebody under arrest, so reasonably speaking, people who get arrested may not want to be arrested.  So for the safety of agents, officers, individuals present and the person being arrested, we have more than -- more is better than less, but by policy at least two.

Q.   Do you know how many officers participated in Mr. Khalil's

arrest?

A.    Four were present.

Q.    Did the officers who arrested Mr. Khalil identify themselves as HSI agents?

A.    Yes.

Q.    Is it HSI's policy that agents should identify themselves when arresting someone?

A.    Yes.

Q.    Why is that HSI's policy?

A.    Because, again, for the safety and as a sworn law enforcement officer, if you are going to effect an arrest or act in the capacity of a sworn law enforcement officer, you have to identify yourself as such.  And during the course of this arrest, all four agents had neck badges visible.  Upon encountering Mr. Khalil and his wife they identified themselves but also had visible badges the whole time.

        MS. CONLON:  Your Honor, I'm going to object to the questions about the specifics of the arrest that this witness wasn't there for as speculation.

        THE COURT:  I've been listening.  You didn't object.

        MS. CONLON:  I'm sorry.  I am objecting now.

        THE COURT:  You can't object after the question has been answered.  If it went beyond the question, you could move to strike.  It didn't go beyond the question.  It stands.  If you have objections, you've put her on notice.  Go ahead.  She

may go ahead and ask the next question.

BY MS. SANTORA:

Q.   You said you did not participate personally in Mr. Khalil's arrest?

A.   I did not.

Q.   How do you know the circumstances surrounding his arrest?

A.   I'm sorry, say that again.

Q.   How do you know the circumstances surrounding his arrest?

A.   I read the report of investigation about the arrest itself, and I also watched videos of the arrest.

Q.   And was that pursuant to your duties as a deputy special agent in charge?

A.   Yes.

Q.   Did the agents who arrested Mr. Khalil wear uniforms?

A.   No.

Q.   Why not?

A.   HSI's special agents are criminal investigators who are special agents.  They run transnational criminal investigations, and we do not have uniforms.  We don't identify -- we always work in plainclothes, have unmarked government issued vehicles, all in furtherance of being undetected, appearing not to be law enforcement.

Q.   Did the agents who were involved in Mr. Khalil's arrest wear masks?

A.   No.

Q. Does HSI have a policy on whether agents can wear masks?

A. No policy, no.

Q. Does your office allow agents to wear masks?

A. We do.

Q. Why?

A. Well, during COVID, masks were sometimes mandatory, but also often for health and safety reasons. Currently in the world of social media and doxing and for safety of agents and their families, agents will wear masks to protect their identities.

Q. Do undercover agents typically wear masks?

A. We have undercover agents who specifically do undercover work. And if they are assigned to do some sort of fieldwork, they very often will wear masks to conceal their identity as their true identity but also their undercover identity.

Q. Following Mr. Khalil's arrest, did HSI transport him anywhere?

A. Agents transported Mr. Khalil to 26 Federal Plaza, which is a federal processing facility for HSI and ERO. At the completion of processing, Mr. Khalil was turned over to ERO custody.

Q. So at that point HSI no longer had custody of Mr. Khalil?

A. Correct.

Q. Were you told that Mr. Khalil was being arrested because of his support of Palestine?

MS. CONLON:  Objection.

THE COURT:  Overruled.

A.   No.

Q.   Were you told that Mr. Khalil was being arrested because of his criticism of Israel?

A.   No.

Q.   Why were you told that Mr. Khalil was being arrested?

A.   Because of the change in his immigration status, the change in his immigration status which now left him illegally present in the United States and amenable to arrest.

MR. SANTORA:  Thank you.  No further questions.

THE COURT:  Ms. Conlon.

MS. CONLON:  Before I begin, Your Honor, I'd like to make a record that we have not received any reports of investigation about Mr. Khalil's arrest, and we would want them.  And if the court has them and they're disclosable to us, we would love to receive them before we question this witness.

THE COURT:  That's appropriate, an appropriate request.  I have various data that has not been disclosed.  I understand that the ROA has been disclosed.

MS. CONLON:  That's right.

THE COURT:  You know, in all honesty, there's nothing here that I recall -- yes, there's a report here of his arrest.  It's on the documents that I have, it's numbered 23 and 24 and 25 of the 337 pages that have been given to me.  I'd call that

a report of arrest.

