UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY


AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs


vs.


MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


********


For Bench Trial Before:
Judge William G. Young




United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 21, 2025


*******


REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

I N D E X

PRELIMINARY MATTERS................................    4

CLOSING ARGUMENT BY MS. KRISHNAN/MS. CONLON........   12

CLOSING ARGUMENT BY MR KANELLIS/MR. KANTER.........   36


E X H I B I T S


(None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT:  Good morning.  Because we have -- I have authorized internet access to these proceedings, it's appropriate for me to say that if you are accessing these proceedings via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, it is especially important that you keep your microphone muted at all times.  If you do not mute your microphone, we will necessarily have to cut you off right away.

All right.  I will start with the plaintiffs. I've been given, um, 6, I think the Clerk said, and I do have 6 binders that have, um, deposition designations, um, in them, um, and --

Yes?

MR. ABDO:  Yes, your Honor.  Alex Abdo for the plaintiffs.

THE COURT:  Yes, Mr. Abdo.

MR. ABDO:  If I could just briefly lay out what happened?

THE COURT:  I think so.  That would be helpful.

MR. ABDO:  Sure.  The 6 binders are the

government's designations of the deposition of one witness. Our counterdesignations in a separate binder, so that's two of the binders. And the other 4 are our designations -- um, targeted designations with respect to 4 of the other witnesses. And we believe that those designations should come in under Rule 32 (a)(3), and are happy to explain why. But that's what you have before you.

THE COURT: Thank you. Let me go step by step.

So as to 2 -- and I take it, um, Brian, um --

MR. ABDO: Shuve, your Honor.

THE COURT: Which are the 2? So we're clear on that.

MR. ABDO: So the 2 that involve the government's designation and our counterdesignations are Mr. Shuve's deposition transcript.

THE COURT: All right, so I'll just start there.

And, Mr. Kanellis, I will read the designations and counterdesignations. I will make notations so that, for possible review, it's very clear what I've sustained. If there are objections -- if there are no objections, I will read the designations or counterdesignations. And other than that, as to Mr. Shuve, I may consider this deposition.

MR. KANELLIS: Yes, your Honor, pursuant to Rule

804(a), and that is because the witness is unavailable, and 804(b) because it is under 804(b) --

THE COURT:  Well I'll get to specifics when there's objections.  I hear no objection.  So you can be sure that I will read the designations, the counterdesignations, and rule on any objections.

MR. KANELLIS:  Your Honor, and I apologize, we would ask -- because we do have additional time and because we are about to go into closing arguments --

THE COURT:  Right.

MR. KANELLIS:  There are select excerpts that we think are important to highlight for the Court as far as our affirmative case.

THE COURT:  Understood, but denied.  I can read. However, if you want to make mention of them in closing, I'll leave this on the bench so I may look at it.

Now back to Mr. Abdo.

So is there a second witness in the same situation?

MR. ABDO:  No, your Honor, that's the only witness we --

THE COURT:  All right.  So now we have -- I have four other, um, binders.

And you offer them?

MR. ABDO:  Yes, your Honor.

THE COURT:  Do you object to these?

MR. KANELLIS:  Oh, absolutely, your Honor.

THE COURT:  Well absolutely.  So now I have to think about ruling.

MR. KANELLIS:  Sure.

THE COURT:  And, Mr. Abdo, I'll hear you.

Why -- on what basis -- well let me be clear.  Are there -- there are designations in here.

So on what basis ought I consider the designations in these as part of the record in this case?

MR. ABDO:  Yes, your Honor.  We think they should come in under Rule 32(a)(3).  That rule allows an adverse party to use, for any purpose, the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6).  We think these individuals, all of four of them, qualify as officers or managing agents of the defendant agencies which we have sued in this case.

THE COURT:  Okay, just a moment.  I clearly know who Mr. Watson is, and he testified, and I know who Mr. Armstrong is.  I have Mr. Veprek and, um, a person by the name of Stuart Wilson.

And, Mr. Kanellis, what is the objection?

MR. KANELLIS:  The objection, your Honor, is that the -- your Honor has given us guidelines about

witnesses, your Honor has said that it expects to hear parties to identify witnesses in advance of trial. Mr. Veprek and Mr. Stuart Wilson -- the second individual, Mr. Wilson, the plaintiffs did not call them as witnesses, their statements do not qualify under Rule 804 for admission, because they were.  They did not, um -- they were available to be subpoenaed, they were able to testify.  They are trying to circumvent your Honor's rules about time by adding in ex-post testimony from witnesses out of context.

THE COURT:  What about Andre Wilson and John Armstrong?

MR. KANELLIS:  Mr. Armstrong and Mr. Watson, your Honor, we don't have an issue with respect to those designations, those witnesses testified, and we think your Honor can fairly balance, um --

THE COURT:  Well so now --

MR. ABDO:  Your Honor --

THE COURT:  Again, so I'm clear, I heard you briefly there -- so we're clear, the record will include the designations as to Andre Watson and John Armstrong. And now I'll let you respond to what Mr. Kanellis said about these other two.

MR. ABDO:  Yes, absolutely.

Mr. Kanellis is relying on the notion of witnesses

being unavailable.  That proposition is --

THE COURT:  He isn't, he's saying you never designated these as witnesses.

MR. ABDO:  They don't need to be designated, respectfully, your Honor, under Rule 32(a)(3) to come in as deposition transcripts because they are the depositions of adverse parties -- of the officers or managing agents of an adverse party.  And the rule is very clear that unavailability or the presence of a witness at trial is not a precondition to designation under that rule.

I can direct the Court's attention to --

THE COURT:  No, no, no, that's okay.

So who is Veprek?

MR. ABDO:  Your Honor, if you just give me one moment.

(Talks to counsel.)

MR. ABDO:  A Special Assistant to the Counselor, your Honor.  These are both senior officials.

THE COURT:  Special Assistant to the Counselor. Of who?

MR. ABDO:  Of the counsel who reports to Secretary Rubio, your Honor.  Of Michael Needham, who is the counsel who reports to the Secretary.

THE COURT:  All right.

And who is Stuart Wilson?

MR. ABDO:  Your Honor, if I can turn it over to Ms. Conlon, who is more familiar with this.

THE COURT:  Who are these people?

MS. CONLON:  Good morning, your Honor.  Stuart Wilson reports directly to John Armstrong, he is the person directly below John Armstrong.  So he oversees not only the Visa Office, but other aspects of the Bureau of Consular Affairs.  He is the person who, if you were to look at Mr. Armstrong's deposition, Mr. Armstrong repeatedly suggests would know a lot of the details about this program that Mr. Armstrong couldn't recall.

THE COURT:  All right, I'll take the matter under advisement, um, as to these.

And I take it, having worked through yours, the plaintiffs now rest?

MS. CONLON:  Yes, your Honor.

THE COURT:  And the defendant public officials now rest?

MR. KANELLIS:  Your Honor, there was one -- we do except for -- there was one outstanding issue, very early, the first day of trial, about the admissibility of an exhibit that your Honor has not ruled on.  Subsequent to that first hearing, the plaintiffs

indicated that there was a just a miscommunication about what document it was and they assented to its admissibility.

THE COURT:  And the number is, or the designation is?

MR. KANELLIS:  I will, um -- your Honor, if you'll allow me, I will identify that document.

THE COURT:  That's fine.  And assuming there's no disagreement, we'll, um -- I will of course receive it in the record.

Now I have said we'll take a deep breath now and get ready for final argument.  I acknowledge the filing of two additional briefs, which I have had the opportunity to read and I thank counsel for them.  I'm prepared now to recess until 10:00, unless you want to start before that.

What's the plaintiffs' pleasure?

MS. KRISHNAN:  We're fine to start at 10:00 a.m.

THE COURT:  At 10:00.  Very well.

We'll stand in recess until 10:00 a.m.  We'll recess.

THE CLERK:  All rise.

(Recess, 9:15 a.m.)

(Resumed, 10:00 a.m.)

THE COURT:  All right.  The plaintiffs will argue

first and then I'll hear the defendants.

CLOSING ARGUMENT BY MS. CONLON/MS. KRISHNAN:

THE COURT:  Ms. Conlon, let me start with a question.

What -- you've assumed throughout -- I don't quarrel with it, you've talked to your witnesses as though this ideological deportation policy was just self-evident and it existed.  Tell me what it is and where the evidence of it is?

MS. CONLON:  Yes, your Honor, in fact what I hoped to do is to, in 10 minutes, summarize for you what we put into evidence that showed what it is and that it exists, and our intention is that Ms. Krishnan will then explain why that policy violates the First Amendment.  But in short, the policy is one of revoking the Visas and green cards of noncitizen students and faculty based on their pro-Palestinian advocacy.

THE COURT:  Why?  In other words, what's the goal of that policy?

MS. CONLON:  Oh, I think that the goal is quite clear from the -- both from what you heard from the witnesses, the documents in evidence, and the statements of public officials.  The goal is to chill speech, the goal is to silence students and scholars who wish to

express their pro-Palestinian views.  It is stifling dissent, your Honor, that's the goal.

Now the government says that the policy that we've challenged is a figment of our imagination, that it doesn't exist.  But outside of this courtroom, the government speaks about it quite freely and demands credit for it.

And, your Honor, over the past two weeks the government officials that you've heard from have acknowledged the policy even if they won't use that word.  They've told you that there's a new process, a new program, a new guidance, new lines of effort --

THE COURT:  Well there are existing processes which have been put to new uses perhaps, um --

MS. CONLON:  Well, your Honor, in particular Mr. Hatch and Mr. Watson didn't say it was an existing process, I mean Mr. Hatch and Mr. Watson literally --

(Interruption, cell phone ringing.)

THE COURT:  You'll have to excuse me.  Go ahead.

MS. CONLON:  Mr. Watson and Mr. Hatch used the word "new," they did that over and over, they just didn't call it a "policy."  And if you look back both at the deposition designations we've submitted and the trial transcripts, I'm confident you'll see that, that they said that this was a new process set up to manage

this influx of referrals that needed to be dealt with quickly.

THE COURT:  Well, yes, an influx of referrals, but, um -- and they dealt with that.  I guess I -- you seem to be trying to cram this into some sort of Administrative Procedure Act context.

Suppose this Court is unpersuaded of that, does the case fail?

MS. CONLON:  No, your Honor.

THE COURT:  Why not?

MS. CONLON:  Well, your Honor, the policy -- whether you call it a "policy" or something else, the fact is that the government is systematically violating the First Amendment by revoking the Visas and green cards of people based on their speech.  So whether you call it a "practice," a "pattern," a "policy," what they are doing is unconstitutional, and what they're doing is having the effect of chilling the speech of the plaintiffs, which is the basis for our claim.

You know, your Honor, I hear you about the sort of cramming it into an Administrative Procedure Act claim. The reason we have spent so much time introducing evidence about the process is because our view is that the creation of the new process, and the manner in which it was executed, proves what the point of the whole

thing was, the fact that this process was developed to be as quick as possible.

The government tells you "Oh, well this is about independent layers of screening and vetting," but the evidence shows that that's not what happened and that's not true, and all of that matters, the Court's examination of the process matters for understanding the existence and the purpose of the policy that we're challenging. So with respect to the process, there's a few things we want to point out.

The Reports of Analysis, that your Honor heard so much about from the Office of Intelligence, relied almost entirely on unvetted allegations supplied by Canary Mission, an extremist pro-Israel group that compiles black lists of students and scholars that it deems to be --

THE COURT:  On Canary Mission, yes, you've now characterized it as an "extremist group."  Do I have that in evidence?

MS. CONLON:  You do.

THE COURT:  Well apparently it's a group who, um, who doxxes people -- I would say the evidence shows, it's a group who doxxes people who they say hate Israel.

MS. CONLON:  Yes, and your Honor actually has in evidence the web pages.  We put them into evidence.  We

didn't spend a lot of time looking at them, because they speak for themselves.

But when you can look at them, you will see that that is -- what the website sets out and purports to do is only to identify people who have these views.  It's not to identify people who are breaking the law.  It's not to identify people who are supporting terrorism.  It's to identify people who have views that they disagree with.

And the fact that that is a pool of people that the government started with for this process tells you what the point of this policy was.  They started by looking at people who hold certain views to see whether there was any enforcement action they could take against those people.  This is why we talked so much about the process, because we think it proves the point.

MS. CONLON:  But the other critical part of the process I wanted to -- no, go ahead.

THE COURT:  It's perfectly appropriate for the government to take leads from any source, it would seem to me.  I mean frequently this Court sits where the lead comes from a wrongdoer or a rival gang or something like that.

MS. CONLON:  Yes.

THE COURT:  And that's perfectly-appropriate law

enforcement.

MS. CONLON:  Well two points about that.

The first, in the instances your Honor just described, those are leads about alleged law-breaking, those are leads about alleged criminal activities.  The "leads," if you call it that here, are just about people who allegedly have criticisms of Israel or criticisms of the United States.  But the second point I want to make is about what you leaned about the next step in the process.

Now I assume, when the Court hears about these leads from law enforcement in other matters in criminal cases, the Court then hears about an investigation that was done, diligent steps that were taken to ensure the accuracy of those leads, particularly when they're found in an unknown or an unreliable source.  But that is not what happened here.

The letters that Watson and his team wrote purport to summarize what's in Mr. Hatch's ROAs, from the Office of Intelligence.  But if you line up a Watson letter next to a Hatch ROA, what you're going to see is that the Watson letter makes enormous inferential leaps that are not supported by what is in the ROA.

What happens in the ROA, as your Honor heard from Mr. Hatch quite candidly, is just a collection of what

somebody said about someone on the internet, the fact of the allegation.  But what happens in the Watson letter is the adoption of those allegations as true without any explanation of how that conclusion was reached, without any vetting of the underlying sort of substance of the allegation.  And that's how you wind up with someone like Ms. Ozturk being described as "pro-Hamas."  The whole process relies ultimately on DHS and the State's indefensible conflation of antisemitism with speech that is anti-war, pro-Palestinian, or critical of Israel.

Now I think it's really very important that nobody from DHS or the State Department have told you that there was a defined meaning of "antisemitism" that's guiding everybody's work or that there was guidance about what that means, either to be "antisemitic" or to express support for a foreign terrorist organization. Instead, the evidence shows that senior officials, like Mr. Armstrong, relied on their own views to guide this work.  And Mr. Armstrong was quite candid about his views.  He believed that slogans calling for a "free Palestine" are inherently antisemitic, or that anti-Israel sentiment is in fact just antisemitism masquerading as a viewpoint, or a "dodge," as you put it.  And importantly, he believed that mere association is not protected expression, but an action that can

warrant the revocation of a Visa or a green card.

And, your Honor --

THE COURT:  And at least under the law he may be right?

MS. CONLON:  Well in terms of whether he has the authority to revoke a Visa for any reason he wants, sure, the statute says "revoke for any reason at any time," but the statute doesn't trump the Constitution. And, Ms. Krishnan, I will not step on her toes, because she is ready and eager to talk about that.

Being mindful of my time, there's a few other -- oh, go ahead.

THE COURT:  But help me out now with -- there is evidence that, as an advocate, to support the things you've just said.  Where is the -- what's the best evidence of the intent now, directed not just to the people we've been talking about -- and I recognize that I limited it to 5, to have a manageable case.  But not just to them, where's the evidence of, um, concern, proper concern on the part of your clients, where's the evidence of intent to influence them to chill their speech?

MS. CONLON:  So I hear that as a two-part question.

THE COURT:  It is.

MS. CONLON: All right. So I'll start with the evidence of intent to chill their speech. Now I think there are two very easy examples to point to.

The first are the unprecedented arrests of these targeted noncitizens, arrests that your Honor heard, from the people who have to oversee the effecting of those arrests, are not part of the ordinary course, and arrests that your Honor heard from the plaintiffs, um, terrifies them.

I think the second thing I would point to is the government officials' public statements about these arrests and what they have done. And we didn't spend time here reading into the record those statements --

THE COURT: Well what's the link between those two?

MS. CONLON: Your Honor, the statements are to the effect of, "You saw what we did to Mr. Khalil, you can be next." The public statements are designed, by the government officials, to terrorize everyone else who shares the views of the people who they have arrested. The government officials don't post on social media about every Visa they revoke, every green card holder who they determine is removable, but in evidence -- and your Honor will see it in all of the exhibits, government officials went out of their way, over and

over again, to make exactly those kinds of statements here.

THE COURT:  One fact point that I think falls in what I understand is your area.  I don't hear any evidence, I don't think, but I have to go back over the whole record, that any, um, member of the group, um, groups, whom you represent was on that Canary Mission list.  There is no such evidence.

MS. CONLON:  There is in fact, your Honor.  Yes.

So, first, you heard from Nadia Abu El-Haj who described not only that she's on the list, but inaccuracies about her in her Canary Mission profile.  You heard testimony from her about that.  And I believe you also heard testimony from Veena Dubal about members being on Canary Mission.

And then, um, you heard -- if your Honor were to look at some of the profiles we've put into evidence -- and just one moment, I want to confirm that what I'm saying is correct.

(Speaks to co-counsel.)

MS. CONLON:  The other thing we have in evidence, your Honor, is that MESA, the Middle Eastern Studies Association, is one of the groups highlighted on the Canary Mission website.  In other words, that the Canary Mission website suggests that the people who are members

of MESA share the views of all of the people that they have identified on the website.

THE COURT:  And that I can confirm by looking at the matters in evidence?

MS. CONLON:  Yes, your Honor.

(Pause.)

MS. CONLON:  And in terms of the harms, your Honor, um --

(Speaks to co-counsel.)

MS. CONLON:  Okay, so I think there's a few things.

The first, um, I think it's clear from the government's public statements that it was the fact of the advocacy by the targeted noncitizens that led to the enforcement efforts against them, and that is one of the things that was terrifying for the plaintiffs.

Second, your Honor, you heard directly from three of the noncitizen plaintiffs who described to you the chilling effect that this had on them.  And one point I want to make about that is that the government went out of its way in its opening to characterize the plaintiffs as "academics obsessed with theories and ideas and, you know, not grounded in reality."  But here's the reality.

Some of the people you heard from are the professors of the students who were targeted for

deportation, like Ms. Abu El-Haj.  Some of the people that you heard from had made the exact same statements that Mr. Armstrong told you could be the basis potentially for an immigration action against them, have said, you know, "Free Palestine," have said -- have made public criticisms of Israel.  And that, I think, is a point that makes the plaintiffs' fear objectively reasonable here.

And in terms of harms, because I thought that was the other part of the question you asked me, in terms of harms, you heard that the plaintiffs refrained from publishing Op-Eds they wrote, abandoned scholarship they were engaged in that touched on this issue, to avoid any potential consequence for being associated with it by the government.  You heard about protests that they, you know, attended, um, taking precautions to attend or didn't attend at all.

And I know your Honor was listening carefully to them, so I will not belabor everything that they said, but those individuals, who testified, the noncitizens, established that the government's policy is working exactly as the government intended, that it is intimidating and scaring students and scholars into silence, to our collective detriment.

I think it may make sense at this point for

Ms. Krishnan to explain to you the First Amendment -- what the -- that the policy we're challenging is exactly what the First Amendment was meant to prevent.

THE COURT:  Thank you.

Ms. Krishnan.

MS. KRISHNAN:  Good morning, your Honor.

And I have three points that I would like to make this morning, um, two of which are responsive to questions your Honor has asked during trial.

The first is that noncitizens lawfully present in the United States have the same First Amendment rights as citizens do.  The second is that the policy is unconstitutionally viewpoint discriminatory.  And the third is that this Court need not reach the constitutionality of the foreign policy provision or any other INA provision that defendants rely on to carry out their policies.

THE COURT:  Why not, as to the third?

MS. KRISHNAN:  Well to be clear, we're not resisting the idea that this Court reach the question whether these, um, provisions would be unconstitutional as applied to the government using these authorities to deport people based on viewpoints, the reason why relief against the policy is essential is one that I think Ms. Conlon made, which is that defendants rely on any

number of statutory authorities to carry out their policies.

You've heard about the foreign policy provision, but as you've heard a bit in Ms. Ozturk's case, the government relied on 221(i) of the INA, which is the State Department's Visa revocation authority.  You've heard from Mr. Armstrong about 4(b), which he said, um, would cover a broad range of statements that express support for Palestinians as well as statements that criticize Israel, and so that testimony made clear that those statements may form the basis of deportation.

And there's another provision too, 214(b) of the INA, which defendants have made clear, um, they believe entitles them to revoke the Visas of students when they engage in activities inconsistent with their student Visa.  And in public statements, as well as in the cables that are before this Court, defendants had indicated that engaging in activism, and in particular activism they consider to be pro-Palestinian or anti-Israel, are activities inconsistent with holding a student Visa.  And so that's why, you know, our argument, our primary argument is that the policy violates the First Amendment and this Court should reach that question.

And secondarily, and this is a point that we made

in our supplementary brief, um, we think that a ruling on that question would provide a complete basis for relief in this case.

THE COURT:  Without -- and your point is, um, without having to hold that, as to any individual's dispute with the government, the, um, the legal authorities invoked are unconstitutional as applied. But as I follow that argument.  Which is what I was pressing Ms. Conlon on.  It seems to me that you have to prove an intent -- implicit perhaps, but an intent to reach the groups that you represent, and chill their speech.  Retribution against these identified people to chill the speech of the larger group that you represent.

Do I understand the argument?

MS. KRISHNAN:  So to be clear, your Honor, we think that intent is an essential component of our *Bantam Books* claim, that is that the defendants are engaged in a campaign of threats to intimidate noncitizens into silence, but we don't believe that intent is a necessary element of our claim that the policy on its face is unconstitutionally viewpoint discriminatory.

THE COURT:  I hear you.  All right, go ahead.  I'm having trouble with this policy.

Look, it seems to me -- and I'm not making any

findings here, I'm just trying to be helpful.  It seems to me we have a new administration who has, you know, absolutely the primary authority over the foreign policy of the United States.  If anything is in the executive, the foreign policy of the United States is in the executive.  Public statements are made by the President, by the Secretary of State, the key officials, um, dealing with the foreign policy of our nation.  And, um, changes are made lower down in Homeland Security and in the State Department.  Procedures may be the same, but Ms. Conlon points to the evidence, that certainly the empathies are different, and then she develops all of that.

Now one can easily say that's an attempt by the professionals, lower-down, implicit or explicit instructions, to see what can be done under the existing legal framework, and indeed they find ways to proceed under the existing legal framework, and they do.  You say, having a consequence on the people you represent.  And I guess all I'm saying is, "Well we've got to find some intent to do that because how that worked out with specific individuals is a matter for those individuals and the legal processes in which they're involved, not this Court."  I guess that's the framework.

Now have I got that right?  Your argument, if I

hear you, is "But you have proved that," whether we call it a "policy" or, um, it is what chilled your clients unconstitutionally, because they fear retribution on the same basis.

Isn't that the essence of your argument?

MS. KRISHNAN:  Yes, your Honor.  Our argument is that the intent and effect of this policy was to chill, um, noncitizens, students and faculty, including our clients' members --

THE COURT:  From the get-go.

MS. KRISHNAN:  From the get-go.  From the get-go. But I want to -- I would like to come back to the point that I made earlier, which is that our claim that the policy is viewpoint discriminatory, does not turn on us being able to show an intent to chill noncitizens into silence.  Suddenly, for standing purposes, we need to show that this policy has harmed our clients.  And our theory of associational standing turns on us showing that the policies have caused, um, the AAUP's and MESA's members to self-censor based on a credible threat of enforcement, and we believe that we have carried that burden.

But to be clear, the claim that the policy is unconstitutionally viewpoint discriminatory, as the Supreme Court cases on viewpoint discrimination make

clear, um, what you need to show is that the regulation is viewpoint-based on its face and that the government hasn't carried their burden to show that that regulation satisfies scrutiny.

The Court has been clear that if a regulation is viewpoint-based, and it said this in *Reid,* it is subject to strict scrutiny, quote, "regardless of the government's designed notice of a content-neutral justification or lack of animus towards the ideas contained in the regulated speech."

And it's true that the government -- you know, um, one of their defenses in this case is that we've always had these statutory authorities.

THE COURT:  And that appears to be the rule.  I mean they go back to the McCarthy era.  And I don't mean that as a normative point, but that's true.  And we're all complicit in that, in the sense that there have been administrations of different political stripes and the like and the majority of our people have voted them in, and Congress hasn't touched those statutes, those statutes, the regulations under which they operate. That's what's been used here in this fashion.

MS. KRISHNAN:  That's true, your Honor.  But the fact that these authorities were already on the books does not foreclose this Court from finding that the

administration has adopted a new enforcement policy. And one of the cases that your Honor cited in its motion to dismiss opinion, um, the case of *Hoye* from the Ninth Circuit, which we cite in our supplementary brief.

THE COURT:  I saw that you did.

MS. KRISHNAN:  I think it's a good illustration of this.  Because the policy that the Court there found unconstitutional was a policy that was adopted after the statute was passed.  And the Court found that notwithstanding the fact that these -- that the authority there was, um, constitutional on its face, the enforcement policy there was content discriminatory, and the government had not shown that it was narrowly-tailored to a compelling government interest. And the policies that we challenge in this case, um, we believe is one that you can find unconstitutional on a similar theory.

THE COURT:  Go ahead.

MS. KRISHNAN:  And it's true that the government has also pointed to national security and foreign policy concerns.  But the mere indication of these concerns cannot immunize the government's actions here from judicial accountability.

THE COURT:  Well I -- I urge you -- I've been thinking about that, and I urge you to, um, all of you,

to read a really brilliant law review article by Judge Jacobs of the Second Circuit called "The Secret Life of Judges," and that article has had a significant effect on my consideration of cases.  And the reason that -- the essence of that article is this.  All professionals look at the world through the lens of their profession. And I think that's true.

So, you know, these public officials, the lower-level professional officials that have testified in this case, they're looking at these things through the national security, um, implications of the responsible positions that they hold.  That may not be determinative in this case given the cases that you cite, which of course I'm bound by, and I will carefully scrutinize. But I've got to take that testimony with respect to their job, which is not my job.  I'll exercise my judicial independence.

But do you see where I'm going?  The government doesn't just cite national security, these people are an aspect of our national security.

I mean one of the problems I have, and I'll tell them straight out, is here, because we've got this 5,000 list of people from Canary Mission, professionals have to be taken off international terrorism, off human trafficking, off transnational corporate greed, to deal

with this.  Why?  Evidently it's a pretty clear inference, they were told to do that.  Not just take a look at this list and see if there's anything here, "Go through these 5,000."  That is -- if not compelling, it's certainly a permissive inference.

I've got a real question about that.  But that's for them.  In essence I must -- I guess I'm just saying, I have to look at what they say -- and in the main it seems credible, I believe that's what they're doing, and I believe that's why they're doing it.  With a couple of exceptions perhaps.  And you say, "Go ahead, Judge, we still win," right?

MS. KRISHNAN:  That's exactly right, your Honor.

THE COURT:  All right.

MS. KRISHNAN:  And no one has to doubt the sincerity of the objectives that these government employees pointed to, and we don't dispute that protecting national security is a government objective of the highest order.  Our complaint is that the government has not carried its burden in showing that targeting students and faculty based on their support for Palestinian and their criticism of Israel is necessary to achieve that objective.  That is our argument.

Now the other interests that the government has

pointed to in this case is countering antisemitism, and I want to be clear, that is a fourth legitimate government interest, um, that's commonly found in the case.  The question in this case is over the means the government is using to pursue that interest.

The policy here -- and you've heard this from Ms. Conlon, conflates legitimate anti-war pro-Palestinian speech with antisemitic speech.  It conflates criticism of Israel, support for Palestinians, and criticisms -- even if this government, the U.S. government's policies towards Israel, with antisemitism, and as a result this policy sweeps in a broad swath of speech that falls at the very core of the First Amendment's protection.

Now even if the policy was more narrowly focused on antisemitism, and in particular the suppression of antisemitic speech, the policy would still be impossible to square with the First Amendment for the reason that your Honor has alluded to at several of our -- you know during the trial and at several case-management conferences, which is that the First Amendment does protect speech that is offensive, it protects even bigoted speech.  But the policy challenged here sweeps far more broadly than speech that is properly characterized as "antisemitic," and so clearly cannot be

reconciled with established First Amendment doctrine.

The last point I wanted to address is one that your Honor posed during opening statements, which is whether noncitizens lawfully present in the U.S. have the same First Amendment rights as citizens do?  And as Justice Ginsburg noted in her concurrence in *AADC vs. Reno*, it has been well-settled, since *Bridges vs. Wixon,* that noncitizens residing in this country enjoy the freedoms of speech and the press, including in the deportation context.  And in fact the Supreme Court has gone further, observing that the First Amendment doesn't acknowledge any distinction between citizens and noncitizens who reside here.  Justice Murphy first made that observation in his concurrence in *Bridges,* and it was later endorsed by the Court in *Qualified Shoe vs. Colin*.

Since then, three courts have appealed.  The Second, the Fourth, and the Ninth, have all held that noncitizens present in the U.S. were entitled to First Amendment rights, including in the immigration enforcement context.  To my knowledge no court of appeals has gone in the opposite direction.  And that makes sense.  Any other rule would make a mockery of noncitizens' First Amendment rights and of political discourse in this country.

If noncitizens can be deported based on their political speech, then they have no First Amendment rights at all, because they must always always worry that their speech and association will displease those in power.  In a country where free speech is the safeguard of democracy, that cannot be the law.

And one note about the cases that the government cited when we were, um, litigating the motion to dismiss, the *Red Scare* line of cases, um, which predates modern First Amendment doctrine.  As you recognized in your motion to dismiss opinion, they don't control.

*Turner*, one of the cases they cited Is an exclusion case and it predates development in constitutional and First Amendment law that recognized that the government can't deprive a person of a benefit in violation of their constitutional rights even if they have no right to the benefit at all.

And then there's *Harisiades*.  And as the Ninth Circuit recognized in *AADC*, and as Judge Wilson recognized in a *Central District Court of California* case from the '80s, *Harisiades* just stands for the proposition that the Supreme Court applies the same standard to noncitizen speech that they apply to citizen speech.

At the time *Harisiades* was decided, um, even

citizens didn't have a First Amendment right to affiliate with and be a member of a communist party, and that explains the Supreme Court's decision in this case. But it actually redounds to plaintiffs' favor because it shows that the same standards that apply to citizens apply to noncitizens.

(Pause.)

MS. KRISHNAN:  And unless your Honor has any further questions?

THE COURT:  No, I don't.

Mr. Kanellis.  Let's start though where she ended, and it's the question that I have posed.

Do the defendants here agree that a person, a noncitizen, lawfully present in the United States, um, has the same right to free speech as a citizen?

CLOSING ARGUMENT BY MR. KANELLIS/MR. KANTER:

MR. KANELLIS:  Good morning, your Honor, and may it please the Court, William Kanellis for the United States.  I also have with me Mr. Kanter, and Mr. Kanter has much more First Amendment expertise than I do and I will refer to him and allow him to answer this specific question before I go into my discussion of the facts of this case, if your Honor would permit it.

THE COURT:  We can, just as I did with them, um,

we can.  But that is my first question.

So, Mr. Kanter.

MR. KANTER:  Yes.  Thank you, your Honor, and may it please the Court.

The answer to the question of whether aliens and citizens have equivalent rights under the First Amendment is "No, they're not equivalent."  But, your Honor, there is no rule --

THE COURT:  And what's your authority for saying that?

MR. KANTER:  My authority for saying that are the cases, one after the next, um, that find a lack of equivalence, and that it is context-dependent.  So those cases.  *Bluman.  OPAWL,* which is O-P-A-W-L, it's an acronym, *vs. Feminist Leadership Association.*  It's a Sixth Circuit decision, your Honor.  The *Amback,* a Supreme Court case.  These are cases involving election law contributions to campaigns, to ballot initiatives, in which money obviously is equated with speech, and they directly address whether aliens, noncitizens, lawful permanent residents -- or simply nonlawful permanent residents, but lawfully in the U.S., aliens have equivalent rights.  And in those cases they hold they do not.

In the context of the national security and

foreign policy, we have many cases that go to the same point and result. The **Munoz** case, **Trump vs. Hawaii**, **Kleindienst vs. Mandel**, and, um, they all derive from what is and what must be, your Honor, a, um, a flexibility.

The nature of the right is context dependent and in relation to the competing government interests in play. That is what these cases demonstrate. And that's not to say that in every instance aliens lack First Amendment rights. It's not to say that. But both Congress and the courts have identified discrete areas in which aliens are not afforded the full panoply of free speech rights.

For example, we know that they do have lesser interests when foreign policy and national security are in play. Why? Because Congress has determined as much. It did so, um, with regard to the provisions of law that my friends have referenced, "endorsing, espousing," which is in 212(a)(3)(b) of the INA, the (a)(4)(c) foreign policy ground, which has been the subject of much testimony and evidence in this case, and it did so with regard to the charges, um, the removal charges and the five so-called "targeted noncitizens" that plaintiffs point to as a reflection of an allegedly unlawful policy.

But, your Honor, in attacking that policy, the plaintiffs are really at odds with a line already drawn by Congress, drawn by Congress in (a)(4)(c).  In (a)(4)(c).

THE COURT:  But do I have to reach that?  You see, um, I understand what you say, and it would seem that 221(i) is even broader with respect to Visa holders.

MR. KANTER:  Yes.

THE COURT:  But that's not their argument as I conceive it.  Their argument here is that what was done -- we'll let those cases all resolve however they resolve.  But they're claiming that what was done there -- and in other cases, I limited it to 5, was intended to chill recognized free speech rights of the people whom they represent.  They cite *Bantam Books*, they cite other cases.  They seek to distinguish yours.  Do I have to reach what Congress has done?

So you're telling me, "Well Congress has done this and that."  Ms. Krishnan, her repost is "You don't have to get into that."  Here the government has not, I -- it's speech, I'm supposed to subject it to strict scrutiny.  I do.  And they have not borne their burden, she says.

MR. KANTER:  Yes, the answer, your Honor, is "No," you don't have to reach that question, the

Constitutionality, the statutory validity of these provisions.  And plaintiffs have been quite clear, they're not challenging the validity of these laws, they are challenging these laws as applied.

Now Mr. Kanellis will go into great detail on other reasons why your Honor does not need to reach this question.  For example, there's no retaliation.  Not one member of the plaintiffs' organizations have been arrested, detained, or removed, or charged with --

THE COURT:  They're concerned about the preenforcement chilling of their speech.

MR. KANTER:  Yes.

THE COURT:  There's ample evidence of that.  What, um, weight I give it here is ultimately going to be part of my analysis.  But there's surely evidence of it.

MR. KANTER:  If your Honor will permit me to, um, attempt to land the point that the Congressional provisions of the Congress's statute, the foreign policy provision "endorsing and espousing," is the representation of a line drawn by Congress in saying -- "endorsing and espousing," that's speech, and yet Congress said, "but when it relates to terrorism."  We are making the judgment.  We are drawing the line that it must yield.

THE COURT:  "When it relates to terrorism"?

MR. KANTER: Well it is -- the provision says what it says and it has to be applied by executive branch officials.

My point is that, in the implementation of those provisions, this is simply another line that has to be drawn in difficult circumstances. And plaintiffs search for some objectionable rule of thumb to pin on government officials, something simple, something -- they've been frustrated, I believe, that's my view, in finding it in the evidence. But it's not easy and it's not simple.

For example, there's no rule -- as we heard from government agents, there's no rule requiring that masks be worn in effectuating an arrest, and there's no rule prohibiting it either.

THE COURT: No, isn't that strange? You know I don't know of a single law enforcement agency in the United States that permits their members, apparently at their option, to wear masks when carrying out their duty. Not one. And, um, it would seem that the -- the common sense inference is that that is to spread fear. And if it's at the option of the agents themselves, what -- they're afraid of doxxing? We've heard a lot about doxxing in this case. You know perhaps they're afraid considering what they're being called upon to do

is a matter of concern.

Go back to -- the Marshal Service -- hear me out.

MR. KANTER:  Yes.

THE COURT:  The Marshal Service -- the distinguished United States Marshal's Service was, in the course of their history, required to enforce an odious law of the United States, the Fugitive Slave Law. A marshal was killed in this city seeking to enforce that law passed by Congress.  None of them ever wore masks.

Masks are an indicia that by its very nature spreads fear.  Isn't it a common sense inference that your clients understand that?  In allowing, alone, among all the law enforcement agents, it goes against -- in municipal law enforcement there are whole sociological tracks written on neighborhood policing and how, um, in, um, all different communities, the law enforcement can better be carried out by making the law enforcement people, um, as much as possible, as one with the community.

Now I recognize that these are federal officers, federal officers who may be deployed in different places of the United States.  Of course this is much more broader, given the policies of the administration, then these, um, people that we're concerned with here.

But when you tell me about masks, I'm not so sure that that's, um -- that the inference somehow is supportive of the government's position here.

MR. KANTER:  Your Honor has spoken about the masks in particular at prior hearings and that's precisely why I raised it to discuss with you, because -- and I take all of your points and, um, we thought carefully about them, and one of the most significant of course is you are the factfinder and you are the one drawing the inference, and that is why, um, I point to the testimony of the, um, HSI, um, officers who testified in this court about that practice and your Honor heard them explain.  And some of them -- these are detectives in -- it's a component of ICE, HSI, Homeland Security Investigations --

THE COURT:  So I beat around the bush.  I, um, again, and I think it's fair to say, I generally credit them, I believe that, I believe what they say, these supervisors.

MR. KANTER:  I am not disputing that.  Merely to note that they -- why is there no rule requiring or prohibiting it?  Because they are in undercover operations --

THE COURT:  They are not in undercover operations. They weren't in an undercover operation arresting

Ms. Ozturk, were they?

MR. KANELLIS:  That's true.  I will accept your Honor's point, which is a good one, however it's because they're in another undercover operation, that they don't want to be seen -- they're effectuating an arrest on one individual, that draws attention, and we live in the age of cell phones and cameras and everything.  The videotape is always rolling, your Honor, and wherever you are.  These are some of the points that they brought to light in their testimony.

They may be --

THE COURT:  Why don't then other law enforcement agencies of equal repute wear masks as a common matter?

MR. KANTER:  That evidence, to my knowledge, was not the subject of testimony.  These HSI detectives testified from their personal knowledge about their own practices and procedures, their own protocols.

THE COURT:  That's correct.

MR. KANTER:  So to the -- ultimately what they testified, your Honor, is it came down to the judgment, experience, and the operational needs of a given agent as to whether that choice was made.

And my -- because I don't want to -- I don't want to intrude on my co-counsel's presentation, your Honor, so I'll end with this.  That plaintiffs' critique of

where those lines have been drawn does not prove the unlawfulness or unconstitutionality of the alleged policy in this case, it is second-guessing a judgment they are not empowered to make.  Congress, in its plenary power, gave it to the agencies who are empowered to make those judgments.

Thank you, your Honor.

THE COURT:  Mr. Kanellis.

MR. KANELLIS:  Your Honor, if I may reframe our closing and say thank you to my colleague for discussing the First Amendment, but after hearing the closing arguments and listening to the evidence at trial, if you'll permit me, I can't help but be reminded of a classic story in literature about two adventurers crossing Spain in the 17th Century.  And as they crested on the corner they saw in the distance 30 giant windmills.  And upon seeing those windmills, the leader of this expedition said --

THE COURT:  I think you're going into German, but now I'm with you in the literature.  Go ahead.

MR. KANELLIS:  I will not speak German.  I promise you.  Lesson learned.

THE COURT:  No, go ahead.

MR. KANELLIS:  But as they spotted these windmills on the horizon, the leader said to the other, "Look

there, Sancho Panza, where 30 giant -- monstrous giants present themselves, all of whom I will engage you now to slay." And upon that he raised his lance and he charged, tilted it towards these windmills, his jousts becoming caught up in the blades, knocking him off his horse. And upon sitting on the ground, now apparently before a giant windmill, he refused to relinquish his illusion, he refused to admit that these were windmills, insisting that instead what must have happened is that these were monsters and they were transforming into windmills after the fact.

And the reason I bring this up, your Honor, is because just as Don Quixote of La Mancha imagined that windmills were monsters, plaintiffs in this case imagined that the lawful arrests of individuals pursuant to laws and standards that have existed for up to 70 years amount to some grand government conspiracy, is this idea that there is an ideological deportation policy targeting individuals merely because they speak out in support of the State of Palestine. And just as Don Quixote, well-intentioned and sincere, imagined that these monsters were windmills -- I'm sorry, that windmills were monsters, erroneously, this policy is a product of the imagination and creative, um, conjuring of the plaintiffs.

Your Honor, if I may approach the slides?

As your Honor has seen the evidence in this case, what happened in this instance was the result of an extensive process exercised by career officials of the United States government pursuant to statutory authority.

THE COURT: In ways never before seen.

MR. KANELLIS: Within their authority, your Honor.

The INA -- you heard testimony that the INA has been an element of the HSI's jurisdiction since its founding in 2003.

THE COURT: My point was only in ways never before seen.

MR. KANELLIS: In ways that made, um, my point of emphasis, in different administrations, your Honor. Certainly every administration -- and your Honor has acknowledged this, every administration has the prerogative, every President has the prerogative to exercise, to deem it important, what he or she feels is most important. And our point here, your Honor, is the evidence is in, the trial is over, you have heard the facts, you've heard the testimony, you've seen the contemporaneous documents of these that articulate that it wasn't speech alone that was the basis for the making those decisions, it was speech and conduct. Your Honor,

the trial and the facts are in.  Plaintiffs have been knocked off their horse.

And what I will do, in the remaining time I have, is I will present two prongs of evidence, the factum provanda, the two questions that this Court must decide factually in order for them to prevail.  And the first one is is there a ideological deportation policy?  And then the second is, if there is such a policy, then how does that harm the plaintiffs?  The plaintiffs, your Honor, the institutions, the organizations.

This trial, your Honor --

THE COURT:  No, you know, um -- they're very big on talking policy and I've pushed back on that.  Maybe it's not policy.  I've got to reflect on these things.  Maybe it's concerted action.  Let me give you a historical anecdote, and I think maybe this suits their argument.

So here's Henry II and he's going around his court and he's saying, "Who will rid me of this troublesome priest?"  And two errant knights go out and they hatch down a bishop, maybe it was an Archbishop, Thomas Becket, in front of his alter.  Now that happened.  That was then.

Now, you know, the President, um, does -- it's in evidence in this case, makes various, um, raises various

concerns about campus protests and, um, you know he doesn't have errant knights, but he's got Stephen Miller, and then, um, at the level you're addressing -- and we have the statutes that Mr. Kanter quite properly raised.  You see it's not like the people who testified here are lawless, that they are just going to go ahead and ignore the law.  If anyone thinks that's what I've gotten from this evidence it's not.  But the law is used in a -- it appears to me, in new and somewhat different ways.  And that's why I've pressed the plaintiffs on intent.  If there was no intent to chill the speech of their clients, they lose.

Have they proved it?  They would like to say, "Well given the way it was used, it affects speech and therefore the burden is on you to show that it was completely neutral."  But the framework is, that I'm grappling with, and that's the my only reason for speaking, is closer to my Henry II example.

So what's wrong with that?

MR. KANELLIS:  There's nothing wrong with that example.

THE COURT:  No, but on this evidence, where does the evidence -- where are the holes in the evidence in that approach to analysis?

MR. KANELLIS:  The holes in the evidence, your

Honor, it's not holes, it's that we have all those that contradict that evidence, that is manifested in the contemporaneous action memos, that is manifested in the contemporaneous documentation created by the career professionals public service who articulated the actual basis for the removal decision, which was not expressly based on free speech.  Those contemporaneous documents, your Honor, that's why we have argued that this case could have been resolved as an APA case.  It is an APA case.  And in an APA case, one of the questions before this Court is whether the agency is articulating a rational basis for its decision, and they have.

THE COURT:  Well I'm telling you I have real problems with their APA case.  You're absolutely right. If this is only an APA case, I think they have a -- they, the plaintiffs, have a very long road to hoe.  But as I've heard the evidence develop, it appears that this is just a straight First Amendment case, um, they think they have proved concerted government action at the cabinet level and below, um, to carry out the President's wishes, they say in a manner that as to their clients is unconstitutional.

MR. KANELLIS:  Your Honor, the *Hartman* decision -- the *Hartman* decision dictates that the question that the Court must ask in determining whether the threshold

question in determining whether there has been a First Amendment violation is whether or not there was legitimately probable cause for the government action. In this case, your Honor, we demonstrated that the evidence of that is overwhelming. *Hartman* controls. And because we have demonstrated through contemporaneous evidence that there's a rational basis, there's the processes that were in place that were followed and adhered to, the criteria that had been in place for up to 70 years, 70 years, were followed, and that is the inquiry as to whether or not this is a First Amendment violation.

Let's go to the first slide.

(On screen.)

MR. KANELLIS:  Your Honor, we don't have a lot of time here, thanks to Mr. Kanellis.  (Laughter.)  But let me go through some of the evidence.

And I think it's helpful to compare -- and you can see on your screen, your Honor, that we have some slides, but we're not going to get through them all. But you can see on the screen that we can compare the statements that were made in the complaint, in the motion for a PI, and we can show that the evidence at trial, after a trial, we now have the benefit of trial, hearing witnesses, and the evidence hasn't bore it out.

They talked about an announced intent to carry out large-scale arrests based upon people who supported pro-Palestinian protest.  Where's the evidence in there?  There is none.

They talked about the government launching a new social media surveillance program, when in fact the testimony bore out that the U.S. CIS started monitoring social media in 2016, and then in 2019 and 2020, well before this administration came about.  The State required Visa applicants to be on social media.

THE COURT:  That is -- I won't say that's a matter of concern, and I think your recitation of the facts is exactly right, but, um, one of the things that I have to grapple with here, and as I look at the decided cases, is that today, um, we have the internet that allows people ostensibly to, um, say all sorts of things on the internet and get audiences that, um, we never had before.  But on the other hand, the government knows more about us than they ever have in the past.  And they especially know, since 2016, about those people who are Visa holders.  No one quarrels with the justification for it.  But these people -- and indeed many Americans now, after DOGE, um, the government knows an awful lot about us.

So, um, I raise that because that -- again just

thinking of the common sense inferences, would make more logical that people would be afraid.

Isn't that so?

MR. KANELLIS:  Perhaps, your Honor, that issue is really not before this Court, it's not an issue.  It would be an interesting trial if we were to have one on that issue.  But my point is merely that the suggestion that this occurred with the new administration is simply not true.

You also heard testimony that the Executive Orders -- from two witnesses, the Executive Orders did not have the effect of law, that they simply set forth the President's priorities, and you heard testimony from AD Watson that every administration that comes in has its -- issues Executive Orders and sets its priorities.

In other words, your Honor, what happened here -- although you may disagree or people may disagree about the wisdom of these policies coming out of the --

THE COURT:  Well let's be clear, I may not. That's not before this Court.  And, um, while I'm trying to be vigorous in grappling with argument and while I respect and enjoy the trial process, I have nothing to say about the wisdom or unwisdom of Executive Action. The people have spoken as to that.

MR. KANELLIS:  And that is our point, your Honor.

That what happened here was an exercise, a lawful exercise. That you heard Mr. Watson testify to this. You heard Mr. Armstrong testify to this. How can we implement the objectives, the broad objectives in these Executive Orders if they are existing authorities? And that is merely my point, that every President gets to choose what he or she believes is important and what was done here was done pursuant to law.

THE COURT: But at the same time, it is my unalterable duty to determine what the First Amendment to the Bill of Rights has to say about the issues that are presented in this case. I'm not going to duck that.

MR. KANELLIS: Of course not, your Honor. I think the evidence though, getting back to the point about whether there is or is not an ideological deportation policy, let's look at the hard facts, let's look at the numbers.

You heard Ms. Dubal testify that AAUP had 50,000 members and yet not a single member was arrested or deported. I will take note, your Honor, that a representation was made that Ms. Dubal testified something about Canary Mission. She did not. I did not hear Ms. Dubal say anything about Canary Mission or their identification on our list. Let's put that aside.

50,000 members of AAUP. 5,000 to 6,000

protesters, not only from Canary Mission, your Honor, because you heard these sources came from other sources outside of Canary Mission, but out of 5,000 to 6,000 protesters, they were 18 total arrests.  5,000 names were received, and HSI created Reports of Analysis for about 2 percent of the 5,000 names received.

And the next slide.

(On screen.)

And, your Honor, I think -- I remember in law school the first Latin term that I learned was res ipsa loquitur, and I think this is a classic embodiment of res ipsa loquitur right here, with this slide.  There is no policy, your Honor, we started with 5,000 protesters.

Next.

(On screen.)

We moved down to 100 of all of our Reports of analyses.

Next.

(On screen.)

We moved down to HSI, NSD recommending 20 to 30 of those for, um, to State.

We moved down to State writing about 20 removal -- or justifying removal for about 20.  And then we have 18 or fewer arrests.

THE COURT:  One of the inferences is that once you

get on this recommendation list, it moves pretty swiftly through State.

MR. KANELLIS:  Your Honor, this is res ipsa loquitur.

Next.

(On screen.)

THE COURT:  It may be.

MR. KANELLIS:  That is not a policy, your Honor. This is not even a statistical anomaly.

If this is a policy, it must be the worst policy in the history of the United States government.  That is why Mr. Armstrong described this allegation as an "ideological deportation policy" as "silly."  "Silly." Because it is.  Because the evidence demonstrates that there is no such policy, because if there was, you would see at least hundreds, you would see many more.

Next slide.

(On screen.)

THE COURT:  Armstrong, pause on him.

It does seem, from his testimony, that he equates, um, what I have defined here as "political speech" with antisemitism, and, um, he equates antisemitism with support for Hamas.  One could at least draw those inferences.

(Pause.)

MR. KANELLIS:  May I respond to that, your Honor?

THE COURT:  That's why I raised it, yes.

MR. KANELLIS:  He was asked a hypothetical question about his personal definition.

THE COURT:  He was asked about his personal -- but of course he was the, in essence, the decision-maker.

MR. KANELLIS:  But you need not speculate about what his motivation is, your Honor, you have contemporaneous documents that recorded, that memorialized his decision.  And those contemporaneous documents, you saw his handwritten comments reflecting that action is not words.  That is the manifestation of the decision, actions, not words.

The next slide.

(On screen.)

And from each of the 5 -- you have in front of you, your Honor, you have the 5 removal -- bases for the removal decisions for the 5.  They're self-evident, as your Honor has indicated, you can read, you can read those documents and you can see what the contemporaneous justification was.  That ends the input.

The next slide.

The next slide.

(On screen.)

Let's talk about -- I'm running out of time.  I've

got 10 minutes.

THE COURT:  You do.

MR. KANELLIS:  Let's talk about First Amendment standing.

Your Honor, we'll brief this after trial, but I want to focus on one aspects of this.  To establish Article III standing, the harm must be concrete, particularized, actual, or imminent, and the problem with their case is that it is so attenuated from the actual allegation -- from the actual allegation of these arrests.

Let's go through them.  The next slide.  Skip the next couple.  I want to go to the chart.

(On screen.)

Your Honor, let's talk about what their theory is. Their theory is that these protesters spoke out and supported Palestine and as a result were arrested.  And that news of their arrests -- now the protesters aren't the parties here, okay?  But the news of their arrests were in the media, who broadcast their arrest, and that ran into a second party.  This second party is also not a plaintiff.  This second party heard news of the arrest and interpreted that to be an ideological deportation policy, and that ideological deportation policy, they communicated their fears.  Now we haven't heard from any

of the supposed students who were terrified or disturbed, but then that was communicated to finally the plaintiffs.

This is not immediately -- this is not something that this Court makes -- I go back to the --

THE COURT:  Well I guess wait a minute.  You've lost me with the little green man there.

(Laughter.)

THE COURT:  It's your chart.  But I followed until we got down to the little green man.

MR. KANELLIS:  Because, your Honor --

THE COURT:  I thought that we had witnesses who embodied the little green man, and the people who are, um, members of the AAUP who, um, and one is MESA, saying "I am scared," "I am scared to go out of the country," "I am scared to go to a protest."  And, yes, it's from the media reports of these arrests, which the media largely, um, portrayed as, um, baseless arrests.  Yeah, I don't see the other steps, is all I'm saying.

MR. KANELLIS:  Your Honor, because the plaintiffs are AAUP, the plaintiffs are trying to demonstrate to the Court how they were harmed.  We had a trial, um, and the harm has been articulated by AAUP.

THE COURT:  But so we're clear, I'm only going to give standing to those people who were in the zone of

concern, that is noncitizen members, graduate students, and professors, um, as -- with respect to Professor Nickel, they're noncitizens.

MR. KANELLIS:  Yes.  Yes, your Honor.

THE COURT:  Look, this isn't as complex.  Now this is extra records, but they fit themselves within this pattern.

The President, um, is a master of speech and is certainly, um, brilliantly uses his right to free speech.  Whether he recognizes it or not, whether other people have any right to free speech, is questionable.  Take he and the falling out with Elon Musk.  Take he and the latest things he had to say about Adam Schiff.  Not my case.  But in each of those, there is at least the allegations which track the allegations here.

Then he talks as he talks, the President.  Then the lower-level people look into the contracts, look into the, um, housing situation, in the Schiff case, and things happen or don't happen or the like.  That's their argument here.  And that is a concerning pattern, I have to tell you, because if it's a selective prosecution based upon protected speech, it would seem -- and I'm focusing and will focus only on the record I have before me, but if that's what happened here in actual fact -- not at the Presidential level, he didn't know Mahmoud

Khalil or any of these peoples, one imagines, but at the cabinet level and below, um, to please the President of the United States, um, that's a matter I have to deal with.

Isn't that right?

MR. KANELLIS:  That, um -- I don't believe it is correct, your Honor, because --

THE COURT:  4 minutes to tell me why not?

MR. KANELLIS:  I'll tell you in under 30 seconds. Because *Hartman* dictates that the first question you ask is whether there was a legitimate basis for the decisions that were made and the evidence shows that there was a legitimate basis.

THE COURT:  Thank you.

MR. KANELLIS:  With respect to the harm, your Honor, I have one more slide.

(On screen.)

And that is I've heard, a lot in this case, a lot about feelings in this case.  You remember that I asked Harvard philosophy chair, Mr. Nickel, about -- a question about Kierkegaard and Kierkegaard's definition of anxiety, "Anxiety is the business of freedom," and I didn't do that as a throwaway question or because of my predilection for 19th Century Western European existentialism, it was because Kierkegaard made the

point, and that is that anxiety is not about the deprivation of freedom, it's about the abundance of freedom.  And the individuals who have testified in this case have all thrived, they've talked about what they've been able to do.

Anxiety, your Honor, federal courts, Article III courts, do not litigate about the nebula of anxiety, they deliberate about material harms, about actual material injury.  And the testimony that you've heard from these witnesses is entirely speculative.

You heard Professor Nickel talk about the heightened risk that someday he may be deported.  That does not satisfy an injury-in-fact requirement of Article III.

Your Honor, I have 2 minutes, I think.

THE COURT:  Go ahead.

MR. KANELLIS:  Let's summarize by looking at this chart of the plaintiffs.

Have we even heard the words "AAUP" and "New York University" mentioned?  No, we haven't.  They're gone.

Have we heard "Rutgers" mentioned at all in this case?  No.  They're gone.

Have we heard the "Middle Eastern Studies Association," has the witness articulated how the Middle Eastern Studies Association was impacted by this

supposed policy?  They're gone.

All we have left is reference to two associations, AAUP, and AAUP Harvard, which I will note, after Khalil's arrest, held a public protest in Harvard Square criticizing the University's decision.  That is not -- that is an exercise of the First Amendment, it is not an abrogation of it.

Your Honor, subject to any questions, the government rests.

THE COURT:  Thank you very much.

MS. CONLON:  Your Honor?

THE COURT:  Let me say --

MS. CONLON:  Okay, we did have 10 minutes remaining and I was hoping to use 3 of them.

THE COURT:  No, you don't have 10 minutes remaining and I don't give rebuttal.  I take that back, you don't have 10 minutes, a few minutes were remaining, but I don't give rebuttal.  You have the opportunity to submit the requests for findings and rulings.

I simply wanted to say how, um, pleased I am by the vigorous advocacy that's been displayed in this courtroom and by the high level of, um, civility and responsiveness and devotion to the facts that's been shown by everyone in this case, and I include the witnesses as well as the attorneys.

It's my responsibility now to deliver a fair and just written opinion on Phase 1.  We have our schedule for submitting the requests for findings and rulings, and I will, um, be about that task.

But my thanks to all of you is most sincere. We'll recess.

(Ends, 11:20 a.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Monday, July 21, 2025, to the best of my skill and ability.



/s/ Richard H. Romanow 07-22-25
_____
RICHARD H. ROMANOW  Date