CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>RUBIO, *et al.*,<br><br>        Defendants. | Case No. 5:25-cv-06618-NW<br><br>**DEFENDANTS' SUPPLEMENTAL PRE-TRIAL BRIEF**<br><br>Date:  May 14, 2026<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................1

II.     ARGUMENT ........................................................................................................................1

        A.      Plaintiffs Lack Standing..........................................................................................1

        B.      The Statutes Do Not Violate The First Amendment................................................2

                1.      The statutes' legitimate scope is broad. ......................................................3

                        (i)     Statutory text...................................................................................4

                        (ii)    Legislative history...........................................................................4

                        (iii)   Historic usage..................................................................................7

                2.      Plaintiffs' undefined category of 'protected speech' cannot be used to
                        evaluate the statutes' constitutionality. ......................................................8

                3.      The statutes' legitimate purposes overcome nonimmigrant visa-
                        holders' reduced First Amendment protections. ......................................10

        C.      The Statutes Do Not Violate The Fifth Amendment. ............................................13

        D.      Plaintiffs' Requested Relief is Problematic. .........................................................14

III.    CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abourezk v. Reagan*,
592 F. Supp. 880 (D.D.C. 1984) ............................................................................................... 7

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011) ........................................................................................ 12

*Boutilier v. INS*,
387 U.S. 118 (1967) ................................................................................................................ 14

*Cuviello v. City of Oakland*,
No. 06-cv-5517-MHP-EMC, 2009 WL 734676 (N.D. Cal. Mar. 19, 2009) ......................... 15

*Demore v. Kim*,
538 U.S. 510 (2003) .......................................................................................................... 10, 13

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) ................................................................................................................ 12

*El-Werfalli v. Smith*,
547 F. Supp. 152 (1982) ........................................................................................................... 7

*Fiallo v. Bell*,
430 U.S. 787 (1977) ................................................................................................................ 13

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .................................................................................................................. 9

*Haig v. Agee*,
453 U.S. 280 (1981) .................................................................................................................. 9

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ...................................................................................................... 12, 13, 14

*Hellenic Lines Ltd. v. Rhoditis*,
398 U.S. 306 (1970) ................................................................................................................ 11

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......................................................................................................... 12, 13, 14

*In re Khalifa*,
21 I&N Dec. 107 (1995) ............................................................................................................ 8

*In re Ruiz-Massieu*,
  22 I&N Dec. 833 (1999) ............................................................................................ 7, 8

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) .................................................................................................... 15

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) .................................................................................................... 11

*Johnson v. United States*,
  576 U.S. 591 (2015) .................................................................................................... 13

*Jordan v. DeGeorge*,
  341 U.S. 223 (1951) .................................................................................................... 14

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) .................................................................................................... 12

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953) .............................................................................................. 10, 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................................... 2

*Mahler v. Eby*,
  264 U.S. 32 (1924) ...................................................................................................... 14

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ...................................................................................................... 13

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .................................................................................................. 2, 3

*Noh v. INS*,
  248 F.3d 938 (9th Cir. 2001) ........................................................................................ 7

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
  118 F.4th 770 (6th Cir. 2024) ..................................................................................... 12

*Palestine Info. Off. v. Shultz*,
  853 F.2d 932 (D.C. Cir. 1988) ............................................................................... 13, 14

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ...................................................................................................... 3

*Rodriguez Diaz v. Garland*,
  53 F.4th 1189 (9th Cir. 2022) ..................................................................................... 11

*Roman v. MSL Capital, LLC*,
    No. 17-cv-2066-JGB, 2019 WL 3017765 (C.D. Cal. July 9, 2019) .................................................... 15

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ........................................................................................................................ 13

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..................................................................................................................... 7, 13

*United States v. Alvarez*,
    567 U.S. 709 (2012) ...................................................................................................................... 8, 9

*United States v. Curtiss–Wright Export Corp.*,
    299 U.S. 304 (1936) ........................................................................................................................ 14

*United States v. Singh*,
    979 F.3d 697 (9th Cir. 2020) ........................................................................................................... 12

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) .................................................................................................................... 8, 10

*Wash. State Grange v. Wash.State Repub. Party*,
    552 U.S. 442 (2008) ................................................................................................................. 2, 3, 8

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .......................................................................................................................... 9

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ............................................................................................................................ 14

**Statutes**

8 U.S.C. § 1182 ........................................................................................................................................ 4
8 U.S.C. § 1201 .................................................................................................................................... 4, 7
8 U.S.C. § 1227 .................................................................................................................................... 4, 7
8 U.S.C. § 1252 ........................................................................................................................................ 3

**Rules**

Federal Rule of Civil Procedure 65 ........................................................................................................ 15

**Other Authorities**

1990 U.S.C.C.A.N. 6784 .......................................................................................................................... 6
H.R. Conf. Rep. 101-955 .......................................................................................................................... 6

## I.    INTRODUCTION

Plaintiffs ask the Court for the remarkable relief of declaring two decades-old statutes unconstitutional on their face based on possible applications to an undefined and amorphous category of "protected speech."  But Plaintiffs lack standing to seek such relief, and the law does not support their claims.

First, as the government has explained previously, Plaintiffs lack Article III standing.  The Court previously construed the government's motion to dismiss as a facial attack on the pleadings and declined to consider the government's factual arguments.  But now, at trial, Plaintiffs have the burden of actually proving their standing.  They have failed to do so.

Second, Plaintiffs' First Amendment challenges fail.  Plaintiffs wholly ignore the visa-revocation provision and foreign-policy-removal provision's broad legitimate scope and long history of bona fide use.  They focus on a vague category of "protected speech" that cannot be compared to the statutes' legitimate scope.  And they fail to recognize that the government's legitimate need to exclude foreign nationals for foreign-policy reasons overcomes—at least as a facial matter—nonimmigrant student-visa holders' reduced First Amendment protections.

Third, Plaintiffs' Fifth Amendment challenges fail for similar reasons.  Congress deliberately crafted these statutes to provide the Executive Branch with flexibility, because foreign-policy concerns often cannot be legislated with particularity in advance.  The Supreme Court has consistently upheld similar statutes against similar challenges.

Finally, even apart from these issues, Plaintiffs' specific requested relief is improper, because at root they are asking for a mere "obey the law" injunction.

For all of these reasons, the Court should enter judgment in favor of the government at the upcoming trial on the papers.

## II.    ARGUMENT

### A.    Plaintiffs Lack Standing.

The Court previously denied the government's motion to dismiss for lack of standing, construing that motion as purely "facial" challenge to Plaintiffs' Verified Amended Complaint.  *See* Dkt. 75 at 10 n.6.  But because Article III standing is an "indispensable part of the plaintiff's case, each element must

be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Without repeating its prior briefing on this issue, the government reincorporates its standing arguments by reference, and respectfully submits that Plaintiffs have failed to establish the requisite elements of standing as a factual matter based on the record in this action. *See generally, e.g.*, Dkt. 66 & 68.

### B. The Statutes Do Not Violate The First Amendment.

Plaintiffs frame their First Amendment claims as "facial[]" challenges "[a]s applied to protected speech." *See, e.g.*, Dkt. 65 ("VAC") ¶¶ 203, 206; Dkt. 44 at 14, 24 n.10. As the Court has already recognized, "Plaintiffs' claims will require the Court to determine if either of the INA's Revocation and Deportation Provisions — laws that broadly implicate U.S. immigration policy and national security — infringe on First Amendment 'protected speech,' not just as applied to Plaintiffs, but facially, meaning in all situations." Dkt. 75 at 18. And yet, "Plaintiffs did not define" the "scope" of "protected speech." *Id.*

As the government explained previously, "[f]acial challenges are disfavored for several reasons." Dkt. 48 at 8 (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)). Such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange*, 552 U.S. at 450 (internal quotation marks omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451. The Supreme Court "has therefore made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

For a facial challenge in the First Amendment context, "[t]he question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* Thus, "[t]he first step in the proper facial analysis is to assess the [challenged] laws' scope." *Id.* at 724. In a facial challenge, courts cannot ignore this requirement merely because a plaintiff has focused on the laws' application to certain situations. *See id.* (explaining parties' and lower courts' error in "focus[ing] on how the laws applied to the content-moderation practices that giant

social-media platforms use," rather than "address[ing] the full range of activities the laws cover, and measur[ing] the constitutional against the unconstitutional applications").[1]

Similarly here, Plaintiffs cannot artificially limit their challenge to the laws' application to "protected speech." Plaintiffs "chose to litigate these [claims] as facial challenges, and that decision comes at a cost." *Moody*, 603 U.S. at 723. Indeed, as discussed below, Plaintiffs' framing merely begs the question of what qualifies as "protected speech" in the context of nonimmigrant student visa holders. And this framing still raises all of the problems the Supreme Court has repeatedly recognized regarding facial challenges more broadly: Plaintiffs ask the Court to speculate on limited facts without even identifying themselves or their foreign members; they ask the Court to abandon the principle of judicial restraint and proactively announce a rule of constitutional law extending beyond the factual circumstances of the parties before it; and the ruling they seek threatens to prevent the government from implementing the laws consistent with the Constitution. *See Wash. State Grange*, 552 U.S. at 450-51.

As explained below, Plaintiffs' First Amendment challenge fails because the statutes' legitimate scope is broad; Plaintiffs' undefined category of "protected speech" cannot meaningfully be evaluated against that legitimate scope; and in any event, the statutes' legitimate scope outweighs the free-speech interests of noncitizens at issue in this case.

### 1.    The statutes' legitimate scope is broad.

Properly construed, the question the Court must decide is whether "a substantial number" of the challenged statutes' applications are unconstitutional in relation to their legitimate sweep. *Moody*, 603 U.S. at 723. The answer is plainly no. Indeed, Plaintiffs make no effort to quantify the relative scopes of what they view as permissible or impermissible enforcement. *See generally* Dkt. 44; Dkt. 32; VAC. Rather, they limit their discussion to what they call applications to "protected speech," without even defining the term.

---

[1] Instead, the proper method for challenging the application of a statute as-applied to specific situations is in individual adjudications, such as habeas proceedings brought by those subject to the provisions. Or, in immigration cases, in eventual petitions for review of removal decisions, where Congress has specifically preserved aliens' rights to raise constitutional challenges. *See* Dkt. 33 at 4-5; *see also, e.g.*, 8 U.S.C. § 1252(a)(2)(D) (preserving courts of appeals' jurisdiction over constitutional claims in review of removal proceedings); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 474, 487 (1999) (holding challenges to removal, including First Amendment ones, must be brought in removal proceedings).

As the text, legislative history, and historical usage all demonstrate, the legitimate scope of the statutes at issue in this case is very broad.

### (i)        Statutory text.

The current form of the visa-revocation provision provides that, "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." 8 U.S.C. § 1201(i). This statute—which makes no mention of speech or similar "protected" conduct—provides wide flexibility for the government to revoke a visa for a wide range of possible reasons, as discussed further below.

Under the foreign-policy-removal provision, the INA's list of "classes of deportable aliens" includes those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1227(a)(4)(C)(i). But the statute expressly provides that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C); *see also id.* § 1227(a)(4)(C)(ii). In other words, "protected speech" could only be used as the basis for removal under § 1227(a)(4)(C) in cases where the Secretary of State himself determines have a particularly and sufficiently high foreign-policy justification. Again, the statute accommodates a wide range of possible foreign-policy reasons why the government might initiate removal proceedings (examples of which are discussed below), and provides a specific congressional-oversight mechanism where those reasons implicate First Amendment concerns.

### (ii)        Legislative history

The legislative history confirms the broad scope of the statutes' legitimate use. Section 1251(a)(4)(C)(i) (the predecessor to § 1227(a)(4)(C)(i)) resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the Immigration and Nationality ("INA"). Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest." 8 U.S.C. § 1182(a)(27) (1988).

The breadth of that prior version, including its historic enforcement against members of the Communist Party, its lack of guidelines and oversight mechanisms, and concerns about its burdens on speech, prompted calls to narrow or remove the provision.

When some representatives proposed to eliminate that provision in 1987, however, the State Department, the Department of Justice, and the former Immigration and Naturalization Service registered their strong objections with their congressional counterparts. *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton).[2]

For example, Judge Sofaer testified on behalf of the State Department that, under the prior "public interest" standard, "[i]n those few cases where this authority is used, it is seen in good faith as necessary to protect important foreign policy concerns." *Id.* at 40. Indeed, "the Executive must have the authority to deny visas to persons whose admission to the United States would cause potentially serious foreign policy consequences." *Id.* at 30. "Virtually every Nation in the world reserves the right to exclude aliens in such cases, and we believe it would be a serious mistake to deny comparable power to our own Government." *Id.* Recognizing, however, that the "public interest" standard contained in the INA at the time was "broad," the Executive therefore suggested replacing that standard "with language that limits the grounds of exclusion to potentially serious foreign policy consequences." *Id.* at 40.

Thus, in a revised legislative proposal, the House Committee on the Judiciary indicated that it "strongly believes that the Executive Branch should continue to have the authority to bar the entry of aliens who may engage in dangerous activities once they enter this country." H.R. Rep. No. 100-882, 100th Cong., 2d Sess. 15 (1988). And the Committee recognized that "the Executive needs to have some flexibility to respond to new crises or difficulties in our international relations." *Id.* at 26. In

---

[2] At the time, members of the public argued that the broad "public interest" standard allowed the government to deny immigration benefits due to foreign nationals' political beliefs and speech. For example, the AAUP submitted a statement asserting that foreign nationals had been denied benefits for "criticizing the American role in Chile," or "writing favorably about conditions in modern-day Siberia," or "youthful membership in 'leftist' political parties." *Id.* at 101.

DEFENDANTS' SUPP. PRE-TRIAL BRIEF
5:25-CV-06618-NW                                          5

particular, "there may be limited circumstances in which an alien's beliefs, statements, and, in particular, associations, may . . . result in harm either to U.S. citizens or property, or to vital foreign policy interests." *Id.* at 27.[3]  Although this proposal was not enacted as written, it would form the basis of the statute that ultimately passed.

Specifically, when Congress passed the Immigration Act of 1990, it overhauled and modernized the grounds for exclusion in the statute, enacting the language at issue in this case.  *See* H.R. Conf. Rep. 101-955, 1990 U.S.C.C.A.N. 6784, 6793 (Oct. 26, 1990).  In explaining its rationale for the statutory text described above, the congressional conference intended that "[t]his provision would authorize the executive branch to exclude aliens for foreign policy reasons in certain circumstances." *Id.* at 6794. With respect to the Secretary of State's "compelling interest" determination, the conference stated its intention that "the 'compelling foreign policy interest' standard be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'" *Id.*  "The fact that the Secretary of State personally must inform the relevant Congressional Committees when a determination of excludability is made under this provision is a further indication that the conferees intend that this provision be used only in unusual circumstances." *Id.*  And the conference gave examples of "some of the circumstances in which exclusion might be appropriate," such as "when an alien's mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran)," or "when an alien's entry would violate a treaty or international agreement to which the United States is party." *Id.* at 6795.

Thus, when Congress created the immigration enforcement framework at issue in this case, it deliberately narrowed the prior longstanding statute in order to increase protections for speech, while maintaining flexibility for the Executive Branch to exclude aliens for foreign-policy reasons, and provided a specific mechanism for congressional oversight where those reasons include potentially protected speech.  In other words, the current versions of the statutes already reflect a careful balancing

---

[3] The Committee was particularly concerned with recent experience involving the former Shah of Iran, "in which it was concluded that his mere entry could place the lives of hostages in jeopardy." *Id.* at 27.

of individuals' speech rights and the Executive Branch's bona fide foreign-policy and national-security interests. Their legitimate scope is broad.

### (iii)    Historic usage.

Finally, the statutes have a well-established and longstanding history of legitimate use. *See* Dkt. 33 at 3-6. Indeed, there are countless indisputably legitimate reasons that the government may decide to revoke a visa after it was issued. The President may decide to revoke the visas of foreign nationals from a certain country for foreign-policy and national-security reasons. *See Trump v. Hawaii*, 585 U.S. 667, 696 (2018). The government may determine that a particular "visa had been obtained illegally." *See, e.g.*, *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001). The list goes on. Indeed, the visa-revocation provision is not limited to speech-based grounds in any way. *See* 8 U.S.C. § 1201(i).

Similarly, the foreign-policy-removal provision has more than three decades of history behind it. *See* Dkt. 33 at 4. The provision makes "deportable" those aliens "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1227(a)(4)(C)(i). The need for such a provision has long been recognized. *See* legislative history, *supra*.

Indeed, the prior version of the statute—which allowed for the exclusion of foreign nationals on "public interest" grounds, including foreign policy and national security—was used to exclude "Otto Skorzeny, a former Nazi SS officer," "Thomas Liaou, an advocate of Formosan independence," and "Mme. Ngo Dinh Nhu, sister-in-law of the former prime minister of Vietnam," all on foreign-policy grounds. *Abourezk v. Reagan*, 592 F. Supp. 880, 885 n.14 (D.D.C. 1984). It was also used to exclude Ahmad El-Werfalli, a Libyan national pursuing a course of study in aeronautics in the United States, based on concerns about how he might use that knowledge upon returning to Libya. *See El-Werfalli v. Smith*, 547 F. Supp. 152 (1982).

And the current version was used to initiate removal proceedings against Mario Ruiz Massieu, a former high-ranking Mexican official whom the United States had attempted to extradite for criminal offenses. *In re Ruiz-Massieu*, 22 I&N Dec. 833 (1999). In that case, the Secretary of State had determined that failure to remove Ruiz Massieu "would jeopardize our ability to work with Mexico on law enforcement matters"; would undermine joint efforts to reform the Mexican judicial system; and

DEFENDANTS' SUPP. PRE-TRIAL BRIEF
5:25-CV-06618-NW                                                  7

"would be a major setback for President Zedillo and our combined efforts to chart a new and effective course of U.S.-Mexican relations." *Id.* at 834. The Board of Immigration Appeals upheld the removal, explaining that Congress had expressly left such determinations to the political branches, *see id.* at 836-39, 842, and the Secretary of State had articulated a "facially legitimate and bona fide" reason for the removal, *id.* at 846; *see also, e.g.*, *In re Khalifa*, 21 I&N Dec. 107 (1995).

In short, the two challenged statutes' "plainly legitimate" scope is broad. Plaintiffs have supplied no evidence or argument comparing that broad scope to what they claim would be the statutes' unconstitutional application, but it is readily apparent that any such application would be exceedingly rare in comparison to the government's large volume of immigration enforcement work. Plaintiffs' facial challenge therefore fails. *See Wash. State Grange*, 552 U.S. at 457-58.

**2.    Plaintiffs' undefined category of 'protected speech' cannot be used to evaluate the statutes' constitutionality.**

The government has previously explained that whether any particular "speech" is "protected" is a case-by-case inquiry that depends on the nature of the speaker, the type and contents of the speech, and the interests of the United States. *See* Dkt. 33 at 16-25; Dkt. 48 at 8-15; Dkt. 68 at 13-14. That is fatal to Plaintiffs' pseudo-facial challenge here.

The identity of the speaker matters because the strength of constitutional protections varies based on an individual's connections to the United States. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" apply). The First Amendment applies differently (if at all) to a foreign national speaking in a foreign country with no intention to visit or reside in the United States, than it does to a United States citizen speaking in the United States.

The nature of the speech matters because the First Amendment extends different protections to different types of speech. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 716-17 (2012). While "as a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," this "general" proposition is subject to several well-recognized exceptions, including for "advocacy intended, and likely, to incite imminent lawless action"; "obscenity"; "so-called 'fighting words'"; "and speech presenting some grave and imminent

threat the government has the power to prevent." *Id.* (cleaned up).  As relevant here, certain statements of support for Palestine or opposition against Israel (or vice versa) may well fall into a traditional category of protected speech, whereas statements inciting disruptive conduct, encouraging violence, or otherwise advocating for lawlessness would not.  And these are frequently not bright lines; context matters for such determinations.

And, finally, the particular interests of the United States matter because under any applicable First-Amendment standard, the burdens on the speaker must be weighed against the government's interest in regulation.  *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) ("This is therefore one of the rare cases in which a speech restriction withstands strict scrutiny."); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 496 (2025) (age-verification requirements for pornographic websites satisfied intermediate scrutiny).  Indeed, the Supreme Court has squarely held "that no governmental interest is more compelling than the security of the Nation," and "[p]rotection of the foreign policy of the United States is a governmental interest of great importance," such that these interest would support restrictions on the speech of even a United States citizen residing abroad.  *Haig v. Agee*, 453 U.S. 280, 307 (1981).

Here, Plaintiffs have never limited their claims in this case to any specific speech, whether related to Palestine or otherwise.  *See generally* VAC.  Despite relying on such alleged intended speech as their hook for standing purposes, they actually seek to enjoin the government from taking any enforcement action under the statutes based on any "protected speech," of any kind, made by any speaker, without any connection to Plaintiffs themselves.  The Court could not possibly adjudicate in the abstract the infinite possibilities of what does or does not qualify as "protected speech."

Nor could the Court specify, in advance, what it means for the government to be prohibited from taking enforcement action "based on" such speech, especially when other problematic conduct is present.  For example, it is unclear whether Plaintiffs argue it would be unconstitutional for the government to even "consider" an individual's speech as it evaluates the totality of circumstances that may or may not support immigration enforcement action.  This ambiguity weighs heavily against granting Plaintiffs the relief they seek.

Even worse, under Plaintiffs' theory, the government could *never* use a foreign national's "protected" speech as the basis to remove them, no matter how severe the foreign-policy or national-

security consequences would be. And this is so, despite Congress creating a careful, multi-branch framework to maintain the government's ability to do exactly that. The Constitution does not mandate this all-or-nothing, inflexible approach.

Prior First Amendment challenges have typically focused on either specific speech or specific types of speech that are defined by the scope of the applicable statutes or regulations. Instead of following that approach, Plaintiffs embarked on a novel quest to declare two statutes unconstitutional as applied to the abstract and undefined term "protected speech." Plaintiffs' claims are inherently circular; their argument is tautological. The Court should not entertain the exercise.

### 3. The statutes' legitimate purposes overcome nonimmigrant visa-holders' reduced First Amendment protections.

Even on its own terms, however, Plaintiffs' challenge to the statutes "as applied to protected speech" fails. The government previously explained that nonimmigrant visa holders have reduced First Amendment rights, and because the statutes have bona fide and legitimate purposes, they do not violate the First Amendment in that context. *See* Dkt. 33 at 16-20.

Instead of responding to the government's argument, Plaintiffs previously attacked a straw man, pretending that the government argues that "noncitizens have *no* First Amendment rights." Dkt. 44 at 17. But the government has not made that argument. *See, e.g.*, Dkt. 33 at 16-19. Rather, the government has explained that, under binding Supreme Court and Ninth Circuit authority, aliens have *reduced* constitutional protections (including First Amendment rights) compared to citizens, and the strength of their rights grows on "a generous and ascending scale" as they increase their "identity with our society." *Id.* at 16 (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953)).

Plaintiffs have yet to offer any substantive response to that principle, which has been repeatedly reaffirmed by the Supreme Court and Ninth Circuit in a variety of contexts. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 522 (2003) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.") (internal quotation marks omitted); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (holding that Fourth Amendment did not apply to search of foreign national's property abroad, and distinguishing prior cases by noting that they "establish only that aliens receive constitutional protections when they have come

within the territory of the United States and developed substantial connections with this country"); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1205-06 (9th Cir. 2022) ("[W]e interpret the Due Process Clause consistent with longstanding precedent recognizing that the process due aliens must account for the government's countervailing interests in immigration enforcement—considerations that do not apply to U.S. citizens.").

Instead, Plaintiffs have cited a variety of cases for the unremarkable proposition that the First Amendment "applies" to lawfully present aliens, without addressing *how* it applies. *See* Dkt. 44 at 15-16. For example, Plaintiffs argued that the Supreme Court's recitation in a footnote in *Kwong Hai Chew* of its prior dicta in *Wixon* somehow means that the First Amendment applies with full force to aliens. *See id.* at 16. But the very same footnote also reaffirmed the principle that aliens' rights increase with their connections to society: "Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Kwong Hai Chew*, 344 U.S. at 596 n.5 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950)).

Similarly, Plaintiffs argued that in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970), the full Supreme Court "adopted" the position of the concurrence in *Wixon*. *See* Dkt. 44 at 16. But *Hellenic Lines* was not about the First Amendment at all; it was about an injured seaman's claim under the Jones Act, and the Court held that a lawful permanent resident with "substantial and continuing contacts . . . with this country" could be subject to liability under the Jones Act even though the injured seamen was Greek. *See* 398 U.S. at 309. If anything, *Hellenic Lines* confirms that the extent of an individual's connections with this country is relevant to evaluating the extent to which American law applies to them. *See id.* But that case involving a lawful permanent resident and the Jones Act plainly does not stand for the proposition that nonimmigrant visitors are entitled to the full protections of citizens under the First Amendment. *See id.*

Thus, the question is not whether the First Amendment *applies*; the question is, what does the First Amendment *require* in these circumstances? Plaintiffs argue for an all-or-nothing approach, such that temporary visitors to the United States receive the same protections as citizens. *See* Dkt. 44 at 14-

DEFENDANTS' SUPP. PRE-TRIAL BRIEF
5:25-CV-06618-NW                                        11

18.  But that argument runs counter to the many authorities discussed recognizing the lesser protections available to noncitizens.  And Plaintiffs' prior attempts to distinguish those authorities falter.

First, Plaintiffs unconvincingly tried to escape the impact of *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), by arguing that it merely held that noncitizens could be punished for their speech to the same extent as citizens.  *See* Dkt. 44 at 17.  But of course, citizens generally cannot be deported.  The very fact that *Harisiades* affirmed a punishment for a noncitizen that could not be used for citizens demonstrates that the groups may indeed be treated differently in some circumstances.  And indeed, then-Judge Kavanaugh cited *Harisiades* in 2011 for the proposition that the Supreme Court "has further indicated that aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas."  *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).

Second, Plaintiffs argued that *Bluman* and two appellate cases relying on it, *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024), and *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020), are inapplicable because they merely concerned "*one* unique abridgment of First Amendment rights, the ability to financially contribute to an election campaign."  Dkt. 44 at 17.  But Plaintiffs concede that these cases confirm the government's central point:  noncitizens have reduced First Amendment rights compared to citizens.  Indeed, as these cases and those discussed above make clear, the extent of aliens' First Amendment rights depends on the context, including the extent of the aliens' connections to the country and the circumstances of the speech at issue.

The practical effect of nonimmigrant visa holders' reduced First Amendment rights in this case is that the challenged statutes are constitutional so long as the government has articulated a facially legitimate and bona fide justification for their use.  *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).  As the government previously explained, the applications of the statutes Plaintiffs challenge here further the government's legitimate national-security and foreign-policy interests in countering support for terrorist groups and addressing antisemitism.  *See* Dkt. 33 at 19 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-32 (2010)).

That is enough to reject Plaintiffs' claims, but as the government argued previously, the statutes would survive review even under a heightened standard.  *See* Dkt. 33 at 20.  That is because the decisions regarding admissibility, foreign policy, and national security by their nature serve compelling

government interests. *See id.* (citing, *e.g.*, *Harisiades*, 342 U.S. at 588-89). And as the government previously explained with respect to Plaintiffs' vagueness challenge, the statutes are appropriately tailored because "so long as Congress wanted to maintain the State Department's discretion to revoke visas and make aliens removable whose presence threatened American foreign policy interests, the only way to do so was to draft statutes like §§ 1201(i) and 1227(a)(4)(C)." *Id.* at 24.

For all of these reasons, Plaintiffs' First Amendment challenge fails.

### C.    The Statutes Do Not Violate The Fifth Amendment.

The parties' dispute regarding the Fifth Amendment boils down to a disagreement as to the scope of the political branches' discretion with respect to the admission and exclusion of nonimmigrants for foreign-policy reasons. *Compare* Dkt. 33 at 20-25, *with* Dkt. 44 at 23-25. The government has the better view.

Indeed, Plaintiffs have not meaningfully disputed that the Supreme Court and lower courts have recognized the political branches' discretion regarding "the admission and exclusion of foreign nationals." *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Harisiades*, 342 U.S. at 588-89; *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988). Nor have Plaintiffs disputed that, over and over again, the Supreme Court has held that noncitizens have reduced Fifth Amendment protections compared to citizens. *See, e.g.*, *Kim*, 538 U.S. at 522 ("Congress may make rules as to aliens that would be unacceptable if applied to citizens."); *Mathews v. Diaz*, 426 U.S. 67, 78 (1976). Plaintiffs' response to these undisputed points is merely that these prior cases did not all arise in the vagueness context, and so the Court should ignore them. *See* Dkt. 44 at 23-25.

Plaintiffs instead relied on the Supreme Court's plurality opinion in *Sessions v. Dimaya*, 584 U.S. 148 (2018), for the proposition that immigration laws are not wholly immune from vagueness challenges. *See* Dkt. 44 at 23. But the issue in *Dimaya* was the INA's incorporation of a criminal statute that the Court had already previously held to be void for vagueness. *See* 584 U.S. at 155 (citing *Johnson v. United States*, 576 U.S. 591 (2015)). It is hardly surprising that the Court held that a criminal statute that was unconstitutionally vague remained vague when it was used for immigration purposes.

But whereas criminal conduct can be defined with relative specificity, "the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that

which has always been considered requisite with regard to domestic affairs." *Palestine Info. Off.*, 853 F.2d at 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324 (1936)). "[B]ecause of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

The Constitution does not require Congress to spell out, in advance, the various specific foreign-policy concerns that could justify visa revocations and removals. Rather, such "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Id.* (quoting *Harisiades*, 342 U.S. at 589).

Again, the legislative history confirms that Congress deliberately ensured that the Executive Branch would retain flexibility in this area. As discussed above, the foreign-policy standard enacted in 1990 was to be more stringent than the "public interest" standard contained in former subsection 1182(a)(27). Even as narrowed, the standard "leaves considerable discretion in the Executive Branch." 1987 Hearing, at 41. Congress understood that "the Executive needs to have some flexibility to respond to new crises or difficulties in our international relations." H.R. Rep. No. 100-882, 100th Cong., 2d Sess. 26 (1988). Indeed, given that "[n]ew crises and difficulties arise every day in our international relations," it would be "difficult and inadvisable to be more precise in defining what constitutes a serious adverse foreign policy consequence." 1987 Hearing, at 41. The statute's legislative history clearly shows that the standard it sets forth is intended to be narrower than the "public interest" standard contained in a prior, broader version of the law.

In that context—in light of their unique, foreign-policy purpose, and the political branches' special discretion in that area—the statutes are not impermissibly vague under the Fifth Amendment. *See, e.g.*, *HLP*, 561 U.S. at 18-20; *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (affirming deportation against vagueness challenge); *Jordan v. DeGeorge*, 341 U.S. 223, 225, 232 (1951) (same); *Mahler v. Eby*, 264 U.S. 32, 40 (1924) ("[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress.").

**D.    Plaintiffs' Requested Relief is Problematic.**

As relief in this matter, Plaintiffs request a declaration that these statutes are unconstitutional as

applied to protected speech, and injunctions against their enforcement.  *See* VAC ¶¶ A-H.  In addition to the merits problems described above, Plaintiffs' requested relief is improper.

For the reasons set forth above, Plaintiffs' requested relief as to the undefined term "protected speech" boils down to an order that the government comply with the First and Fifth Amendments.  But as Judge Chen of this District has previously recognized, orders merely stating that law enforcement agencies "are barred from interfering with Plaintiffs' free speech rights" and "permitted to make only lawful arrests" are improper "'obey the law' injunctions and thus not enforceable." *Cuviello v. City of Oakland*, No. 06-cv-5517-MHP-EMC, 2009 WL 734676, at \*3 (N.D. Cal. Mar. 19, 2009).  Indeed, "'[o]bey the law' injunctions such as this are disfavored, as they are not narrowly tailored and are at odds [with] Federal Rule of Civil Procedure 65(d)." *Roman v. MSL Capital, LLC*, No. 17-cv-2066-JGB, 2019 WL 3017765, at \*5 (C.D. Cal. July 9, 2019), *aff'd*, 820 F. App'x 592 (9th Cir. 2020).

Plaintiffs have previously argued that their theory of recovery is authorized by *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010).  *See* Dkt. 67 at 2 n.1 & 25.  But the terms of the requested injunction in that case were clear and specific: the plaintiffs were "seeking to enjoin the [Washington] secretary of state from publicly releasing any documents that would reveal the names and contact information of the R–71 petition signers." *John Doe No. 1*, 561 U.S. at 193.  Even so, because the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs," the Court held that the plaintiffs "must therefore satisfy [its] standards for a facial challenge to the extent of that reach." *Id.* at 194.  And, applying those facial-challenge standards, the Court held that the public disclosure of petition signers' names "does not as a general matter violate the First Amendment." *Id.* at 191.  Thus, no court even needed to grapple with the scope of any injunction, because the plaintiffs' facial challenge failed on its own terms.  Here, while Plaintiffs' facial challenges similarly fail on the merits, *see supra*, their requested relief would not be so specific, but would instead depend on the undefined and undefinable term "protected speech."  The Court cannot issue declaratory or injunctive relief based on such ambiguity.

## III.    CONCLUSION

For the foregoing reasons, following the trial on the papers in this matter, the Court should deny all of Plaintiffs' claims and enter final judgment in favor of Defendants.

Dated:  April 9, 2026

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants
