Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org
Email: daniel.zahn@fire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@fire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, <br><br> *Defendants*. | Case No. 5:25-cv-06618-NW <br><br> **PARTIES' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS** |

| Claim or Defense | Parties' Undisputed Facts & Supporting Evidence |
|---|---|
| | **All Claims (Facts Related to Standing)** |
| The parties | Fact 1:    Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper at Stanford University. Verified Am. Compl. ¶ 81; Answer ¶ 81. |
| | Fact 2:    Stanford Daily is a validly incorporated 501(c)(3) organization. Verified Am. Compl. ¶ 82. |
| | Fact 3:    Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities." Verified Am. Compl. ¶ 84; Answer ¶ 84. |
| | Fact 4:    Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa. Verified Am. Compl. ¶ 135. |
| | Fact 5:    Jane Doe is a former student at a United States university. Verified Am. Compl. ¶¶ 136 |
| | Fact 6:    There is no relationship between Stanford Daily and Jane Doe. Jane Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily. Verified Am. Compl. ¶¶ 137–38. |
| | Fact 7:    As of this date, Plaintiff Jane Doe has not, to her knowledge, experienced any immigration enforcement action against her. |
| | Fact 8:    John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa. Verified Am. Compl. ¶ 158. |
| | Fact 9:    John Doe traveled to the United States to study journalism, and a primary reason he chose the United States is its strong protection for freedom of speech and freedom of the press. Verified Am. Compl. ¶ 158. |
| | Fact 10:   John Doe is a former student at a United States university. Verified Am. Compl. ¶ 159. |
| | Fact 11:   There is no relationship between Stanford Daily and John Doe. John Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily. Verified Am. Compl. ¶¶ 150–61. |
| | Fact 12:   As of this date, Plaintiff John Doe has not, to his knowledge, experienced any immigration enforcement action against him. |
| | Fact 13:   Secretary of State Marco Rubio heads the Department of State, which determines whether and on what conditions noncitizens are permitted to enter and remain in the United States. 8 U.S.C. § 1104. |

| | |
|---|---|
| | Fact 14: From January 25, 2025, to March 24, 2026, Kristi Noem served as Secretary of Homeland Security. |
| | Fact 15: Since March 24, 2026, Secretary of Homeland Security Markwayne Mullin has headed the Department of Homeland Security, which is charged with protecting the United States from internal terrorist threats and similar harms. 6 U.S.C. § 111. |
| Issue 1: Whether Plaintiffs intend to engage in protected activity. | Fact 16: Stanford Daily intends to publish journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. Verified Am. Compl. ¶ 105.[1] |
| | Fact 17: Stanford Daily intends to provide community members with a platform to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues. Verified Am. Compl. ¶ 106. |
| | Fact 18: Stanford Daily intends to cover news and publish opinions related to foreign affairs, Israel, and Palestine. Verified Am. Compl. ¶ 109. |
| | Fact 19: A lawfully present noncitizen former editor who was on Stanford Daily's staff intends to rejoin and continue being a member of Stanford Daily. Verified Am. Compl. ¶¶ 114–15. |
| | Fact 20: A lawfully present noncitizen student on Stanford Daily's staff intends to publish an article about a vigil related to the conflict in Gaza. Verified Am. Compl. ¶¶ 116–17. |
| | Fact 21: A lawfully present noncitizen editor on Stanford Daily's staff intends to republish an article they had previously written about pro-Palestinian campus activism and to edit stories involving Israel and Palestine. Verified Am. Compl. ¶¶ 118–19. |
| | Fact 22: International students intend to resume speaking freely with Stanford Daily. Verified Am. Compl. ¶¶ 125–26. |
| | Fact 23: Stanford Daily noncitizen contributors intend to resume contributing articles to Stanford Daily. Verified Am. Compl. ¶¶ 116–17. |
| | Fact 24: Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." Verified Am. Compl. ¶ 140. |
| | Fact 25: She has also used the slogan, "from the river to the sea, Palestine will be free." Verified Am. Compl. ¶ 140. |
| | Fact 26: Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel. Verified Am. Compl. ¶ 141. |

---

[1] Citations to verified portions of the Amended Complaint are cited as "Verified Am. Compl." Citations to unverified portions of the Amended Complaint are cited as "Am. Compl."

| | |
|---|---|
| | Fact 27:   Jane Doe intends to resume publishing and voicing her true opinions regarding Palestine and Israel. Verified Am. Compl. ¶ 149. |
| | Fact 28:   Jane Doe intends to reactivate her social media account containing her past expression. Verified Am. Compl. ¶ 149. |
| | Fact 29:   After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online. Verified Am. Compl. ¶ 162. |
| | Fact 30:   At protests, John Doe participated in chants including, "[f]rom the river to the sea, Palestine will be free," chants accusing Israel of committing "genocide," and chants calling Israel a "terrorist state." Verified Am. Compl. ¶ 163. |
| | Fact 31:   John Doe has resumed engaging in some protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel and Palestine. Verified Am. Compl. ¶ 167. |
| | Fact 32:   John Doe's expression is reduced and limited from what it was before the government started enforcing the Deportation and Revocation Provisions. Verified Am. Compl. ¶ 178. |
| | Fact 33:   John Doe intends to publish and voice his true opinions regarding Palestine and Israel. Verified Am. Compl. ¶ 166. |
| Issue 2:   Whether Plaintiffs refrained from engaging in expressive activity. | Fact 34:   Many of Stanford Daily's noncitizen writers have declined to cover pro-Palestinian student protests at Stanford. Verified Am. Compl. ¶ 16. |
| | Fact 35:   Many of Stanford Daily's noncitizen writers have refrained from covering topics related to the conflict in Gaza. Verified Am. Compl. ¶ 16. |
| | Fact 36:   Lawfully present noncitizen students who are Stanford Daily members have self-censored expression. Verified Am. Compl. ¶ 112. |
| | Fact 37:   Lawfully present noncitizen contributors and sources have refused to talk on the record with Stanford Daily reporters. Verified Am. Compl. ¶ 113. |
| | Fact 38:   Lawfully present noncitizen contributors have stopped submitting opinion pieces to *The Stanford Daily*. Verified Am. Compl. ¶ 113. |
| | Fact 39:   A lawfully present noncitizen editor on Stanford Daily's staff quit Stanford Daily because of the student's nonimmigrant visa status. Verified Am. Compl. ¶ 114. |

| | |
|---|---|
| | Fact 40: A lawfully present noncitizen student on Stanford Daily's staff decided against publishing an article about a vigil related to the conflict in Gaza. Verified Am. Compl. ¶ 116.

Fact 41: A lawfully present noncitizen student on Stanford Daily's staff asked for articles they had previously written about pro-Palestinian campus activism to be removed and asked that they no longer be assignmed to edit stories involving Israel or Palestine. Verified Am. Compl. ¶ 118.

Fact 42: A lawfully present noncitizen Stanford Daily staff writer asked Stanford Daily to remove all her articles from Stanford Daily's website because some related to Israel, Palestine, and other foreign affairs topics. Verified Am. Compl. ¶ 120.

Fact 43: A lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website. Verified Am. Compl. ¶ 122.

Fact 44: Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government. Verified Am. Compl. ¶ 154.

Fact 45: Jane Doe no longer attends pro-Palestinian protests. Verified Am. Compl. ¶ 155.

Fact 46: Jane Doe no longer wears a keffiyeh to support the Palestinian cause. Verified Am. Compl. ¶ 155.

Fact 47: Jane Doe no longer engages in direct-action organizing supporting Palestinians. Verified Am. Compl. ¶ 155.

Fact 48: Jane Doe no longer holds up the Palestinian flag. Verified Am. Compl. ¶ 155.

Fact 49: Jane Doe no longer maintains her main social media account containing pro-Palestinian commentary. Verified Am. Compl. ¶ 155.

Fact 50: Jane Doe no longer posts pro-Palestinian content on her other social media accounts. Verified Am. Compl. ¶ 155.

Fact 51: The only public expression in which Jane Doe now engages to support the Palestinian cause is wearing watermelon earrings that are easily removable. (Watermelons share the same colors as the Palestinian flag, and pro-Palestinian speakers often use the symbol to support the Palestinian cause.) Verified Am. Compl. ¶ 155.

Fact 52: John Doe has altered and reduced his pro-Palestinian/anti-Israel protected expression. Verified Am. Compl. ¶ 168. |

| | |
|---|---|
| | Fact 53:  John Doe has made his X social media account, which contains pro-Palestinian/anti-Israel commentary, private. Verified Am. Compl. ¶ 169. |
| | Fact 54:  Members of John Doe's extended family who are noncitizens but lawfully reside in the United States fear associating with him and have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy. Verified Am. Compl. ¶ 170. |
| | Fact 55:  John Doe avoids wearing "Palestinian Youth Movement" apparel including a sweatshirt with "Gaza, the Occupier's Graveyard" written in Arabic. Verified Am. Compl. ¶ 171. |
| | Fact 56:  John Doe has self-censored, including decreasing his expression supporting Palestinians, criticizing American foreign policy, and opposing the Israeli government. Verified Am. Compl. ¶ 176. |
| | Fact 57:  John Doe continues to reduce and limit his protected expression about Israel and Palestine. Verified Am. Compl. ¶ 178. |
| Issue 3:  Whether Plaintiffs self-censored because they feared that the challenged statutes will be enforced against them. | Fact 58:  Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions invoking the Deportation and Revocation Provisions. Verified Am. Compl. ¶ 110. |
| | Fact 59:  Lawfully present noncitizens who are Stanford Daily members have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions. Verified Am. Compl. ¶ 112. |
| | Fact 60:  Lawfully present noncitizens who are Stanford Daily contributors and sources have refused to talk on the record with Stanford Daily reporters and stopped submitting opinion pieces to *The Stanford Daily* due to fear of adverse immigration consequences under the Deportation and Revocation Provisions. Verified Am. Compl. ¶ 113. |
| | Fact 61:  Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university. Verified Am. Compl. ¶ 139. |
| | Fact 62:  Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website. Verified Am. Compl. ¶ 142. |
| | Fact 63:  Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations that Canary Mission believes "promote hatred of the |

USA, Israel and Jews on North American college campus and beyond." *AAUP* Ex. 229, Dkt. No. 81-6, at 282.[2]

Fact 64:   Peter Hatch, a senior official in ICE's Homeland Security Investigations unit, was told to review the names of student protestors on the Canary Mission website. *AAUP* Trial Transcript July 9, at 109–11, Dkt. No. 82-3.

Fact 65:   Mr. Hatch was asked, "Many of the names of the student protesters provided to you for the Office of Intelligence to produce reports of analysis on came from the website Canary Mission, correct?" He answered, "It's true many of the names, even most of the names came from that website, but we were getting names and leads from many different sources." *AAUP* Trial Transcript July 9, at 44, Dkt. No. 82-3.

Fact 66:   Mr. Hatch was asked, "I understand that at least 75 percent of the leads that the Tiger Team looked at came from the Canary Mission website, is that correct?" He answered, "Yes, most of the names came from Canary Mission." *AAUP* Trial Transcript July 10, at 15, Dkt. No. 82-4.

Fact 67:   Mr. Hatch testified that "the State Department can use the [report] and the information we collect in whatever way they need to to [sic] make decisions related to the State Department. I think Visa revocations is one way they may use it. But it may not be the only way." *AAUP* Trial Transcript July 9, at 101, Dkt. No. 82-3.

Fact 68:   Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi before their detentions and attempted deportations. Exs. L, M, N, Dkt. No. 14.

Fact 69:   Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk, including articles quoting government statements about the detention and deportation of these noncitizens. Verified Am. Compl. ¶ 148.

Fact 70:   Consequently, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression. Verified Am. Compl. ¶ 148.

Fact 71:   Jane Doe has personally read and is aware of government statements related to the Revocation and Deportation Provisions,

---

[2] All references to "AAUP" in citations are to the AAUP trial transcripts and exhibits filed in this matter's docket pursuant to the Court's March 13, 2026, Order. (Dkt. No. 78.)

including the government's statements referenced in this lawsuit or substantially similar statements. Verified Am. Compl. ¶ 150.

Fact 72:   Jane Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions against individuals such as Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi. Verified Am. Compl. ¶ 151.

Fact 73:   Jane Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk. Verified Am. Compl. ¶ 152.

Fact 74:   Because of the government's statements about and enforcement of the Revocation and Deportation Provisions, Jane Doe has self-censored and continues to self-censor. Verified Am. Compl. ¶¶ 154, 156.

Fact 75:   Based on Jane Doe's knowledge of government statements and enforcement concerning the Revocation and Deportation Provisions, Jane Doe fears adverse immigration action under the Deportation and Revocation Provisions if she engages in constitutionally protected speech. Verified Am. Compl. ¶¶ 150, 157.

Fact 76:   After the Trump administration began taking immigration enforcement actions against certain alien students, like Mahmoud Khalil and Badar Khan Suri, the professor for whom John Doe served as a teaching assistant advised John Doe to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status. Verified Am. Compl. ¶ 164.

Fact 77:   In March 2025, John Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri, including articles quoting government statements about the detention and deportation of these noncitizens. Verified Am. Compl. ¶ 165.

Fact 78:   Consequently, fearing Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision, John Doe refrained from publishing his findings containing criticism of Israel's actions in Gaza, which John Doe views as a genocide backed by the United States' foreign policy. Verified Am. Compl. ¶ 165.

Fact 79:   John Doe has personally read and is aware of government statements about visa revocation and deportation under the Revocation and Deportation Provisions, including the government's statements referenced in this lawsuit or substantially similar statements. Verified Am. Compl. ¶ 172.

Fact 80:   John Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions against

| | individuals such as Mahmoud Khalil, Rümeysa Öztürk, Badar Khan Suri, and Mohsen Mahdawi. Verified Am. Compl. ¶ 173. |
|---|---|
| | Fact 81:  John Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk. Verified Am. Compl. ¶ 174. |
| | Fact 82:  Because of the government's statements about and enforcement of the Revocation and Deportation Provisions, John Doe has self-censored and continues to self-censor. Verified Am. Compl. ¶¶ 176–78. |
| | Fact 83:  Based on John Doe's knowledge of government statements and enforcement concerning the Revocation and Deportation Provisions, John Doe fears adverse immigration action under the Deportation and Revocation Provisions if he engages in constitutionally protected speech as he once did and even if he continues his current diminished expression. Verified Am. Compl. ¶¶ 176–78. |
| Issue 4:  Whether Plaintiffs' intended speech is proscribed by the challenged Provisions. | Fact 84:  The Deportation Provision's text allows the Secretary of State to render lawfully present noncitizens deportable for their protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii); *see also id.* 1227(a)(4)(C)(i)–(ii). |
| | Fact 85:  The Revocation Provision's text allows the Secretary of State "at any time, in his discretion" to "revoke [a] visa or other documentation." 8 U.S.C. § 1201(i). |
| | Fact 86:  John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs, was asked whether the Revocation Provision "let's [sic] you revoke not for foreign policy reasons, but for any reason?" He answered, "That is correct." *AAUP* Trial Transcript July 18, at 65, Dkt. No. 82-9. |
| Issue 5:  Whether the government has threatened enforcement. | Fact 87:  On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza. Am. Compl. ¶ 21; Answer ¶ 21. |
| | Fact 88:  At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel. Am. Compl. ¶ 22; Answer ¶ 22. |
| | Fact 89:  Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution." Am. Compl. ¶ 23; Answer ¶ 23. |

|  | Fact 90:   Other events featured pro-Palestinian advocates handing out flyers. Am. Compl. ¶ 24; Answer ¶ 24. |
|  | Fact 91:   Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums. Am. Compl. ¶ 26; Answer ¶ 26. |
|  | Fact 92:   President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States, and his campaign website linked to the Republican Party platform. Am. Compl. ¶¶ 27, 29; Answer ¶ 27. |
|  | Fact 93:   The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism." Am. Compl. ¶ 28; Answer ¶ 28. |
|  | Fact 94:   Mr. Trump's campaign website separately said: "Deport pro-Hamas radicals and make our college campuses safe and patriotic again." *Agenda 47*, Trump Vance, https://perma.cc/H2RM-JSSP (June 18, 2025) (capitalization altered). |
|  | Fact 95:   At campaign rally on October 16, 2023, Mr. Trump said he would revoke the visas of foreign students deemed "radical, anti-American, and antisemitic" and to aggressively deport aliens with "jihadist sympathies." Ex. B, Dkt. No. 13, at 5. |
|  | Fact 96:   At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas and sympathizers on college campuses. The college campuses are being taken over. And all of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it, come 2025 we will find you and we will deport you. We will deport you." *Speech: Donald Trump Addresses the Republican Jewish Coalition in Las Vegas – October 28, 2023*, Roll Call, https://perma.cc/8S83-KBSQ (Mar. 31, 2026). |
|  | Fact 97:   At a campaign rally on November 8, 2023, Mr. Trump said, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses which have been infested with radicalism like never before." *Speech: Donald Trump Holds a Political Rally in Hialeah, Florida - November 8, 2023*, Roll Call, https://perma.cc/P455-HZ97 (Mar. 31, 2026). |
|  | Fact 98:   At the same rally, Mr. Trump said, "If you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you, and we will deport you." *Speech: Donald Trump Holds a Political Rally in Hialeah, Florida - November 8, 2023*, Roll Call, https://perma.cc/P455-HZ97 (Mar. 31, 2026). |

Fact 99:   On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave." Ex. A, Dkt. No. 13, at 2.

Fact 100:  On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." *AAUP* Ex. 70, Dkt. No. 81-3, at 217; Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

Fact 101:  On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *AAUP* Ex. 45, Dkt. No. 81-2, at 81; *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

Fact 102:  On March 4, 2025, President Trump posted on social media: "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter." Donald J. Trump (@realDonaldTrump), Truth (Mar. 4, 2025, at 7:30 AM), https://perma.cc/YD7P-MXVF.

Fact 103:  On March 6, 2025, Secretary Rubio posted on social media: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." *AAUP* Ex. 24, Dkt. No. 81-1, at 87; Secretary Marco Rubio (@SecRubio), X (Mar. 6, 2025, at 5:30 PM), https://perma.cc/H2LP-M57P.

Fact 104:  On March 13, 2025, Vice President J.D. Vance was asked, "Do you see more such deportations happening?" He answered, "I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country. So yeah, I don't know how high that number is going to be, but you're going to see more people." *AAUP* Ex. 31, Dkt. No. 81-1, at 147.

Fact 105: On March 16, 2026, Secretary Rubio said that "every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well." *AAUP* Ex. 33, Dkt. No. 81-1, at 157.

Fact 106: Secretary Rubio said, "And if you tell us when you apply for a visa, I'm coming to the U.S. to participate in pro-Hamas events, that runs counter to the foreign policy interests of the United States of America. It's that simple. So you lied. You came—if you had told us that you were going to do that, we never would have given you the visa. Now you're here, now you do it, so you lied to us. You're out. It's that simple; it's that straightforward." *AAUP* Ex. 33, Dkt. No. 81-1, at 157.

Fact 107: Secretary Rubio said, "I find it ironic that a lot of these people out there defending the First Amendment speech—alleged free speech rights of these Hamas sympathizers … they had no problem, okay, pressuring social media to censor American political speech. So I think it's ironic and hypocritical. But the bottom line is this: If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate … in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave." *AAUP* Ex. 33, Dkt. No. 81-1, at 158.

Fact 108: On March 27, 2025, Secretary Rubio was asked to confirm the news reporting that the State Department had revoked 300 visas. He answered, "Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa." *AAUP* Ex. 35, Dkt. No. 81-2, at 9.

Fact 109: On March 28, 2025, Secretary Rubio was asked, "And what does it mean when you say against the foreign policy of the United States?" He answered, "It runs counter to our foreign—that's how we issue visas coming in. I think about it this way. If we knew this information—my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa." *AAUP* Ex. 36, Dkt. No. 81-2, at 18.

Fact 110: Secretary Rubio said, "I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws—I mean, we're obviously not going to yank a visa over that." *AAUP* Ex. 36, Dkt. No. 81-2, at 20–21.

Fact 111: Secretary Rubio said, "But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in

11

the United States, your visa is going to get yanked." *AAUP* Ex. 36, Dkt. No. 81-2, at 21.

Fact 112: Secretary Rubio said, "Let's be clear: It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with." *AAUP* Ex. 36, Dkt. No. 81-2, at 22.

Fact 113: When asked about Ms. Öztürk's visa revocation, Secretary Rubio said, "The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. If necessary and a court compels us, we'll provide that information. But ultimately it's a visa. Judges don't issue student visas. There is no right to a student visa. We can cancel a student visa under the law just the same way that we can deny a student visa under the law. And we will do so in cases we find appropriate." *AAUP* Ex. 36, Dkt. No. 81-2, at 23.

Fact 114: Secretary Rubio said, "The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life. So I just think it's crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest." *AAUP* Ex. 36, Dkt. No. 81-2, at 23–24.

Fact 115: On April 8, 2025, Secretary Rubio said, "So if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, because we don't like or have questions about some of your political activities and your views. We just won't give you a visa proactively, on the front end. My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it? In essence, if we wouldn't—if there are things about you that had we known we would not have given you a visa, we should be taking away your visa. It's as simple as that." *AAUP* Ex. 37, Dkt. No. 81-2, at 44.

Fact 116: Secretary Rubio said, "So I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa. And we're revoking those visas, and they have to leave." *AAUP* Ex. 37, Dkt. No. 81-2, at 44.

|  | Fact 117: On April 14, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller said on Fox News that any noncitizen "who preaches hate for America" will be deported. *AAUP* Ex. 39-1, Dkt. No. 81-2, at 58. |
|---|---|
|  | Fact 118: On April 17, 2025, Secretary Rubio was asked, "What are the standards that are being used to determine whether somebody should stay in the United States or should go?" He said, if "all of a sudden it becomes obvious you think Hamas is a good group[,] [w]ell, then we should revoke your visa." *AAUP* Ex. 40, Dkt. No. 81-2, at 63. |
|  | Fact 119: Secretary Rubio said, "It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them. That's not in our national interest." *AAUP* Ex. 40, Dkt. No. 81-2, at 63. |
|  | Fact 120: Secretary Rubio said, "[W]hen someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country. You're not going to be here; it's just that simple." *AAUP* Ex. 40, Dkt. No. 81-2, at 64. |
|  | Fact 121: On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU. |
|  | Fact 122: On May 20, 2025, Secretary Rubio testified before the Senate foreign relations committee. He said, in reference to visa revocations, "There are more coming. We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas. It's as simple as that. I want to do more. I hope we can find more of these people." Am. Compl. ¶ 64; Answer ¶ 64. |
|  | Fact 123: On May 21, 2025, Secretary Rubio testified before the House foreign affairs committee. Responding to a question about the revocation of Öztürk's visa, he said he "proudly" revoked her visa, that |

13

he revokes visas every day, and that he would continue revoking visas. Am. Compl. ¶ 65; Answer ¶ 65.

Fact 124: On July 29, 2025, Mr. Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for American or its people"— not just noncitizens who criticize Israel. Ex. O, Dkt. No. 14, at 38.

Fact 125: On August 20, 2025, DHS posted on X: "If you hate America, you have no business demanding to live in America." Homeland Security (@DHSgov), X (Aug. 20, 2025, at 12:30 PM), https://perma.cc/K649-DNLK.

Fact 126: On September 11, 2025, in response to Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau posted on X: "In light of yesterday's horrific assassination of a leading political figure, I want to underscore that foreigners who glorify violence and hatred are not welcome visitors to our country. I have been disgusted to see some on social media praising, rationalizing, or making light of the event, and have directed our consular officials to undertake appropriate action. Please feel free to bring such comments by foreigners to my attention so that the @StateDept can protect the American people." Christopher Landau (@DeputySecState), X (Sep. 11, 2025, at 8:20 AM), https://perma.cc/7N8S-TT75.

Fact 127: On September 14, 2025, Mr. Landau responded on X to a video of a noncitizen mocking Charlie Kirk's assassination: "Rest assured that the @StateDept has revoked his visa so at least he will not be engaging in his grotesque diatribes on American soil." Christopher Landau (@DeputySecState), X (Sep. 14, 2025, at 12:35 PM), https://perma.cc/6KB2-DJ9M.

Fact 128: On September 15, 2025, Secretary Rubio posted on X: "America will not host foreigners who celebrate the death of our fellow citizens. Visa revocations are under way. If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country." Secretary Marco Rubio (@SecRubio), X (Sep. 15, 2025, at 10:54 PM), https://perma.cc/L24D-NRKV.

Fact 129: On October 5, 2025, DHS posted on X that it arrested "terrorist sympathizers across our country." Homeland Security (@DHSgov), X (Oct. 5, 2025, at 7:09 PM), https://perma.cc/MX99-CR62.

Fact 130: On October 14, 2025, the State Department posted on X: "The United States has no obligation to host foreigners who wish death on Americans. The State Department continues to identify visa holders who celebrated the heinous assassination of Charlie Kirk. Here are just

| | |
|---|---|
| | a few examples of aliens who are no longer welcome in the U.S." The post was followed by six examples:<br><br>"An Argentine national said that Kirk 'devoted his entire life spreading racist, xenophobic, misogynistic rhetoric' and deserves to burn in hell. Visa revoked."<br><br>"A South African national mocked Americans grieving the loss of Kirk, saying 'they're hurt that the racist rally ended in attempted martyrdom' and alleging 'he was used to astroturf a movement of white nationalist trailer trash.' Visa revoked."<br><br>"A Mexican national said that Kirk 'died being a racist, he died being a misogynist' and stated that 'there are people who deserve to die. There are people who would make the world better off dead.' Visa revoked."<br><br>"A Brazilian national charged that 'Charlie Kirk was the reason for a Nazi rally where they marched in homage to him' and that Kirk 'DIED TOO LATE.' Visa revoked."<br><br>"A German national celebrated Kirk's death and attempted to justify his murder, writing 'when fascists die, democrats don't complain.' Visa revoked."<br><br>"A Paraguayan national charged that 'Charlie Kirk was a son of a b**** and he died by his own rules.' Visa revoked."<br><br>Ex. P, Dkt. No. 44-1, at 4.<br><br>Fact 131: The State Department also posted: "Aliens who take advantage of America's hospitality while celebrating the assassination of our citizens will be removed." Ex. P, Dkt. No. 44-1, at 4; Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://perma.cc/S6FW-WR3C.<br><br>Fact 132: On October 17, 2025, the State Department posted on X: "We heard Bluesky is a great place to research visa revocations." Department of State (@StateDept), X (Oct. 17, 2025), at 7:24 PM), https://perma.cc/G7CC-YUHP.<br><br>Fact 133: On November 18, 2025, Mr. Miller said, "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." Am. Compl. ¶ 80; Answer ¶ 80. |
| Issue 6: Whether the government has disavowed future enforcement. | Fact 134: Stanford Daily members are unaware of any government officials disavowing invoking the Deportation and Revocation Provisions against protected speech outside of the litigation documents filed in this case. Verified Am. Compl. ¶ 111.<br><br>Fact 135: Jane Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing |

15

| | |
|---|---|
| | invoking the Provisions against protected speech. Verified Am. Compl. ¶ 153. |
| | Fact 136: John Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech. Verified Am. Compl. ¶ 175. |
| Issue 7:   Whether the government has a history of enforcement. | Fact 137: Historically and at all times relevant to this action, when HSI Office of Intelligence analysts receive referrals, they would conduct open-source analysis and various checks to validate the availability of information and/or the referral, and, if warranted, prepare an ROA.  *AAUP* Trial Transcript July 17, at 49-50, Dkt. No. 82-8. |
| | Fact 138: The Office of Intelligence has historically generated approximately 25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement information to its leadership and other Executive Branch partners.  *AAUP* Trial Transcript July 9 at 49–50, Dkt. No. 82-3. |
| | Fact 139:  Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the HSI Office of Intelligence team investigated under Title 8 and for potential violations of law.  *AAUP* Trial Transcript July 10, at 10, 83-84, 97, Dkt. No. 82-4. |
| | Fact 140: The Canary Mission website was one of multiple publicly available sources the HSI Office of Intelligence team reviewed. *AAUP* Trial Transcript July 9, at 118, Dkt. No. 82-3; *AAUP* Trial Transcript July 10, at 75–78, Dkt. No. 82-4. |
| | Fact 141:  From the more than 5,000 names it received, the Office of Intelligence team generated between 100 and 200 ROAs, approximately. *AAUP* Trial Transcript July 10, at 83–84, 97–98, 105––08, Dkt. No. 82-4. |
| | Fact 142: For the remaining approximately 95% of the names, the Office of Intelligence took no further action.  *AAUP* Trial Transcript July 10, at 106, Dkt. No. 82-4. |
| | Fact 143: From the roughly 200 ROAs, between approximately 10 and 50 were referred to State regarding specific individuals associated with these protests. *AAUP* Trial Transcript July 17, at 55–56, 77, Dkt. No. 82-8. |
| | Fact 144: Of referrals to State involving nonimmigrant visa holders, approximately 25% to 30% do not result in revocations or removability determinations, either because they are sent back to DHS to ask for |

16

more information or because State finds the information not significant enough to warrant revocation. *AAUP* Trial Transcript July 10, at 93–94, Dkt. No. 82-5.

Fact 145: While testifying under oath, Assistant Director Peter Hatch, the most senior official at the Office of Intelligence, said his office developed reports of analysis (ROAs) on the campus protestors and looked whether "any of them [were] supporting terrorist organizations." *AAUP* Trial Transcript July 9, at 74, Dkt. No. 82-3.

Fact 146: Mr. Hatch did not receive direction or definition as to what "supporting terrorist organizations" means. *AAUP* Trial Transcript July 9, at 93, Dkt. No. 82-3.

Fact 147: Mr. Hatch was asked, "Did anyone mention that you were, among other things, going to take a look at Hamas or pro-Hamas activity?" He responded, "Um, yes, we—the—supporting Hamas would be, um, relative to a violation of law. So it would be standard practice for an analyst to that anyway. However, um, my direction to the team, um, was to look for, um—as an example, to look for Hamas, any statements in support of Hamas, or any activities." *AAUP* Trial Transcripts July 9, at 90, Dkt. No. 82-3.

Fact 148: Mr. Hatch was asked, "What does 'supporting a terrorist organization' mean when you say it?" He responded, "Again the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism. So we look for activities, um, such as, um, support for a terrorist—statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization. But I really don't want to say any more detail than that." *AAUP* Trial Transcript July 9, at 93–94, Dkt. No. 82-3.

Fact 149: ICE's Homeland Security Investigations unit focused on creating ROAs for noncitizens who participated in protests after the October 7, 2023, attack. *AAUP* Trial Transcript July 10, at 97–98, 109–110, Dkt. No. 82-4.

Fact 150: While testifying under oath, John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs, said "support for Hamas will get your Visa revoked." *AAUP* Trial Transcript July 18, at 32, Dkt. No. 82-9.

Fact 151: Mr. Armstrong was asked if "the phrase, 'From the river to the sea, Palestine will be free,' could be covered by the endorsing, espousing, supporting, a terrorist organization provision." He answered, "It's basically calling for genocide of all Israelis, because there's no space for Israelis in that 'river to the sea.'" *AAUP* Trial Transcript July 18, at 34, Dkt. No. 82-9.

17

Fact 152: Mr. Armstrong was asked if "a statement denouncing Zionism could be covered because Zionism is Jewish patriotism or Israeli patriotism." He answered, "It could be, yes." *AAUP* Trial Transcript July 18, at 34, Dkt. No. 82-9.

Fact 153: Mr. Armstrong was asked if "a statement criticizing Israel's actions in Gaza could be covered, depending on the statement." He answered, "Yes, depending on the statement. It could definitely. If you say that 'They're worse than Hitler in what they're doing in Gaza,' that would be a statement that I think would be leading in that direction that you seem to be going, Counselor." *AAUP* Trial Transcript July 18, at 34, Dkt. No. 82-9.

Fact 154: Mr. Armstrong was asked if "a statement comparing the policy of Israel to that of the Nazis" could lead to adverse immigration consequences. He answered, "I'm saying it's worst than the Nazis." *AAUP* Trial Transcript July 18, at 34, Dkt. No. 82-9.

Fact 155: Mr. Armstrong was asked if a "statement calling for an arms embargo on Israel could be covered." He answered, "It could be." *AAUP* Trial Transcript July 18, at 34–35, Dkt. No. 82-9.

Fact 156: Mr. Armstrong was asked if a "statement calling for limiting military aid to Israel could be covered." He answered, "In my opinion, yes." *AAUP* Trial Transcript July 18, at 35, Dkt. No. 82-9.

Fact 157: Mr. Armstrong was asked if a "statement calling Israel an 'apartheid state' could probably be covered." He answered, "It might be. We'd have to look at the totality of the case. Which is what we do in the Visa revocations." *AAUP* Trial Transcript July 18, at 35, Dkt. No. 82-9.

Fact 158: Mr. Armstrong was asked, "What do you think is the common understanding of what 'antisemitism' is?" He answered, "In my opinion, antisemitism is unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them." *AAUP* Trial Transcript July 18, at 28, Dkt. No. 82-9.

Fact 159: Mr. Armstrong was asked, "In other words, in your understanding antisemitism includes hatred or prejudice against Israel and the Israeli people, right?" He answered, "Yes. In my understanding antisemites will sometimes try to hide their views and say they're not against Jews, they're just against Israel, which is a farcical argument in my mind. It's just a dodge." *AAUP* Trial Transcript July 18, at 28, Dkt. No. 82-9.

Fact 160: With respect to who at the State Department can make the determination necessary to trigger the Deportation Provision, Mr. Armstrong testified, "I cannot make that determination, only the

Secretary of State, whoever that person may be." *AAUP* Trial Transcript July 18, at 45, Dkt. No. 82-9.

Fact 161: Mr. Armstrong testified that the State Department does not have an "ideological deportation policy"; that the State Department does not "have any policy to revoke Visas based on protected speech"; and that the State Department does not "have any policy to find people removable based on protected speech." *AAUP* Trial Transcript July 11 at 121, Dkt. No. 82-5.

Fact 162: Mr. Armstrong testified that no one has "ever told [him] to revoke the Visas on the basis of protected speech" or to "prepare the materials for the Secretary to make that finding." *AAUP* Trial Transcript July 11 at 122, Dkt. No. 82-5.

Fact 163: AD Watson testified that the United States government does not "target individuals for removal from the U.S. based solely on participating in public protests." *AAUP* Trial Transcript July 17, at 39, Dkt. No. 82-8.

Fact 164: AD Watson testified that, in more than 20 years at DHS, he had never "heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech." *AAUP* Trial Transcript July 17, at 59, Dkt. No. 82-8.

Fact 165: AD Watson testified that he was not aware of "any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech." *AAUP* Trial Transcript July 17, at 60, Dkt. No. 82-8.

Fact 166: Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder). Verified Am. Compl. ¶ 41; Answer ¶ 41.

Fact 167: Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities. Verified Am. Compl. ¶ 42; Answer ¶ 42.

Fact 168: On March 6, 2025, HSI issued an ROA for Mr. Khalil. The ROA did not note criminal history, attached news articles and social media posts indicating that Mr. Khalil had been critical of Israel and participated in protests, and included a Canary Mission article. *AAUP* Ex. 233, Dkt. No. 81-6, at 317–21.

Fact 169: On March 7, 2025, Mr. Watson signed a referral letter that provided a summary of action that "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" Mr. Khalil's "presence or

19

activities consistent with" the Deportation Provisions. *AAUP* Trial Transcript July 17, at 79, Dkt. No. 82-8; *AAUP* Ex. 242, Dkt. No. 81-6, at 370–71.

Fact 170: Mr. Watson is the Assistant Director of the National Security Division within ICE. *AAUP* Trial Transcript July 17, at 26–27, Dkt. No. 82-8.

Fact 171: Upon receipt of the relevant materials, Mr. Watson would send referral letters from DHS to the State Department in certain cases.

Fact 172: The referral letter said Mr. Khalil's "involvement in the March 6, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'" *AAUP* Ex. 242, Dkt. No. 81-6, at 370.

Fact 173: The letter said that "HSI is concerned that the distribution of Hamas-authored flyers, leadership roles in antisemitic activities, and leadership in disruptive protests may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *AAUP* Ex. 242, Dkt. No. 81-6, at 370.

Fact 174: On March 8, 2025, Mr. Armstrong authored an action memo concerning Mr. Khalil, recommending that Secretary Rubio render Mr. Khalil removable under the Deportation Provisions. *AAUP* Ex. 247, Dkt. No. 81-6, at 385–89.

Fact 175: Mr. Armstrong's action memo cited only the DHS referral letter and the ROA in making his recommendation. *AAUP* Ex. 247, Dkt. No. 81-6, at 385–89.

Fact 176: Mr. Armstrong concluded that Mr. Khalil's activities in the United States "have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because [his] participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world." *AAUP* Ex. 247, Dkt. No. 81-6, at 387.

Fact 177: Mr. Armstrong wrote that "DHS has not identified any alternative grounds of removability that would be applicable to … Khalil, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity." *AAUP* Ex. 247, Dkt. No. 81-6, at 387.

Fact 178: Mr. Armstrong wrote that he was "not aware of any prior exercises of the Secretary's removal authority" under the Deportation Provision and that Mr. Khalil was "likely to challenge [his] removal

under this authority, and courts may scrutinize the basis for these determinations." *AAUP* Ex. 247, Dkt. No. 81-6, at 387.

Fact 179: On March 8, 2025, Secretary Rubio adopted Mr. Armstrong's recommendations. *AAUP* Ex. 8, Dkt. No. 81-1, at 33–34.

Fact 180: Secretary Rubio wrote that the determination was "based on information provided by the DHS/ICE/HSI regarding the participation and role[] of … Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." *AAUP* Ex. 8, Dkt. No. 81-1, at 33–34.

Fact 181: Secretary Rubio wrote, "The public actions and continued presence of … Khalil in the United States undermine[s] U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." *AAUP* Ex. 8, Dkt. No. 81-1, at 34.

Fact 182: Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail on March 10, 2025, and initiated proceedings to deport him from the United States. Am. Compl. ¶ 43; Answer ¶ 43.

Fact 183: Mr. Khalil's Notice to Appear stated that "The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." *AAUP* Ex. 9, Dkt. No. 81-1, at 36.

Fact 184: On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Ex. E, Dkt. No. 13, at 29.

Fact 185: That same day, DHS posted on social media, "On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization." *AAUP* Ex. 25, Dkt. No. 81-1, at 89.

Fact 186: On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional "students and paid agitators" involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." Ex. F, Dkt. No. 13, at 31.

Fact 187: On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he

"sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women and children." Ms. Leavitt said Mr. Khalil "distributed pro-Hamas propaganda, fliers with the logo of Hamas" on Columbia's campus. She said that "this administration is not going to tolerate individuals … studying in our country and then siding with pro-terrorist organizations." *AAUP* Ex. 28, Dkt. No. 81-1, at 99–100.

Fact 188: Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds. Am. Compl. ¶ 49; Answer ¶ 49.

Fact 189: On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar said about Mr. Khalil: "This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it." *AAUP* Ex. 29, Dkt. No. 81-1, at 117.

Fact 190:  Mr. Edgar was asked, "So what is the standard? Is any criticism of the Israeli government a deportable offense?" He answered, "Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is." *AAUP* Ex. 29, Dkt. No. 81-1, at 118.

Fact 191: Mr. Edgar was asked, "Is any criticism of the United States government a deportable offense?" He answered, "Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point ...." *AAUP* Ex. 29, Dkt. No. 81-1, at 118.

Fact 192:  Mr. Edgar was asked, "Is any criticism of the government a deportable offense?" He answered, "Let me put it this way, Michel, imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." *AAUP* Ex. 29, Dkt. No. 81-1, at 118–19.

Fact 193: Mr. Edgar was asked, "Is protesting a deportable offense?" He answered, "You're focused on protests. I'm focused on the visa process. He went through a legal process ...." *AAUP* Ex. 29, Dkt. No. 81-1, at 119.

Fact 194:  The government continues to pursue Mr. Khalil's removal; the case is currently on appeal with the Board of Immigration

Appeals,[3] and there is a related case at the Third Circuit. *See Khalil v. President*, 25-2357 (3rd Cir. pet. for reh'g en banc filed Mar. 31, 2026).

Fact 195: Rümeysa Öztürk is a PhD student at Tufts University in Medford, Massachusetts. *AAUP* Ex. 232, Dkt. No. 81-6, at 303.

Fact 196: She is a citizen of Turkey and entered the United States on an F-1 student visa. *AAUP* Ex. 232, Dkt. No. 81-6, at 303.

Fact 197: Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, The Tufts Daily, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies. Ex. G, Dkt. No. 13, at 33–34.

Fact 198: On March 17, 2025, HSI issued an ROA concerning Ms. Öztürk. *AAUP* Ex. 232, Dkt. No. 81-6, at 303–15.

Fact 199: The report located no criminal history or HSI investigations associated with Öztürk. *AAUP* Ex. 232, Dkt. No. 81-6, at 303.

Fact 200: The report attached a February 6, 2025, Canary Mission post describing Ms. Öztürk as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." *AAUP* Ex. 232, Dkt. No. 81-6, at 305.

Fact 201: The report attached Ms. Öztürk's op-ed. *AAUP* Ex. 232, Dkt. No. 81-6, at 311–312.

Fact 202: The report attached a news article from Boston.com showing the suspension of the group "Tufts Students for Justice in Palestine." *AAUP* Ex. 232, Dkt. No. 81-6, at 313.

Fact 203: The report said the Boston.com article "ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada," but that "[a]nalysts were unable to locate images matching the exact reference to signs." *AAUP* Ex. 232, Dkt. No. 81-6, at 313.

Fact 204: On March 21, 2025, Mr. Watson signed a referral letter concerning Ms. Öztürk. *AAUP* Ex. 245, Dkt. No. 81-6, at 379–80.

Fact 205: Mr. Watson wrote "to provide a summary of the actions by Rumeysa Ozturk for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether ... [her] ... presence or activities in the U.S. compromise a compelling U.S. foreign policy

---

[3] Immigration court filings are not public, but Mr. Khalil's counsel publicized a redacted version of his opening brief to the Board of Immigration appeals, which was filed on March 2, 2026. That redacted brief is available at https://perma.cc/EBJ7-U7B2.

interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision. *AAUP* Ex. 245, Dkt. No. 81-6, at 379.

Fact 206: Mr. Watson identified Ms. Öztürk as a co-author of the op-ed and connected this to the Graduate Students for Palestine's joining Tufts SJP's call to reject Tufts' response to proposed resolutions by the Coalition for Palestinian Liberation at Tufts. *AAUP* Ex. 245, Dkt. No. 81-6, at 379–80.

Fact 207: Mr. Watson does not claim a direct connection between Ms. Öztürk and the Tufts SJP. *AAUP* Ex. 245, Dkt. No. 81-6, at 379–80.

Fact 208: Mr. Watson concluded that Ms. Öztürk's co-authoring of an op-ed in which the authors joined in voicing opposition to Tufts' investment in Israel with a different group that later was suspended for violent imagery and a call for intifada was "associations" that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *AAUP* Ex. 245, Dkt. No. 81-6, at 379–80.

Fact 209: Mr. Watson also provided information to determine whether Ms. Öztürk's visa should be revoked under the Revocation Provision. *AAUP* Ex. 245, Dkt. No. 81-6, at 380.

Fact 210: On March 21, 2025, Deputy Assistant Secretary Stuart Wilson determined enforcing the Revocation Provision against Ms. Öztürk was appropriate and recommended a "silent" revocation of her F-1 student visa. *AAUP* Ex. 250, Dkt. No. 81-6, at 403–06.

Fact 211: Mr. Wilson's memo recounts that Ms. Öztürk "co-authored an op-ed in Tufts' student newspaper. In this article, the authors wrote, 'Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response' (to a student government resolution)." *AAUP* Ex. 250, Dkt. No. 81-6, at 404.

Fact 212: Mr. Wilson quoted the referral letter, writing that Ms. Öztürk's "involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *AAUP* Ex. 250, Dkt. No. 81-6, at 404.

Fact 213: Mr. Wilson wrote, "While Öztürk has been involved with actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements indicating

support for a terrorist organization or antisemitism generally." *AAUP* Ex. 250, Dkt. No. 81-6, at 404.

Fact 214: Mr. Wilson wrote, "While the [Öztürk ROA] implies a connection between Öztürk and the now-banned Tufts Student[s] for Justice in Palestine (TSJP), the report presents no evidence other than Öztürk's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TJSP. Nor has DHS/ICE/HSI shown any evidence that Öztürk was involved in any of the activities which resulted in TJSP being suspended from Tufts." *AAUP* Ex. 250, Dkt. No. 81-6, at 404–05.

Fact 215: Mr. Wilson wrote, "Although information provided by DHS/HSI/ICE does not establish any potential ineligibility for Öztürk, you may in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances." *AAUP* Ex. 250, Dkt. No. 81-6, at 406.

Fact 216: Maureen Smith, senior adviser in the Bureau of Consular Affairs who reports to Mr. Armstrong, was asked whether "engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status—I'll state it differently —is grounds for revoking his visa status?" Ms. Smith answered, "I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest." *AAUP* Trial Transcript July 11, at 8–10, 55, Dkt. No. 82-5.

Fact 217: On March 21, 2025, Mr. Armstrong approved the recommendation to revoke Ms. Öztürk's visa. *AAUP* Trial Transcript July 18, at 61–62, Dkt. No. 82-9.

Fact 218: Mr. Armstrong said the "key things" in his decision to revoke Ms. Öztürk's visa were her "actions of protesting Tufts' relationship with Israel" and "activities and associations" of co-authoring an op-ed with the Tufts chapter of Students for Justice in Palestine. *AAUP* Trial Transcript July 18, at 61–62, Dkt. No. 82-9.

Fact 219: A DHS spokesperson justified the revocation of Ms. Öztürk's visa by asserting Ms. Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists." Am. Compl. ¶ 54; Answer ¶ 54.

Fact 220: On March 25, 2025, multiple federal officers arrested Ms. Öztürk outside her home in Somerville, Massachusetts. The officers detained her and transported her to a Louisiana immigration jail. *AAUP* Ex. 225, Dkt. No. 81-6, at 271 (video filed manually).

| | Fact 221: Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds. Am. Compl. ¶ 55; Answer ¶ 55. |
|---|---|
| | Fact 222: The government continues to pursue Ms. Öztürk's deportation, currently appealing an immigration judge's decision to terminate her removal proceeding[4] and defending its termination of Ms. Öztürk's Student and Exchange Visitor Information System record at the First Circuit. *See Ozturk v. Hyde*, No. 26-1135 (1st Cir. filed Feb. 7, 2025). |
| | Fact 223: Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States. Am. Compl. ¶ 56. |
| | Fact 224: As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests. Am. Compl. ¶ 57; Answer ¶ 57. |
| | Fact 225: On March 12, 2025, HSI issued an ROA for Mr. Mahdawi. *AAUP* Ex. 235, Dkt. No. 81-6, at 331–36. |
| | Fact 226: The report cited Mr. Mahdawi's pro-Palestinian social media posts and media appearances, including on 60 Minutes. *AAUP* Ex. 235, Dkt. No. 81-6, at 333–35. |
| | Fact 227: The report referred to media characterizations of discourse about his posts and media appearances as "pro-Hamas," "justifying October 7th Hamas attack on Israel," "calling for the destruction of Israel," "accusing Israel of genocide," and "speak[ing] about Jews in a derogatory way." *AAUP* Ex. 235, Dkt. No. 81-6, at 333–35. |
| | Fact 228: On March 14, 2025, Mr. Watson signed a referral letter concerning Mr. Mahdawi. *AAUP* Trial Transcript July 17, at 97, Dkt. No. 82-8; *AAUP* Ex. 244, Dkt. No. 81-6, at 376–77. |
| | Fact 229: Mr. Watson wrote "to provide a summary of the actions by Mohsen Mahdawi in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether" Mahdawi's "presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision. *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |
| | Fact 230: Mr. Watson wrote that Mr. Mahdawi's "involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting 'Hamas sympathizers.'" *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |

---

[4] Immigration court filings are not public, but counsel has confirmed the appeal.

| | Fact 231:  The letter cites Mr. Mahdawi's "leadership and involvement in these disruptive protests." *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |
| --- | --- |
| | Fact 232:  The letter cites news media articles characterizing Mr. Mahdawi's advocacy as "calling for Israel's destruction and justifying Hamas terrorism in late 2023." *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |
| | Fact 233:  The letter cites Mr. Mahdawi's use of the slogan, "From the river to the sea, Palestine will be free." *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |
| | Fact 234:  The letter cites a poem attributed to Mr. Mahdawi that, in the government's view, "exemplified" Mr. Mahdawi's "glorification of terrorism." *AAUP* Ex. 244, Dkt. No. 81-6, at 376. |
| | Fact 235:  The letter cites Mr. Mahdawi's co-presidency of DAR Palestinian, an undergraduate pro-Palestinian student group at Columbia University. *AAUP* Ex. 244, Dkt. No. 81-6, at 377. |
| | Fact 236:  The letter cites Mr. Mahdawi's 2023 affiliation with "the pro-terror activist group Within Our Lifetime" and that he was "reportedly a member of Students for Justice in Palestine." *AAUP* Ex. 244, Dkt. No. 81-6, at 377. |
| | Fact 237:  Mr. Watson concluded that "HSI is concerned that Mahdawi's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *AAUP* Ex. 244, Dkt. No. 81-6, at 377. |
| | Fact 238:  On March 15, 2025, Mr. Armstrong authored an action memo for Secretary Rubio concerning Mr. Mahdawi. *AAUP* Ex. 248, Dkt. No. 81-6, at 391–95. |
| | Fact 239:  Mr. Armstrong relayed information concerning Mr. Mahdawi's activities at a protest at Columbia and that "[o]pen-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force soldiers as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters." *AAUP* Ex. 248, Dkt. No. 81-6, at 392. |
| | Fact 240:  Mr. Armstrong concluded that "[t]he activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States." *AAUP* Ex. 248, Dkt. No. 81-6, at 392–93. |
| | Fact 241:  Mr. Armstrong highlighted that "DHS/ICE/HSI has not identified any alternative grounds of removability applicable to |

|  | Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity." *AAUP* Ex. 248, Dkt. No. 81-6, at 393. |
|  | Fact 242: On March 15, 2025, Secretary Rubio issued a memo concerning Mr. Mahdawi, explaining that he has rendered Mr. Mahdawi deportable under the Deportation Provision. *AAUP* Ex. 12, Dkt. No. 81-1, at 45–46. |
|  | Fact 243: Secretary Rubio wrote that this determination was "based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." *AAUP* Ex. 12, Dkt. No. 81-1, at 45–46. |
|  | Fact 244: Secretary Rubio further wrote that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *AAUP* Ex. 12, Dkt. No. 81-1, at 46. |
|  | Fact 245: On April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, DHS agents arrested him and placed him in ICE custody. Am. Compl. ¶ 58; Answer ¶ 58. |
|  | Fact 246: The Trump administration then began proceedings to deport Mr. Mahdawi from the United States. *AAUP* Trial Transcript July 15, at 27–31, Dkt. No. 82-7. |
|  | Fact 247: DHS detained Mr. Mahdawi at the Northwest State Correctional Center in St. Albans, Vermont, until he was released on April 30, 2025. Answer ¶ 60. |
|  | Fact 248: The government continues to pursue Mr. Mahdawi's deportation, currently appealing an immigration judge's decision to terminate his removal proceeding.[5] |

---

[5] Immigration court filings are not public, but Mr. Mahdawi's counsel issued a press release stating that "the government has asked the Board of Immigration Appeals to resume deportation proceedings" and that "Mr. Mahdawi's legal team has filed a cross-appeal asking the Board of Immigration Appeals to terminate the case with prejudice to prevent the government from refiling the case." Press Release, Am. C.L. Union, Government Seeks to Resume Immigration Proceedings Against Mohsen Mahdawi (March 16, 2026, at 11:10 AM) (https://perma.cc/J5T7-R8K5).

Fact 249: On March 10, 2025, HSI issued an ROA for Bader Khan Suri. *AAUP* Ex. 234, Dkt. No. 81-6, at 323–29.

Fact 250: The report stated that, "[a]ccording to open-source reporting, [Mr. Khan Suri] actively spreads Hamas propaganda and promotes antisemitism on social media." *AAUP* Ex. 234, Dkt. No. 81-6, at 323.

Fact 251: The report noted that Mr. Khan Suri had "[n]o associated criminal history or HSI investigation." *AAUP* Ex. 234, Dkt. No. 81-6, at 323.

Fact 252: The report also included social media posts, concluding that Mr. Khan Suri "appears to post pro-Palestine content" on social media. *AAUP* Ex. 234, Dkt. No. 81-6, at 323.

Fact 253: On March 14, 2025, Mr. Watson signed a referral letter concerning Mr. Khan Suri. *AAUP* Trial Transcript July 17, at 99, Dkt. No. 82-8; *AAUP* Ex. 246, Dkt. No. 81-6, at 382–83.

Fact 254: Mr. Watson wrote the letter "to provide a summary of the actions by Badar Khan Suri in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision. *AAUP* Ex. 246, Dkt. No. 81-6, at 382.

Fact 255: Mr. Watson identified Khan Suri "as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads [its] propaganda and promotes antisemitism on social media." *AAUP* Ex. 246, Dkt. No. 81-6, at 382.

Fact 256: On March 15, 2025, Mr. Armstrong authored an action memo concerning Mr. Khan Suri. *AAUP* Ex. 249, Dkt. No. 81-6, at 397–401.

Fact 257: Mr. Armstrong quoted the referral letter, writing that Mr. Khan Suri was "'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.'" *AAUP* Ex. 249, Dkt. No. 81-6, at 398.

Fact 258: Mr. Armstrong noted that "we have not independently uncovered additional open source information regarding Suri's involvement in antisemitic conduct or intimidation of Jewish students." *AAUP* Ex. 249, Dkt. No. 81-6, at 398.

Fact 259: Mr. Armstrong wrote, "DHS/ICE/HSI has not provided [Consular Affairs] with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his

29

relationship with Ahmed Yousef." *AAUP* Ex. 249, Dkt. No. 81-6, at 399.

Fact 260: Mr. Armstrong also wrote, "Given the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination." *AAUP* Ex. 249, Dkt. No. 81-6, at 400.

Fact 261: On March 15, 2025, Secretary Rubio issued a memo concerning Mr. Khan Suri, explaining that he has rendered Mr. Khan Suri deportable under the Deportation Provision. *AAUP* Ex. 21, Dkt. No. 81-1, at 74–75.

Fact 262: Secretary Rubio wrote that this determination was "based on the assessment and conclusion provided by DHS/ICE/[HSI], to which we defer as DHS/ICE is the principal investigative unit of DHS, that … 'Suri's direct connection to Hamas leadership and involvement in antisemitic activities ... [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization. In addition, DHS/ICE/HSI also assess that Suri is 'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.' The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States." *AAUP* Ex. 21, Dkt. No. 81-1, at 74–75.

Fact 263: Secretary Rubio also wrote that "the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *AAUP* Ex. 21, Dkt. No. 81-1, at 75.

Fact 264: On March 17, 2025, DHS officials arrested Mr. Khan Suri. *AAUP* Trial Transcript July 15, at 116, Dkt. No. 82-8; *AAUP* Ex. 22, Dkt. No. 81-1, at 77–79.

Fact 265: On March 19, 2025, Ms. McLaughlin posted: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media." *AAUP* Ex. 34, Dkt. No. 81-1, at 162.

Fact 266: A federal district court ordered Mr. Khan Suri released, and the government is currently appealing that decision. *Suri v. Trump*, No. 25-cv-480, 2025 WL 1392143 (E.D. Va. May 14, 2025), *appeal docketed*, No. 25-1560 (4th Cir. argued Mar. 17, 2026).

| | |
|---|---|
| | Fact 267: On October 26, 2025, ICE arrested Sami Hamdi, a British political commentator who was on a speaking tour in the United States. Am. Compl. ¶ 76; Answer ¶ 76. |
| | Fact 268: Mr. Hamdi often supports Palestine. Christian Edwards, *Why Has ICE Detained British Commentator Sami Hamdi on His US Speaking Tour*, CNN (Oct. 27, 2025), https://perma.cc/K8V5-Y68Y. |
| | Fact 269: That same day, Ms. McLaughlin quoted a post about Mr. Hamdi's arrest and said: "Thanks to the work of @Sec_Noem and @SecRubio and the men and women of law enforcement, this individual's visa was revoked and he is in ICE custody pending removal. Under President Trump, those who support terrorism and undermine American national security will not be allowed to work or visit this country. It's commonsense." Tricia McLaughlin (@TriciaOhio), X (Oct. 26, 2025, at 2:28 PM), https://perma.cc/ZKQ8-Q8RY. |
| | Fact 270: That same day, the State Department quoted Ms. McLaughlin's post and said: "We've said it before, we'll say it again: The United States has no obligation to host foreigners who support terrorism and actively undermine the safety of Americans. We continue to revoke the visas of persons engaged in such activity. Thank you to our partners at @DHSgov for their efforts to remove this individual." Department of State (@StateDept), X (Oct. 26, 2025, at 5:46 PM), https://perma.cc/WMP6-XMK7. |
| | Fact 271: On November 5, 2025, DHS posted on X: "The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again." Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS. |
| | Fact 272: After over two weeks in immigration detention, Mr. Hamdi agreed to voluntarily leave the United States. Rebecca Santana, *British Muslim Commentator Sami Hamdi Agrees to Leave US After Immigration Detention*, AP News (Nov. 11, 2025, at 3:34 PM), https://perma.cc/Q6SE-6DPQ. |
| Issue 8: Whether Stanford Daily has suffered organizational injuries. | Fact 273: Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions. Verified Am. Compl. ¶ 83. |

31

| | Fact 274: Stanford Daily disseminates its content to readers through its website, social media accounts, email digests, and print editions. Verified Am. Compl. ¶ 100; Answer ¶ 100. |
| --- | --- |
| | Fact 275: Stanford Daily publishes content on its website, stanforddaily.com. It also publishes content on X, Instagram, Facebook, YouTube, TikTok, and Spotify. In the past, Stanford Daily published content on LinkedIn, but it does not currently use that platform. Verified Am. Compl. ¶ 101; Answer ¶ 101. |
| | Fact 276: Stanford Daily also disseminates its content through two types of email digests. First, it disseminates a Daily Digest that comes out every morning of the school week, providing headlines, descriptions, and links to articles in each of its print sections to offer a general overview of what is happening in the Stanford community. And second, Stanford Daily occasionally disseminates a Breaking News email when an article is deemed by its editorial staff to be sufficiently urgent and important to include in its own email to its subscribers after a story breaks. Verified Am. Compl. ¶ 102. |
| | Fact 277: Stanford Daily also disseminates its content by printing *The Stanford Daily*. The newspaper is printed once a week over the academic school year aside from breaks and finals weeks. It is distributed every Friday with content from the past week of publication. Verified Am. Compl. ¶ 103. |
| | Fact 278: Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast. *The Stanford Daily*'s content includes news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle" game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year. Verified Am. Compl. ¶ 104. |
| | Fact 279: In line with Stanford Daily's mission and core business activities, The Stanford Daily has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. Verified Am. Compl. ¶ 105. |
| | Fact 280: Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members |

to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues. Verified Am. Compl. ¶ 106.

Fact 281: To support its mission, Stanford Daily covers matters related to foreign affairs, Israel, and Palestine, such as covering student groups like Students for Justice in Palestine, Law Students for Justice in Palestine, and Stanford Israel Association; student events such as the "All Eyes on Gaza" vigil and the "Rally for Hostages" event, both on October 7, 2025; Israel's detention and deportation of a Stanford alumna who attempted to sail toward Gaza on the Global Sumud Flotilla; Stanford pro-Palestinian protesters being indicted on felony charges; a Stanford chemist suing Stanford University for antisemitism and anti-Israel discrimination; and similar issues. Verified Am. Compl. ¶ 107.

Fact 282: Stanford Daily also provides an outlet for people to publish opinions. Some of this content relates to American foreign affairs, Israel, and Palestine, such as opinion pieces about standing in solidarity with the Palestinian cause, opposing Hamas's actions on October 7, the prosecution of Stanford pro-Palestinian protestors, hunger strikes in support of Palestine, and inviting more pro-Palestinian speakers to campus. Verified Am. Compl. ¶ 108.

Fact 283: To support its mission, Stanford Daily has covered this news and provided this outlet for opinions before Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. It has continued to cover news related to foreign affairs, Israel, and Palestine since Israel and Hamas entered a ceasefire and hostage-exchange agreement on October 9, 2025, and it expects to continue covering news and publishing opinions related to foreign affairs, Israel, and Palestine. Verified Am. Compl. ¶ 109.

Fact 284: The government's actions have specifically impacted Stanford Daily by causing lawfully present noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down, and ask for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions. Verified Am. Compl. ¶¶ 112–23.

Fact 285: Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri for deportation in March 2025, Stanford Daily has received numerous requests from noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech. Verified Am. Compl. ¶ 124.

Fact 286: Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri  for deportation in March 2025,

33

| | |
|---|---|
| | international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine. Verified Am. Compl. ¶ 125. |
| | Fact 287: Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri for deportation in March 2025, Stanford Daily has received other requests from current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles. Verified Am. Compl. ¶ 127. |
| | Fact 288: The government's actions have specifically impacted Stanford Daily by decreasing the quantity and diversity of opinion pieces *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. Before the government's actions related to the Revocation and Deportation Provisions, Stanford Daily published opinion pieces by noncitizen contributors. But since the government began enforcing the Provisions, Stanford Daily has experienced substantially reduced participation from noncitizen contributors. Verified Am. Compl. ¶ 130. |
| | Fact 289: The government's actions have specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is able to publish. Before the government's related to the Revocation and Deportation Provisions, Stanford Daily writers could incorporate a wide variety of sources and quotes into their news articles, including perspectives from international students. But now, noncitizen students no longer want to speak with Stanford Daily as sources or contribute opinion pieces. Verified Am. Compl. ¶ 131. |
| | Fact 290: Legally present noncitizen Stanford Daily members who have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity have continued to take those actions since this case was filed. Verified Am. Compl. ¶ 133. |
| Issue 9:   Whether Stanford Daily has suffered corporate injuries. | Fact 291: Stanford Daily is composed of United States citizens and noncitizens, some of whom are lawfully present in the United States pursuant to lawful admission on nonimmigrants visas, such as the F-1 student visa. Verified Am. Compl. ¶ 94. |
| | Fact 292: The government's statements about and enforcement of the Deportation and Revocation Provisions have caused Stanford Daily's members and contributors to self-censor. Verified Am. Compl. ¶¶ 112–13. |
| Issue 10:  Whether Stanford Daily has | Fact 293: As part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the |

| | |
|---|---|
| suffered associational injuries. | news and publish opinions without government or university retaliation. Verified Am. Compl. ¶ 85. |
| | Fact 294: For a famous example, after the chief of the Palo Alto Police Department James Zurcher raided The Stanford Daily's offices in 1971, Stanford Daily sued to protect its members and defend press freedom. *See Zurcher v. Stanford Daily*, 436 U.S. 547 (1978). Verified Am. Compl. ¶ 86. |
| | Fact 295: And for a recent example, in 2024, Stanford Daily advocated against its reporter's arrest, highlighting the "violation of his First Amendment and Fourth Amendment rights" and the "threat to the freedom of the press." Verified Am. Compl. ¶ 87. |
| | Fact 296: Even before filing this suit, Stanford Daily had started advocating against the government's use of the Revocation and Deportation Provisions based on protected speech, noting in April 2025 that "student speech, from our own reporters and those we're reporting on, is startlingly chilled" by the government's threats and past enforcement actions. Verified Am. Compl. ¶ 88. |
| | Fact 297: Stanford Daily is a voluntary membership organization. Verified Am. Compl. ¶ 89; Answer ¶ 89. |
| | Fact 298: Everyone who wants to join Stanford Daily is guaranteed a spot. Verified Am. Compl. ¶ 90. |
| | Fact 299: Stanford Daily has over 150 identifiable members. Verified Am. Compl. ¶ 91. |
| | Fact 300: Stanford Daily's members voluntarily joined the organization to support its mission. Verified Am. Compl. ¶ 92. |
| | Fact 301: Stanford Daily's members receive updates about the status of this case from Stanford Daily's leadership. Stanford Daily's members elect seven directors who sit on Stanford Daily's nine-member board. The board represents the interests of Stanford Daily's members and has input on the direction of this case. Verified Am. Compl. ¶ 93. |
| | Fact 302: Stanford Daily's members include United States citizens and noncitizens. Some of Stanford Daily's members are noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa. Other noncitizen members are lawfully present in the United States pursuant to their status as lawful permanent residents on immigrant visas. Verified Am. Compl. ¶ 94. |
| | Fact 303: Stanford Daily's members are either editorial members or business members. Verified Am. Compl. ¶ 95; Answer ¶ 95. |
| | Fact 304: To be considered an editorial member, one must have worked for Stanford Daily for at least two calendar months in the |

35

| | |
|---|---|
| | current or most recent fall, winter, or spring academic quarter and demonstrated continued interest and commitment through meeting attendance and/or contributions to Stanford Daily's operations. Verified Am. Compl. ¶ 96. |
| | Fact 305: To be considered a business member, one must have worked for Stanford Daily at least two months prior to the date of the approval of the membership list and have worked for an average of five or more hours per week since beginning work at Stanford Daily. Verified Am. Compl. ¶ 97. |
| | Fact 306: Stanford Daily's content is produced by Stanford Daily members and contributors. Verified Am. Compl. ¶ 98. |
| | Fact 307: Any individual who submits and has content of any type published in *The Stanford Daily* is a contributor. Contributors need not be Stanford Daily members nor Stanford affiliates. Although contributors to *The Stanford Daily* are associated with Stanford Daily, contributors are not necessarily Stanford Daily members. Verified Am. Compl. ¶ 99. |
| | Fact 308: Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions referenced in this lawsuit. Verified Am. Compl. ¶ 110. |
| Issue 11: Whether Plaintiffs' injuries are traceable to the government. | Fact 309: The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The Secretary of State serves at the pleasure of the President. Am. Compl. ¶ 37; Answer ¶ 37. |
| | Fact 310: The Department of Homeland Security oversees Immigration and Customs Enforcement (ICE), ICE's Enforcement and Removal Operations branch (ERO), ERO's Department of Homeland Security Investigations (HSI), and HSI's Office of Intelligence. *AAUP* Trial Transcript July 9, at 42–43, 54–56, Dkt. No. 82-3. |
| | Fact 311: HSI's Office of Intelligence supports investigations by producing research and analysis, which it compiles into Reports of Analysis (ROAs). *AAUP* Trial Transcript July 9, at 56, Dkt. No. 82-3. |
| | Fact 312: The current administration has used a process for enforcing the Revocation Provision in which HSI's OI issues an ROA to HSI's National Security Division. The Division determines whether the ROA is appropriate and, if it is, sends a DHS referral letter to the Department of State. A State official reviews the letter and makes a recommendation to a Bureau of Consular Affairs official. If the recommendation is approved, the Department of State revokes the visa and informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status. *AAUP* Trial Transcript July 9, at 100, |

36

| | |
|---|---|
| | Dkt. No. 83-2; *AAUP* Trial Transcript July 18, at 54–55, 65, Dkt. No. 83-9; *AAUP* Trial Transcript July 11, at 91–92, Dkt. No. 83-5. |
| | Fact 313: The current administration has used a process for enforcing the Deportation Provisions in which HSI's OI issues an ROA to HSI's National Security Division. The Division determines whether the ROA is appropriate and, if it is, sends a DHS referral letter to the Department of State. A State official reviews the letter and then makes a recommendation to the Secretary of State, who then makes a determination. If the Secretary of State makes the personal determination to remove the noncitizen, he informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status. *AAUP* Trial Transcript July 9, at 100, Dkt. No. 83-2; *AAUP* Trial Transcript July 18, at 45, 50, Dkt. No. 83-9; *AAUP* Trial Transcript July 11, at 91–92, Dkt. No. 83-5. |
| Issue 12: Whether Plaintiffs' injuries are redressable by the limited relief sought. | Fact 314: But for what a lawfully present noncitizen considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, a lawfully present noncitizen member who quit Stanford Daily would rejoin the organization and continue being a member of Stanford Daily. Verified Am. Compl. ¶ 115. |
| | Fact 315: But for what a lawfully present noncitizen on Stanford Daily's staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would publish an article about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. Verified Am. Compl. ¶¶ 116–17. |
| | Fact 316: But for what a lawfully present noncitizen on Stanford Daily's editorial staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would republish the article they had taken down and would edit stories involving Israel and Palestine. Verified Am. Compl. ¶ 119. |
| | Fact 317: But for what a lawfully present noncitizen on Stanford Daily's staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the staff writer would not have asked Stanford Daily to remove all her articles from Stanford Daily's website, including those about Israeli and Palestinian officials, as well other foreign affairs topics. Verified Am. Compl. ¶¶ 120–21. |
| | Fact 318: But for what a lawfully present noncitizen on Stanford Daily's editorial board considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would not have asked to remove an article about |

| | |
|---|---|
| | the Israeli Defense Forces they worked on. Verified Am. Compl. ¶¶ 122–23.<br><br>Fact 319: But for what students consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily. Verified Am. Compl. ¶ 126.<br><br>Fact 320: But for what Stanford Daily writers consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper. Verified Am. Compl. ¶ 128.<br><br>Fact 321: But for what Stanford Daily contributors consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily. Verified Am. Compl. ¶ 129.<br><br>Fact 322: But for what Jane Doe considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression. Verified Am. Compl. ¶ 149.<br><br>Fact 323: But for what John Doe considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, John Doe would have published and voiced his true opinions regarding Palestine and Israel without delay or fear. Verified Am. Compl. ¶ 166. |

| |
|---|
| **Claims 1 and 2: First Amendment Claim for Declaratory and Injunctive Relief Against the Deportation Provision (8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i))** |
| The parties agree Plaintiffs raise a First Amendment challenge to the Deportation Provision as it applies to deportations based on protected speech. Verified Am. Compl. ¶¶ A, C, D. The Plaintiffs "must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). The parties agree that whether the First Amendment prohibits the government from rendering a noncitizen deportable under the Deportation Provision based on protected speech is a question of law. The parties further agree that whether the Plaintiffs satisfy the standard for their challenge involves only legal questions. *See Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016) (noting the "action turns on a question of law" and "require[s] no further factual development" when plaintiffs "seek to enjoin the enforcement of the Act on the grounds that it is unconstitutional"), *rev'd sub nom.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). |
| **Claims 3 and 4: Fifth Amendment Vagueness Claim for Declaratory and Injunctive Relief Against the Deportation Provision (8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i))** |
| The parties agree Plaintiffs raise a Fifth Amendment challenge to the Deportation Provision as it applies to deportations based on protected speech. Verified Am. Compl. ¶¶ B, C, D. The Plaintiffs "must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). The parties agree that whether the Fifth Amendment prohibits the government from using the Deportation Provision to render a noncitizen deportable based on protected speech is a question of law. The parties further agree that whether the Plaintiffs satisfy the standard for their challenge involves only legal questions. *See Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016) (noting "action turns on a question of law" and "require[s] no further factual development" when plaintiffs "seek to enjoin the enforcement of the Act on the grounds that it is unconstitutional"), *rev'd sub nom.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). |
| **Claim 5 and 6: First Amendment Claim for Declaratory and Injunctive Relief Against the Revocation Provision (8 U.S.C. § 1201(i))** |
| The parties agree Plaintiffs raise a First Amendment challenge to the Revocation Provision as it applies to visa revocations based on protected speech. Verified Am. Compl. ¶¶ E, G, H. The Plaintiffs "must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). The parties agree that whether the First Amendment prohibits the government from using the Revocation Provision to revoke a noncitizen's visa based on protected speech is a question of law. The parties further agree that whether the Plaintiffs satisfy the standard for their challenge involves only legal questions. *See Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016) (noting "action turns on a question of law" and "require[s] no further factual development" when plaintiffs "seek to enjoin the enforcement of the Act on the grounds that it is unconstitutional"), *rev'd sub nom.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). |
| **Claim 7 and 8: Fifth Amendment Vagueness Claim for Declaratory and Injunctive Relief Against the Revocation Provision (8 U.S.C. § 1201(i))** |
| The parties agree Plaintiffs raise a Fifth Amendment challenge to the Revocation Provision as it applies to visa revocations based on protected speech. Verified Am. Compl. ¶¶ F, G, H. The |

Plaintiffs "must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). The parties agree that whether the Fifth Amendment permits the government to use the Revocation Provision to revoke a noncitizen's visa on the basis of protected speech is a question of law. The parties further agree that whether the Plaintiffs satisfy the standard for their challenge involves only legal questions. *See Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016) (noting "action turns on a question of law" and "require[s] no further factual development" when plaintiffs "seek to enjoin the enforcement of the Act on the grounds that it is unconstitutional"), *rev'd sub nom.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018).

Dated: April 9, 2026

CRAIG H. MISSAKIAN
United States Attorney

/s/ *Kelsey J. Helland* (w/consent)
KELSEY J. HELLAND
Assistant United States Attorney
United States Attorney's Office
Northern District of California
Telephone: (415) 436-6488
Email: Kelsey.Helland@usdoj.gov

*Counsel for Defendants*

Respectfully Submitted,

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org

Colin P. McDonell (Cal. Bar #289099)
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
*Admitted pro hac vice

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
VAN DER HOUT LLP
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003

*Counsel for Plaintiffs*

40