Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org
Email: daniel.zahn@fire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@fire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, <br><br> *Defendants*. | Case No. 5:25-cv-06618-NW <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION...............................................................................................................1

ARGUMENT .....................................................................................................................2

I.    Plaintiffs assert a "hybrid" challenge to the Revocation and Deportation Provisions limited to enforcement against protected speech. ...............................................................2

II.    Protected speech is a recognized, definable category in caselaw and statutes....................4

III.    The Revocation and Deportation Provisions violate the Constitution as applied to protected speech. .....................................................................................................6

    A.    The Provisions violate the First and Fifth Amendments as applied to speech........6

    B.    The Trump administration has taken advantage of the Provisions' allowance for viewpoint and content discriminatory enforcement. .........................................7

CONCLUSION ...............................................................................................................11

PLAINTIFFS' SUPPLEMENTAL BRIEF               CASE NO. 5:25-cv-06618-NW

# TABLE OF AUTHORITIES

**Cases**

*AAUP v. Rubio*,
   802 F. Supp. 3d 120 (D. Mass. 2025) ........................................................................................ 8

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
   70 F.3d 1045 (9th Cir. 1995)..................................................................................................... 6

*Biden v. Texas*,
   597 U.S. 785 (2002) ................................................................................................................ 11

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) .................................................................................................................. 5

*Bridges v. Wixon*,
   326 U.S. 135 (1945) .................................................................................................................. 6

*Cath. Leadership Coal. of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014).................................................................................................... 4

*Chiles v. Salazar*,
   No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026)............................................................ 4, 6

*Collin v. Smith*,
   578 F.2d 1197 (7th Cir. 1978).................................................................................................. 8

*Counterman v. Colorado*,
   600 U.S. 66 (2023) .................................................................................................................... 4

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) .................................................................................................................. 6

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. 461 (2025) .................................................................................................................. 7

*Green Party of Tenn. v. Hargett*,
   791 F.3d 684 (6th Cir. 2015).................................................................................................... 4

*Hustler Mag., Inc. v. Falwell*,
   485 U.S. 46 (1988) .................................................................................................................... 6

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) .................................................................................................................. 6

*John Doe No. 1 v. Reed*,
   561 U.S. 186 (2010)......................................................................................................... 2, 3, 4

PLAINTIFFS' SUPPLEMENTAL BRIEF                    CASE NO. 5:25-cv-06618-NW

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012)..................................................................................... 7

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953) ..................................................................................................... 6

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024)..................................................................................... 4

*McGuire v. Marshall*,
  50 F.4th 986 (11th Cir. 2022)..................................................................................... 3

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ..................................................................................................... 6

*Project Veritas Action Fund v. Rollins*,
  982 F.3d 813 (1st Cir. 2020) ...................................................................................... 3

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..................................................................................................... 7

*United States v. Alvarez*,
  617 F.3d 1198 (9th Cir. 2010)..................................................................................... 5

*United States v. Falvey*,
  540 F. Supp. 1306 (E.D.N.Y. 1982)........................................................................... 5

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ..................................................................................................... 5

*United States v. Stevens*,
  559 U.S. 460 (2010) ..................................................................................................... 4

*United States v. Sup. Ct. of N.M.*,
  839 F.3d 888 (10th Cir. 2016)..................................................................................... 3

**Statutes**

8 U.S.C.
  § 1182(a)(3)(C)(iii) ................................................................................................... 2, 7
  § 1201(i) ......................................................................................................................... 7
  § 1227(a)(4)(C)(ii) ....................................................................................................... 2
  § 1252(f)................................................................................................................... 11, 12

15 U.S.C.
  § 1681u(a) ..................................................................................................................... 5

50 U.S.C.
  § 1805(a)(2)(A) ............................................................................................................. 5

-iii-

§ 1824(a)(2)(A) ............................................................................................................. 5
§ 1842 ........................................................................................................................... 5

-iv-

**INTRODUCTION**

It has been 397 days since the Trump administration arrested Mahmoud Khalil, 380 days since it arrested Rümeysa Öztürk, and 246 days since Plaintiffs filed this lawsuit. And at no point has the government disclaimed the authority to revoke visas or deport noncitizens based on protected speech. Instead, the administration continues to aggressively pursue the detention and deportation of Mr. Khalil, Ms. Öztürk, and others for voicing opinions the government disfavors. J.S. 194, 222, 248, 266.[1] And now, with the benefit of the *AAUP v. Rubio* trial testimony and exhibits in the record, the administration's use of the Revocation and Deportation Provisions to target disfavored speech is in full view.

The *AAUP* trial record reveals the State Department used the Revocation Provision against Ms. Öztürk despite *acknowledging* the lack of "any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally." J.S. 213. The record likewise makes plain that the State Department used the Deportation Provision—which covers solely protected speech—to target Mr. Khalil: "DHS has not identified any alternative ground of removability that would be applicable … including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity." J.S. 177.

In short, the *AAUP* record confirms what the Trump administration's public statements already made clear: the government is using the Revocation and Deportation Provisions to target lawfully present noncitizens for deportation based on their protected speech. For Jane Doe, John Doe, and *The Stanford Daily*'s noncitizen writers and editors, the lone path to safely exercise their rights to free speech is a judgment from this Court declaring the Revocation and Deportation Provisions violate the First and Fifth Amendments as applied to protected speech and enjoining the government from enforcing the Provisions against Plaintiffs based on protected speech.

---

[1] J.S. refers to the parties' joint statement of undisputed material facts, Dkt. No. 78. The number refers to the fact number in the joint statement.

-1-

PLAINTIFFS' SUPPLEMENTAL BRIEF                                  CASE NO. 5:25-cv-06618-NW

## ARGUMENT

**I.  Plaintiffs assert a "hybrid" challenge to the Revocation and Deportation Provisions limited to enforcement against protected speech.**

Plaintiffs filed this lawsuit to ensure the government would not revoke their visas or render them deportable because of their protected speech, and their claims are narrowly tailored to that end: Plaintiffs challenge the Revocation and Deportation Provisions solely as they apply to protected speech. Verified Am. Compl. ¶¶ 220, 223–24, 237, 240–41, 256, 259–60, 270, 273–74.[2] At the January 6, 2026, hearing and in prior briefing, the government incorrectly suggested Plaintiffs must either challenge the Provisions in all of their applications as an exclusively "facial" challenge or only as to speech in which Plaintiffs have engaged as an exclusively "as-applied" challenge. Tr. Jan. 6, 2026, Hr'g 14; Defs.' Reply 8–9, Dkt. No. 48. The United States Supreme Court, and published decisions from circuits across the country, confirm the government is wrong. Plaintiffs can facially challenge the Provisions solely as to one application of the statutes, in this case enforcement against protected speech.

The Court can start, and end, with *John Doe No. 1 v. Reed*, which confirmed that a First Amendment suit can challenge a particular subset of a statute's applications. 561 U.S. 186 (2010). There, supporters of a ballot referendum sued to enjoin the Washington Secretary of State from using the state's Public Records Act to reveal the identities of those who signed the petition to place the issue on the ballot. *Id.* at 193. The complaint asserted the PRA was "unconstitutional as applied to referendum petitions." *Id.* The parties disagreed about whether the claim raised a facial or an as-applied challenge. *Id.* at 194. The Supreme Court noted the claim "obviously has characteristics of both." *Id.* It was as applied in "that it does not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions." *Id.* It was facial "in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum

---

[2] As Plaintiffs explained in prior briefing and at the January 6, 2026, hearing, Tr. Jan. 6, 2026, Hr'g 56:16–57:14, the Deportation Provision is already textually limited solely to protected speech. *See* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii) (providing that a noncitizen shall not be rendered deportable "because of the alien's past, current, or expected beliefs, statement, or associations, if such beliefs, statements, or associations *would be lawful* in the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." (emphasis added)).

-2-

PLAINTIFFS' SUPPLEMENTAL BRIEF                    CASE NO. 5:25-cv-06618-NW

petitions." *Id.* The label was "not what matters." *Id.* "The important point is that plaintiffs' claim and the relief that would follow … reach beyond the particular circumstances of these plaintiffs." *Id.* Plaintiffs thus had to meet the "standards for a facial challenge *to the extent of that reach*." *Id.* (emphasis added). So the plaintiffs had to meet the standards for a facial challenge to the PRA not as to all of its applications, but as to its applications against *referendum petitions*.

Here, Plaintiffs need not meet the standards for a facial challenge as to all of the Revocation and Deportation Provisions' conceivable applications, only those against *protected speech*.

Circuit courts across the country uniformly recognize this type of "hybrid" claim. In 2020, the First Circuit assessed a First Amendment challenge to a Massachusetts statute criminalizing "record[ing] another person's words secretly and without consent." *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020). The plaintiffs included a narrow challenge to the law "as it applied to ban the secret nonconsensual audio recording of any government officials discharging their duties in public." *Id.* at 824. The First Circuit explained, "the Supreme Court has confronted similar half-fish half-fowl First Amendment challenges and instructed that where the challengers 'do not seek to strike a statute in all its applications' but the relief sought 'reaches beyond the particular circumstances of the plaintiffs, they must satisfy the standards for a facial challenge to the extent of that reach.'" *Id.* at 826 (cleaned up) (quoting *John Doe No. 1*, 561 U.S. at 194).

Similarly, in 2016, the Tenth Circuit addressed a challenge to a New Mexico ethics rule prohibiting prosecutors from subpoenaing lawyers to present evidence about past or present clients. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 893 (10th Cir. 2016). The United States challenged the rule on Supremacy Clause grounds solely as it applied to "federal prosecutors licensed in New Mexico." *Id.* The Tenth Circuit, like the First Circuit, had no trouble applying *John Doe No. 1* to resolve the suit, explaining it was a "dual claim" which "focuses only on the constitutional validity of the subset of applications targeted by the plaintiffs' substantive claim." *Id.* at 915 (noting, as *John Doe No. 1* and *Project Veritas* did, that the plaintiffs were "obliged to satisfy our standards for a facial challenge but only to the extent of that claim's reach" (cleaned up) (quoting *John Doe No. 1*, 561 U.S. at 194 (cleaned up))). Other circuits follow the same path. *See, e.g.*, *McGuire v. Marshall*, 50 F.4th 986, 1003–04 (11th Cir. 2022) (per curiam) (interpreting *John Doe No. 1* to allow "quasi-

-3-

facial claims"); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (interpreting *John Doe No. 1* to allow claims with "characteristics of as-applied and facial challenges"); *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (same); *see also Chiles v. Salazar*, No. 24-539, 2026 WL 872307, at *13 (U.S. Mar. 31, 2026) (holding Colorado's conversion therapy ban was viewpoint discriminatory under the First Amendment as applied to enforcement against talk therapy involving only the spoken word).

So, here, when enforced against protected speech, the Revocation and Deportation Provisions violate the First Amendment as unconstitutional viewpoint- and content-based speech restrictions and the Fifth Amendment as an unconstitutionally vague speech restriction.

## II.     Protected speech is a recognized, definable category in caselaw and statutes.

The government wrongly insists "protected speech" is an unknown quantity and thus an unmanageable standard for a judgment. *See* Tr. Jan. 6, 2026, Hr'g 13–14. But a return to first principles—and a litany of federal national security statutes treating "protected speech" as a known, definable category—show the error in the government's view.

The First Amendment's starting position is that "speech is protected unless it falls within a narrow exception to First Amendment protection." *Matsumoto v. Labrador*, 122 F.4th 787, 811 (9th Cir. 2024). Indeed, "'[f]rom 1791 to the present,' the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas.'" *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). These "historic and traditional categories … long familiar to the bar" include obscenity, child pornography, defamation, fraud, incitement, fighting words, and speech integral to criminal activity. *Stevens*, 559 U.S. at 468, 471 (citation omitted) (collecting cases). These are "narrowly drawn," "exceptional" categories of speech. *Chiles*, 2026 WL 872307, at *7. The Court has rejected any "freewheeling authority to declare new categories of speech outside the scope of the First Amendment" and steadfastly resists any attempt to expand the exceptions as "startling and dangerous." *Stevens*, 559 U.S. at 470, 472. It repeatedly confirms that courts have no "authority to declare new categories of speech outside the scope of the First Amendment." *Id. at* 468–69, 472.

-4-

PLAINTIFFS' SUPPLEMENTAL BRIEF                                    CASE NO. 5:25-cv-06618-NW

That means "protected speech," far from being an unknowable quantity, includes *all* speech other than that falling within traditional categories of unprotected speech, each of which has its own rigorous test that makes them easily excludable and the remainder easily identifiable. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504–05 (1984). And it is always the government's burden to demonstrate speech fits within an unprotected category. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816, 818 (2000); *United States v. Alvarez*, 617 F.3d 1198, 1205 (9th Cir. 2010) ("[W]e presumptively protect *all* speech … , leaving it to the government to demonstrate … a compelling need to remove some speech from protection …."), *aff'd*, 567 U.S. 709 (2012).

Unsurprisingly, then, federal statutes—and national security statutes in particular—often demark "protected speech" as territory where a statute's reach must end. For example, under the federal statute authorizing pen registers and trap and trace devices "for any investigation to obtain foreign intelligence information," investigation may not be "conducted solely upon the basis of activities protected by the first amendment to the Constitution." 50 U.S.C. § 1842. Similarly, a statute requiring consumer reporting agencies to furnish the FBI with customer banking information in certain circumstances nevertheless provides such authorization only if "such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 15 U.S.C. § 1681u(a). Likewise, the statute governing warrants for physical searches of suspected agents of foreign powers expressly provides that "no United States person shall be considered an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 50 U.S.C. § 1824(a)(2)(A). And the statute governing approval for electronic surveillance provides the same. *Id.* § 1805(a)(2)(A); *see also United States v. Falvey*, 540 F. Supp. 1306, 1314 (E.D.N.Y. 1982) (noting that "to obtain a FISA surveillance order, the Government must provide the FISA judge with something more than the target's sympathy for the goals of a particular group").

Even in the most sensitive areas of national security, Congress has repeatedly drawn a line at protected speech to ensure the government respects First Amendment boundaries. The government provides no reason why that boundary is constitutionally unmanageable here.

-5-

PLAINTIFFS' SUPPLEMENTAL BRIEF                                        CASE NO. 5:25-cv-06618-NW

**III.    The Revocation and Deportation Provisions violate the Constitution as applied to protected speech.**

    **A.    The Provisions violate the First and Fifth Amendments as applied to speech.**

"Freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). As the Supreme Court explained:

> [O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments … They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

*Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)).

The Ninth Circuit squarely held the First Amendment bars the government from deporting noncitizens because of their speech. It explained, "[A]lthough Congress and the President may regulate aliens' admission and residence in the country, that regulation must be 'consistent with the Constitution.'" *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995) (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 712 (1893)). "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Id.* (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)).

A core protection of the First Amendment is that it prohibits government officials from "us[ing] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). That is because a "central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (citation omitted). Critical here, when the government targets "certain perspectives" on an issue, it "represent[s] an egregious form of content discrimination where First Amendment concerns are at their most blatant." *Chiles*, 2026 WL 872307, at *7 (cleaned up). In short, the Supreme Court explained, a "finding of viewpoint bias end[s] the matter" and it is irrelevant that a law "might admit some permissible applications." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). At minimum, viewpoint discrimination, like content discrimination, is "presumptively

-6-

unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and must face the "unforgiving" obstacle of strict scrutiny, which "succeeds in that purpose if and only if, as a practical matter, it is fatal in fact absent truly extraordinary circumstances." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484–85 (2025).

As Plaintiffs' prior briefing explains, the Revocation and Deportation Provisions unconstitutionally discriminate against viewpoint and content when enforced based on protected speech. The Deportation Provision sanctions viewpoint discrimination by giving the Secretary authority to revoke noncitizens' visas and render them deportable if they speak against the government's foreign policy but not for it. *See* Mot. Summ. J. 17–19, Dkt. No. 32-1; *see also* 8 U.S.C. § 1182(a)(3)(C)(iii). The Revocation Provision's grant of unbridled discretion to revoke visas based on protected speech, exemplified by the government's use against disfavored speakers like Ms. Öztürk renders it viewpoint discriminatory as to revocations based on protected speech. 8 U.S.C. § 1201(i); *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012) (holding unbridled discretion to limit speech is viewpoint discrimination per se). And the Provisions' unconstitutional vagueness leaves lawfully present noncitizens guessing what opinions they must avoid voicing to remain in the country. Mot. Summ. J. 23–25.

**B.    The Trump administration has taken advantage of the Provisions' allowance for viewpoint and content discriminatory enforcement.**

The *AAUP* exhibits and trial testimony bolster the existing record to further demonstrate how the government can and has weaponized the Revocation and Deportation Provisions against protected speech.[3] In word and in deed, the government's message to lawfully present noncitizens has been unmistakable: Watch what you say, or face arrest and deportation. *See AAUP* Trial Ex. 225, at 271, Dkt. No. 81-6 (video filed manually depicting ICE's ambush and arrest of Ms. Öztürk).

---

[3] Plaintiffs do not seek for Judge Young's findings of fact and conclusions of law to have a res judicata or collateral estoppel effect in this action. Rather, the documents and testimony from the *AAUP* trial, now part of the record in this action, simply provide additional factual support for Plaintiffs' position that the Revocation and Deportation Provisions can be and have been used in a viewpoint and content discriminatory way and in a manner which chills lawfully present noncitizens' protected speech.

-7-

PLAINTIFFS' SUPPLEMENTAL BRIEF                    CASE NO. 5:25-cv-06618-NW

Start with its speech-based enforcement of the Deportation Provision against noncitizens like Mahmoud Khalil, Moshen Mahdawi, and Badar Khan Suri.[4] The *AAUP* trial revealed that the government targeted Mr. Khalil because of his "involvement" in a "protest at Barnard College, where Hamas fliers were distributed." J.S. 172. When Secretary Rubio invoked the Deportation Provision to render Mr. Khalil deportable, he claimed Mr. Khalil participated in "antisemitic protests." J.S. 180. Even if his protests and rhetoric could be categorized as "antisemitic," antisemitism is a viewpoint, and the government cannot target antisemitic protesters any more than it could target pro-Jewish demonstrators. *See Collin v. Smith*, 578 F.2d 1197, 1210 (7th Cir. 1978) (affirming the First Amendment protected Nazis' right to march in Skokie, Illinois, explaining that if "civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises").

The *AAUP* trial record likewise reflects Secretary Rubio rendered Mr. Mahdawi deportable based on pro-Palestinian speech. DHS' Report of Analysis on Mr. Mahdawi highlighted the viewpoints he shared in a 60 Minutes interview and a social media post where he "accus[es] Israel of Genocide." J.S. 225–27. DHS' referral letter to the State Department similarly focused on Mahdawi's protected speech, pointing to instances of him "calling for Israel's destruction," "justifying Hamas terrorism in late 2023," writing a pro-Palestinian poem, and using the slogan, "From the river to the sea, Palestine will be free." J.S. 228–36. The action memo prepared for Secretary Rubio cited Mr. Mahdawi's "anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force soldiers as terrorists." J.S. 238–39. And when Secretary Rubio invoked the Deportation Provision to render Mr. Mahdawi deportable, he explicitly justified his decision by

---

[4] As Judge Young explained, "Since March 2025, the process for initiating the removal of a noncitizen under" the Deportation Provision or revoking a visa under the Revocation Provision "is straight-forward." *AAUP v. Rubio*, 802 F. Supp. 3d 120, 134 (D. Mass. 2025). DHS first compiles "reports of analysis" on noncitizens, which are intelligence reports covering, among other things, possible violations of immigration and criminal laws. *AAUP* July 9, 2025, Trial Tr. 55:10–58:14, Dkt. No. 82-3. These reports may also include "subject profiles" on particular noncitizens. *AAUP* July 10, 2025, Trial Tr. 28:14–20, 92:1–6, Dkt. No. 82-4. After internal review of these reports, if DHS determines it is appropriate, it sends a referral letter to the State Department for review so it can consider possible enforcement action. *AAUP* July 9, 2025, Trial Tr. 99:13–100:17, Dkt. No. 82-3. When the basis for deportability is the Deportation Provision, Secretary Rubio receives the recommendation so he can personally make the statutorily required foreign-policy determination. *AAUP* July 18, 2025, Trial Tr. 45:7–15, 50:11–23, Dkt. No. 82-9. When the State Department approves a recommended revocation or deportation, it informs DHS. *AAUP* July 11, 2025, Trial Tr. 91:23–92:4, Dkt. No. 82-5. DHS may then issue an administrative warrant if it seeks detention of the noncitizen. *AAUP* July 15, 2025, Trial Tr. 21:1–22:4, Dkt. No. 82-7.

-8-

claiming Mahdawi was involved in "pro-Palestinian protests and call[ed] for Israel's destruction." J.S. 242–43.

The government similarly targeted Mr. Khan Suri because of his protected speech. The action memo for Secretary Rubio claimed Mr. Khan Suri "actively spreads [Hamas] propaganda and promotes antisemitism on social media." J.S. 256–57. And the government conceded in its internal communications that "we have not independently uncovered additional open source information regarding Suri's involvement in antisemitic conduct or intimidation of Jewish students." J.S. 258. As with Messrs. Khalil and Mahdawi, when Secretary Rubio used the Deportation Provision to render Mr. Khan Suri deportable, he pointed to protected pro-Palestinian expression. *See* J.S. 261–62.

For each of the three, the government internally acknowledged it lacked a non-speech statutory authorization to target their status. For Mr. Khalil, DHS admitted in an internal memo that it "has not identified any alternative grounds of removability that would be applicable to" him, "including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity." J.S. 177. For Mr. Mahdawi, the government had "not identified any alternative grounds of removability," nor "any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity." J.S. 241. And for Mr. Khan Suri, the government could not locate "any alternative grounds of removability that would be applicable." J.S. 259.

The *AAUP* trial testimony and exhibits, plus the government's public statements, likewise confirm it weaponized the Revocation Provision against Ms. Öztürk because of her protected pro-Palestinian advocacy. The government targeted Ms. Öztürk because she coauthored an op-ed criticizing Tufts University's refusal to recognize a genocide in Gaza and divest from Israeli companies. *See* J.S. 197, 208, 218. DHS attached the op-ed to its Report of Analysis and Deputy Assistant Secretary of State Stuart Wilson relied on it in his recommendation to revoke Ms. Öztürk's visa. J.S. 201, 211.

In that recommendation, Mr. Wilson acknowledged "DHS/ICE/HSI has not … provided any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements

-9-

PLAINTIFFS' SUPPLEMENTAL BRIEF                                CASE NO. 5:25-cv-06618-NW

indicating support for a terrorist organization or antisemitism generally." J.S. 213. Mr. Wilson further noted there was "no evidence other than Öztürk's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TJSP [Tufts Students for Justice in Palestine]. Nor has DHS/ICE/HSI shown any evidence that Öztürk was involved in any of the activities which resulted in TJSP being suspended from Tufts." J.S. 214.

Mr. Armstrong approved the recommendation to revoke Ms. Öztürk's visa, citing Ms. Öztürk's "actions of protesting Tufts' relationship with Israel" and pointing to her "activities and associations" of joining with the TJSP in the op-ed. J.S. 217–18. And during the *AAUP* trial, a senior adviser reporting to Mr. Armstrong said that "protesting in a way that supports terrorism, even if it's a nonviolent protest" could be "grounds for revoking [a noncitizen's] visa status." J.S. 216.

The *AAUP* record confirms the unconstitutional danger that will remain absent judgment for Plaintiffs. President Trump promised to "quickly cancel the student visas of all Hamas sympathizers on college campuses." J.S. 97. Secretary Rubio vowed to pursue "visa denial or revocation, and deportation" for those who vocally support terrorists. J.S. 103. He further committed to throwing out noncitizens who "participate in pro-Hamas events" and "people that are supportive of movements that run counter to the foreign policy of the United States." J.S. 106, 113. And he pledged to revoke the visas of those who "think Hamas is a good group." J.S. 118. He added, "when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked." J.S. 111.

Indeed, after the *AAUP* trial, the government continued to use the Provisions to target noncitizens' immigration status based on protected speech. In fall 2025, the State Department revoked the visas of at least six noncitizens for "celebrat[ing]" the assassination of Charlie Kirk. J.S. 130. Secretary Rubio promised, "If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country." J.S. 128.

Then, on October 26, 2025, ICE arrested Sami Hamdi, a pro-Palestinian British political commentator on a speaking tour in the United States. J.S. 267–68. The State Department and DHS

-10-

both pointed to Mr. Hamdi's speech to justify targeting his immigration status. The State Department announced, "The United States has no obligation to host foreigners who support terrorism and actively undermine the safety of Americans. *We continue to revoke the visas* of persons engaged in such activity." J.S. 270 (emphasis added). DHS likewise proclaimed, "There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks that they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again." J.S. 271.

The Trump administration's weaponization of the Revocation and Deportation Provisions against lawful protected speech has cast a pall of fear over noncitizens across the country. *See* Amicus Br. of Student Press L. Ctr. et al. 6, Dkt. No. 42-1 ("Contrary to Defendants' assertions, the chilling effects of the government's actions are real, widespread, and well-documented."); Amicus Br. of 19 States & D.C. 17 & n.42, Dkt. No. 37-1 (highlighting "[c]ountless news articles have documented this chilling effect"); Amicus Br. of Cato Inst. et al. 4, Dkt. No. 39 ("Predictably, the fear of adverse consequences, such as deportation, has produced a chilling effect.") John Doe, Jane Doe, and the noncitizen writers and editors at *The Stanford Daily* can only cross their fingers hoping they will not be the next Mahmoud Khalil or Rümeysa Öztürk. The First Amendment's guarantee of freedom of speech must not fall. The Court should promptly declare that the Revocation and Deportation Provisions violate the First and Fifth Amendments as applied to protected speech and enjoin the government from enforcing the Provisions against Plaintiffs based on protected speech.

## CONCLUSION

For the above reasons, the Court should enter Judgment in favor of Plaintiffs consistent with the Prayer for Relief in the Verified Amended Complaint enjoining and declaring the Provisions unconstitutional as applied to protected speech. However, pursuant to 8 U.S.C. § 1252(f), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. *See* Verified Am. Compl. 44 n.5; *Biden v. Texas*, 597 U.S. 785, 800–01 (2002) (explaining Section 1252(f) bars only injunctive relief, not declaratory relief). Therefore, to ensure Plaintiffs have a vehicle to obtain from the Supreme Court the relief sought in Claims II and IV (permanent injunctive

-11-

relief against the Deportation Provision), the Court should deny Plaintiffs relief on Claims II and IV on the basis that Section 1252(f) bars this Court from awarding the relief requested. Plaintiffs respectfully request that the Court note in its Opinion and Order that the Court would rule in Plaintiffs' favor on Claims II and IV but for Section 1252(f).

Dated: April 9, 2026

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Respectfully Submitted,

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org
Email: daniel.zahn@fire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@fire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

PLAINTIFFS' SUPPLEMENTAL BRIEF                    CASE NO. 5:25-cv-06618-NW