CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-6488
   FAX: (415) 436-6748
   kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>RUBIO, *et al.*,<br><br>    Defendants. | Case No. 5:25-cv-06618-NW<br><br>**DEFENDANTS' [PROPOSED] POST-TRIAL ORDER**<br><br>Trial Date:  May 27, 2026<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

## [PROPOSED] POST-TRIAL ORDER

Plaintiffs are Stanford Daily Publishing Corporation and Jane Doe and John Doe, noncitizens holding F-1 student visas issued by the United States.  Plaintiffs brought this lawsuit alleging claims under the First and Fifth Amendments against Marco Rubio, in his official capacity as Secretary of State, and Markwayne Mullin, in his official capacity as Secretary of Homeland Security (together, the "Government").  The Court held a bench trial in this matter on May 27, 2026.

After considering the parties' Joint Proposed Findings of Fact, and the arguments of counsel in their papers and at trial, the Court now DISMISSES this action for lack of Article III standing and enters judgment in favor of the Government.

## I.    BACKGROUND

### A.    Legislative History of the Challenged Statutes.

This action challenges the constitutionality of two federal statutes: 8 U.S.C. §§ 1201(i) (the "visa-revocation provision") and 1227(a)(4)(C)(i) (the "foreign-policy-removal provision").  The visa-revocation provision provides, "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation."  8 U.S.C. § 1201(i).

Under the foreign-policy-removal provision, the list of "classes of deportable aliens" in the Immigration and Nationality Act ("INA") includes those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."  *Id.* § 1227(a)(4)(C)(i).  But the statute provides that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest."  *Id.* § 1182(a)(3)(C); *see also id*. § 1227(a)(4)(C)(ii).

The current version of the foreign-policy-removal provision resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the INA.  Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                                    1

would be prejudicial to the public interest." 8 U.S.C. § 1182(a)(27) (1988). This prior version of the statute was used to exclude "Otto Skorzeny, a former Nazi SS officer," "Thomas Liaou, an advocate of Formosan independence," and "Mme. Ngo Dinh Nhu, sister-in-law of the former prime minister of Vietnam," all on foreign-policy grounds. *Abourezk v. Reagan*, 592 F. Supp. 880, 885 n.14 (D.D.C. 1984). It was also used to exclude Ahmad El-Werfalli, a Libyan national pursuing a course of study in aeronautics in the United States, based on concerns about how he might use that knowledge upon returning to Libya. *See El-Werfalli v. Smith*, 547 F. Supp. 152 (1982).

When some congressional representatives proposed to eliminate the prior provision in 1987, the State Department, the Department of Justice, and the former Immigration and Naturalization Service registered objections with their congressional counterparts. *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton). For example, Judge Sofaer testified on behalf of the State Department that, under the prior "public interest" standard, "[i]n those few cases where this authority is used, it is seen in good faith as necessary to protect important foreign policy concerns." *Id.* at 40. He testified that "the Executive must have the authority to deny visas to persons whose admission to the United States would cause potentially serious foreign policy consequences." *Id.* at 30. "Virtually every Nation in the world reserves the right to exclude aliens in such cases, and we believe it would be a serious mistake to deny comparable power to our own Government." *Id.* Recognizing, however, that the "public interest" standard contained in the INA at the time was "broad," the Executive therefore suggested replacing that standard "with language that limits the grounds of exclusion to potentially serious foreign policy consequences." *Id.* at 40.

Thus, in a revised legislative proposal, the House Committee on the Judiciary indicated that it "strongly believes that the Executive Branch should continue to have the authority to bar the entry of aliens who may engage in dangerous activities once they enter this country." H.R. Rep. No. 100-882, 100th Cong., 2d Sess. 15 (1988). And the Committee recognized that "the Executive needs to have some flexibility to respond to new crises or difficulties in our international relations." *Id.* at 26. In

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                                          2

particular, "there may be limited circumstances in which an alien's beliefs, statements, and, in particular, associations, may . . . result in harm either to U.S. citizens or property, or to vital foreign policy interests." *Id.* at 27.

When Congress passed the Immigration Act of 1990, it overhauled and modernized the grounds for exclusion in the statute, enacting the language at issue in this case. *See* H.R. Conf. Rep. 101-955, 1990 U.S.C.C.A.N. 6784, 6793 (Oct. 26, 1990). In explaining its rationale for the statutory text described above, the congressional conference intended that "[t]his provision would authorize the executive branch to exclude aliens for foreign policy reasons in certain circumstances." *Id.* at 6794. With respect to the Secretary of State's "compelling interest" determination, the conference stated its intention that "the 'compelling foreign policy interest' standard be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'" *Id.* "The fact that the Secretary of State personally must inform the relevant Congressional Committees when a determination of excludability is made under this provision is a further indication that the conferees intend that this provision be used only in unusual circumstances." *Id.* And the conference gave examples of "some of the circumstances in which exclusion might be appropriate," such as "when an alien's mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran)," or "when an alien's entry would violate a treaty or international agreement to which the United States is party." *Id.* at 6795.

### B.    Plaintiffs Have Not Faced Enforcement Under the Statutes.

Plaintiff Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper at Stanford University. Joint Proposed Findings of Fact ("JPFF") No. 1. Stanford Daily publishes, and intends to publish in the future, journalism and opinions on campus events and foreign affairs, and to provide a platform for community members to express their views on the same. JPFF Nos. 16-18. Plaintiffs have neither alleged nor proven that any of Stanford Daily's members have experienced any immigration enforcement action under the challenged statutes. *See generally* Verified Amended Comlaint, Dkt. 65 ("VAC"); JPFF.

Plaintiff Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                                    3

admission on an F-1 student visa. JPFF No. 4. Other than as parties to this litigation, Jane Doe has no relationship with Stanford Daily. JPFF No. 6. Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." JPFF No. 24. Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website. JPFF No. 62. As of this date, Jane Doe has not, to her knowledge, experienced any immigration enforcement action against her. JPFF No. 7.[1]

Plaintiff John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa. JPFF No. 8. Other than as parties to this litigation, John Doe has no relationship with Stanford Daily. JPFF No. 11. John Doe has attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online. JPFF No. 29. As of this date, Plaintiff John Doe has not, to his knowledge, experienced any immigration enforcement action against him. JPFF No. 12.

## II.    DISCUSSION

### A.    Plaintiffs Lack Standing.

The Court previously denied the Government's motion to dismiss for lack of standing, construing that motion as purely "facial" challenge to Plaintiffs' Verified Amended Complaint. *See* Dkt. 75 at 10 n.6. But because Article III standing is an "indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Now, having considered the record in this matter, the Court finds that Plaintiffs lack Article III standing to pursue their claims.

### 1.    The Doe Plaintiffs lack standing.

The individual Plaintiffs lack standing because they have not shown a substantial likelihood that they will face visa revocations or removal proceedings based on their protected speech. *See Int'l Ps. for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs have not demonstrated that their injuries are imminent"). In order for a plaintiff to demonstrate standing

---

[1] Because Jane Doe and John Doe are proceeding pseudonymously, the Government does not know the true identities or immigration status of these Plaintiffs.

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                                    4

based on potential future enforcement, the threat of enforcement must be "substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024).

Here, despite having previously engaged in the type of speech that they are concerned about, neither individual Plaintiff has, to the parties' knowledge, been targeted for enforcement or received any direct threat of enforcement, nor suffered any actual enforcement action under the statutes. *See* JPFF Nos. 7, 12. The past enforcement actions against other individuals that Plaintiffs have identified primarily occurred more than a year ago. *See, e.g.*, JPFF Nos. 179, 217, 242, 261. The record contains sparse information on any enforcement actions since that time, and even less for any individuals engaging in the type of speech about which Plaintiffs claim to have an interest. *See generally* JPFF. Thus, "without proof of an ongoing pressure campaign, it is entirely speculative" that Plaintiffs will be targeted for enforcement in the future, and their claim for standing fails. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024).

On the other side of the ledger, Government witnesses involved with enforcement of the statutes have testified that they did not understand there to be a policy of enforcement based on protected speech. *See* JPFF Nos. 161-65. John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs, testified that the State Department does not have an "ideological deportation policy"; that the State Department does not "have any policy to revoke Visas based on protected speech"; and that the State Department does not "have any policy to find people removable based on protected speech." JPFF No. 161; *see also* JPFF No. 86. Mr. Armstrong testified that no one has "ever told [him] to revoke the Visas on the basis of protected speech" or to "prepare the materials for the Secretary to make that finding." JPFF No. 162. Similarly, the Assistant Director of the National Security Division within ICE, Mr. Andre Watson, testified that the United States government does not "target individuals for removal from the U.S. based solely on participating in public protests." JPFF No. 163. Mr. Watson testified that, in more than 20 years at DHS, he had never "heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech." JPFF No. 164. And he testified that he was not aware of "any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech." JPFF No. 165.

Considering this evidence, the Court finds that the individual Plaintiffs have not established a "substantial" threat of future enforcement, and they therefore lack Article III standing for their claims. *See, e.g.*, *Murthy*, 603 U.S. at 58; *Int'l Ps. for Ethical Care*, 146 F.4th at 853.

### 2. Stanford Daily lacks standing.

Stanford Daily lacks standing for similar reasons. The Court previously found that Stanford Daily had sufficiently alleged facts to support associational standing and organizational standing based on its members' and other students' fears of immigration actions. *See* Dkt. 75 at 16-17. However, as with the individual Doe Plaintiffs, Stanford Daily has not shown on the record in this case that the threat of any such enforcement is substantial or imminent. Thus, Stanford Daily lacks Article III standing in this matter as well.

### B. The Statutes Are Not Unconstitutional.

Even if Plaintiffs had standing, the Court finds that they have not proven that the challenged statutes violate the Constitution.

### 1. The statutes do not violate the First Amendment.

Plaintiffs frame their First Amendment claims as "facial[]" challenges to the statutes "[a]s applied to protected speech." *See, e.g.*, VAC ¶¶ 203, 206. The Supreme Court has instructed that "[f]acial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008). Such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451. The Supreme Court "has therefore made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

For a facial challenge in the First Amendment context, "[t]he question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* Thus, "[t]he first step in the proper facial analysis is to assess the [challenged] laws' scope." *Id.* at 724. In a facial challenge, courts cannot ignore this requirement merely because a

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                                 6

plaintiff has focused on the laws' application to certain situations. *See id.*

The Court finds that the statutes have a broad legitimate scope. The visa-revocation provision—which makes no mention of speech or similar "protected" conduct—provides wide flexibility for the Government to revoke a visa for a range of possible reasons. *See* 8 U.S.C. § 1201(i). Prior courts have recognized that the Government may revoke visas on both a categorical and individual basis for various reasons. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 696 (2018) ("President Carter invoked § 1185(a)(1) to deny and revoke visas to all Iranian nationals."); *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001) (affirming revocation of visa that "had been obtained illegally"). Plaintiffs have not established that any constitutionally suspect applications of this provision are "substantial" when compared to its legitimate uses.

So too for the foreign-policy-removal provision. Unlike the visa-revocation provision, the statute challenged here is limited by its own terms, such that only enforcement actions based on "past, current, or expected beliefs, statements, or associations" that "would be lawful within the United States" are at issue. *See* 8 U.S.C. § 1182(a)(3)(C); *see also id*. § 1227(a)(4)(C)(ii). But the statute only allows such enforcement where "the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C). The Court cannot conclude, as Plaintiffs would have it, that this statute is unconstitutional in all of its applications. When sufficiently compelling foreign-policy interests are at stake, as personally confirmed by the Secretary of State, the First Amendment does not prohibit the Government from initiating removal proceedings based on the otherwise-lawful beliefs, statements, or associations of foreign nationals in this country. For purposes of Plaintiff's facial challenge, the Court finds that Plaintiffs have not established that any constitutionally problematic applications of this statute are "substantial" compared to its legitimate scope.

In evaluating the statutes' scope, the Court is cognizant that the Supreme Court has "indicated that aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas." *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.) (citing *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)), *aff'd*, 565 U.S. 1104 (2012). As the Ninth Circuit has recognized, "[d]ue to the federal government's plenary power over foreign affairs and immigration," "Congress has

DEFENDANTS' [PROPOSED] POST-TRIAL ORDER
5:25-CV-06618-NW                    7

the power to prohibit foreign nationals from donating and contributing to state and local elections," notwithstanding the First Amendment. *United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020). Indeed, the Supreme Court has long recognized that foreign nationals' rights grow on "a generous and ascending scale" as they increase their "identity with our society." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950)); *see also Harisiades*, 342 U.S. 592 ("We think the First Amendment does not prevent the deportation of these aliens.").

Finally, Plaintiffs argue that the statutes are unconstitutional every time they are applied to "protected speech," because they allow the Government to consider the content of such speech for purposes of enforcement action. However, the mere fact that the statutes allow consideration of the content of speech does not render them facially unconstitutional. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) ("*HLP*") (upholding statute even though it "regulates speech on the basis of its content"). Given that the Government can, in sufficiently compelling circumstances, consider the content of an individual's speech as a basis for enforcement action, *see id.*, the Court cannot say that the statutes at issue here are unconstitutional in every application (or even a "substantial" number of applications) in which they may be used. *See, e.g.*, *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 496 (2025) (age-verification requirements for pornographic websites satisfied intermediate scrutiny); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) ("This is therefore one of the rare cases in which a speech restriction withstands strict scrutiny."); *Haig v. Agee*, 453 U.S. 280, 307 (1981).

### 2.    The Statutes Do Not Violate The Fifth Amendment.

Nor do the statutes violate the Fifth Amendment. The Supreme Court and lower courts have recognized the political branches' discretion regarding "the admission and exclusion of foreign nationals." *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Harisiades*, 342 U.S. at 588-89; *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988). "[T]he special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Palestine Info. Off.*, 853 F.2d at 944 (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324 (1936)). "[B]ecause of the leeway necessary to represent adequately this nation's interests in

foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

Moreover, the Supreme Court and lower courts have repeatedly held that noncitizens have reduced Fifth Amendment protections compared to citizens. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 522 (2003) ("Congress may make rules as to aliens that would be unacceptable if applied to citizens."); *Mathews v. Diaz*, 426 U.S. 67, 78 (1976); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).

Here, the legislative history discussed above reflects that the foreign-policy removal standard enacted in 1990 was to be more stringent than the "public interest" standard contained in former subsection 1182(a)(27). But even as narrowed, the standard "leaves considerable discretion in the Executive Branch." 1987 Hearing, at 41. Congress understood that "the Executive needs to have some flexibility to respond to new crises or difficulties in our international relations." H.R. Rep. No. 100-882, 100th Cong., 2d Sess. 26 (1988). Given that "[n]ew crises and difficulties arise every day in our international relations," it would be "difficult and inadvisable to be more precise in defining what constitutes a serious adverse foreign policy consequence." 1987 Hearing, at 41.

In light of the challenged statutes' unique, foreign-policy purpose, and the political branches' special discretion in that area, the Court finds that the statutes are not impermissibly vague under the Fifth Amendment. *See, e.g.*, *HLP*, 561 U.S. at 18-20; *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (affirming deportation against vagueness challenge); *Jordan v. DeGeorge*, 341 U.S. 223, 225, 232 (1951) (same); *Mahler v. Eby*, 264 U.S. 32, 40 (1924) ("[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress.").

## III.    CONCLUSION

For the foregoing reasons, the Court dismisses the Verified Amended Complaint with prejudice and enters judgment in favor of Defendants. The Clerk shall close the file.

DATED:

_____
HON. NOËL WISE
United States District Judge