Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@fire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, <br><br> *Defendants*. | Case No. 5:25-cv-06618-NW <br><br> **[PROPOSED] MEMORANDUM OF DECISION** <br><br> Judge Noël Wise |

Plaintiffs Stanford Daily Publishing Corporation, Jane Doe, and John Doe brought this action alleging that two provisions of the Immigration and Nationality Act facially violate the First and Fifth Amendments to the United States Constitution as applied to enforcement based on protected speech.[1] On May 27, 2026, pursuant to a stipulation by the parties that this Court should resolve the remaining issues of law and any issues of fact on a defined record, the Court held a hearing on the parties' assented-to trial on the papers. The following memorandum constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

## I.    Background and Findings of Fact

On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza. Joint Findings of Fact ("JFOF"), ECF No. 101, ¶ 87. At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel. *Id.* ¶ 88. Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution." *Id.* ¶ 89. Other events featured pro-Palestinian advocates handing out flyers. *Id.* ¶ 90. Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums. *Id.* ¶ 91.

### A.    Immigration Policy

President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States, and his campaign website linked to the Republican Party platform. *Id.* ¶ 92. The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism." *Id.* ¶ 93. At a campaign rally on October 16, 2023, Mr. Trump said he would revoke the visas of foreign students deemed "radical, anti-American, and antisemitic" and would aggressively deport aliens with "jihadist sympathies." *Id.* ¶ 95. At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas and sympathizers on college

---

[1] As explained in Section II.B *infra*, this is a kind of hybrid challenge the Supreme Court has recognized.

-1-

campuses. The college campuses are being taken over. And all of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it, come 2025 we will find you and we will deport you. We will deport you." *Id.* ¶ 96. On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave." *Id.* ¶ 99.

### 1.  Revocation and Deportation Provisions of the INA

"Congress passed the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., ("INA") in 1952 [and] delegated to the Secretary of State significant authority to exclude or classify as deportable non-citizens from the United States, and to revoke visas." Order Denying Mot. Dismiss, ECF No. 75, at 3 (quoting *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 132 (D. Mass. 2025)). The INA sections pertinent to this case are 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision") and § 1201(i) (the "Revocation Provision").

Under the Revocation Provision, the Secretary of State has broad, discretionary power to revoke visas:

> **After the issuance of a visa or other documentation to any [noncitizen]**, the consular officer or the **Secretary of State may at any time, in his discretion, revoke such visa or other documentation**. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance .... There shall be no means of judicial review ... of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added). After revoking a visa, the government may place the noncitizen into removal proceedings. *See id.* § 1227(a)(1)(B).

Under 8 U.S.C. § 1227(a)(4)(C)(i), if the "Secretary of State has reasonable ground to believe" that a noncitizen's presence or "activities in the United States ... would have potentially serious adverse foreign policy consequences for the United States," the noncitizen "is deportable."

[PROPOSED] MEMORANDUM OF DECISION                    No. 5:25-cv-06618-NW

There is an exception, however; noncitizens shall not be deportable because of their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States ...." 8 U.S.C. § 1182(a)(3)(C)(iii).[2] The exception is then subject to a further exception: noncitizens shall not be deportable because of their lawful "beliefs, statements, or associations" "*unless* the Secretary of State *personally determines* that the [noncitizen's] admission would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphases added). The Secretary's ability to override the prohibition on relying on protected speech is what Plaintiffs and this opinion refer to as the "Deportation Provision."

While the Secretary of State has the discretion to revoke visas and render noncitizens deportable, the Secretary of Homeland Security has the practical role of carrying out that authority. The Department of Homeland Security ("DHS") and its sub-agency U.S. Immigration Customs and Enforcement ("ICE") have authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending. *See generally Johnson v. Guzman Chavez,* 594 U.S. 523, 527 (2021) (describing DHS's immigration enforcement responsibilities).

DHS oversees ICE's Enforcement and Removal Operations branch (ERO), ERO's Department of Homeland Security Investigations (HSI), and HSI's Office of Intelligence (OI). JFOF ¶ 310. HSI's OI supports investigations by producing research and analysis, which it compiles into Reports of Analysis (ROAs).

The current administration uses a process for enforcing the Revocation Provision in which HSI's OI issues an ROA to HSI's National Security Division. The Division determines whether the ROA is appropriate and, if it is, sends a DHS referral letter to the Department of State. A State official reviews the letter and makes a recommendation to a Bureau of Consular Affairs official. If the recommendation is approved, the Department of State revokes the visa and informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status. *Id.* ¶ 312.

---

[2] 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable." Section 1227(a)(4)(C)(ii) incorporates this exception into the criteria for when a noncitizen is deportable.

-3-

[PROPOSED] MEMORANDUM OF DECISION                    No. 5:25-cv-06618-NW

For the Deportation Provision, the process is the same except that the State official reviewing the letter makes a recommendation to the Secretary of State, who then makes a determination. If the Secretary of State makes the personal determination to remove the noncitizen, he informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status. *Id.* ¶ 313.

### 2.    Examples of Enforcement

On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025); JFOF ¶ 100. Ten days later, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Id.* ¶ 101.

In March 2025, the government began enforcing the Revocation and Deportation Provisions against lawfully present noncitizens who had engaged in pro-Palestinian advocacy. Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder). *Id.* ¶ 166. Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities. *Id.* ¶ 167.

On March 6, 2025, HSI issued an ROA for Mr. Khalil. The ROA did not note any criminal history for Mr. Khalil and attached news articles and social media posts indicating that Mr. Khalil had been critical of Israel and participated in protests. *Id.* ¶ 168. On March 7, 2025, Andre Watson, the Assistant Director of the National Security Division of ICE, signed a referral letter that provided a summary of action that "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" Mr. Khalil's "presence or activities consistent with" the Deportation Provision. *Id.* ¶¶ 169–170. John Armstrong, the Senior

-4-

Bureau Official of the Bureau of Consular Affairs, received Mr. Watson's referral letter and thereafter authored an action memo concerning Mr. Khalil, recommending that Secretary Rubio render Mr. Khalil removable under the Deportation Provision. *Id.* ¶¶ 150, 171, 174. On March 8, 2025, Secretary Rubio adopted Mr. Armstrong's recommendation and rendered Mr. Khalil removable under the Deportation Provision. *Id.* ¶ 179. Later that evening, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail on March 10, 2025, and initiated proceedings to deport him from the United States. *Id.* ¶ 182.

On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* ¶ 184. On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional "students and paid agitators" involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." *Id.* ¶ 186.

Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States. *Id.* ¶ 223. As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests. *Id.* ¶ 224. On March 12, 2025, HSI issued an ROA for Mr. Mahdawi, citing Mr. Mahdawi's pro-Palestinian social media posts and media appearances, including on the *60 Minutes* television program. *Id.* ¶¶ 225–26.

On March 14, 2025, Mr. Watson wrote and signed a referral letter "to provide a summary of the actions by Mohsen Mahdawi in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether" Mahdawi's "presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision. *Id.* ¶¶ 228–29.

Like with Mr. Khalil, Mr. Armstrong authored an action memo for Secretary Rubio concerning Mr. Mahdawi, recommending that Secretary Rubio render Mr. Mahdawi removable under the Deportation Provision as a threat to American "foreign policy." *Id.* ¶¶ 238, 240. On March 15, 2025, Secretary Rubio issued a memo concerning Mr. Mahdawi, explaining that he has rendered

-5-

[PROPOSED] MEMORANDUM OF DECISION                                    No. 5:25-cv-06618-NW

Mr. Mahdawi deportable under the Deportation Provision. *Id.* ¶ 242. Secretary Rubio wrote that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *Id.* ¶ 244. On April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, DHS agents arrested him and placed him in ICE custody. *Id.* ¶ 245.

Rümeysa Öztürk is a PhD student at Tufts University in Medford, Massachusetts. *Id.* ¶ 195. She is a citizen of Turkey and entered the United States on an F-1 student visa. *Id.* ¶ 196. Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, *The Tufts Daily*, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies. *Id.* ¶ 197.

On March 17, 2025, HSI issued an ROA concerning Ms. Öztürk, which located no criminal history or HSI investigations associated with Ms. Öztürk. *Id.* ¶¶ 198–99. The report attached a February 6, 2025, Canary Mission post describing Ms. Öztürk as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." *Id.* ¶ 200. The report attached Ms. Öztürk's op-ed. *Id.* ¶ 201. The report also attached a news article from Boston.com showing the suspension of the group "Tufts Students for Justice in Palestine" and said the article "ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada," but that "[a]nalysts were unable to locate images matching the exact reference to signs." *Id.* ¶¶ 202–03.

On March 21, 2025, Mr. Watson signed a referral letter concerning Ms. Öztürk. *Id.* ¶ 204. His letter did not claim a direct connection between Ms. Öztürk and the Tufts SJP, but concluded that her joining an op-ed with the group constituted "associations" that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *Id.* ¶¶ 207–08. Mr. Watson also provided information to determine whether Ms. Öztürk's visa should be revoked under the Revocation Provision. *Id.* ¶ 209.

-6-

The same day, Deputy Assistant Secretary Stuart Wilson determined enforcing the Revocation Provision against Ms. Öztürk was appropriate and recommended a "silent" revocation of her F-1 student visa. *Id.* ¶ 210. Mr. Wilson's memo recounted that she "co-authored an op-ed in Tufts' student newspaper," but added, "While Öztürk has been involved with actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally." *Id.* ¶¶ 211, 213. Mr. Wilson explained that "While the [Öztürk ROA] implies a connection between Öztürk and the now-banned Tufts Student[s] for Justice in Palestine (TSJP), the report presents no evidence other than Öztürk's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TJSP. Nor has DHS/ICE/HSI shown any evidence that Öztürk was involved in any of the activities which resulted in TJSP being suspended from Tufts." *Id.* ¶ 214.

On March 21, 2025, Mr. Armstrong approved the recommendation to revoke Ms. Öztürk's visa. *Id.* ¶ 217. Mr. Armstrong said the "key things" in his decision to revoke Ms. Öztürk's visa were her "actions of protesting Tufts' relationship with Israel" and "activities and associations" of co-authoring an op-ed with the Tufts chapter of Students for Justice in Palestine. *Id.* ¶ 218. A DHS spokesperson justified the revocation of Ms. Öztürk's visa by asserting Ms. Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists." *Id.* ¶ 219. On March 25, 2025, multiple federal officers arrested Ms. Öztürk outside her home in Somerville, Massachusetts. The officers detained her and transported her to a Louisiana immigration jail. *Id.* ¶ 220.

**B.    Government Statements Regarding Further Enforcement**

On March 6, 2025, Secretary Rubio posted on social media: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." *Id.* ¶ 103. On March 27, 2025, Secretary Rubio was asked to confirm the news reporting that the State Department had revoked 300 visas. He answered, "Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa." *Id.* ¶ 108.

[PROPOSED] MEMORANDUM OF DECISION                    No. 5:25-cv-06618-NW

On March 28, 2025, Secretary Rubio was asked, "And what does it mean when you say against the foreign policy of the United States?" He answered, "It runs counter to our foreign—that's how we issue visas coming in. I think about it this way. If we knew this information—my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa." *Id.* ¶ 109. Secretary Rubio added, "I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws—I mean, we're obviously not going to yank a visa over that." *Id.* ¶ 110.

On April 14, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller said on Fox News that any noncitizen "who preaches hate for America" will be deported. *Id.* ¶ 117. Similarly, on May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." *Id.* ¶ 121. Then, on May 21, 2025, Secretary Rubio testified before the House Foreign Affairs Committee. Responding to a question about the revocation of Ms. Öztürk's visa, he said he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas. *Id.* ¶ 123. On July 29, 2025, Mr. Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for America or its people"—not just noncitizens who criticize Israel. *Id.* ¶ 124.

On September 15, 2025, in the aftermath of Charlie Kirk's assassination, Secretary Rubio posted on X: "America will not host foreigners who celebrate the death of our fellow citizens. Visa revocations are under way. If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country." *Id.* ¶ 128. To that end, on October 14, 2025, the State Department posted on X that it had revoked the visas of six individuals who the State Department contended celebrated Kirk's assassination on social media. *Id.* ¶ 130. On October 17, 2025, the State Department posted on X: "We heard Bluesky is a great place to research visa revocations." *Id.* ¶ 132. And on November 18, 2025, Mr. Miller said, "The

[PROPOSED] MEMORANDUM OF DECISION     No. 5:25-cv-06618-NW

State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." *Id.* ¶ 133.

### C.    Plaintiffs

Plaintiffs Jane Doe and John Doe are noncitizen student F-1 visa holders who are lawfully present in the United States. *Id.* ¶¶ 4, 8. Jane Doe has published commentary online that contains pro-Palestine and anti-Israel sentiments and has engaged in peaceful pro-Palestinian advocacy. *Id.* ¶ 24. John Doe has peacefully attended pro-Palestinian protests and academic discussions and has shared pro-Palestine and anti-Israel commentary online. *Id.* ¶ 29.

Because they fear that the government will revoke their visas and deport them, Jane Doe and John Doe are self-censoring, refraining from voicing their true opinions regarding Palestine and Israel. *Id.* ¶¶ 44, 56. Jane Doe no longer attends pro-Palestinian protests, no longer wears a keffiyeh to support the Palestinian cause, no longer engages in direct-action organizing supporting Palestinians, no longer holds up the Palestinian flag, no longer maintains her main social media account, and no longer posts pro-Palestinian content on her other social media accounts. *Id.* ¶¶ 45–50. John Doe has made his social media account private and avoids wearing apparel that shows a pro-Palestinian message. *Id.* ¶¶ 53, 55. Additionally, members of John Doe's extended family who are also noncitizens lawfully residing in the United States have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy. *Id.* ¶ 54.

But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe and John Doe would have resumed publishing and voicing their true opinions regarding Palestine and Israel. *Id.* ¶¶ 322, 323.

Plaintiff Stanford Daily, a California nonprofit corporation, is the parent organization for *The Stanford Daily. Id.* ¶¶ 1–2. *The Stanford Daily* is the independent, student-run newspaper of Stanford University. *Id.* ¶ 1. The paper covers news related to Stanford University and has covered student opinions and campus protests related to the conflict between Israel and Palestine. *Id.* ¶ 16. Stanford Daily is a voluntary membership organization with over 150 identifiable members. *Id.* ¶¶

297, 299. Its members include noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa. *Id.* ¶ 302.

Since March 2025, lawfully present noncitizen students who are Stanford Daily members have self-censored expression due to fears that Secretary Rubio will revoke their visas under the Revocation Provision and render them deportable under the Deportation Provision. *Id.* ¶ 36. These writers have declined to cover pro-Palestinian student protests at Stanford University, refrained from covering topics related to the conflict in Gaza, and requested removal of their previous articles about the topic. *Id.* ¶ 34–35, 41–43, 59. Stanford Daily continues to see examples of noncitizen writers altering their expression. *See generally id.* ¶¶ 34–43, 58–60.

### D.    Procedural Background

On August 6, 2025, Plaintiffs filed suit against Defendants, alleging eight claims seeking injunctive and declaratory relief on the basis that the Revocation and Deportation Provisions are unconstitutional as applied to protected speech. *See generally* Verified Compl., ECF No. 1; *see also* Verified Am. Compl., ECF No. 65. Specifically, Plaintiffs alleged claims for (1) declaratory relief on the Deportation Provision under the First Amendment (First Claim), (2) injunctive relief against the Deportation Provision under the First Amendment (Second Claim), (3) declaratory relief on the Deportation Provision as vague under the Fifth Amendment (Third Claim), (4) injunctive relief against the Deportation Provision as vague under the Fifth Amendment (Fourth Claim), (5) declaratory relief on the Revocation Provision under the First Amendment (Fifth Claim), (6) injunctive relief against the Revocation Provision under the First Amendment (Sixth Claim), (7) declaratory relief on the Revocation Provision as vague under the Fifth Amendment (Seventh Claim), and (8) injunctive relief against the Revocation Provision as vague under the Fifth Amendment (Eighth Claim).

That same day, Plaintiffs filed a motion for preliminary injunction. ECF No. 11. Based on the agreement of the parties, Plaintiffs subsequently converted their motion for preliminary injunction to a motion for summary judgment, and the parties briefed cross-motions for summary judgment. *See* ECF Nos. 28, 30, 32, 33. The Court denied as premature the cross-motions for summary judgment without prejudice. ECF No. 60.

[PROPOSED] MEMORANDUM OF DECISION                    No. 5:25-cv-06618-NW

On December 4, 2025, Plaintiffs amended their complaint, ECF No. 65, and Defendants then moved to dismiss based on lack of standing, ECF No. 66. On January 16, 2026, the Court denied the motion to dismiss, concluding that Plaintiffs had adequately alleged standing. ECF No. 75.

The parties agreed to proceed to a bench trial on the papers, based on stipulated facts and exhibits submitted into evidence, including exhibits and transcripts of witness testimony from the trial in *American Association of University Professors* ("*AAUP*") *v. Rubio*, No. 25-10685 (D. Mass.). *See* ECF Nos. 77–78; *see also* ECF Nos. 81–82 (*AAUP* exhibits and transcripts); ECF No. 85 (joint statement of undisputed facts). On May 27, 2026, the Court held a bench trial on the papers, during which the parties presented argument based on the submitted facts and evidence.

## Conclusions of Law

## II.    Plaintiffs Have Standing to Challenge the Revocation and Deportation Provisions

Under the "case or controversy" requirement of Article III to the United States Constitution, a federal court has subject matter jurisdiction over a claim only if the plaintiff has standing to bring the claim. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). To demonstrate standing, a plaintiff must show three things: (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2010). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* "First Amendment cases raise 'unique standing considerations,' that 'tilt[] dramatically toward a finding of standing.'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (cleaned up). In the context of a pre-enforcement challenge, which is what Plaintiffs bring here, the injury-in-fact "is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).

On January 16, 2026, this Court denied the government's motion to dismiss the case for lack of standing. ECF No. 75. The Court found Plaintiffs alleged sufficient facts to demonstrate Jane and John Doe's individual standing and organizational and associational standing for Stanford Daily. *Id.* at 10–18.

A plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus,

-11-

Plaintiffs' responsibility at the pleading stage to allege facts supporting standing becomes a responsibility to prove those facts at the merits stage. *Id.*

The government's supplemental brief renews its challenge to Plaintiffs' standing principally by incorporating its prior briefing on the topic from the motion to dismiss stage. ECF No. 84, at 1–2. However, the Verified Amended Complaint's allegations that this Court cited to deny the motion to dismiss are now undisputed facts in the parties' Joint Findings of Facts. For example, the Joint Findings reflect that President Trump, Secretary Rubio, and prominent administration officials publicly promised to revoke visas based on protected speech and committed, for example, that "noncitizens 'pushing Hamas propaganda,' 'glorifying terrorists,' or otherwise engaging in 'anti-American' conduct 'can expect your visa will be revoked.'" *Id.* ¶ 121. They confirm the administration targeted lawfully present noncitizens for their speech, with internal documents pointing to Mahmoud Khalil's participation in pro-Palestinian protests, *id.* ¶¶ 168–81, Rümeysa Öztürk's editorial, *id.* ¶¶ 198–215, and a *60 Minutes* interview by Mohsen Mahdawi, *id.* ¶¶ 225–44. They also confirm that, fearing adverse immigration consequences based on those threats and actions, Jane Doe took down her social media account containing pro-Palestinian commentary, John Doe made his account private, and noncitizen *Stanford Daily* writers and editors declined Middle East–related assignments, and some quit the paper. *See, e.g.*, *id.* ¶¶ 34–43, 53, 70. As these facts provided the basis for the Court to find Plaintiffs had sufficiently alleged standing, they now establish standing.

## III.    Legal Standard

### A.  Burden

"[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Imperial Sovereign Court of Montana v. Knudsen*, 170 F.4th 820, 842 (9th Cir. 2026) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled in part on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)); *see also Thalheimer*, 645 F.3d at 1116 (explaining that "the burden of proof at the

-12-

preliminary injunction phase tracks the burden of proof at trial"); *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 n.4 (9th Cir. 2000) ("In general, where a plaintiff claims suppression of speech under the First Amendment, the plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question. The burden then shifts to the defendant governmental entity to prove that the restriction in question is constitutional." (cleaned up)).

For a Fifth Amendment vagueness challenge to a statute, the complainant must prove that the statute is vague. *Vill. of Hoffman Ests. v. Flipside, Hofman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982). A law is unconstitutionally void for vagueness if it either "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

### B. Scope of Plaintiffs' Challenge

Plaintiffs challenge the Revocation and Deportation Provisions solely with respect to their enforcement against protected speech.[3] Typically, litigants challenge a law in all of its applications (a "facial" challenge) or solely with respect to its enforcement against the plaintiff's particular speech (an "as-applied" challenge). The government here argues Plaintiffs must choose one or the other, while Plaintiffs assert the law recognizes a "hybrid" challenge where a plaintiff challenges a discrete subset of a statute's applications.

Under binding Supreme Court precedent, Plaintiffs are correct. In *John Doe No. 1 v. Reed*, the Court confirmed that a First Amendment suit may challenge a particular subset of a statute's applications. 561 U.S. 186 (2010). In that case, supporters of a ballot referendum sued to enjoin the Washington Secretary of State from using the state's Public Records Act (PRA) to reveal the identities of those who signed the petition to place the issue on the ballot. *Id.* at 193. The complaint asserted the PRA was "unconstitutional as applied to referendum petitions." *Id.* The parties disagreed about whether the claim raised a facial or an as-applied challenge. *Id.* at 194. The Supreme

---

[3] As used herein, "protected speech" refers to activity that, if a U.S. citizen engaged in it, the First Amendment would protect it, but excludes donating to campaigns, which is subject to a unique prohibition for noncitizens due to its inter-relationship with the maintenance of an election. *See* Section IV.A.1 *infra*.

[PROPOSED] MEMORANDUM OF DECISION                              No. 5:25-cv-06618-NW

Court noted the claim "obviously has characteristics of both." *Id.* It was as-applied in "that it does not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions." *Id.* It was facial "in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions." *Id.* The label was "not what matters." *Id.* "The important point is that plaintiffs' claim and the relief that would follow … reach beyond the particular circumstances of these plaintiffs." *Id.* Plaintiffs thus had to meet the "standards for a facial challenge to the extent of that reach." *Id.* (emphasis added). So, the plaintiffs had to meet the standards for a facial challenge to the PRA not as to all of its applications, but as to all of its applications against *referendum petitions*. *Id.*; *see also Veritas Action Fund v. Rollins*, 982 F.3d 813, 826 (1st Cir. 2020) (applying *John Doe No. 1* to consider hybrid challenge to Massachusetts' two-party recording statute with a claim limited to nonconsensual recordings of police officers engaging in their official duties); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 907–08 (10th Cir. 2016) (applying *John Doe No. 1* to allow federal government to maintain hybrid challenge against New Mexico ethics rule with respect to enforcement against federal prosecutors).

Here, the scope of Plaintiffs' claims, and this Court's inquiry, is whether, as to enforcement on the basis of protected speech, the Revocation and Deportation Provisions are unconstitutional under the First Amendment as unlawful viewpoint- and/or content-based speech restrictions and are unconstitutionally vague under the Fifth Amendment.

The government takes issue with Plaintiffs' use of "protected speech" as the demarcation line for their hybrid challenge to the Provisions, calling it "an undefined and amorphous category." Govt. Suppl. Br., ECF No. 84, at 1. The Court disagrees. Under the First Amendment, "speech is protected unless it falls within a narrow exception to First Amendment protection." *Matsumoto v. Labrador*, 122 F.4th 787, 811 (9th Cir. 2024). "'From 1791 to the present,' the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas.'" *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Those "historic and traditional categories … long familiar to the bar" include obscenity, child pornography, defamation, fraud, incitement, fighting words, and speech integral to criminal activity. *Stevens*, 559 U.S. at 468, 471. The government bears the burden of demonstrating speech falls within

-14-

an unprotected category. *United States v. Alvarez*, 617 F.3d 1198, 1205 (9th Cir. 2010) ("[W]e presumptively protect *all* speech … , leaving it to the government to demonstrate … a compelling need to remove some speech from protection …."), *aff'd*, 567 U.S. 709 (2012) (emphasis in original).

The Court notes several federal national security statutes demark "protected speech" as the line where the statute's reach ends. For example, under the federal statute authorizing pen registers and trap and trace devices "for any investigation to obtain foreign intelligence information," investigation may not be "conducted solely upon the basis of activities protected by the first amendment to the Constitution." 50 U.S.C. § 1842; *see also* 15 U.S.C. § 1681u(a); 50 U.S.C. § 1805(a)(2)(A), § 1824(a)(2)(A). The Court holds the same standard is workable here.

The government argues injunctive relief in this case would amount to an impermissible "obey the law" injunction. *See Brady v. United Omaha Life Ins. Co.*, 902 F. Supp. 2d 1274, 1284 (N.D. Cal. 2012) ("Broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck from an order for injunctive relief.") (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987)). The Court disagrees for two reasons. First, the Ninth Circuit has "not adopted a rule against 'obey the law' injunctions per se." *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012). Second, Plaintiffs are not seeking an "obey the law" injunction. Plaintiffs seek an injunction preventing the government from rendering them deportable or revoking their visas based on protected speech, arguing the statutes violate the First and Fifth Amendments when enforced based on protected speech. The government contends the statutes are constitutional when enforced based on protected speech. Because the parties disagree what the law requires and the requested injunctive relief will resolve that dispute, there is a live controversy for the Court to resolve, and the declaratory and injunctive relief Plaintiffs seek are appropriate remedies.

### C. Standard for Plaintiffs' First Amendment Challenge

The Court next addresses the test applicable for Plaintiffs' hybrid challenge to the Revocation and Deportation Provisions. As explained above, under *John Doe No. 1*, because Plaintiffs challenge the Provisions facially as applied to enforcement against protected speech,

-15-

Plaintiffs must meet the "standards for a facial challenge to the extent of that reach." 561 U.S. at 194. The parties disagree about what those standards are. Plaintiffs argue that, because they challenge the Provisions as viewpoint and content discriminatory, the Court examines the statutes under the applicable level of constitutional scrutiny. The government disagrees, arguing that, under the Supreme Court's 2024 decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), the standard for all First Amendment facial challenges "is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Govt. Suppl. Br., ECF No. 84, at 2. The government asserts that, rather than proceeding to a strict scrutiny analysis, the Court must first "assess the [challenged] laws' scope" and then "measur[e] the constitutional against the unconstitutional applications." *Id.* at 2–3 (quoting *Moody*, 603 at 724).

Plaintiffs have it right. The test the government requests is "the standard [courts] apply when analyzing a First Amendment facial overbreadth claim." *Imperial Sovereign*, 170 F.4th at 844. But as Plaintiffs' Amended Verified Complaint reflects, and Plaintiffs' counsel confirmed at oral argument, Plaintiffs do not bring an overbreadth challenge in this action. *See* Verified Am. Compl., ECF No. 65; May 27, 2026 Tr. at 62:17–18. The Ninth Circuit held on March 13, 2026, that *Moody* "did not displace the longstanding and myriad precedents setting forth the tiered scrutiny analysis we apply to a facial claim challenging a law on the ground that it is an unconstitutional content-based restriction on speech." *Imperial Sovereign*, 170 F.4th at 845. The court explained, "It is well established that plaintiffs may bring a facial First Amendment challenge on the ground that a statute is content or viewpoint based … [and] that if a plaintiff shows that a statute is content based and the government fails to show that the restriction satisfies strict scrutiny, the plaintiff prevails on their facial challenge." *Id.* at 844–45.

The government relies on the Ninth Circuit's decision in *NetChoice v. Bonta*, 170 F.4th 744 (2026), decided a day before *Imperial Sovereign*, for its argument that, post-*Moody*, the overbreadth standard governs Plaintiffs' facial viewpoint and content discrimination claims. Govt. Suppl. Resp. Br., ECF No. 90, at 3. Putting aside that, as noted, *Moody* analysis applies only to overbreadth challenges, NetChoice facially challenged a statute with a "full range" of speech and non-speech applications. 170 F.4th at 758, 759. The court thus held NetChoice "may not 'treat the law as having

-16-

certain heartland applications, and mostly confine the battle to that terrain.'" *Id.* at 758 (quoting *Moody*, 603 U.S. at 724). Here, however, Plaintiffs challenge the Revocation and Deportation Provisions "solely" as to their enforcement against protected speech—so a ruling in their favor would not affect the Provisions' non-speech applications. Plaintiffs assert all protected speech-based enforcement is viewpoint and/or content discrimination and thus unconstitutional in all applications. Verified Am. Compl. at 43–44.

This Court agrees with *Imperial Sovereign* that *Moody* did not displace the traditional test for viewpoint and content discrimination. The Court finds instructive that, in 2019, the Supreme Court rejected the argument that the overbreadth test applies to facial viewpoint discrimination claims. *Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019). The Supreme Court explained it "had never applied that kind of analysis to a viewpoint-discriminatory law." *Id.* This Court agrees with Plaintiffs that it is unlikely *Moody*, which did not mention *Iancu*, implicitly overruled *Iancu*. *See Mallory v. Norfolk So. Ry. Co.*, 600 U.S. 122, 136 (2023) (holding the Pennsylvania Supreme Court "clearly erred" by disregarding prior United States Supreme Court precedent based on the belief it had been "implicitly overruled," explaining: "If a precedent of this Court has direct application in a case … a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (internal quotation omitted)).

Moreover, even if *Moody* does apply, it does not change the analysis. Because, as explained below, all of the applications of the challenged statutes are either unconstitutionally viewpoint or content based as applied to protected speech, there are no constitutional applications within the scope of Plaintiffs' challenge to balance against these unconstitutional applications.

## IV. Discussion

Plaintiffs argue that the Revocation and Deportation Provisions violate the First Amendment with respect to enforcement based on protected speech because revoking visas and rendering noncitizens deportable based on protected speech constitutes viewpoint discrimination or, at minimum, content discrimination and the government cannot meet the demanding requirements of strict scrutiny. Plaintiffs also argue that the Provisions violate the Fifth Amendment with respect to enforcement based on protected speech because the Provisions do not give lawfully present

-17-

noncitizens sufficient information to know how to avoid adverse immigration action and do not provide sufficient guidance to government enforcers necessary to restrain arbitrary enforcement. For the reasons below, the Court agrees.

### A.      The Revocation and Deportation Provisions Violate the First Amendment as applied to Protected Speech

The First Amendment ensures that "Congress shall make no law … abridging the freedom of speech, or of the press … or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. The Framers "designed and intended" the First Amendment to "remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971). In short, "freedom of speech is a negative liberty. The First Amendment is a restriction on the government's power to 'abridge' speech." *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) (cleaned up); *see also Stevens*, 559 U.S. at 468 (explaining that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" (citation omitted)). First Amendment protections are crucial for protecting people in the United States from government overreach and ensuring that individuals "participate in the public debate through political expression." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Freedom of speech is fundamental to our democracy and is at the heart of this case.

### 1.      The First Amendment Protects Noncitizens

The right to freedom of speech and its correlative protection from government retribution based on hostility towards speech has generally been accorded to noncitizens living in the United States. *Am.-Arab Anti-Discrimination Comm. v. Reno* (*AADC*), 70 F.3d 1045, 1064 (9th Cir. 1995); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded [to noncitizens] residing in this country."). Because the Constitution divested the government of authority to interfere with the marketplace of ideas, the First Amendment acknowledges no "distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted). One of the first modern First Amendment cases involved noncitizens' speech. *Abrams v. United States*, 250 U.S. 616, 617 (1919).

-18-

In *AADC*, the Ninth Circuit held the First Amendment prohibits deporting aliens for protected speech. 70 F.3d at 1064. The court explained, "[t]he Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection. 'As [aliens] owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage.'" *AADC*, 70 F.3d at 1065 (quoting James Madison, *Report on the Virginia Resolutions*, *reprinted in* Jonathan Elliot, 4 *Debates on the Federal Constitution* 546, 556 (1907)). Therefore, "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Id.* at 1064. After all, "[i]f aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities." *Id.* at 1065–66.

The First Amendment constrains how the legislative and executive branches may exercise their enumerated, plenary powers over immigration. For example, while Congress may "lay and collect Taxes," U.S. Const. art. 1, § 8, cl. 1, it would violate the First Amendment to condition a tax rebate on having a Republican (or Democratic) yard sign. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("Congress may not by withdrawal of mailing privileges place limitations upon the freedom of speech which if directly attempted would be unconstitutional."). Here, while Congress has authority to craft legislation regulating noncitizens in the country, *see Galvan v. Press*, 347 U.S. 522, 530 (1954), it cannot legislate in a manner that targets their protected speech. In sum, as the Ninth Circuit explained: "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *AADC*, 70 F.3d at 1065 (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)).

The government asserts it has significant authority on matters of foreign affairs and national security. While true, the First Amendment likewise restrains the exercise of that authority. The Supreme Court explained, "Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal." *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). On

-19-

several occasions, the Supreme Court has invalidated foreign-affairs laws on First Amendment grounds. In *Boos v. Barry*, the Court struck down regulations barring demonstrations critical of foreign governments within 500 feet of a foreign embassy. 485 U.S. 312 (1988). In *Lamont v. Postmaster General*, it invalidated a federal law that limited the First Amendment right to receive foreign Communist literature. 381 U.S. 301 (1965). In *Robel*, too, the Court struck down a national defense statute on First Amendment grounds, explaining that "[i]t would indeed be ironic, if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." 389 U.S. at 264.

The government next asserts that *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), supports its contention that it may deport noncitizens for otherwise lawful speech. This Court joins the *AAUP* court in rejecting that argument. *See AAUP*, 802 F. Supp. 3d at 183; *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 382 (D. Mass. 2025). *Harisiades*, applying the First Amendment jurisprudence at the time, concluded the Constitution did not prohibit deportation for being a Communist Party member because citizens could be punished for the same affiliation. 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also* 1 Smolla & Nimmer on Freedom of Speech § 10:19 (detailing how subsequent Supreme Court precedent limited *Dennis*). As the Ninth Circuit explained, "read properly, *Harisiades* establishes that deportation grounds are to be judged by the same standard applied to other burdens on First Amendment rights." *AADC*, 70 F.3d at 1064 (quotation marks omitted). The government has not supplied any decision allowing deportation of a lawfully present noncitizen for speech that would be protected if uttered by an American citizen.

The government argues that noncitizens present in the United States have "reduced" First Amendment protection that "varies" based on an "ascending scale." Gov't Suppl. Br., ECF No. 84, at 8, 10. The government fails to cite any case applying the "ascending scale" doctrine from procedural due process caselaw to lawfully present noncitizens' First Amendment rights. The Ninth Circuit, considering similar arguments, held it is an "uncontested proposition" that student visa holders in the United States can assert claims under the First Amendment. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994 (9th Cir. 2012) (further holding that the plaintiff, a Stanford

-20-

student, whose student visa was revoked while traveling outside the United States, could assert First Amendment claims). The government does not explain what First Amendment protections it believes noncitizens have—just that the "reduced" First Amendment rights of "nonimmigrant visa-holders" are insufficient for purposes of challenging the Revocation and Deportation Provisions. Govt. Suppl. Br., ECF No. 84, at 10.

The government's proffered authority does not support its position that lawfully present noncitizens have reduced First Amendment protections. *Demore v. Kim*, 538 U.S. 510, 522–23 (2003), addressed a due process challenge to detention pending removal, and *United States v. Verdugo-Urquidez*, 494 U.S. 259, 262, 269 (1990), held the Fourth Amendment did not apply to the search of homes in Mexico belonging to a noncitizen who resided in Mexico. The government's remaining authority generally differentiates the rights of *resident* noncitizens from noncitizens residing outside of United States. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (rejecting "extraterritorial application" of due process protections to enemy aliens captured in China and detained in Germany); *Verdugo-Urquidez*, 494 U.S. at 269. None of these cases support the proposition that visa-holders have second-class First Amendment protections compared to other lawfully present noncitizens such that the government could revoke a visa, but not deport a green card holder, for voicing the same opinion.

The government also relies on authority holding that noncitizens are subject to one unique speech abridgment: restrictions on contributing money to federal election campaigns. The government chiefly points to then-Judge Kavanaugh's opinion in *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011). But *Bluman* did not hold that noncitizens have reduced First Amendment rights. Instead, it upheld the contribution restriction under a line of authority allowing the government "to bar [noncitizens] from voting, serving as jurors, working as police or probation officers, or working as public school teachers" because the activities are integral to "democratic self-government." *Id.* at 287 (collecting cases). The court reasoned that direct campaign expenditures "constitute part of the process of democratic self-government." *Id.* at 288. Critically, *Bluman* explicitly cited *Wixon* as mandating that "resident aliens [are] protected by the First Amendment in the context of deportation." *Id.* at 286 (citing *Wixon*, 326 U.S. at 148). And the court explicitly cautioned that

-21-

[PROPOSED] MEMORANDUM OF DECISION                                    No. 5:25-cv-06618-NW

"speaking on issues of general public interest is a quite different context from participation in a political campaign for election." *Id.* at 290 (cleaned up) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788 n.26 (1978)).

At the hearing on May 27, 2026, the government argued "weighing in on a peace deal that's being negotiated" as a permissible basis, in the government's view, for revoking a noncitizen's visa or rendering them removable. May 27, 2026 Tr. at 82:9–10. In the Court's view, that is the type of "speaking on issues of general public interest" *Bluman* held retains full First Amendment protection.

Some of the government's proffered authority involves exclusion of noncitizens (*i.e.*, refusal to permit entry) rather than removal of lawfully present noncitizens. *See, e.g.*, Govt. Suppl. Br., ECF No. 84, at 12 (citing *Dep't of State v. Muñoz*, 602 U.S. 899 (2024); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). But the Supreme Court has explained that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Ninth Circuit noted, "The Supreme Court has consistently distinguished between aliens in the United States and those seeking to enter from outside the country, and has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens." *AADC*, 70 F.3d at 1063–64 (citing *Kwong Hai Chew*, 344 U.S. at 596 n.4); *see also id.* at 1065 ("[W]e decline to extend *Kleindienst* to apply to the deportation context."). In sum, under *Wixon* and *AADC*, both of which bind this Court, lawfully present noncitizens like Plaintiffs are entitled to "[f]reedom of speech and of press," *Wixon*, 326 U.S. at 148, and "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting," *AADC*, 70 F.3d at 1064.

**2.    The Deportation Provision Violates the First Amendment as applied to Protected Speech**

Plaintiffs argue that the Deportation Provision violates the First Amendment as applied to protected speech because it constitutes viewpoint discrimination or, alternatively and at a minimum, unconstitutional content discrimination. A "central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S.

-22-

726, 745–46 (1978). That tenet means that the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). This is particularly true regarding "speech on public issues," which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks and citation omitted); *see also Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("[P]olitical speech must prevail against laws that would suppress it."). Viewpoint- and content-discriminatory laws "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Such laws are subject to strict scrutiny, an "unforgiving" analysis "because it is the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). Such laws withstand constitutional review "only if the government proves that they are narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163, and they are "the least restrictive means of achieving" those interests, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Last year, the Supreme Court explained that "[s]trict scrutiny is designed to enforce 'the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Free Speech Coal.*, 606 U.S. at 484–85 (quoting *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). Strict scrutiny "succeeds in that purpose if and only if, as a practical matter, it is fatal in fact absent truly extraordinary circumstances." *Id.*[4]

Plaintiffs assert that the Deportation Provision is not only content-based but viewpoint-discriminatory,[5] because it singles out speech the government deems contrary to American foreign

---

[4] The government argues immigration statutes are exempt from the normal scrutiny doctrine and survive if "the government has articulated a facially legitimate and bona fide justification for their use." Opp'n, ECF No. 33 at 19. However, the Ninth Circuit has held that standard applies only "to lawsuits challenging an executive branch official's decision to issue or deny an individual visa based on the application of a congressionally enumerated standard to the particular facts presented by that visa application." *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017).

[5] The government's briefs did not challenge Plaintiffs' assertion that deportations under the Deportation Provision are inherently content discriminatory. At the May 27, 2026, hearing on the

-23-

policy as a deportable offense, while leaving expression in line with American foreign policy untouched. The Court agrees. The "essence of viewpoint discrimination," which violates "bedrock First Amendment principle[s]," is when a law "reflects the Government's disapproval of a subset of messages." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring); *id.* at 223 (plurality op.). The Deportation Provision has "facial viewpoint bias" in all of its applications because it expressly singles out speech contrary to American foreign policy and thus "results in viewpoint-discriminatory application." *Iancu*, 588 U.S. at 395. Here, for example, Secretary Rubio has invoked the Deportation Provision against noncitizens who criticized Israel's military operations in Gaza, protested for Palestinians, or advocated for a ceasefire on the basis that their expression imperiled American foreign policy, but has not applied the Provision against those who express contrary views. *See* JFOF ¶¶ 181, 244. At the January 6 hearing on the government's motion to dismiss, the Court asked whether the government could provide an example of it enforcing the Deportation Provision against pro-Israel speech. Jan. 6, 2026 Tr. 19:8–20:6. The government has not supplied one.

"The Supreme Court has repeatedly emphasized the First Amendment's near-absolute prohibition on laws that restrict speech based on the viewpoint of the speaker." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1124 n.1 (9th Cir. 2023) (VanDyke, J., concurring) (collecting cases). The Court recently explained that "viewpoint discrimination … represents an egregious form of content regulation, and governments in this country must nearly always abstain from it." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (cleaned up). In *Matal*, for example, a "finding of viewpoint bias ended the matter" of the law's unconstitutionality because once a court has "found that a law 'aims at the suppression of views,' why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute?" *Iancu*, 588 U.S. at 399 (quoting *Matal*, 582 U.S. at 248 (Kennedy, J., concurring)); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024) (noting viewpoint discrimination is "likely even invalid per se").

---

trial on the papers, the government conceded that the Deportation Provision is inherently content-based. May 27, 2026 Tr. at 41:6–16.

[PROPOSED] MEMORANDUM OF DECISION                                    No. 5:25-cv-06618-NW

The Court need not decide whether viewpoint discrimination is *per se* unconstitutional because, under strict scrutiny, the government does not have a compelling interest in suppressing particular viewpoints. "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011). In *Moody*, the Court explained that such "suppression of free expression" is not a "valid, let alone substantial" governmental interest. 603 U.S. at 740; *see also Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("Government action that stifles speech on account of its message … pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion."). The Deportation Provision authorizes suppression of opinions the government deems harmful to its foreign policy. That is not a valid interest and therefore fails strict scrutiny.

The government cannot sustain the Deportation Provision based on its asserted interest in "countering support for terrorist groups and addressing antisemitism." Opp'n, ECF No. 33, at 19. The Supreme Court has made clear that philosophical support for terrorist groups and antisemitism is protected speech. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 25–26 (2010) (distinguishing between the protected advocacy of "speak[ing] and writ[ing] freely" in support of terrorist organizations and unlawful "material support" for terrorism); *Collin v. Smith*, 578 F.2d 1197, 1210 (7th Cir. 1978) (affirming the First Amendment protected Nazis' right to march in Skokie, Illinois, explaining that "if these civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises").

The Deportation Provision also fails the narrow tailoring requirement of strict scrutiny. It provides unlimited (and, in the government's view, unreviewable) discretion to the Secretary of State to decide which "beliefs, statements, or associations" endanger foreign policy. 8 U.S.C. § 1182(a)(3)(C)(iii). It also lacks temporal tailoring, encompassing the noncitizen's "past, current, *or expected*" protected speech. *Id.* (emphasis added). The government argues "Congress could not have drafted a narrower law." Govt. Suppl. Resp., ECF No. 90, at 9. But Congress did not narrow the Deportation Provision, only who may enforce it. *Cf. Massieu v. Reno*, 915 F. Supp. 681, 710

-25-

(D.N.J.) (noting that under the foreign policy provision the Secretary need only claim, rather than prove, a deportation is necessary for the provision to be satisfied), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

The Deportation Provision likewise is not the least restrictive means of achieving the government's interests. "If a less restrictive alternative would serve the Government's purpose," it "must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). If the government disagrees with a noncitizen's speech, it may respond in the court of public opinion and offer the government's own view. The Supreme Court explained that "a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump v. United States*, 603 U.S. 593, 629 (2024); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."). The Joint Findings of Fact in this case contain numerous examples of administration officials criticizing pro-Palestinian activists. *See, e.g.*, JFOF ¶¶ 94–98, 112, 119, 121, 122, 176, 187, 189, 208, 219, 227, 230–36, 243, 271. The government has not explained why its ability to publicly respond to a noncitizen's speech is insufficient to meet its asserted interests.

The INA itself contains less-restrictive, speech-neutral bases serving the government's proffered national security interests. The INA provides the government authority to remove, for example, individuals who have or are likely to engage in "terrorist activity." 8 U.S.C. § 1227(a)(4)(B), §1182(a)(3)(B)(i). It similarly authorizes removal of individuals who have engaged in criminal activity that "endangers" "national security." *Id.* § 1227(a)(4)(A)(ii). Likewise for noncitizens who have violated laws relating to "espionage or sabotage*." Id.* § 1227(a)(4)(A)(i). Additionally, the INA still permits the government to remove noncitizens whose presence in the United States, unrelated to their speech activities, the Secretary has "reasonable ground to believe" would "have potentially serious adverse foreign policy consequences for the United States." *See id.* § 1227(a)(4)(C)(i). The government did not respond to Plaintiffs' argument that such provisions provide a less restrictive way for the government to achieve its asserted interests. Thus, the Court

-26-

holds that, even if the government had established an interest in the Deportation Provision separable from targeting and removing speakers with particular viewpoints, the Deportation Provision is not a narrowly tailored or the least restrictive means of achieving those interests.

In sum, the Court holds that the Deportation Provision is not narrowly tailored to achieve a compelling government interest. Therefore, the Court agrees with Plaintiffs and holds the Deportation Provision violates the First Amendment.

**3.    The Revocation Provision Violates the First Amendment as applied to Protected Speech**

Plaintiffs assert that the Revocation Provision violates the First Amendment as applied to protected speech because revocations predicated on speech are necessarily viewpoint, and at minimum, content-based. The Court agrees. When a noncitizen's protected speech is the but-for factor in a visa revocation determination, the government is singling out that speech for disfavored treatment based on its viewpoint or content.[6] The Court holds such revocations fail strict scrutiny for the same reasons as the Deportation Provision and accordingly holds that the Revocation Provision violates the First Amendment as applied to protected speech. *See Rosenberger*, 515 U.S. at 829; *Reed*, 576 U.S. at 163.

The parties' Joint Statement reflects that Secretary Rubio, asked about speech-based immigration enforcement, responded, "I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws—I mean, we're obviously not going to yank a visa over that." JFOF ¶ 110. Secretary Rubio's statement reflects the content-centered nature of revoking visas based on protected speech as the revocation necessarily uses the content of the noncitizen's speech as a referent.

---

[6] The government's briefs did not challenge Plaintiffs' assertion that visa revocations predicated on protected speech are inherently content discriminatory.

-27-

[PROPOSED] MEMORANDUM OF DECISION                    No. 5:25-cv-06618-NW

The Court holds that revoking a visa based on protected speech fails strict scrutiny for the same reasons as the Deportation Provision. The Court therefore likewise holds that the Revocation Provision violates the First Amendment as applied to protected speech.

**B.    The Revocation and Deportation Provisions Are Void for Vagueness Under the Fifth Amendment as applied to Protected Speech**

Plaintiffs argue the Revocation and Deportation Provisions violate the Fifth Amendment's guarantee of due process under the void for vagueness doctrine. "Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (cleaned up). The prohibition on vagueness "is an essential of due process, required by both ordinary notions of fair play and the settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (plurality op.) (cleaned up). "The void-for-vagueness doctrine … guarantees that ordinary people have fair notice of the conduct a statute proscribes. And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Id.* at 155–56 (cleaned up).

Additionally, when a law "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). That is because "[u]ncertain meanings inevitably lead" people to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," distorting the marketplace of ideas through self-censorship. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up). In this case, Plaintiffs argue the Revocation and Deportation Provisions are void for vagueness with respect to enforcement based on protected speech because the Provisions fail to provide noncitizens fair notice or warning regarding what activity may subject them to adverse immigration action and additionally fail to provide "reasonably clear guidelines for law enforcement officials … in order to prevent arbitrary and discriminatory enforcement." *Smith*, 415 U.S. at 573 (cleaned up).

[PROPOSED] MEMORANDUM OF DECISION                                    No. 5:25-cv-06618-NW

### 1.      The Fifth Amendment Protects Noncitizens

The Supreme Court has held that the Fifth Amendment's prohibition against vague laws protects noncitizens. *Sessions* held that because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (cleaned up) (applying heightened vagueness test to invalidate an INA provision).

### 2.      The Deportation Provision is Void for Vagueness as applied to Protected Speech

Plaintiffs argue that the Deportation Provision—the override allowing the Secretary of State to render a noncitizen deportable based on past, present, or expected protected speech if the Secretary determines the speech "compromises a compelling United States foreign policy interest"—is void for vagueness. Plaintiffs contend the Provision provides insufficient guidance to noncitizens regarding what expression may lead to their removal. Similarly, Plaintiffs contend the Provision provides insufficient guardrails for the government by giving the Secretary standardless discretion to decide when speech "compromises" foreign policy.

The Court agrees with Plaintiffs. The Deportation Provision provides noncitizens no "statutory definitions, narrowing context, or settled legal meanings" as guidance to avoid removability. *Williams*, 553 U.S. at 306. As another court explained, the "nation's foreign policy is an ever-changing amalgamation of interests … often known only to the Secretary, himself." *Massieu*, 915 F. Supp. at 701 (holding the Deportation Provision's underlying authorization for the Secretary of State to render a noncitizen deportable based on "foreign policy" concerns was void for vagueness). The core of the vagueness doctrine is that people should not have to "guess" whether they are violating the law. *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964). The Deportation Provision requires noncitizens to guess both what United States foreign policy is on a particular subject and whether their speech could have "potentially serious adverse" consequences on the policy.

The Deportation Provision also lacks guidance to ensure the Secretary does not act in an arbitrary or discriminatory way. The vagueness doctrine requires "a legislature establish minimal guidelines to govern law enforcement," *Kolender v. Lawson,* 461 U.S. 352, 358 (1983) (quoting

-29-

[PROPOSED] MEMORANDUM OF DECISION                                        No. 5:25-cv-06618-NW

*Smith*, 415 U.S. at 574), to prevent "arbitrary and erratic" applications of the law, *Papachristou,* 405 U.S. at 162. But the Deportation Provision contains no guardrails for enforcement. The phrase "compromises a compelling foreign … policy interest" means whatever the sitting Secretary of State wishes it to mean. The Deportation Provision is void for vagueness.

### 3. The Revocation Provision is Void for Vagueness as applied to Protected Speech

Plaintiffs also assert that the Revocation Provision is unlawfully vague with respect to revocations based on protected speech. The Court agrees. The Revocation Provision gives the Secretary of State power to "at any time, in his discretion, revoke [a] visa or other documentation." 8 U.S.C. § 1201(i). The government acknowledged in this action the Revocation Provision gives the Secretary of State "completely unfettered, unreviewable discretion" to revoke a visa. Jan. 6, 2026 Tr. at 23:16–24:8.

That unchecked power violates the Supreme Court's vagueness doctrine as applied to protected speech for the same reasons as the Deportation Provision. As reflected in the Joint Findings of Fact, the current administration has revoked visas based on, *inter alia*, an op-ed in a student newspaper critical of a university's position on Israel, JFOF ¶¶ 197–219, social media posts celebrating the assassination of political commentator Charlie Kirk, *id.* ¶¶ 127–31, and pro-Palestinian commentary, *e.g.*, *id.* ¶¶ 267–71. Meanwhile, Secretary Rubio has said he would not revoke a visa for protesting "paper straws." *Id.* ¶ 110. Nothing in the text of the Revocation Provision provides noncitizens guidance regarding what expression may trigger revocation of their visa. Nor does it constrain the government's discretion to avoid arbitrary or discriminatory enforcement against speech. The Revocation Provision is void for vagueness as to protected speech.

## V.    Remedy

For the foregoing reasons, the Court determines that Plaintiffs are entitled to a declaratory judgment that the Deportation Provision violates the First Amendment and is void for vagueness in violation of the Fifth Amendment. The Court also determines that Plaintiffs are entitled to a declaratory judgment that the Revocation Provision violates the First Amendment with respect to enforcement based on protected speech and is void for vagueness in violation of the Fifth

-30-

Amendment with respect to enforcement based on protected speech. The Court further determines Plaintiffs are entitled to a permanent injunction prohibiting Defendants from revoking Plaintiffs' visas based on protected speech.[7]

As Plaintiffs correctly note, however, 8 U.S.C. § 1252(f)(1) provides that only the Supreme Court may enjoin "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." The Deportation Provision falls within that restriction, while the Revocation Provision does not. Accordingly, this Court cannot enter permanent injunctive relief against the Deportation Provision and therefore denies relief on Claims II and IV of Plaintiffs' Complaint.

An appropriate order of judgment will follow.

SO ORDERED this ___ day of _____, 2026.

_____
Honorable Noël Wise
United States District Judge

---

[7] The Court holds that Plaintiffs otherwise satisfy the requirements for injunctive relief, as they have shown, "(1) [they are] likely to suffer irreparable injury that cannot be redressed by an award of damages; (2) that 'considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted'; and (3) 'that the public interest would not be disserved by a permanent injunction.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). And the balance of equities and public interest favor the protection of First Amendment rights. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

[PROPOSED] MEMORANDUM OF DECISION                         No. 5:25-cv-06618-NW