United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STANFORD DAILY PUBLISHING CORPORATION, et al.,
Plaintiffs,
v.
MARCO RUBIO, et al.,
Defendants.

Case No. 25-cv-06618-NW

**MEMORANDUM OF DECISION**

Plaintiffs contend the government has weaponized enforcement of two Immigration and Nationality Act provisions by revoking visas, and arresting, detaining, and deporting noncitizens who express opinions the government wants to suppress. Plaintiffs bring their challenge against the government under the First and Fifth Amendments to the United States Constitution.

In 1737, nearly forty years before Benjamin Franklin signed the Declaration of Independence, and fifty years before he signed the Constitution, Franklin published an essay in the Pennsylvania Gazette titled *On Freedom of Speech and the Press*. He began, "Freedom of speech is a principal pillar of a free government: when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins."[1] He ended the essay observing that, "to suppress inquiries into the administration is good policy in an arbitrary government; but a free constitution and freedom of speech have such reciprocal dependance on each other, that they cannot subsist without consisting together." *Id.*

Franklin died the year before the Bill of Rights was ratified, but other Founding Fathers, including James Madison and Thomas Jefferson, guaranteed that our inherent right to speak freely

[1] BENJAMIN FRANKLIN, ON FREEDOM OF SPEECH AND THE PRESS (1737), *reprinted in* MEMOIRS OF BENJAMIN FRANKLIN; WRITTEN BY HIMSELF 2, 71–82 (Harper & Brothers eds., 1860).

was embodied in the Constitution. The First Amendment ensures that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . or the right of the people peaceably to assemble[.]" U.S. CONST. amend. I.

The language of the Amendment makes clear that it is not the government that gives freedom of speech to the people. Instead, that freedom is imbued in the people, and "Congress shall make no law" to abridge it. "In this Nation, no official—'high or petty'—may command our tongues or silence our voices." *Chiles v. Salazar*, 607 U.S. ___, ___, 146 S. Ct. 1010, 1021 (2026) (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)).

Stated plainly, in the United States, freedom of speech belongs to the people. It is not the government's to take.

* * *

Plaintiffs, Stanford Daily Publishing Corporation and Jane Doe,[2] a noncitizen student holding an F-1 visa issued by the United States, bring their claims against Marco Rubio, in his official capacity as Secretary of State, and Markwayne Mullin, in his official capacity as Secretary of Homeland Security[3] (together, the "government"). Plaintiffs allege that, since March 2025, the government has changed its immigration policy and pattern of enforcement, namely by arresting, detaining, and deporting students with F-1 visas when those students use their freedom of speech to express opinions that the government does not like—such as expressing support or empathy for Palestinian people, or criticizing Israel's actions regarding Palestine or the conflict in Gaza. Plaintiffs argue that the provisions of the Immigration and Nationality Act ("INA") (8 U.S.C. §§ 1182(a)(3)(C)(iii), 1201(i) and 1227(a)(4)(C)(i)) that the government relies on for its authority to cancel student visas and initiate deportation proceedings are unconstitutional.

The Court agrees, and in the following findings of fact and conclusions of law, holds that Plaintiffs are entitled to declaratory judgment that the challenged provisions of the INA violate the

[2] The parties jointly stipulated to dismiss Plaintiff John Doe on July 27, 2026. ECF No. 105.

[3] Markwayne Mullin was confirmed as Secretary of Homeland Security on March 24, 2026, after the termination of the former secretary, Kristi Noem. Pursuant to Fed. R. Civ. P. 25(d), Mullin was "automatically substituted as a party" as Noem's successor.

First and Fifth Amendments as applied to enforcement based on protected speech.

## BACKGROUND AND PROCEDURAL HISTORY

On August 6, 2025, Plaintiffs filed suit against the government.[4] *See generally* Verified Compl., ECF No. 1. Plaintiffs specifically challenge two provisions of the INA: the Deportation Provision (8 U.S.C. §§ 1182(a)(3)(C)(iii) and 1227(a)(4)(C)(i)) and the Revocation Provision (8 U.S.C. § 1201(i)). Plaintiffs argue that these two INA provisions, which the government relies on for its authority to cancel student visas and initiate deportation proceedings, are unconstitutional as applied to protected speech under the First and Fifth Amendments. Verified Am. Compl., ECF No. 65 ("VAC").

Plaintiffs bring eight claims against the government, four as to the Deportation Provision, and another four that follow the same pattern under the Revocation Provision:

Claim 1 – Deportation Provision, Declaratory relief under the First Amendment

Claim 2 – Deportation Provision, Injunctive relief under the First Amendment

Claim 3 – Deportation Provision, Declaratory relief under the Fifth Amendment

Claim 4 – Deportation Provision, Injunctive relief under the Fifth Amendment

Claim 5 – Revocation Provision, Declaratory relief under the First Amendment

Claim 6 – Revocation Provision, Injunctive relief under the First Amendment

Claim 7 – Revocation Provision, Declaratory relief under the Fifth Amendment

Claim 8 – Revocation Provision, Injunctive relief under the Fifth Amendment

*See generally* VAC.

The government moved to dismiss the VAC for lack of standing. ECF No. 66. The Court denied the motion, finding that Plaintiffs had adequately alleged standing at the pleadings stage. ECF No. 75. The government filed its answer to the VAC on February 13, 2026. ECF No. 76.

---

[4] Also on August 6, 2025, Plaintiffs filed a motion for preliminary injunction. ECF No. 11. By agreement of the parties, Plaintiffs later converted their motion for preliminary injunction to a motion for summary judgment. The government also sought summary judgment, and the parties stipulated to a briefing schedule for their cross-motions. *See* ECF Nos. 28, 30, 32, 33. On November 19, 2025, the Court denied the cross-motions for summary judgment without prejudice as premature. ECF No. 60.

United States District Court
Northern District of California

On March 6, 2026, the parties agreed to a bench trial on the papers pursuant to Federal Rule of Civil Procedure 52(a)(1), and asked this Court to resolve the remaining issues of law and any issues of fact on a defined, stipulated record. ECF Nos. 77–78. During the May 27, 2026 bench trial, the parties presented argument based on the submitted facts and evidence. This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

**FINDINGS OF FACT**

The parties asked the Court to rely on a stipulated factual record based on three sources: (1) a joint statement of undisputed facts (ECF No. 85); (2) the Parties' Joint Proposed Findings of Fact (ECF No. 101) ("Parties' Undisputed Facts"); and (3) findings of fact,[5] exhibits, and transcripts of witness testimony from the bench trial in *American Association of University Professors v. Rubio*, 802 F.Supp.3d 120 (D. Mass. 2025) ("*AAUP*") (ECF Nos. 81–82 (*AAUP* exhibits and transcripts)).

The Court relies exclusively on the stipulated record from these three sources. Collectively, that complete record is approximately 2,200 pages. It would be unwieldy and overbroad for the Court to recite the totality of those stipulated facts here, so the Court instead incorporates them by reference in this Memorandum of Decision. The Court begins by recounting

[5] Initially the parties asked the Court to rely on the underlying factual record from the nine-day *AAUP* bench trial. At the May 27, 2026 bench trial in this case, the Court inquired why the parties were asking the Court to rely on the underlying record instead of the factual findings laid out in Judge Young's 161-page *AAUP* Rule 52(a) "Findings of Fact and Conclusions of Law" issued on September 30, 2025. Bench Trial Tr. at 3:23–20:9. The Court noted that, without being present at that trial and therefore not hearing the tone or seeing the body language of the witnesses, this Court was in an inferior position to assess credibility. Further, even if the parties disputed the legal conclusions in *AAUP*, in a bench trial, the judge is the finder of fact. Therefore, Judge Young's factual findings are the facts unless or until an appellate court determines they were "clearly erroneous" under Fed. R. of Civ. P. 52(a)(6). The parties then agreed that they had no disputes regarding the findings of fact issued in *AAUP*. Bench Trial Tr. 8:8–18; *see also* ECF No. 85. Reiterating this point, counsel for the government stated, and counsel for Plaintiffs confirmed, that the Court had already ordered the parties to file a list of any factual findings upon which they were relying in this case that deviated from a finding of fact in *AAUP*. *Id*. Because neither party disagreed with those factual findings as applicable to this case (*e.g.*, *AAUP* involved different plaintiffs and the factual findings regarding those plaintiffs were irrelevant to this action), counsel confirmed that neither party filed a list. Consistent with the parties' agreement on this point, this Court relies on the findings of fact in the *AAUP* decision. Notably, those factual findings are consistent with the Parties' Undisputed Facts filed on June 26, 2026. ECF No. 101.

the most pertinent factual findings from *AAUP* and then incorporates the Parties' Undisputed Facts in their entirety.

### I. THE *AAUP* FINDINGS

The parties bring this case on the heels of *AAUP*, a substantially related action in the District of Massachusetts. Because the Plaintiffs in this action and the issues they raise are related to but distinct from those in *AAUP*, it is necessary for this Court to explain how and to what extent the findings of fact from *AAUP* inform the stipulated factual record in this case.

The *AAUP* plaintiffs, a group of nonprofit associations (including AAUP, several of its university-affiliated chapters, and a nonprofit called the Middle East Studies Association), similarly challenged the government's use of the Deportation and Revocation Provisions to enforce Executive Orders 14161 and 14188 on First Amendment grounds. The *AAUP* plaintiffs additionally brought claims under the Administrative Procedural Act ("APA").

The *AAUP* plaintiffs alleged that Secretary of State Rubio, Secretary of Homeland Security Noem, the Department of State, the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and subordinates (collectively, "Public Officials") implemented two Executive Orders through a discrete, unwritten "mode of enforcement" that targeted noncitizens for detention, deportation, and visa revocation specifically because of their pro-Palestinian or anti-Israel speech and association. 802 F. Supp. 3d 120. The plaintiffs alleged that this mode of enforcement constitutes an "ideological-deportation policy" that is viewpoint discriminatory in violation of their First Amendment rights. *Id.* at 174–75. "[T]o the extent that the Public Officials rel[ied] on 'security and related grounds of inadmissibility' such as the 'foreign policy provisions'" of 8 U.S.C. § 1227(a)(4)(C)(i) (the Deportation Provision), the plaintiffs brought an as-applied challenge to those provisions. *Id.* at 175.

The *AAUP* court held a nine-day bench trial. After considering the entire record, including the testimony of 15 witnesses and 250 admitted exhibits, the court concluded that Secretaries Noem and Rubio, and their subordinate officials and agents, by implementing the "mode of enforcement" of the Executive Orders, "deliberately and with purposeful aforethought, did so concert their actions and those of their two departments intentionally to chill the rights to freedom

of speech and peacefully to assemble of the noncitizen plaintiff members of the plaintiff associations." *Id.* at 131. The court found that the government's "ideological-deportation policy" violated the First Amendment, and that this policy was arbitrary or capricious in violation of the APA.

The *AAUP* court first reviewed the evidence of the Public Officials' "mode of enforcement" of Executive Orders 14161 and 14188. *Id.* at 131–72. Following the issuance of the Executive Orders in January 2025, the Department of Justice formed the "Taskforce to Combat Anti-Semitism." *Id.* at 137. As part of that effort, DHS began investigating campus protesters in March 2025. *Id.* at 138. DHS entrusted an ICE agency called the Department of Homeland Investigations ("HSI") "'[t]o look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to immigration and customs laws." *Id.* at 138–39 (citing Trial Tr. vol. I, 74:14-17, Jul. 9, 2025) (emphasis omitted). To expedite preparation of Reports of Analysis ("ROAs") responsive to the Executive Orders, HSI leadership assembled a "Tiger Team." *Id.* at 139. The team was instructed to review approximately 5,000 names pulled from several sources, but predominantly from Canary Mission—a website that claims to "document[] individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond." *Id.* (citing "Our Mission," Canary Mission, *AAUP* Ex. 229). Based on their review of the Canary Mission website and other sources, the team generated ROAs on certain noncitizens, which were then passed up the chain of command to DHS and State Department officials. *Id.* at 139–40. "Of approximately 5,000 individuals investigated by the Office of Investigations, ROAs were prepared for less than 5%." *Id.* at 140 (citing Trial Tr. vol. II, 105:15–106:11).

Assistant Director Peter Hatch ("AD Hatch"), the most senior official at the Office of Intelligence, "understood that his department's ROAs were to focus only [on] individuals engaged in protests because of the volume of names on the lists, which was a deviation from their normal practice of doing an ROA on all of those reviewed." *Id.* at 140 (citing Trial Tr. vol. II, 97:25–98:12, 109:24–110:4, Jul. 10, 2025). "Notably, no direction or definition as to what 'supporting terrorist organizations' [meant] was provided [to AD Hatch by HSI leadership]." *Id.* at 139 (citing

Trial Tr. vol. II, 93:4–8, Jul. 9, 2025). But AD Hatch stated "that his office performed their analysis in the usual manner." *Id.* at 139 (citing Trial Tr. vol. II, 93: 9–13). When asked during the bench trial what "supporting a terrorist organization" means, AD Hatch declined to provide detail but testified that he was simply "told by DHS leadership (Hatch could not recall who) to review the names of student protestors on the Canary Mission website, which contains a database of over 5,000 individuals." *Id.* at. 130 (citing Trial Tr. vol. II, 109-111).

In March 2025, Secretary Rubio began "exercising his authority to classify [certain noncitizen students] as deportable under the foreign policy exception, INA 237(a)(4)(C) [the Deportation Provision]." *Id.* at 144. HSI agents arrested lawful permanent residents and student visa holders, including Mahmoud Khalil, Yunseo Chung, Badar Khan Suri, Rümeysa Öztürk, and Mohsen Mahdawi. *Id.* at. 144–63. As grounds for their arrests, HSI and Rubio cited protest attendance, "association" with pro-Palestinian groups, social media posts, and op-eds. *See id.* at 144–45, 154, 157–58. As Rubio and other officials repeatedly acknowledged, none of the students' ROAs relied on acts of violence or material support for terrorist groups. *See id.* at 142, 147–48, 150, 152–53, 158.

In the wake of the arrests, President Trump, Secretary Rubio, White House Deputy Chief of Staff Stephen Miller, Vice President J.D. Vance, and DHS spokespeople made numerous public statements framing visa and green card holders as deportable for "supporting Hamas" or protesting, explicitly stating that the visa revocations and deportations related to views on Israel and its war in Gaza were not about "free speech" but about who is permitted to be a "guest" in the United States. *See id.* at 147, 150, 156, 169.

Despite arresting student protestors on the basis that their statements and actions amounted to "anti-Semitism," the Public Officials never clearly defined the term. *See id.* at 140–41, 144–45, 152, 154–55. As the *AAUP* court noted, John Armstrong ("SBO Armstrong"), "the highest ranking consular official at the Department of State's Bureau of Consular Affairs," who authored action recommendations to Secretary Rubio,[6] "never received guidance on what constitutes

[6] *See, e.g.*, SF ¶¶ 174, 179, 217, 313.



United States District Court
Northern District of California

antisemitism." *Id.* at 142 (citing Trial Tr. vol. I, 25:15–25-28:4, Jul. 18, 2025). "Rather, he believes that 'there's a common understanding in our culture in our society of what antisemitism is.'" *Id.* (citing Trial Tr. vol. I, 28:3-4). "Armstrong is informed by the public statements by Secretary Rubio that the United States has a strong policy against anti-Semitism, particularly on college campuses. [Trial Tr. vol. I, 21:2-8]. According to [SBO] Armstrong, this includes 'anyone organizing antisemitic activity in the United States.'" *Id.* at 143 (citing Trial Tr. vol. I, 21:21-22:5). But "[g]uidance exists within the Department of State . . . which has an entire web page dedicated to the definition of anti-Semitism, in which it acknowledges, among other things, that '[m]anifestations [of Anti-Semitism] might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic.'" *Id.* at 143 (quoting *AAUP* Ex. 210; https://www.state.gov/defining-antisemitism/) (emphasis omitted).

The *AAUP* court found that the Executive Orders, "although couched in a concern for hateful ideologies, antisemitism, and antisemitic harassment, and accompanied by appropriate disclaimers as to the lawfulness of any actions taken pursuant to them, in fact incorporated a definition of antisemitism that encompassed protected political speech, and, by means of intentionally discriminatory enforcement procedures implementing them, led to the singling out of pro-Palestine and anti-Israel speech for a campaign of speech-chilling retribution." *Id.* at 186. On the record before the *AAUP* court, the plaintiffs "proved[] a discrete practice of targeting pro-Palestine and anti-Israel speech, which arose from a kind of intentional ratcheting-up of the Executive Orders' instruction to target antisemitic harassment and violence, while referencing a definition of antisemitism that includes protected speech such as comparing Israel's policies to those of the Nazis." *Id.* at 187.

The court also found the implementation of the Executive Orders "was targeted intentionally at specific viewpoints in order to chill speech." *Id.* It concluded:

> The evidence presented at trial included the Public Officials' many public statements suggesting that they wished to staunch public protest related to Israel's treatment of Palestinians, including the President's campaign promise that he would put an end to the student protests on this issue by kicking out protestors and

> subsequent promise that the Public Officials would deport and cancel the visas of those "who joined in the pro-jihadist protests" and Secretary Rubio's plainspoken guarantee to deport "Hamas-supporters" and those who "participat[e] in pro-Hamas events." Evidence introduced at trial also showed that the Public Officials consistently referred to campus protests related to Palestine as per se "pro-Hamas," key inter-agency meetings included discussion of whether protesting alone could be grounds for visa revocation, and the tasking of HSI with investigating protestors for violations of laws based on anonymous website lists targeted at protesters. The Plaintiffs have proved that, as the fruits of this investigation percolated up the chain of command, decisionmakers at every step of the challenged implementation interpreted the "support" for terrorists (a key term from Executive Order 14161) that they construed as potentially subject to the penalty of detention, deportation, and visa revocation to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds.
>
> This review process, such as it was, was essentially frictionless. Despite the apparent good intentions and professionalism of the Public Officials' subordinates, the Court saw virtually no evidence that anyone along the way seriously questioned whether pure political speech in support of Palestine or against Israel could be construed as support for terrorism, whether support for terrorism as such could be grounds for the adverse actions that were contemplated, or whether any targeted individual had met any circumscribed, ascertainable standard of speech or conduct that might be grounds for these actions. Trial produced no evidence that the challenged procedures contemplated the speech to have been as incitement to imminent violence or, per the terms of an older test, clear and present danger. Rather, the subordinates spoke the language of "violat[ing]" the Executive Orders, as if they were the law, and of "align[ing] with the executive order's focus on deporting 'Hamas sympathizers,' " as if "Hamas sympathizers" were a self-interpreting term. They appear to have treated "antisemitism," which, however heinous, is, without more, protected speech, as something that, in essence, one simply knows when one sees it. In short, if it looked like the Executive Orders might have disapproved of it, that was potential grounds for deportation.

*Id.* at 187–88.

The *AAUP* court found that the Secretary of State and "other high officials" demonstrated "recklessness or even indifference as to how the Executive Orders ought to be interpreted or what the Constitution requires." *Id.* at 188. Their "apparent indifference as to whether support or sympathy for terrorism, as opposed to material support, could be grounds for adverse action by law, or whether such support could be construed to include the voicing of support for Palestine or objection to the policies of the State of Israel, is no defense to the charge that they have done what

they have repeatedly said they were doing: intentionally targeted political speech in order to stop campus protests." *Id.*

Moreover, the court found, the government's "selection of anonymously sourced lists of campus protestors to supply the thousands of names initially subject to investigation, . . . -- despite their representations, which the Court credit[ed], that HSI may at other times act on totally anonymous tips -- belies any suggestion that whatever unnamed person who supplied the lists to HSI for review did not intend the policy to operate as it did. Due to the frictionless quality described above, once one was on the lists, one was potentially subject to adverse action so long as, it seems, there was any online mention of one's pro-Palestine activities." *Id.* Though "few of the originally investigated names were targeted," the "names that were passed up the chain of command by the investigating subordinates were almost universally approved for adverse action, and, again, the reasons for being passed up the chain of command included any form of online suggestion that one was 'pro-Hamas,' including Canary Mission's own anonymous articles." *Id.* at 188–89.

Based on the evidence presented a trial, the *AAUP* court concluded that while there was no written "ideological deportation policy . . . , the intent of the Secretaries [in enforcing the Executive Orders] was more invidious -- to target a few for speaking out and then use the full rigor of the Immigration and Nationality Act (in ways it had never been used before) to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome." *Id.* at 172–73.

Thus, based on the evidence presented at the *AAUP* trial, which the parties have adopted here, the *AAUP* court found that "Plaintiffs have shown that Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated. Such conduct is not only unconstitutional, but a thing virtually unknown to our constitutional tradition." *Id.* at 184.

Judge Young's factual findings in *AAUP* align with the factual record that was before him

and are also consistent with the stipulated facts the parties provided in this case. Collectively, those facts, stipulated by the parties, provide the bedrock for this Court's Order. The Court incorporates the *AAUP* factual findings into this Memorandum of Decision because the parties have stipulated to relying on the underlying record, the parties do not find that the record before this Court deviates from the factual findings in *AAUP*, and because the Court finds Judge Young's conclusions are adequately supported by the *AAUP* trial record.[7]

This case stems from the same environment of chilled speech brought on by the enforcement of Executive Orders 14161 and 14188 that is outlined in detail in *AAUP*.[8] But the *AAUP* plaintiffs did not challenge the Deportation or Revocation Provisions directly, instead alleging that the "ideological-deportation policy" implemented by the Public Officials was itself viewpoint discriminatory. *Id.* at 174–75 (citing *AAUP* complaint ¶¶ 134–35). The *AAUP* plaintiffs challenged "security and related grounds of inadmissibility" such as the Deportation Provision only to the extent that the Public Officials relied on those grounds to justify the "ideological-deportation policy." *Id.* The *AAUP* court concluded that the "ideological-deportation policy" was viewpoint discriminatory and was intended to chill the plaintiffs' protected speech under the First Amendment. *Id.* at 175. The *AAUP* court did not reach the question of whether the Deportation Provision, or any other statutes providing "security and related grounds of admissibility" such as the Revocation Provision, violated the First Amendment as applied to the *AAUP* plaintiffs' protected speech.

Here, Plaintiffs seek relief beyond what was requested by the plaintiffs in *AAUP*. Plaintiffs ask the Court to evaluate the Deportation and Revocation Provisions as applied to protected speech on First and Fifth Amendment grounds.

## II. STIPULATED FACTS

The facts in this case are undisputed. Except as noted in footnote 9, the following facts are

---

[7] As noted above, the Court relies on the *AAUP* findings of fact because the parties' have stipulated to put the *AAUP* record before this Court in this case. The Court does not otherwise rely on the *AAUP* conclusions of law any more than the Court would rely upon any other similarly situated non-binding but persuasive authority. *See, supra*, n. 5.

[8] *See* ECF No. 101 ¶¶ 100–01.

copied verbatim from the Parties' Undisputed Facts, ECF No. 101.[9]

**1. The Parties**

Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper at Stanford University.[10] Stanford Daily is a validly incorporated 501(c)(3) organization.[11] Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities."[12]

Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.[13] Jane Doe is a former student at a United States university.[14] There is no relationship between Stanford Daily and Jane Doe. Jane Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and [has] never [been] affiliated with Stanford Daily.[15] As of this date, Plaintiff Jane Doe has not, to her knowledge, experienced any immigration enforcement action against her.[16]

Secretary of State Marco Rubio heads the Department of State, which determines whether and on what conditions noncitizens are permitted to enter and remain in the United States.[17] From January 25, 2025, to March 24, 2026, Kristi Noem served as

---

[9] *See* Parties' Undisputed Facts for the stipulated facts ("SF"), ECF No. 101. For ease of reading and reference, the Court has omitted the paragraph formatting, moved the parties' record citations to footnotes, and added headings. The Court has also added clarifying information in brackets (for example to define an acronym), and removed stipulated facts that were only relevant to former Plaintiff John Doe, who has since been dismissed from this action. Finally, as noted in the Parties' Joint Proposed Findings of Fact, for the purposes of this section: the citations to verified portions of the Amended Complaint are cited as "VAC,"; citations to unverified portions of the Amended Complaint are cited as "Am. Compl."; and all references to "AAUP" in citations are to the *AAUP* trial transcripts and exhibits filed in this matter's docket pursuant to the Court's March 13, 2026, Order. ECF No. 78.

[10] SF ¶ 1; VAC ¶ 81; Answer ¶ 81.

[11] SF ¶ 2; VAC ¶ 82.

[12] SF ¶ 3; VAC ¶ 84; Answer ¶ 84.

[13] SF ¶ 4; VAC ¶ 135.

[14] SF ¶ 5; VAC ¶ 136.

[15] SF ¶ 6; VAC ¶¶ 137–38.

[16] SF ¶ 7.

[17] SF ¶ 13; 8 U.S.C. § 1104.



United States District Court
Northern District of California

United States District Court
Northern District of California

Secretary of Homeland Security.[18] Since March 24, 2026, Secretary of Homeland Security Markwayne Mullin has headed the Department of Homeland Security, which is charged with protecting the United States from internal terrorist threats and similar harms.[19]

**2. Plaintiffs' Expression**

Stanford Daily intends to publish journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.[20] Stanford Daily intends to provide community members with a platform to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.[21] Stanford Daily intends to cover news and publish opinions related to foreign affairs, Israel, and Palestine.[22]

A lawfully present noncitizen former editor who was on Stanford Daily's staff intends to rejoin and continue being a member of Stanford Daily.[23] A lawfully present noncitizen student on Stanford Daily's staff intends to publish an article about a vigil related to the conflict in Gaza.[24] A lawfully present noncitizen editor on Stanford Daily's staff intends to republish an article they had previously written about pro-Palestinian campus activism and to edit stories involving Israel and Palestine.[25] International students intend to resume speaking freely with Stanford Daily.[26] Stanford Daily noncitizen contributors intend to resume contributing articles to Stanford Daily.[27]

Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid."[28] She has also

---

[18] SF ¶ 14.

[19] SF ¶ 15; 6 U.S.C. § 111.

[20] SF ¶ 16; VAC ¶ 105.

[21] SF ¶ 17; VAC ¶ 106.

[22] SF ¶ 18; VAC ¶ 109.

[23] SF ¶ 19; VAC ¶¶ 114–15.

[24] SF ¶ 20; VAC ¶¶ 116–17.

[25] SF ¶ 21; VAC ¶¶ 118–19.

[26] SF ¶ 22; VAC ¶¶ 125–26.

[27] SF ¶ 23; VAC ¶¶ 116–17.

[28] SF ¶ 24; VAC ¶ 140.

used the slogan, "from the river to the sea, Palestine will be free."[29] Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel.[30] Jane Doe intends to resume publishing and voicing her true opinions regarding Palestine and Israel.[31] Jane Doe intends to reactivate her social media account containing her past expression.[32]

**3. Plaintiffs' Responses to the Deportation and Revocation Provisions**

Many of Stanford Daily's noncitizen writers have declined to cover pro-Palestinian student protests at Stanford.[33] Many of Stanford Daily's noncitizen writers have refrained from covering topics related to the conflict in Gaza.[34] Lawfully present noncitizen students who are Stanford Daily members have self-censored expression.[35] Lawfully present noncitizen contributors and sources have refused to talk on the record with Stanford Daily reporters.[36] Lawfully present noncitizen contributors have stopped submitting opinion pieces to *The Stanford Daily*.[37] A lawfully present noncitizen editor on Stanford Daily's staff quit Stanford Daily because of the student's nonimmigrant visa status.[38] A lawfully present noncitizen student on Stanford Daily's staff decided against publishing an article about a vigil related to the conflict in Gaza.[39] A lawfully present noncitizen student on Stanford Daily's staff asked for articles they had previously written about pro-Palestinian campus activism to be removed and asked that they no longer be assigned to edit stories involving Israel or Palestine.[40] A lawfully present noncitizen Stanford Daily staff writer asked Stanford Daily to remove all her articles from Stanford Daily's website because

---

[29] SF ¶ 25; VAC ¶ 140.

[30] SF ¶ 26; VAC ¶ 141.

[31] SF ¶ 27; VAC ¶ 149.

[32] SF ¶ 28; VAC ¶ 149.

[33] SF ¶ 34; VAC ¶ 16.

[34] SF ¶ 35; VAC ¶ 16.

[35] SF ¶ 36; VAC ¶ 112.

[36] SF ¶ 37; VAC ¶ 113.

[37] SF ¶ 38; VAC ¶ 113.

[38] SF ¶ 39; VAC ¶ 114.

[39] SF ¶ 40; VAC ¶ 116.

[40] SF ¶ 41; VAC ¶ 118.



United States District Court
Northern District of California

some related to Israel, Palestine, and other foreign affairs topics.[41] A lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website.[42]

Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government.[43] Jane Doe no longer attends pro-Palestinian protests.[44] Jane Doe no longer wears a keffiyeh to support the Palestinian cause.[45] Jane Doe no longer engages in direct-action organizing supporting Palestinians.[46] Jane Doe no longer holds up the Palestinian flag.[47] Jane Doe no longer maintains her main social media account containing pro-Palestinian commentary.[48] Jane Doe no longer posts pro-Palestinian content on her other social media accounts.[49] The only public expression in which Jane Doe now engages to support the Palestinian cause is wearing watermelon earrings that are easily removable. (Watermelons share the same colors as the Palestinian flag, and pro-Palestinian speakers often use the symbol to support the Palestinian cause.)[50]

Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions invoking the Deportation and Revocation Provisions.[51] Lawfully present noncitizens who are Stanford Daily members have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions.[52] Lawfully present noncitizens who are Stanford Daily contributors

---

[41] SF ¶ 42; VAC ¶ 120.

[42] SF ¶ 43; VAC ¶ 122.

[43] SF ¶ 44; VAC ¶ 154.

[44] SF ¶ 45; VAC ¶ 155.

[45] SF ¶ 46; VAC ¶ 155.

[46] SF ¶ 47; VAC ¶ 155.

[47] SF ¶ 48; VAC ¶ 155.

[48] SF ¶ 49; VAC ¶ 155.

[49] SF ¶ 50; VAC ¶ 155.

[50] SF ¶ 51; VAC ¶ 155.

[51] SF ¶ 58; VAC ¶ 110.

[52] SF ¶ 59; VAC ¶ 112.



United States District Court
Northern District of California

United States District Court
Northern District of California

and sources have refused to talk on the record with Stanford Daily reporters and stopped submitting opinion pieces to *The Stanford Daily* due to fear of adverse immigration consequences under the Deportation and Revocation Provisions.[53]

Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university.[54] Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website.[55] Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations that Canary Mission believes "promote hatred of the USA, Israel and Jews on North American college campus[es] and beyond."[56]

Peter Hatch, a senior official in ICE's Homeland Security Investigations [("HSI")] unit, was told to review the names of student protestors on the Canary Mission website.[57] Mr. Hatch was asked, "[m]any of the names of the student protesters provided to you for the Office of Intelligence to produce reports of analysis on came from the website Canary Mission, correct?" He answered, "[i]t's true many of the names, even most of the names came from that website, but we were getting names and leads from many different sources."[58] Mr. Hatch was asked, "I understand that at least 75 percent of the leads that the Tiger Team looked at came from the Canary Mission website, is that correct?" He answered, "[y]es, most of the names came from Canary Mission."[59] Mr. Hatch testified that "the State Department can use the [report] and the information we collect in whatever way they need to to [sic] make decisions related to the State Department. I think [v]isa revocations is one way they may use it. But it may not be the only way."[60]

Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi before their detentions and attempted deportations.[61] Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk, including articles quoting government

[53] SF ¶ 60; VAC ¶ 113.

[54] SF ¶ 61; VAC ¶ 139.

[55] SF ¶ 62; VAC ¶ 142.

[56] SF ¶ 63; *AAUP* Ex. 229, ECF No. 81-6 at 282.

[57] SF ¶ 64; *AAUP* Trial Transcript July 9 at 109–11, ECF No. 82-3.

[58] SF ¶ 65; *AAUP* Trial Transcript July 9 at 44, ECF No. 82-3.

[59] SF ¶ 66; *AAUP* Trial Transcript July 10 at 15, ECF No. 82-4.

[60] SF ¶ 67; *AAUP* Trial Transcript July 9 at 101, ECF No. 82-3.

[61] SF ¶ 68; Exs. L, M, N, ECF No. 14.

statements about the detention and deportation of these noncitizens.[62] Consequently, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression.[63] Jane Doe has personally read and is aware of government statements related to the Revocation and Deportation Provisions, including the government's statements referenced in this lawsuit or substantially similar statements.[64]

Jane Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions against individuals such as Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.[65] Jane Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk.[66] Because of the government's statements about and enforcement of the Revocation and Deportation Provisions, Jane Doe has self-censored and continues to self-censor.[67] Based on Jane Doe's knowledge of government statements and enforcement concerning the Revocation and Deportation Provisions, Jane Doe fears adverse immigration action under the Deportation and Revocation Provisions if she engages in constitutionally protected speech.[68]

**4. Immigration Provisions at Issue**

The Deportation Provision's text allows the Secretary of State to render lawfully present noncitizens deportable for their protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii); *see also id.* § 1227(a)(4)(C)(i)–(ii).[69] The Revocation Provision's text allows the Secretary of State "at any time, in his discretion" to "revoke [a] visa or other documentation." 8 U.S.C. § 1201(i).[70] John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of

---

[62] SF ¶ 69; VAC ¶ 148.

[63] SF ¶ 70; VAC ¶ 148.

[64] SF ¶ 71; VAC ¶ 150.

[65] SF ¶ 72; VAC ¶ 151.

[66] SF ¶ 73; VAC ¶ 152.

[67] SF ¶ 74; VAC ¶¶ 154, 156.

[68] SF ¶ 75; VAC ¶¶ 150, 157.

[69] SF ¶ 84.

[70] SF ¶ 85.

Consular Affairs, was asked whether the Revocation Provision "let's [sic] you revoke not for foreign policy reasons, but for any reason?" He answered, "[t]hat is correct."[71]

On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza.[72] At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel.[73] Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution."[74] Other events featured pro-Palestinian advocates handing out flyers.[75] Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums.[76]

**5. The Government's Statements on Student Visa Holders**

President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States, and his campaign website linked to the Republican Party platform.[77] The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism."[78] Mr. Trump's campaign website separately said: "Deport pro-Hamas radicals and make our college campuses safe and patriotic again."[79]

At [a] campaign rally on October 16, 2023, Mr. Trump said he would revoke the visas of foreign students deemed "radical, anti-American, and antisemitic" and [would] aggressively deport aliens

[71] SF ¶ 86; *AAUP* Trial Transcript July 18 at 65, ECF No. 82-9.

[72] SF ¶ 87; Am. Compl. ¶ 21; Answer ¶ 21.

[73] SF ¶ 88; Am. Compl. ¶ 22; Answer ¶ 22.

[74] SF ¶ 89; Am. Compl. ¶ 23; Answer ¶ 23.

[75] SF ¶ 90; Am. Compl. ¶ 24; Answer ¶ 24.

[76] SF ¶ 91; Am. Compl. ¶ 26; Answer ¶ 26.

[77] SF ¶ 92; Am. Compl. ¶¶ 27, 29; Answer ¶ 27.

[78] SF ¶ 93; Am. Compl. ¶ 28; Answer ¶ 28.

[79] SF ¶ 94; *Agenda 47*, Trump Vance, https://perma.cc/H2RM-JSSP (June 18, 2025) (capitalization altered).

United States District Court
Northern District of California

with "jihadist sympathies."[80]

> At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas and sympathizers on college campuses. The college campuses are being taken over. And all of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it, come 2025 we will find you and we will deport you. We will deport you."[81]
>
> At a campaign rally on November 8, 2023, Mr. Trump said, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses which have been infested with radicalism like never before."[82] At the same rally, Mr. Trump said, "[i]f you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you, and we will deport you."[83]
>
> On May 14, 2024, Mr. Trump said at a campaign event, "[o]ne thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[84]
>
> On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security."[85]
>
> On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "[t]o all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested

---

[80] SF ¶ 95; Ex. B, ECF No. 13 at 5.

[81] SF ¶ 96; *Speech: Donald Trump Addresses the Republican Jewish Coalition in Las Vegas – October 28, 2023*, Roll Call, https://perma.cc/8S83-KBSQ (Mar. 31, 2026).

[82] SF ¶ 97; *Speech: Donald Trump Holds a Political Rally in Hialeah, Florida - November 8, 2023*, Roll Call, https://perma.cc/P455-HZ97 (Mar. 31, 2026).

[83] SF ¶ 98; *Speech: Donald Trump Holds a Political Rally in Hialeah, Florida - November 8, 2023*, Roll Call, https://perma.cc/P455-HZ97 (Mar. 31, 2026).

[84] SF ¶ 99; Ex. A, ECF No. 13 at 2.

[85] SF ¶ 100; *AAUP* Ex. 70, ECF No. 81-3 at 217; Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

with radicalism like never before."[86]

On March 4, 2025, President Trump posted on social media: "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter."[87]

On March 6, 2025, Secretary Rubio posted on social media: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."[88]

On March 13, 2025, Vice President J.D. Vance was asked, "[d]o you see more such deportations happening?" He answered, "I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country. So yeah, I don't know how high that number is going to be, but you're going to see more people."[89]

On March 16, 2026, Secretary Rubio said that "every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well."[90] Secretary Rubio said, "[a]nd if you tell us when you apply for a visa, I'm coming to the U.S. to participate in pro-Hamas events, that runs counter to the foreign policy interests of the United States of America. It's that simple. So you lied. You came—if you had told us that you were going to do that, we never would have given you the visa. Now you're here, now you do it, so you lied to us. You're out. It's that simple; it's that straightforward."[91] Secretary Rubio said, "I find it ironic that a lot of these people out there defending the First Amendment speech—alleged free speech rights of these Hamas sympathizers … they had no problem, okay, pressuring social media to censor American political speech. So I think it's ironic and

[86] SF ¶ 101; *AAUP* Ex. 45, ECF No. 81-2 at 81; *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

[87] SF ¶ 102; Donald J. Trump (@realDonaldTrump), Truth (Mar. 4, 2025, at 7:30 AM), https://perma.cc/YD7P-MXVF.

[88] SF ¶ 103; *AAUP* Ex. 24, ECF No. 81-1 at 87; Secretary Marco Rubio (@SecRubio), X (Mar. 6, 2025, at 5:30 PM), https://perma.cc/H2LP-M57P.

[89] SF ¶ 104; *AAUP* Ex. 31, ECF No. 81-1 at 147.

[90] SF ¶ 105; *AAUP* Ex. 33, ECF No. 81-1 at 157.

[91] SF ¶ 106; *AAUP* Ex. 33, ECF No. 81-1 at 157.



United States District Court
Northern District of California

hypocritical. But the bottom line is this: If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate … in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave."[92]

On March 27, 2025, Secretary Rubio was asked to confirm the news reporting that the State Department had revoked 300 visas. He answered, "[m]aybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa."[93]

On March 28, 2025, Secretary Rubio was asked, "[a]nd what does it mean when you say against the foreign policy of the United States?" He answered, "[i]t runs counter to our foreign—that's how we issue visas coming in. I think about it this way. If we knew this information—my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa."[94] Secretary Rubio said, "I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws—I mean, we're obviously not going to yank a visa over that."[95] Secretary Rubio said, "But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked."[96] Secretary Rubio said, "[l]et's be clear: It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with."[97]

When asked about Ms. Öztürk's visa revocation, Secretary Rubio said, "[t]he activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. If necessary and a court compels us, we'll provide that information. But ultimately it's a visa. Judges don't issue student visas. There is no right to a student visa. We can cancel a student visa under the law just the same way that we can deny a student visa

[92] SF ¶ 107; *AAUP* Ex. 33, ECF No. 81-1 at 158.

[93] SF ¶ 108; *AAUP* Ex. 35, ECF No. 81-2 at 9.

[94] SF ¶ 109; *AAUP* Ex. 36, ECF No. 81-2 at 18.

[95] SF ¶ 110; *AAUP* Ex. 36, ECF No. 81-2 at 20–21.

[96] SF ¶ 111; *AAUP* Ex. 36, ECF No. 81-2 at 21.

[97] SF ¶ 112; *AAUP* Ex. 36, ECF No. 81-2 at 22.

> under the law. And we will do so in cases we find appropriate."[98]
>
> Secretary Rubio said, "[t]he overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life. So I just think it's crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest."[99]
>
> On April 8, 2025, Secretary Rubio said, "[s]o if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, because we don't like or have questions about some of your political activities and your views. We just won't give you a visa proactively, on the front end. My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it? In essence, if we wouldn't—if there are things about you that had we known we would not have given you a visa, we should be taking away your visa. It's as simple as that."[100] Secretary Rubio said, "[s]o I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa. And we're revoking those visas, and they have to leave."[101]
>
> On April 14, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller said on Fox News that any noncitizen "who preaches hate for America" will be deported.[102]
>
> On April 17, 2025, Secretary Rubio was asked, "[w]hat are the standards that are being used to determine whether somebody should stay in the United States or should go?" He said, if "all of a sudden it becomes obvious you think Hamas is a good group[,] [w]ell, then we should revoke your visa."[103] Secretary Rubio said, "[i]t is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to

[98] SF ¶ 113; *AAUP* Ex. 36, ECF No. 81-2 at 23.

[99] SF ¶ 114; *AAUP* Ex. 36, ECF No. 81-2 at 23–24.

[100] SF ¶ 115; *AAUP* Ex. 37, ECF No. 81-2 at 44.

[101] SF ¶ 116; *AAUP* Ex. 37, ECF No. 81-2 at 44.

[102] SF ¶ 117; *AAUP* Ex. 39-1, ECF No. 81-2 at 58.

[103] SF ¶ 118; *AAUP* Ex. 40, ECF No. 81-2 at 63.

invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them. That's not in our national interest."[104] Secretary Rubio said, "[W]hen someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country. You're not going to be here; it's just that simple."[105]

On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked."[106]

On May 20, 2025, Secretary Rubio testified before the Senate foreign relations committee. He said, in reference to visa revocations, "[t]here are more coming. We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas. It's as simple as that. I want to do more. I hope we can find more of these people."[107]

On May 21, 2025, Secretary Rubio testified before the House foreign affairs committee. Responding to a question about the revocation of Öztürk's visa, he said he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas.[108]

On July 29, 2025, Mr. Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for America or its people"—not just noncitizens who criticize Israel.[109]

On August 20, 2025, DHS [Department of Homeland Security] posted on X: "If you hate America, you have no business

[104] SF ¶ 119; *AAUP* Ex. 40, ECF No. 81-2 at 63.

[105] SF ¶ 120; *AAUP* Ex. 40, ECF No. 81-2 at 64.

[106] SF ¶ 121; Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU.

[107] SF ¶ 122; Am. Compl. ¶ 64; Answer ¶ 64.

[108] SF ¶ 123; Am. Compl. ¶ 65; Answer ¶ 65.

[109] SF ¶ 124; Ex. O, ECF No. 14 at 38.

demanding to live in America."[110]

On September 11, 2025, in response to Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau posted on X: "In light of yesterday's horrific assassination of a leading political figure, I want to underscore that foreigners who glorify violence and hatred are not welcome visitors to our country. I have been disgusted to see some on social media praising, rationalizing, or making light of the event, and have directed our consular officials to undertake appropriate action. Please feel free to bring such comments by foreigners to my attention so that the @StateDept can protect the American people."[111] On September 14, 2025, Mr. Landau responded on X to a video of a noncitizen mocking Charlie Kirk's assassination: "Rest assured that the @StateDept has revoked his visa so at least he will not be engaging in his grotesque diatribes on American soil."[112]

On September 15, 2025, Secretary Rubio posted on X: "America will not host foreigners who celebrate the death of our fellow citizens. Visa revocations are under way. If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country."[113]

On October 5, 2025, DHS posted on X that it arrested "terrorist sympathizers across our country."[114] On October 14, 2025, the State Department posted on X: "The United States has no obligation to host foreigners who wish death on Americans. The State Department continues to identify visa holders who celebrated the heinous assassination of Charlie Kirk. Here are just a few examples of aliens who are no longer welcome in the U.S." The post was followed by six examples:

"An Argentine national said that Kirk 'devoted his entire life spreading racist, xenophobic, misogynistic rhetoric' and deserves to burn in hell. Visa revoked."

"A South African national mocked Americans grieving the loss of Kirk, saying 'they're hurt that the racist rally ended in attempted martyrdom' and alleging 'he was used to astroturf a

---

[110] SF ¶ 125; Homeland Security (@DHSgov), X (Aug. 20, 2025, at 12:30 PM), https://perma.cc/K649-DNLK.

[111] SF ¶ 126; Christopher Landau (@DeputySecState), X (Sep. 11, 2025, at 8:20 AM), https://perma.cc/7N8S-TT75.

[112] SF ¶ 127; Christopher Landau (@DeputySecState), X (Sep. 14, 2025, at 12:35 PM), https://perma.cc/6KB2-DJ9M.

[113] SF ¶ 128; Secretary Marco Rubio (@SecRubio), X (Sep. 15, 2025, at 10:54 PM), https://perma.cc/L24D-NRKV.

[114] SF ¶ 129; Homeland Security (@DHSgov), X (Oct. 5, 2025, at 7:09 PM), https://perma.cc/MX99-CR62.

movement of white nationalist trailer trash.' Visa revoked."

"A Mexican national said that Kirk 'died being a racist, he died being a misogynist' and stated that 'there are people who deserve to die. There are people who would make the world better off dead.' Visa revoked."

"A Brazilian national charged that 'Charlie Kirk was the reason for a Nazi rally where they marched in homage to him' and that Kirk 'DIED TOO LATE.' Visa revoked."

"A German national celebrated Kirk's death and attempted to justify his murder, writing 'when fascists die, democrats don't complain.' Visa revoked."

"A Paraguayan national charged that 'Charlie Kirk was a son of a b**** and he died by his own rules.' Visa revoked."[115]

The State Department also posted: "Aliens who take advantage of America's hospitality while celebrating the assassination of our citizens will be removed."[116] On October 17, 2025, the State Department posted on X: "We heard Bluesky is a great place to research visa revocations."[117] On November 18, 2025, Mr. Miller said, "[t]he State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more."[118]

Stanford Daily members are unaware of any government officials disavowing invoking the Deportation and Revocation Provisions against protected speech outside of the litigation documents filed in this case.[119] Jane Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech.[120]

**6. Homeland Security Investigations**

Historically and at all times relevant to this action, when HSI Office of Intelligence analysts receive referrals, they [] conduct open-source analysis and various checks to validate the availability of information and/or the referral, and, if warranted, prepare an

[115] SF ¶ 130; Ex. P, ECF No. 44-1 at 4.

[116] SF ¶ 131; Ex. P, ECF No. 44-1 at 4; Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://perma.cc/S6FW-WR3C.

[117] SF ¶ 132; Department of State (@StateDept), X (Oct. 17, 2025), at 7:24 PM), https://perma.cc/G7CC-YUHP.

[118] SF ¶ 133; Am. Compl. ¶ 80; Answer ¶ 80.

[119] SF ¶ 134; VAC ¶ 111.

[120] SF ¶ 135; VAC ¶ 153.

> ROA [report of analysis].[121] The Office of Intelligence has historically generated approximately 25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement information to its leadership and other Executive Branch partners.[122]
>
> Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the HSI Office of Intelligence team investigated under Title 8 and for potential violations of law.[123] The Canary Mission website was one of multiple publicly available sources the HSI Office of Intelligence team reviewed.[124] From the more than 5,000 names it received, the Office of Intelligence team generated between 100 and 200 ROAs, approximately.[125] For the remaining approximately 95% of the names, the Office of Intelligence took no further action.[126] From the roughly 200 ROAs, between approximately 10 and 50 were referred to [the Department of] State regarding specific individuals associated with these protests.[127] Of referrals to State involving nonimmigrant visa holders, approximately 25% to 30% do not result in revocations or removability determinations, either because they are sent back to DHS to ask for more information or because State finds the information not significant enough to warrant revocation.[128]
>
> While testifying under oath, Assistant Director Peter Hatch, the most senior official at the Office of Intelligence, said his office developed reports of analysis (ROAs) on the campus protestors and looked whether "any of them [were] supporting terrorist organizations."[129] Mr. Hatch did not receive direction or definition as to what "supporting terrorist organizations" means.[130] Mr. Hatch was asked, "[d]id anyone mention that you were, among other

---

[121] SF ¶ 137; *AAUP* Trial Transcript July 17 at 49-50, ECF No. 82-8.

[122] SF ¶ 138; *AAUP* Trial Transcript July 9 at 49–50, ECF No. 82-3.

[123] SF ¶ 139; *AAUP* Trial Transcript July 10 at 10, 83-84, 97, ECF No. 82-4.

[124] SF ¶ 140; *AAUP* Trial Transcript July 9 at 118, ECF No. 82-3; *AAUP* Trial Transcript July 10 at 75–78, ECF No. 82-4.

[125] SF ¶ 141; *AAUP* Trial Transcript July 10 at 83–84, 97–98, 105–08, ECF No. 82-4.

[126] SF ¶ 142; *AAUP* Trial Transcript July 10 at 106, ECF No. 82-4.

[127] SF ¶ 143; *AAUP* Trial Transcript July 17 at 55–56, 77, ECF No. 82-8.

[128] SF ¶ 144; *AAUP* Trial Transcript July 10 at 93–94, ECF No. 82-5.

[129] SF ¶ 145; *AAUP* Trial Transcript July 9 at 74, ECF No. 82-3.

[130] SF ¶ 146; *AAUP* Trial Transcript July 9 at 93, ECF No. 82-3.

things, going to take a look at Hamas or pro-Hamas activity?" He responded, "[u]m, yes, we—the—supporting Hamas would be, um, relative to a violation of law. So it would be standard practice for an analyst to [sic] that anyway. However, um, my direction to the team, um, was to look for, um—as an example, to look for Hamas, any statements in support of Hamas, or any activities."[131]

Mr. Hatch was asked, "[w]hat does 'supporting a terrorist organization' mean when you say it?" He responded, "[a]gain the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism. So we look for activities, um, such as, um, support for a terrorist—statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization. But I really don't want to say any more detail than that."[132] ICE's Homeland Security Investigations unit focused on creating ROAs for noncitizens who participated in protests after the October 7, 2023, attack.[133]

While testifying under oath, John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs, said[,] "support for Hamas will get your Visa revoked."[134] Mr. Armstrong was asked if "the phrase, 'From the river to the sea, Palestine will be free,' could be covered by the endorsing, espousing, supporting, a terrorist organization provision." He answered, "[i]t's basically calling for genocide of all Israelis, because there's no space for Israelis in that 'river to the sea.'"[135]

Mr. Armstrong was asked if "a statement denouncing Zionism could be covered because Zionism is Jewish patriotism or Israeli patriotism." He answered, "[i]t could be, yes."[136]

Mr. Armstrong was asked if "a statement criticizing Israel's actions in Gaza could be covered, depending on the statement." He answered, "[y]es, depending on the statement. It could definitely. If you say that 'They're worse than Hitler in what they're doing in Gaza,' that would be a statement that I think would be leading in that direction that you seem to be going, Counselor."[137]

---

[131] SF ¶ 147; *AAUP* Trial Transcripts July 9 at 90, ECF No. 82-3.

[132] SF ¶ 148; *AAUP* Trial Transcript July 9 at 93–94, ECF No. 82-3.

[133] SF ¶ 149; *AAUP* Trial Transcript July 10 at 97–98, 109–110, ECF No. 82-4.

[134] SF ¶ 150; *AAUP* Trial Transcript July 18 at 32, ECF No. 82-9.

[135] SF ¶ 151; *AAUP* Trial Transcript July 18 at 34, ECF No. 82-9.

[136] SF ¶ 152; *AAUP* Trial Transcript July 18 at 34, ECF No. 82-9.

[137] SF ¶ 153; *AAUP* Trial Transcript July 18 at 34, ECF No. 82-9.

Mr. Armstrong was asked if "a statement comparing the policy of Israel to that of the Nazis" could lead to adverse immigration consequences. He answered, "I'm saying it's worst [sic] than the Nazis."[138]

Mr. Armstrong was asked if a "statement calling for an arms embargo on Israel could be covered." He answered, "[i]t could be."[139]

Mr. Armstrong was asked if a "statement calling for limiting military aid to Israel could be covered." He answered, "[i]n my opinion, yes."[140]

Mr. Armstrong was asked if a "statement calling Israel an 'apartheid state' could probably be covered." He answered, "It might be. We'd have to look at the totality of the case. Which is what we do in the [v]isa revocations."[141]

Mr. Armstrong was asked, "[w]hat do you think is the common understanding of what 'antisemitism' is?" He answered, "[i]n my opinion, antisemitism is unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them."[142] Mr. Armstrong was asked, "[i]n other words, in your understanding antisemitism includes hatred or prejudice against Israel and the Israeli people, right?" He answered, "[y]es. In my understanding antisemites will sometimes try to hide their views and say they're not against Jews, they're just against Israel, which is a farcical argument in my mind. It's just a dodge."[143]

With respect to who at the State Department can make the determination necessary to trigger the Deportation Provision, Mr. Armstrong testified, "I cannot make that determination, only the Secretary of State, whoever that person may be."[144]

Mr. Armstrong testified that the State Department does not have an "ideological deportation policy"; that the State Department does not "have any policy to revoke [v]isas based on protected speech"; and that the State Department does not "have any policy to

---

[138] SF ¶ 154; *AAUP* Trial Transcript July 18 at 34, ECF No. 82-9.

[139] SF ¶ 155; *AAUP* Trial Transcript July 18 at 34–35, ECF No. 82-9.

[140] SF ¶ 156; *AAUP* Trial Transcript July 18 at 35, ECF No. 82-9.

[141] SF ¶ 157; *AAUP* Trial Transcript July 18 at 35, ECF No. 82-9.

[142] SF ¶ 158; AAUP Trial Transcript July 18 at 28, ECF No. 82-9.

[143] SF ¶ 159; *AAUP* Trial Transcript July 18 at 28, ECF No. 82-9.

[144] SF ¶ 160; *AAUP* Trial Transcript July 18 at 45, ECF No. 82-9.

find people removable based on protected speech."[145] Mr. Armstrong testified that no one has "ever told [him] to revoke the [v]isas on the basis of protected speech" or to "prepare the materials for the Secretary to make that finding."[146] AD Watson testified that the United States government does not "target individuals for removal from the U.S. based solely on participating in public protests."[147] AD Watson testified that, in more than 20 years at DHS, he had never "heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech."[148] AD Watson testified that he was not aware of "any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech."[149]

**7. Student Visa Revocations**

Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder).[150] Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities.[151] On March 6, 2025, HSI issued an ROA for Mr. Khalil. The ROA did not note criminal history, attached news articles and social media posts indicating that Mr. Khalil had been critical of Israel and participated in protests, and included a Canary Mission article.[152] On March 7, 2025, Mr. Watson signed a referral letter that provided a summary of action that "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" Mr. Khalil's "presence or activities consistent with" the Deportation Provisions.[153] Mr. Watson is the Assistant Director of the National Security Division within ICE.[154] Upon receipt of the relevant materials, Mr. Watson would send referral letters from DHS

---

[145] SF ¶ 161; *AAUP* Trial Transcript July 11 at 121, ECF No. 82-5.

[146] SF ¶ 162; *AAUP* Trial Transcript July 11 at 122, ECF No. 82-5.

[147] SF ¶ 163; *AAUP* Trial Transcript July 17 at 39, ECF No. 82-8.

[148] SF ¶ 164; *AAUP* Trial Transcript July 17 at 59, ECF No. 82-8.

[149] SF ¶ 165; *AAUP* Trial Transcript July 17 at 60, ECF No. 82-8.

[150] SF ¶ 166; VAC ¶ 41; Answer ¶ 41.

[151] SF ¶ 167; VAC ¶ 42; Answer ¶ 42.

[152] SF ¶ 168; *AAUP* Ex. 233, ECF No. 81-6 at 317–21.

[153] SF ¶ 169; *AAUP* Trial Transcript July 17 at 79, ECF No. 82-8; *AAUP* Ex. 242, ECF No. 81-6 at 370–71.

[154] SF ¶ 170; *AAUP* Trial Transcript July 17 at 26–27, ECF No. 82-8.

to the State Department in certain cases.[155] The referral letter said Mr. Khalil's "involvement in the March 6, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'"[156] The letter said that "HSI is concerned that the distribution of Hamas-authored flyers, leadership roles in antisemitic activities, and leadership in disruptive protests may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."[157]

On March 8, 2025, Mr. Armstrong authored an action memo concerning Mr. Khalil, recommending that Secretary Rubio render Mr. Khalil removable under the Deportation Provisions.[158] Mr. Armstrong's action memo cited only the DHS referral letter and the ROA in making his recommendation.[159] Mr. Armstrong concluded that Mr. Khalil's activities in the United States "have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because [his] participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world."[160] Mr. Armstrong wrote that "DHS has not identified any alternative grounds of removability that would be applicable to … Khalil, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity."[161] Mr. Armstrong wrote that he was "not aware of any prior exercises of the Secretary's removal authority" under the Deportation Provision and that Mr. Khalil was "likely to challenge [his] removal under this authority, and courts may scrutinize the basis for these determinations."[162]

On March 8, 2025, Secretary Rubio adopted Mr. Armstrong's recommendations.[163] Secretary Rubio wrote that the determination was "based on information provided by the DHS/ICE/HSI regarding the participation and role[] of … Khalil in antisemitic protests and disruptive activities, which fosters a hostile

[155] SF ¶ 171.

[156] SF ¶ 172; *AAUP* Ex. 242, ECF No. 81-6 at 370.

[157] SF ¶ 173; *AAUP* Ex. 242, ECF No. 81-6 at 370.

[158] SF ¶ 174; *AAUP* Ex. 247, ECF No. 81-6 at 385–89.

[159] SF ¶ 175; *AAUP* Ex. 247, ECF No. 81-6 at 385–89.

[160] SF ¶ 176; *AAUP* Ex. 247, ECF No. 81-6 at 387.

[161] SF ¶ 177; *AAUP* Ex. 247, ECF No. 81-6 at 387.

[162] SF ¶ 178; *AAUP* Ex. 247, ECF No. 81-6 at 387.

[163] SF ¶ 179; *AAUP* Ex. 8, ECF No. 81-1 at 33–34.

environment for Jewish students in the United States."[164] Secretary Rubio wrote, "[t]he public actions and continued presence of … Khalil in the United States undermine[s] U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States."[165]

Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail on March 10, 2025, and initiated proceedings to deport him from the United States.[166] Mr. Khalil's Notice to Appear stated that "[t]he Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States."[167] On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "[w]e will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[168] That same day, DHS posted on social media: "On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization."[169]

On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional "students and paid agitators" involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come."[170]

On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women and children." Ms. Leavitt said Mr. Khalil "distributed pro-Hamas propaganda, fliers with the logo of Hamas" on Columbia's campus. She said that "this administration is not going to tolerate individuals … studying in our country and then siding

---

[164] SF ¶ 180; *AAUP* Ex. 8, ECF No. 81-1 at 33–34.

[165] SF ¶ 181; *AAUP* Ex. 8, ECF No. 81-1 at 34.

[166] SF ¶ 182; Am. Compl. ¶ 43; Answer ¶ 43.

[167] SF ¶ 183; *AAUP* Ex. 9, ECF No. 81-1 at 36.

[168] SF ¶ 184; Ex. E, ECF No. 13 at 29.

[169] SF ¶ 185; *AAUP* Ex. 25, ECF No. 81-1 at 89.

[170] SF ¶ 186; Ex. F, ECF No. 13 at 31.

with pro-terrorist organizations."[171]

Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds.[172]

On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar said about Mr. Khalil: "This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it."[173] Mr. Edgar was asked, "[s]o what is the standard? Is any criticism of the Israeli government a deportable offense?" He answered, "[l]ike I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is."[174] Mr. Edgar was asked, "[i]s any criticism of the United States government a deportable offense?" He answered, "[l]ike I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point ...."[175]. Mr. Edgar was asked, "[i]s any criticism of the government a deportable offense?" He answered, "[l]et me put it this way, Michel, imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country."[176] Mr. Edgar was asked, "[i]s protesting a deportable offense?" He answered, "[y]ou're focused on protests. I'm focused on the visa process. He went through a legal process . . . ."[177]

The government has continued to pursue Mr. Khalil's removal. Proceedings have concluded at the Board of Immigration Appeals, and Mr. Khalil's counsel has filed an appeal with the Fifth Circuit.[178] In a related habeas corpus action, the Third Circuit has rendered a decision, and the potential next step is to petition the

[171] SF ¶ 187; *AAUP* Ex. 28, ECF No. 81-1 at 99–100.

[172] SF ¶ 188; Am. Compl. ¶ 49; Answer ¶ 49.

[173] SF ¶ 189; *AAUP* Ex. 29, ECF No. 81-1 at 117.

[174] SF ¶ 190; *AAUP* Ex. 29, ECF No. 81-1 at 118.

[175] SF ¶ 191; *AAUP* Ex. 29, ECF No. 81-1 at 118

[176] SF ¶ 192; *AAUP* Ex. 29, ECF No. 81-1 at 118–19.

[177] SF ¶ 193; *AAUP* Ex. 29, ECF No. 81-1 at 119.

[178] Immigration court filings are not public, but Mr. Khalil's counsel has publicized these details at https://www.aclu.org/press-releases/after-new-evidence-of-doj-misconduct-mahmoud-khalil-calls-on-board-of-immigration-appeals-to-terminate-case.

United States District Court
Northern District of California

Supreme Court for review.[179]

Rümeysa Öztürk is a PhD student at Tufts University in Medford, Massachusetts.[180] She is a citizen of Turkey and entered the United States on an F-1 student visa.[181] Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, The Tufts Daily, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies.[182]

On March 17, 2025, HSI issued an ROA concerning Ms. Öztürk.[183] The report located no criminal history or HSI investigations associated with Öztürk.[184] The report attached a February 6, 2025, Canary Mission post describing Ms. Öztürk as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement."[185] The report attached Ms. Öztürk's op-ed.[186] The report attached a news article from Boston.com showing the suspension of the group "Tufts Students for Justice in Palestine."[187] The report said the Boston.com article "ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada," but that "[a]nalysts were unable to locate images matching the exact reference to signs."[188] On March 21, 2025, Mr. Watson signed a referral letter concerning Ms. Öztürk.[189] Mr. Watson wrote "to provide a summary of the actions by Rumeysa Ozturk for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether . . . [her] . . . presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy

[179] SF ¶ 194; *See Khalil v. President*, 25-2357 (3rd Cir.).

[180] SF ¶ 195; *AAUP* Ex. 232, ECF No. 81-6 at 303.

[181] SF ¶ 196; *AAUP* Ex. 232, ECF No. 81-6 at 303.

[182] SF ¶ 197; Ex. G, ECF No. 13 at 33–34.

[183] SF ¶ 198; *AAUP* Ex. 232, ECF No. 81-6 at 303–15.

[184] SF ¶ 199; *AAUP* Ex. 232, ECF No. 81-6 at 303.

[185] SF ¶ 200; *AAUP* Ex. 232, ECF No. 81-6 at 305.

[186] SF ¶ 201; *AAUP* Ex. 232, ECF No. 81-6 at 311–312.

[187] SF ¶ 202; *AAUP* Ex. 232, ECF No. 81-6 at 313.

[188] SF ¶ 203; *AAUP* Ex. 232, ECF No. 81-6 at 313.

[189] SF ¶ 204; *AAUP* Ex. 245, ECF No. 81-6 at 379–80.

consequences consistent with" the Deportation Provision.[190] Mr. Watson identified Ms. Öztürk as a co-author of the op-ed and connected this to the Graduate Students for Palestine's joining Tufts SJP's call to reject Tufts' response to proposed resolutions by the Coalition for Palestinian Liberation at Tufts.[191] Mr. Watson does not claim a direct connection between Ms. Öztürk and the Tufts SJP.[192] Mr. Watson concluded that Ms. Öztürk's co-authoring of an op-ed in which the authors joined in voicing opposition to Tufts' investment in Israel with a different group that later was suspended for violent imagery and a call for intifada was "associations" that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."[193] Mr. Watson also provided information to determine whether Ms. Öztürk's visa should be revoked under the Revocation Provision.[194]

On March 21, 2025, Deputy Assistant Secretary Stuart Wilson determined enforcing the Revocation Provision against Ms. Öztürk was appropriate and recommended a "silent" revocation of her F-1 student visa.[195] Mr. Wilson's memo recounts that Ms. Öztürk "co-authored an op-ed in Tufts' student newspaper. In this article, the authors wrote, 'Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response' (to a student government resolution)."[196] Mr. Wilson quoted the referral letter, writing that Ms. Öztürk's "involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."[197] Mr. Wilson wrote, "[w]hile Öztürk has been involved with actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally."[198] Mr. Wilson wrote, "[w]hile the [Öztürk ROA] implies a connection between Öztürk and the now-

[190] SF ¶ 205; *AAUP* Ex. 245, ECF No. 81-6 at 379.

[191] SF ¶ 206; *AAUP* Ex. 245, ECF No. 81-6 at 379–80.

[192] SF ¶ 207; *AAUP* Ex. 245, ECF No. 81-6 at 379–80.

[193] SF ¶ 208; *AAUP* Ex. 245, ECF No. 81-6 at 379–80.

[194] SF ¶ 209; *AAUP* Ex. 245, ECF No. 81-6 at 380.

[195] SF ¶ 210; *AAUP* Ex. 250, ECF No. 81-6 at 403–06.

[196] SF ¶ 211; *AAUP* Ex. 250, ECF No. 81-6 at 404.

[197] SF ¶ 212; *AAUP* Ex. 250, ECF No. 81-6 at 404.

[198] SF ¶ 213; *AAUP* Ex. 250, ECF No. 81-6 at 404.

banned Tufts Student[s] for Justice in Palestine (TSJP), the report presents no evidence other than Öztürk's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TJSP. Nor has DHS/ICE/HSI shown any evidence that Öztürk was involved in any of the activities which resulted in TJSP being suspended from Tufts."[199] Mr. Wilson wrote, "[a]lthough information provided by DHS/HSI/ICE does not establish any potential ineligibility for Öztürk, you may in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances."[200]

Maureen Smith, senior adviser in the Bureau of Consular Affairs who reports to Mr. Armstrong, was asked whether "engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status—I'll state it differently —is grounds for revoking his visa status?" Ms. Smith answered, "I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest."[201]

On March 21, 2025, Mr. Armstrong approved the recommendation to revoke Ms. Öztürk's visa.[202] Mr. Armstrong said the "key things" in his decision to revoke Ms. Öztürk's visa were her "actions of protesting Tufts' relationship with Israel" and "activities and associations" of co-authoring an op-ed with the Tufts chapter of Students for Justice in Palestine.[203] A DHS spokesperson justified the revocation of Ms. Öztürk's visa by asserting Ms. Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists."[204]

On March 25, 2025, multiple federal officers arrested Ms. Öztürk outside her home in Somerville, Massachusetts. The officers detained her and transported her to a Louisiana immigration jail.[205] Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds.[206] The government continued to pursue Ms. Öztürk's

---

[199] SF ¶ 214; *AAUP* Ex. 250, ECF No. 81-6 at 404–05.

[200] SF ¶ 215; *AAUP* Ex. 250, ECF No. 81-6 at 406.

[201] SF ¶ 216; *AAUP* Trial Transcript July 11 at 8–10, 55, ECF No. 82-5.

[202] SF ¶ 217; *AAUP* Trial Transcript July 18 at 61–62, ECF No. 82-9.

[203] SF ¶ 218; *AAUP* Trial Transcript July 18 at 61–62, ECF No. 82-9.

[204] SF ¶ 219; Am. Compl. ¶ 54; Answer ¶ 54.

[205] SF ¶ 220; *AAUP* Ex. 225, ECF No. 81-6 at 271 (video filed manually).

[206] SF ¶ 221; Am. Compl. ¶ 55; Answer ¶ 55.

deportation until April 2026, when Ms. Öztürk decided to depart the United States for Turkey, after which the government and Ms. Öztürk filed a joint motion to terminate her removal proceedings. [Footnote 4 within the JF] Immigration court filings are not public, but Ms. Öztürk's counsel publicized these details at https://www.aclu.org/press-releases/after-earning-ph-d-rumeysa-ozturk-chooses-her-next-chapter.[207]

Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States.[208] As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests.[209]

On March 12, 2025, HSI issued an ROA for Mr. Mahdawi.[210] The report cited Mr. Mahdawi's pro-Palestinian social media posts and media appearances, including on 60 Minutes.[211] The report referred to media characterizations of discourse about his posts and media appearances as "pro-Hamas," "justifying October 7th Hamas attack on Israel," "calling for the destruction of Israel," "accusing Israel of genocide," and "speak[ing] about Jews in a derogatory way."[212]

On March 14, 2025, Mr. Watson signed a referral letter concerning Mr. Mahdawi.[213] Mr. Watson wrote "to provide a summary of the actions by Mohsen Mahdawi in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether" Mahdawi's "presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision.[214] Mr. Watson wrote that Mr. Mahdawi's "involvement in disruptive protests at Columbia University align with the executive orders' [sic] focus on deporting 'Hamas sympathizers.'"[215] The letter cites

[207] SF ¶ 222; Contained in SF ¶ 222 as fn 3.

[208] SF ¶ 223; Am. Compl. ¶ 56.

[209] SF ¶ 224; Am. Compl. ¶ 57; Answer ¶ 57.

[210] SF ¶ 225; *AAUP* Ex. 235, ECF No. 81-6 at 331–36.

[211] SF ¶ 226; *AAUP* Ex. 235, ECF No. 81-6 at 333–35.

[212] SF ¶ 227; *AAUP* Ex. 235, ECF No. 81-6 at 333–35.

[213] SF ¶ 228; *AAUP* Trial Transcript July 17 at 97, ECF No. 82-8; *AAUP* Ex. 244, ECF No. 81-6 at 376–77.

[214] SF ¶ 229; *AAUP* Ex. 244, ECF No. 81-6 at 376.

[215] SF ¶ 230; *AAUP* Ex. 244, ECF No. 81-6 at 376.

Mr. Mahdawi's "leadership and involvement in these disruptive protests."[216] The letter cites news media articles characterizing Mr. Mahdawi's advocacy as "calling for Israel's destruction and justifying Hamas terrorism in late 2023."[217] The letter cites Mr. Mahdawi's use of the slogan, "From the river to the sea, Palestine will be free."[218] The letter cites a poem attributed to Mr. Mahdawi that, in the government's view, "exemplified" Mr. Mahdawi's "glorification of terrorism."[219] The letter cites Mr. Mahdawi's co-presidency of DAR Palestinian, an undergraduate pro-Palestinian student group at Columbia University.[220] The letter cites Mr. Mahdawi's 2023 affiliation with "the pro-terror activist group Within Our Lifetime" and that he was "reportedly a member of Students for Justice in Palestine."[221] Mr. Watson concluded that "HSI is concerned that Mahdawi's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."[222]

On March 15, 2025, Mr. Armstrong authored an action memo for Secretary Rubio concerning Mr. Mahdawi.[223] Mr. Armstrong relayed information concerning Mr. Mahdawi's activities at a protest at Columbia and that "[o]pen-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force soldiers as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters."[224] Mr. Armstrong concluded that "[t]he activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States."[225] Mr. Armstrong highlighted that "DHS/ICE/HSI has not identified any

[216] SF ¶ 231; *AAUP* Ex. 244, ECF No. 81-6 at 376.

[217] SF ¶ 232; *AAUP* Ex. 244, ECF No. 81-6 at 376.

[218] SF ¶ 233; *AAUP* Ex. 244, ECF No. 81-6 at 376.

[219] SF ¶ 234; *AAUP* Ex. 244, ECF No. 81-6 at 376.

[220] SF ¶ 235; *AAUP* Ex. 244, ECF No. 81-6 at 377.

[221] SF ¶ 236; *AAUP* Ex. 244, ECF No. 81-6 at 377.

[222] SF ¶ 237; *AAUP* Ex. 244, ECF No. 81-6 at 377.

[223] SF ¶ 238; *AAUP* Ex. 248, ECF No. 81-6 at 391–95.

[224] SF ¶ 239; *AAUP* Ex. 248, ECF No. 81-6 at 392.

[225] SF ¶ 240; *AAUP* Ex. 248, ECF No. 81-6 at 392–93.

alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity."[226]

On March 15, 2025, Secretary Rubio issued a memo concerning Mr. Mahdawi, explaining that he has rendered Mr. Mahdawi deportable under the Deportation Provision.[227] Secretary Rubio wrote that this determination was "based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States."[228] Secretary Rubio further wrote that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict."[229]

On April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, DHS agents arrested him and placed him in ICE custody.[230] The Trump administration then began proceedings to deport Mr. Mahdawi from the United States.[231] DHS detained Mr. Mahdawi at the Northwest State Correctional Center in St. Albans, Vermont, until he was released on April 30, 2025.[232] The government continues to pursue Mr. Mahdawi's deportation, currently appealing an immigration judge's decision to terminate his removal proceeding. [Footnote 5 within the JF] Immigration court filings are not public, but Mr. Mahdawi's counsel issued a press release stating that "the government has asked the Board of Immigration Appeals to resume deportation proceedings" and that "Mr. Mahdawi's legal team has filed a cross-appeal asking the Board of Immigration Appeals to terminate the case with prejudice to prevent the government from

---

[226] SF ¶ 241; *AAUP* Ex. 248, ECF No. 81-6 at 393.

[227] SF ¶ 242; *AAUP* Ex. 12, ECF No. 81-1 at 45–46.

[228] SF ¶ 243*; AAUP* Ex. 12, ECF No. 81-1 at 45–46.

[229] SF ¶ 244; *AAUP* Ex. 12, ECF No. 81-1 at 46.

[230] SF ¶ 245; Am. Compl. ¶ 58; Answer ¶ 58.

[231] SF ¶ 246; *AAUP* Trial Transcript July 15 at 27–31, ECF No. 82-7.

[232] SF ¶ 247; Answer ¶ 60.

refiling the case."[233]

On March 10, 2025, HSI issued an ROA for Bader Khan Suri.[234] The report stated that, "[a]ccording to open-source reporting, [Mr. Khan Suri] actively spreads Hamas propaganda and promotes antisemitism on social media."[235] The report noted that Mr. Khan Suri had "[n]o associated criminal history or HSI investigation."[236] The report also included social media posts, concluding that Mr. Khan Suri "appears to post pro-Palestine content" on social media.[237]

On March 14, 2025, Mr. Watson signed a referral letter concerning Mr. Khan Suri.[238] Mr. Watson wrote the letter "to provide a summary of the actions by Badar Khan Suri in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" the Deportation Provision.[239] Mr. Watson identified Khan Suri "as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads [its] propaganda and promotes antisemitism on social media."[240]

On March 15, 2025, Mr. Armstrong authored an action memo concerning Mr. Khan Suri.[241] Mr. Armstrong quoted the referral letter, writing that Mr. Khan Suri was "'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.'"[242] Mr. Armstrong noted that "we have not independently uncovered additional open source information regarding Suri's involvement in antisemitic conduct or

---

[233] SF ¶ 248; Press Release, Am. C.L. Union, Government Seeks to Resume Immigration Proceedings Against Mohsen Mahdawi (March 16, 2026, at 11:10 AM) (https://perma.cc/J5T7-R8K5).

[234] SF ¶ 249; *AAUP* Ex. 234, ECF No. 81-6 at 323–29.

[235] SF ¶ 250; *AAUP* Ex. 234, ECF No. 81-6 at 323.

[236] SF ¶ 251; *AAUP* Ex. 234, ECF No. 81-6 at 323.

[237] SF ¶ 252; *AAUP* Ex. 234, ECF No. 81-6 at 323.

[238] SF ¶ 253; *AAUP* Trial Transcript July 17 at 99, ECF No. 82-8; *AAUP* Ex. 246, ECF No. 81-6 at 382–83.

[239] SF ¶ 254; *AAUP* Ex. 246, ECF No. 81-6 at 382.

[240] SF ¶ 255; *AAUP* Ex. 246, ECF No. 81-6 at 382.

[241] SF ¶ 256; *AAUP* Ex. 249, ECF No. 81-6 at 397–401.

[242] SF ¶ 257; *AAUP* Ex. 249, ECF No. 81-6 at 398.



United States District Court
Northern District of California

intimidation of Jewish students."[243] Mr. Armstrong wrote, "DHS/ICE/HSI has not provided [Consular Affairs] with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his relationship with Ahmed Yousef."[244] Mr. Armstrong also wrote, "[g]iven the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination."[245]

On March 15, 2025, Secretary Rubio issued a memo concerning Mr. Khan Suri, explaining that he has rendered Mr. Khan Suri deportable under the Deportation Provision.[246] Secretary Rubio wrote that this determination was "based on the assessment and conclusion provided by DHS/ICE/[HSI], to which we defer as DHS/ICE is the principal investigative unit of DHS, that … 'Suri's direct connection to Hamas leadership and involvement in antisemitic activities ... [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization. In addition, DHS/ICE/HSI also assess that Suri is 'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.' The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States."[247] Secretary Rubio also wrote that "the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict."[248]

On March 17, 2025, DHS officials arrested Mr. Khan Suri.[249] On March 19, 2025, Ms. McLaughlin posted: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social

[243] SF ¶ 258; *AAUP* Ex. 249, ECF No. 81-6 at 398.

[244] SF ¶ 259; *AAUP* Ex. 249, ECF No. 81-6 at 399.

[245] SF ¶ 260; *AAUP* Ex. 249, ECF No. 81-6 at 400.

[246] SF ¶ 261; *AAUP* Ex. 21, ECF No. 81-1 at 74–75.

[247] SF ¶ 262; *AAUP* Ex. 21, ECF No. 81-1 at 74–75.

[248] SF ¶ 263; *AAUP* Ex. 21, ECF No. 81-1 at 75.

[249] SF ¶ 264; *AAUP* Trial Transcript July 15 at 116, ECF No. 82-8; *AAUP* Ex. 22, ECF No. 81-1 at 77–79.

> media."[250] A federal district court ordered Mr. Khan Suri released, and the government is currently appealing that decision.[251]
>
> On October 26, 2025, ICE arrested Sami Hamdi, a British political commentator who was on a speaking tour in the United States.[252] Mr. Hamdi often supports Palestine.[253] That same day, Ms. McLaughlin quoted a post about Mr. Hamdi's arrest and said: "Thanks to the work of @Sec_Noem and @SecRubio and the men and women of law enforcement, this individual's visa was revoked and he is in ICE custody pending removal. Under President Trump, those who support terrorism and undermine American national security will not be allowed to work or visit this country. It's commonsense."[254] That same day, the State Department quoted Ms. McLaughlin's post and said: "We've said it before, we'll say it again: The United States has no obligation to host foreigners who support terrorism and actively undermine the safety of Americans. We continue to revoke the visas of persons engaged in such activity. Thank you to our partners at @DHSgov for their efforts to remove this individual."[255]
>
> On November 5, 2025, DHS posted on X: "The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again."[256] After over two weeks in immigration detention, Mr. Hamdi agreed to voluntarily leave the United States.[257]

---

[250] SF ¶ 265; *AAUP* Ex. 34, ECF No. 81-1 at 162.

[251] SF ¶ 266; *Suri v. Trump*, No. 25-cv-480, 2025 WL 1392143 (E.D. Va. May 14, 2025), *appeal docketed*, No. 25-1560 (4th Cir. argued Mar. 17, 2026).

[252] SF ¶ 267; Am. Compl. ¶ 76; Answer ¶ 76.

[253] SF ¶ 268; Christian Edwards, *Why Has ICE Detained British Commentator Sami Hamdi on His US Speaking Tour*, CNN (Oct. 27, 2025), https://perma.cc/K8V5-Y68Y.

[254] SF ¶ 269; Tricia McLaughlin (@TriciaOhio), X (Oct. 26, 2025, at 2:28 PM), https://perma.cc/ZKQ8-Q8RY.

[255] SF ¶ 270; Department of State (@StateDept), X (Oct. 26, 2025, at 5:46 PM), https://perma.cc/WMP6-XMK7.

[256] SF ¶ 271; Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS.

[257] SF ¶ 272; Rebecca Santana, *British Muslim Commentator Sami Hamdi Agrees to Leave US After Immigration Detention*, AP News (Nov. 11, 2025, at 3:34 PM), https://perma.cc/Q6SE-

Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions.[258] Stanford Daily disseminates its content to readers through its website, social media accounts, email digests, and print editions.[259] Stanford Daily publishes content on its website, stanforddaily.com. It also publishes content on X, Instagram, Facebook, YouTube, TikTok, and Spotify. In the past, Stanford Daily published content on LinkedIn, but it does not currently use that platform.[260]

Stanford Daily also disseminates its content through two types of email digests. First, it disseminates a Daily Digest that comes out every morning of the school week, providing headlines, descriptions, and links to articles in each of its print sections to offer a general overview of what is happening in the Stanford community. And second, Stanford Daily occasionally disseminates a Breaking News email when an article is deemed by its editorial staff to be sufficiently urgent and important to include in its own email to its subscribers after a story breaks.[261] Stanford Daily also disseminates its content by printing *The Stanford Daily*. The newspaper is printed once a week over the academic school year aside from breaks and finals weeks. It is distributed every Friday with content from the past week of publication.[262]

Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast. *The Stanford Daily*'s content includes news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle" game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year.[263]

---

6DPQ.

[258] SF ¶ 273; VAC ¶ 83.

[259] SF ¶ 274; VAC ¶ 100; Answer ¶ 100.

[260] SF ¶ 275; VAC ¶ 101; Answer ¶ 101.

[261] SF ¶ 276; VAC ¶ 102.

[262] SF ¶ 277; VAC ¶ 103.

[263] SF ¶ 278; VAC ¶ 104.

In line with Stanford Daily's mission and core business activities, The Stanford Daily has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.[264] Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.[265] To support its mission, Stanford Daily covers matters related to foreign affairs, Israel, and Palestine, such as covering student groups like Students for Justice in Palestine, Law Students for Justice in Palestine, and Stanford Israel Association; student events such as the "All Eyes on Gaza" vigil and the "Rally for Hostages" event, both on October 7, 2025; Israel's detention and deportation of a Stanford alumna who attempted to sail toward Gaza on the Global Sumud Flotilla; Stanford pro-Palestinian protesters being indicted on felony charges; a Stanford chemist suing Stanford University for antisemitism and anti-Israel discrimination; and similar issues.[266]

Stanford Daily also provides an outlet for people to publish opinions. Some of this content relates to American foreign affairs, Israel, and Palestine, such as opinion pieces about standing in solidarity with the Palestinian cause, opposing Hamas's actions on October 7, the prosecution of Stanford pro-Palestinian protestors, hunger strikes in support of Palestine, and inviting more pro-Palestinian speakers to campus.[267] To support its mission, Stanford Daily has covered this news and provided this outlet for opinions before Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. It has continued to cover news related to foreign affairs, Israel, and Palestine since Israel and Hamas entered a ceasefire and hostage-exchange agreement on October 9, 2025, and it expects to continue covering news and publishing opinions related to foreign affairs, Israel, and Palestine.[268]

The government's actions have specifically impacted Stanford Daily by causing lawfully present noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down, and ask for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions.[269] Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri for deportation in March 2025, Stanford

[264] SF ¶ 279; VAC ¶ 105.

[265] SF ¶ 280; VAC ¶ 106.

[266] SF ¶ 281; VAC ¶ 107.

[267] SF ¶ 282; VAC ¶ 108.

[268] SF ¶ 283; VAC ¶ 109.

[269] SF ¶ 284; VAC ¶¶ 112–23.

Daily has received numerous requests from noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech.[270]

Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri for deportation in March 2025, international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine.[271] Since the Trump administration began taking immigration enforcement actions against certain alien students like Mahmoud Khalil and Badar Khan Suri for deportation in March 2025, Stanford Daily has received other requests from current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles.[272]

The government's actions have specifically impacted Stanford Daily by decreasing the quantity and diversity of opinion pieces *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. Before the government's actions related to the Revocation and Deportation Provisions, Stanford Daily published opinion pieces by noncitizen contributors. But since the government began enforcing the Provisions, Stanford Daily has experienced substantially reduced participation from noncitizen contributors.[273]

The government's actions have specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is able to publish. Before the government's related to the Revocation and Deportation Provisions, Stanford Daily writers could incorporate a wide variety of sources and quotes into their news articles, including perspectives from international students. But now, noncitizen students no longer want to speak with Stanford Daily as sources or contribute opinion pieces.[274] Legally present noncitizen Stanford Daily members who have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity have continued to take those actions since this case was filed.[275]

Stanford Daily is composed of United States citizens and noncitizens, some of whom are lawfully present in the United States

---

[270] SF ¶ 285; VAC ¶ 124.

[271] SF ¶ 286; VAC ¶ 125.

[272] SF ¶ 287; VAC ¶ 127.

[273] SF ¶ 288; VAC ¶ 130.

[274] SF ¶ 289; VAC ¶ 131.

[275] SF ¶ 290; VAC ¶ 133.

pursuant to lawful admission on nonimmigrants visas, such as the F-1 student visa.[276] The government's statements about and enforcement of the Deportation and Revocation Provisions have caused Stanford Daily's members and contributors to self-censor.[277]

As part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation.[278] For a famous example, after the chief of the Palo Alto Police Department James Zurcher raided The Stanford Daily's offices in 1971, Stanford Daily sued to protect its members and defend press freedom. *See Zurcher v. Stanford Daily*, 436 U.S. 547 (1978).[279] And for a recent example, in 2024, Stanford Daily advocated against its reporter's arrest, highlighting the "violation of his First Amendment and Fourth Amendment rights" and the "threat to the freedom of the press."[280] Even before filing this suit, Stanford Daily had started advocating against the government's use of the Revocation and Deportation Provisions based on protected speech, noting in April 2025 that "student speech, from our own reporters and those we're reporting on, is startlingly chilled" by the government's threats and past enforcement actions.[281]

Stanford Daily is a voluntary membership organization.[282] Everyone who wants to join Stanford Daily is guaranteed a spot.[283] Stanford Daily has over 150 identifiable members.[284] Stanford Daily's members voluntarily joined the organization to support its mission.[285]

Stanford Daily's members receive updates about the status of this case from Stanford Daily's leadership. Stanford Daily's members elect seven directors who sit on Stanford Daily's nine-member board. The board represents the interests of Stanford

---

[276] SF ¶ 291; VAC ¶ 94.

[277] SF ¶ 292; VAC ¶¶ 112–13.

[278] SF ¶ 293; VAC ¶ 85.

[279] SF ¶ 294; VAC ¶ 86.

[280] SF ¶ 295; VAC ¶ 87.

[281] SF ¶ 296; VAC ¶ 88.

[282] SF ¶ 297; VAC ¶ 89; Answer ¶ 89.

[283] SF ¶ 298; VAC ¶ 90.

[284] SF ¶ 299; VAC ¶ 91.

[285] SF ¶ 300; VAC ¶ 92.

Daily's members and has input on the direction of this case.[286] Stanford Daily's members include United States citizens and noncitizens. Some of Stanford Daily's members are noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa. Other noncitizen members are lawfully present in the United States pursuant to their status as lawful permanent residents on immigrant visas.[287]

Stanford Daily's members are either editorial members or business members.[288] To be considered an editorial member, one must have worked for Stanford Daily for at least two calendar months in the current or most recent fall, winter, or spring academic quarter and demonstrated continued interest and commitment through meeting attendance and/or contributions to Stanford Daily's operations.[289] To be considered a business member, one must have worked for Stanford Daily at least two months prior to the date of the approval of the membership list and have worked for an average of five or more hours per week since beginning work at Stanford Daily.[290]

Stanford Daily's content is produced by Stanford Daily members and contributors.[291] Any individual who submits and has content of any type published in *The Stanford Daily* is a contributor. Contributors need not be Stanford Daily members nor Stanford affiliates. Although contributors to *The Stanford Daily* are associated with Stanford Daily, contributors are not necessarily Stanford Daily members.[292]

Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions referenced in this lawsuit.[293]

The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The

[286] SF ¶ 301; VAC ¶ 93.

[287] SF ¶ 302; VAC ¶ 94.

[288] SF ¶ 303; VAC ¶ 95; Answer ¶ 95.

[289] SF ¶ 304; VAC ¶ 96.

[290] SF ¶ 305; VAC ¶ 97.

[291] SF ¶ 306; VAC ¶ 98.

[292] SF ¶ 307; VAC ¶ 99.

[293] SF ¶ 308; VAC ¶ 110.

United States District Court
Northern District of California

Secretary of State serves at the pleasure of the President.[294] The Department of Homeland Security oversees Immigration and Customs Enforcement (ICE), ICE's Enforcement and Removal Operations branch (ERO), ERO's Department of Homeland Security Investigations (HSI), and HSI's Office of Intelligence.[295] HSI's Office of Intelligence supports investigations by producing research and analysis, which it compiles into Reports of Analysis (ROAs).[296]

The current administration has used a process for enforcing the Revocation Provision in which HSI's OI issues an ROA to HSI's National Security Division. The Division determines whether the ROA is appropriate and, if it is, sends a DHS referral letter to the Department of State. A State official reviews the letter and makes a recommendation to a Bureau of Consular Affairs official. If the recommendation is approved, the Department of State revokes the visa and informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status.[297]

The current administration has used a process for enforcing the Deportation Provisions in which HSI's OI issues an ROA to HSI's National Security Division. The Division determines whether the ROA is appropriate and, if it is, sends a DHS referral letter to the Department of State. A State official reviews the letter and then makes a recommendation to the Secretary of State, who then makes a determination. If the Secretary of State makes the personal determination to remove the noncitizen, he informs the Secretary of Homeland Security, ICE, and HSI of the change in the noncitizen's status.[298]

But for what a lawfully present noncitizen considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, a lawfully present noncitizen member who quit Stanford Daily would rejoin the organization and continue being a member of Stanford Daily.[299] But for what a lawfully present noncitizen on Stanford Daily's staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would publish an article about a vigil that brought together Jewish and Palestinian families to honor those who died in the

---

[294] SF ¶ 309; Am. Compl. ¶ 37; Answer ¶ 37.

[295] SF ¶ 310; *AAUP* Trial Transcript July 9 at 42–43, 54–56, ECF No. 82-3.

[296] SF ¶ 311; *AAUP* Trial Transcript July 9 at 56, ECF No. 82-3.

[297] SF ¶ 312; *AAUP* Trial Transcript July 9 at 100, ECF No. 83-2; *AAUP* Trial Transcript July 18 at 54–55, 65, ECF No. 83-9; *AAUP* Trial Transcript July 11 at 91–92, ECF No. 83-5.

[298] SF ¶ 313; *AAUP* Trial Transcript July 9 at 100, ECF No. 83-2; *AAUP* Trial Transcript July 18 at 45, 50, ECF No. 83-9; *AAUP* Trial Transcript July 11 at 91–92, ECF No. 83-5.

[299] SF ¶ 314; VAC ¶ 115.

conflict in Gaza.[300] But for what a lawfully present noncitizen on Stanford Daily's editorial staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would republish the article they had taken down and would edit stories involving Israel and Palestine.[301] But for what a lawfully present noncitizen on Stanford Daily's staff considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provisiofn, the staff writer would not have asked Stanford Daily to remove all her articles from Stanford Daily's website, including those about Israeli and Palestinian officials, as well other foreign affairs topics.[302] But for what a lawfully present noncitizen on Stanford Daily's editorial board considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the student would not have asked to remove an article about the Israeli Defense Forces they worked on.[303]

But for what students consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily.[304] But for what Stanford Daily writers consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper.[305] But for what Stanford Daily contributors consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily.[306]

But for what Jane Doe considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression.[307]

---

[300] SF ¶ 315; VAC ¶¶ 116–17.

[301] SF ¶ 316; VAC ¶ 119.

[302] SF ¶ 317; VAC ¶¶ 120–21.

[303] SF ¶ 318; VAC ¶¶ 122–23.

[304] SF ¶ 319; VAC ¶ 126.

[305] SF ¶ 320; VAC ¶ 128.

[306] SF ¶ 321; VAC ¶ 129.

[307] SF ¶ 322; VAC ¶ 149.

## CONCLUSIONS OF LAW

The Court begins its analysis with an overview of the relevant immigration provisions and then turns to the issue of standing. Finally, the Court evaluates each of Plaintiffs' eight causes of action in turn, starting with the four Deportation Provision claims and concluding with the four Revocation Provision claims.

### I. IMMIGRATION PROVISIONS FRAMEWORK

"Congress passed the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., ("INA") in 1952 [and] delegated to the Secretary of State significant authority to exclude or classify as deportable non-citizens from the United States, and to revoke visas." *AAUP*, 802 F. Supp. 3d at 132.[308] The INA sections relevant to this case are 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision")[309] and § 1201(i) (the "Revocation Provision"), which authorize the government to revoke student visas and deport visa holders.[310]

Under the Revocation Provision, the Secretary of State has broad, discretionary power to revoke visas:

> **After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.** Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added).[311] After revoking a visa, the government may place the noncitizen into removal proceedings. 8 U.S.C. § 1227(a)(1)(B).

---

[308] *See* SF ¶ 13.

[309] The Deportation Provision is also referred to as INA 237(a)(4)(C), including by the witnesses in the *AAUP* trial transcripts.

[310] *See* SF ¶¶ 84–85.

[311] Unlike the Deportation Provision, the Revocation Provision, 8 U.S.C. § 1201(i), does not contain an exception for revocation of visas based on "beliefs, statements, or associations" that "would be lawful within the United States." *Compare id.* § 1201(i) *with id.* § 1182(a)(3)(C)(iii).

Under the Deportation Provision, if the "Secretary of State has reasonable ground to believe" that a noncitizen's "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States," the noncitizen "is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). But there is both an exception and a further exception to the Secretary's authority: "*an alien . . . shall not be [deportable]*[312] . . . because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States *unless* the Secretary of State *personally determines* that the alien's [presence][313] would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added).[314] It is the language that begins with the word "unless"—the exception to the exception—that is at the heart of several claims in this case.

While the Secretary of State has the discretion to revoke visas and render noncitizens deportable, the Secretary of Homeland Security has the practical role of carrying out that authority. The Department of Homeland Security ("DHS") and its sub-agency U.S. Immigration Customs and Enforcement ("ICE") have "authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending."[315]

### A. Prior Enforcement

From the time the Deportation Provision (8 U.S.C. § 1227(a)(4)(C)(i)) was enacted in

---

[312] 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable." Section 1227(a)(4)(C)(ii) makes this exception "apply to deportability . . . in the same manner as they apply to inadmissibility." 8 U.S.C. § 1227(a)(4)(C)(ii).

[313] The Court replaces "admission" here, and wherever relevant, with "presence" to indicate that the government is evaluating deportability for noncitizens who are already present in the United States. As noted above, 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable," and 8 U.S.C. § 1227(a)(4)(C)(ii) incorporates this exception into the criteria for when a noncitizen already present in the United States is deportable.

[314] In *AAUP*, the court stated that these "exceptions place profound – but narrow . . . deportability classification power solely with the Secretary of State." 802 F. Supp. 3d at 133.

[315] VAC ¶ 20.

1990, until March 2025, there have been only a handful of examples of its enforcement. *See* Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (1990).[316] During the *AAUP* bench trial, plaintiffs' counsel questioned SBO Armstrong about prior usage of the Revocation Provision, and SBO Armstrong "clarified that he believed INA 237(a)(4)(C) 'was used at other times' and 'was used at some time earlier as a matter of fact in this century,' but could not recall when." *AAUP*, 802 F. Supp. 3d at 144 (quoting Trial Tr. vol. I, 49: 4–5, 16–19, Jul 18, 2025). The *AAUP* court noted that "[i]n *Khalil* [*v. Trump*], the [District of New Jersey] court requested INA 237(a)(4)(C) enforcement information from, among others, the same defendants here, and was provided only **four** instances of the Secretary of State's exercising this extraordinary authority before 2025: twice in 1995, once in 1997, and once in 1999 – none of which concerned domestic speech." *Id.* at 144, n. 20 (citing 784 F.Supp.3d 705, 745–51) (emphasis in original).[317]

These four examples of past enforcement do not stem from the government invoking the Deportation Provision on the basis of a noncitizen's protected speech. For example, in *In Re Mohammad J.A. Khalifa*, the State Department issued a certification of revocation of Mr. Khalifa's visa and charged him with deportability on the grounds that he "lack[ed] of a valid entry visa and for being in the United States in violation of law" and because he "had provided financial support for bombing attacks at cinemas in Jordan." 21 I. & N. Dec. 107, 108–09 (BIA 1995).[318]

---

[316] *AAUP* did not discuss the enforcement history of the Revocation Provision, nor did the parties discuss it in their briefing.

[317] In this case, the government has not identified any additional examples of enforcement.

[318] The other three enforcement examples concern similar conduct that far exceeds a noncitizen engaging in protected speech. In 1995, Secretary of State Christopher issued a certification of deportability for a Haitian leader of an "illegitimate paramilitary organization whose members were responsible for numerous rights violations in Haiti." Letter from Warren Christopher, Sec'y of State, to Janet Reno, Att'y Gen. (Mar. 29, 1995), U.S. Dep't of State, https://perma.cc/24DS-V4DR (accessed on May 28, 2025) (retrieved through the Digest of United States Practice in International Law 1991-1999). In 1997, Secretary of State Albright issued a certification letter for Mousa Mohammed Abu Marzook, who was "a top official of Hamas, [and] ha[d] been declared a 'Specially Designated Terrorist' under the authority of [a Presidential] executive order by virtue of his actions on behalf of Hamas," as well as after "two U.S. courts found probable cause that he was criminally responsible for ten specific, grave incidents of terrorism." Letter from Madeleine Albright, Sec'y of State, to Janet Reno, Att'y Gen. (Apr. 4, 1997) (quoting *Marzook v. Christopher*, 1996 WL 583378 (S.D.N.Y. Oct. 10, 1996)), https://perma.cc/Q87M-UD99 (retrieved through the Digest of United States Practice in International Law 1991-1999) (accessed

As the *AAUP* court noted, until 2025, no administration had openly revoked visas and deported noncitizens for solely exercising their First Amendment rights, even if the plain language of the Deportation Provision authorizes that application.

## II. STANDING

Under the "case or controversy" requirement of Article III to the United States Constitution, a federal court has subject matter jurisdiction over a claim only if the plaintiff has standing to bring the claim. *Chandler v. State Farm Mutual Automobile Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). To demonstrate standing, a plaintiff must show three things: (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* at 431–32. "First Amendment cases raise 'unique standing considerations,' that 'tilt[] dramatically toward a finding of standing.'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (internal citations omitted).

In the context of a pre-enforcement challenge, the injury-in-fact "is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). The "injury-in-fact requirement" "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The Supreme Court has held that "a plaintiff satisfies the injury-in-fact requirement where he alleges [1] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Put differently, for a First Amendment pre-

on May 28, 2025). Finally, in 1999, Secretary of State Christopher determined that Mario Ruiz-Massieu was deportable after finding that Mr. Massieu faced "charges of money laundering, criminal unjust enrichment, embezzlement, obstruction of justice, accessory after the fact, intimidation, and torture in Mexico," and the Mexico "Government ha[d] tried unsuccessfully four times to extradite" him. *Matter of Ruiz-Massieu*, 22 I. & N. Dec. 833 (BIA 1999). The Court in *Matter of Ruiz-Massieu* confirmed that, at the time, the only other published opinion regarding the Deportation Provision was in *In Re Mohammad J.A. Khalifa*, and the only time a federal court had dealt with these issues was in the same case, *Massieu*, heard in the District of New Jersey before being remanded to the BIA. *Matter of Ruiz-Massieu*, 22 I. & N. Dec. at 838.

enforcement challenge, "a plaintiff must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Mahmoud v. Taylor*, 606 U.S. 522, 560 (2025) (quoting *Susan B. Anthony List*, 573 U.S. at 158). A "plaintiff who wishes to challenge the constitutionality of a law" is not required "to confess that he will in fact violate that law." *Susan B. Anthony List*, 573 U.S. at 163. Instead, where a plaintiff demonstrates that they have "an actual and well-founded fear that the law will be enforced against [them]," "[s]elf-censorship qualifies as injury-in-fact." *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 835 (9th Cir. 2026).

This Court denied the government's motion to dismiss Plaintiffs' case for lack of standing, finding that at the pleading stage Plaintiffs sufficiently alleged facts demonstrating individual standing for Jane Doe, and organizational and associational standing for Stanford Daily. ECF No. 75. The government has renewed its standing challenge, correctly noting that Plaintiffs must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Since the Court denied the government's motion to dismiss for lack of standing, Plaintiffs' arguments and evidentiary basis in support of standing have only improved. This is because Plaintiffs' allegations are now before the Court as stipulated facts, as agreed in the Parties' Undisputed Facts filed June 26, 2026. ECF No. 101.

The parties concur it is Plaintiffs' burden to demonstrate that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Mahmoud*, 606 U.S. at 560 (internal quotes omitted). They dispute whether Plaintiffs have met that burden here. The government contends Plaintiffs have not shown a substantial risk that it will target them for immigration enforcement using the Revocation and Deportation Provisions.[319] Plaintiffs point to the record and vehemently disagree.

The Parties' Undisputed Facts are replete with examples of the government enforcing the

[319] In its supplemental brief, the government challenges Stanford Daily's standing exclusively on the grounds that "as with the individual Doe Plaintiffs, Stanford Daily has not shown on the record in this case that the threat of any such enforcement is substantial or imminent." ECF No. 102 at 7.

Revocation and Deportation provisions against noncitizens who have publicly expressed—through their speech, writings, or participation in protests—disagreement with Israel or support for Palestine; this includes denouncing Israel's actions in Gaza, criticizing the United States' policies related to Israel and the ongoing war, or expressing concern for Palestinian people generally, and their suffering in Gaza.[320] For example, the government invoked the Deportation and Revocation Provisions against Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi[321] because they participated in pro-Palestinian protests, engaged in pro-Palestinian associations, and repeatedly criticized Israel, in their speech and publications, including its military operations in Gaza.[322] More specifically, and as an example, before invoking the Revocation Provision against Ms. Öztürk, the government compiled a report that included her op-ed related to on-campus debates about the genocide in Gaza,[323] and notes about her participation in the group "Tufts Students for Justice in Palestine."[324] Based on this report, the government "determined enforcing the Revocation Provision against Ms. Öztürk was appropriate and recommended a 'silent' revocation

[320] The District of Massachusetts in *AAUP* likewise found that there were numerous examples of enforcement.

[321] Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi's arrests and detentions are detailed in the stipulated facts. *See* SF ¶¶ 161–248.

[322] *See* SF ¶¶ 167–89, 195–215, 217–222, 223–246 (*e.g.*, as to Khalil: "Deputy Homeland Security Secretary Troy Edgar said about Mr. Khalil: 'This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it.'"; as to Öztürk: "On March 21, 2025, [SBO] Armstrong approved the recommendation to revoke Ms. Öztürk's visa. . . . [He] said the 'key things' in his decision to revoke Ms. Öztürk's visa were her 'actions of protesting Tufts' relationship with Israel' and 'activities and associations' of co- authoring an op-ed with the Tufts chapter of Students for Justice in Palestine;" as to Mahdawi: "[SBO] Armstrong concluded that '[t]he activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States. . . . DHS/ICE/HSI has not identified any alternative grounds of removability applicable to Mahdawi."); VAC ¶¶ 42, 140–166; *AAUP* Ex. 232, ECF No. 81-6 at 305.

[323] SF ¶ 198; *AAUP* Ex. 232, ECF No. 81-6 at 303–15.

[324] SF ¶ 202; *AAUP* Ex. 232, ECF No. 81-6 at 313.

of her F-1 student visa."[325]

The government has made clear its intentions to revoke visas and deport visa holders. For example, on April 8, 2025, Secretary Rubio said, "[T]hat's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa. And we're revoking those visas, and they have to leave."[326] A few weeks later, on May 20, 2025, Secretary Rubio testified before the Senate foreign relations committee. When asked about visa revocations, Secretary Rubio stated: "There are more coming. We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas. It's as simple as that. I want to do more. I hope we can find more of these people."[327] This sentiment has been echoed and expanded on by White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller, who posted on X (formerly, Twitter) on July 29, 2025, that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for America or its people"—not just noncitizens who criticize Israel.[328]

At the bench trial hearing, the government expanded on this last point arguing that while Plaintiffs contend that the government should not rely on any speech protected by the First Amendment when enforcing the Revocation and Deportation Provisions, "the First Amendment analysis is quite a bit more case specific than that . . . . The content of the [noncitizen's] speech would matter." Bench Trial Tr. at 81-82. The government stated that "even if" the noncitizen's speech was "not strictly incitement" of violence, that speech might still not be protected from enforcement. *Id.* The government then provided an example of protected speech that the government might use against a noncitizen as a basis for its enforcement of the Revocation and

[325] SF ¶ 210; *AAUP* Ex. 250, ECF No. 81-6 at 403–06.

[326] SF ¶ 116; *AAUP* Ex. 37, ECF No. 81-2 at 44.

[327] SF ¶ 122; Am. Compl. ¶ 64; Answer ¶ 64.

[328] SF ¶ 124; Ex. O, ECF No. 14 at 38.

Deportation Provisions: "Weighing in on a peace deal that's being negotiated abroad [] might be something that implicates very important United States' foreign policy interests[.]" *Id.* Plaintiffs' counsel responded that "the government is arguing that if Standford Daily publishes a non-citizen[']s editorial criticizing the proposed peace deal with Iran right now, that that is a compelling foreign policy interest, and the Secretary of State can render them deportable." *Id.* at 90. The government did not offer a denial. Plaintiffs argued that even that colloquy at trial "is part of the chilling effect" on protected speech, stating:

> But even if the administration goes after a select few, whether it is for espousing views that are sympathetic to Palestine or expressing that they do not have grief over the death of Charlie Kirk, or whether they are opposed to peace negotiations between the United States and Iran.
>
> I guess, you don't know until somebody else gets prosecuted, and then when they get prosecuted, you realize, now I'm not permitted to talk about those things, but then you have to wait to wait to see what else it is okay for you to say.

*Id.* at 137. In response the government stated, "I don't think the Fifth Amendment requires anything more definite in these contexts." *Id.*

One of the sources the government has relied on to gather information about the content of noncitizen's speech and has used to identify noncitizens to investigate is the Canary Mission website, an anonymously and privately run website that publishes personal information of individuals and organizations that the Canary Mission personally deems "anti-Israel."[329] DHS asked ICE to generate "reports" for the State Department on individuals listed on the Canary Mission website to aid in the government's decision-making about visa revocations and possible subsequent deportations.[330] These "reports" form the basis of DHS's recommendation to

[329] SF ¶¶ 63–66; *see also AAUP*, 802 F. Supp. 3d at 139.

[330] SF ¶¶ 67–68 ("[T]he State Department can use the [report] and the information [DHS] collect[s] in whatever way they need to . . . . I think Visa revocations is one way they use it. But it may not be the only way."); *AAUP*, 802 F. Supp. 3d at 139 ("the National Security Division of Homeland Security Investigations would compile the information and provide it to the State Department; and [] the State Department would decide on what action to take, if any.").

United States District Court
Northern District of California

Secretary Rubio "so he may then make the statutorily required personal determination as to whether the non-citizen ought be removed."[331] This was confirmed during the *AAUP* bench trial when AD Hatch, the most senior official at the Office of Intelligence (operating under HSI), testified that DHS leadership told him to review the names of student protestors on the Canary Mission website.[332] Within about a week, a "Tiger Team" was assembled to expedite the review of approximately 5,000 names on the website.[333, 334] AD Hatch acknowledged that at least 75 percent of the ICE reports regarding student protestors were generated from the names included on the Canary Mission website.[335] Prior to the government's immigration enforcement actions against them, Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi all had profiles published about them on the Canary Mission website.[336]

Here, just as in *AAUP*, the government does not disavow its intention to detain, deport, or revoke student visas in response to speech that "would inarguably be constitutionally protected" if uttered by a citizen. *AAUP*, 802 F. Supp. 3d at 181. Plaintiffs are rightfully concerned that their speech and behavior was substantially like the speech and behavior of noncitizens like Khalil, Öztürk, and Mahdawi who the government arrested, detained, and sought to deport.

Jane Doe has demonstrated that her past behavior falls into the crosshairs of the

---

[331] *AAUP*, 802 F. Supp. 3d at 134

[332] *Id.* at 139; SF ¶ 313.

[333] *AAUP*, 802 F. Supp. 3d at 139; SF ¶ 139–40.

[334] The level of import the government attributed to names listed on the Canary Mission Website can be inferred from the magnitude of the resources the government dedicated to investigating everyone on the list. As described in *AAUP*, "[d]ue to the workload, the requirement to review all 5,000 individuals on the Canary Mission Website, the assembly of the Tiger Team required analysts be taken off of the 'Counterintelligence Unit, the Counterterrorism Intelligence Unit, from the Cyber Intelligence Unit, from the Global Trade Intelligence Unit, from all different parts of HSI intelligence.'" *AAUP*, 802 F. Supp. 3d at 139. "[T]he Tiger Team was needed because 'the normal unit or section or group of analysts . . . operating in [the] normal organizational construct couldn't handle that workload." *Id.* at 139 n. 16.

[335] SF ¶ 66; *see also AAUP*, 802 F. Supp. 3d at 140 ("Canary Mission's list made up the bulk of the sources for HSI's investigations.").

[336] SF ¶ 68; *AAUP*, 802 F. Supp. 3d at 142 (Khalil), 157 (Öztürk).

United States District Court
Northern District of California

government's stated enforcement priorities. And, accordingly, Jane Doe has shown that the "threatened injury" of the Deportation and Revocation Provisions being invoked against her is "certainly impending, or there is a substantial risk that the harm will occur.'" *Mahmoud*, 606 U.S. at 560. Jane Doe's behavior is similar to that of Khalil, Öztürk, and Mahdawi. At her university, Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine.[337] She published pro-Palestine/anti-Israel commentary online, including accusing Israel of committing "genocide" and perpetuating "apartheid," using the slogan, "from the river to the sea, Palestine will be free," and she has publicly criticized the United States' relationship with Israel.[338] Jane Doe was listed on the Canary Mission website.[339] Now, "[b]ecause of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government."[340, 341] She has stopped: attending pro-Palestinian protests and holding up the Palestinian flag; wearing a keffiyeh to show her support for Palestine; engaging in direct-action organizing; maintaining her main social media account and posting pro-Palestinian content on her other social media accounts.[342] "But for what Jane Doe considers to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account

---

[337] SF ¶ 61.

[338] SF ¶¶ 24–26.

[339] SF ¶ 62.

[340] VAC ¶ 154; SF ¶¶ 44, 74, 82.

[341] As discussed further in Section III.C., "protected speech" in this context means speech that is legally protected under the Frist Amendment. *See, infra*, § III.C.

[342] SF ¶¶ 45–50.

United States District Court
Northern District of California

containing her past expression."[343] Jane Doe has established that she has "an actual and well-founded fear that" the Deportation and Revocation Provisions will be enforced against her, and that she self-censored as a result. *Imperial Sovereign*, 170 F.4th at 835. She has accordingly established an injury-in-fact.

The government retreated from its prior challenge to Stanford Daily's organizational or associational standing and did not argue as much in its proposed order. *See* ECF No. 102. Instead, the government offers only a sentence to challenge Stanford Daily's standing, stating: "Stanford Daily has not shown on the record in this case that the threat of any such enforcement is substantial or imminent." ECF No. 102 at 7.

As with Jane Doe, Stanford Daily's members demonstrated that their expression falls within the categories that the government has investigated and pursued. Noncitizen students attended events in a reporting capacity, interviewed sources, and wrote articles that questioned or criticized Israel's actions in relation to Palestinians and the war in Gaza.[344] Stanford Daily has recounted myriad examples of its noncitizen members who engaged in such expression and, since the government began taking immigration enforcement actions against similarly situated F-1 visa holders, have: "quit Stanford Daily," "taken down" or asked Stanford Daily to remove their articles, and decided against publishing articles in the first place, on topics including "a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza[,] . . . [and articles] about Israeli and Palestinian officials, as well other foreign affairs topics."[345]

Through these examples of government enforcement, coupled with the government's many statements about how it will revoke visas and deport noncitizens who express opinions unacceptable to the government regarding Israel and Palestine, Stanford Daily has established that there is a substantial risk that its members too face visa revocation and deportation. Stanford Daily, on behalf of its members, has adequately demonstrated facts to support that its members

---

[343] SF ¶ 322; VAC ¶ 149.

[344] SF ¶¶ 282–84.

[345] SF ¶¶ 314–21.

have "an actual and well-founded fear that" the Deportation and Revocation Provisions will be enforced against them, and that members refrained from expressive activity based on their reasonable fear that the government may disapprove of their speech as to Israel and Palestine, much like the government's disapproval of the speech of Khalil, Öztürk, and Mahdawi. *Imperial Sovereign*, 170 F.4th at 835. But for "threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, . . . the current and former writers [of Stanford Daily] would not seek to have their pieces, quotes, or identities removed from the newspaper."[346] Further, "[b]ut for what Stanford Daily contributors consider to be threats of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Stanford Daily noncitizen contributors would resume contributing articles" about Israel, Palestine, and foreign affairs generally to Stanford Daily.[347]

The government argues that because Plaintiffs have not "suffered any actual enforcement action under the statutes," Plaintiffs do not have standing. ECF No. 102 at 6. The government is wrong. It is not necessary for the government to arrest and detain Plaintiffs, revoke their visas, or deport them, for Plaintiffs to have standing to bring this action. *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) (to demonstrate injury-in-fact for pre-enforcement First Amendment claims, as here, plaintiffs need only show that they have "refrained from engaging in expressive activity for fear of prosecution under the challenged statute . . . based on 'an actual and well-founded fear' that the challenged statute will be enforced."). In the First Amendment context, the Supreme Court has dispensed with rigid standing requirements, recognizing that where "the alleged danger of [a] statute is, in large measure, one of self-censorship," the harm for standing purposes "can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, *certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988).

Indeed, there is a logical fallacy in the government's argument on this point. On May 14,

---

[346] *Id.*

[347] SF ¶ 321; VAC ¶ 129.

2024, then-former President Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[348] Behave has a clear meaning in this context—it means stop protesting. On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[349] According to White House Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller, since then "[t]he State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more."[350] Now the government contends, as though unrelated to its 2025 full-court press to chill noncitizens' speech critical of Israel's role in the Gaza War, that the government has taken far fewer enforcement actions under the Revocation and Deportation Provisions over the last year, "and even less for any individuals engaging in the type of speech about which Plaintiffs claim to have an interest." ECF No. 102 at 6. The government concludes that "'without proof of an ongoing pressure campaign, it is entirely speculative' that Plaintiffs will be targeted for enforcement in the future, and their claim for standing fails." *Id.*

But the government's syllogism fails because it is built on a false premise. The government claims that its ostensible lack "of an ongoing pressure campaign" against noncitizen students who speak and protest against Israel or on behalf of Palestinians in Gaza means that there is little risk that the government will target those students for immigration enforcement actions in the future. But what student protests against Israel or in support of Palestine has the government ignored in recent months? What protected speech critical of events in Gaza has the government tolerated by noncitizen student reporters? The record is void of these facts because college campuses have been void of this speech. The government has offered a chilling message regarding protected speech—speak out against Israel or in support of Palestinians and we will

---

[348] SF ¶ 99.

[349] SF ¶ 184.

[350] SF ¶ 133.

revoke your visa and deport you. Behave. Noncitizen students heard the warning and heeded. And, as the idiom goes, the silence is deafening.

Plaintiffs have shown that they face a substantial risk of enforcement of the Deportation and Revocation Provisions. Plaintiffs have standing to bring this action.

## III. SCOPE OF PLAINTIFFS' CHALLENGE

Plaintiffs ask the Court to find portions of the Deportation Provision and the Revocation Provision unconstitutional. Plaintiffs bring eight claims against the government: four claims each arising from the Deportation Provision and Revocation Provision respectively, seeking declaratory and injunctive relief under the First and Fifth Amendments.

Plaintiffs specifically challenge the portion of the Deportation Provision, as applied to protected speech, that provides that noncitizens shall not be deportable,[351] "**unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest**" (hereinafter, "Challenged Portion of the Deportation Provision"). 8 U.S.C. §§ 1182(a)(3)(C)(iii) (emphasis added); *see* VAC ¶¶ 198, 233.

For the Revocation Provision, Plaintiffs specifically challenge the portion, as applied to protected speech, that states: "**After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation**" (hereinafter, "Challenged Portion of the Revocation Provision"). 8 U.S.C. § 1201(i) (emphasis added); *see* VAC ¶¶ 247, 269.

Plaintiffs ask this Court to find the Challenged Portions of the Revocation and Deportation Provisions unconstitutional only to the extent the government enforces those Challenged Portions against noncitizens for their "protected speech."[352] As they did in *AAUP*, the parties repeatedly

---

[351] Plaintiffs do not challenge 8 U.S.C. §§ 1182(a)(3)(C)(iii) as it relates to excludability, and the Court does not reach that issue.

[352] The court in *AAUP* also uses the phrase "protected speech" sometimes interchangeably with "legally protected speech," both referencing speech protected by the First Amendment. *AAUP* at *41 ("This Court rules that the Plaintiffs have shown by clear and convincing evidence that Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech."). Other courts sometimes refer to this as "protected expression," *see Speech First, Inc. v. Cartwright*, 32 F. 4th

use the phrase "protected speech," in this case as shorthand for speech that is legally protected under the First Amendment of the Constitution.[353]

Litigants typically either challenge all applications of a law – a "facial" challenge; or they challenge a law solely based on how the government has enforced it against the plaintiffs' specific speech – an "as-applied" challenge. Here, Plaintiffs assert a "hybrid" challenge, meaning they challenge "a discrete subset of a statute's applications." ECF No. 103 at 14. The government argues that Plaintiffs cannot frame their claims in this manner; instead, they contend Plaintiffs must choose between a facial or an as-applied challenge.

Plaintiffs are correct. In *John Doe No. 1 v. Reed*, the Supreme Court confirmed that a First Amendment suit may challenge a particular subset of a statute's applications. 561 U.S. 186 (2010). In that case, supporters of a ballot referendum sued to enjoin the Washington Secretary of

---

1120 (11th Cir. 2022), or "protected political expression" as well as "protected political speech." For noncitizens, protected speech excludes expression in the form of campaign donations, because such speech is "intimately related to the process of democratic self-government." *See Bernal v. Fainter*, 467 U.S. 216, 220 (1984); *see also, infra*, n. 354 (exploring the carve-out as explained by then-Judge Kavanaugh in *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011); this limitation is not at issue in this case).

[353] Notwithstanding the parties repeated us of the phrase in this case, including within the stipulated facts, the government takes issue with Plaintiffs' use of "protected speech" as the demarcation line for their hybrid challenge to the Provisions, calling it "an undefined and amorphous category." ECF No. 84 at 6. The Court disagrees with that characterization and finds the government's argument on this point unsound. Under the First Amendment, "speech is protected unless it falls within a narrow exception to First Amendment protection." *Matsumoto v. Labrador*, 122 F.4th 787, 811 (9th Cir. 2024). "'From 1791 to the present,' the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas.'" *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Those "historic and traditional categories . . . long familiar to the bar" include obscenity, child pornography, defamation, fraud, incitement, fighting words, and speech integral to criminal activity. *Stevens*, 559 U.S. at 468, 471. The government bears the burden of demonstrating speech falls within an unprotected category. *United States v. Alvarez*, 617 F.3d 1198, 1205 (9th Cir. 2010) ("[W]e presumptively protect *all* speech . . . , leaving it to the government to demonstrate . . . a compelling need to remove some speech from protection. . . ."), *aff'd,* 567 U.S. 709 (2012) (emphasis in original).

Several federal national security statutes demark "protected speech" as the line where a statute's reach ends. For example, under the federal statute authorizing pen registers and trap and trace devices "for any investigation to obtain foreign intelligence information," investigation may not be "conducted solely upon the basis of activities protected by the first amendment to the Constitution." 50 U.S.C. § 1842; *see also* 15 U.S.C. § 1681u(a); 50 U.S.C. § 1805(a)(2)(A), § 1824(a)(2)(A). The same standard of using "protected speech" as the demarcation for the Revocation and Deportation Provisions is workable here.

State from using the state's Public Records Act ("PRA") to reveal the identities of people who signed the petition to place the issue on the ballot. *Id.* at 193. The complaint asserted the PRA was "unconstitutional as applied to referendum petitions." *Id.* The parties disagreed about whether the claim raised a facial or an as-applied challenge. *Id.* at 194. As the Supreme Court explained in allowing the challenge to proceed, the claim:

> obviously has characteristics of both: [it] is "as-applied" in the sense that it does not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions. [It] is "facial" in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions.

*Id.* Labeling the type of challenge is "not what matters." *Id.* Rather, "[t]he important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Id.* The plaintiffs therefore had had to meet the "standards for a facial challenge to the extent of that reach." *Id.* That meant the plaintiffs in *Doe v. Reed* had to meet the standards for a facial challenge to the PRA not as to all its applications, but as to all its applications against *referendum petitions*. *Id.*; *see also Veritas Action Fund v. Rollins*, 982 F.3d 813, 826 (1st Cir. 2020) (applying *Doe v. Reed* to permit plaintiffs' hybrid challenge to Massachusetts' two-party recording statute, *i.e.*, to challenge the statute "facially . . . but only insofar as it applies to bar the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces."); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 907–08 (10th Cir. 2016) (applying *Doe v. Reed* to allow federal government to maintain a hybrid challenge against New Mexico ethics rule via a "purely legal" challenge but applied only to "federal prosecutors licensed in New Mexico.").

Here, Plaintiffs ask the Court to evaluate the Challenged Portions' application to protected speech, under both the First and Fifth Amendments. Plaintiffs seek relief "beyond the[ir] particular circumstances." *Doe v. Reed*, 561 U.S. at 193. Accordingly, Plaintiffs must meet the "standards for a facial challenge to the extent of that reach," namely the extent of the Challenged Portions of the Revocation and Deportation Provisions' application to protected speech. *Id.*

## IV. RIGHTS OF NONCITIZENS

The First Amendment acknowledges no "distinction between citizens and resident aliens."

*Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted). The right to freedom of speech, and its correlative protection from government retribution based on hostility towards speech, has generally been accorded to noncitizens living in the United States. *Am.-Arab Anti-Discrimination Comm. v. Reno* ("*AADC*"), 70 F.3d 1045, 1064 (9th Cir. 1995); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded [to noncitizens] residing in this country."). In *AADC*, the Ninth Circuit held the First Amendment prohibits deporting aliens for protected speech. 70 F.3d at 1064. As the court explained, "The Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection. 'As [aliens] owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage.'" *AADC*, 70 F.3d at 1065 (quoting JAMES MADISON, REPORT ON THE VIRGINIA RESOLUTIONS, *reprinted in* 4 DEBATES ON THE FEDERAL CONSTITUTION 546, 556 (Jonathan Elliot ed., 1907)). Therefore, "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Id.* at 1064. After all, "[i]f aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities." *Id.* at 1065–66.

The government argues that noncitizens present in the United States have "reduced" First Amendment protection that "varies" based on an "ascending scale." ECF No. 84 at 13, 15.[354] The

[354] The government also relies on authority holding that noncitizens are subject to one unique speech abridgment: restrictions on financial contributions to federal election campaigns. The government chiefly points to then-Judge Kavanaugh's opinion in *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011). But *Bluman* did not hold that noncitizens have reduced First Amendment rights. Instead, it upheld the contribution restriction under a line of authority allowing the government "to bar [noncitizens] from voting, serving as jurors, working as police or probation officers, or working as public school teachers" because the activities are integral to "democratic self-government." *Id.* at 287 (collecting cases). The court reasoned that direct campaign expenditures "constitute part of the process of democratic self-government." *Id.* at 288. Critically, *Bluman* explicitly cited *Wixon* as mandating that "resident aliens [are] protected by the First Amendment in the context of deportation." *Id.* at 286 (citing *Wixon*, 326 U.S. at 148). And the court explicitly cautioned that "speaking on issues of general public interest is a quite different context from participation in a political campaign for election." *Id.* at 290 (internal alterations and quotation marks omitted) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788 n.26 (1978)).

government fails to cite any case applying their purported "ascending scale" doctrine to lawfully present noncitizens' First Amendment rights. The Ninth Circuit, considering similar arguments, held it is an "uncontested proposition" that student visa holders in the United States can assert claims under the First Amendment. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994 (9th Cir. 2012) (further holding that the plaintiff, a Stanford student, whose student visa was revoked while traveling outside the United States, could assert First Amendment claims). Indeed, the government does not explain what First Amendment protections it believes are accorded noncitizens – it only states that whatever "reduced" First Amendment rights "nonimmigrant visa-holders" may have are insufficient for purposes of challenging the Revocation and Deportation Provisions.[355] ECF No. 84 at 15.

Some of the government's proffered authority involves exclusion or admissibility of noncitizens (*i.e.*, refusal to permit entry) rather than removal of lawfully present noncitizens. *See, e.g.*, ECF No. 84 at 17 (citing *Dep't of State v. Muñoz*, 602 U.S. 899 (2024); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). But the Supreme Court has explained that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

"The Supreme Court has consistently distinguished between aliens in the United States and those seeking to enter from outside the country, and has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens." *AADC*, 70 F.3d at 1063–64 (citing *Kwong Hai Chew*, 344 U.S. at 596 n.4); *see also*

[355] The government's proffered authority does not support its position that lawfully present noncitizens have reduced First Amendment protections. *Demore v. Kim*, 538 U.S. 510, 522–23 (2003), addressed a due process challenge to detention pending removal, and *United States v. Verdugo-Urquidez*, 494 U.S. 259, 262, 269 (1990), held the Fourth Amendment did not apply to the search of homes in Mexico belonging to a noncitizen who resided in Mexico. The government's remaining authority generally differentiates the rights of *resident* noncitizens from noncitizens residing outside of United States. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (rejecting "extraterritorial application" of due process protections to enemy aliens captured in China and detained in Germany); *Verdugo-Urquidez*, 494 U.S. at 269. This case does not concern questions of admissibility or rights of noncitizens who are outside of the United States. None of the government's cases support the proposition that visa-holders have second-class First Amendment protections compared to other lawfully present noncitizens such that the government could for example revoke a visa, but not deport a green card holder, for voicing the same opinion.

*id.* at 1065 ("[W]e decline to extend *Kleindienst* to apply to the deportation context."). And the very authority the government relies upon confirms that "resident aliens [are] protected by the First Amendment in the context of deportation." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 286 (D.D.C. 2011) (Kavanaugh, J.) (citing *Wixon*, 326 U.S. at 148). Plaintiffs' claims here do not concern questions of admissibility or exclusion, so the government's references to legal authority that addresses admissibility or exclusion instead of visa revocation or deportation, are not relevant.

As to the Fifth Amendment's prohibition against vague laws, it equally protects citizens and noncitizens, including in the immigration context. In *Sessions*, the Supreme Court held that because deportation is a "grave" and "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions v. Dimaya*, 584 U.S. 148, 156–57 (2018) (plurality op.) (applying heightened vagueness test to invalidate an INA provision).

Finding that as relevant to this case, noncitizens are afforded First and Fifth Amendment rights to the same extent as citizens, the Court turns to the merits of Plaintiffs' challenge to the Deportation and Revocation Provisions as applied to protected speech.

## V. DEPORTATION PROVISION

Plaintiffs argue that the Challenged Portion of the Deportation Provision is unconstitutional on First and Fifth Amendment grounds.

As explained above, the Deportation Provision is comprised of two statutes: 8 U.S.C. §§ 1227(a)(4)(C)(i) and 1182(a)(3)(C)(iii). The complete text of the Deportation Provision as relevant reads as follows:

> An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable. [8 U.S.C. § 1227(a)(4)(C)(i).]
>
> An alien . . . shall not be [deportable][356] or subject to restrictions or

[356] 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable." Section

> conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest. [8 U.S.C. § 1182(a)(3)(C)(iii).]

It is this final exception within the Deportation Provision that Plaintiffs challenge: "unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." *Id.*

**A. Declaratory Relief**

Among their Deportation Provision causes of action, Plaintiffs bring two claims for declaratory relief, one claim under the First Amendment (First Claim), and one under the Fifth Amendment (Third Claim). Following the analysis on declaratory relief, the Court addresses Plaintiffs' claims for injunctive relief for the Deportation Provision claims (Second and Fourth Claims).

**1. First Amendment (First Claim)**

Plaintiffs ask this Court to evaluate whether, as to enforcement based on protected speech, the Challenged Portion of the Deportation Provision is unconstitutional under the First Amendment as an unlawful viewpoint- or content-based speech restriction. As a threshold issue, the Court must resolve what standard of review is applicable to Plaintiff's First Amendment viewpoint- and content-based discrimination challenge.

The government conceded during the bench trial, and did not challenge in its briefs, that the Challenged Portion of the Deportation Provision is inherently viewpoint- and content-based. *See* Bench Trial Tr. at 41:6–16. As applied here, the Challenged Portion of the Deportation Provision regulates the content of Plaintiffs' speech by prescribing what they can express. The Challenged Portion of the Deportation Provision renders noncitizens deportable because of their lawful "beliefs, statements, or associations" if "the Secretary of State *personally determines* that the alien's [presence] would compromise a compelling United States foreign policy interest." 8

---

1227(a)(4)(C)(ii) makes this exception "apply to deportability . . . in the same manner as they apply to inadmissibility." 8 U.S.C. § 1227(a)(4)(C)(ii).

United States District Court
Northern District of California

U.S.C. § 1182(a)(3)(C)(iii) (emphasis added). In essence, the Challenged Portion of the Deportation Provision forbids Plaintiffs from expressing lawful "beliefs, statements, or associations" that do not comport with what the Secretary of State "personally determines" is acceptable. *Id.* When a noncitizen's protected speech is the but-for factor in a visa revocation and subsequent deportation determination, the government is singling out that speech for disfavored treatment based on its viewpoint or content.

Plaintiffs allege that the Challenged Portion of the Deportation Provision is unconstitutional as applied to enforcement against protected speech. Therefore, as in *Doe v. Reed*, Plaintiffs must meet the "standards for a facial challenge to the extent of that reach." 561 U.S. at 194. The parties disagree about what those standards are. Plaintiffs argue that, because they contest the Challenged Portion of the Deportation Provision as viewpoint- and content-based, the Court should apply strict scrutiny analysis. The government contends instead that the Supreme Court's 2024 holding in *Moody v. NetChoice, LLC* controls. 603 U.S. 707 (2024). According to the government, *Moody* found that the standard for all First Amendment facial challenges "is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." 603 U.S. at 723; ECF No. 84 at 7. The government asserts that, rather than proceeding to a strict scrutiny analysis, the Court must first "assess the [challenged] laws' scope" and then "measure the constitutional against the unconstitutional applications." *Id.* at 7–8 (quoting *Moody*, 603 at 724).

Plaintiffs are correct. Strict scrutiny analysis is the proper standard here. The government mistakes the *Moody* analysis as applicable, when in actuality *Moody* outlines the test courts "apply when analyzing a First Amendment facial *overbreadth* claim." *Imperial Sovereign*, 170 F.4th at 844 (emphasis added). But as Plaintiffs' Verified Amended Complaint reflects, and as Plaintiffs' counsel confirmed during the bench trial, Plaintiffs do not bring an overbreadth challenge in this action. *See* VAC; Bench Trial Tr. at 62:17–21, ECF No. 100. The Ninth Circuit held in *Imperial Sovereign*, in early 2026, that *Moody* "did not displace the longstanding and myriad precedents setting forth the tiered scrutiny analysis we apply to a facial claim challenging a law on the ground that it is an unconstitutional content-based restriction on speech." *Imperial Sovereign*, 170 F.4th

at 845. "It is also well established that if a plaintiff shows that a statute is content based and the government fails to show that the restriction satisfies strict scrutiny, the plaintiff prevails on their facial challenge." *Id.* at 844–45 (collecting Supreme Court precedent).

The government's reliance on *NetChoice v. Bonta*, 170 F.4th 744 (2026), decided a day before *Imperial Sovereign*, does not change this analysis. *See* ECF No. 90 at 8. *NetChoice* is inapplicable here. In *NetChoice*, plaintiff brought a facial challenge to a statute with a "full range" of speech and non-speech applications, *e.g.*, applications to "ride sharing services, electronic ticketing services, and financial transaction services." 170 F.4th at 758. The Ninth Circuit held that NetChoice "may not 'treat the law as having certain heartland applications, and mostly confine the battle to that terrain.'" *Id.* at 758 (quoting *Moody*, 603 U.S. at 724). Rather, if its "prime concern is the [law's] effect on social media companies or publishers, it could have brought an as-applied challenge on behalf of [them]." *Id.* at 759–60. Here, by contrast, Plaintiffs' hybrid challenge comprising a facial challenge to the Challenged Portion of the Deportation Provision as-applied to their enforcement against *any* protected speech means the Court need not review the Deportation Provision's non-speech applications. In other words, this case is akin to *Imperial Sovereign*, not *NetChoice*, because Plaintiffs assert that *all* protected speech-based enforcement of the Challenged Portion of the Deportation Provision is viewpoint and content discrimination and therefore that enforcement is unconstitutional in *all* applications to protected speech. VAC at 34–36.

Moreover, in line with *Imperial Sovereign*, the Supreme Court itself has rejected the argument that the overbreadth test applies to facial viewpoint discrimination claims. *See Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019). It explained then that it "has never applied that kind of analysis to a viewpoint-discriminatory law." *Id.* The government invites this Court to take it upon itself to conclude that the Supreme Court in *Moody* overruled its own precedent from five years earlier in *Iancu* and that it did so without so much as a word to that effect. This Court declines that invitation. It is not this Court's prerogative to find that *Moody*, which did not even mention

*Iancu*, implicitly overruled it.[357] *See Mallory v. Norfolk So. Ry. Co.*, 600 U.S. 122, 136 (2023) (holding the Pennsylvania Supreme Court "clearly erred" by disregarding prior United States Supreme Court precedent based on the belief it had been "implicitly overruled"; "If a precedent of this Court has direct application in a case . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (internal quotation omitted)).

The Court turns to the appropriate tiered scrutiny analysis. The Supreme Court "has long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" *Chiles*, 607 U.S. at ___, 146 S. Ct. at 1021 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). As the Supreme Court affirmed in March 2026, content-based restrictions generally warrant strict scrutiny, "a demanding standard that requires the government to prove its restriction on speech is 'narrowly tailored to serve compelling state interests.'" *Id.* Under a strict scrutiny analysis, it is "'rare that a regulation . . . will ever be permissible.'" *Id.* (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011)).[358] To withstand strict scrutiny, the government must show that the viewpoint- and content-based restriction on speech, "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799. The government "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution. That is a demanding standard." *Id.* (internal citations omitted).

Plaintiffs have met their "initial burden of making a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Imperial Sovereign*,

---

[357] Moreover, even if *Moody* does apply, it does not change the analysis. Because, as explained below, all the applications of the challenged statutes are either unconstitutionally viewpoint or content based as applied to protected speech, there are no constitutional applications within the scope of Plaintiffs' challenge to balance against these unconstitutional applications.

[358] The government does not argue in the alternative that the Challenged Portion of the Deportation Provision invokes any recognized exception to the strict scrutiny analysis for content-based restrictions; the government argues exclusively that the Court should review the Challenged Portions under *Moody*'s overbreadth test.

170 F.4th at 842 (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled in part on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)). The burden now "shifts to the government to justify the restriction." *Id.*; *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 n.4 (9th Cir. 2000) ("In general, where a plaintiff claims suppression of speech under the First Amendment, the plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question. The burden then shifts to the defendant governmental entity to prove that the restriction in question is constitutional." (internal citations omitted)).

The Court notes that the government relied almost exclusively on the *Moody* overbreadth test in its briefing and proposed order. *See* Bench Trial Tr. at 85:16–86:7 (colloquy between the Court and government's counsel regarding where, if at all, the government briefed the issue of narrow tailoring); *see also, generally*, ECF Nos. 33, 84, 90, 102 (the government's cross-motion for summary judgment, supplemental pre-trial bench brief, response to Plaintiffs' supplemental pre-trial bench brief, and proposed order, respectively). To the extent the government offers even in passing a nod to any part of the strict scrutiny analysis, it is within the incorrect context of an overbreadth analysis and *Moody*. For example, in its proposed order the government writes, "[t]he Court cannot conclude, as Plaintiffs would have it, that this statute is unconstitutional in all of its applications. When sufficiently compelling foreign-policy interests are at stake, as personally confirmed by the Secretary of State, the First Amendment does not prohibit the Government from initiating removal proceedings based on the otherwise-lawful beliefs, statements, or associations of foreign nationals in this country." ECF No. 102 at 8. The government repeats that sentiment at the end of its argument on overbreadth stating, "[g]iven that the Government can, in sufficiently compelling circumstances, consider the content of an individual's speech as a basis for enforcement action, *see id.*, the Court cannot say that the statutes at issue here are unconstitutional in every application (or even a 'substantial' number of applications) in which they may be used." *Id.* at 9. Conclusively using the phrase "compelling foreign-policy interests" or "sufficiently compelling circumstances" is not a proxy for proving the government's purported compelling interest in abridging the freedom of speech under the First Amendment.

It is irrefutable that the government has significant authority on matters of foreign policy and affairs as well as national security. Yet even in those arenas, the government's authority is constrained by First Amendment rights. The Supreme Court has explained that, "[f]aced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal." *E.g.*, *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). On several occasions, the Supreme Court has invalidated foreign-affairs laws on First Amendment grounds. In *Boos v. Barry*, the Court struck down regulations barring demonstrations critical of foreign governments within 500 feet of a foreign embassy. 485 U.S. 312 (1988). In *Lamont v. Postmaster General*, it invalidated a federal law that limited the First Amendment right to receive foreign Communist literature. 381 U.S. 301 (1965). In *Robel* itself, the Court struck down a national defense statute on First Amendment grounds, explaining that "[i]t would indeed be ironic, if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile." 389 U.S. at 264.

The government's asserted interests in "countering support for terrorist groups and addressing antisemitism" do not add additional weight to its position. ECF No. 33 at 26. The government's reliance on *Holder v. Humanitarian Law Project*, which concerned a statute that prohibited the provision of material support to foreign terrorist organizations, is misplaced, and in fact provides further support for protecting speech such as Plaintiffs'. *See* 561 U.S. 1 (2010). Notably, in *Holder* the Supreme Court applied strict scrutiny, a standard the government rejects in this case. Further, in *Holder*, the Supreme Court made clear that even *philosophical* support for terrorist organizations constitutes protected speech. *Id.* at 25–26. The Supreme Court distinguished between the protected advocacy of "speak[ing] and writ[ing] freely" in support of terrorist organizations and the unlawful "material support" for terrorism. *Id.* The Supreme Court carved a sliver of an exception for the material support statute, finding that the statute did not violate the First Amendment because it is "carefully drawn to cover only a narrow category of speech," specifically speech that is "to, under the direction of, or in coordination with foreign

groups that the speaker knows to be terrorist organizations." *Id.* at 26. This reasoning drew upon the overlap between conduct and speech related to conduct. *Id.* at 26–27. The Supreme Court clarified that the statute does not cover "pure political speech," and plaintiffs "may speak and write freely" and "may advocate" on issues relevant to the organizations; the narrow limitation that survived strict scrutiny in *Holder* was that when it came to the government's compelling national security interest, the First Amendment does not protect material support for terrorist organizations. *Id*. at 25–27; *see also United States v. Stevens*, 559 U.S. 460, 468 (2010) (the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

Here, the Challenged Portion of the Deportation Provision does not fall within a similar exception to First Amendment protections, nor has the government suggested as much. *Holder* affirms that "pure political speech," even in the context of foreign policy interests, is squarely covered by First Amendment protections. *See* 561 U.S. at 25–26. Our Constitutional right to freedom of speech guarantees people the right to express—through their words, actions, or assembly—opinions that may be repugnant, views that run counter to prevailing political norms, or beliefs that that otherwise challenge the country's domestic or foreign policy, military engagement, or war. *See, e.g.*, *Tinker v. Des Moines Independent Community School Dist*., 393 U.S. 503, 513 (1969) (finding the First Amendment protected students who wore black armbands at school to protest the Vietnam war stating, "[u]nder our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots."). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Turning to the issue of whether the Challenged Portion of the Deportation Provision is narrowly tailored, the government asserts "Congress could not have drafted a narrower law." ECF No. 90 at 14. But the Challenged Portion of the Deportation Provision is not "carefully drawn to

cover only a narrow category of speech." *Id.* Indeed, Congress did not tailor the Challenged Portion to "cover only a narrow category of speech" at all; Congress only limited the Challenged Portion of the Deportation Provision by who may make determinations or enforce the statute. Thus, the Challenged Portion of the Deportation Provision is an intentionally broad delegation providing the Secretary of State leeway to suppress opinions that he deems harmful to foreign policy. The Secretary of State has wide latitude to enforce the provision with no limiting principles on how enforcement priorities are determined. The Challenged Portion of the Deportation Provision provides unlimited (and, in the government's view, unreviewable) discretion to the Secretary of State to decide which "beliefs, statements, or associations" endanger foreign policy. 8 U.S.C. § 1182(a)(3)(C)(iii). This cannot be squared with First Amendment protections.

The Challenged Portion of the Deportation Provision likewise is not the least restrictive means of achieving the government's interests. "If a less restrictive alternative would serve the Government's purpose," it "must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The INA itself contains less-restrictive, speech-neutral bases serving the government's proffered foreign policy interests. The INA provides the government authority to remove, for example, individuals who have or are likely to engage in "terrorist activity." 8 U.S.C. §§ 1227(a)(4)(B), 1182(a)(3)(B). It similarly authorizes removal of individuals who have engaged in criminal activity that "endangers" "national security." *Id.* § 1227(a)(4)(A)(ii). Likewise for noncitizens who have violated laws relating to "espionage or sabotage." *Id.* § 1227(a)(4)(A)(i). Additionally, the INA still permits the government to remove noncitizens whose presence in the United States the Secretary of State has "reasonable ground to believe" would "have potentially serious adverse foreign policy consequences for the United States," *as long as such removal is not based on their protected speech activities*. *See id.* § 1227(a)(4)(C)(i). The government provided no alternative explanation in its briefing or in oral argument for why the Challenged Portion of the Deportation Provision is the least-restrictive means of accomplishing the government's interests.

The Court holds that, even if the government had established a compelling interest in the

Challenged Portion of the Deportation Provision, separate from targeting noncitizen speakers with particular viewpoints, the Challenged Portion of the Deportation Provision is not narrowly tailored nor the least restrictive means of achieving those interests.

Freedom of speech is illusory if we are only "free" to express complementary views about the government and its leaders. The true freedom in the United States is our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The Court finds that the Challenged Portion of the Deportation Provision is unconstitutional under the First Amendment as applied to protected speech.

**2. Fifth Amendment (Third Claim)**

In addition to their First Amendment claims, Plaintiffs challenge the Deportation Provision on Fifth Amendment grounds. The question before the Court is whether, as to the government's enforcement based on protected speech, the Challenged Portion of the Deportation Provision is unconstitutionally vague under the Fifth Amendment.

For a Fifth Amendment challenge, a plaintiff must prove that the statute is vague by showing either that the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012) (internal quotation marks omitted); *Imperial Sovereign*, 170 F.4th at 843 (affirming that a "vague statute violates the Fifth Amendment because it 'may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits' or 'may authorize and even encourage arbitrary and discriminatory enforcement' due to its nebulous terms.'" (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999))).

Courts apply a "more stringent" Fifth Amendment vagueness test "[w]hen a 'law interferes with the right of free speech or of association.'" *Imperial Sovereign*, 170 F.4th at 843 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)); *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (when a law "is capable of reaching expression sheltered by the

First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts."). "Uncertain meanings inevitably lead" people to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," distorting the marketplace of ideas through self-censorship. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). This is of particular concern in the deportation context. Because deportation is a "grave" and "drastic measure, often amounting to lifelong banishment or exile," courts apply the "most exacting vagueness standard" applicable to criminal laws to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (applying heightened vagueness test to invalidate an INA provision).

Plaintiffs argue the Challenged Portion of the Deportation Provision is void for vagueness with respect to government enforcement actions based on protected speech. Plaintiffs maintain that the Challenged Portion "fails to provide a person of ordinary intelligence fair notice of what is prohibited," and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox*, 567 U.S. at 253. The Court agrees.

The Challenged Portion of the Deportation Provision "fails to provide . . . fair notice" to noncitizens "of what is prohibited" because it is at odds with the other portions of the Deportation Provision. *F.C.C. v. Fox*, 567 U.S. at 253. The Deportation Provision provides that a noncitizen shall not be deportable because of their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," but is immediately followed by the Challenged Portion, "*unless* the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." The Challenged Portion renders the first provision meaningless. Reading the provisions together reveals that a noncitizen can be deported based on their lawful "past, current, or expected beliefs, statements, or associations" if the Secretary of State "personally determines" that the noncitizen's presence "would compromise a compelling United States foreign policy interest." Read as a whole, the Deportation Provision fails to provide noncitizens with "the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Imperial Sovereign*, 170 F.4th at 843. In this case, as in *AAUP*, the mixed messages within the Deportation Provision "inevitably lead" noncitizens to "steer far wider of the unlawful zone," stymying

noncitizens' protected speech through self-censorship. *Grayned*, 408 U.S. at 109.

Further, the phrases "personally determines" and "compromise a compelling United States foreign policy interest" within the Challenged Portion of the Deportation Provision also fail to give ordinary people the type of notice that will enable them to understand how to comport their "beliefs, statements, or associations" to comply with the law. *Imperial Sovereign*, 170 F.4th at 843. The Deportation Provision does not include any "statutory definitions, narrowing context, or settled legal meanings" to specify "personally determines" and "compromise a compelling United States foreign policy interest" to an extent that allows noncitizens to avoid deportability. *United States v. Williams*, 553 U.S. 285, 306 (2008). At its core the vagueness doctrine protects people from having to "guess" whether they are violating the law. *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964). But that is exactly what the Challenged Portion of the Deportation Provision requires of noncitizens—they must "guess": what the Secretary of State will "personally determine"; what the "foreign policy" of the United States is at any given moment and on any given subject; what constitutes a "compelling United States foreign policy interest" and what might "compromise" it; and whether their speech could have "potentially serious adverse" consequences for the unidentified policy.[359] This is an incomprehensible standard.

Secretary of State Rubio provided an illustrative example of the nebulous nature of the language, "compromise a compelling United States foreign policy interest":

> On March 28, 2025, Secretary Rubio was asked, "[a]nd what does it mean when you say against the foreign policy of the United States?"
>
> He answered, "[i]t runs counter to our foreign—that's how we issue visas coming in. I think about it this way. If we knew this information—my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa."
>
> Secretary Rubio said, "I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws—I mean, we're obviously not going to yank a visa over that."

[359] SF ¶ 111; *AAUP* Ex. 36, ECF No. 81-2 at 21.

> Secretary Rubio said, "[b]ut when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked."[360]

Secretary Rubio's comments only further convolute what standard he applies when he "personally determines" whether "a compelling United States foreign policy interest" has been compromised. Is it "a little bit of common sense"? It is objectively impossible for any noncitizen to know how to conform their protected speech to this standard. Further, it is highly unlikely that a noncitizen could know that their protected speech "would or could cause adverse foreign policy consequences when our foreign policy is unpublished, ever-changing, and often highly confidential." *Massieu*, 915 F. Supp. at 700, *rev'd on other grounds,* 91 F.3d 416 (3d Cir. 1996).[361]

---

[360] This language is directly quoted from the stipulated facts. *See* SF ¶¶ 106-112.

[361] On at least two other occasions, district courts have held that either the current Deportation Provision, or its precursor, was void for vagueness. The case involving the precursor provision is the 1996 decision in *Massieu v. Reno*, 915 F. Supp. at 699. The statute at issue in *Massieu*, 8 U.S.C. § 1251(a)(4)(C)(i), provided, "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." The District of New Jersey found that deportation provision void for vagueness. *Massieu*, 915 F. Supp at 703. That predecessor statute overlaps with the current Deportation Provision in large part, including in the broad discretion afforded to the Secretary of State. While *Massieu* was later overturned on exhaustion of remedies grounds, the District of New Jersey's reasoning on the vagueness issue is instructive and sound. *See Massieu v. Reno*, 91 F.3d 416, 417 (3d Cir. 1996) (declining to "reach the merits of the constitutional questions decided by the district court," and instead holding "that the district lacked jurisdiction to entertain plaintiff's claims."). The District of New Jersey found that "[i]t simply cannot be disputed, and indeed the government does not, that the statute provides absolutely no notice to aliens as to what is required of them under the statute." *Massieu*, 915 F. Supp. at 699. The court reasoned that the "nation's foreign policy is an ever-changing amalgamation of interests . . . often known only to the Secretary, himself." *Id.* at 701. The same concerns apply to the Deportation Provision, where the Secretary of State has been imbued with the power to *personally determine* which of the nation's "ever-changing amalgamation of interests" are grounds for deportation. *Id.*

In a second example, in *Khalil v. Trump*, the District of New Jersey was asked to grant Mr. Khalil (discussed above) a preliminary injunction on his habeas petition. Mr. Khalil additionally asked the Court to find that the Deportation Provision is unconstitutionally vague. This Court recognizes the limited persuasive nature of an out of circuit and later overturned-on-other-grounds opinion. Nevertheless, the *Khalil* court is one of the only other courts to have dealt with the current Deportation Provision or its predecessor (apart from *Massieu*), and the Court finds it informative that the *Khalil* and *Massieu* courts both held the Deportation Provision to be unconstitutionally vague. The District of New Jersey in *Khalil* found that the Deportation

The government urges the Court to consider the Deportation Provision's legislative history in support of its proposition that the Deportation Provision was left intentionally broad with "considerable discretion in the Executive Branch." ECF No. 102 at 10 (quoting *Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987)). Not only does the legislative history provide little clarification, but the government misses the point that the Challenged Portion must be clear on its face to provide adequate notice to noncitizens. *Fleuti v. Rosenberg*, 302 F.2d 652, 657 (9th Cir. 1962) ("[I]n determining whether a statute is void for vagueness, the statute must be judged on its face, without reference to legislative history."). While the Court understands that the government has been granted considerable discretion on foreign policy and immigration matters, that discretion must nevertheless still ensure that ordinary people can understand what the law permits and prohibits. In fact, the legislative history here acknowledges how the government's discretionary authority must be balanced with First Amendment protections. The 1990 House Report suggests that the House intended that the discretionary authority under the Challenged Portion of the Deportation Provision "would be used sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies." H.R. Rep. No. 101-955, 129 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 6784, 6794.

Plaintiffs also assert that the Challenged Portion is vague because it fails to provide "reasonably clear guidelines . . . to prevent arbitrary and discriminatory enforcement." *Smith*, 415 U.S. at 573 (internal quotes omitted). The "legislature [must] establish minimal guidelines to govern law enforcement," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), to prevent "arbitrary

---

Provision was vague because "[i]t does not put the ordinary person on notice as to what is allowed and what is not," "[a]nd it does not delineate the power of the government sharply enough." *Khalil v. Trump*, 784 F. Supp. 3d 705, 720 (D.N.J. 2025), *vacated and remanded sub nom. Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026). The *Khalil* court pointed out that there was no published guidance, administrative regulations, or administrative case law that could inform interpretations of the statute. *Khalil*, 784 F. Supp. 3d at 722–23. The *Khalil* court noted that the lack of resources outside of the statutory language exacerbated the lack of notice to noncitizens in interpreting the statute and in limiting government enforcement discretion. *Id.*

and erratic" applications of the law. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Here, the Challenged Portion contains no such "minimal guidelines." The phrase "compromises a compelling foreign United States policy interest" means whatever the sitting Secretary of State decides it means. As observed in this case and in *AAUP*, this lack of guidelines has allowed the government to roll out new applications of the Challenged Portions of the Deportation Provision without notice, and, certainly as to Plaintiffs here and in *AAUP*, in a "discriminatory" manner. *Smith*, 415 U.S. at 573.

Moreover, the inclusion of the Challenged Portion in the Deportation Provision distorts an otherwise core protection of the Provision, rendering the entirety of the Deportation Provision hopelessly vague. Without the Challenged Portion, the Deportation Provision cannot be used to deport a noncitizen based on their lawful "past, current, or *expected* beliefs, statements, or associations." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added). But with the Challenged Portion included, this protection instead becomes a vague license: the Secretary of State may deport a noncitizen based on their "past, current, or *expected* beliefs, statements, or associations[.]" No criteria are provided to guide the Secretary's expectations for another person's future beliefs, statements, or associations. Perhaps based on stereotypes, a noncitizen's country of birth, or even reliance on what a noncitizen reads, writes, or who they befriend, the Secretary may have certain expectations about what beliefs that noncitizen holds or will hold in the future. But such speculation is not only fraught with error, it is dangerous, particularly if the consequence is something as severe as arrest, detention, or deportation. Yet, as currently written the statute permits the Secretary of State to render noncitizens deportable solely based on his expectations of what they will—at some point in the future—believe or state, or with whom he expects them to associate. If the Challenged Portion of the Deportation Provision stands, "ordinary people" cannot possibly "understand what conduct" they must eschew to avoid deportation. *See Imperial Sovereign*, 170 F.4th at 843. With the Challenged Portion, the Revocation Provision is also vague because authorizes arbitrary and discriminatory application, as the Secretary of State's expectations may be ever-changing, unpublished, and private. Without the Challenged Portion, the Revocation Provision does not suffer from this fatal flaw.

"Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids." *Papachristou*, 405 U.S. at 162. The Deportation Provision, with the inclusion of the Challenged Portion, leaves noncitizens without clear guidance about what if any protected speech they are safely free to utter to avoid deportation. The Challenged Portion is vague, and that vagueness contributes to the chilling of noncitizens' protected speech. Without the Challenged Portion, the Deportation Provision does not suffer from these unconstitutional flaws.

The Court finds that the Challenged Portion of the Deportation Provision is unconstitutionally void for vagueness as applied to protected speech.

### B. Injunctive Relief (Second and Fourth Claims)

Section 1252(f)(1) provides that only the Supreme Court may enjoin "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. § 1252(f)(1). The Deportation Provision falls within that restriction. Accordingly, this Court cannot enter permanent injunctive relief against the Challenged Portion of the Deportation Provision and therefore denies relief on Plaintiffs' Second Claim and Fourth Claim.

## VI. REVOCATION PROVISION

Plaintiffs allege that the Challenged Portion of the Revocation Provision is unconstitutional under the First and Fifth Amendments. Like their claims under the Deportation Provision discussed above, Plaintiffs bring two causes of action for declaratory relief (Fifth and Seventh Claims) and two causes of action seeking injunctive relief (Sixth and Eighth Claims) as to the Challenged Portion of the Revocation Provision. The First and Fifth Amendment law that applies to these claims is the same as previously explained by the Court. *See, supra*, §§ V.A.1. (First Amendment strict scrutiny), V.A.2. (Fifth Amendment vagueness standard).

The Revocation Provision states:

> **After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.** Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the

> context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added as to the Challenged Portion). After revoking a visa, the government may place the noncitizen into removal proceedings. *See id.* § 1227(a)(1)(B).

### A. Declaratory Relief

As with the Deportation Provision, Plaintiffs bring two claims for declaratory relief as to the Challenged Portion of the Revocation Provision: one claim under the First Amendment (Fifth Claim), and one under the Fifth Amendment (Seventh Claim). Following the analysis on declaratory relief, the Court addresses Plaintiffs' claims for injunctive relief for the Challenged Portion of the Revocation Provision (Sixth and Eighth Claims).

#### 1. First Amendment (Fifth Claim)

Plaintiffs ask the Court to evaluate whether, as to enforcement based on protected speech, the Challenged Portion of the Revocation Provision is unconstitutional under the First Amendment as an unlawful viewpoint- and content-based speech restriction.

As with the Deportation Provision, the government conceded that the Challenged Portion of the Revocation Provision is a viewpoint- and content-based speech restriction. Such a viewpoint- and content- based speech restriction requires strict scrutiny review. Viewpoint- and content-based restrictions, such as the Challenged Portion of the Revocation Provision, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. at 163.

For the same reasons the Court identified for the Deportation Provision, the Court finds that the government has failed to demonstrate how the Challenged Portion of the Revocation Provision is "narrowly tailored to serve compelling state interests." *Id.* The government again incorrectly brings its arguments primarily under the First Amendment in reliance on *Moody*'s overbreadth test. For reasons this Court has already addressed, that reliance is misplaced. *See, supra*, § V.A.1.

To the extent the government hints at a basis for "compelling state interests," the government points to the weight of its interest in the ability to revoke visas "for a range of possible reasons," and to be able to do so "on both a categorical and individual basis for various reasons." *See* ECF No. 102 at 8. The Court acknowledges the government's interest in managing

immigration and foreign affairs. But this power must lawfully coexist with the freedom of speech embodied in the First Amendment. The government has provided *no indication* for how the Challenged Portion of the Revocation Provision—which does not include the same exception for lawful beliefs, statements, or associations in the Revocation Provision—is narrowly tailored to accomplish the government's interest in managing immigration and foreign affairs. The government instead highlights the statute's "broad legitimate sweep." *Id*. The government has not cleared the high hurdle of strict scrutiny, as it has not justified that the Challenged Portion of the Revocation Provision as applied to protected speech is "narrowly tailored to serve a compelling state interest." *Reed v. Town of Gilbert*, 576 U.S. at 163.

Congress could have drafted the Challenged Portion to be more narrowly tailored. But as the government explained, it instead gave the statute a "broad" purview. It is not for this Court to devise more narrowly tailored statutory language.

The Court finds that the Challenged Portion of the Revocation Provision is a viewpoint- and content- restriction as applied to protected speech. The government has neither demonstrated nor argued that the Challenged Portion is narrowly tailored to serve a compelling government interest. Accordingly, the Court holds that the Challenged Portion of the Revocation Provision violates the First Amendment as applied to protected speech.

**2. Fifth Amendment (Seventh Claim)**

Plaintiffs also assert that the Challenged Portion of the Revocation Provision is unlawfully vague with respect to visa revocations based on protected speech. The Court agrees.

As discussed in the Deportation Provision, *see, infra*, § V.A.2, to succeed on a Fifth Amendment void for vagueness challenge, a plaintiff must prove either that the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox*, 567 U.S. at 253.

The Challenged Portion of the Revocation Provision grants the Secretary of State broad discretion. The government acknowledged during oral argument on its motion to dismiss that the Challenged Portion of the Revocation Provision gives the Secretary of State "completely

unfettered, unreviewable discretion" to revoke a visa. Jan. 6, 2026 Hrg. Tr. at 23:16–24:8, ECF No. 74. In one respect the statute is quite clear: the Secretary may do what he pleases when it comes to revoking visas; he may revoke them "at any time, in his discretion."

The record in this case reflects "standardless" and "seriously discriminatory enforcement" of the Revocation Provision. As presented in the Parties' Undisputed Facts, over the last year and a half the government has revoked visas based on, among other reasons, an op-ed in a student newspaper critical of a university's position on Israel, social media posts celebrating the assassination of political commentator Charlie Kirk, and pro-Palestinian commentary.[362] Meanwhile, Secretary Rubio has indicated that he would not go as far as to revoke a visa for protesting "paper straws." *Id.* ¶ 110. This wide range of examples illustrates that when it comes to enforcement of the Revocation Provision based on protected speech, the Secretary's power is limitless, including revoking visas for any content- or viewpoint- restriction the Secretary sees fit to apply. The record does reveal one clear pattern in the enforcement actions the government has taken to revoke noncitizens' visas since March of 2025: the Secretary revokes visas when noncitizens are critical of the government or the causes or people it favors. This exemplifies "seriously discriminatory enforcement." *F.C.C. v. Fox*, 567 U.S. at 253.

The government argues that the discretionary power under Challenged Portion of the Revocation Provision is cabined by the Foreign Affairs Manual, which sets out instructions for State Department officers. In *AAUP*, the court confirmed that the Secretary of State's "[d]iscretion is guided by Chapter 9 of the Foreign Affairs Manual ('FAM'), consular guidance through cables, emails and webinars distributed by the State Department." *AAUP*, 802 F. Supp. 3d at 133 (citing Trial Tr. vol. I, 21:1-23, Jul. 11, 2025). *AAUP* did not further identify or evaluate the guidance included in Chapter 9 of the FAM. The government agrees that Chapter 9 of the FAM is the applicable portion of the guidance that describes when a "Prudential Revocation[]" is appropriate:

> Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled

[362] SF ¶¶ 127–31, 197–219, 267–71.

> to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a "prudential revocation." In addition to the conditions described in 9 FAM 403.11-5(A) above, *the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community*.

9 FAM 403.11-5(B)(a).

As an initial matter, this guidance is not incorporated into the language of the Revocation Provision. But even if it was, like the Revocation Provision, the guidance fails to provide a person of ordinary intelligence fair notice of what conduct is prohibited. The FAM does not define "derogatory information," nor when information is sufficiently "derogatory" to "warrant" a revocation. The manual is also not sufficiently clear to remedy the broad and undefined discretion granted to the Secretary of State. Moreover, the guidance cannot "insert missing terms into the statute" to defend against vagueness. *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998). The FAM provides no guidance to noncitizens for how to maintain their visas. It also places no restrictions on the government's use of a noncitizen's protected speech as "derogatory" information that can support visa revocation. Vague laws and guidance such as the Challenged Portion of the Revocation Provision "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108–09. The Challenged Portion delegates resolution of what information about a noncitizen is sufficiently "derogatory" to "warrant" revocation to State Department officers; such "ad hoc" and "subjective" determinations only make it more likely that there will be—as there has been—"seriously discriminatory enforcement." *F.C.C. v. Fox*, 567 U.S. at 253. In short, nothing in the text of the Revocation Provision, or in the applicable guidance, constrains the government's discretion to avoid arbitrary or discriminatory enforcement against speech.

The Court finds that the Challenged Portion of the Revocation Provision is void for vagueness as applied to protected speech.

### B. Injunctive Relief (Sixth and Eighth Claims)

In addition to declaratory relief, Plaintiffs ask the Court to enter permanent injunctive relief

prohibiting the government from revoking Plaintiffs' visas based on protected speech. The fact that Jane Doe and the members of Stanford Daily remain anonymous raises issues for granting particularized injunctive relief.

As a general rule, judicial proceedings are conducted publicly, with all parties' names accessible. *See* Fed. R. Civ. P. 10(a). But the Ninth Circuit "allow[s] parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary to protect a person from harassment, injury, ridicule or personal embarrassment.'" *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000) (internal ellipses and citations omitted). In determining "the need for anonymity" in a judicial proceeding, district courts evaluate: "(1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, (3) the anonymous party's vulnerability to such retaliation, . . . [(4)] the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice, . . . [and] [(5)] whether the public's interest in the case would be best served by requiring that the litigants reveal their identities." *Id.* at 1068–69. The fourth factor—prejudice to the opposing party—is often mitigated where a Court crafts a protective order permitting a defendant, but not the general public, to learn the identity of a plaintiff. *See id.* at 1096. But in some cases, particularly where a litigant brings a facial challenge to vindicate sensitive First Amendment rights, courts have permitted plaintiffs to proceed pseudonymously even in the absence of notification to defendants of their identities. *See, e.g.*, *Publius v. Boyer-Vine*, 321 F.R.D. 358, 364 (E.D. Cal. 2017) ("Publius should not be forced to choose between his right to anonymous political speech and his right to avail himself of the federal courts."); *Doe v. Madison Sch. Dist. No. 321*, 147 F.3d 832, 834 n.1 (9th Cir. 1998), *vacated on other grounds,* 177 F.3d 789 (9th Cir. 1999) (en banc) (noting that "Doe filed this case using a pseudonym because she feared retaliation by the community. The district court judge met in chambers with Doe, without defense counsel present, to determine whether she has standing.").

In this case, Plaintiff Jane Doe has been proceeding using a pseudonym and Plaintiff Stanford Daily has been proceeding without disclosure of the identities of its members because of their reasonable fears of serious, retaliatory immigration consequences. The government has not

objected and, in any case, the parties' reliance on stipulated facts and the "purely legal nature of the issue[s] presented" means that there has been and continues to be no prejudice to the government as well as "an atypically weak public interest in knowing the litigants' identities." *Publius*, 321 F.R.D. at 366. But if the Court were to order specific injunctive relief as to Jane Doe or the members of Stanford Daily, some disclosure of identity may be required to enable the government to comply with the Court's particular injunctive relief.

Given that the Court has found that the Challenged Portion of the Revocation Provision is unconstitutional under the First and Fifth Amendments as applied to protected speech, the Court need not reach the issue of particularized injunctive relief. It is axiomatic that "the scope of [an] injunction must be no broader and no narrower than necessary to redress the injury shown by the plaintiffs." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024). But if the Court's injunctive remedies are vacated, then within 48 hours Plaintiffs shall submit, under seal, the identity of Jane Doe and Stanford Daily's current members so that the Court may craft any necessary, specific relief.[363]

**CONCLUSION**

Earlier this year the Supreme Court stated that "[t]he First Amendment 'envisions the United States as a rich and complex place' where all enjoy the 'freedom to think as you will and to

[363] But for the Court finding that the Challenged Portion of the Revocation Provision is unconstitutional under the First and Fifth Amendments as applied to protected speech, and granting the attendant declaratory relief, the Court would otherwise find that Plaintiffs have demonstrated that injunctive relief is appropriate under the Revocation Provision, and would grant that injunctive relief now. Injunctive relief is appropriate where plaintiffs have demonstrated that "(1) [they are] likely to suffer irreparable injury that cannot be redressed by an award of damages; (2) that 'considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted'; and (3) 'that the public interest would not be disserved by a permanent injunction.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiffs have adequately demonstrated each factor. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). And the balance of equities and public interest favor the protection of First Amendment rights. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

United States District Court
Northern District of California

speak as you think.'" *Chiles*, 607 U.S. at ___, 146 S. Ct. at 1020 (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023)). While the quotation is new, the reverence for the freedom of thought and speech is the same one that fueled the Declaration of Independence, the Constitution, and the Bill of Rights.

Foundational to America's enduring democracy are our freedoms of speech and the press embodied in the First Amendment. In the United States, free speech, including the freedom to criticize the government and its leaders, is not a sign of our democracy's fragility. It is evidence of its strength. That strength is diminished when members of our society—citizens and noncitizens alike—must self-censor and "behave" or suffer the government's retaliation. In March 2025, that retaliation was directed at those engaged in pro-Palestine and anti-Israel speech. In September 2025, caught in the government's net were people critical of Charlie Kirk. In May 2026, it potentially included "weighing in on a peace deal that's being negotiated" in Iran regarding the Strait of Hormuz.[364] Tomorrow, or perhaps even today, targets may include anyone in the United States who exercises their freedom of speech to simply express opinions the government does not like.

This downward spiral is antithetical to our Constitution that recognizes our right to speak freely. Here you can simultaneously hate the content of a person's speech and love the country that cherishes the freedom to allow it. Zealous protection of our Constitutional right to free speech is a provocative demonstration of our country's powerful lack of fear.

On September 17, 1787, when Benjamin Franklin was exiting Independence Hall in Pennsylvania right after signing the Constitution, a woman named Elizabeth Willing Powel asked him what kind of government the delegates had given the American people, a republic or a monarchy? Franklin responded, "A republic, if you can keep it."[365]

* * *

The Court finds that Plaintiffs are entitled to a declaratory judgment that:

---

[364] Bench Trial Tr. at 82–90; 137.

[365] MAX FARRAND, *James McHenry: Anecdotes*, *in* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 (1911).

United States District Court
Northern District of California

(1) the Challenged Portion of the Deportation Provision violates the First Amendment with respect to enforcement based on protected speech;

(2) the Challenged Portion of the Deportation Provision is void for vagueness in violation of the Fifth Amendment with respect to enforcement based on protected speech;

(3) the Challenged Portion of the Revocation Provision violates the First Amendment with respect to enforcement based on protected speech;

(4) The Challenged Portion of the Revocation Provision is void for vagueness in violation of the Fifth Amendment with respect to enforcement based on protected speech.

Because the Court has found the Challenged Portion of the Revocation Provision unconstitutional, the Court holds that Plaintiffs' request for permanent injunctive relief is not appropriate at this stage. The Court denies Plaintiffs' requested relief on their Second and Fourth Claims for injunctive relief under the Deportation Provision, as only the Supreme Court may provide that relief.[366]

The Clerk of Court shall issue judgment accordingly and shall close this case.

**IT IS SO ORDERED.**

Dated: August 28, 2026

Noël Wise
United States District Judge

---

[366] *See* § V.B.