And does the government object to turning this over to the plaintiffs?

MS. SANTORA:  Your Honor, we do based on privilege grounds.

THE COURT:  Well, what privilege, though, applies to this?

MS. SANTORA:  Your Honor, I'd have to see the document that you're looking at.

THE COURT:  Here, take a look at it.  Report of the arrest is what she asked for.  I mean, you called this witness.

MS. CONLON:  My understanding is the privilege that we think was asserted with respect to this document, though it's a little hard to know --

THE COURT:  She hasn't identified any privilege yet that I heard.

MS. CONLON:  Okay.  Your Honor.

MS. SANTORA:  Your Honor, we would assert law enforcement privilege over this document.

THE COURT:  Law enforcement privilege for something that's happened?

MS. SANTORA:  Well, this talks about the officers' actions leading up to the arrest.

THE COURT:  Well, yes, so it does, but these are the common -- it doesn't reveal any special technique.  It doesn't

reveal anything that is uncommon.  I don't mean it critically, but this is what law enforcement officers do.

MS. SANTORA:  To the extent it reveals their methods and techniques leading up to the arrest.

THE COURT:  But that's true.  If the privilege were that broad, no police report could ever be produced if the government decided not to produce it.  That's not the law enforcement privilege.  You give me some case that sweeps that broadly.

That's what has baffled me from the outset here.  This has no forward-looking aspect.  It has no revelation as to planned law enforcement operations, and at least in my limited experience this all looks like just sound police work carrying out their directions.

MS. SANTORA:  Your Honor, to the extent that it reveals the methods that the officers used in surveilling an individual, that could be extrapolated to other cases and allow other individuals to potentially --

THE COURT:  Let me see.  Since you don't seem to be able to put your finger on it and we have to work from the -- now, this you say can be extrapolated from -- actually, we have another copy.  But so if you need one, Mr. Hohler will give you one.

You did surveillance and had his picture.  I don't see anything -- and I mean no disrespect -- anything specifically

secret about going about criminal investigations that way.  No. It's overruled.

And I really scrupulously want to honor the stay of the Court of Appeals, but this does not seem to fall within that order, and it may be given to the plaintiffs, and Mr. Hohler will give a copy to the plaintiffs, pages 23, 24 and 25 of 337.

MS. SANTORA:  Your Honor, unfortunately, we only have a copy that is double-sided, which will reveal an additional page.

THE COURT:  We'll give you our copy.  It happens I have two copies, and I have a wonderful law clerk who can find it.  You may have it.

MS. CONLON:  May I receive a copy?

THE COURT:  Oh, yes.  I said we have all these copies. Now I'll give you the one that I have.

MS. CONLON:  Thank you.

THE COURT:  There's two sets.  And what we'll do is we'll let her cross-examine.  We'll xerox the copy, or when she's done her cross-examination, she can give you the copy she's been operating from and you can use it for redirect if you wish.  Go ahead, Ms. Conlon.

MS. CONLON:  Yes, Your Honor.

THE COURT:  Once again, after all this work, it's hardly a smoking gun.

MS. CONLON:  I take the court's word for it, and one of my colleagues will surely let me know.

THE COURT:  We lawyers have to act like lawyers.

THE WITNESS:  I understand.  You're doing a good job, Judge.

MS. CONLON:  For better or worse.

THE COURT:  Go ahead.

CROSS-EXAMINATION BY MS. CONLON:

Q.   Okay.  Agent McCormack, is that -- what's the right title to use?

A.   That's fine.

Q.   On March 6, thereabouts, you received initial instructions concerning Mahmoud Khalil, right?

A.   No.

Q.   Okay.  On what date?

A.   I became with aware of Mr. Khalil on or around the 7th, March 7th.

Q.   And on the date that you became aware of him you received some initial instructions about him, right?

A.   Yes.

Q.   Those instructions included conducting pattern of life surveillance; is that right?

A.   The instructions were to locate him and, yes, establish a pattern of life with surveillance.

Q.   And those instructions came from HSI senior leadership,

right?

A.    Through other channels, but yes, ultimately through HSI leadership at headquarters.

Q.    And through other channels, meaning it filtered to you through the special agent in charge?

A.    Correct.

Q.    Now, at that time when you first were made aware of Mr. Khalil, you did not understand him to be the subject of a criminal or civil enforcement action; is that correct?

A.    Can you repeat the question?

        THE COURT:  When you first heard of him, you didn't understand that he was the subject of a criminal or civil investigation, when first you heard of him?

        THE WITNESS:  No, I did not understand him to be either.

BY MS. CONLON:

Q.    You understood at that time that somebody at a higher level than you had some interest in him; is that right?

A.    I was informed that somebody at a higher level than the people I was speaking to had an interest in him for whatever reason.

Q.    Someone at a higher level even than the special agent in charge, in other words?

A.    Correct, but this conversation was not with the special agent in charge.

Q. Who was this one with?

A. The acting assistant director.

Q. The acting assistant director --

A. For domestic operations, for HSI's domestic operations.

Q. William Walker?

A. Yes.

Q. And William Walker conveyed to you that the State Department had an interest in him, right?

A. I believe at some point the State Department's interest came up in conversation, yes.

Q. Just a moment.

He conveyed to you, specifically, that Secretary Rubio was interested in Mr. Khalil, correct?

A. At some point I was made aware that the Secretary of State and/or the White House had an interest in Mr. Khalil.

Q. And you were made aware of that through Mr. William Walker?

A. Correct.

Q. Now, approximately the day after you began or HSI began surveilling Mr. Khalil, you received a memo from the State Department about him, right?

A. Can you repeat the first part of the question, for the timing.

Q. Sure. The day after you became aware of Mr. Khalil and were surveilling him, you then received a memo about him from

the State Department, right?

A.    Correct.

Q.    The memo indicated that the State Department had determined that he was removable, correct?

A.    The memo indicated that his status, his immigration status in the United States had changed.  It did not say anything about -- if we're talking about the same document --

Q.    I'm not sure if we are.

A.    I don't recall it saying anything about his removability.

Q.    That his status had changed in a manner that made him no longer a lawful permanent resident or something to that effect?

A.    Something to that effect.

Q.    Now, you had never seen a memo like this?

A.    When you say "like this" --

Q.    A memo from the State Department in this manner.

        MS. SANTORA:  Objection.  If we're discussing a document, can we show the witness?

        MS. CONLON:  My time is short and I think we all know the document I'm talking about so I'd prefer not to.

        THE COURT:  I'm not sure that he knows it.  They talk about these A4(c) memos.  Is that what you --

        THE WITNESS:  I'm understanding the memo written by Secretary of State signed at the top.

        THE COURT:  Right.

        THE WITNESS:  Yes, yes, if that's what we're referring

to.

THE COURT:  She may question.

MS. SANTORA:  Your Honor, we would ask that to the extent they continue to question on the document the witness be shown the document.

THE COURT:  Show him the document.  She may continue.

Q.   In your current position, you had never seen a memo like this before signed by the Secretary, correct?

A.   When you say "like this," can you be more specific?

Q.   A memo from the Secretary indicating that a person's status had changed, correct?

A.   I've seen memos from the Secretary of State before when I worked overseas.

Q.   I'll ask you again.  In your current position you had never seen a memo from the Secretary of State indicating that a person's status had changed, correct?

A.   I have not, correct.

Q.   Now, you got this memo, and after you received it, you checked in with somebody named William Joyce who works in ERO, right?

A.   Yes.

Q.   And you did that because civil Title 8 enforcement is usually in the purview of ERO, correct?

A.   I did that because while Title 8 or any sort of civil, criminal or administrative enforcement is in the statutory

authority of HSI agents, we historically, in the recent time, had not enforced those laws.  So in an effort to comply with what my headquarters was asking, I wanted to confirm there was a legal basis for arrest with Mr. Joyce.

Q.   Right.  So headquarters HSI told you to make the arrest, but you checked in about it with William Joyce at ERO, correct?

A.   HSI headquarters said, "Do your best to find him.  If you find him, arrest him."

Q.   And then you checked in about it with ERO, right?

A.   Correct.

Q.   And you checked in with ERO because they're the steward, historically at least, of all things immigration that are civil in Title 8, right?

A.   It's more of their priority mission set, yes.

Q.   And after checking in with ERO, that was when you determined that Mr. Khalil could be arrested; is that right?

A.   I had confirmation from ERO that he was arrestable, given the change in status referenced in the Secretary of State's memo, at which point I informed -- I delegated the same instructions of locate and arrest to people in my chain of command.

Q.   You weren't there for the arrest, correct?

A.   I was not there for the arrest.

Q.   What you know about it is what the people who effected it told you and whatever you saw in videos; is that right?

A.   And what I read in multiple records reports.

Q.   There were multiple reports about his arrest?

A.   There was a synopsis that was provided to me that night. There was a synopsis emailed to me.  There was a traditional report of investigation.  There was what I believe the judge was just looking at, the report, I think it's an I-213.  I think that's it.

MS. CONLON:  Okay.  I'm going to make the court aware that that, to us, sounds like there are several more documents relating to this arrest that we have not received, and I'll just turn to finish this examination.

Q.   You don't know why HSI had to do this civil arrest of Mr. Khalil rather than ERO, do you?

A.   Repeat the question.

Q.   You're not sure why it was that this got assigned to HSI when it was a civil enforcement action as opposed to ERO, correct?

A.   No, I'm not sure why.

Q.   You wondered about it at the time, and you still don't know, correct?

MS. SANTORA:  Objection.

THE COURT:  Well, it's compound, so I'll sustain it.

Q.   You wondered at the time why it was coming to you, correct?

MS. SANTORA:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Am I answering that?

THE COURT:  Yeah, you answer.

A.   I wondered why HSI was effectuating this arrest, not ERO, yes.

Q.   And you still don't know?

A.   I don't know.

MS. CONLON:  Nothing further.

THE COURT:  Nothing further, Ms. Santora?

MS. SANTORA:  Nothing further.

THE COURT:  You may step down.  And may I have the document back?  Simply because -- what we'll do is, the record is clear I showed it to you.  Today we'll cause copies to be made both to the government and for plaintiffs so you know exactly what it is that I asked --

MS. CONLON:  Your Honor, with respect to those additional documents, does the court know whether the court is in receipt of these additional reports that the witness mentioned?

THE COURT:  No.  I'm not going to be put in a position of culling through everything.  I'm doing the best I can.  You're going to give me a list, and in addition to the list I suppose you're going to give me a request, and I will take my time promptly and address it.

MS. CONLON:  With respect to the next witness --

sorry.

THE COURT:  Let's call the next witness while we're talking.

MS. CONLON:  Okay.  Well, it's an application to preclude the next witness, so I don't know if you want him in the room for it or not.

THE COURT:  It's what?

MS. CONLON:  An application to preclude the next witness, simply on this ground.  Your Honor indicated Friday of last week very clearly that we weren't going to be putting on witnesses who had not been deposed.  This is a witness who we did not get to depose.  We had asked the government to let us. We brought that to the court's attention.  The court said, "Work it out between the parties."  It didn't work out.  We didn't depose him.  We move to preclude him.

MS. STROKUS:  Your Honor, may I be heard?

THE COURT:  Yes.

MS. STROKUS:  Your Honor, since last Friday we have made Agent Heck available to plaintiffs.  They simply have not asked to depose him yet.

THE COURT:  He may testify.  I'll give rather broad cross-examination.  He may be called.

MS. SANTORA:  Your honor, defendants call acting special agent in charge Christopher Heck.

THE COURT:  He may be called.

CHRISTOPHER HECK, Sworn

COURTROOM CLERK:  Can you please state your full name, and spell your last name for the record.

THE WITNESS:  Sure.  It's Christopher Reid Heck, H-e-c-k.

THE COURT:  Thank you.  You may be seated.

Ms. Strokus, you may continue -- or you may commence.

DIRECT EXAMINATION BY MS. STROKUS:

Q.   Good morning, Mr. -- excuse me, Special Agent Heck.

A.   Good morning.

Q.   Where do you currently work?

A.   I currently work in the Immigration and Customs Enforcement, Homeland Security Investigations, Washington, D.C. field office.

Q.   And what is your current job title?

A.   My current job title is acting special agent in charge.

Q.   How long have you held that role?

A.   Approximately five months.

Q.   And what does a special agent in charge do?

A.   Sure.  In my current capacity, I'm responsible right now for administrative and operational oversight of our office's operations in the District of Columbia, the Commonwealth of Virginia and West Virginia.

Q.   When did you begin working for the United States Government?

A.   Approximately June 2003.

Q.   And what were you doing?

A.   When I first became employed by the U.S. Government, I started out as a U.S. Customs inspector in Tampa, Florida.

Q.   What did you do after that?

A.   So U.S. Customs transitioned into U.S. Customs and Border Protection after the merger after 9/11.  Then I became hired by Immigration and Customs Enforcement, Homeland Security Investigations around November of 2008.

Q.   Can you briefly walk us through the different roles you've had at HSI?

A.   Sure.  Upon graduation of the Federal Law Enforcement Training Center in Glynco, Georgia, I was initially assigned to the New York field office for approximately eight or nine years.

Within that stint, I was assigned an 18-month TDY or temporary duty assignment to our headquarters in Washington, D.C.  And then upon arriving back at the New York field office, I was promoted to a program manager in the front office where the special agent in charge worked at the executive leadership and was supporting executive leadership at the time.

Then I was promoted again in the New York field office to a group supervisor or supervisory special agent over our trade enforcement group in New York.

Q.   And after that you became the acting special agent in

charge in Washington?

A.    No.   So after New York, I took a promotion as the resident agent in charge in Jackson, Mississippi, and that was in roughly February 2019.

And then I became an assistant special agent in charge in our St. Louis office, overseeing operations in most of Missouri outside of the suburban Kansas City area as well as the eastern part of Iowa.

After a short stint there, I took a temporary detail, temporary duty assignment to our headquarters again where I became the acting deputy assistant director for our public safety and border security division in headquarters.

From there, in 2003, I was the HSI chief of staff for approximately two years prior to this current role.

Q.    And you mentioned that you had received training all the way back when you first started with HSI, correct?

A.    Yes, ma'am.

Q.    And that was at what is commonly referred to at HSI as FLETC, the FLETC training center?

A.    That is correct.

Q.    And what type of training did you receive there?

A.    Sure.   You receive basic law enforcement training, such as firearms training, arrest techniques, handcuffing, defensive tactics, physical fitness and also, because we are investigators, we also receive criminal investigator training

program, criminal investigator training where we receive customs law, a little bit of immigration law as well as other activities.

Q.   And after that training was complete, did you receive any other training?

A.   Sure.  Throughout the course of my career and every special agent's career, we get annual training, legal training, firearms training, defensive tactics training.  Depending on what type of investigative discipline you're assigned, whether it is criminal investigations or Title 8 work, you receive on-the-job training and sometimes advanced training as well.

Q.   So would it be fair to say that you've received continuous training on law enforcement techniques?

A.   Yes, ma'am.

Q.   As the acting special agent in charge for the Washington, D.C. area, how many people do you supervise?

A.   Between administrative and government law enforcement officers as well as state and local task force officers, it's roughly 400.

Q.   And of the agents that you supervise, do they also receive the same training that you receive?

A.   The special agents do, yes.

Q.   And that includes continuous training on law enforcement techniques as well?

A.   Yes, quarterly defensive tactics training as well as

firearms training.

Q.   What type of work do the agents that you supervise perform?

A.   Agents under my purview, with any HSI special agent, we conduct criminal investigations pursuant to Title 18 of the U.S. Code, Title 19 of the U.S. Code, as well as Title 8 enforcement operations.

Q.   In your rather long career at HSI, have you personally performed arrests?

A.   I have.

Q.   And are you familiar with the protocol surrounding arrest operations?

A.   I am.

Q.   Are your agents that you currently supervise similarly familiar with arrest protocols and practices?

A.   Yes, they are.

Q.   I would like to ask you a few questions about the arrest of Mr. Badar Khan Suri.  Were you involved in that arrest in any capacity?

A.   In charge of the field office, I oversaw the arrest, but I was not physically present at the time of arrest.

Q.   So what was your role in the arrest?

A.   To oversee the administrative arrest of Badar Khan Suri.

Q.   Were normal HSI procedures followed with respect to Mr. Suri's arrest?

A.   Again, I was not out there present on the street with the arrest.  However, there would be no -- yes, the proper protocols would have been followed if I would have been --

MS. CONLON:  Objection, Your Honor.  I'm moving to strike this as speculative based on his response.

THE COURT:  Well, I'll let what he responded to stand and I'll stop him at that point.  He doesn't know of any deviation from procedure is what I get from him.

Q.   Would you have been informed if there were any deviations from regular HSI procedures that occurred at Mr. Suri's arrest?

MS. CONLON:  Objection.  Calls for speculation.

THE COURT:  Sustained.  It does.

Q.   With respect to Mr. Suri, when did you first become aware of Mr. Suri?

A.   Sometime in mid March.  I don't recall the specific date.

Q.   And how did you become aware of Mr. Suri?

A.   I received a phone call from our headquarters stating that the Department of State may deem Mr. Suri removable and that he may be amenable to administrative arrest at some point should that removability happen.

Q.   And did you receive any instructions from headquarters on what to do with respect to Mr. Suri at that time?

A.   Yes, sure.  Headquarters just stated to get out and start beginning surveillance to try and locate Mr. Suri in the event that the State Department deemed him removable.

Q.   Did HSI engage in this surveillance of Mr. Suri?

A.   We did, yes.

Q.   And at what point did HSI arrest Mr. Suri?

A.   A few days later.  Again, I don't remember the specific dates.  I want to say I was notified on the weekend, and I believe he was arrested on a Monday night, from my recollection.

Q.   Are you familiar with how Mr. Suri was arrested?

A.   I'm aware that he was arrested in the Rosslyn, Virginia area and taken into custody there administratively, yes.

Q.   Are you aware of any specifics with respect to Mr. Suri's arrest?

A.   The specific arrest, he was apprehended in Rosslyn and taken into custody as normal protocol policies would dictate.

MS. CONLON:  Objection, Your Honor.  Moving to strike that last portion as speculative.

THE COURT:  He doesn't know any evidence that they were not.  I'll let it stand for that.  Go ahead.

Q.   At any point were you told or was it ever suggested to you that Mr. Suri was going to be arrested because of his support for Palestine?

MS. CONLON:  Objection, form.

THE COURT:  Overruled.  I've allowed questions in this form.  It goes to the heart of the case.  They may get his answers.

A.   Can you repeat the question, please?

Q.   Sure.

        THE COURT:   Were you ever told or was it suggested to you that the reason for his arrest was his support for Palestine?

A.   No.

Q.   Were you ever told or was it ever suggested to you that Mr. Suri would be arrested because of his criticism of Israel?

A.   No, never told that.

Q.   Did you ever receive any communication of any kind at any time indicating that Mr. Suri was being arrested because of his political views?

A.   No.

        MS. STROKUS:   I tender the witness, Your Honor.

        THE COURT:   Thank you.

        Any questions for this witness?

        MS. CONLON:   No, I don't think we do.

        THE COURT:   You may step down.   Thank you.

        All right.   That concludes the testimony for today. I'm not charging this last hour to anyone because witnesses that are available and could be called clearly fall within the stay of the Court of Appeals, and to honor that stay, it would be unfair to charge the time.   Let me tote up the time that we have used and we'll recess.

        Total elapsed time, plaintiff three days, one hour, 35

minutes.  Defense, one day, three hours, five minutes.

One thing, anticipating that we may get Mr. Armstrong back and I think we've discussed it sufficiently that I'm able to rule.  I do rule that the assertion of the deliberative privilege applies to those statements apparently of Mr. Armstrong on the discussion letters, so I'm not going to consider those statements.  However, given Mr. Armstrong's central role here, he may be examined as to his views about the matters where he has written something on those statements.

Should he not remember, the discussion letters may be used to refresh his memory without them being in evidence, and I think that's sufficient under the circumstances.

MS. CONLON:  Your Honor, may I -- sorry.

THE COURT:  Actually, I saw Ms. Santora first.  We'll go with their side first, but I could use the recess.

Ms. Santora, anything before we recess?

MS. SANTORA:  Yes, Your Honor.  We do have documents that the plaintiffs requested earlier today.

THE COURT:  Then they may of course be disclosed.

Mr. Kanellis.

MR. KANELLIS:  Your Honor, yesterday we raised the question of the timing of the posttrial --

THE COURT:  You did and I didn't answer it.  I don't know that I can answer it, but I'm thinking about it.

Here is what I'm thinking.  Suppose my hopes are

realized and at least the stay is lifted.  My primary goal, as I reported to the Court of Appeals, is to get through the evidentiary portion, and I'm going to do that.  And then I'm going to entertain final arguments.  I'm open to 45 minutes a side final arguments, but don't take this as an expansion of the time limits.  If they go that long, probably that will be on another day.  But final arguments, as I conceive of it, should be immediate or the next day because everything is out here, I will be more imbued with the case than at any time.

MR. KANELLIS:  Your Honor, just a point of clarification.  Sorry to interrupt.

THE COURT:  I'm over-speaking, I know.  Go ahead.

MR. KANELLIS:  No.  I'm interrupting.  When you say final, are you talking about the written briefs?

THE COURT:  No, no.  I'm talking about the oral arguments.

MR. KANELLIS:  And we'll be prepared to do the oral argument on Friday, but my question is about the written posttrial brief.

THE COURT:  I was getting there.

MR. KANELLIS:  I apologize.

THE COURT:  Right.  At that time, because I expect this to be interactive as I have been throughout, especially when you're making the arguments, both sides, I will say, as I have at other times, "But what about the statute," for example.

I can imagine my saying in anticipation of some expected argument, "But don't you think that," whatever, and we'll go back and forth.

Now, how you take my initial reactions is going to inform the briefs. So when we're done with that, as I reported to the Court of Appeals and it remains my intention, that's the time we will say, "When can you get me, I want requested findings of fact and rulings of law addressed to phase one." And of course I will accept posttrial briefs which have the appropriate citations to what's going on here at trial.

Does that answer your question?

MR. KANELLIS: Yes, Your Honor. I just want to make sure that you're not expecting from us a written posttrial brief on Friday.

THE COURT: Why did I just speak?

MR. KANELLIS: Yes.

THE COURT: Okay.

MS. CONLON: Your Honor, we have some questions and requests. Regarding closing arguments and posttrial briefing, we'd I guess ask the court and the government to consider this. We think that the court and the parties could benefit from having briefed the legal argument before it is argued so that the court may ask questions as to the arguments that are actually being put forward by the parties. In other words, we would suggest strongly that we be able to submit the posttrial

brief and then have the legal argument on the brief.

It seems difficult to do that on Friday before the court has actually received an articulation of what these arguments are, and we want to make sure we are responsive to the court's questions.  And we have been working on our brief throughout diligently because we understood it was due Friday.

So if the court -- I understand the government wants more time for their brief.  If the briefs were submitted Monday, we could appear truly as soon as the court wanted to do argument about it, but we want to make sure that we are as efficient as we can be with the court's time and that we are responsive to the court's questions.  So that's my first request.

THE COURT:  I've got to think about it.  My initial reaction is, I think I'm a pretty transparent person, and I've got in mind the questions I have about the issues that are before the court.  I don't know that I need some separate argument.  In other words, do it in two stages.

And my hesitancy is this.  Some of it depends on the finding.  And to me the finding, it is very -- findings, plural, are first and foremost.  What do I think of all this?  And as to that, I hope I've been, as judges should be, appropriately cagey, but that's because I very much want to hear it all before, in a written opinion, I commit myself in a sound written opinion.

I'm not embarrassed by the objections.  The guts of it are before the court, and I really think counsel on both sides have done a fine job.  I just don't know what --

MS. CONLON:  Would the court consider --

THE COURT:  I mean, arguing the law, the law doesn't make much difference until we know what the facts are.

MS. CONLON:  With that, I think we're on the same page.  And what I would like to propose is we argue on the facts on Friday.  We all have heard the testimony.  The court sat through it too, we're all in a position to discuss it, but that you allow us to appear to respond to Your Honor's questions on the law after we have submitted to you how we think the law applies to these facts.  In other words, two parts.  So what we would propose is that on Friday we do the findings of fact.

THE COURT:  If I need it, I'll call you back.

MS. CONLON:  Okay.

THE COURT:  Go ahead.  What else?

MS. CONLON:  Yes, next, okay.  In terms of the sort of the thing you said at the very beginning about Mr. Armstrong, since I will be, if we're allowed to, resuming that cross and I want to make sure I heard it.  I missed part of what you said.  You said the deliberative process privilege applies.  Is it only to his annotations?

THE COURT:  Yes.

MS. CONLON:  Okay.  I just wanted make sure I got that.  Then with respect to certain documents, obviously, we understand that this is in front of the circuit right now, but we wanted to make the court aware that in what we have received from the court we have not seen the action memos, the Armstrong action memos for Mr. Suri or for Mr. Mahdawi.

We can tell from various filings the government has made that the court received those as exhibits to docket 131, Exhibit M and Exhibit N.  We received L and O, not M and N as in Nancy.  And we are making the request for those in advance of -- depending on what happens, but in advance of Mr. Armstrong's cross-examination.  We think they are part of the core documents in the case.

THE COURT:  When you say "depending on what happens," you mean depending what the Court of Appeals does?

MS. CONLON:  Well, I think we've made our position to this court and the circuit clear that we think that these particular documents should be squarely permitted to be part of this examination, but I'm saying -- yes, so yes.

THE COURT:  That's right.  Because reading their order, and it's an order, fairly, I'm not disclosing anything that trenches on that order.  Depending upon what I am told, to the extent that I have discretion, I will wisely exercise that discretion.  Beyond that, there's nothing I can say.

MS. CONLON:  And one more thing to ask the court to

consider, if the court will allow me. Obviously, the court knows that we are very focused on time, and we appreciate that the court is, too. The court indicated that closing arguments could occur Friday, up to 45 minutes. We just want to make sure we understand whether that comes out of --

THE COURT: That comes out of your trial time.

MS. CONLON: Okay. And then we understand the court to have calculated our trial time as three days, one hour and 35 minutes and wanted to clarify whether that is inclusive of the ten-minute-or-so colloquy I had with the court and the government about whether they would give us this report before I began my cross-examination. I'm scraping for -- I'll take, even if I can get my ten minutes back, I'll take them. That's the level of desperation.

THE COURT: That's the ruling of the court. I've done it fairly since I came on the bench at 9:00.

All right. I do thank you all.

I don't know as you're going to be done by Friday. I mean, I think we might well shoot for Monday here, so -- well, I don't know. We have Armstrong's cross, redirect, et cetera, and we have -- those are the only two witnesses that are left, right?

MS. CONLON: Armstrong, Watson, the government's summary witness, and Veena Dubal for the plaintiffs.

THE COURT: Okay. I don't know if we're going to be

done.  You know, let me say, and I probably shouldn't do this.  I don't have much trouble with their summaries.  It seems to me that the summaries are, broadly speaking, relevant.  I do have trouble with one witness trying to put in all these summaries, unless that witness had something to do with preparing the summaries.  That does seem to be the First Circuit law.  But I'd just as soon not waste time on the witness and accept the summaries.  They're peripheral, but assuming they're accurate, that's what people were posting or not posting, and it might be helpful to see it.

MS. CONLON:  Your Honor, I would defer to my colleague.

THE COURT:  Wait a minute.  The gentleman I haven't heard from, just simply --

MR. WILKENS:  Yes, Your Honor.  Mr. Wilkens, Scott Wilkens.

THE COURT:  Mr. Wilkens again, yes, sir.

MR. WILKENS:  Yes.  One quick question, which is, did you receive the motion in limine that we filed yesterday on these exhibits?

THE COURT:  I did.

MR. WILKENS:  Okay.

THE COURT:  That's what caused me to speak.

MR. WILKENS:  Okay.  Thank you, Your Honor.

THE COURT:  It's not a ruling.  I'm just talking.

See, if I sit here and talk with you, the time goes by.

Ms. Conlon.

MS. CONLON:  I hear the court, and unfortunately I think that our view would be that we -- we have concerns about the reliability of the summary exhibits and whether they show what they purport to show, in other words.  We of course don't know -- we don't know who prepared them, obviously, so I can't address that.

THE COURT:  Well, a summary exhibit, if it was a jury, let's say they pass 1006, I would always say to the jury, "Now, I'm letting you see this because this, they say, purports to summarize voluminous exhibits."  Then I trash it in front of the jury.  I say, "Now, understand, they made this up for this trial."

Now, I give myself the same instruction.  But I'd just as soon have a more complete record rather than a less.

Mr. Kanellis.

MR. KANELLIS:  I'll just note for the record this summary witness will comply with the *Milavetz* decision, which is the controlling First Circuit decision on 1006 summaries, and you'll be relieved to know he's going to be ten minutes on the stand.  That's it.

THE COURT:  Now it's time for me to recess.  We'll recess.  I don't sit tomorrow, as I said.  9:00 on Thursday, assuming we have something to do, but we have at least the

witnesses not covered by the First Circuit's order, and I would like to hear those witnesses.  Thank you.  We'll recess.

(Adjourned, 12:17 p.m.)


* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this  15th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter